FILED
JUN 11 2018
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

AO 241 (Rev. 09/17)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| | |
|---|---|
| **United States District Court** | District: Northern District of California |
| Name (under which you were convicted): Donel Poston | Docket or Case No.: |
| Place of Confinement : High Desert State Prison | Prisoner No.: AT2512 |
| Petitioner (include the name under which you were convicted) DONEL POSTON v. | Respondent (authorized person having custody of petitioner) M. Eliot Spearman |
| The Attorney General of the State of: | |

CV 18 3450 EDL
(PR)

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
Alameda County Courts, 1225 Fallon St, Oakland, CA 94612

(b) Criminal docket or case number (if you know): 172522B

2. (a) Date of the judgment of conviction (if you know): 02/03/2014

(b) Date of sentencing: 03/21/2014

3. Length of sentence: 72 to life

4. In this case, were you convicted on more than one count or of more than one crime? ☑ Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: Murder, attempted murder, unlawful possession of firearm

6. (a) What was your plea? (Check one)

☑ (1) Not guilty ☐ (3) Nolo contendere (no contest)
☐ (2) Guilty ☐ (4) Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? ______

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes ☐ No

8. Did you appeal from the judgment of conviction?

☑ Yes ☐ No

9. If you did appeal, answer the following:

(a) Name of court: California Court of Appeal, First District, Division Five

(b) Docket or case number (if you know): A141557

(c) Result: Affirmed

(d) Date of result (if you know): 01/06/2017

(e) Citation to the case (if you know): ______

(f) Grounds raised: See attachment

(g) Did you seek further review by a higher state court? ☑ Yes ☐ No

If yes, answer the following:

(1) Name of court: California Supreme Court

(2) Docket or case number (if you know): S239918

(3) Result: Review denied

(4) Date of result (if you know): 03/29/2017

(5) Citation to the case (if you know): ______

(6) Grounds raised: See attachment

(h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☑ No

If yes, answer the following:

(1) Docket or case number (if you know): ______

(2) Result: ______

(3) Date of result (if you know): ______

(4) Citation to the case (if you know): ______

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? ☑ Yes ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: California Court of Appeal, First District, Division Five

(2) Docket or case number (if you know): A148986

(3) Date of filing (if you know): 08/10/2016

(4) Nature of the proceeding: Petition for writ of habeas corpus

(5) Grounds raised: See attachment

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☑ No

(7) Result: Denied

(8) Date of result (if you know): 01/06/2017

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: California Supreme Court

(2) Docket or case number (if you know): S240034

(3) Date of filing (if you know): 02/14/2017

(4) Nature of the proceeding: Petition for Review

(5) Grounds raised: See attachment

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☑ No

(7) Result: Denied

(8) Date of result (if you know): 03/29/2017

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☐ No

(7) Result: ______

(8) Date of result (if you know): ______

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: ☑ Yes ☐ No

(2) Second petition: ☑ Yes ☐ No

(3) Third petition: ☐ Yes ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

______

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** Insufficient evidence to support convicitons of murder and attempted murder

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attachment

(b) If you did not exhaust your state remedies on Ground One, explain why: ______

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☑ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: ______________________

______________________

______________________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ______________________

Name and location of the court where the motion or petition was filed: ______________________

______________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

______________________

______________________

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______________________

______________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

______________________

______________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

______________________

______________________

______________________

______________________

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: ______

**GROUND TWO:** Admission of irrelevant, inflammatory evidence of Poston's statements pertaining to pimping and prostitution was an abuse of discretiuoin which violated due process

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attachment

(b) If you did not exhaust your state remedies on Ground Two, explain why: ______

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☑ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: ______

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ______

Name and location of the court where the motion or petition was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : ______

**GROUND THREE:** CALCRIM No. 3471 on mutual combat violated Poston's constitutional rights to jury trial, to due process, and to present a defense

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attachment

(b) If you did not exhaust your state remedies on Ground Three, explain why: ____________________

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☑ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: ____________________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ____________________

Name and location of the court where the motion or petition was filed: ____________________

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ____________________

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:** Failure to instruct on an element of provocative act murder violated Poston's constitutional rights to jury trial, to due process, and to present a defense

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attachment

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☑ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed: ______________________

______________________________________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

______________________________________________

______________________________________________

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______________________

______________________________________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

______________________________________________

______________________________________________

______________________________________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: ______________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☑ Yes ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: ______

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: ______

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? ☐ Yes ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. ______

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? ☑ Yes ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. California Court of Appeal, First District, Division Five, 350 McAllister St., San Francisco, CA. Motion to recall remittitur to allow briefing on Senate Bill 620, amendment to Cal. Penal Code section 12022.53(h) permitting discretion to strike firearm enhancements

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: ______

(b) At arraignment and plea: ______

(c) At trial: David Bryden, 160 Franklin St. Oakland, CA. 94607

(d) At sentencing: David Bryden, 160 Franklin St. Oakland, CA. 94607

(e) On appeal: Randi Covin, PO Box 1120, Willits, CA. 95490

(f) In any post-conviction proceeding: Randi Covin, PO Box 1120, Willits, CA. 95490

(g) On appeal from any ruling against you in a post-conviction proceeding: ______

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ☐ Yes ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

______

(b) Give the date the other sentence was imposed: ______

(c) Give the length of the other sentence: ______

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? ☐ Yes ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

______

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: Issue an order to show cause; appoint counsel; order an evidentiary hearing; reverse the judgment; such other relief as the Court deems appropriate in the interests of justice

or any other relief to which petitioner may be entitled.

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on 6-04-2018 (month, date, year).

Executed (signed) on 6-04-2018 (date).

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

DONEL POSTON V. M. ELIOT SPEARMAN, WARDEN

**ATTACHMENT**

**9 (f):**

I. POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE;

II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL;

III. THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE;

IV. THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE;

V. PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL;

VI. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND

THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS;

VII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

**9. (g)(6):**

I. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE;

II. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL;

III. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE;

IV. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS

TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE;

V. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL;

VI. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS;

VII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

**11. (a)(5):**

I. TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

II. TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL

III. TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

IV. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

V. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

VI. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

VII. THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY BRADY V. MARYLAND AND DUE PROCESS;

VIII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

**11. (b)(5):**

I. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

II. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

III. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

IV. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

V. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

VI. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN

AMERICAN CULTURE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL;

VII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY BRADY V. MARYLAND AND DUE PROCESS;

IX. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

**12.**

**GROUND ONE:** **POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.**

(a) Supporting facts:

This is an unusual case in which the charged shooting was captured on surveillance videos and the undisputed facts show a textbook case of self-defense. Petitioner, Donel Poston, had an unplanned encounter with co-defendant, Joe McNeely, at a little after 10 p.m. on April 5, 2013, at a Valero gas station in East Oakland. The surveillance videos indisputably show that McNeely started a verbal

altercation with Poston, hit him in the face and tripped him, knocking him to the ground, then pulled out a gun while Poston was getting up.

Valero Camera 11 shows McNeely repeatedly opening his jacket while talking to Poston. (Pros. Exh. 8, file _11_R_20130405100000PM.dav at 10:12:21-22.) At 10:12:28 to 10:12:29, McNeely approaches Poston, getting right in his face, talking and gesturing aggressively. At 10:12:30, McNeely punches or slaps Poston in the face or head with his right hand while placing his left foot behind Poston's right foot. At 10:12:31, Poston falls backwards with both hands on the ground.

Valero camera 13 shows McNeely reaching inside his jacket with his right hand as Poston gets up. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 33; 11 RT 498.) McNeely has what appears to be a gun in his right hand before Poston fires his first shot. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 34.)

Poston and Bailey both testified that McNeely initiated the incident by insulting, "ranting," and yelling at Poston. (18 RT 1410-1411, 1540-1545, 1559-1560; 19 RT 1723-1724.) Both Poston and Bailey saw McNeely's gun when he repeatedly opened his jacket and said he kept "a strap for bitch-ass niggers" like Poston. (18 RT 1412-1413, 1507-1508, 1541; 19 RT 1722-1723.) McNeely threatened to slap Poston, then threw down the cup he was holding and punched or slapped Poston to the ground. (18 RT 1545, 1561; 19 RT 1730-1731.)

Poston testified that, as he got up from the ground, he saw McNeely reach inside his jacket. (18 RT 1546, 1561.) Poston thought

he was about to get shot and feared for his life. (18 RT 1546, 1561; 19 RT 1638.) He had been shot before. (18 RT 1526-1527.)

Poston only had one or two seconds to think. (19 RT 1756.) He pulled out his gun and started shooting, "rapid fire," at McNeely, then ran when McNeely went down. (18 RT 1548; 19 RT 1657.) McNeely did in fact have a gun and fired it repeatedly as Poston ran away, hitting Fluker. (11 RT 494, 496, 505, 508, 519, 529; 15 RT 934-937, 972-973; 18 RT 1551-1552; 20 RT 1881, 1903.)

Despite this textbook case of self-defense, the prosecutor argued that Poston was guilty of murder and attempted murder because he and McNeely both "chose to engage in this gun battle at the public gas station, on a busy street, in front of all these people . . . ." (20 RT 1864.)

Contrary to the prosecutor's claim, Poston was not guilty of murder or attempted murder based on voluntary participation in a gun battle - mutual combat. The surveillance videos and the testimony of Poston and Bailey showed that McNeely instigated the quarrel, escalated it, and unlawfully assaulted Poston, as the prosecutor necessarily conceded. (20 RT 1867, 1884-1885, 1888.) There was no evidence whatsoever that Poston expressly or impliedly agreed to fight McNeely before McNeely struck the first blow. Thus, there was no evidence of mutual combat under California law.

The uncontroverted evidence established all the elements of perfect self-defense, which applies to any responsibility Poston might otherwise have had for McNeely's accidental shooting of Fluker, as well as for Poston's shooting of McNeely. But even if Poston's resort to deadly force was unreasonable, he could lawfully be convicted of

voluntary manslaughter and attempted voluntary manslaughter at most. His convictions of murder and attempted murder are not supported by sufficient evidence he did not act in the actual belief in the need for self-defense, whether reasonable or not.

Poston's convictions of murder and attempted murder should be reversed for the additional reason that no rational juror could have found proof beyond a reasonable doubt that he did not act in the heat of passion on adequate provocation.

McNeely insulted, ranted, and yelled right in Poston's face, calling him a "bitch ass nigger," while gesturing aggressively, punched or slapped Poston in the face, knocking him to the ground, then pulled out a handgun. Poston reacted to the dangerous and provocative situation in which he found himself. The uncontroverted evidence establishes as a matter of law that he acted in self-defense. In addition, McNeely's extreme provocation caused him to act from passion - fear for his life - which negated malice.

(c)(1): Yes.

(d)(1): No.

**<u>GROUND TWO</u>:** **THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL.**

(a) Supporting facts:

Over Poston's objection, the trial court admitted extensive, inflammatory evidence of Poston's out-of-court statements pertaining to pimping and prostitution to impeach his credibility. (5 RT 185; 8 RT 399-400; 18 RT 1576-1579.)

Officer Perez-Angeles and Sergeant James Gantt interviewed Poston after his arrest and then transported him to the jail. (19 RT 1780-1781.) Poston asked about the charges. (19 RT 1781.) When he was told he was being charged with attempted murder, Poston said he was not trying to kill McNeely; he was just trying to get McNeely off of him. (19 RT 1781-1782.)

On July 8, 2013, Sheriffs Technician Tina Key intercepted a letter from Poston to Bosworth stating that he would find out the identity of a woman who e-mailed the police and identified him as having shot someone. (16 RT 1105, 1109; Pros. Exh. 25.) On July 24, 2013, Key intercepted a letter from Poston to Jon Owens suggesting that a woman had incriminated him. (16 RT 1110, 1112; Pros. Exh. 26.)

In the second letter, Poston talked about all the songs he had written, some of which had been confiscated in a cell search. (16 RT 1111-1112.) He said he planned to assert his speedy trial rights and "forc[e] they hand," because "I ain't did shit but stand my ground." (16 RT 1112.)

Key forwarded Poston's letters to Officer Perez-Angeles, who then searched Poston's cell because he believed witnesses might be in danger. (16 RT 1128-1129, 1133.) Officer Perez-Angeles seized four

pages of rap lyrics from Poston's cell. (16 RT 1134-1135; Pros. Exh. 30.) The rap lyrics stated:

[Page 1]

> You got to be higher than Richard Pryor . . . wit a prior. If you think you gonna to fire on a nigga and get away with it, that'll be the day when hell freezes over, dondidit, don't get it. That's why I pack this pistola - gone off cola, probably off a molly. You almost got bodied, instead caught you a body. I'm swift on my toes. Niggas in my circle keep them 40s real close concealed in they clothes, and never lose composure, make a nigga see the light over exposure. Wit 5 Bingo-Jingo from the dondiditliveshow. It's all self-defense under the proper pretense.

(16 RT 1135-1136.)

> [Page 2]
>
> I am 37 and countin'. Ya 38 and down. Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda, but I just popped a nigger and my BM e-mailing investigators. Consider that snitchin but I ain't trippin. . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings. Bottom line to that, I ain't dealing. . . . If God is willing when this soap opera over I'll have All My Children - Days of our Life. Hustling all night, married to the game, and the streets is my wife.

(16 RT 1136.)

> [Page 3]

> Niggas hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses. What you got them guns for if you ain't using 'em. Better start shootin dem nigger to left just a faggot. When ya see nigga at, I'm ya best dog. I'm the pick of the litter. Won't hesitate to make the K go cray, Dirty Dada Nigga. Yeah, make my day. Strip the Nigger down to his birthday suit. All about you. You got brand new shoes. I got no commissary. Tom, Dick, and Hairy sleeping on my fucking couch. Must a forgot I'm the reason . . . in the house.

(16 RT 1136-1137.)

> [Page 4]
>
> Yea, the game is deep. We are the lost sheep. It's the irony of the info age, them little niggas showing choppas [assault rifles] on they Facebook page. Assemblin' a Glock [brand of firearm] on their me-ma porch, let that thing rang like it was the 4th. . . . Fuck you. Fuck you, pal. I ain't having that. Don't never leave the house without my strap [firearm].

(16 RT 1137 [Officer Perez-Angeles's definitions in brackets].)

The prosecutor played a Youtube video of one episode of Poston's internet show, Donditliveshowww, showing Poston with cash and two guns. (16 RT 1086; Pros. Exh. 24A [recording], 24B [transcription].) In the redacted audio portion, Poston says:

> It's the Dondititliveshowww. I am Don Dada. I have done did it. And it is a done deal. You know what I'm sayin'? But if you come around this motherfucker, I'm playing with little sure things - these little dumb dumb - they gonna, they gonna just - they gonna put it right in the uh, in the snub nose in my motherfuckin' pocket. You know what I'm sayin'? I'm not gonna keep on playing with these dudes man. This is Don Dada.

(Pros. Exh. 24A, 24B.)

Sergeant Gantt testified that he viewed multiple episodes of the Dondiditliveshowww and only this one had any evidentiary value. (16 RT 1101.) In some of the episodes, Poston played a character - a different persona. (16 RT 1101.)

The prosecutor also played numerous recorded phone calls Poston made from the jail to his mother, Bailey, and an "unknown male," apparently his brother Robbie. (19 RT 1625, 1628; Pros. Exhs. 32 [recording], 32A [transcription].) In a June 19, 2013, call to an unknown male, Poston talked about his "bitches" - his "hoe-bo, [his] hoe-bo, [and] [his] hoe-bitch . . . ." (Pros. Exh. 32A at p. 1.)

Poston complained that he had "just paid the bitch phone bill" when he wanted "the bitch to pay [his] way." (Pros. Exh. 32A at p. 1.) The unknown male said, "(Unintelligible) a old pimp is a new pimp." (Pros. Exh. 32A at p. 1.) Poston said there was only one friend he wanted to have his "bitch" because "that's the only nigga gonna make sure I'm eating" instead of just "fuck[ing] on the bitch." (Pros. Exh. 32A at p. 2.)

In a June 19, 2013, phone call to an unknown male, Poston said, "I ain't never been too proud to beg from a bitch in my life, Robbie. . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my hoe-bos, all my baby mamas, I'm finna call my one baby mama right now." (Pros. Exh. 32A at p. 3.)

In a June 22, 2013, phone call to an unknown male, Poston said he had asked Bailey what she was doing and she said she was sitting

in the bed. (Pros. Exh. 32A at p. 4.) Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner." (Pros. Exh. 32A at p. 4-5.)

In a June 29, 2013, phone call to an unknown male, Poston said his lawyer told him "this is in the bag. We got this." (Pros. Exh. 32A at p. 6.) He said: "On self defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity. You feel me?" (Pros. Exh. 32A at p. 6.)

In a July 1, 2013, phone call to his mother, Poston said: "I'm not even trying to say that I wasn't there no more. . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're gonna see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag." (Pros. Exh. 32A at p. 8.)

In a July 14, 2013, phone call to his mother, Poston asked if "Sharan" was coming to court. (Pros. Exh. 32A at p. 10.) When his mother said she was, Poston said to tell Bailey something else. (Pros. Exh. 32A at p. 10.) In a July 16, 2013, phone call to Bailey, Poston said he did not tell her not to go to court because of another woman. (Pros. Exh. 32A at p. 11.) He said he kept getting mad at Bailey for asking "stupid questions" because "I be trying to keep it, I'm trying to

keep it, I mean these phone calls is being recorded, you know what I'm saying? So if I say too much then I'm giving up my fucking game though . . . ." (Pros. Exh. 32A at p. 12.)

A moment later, Poston said he was not cussing out Bailey, he was not mad, he was just "under a lot of duress right now," but he was "happy as a faggot in a dick farm . . . ." (Pros. Exh. 32A at p. 13.) He told Bailey to cooperate with his investigator. (Pros. Exh. 32A at p. 13.)

In a July 22, 2013, phone call to Robbie, Poston said his lawyer was mad at him: "Ah man, that man mad as a motherfucker. That nigga seen all that money on Youtube. That nigga mad as a motherfucker. That nigga, everytime I come, the first thing he says, 'That's a lot of money.' I swear to God. Everytime that nigga see me, that nigga be like, "That's a lot of money. You're tripping.' I'm like 'hey man that shit is gone in the wind. I mean I need you right now. What could we do.' He's like 'no.' I'm like 'yeah man.' He like 'man, are you sure?" I'm like 'look, check this out nigga. I was on the run for 90 days. Man, hotels, hoes, you name it I did it nigga." (Pros. Exh. 32A at pp. 17-18.)

In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. (Pros. Exh. 32A at p. 19.) Poston's mother expressed concerns about Bailey's reliability. (Pros. Exh. 32A at p. 19.) Poston said: "This is my bitch, mommy. . . . . My bitch, mommy. Listen to me. That lay, she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to me, 'cause you not. I'm the one fucking her mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear

what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" (Pros. Exh. 32A at p. 20.)

A moment later, Poston said again that Bailey would do what he told her to do. (Pros. Exh. 32A at p. 21.) Otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that?' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't. . . . [If I marry anyone,] I'm gonna marry Sharan, you feel me? And that's 'cause I need her smarts. I don't need a dumb broad who don't even know how to work the internet in 2013." (Pros. Exh. 32A at p. 22.)

Poston's mother told him to "reverse [his] whole attitude about this aggressiveness," and stop calling Bailey "bitch." (Pros. Exh. 32A at p. 21.) Poston explained that Bailey was his "bitch" and Sharan was his woman. (Pros. Exh. 32A at p. 22.)

In an August 21, 2013, phone call to his mother, Poston said he was "shook up" about the paperwork he had gotten showing that the prosecutor had two letters confiscated from his house. (Pros. Exh. 32A at p. 24.) He had not said anything incriminating but they were "trying to take [his] statement and twist it" to fit their theory of the case. (Pros. Exh. 32A at p. 24-25.) They were "trying to use it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? . . . Just having an optimistic attitude. But in their eyes, that may be an aggressive front." (Pros. Exh. 32A at p. 26.)

Poston's mother asked if they were going to show the video because "the video itself will show who the aggressor is. The video will show you never touched the man." (Pros. Exh. 32A at p. 25.) Poston responded: "Okay, so then, this is a valid point they raised the other day. You can't bring a knife to a gun fight. Okay? . . . See how slick they are with that shit? You feel me? . . . No. No, no, no, no. Not a knife. They said you can't bring a knife to a fistfight." (Pros. Exh. 32A at p. 25.)

Poston complained that someone had taken his clothes from his house, including the suit he had intended to wear for his trial. (Pros. Exh. 32A at p. 30.) He said he had been "on the run" and did not have money for bills at his house even though he still had a prostitute. (Pros. Exh. 32A at p. 31.) When his mother protested at his mention of a prostitute, Poston said, "I'm the one in here doing time. Do you think I'm gonna incriminate myself?" (Pros. Exh. 32A at p. 32.)

In an August 31, 2013, phone call to his mother, Poston again brought up the suit he wanted to wear for his testimony. (Pros. Exh. 32A at p. 35.) He said he wanted more comfortable clothes to wear in court "until it was time for me to actually go perform." (Pros. Exh. 32A at p. 35.) He told his mother how he had been trying to instruct Bailey about how to dress and groom herself for court. (Pros. Exh. 32A at pp. 38-39.) Poston agreed when his mother said Bailey "needs to tell the truth" - the same thing she had told Poston's attorney. (Pros. Exh. 32A at p. 39.)

Poston's mother said: "She don't need to put nothing on it. She needs to tell the truth, Donnie." (Pros. Exh. 32A at p. 39.) Poston responded: "Exactly. That's what I told her, mommy." (Pros. Exh.

32A at p. 39.) Poston and his mother shared concerns about Bailey's poor grooming, body odor, and lack of intelligence. (Pros. Exh. 32A at pp. 39-40.) Poston said, "Man they gonna eat this bitch alive." (Pros. Exh. 32A at p. 40.)

Poston said he was going to practice his testimony: "I was like I'm going in here, and I need to have my full, I will not say one ghetto-ebonic-slur, will not come out of my mouth. All the articulate shit that I've learned in my 37 years, all the positive things and attributes that I got to say about myself, will truly be honed out today. You feel me? I mean, you know, I mean man, 'cause I just, I have to paint a different portrait than what . . . ." (Pros. Exh. 32A at p. 41.) He asked: "You know what they always say, mommy? Proper preparation prevents poor performance. You feel me?" (Pros. Exh. 32A at p. 42.)

In a September 5, 2013, phone call to his mother, Poston said he was not saying he was not there - that was not his defense. (Pros. Exh. 32A at p. 45.) Then he chastised himself for talking about his legal strategy on the recorded phone call. (Pros. Exh. 32A at p. 45.)

In a September 14, 2013, phone call to Bailey, Poston said he was trying to figure out the best strategy for winning his case. (Pros. Exh. 32A at p. 48.)

Based on the recorded phone calls, the prosecutor asked Poston on cross-examination: "[Y]ou've been practicing your performance for this case, right?" (19 RT 1625.) And, "you only need to practice if it's not the truth, right?" (19 RT 1625.) The prosecutor continued:

Q: [Y]ou're trying to get over on this jury, aren't you?

A: No, ma'am.

Q: Didn't you tell your mom that you wanted to save your good suit for when it was time for you to perform?"

A: Ma'am, maybe only a metaphor.

Q: Well, didn't you also tell your mom you have to paint a different picture, a different portrait for this jury?

A: Yes, ma'am, especially if you're going to paint one picture.

Q: Well, the picture that you are on the streets is what you're afraid of, right?

A: Hmm, I don't get it.

Q: Well, the picture that you are out on the streets as a hard-core thug, into guns, and being a gangster?

A: No, ma'am.

(19 RT 1627-1628.)

The prosecutor suggested that Poston fabricated his defense of self-defense when incriminating letters were seized from his jail cell in which he admitted he was there at the Valero and dropped his hat when he ran away. (19 RT 1643.) She asked, "You've read a lot of cases about self-defense, haven't you?" and "[y]ou know exactly what you need to say in order to try and prevail on a claim of self-defense?" (19 RT 1643.)

The prosecutor asked Poston if he was a pimp, quoting statements he made about "hoes" and prostitutes. (19 RT 1653-1654.)

She asked Poston about a letter to his brother stating, "[t]hat last weed I gave you came from out a ho ass. She turned a date for two zips and a hundred dollars." (19 RT 1654.) The "ho" Poston talked about in jail calls was Brianna Howard, the young woman who was with him when he was arrested. (17 RT 1353-1354; 19 RT 1666.)

McNeely's attorney played additional jail phone calls during his cross-examination of Poston, further emphasizing Poston's discussion of "hoes," and "bitches." (19 RT 1675-1693, 1758-1759; Def. Exhs. P, P-1, Z, AA, BB.) In a June 16, 2013, phone call, Poston said:

> But the Ho-Bitch need to go on about her way, though. You feel me? She can get down to LA with her friends and shit you know what I mean, she can get back to working where she belongs . . . you know what I mean but she can get down there with their friends and shit, she can turn some dates down there, do what she need to do, and get back in the mix. She got a few tricks that we was leaning on, you feel me. A thousand here. A thousand there. She'll be alright.

(Def. Exh. P-1 at p. 3.)

In a June 22, 2013, phone call, Poston and Bailey discussed another woman:

> Bailey: What did you . . . still trying to hold onto her for?
>
> Poston: Hold onto her, bitch, I ain't holding onto nothing except my motherfucking pocketbook, what you talking about?
>
> Bailey: But you talking about you wish you had her number, You don't even need her number.

Poston: Yeah, bitch, 'cause I need all she got to offer me!
What you mean? That bitch sockin it to my pocket
like the Chinese stock market, bitch, you got nothing
to give me right now, what the fuck you mean?!
What you talking about? You ain't taking no
contributions, no donations. What you talking about?
When did you stop taking contributions and donations?

(Def. Exh. P-1 at p. 5.)

McNeely also played more of Poston's Youtube videos talking about the Seminary neighborhood, the "kill zone," where most East Oakland murders occur, Poston's book, "A Day in the Life of a Hustler," and rap lyrics Poston wrote. (19 RT 1696-1709.)

(c)(1): Yes.

(d)(1): No.

**<u>GROUND THREE</u>: THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.**

(a) Supporting facts:

The trial court instructed generally on self-defense in accord with CALJIC No. 5.30 and CALCRIM No. 505. (6 CT 1467.52, 1467.57-1467.60; 20 RT 2000-2005.) The court also instructed on mutual combat as a limitation on self-defense in accord with CALCRIM No. 3471 as follows:

A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

1. He actually and in good faith tried to stop fighting;

2. He indicated, by word or conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

(6 CT 1467.53-1467.54; 20 RT 2001-2002.)

The prosecutor argued pervasively that Poston did not have a right to self-defense because he engaged in mutual combat - a gun battle. (20 RT 1864-1866, 1872, 1883, 1887, 1890, 1901, 1963-1968, 1971.)

It was error to give the instruction because there was insufficient evidence Poston expressly or impliedly agreed to fight

with McNeely before McNeely struck the first blow – there was insufficient evidence of mutual combat under California law.

(c)(1): Yes.

(d)(1): No.

**GROUND FOUR:** **THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.**

(a) Supporting facts:

The trial court instructed on provocative act murder in accord with a modified version of CALCRIM No. 560 as follows:

> Donel Poston is charged in Count 1 with the murder of Lionel Fluker.
>
> A person can be guilty of murder under the provocative act doctrine, if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot.
>
> The provocative act murder doctrine focuses on the provocateur's conduct and his knowing his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet.
>
> The elements of a provocative act murder are more fully explained below.
>
> To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that:

1. Donel Poston intentionally committed a provocative act;

2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for human life;

3. In response to Poston's provocative act, McNeely killed Fluker; AND

4. Lionel Fluker's death was the natural and probable consequence of the defendant's provocative act.

A provocative act is an act:

1. That goes beyond what is necessary to accomplish the crime; AND

2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

In order to prove that Lionel Fluker's death was the natural and probable consequence of the defendant's provocative act, the People must prove that:

1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act could begin a chain of events resulting in someone's death;

2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND

3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act.

A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death.

A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else. An independent criminal act is a free, deliberate, and informed criminal act by a person who is not acting with the defendant.

The People allege that Donel Poston committed the following provocative acts:

- Drawing a loaded .40 caliber semiautomatic gun
- Shooting Joe McNeely multiple times

You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another.

You do not all have to agree on which provocative act Donel Poston committed.

(6 CT 1467.63-1467.65; 20 RT 2007-2009.)

Poston and McNeely did not have equally culpable mental states and did not engage in precisely the same conduct at the same time. There was no evidence Poston had a preexisting intent to fight or shoot McNeely. Rather, the uncontroverted evidence showed that Poston started carrying a gun for self-protection after being shot in the chest. He had his gun with him when he went to the Valero station because "it's nighttime, it's Friday night in Oakland, it is crazy. . . . [T]here is a war going on out there . . . ." (19 RT 1612.)

Poston's shooting of McNeely was a spontaneous response to McNeely's provocative acts. McNeely was significantly more culpable because he instigated and escalated the quarrel. He was the

first to use physical force, and he apparently intended to use potentially lethal force from the outset - after knocking Poston to the ground, he reached for his gun while Poston was still getting up. Because Poston did not initiate the chain of events and was not as culpable as the actual killer, he could not be liable for Fluker's murder under the provocative act doctrine under California law.

CALCRIM No. 560 as given omitted a key element of provocative act murder, violating Poston's constitutional rights to jury trial, to due process, and to present a defense.

(c)(1): Yes.

(d)(1): No.

**GROUND FIVE:** **PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL.**

(a) Supporting facts:

In her opening statement, the prosecutor referred to the charged offenses as "a shoot-out as if it were the wild wild west." (11 RT 483.) As the result of the defendants' "gun battle," an "innocent passerby" was shot dead. (11 RT 484.) The "gun-battle" theme was repeated throughout the trial.

In her cross-examination of Poston, the prosecutor suggested that Poston's desire for a nice suit to wear for his testimony and his references to "practicing" for that "performance" showed that he was

lying. (19 RT 1625-1629.) She asked: "[Y]ou're trying to get over on this jury, aren't you? (19 RT 1627.)

She suggested that Poston's alternating use of African American Vernacular English in rap lyrics, YouTube videos, letters, and phone calls from the jail, and Standard English in court showed that he was lying. (19 RT 1628.) And she suggested that, "out on the streets," Poston was "a hard-core thug, into guns, and being a gangster[.]" (19 RT 1628.)

The prosecutor asked Poston about some of his rap lyrics, suggesting that they refuted his claim of self-defense:

> I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life[.]

(19 RT 1640.)

> You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a nigga and get away with it."

(19 RT 1641.)

Poston asked the prosecutor whether she understood "African-American vernacular from the street perspective." (19 RT 1642.) He explained that his rap lyrics and other writings are "artistic endeavors," reflecting all of the things he had seen growing up in East Oakland, not necessarily things he had done. (19 RT 1640.)

The prosecutor played Poston's recorded phone calls from the jail, emphasizing that he lied to Bailey and called her a "bitch." (19

RT 1647-1648.) She played phone calls in which Poston and his mother talked about Bailey, her vulnerability on cross-examination, and the need for her to tell the truth. (19 RT 1650.)

The prosecutor emphasized Poston's use of the words "ho," "pimp," and "prostitute," quoting some of the most offensive and inflammatory statements in the jail calls, such as: "That last weed I gave you came from out a ho ass." (19 RT 1654-1666; Pros. Exh. 32A at pp. 1-2.)

The prosecutor questioned Poston about his quoting of her statement in a prior court proceeding that you can't bring "a knife to a fistfight," suggesting that Poston's use of the expression in a jail phone call was an admission of guilt. (19 RT 1661-1662.) She questioned him about a jail call in which he said he spent all the money in the YouTube video on hotels and "hos." (19 RT 1665.)

The prosecutor argued to the jury that in a true case of self-defense, "the person who had to use force because they were instantly about to die, calls the police. They wait for the police. They are waiting on their porch with a smoking gun. 'Yeah, I had to kill him, and you know what, I would do it again tomorrow, because my life was in danger.' That's the true picture of self-defense. Not what you have here." (20 RT 1892.)

The prosecutor argued:

> There is no clearer picture of what was going on in [Poston's] mind than his own words. You know, normal people, law-abiding citizens, don't go into an altercation with someone with the state of mind of, "Disrespect me and you're going to find yourself six feet under."

(20 RT 1897.)

> With respect to Mr. Poston, he fled the scene, he left Oakland. He said repeatedly in the jail calls he was on the run. Not the state of mind and not the use of phrasing that innocent, justified people use. And he also dumped the gun.

(20 RT 1898.)

> [T]here were a variety of jail calls that we listened to with [Poston] talking to his girlfriend, with him talking to his mom about his girlfriend, and what she should say. And, you know that, hmm, he tried to get her to lie for him.

(20 RT 1898.)

> With respect to Mr. Poston's testimony, you know when you tell the truth. The truth is the truth. You don't have to practice it, you don't have to perform it. And you heard in a variety of jail calls from him how much of the story he was trying to sell all of you. He was performing, and he was trying to paint a portrait of himself that's different than the portrait that you've seen in the video, in the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew that you couldn't see that. [¶] So he was practiced, he was prepared, he stayed calm.

(20 RT 1899.)

In her rebuttal argument the prosecutor returned to her "gun battle" theme, explaining that if it is a gun battle, it is murder:

> You know, [McNeely's counsel] counted how many times I used the word "gun battle" [more than 15 according to McNeely's counsel] and I submit to you that's because that is the position that I'm taking. This was a gun battle. And that's why you have implied malice, and that's why it's murder.
>
> But you have to ask yourselves, why is the defense so afraid of it being a gun battle? Why spend so much time talking about it's not a gun battle? Why did they not want you to find that it was a gun battle? Because a gun battle equals murder, and then you're done because you're looking at their state of mind at the time that this starts. A gun battle equals murder for both defendants, and they're both equally guilty.

(20 RT 1909, 1962-1965, 1971.)

Then the prosecutor explained that people like McNeely and Poston walk around ready for gun battles, disregarding the safety of innocent bystanders:

> You know, this world is a world that I would hope and imagine is unfamiliar to all of you. It's a world that you've gotten a glimpse of, but it's a world that you heard yesterday from Lieutenant Jones, now they're not playing by any rules. But there are some things that are expected. Both of them were a part of this world. Both of them went to this gas station that is known for crime, it's known for shootings, it's known for murders.
>
> McNeely went there with drugs for sale. McNeely is the one walking up to this car, that car, and another car, talking to people in the parking lot of a gas station. So he's a drug dealer. He's in this world.
>
> Mr. Poston clearly is in this world, a self-professed person who promotes his videos and whatnot. Both of

> them knew they couldn't walk away. That's just not how it happens. That's not how you walk away and save face and have any respect.
>
> But these days, they don't settle disputes with fists, they settle them with guns. You know, I don't know if Mr. Poston could see Mr. McNeely was armed. I would submit to you it's not important. Each of them knew that the other was armed.
>
> You know, I'm reminded of a friend of mine and a story he told me, his little brother was going off to college. And I shouldn't say little, his younger brother, he's huge, ginormous. My friend sits him down and he says, "Look, if you are ever out, whether it's a party, or a game, or restaurant or wherever, and some little guy wants to pick a fight with you, you have to know that he has an equalizer of some sort, he has some sort of weapon. Because what little guy is going to pick a fight with you, this big strapping football player?"
>
> That's what's (sic) it's like on the streets of Oakland now. You've got all these little guys running around, but they're all armed, making them feel like big men. And that's what happened in this case. These guys were going to shoot it out, and that - and who cares about who was left in their wake? Who cares what innocent people are in the way?

(20 RT 1966-1967.)

The prosecutor argued that Poston's alternating use of African-American Vernacular English in the jail calls and Standard English on the witness stand showed that he was lying:

> You have heard a lot of our evidence about Mr. Poston and his world. You heard a lot of jail calls where he is not speaking in the same calm, controlled manner that

> he's speaking here in court. And that's why you heard the other jail call, where he's talking about the fact that he needs to paint a different portrait for you and put on a performance. Because if you see the real him, you'll know the verdict that is required.

(20 RT 1971.)

Finally, the prosecutor argued that Poston's rap lyrics showed he did not feel badly about Fluker's death:

> There is no evidence that [Poston] feels badly about what happened to Mr. Fluker. The evidence is actually contrary to that. Because the only rap that he wrote regarding this incident was boastful. It was bragging. It was, "I wish I coulda, shoulda, woulda killed him."
>
> The argument seems to be that this, on one hand or another, is perfectly acceptable behavior. And that's offensive. Because what is Lionel Fluker? Just collateral damage? Your verdict will not bring him back to the family who loved him. It will not restore any social order or change things in the area of Seminary and MacArthur, but holding them accountable for what they did will bring some sort of justice. And so I trust you now, and I leave it in your hands to do justice.

(20 RT 1972.)

The prosecutor's whole theory of the case was that Poston was guilty of murder and attempted murder, despite the undisputed fact that McNeely was the armed aggressor, because he was a bad character - a "thug" and a "pimp" - who did not talk or behave like she thought an innocent person would. (20 RT 1897-1899, 1966-1967, 1971-1972.)

The prosecutor appealed to the jurors' fear of random street violence - of being crime victims - with repeated references to a gun battle and both defendants' disregard for the safety of innocent bystanders. The argument was misleading and unfair because there was no evidence Poston agreed or intended to engage in mutual combat or a gun battle before McNeely struck the first blow. Rather all the evidence showed that Poston acted in self-defense.

The prosecutor emphasized Poston's references to pimping and "hoes." (19 RT 1954-1966.) As Poston has explained, references to pimping and "hoes" were irrelevant and inflammatory, and the prosecutor used them unfairly to attack Poston's character and portray him as the kind of person who would deliberately instigate a shooting and then claim self-defense.

The prosecutor appealed to conscious and unconscious racial bias by repeatedly called Poston a "thug" - a racial "dog whistle," akin to using the N word.

The prosecutor also appealed to racial bias by emphasizing Poston's use of African-American Vernacular English. She also argued that Poston's alternating use of AAVE with friends and family and Standard English on the witness stand showed that he was trying to fool the jury. In fact, it is very common for African-Americans and others to switch between standard English and their native language or dialect - a phenomenon called "code-switching."

(c)(1): Yes.

(d)(1): No.

**<u>GROUND SIX</u>: THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS.**

(a) Supporting facts:

Poston's case should have been severed from McNeely's based on antagonistic defenses because each defendant was charged with the attempted murder of the other and their defenses were so antagonistic that the two defendants battled each other through their respective counsel repeatedly throughout the trial.

The two defense attorneys' contentious presentation of the antagonistic and irreconcilable defenses rendered the joint trial fundamentally unfair in violation of due process. McNeely was the one to proffer Poston's recorded telephone calls; at the pretrial motion hearing, the prosecutor stated she did not intend to present any of the calls at that time. (2 RT 156-157.) The prosecutor later decided to present numerous recorded calls.

McNeely objected to Poston's proffer of evidence that he had previously been shot and had received psychological counseling for his resulting fear. (2 RT 166-170.) He joined the prosecutor's motion to admit Poston's YouTube video, explaining that "the statements that are made in the video undermine Poston's self-defense state of mind as expected in this case. And as I stated yesterday, that's a necessary showing that Mr. McNeely needs to make to defend his case." (6 RT 280.)

McNeely objected to admission of Poston's statement to Sergeant Gantt that he was just trying to get McNeely off of him. (6 RT 300-301.) He moved to admit multiple statements of Poston in jail

calls and various writings over Poston's objection. (7 RT 369-370.) He argued without evidentiary support that Poston told Bailey what to say. (7 RT 388-389.) Eventually the prosecutor joined in McNeely's motion. (8 RT 400.)

During jury selection, both defendants requested additional separate peremptory challenges because of their antagonistic defenses. (9 RT 448; 10 RT 453.) In his opening statement, McNeely's attorney stated that McNeely was another victim of Poston, in addition to Fluker. (11 RT 506-507.) Poston's attorney stated that McNeely was the instigator and Poston was only defending himself. (11 RT 523-529.)

McNeely's cross-examination of Bailey and Poston was more extensive and adversarial than the prosecutor's cross-examination. (18 RT 1417-1442, 1444-1505; 19 RT 1603-1670, 1673-1752, 1758-1759.) McNeely's attorney cross-examined both Bailey and Poston about their relationship, Poston's other sexual relationships, Poston's verbal abuse (i.e., "shut up, bitch"), his uncharged petty crimes, and his relationship to prostitutes, repeatedly referring to pimping and hoes. (18 RT 1457; 19 RT 1677-1681, 1688-1692, 1695-1696, 1698-1708, 1750-1751, 1758-1759.)

In his closing argument, McNeely's attorney blamed Poston for Fluker's death. (20 RT 1903.) Like the prosecutor, McNeely unfairly argued that Poston's quoting of the prosecutor about bringing a knife to a fist fight was an admission of guilt. (20 RT 1904.) He called Poston and Bailey liars and told the jurors not to trust them or Poston's "team." (20 RT 1906, 1915-1910.) He asked: "Would you buy something over the internet from either Ms. Bailey or Mr. Poston, and

send money to them through PayPal? If not, throw out their testimony." (20 RT 1919.)

Poston could find no case where jointly tried defendants were charged with violent crimes against each other. As his trial attorney argued, this was a unique case in that respect. (2 RT 114.) Poston and McNeely were forced into the roles of both victim and perpetrator as to each other. Each had to prove that the other was solely responsible for the entire incident and that each acted in self-defense.

The jurors could not logically have accepted both defenses. Thus, the great potential for prejudice was apparent from the outset and the trial court should have granted severance. The two defense attorneys' contentious presentation of the antagonistic and irreconcilable defenses rendered the joint trial fundamentally unfair in violation of due process.

This was a unique case in which the defendants were charged with attempting to murder each other. The prosecutor's pervasive "gun-battle" theme seriously impaired Poston's defense. McNeely's extensive, vicious attacks on Poston's character removed any chance of a fair trial. The joint trial was fundamentally unfair in violation of due process.

(b) (c)(1): Yes.

(c) (d)(1): No.

**<u>GROUND SEVEN</u>: TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts:

Poston argued on appeal that the prosecutor committed pervasive, prejudicial misconduct in her cross-examination of Poston and her closing argument. (AOB 109-129; Ground Five.) In addition, trial counsel's failure to object denied Poston the effective assistance of counsel.

Trial counsel Bryden explained that he considered objecting to the prosecutor's many unfair and misleading statements and questions. (Exh. 13 to State Pet., ¶ 9.) He decided not to object because he thought it was futile. The trial court had admitted all the prejudicial "bitch" and "ho" evidence over his objection. Bryden did not think it was misconduct for the prosecutor to emphasize evidence admitted by the trial court, no matter how devastating to the defense. And he was certain any objections would be overruled, likely making things appear even worse to the jurors. (Exh. 13, ¶ 10.)

Of course, Bryden could have objected at sidebar or during any of the many hearings outside the jury's presence. He could have protested that the prosecutor was going way beyond the main asserted purpose for the character evidence - to try to show that Poston controlled Bailey's testimony as her pimp. (8 RT 396-400.) Poston had already been impeached with multiple prior convictions involving moral turpitude. (18 RT 1516-1520.) The prosecutor's argument that the "pimp," "bitch," and "ho" evidence was also admissible to show

Poston's "illegitimate lifestyle," state of mind, and the absence of self-defense was specious. (18 RT 1875.)

Poston believes the trial court abused its discretion in admitting the "pimp," "bitch," and "ho" evidence. But the prosecutor's repeated emphasis on the bad character evidence was unconstitutional even if some limited evidence was admissible to impeach Poston's and/or Bailey's credibility.

Similarly, the prosecutor's repeated emphasis of her "gun-battle" theme, complete with accusations that Poston did not care about the safety of innocent bystanders, was objectionable even if the gun-battle theme had been supported by the evidence. But the gun-battle theme was not supported, as Bryden would have discovered if he had read *People v. Ross,* 155 Cal.App.4th at 1045, cited in the notes to CALCRIM No. 3471.

Some objections may have been futile, as Bryden believed. But the trial court may well have sustained an objection that the prosecutor's pervasive emphasis on bad character evidence went beyond any permissible use. And the trial court may well have sustained objections to the prosecutor's unfair and misleading statements and questions relating to African American Vernacular English, consciousness of guilt, and mutual combat. Any reasonably competent criminal defense attorney would have realized that the prosecutor's improper questions and arguments exceeded the scope of the trial court's pretrial rulings and would have objected.

(c)(1):No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**GROUND EIGHT:** **TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts:

Poston argued on appeal that the trial court erred in instructing on mutual combat without sufficient evidence, violating his constitutional rights to jury trial, to due process, and to present a defense. In addition, trial counsel's failure to object or request modification of the standard instruction denied Poston the effective assistance of counsel.

The trial court instructed generally on self-defense in accord with CALJIC No. 5.30 and CALCRIM No. 505. (6 CT 1467.52, 1467.57-1467.60; 20 RT 2000-2005.) The court also instructed on mutual combat as a limitation on self-defense in accord with CALCRIM No. 3471 as follows:

A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

1. He actually and in good faith tried to stop fighting;

2. He indicated, by word or conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

(6 CT 1467.53-1467.54; 20 RT 2001-2002.)

Trial counsel Bryden acknowledges that he did not read *Ross* and did not know the mutual combat exception to self-defense applies only if there is proof beyond a reasonable doubt that the defendant intended or agreed to fight before the first assaultive conduct occurred. (Exh. 13, ¶¶ 11-14; *Ross,* 155 Cal.App.4th at 1045, fn. 14.) He acknowledges that he would have objected to CALCRIM No. 3471 and/or requested modification to include the "first assaultive conduct" language if he had read *Ross*. (Exh. 13, ¶ 14.) As Bryden explains, modification "would have cut off the prosecutor's argument

that it was mutual combat because Poston fired the first shot even though McNeely committed the first assault." (Exh. 13, ¶ 15.)

Poston's primary defense was self-defense and the prosecutor's pervasive response was "mutual combat." Bryden saw the citation to *Ross* for the definition of "mutual combat." (Exh. 13, ¶ 13.) Any reasonably competent criminal defense lawyer would have read *Ross* instead of relying entirely on the CALCRIM notes on the most critical issue in the case. Bryden's failure to do so denied Poston the effective assistance of counsel.

(c)(1):No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**GROUND NINE:** **TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts:

Bryden's failure to adequately prepare Poston to testify and failure to adequately rehabilitate him on redirect examination denied Poston the effective assistance of counsel. Bryden told Poston he had

to testify, but admittedly did not spend much time preparing him because he thought he was sophisticated and well-spoken and did not need help. (Exh. 2, ¶ 18; Exh. 13, ¶ 26.)

Bryden knew the bad character evidence in the jail phone calls and rap lyrics was "devastating to the defense." (Exh. 13, ¶ 7.) Yet he never had a transcription made; never listened to the calls with Poston; never discussed the calls in detail with Poston; and never counseled him as to how to respond to questions on cross-examination about the calls and rap lyrics. (Exh. 2, ¶¶ 16, 19, 21.)

Nor did Bryden give Poston a copy of his letter from the jail, provided in discovery, which was used during cross-examination to impeach Poston. (19 RT 1633.) Nor did Bryden counsel Poston as to how to respond to questions about his prior convictions or apparently incriminating items seized from Poston's house. (Exh. 2, ¶ 24.)

As a result of Bryden's complete abdication of his duty to prepare Poston to testify, both the prosecutor and McNeely's attorney were able to unfairly portray Poston as a liar, as well as a pimp and a thug. Had Poston been properly prepared, he could have explained why he did not consider himself a pimp; why he used the word "pretense" in his rap about self-defense; why he talked to his family about the legal rules pertaining to self-defense; and why he denied knowledge of the indicia of credit card fraud in his house, though he was previously convicted of check fraud.

Had Bryden discussed these issues, Poston's testimony on cross-examination would likely have been more coherent and believable. Bryden could also have addressed the issues on redirect, if

necessary, neutralizing the unfair attacks on Poston's credibility by the prosecutor and McNeely's counsel.

Poston's credibility was critical, despite the seemingly dispositive surveillance video, because the prosecutor's whole theory of the case was that Poston was a bad character looking for a fight who was not entitled to defend himself. Had Bryden adequately prepared Poston and/or rehabilitated him on redirect, at least one juror might well have had a reasonable doubt as to his guilt. Bryden's unreasonable failure to do so undermines confidence in the judgment and requires reversal.

(c)(1):No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**GROUND TEN:** **TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts:

Bryden's failure to investigate and present corroborating evidence denied Poston the effective assistance of counsel. Had Bryden just discussed Poston's jail calls and rap lyrics with him, he would have discovered and could have presented the self-defense

packet Poston received from the law librarian at the jail. Poston's handwritten comments on the self-defense packet would have strongly supported his testimony that he did not fabricate the circumstances of his case to fit the legal rules; rather, he was happy and relieved to find that the law of self-defense fit his case. (Exh. 2, ¶¶ 9-10; Exh. 3; Exh. 15, ¶ 22.)

For instance, Poston noted on the self-defense packet that he could prove his fear of McNeely was reasonable. He commented that it was "important" that there is no duty to retreat and that even a felon can use a firearm in self-defense, though he is prohibited from possessing it. None of Poston's notes on the self-defense packet are incriminating, so as to preclude their use to support his testimony.

Bryden would also have discovered that Poston's dictionary included two alternative definitions of "pretense" which were neutral - they did not indicate falsity. (Exh. 4.) The dictionary page and the earlier draft of the rap lyric stating, "[i]t's all self-defense under the correct pretext," could have corroborated Poston's testimony that he was trying to write rhyming lyrics and did not mean to indicate a false claim. (Exhs. 4, 5; 16 RT 1135-1136.)

If Bryden had adequately investigated, even after Poston's cross-examination, he could have presented the testimony of Poston's mother and brother and his brother's mechanic to corroborate Poston's testimony that there was a bullet hole in Bailey's car right after the charged shooting. (Exhs. 6, 7, 8, 15, ¶ 22; 19 RT 1738-1740.) Had Bryden presented the corroborating evidence, he could have countered McNeely's insinuations during cross-examination, cutting off

McNeely's argument that Poston's testimony about the radiator was another example of him lying. (20 RT 1907, 1918.)

The prosecutor and McNeely's counsel unfairly used Poston's out-of-court statements about the law of self-defense, his rap lyrics, and his testimony about Bailey's radiator to portray him as a liar who should not be believed. Bryden should have investigated and countered these attacks on Poston's credibility with readily available corroborating evidence. His failure to do so denied Poston the effective assistance of counsel.

Had Bryden investigated and presented the corroborating evidence there is a reasonable probability that at least one juror would have had a reasonable doubt as to Poston's guilt. Bryden's unreasonable failure to do so undermines confidence in the judgment and requires reversal.

(c)(1):No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**<u>GROUND ELEVEN</u>: TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts:

Bryden's failure to investigate and present expert testimony on African-American Vernacular English ("AAVE") denied Poston the effective assistance of counsel.

Professor Rickford's testimony would have been admissible to interpret Poston's statements in AAVE. Indeed, Lieutenant Jones testified as to the meaning of some of Poston's statements in AAVE. (19 RT 1799-1828.)

Bryden acknowledges that at least some of Professor Rickford's testimony might have been admitted; that Professor Rickford appears to be a well-qualified expert; that Professor Rickford's proposed expert testimony might have swayed at least one juror at least to the point of harboring a reasonable doubt as to Poston's guilt; and that some or all of the jurors, almost all of whom were white or Asian and from the suburbs, might have benefitted from the proposed expert testimony, refuting the incorrect assumptions about AAVE put forth by the prosecution. (Exh. 13, ¶ 20.)

Bryden claims no tactical reason for failing to investigate possible expert testimony on AAVE. (Exh. 13, ¶ 15.) He has represented numerous African-American defendants and he is somewhat familiar with AAVE. He is also aware that many African American people speak SAE as well as AAVE. (Exh. 13, ¶ 16.)

Bryden did believe that the prosecutor's interpretation of some of Poston's statements in AAVE was incorrect and he tried to present a different, innocent interpretation in his redirect examination of Poston and his closing argument. It simply did not occur to Bryden that he needed an expert or that there was an expert who could provide any admissible, favorable testimony. (Exh. 13, ¶ 16.)

A Google search for "African American Vernacular" turns up Professor Rickford's webpage - the second entry: https://www.google.com/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#q=african%20american%20vernacular; http://www.johnrickford.com/.

Professor Rickford is a nationally recognized expert on AAVE who teaches at Stanford University and has a special interest in AAVE in the courts. (Exh. 9, ¶¶ 1-2, 8-12; Exh. 10.) He could have testified that most of Poston's statements and rap lyrics are not incriminating at all. The one that is arguably facially incriminating - "it's all self-defense under the proper pretense" - should not be interpreted literally because rap lyrics are a form of artistic expression and Poston may have just been trying to use rhymes. (Exh. 9, ¶¶ 13-22.)

Professor Rickford could have testified that it was normal, desirable and even essential for Poston to practice speaking in SAE for his testimony. Had he testified in AAVE with profanity he would almost certainly have been negatively judged and disbelieved. His testimony might even have been incomprehensible to the jurors. (Exh. 9, ¶¶ 10-12.)

Professor Rickford could have testified that virtually all English speakers code-switch - they change their language and sentence structure depending on audience and context. (Exh. 9, ¶¶ 6-7.) Code-switching does not indicate dishonesty. (Exh. 9, ¶¶ 7-12.) Nor does AAVE indicate dishonesty, criminality, or "bad" English, though non-African Americans and even some African-Americans view it negatively. (Exh. 9, ¶¶ 5, 9.) Professor Rickford states it was "critical" to discuss these issues pertaining to AAVE and SAE in order to neutralize the jurors' unconscious racism and bias against AAVE. (Exh. 9, ¶ 5.)

Any reasonably competent criminal defense lawyer would have concluded that the prosecutor's heavy reliance on incorrect interpretations of the defendant's statements in AAVE, bolstered by a police expert, with an almost all suburban, white and Asian jury, at least warranted investigation into the possible availability of a rebuttal expert. Had Bryden investigated even minimally, he would have found Professor Rickford.

There is a reasonable probability of a more favorable outcome had Bryden investigated and presented expert testimony to counter the unfair and misleading interpretations of Poston's statements put forth by the prosecutor and McNeely's counsel. At least one juror would likely have had a reasonable doubt as to Poston's guilt. Bryden's failure to do so undermines confidence in the judgment and requires reversal.

(c)(1):No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**GROUND TWELVE: TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts:

Bryden's failure to investigate and present expert testimony on African-American culture denied Poston the effective assistance of counsel.

As with Professor Rickford, Bryden acknowledges that at least some of Professor Morrell's testimony might have been admitted; that Professor Morrell appears to be a well-qualified expert; that Professor Morrell's proposed expert testimony might have swayed at least one juror at least to the point of harboring a reasonable doubt as to Poston's guilt; and that some or all of the jurors, almost all of whom were white or Asian and from the suburbs, might have benefitted from the proposed expert testimony, refuting the incorrect assumptions about African-American people put forth by the prosecution. (Exh. 13, ¶ 20.)

Again, Bryden does not claim a tactical reason for his omission. Bryden is aware that criminal defense lawyers have occasionally presented a cultural defense explaining the defendant's perspective as a member of a minority group. He is aware that many African American people in Oakland and elsewhere distrust the police and the court system. (Exh. 13, ¶ 17.)

But it never occurred to Bryden that Poston's possession of a loaded firearm and flight after the shooting could not properly be argued by the prosecutor as consciousness of guilt. Bryden has seen this argument made by numerous prosecutors as to defendants of various races. It never occurred to him that he could or should object, present evidence to counter the argument, or argue that, among African American people, firearm possession and flight do not show consciousness of guilt because of distrust of the police and court system. (Exh. 13, ¶ 18.)

While Professor Morrell was more difficult to find than Dr. Rickford, numerous other local experts on African-American culture confirmed appellate counsel's suppositions about African-Americans' distrust of the police and courts. They all agreed that possession of a firearm and flight from the police does not indicate consciousness of guilt among African-Americans. Professor Morrell was the first expert counsel found who was willing to work on a court case, but every step of her investigation encouraged her to continue and led her to Professor Morrell. (Exh., 15, ¶¶ 7, 10.)

Had Bryden investigated, Professor Morrell could have refuted the prosecutor's argument that Poston's possession of a firearm before the shooting and his flight after the shooting showed that he did not

act in self-defense, but rather, in retaliation for McNeely's assault and with an intent to engage in mutual combat. Professor Morrell could have testified that it is not uncommon for urban African-American people to arm themselves for self-defense, with no intention to act unlawfully or to harm anyone. And it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police based on their own past experiences and those of their friends and relatives. (Exh. 11, ¶ 5.)

Poston's history and beliefs, as conveyed to Professor Morrell during a telephone interview, were consistent with those of many African-American people the professor has known as well as his own experience and the professional literature. (Exh. 11, ¶ 6.) If called as an expert witness, Professor Morrell could have testified that the circumstances of this case - in particular, Poston's possession of a firearm and his flight after the shooting - were not inconsistent with a young, urban African-American man acting in self-defense, rather than in retaliation for an assault or with an intention to engage in mutual combat. (Exh. 11, ¶ 13.)

Nor was Poston's alternating use of AAVE and SAE inconsistent with innocence and honesty. While the prosecutor's arguments may have seemed logical to the predominantly suburban white and Asian jurors who convicted Poston, they were based on inaccurate assumptions and myths about African-American people which Professor Morrell could have refuted. (Exh. 11, ¶ 13.)

Bryden knew that many African American people in Oakland and elsewhere distrust the police and the court system and he knew

that criminal defense lawyers have occasionally presented a cultural defense explaining the defendant's perspective as a member of a minority group. (Exh. 13, ¶ 17.) His failure to investigate and present expert testimony refuting the prosecutor's arguments about consciousness of guilt denied Poston the effective assistance of counsel.

There is a reasonable probability of a more favorable outcome had Bryden investigated and presented expert testimony to counter the unfair and misleading inferences urged by the prosecutor. At least one juror would likely have had a reasonable doubt as to Poston's guilt. Bryden's failure to do so undermines confidence in the judgment and requires reversal.

(c)(1):No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**<u>GROUND THIRTEEN</u>: THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY BRADY V. MARYLAND AND DUE PROCESS.**

(a) Supporting facts:

It appears from news reports that Lieutenant Jones has been placed on leave during an Internal Affairs investigation into a

complaint that he sent racist text messages to another officer. (Exhs. 16, 17.) In addition, it appears that the Oakland Police Department paid to settle two lawsuits involving Lieutenant Jones, most recently in 2005. (Exh. 20.)

Poston's appellate counsel specifically requested disclosure pursuant to *Brady v. Maryland* of any information pertaining to Lieutenant Jones, including information about the racist text messages. (Exh. 19.) She did not receive any response from the District Attorney. (Exh. 15, ¶ 39.) Bryden reports that he never received disclosure of any impeachment evidence pertaining to Lieutenant Jones, racist text messages, or settled lawsuits. (Exh. 15, ¶ 40.)

The news reports state that the racist text messages date back to at least 2014. (Exhs. 16, 17.) Poston's trial was in January 2014. (3 CT 739; 5 CT 1421.) Sentencing was on March 21, 2014. (3 CT 887-891; 6 CT 1483-1487.)

As the result of the *Brady* violation, Poston was denied the opportunity to cross-examine Lieutenant Jones about his text messages as an indication of possible bias against African-American suspects. Race and racism, conscious and/or unconscious, pervaded Poston's trial. The remedy was to bring it out in the open through Poston's testimony, expert testimony on AAVE and African-American culture, and cross-examination of Lieutenant Jones about the extent to which bias against African-Americans may have colored his expert testimony against Poston.

The prosecutor's failure to disclose material impeachment evidence pertaining to Lieutenant Jones' racist text messages and

involvement in settled lawsuits violates *Brady* and due process. Thus, the writ should be granted and the judgment should be reversed.

(c)(1): No.

(c)(2): Claim of ineffective assistance depended on evidence outside the record.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.

**<u>GROUND FOURTEEN</u>: CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.**

(a) Supporting facts:

Poston raised claims of cumulative prejudice both on appeal and on habeas corpus. He believes that each and every error of the trial court, the prosecutor, and defense counsel was prejudicial but, even if the Court disagrees, the cumulative effect of the errors raised on appeal and on habeas corpus rendered the trial fundamentally unfair in violation of due process.

At first glance, Poston's convictions are mystifying. Having recently survived a potentially fatal gunshot wound inflicted by an unidentified burglar, Poston armed himself for self-protection. He lived in the same rough area of East Oakland where he grew up, an area where everyone was armed and shootings were a common occurrence, as the prosecutor herself explained. (20 RT 1967.)

Poston stopped at a gas station on his way to work and was unexpectedly attacked by McNeely. The surveillance video shows that McNeely started a quarrel, knocked Poston to the ground, and reached for a gun before Poston fired a shot, as the prosecutor acknowledged. The evidence was insufficient to support Poston's convictions.

The prosecutor won convictions despite clear evidence of self-defense by exploiting the jurors' conscious and unconscious racism and fear of street violence. She and McNeely's attorney persuaded the trial court to admit voluminous out-of-court statements by Poston talking about "pimps" and "bitches" and "hoes" in AAVE. The prosecutor unfairly twisted Poston's words to make him sound guilty and argued that he was guilty because he did not talk or act like an innocent person would and that his code-switching showed he was lying.

The prosecutor unfairly argued that Poston was guilty because he engaged in mutual combat and a gun battle despite uncontroverted evidence that it was McNeely who initiated everything. The trial court's erroneous instructions supported the misleading argument and eviscerated Poston's defense. The joint trial with McNeely resulted in a second attorney helping the prosecutor to attack Poston's character and deflect from the seemingly dispositive video.

There were a number of ways defense counsel Bryden could have mitigated the harm. He could have objected to pervasive prosecutorial misconduct and unsupported, incomplete instruction on mutual combat. He could have prepared Poston to testify and rehabilitated him further on redirect examination if needed. He could have investigated and presented evidence corroborating Poston's

testimony on disputed points. And he could have presented expert testimony on AAVE and African-American culture. If the prosecutor had timely disclosed material impeachment evidence, Bryden could also have cross-examined Lieutenant Jones about racial bias and possible misconduct toward African-American suspects.

Poston was convicted of murder and attempted murder because he was an African American man who spoke African American Vernacular English as well as Standard English, who lived in a high crime area, who associated with gangsters and prostitutes, and who talked with his mother on the jail phone about his relief in finding that the law of self-defense fit his case "to a T."

Had Poston been tried separately; had all the irrelevant and inflammatory evidence been excluded; had the jurors been correctly instructed; had the prosecutor not committed pervasive misconduct; and had defense counsel adequately investigated, adequately objected, competently prepared Poston to testify, presented corroborating evidence, and presented expert testimony, a more favorable result was reasonably possible and probable. Cumulative prejudice rendered the trial fundamentally unfair in violation of due process and the judgment should be reversed.

(c)(1): Yes.

(d)(1): Yes.

(d)(2): Petition for writ of habeas corpus.