XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,** Petitioner, **v.** **JASON PICKETT, Acting Warden,** Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBIT 5

## Supplemental Reporter's Transcript, Vol. 1 of 1

CALIFORNIA COURT OF APPEAL
FIRST APPELLATE DISTRICT
---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA NO. C172522A/B

PLAINTIFF AND RESPONDENT,

VS.

JOE McNEELY (A),
DONEL POSTON (B),

DEFENDANTS AND APPELLANT.
_______________________________/

COPY

9-9/10/12-13 Augm. RT 1-129

**REPORTER'S TRANSCRIPT ON APPEAL**

**FROM FINAL JUDGMENT OF THE SUPERIOR COURT**
**OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF ALAMEDA**

**HONORABLE JEFFREY W. HORNER, JUDGE**

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco CA 94102

FOR THE DEFENDANTS AND APPELLANT:
In Propia Persona

# INDEX

## WITNESSES


| | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|
| **FOR THE PEOPLE:** | | | | | |
| ERIBERTO PEREZ-ANGELES | 34 | 40 | | | |
| JOE McNEELY | 89 | 91 | | | |
| **FOR THE DEFENDANT:** | | | | | |
| DONEL POSTON | 44 | 46 | | | |


---oOo---

**MORNING SESSION, MONDAY SEPTEMBER 9, 2013**

**PROCEEDINGS**

**---oOo---**

THE COURT: Good morning. Let's go on the record in the matter of the People of the State of California versus Donel Poston. Docket number 171976. The record will show we are in open court. Mr. Poston is present. Good morning, sir. His attorney is present, Mr. Bryden. Good morning, Mr. Bryden.

MR. BRYDEN: Good morning, Your Honor.

THE COURT: And Mr. Ford is present representing the People. Good morning, Mr. Ford.

MR. FORD: Good morning, Your Honor.

THE COURT: There is one witness present in court who is present and we have requested the District Attorney and the Court to do what I believe to be an in-camera person for the person that is identified as a confidential informant or referred to as confidential informant in the search warrant in this case is not a material witness, but before we get to that, there are perhaps two other matters I should note. One is, I received an e-mail and I believe Mr. Bryden, you received a copy of the same e-mail indicating a case that deals with the subject that we would be addressing this afternoon and that is, whether or not the, a person asserts the Fifth Amendment privilege, should that be done outside the presence of the jury and Mr. Ford as noted, the case of *People vs. Hill*, 3Cal.4th, 959 at page 991.

First of all Mr. Bryden, did you get a copy of that e-mail?

MR. BRYDEN: Yes, I did, Your Honor.

THE COURT: I want to get that issue. I just want to make sure everyone is on the same page with respect to documents filed this morning. I have one document entitled, "People's Motions In Limine." There are two documents filed this morning. One, "People's Motion In Limine," a three-page document authored by Mr. Ford and a second three-page document entitled, "People's Potential Witness List."

And Mr. Bryden, do you have copies of both of those documents?

MR. BRYDEN: Yes, Your Honor.

THE COURT: Now, Mr. Ford has noted a request to go in-camera. I assume he meant himself and the Court and the court reporter pursuant to 1054.7. That is a request; is that correct, Mr. Ford?

MR. FORD: It is, Your Honor.

THE COURT: What I will do is, read the pertinent parts of that section, but I will read the whole section. It states as follows: "The disclosure required under this chapter" -- and I will note the chapter to which there is reference, the discovery chapter 1054 and the sections that follow in the Penal Code. I will start again. "The disclosures required under this chapter shall be made at least 30-days prior to trial unless good cause is shown why disclosure is to be denied, restricted or deferred. If the material or information becomes known to or comes within the possession of a party within 30 days of the trial, disclosure shall be made immediately unless good cause is shown why disclosure should be denied, restricted or deferred. Good cause is limited to threats or possible danger to the safety of

and spell both names?

THE WITNESS: My first name is Eriberto. Last name is Perez-Angeles, spelled E-R-I-B-E-R-T-O. Last name, P-E-R-E-Z-A-N-G-E-L-E-S.

THE CLERK: Is there a hyphen between Perez and Angeles?

THE WITNESS: Yes.

THE COURT: Thank you very much. Okay. All right.

I have read into the record in open court, the section that Mr. Ford is proceeding under and that is Penal Code section 1054.7, which indicates in part, on the request of any party, the Court may permit a showing of good cause for even the denial or regulation of disclosures, or any portion of that showing and that that will be made in-camera and that there is a verbatim record that will be prepared for such proceeding. Of course, the reporter is present reporting what we are saying here.

So what I will do Mr. Ford, is turn the floor over to you and you tell me what it is that you want to call to the Court's attention?

MR. FORD: Thank you, Your Honor.

On Friday, Officer Perez-Angeles and myself received an e-mail from Susan Malloy at the Oakland Police Department Crime Lab.

THE COURT: Could you name that person again?

MR. FORD: Susan Malloy. Last name spelled, M-O-L-L-O-Y. And she indicated that she had tested nine millimeter Luger caliber cartridge casings that were recovered from this case and that those casings were leaning to nine millimeter Luger cartridge casings under a different police report number

13-035910.

THE COURT: Could you give me that number one more time?

MR. FORD: Sure. 13-035910.

That police report number is subsequent to the police report number in our case of 13-017162.

THE COURT: One more time? The police report in our case, what is that again?

MR. FORD: 13-017162.

THE COURT: Thank you.

MR. FORD: I asked Officer Perez-Angeles to check in to see whether or not the disclosure of this information of the defense would possibly compromise the investigation in the other case?

At this point, I want to turn it over the Officer Perez-Angeles as to what he found in checking to see what this was linked to.

THE COURT: All right.

Give me just a second officer before you start. Okay.

Officer, what can you tell me here?

THE WITNESS: After receiving an e-mail from our crime lab Technician, Susan Malloy and the report number 13-035910, I looked at the report on our data system and found out that that report came back to a stolen vehicle report, which I believe Technician Malloy perhaps might have misread the report and there has been an e-mail she sent, stating that is the report I just provided comes back to a shooting. I tried to contact Susan Malloy on Friday, but I got no answer.

THE COURT: Can I just interrupt for a minute? Could you maybe go over this again, the initial report that Susan Malloy

gave you when you checked that report; it was a stolen vehicle report?

THE WITNESS: It came back to a stolen vehicle report.

THE COURT: And you believed there was no shooting component of that report.

THE WITNESS: Not that I could find, Your Honor, no.

THE COURT: What did you do to determine possibly what the correct report would be?

THE WITNESS: I attempted to contact Susan Malloy to confirm with her that the report number that she provided e-mail was the one she was making reference to that was linked to a shooting that I got no answer and this was late on Friday.

MR. FORD: And I called Susan Malloy this morning and she's not in today.

THE COURT: All right.

Do you have any information Mr. Ford as to when she's going to be in from her superiors or supervisors or whatever?

MR. FORD: I don't, but I believe it is likely a one day absence, because when I called they said that the only people in the crime lab today were the drug analysts. And so it indicated to me that perhaps there was some kind of a training or -- do you know, Officer Perez?

THE WITNESS: Yes. Actually, Your Honor. It is a furlough day today.

THE COURT: It is a what day?

THE WITNESS: A furlough day.

THE COURT: Oh.

THE WITNESS: Oh, I believe all civilians are off. That's

what I was told by my supervisor this morning.

THE COURT: So in all likelihood, Miss Malloy -- is she a technician?

THE WITNESS: Yes. She is a crime lab technician and her specialty is to analyze cartridges recovered from scenes, weapons and --

THE COURT: It would appear to me that it is likely that she would be back tomorrow. It is a one day furlough. Is that your information?

THE WITNESS: I believe so, Your Honor, yes.

THE COURT: What would you like to do, Mr. Ford and I will certainly allow Officer Perez-Angeles to chime in here.

MR. FORD: Well, Your Honor, my concern is I don't want to disclose information that could possibly effect a pending investigation until we know exactly what that is and whether or not this is something that really needs to be protected or is something that would be okay disclosed to the defense. And so until we know more information, I am asking that it not be disclosed.

THE COURT: All right.

Officer Perez-Angeles, anything you wanted to add to that request?

THE WITNESS: Yes. I think that will work. That will give me time to go back and see if I can find that report number that Susan is making reference to that is lending to a shooting, because in the report, she provided an e-mail that does not come back to a shooting, it comes back to a vehicle theft and sometimes all it takes is a number to provide a wrong report

number.

THE COURT: Is there any chance officer of you going to the crime lab and seeing what reports Susan Malloy may have prepared that might still be in the crime lab you can use to check and see what other numbers might be available?

THE WITNESS: I could definitely go to the crime lab, Your Honor and see if anybody can provide me with that information and try to establish if that's the correct number that she found a match to.

THE COURT: All right.

Anything in addition you want to suggest, Mr. Ford?

MR. FORD: Just to go over a day on this matter. If she is back tomorrow, she would be able to clear this up.

THE COURT: All right.

What I didn't bring in was my schedule for in limine motions. Do you happen to recall what our plans were for tomorrow?

MR. FORD: I don't know that we had anything specific for tomorrow. Most of our motions are for today. So I don't recall anything specifically on the calendar.

THE COURT: One thing comes to mind would be to go over the jury questionnaires and finalize those and get those printed up by the county printer. We do have to spend -- counsel; you and Mr. Bryden and myself need to go over the draft questionnaires and that was tentatively scheduled for tomorrow. Give me a second longer.

I will grant the request to delay any ruling on whether or not good cause exist under section 1054.7. At this point, I

don't think there is anything, I don't have enough information, nor do counsel or the officer. So I will put the matter over and what I will do is put it to tomorrow afternoon at say 1:30. And hopefully, officer, this will give you a chance, if you can't find anything today and I can understand perhaps if you are not able to go any further than you have today, assuming that Technician Malloy is back tomorrow morning and you can talk directly with her and find out what you know and we will schedule a return appearance if you don't mind tomorrow afternoon and we will undoubtedly come back here tomorrow in-camera and under 1054, find out what information it is. So in terms of the ruling today, I am simply putting it off and continuing the matter for further in-camera hearing.

Now, in terms of what I reveal to the defense, my general thoughts would be to simply indicate that I don't have enough information to make a ruling. So I am putting the matter over until 1:30 tomorrow to secure information and I will continue the in-camera hearing then.

Any thought about that, or does that cause any problems?

MR. FORD: I think that's appropriate.

THE COURT: Officer, do you agree with that?

THE WITNESS: I think that's fine, Your Honor.

THE COURT: So we will be back here no doubt, starting out in open court and coming back in-camera to continue with this hearing. It is premature yet, but I am going to order that the transcript of these proceedings, whenever they are complete be filed with the clerk of the court in a sealed condition pursuant to 1054. Okay.

Let's go back to open court. I expect we will be coming back here shortly under a second hearing, which will also involve the same cast here; Mr. Ford and Officer Perez-Angeles, but let's go back out first.

(Whereupon the matter returned to open court.)

THE COURT: The record will show we are back in open court and all parties are again present. Mr. Poston, Mr. Bryden, Mr. Ford and the court's staff. Officer Perez-Angeles remains in the audience portion of the courtroom. At this point, I don't have sufficient information, nor does Mr. Ford or Officer Perez-Angeles for me to make a ruling regarding whether or not the provisions of section 1054.7 should be imposed. I expect that I will have sufficient information conveyed by either Officer Perez-Angeles or Mr. Ford tomorrow. So I am simply going to continue the in-camera hearing under section 1054.7 until tomorrow afternoon at 1:30 and we have other matters to deal with here. Again, I emphasize that I haven't ruled yet, but until I get more information, I will rule. I am continuing the matter until 1:30 tomorrow afternoon and we will convene in open court and we will be back in chambers under section 1054.7 presumably and completing the hearing, making whatever rule is appropriate. All right.

I know again, you don't know what's behind the curtain, Mr. Bryden. Do you have any thoughts on the procedure as I have announced it so far?

MR. BRYDEN: Not on the procedure. If I get the discovery I may react to the substance.

THE COURT: I understand that. All right.

Let's do this: I will move on to another issue before the Court and the other issue is, it starts with Mr. Bryden, your request of the person identified in the underlying search warrant, which is your in limine motion number two to have the Court order that the identity of the person who is referred to in this warrant as confidential informant of the identity of that person revealed as a material witness.

Now, the history on this is one that has been relayed to me largely by both counsel; Mr. Ford and Mr. Bryden and that was originally before Judge Hymer in another court. I believe that was contemporaneous with another motion under Penal Code section 995; is that correct, Mr. Bryden?

MR. BRYDEN: Yes.

THE COURT: And at that time you made the motion before Judge Hymer that the Court order that the examination, that the procedure be invoked that would lead to the revealing the identity of the person referred to as a confidential informant. As I understand it, Judge Hymer did not rule on that motion, but what he did do was, he ordered the search warrant and affidavit in support of the search warrant which has previously been sealed, to be unsealed and distributed to both counsel. Let me stop there. Am I right so far? Mr. Bryden, is that what happened in Judge Hymer's courtroom?

MR. BRYDEN: That's my recollection. Yes, sir.

THE COURT: And you were given a copy of the warrant and affidavit in support of that warrant; is that right?

MR. BRYDEN: Sometime after that hearing.

THE COURT: And it was based on your receiving those

documents that you filed this motion. Let's go back. My understanding is that Judge Hymer deferred any ruling on your motion to the trial court. So the motion has not yet been ruled upon. The only action Judge Hymer took was to order that documents be unsealed and distributed to counsel; is that your understanding?

MR. BRYDEN: Yes. The clerk's record in the file would include a written motion both to unseal the affidavit, which Judge Hymer did and to provide me with the confidential informant's contact information. And Judge Hymer wanted to schedule further hearing on that, but when I pointed out that we had a trial date on a no time waiver basis, he felt it better to be heard as he expressed it by the trial court.

THE COURT: Okay.

So your understanding, pursuant to Judge Hymer's order, I am ruling that that matter is not before me; is that right?

MR. BRYDEN: That is correct.

THE COURT: And Mr. Ford, are we right so far in terms of the procedure as you understand it?

MR. FORD: As I understand it, yes.

THE COURT: Were you present before Judge Hymer or was another member present?

MR. FORD: I was not present. It was another Deputy DA.

THE COURT: Who was that?

MR. FORD: Shara Beltramo.

THE COURT: Now, Miss Beltramo has filed a document that deals with several issues. One of them being the procedure that we should follow in a case where there is a request to reveal

and divulge information which had previously been ruled to be confidential. That is, reveal the identity of the person identified as a confidential informant. That is in the court file and Mr. Bryden, you have seen a copy of that particular document authored by a particular Deputy District Attorney, Shara Beltramo.

MR. BRYDEN: Yes, I have.

THE COURT: I have read that as well. So I have those points and authorities before me as well as your motion, Mr. Bryden and the authorities that you have cited on the motion. My understanding, Mr. Ford, is that your officer is, intends to invoke the privilege not to divulge the information pursuant the Evidence Code section 1041 and 242; is that correct?

MR. FORD: That's my understanding.

THE COURT: Then what I propose to do is to once again, go in camera. This time on the issue of whether or not I should grant Mr. Bryden's motion or deny it and the issue I believe as framed both by Mr. Bryden and Miss Beltramo, is whether or not the person identified as the confidential informant is, or is not a material witness as the law defines that term.

Is that your understanding, Mr. Bryden, of the issue?

MR. BRYDEN: Yes.

THE COURT: Yours as well?

MR. FORD: Yes, Your Honor.

THE COURT: All right.

The affiant on the search warrant is again, Officer Perez-Angeles. He remains present in court. So what I would

propose to do, is one more time ask the reporter to go back into chambers and ask Mr., or Officer Perez-Angeles to accompany us and we will conduct an in-camera hearing under Penal Code section 1041 and 1042. Okay.

So we will take a break.

(Whereupon, a brief recess was taken.)

THE COURT: Let's go on the record in the matter of the People of the State of California versus Donel Poston, Information number 171976. The record will show as I indicated in open court, the record will show that we are now in chambers. The persons present in chambers are myself, the Court's reporter, Mr. Ford representing the People and Officer Perez-Angeles. As I have indicated, these proceedings are being reported and ultimately, at the conclusion of these proceedings, I will order that the transcript be sealed and that it be preserved in the Clerk's office of the Alameda County Superior Court for review by either an Appellate Court or any appropriate Court. What I am going to do, we have had another in camera hearing on other issues. I am going do it again for these proceedings. So could you raise your right-hand?

**ERIBERTO PEREZ-ANGLES**

Called on behalf of the People as a witness, after having been first duly sworn, was examined and testified as follows:

THE COURT: One more time, would you state your full name and spell both first and last names for our record?

THE WITNESS: My name is Eriberto Perez-Angeles. First name spelled, E-R-I-B-E-R-T-O. Last name is P-E-R-E-Z-A-N-G-E-L-E-S.

THE COURT: Thank you very much. Give me just a second, if you will. Let me just ask a few preliminary questions and then Mr. Ford, I anticipate turning it over to you to conduct an examination of Officer Perez-Angeles.

MR. FORD: Your Honor, as a preliminary matter, there is some information I would like to disclose to you before we get into that.

THE COURT: Sure.

MR. FORD: It is my understanding that the identity of the confidential informant was turned over to Drew Steckler as part of discovery in docket, Oakland docket 586330. That's the People vs. Anthony Lister who is charged with murder for shooting of Lionel Fluker as part of this incident.

THE COURT: Can you give me those numbers again?

MR. FORD: Yes. Docket 586330.

THE COURT: 586330?

MR. FORD: Yes.

THE COURT: Is that a matter now pending in the Wiley Manuel Courthouse wherein Mr. Lister --

MR. FORD: Joe McNeely is his true correct name. Anthony Lister is the aka.

THE COURT: And Mr. Lister, also known as Mr. McNeely is charged with murder, the murder of Mr. Fluker, I believe in that action number 586330?

MR. FORD: Yes.

THE COURT: And your information is that the identity of this person as indicated as confidential informant in the underlying search warrant has been turned over to Mr. Steckler?

MR. FORD: That's correct.

THE COURT: Any further thought on that in terms of what we should do here?

MR. FORD: Well, there is a serious safety concern given the defendant's jail letters. And it is my understanding, the fact that Mr. Bryden is still asking for this motion, that he is not aware that that information has gone to Mr. Steckler and more likely, Mr. Steckler has not paid any attention to that particular detail because it is not relevant at all in his case. And so --

THE COURT: Okay.

Before I and you representing the People get into the issue of whether or not the informant is a material witness in these proceedings or not, strike what I just said.

It is an interesting development an attorney in a related case is aware of the information. Can you tell me how that information that is identity of the confidential informant was conveyed to Mr. Steckler?

MR. FORD: There was a discovery packet consisting of about 100 some odd pages and an e-mail containing the name of the confidential informant. In fact, the e-mail that was received by the Oakland Police Department as the basis for the affidavit was included within that discovery packet.

THE COURT: And something, and there was a document that was turned over to Mr. Steckler. What was the nature of the document?

MR. FORD: I have a copy of that document here, Your Honor.

THE COURT: Why don't you first just describe it to me?

What is it?

MR. FORD: Sure. It is an e-mail addressed to Lisa Ausmus. It has, "Hi Sergeant Ausmus, as per our phone conversation, I received some information that may be useful regarding the shooting that took place on Sunday, March 17th at approximately 6:00 p.m. at 3015 55th Avenue." It says, "our R dash P, state that this intended target was Don Donnie, a drug dealer, working the Seminary Foothill area. He was staying at the above listed address until the shooting happened. His girlfriend is leasing the house from Fannie Mae." That e-mail actually doesn't contain anything specific to this case, but the subsequent e-mail says, "Sergeant Allison, please call me. I heard that this guy, Donnie also be involved in the shooting that happened at Seminary and Mac on Friday night."

And their is another e-mail --

THE COURT: Before you go into the other e-mail, who is the author of these e-mails? Is it the same person?

MR. FORD: It is.

THE COURT: Who is it?

MR. FORD: The informant, Arianna Richards.

THE COURT: This is the informant, herself is the author of the e-mail?

MR. FORD: Yes.

THE COURT: And the e-mail is addressed to Sergeant Ausmus?

MR. FORD: Yes.

THE COURT: And how do you spell Sergeant Ausmus' last name?

MR. FORD: A-U-S-M-U-S.

THE COURT: One more time for the record, the author of the e-mails to Sergeant Ausmus is Arianna Richards.

MR. FORD: Yes and one e-mail was to Sergeant Allison, Michele Allison.

THE COURT: Okay.

Does Arianna Richards identify herself in the e-mails as the confidential informant that was referenced in the search warrant affidavit?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. All right.

Now, above and apart from whether the confidential informant, who I now know as Miss Richards is a material witness as that term is defined by law, you're indicating, is there some safety concerns?

MR. FORD: There is.

THE COURT: And these are concerns you feel I should adhere in camera.

MR. FORD: Well, I think it is. I think it is also relevant to whether or not this information should be turned over. I think Officer Perez -- well, I will let you speak as to what you think is a safety concern.

THE WITNESS: I believe it is a safety concern, Your Honor, after um, I attended a preliminary hearing for this matter and testified that I have received information from who I refer as a citizen informant um, regarding the identity of Mr. Poston. Immediately after the preliminary hearing, I was contacted by Santa Rita jail classifications, Technician Tina Key who told me that they, the classification unit had intercepted a letter

authored by Mr. Poston in which he is asking Nicholas Bosworth, who is the person that lived, at the time lived with Mr. Poston, to contact what I believed was the citizen informant I spoke about during the preliminary hearing.

THE COURT: So is this a phone call that was intercepted from Mr. Poston to Mr. Bosworth or --

THE WITNESS: It is actually a letter and I have a copy of the letter and I would like to read part of it if that is okay.

THE COURT: Go ahead.

THE WITNESS: So I am quoting. So it reads: "Some bitch e-mailed the police. I will finds out once I put this discovery motion in on the 17th and it goes to who that is. My phone number that Don did it shows and our address and told the police I shot somebody two weeks before. Wow, e-mail. I think" and then Mr. Poston says, "I think it is Sarah, but I don't know." And then it goes, "call that faggot bitch. She Dert best friend" D-E-R-T, and he provides a phone number of 333-9164 and then says, "check this out."

THE COURT: Other portions of that letter to Mr. Bosworth that you feel are relevant to your safety concerns?

THE WITNESS: Based on this information, Your Honor, when this letter was intercepted, I was able to author a search warrant for Mr. Poston's cell and I found several other letters directed to different people. Some of those letters I have not been able to decipher if they are actual real threats or what he claims to be rap songs.

THE COURT: All right.

Thank you.

Let me go back to the e-mail that was included in the discovery package to Mr. Steckler who represents Mr. Lister, also known as Mr. McNeely in the case at the Wiley Manuel courthouse. When did that discovery document, when was that discovery document turned over to Mr. Steckler?

MR. FORD: I am not sure about the exact date, although I know it was over a month ago.

THE COURT: Well, let's do this: Let me set this issue of what you have described as your safety concerns and the letter from Mr. Poston to Mr. Nicholas Bosworth and you made some references to other letters, the meaning of which is unclear at this time. Let me set those aside and let's focus on the issue that I had originally believed was going to be the issue we would litigate here and that is, is the person who I now know to be Arianna Richards, who is referred to as a confidential citizen informant in a search warrant in this matter. Is she a material witness as that term is described by law?

THE WITNESS: Yes.

THE COURT: What I will do, I have some questions of Officer Perez-Angeles on that issue, but let me allow you to engage in some questions first.

MR. FORD: Thank you, Your Honor.

Q. Officer Perez, what information exactly did you receive from the citizen informant?

A. I received -- the information I received was a citizen informant, Mrs. Richards had sent an e-mail to Sergeant Lisa Ausmus. That e-mail was eventually forwarded to me and what that e-mail read was that Mrs. Richards had received information

that may be useful regarding the incident that took place involving Mr. Poston and Mr. Lister. And the informations was that Mrs. Richards believes that Mr. Poston might be involved in that incident. She provided an address of 3015 55th Avenue. A nickname who she referred as Mr. Poston as Donnie and a phone number which was area code (510) 730-5207.

Q. What is Miss Richards's full name?

A. Arianna Richards.

Q. And was this information received in confidence?

A. Yes.

Q. And did she indicate that she was a percipient witness in this case?

A. No, she did not indicate that.

Q. Well, based off of her e-mail, were you able to determine if she was a percipient witness or rather just passing on information that she received?

A. I believe from the e-mail, as it arrived, she was passing on the information --

Q. Why do you say that?

A. Because she makes reference in the e-mail that she received some information that may be useful. She never made reference that she witnessed any of the information that she is providing.

Q. And specifically, what are the words that she used that led you to believe that?

A. Um, she makes reference as, "I heard this guy Donnie" and I am reading from the e-mail. "I heard this guy, Donnie may also be involved in the shooting that happened on Seminary and Mac." She also makes reference as to, "I received some information

that may be useful regarding the incident."
Q. And do you believe that the disclosure of her identity will put her in danger?
A. Yes. I say that based on the letter that Mr. Poston authored and was mailing to Mr. Nicholas Bosworth, which at the time was a roommate of Mr. Poston and I would like to add that during that search warrant I executed at 3015 55th Avenue, I did find a loaded firearm in what I believe was Mr. Bosworth's room.
Q. And was there indicia in his name in that room?
A. Yes.
MR. FORD: I don't have any more questions, Your Honor.
THE COURT: Okay.
Let me just follow up if I may?
Q. Your conclusion officer, is that based on the information and the language used in the e-mail to Sergeant Ausmus, that this was information that the confidential informant or citizen informant, Miss Richards had picked up from other sources that it was not based on her own personal observation; is that correct?
A. That is correct, Your Honor.
Q. And the language in part that you rely on there is her language where she states, "I heard this guy Donnie may be involved in the shooting at Seminary and Mac," meaning, MacArthur?
A. Yes, Your Honor.
Q. And in the same e-mail, she used the words, "I received information?
A. Yeah, "that I received information." The original e-mail

Mrs. Richards had sent to Sergeant Ausmus.

MR. FORD: And just so the record is clear, that is an e-mail that pre-dates this shooting. That is a prior shooting.

THE COURT: Have you spoken personally to sergeant Ausmus regarding the e-mails that she received from Arianna Richards?

THE WITNESS: No. I have not spoken to her in person.

THE COURT: Well, here is what I am inclined to do: I think it is important that this Court hear directly from Sergeant Ausmus, because she is the person that received these e-mails and she may have, I emphasize, may have additional information regarding who Arianna Richards is and what her position is with respect to either this case or any other information she may have in other matters with Sergeant Ausmus. It would appear based on what Officer Perez-Angeles has said, that his conclusion is correct, that based on the language that Miss Richards uses in her e-mail to Sergeant Ausmus, that she would not be a material witness as that term is defined by law under cases such as *Roviaro vs. United States*, R-O-V-I-A-R-O, vs. United States, 353 US 53 at pages 60 and 61. That she rather would appear to be a mere informer or a finger pointer as those terms are used. And thus, not a material witness to the events that are the basis of the arrest of the defendant. I am relying on cases such as *People vs. Hardeman*, H-A-R-D-E-M-A-N, 130Cal.App.3d, 823 at pages 828 to 859. And *People vs. Benny*, B-E-N-N-Y, 230Cal.App.3d, 192 where -- which relies on the *Harding* case. However, in view of the fact that the e-mail was sent to another officer, I think it is important that I hear from the other officer to find out if there is any additional

information Sergeant Ausmus has specifically on the issue of, was Miss Richards the citizen informant present at the scene? It would appear unlikely based on the language in the e-mails themselves, but I think in view of the fact that Sergeant -- I mean, that Officer Perez-Angeles can't tell us more about that, because he doesn't speak directly to Sergeant Ausmus, I need to hear from Sergeant Ausmus.

So what I will do this is, the second time in a row I am doing this, is continue this matter for further in camera hearing at a time when I can hear directly from Sergeant Ausmus. What information do either of you, Mr. Ford, or Officer Perez-Angeles have about when Sergeant Ausmus will be available?

THE WITNESS: I can get a hold of her and ask her.

THE COURT: Why don't we go off the record and why don't you make a phone call if you have got your phone with you now?

MR. FORD: Would the Court be okay if he spoke to her on the phone about this issue and have him testify on it?

THE COURT: No. I would like to hear from Sergeant Ausmus because I would like to give you the opportunity to ask her questions and perhaps, the Court. I don't anticipate a long hearing, because the issues as I perceive them are fairly simple. Was she a percipient witness in the sense of being present at the events that give rise to this trial or not, but I think I need to hear directly from her.

I indicated we would go off the records for the officer to make the phone call, but anything else that goes on in chambers, keep reporting. We will put the matter over for further in camera hearing at 1:30.

MR. FORD: Your Honor, I believe it is, Michele Allison is the Sergeant that we need, because she is the one that actually received the e-mail related to this case.

THE WITNESS: Sergeant Allison sent me the e-mail, but the original e-mail was sent to Sergeant Ausmus and then I won't point out, I believe maybe Mrs. Richards also reached out to Sergeant Allison. I believe Mrs. Richards is some type of neighborhood watch coordinator. I don't know her exact title.

THE COURT: But your information is that Sergeant Ausmus is the person that received the e-mail from the citizen informant, Miss Richards?

MR. FORD: Your Honor, she received the first e-mail. The one that pre-dates this crime where she is talking about Donnie's involvement in a different shooting. But the shooting in this case, the e-mail regarding that, was to Sergeant Michele Allison. So I think it would -- well, I think we would probably need Sergeant Allison here for the hearing itself.

THE COURT: Let me ask both you, Mr. Ford and you, Officer Perez-Angeles, the information that you related to me, which I based your conclusion on that, because of the language of the e-mail, most likely Arianna Richards is not a material witness, is that the e-mail that was sent to Officer Allison or Sergeant Allison or Sergeant Ausmus?

MR. FORD: Sergeant Allison as to this case and then a similar e-mail as to a different incident went to Sergeant Ausmus where again, she said, "I received some information which indicated that she is not a percipient witness.

THE COURT: Let's bring them both in. Sergeant Allison and

Sergeant Ausmus and again, I am proposing that we put the matter over until tomorrow afternoon at 1:30, a further in camera hearing and what I would intend to do, I think we have room on the couch and a chair to bring all three officers, Perez-Angeles, Sergeant Ausmus, Sergeant Allison in here. I will swear them, both the new witnesses again and have them relate what the nature of the e-mail communications were and we will deal with the subject of whether or not Miss Richards was present at the scene of the crime, or whether it was information that she related from other sources. In other words, is she a material witness or not?

So we will adjourn these proceedings now. I will go out and explain to Mr. Bryden and Mr. Poston, we will continue the further in camera hearing tomorrow at 1:30 so the Court can get some more information.

Any thoughts on that?

MR. FORD: That seems appropriate.

THE COURT: Okay.

That will be the end of our in-camera hearing until tomorrow morning at 1:30 in the afternoon.

(Whereupon, the in camera proceedings were completed.)

THE COURT: The record will show we are back in open court. That Mr. Poston is present. Again, he remains at counsel table with his attorney, Mr. Bryden. Mr. Ford is present representing the People. The Court is here. Again, Mr. Perez-Angeles who has been present in chamber when we conducted our in camera hearing is present in court.

I may sound like a bit of a broken record, but once again,

I don't have enough information at this point to make a ruling on the underlying issue here as to whether or not the person identified as the citizen informant or confidential informant in the search warrant is or is not a material witness. And I need to secure the attendance of, I indicated two more witnesses with the Oakland Police Department that may help provide that information. So I am putting this matter over until tomorrow afternoon at 1:30. I will ask Officer Perez-Angeles to return as well as two additional members of the Oakland Police Department. I anticipate that we will have additional information before I make a ruling on the underlying issue as to that being whether the person identified as the citizen or confidential informant is, or is not a material witness.

So 0 for two so far. But that's what we will do in this case. Now, the reporter has been reporting constantly although in chambers mostly. So I am going to take a break for the benefit of the Court staff. Let's take a break until, let's say five minutes after 11:00. I will ask everyone to come back at five after 11:00 and we will move on to our next issue, which I believe will not involve an in-camera matter. We will proceed in open court. So a 15-minute break until five after 11:00 and we will see you all.

MR. BRYDEN: Thank you, Your Honor.

(Whereupon a brief recess was taken.)

THE COURT: Let's go back on the record in the matter of the People versus Donel Poston. Mr. Poston is present at counsel table with his attorney, Mr. Bryden. Mr. Ford is present representing the People. The Court's staff is here.

You had indicated, I believe that you had a request Mr. Ford, you have a request with respect to two persons named on your witness list who I believe are present in court today, that you would like the Court to address with respect to a motion to exclude witnesses from the trial; is that correct?

MR. FORD: That's correct, Your Honor. Tamena Bailey is present in the courtroom, I believe as well as Lietta Poston.

THE COURT: Thank you very much. Miss Bailey is number 33 on your witness list and the second person is the last name of the witness was number 41, Lietta Poston?

MR. FORD: Yes.

THE COURT: Are you making a motion for the Court to exclude any witnesses, either counsel anticipates to be called as witnesses in the trial to be excluded in the trial proceedings, including pretrial proceedings?

MR. FORD: That's correct, Your Honor.

THE COURT: Do you want to be heard ton general witness exclusion order, Mr. Bryden?

MR. BRYDEN: It is my belief, I can't really cite this to law, but the reason we exclude witnesses from the trial so that they don't hear the testimony by the witnesses. Inasmuch as this early stage of the proceedings is none testimonial in nature, I think they could be allowed to stay this morning. There is a witness coming in this afternoon and they will be excluded from that.

THE COURT: All right. Thank you.

Mr. Ford, do you want to be heard?

MR. FORD: Submitted, Your Honor.

THE COURT: No. I am inclined as I routinely do. If either counsel make a motion to exclude witnesses that he anticipates are going to be witnesses at trial, I accept Mr. Ford's representation as an officer of the court that these are going to be witnesses in this case, I would exclude them from all proceedings in the trial, including pretrial proceedings. They are in part in evidentiary proceedings.

The next thing we are going to engage is an evidentiary hearing involving a testimony of a witness, albeit the Oakland Police Department involving circumstances of a statement made by, purportedly made by the defendant. I think the purpose of the witness exclusion order are as you stated them, but they would apply to this proceeding.

So there are two ladies in the courtroom. Which of you is Miss Tamena Bailey?

MS. BAILEY: I am.

THE COURT: Hi Miss Bailey. Good morning.

MS. BAILEY: Good morning.

THE COURT: And the other lady seated next to Miss Bailey is Miss Lietta Poston; is that right?

MS. POSTON: Yes.

THE COURT: I appreciate your being here and I understand your interest in these proceedings and I appreciate that is a legitimate interest. However, the law requires the Court to exclude anyone from the courtroom if it is anticipated that you will be witnesses in the case. And so you are both potential witnesses here. So I am going to exclude you from the courtroom. I am not excluding you from the courthouse or

anything else. You are welcome to stay outside in the hall or the witness room, but I am going to ask you to step outside during the remainder of the pretrial proceedings and the trial proceedings.

Now, either counsel may ask that you attend this court as a witness and if you are subpoenaed to come into court to be a witness, of course, you must do that. You must follow the rules of the order and the subpoena ordering you to come to court. Other than you appearing in this Court pursuant to a subpoena issued by either counsel here, that is, Mr. Bryden or Mr. Ford, I am excluding you from the courtroom for the remainder of these proceedings. So what I will do is, ask you both to step outside now. Again, you are subject to your being subpoenaed here by either counsel.

MR. FORD: Your Honor, I just want to make something clear. As far as Lietta Poston, I don't know for certain whether I am going to call her and so I may call her depending on what others testify to in the case. And so I just want the Court to be aware that I can't say for certain that I will be calling her or that Mr. Bryden will be calling her.

THE COURT: But is she a potential witness?

MR. FORD: She a potential witness for impeachment purposes.

THE COURT: Do you agree with that, Mr. Bryden, Miss Poston is a potential witness?

MR. BRYDEN: She is a potential witness. I don't intend to call her.

THE COURT: Well, that will be the order. So Miss Bailey

and Miss Poston, you are excluded from being present during the courtroom proceedings. You are to follow any order that the Court gives to a subpoena for you to being here to testify as a witnessed. You both understand that?

MS. BAILEY: Yes.

MS. POSTON: Yes.

THE COURT: Thanks very much and I will ask you both to step outside.

MR. FORD: Your Honor, as to Miss Lietta Poston, can I have the Court to order her to return back on September 30th at 9:00 a.m.

THE COURT: September 30th is a Monday. So Miss Poston, I am going to order that you come back to this courtroom on Monday, September 30th.

MS. POSTON: Your Honor, excuse me. I was not aware of me being, participating or the possibility of me being subpoenaed for anything. I will be in Washington, DC during that period of time. I will be not able to attend any court hearings.

THE COURT: Is that a pre-scheduled trip?

MS. POSTON: This is something I have been planning sometime ago, surgery for a family member. This is, like I said, I wasn't aware of that, that I would have any part of this at all. Nobody has even ever said anything to me.

THE COURT: All right.

I appreciate that. What I will do is, I won't make that order now in view of what you have told me here regarding the surgery to your family member and I hope that goes well. I will certainly extend my best wishes for that. I won't make the

order for you to appear on the 30th. What we will probably do, I will take a short break. Mr. Ford, why don't you speak with Miss Poston outside the courtroom regarding the time that she will be scheduled to be in Washington, whether other arrangements might be made for her testimony. So we will take a short break and you can be present also Mr. Bryden.

MR. BRYDEN: I appreciate that.

THE COURT: We will take a short break. Counsel, why don't you and Miss Bailey and Miss Poston confer outside and we will get back on the record when you are done.

(Whereupon, a brief recess was taken.)

MR. BRYDEN: Mr. Ford says, he is not going to have you order Miss Poston back. So Miss Poston is going to come back into the courtroom today. I didn't know what the answer to that was.

MR. FORD: I will object to that, because when she is back. It is my understanding, she doesn't have a set plane ticket yet.

THE COURT: I am going to continue the order that they are both excluded from the courtroom unless they are subpoenaed by either side to appear on a particular date.

MR. BRYDEN: I will just tell them. Pardon me.

THE COURT: Sure. Let's go back on the record in the matter of the People versus Donel Poston. Again, we are in open court. Mr. Poston is present with his attorney, Mr. Bryden and Mr. Ford is present for the People. The Court's staff is here.

Mr. Ford, our next in limine hearing was scheduled to litigate the issue of any statements made by Mr. Poston to law enforcement as to whether or not it provided Miranda

requirements and whether or not it is under all the circumstances in the case whether it is a voluntary statement. So are you prepared to proceed on that issue?

MR. FORD: I am Your Honor.

THE COURT: Is the witness present who appears to be Officer Perez-Angeles.

MR. FORD: Yes, Your Honor.

THE COURT: You may call him.

MR. FORD: Officer Perez-Angeles. You may be sworn.

**ERIBERTO PEREZ ANGELES**

Called on behalf of the People as a witness, after having been first duly sworn, was examined and testified as follows:

THE CLERK: Thank you. Please be seated. Would you please state your name and spell your first and last name for the record?

THE WITNESS: Eriberto Perez-Angeles, E-R-I-B-E-R-T-O. Last name, P-E-R-E-Z-A-N-G-E-L-E-S.

THE COURT: Thanks Officer Perez-Angeles. Perhaps you can, you will pull that mike a little closer to you. Thank you very much. Can I get you a glass of water?

THE WITNESS: I am good sir, thank you.

THE COURT: Go ahead, Mr. Ford.

MR. FORD: Thank you.

**DIRECT EXAMINATION**

**BY MR. FORD:**

Q. By whom are you employed?
A. The Oakland Police Department.
Q. What capacity do you work for the Oakland Police

Department?
A. As police officer, currently assigned as a homicide investigator.
Q. How long have you been a police officer?
A. Since 2006.
Q. How long have you been in your current assignment as homicide investigator?
A. Over two years.
Q. I wanted to direct your attention to June 14th, 2013. Were you working that day at approximately 10:20 p.m.?
A. Yes, I was.
Q. Where were you at that date and time?
A. I was at the Oakland Police Department, CID section.
THE COURT: What time was this again?
THE WITNESS: It was around 10:00 p.m., Your Honor.
THE COURT: Thank you so much. Go ahead.
MR. FORD:
Q. Were you working on a particular case at that date and time?
A. Yes.
Q. What case were you working on?
A. I was working on a homicide case that had occurred back in April, 2013.
Q. And what were you doing in regards to this case?
A. I was interviewing Mr. Donel Poston in regards to that incident.
Q. Do you see Mr. Donel Poston in the courtroom today?
A. Yes.

Q. Could you please point to him and describe what he is wearing?
A. It is the gentleman in the red shirt with white sleeves.
THE COURT: The record will indicate that the witness has identified the defendant, Donel Poston.
MR. FORD:
Q. Where did you meet with the defendant that day?
A. I met with him at what we call the Criminal Investigation Division, which is situated in our police department.
Q. This is an interview room?
A. Yes.
Q. And was he seated in the chair during this interview?
A. Yes.
Q. Was he in handcuffs?
A. No.
Q. Is he under arrest at this time?
A. Yes.
Q. Were you with a partner or were you by yourself?
A. I had a partner.
Q. What was the defendant arrested for?
A. Previously to that, I altered an attempted murder warrant for Mr. Poston. At that time, Mr. Poston had been arrested by the Oakland Police Department. So he was brought to the department to be interviewed regarding that incident.
Q. That incident was connected to the murder investigation you were working on as well; is that correct?
A. That is correct.
Q. When you met with the defendant that day, prior to speaking

to him, was he admonished?
A. Yes. Sergeant Mike Gantt was the one who admonished Mr. Poston.
Q. And do you recall, what did he admonish him on?
A. He admonished him on -- I am sorry, can you repeat the question?
Q. Sure.
Did he admonish him regarding his right to remain silent and his right to an attorney?
A. Yes. He read him his Miranda rights.
Q. And was this read off of a standard form?
A. Yes.
MR. BRYDEN: Objection, hearsay and no foundation.
THE COURT: Overruled. You may answer.
THE WITNESS: Yes. I was present when Sergeant Gantt admonished Mr. Poston and he did it out of a statement form which has the Miranda rights.
MR. FORD:
Q. And can you tell us what those rights are?
A. Can I pull out the statement form and I can read it verbatim.
MR. FORD: Your Honor, may he pull out the form?
THE COURT: Sure.
MR. FORD: Go ahead.
THE WITNESS: It read as follows: "You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you are being questioned. If you cannot

afford a lawyer, one will be appointed to represent you regarding answering the questions if you wish one. Do you understand each of these rights that I have explained to you?"

MR. FORD:

Q. Did the defendant answer that question?

A. Yes.

Q. And what did he say?

A. He answered by saying "yes."

Q. And did he appear to understand?

A. Yes.

Q. What was done after Sergeant Gantt read him his Miranda rights?

A. At one point during the interview, Sergeant Gantt confronted Mr. Poston with the incident and then after that, Mr. Poston asked for his lawyer. So we terminated the interview.

Q. How long had you been speaking to him prior to Sergeant Gantt bringing up the incident he had been arrested for?

A. I believe he admonished him -- since the admonishment started to when he asked for a lawyer, I believe was within 10 minutes.

Q. At any time during this interview, was the defendant threatened?

A. No.

Q. Were any promises made to him?

A. No.

Q. Was he physically assaulted at any time?

A. No.

Q. Did the defendant appear to be under the influence of any alcohol or drugs?
A. No.
Q. After the defendant invoked his right to an attorney, you mentioned that this interview was terminated?
A. Yes.
Q. What happened next?
A. Me and my partner, Sergeant Gantt stepped out of the room and then we made arrangements to transfer Mr. Poston to jail.
Q. And what did you do to transport the defendant to jail?
A. After we had terminated and we had the appropriate documents to make the transport, we went back inside the interview room. Mr. Poston was handcuffed and then transported from the building to one of our cars.
Q. Did you transport him to one of your cars?
A. Yes.
Q. And during that time, did the defendant say anything to you?
A. Yes. As we were walking to our vehicle, Mr. Poston asked me what he was being charged with.
Q. And prior to him asking that, had you been talking to him during that walk about the case or any of the charges?
A. No.
Q. I am sorry, what specifically did he ask you?
A. I believe he asked me what he was being charged with.
Q. And what did you do when he asked you that?
A. I told him he was being arrested for attempted murder.
Q. And what happened after you said that?

A. After I told him that, he spontaneously told me, "I wasn't trying to kill him. I was only trying to get him off me."
Q. Did he say anything else to you after that?
A. I remember there were other conversations that um, but I don't remember exactly what it was.
Q. Was that the only thing he said in relation to the charges in this case?
A. That's the only thing that I believe he said that was pertinent to the case, yes.
Q. Okay.
And when he responded that he wasn't trying to kill him, he was only trying to back him off, had you asked him anything else other than what you have already testified to?
A. No.
MR. FORD: Thank you. I have nothing further.
THE COURT: All right.
Thank you, Mr. Ford.
Mr. Bryden.
MR. BRYDEN: Yes.

**CROSS-EXAMINATION**

**BY MR. BRYDEN:**

Q. Good morning, officer.
A. Good morning.
Q. Isn't it true that when Mr. Poston was arrested by a warrant, that he was informed of what he was charged with?
A. I myself, I never told him what he was being charged with at the time of his arrest.
Q. So prior to him being interviewed, he did not know why he

was arrested?

A. I didn't tell him. I don't know if the arresting officer in the field told him or not.

Q. Was this alleged declaration that he made as he was getting into the police car, was this recorded in some way?

A. No. The only thing that records is -- well, the rooms where we conduct interviews are equipped with sound videotape. As we were walking to the car, it was not being recorded.

Q. And neither you nor sergeant Gantt had a so called PDR device in operation at that time?

A. CID investigators do not have PDRD's.

Q. Did you somehow make a written record of this exchange between you and Mr. Poston?

A. Eventually, yes. I wrote it down in my followup, but not then.

Q. When did you do that?

A. When I was writing my followup. I don't remember the exact date.

Q. Was Sergeant Gantt present when Mr. Poston said something to the affect that he wasn't trying to kill somebody, he was just trying to get them off of him? Was Sergeant Gantt present?

A. Yes, he was present.

Q. So he would testify to the same thing as you?

MR. FORD: Objection, speculation.

THE COURT: Sustained.

MR. BRYDEN:

Q. After you had terminated the custodial interrogation of Mr. Poston and were walking him to the car, did Sergeant Gantt

say something to the effect that Mr. Poston was a poor shot, a bad shot?

A. I don't recall.

Q. Okay.

Did you say something to the effect, that you felt that Mr. Poston was a bad shot or poor shot, because he had not been able to kill Mr. Lister?

A. I don't recall that.

MR. BRYDEN: Okay.

I have no other questions.

THE COURT: Thank you, Mr. Bryden.

Back to you, Mr. Ford. Anything further?

MR. FORD: No, Your Honor.

THE COURT: Anything further, Mr. Bryden?

MR. BRYDEN: No.

THE COURT: Then what I am prepared to do is excuse Officer Perez-Angeles. It is noted, he would appear later on, but I am going to excuse him for the purpose of this hearing.

Thank you very much, officer. I appreciate you coming to court and sticking around the majority of the morning. I guess the next we will see you is tomorrow afternoon.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you very much. We will see you then. Take care. All right.

The record will show that Officer Perez-Angeles has stepped down and is leaving the courtroom. Thanks again, officer. Take care. We will see you tomorrow.

THE WITNESS: See you tomorrow, Your Honor.

THE COURT: We will start with you, Mr. Ford. Do you wanted to be heard on whether or not the statement purportedly made by Mr. Poston is admissible?

MR. FORD: Yes, Your Honor. I think it is pretty clear from the officer's testimony that this is a spontaneous declaration. The statement regarding, "that I wasn't trying to kill him. I was only trying to back him up off of me" was in response to a question. The defendant initiated the question about what he was charged with. So given his circumstances, I don't believe there is any interrogation, but rather it is a spontaneous declaration.

THE COURT: All right. Thank you.

Mr. Bryden.

MR. BRYDEN: I would like to call Mr. Poston as to the issue to give testimony limited to the issue on the 402 hearing.

THE COURT: You would like him to testify solely on the issue of the events that Officer Perez-Angeles has testified to regarding any statement made by him?

MR. BRYDEN: Exactly. I don't mean to open up the door to anything that may have occurred on April fifth.

THE COURT: I am inclined to honor that request and define whatever it is the defendant says to the events that the officer has described here that occurred on June 14th, 2013 in the vicinity of 10:00 o'clock in the evening either in the interview room, or in the transportation to the walking to the police car.

Any thoughts on the limitation, Mr. Ford?

MR. FORD: That's fine with me, Your Honor.

THE COURT: Okay.

Your name has been pronounced two different ways. How do you like your name pronounced?

THE WITNESS: Poston.

**DONEL POSTON**

Called on behalf of the Defendant as a witness, after having been first duly sworn, was examined and testified as follows:

THE CLERK: Thank you. Please be seated. Would you please state your name and spell your first and last name for the record?

THE WITNESS: Donel Poston, D-O-N-E-L. Last name Poston, P-O-S-T-O-N.

THE CLERK: Thank you.

THE COURT: Thank you, Mr. Poston.

Go ahead, Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. BRYDEN:**

Q. Mr. Poston, do you recall being arrested on June 14th of this year?

A. Yes, sir.

Q. Where did that arrest occur?

A. 106th Avenue.

Q. What time did the arrest occur?

A. In the afternoon, maybe four in the evening.

Q. And when you say four in the evening, are you saying 4:00 p.m.?

A. 4:00 p.m., sir.

Q. Okay.

Do you know the names of the officer or officers that arrested you?

A. No, sir. There was a plethora of officers that got me.

Q. At what point, if at any, were you informed as to the reason you were being arrested?

A. I was sitting on the side of the road on 106th and Foothill, I think the small street may be called Stanley.

Q. And well, what, if anything, were you told sometime around 4:00 p.m. on June 14th as the reason you were being arrested?

A. I asked the officers why they were using such force to arrest me, because they used guns and threw me out the car like I practically robbed a bank or something. So the officer replied that we have you under attempted murder.

Q. At that point, did you become aware that you were being arrested for attempted murder?

A. Yes, sir.

Q. Did you know before Sergeant Gantt and Officer Perez-Angeles interviewed you later that evening about 10:00 o'clock then why you had wean arrested?

A. Yes.

Q. At the conclusion of the interview -- excuse me. At some point, you asked to speak to a lawyer as I understand it?

A. Yes, sir.

Q. The officer today, he has testified that they stopped interrogating you at that point?

A. Yes, sir.

Q. Did you sometime after they stopped asking you questions,

because you had asked for a lawyer, did you ask them why you were being arrested or detained?

A. No.

MR. FORD: Objection, leading.

THE COURT: Overruled.

I am sorry, your answer?

THE WITNESS: No, sir.

MR. BRYDEN:

Q. As you were -- strike that. Did either Sergeant Gantt or Detective Perez-Angeles make any other statements or ask any other questions after you had left the interrogation room at the Oakland Police Department?

A. Yes, sir. He told me that I was a bad shot. He is like, "neither of you could shoot." And I responded, "I wasn't trying to kill him. I was trying to back him off me."

Q. Which officer told you, you were a bad shot?

A. Officer Mike Gantt.

MR. BRYDEN: All right.

I have no other questions

THE COURT: All right.

Thank you, Mr. Bryden.

Mr. Ford, cross-examination.

**CROSS-EXAMINATION**

**BY MR. FORD:**

Q. Good morning.

A. Good morning, sir.

Q. Sergeant Gantt never asked you the question of whether or not you were trying to kill the other individual, correct?

A. No. He made an assertion.
Q. He didn't ask you that question though; did he?
A. No. He made an assertion.
Q. So he didn't ask you any questions at all while you were walking from the interview room to the police vehicle, correct?
A. No, he made an assertion.
Q. What do you mean by an assertion?
A. He led me on. He said, "you were a bad shot."
Q. Did you ask the officers any questions while you were walking from the interview room to the police vehicle?
A. No, sir, because I invoked my right to have a lawyer.
Q. So you knew you didn't have to talk to the police?
A. Why would I talk and I didn't want to talk inside the boiler room, inside the CID room?
Q. So you had all those rights in mind as you were walking to the car, correct?
A. Yes.
Q. And you chose to answer his questions willingly, correct? Oh, I am sorry. He didn't ask you any questions. You chose to tell him that "I wasn't trying to kill him. I was just trying to back him up off me?"
A. Exactly.
MR. FORD: Thank you. I have nothing further.
THE COURT: All right.
Thank you, Mr. Ford.
Back to you, Mr. Bryden.
MR. BRYDEN: I have no further questions.
THE COURT: Either counsel have any other questions on this

issue of Mr. Poston?

MR. FORD: No, Your Honor.

MR. BRYDEN: Yes.

THE COURT: You may step down. Mr. Poston, I appreciate that very much. You want to sit back down next to your attorney. All right.

Mr. Ford, do you have any other witnesses that you want to produce at this hearing?

MR. FORD: No, Your Honor.

THE COURT: Mr. Bryden, do you have any other witnesses that you want to produce?

MR. BRYDEN: No, we don't. Thank you, Your Honor.

THE COURT: By way of argument, back to you Mr. Ford, any additional thoughts or authorities with respect to whether I should allow this statement to be used in trial?

MR. FORD: Well, Your Honor, even under the defendant's theory of what took place between that walk from the interview room to the police vehicle, there still was not an interrogation by Sergeant Gantt. He didn't ask any questions to him. The defendant knew his rights. Having them in mind, did not want to talk to him about the incident. He made a conscious choice to make this statement not in response to any questions. So this is clearly under his theory, if in fact that's what happened, but again, Officer Perez-Angeles testified he doesn't recall any of that. It still does not constitute interrogation.

THE COURT: Thank you.

Mr. Bryden, what are your thoughts?

MR. BRYDEN: Well, first of all, of course, it matters as

the credibility between two witnesses. One witness said, he couldn't recall. He didn't definitively say no, that didn't occur. I think it is more likely than not that the arresting officer warned Mr. Poston why he was charged and that he knew why he was there, based on the first 10 minutes of questioning before he invoked his right to have a lawyer. He must have gleaned during that questioning, the subject matter. So he knew why he was there and the, perhaps mocking him or suggesting him that he was a bad shot seemed to be designed to elicit a response that might inculpate my client. So I will submit it.

THE COURT: Thank you.

Any thought on that, Mr. Ford?

MR. FORD: Submitted, Your Honor.

THE COURT: All right.

Both counsel submit?

MR. FORD: Yes.

THE COURT: Mr. Bryden.

MR. BRYDEN: Yes, I do.

THE COURT: You said that. I just want to make sure there isn't a change of minds.

First of all, with respect to the Miranda admonition, I believe it was appropriately given, properly given in its entirety. So I find that requirement of the Miranda issue has been met.

In terms of the allegation that Mr. Poston has made that maybe Sergeant Gantt told him when they were walking to the police car to transport the defendant to the jail facility that he, the defendant, was a bad shot, Sergeant Perez-Angeles said

he didn't recall that being said. Mr. Poston, of course, does recall it being said and has so testified.

I have had a chance to observe both Mr. Poston and his demeanor on the witness stand and the chance to answer questions, although the questions were brief. I have had the same opportunity to observe Officer Perez-Angeles and make the same observations. My ruling will be that I accept and I adopt the position that Mr. Ford has taken, even if Sergeant Gantt made the statement that Mr. Poston says that he made, that Sergeant Gantt said that Mr. Poston was a bad shot. I don't believe this is the kind of statement that was designed to elicit an incriminating statement or an incriminating response. I believe it is a relatively innocuous statement, but importantly as I have said, it isn't designed to develop or engender an incriminating response. So I find that even if the circumstances were such as Mr. Poston described it, that this is not a violation of the rules regarding interrogation and thus, my ruling is that the statement is not made as a result of the custodial interrogation. As I have said, it is not designed to elicit incriminating responses and thus, I will allow the statement to be made by either counsel should they -- strike that. By the People if they choose to elicit that statement here in trial. So that's my ruling.

With respect to voluntariness, my ruling is applied. Specifically, I believe that under all the circumstances of the statements, that the statement was voluntarily made. So my ruling is it is admissible. It may be used by the People in the course of the trial if they should do so.

MR. BRYDEN: And Judge, I am asking that if I could elicit that from the officer as a say, prior consistent statement, that I should be allowed to bring it up?

THE COURT: All right.

Let me ask Mr. Ford for his position on that.

Suppose Mr. Bryden wants to elicit that from Sergeant Gantt or Officer Perez-Angeles, what is your position?

MR. FORD: I would object that it is hearsay, Your Honor. It does not fall under 1220, being an admission by party opponent. As to his theory of being a prior inconsistent statement. They are only admissible when there is an inconsistent statement made after the consistent statement. I am not aware of one that Mr. Bryden is referring to that would allow this to be admissible as a prior inconsistent statement.

THE COURT: Give me just a second Mr. Bryden.

Thank you, Mr. Ford.

You want to be heard further, Mr. Bryden?

MR. BRYDEN: No, but my request would extend to also, I want to elicit this from Mr. Poston. So --

THE COURT: Thank you. In other words, if you call him as a witness in your own case and as a witness in his own behalf, may he address that question and answer in the fashion that he has, I presume here in this courtroom?

MR. BRYDEN: Hopefully it will be similar.

THE COURT: Mr. Ford, any thought on that?

MR. FORD: Well again, Your Honor, that is still hearsay. His statements at that time to the police.

THE COURT: No, I believe that Mr. Ford is right. This is

a hearsay statement. It may be offered as a, if it is offered against the declarant in an action to which he is a party. That's Rule of Evidence Code section 1220, but it would not be the, it is offered on behalf of the person. It is not admissible. So obviously, Mr. Poston may testify if he chooses to do so, but this statement would be hearsay if offered in his favor. It is not a statement offered against the declarant in an action which he is the party. Only the People can offer such a statement. So that's my ruling. All right.

We have several other matters which we can offer in limine. Some of which require further in camera hearings. We have scheduled those tomorrow at 1:30.

This afternoon, we have scheduled the appearance of Mr. Lister, also known as Mr. McNeely who will be appearing with his counsel, Mr. Steckler. And we will address the issue of whether Mr. Lister will invoke the Fifth Amendment privilege if he is asked questions regarding the facts underlying the charges that appear in the Information.

Now, in that respect, Mr. Ford has submitted a case which we made note of earlier and that is *People vs. Hill*, 3Cal.4th, 959 at 991. And I see *People vs. Frierson*, which is a 53Cal.3d, 730 at page 743. And I have read the *Hill* case and I apologize, I was not aware of the additional case you cited. I have read the *Hill* case. The *Hill* case will stand for proposition that I have read it is appropriate to have Fifth Amendment privileges if they are going to be invoked, to have that done outside the presence of the jury.

What's your understanding of what the *Frierson* case says?

MR. FORD: It is more or less exactly the same thing. It is appropriate for it to be done outside the presence of the jury.

THE COURT: Mr. Bryden, have you had the chance to review both *Hill* and *Frierson*?

MR. BRYDEN: Yes.

THE COURT: Any thoughts to the contrary of what Mr. Ford has asserted?

MR. BRYDEN: No. It is somewhat consistent, but I will make a nuance distinction. The *Frierson* case, citing the case called *People vs. Pugh*, 145Cal.App.3d, 854 and *Frierson* is in agreement. The Court has discretion as to whether or not to have somebody invoke in front of the jury or not. The Court seems to pretty clear that the preferred thing is to have the determination as to whether a declarant is going to invoke the fifth to be determined outside the presence of the jury, but the Court has that discretion and I think *Frierson* suggests that if the defense requests an instruction to the effect that the reason Mr. Lister is not called as a witness, it isn't because I am not trying to call the available witnesses or get the best evidence is because he hasn't evoked the fifth and that the Court cannot -- I mean, not the Court. Excuse me. The jury cannot infer anything from Mr. Lister's invocation. So again, we are still asking that I be allowed to call him as a witness in front of the jury. And if that doesn't occur, that we will later ask for these instructions discussed in *Frierson*.

THE COURT: I note that in the *Hill* case, which I have read, that the Supreme Court indicates that the preferred

practice would be to litigate the issue of the Fifth Amendment privilege and invocation out of the presence of the jury. It does note that the trial Court inform the jury in the language quoted in the *Hill* case at page 991, "this Court, the Court is taking judicial notice of and hereby advising the jury that Michael McCray, the witness in the case, was called as a witness in this case, outside the presence of the jury and that Michael McCray was advised by his counsel, refused to testify based on his refusal of his constitutional privilege against self-incrimination." The Supreme Court goes on to note, "the jury was clearly and adequately informed of the reason why McCray did not testify." So that was a factor the Supreme Court took note of and that the trial Court did. What I am going to do is just take a quick break to go into chambers get the Frierson case and I want to check that issue out. Your recollection of *Frierson* is that the same thing happened in the trial court?

MR. BRYDEN: No. A little different, but it concurs with what you are stating the *Hill* thing is if the defendant had asked for that instruction that you're suggesting it is suggested by Hill, the reason McCray didn't testify, then we do get that instruction. But actually, my recollection in the *Frierson* case, the defendant didn't ask for the instruction. So it wouldn't reversible error.

THE COURT: Was the invocation of the Fifth Amendment privilege of the witness in *Frierson*, was that also done outside the presence of the jury?

MR. BRYDEN: Yes and that's the preferred, but they cite

that the Court has the discretion.

THE COURT: Any thoughts on this, Mr. Ford?

MR. FORD: I believe that that is a correct statement of those cases in that in each of them they did, or the Court did rule that it would have been okay to have given this instruction to the jury about why the person isn't testifying. If the Court is inclined to do that in this case, I would also ask that the Court inform the jury about the fact that the witness is charged with murder so they are not speculating that he is not testifying in this case, because of what we see on the video, the shooting between the two of them right at that location. Otherwise, they are going to be presuming that we are only prosecuting one person and that we are singling him out, when in fact, they both committed crimes in this case and that's the reason why he is not testifying, not for the actions that are seen leading up to it.

THE COURT: Is it correct that neither *Hill* nor *Frierson* discussed that expanded instructions to the jury?

MR. FORD: I don't recall seeing that discussed in either of those cases.

THE COURT: Well, let's do this: I would like to review *Frierson* and I apologize not having done that before. I accept counsel's representation in terms of their understanding of the case. I would like to examine it to determine the circumstances of the instruction. I am not doubting what Mr. Bryden has indicated his understanding is. I would like to read it further to see if there is any light that can be shed on whether or not I should expand the instruction past simply that that was given

in the *Hill* case, the trial court. So I will address this again at 1:30. We will see Mr. Lister here. He is in custody. He will be brought to court and I expect your information remains that Mr. Steckler will be here at 1:30.

MR. FORD: He indicated to me he will be here at 1:30. He does have a matter at 2:00 in Department No. 11.

THE COURT: I will anticipate that we will be able to resolve this in a half an hour. Do you agree with that, Mr. Bryden?

MR. BRYDEN: I will concur with the Court, but I want the Court to give me time. I will do my best to get Mr. Steckler back to 11.

THE COURT: Okay.

We will be back here at 1:30 and I will address the issue of *Frierson* and I will address that issue and we will call Mr. Lister as a witness. What I intend to do is to have Mr. Lister take the witness stand, have Mr. Steckler sit in juror seat number seven so he is available immediately adjacent to the witness and then who I will do Mr. Ford, is have you pose the questions that you would ask of Mr. Lister and I would focus and ask you to focus directly on the incident in question. The date, time and place if you understand it and pose questions that could be directly answered by the witness in terms of his involvement. And, of course, we will give him the opportunity to invoke the privilege if he chooses to do so. And I would give him the opportunity to confer with his attorney if he chooses to do that.

MR. FORD: Your Honor, when you review the *Frierson* case

this afternoon, I would also ask that you review Evidence Code section 913?

THE COURT: I can do that.

MR. FORD: It puts my argument into context.

THE COURT: Evidence Code section 913?

MR. FORD: Yes.

THE COURT: My reading over the noon hour will be the *Frierson* case and Evidence Code section 913 and I will review any of the cases that Mr. Bryden called my attention to. *People vs. Pugh*, I think you said?

MR. BRYDEN: Yes.

THE COURT: Okay.

See you all at 1:30.

MR. FORD: Okay.

THE COURT: All right.

Mr. Poston, we will see you at 1:30.

THE DEFENDANT: Yes, Your Honor.

**AFTERNOON SESSION, MONDAY SEPTEMBER 9, 2013**

**PROCEEDINGS**

---oOo---

THE COURT: Let's go back on the record in the matter of the People of the State of California versus Donel Poston. The record will show we are in open court. Mr. Poston is present with his attorney, Mr. Bryden. Mr. Ford is representing the People. Mr. Lister is the subject of our hearing. He is present in the building. His attorney is not yet here. That is Mr. Steckler.

So what I propose to do is wait for Mr. Steckler and talk about some other issues in law.

I have read the *Frierson* case, F-R-I-E-R-S-O-N, 53Cal.3d, 730. In particular, the language at page 743 and, of course, I have reviewed *People vs. Hill*, H-I-L-L, 3Cal.4th, 959. Does either counsel have anything in addition that they want to add or urge the Court with respect to what either or both of these cases hold?

MR. FORD: No, Your Honor. Unless there is something you want me to address?

THE COURT: Not now.

Mr. Bryden, how about you?

MR. BRYDEN: No. Thank you.

THE COURT: I am inclined to follow both the *Hill* and *Frierson* case in the sense that it appears to me that the better practice that has been affirmed several times by the California Supreme Court is in instances where the Court anticipates the witness may invoke the privilege against self-incrimination,

Fifth Amendment privilege or any other applicable privilege to avoid testimony, that that should be done outside the presence of the jury. So I will adopt that process and I preliminarily indicated that that is the process that I anticipate following. The law squarely supports that.

I note as we previously discussed that the trial Court in the *Hill* case advised the jury that the defendant -- strike that. That the witness with the advice of his counsel, has refused to testify basing his refusal on his constitutional privilege against self-incrimination and the Supreme Court appears to approve that instruction. So if I am requested to so instruct the jury, I will so instruct the jury. I am inclined -- strike that. I will not expand that instruction. However, to indicate such things as in this case, the witness, the person who is identified as the victim in our complaint, or Information has been charged with murder. If that's a relevant fact. One that would cause more speculation, give rise to more confusion and speculation and it wouldn't solve and thus, the probative value of such an additional instruction is far outweighed by the prejudice that would result from it, that being confusion of the jury on issues that are not before us. So if I am asked to do it, I will instruct the jury in the same fashion that the trial Court did in the *Hill* case. And that instruction is set out in full at 3Cal.4th at page 991 down at the bottom of the page. So that's my ruling. So what we will do is, wait Mr. Steckler's arrival.

MR. FORD: Your Honor?

THE COURT: Yes.

MR. FORD: Would the Court allow me to elicit that Mr. Lister has been arrested for murder in relation to this case?

THE COURT: No.

MR. FORD: Your Honor, may I make a couple of points as to the reason why I would like to do that?

MR. FORD: In the *Frierson* case and the *Hill* case, they didn't expand beyond that general instruction. And one of the reasons they didn't is because there wasn't an issue in that case as to the reason for why those witnesses were invoking their Fifth Amendment right against self-incrimination, because this each of those cases, the witnesses, well, the reason why they invoked is because they were going to be accused of for the defense in this case whether they were the person that actually committed the crime for which the defendant was charged. So there wasn't any issue of confusion. The jury was very much aware of why they weren't testifying. Whereas in our case, they are not going to be aware and they are going to starts speculating possibly about the witness not testifying because of in fact maybe, I don't know, the defendant is innocent and he committed the crime for which the defendant is charged here, which is not the case and I think if you look at Evidence Code section 913, the rationale behind it is to insure that the jury does not make any improper inferences.

THE COURT: Thank you, Mr. Ford. I am going to get to you in just a second, Mr. Bryden. I am going to look at that section. All right. Thank you.

Mr. Bryden, any thoughts or comments on Mr. Ford's request?

MR. BRYDEN: In the context of motions in limine's that I have brought, I kind of have an either or feeling towards this. I have asked that either -- well, I am asking that Mr. Lister be brought in front of a jury to testify if he invokes in front of them. I kind of like the idea of that show up. I also asked that the District Attorney that's prosecuting him come in and make that fact aware, because I think that ultimately, the Alameda County District Attorney's office is pursuing two distinct theories, that if Mr. Lister was saying this was self-defense there, they are saying, no. And you know, Mr. Poston is here in this courtroom saying, this was self-defense and they are saying no. So I think to some degree if they get to murder for Lister, he had no right to be shooting at Mr. Poston and the theory in that case against Lister or McNeely, whoever it is, is that you know, he was the aggressor, that he had no right to use a firearm and his intent to kill Mr. Poston was transferred to this Mr. Fluker. So I am actually sympathetic to bringing all that out.

On the other hand, I feel that if the District Attorney that's prosecuting Lister isn't to testify as to these two conflicting theories and my point being is, if the District Attorney's office has reasonable doubt at to what happened, the jury should have reasonable doubt as to what happened given the same sets of facts or the same videotape.

On the other hand, if I am not getting all that in, then I am concerned about some sort of discussion about Fluker's death causing prejudice against my client and them wanting to punish him in a sense for a crime he is not charged with. So I have

mixed sympathy here depending on all of the rulings and how it plays out as to what's coming in.

THE COURT: I appreciate the mixed sympathies, but I need to know mixed sympathies, notwithstanding, do you ascribed to the request that Mr. Ford is making, or are you objecting?

MR. BRYDEN: If Lister is not going to be brought in front of a jury and the Court denies my motion in limine, number four, then I am in favor of what Mr. Ford is saying.

THE COURT: I appreciate that. I have not yet litigated your motion number four. I am prepared to do that and I appreciate the remarks that you just made and when we do get to that, I will certainly incorporate all those remarks as you have stated them again, although you are free to again restate them, but I will address that issue.

My inclination remains the same and that is that assuming for the moment, that we are getting ahead of the hearing, we have not yet conducted that. In fact, if Mr. Lister does invoke his Fifth Amendment privilege out of the presence of the jury which appears to be a better practice of underscoring by *Hill* and *Frierson* and other cases cited and if I conclude that he will, he, Mr. Lister will continue to invoke his Fifth Amendment privilege on any question related to these events, the subject of this trial, I will honor that privilege and not require that he be brought in in the presence of the jury.

Now, with respect to instructions I will give the jury in view of the holding of *Hill*, I will follow the instructions or paraphrase the instruction that the *Hill* trial court gave that the Supreme Court approved, regarding the reason for the witness

not being present and that he invoked his right against self-incrimination, but I will not instruct the jury any further. I will not instruct the jury as to the fact that Mr. Lister has been charged with murder or anything about that pending action. I think that is irrelevant to the proceeding and I think it does exactly what the Evidence Code suggests under section 913 I should not do. So I am not going to do it and that's my firm ruling, that what I will instruct the jury is that which the *Hill* case approved and that's it.

Now, we haven't as I have said, litigated your motion number four and that's a serious motion and one I intend to address seriously and I will do so when we get Mr. Lister and his attorney dealt with with respect to this hearing.

Anything further on what I have just said though with respect to instructions to the jury?

MR. FORD: No, Your Honor.

MR. BRYDEN: No, thank you, Your Honor.

THE COURT: Okay.

The offered stipulation will be Exhibit No. 1 for identification. All right.

(Whereupon, a brief recess was taken.)

Let's go back on the record in the matter of People vs. Donel Poston. Again, Mr. Poston is present in court with his attorney, Mr. Bryden. Mr. Ford is present representing the People and the Court's staff is here.

Mr. Lister is in the building, however, his attorney has not yet appeared. And so, I don't want to proceed with Mr. Lister in the absence of his attorney. So we will put that

on the back burner and we will turn instead to other motions. There are several possibilities. One would be -- well, let me indicate that Mr. Ford, that you have asked with respect to Mr. Bryden's motion number four, you would like more time to review that. So we will do that tomorrow morning.

The record will show that Mr. Steckler has appeared.

MR. STECKLER: Good afternoon, Your Honor.

THE COURT: What is your schedule like, Mr. Steckler with respect to Department No. 11?

MR. STECKLER: In about three minutes, I have three very brief matters on. It is just a matter of picking new days.

THE COURT: Let me suggest this: Your client is in the building. Why don't you go over to Department No. 11 and deal with whatever matters you have there and then when you are done there, you can come back here and we will stop doing what we are doing and shift over to the case involving Mr. Lister?

MR. STECKLER: Thank you. I will do that.

THE COURT: Does that work?

MR. STECKLER: It does. Thank you very much, Your Honor.

THE COURT: We will see you when you get back here. All right.

I was beginning to discuss our options. We can discuss the remaining motions in limine. Mr. Bryden has several other motions in limine, although we may have dealt with those or we may have approved matters we have yet to conduct more in-camera hearings or we can turn to the People's motions in limine, which is a three-page document filed this morning. Or we can shift to the question of the makeup of the written questionnaire, both

sides, both counsel have submitted written questionnaires and we can turn to those.

Do you have a preference, Mr. Ford?

MR. FORD: Whatever the Court prefers is fine with me.

THE COURT: Mr. Bryden, do you have a preference?

MR. BRYDEN: No.

THE COURT: Let me turn to the People's motions in limine. Mr. Bryden, you have a copy of that as well?

MR. BRYDEN: Yes, I do.

THE COURT: All right.

We will take them on the relevance of any none percipient witnesses testifying in the case.

MR. FORD: I don't believe that the defense has any none percipient witnesses. So I will withdraw that motion.

THE COURT: Is that your understanding, Mr. Bryden? That at the present time, you don't have any witnesses who are none percipient witnesses who you intend to call?

MR. BRYDEN: That's correct. However, I would join in the motion and ask that it apply to both the defendant and the prosecution.

THE COURT: All right.

I imagine you have a large list of witness lists that you submitted, Mr. Ford?

MR. FORD: I do. 41 of them.

THE COURT: I would presume -- well, you tell me. What witnesses do you intend to call who are percipient witnesses? Let's assume that Mr. Lister is not among them for the reasons that we are going to litigate later. Let's assume that he

invokes his Fifth Amendment privilege, thus he is not going to testify. Who else is a percipient witness that you intend to call?

MR. FORD: Possibly Uticio (sic), Garcia Chavez.

THE COURT: What number is that on the witness list?

MR. BRYDEN: Number 37 on page three.

THE COURT: Okay. Got it. All right.

Anyone else, Mr. Ford that you intend to call as a percipient witness?

MR. FORD: Rafael Whitlock is also a percipient witness.

THE COURT: What number is he?

MR. BRYDEN: 38.

MR. FORD: And then possibly Tamena Bailey, number 33. Although, I expect the defense is going to call her.

THE COURT: In any event, do you believe she is a percipient witness?

MR. FORD: Yes.

THE COURT: Am I correct that everyone else on this list is not a percipient witness?

MR. FORD: Yes.

THE COURT: Let me ask this: Rather than go through all those names for specific offers of proof, are there any people Mr. Bryden, that you really feel you need an offer of proof at this time, or are you satisfied from your discovery that you pretty well know what other people are going to be saying?

MR. BRYDEN: I am not that satisfied. I am certainly willing to concede that in a sense, technicians that found shell casings and recovered evidence are percipient witnesses of what

they are going to testify to. So I am taking a broader view of percipient witnesses and perhaps Mr. Ford, but some of these names I don't recognize and I am saying this to make an offer of proof now, but if he was to call a witness, or let me know a little bit before he calls a witness, I am going to call this person and I might just want to know what they are going to testify to.

MR. FORD: I am happy to tell him informally off the record, it is a minor point, each one of the witnesses I am going to call.

THE COURT: Why don't you do that. Let me ask both counsel to confer with each other about the none percipient witnesses, what they are going to say. And Mr. Ford, you can inform Mr. Bryden informally of what you understand the witnesses will say and if that is not satisfactory, Mr. Bryden, then we will go on the record and we will deal with it her. That might be a more expeditious way the to deal with this.

MR. BRYDEN: I think you're absolutely right. What I would do is, I could ask if we can have a side-bar. If he says, I am calling Officer Blakely now. If he doesn't tell me ahead of time, I will have a side-bar.

MR. FORD: I will tell you ahead of time.

THE COURT: No. I am asking that Mr. Ford tell you ahead of time so we can possibly avoid a side-bar. I am not at all elected to dealing with it on the record, or in chambers, whatever is appropriate, but I am thinking if the two of you get together and talk, you should be satisfied that you know what these witnesses will say. If there are those that you still are

uncertain about, we will go on the record and deal with it.

MR. BRYDEN: Okay. Thank you.

THE COURT: Let me move on to, the prosecution will be ordered to view all photographs in the real evidence which the defendant intends to offer as evidence in trial for the presentation of evidence.

Mr. Bryden, other than the videotape which we have all seen informally, are there any other photographs or real evidence that you intend to offer at this trial?

MR. BRYDEN: You know, there may be and I would show them to Mr. Ford. I think I gave him some sort of diagram where we had prepared the reports to show the various camera angles, what they depict at the gas station. So we have that. And I think there is some still photograph that we blew up from the frame by frame that I have given to him.

THE COURT: Do you have any objection if I grant this order?

MR. BRYDEN: Just again, I would join in it with the understanding that it is also for the defense.

THE COURT: So I will make that order if it has not already been done that both sides provide the other side an opportunity to review any photographs of any real evidence that either side tends to offer. Before we leave the point of viewing the photographs and so on, let me put on the record an event that occurred on Friday. I had conferred with both counsel by telephone and asked if they'd come into Court if it was agreeable with both sides on Friday of last week. The purpose being that I wanted the opportunity to view the surveillance

video that have been made by the surveillance cameras outside the Valero Gas station that purported to show the events that is the subject of this Information. Both counsel agreed to that and agreed and Mr. Bryden, I believe that you agreed that you will waive the presence of your client for the purpose of you and me and Mr. Ford viewing that video; is that correct?

MR. BRYDEN: That is correct.

THE COURT: So we did meet on Friday and we spent a fair amount of time here first with Mr. Ford and then with Mr. Bryden and his investigator viewing portions of the pertinent portions of the surveillance video. And I appreciate both counsel doing that. So have I stated it correctly that both counsel agreed to this and Mr. Bryden, have you waived the presence of your client when we did in fact view the surveillance video or recording on Friday of last week?

MR. BRYDEN: Yes, Your Honor.

MR. FORD: Yes, Your Honor.

THE COURT: So I am granting number two. It is a reciprocal order. Both counsel ordered it. Provide an opportunity for opposing counsel to view all photographs and any real evidence which either side tends to produce.

Number three is an order that I dealt with in part with respect to two witnesses this morning. An order that all witnesses, request for an order that all witnesses be excluded prior to their testimony and while they are subject to recall. And admonish witnesses that they are not to discussion their testimony until the conclusion of the trial. I am inclined to grant that and I have granted it with respect to two witnesses

who were here in court this morning.

Do you want to be heard at all on this, Mr. Bryden?

MR. BRYDEN: I don't think I want to call them, but I may call the Walt Stannard who is my investigator to authenticate any pictures that he took at the gas station after the incident and I would like to name him as my lead investigator in case he comes in at some other point.

THE COURT: All right.

Let me indicate what I generally do with respect to exclusion orders, witness exclusion orders. I accept from that order, the investigator or investigators employed by defense counsel that are helping defense counsel in the preparation of the defense in the case and I accept from the order, the District Attorney investigators or inspectors who are similarly helping the prosecution with the case. My general policy is to allow these individuals to be in court at any time, even if they are going to testify in the case. Now, your inspector, this is a matter of some transition at this point. Do you know who your inspector is going to be for the remainder of the trial?

MR. FORD: I believe it is going to be Steve Brown. Although, I am not certain. I haven't spoken with him yet.

THE COURT: Let's do this: What I am inclined to do is to allow any investigator that is working with you, any inspector that is working with you, Mr. Ford, to be present in court at any time, during any part of the trial, even if that person is going to be called to testify as a witness.

Similarly, in this case, your investigator is Mr. Stannard. So he may be present at any time in court and even if he is

called as a witness to testify. And I will ask Mr. Ford, when he is informed of any other people who are helping him out, investigators or any other people, just tell the Court and counsel. Does that work?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes, Your Honor.

THE COURT: Okay.

Let's move on. So that is granted with the exception that's made for investigators and inspectors.

Number four. Should the defendant testify, the People seek to introduce evidence of the defendant's felony convictions involving moral turpitude pursuant to *People vs. Castro*, 38Cal.3d, 301 and *People vs. Beagle*, 6Cal.3d, 441. And Mr. Ford has listed seven felony convictions for a variety or offenses that he enumerates in this motion. So I think it is incumbent on the Court to conduct a hearing pursuant to the cases that Mr. Ford cites; *People vs. Castro* and *People vs. Beagle*.

In conducting this hearing, I think this is the type of hearing that does require at presentation of evidence that we can deal with it on offers of proof made by either counsel.

Does that work for both counsel?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes, Your Honor.

THE COURT: So let me just go through the list here. The list appears to be in reverse numerical order. Arranging from a felony conviction in 1996 for a violation of section 11360 of the Health and Safety Code. 1999, a violation of Section 11352 of the Health and Safety Code. 2002, a violation of section 476

of the Penal Code. In 2002, a violation section 11360 of the Health and Safety Code. 2003, a violation of section 11351.5 of the Health and Safety Code. 2007, a conviction for Vehicle Code section 2800.2. And most recently, 2008, a violation of section 475(a).

Mr. Ford, you had cited cases in your moving that I presume indicate that each of these particular felony convictions is a conviction for a crime of moral turpitude; is that right?

MR. FORD: Yes, Your Honor.

THE COURT: The particular code section involved has been declared by the Appellate Court as being a crime of moral turpitude.

MR. FORD: That's correct.

Now, with respect to *People vs. Lopez*, which is cited as the first felony conviction for PC 475 and then the fifth one was for PC 476, it is my recollection, that case deal with a violation of 470. However, they are both forgery cases or fraud type cases. It is the same class of crimes, even though it doesn't specifically list that Penal Code section.

THE COURT: All right. Thank you.

Give me a second. All right.

The first matter that we need to deal with are the felony convictions for crimes of moral turpitude. If they are not then that's the end of the inquiry. My understanding of each of these violations is that they are crimes of moral turpitude. So that's not the end of the inquiry, but that initial part, I am satisfied at least preliminarily that they are.

Mr. Bryden, how about you? Do you have any --

MR. BRYDEN: I will submit on that determination.

THE COURT: I am going to find that these all, all seven of these felony convictions are for crimes of moral turpitude. Now there are other issues to deal with. One is the issue of remoteness. The most distant in terms of time, the date of offense is 1996 for a violation of section 11360 of the Health and Safety Code. Standing alone, that might raise issues of remoteness. However, the case law indicates that an offense where you gain too remote only, if the defendant has lead a legally blameless life since the prior conviction. If he has not lead a legally blameless life, there is no issue of remoteness. Many cases hold this. *People vs. Muldrow*, M-U-L-D-R-O-W, 202Cal.App.3d, 636 at page 647. *People vs. Burns*, B-U-R-N-S, 189Cal.App.3d, 734 and 738. *People vs. Beagle*, 6Cal.3d, 441 at page 453. *People vs. Mendoza*, M-E-N-D-O-Z-A, 78Cal.App.4th at page 925. That's 918 at page 925. And *People vs. DeCosse*, 183Cal.App.3d, 404. It would appear just from looking at this document that Mr. Poston has not led a legally blameless life. Since 1996 he has had six subsequent felony convictions. 1999, 2002, again in 2002, 2003, 2007 and 2008. So I am inclined to say the remoteness is not an issue based on the cases that I have cited here.

Anyone wanted to be heard on that, Mr. Bryden?

MR. BRYDEN: Yes, Your Honor. Respectfully, we actually would object to the felony conviction in 2003. The one -- both in 2002, the one in 1999 and 1996 as being remote and also unduly prejudicial in terms of the balance and the probative value of the moral turpitude because of remoteness, I think it

is prejudicial. It has been some 13 or 10 years since the 2003 one. Since 2008 he has led a blameless life. So because I think it is just unduly prejudicial, a consumption of this Court's time, the probative value in balancing also with the crimes, although these crimes except for the 476 you could make a fair argument that the Court's have found them to be moral turpitude, but then there is moral turpitude and then there is greater moral turpitude. I think 475, 476 speaks more to dishonesty than drug possession or drug sales. So it is just my opinion. So slight in terms of the moral turpitude crimes where he is lying or deceiving, that he is committing crimes and so we just want the record to be clear that we would object to those.

THE COURT: All right. I appreciate that.

Do you want to be heard, Mr. Ford?

MR. FORD: Just to briefly respond. The Court has properly indicated I believe, that in fact, the defendant has not led a legally blameless life. So they are not too remote. As for the convictions he suffered other than the fraud/forgery conviction, the law is such that it doesn't necessarily have to be one to show dishonesty, but also one that shows a readiness to do evil and those convictions do in fact show that. And that's why they are moral turpitude and they are probative as to the defendant's credibility.

THE COURT: All right.

I appreciate it. Thank you. Is it submitted on this part of the issue here?

MR. BRYDEN: Yes, Your Honor.

MR. FORD: Yes.

THE COURT: As I have said, the cases are clear that an offense will be deemed remote only if the defendant has led a legally blameless life since the prior conviction and it is clear from, except in the offer of proof that these convictions in fact occurred on the dates in question and for the offenses in question. It is clear that Mr. Poston has not led a legally blameless life. So he has had a continual series of felony convictions, seven in number beginning in 1996, but going on an almost yearly basis, '99, 2002, 2003, 2007 and 2008. So for that reason, I feel that the issue of remoteness is no longer before this Court.

Now, there is perhaps a related issue and that is, the number of prior convictions. Sometimes a numerosity is used. I am not sure that's really a word, but it applies that some consideration should be made for the number of prior convictions that would be used. Here would be seven.

Do you have any thoughts on this, Mr. Ford?

MR. FORD: Yes, Your Honor. It is kind of in line with the reasoning of the Court for the prior factor in that it shows that he has not lived a legally blameless life and has been committing these crimes of moral turpitude continuously in his adult life. And so the fact that it shows one after another after another shows that this is a person who has issues of moral turpitude. Whereas, if you took out three or four of them, then it could appear that maybe this person has only committed these crimes in short periods, something was going on in their life, but rather when you get them all together, it is highly probative as to the witness' credibility that he engages

in these crimes and has a life involving committing crimes of moral turpitude.

THE COURT: All right. Thank you.

Mr. Bryden.

MR. BRYDEN: I do think the number of the offenses is unduly prejudicial and is a danger of ~~finding that he is a bad~~ person. None of these have any kind of assaultive conduct associated with them whatsoever. I wouldn't want the jury to be misled by numerous felony convictions my client has suffered and believe he must be guilty of this particular assaults.

THE COURT: All right. Thank you.

Is it submitted on this issue?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes.

THE COURT: Again, the case law is clear that the number of prior convictions that are contemplated is one of the factors to be weighed in the evaluation under section 352 of the Evidence Code balancing prejudice versus probative value. And there is only one. There are a number of cases that -- and I will quote from in a minute that stands for the proposition that a series of crimes evidencing moral turpitude is more probative than a defendant's willingness to give false testimony than a single such offense. This is a specific holding in the case of *People vs. Lewis*, L-E-W-I-S, 191Cal.App.3d, 1288 at page 1297. And it is the holding of several additional cases, *People vs. Holt*, 37Cal.3d. at page 452. *People vs. Dillingham*, 186Cal.App.3d, 688 at page 695. And *People vs. Clark*, C-L-A-R-K, 2011 case, 52Cal.4th, 856, pages 932 to 933. In this most recent case, the

*Clark* case, the Supreme Court specifically held that a series of crimes is more probative than a single crime. So I am aware of the number. The number seven is not dispositive by itself. I will allow each of these, because I feel that in the beginning, it shows a series of crimes which has probative value of it in itself, more probative than a single crime. I don't see any similarities between any of these charges and the offense that is charged. That is attempted murder. That is another factor for the Court to consider, although the case law has held that even identical offenses may be used to impeach if they are crimes of moral turpitude. However, in this case, our case, it doesn't appear that any of these crimes are for offenses similar to, or identical to the attempted murder charge which is the principle charge here. So I am going to allow them all to be used if Mr. Poston does testify as a witness in his own behalf in terms of the number of offenses.

Now, are there any other grounds that you would urge the Court to consider in terms of either restricting or limiting the admission of these prior convictions, Mr. Bryden?

MR. BRYDEN: No, I would submit it.

THE COURT: All right. Thank you. That will be my ruling. Let me just make two additional comments although not specifically raised, but it is a fact that this Court will consider and does consider. One is, Mr. Bryden is represented here, although this is a decision that is obviously his and his client's to make. His statement is not binding at this point. That he does anticipate his client will testify in this case. One of the factors that is occasionally raised in the court is

whether or not the Court's decision, trial Court's decision on whether or not the defendant would be impeached with prior convictions will have an effect on his decision to testify or not to testify. The courts have dealt with this subject before. The courts have stated several things. One being, a defendant, if he is a witnesses in his own behalf is not entitled to a false aura of veracity. He should not be allowed to in effect blackmail the Court by threatening not to testify unless he is allowed to do that with a false aura of veracity. Now, make no mistake, I am not accusing Mr. Bryden of trying to blackmail this court. That's not my understanding at all. I used the word, blackmail, because that's the language that courts used, the Appellate Courts have used in evaluating the affect of a trial court's decision and on a defendant's decision as to whether to testify or not and how the Court should consider. They use the word blackmail and I will emphasize that I am not in any way implying that I think Mr. Poston or Mr. Bryden are doing that kind of thing. Not at all.

The cases that I cited that use that word include *People vs. Johnson*; 193Cal.App.3d, 1570 at page 1579. And, of course, the *Beagle* case itself which is cited by the Court in People vs. Johnson. That is 6Cal.3d, at page 453.

One final issue that has been raised as part of the Court's analysis and that is, should the Court sanitize any of these priors? That is, eliminate specific reference to specific code sections or description of what the offense is to keep those facts from the jury. In my conclusion is no. I will not sanitize that. In other words, if the defendant testifies, he

can be impeached by each prior conviction and the jury maybe informed by way of questions and otherwise of the nature of the prior conviction. What it is for, the code section it is for, what it means -- strike that. What the offense is, a description of the felony offense?

MR. FORD: Your Honor, may I inform the jury it is a crime of moral turpitude?

THE COURT: No. The defendant may be impeached by his prior convictions. That is, what the crime is for, what the conviction is for and a brief description of what the offense is. The date of the conviction and the court in which the conviction took place. An additional -- the question of moral turpitude is a legal decision the Court makes, but it is not one that I feel is relevant for the jury to initially consider. In effect, it is not a comment by the prosecutor or the Court to ask any of this on the crime. I don't feel that's appropriate. The cases that indicate that sanitation is not necessary or appropriate, include *People vs. Valentine*, V-A-L-E-N-T-I-N-E, 42Cal.3d, 170 at page 182 and footnote 8 and *People vs. Rollo*, R-O-L-L-O, 20Cal.3d, 109 at page 118 to 119. And the reason why the Courts hold that the trial court should not sanitize the prior felony so they are used to impeach is that it is the nature of the felony, which is probative as to credibility to sanitize and prevent the jury from making a meaningful assessment of the relevance of the prior conviction. And it will encourage speculation by the jury. There are a number of other cases that deal with that subject, but I feel that the *Rollo* case and the *Valentine* case are dispositive. So that's my

ruling.

And in terms of how this is done, obviously the most expeditious way to deal with this is when the defendant testifies as a witness, he may be asked by counsel. But isn't it a fact that on a particular date in question, he was convicted of a felony offense, to wit: A description of what the offense is, the code section and a brief four, five, six word description of what that offense is. And that's a felony. The defendant, if the defendant admits that, that is true, then there are you know, there would be no need for any further proof. If the defendant denies that or gives answers and the people may prove it independently by independent evidence. Minutes orders, court records and the like, but that most expeditiously would be for counsel to address these questions.

Now, if the defendant testifies, Mr. Bryden would be calling him and there is nothing preventing Mr. Bryden from asking these questions of his client. If Mr. Bryden doesn't ask all the questions, you may do so. Again, if the defendant denies these prior convictions, you may bring in the appropriate proof; witnesses or documentary evidence.

Any questions about the procedure?

MR. FORD: No, Your Honor.

THE COURT: Mr. Bryden.

MR. BRYDEN: No, Your Honor.

THE COURT: Okay.

Then moving on, People's motion number five. Order the defense not make speaking objections, claim discovery violations, make motions to dismiss, *Wheeler/Batson* motions,

motions for mistrial, motions for sanctions within earshot of the jury. Now, I am inclined to grant this, but I would like to amplify it more when we get to talking about the ground rules so to speak of how the Court conducts trials. So my inclination is, as I have said, to grant this request, but I would like to speak a little more length on this so, in effect I am asking you to confer consideration of this until later.

Does that work for both counsel?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes.

THE COURT: The People request to use exhibits during the opening statements.

MR. BRYDEN: No objection.

THE COURT: Okay.

And it is, my practice has generally been that if either counsel believes in good faith that a particular exhibit is going to be used during the course of the trial, that they may use that exhibit in their opening statement. And that covers any type of exhibits; photographs, recordings, other documents, things of that nature. I presume that both counsel will be aware of all those exhibits by way of the discovery process. But that's -- my inclination is to grant that.

You have no objection, Mr. Bryden?

MR. BRYDEN: That's correct.

THE COURT: Then I will grant this motion.

Next, any party seeking to introduce an audio recording, have the tape ruled admissible by the Court and provide the transcription of the tape recording to opposing counsel prior to

the tape being played. Citing California Rules of Court, 203.5 and 503.5. Are there any audio recordings that are going to be played to this jury?

MR. FORD: Potentially there are some jail calls, Your Honor, but that might depend on how the witnesses are testifying. There is also a YouTube video that I would like to play of the defendant.

THE COURT: I am sorry, say that last thing again? A YouTube of what?

MR. FORD: A YouTube video of the defendant. It is about two minutes long that I would like to play.

THE COURT: Has this been the subject of discovery?

MR. FORD: It is.

THE COURT: Thoughts of any of this generally or specifically?

MR. BRYDEN: Well, specifically, I have no objection to the first part of the motion, the generalization that you provide a transcript of any audio recordings and seek admissibility first. So I won't object to that portion. I would make a relevancy objection and an Evidence Code 352 objection to the specific portion of motion in limine number seven as to the YouTube video. I don't think relevant to anything that has issue here. I think that culturally speaking, people have different tastes in music videos and can have a strong aversion to them. This is a video, just to describe it briefly where Mr. Poston is holding a large amount of money in one hand and I think a replica gun, and maybe it is a real gun in another hand. It was created for a specific entertainment purpose I think and it has really

nothing to do with the issue. Although certain individuals, myself included. I am more of a Sinatra kind of guy, could have a deeper aversion.

THE COURT: I should rule inadmissible or admissible based on your Sinatra preference.

MR. BRYDEN: So I just don't think it is relevant and I think it could be prejudicial in that you know, different people don't get excited when Clint Eastwood is waving a gun on television, but some people may be revolted by rap music and guns and that sort of association.

THE COURT: Well, let me ask you this: It would seem to me that this would cry out for a hearing outside the presence of the jury so the Court gets a chance to look at this. Does that work for both counsel?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes. I don't see how you could rule without seeing the video. I just wanted to make sure --

THE COURT: You framed the issue well. Why don't we set up a time when we can do that at a later juncture as to when the Court can take a look at this. You have got this in your computers. So you can play it on the screen here?

MR. FORD: At this moment, I don't have my computer, but I will have it for tomorrow or the next day, whenever the Court would like to do it.

THE COURT: Again, why don't we defer that that until the end of the day. My inclination is to grant this order with respect to ordering that transcription be made of tape recordings and that rulings be made on the admissibility, which

I am going to do at some point with respect to the YouTube and I will discuss this more in detail.

Mr. Steckler has entered the courtroom. Are you free and clear now to stay here for now? And we are going to take a 10-minute recess. And Mr. Steckler, we will bring your client down and then perhaps you can confer with him, what -- just so you understand what I intend to do is have Mr., have your client come on up here and take the witness stand. He is in a wheelchair. So we will perhaps accommodate him, just have him locate himself somewhere down in front of the jury box. I will administer the oath and then note that you are present and representing him and you can sit next to him in the jury box.

It is my intention to address the individual questions to your client that all relate to events that are the subject of this information. And after each question has been posed, then I will give your client an opportunity to speak with you and then he can tell me whether or not he wishes to invoke his right to not testify and invoking the Fifth Amendment privilege against self-incrimination. Does this seem a workable way to deal with this?

MR. STECKLER: Very workable and is there any paperwork or can I inquire; what is the motion? What is this under?

THE COURT: Well --

MR. STECKLER: It is a 402 hearing as a percipient witness and he has been subpoenaed as a witness in the file?

THE COURT: Yes. Are you generally aware of the facts that are alleged to be the source of --

MR. STECKLER: I am very aware of the facts.

THE COURT: My intention is, I was -- given the nature of the facts that give rise to this Information. It was my presumption that there was at least a possibility that your client would refuse to testify and would invoke his Fifth Amendment privilege. The case law indicates that if this is what the Court anticipates what's going to happen and it should be done outside the presence of the jury. And so that's why we are doing this hearing, but I think it is appropriate not to have your client called in court in the presence of the jury and invoke his privilege there, but to do so in a setting like this.

MR. STECKLER: I understand.

THE COURT: My thought would be that if I am satisfied that after -- oh, I don't know how many number of questions are addressed and he invokes some Fifth Amendment privilege and refuse to testify with your consent and advice, I would not go o any further. I would deem that he is unavailable as a witness because of the Fifth Amendment privilege and then I would excuse him and excuse you. That, that's where I anticipate going and obviously, we will see what transpires in court, but does that work for you?

MR. STECKLER: It's does. Thank you very much.

THE COURT: Why don't we take about a 10-minute break and when 10 minutes is over, I am sure Mr. -- your client will be down here before then. So he will be down here before the end of that and you can talk to him and explain to him what we anticipate doing and when you are comfortable proceeding, I will start.

MR. STECKLER: All right.

(Whereupon, a brief recess was taken.)

THE COURT: Let's go on the record in the matter of the People of the State of California versus Donel Poston. This is Alameda County Information number 171976. The record will show that we are in open court, that Mr. Poston is present seated at counsel table. He is accompanied by his attorney, Mr. David Bryden. The District Attorney is present represented by Deputy District Attorney, Scott Ford. Present in court is the gentleman identified to me as Miss Anthony Lister, also known as Mr. Joseph McNeely. I will refer to you -- what is your -- Mr. Steckler, I would ask you what his true name is?

MR. BRYDEN: Can I just ask? Joe McNeely is my understanding.

THE COURT: Then I will refer to him as Mr. McNeely. The record will show that Mr. McNeely is present in court. That his attorney, Mr. Drew Steckler is present representing him and Mr. Steckler, it is correct that you represent Mr. McNeely in another matter before the Superior Court in this county; is that correct?

MR. STECKLER: That is correct.

THE COURT: Mr. Steckler, have you had an adequate opportunity to discuss with your client, Mr. McNeely, what you anticipate to be the scope of our hearing today?

MR. STECKLER: Yes, I have.

THE COURT: Do you need more time to discuss that matter with him?

MR. STECKLER: No.

THE COURT: What I will do is Mr. McNeely, I will have the

clerk administer the oath to you as a witness and then I will ask you to state your name for the record, spell your first and last name, which is a routine we generally follow with all witnesses and then I am going to ask the prosecutor to address a series of questions to you that relate to the events that I am informed are the basis of the criminal action in this trial against Mr. Poston, the defendant in this case. The gentleman seated at counsel table. After each question, I will give you and your counsel the opportunity to talk with each other and you can inform me how you wish to answer that question or how you wish to respond to that question.

Is this agreeable with you, Mr. McNeely in terms of our procedure?

MR. STECKLER: May I speak to him?

THE COURT: Sure. Let me ask you that question, Mr. Steckler?

MR. STECKLER: I would state that one thing occurred. I was present at the preliminary hearing in this case, in the Poston case and Mr. Bryden made some, I don't know if they were arguments, but certainly insinuations about the fact of two names; Anthony Lister, Joseph McNeely. And so as I don't recall it, there were arguments or insinuations. I just assume my client not even state his name. I told the Court just now, my understanding is his true name is Joe McNeely. He is going to be, as you will see shortly, asserting his Fifth Amendment.

THE COURT: I think I will proceed that way, Mr. Steckler. I will accept your representation that this is your client and that your client's name is Joe McNeely and that you represent

him in an unrelated matter.

MR. STECKLER: That's correct.

THE COURT: I am prepared to proceed with that understanding. I do need to have the oath administered to your client, because whatever responses he gives, needs to be under the oath, even if it is invoking the privilege. Do you have any difficulty with that, Mr. Steckler?

MR. STECKLER: No, I do not.

MR. BRYDEN: May I chime in, Your Honor? I also wanted to ask this witness some questions and I was also going to ask him about his identity and I think that the Court has to make a determination as to whether or not he can properly invoke his Fifth Amendment privilege as to questions such as that.

THE COURT: All right.

I appreciate that. I intend to allow, I am going to start with Mr. Ford. I will have Mr. Ford ask whatever number of questions that he feels appropriate to ask the witness. I will afford the witness the opportunity to talk to his attorney and I will give you the same opportunity. Obviously, I want both counsel to ask a limited number of questions, but I will give both counsel the opportunity. In terms of the Court's ability to determine the identity of the person I am speaking to, that is the witness, Mr. Steckler has represented that he is an attorney of law and I know Mr. Steckler to be an attorney of many years standing in this Court. As an officer of the court, he has informed me that he represents this witness, the gentleman seated here and that his name is Joe McNeely. The People have moved and I have accepted this motion and I have

amended the Information to allege two names; Anthony Lister also known as Joseph McNeely. So I think the combination of the names that are stated in the information, Mr. Steckler's representation as an officer of the court, that he represents this man and his name is Joe McNeely, I think I can, I have sufficiently identified in my mind the identity of the person that is sitting here in the courtroom. So I understand your position. I will allow you to ask questions, but then we will go on a question-by-question basis.

So if you will administer the oath to the witness?

**JOE McNEELY**

Called on behalf of the People as a witness, after having been first duly sworn was examined and testified as follows:

THE CLERK: Thank you.

THE COURT: All right.

In lieu of asking the name of the witness as I have said, I am accepting Mr. Steckler's representation here as an officer of the court regarding his name. So what I will do Mr. Ford is, give you the first opportunity to address questions to this witness, Mr. McNeely, regarding events allegedly occurring on or about April fifth, 2013 in the City of Oakland, County of Alameda.

MR. FORD: Thank you.

**DIRECT EXAMINATION**

**BY MR. FORD:**

Q. Mr. McNeely, have you ever been to the gas station located at the corner of Seminary?

A. On advice of counsel, I am asserting my right under the

Fifth Amendment. I respectfully decline to answer this question.

THE COURT: All right. Thank you.

Mr. Ford, you can ask your next question.

MR. FORD:

Q. Do you see the individual in the red outfit to my right? Do you recognize him?

A. Under advice of my counsel, I am as asserting my right under the Fifth Amendment. I respectfully decline to answer that question.

THE COURT: Next question, Mr. Ford.

MR. FORD:

Q. Why are you in a wheelchair today?

A. On advice of counsel, I am asserting my right of the Fifth Amendment. I respectfully decline to answer that question.

Q. Were you involved in a shooting on April fifth, 2013?

A. On advice of counsel, I assert my right under the Fifth Amendment. I respectfully decline to answer your question.

Q. Have you ever been shot before?

A. Under advice of counsel, I am asserting my right of the Fifth Amendment. I respectfully decline to answer the question.

MR. FORD: I don't have any more questions.

THE COURT: All right. Thank you.

Give me just a second, Mr. Bryden before I turn to you. All right.

Mr. Bryden, you may address some questions of the witness.

MR. BRYDEN: Thank you, Your Honor.

///

CROSS-EXAMINATION

**BY MR. BRYDEN:**

Q. Good afternoon, Mr. McNeely.
A. Good afternoon.
Q. My name is David Bryden. I am the attorney for Donel Poston, this gentleman over here. Let me ask you this sir. Have you ever used the name Anthony Lister?
A. On advice of counsel, I am asserting my right under the Fifth Amendment. I respectfully decline to answer that question.
Q. Prior to April fifth, 2013, what was your address, sir?
A. Under advice of counsel, I am asserting my right under the Fifth Amendment. I respectfully decline to answer that question.
Q. Were you employed on or about April fifth of this year?
A. On advice of counsel, I am asserting my rights under the Fifth Amendment. I respectfully decline to answer that question.
Q. Are you known by the nickname, Two Gun Joe?
A. Under advice of counsel, I am asserting my rights under the Fifth Amendment. I respectfully decline to answer that question.
Q. Are you familiar with the general area of Seminary and 98th Avenue in the City of Oakland California?
A. Under advice of counsel, I am asserting my right under the Fifth Amendment. I respectfully decline to answer that question.
MR. BRYDEN: And, Your Honor, I guess you are acquiescing

in his invocation of the Fifth Amendment under advice of counsel and I feel it would be futile for me to ask questions if the answer to every question would be the same each time.

THE COURT: All right.

Thank you, Mr. Bryden.

Let me ask a general question of you, Mr. Steckler. As the attorney for this witness; is it your understanding that the witness will continue to invoke his privilege under the Fifth Amendment to decline to answer any further questions that deal with the subject matter of the Information in this case, the Information that charges Mr. Poston with attempted murder of this witness on April fifth, 2013?

MR. STECKLER: Yes, that is my understanding.

THE COURT: I will hear from counsel if you wish to be heard. My inclination is to honor this privilege and I follow the language in Supreme Court in *People vs. Hill*. I think it would be both futile and a meaningless ritual for us to continue to address additional questions. So what my inclination is, is to allow this witness and Mr. Steckler to leave the courtroom and I will excuse the witness from further testimony in this case.

Do you want to be heard on that, Mr. Ford?

MR. FORD: No, Your Honor.

THE COURT: Thank you.

Do you want to be heard on that, Mr. Bryden?

MR. BRYDEN: Submitted.

THE COURT: Then I make the findings: That I do intend to honor the desires of the witness to invoke the Fifth Amendment

privilege against self-incrimination, to decline to answer any further questions.

Mr. McNeely, thank you very much for attending this Court and Mr. Steckler, thank you very much for attending the Court and for assistance here. Any further thoughts, Mr. Steckler before I excuse your client and excuse you from further attendance?

MR. STECKLER: No. Thank you, Your Honor.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: We will take a short break to accommodate the witness and we will proceed with the in limine matters that don't relate to his testimony.

(Whereupon, a brief recess was taken.)

THE COURT: All right.

Let's go back on the record and the record will show that Mr. Poston is present, seated at counsel table. His attorney, Mr. Bryden is present with him. The District Attorney, Mr. Ford is present. Our witness who was identified to me as Mr. McNeely has left the courtroom. His attorney, Mr. Steckler remains in the courtroom.

Two findings I made with respect to the hearing that we conducted with Mr. McNeely present as a witness that is, that based on his responses to the questions posed by Mr. Ford and Mr. Bryden and his invocation of the Fifth Amendment privilege to the client in answering these questions, I find that he is unavailable as a witness. I am mindful of the language of the Supreme Court in both *People vs. Frierson*, which I previously cited and *People vs. Hill*, which I have previously cited. That

it is the better practice for the Court to require the exercise of the privilege out of the presence of the jury. And further, that it would be inappropriate to require that the witness can be called and again, be forced to invoke his privilege under the Fifth Amendment in the presence of the jury. Again, I make these findings pursuant to *People vs. Hill* at 3Cal.4th, 959 at page 991. And *People vs. Frierson*, at 53Cal.3d, 730 at page 743.

Mr. Ford, let me ask you. Are there any other additional findings that you wish me to make with respect to Mr. McNeely's testimony?

MR. FORD: No, Your Honor.

THE COURT: Mr. Bryden.

MR. BRYDEN: No additional findings, Your Honor, butt just out of an abundance of caution, I am requesting the *Hill* type instruction that is found in 991 and I hope if I am not suffering from some sort of Alzheimer, I will write out that instruction later. So I am going to ask for that instruction.

THE COURT: All right.

I appreciate that. We had discussed this earlier on the record. Let me just repeat the Supreme Court in *People vs. Hill*, 3Cal.4th at page 991 noted that the trial court in that case allowed the invocation of the Fifth Amendment privilege outside the presence of the jury, but the Supreme Court noted that the trial court had informed the jury and I am going to quote what the trial court addressed to the jury. The witness was named Michael MacCray, M-A-C-C-R-A-Y. The trial court advised the jury as follows: "The Court is taking judicial

notice of and hereby advising the jury that Michael MacCray was called as a witness in this case outside the presence of the jury and that Michael MacCray, with the advice of his counsel refused to testify basing his refusal on his constitutional privilege against self-incrimination." That's the end of the quote from *People vs. Hill*.

And Mr. Bryden, you are requesting this type of instruction to be given. I will indicate now that I am inclined to give that instruction. We will be discussing jury instruction in much more detail later in this case. I am inclined to follow the decision in *People vs. Hill* in following your request to give this instruction. You want to be heard at all, Mr. Ford?

MR. FORD: No, Your Honor.

THE COURT: Anything further on this?

MR. BRYDEN: No. Thank you, Your Honor.

THE COURT: Then we will shift gears again.

MR. FORD: Your Honor, I think you have already ruled on my next motion in limine.

THE COURT: Well, your next motion would be number eight?

MR. FORD: Yes.

THE COURT: I believe I have, but let me make sure I finished up with number seven.

MR. FORD: Okay.

THE COURT: Then any party seeking to introduce an audio recording have a tape ruled admissible by the Court and provide a transcription of the tape recording to opposing counsel prior to the tape being played citing Rules of Court 203.5 and 503.5. I believe I did indicate that I am inclined to grant that order.

There was specific reference to a YouTube Y-O-U-T-U-B-E video of the defendant and I indicated that I wished to see that, to view that YouTube video in the courtroom. Have you and Mr. Bryden had a chance to talk about a convenient time to do that?

MR. FORD: No, but whatever time Mr. Bryden would like is fine with me.

THE COURT: Are you able to play this video today or is that going to require some --

MR. FORD: I don't have my laptop here today, but I can bring it at the end of the day.

THE COURT: Why don't we plan on doing this tomorrow morning? Can you be prepared to bring the equipment in and the recording, if necessary?

MR. FORD: Absolutely.

THE COURT: The items of business we have yet to deal with are finish up the in limine motions here. Tomorrow afternoon, we have scheduled to resume several in-camera hearings that I indicated I did not have enough information. Tomorrow morning though would probably work in terms of the YouTube video. Does that work for you, Mr. Bryden?

MR. BRYDEN: Yes. I can be here and we can also do the questionnaire.

THE COURT: Well, let's plan on doing that. Let's have both sides ready to deal with the YouTube video. Is there a sound track of this?

MR. FORD: There is, Your Honor. I had it transcribed. Although, I am still in the process of editing it. It is only a two-minute video. So I should have it.

THE COURT: Do you have a transcript?

MR. FORD: Yes.

THE COURT: And you will bring that and provide it to counsel and the Court?

MR. FORD: Yes.

We may shift over to questionnaires this afternoon or if we don't have time, we will do that as well tomorrow morning. I would like to get that process ironed out and the questionnaire decided on so we can get to the printer so we can keep the rest of our schedule which contemplates the present plan to have the first of two panels of jurors in here on Thursday. So we need to get moving earlier rather than later on the questionnaire, but that's probably specific enough for now. Okay.

Moving on to number eight. This is a motion to introduce the evidence of Mr. McNeely. And I think I have already dealt with that as you have suggested.

Any further thoughts on number eight, Mr. Bryden?

MR. BRYDEN: I think it is probative.

THE COURT: It is to call Mr. McNeely as a witness and I have previously ruled pursuant to *People vs. Hill* and *People vs. Frierson* that based on his responses here and on the advice of his counsel, Mr. Steckler, is that I am going to honor his privilege and not require him to testify further, that I will not require him to testify in the presence of the jury following the better practice encouraged by the Supreme Court in the *Hill* and *Frierson* case. And thus, that I will be denying this motion for the reasons we have already put on the record.

MR. BRYDEN: That's not quite how I read the motion, Your

Honor. I think it is seeking to introduce evidence that he has been charged with murder resulting from the same incident.

THE COURT: I believe you are right. I may be misreading it. Do you want to be heard on that issue? You were heard previously in part. Do you want to respond anymore?

MR. FORD: No, Your Honor. I think you have made it clear where your ruling was on this.

THE COURT: No. I am not going to allow this. I am going to make the statements to the jury pursuant to Mr. Bryden's request regarding Mr. McNeely's indication of the Fifth Amendment privilege, but I am not going to make a factual statement to the jury informing the jury that Mr. McNeely has been charged with murder. I don't think that's a relevant factor for the jury's consideration. It will, under section 352 of the Evidence Code, I think the probative value, and I find virtually none, is vastly outweighed by the prejudicial effect that we have heard any speculation by the jury and confusing the jury with issues not before it. So no. The request is denied.

Now, moving on to number nine. The People request that the Court take judicial notice of the Court file that Donel Poston's Alameda County PFN number is AXP346. And citing Evidence Code Section 452. I am mindful of the judicial notice sections of the Evidence Code, but what's the relevance of Mr. Poston's PFN number?

MR. FORD: It is how I establish that the jail letters that were written belong to him, because he writes his PFN on there along with his name.

THE COURT: All right.

We have not litigated any of what you refer to as jail letters. Are you, Mr. Bryden, asking this Court to make a ruling on the question of the admissibility of jail letters?

MR. BRYDEN: I am not seeking to admit and there is portions of them as I have indicated informally that if they were to be admitted I think would be redacted or he refers rather exclusively of his indication of his right to have an attorney during questioning.

THE COURT: All right.

Mr. Ford, are you asking this Court to conduct a hearing to review jail letters that you would be asking the Court to ultimately admit and allow the jury to see?

MR. FORD: Correct, Your Honor. I would like to have a ruling as to the admissibility. I am not saying I am going admit them for certain, but I would like to get a ruling if Mr. Bryden is objecting to their admission.

THE COURT: Well, I am hearing an objection, at least in part. So I would think that the best procedure would be for you to mark them as a Court's exhibit and the Court will review them and hear argument from counsel.

Does that work for you, Mr. Bryden?

MR. BRYDEN: Yes, it would.

THE COURT: How many letters are there that you are seeking the Court to review?

MR. FORD: There are two letters. One of them is two pages handwritten and the other one is also two pages.

THE COURT: I am sorry?

MR. FORD: They are both two pages.

THE COURT: Okay. Got it. Thank you.

MR. BRYDEN: Your Honor, I am going to make an additional just in blank objection to the admission of the letters besides my specific objections to those portions indicating he invoked his right to counsel under Evidence Code 352. He uses a lot of objection language. It is obviously sent, it is targeted for a certain individual and rhetorically, the language, I think it offensive in its limited probative relevant value to the context of these letters.

THE COURT: All right.

Perhaps this is something we can do right now. Any reason why we can't mark these and have the Court review them and have argument of counsel?

MR. FORD: I don't see a problem with that.

THE COURT: Why don't you come up here and mark them for identification as the next exhibit in order. At this point, these are all Court exhibits. You may renumber them later if it is appropriate, or bring additional copies in of exhibits. I want you to understand, these are Court's exhibits at this point for the purposes of our in limine hearing. You have copies of these, Mr. Bryden?

MR. BRYDEN: I have read them, yes.

THE COURT: You have a copy?

MR. BRYDEN: Yes.

THE COURT: What I will do is, let me take a moment and review the letters that Mr. Ford has marked. And then I will hear argument from counsel and ultimately rule and after I have ruled on the content of the letters, I will rule on the motion

to have me take judicial notice of the PFN number. So Court's Exhibit No. 2 appears to be a letter addressed to Jon Owens. It appears to read Jon, J-O-N. Last name O-W-E-N-S at 1200 50th Avenue in Oakland. Zip code, 94612. There is a notation that the date -- strike that. The body of the letter indicates that the letter was written on 7-21-13.

MR. BRYDEN: 7-21?

THE COURT: Well, there is another date that appears to be written by a Sheriff's technician or Sheriff's deputy indicating 7-24-13 and I will ask Mr. Ford for an offer of proof at some point as to what that refers to. I assume that was either when the letter was either intercepted or something of that nature. Let me take a minute. Maybe you can answer that right now. What does the notation 7-24-13, F/TT period key, K-E-Y number 334 indicate?

MR. FORD: My understanding that the date is the date that it was intercepted in the outgoing mail. T. Key is Tina. Key she works at the Alameda County jail on the witness list. 334 is her serial number and F/T, I cannot recall what S dash T is, but it is something to do with intercepting the jail --

THE COURT: It may refer to her position in the Sheriffs Department, but I don't know that for sure either. Let me do this: I am going to go off the record for a moment. The sole purpose being to read this documents here. I am going to read it to myself. So give me a moment and I will be right back.

(Whereupon, a brief recess was taken.)

THE COURT: We are back on the record. The record will show I have been off the record for about 10 minutes. So while

I have been reading these letters, maybe less, I didn't time it exactly. Nothing has happened in the courtroom other than my reading the letters. Everyone is still here. The defendant, his counsel, the District Attorney and the Court's staff. We have marked the two letters as Court's Exhibit No. 2, which is a letter that has the date 7-21-13, meaning 2013 and a notation apparently from the Sheriffs technician T. Key as 7-24-13. Exhibit No. 3 is a letter that apparently was written and intercepted earlier and the date of inception was 7-8-13 again by Technician Key. You want to talk about these in chronological order, Mr. Ford?

MR. FORD: That's fine, Your Honor.

THE COURT: Why don't we deal with Exhibit No. 3 first in that it appears to be written first. What is your theory about the admissibility, why I should admit this document or parts of it?

MR. FORD: Your Honor, I believe it is admissible by the prosecution under 1220 of the Evidence Code. Specifically the relevance is that it shows consciousness of guilt, established that he is the person that committed this act and I will refer to the first four or five lines, he is referring to Two Gun Joe as being a snitch. I think it is a reasonable inference that Two Gun Joe, it would be Joe McNeely and the fact that he is referring to him as a snitch indicates consciousness of guilt and that his actions were not appropriate under the circumstances.

THE COURT: His meaning whose?

MR. FORD: The defendant, Donel Poston's.

THE COURT: All right. Go ahead.

MR. FORD: And similarly, the paragraph, about halfway down. Oh, before I get to that. Let's see here. Line eight about halfway through it, he starts discussing the interaction he had with Joe McNeely leading up to this incident. So, that's relevant as to explain what took place and then subsequent to that in a letter starting with a line with the first two words are, "some bitch." He starts talking about the fact that an informant gave his information to the police. Again, this is relevant in showing consciousness of guilt. And then subsequent to that, he starts talking about a True Religion hat. It is also relevant. He acknowledges that he had that True Religion hat, because a True Religion hat was left at the scene by the defendant. That goes towards ID. And then after that, the second page is talking become the shooting itself.

So I think the whole letter is relevant and it is admissible by the prosecution.

THE COURT: Thank you.

Give me a minute, Mr. Bryden. I will refer to you. Okay. Mr. Bryden; what's your thought regarding Exhibit No. 3?

MR. BRYDEN: We are objecting to it in its entirety. It is ambiguous as to his analysis being some sort of an admission in the first page of the letter. He just seems to be relating in a way that I think would offend a number of potential jurors as to his analysis of his legal situation. The idea where he said, "some bitch e-mailed the police. I will find out once I put this discovery motion in." He is not again, admitting any sort of guilt there, or making any sort of admission. He is just

saying, he is stating what he understands is the case against him to some party that we don't know. Again, he had suggested by Mr. Ford that there is an admission nation they found a True Religion hat at his house. The way I read it again and again, he is using this language, "faggot bitch" which women are going to find offensive. Homosexuals are going to find it offensive. Everybody is going to find it offensive and hold it against him. That is True Religion -- it says, "that niggas at that house only wear True Religion," seems to only be suggesting this state of the evidence. He doesn't seem to be my house, or it seems to be some other niggas house of where this hat was. So I think the probative value is very weak. You can argue that there might be some sort of admission here, but the I think the main reason that the prosecution wants to get this in is because it is littered with the language that is offensive and prejudicial. As to my client, given the average jurors comes from a different cultural loop and finds these kind of words offensive. African Americans find the words, even when African-Americans are using the word, "nigga, nigga" to be offensive. Bitch is offensive. So I don't want to belabor that point. I am just criticizing the analysis that this is some sort of admission. It seems to be, this is a statement at how he perceives the evidence related against him referring to a third party.

THE COURT: Thank you, Mr. Bryden.

MR. BRYDEN: And more specifically, I am sorry to be remiss. There is a more specific objection to the line which says, and this is on the seconds page. "Investigators were made because I lawyered up." I think that's kind of like an error

"then tried to play me."

THE COURT: Well, it generally refers to efforts by the prosecution to inform the jury that someone has invoked their right to an attorney.

MR. BRYDEN: And that's how I interpret it. The investigator was made because I lawyered up.

THE COURT: Well, this is the defendant talking.

MR. BRYDEN: Well, he is seeking to admit this.

THE COURT: I know it is.

MR. BRYDEN: Okay.

THE COURT: I understand your position.

Mr. Ford.

MR. FORD: I completely disagree with Mr. Bryden's analysis of this statement. I mean, certainly, this is just not how a person would write when they don't have something to hide where they haven't acted inappropriately. You don't call somebody a snitch when you haven't done anything wrong. You don't try to track down who it was that told the police about you when you haven't done anything wrong. If you haven't done anything wrong, your actions are, you go to the police, certainly aren't using profanity to prefer to the person that contacted the police and you certainly aren't calling the person that you got into this gun fight with is a snitch. And I think Mr. Bryden has left out also that his client in this document, specifically admits to shooting the other individual. He says, "I ran up on him; hit him three X" apostrophe s. "His bitch ass got up and through a shot at that reporter." He is admitting to doing the shooting in this case. So it is very relevant.

THE COURT: Where in the letter is this passage that you are referring to?

MR. FORD: It is the very end of the letter. It is the last three lines.

THE COURT: Okay.

I have got it. All right.

MR. FORD: Your Honor, I expect the defense, in this case, is going to be self-defense as has been discussed and this letter is very probative on his state of mind at the time of the shooting.

THE COURT: Mr. Bryden, let me ask you this: If I were to contemplate excising or redacting a portion, let's look at the second page. A portion of the letter that references to lawyering up, how much of that statement after that, how much are you suggesting that I cut out?

MR. BRYDEN: Well, I believe the Court understands, I am objecting to the letter in its entirety. However --

THE COURT: No. I am not waiving your position. If I am inclined to deny that request and I start redacting portions, you specifically call attention to lawyering up. You believe that is an improper reference.

MR. BRYDEN: Thank you for allowing me this input. I would starting after investigator.

THE COURT: Yes.

MR. BRYDEN: "Was mad because I lawyered up." I would just say investigators, he tried to play me. So it would read, investigators. He tried to play me and said when we was walking to the car.

THE COURT: It goes on, he said, "I was a bad shot?"

MR. BRYDEN: Um-hum. I would leave all of that.

THE COURT: All of it should come out?

MR. BRYDEN: No. In. That stays in. The only part I would take out was, "investigators," I would leave in and I would take out, "was mad because I lawyered up, then." I would cut that out and leave in the rest.

THE COURT: So leave in the word "investigators," and cut out the words, "was made because I lawyered up."

MR. BRYDEN: Out.

THE COURT: Cut that out and leave everything that follows in?

MR. BRYDEN: I would take out "then," because it is grammatically incorrect. So it would read: "Investigators. He tried to play and said when we was walking to the car." I would leave all that. Just the portion where he says, "was mad because I lawyered up then." I would strike that. Am I making sense?

THE COURT: No. You are. So assuming again that I deny your request to exclude the whole letter and I am talking about redacting and you believe that on the second page beginning at the 10th line, I leave the word "investigators" in. I cut out the words, "was mad because I lawyered up then." Pick it up where the words read, "he tried to play me;" is that right?

MR. BRYDEN: Yes, sir.

THE COURT: Okay.

What are your thoughts on this, Mr. Ford? Assuming for a moment just for the discussion, that I deny your motion to

redact and include the whole letter, what's your feeling about this suggestion?

MR. FORD: If the Court was going to redact a portion, I think it would be more appropriate to start out with investigators and cut out everything up to tried. The investigators tried to play me when he was walking to the car and said, that was bad shot.

THE COURT: Leave that in?

MR. FORD: Well, I feel the whole thing should be in, but yeah.

THE COURT: Okay.

I want to make sure I understand your position. Your position is, it sounds like the same as Mr. Bryden's if I do what I indicated. So it would read: Investigators. He tried to play me and said when he was walking to the car, he said I was a bad shot?

MR. FORD: You know, Your Honor. Actually, not at the point, I don't want to cut it to the point where it says tried. But go, investigators said when we was walking to the car.

THE COURT: You don't want, investigators he tried to play me?

MR. FORD: No.

THE COURT: What about the last two lines, there is reference. It says, "because I ran up on you. Hitting three times. His bitch ass got up and threw a shot that hit that reporter." I would be inclined to cut out the words, "that hit that reporter." That's not relevant to these proceedings. The inclined to say, "I ran up on him, hitting three times. His

bitch ass got up and threw a shot." Stop there. Cut out the words, "that hit that reporter." That's kind of my own motion about redaction. What's your thought about that?

MR. FORD: Well, as the Court ruled earlier about not getting into the fact that Mr. McNeely is charged with murder. Given that --

THE COURT: What is your thought, Mr. Bryden?

MR. BRYDEN: I will submit on that point.

THE COURT: All right.

Is it submitted on this particular letter. That is, Court's Exhibit No. 3?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes, Your Honor.

THE COURT: Okay.

Here is -- my ruling is this: First of all, I believe a number of these statements constitute admissions since that term is defined by the law. I would call your attention to the definition of admissions. Let me just read it into the record now. It is perhaps best stated by CALJIC jury instruction 2.71, which I believe correctly states the law and the cases recited in the use note and comments are correct statements of the law. "An admission is a statement made by the defendant, which does not by itself acknowledge his guilt of the crimes for which the defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence." I think that the letter and some exceptions that I am going to note constitutes admissions. His participation in this event. It establishes to some degree, a motive for his violent act against

the named victim. The specific objection to what Mr. Bryden terms "objectionable language," specifically, the word "bitch" is repeated a number of times. The word, "nigga," N-I-G-G-A or N-I-G-G-A-S, which is also repeated a number of times, I don't find that those words are so inflammatory and incendiary that they, the fact that they are included in statements that are attributed to the defendant will cause the jury to be so inflamed that they will disregard such things as the fact of the burden of proof is on the prosecution, that the defendant is presumed innocent and things of that nature. I don't think those words are so inflammatory and incendiary as to call for that category. So I decline to edit out those words. I think to edit out those words, it would somehow substitute other words that would render the statement relatively incomprehensible. So I am going to leave those references in. What I will cut out in order to be redacted on page two of the letter and I am starting with line one -- let me count down from the top. It appears to be the 10th line. I will redact the words, "was mad because I lawyered up then." So that sentence would read with the redactions: Investigators, he tried to play me and the rest of the language remains in tact down to the second from the end and the last line and as I have indicated going back a few lines, the statement reads: "I ran up on him, hit him three times. His batch ass got up and threw a shot." I will stop there and order that the words that follow, "that hit that reporter" be redacted. The remaining words, I am not sure I fully understand, I will allow to remain in. It looks like the words are either spelled I-A-G, B-A-G and then the words BIANGO-JINGO.

So the only redactions are starting at line 10, the words, "was mad because I lawyered up then." And on the second to the last line and the last line, "that hit that reporter." Those words I will have ordered redacted. Otherwise I would allow Exhibit No. 3 to be admitted assuming and presuming that there is adequate foundation to establish who I presume Technician Key or other individuals as to how this letter was intercepted. I am inclined to grant the request of the People's motions in limine to take judicial notice from the Court file of the defendant's PFN number AXP346, which Mr. Poston puts on the address of the envelope identifying himself by that PFN number.

Now, let me turn to the second letter, which is the second in terms of the date, although it is marked as Court's Exhibit No. 2.

MR. FORD: Let me just say, Your Honor. As to this letter, I don't know that I would or there are portions of it that I would use unless it became relevant as the trial went on for impeachment purposes or some other purposes. However, parts that stand out to me here about seven lines up from the bottom of the first page, the defendant says, "I am guilty of having a sling shot, because this sucka ass nigga have been charged with murder." The portion about being guilty of having a sling shot, I think it is an admission he is referring to the gun.

THE COURT: You are urging that the Court for the purpose of this motion, draw the inference of the reference to sling shot is a reference to a firearm?

MR. FORD: Yes, Your Honor. Actually, in order to draw that reference, you almost need to read all of the proceeding

lines and the rest of the lines on that page.

THE COURT: Let me ask you this; how much of this letter do you anticipate wanting to use if at the appropriate time at trial? It sounds like to me, what you are telling me is a good portion of it, you don't think is relevant at all.

MR. FORD: Again, Your Honor, it depends on witnesses testimony, specifically defense witnesses, but as of right now yes, a large portion of it don't seem to be relevant in my case in chief.

THE COURT: Okay.

Before I turn back to you, Mr. Bryden, give me a second longer to review this letter again. Here is what I am inclined to do at this point: And the record will show you have been sitting here watching me reading this letter for five minutes or so. Nothing else occurred in the courtroom. Let me ask a question regarding relevance, and part of this has to do with what reasonable inferences might be drawn from certain terms. The first page about three quarters of the way down. Actually, five lines from the bottom. There is reference to the words, "are glad there wasn't, wasn't my batteries that found in that nigga. Plus this stupid ass nigga got to the hospital and had used battery in his clothes that came tumbling out."

Now, Mr. Ford, let me ask you by way of an offer of the proof. Is it your relief that the word battery refers to bullets or shell casings?

MR. FORD: Yes, because Joe McNeely had a bullet that came out when he got to the hospital.

THE COURT: A slug or a shell casing?

MR. FORD: I believe it was a slug, not a shell casing. It was an actual bullet.

THE COURT: And your understanding is when Mr. McNeely got to the hospital, a bullet came out of his clothes?

MR. FORD: Yes.

THE COURT: Do you have any understanding or belief as to what the reference to "glad that wasn't my batteries found in that nigga?"

MR. FORD: When he is referring to the bullet that killed the Oakland Tribune reporter, Lionel Fluker, the innocent victim.

THE COURT: Well, Mr. Bryden, I have asked Mr. Ford some questions about the possible meaning of certain phrases. Do you want to chime in on that or any other issue related to this letter?

MR. BRYDEN: Well, a larger issue would be, the Court kind of specifically is looking at some sentences in the context of an entire paragraph. As I read it, it starts at nine from the bottom. And he is, to my mind, speaking or writing in the future subjective. Subjunctive. He is saying, if I beat the attempt, then clearly I am guilty of having a sling shot, because this bitch ass nigger has been charged with murder. So, he is looking in the future is subjunctive. If this happens, it seems to me to be an analysis of the evidence against him. Again, rather than um, an admission. And then it is referring to you know, in terms of the specifics, when the batteries, is that a shell casing, used batteries would be a spent casing. This is just his analysis of what he has read in the police

report rather than any sort of admission on his part in kind of street lingo. This is the state of the evidence; we are hoping for the best. It is possible I could do attempt, but then I might go down on having the ex felon in possession of a gun, because this is this, that or the other. He is not saying he did any of this.

THE COURT: All right.

Thank you, Mr. Bryden.

Back to you, Mr. Ford. Any other thoughts?

MR. FORD: The fact that he is not denying it explicitly is an adoptive admission.

THE COURT: It is an adoptive admission?

MR. BRYDEN: I have to disagree with it being adoptive. Only if you had a letter maybe coming from the individual, this letter is addressed to you saying, I heard you did this and blah, blah, blah.

MR. FORD: He is talking -- first of all, I think he clearly shows it is a flat out admission as to the gun, but if we are talking about his analysis of him, of the defendant talking about the state of the evidence under that analysis, I think that, which I don't think that it is, but under that analysis, the fact that you don't actually see him saying no, I didn't do it. No, I didn't have a gun. I didn't shoot this person. I am not guilty of attempted murder. The fact that you don't see that shows he is adopting the position that in fact you did have a gun. There is some issue as to whether or not he thinks he is innocent.

MR. BRYDEN: It is further problematic when the Court based

on this earlier ruling that you don't want reference to the murder charge of the innocent reporter. Calling the innocent reporter nigga in this letter. So I think if you are going to say you have to bring the whole -- I am guilty of having a sling shot out of context, he is saying, because this sucka ass nigga having been charged with murder, regular nigga. You have to bring that all in to give it context I think, or stick to your earlier redaction of that portion of the previous letter we discussed that refers to the innocent bystander being murdered. Otherwise, you chop it up in a way where it does begin to look like an admission. Here it is not in total context. It doesn't appear to be an admission to me, nor an adoptive admission, because he is not --

THE COURT: Your position is and again, I am asking you to accept the possibility that I am going to deny your motion to exclude the whole letter, but in terms of individual redactions, if I were to allow these words; "if I beat the attempt, then clearly I am guilty of having a sling shot." If I were to stop it there, it takes the context away and changes the meaning of the words that follow, which will be "because this sucka ass nigga been charged with murder on the innocent reporter nigga." Is that your position.

MR. BRYDEN: No. My position is that if you didn't redact it, it creates, it makes it look more like it is an admission than it really is if you are forcing yourself to take out the reference to the innocent bystander.

THE COURT: What's your position on that specific area, Mr. Ford?

MR. FORD: Well, I don't think it makes it look more like an admission. It is an admission. Although I would prefer to have it as a portion of -- we have already addressed that issue.

MR. BRYDEN: Well, because it takes away his reasoning for him being found guilty. He is clearly talking about an outcome in this case. He is saying, if this happens, maybe this will happen as an outcome of the case. He is referring to the outcome of the case.

THE COURT: The words, "then clearly I am guilty of having a sling shot." If we assume that sling shot can be interpreted to mean a firearm, which I think is generally reasonable given the context of the entire letter. If we take those words alone, that it would appear to be an admission that he is guilty of one of the charges in the Information against him, possession of a firearm. Your position, I gather is if we stop there, we change the meaning of the statement which you feel would not be as clearly as an admission if the rest of the words were included.

MR. BRYDEN: Well, of course you can say -- well, it goes to the weight of the evidence to make the argument, but he goes on to, "sucka ass niggas and charge murder." They are going to find me guilty of something, because this person got killed at some point in the case and so I am going down one way or the other, but he is analyzing the state of the evidence against him and what he has read in police reports rather than saying, I am guilty of having a sling shot. He says cause, if. This may or may not be the outcome. This may or may not be the outcome, but we are hoping for the best. Here is one possibility, here is another possibility. They are going get me on something maybe,

because of the innocent bystander was shot.

THE COURT: All right.

Is it submitted on the admissibility of People's Exhibit No. 2 or the Court's Exhibit No. 2?

MR. FORD: Yes, Your Honor.

MR. BRYDEN: Yes, Your Honor.

THE COURT: All right.

Here is -- my ruling is this: I am not going to allow People's Exhibit No. 2 in its entirety and rule the whole letter admissible. Let me explain the reasons why. I am going to address the part of the letter that I just talked about with counsel, the sling shot reference and such, but the letter, a good part of the letters has to do with complaints that the defendant has about, as I read it, the Sheriffs Department or other law enforcement agency removing a number of songs that apparently he had written. Now, I don't know anything more about the defendant's musical adventures when I read this letter, but it would appear that the defendant has written a number of songs, which he hoped as he states here, to be published in some fashion, that the police removed these songs or removed this music from his cell and he is upset about that. That's a good part of the subject that he returns to at various different places in the letter and that subject is just overly irrelevant to any of the issues that we are dealing with here. His description of, in turn as Mr. Bryden indicated is the state of the evidence. In particular, the reference on two thirds of the way down the first page um, "if I beat the attempt, then clearly I am guilty of having a sling shot." I think standing

alone that is an admission given the reasonable inferences that the jury would be allowed to draw, but I tend to unsubscribe to what Mr. Bryden said about the words that follow. That the words that follow really are meant to qualify what I have termed as otherwise standing alone as an admission. And unfortunately, here is a back qualification, it brings reference to the murder charge that this person, the other person, the alleged victim, that he has been charged with murder on an innocent reporter. And I have indicated before, that I am going to maintain my ruling, that that is not relevant to our proceedings here, whether or not Mr. McNeely has been charged with murder. Certainly, that's central theme of the case against Mr. McNeely, but I don't believe it is a relevant fact to be brought to the jury's attention here. And if it were as I have stated in earlier context under section 352 of Evidence Code, whatever probative value it has is vastly outweighed by the prejudicial effect and the confusion of the jury, the undue consumption of the time and bringing before them, which I have said issues which are simply not relevant for the determination here. So the bottom line analysis here, is that I am not going to let People's No. 2 come in.

Now, I may have to revisit this issue depending on what happens during the course of the trial. It may be that testimony is received in this trial either from the defendant or other witnesses that might cause me to revisit that. And if so, I will do that and allow us to do that outside the presence of the jury, but right now, I am ruling People's, or Court's Exhibit No. 2 is not admissible in its entirety. So I suggest

that we take our leave and that we come back tomorrow morning at 9:30. I will ask everyone to be here. I believe we have dealt with the People's in limine motions; have we not?

MR. FORD: We have, Your Honor.

THE COURT: Other than the ones that involve in camera hearing. We will do that tomorrow afternoon.

Mr. Bryden, have we dealt with your in limine motions, save and except those that require continuation of our in camera motions?

MR. BRYDEN: I made a motion that I be informed as to the identity of the District Attorney deputy that is prosecuting Lister and that I be allowed to bring him or her in.

THE COURT: That motion is denied. I imagine you may be able to discover the person who is assigned to prosecute Mr. Lister, also known as Mr. McNeely's case. I am not going to order that the people turn that over and I will definitely deny you bringing that person to come in and testifying in this case. So that motion is denied.

MR. BRYDEN: I had a further motion and I think you completely ruled on it, but just so we had the record that if that was the case, that Mr. Fluker's death not be brought into evidence and I assume that you ruled on that in a sense.

THE COURT: Well, I certainly meant to. To me, the death of Mr. Fluker, while clearly a tragedy, the unmitigated tragedy is not relevant in my view of these proceedings and these charges. And whatever probative value it might have, I believe is vastly outweighed by the prejudicial effect of section 352 of the Evidence Code. So no, I am not precluding any reference to

the death of Mr. Fluker by the defendant. Any questions about that, Mr. Ford?

MR. FORD: No, Your Honor.

THE COURT: Mr. Bryden.

MR. BRYDEN: No questions.

THE COURT: Mr. Bryden, does your client understand that includes him, that if he does testify in this action, or in any other context in this courtroom, that fact is not to come out of his mouth?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

Mr. Poston, is nodding his head and acknowledging that.

MR. BRYDEN: And he said yes, sir.

THE COURT: Okay. Thank you.

MR. BRYDEN: So he is speaking for himself on that issue.

THE COURT: Well, I appreciate that. Okay.

We are in recess. We will see you all at 9:30 tomorrow morning and let's talk about the questionnaires first and foremost. I have both your draft questionnaires and we will proceed with those. Okay

MR. BRYDEN: Thank you, Your Honor.

MR. FORD: Thank you.

THE COURT: See you then.

**MORNING SESSION, TUESDAY** **SEPTEMBER 10, 2013**

**PROCEEDINGS**

---oOo---

THE COURT: The record will show that we are in open court. This is the matter of the People of the State of California versus Donel Poston. This is Alameda County Superior Court information number 171976. The record will show that we are in open court. As I have said, Mr. Poston is present in open court. Good afternoon.

THE DEFENDANT: Hello, sir.

THE COURT: His attorney, Mr. Bryden is present with him. Good afternoon, Mr. Bryden.

MR. BRYDEN: Good afternoon.

THE COURT: And the District Attorney, Scott Ford is present. Good afternoon.

MR. FORD: Good afternoon.

THE COURT: What we are going to do at this point is put this matter over for two days until Thursday, September 12th in this department, Department No. 13 at 9:30 in the morning. So that will be the Court's order. We will continue the matter for further proceedings.

So I will order everyone to be present on Thursday at 9:30 in the morning.

**MORNING SESSION, THURSDAY SEPTEMBER 12, 2013**

**PROCEEDINGS**

---oOo---

THE COURT: Let's go on the record in the matter of the People of the State of California versus Donel Poston. The record will show that we are in open court. Mr. Poston is present seated at counsel table.

Good morning, Mr. Poston.

THE DEFENDANT: Good morning.

THE COURT: Mr. Poston is represented by his attorney, Mr. David Bryden. Good morning.

MR. BRYDEN: Good morning.

THE COURT: And the District Attorney's office is represented by Mr. Scott Ford. Good morning, Mr. Ford.

MR. FORD: Good morning.

THE COURT: We had put this matter over from Tuesday two days ago. And my understanding is that there may be a resolution of this matter. So let me turn the floor over to you, Mr. Ford and you can tell me what's happening?

MR. FORD: Your Honor, at this time, the People are making a motion to dismiss the Information in order to charge the defendant with murder and with the counts from this case.

THE COURT: All right.

Let me ask you in the interim, between Tuesday and today, has the District Attorney's office filed an amended Information charging Mr. Poston with murder?

MR. FORD: We have not filed the Information. I expect that it will be filed by tomorrow at the latest.

THE COURT: All right.

But your motion is to dismiss this case. That is, Information number 171976 today?

MR. FORD: Correct. Inspector Steve of my office has provided the deputies in court with a consolidated arrest report on the new charges.

THE COURT: All right.

Thank you.

Mr. Bryden, any thought or comments?

MR. BRYDEN: Let me try to absorb. There is some sort of warrant for my client that has been served on the deputies. Otherwise, I would ask that he be released and have his property returned.

THE COURT: I understand.

Is there an outstanding warrant for Mr. Poston charging him with murder?

MR. FORD: There is a consolidated arrest report.

THE COURT: Is there a warrant?

MR. FORD: I don't know that it is a warrant per se, but --

THE COURT: Well, what I am saying, what I am asking you, is there a hold on him so that if I dismiss this charge, he will be held in the county jail pending the filing of the Information? I was lead to believe that the Information would be filed.

MR. BRYDEN: Otherwise, we are prepared to proceed and we will ask this be dismissed.

THE COURT: I understand you do not oppose a request to dismiss.

MR. BRYDEN: That's correct.

THE COURT: Let me ask the Court's bailiff, is there any warrants on file as a hold on Mr. Poston?

THE BAILIFF: No. I have no holds on him.

THE COURT: And your motion is for this Court to dismiss this action? That is, Information 171976 right now?

MR. FORD: Correct. And that he be placed under arrest based on the new charges based on the consolidated arrest report that has been provided itself by the deputy.

THE COURT: Let me ask you this Mr. Ford, why wasn't this filed yesterday as Mr. Moore indicated what he was going to do? Why didn't that happen?

MR. FORD: I can't speak for the charging deputy in the matter as to why charges weren't filed. I know once he has been placed under arrest for these charges, we have 48 hours to file the new charges prior to him being released on that.

THE COURT: All right.

Here is what I am going to do: I am going take the motion under advisement. I expect I am going to grant the motion at some point. There appears to me to be some substantial confusion as to what will happen to Mr. Poston now. If there is no hold on him, there is no warrant on file, he has not been charged and you are asking to dismiss and I grant that motion, then I expect Mr. Poston to be released. Now, he won't be released from this courtroom. He will need to be sent back to Santa Rita. He will be released from Santa Rita, but I expect that will occur today. So I am going to take a recess on this matter for however long it takes for you to perhaps, concur with

some folks on the 9th floor and as to just exactly what the status of Mr. Poston will be if I release on this Information.

MR. BRYDEN: Just so I can make a record, I am opposed again to this recess. I was prepared to proceed with the trial as it was scheduled on Tuesday.

THE COURT: I understand that, Mr. Bryden and we are certainly capable of proceeding with the trial. Now, the trial as you are well aware, we are in the series of in limine motions. They include several continued in camera motions that I haven't completed that had originally been scheduled to be heard, I believe Tuesday afternoon. We haven't even begun the jury selection process yet. We have to discuss a number of things such as the questionnaire that we were going to use, things like that. So by proceeding with the trial, the first thing to do is continue and complete those series of in limine motions. But I understand your position, you are prepared to proceed, but I nevertheless am going to take recess. I expect when we are talking about a recess of half an hour or so, but I think, I need to know and all counsel need to know and for that matter, Mr. Poston needs to know what's going to happen if I dismiss this charge and he goes back out to Santa Rita. Is he going to be released to go home, or is he going to be rearrested on a new charge? So I think it is well worth all our time and in everyone's best interest, including Mr. Poston so he is not left in the dark here of what's happening to him if we resolve this.

So let me suggest that you go upstairs and find out what's happening, Mr. Ford and come back and let us know, okay?

So we will be in recess until you let us know. I am contemplating that this will be a half an hour.

MR. FORD: Your Honor, may we speak in chambers off the record for a few moments?

THE COURT: Sure. With Mr. Bryden, of course.

(Whereupon, a brief recess was taken.)

THE COURT: The record will show we are back and everyone is still here. That is, Mr. Poston is present at counsel table with his attorney, Mr. Bryden. Mr. Ford is present with the People. The Court's staff is here.

What we did in chambers was, Mr. Ford showed the Court and counsel a copy of the consolidated arrest report that has been filed that accuses Mr. Poston of murder, being a convicted felon in possession of a firearm and attempted murder. And I have reviewed the declarations in support of the consolidated arrest report. So here is what we will do: I will grant your request of the District Attorney to dismiss the charges in Alameda County Superior Court Information, 171976. And so Mr. Poston, so you know what's happening here. And that is, you will not be released. You are going to be sent back to Santa Rita. There is a hold placed on you by virtue of this consolidated arrest report that charges you with murder, attempted murder and is a felon in possession of a firearm, section 187(a) of the Penal Code. 187 and 664 of the Penal Code, that's attempted murder and Penal Code section 29800 subdivision (a), subdivision (1), that's charging you as a felon in possession of a firearm.

So there is no hold on you. You will be know doubt be transported to the Wiley Manuel Court facility. Whether that

takes place today, tomorrow or Monday, I can't say, but just so you know, the fact that I am dismissing this charge will not result in your being released. You will be taken to Santa Rita. There is a hold on you charging murder and other charges that I indicated to you. So that is what's happening. I am granting the request to dismiss the case charges in Information number 171976. All right.

I am going to return the consolidated arrest report and attached documents to you, Mr. Ford. Thank you all very much and this Court is in recess.

MR. BRYDEN: I merely was discussing the arraignment would be in Department 11 at 2:00 o'clock. That's why I didn't object to that procedure. I thought it made more sense.

(Whereupon, a brief recess was taken.)

THE COURT: The record will show that Mr. Moore is present with Mr. Ford representing the People. Mr. Moore, do you want to go through what it is you told us here so the record will reflect that?

MR. MOORE: Yes.

The day before yesterday, which would have been Tuesday, September the 10th, I had indicated to both Mr. Bryden and the Court that it was our intention to amend an existing complaint against the defendant Lister, which is currently pending in Department No. 11 against the defendant Lister. We were planning on amending that complaint to add Mr. Poston as a defendant in that existing complaint and charging Mr. Poston with murder in addition to the charges that are currently, that were currently pending on the Information. Because the existing

complaint is on in Department No. 11 on Monday, September 16th, I indicated to Mr. Bryden and the Court that, or I asked Mr. Bryden, if there was any objection to the arraignment being in Department No. 11 on Monday, September 16th. In no way was Mr. Bryden waiving any objection to us proceeding with the murder charges, but he indicated as far as procedurally, no objection to the arraignment on the amended complaint being in Department No. 11 on Monday, September the 16th. What that accomplishes essentially is putting it directly in Department No. 11, which for the record, is our court that handles murder cases pre PX. It would normally go to 112 first. So because the defendant Lister is already on on Monday, it is our intention to calendar Mr. Poston on Monday as well for that arraignment on the amended complaint which will have, not only the charges that he was charged with on the Information, but in addition an additional count of murder.

Now, because of the time constraints for by which a defendant is to be arraigned after being arrested, our office has decided to arrest him today, Thursday, September 12th, because then we have two court days, obviously Friday being one court day and Monday being the second court date, that way we can timely arraign him and also handle both defendants in Department No. 11. And I just wanted to state that for the record, because I think that was the, that was the procedure that was discussed off the record the day before yesterday, September the 10th.

THE COURT: And that is also my recollection of what the discussion was in chambers. Thanks for reminding us of that.

Any thoughts, Mr. Bryden?

MR. BRYDEN: No, that is my recollection as well.

THE COURT: So what I am doing, I am dismissing the charges in Alameda County Superior Court action number 171976. And now the Court will be in recess.

(Whereupon this matter was concluded.)

STATE OF CALIFORNIA )
) SS.
COUNTY OF ALAMEDA )

I, KATHY A. LYONS, here certify:

That I am a duly Certified Shorthand Reporter of the Superior Court of the County of Alameda, State of California.

That in the pursuance of my duties as such in the foregoing matter and reported all of the proceedings and testimony therein;

That the foregoing is a full, true and correct transcript of my shorthand notes so taken.

Dated: Oakland, California, July 28, 2015.

KATHY A. LYONS
C.S.R. 7230