XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,**<br><br>Petitioner,<br><br>**v.**<br><br>**JASON PICKETT, Acting Warden,**<br><br>Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBIT 6

## 2nd Supplemental Reporter's Transcript, Vols. 1-3 of 6

CALIFORNIA COURT OF APPEAL

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent

NO:

ALAMEDA COUNTY NO: **172522 A&B**

vs.

**JOE DANIEL MCNEELY, aka: ANTHONY LISTER, and DONEL POSTON,**

Defendants and Appellants.

______________________________________/

COPY

**AUGMENT TO REPORTER'S TRANSCRIPT ON APPEAL**

FROM FINAL JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

HONORABLE MICHAEL GAFFEY, JUDGE

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco, CA 94102

FOR THE DEFENDANTS AND APPELLANTS:
In Propria Persona

OFFICIAL COURT REPORTER:
Ronda Roope, CSR. NO. 5609

**JURY SELECTION ONLY - DATE: 12/12/13**
**(AUGMENT) VOL: 1**
**PAGES: 1-44**

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ALAMEDA
BEFORE HONORABLE MICHAEL GAFFEY, JUDGE
DEPARTMENT 517

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs. NO: **172522 A/B**

**JOE DANIEL MCNEELY**, aka:
**ANTHONY LISTER**, and
**DONEL POSTON**,

Defendants.

________________________________/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**AUGMENT TO TRANSCRIPT ON APPEAL**
**(JURY SELECTION)**
**DECEMBER 12, 2013**

Hayward Hall of Justice
Hayward, California

A P P E A R A N C E S

For the People: NANCY O'MALLEY
DISTRICT ATTORNEY
BY: STACIE PETTIGREW
Deputy District Attorney

For the Defendant **JOE DANIEL MCNEELY:** BRENDON D. WOODS
PUBLIC DEFENDER
BY: ANDREW STECKLER
Assistant Public Defender

For the Defendant **DONEL POSTON:** DAVID BRYDEN
Attorney at Law

Official Court Reporter: RONDA ROOPE
CSR NO. 5609

December 12, 2013

P R O C E E D I N G S

THE COURT: Good morning, ladies and gentlemen. Welcome to Department 517 in the Hayward Hall of Justice. This is a jury trial department and you have been sent here as prospective jurors to assist in the trial of two cases, actually. We thank you for taking your time out of your busy schedules to come here and be jurors or participate as jurors.

Now, by law, you're not qualified to serve as jurors unless several things are true. You have to be a United States citizen. If there is anybody here who is not, you can raise your hand and we'll deal with that right away. You have to be 18 years of age or older. So if you're not, let us know. You currently have to live in Alameda County. So this normally isn't a problem. Sometimes youth who are going to college will get their mail at home at their parents' house, and say they live in San Diego and going to San Diego State or UC San Diego, whatever institutions of learning, but they're living down there and they are conscientious and they come home because they got their summons for jury duty. You have to live in the county. If you got your -- if you say, you know what, I live in Modesto, I got to go live in San Francisco, or any of those things mean you can't serve as a juror here because you don't live in our county. The last thing is if you have suffered a felony conviction and you haven't taken on the process of the motions to get

your felony reduced or dismissed and all those things, then you might not be qualified because you have a felony on your record; that would be a disqualification. I don't see anybody raising their hand to any of those four things.

There's another group of people who are sworn peace officers under the Penal Code section in the State of California, and the Legislature has decided we don't want those people to serve because for whatever reasons they decide when they made that law. So if you're a sworn peace officer in the State of California and somehow you ended up on the list, please let us now; we'll excuse you, as well. Not seeing anybody alerting us to any of these issues, that means you're all presumptively eligible to serve as a juror in this courtroom and in this county.

So what we're going to ask, I am going to ask the clerk to give you the oath to answer truthfully all the questions we put to you in voir dire. So this is an oath; you're going to swear under oath or affirmation that whether the questions are from me or one of the attorneys, the questions, you will answer them truthfully. Presumptively, you're eligible. You can answer our questions truthfully and that will make other decisions down the road.

So I am going to ask you to please stand and listen to the clerk's admonition of the oath and you're going to raise -- answer yes or no.

THE CLERK: You want to raise your right hand?

THE COURT: We kind of assume you're going to say yes, so if you answer no let us know because we may not hear.

(Whereupon, the prospective jury panel was duly sworn by the clerk)

A PROSPECTIVE JUROR: We can't hear you.

(Whereupon, the prospective jury panel was duly sworn by the clerk)

THE CLERK: Thank you. Please be seated.

THE COURT: So, as you know now, this is a jury trial department. We're here to try a criminal case for jury trial. This is the case of People of the State of California versus Joe McNeely, also known as Anthony Lister, and Donel Poston. It's case number 172522.

Coming to serve as a juror is both a legal obligation and it's a privilege as a citizen of the United States. Jury service is an obligation that a citizen owes the Government. It's been that way in kind of the Anglo-American system for several hundred years. But it's more than an obligation; it's part of the checks and balances of our legal system.

You are going to participate in something that's been at the heart of our entire system for at least 200 years here in the United States. It has its roots in the legal system that came here from Europe, going -- from England, rather, going back as far as 900 years.

So what's the heart of that system? The heart of the system, as I see it, is it's the right of a person

who's been accused of a crime by the Government to have his or her guilt decided by a jury of his or her peers. And we've come to define his or her peers in our law as the people that live in the same county as where the crime is alleged to have occurred. At other times in history, as well as even today in other places, the right to a jury trial does not exist. In some countries the accused can be held without trial for long periods of time. They may even die in prison without having been given a trial, or they may be given kind of a summary trial where they don't have all the rights that we provide in our country. In some countries people can be accused, tortured, even unto death, and executed without having received a jury trial. So knowing that that's the state of affairs elsewhere, it should remind us how important it is to preserve the jury system here in the United States, in California, in Alameda County, for anyone who's accused of a crime. To preserve that right to a jury trial we obviously need jurors who understand that it's their responsibility as a citizen and they are willing to come and serve for our trials. The -- our experience in America, we kind of have to -- I'd like you to take a minute and listen while we go -- I want to talk about a few of the documents of our history.

Probably the most important and earliest document would be our Declaration of Independence. Right? And in our Declaration of Independence, we celebrate that on the July 4th of every year when we have the 4th of July. But

even at the time of the 4th of July 1776, there wasn't really a right to a trial by jury in England. You might get a trial in front of a judge; you might get jurors; but as we understand jury trial, it wasn't the same as we have it today. You wouldn't necessarily get notice of when your trial was going to be. You might sit in prison for a year or two and then they say on Tuesday we're starting your trial. You wouldn't be appointed a lawyer. You'd have to find a lawyer. You might have to go to trial, and if your lawyer couldn't get there when the King said you're going to trial, you essentially didn't have your lawyer. So while we say we come from that, our system has developed over time, and the things that we have today are rights that are valuable rights that I don't think we should ignore.

So after the Revolutionary War, we had the Constitution. But even in 1787 when the Constitution was adopted the Bill of Rights wasn't there yet. And so they had the three branches of government, the Legislature, which makes the laws; the Executive Branch, which enforces the laws; and the Courts, which settle legal disputes as to whether or not there's been a violation of the law. But in 1787 they didn't say you had the right to a jury trial; they didn't say you had the right to counsel. All those things weren't in the original Constitution. It's only with the Bill of Rights that comes in 1791 that that all is adopted.

So jury service is just as important as exercising

your right to vote and to elect representatives to represent you and run the government. So I'm encouraging you to take that seriously as we go through this process. Frequently -- it's not uncommon, let's put it that way, for us to hear back from jurors who served on cases who are interested in what's going on or had the opportunity to be on the jury, maybe they got excused, but to call and find out what happened, or other jurors who did serve might want to tell us how much they enjoyed the process, how much they learned from the process, and how they were -- it turned out to be a better experience at the end of the day than they thought it was going to be when they were sitting in your chair.

Okay. So, as I mentioned, the Constitution in 1787 set up the three branches of government. Our Legislative branch in Washington is the Congress. And in the State of California it's the Legislature, and the Legislative branch makes the laws. So they pass laws and they say -- generally, they are saying what's unlawful conduct, what conduct is unlawful. Then the Executive branch is charged with enforcing the law if there is a alleged violation. They are charged with enforcing the law. And where is it decided as to whether or not that violation of law actually occurred? That's when they come to court. That's why we have the third branch of government, which is the Judiciary. So after the Legislature passes the law, then something happens out in the community, and somebody investigates it, maybe the

police department, then they go to the D.A. and bring in papers and the D.A. files a complaint or a charge. So the criminal case is started in the courts when the Government files a charge and accuses somebody of the crime. In the early stages that charge is filed on a paper called a complaint, and one that will be before us is a paper called the information. It's important to remember, whether it's an information or -- a information or complaint, that this is merely a document; this is not evidence of anything. So it's simply the accusation. It puts it that the Government is accusing somebody of a crime and puts at issue the things that the Government must prove in order to prove the person is guilty of the crime.

When a person is accused by the Prosecution of a crime, you'll recall because of our Bill of Rights and our California Constitution, there are a number of rights that are contained in those. There are a number of rights when a person is accused that guarantee them a right to a fair trial. Most important is the right to counsel. There is the right to a public trial by a jury of one's peers. At trial, counsel has the ability to confront and cross-examine the witnesses that the Prosecution calls to present evidence of guilt, and counsel gets a chance to test their memory, to test their believability, to test their truthfulness. So the right to counsel is a very important right. Also the defendant in a criminal case is cloaked in the presumption of innocence. So just because

an information has been filed or just because an accusation has been made, they are still presumed to be innocent until and unless the evidence is presented by the Government that proves to a jury beyond a reasonable doubt that they're guilty. So they are cloaked in the presumption of innocence. This means the burden of proof throughout the proceedings is on the Government to prove guilt beyond a reasonable doubt and to an abiding conviction. So there is no -- if the Government doesn't present evidence that the person is guilty beyond a reasonable doubt and to an abiding conviction, then the jury has an obligation to say, well, you didn't prove it to a reasonable doubt and we find the accused not guilty.

There's another constitutional principle that kind of goes hand in glove with the presumption of innocence and the burden of proof, and that is because the burden's on the Government anyone who's accused of a crime has the right to remain silent. We hear about that all the time when we watch TV. But what it really means, the Government can't call them as a witness against themselves. They have the right to say if you're going to accuse me of a crime you prove it beyond a reasonable doubt; I don't have to prove anything. That's all about the presumption of innocence and the burden being on the Government. So at trial, because of that right, it's possible -- it's many -- oftentimes, the case that a person says, you know what, I don't think the Government's proven this case beyond a reasonable doubt and I am not

going to testify. And the jury cannot consider that the person doesn't testify, cannot hold that against them, can't use that and say, well, if he had something to say he would have got up here and told us. You can't do that. You have to use the evidence that's presented. That's all you get to use. You don't get to surmise about what's not presented. You have to use what's presented in the trial. And if a witness says I don't want to testify, they have that right and you can't use that against them because there is no evidence about why they didn't testify or what they would have said if they testified. You can't use that against them because that's their constitutional right.

So I've kind of gotten through a number of constitutional principles that protect those that's accused of a crime. Is there anybody here who says, you know, I don't understand those, or you know, I just don't agree to that, I think it would be much different than that and I couldn't follow all that constitutional stuff? Anybody feels that way? I don't see anybody responding and that's very heartening. I suppose that's why we're here today. I suppose if you felt that way maybe you wouldn't have come here in the first place.

So let's go back. How does a criminal case get started? A criminal case gets started when the Government files a charge. And in a State case -- you're in State Court. We have two levels of court. That's the State Courts in each county, and then there is Federal Court

from the Federal Government. We got a Federal Court in San Jose, one in Oakland and San Francisco in our northern district. But in State Courts the prosecutor is the Alameda County District Attorney. So in our county our the elected District Attorney is Nancy O'Malley. Now we've got probably, I don't know, 75 courts or 80 courts in our county and, obviously, Nancy O'Malley can't prosecute in every court. So the District Attorney has a number of Deputy District Attorneys and Assistant District Attorneys that are in court every day doing the job of enforcing the law for the Government. So in our court we have a prosecutor today and I will ask her to introduce herself to the jury.

MS. PETTIGREW: Thank you, Your Honor.

Good morning, ladies and gentlemen. My name is Stacie Pettigrew and I am a Deputy District Attorney for Alameda County.

THE COURT: And in this case you'll recall that I said there's actually two trials going on here, so there are two accused. Each of them has their right to their own trial. So you're not being asked to decide one thing; you're being asked to decide the case of the People of the State of California versus two individuals. One is -- well, I will ask Mr. Steckler to go ahead and introduce himself.

MR. STECKLER: Thank you, Your Honor.

First, myself. Good morning everybody. My name is Drew Steckler. I am an attorney and I represent my

client here. This is Joe McNeely. I will ask him to stand up and say good morning.

MR. MCNEELY: Good morning, ladies and gentlemen. I am Joe McNeely.

THE COURT: Thank you, Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

THE COURT: Mr. Bryden, would you like to introduce yourself and your client.

MR. BRYDEN: Good morning, Your Honor.

I am David Bryden. It's my privilege in this trial to be representing my client, Mr. Donel Poston.

Would you stand and introduce yourself?

MR. POSTON: Good morning, ladies and gentlemen. It's a pleasure to have you guys.

THE COURT: Thank you, ladies and gentlemen, gentlemen, and Ms. Pettigrew.

In a criminal trial, think about it, we have a trial of Mr. McNeely; there is a trial of People versus Mr. Poston. For legal reasons, both their cases have all -- a lot of the evidence is going to be related, so you will hear the trial of each of them at the same time. Whoever serves on the jury will get to be the trier of fact, and the Court gets to be the trier of the law. So there is kind of two judges here, the judge of the facts and the judge of the law. And the Court will provide the law and the jury will hear the evidence that's presented and try to apply the law to the evidence that's presented and determine if the burden of proof has been

met, if there has been proof beyond a reasonable doubt as to guilt. If that burden is met and there is proof beyond a reasonable doubt as to guilt on the charges, then the jury has an obligation to find them guilty. And if the burden has not been met, then the obligation is to find a person not guilty. Okay.

So in the course of the trial you may run into people in the hallway that you think are somehow related to the case. You may see them in court at various times or you may see them in the hallway. I am going to order you not to talk to any person that you think is involved in the trial. So if you see one of the attorneys in the hallway elevator, you see them down at the coffee court, I am advising them not to communicate with you and I am asking you not to talk to them. And it's kind of -- we just want to make sure whatever evidence is heard and decided on in this case is received in court when the jury is present and when each counsel is present and when the defendants are present so that everybody knows we've all got the same playing field. It might happen -- if I didn't tell you this -- you might talk to somebody and maybe they don't tell you -- maybe you see one of the attorneys and they don't say anything else about the case, but somebody else might hear or see you talking to them and assume you are talking to them about the case. We want to avoid any appearance of impropriety. We want to just try and keep it so it's fair to both sides; it's fair to the accused, it's fair to the prosecutor. So please

don't talk to anybody, whether it's an attorney or you see a witness or something like that; don't talk to anybody outside of court. If you inadvertently talk to somebody and you see, oh, that person later comes in is a witness, just send us a note and tell us I ran into that person outside in the parking lot; I didn't know they were a witness. And we'll talk to you and get it ironed out. But we just want to make sure that whoever serves as a juror receives all their information during the trial while we're in session with everybody present.

Now between coming and going you may see the attorneys in the hallway and oftentimes in -- well, in this particular case the two gentlemen that are on trial are in custody so you won't see them in the hallway. But being in custody, just like I told you, the charge in the information, the charges are not evidence. The fact that somebody has been arrested for a crime, accused of a crime, put on trial, that's not evidence. You haven't heard any evidence and you won't until we get a witness on the stand. Okay. So if -- you're not to hold it against anybody that they're exercising their right to trial, that they are in custody, or they have been accused of a crime. None of those are things are evidence for you to consider; they just happen to be facts that exist. Okay.

All right. Now, the next thing I want to address to you is the charges of the case. So you know the people who are involved in the case. The charges are some very serious charges. There are -- in count one, each of the

defendants is accused of one count of murder and the use of a firearm of a person by the name of Fluker. Count two and count three are attempted murder charges with the use of a firearm. And in counts two and three Mr. Poston and Mr. McNeely are accused of shooting at each other and trying to kill each other. Count four and count five are assault with a deadly weapon count. So the difference in that would be they are charged in the alternative, in counts two and three with attempted murder and in counts four and five, if you don't find intent to kill, maybe it's assault with a deadly weapon on each other with a firearm. Then in count six and seven, each of them is accused of being a felon in possession of a firearm on the date when this occurred.

In our -- we've had a number of pretrial motions and discussions, and in the course of those motions and discussions I think I should tell you a little bit about the case briefly. What I tell you is not evidence; it's just an idea to give you kind of a framework as to what the issues of the case might be. The case might have received some -- some press coverage at the time that it occurred. I don't recall the date on the information. April 5th of 2013; is that the right day?

MS. PETTIGREW: Yes.

THE COURT: So on April 5th of this year at -- there's a Valero gas station at MacArthur and Seminary in the city of Oakland. And on that day the evidence will show that two men shot at each other, and in the course of

their acts an uninvolved person was shot and killed. I think that's not -- I am not telling you that that's what the evidence is, but I am saying that's kind of what we anticipate may be shown in this trial. But it may have been in the newspaper and it may have been on TV. So think back to what I said a few minutes ago; we want to receive all our evidence in court from the witnesses. So we're going to -- at some point we're going to be asking you some questions about whether or not you remember seeing or hearing anything about this in the news and we're asking you to be truthful and tell us that, but I am also going to order you, because we have these handy little phones, laptops, and iPads, and all these things it's easy to go out and find information out on the internet, but it's also easy to say sometimes we read something in the newspaper or see something in the -- something in the news and it doesn't always turn out to be the way the news presented or the way it's presented in the news. It's not subject to examination of counsel by the People or by the Defense. So I am going to order you not to do any searches. Don't go out, search anything about this event. Don't go out and do any Google searches. Don't go to the Valero gas station at MacArthur and Seminary. Don't do any searches of law that might apply to the case. Don't do any experiments. And if somebody -- when you go home, it's probably best to say I am on a case and the judge told me not to talk about it until it's all over. Because you go say this is the case

that's at the Valero and blah-blah-blah, and maybe you haven't seen anything, and the other person is going to want to tell you about it. And, again, that's not from the witness stand and not subject to cross-examination of the parties. So, again, let's try the keep this as kind of a pure process as we can. The attorneys will present everything that they think you need to know in order to decide it. Don't do any personal investigation of law, or facts, or circumstances, or anything else. Okay. It doesn't matter what was in the paper or what might have been on the news back in the day; what's only important is what you hear in trial. Okay.

There have been cases that I have read about -- fortunately, none happened in this court or county that I am aware of -- where people have gone out and done research or investigations on their own. It really only makes problems for everybody. It makes problems for the court, it makes problems for the person who does it, and makes problems for the attorneys because we don't know what's going on. We don't condone it and it puts somebody at a disadvantage, one side or the other at a disadvantage, and it could result in you being held in contempt of court because I am taking pretty lengthy time to tell you not to do this, and if you go ahead and do it anyway it means you're not following the law and instructions of the Court. It may not seem like a big deal, but these proceedings are serious proceedings and we're asking you to be aware and follow these rules.

So I think you know enough about the case at this point to go on to the next. How is this trial going to proceed? We're going to have jury selection. We're going to start jury selection. Then after we select the jury, then we go into the presentation of evidence. And then after the presentation of evidence there is the arguments of counsel and the Court provides you with the law. And then the last part is the jury begins their deliberations. We are going to use a jury questionnaire. So when we were doing our motions, both Counsel and the Court have reviewed this, and we have a jury questionnaire so you can see that the -- some of the issues in the case might be -- take some time to think about. And to give you the time and opportunity to think about those things and give us meaningful answers, and rather than have everybody kind of sit here and go through the oral voir dire in a very lengthy process, we're going to use a written questionnaire. The written questionnaire is going to give you a chance -- we're going to give it to you in a few minutes and we're going to you ask you to go next door and fill out the entire questionnaire.

The first page gives you instructions, tells you what to do. Fill out the first page and fill it in. Okay. And the second page has a calendar on the back and it tells the hours that we're in session. And then after that it goes right into asking you to fill out, tell us what your name is, what part of the county you live in. You don't have to tell us your street address, maybe just

tell us I live in Hayward, I live in Berkeley, I live in Oakland, that's fine. And then you're asked things that -- these questions are designed to help the attorneys to figure out are you an appropriate person for this case in their client's -- you know, in their client's position. So whether it's Mr. McNeely, Mr. Poston, or the People, each of them are -- is entitled to a fair trial, and these questionnaires are designed to give them the information that they can make those decisions most intelligently. You will get into the back portion and there's going to be a few questions that relate to, you know, what happened at the Valero gas station. None of those questions are designed to present you with evidence because none of the questions are evidence. They're designed to get you to think about legal issues that may come up in the trial that you -- they want may want to know a little bit about how this is. By doing the questionnaire this way means we don't have to spend several days with you sitting here listening to the same questions over and over. We get the same information and it's a much more limited time burden on you. Then at the end there's a -- dare I say on page 20, there's a list of all the witnesses. So we want to know do you think you know any of these witnesses. We told you this happened at the Valero gas station in Oakland, but these are all the witnesses. Look over the list. Tell us is that somebody you know and then just tell us how you might know them. Then on the last page we get to the -- a hardship. So we understand that it's

So this calendar is actually on page two. So what I am recommending you do is -- you can see the calendar here. Every Friday the Court has a law and motion calendar so I handle other cases on Friday, so we'll never be in session on a Friday. If you look at January 20th, that's Martin Luther King day, and February 12th we're not in session that day; that's Lincoln's birthday. So I think this is perhaps a little bit longer than will actually be required. But the process is once we begin deliberations it's up to the jury to decide how long it takes for them to try and reach a verdict. And so we may -- I don't -- I can't anticipate how long it's going to be for jury deliberations. It could be the People's case is, I don't know, five or six days, maybe the Defense case is four days, so that would be maybe nine days. We might be done by the end of January. We don't know. So I am putting in a few extra days in there because we don't know. And, in addition, we got a couple days of jury selection in there and, in addition, we usually will take a day off because the most complicated part of the trial for me is to come up with the right law to give you so I don't give you the wrong law and then we have a problem. So I want to make sure I give you the right law. I always talk to the attorneys about what law should be given. We've already begun those discussions. They've given me the instructions they think will apply. We have to sit down and talk about those. Maybe we get that all done on a Friday some day and it won't delay the trial. But they

almost always inconvenient to serve as a juror, almost always, and we would like to respect your time and not be unduly burdensome. But as we talked about earlier, it's important that we get a jury for a criminal case.

Now, the Legislature makes laws and they've also set certain guidelines that I can consider as what might be they call an undue hardship on you. Undue hardship has to be on you, not necessarily on your boss, but on you. It has to cause an extreme financial burden. And there could be other -- it has to be more than kind of a mere inconvenience, I'd rather be somewhere else. We'd all rather be somewhere else. That's not a hardship.

Okay. Let's turn to what is our schedule going to be. We're going to ask you to fill out this questionnaire, and you can -- and I will talk to you in a minute. We're not going to actually do anything further with the jury until January 6th. So we're not going to be here -- you're not going to be here between now and January 6th. You fill out the questionnaire and we'll come back on January 6th and we'll go through and the attorneys will have read all these questionnaires, they'll have considered your answers, they'll know who's here and they'll know who's coming up next, and they will be able to figure out what they want to do. And we think usual -- usually when we do this process, jury selection part can be done in a day to two days as opposed to it would take much longer if we do it otherwise. So in our experience this works the best.

So this calendar is actually on page two. So what I am recommending you do is -- you can see the calendar here. Every Friday the Court has a law and motion calendar so I handle other cases on Friday, so we'll never be in session on a Friday. If you look at January 20th, that's Martin Luther King day, and February 12th we're not in session that day; that's Lincoln's birthday. So I think this is perhaps a little bit longer than will actually be required. But the process is once we begin deliberations it's up to the jury to decide how long it takes for them to try and reach a verdict. And so we may -- I don't -- I can't anticipate how long it's going to be for jury deliberations. It could be the People's case is, I don't know, five or six days, maybe the Defense case is four days, so that would be maybe nine days. We might be done by the end of January. We don't know. So I am putting in a few extra days in there because we don't know. And, in addition, we got a couple days of jury selection in there and, in addition, we usually will take a day off because the most complicated part of the trial for me is to come up with the right law to give you so I don't give you the wrong law and then we have a problem. So I want to make sure I give you the right law. I always talk to the attorneys about what law should be given. We've already begun those discussions. They've given me the instructions they think will apply. We have to sit down and talk about those. Maybe we get that all done on a Friday some day and it won't delay the trial. But they

need time to prepare their arguments and the Court needs time to prepare the law, so there are things that don't necessarily show up on one of these TV shows; that's why they can get done in an hour. We're doing this in a more serious situation, and everybody takes their responsibilities very seriously and we don't want to inadvertently rush things and make a bad decision. At any rate, the calendar will be here. So when you get this case what I am going to ask you to do is this. You can tear off the first page. That way you can take this with you. You will have the calendar of all the days we're in session. You will have the phone number of the court. You will have the hours the court's in session. We're in session usually 9:30 until 12:00 with a morning break, usually 1:30 to 4:30 in the afternoon with an afternoon break. And we're never in session on Fridays. And so this is all reflected in this calendar that you will get. If you just take this, tear this off and start the rest, you will be able to go through it.

So now here's what you have to do for the rest of the day. We're going to hand the questionnaire out to each person who's here. If you say, you know, I will be able to work this out with my boss and I will be able to come in here and serve on this jury, you fill out the questionnaire and the instructions on the back in this box. So if you are not asking for a hardship excuse, turn in the questionnaire at the jury room and come back to the jury room on January 6th at 9:30. So you fill out this

questionnaire, you take this paper home with you, and then you come back on January 6th at 9:30 over there 'cause it's more comfortable to sit over there. They will make the announcement when we need you to come down here. And when you come down here on January 6th, the attorneys will have read all these questionnaires, they will have considered all your answers, they will be ready to maybe ask you a few questions, but I am going to limit them in terms of time because they got a lot of information. They will be able to explore things they might be interested in but not go over everything that's here. We're going to try and streamline that. So if you do not have a hardship, fill this out, turn it in, take this paper with you and come back on January 6th. If you think I am not sure and you go in the jury assembly room, call your boss, and if your boss says we only pay for however much jury service and you think it's a hardship, then you're going to fill out this questionnaire, and on the last page you're going to check the box, "I ask to be excused because it's an undue hardship," and then you're going to tell me in here what your hardship is. When you turn it in during the lunch hour, I am going to read these and come back. You will come back at two o'clock and I will make a decision whether I am going to grant your hardship this afternoon.

So everybody gets a questionnaire. Some people going to fill them out, come back January 6th. Some people that are saying I am not sure I can be here as long

as that trial looks, you're going to fill them out and come back this afternoon. But fill out the whole thing this afternoon. I have never gone through this where somebody didn't have a question, so don't be embarrassed; raise your hands tell us what it is.

THE COURT: Sir?

A PROSPECTIVE JUROR: Do you already know -- if you already know you're traveling because of your business --

THE COURT: That's something we have to talk about it. That might be a hardship on your boss and not you.

A PROSPECTIVE JUROR: Okay.

THE COURT: That's something we'll talk about this afternoon. May get granted, may not get granted.

A PROSPECTIVE JUROR: On January 30th, I have a plane reservation to go to San Diego for the weekend. I don't know where that fits in.

THE COURT: Why don't you tell us what the issues are. You're going to go on January 30th for a weekend?

A PROSPECTIVE JUROR: Right.

THE COURT: If the case is still going, maybe we would take a break and let you go. You could fill it out, but if you see me this afternoon that's not going to fit into the category of things we'll excuse you for. But I haven't heard if you want to tell yes or no and come back this afternoon.

A PROSPECTIVE JUROR: What time this afternoon?

THE COURT: There was the guy in the second row.

A PROSPECTIVE JUROR: That Tuesday, the 7th, is that only morning or afternoon, "p.m. only"?

THE COURT: P.m. only means afternoon only. You don't have to come at seven o'clock. I thought that might have been confusing.

And over here in the red shirt.

A PROSPECTIVE JUROR: January 6th all the way to January 30th the trial's going to be?

THE COURT: No. Depending on how long the deliberations go, it could go into February. The attorneys don't think so. The attorneys think it's going to be quicker. But I am cautious. I don't know is this two weeks too long. They were saying they thought by the end of January. And I don't -- just don't know. You never know what's going to happen.

A PROSPECTIVE JUROR: That's every day that we have to be here?

THE COURT: Every day we have that's on this calendar. We're not in session on the Fridays, never in session. And on January 20th, Martin Luther King day, all the courts are closed. No trial on the 20th of January. And there would be no trial on the 12th of February. But, I mean, I think the attorneys believe we'll be done sooner than that, maybe -- but you never know, so we don't -- I can't predict. It's not an exact science predicting how long the trial is.

THE COURT: Yes, sir.

A PROSPECTIVE JUROR: When we come back on January

6th, 9:30 we got to be here?

THE COURT: Yes.

A PROSPECTIVE JUROR: Nine o'clock?

THE COURT: I think it says 9:30.

A PROSPECTIVE JUROR: Okay.

THE COURT: It says 9:30 on January 6th. The instructions are pretty clear. The only thing I am not sure, maybe write on this paper what time and what day you come back because I didn't think of this. If I ever have another trial, we'll get it right, we'll put on this page what time you return.

THE COURT: Yes, sir.

A PROSPECTIVE JUROR: What if there is a hardship when the trial begins?

THE COURT: In the middle of trial?

A PROSPECTIVE JUROR: When we come back. I have some treatment issues. They may go further. I only know up until this month.

THE COURT: How about you put in here and let us know. If you want to come back at 2:00, you can come back at 2:00. And if you want to come back and let us know whatever, we're agreeable. Okay?

Is there a question over here?

A PROSPECTIVE: Yes, just to re-clarify. If we have a hardship, we are still required to fill out the entire questionnaire, correct?

THE COURT: Yes, ma'am. The reason being is, not disrespecting anybody, but you think it's a hardship and

sometimes the law wouldn't allow me to grant that hardship. So if I don't grant that hardship, we don't know what the answers to the questions are. We're going to make copies and give them to each of the attorneys, so if there is no answers there it's not helpful and that would be somewhat of a problem. Okay.

Yes, ma'am?

A PROSPECTIVE JURORS: If you believe you have an unfair bias, do you just state that in the questionnaire?

THE COURT: That is a little bit different. You state it in the questionnaire, but you don't have to come back on the hardship. That would be a different issue.

So there is a lot of questions in here that are designed to draw out people who might -- people who might have a bias. Put what you think is a truthful answer to the question. Remember you're under oath when you answer this questionnaire, so answer these truthfully as if it was put to you by me or one of the attorneys. Okay? That's all we're seeking to get you to do in the questionnaire. All right.

Thank you very much for coming down and responding. If I don't see you this afternoon, have a good Christmas and we'll see you next year.

Okay. Each person will take a questionnaire.

THE CLERK: Please make sure you turn these in at the jury assembly room, even if you're coming for a hardship, before you leave.

THE COURT: Mr. Clerk, hang on a second.

It's important to turn them in so I can read the last page so I can determine if I am going to grant your hardship. You can leave the courthouse and come back at 1:30 or 2:00. You don't have to stay in the building. You can go out to lunch.

A PROSPECTIVE JUROR: So after we fill it out, if we're not asking for a hardship --

THE COURT: You're free. You can go until January 6th. You don't have to come back.

Yes, sir.

A PROSPECTIVE JUROR: Your Honor, if there are any changes that, for whatever reason, to start on the 6th, is there any mechanism by which we can contact the court either early morning on the 6th or if we find out the week before?

THE COURT: Should we put something on our answering machine before January 6th so they know like the Friday before. Will you be here?

THE CLERK: Yes.

THE COURT: If they call this number -- that's a good question -- 690-2726. If you tear this paper off, this is the Court's phone number, and we'll leave a message the Friday before, which would be what, January 3rd? We'll put something on there January 3rd to tell you we're still a go on the 6th if that's the case. Okay. This schedule is on this paper. And if you have your questionnaire, I would encourage you probably be more comfortable if you go next door. They have pens in the

jury assembly room. So you're free to go there.

Okay. Thank you very much.

(Whereupon, the prospective jurors exit the courtroom)

THE COURT: Is there anything else you want TO put on the record, or you just want to come back about quarter to two or five to two or something?

MS. PETTIGREW: Sure.

MR. STECKLER: I have a brief matter. There are no jurors in the courtroom now.

THE COURT: Were we on the record, Madam Reporter?

MR. STECKLER: At the outset, you mentioned that my client's name was Joe McNeely, also known as Anthony Lister.

THE COURT: Right.

MR. STECKLER: That's not anywhere on the questionnaire. It's not on the information. I don't know if it's going to come into evidence. His true name is Joe McNeely, so I object to that.

THE COURT: Okay.

MR. STECKLER: I didn't want to interrupt the Court's presentation to the jury, so I didn't object at that time, but --

THE COURT: Okay.

MS. PETTIGREW: I would just state for the record that I anticipate that it would come in insofar as that is the name he is booked under out at Santa Rita. And if any jail calls come in, that's the name that Tina Key, K-e-y,

puts on the CD. So I anticipate it would come into evidence, at least that way, if a jail call is admitted.

THE COURT: Okay.

I guess -- I just was looking at the information for when I wrote down my notes for what I was saying and that was what appeared on the information.

MR. STECKLER: I understand. I know there was no advertence; but, nevertheless, I think there is some prejudice there unless and until it comes into evidence.

THE COURT: Right.

MR. STECKLER: Just to perfect my point, I would object and move for a mistrial and move to strike this panel.

THE COURT: At this point that's somewhat speculative, so I will deny your motion at this time. And, additionally, I think for the reason -- from what I've heard about that -- from what I've heard about the evidence in this case, I can hardly think what I said to the jury during this stage of the trial is going to be a determining factor in their deliberations or whatever outcome they reach. So for those reasons I will deny it.

MR. STECKLER: Thank you, Your Honor.

THE COURT: We'll see you at -- you want to say ten to two?

MR. STECKLER: Yes, sir.

MS. PETTIGREW: Thank you.

(Whereupon, the noon recess was taken)

THE COURT: Good afternoon, ladies and gentlemen. I have asked the clerk to count how many people are here.

THE CLERK: I have 31.

THE COURT: 31.

THE COURT: So I went through all the questionnaires that people filled out and on the last page said they were asking for a hardship. There's apparently a couple more people that are asking for a hardship that may not have checked the box on the last page. So I am going to go through everybody alphabetically that I recognize and checked off the questionnaire and then we'll find out who the extra people who are here. So let me determine who's here.

Fred Atkins. Could you just raise your hand?

Thank you, sir.

John Bagby. All right.

Susan Bloom. Thank you, Ms. Bloom.

Sandra Chapman. Okay.

Victor Chia.

Ariel Clifford.

Michael Colon.

Jennifer Farinha.

Kelly Hanzel. All right. Thank you, Ms. Hanzel.

Andreas Kadavanich, or no, I think Kadavanich.

MR. KADAVANICH: Kadavanich.

THE COURT: Kadavanich. Thank you.

Here's a harder one for me. Pareshkumar Lad.

Thank you, sir.

John, is it Lepe or Lepe?

MR. LEPE: Lepe.

THE COURT: Lepe. All right.

Alain Levesque.

Eric Mathy. There we go.

David Matz. All right.

Sonia Melgoza. Okay.

Andrew Nakamura.

Martin Nissen.

Irma Sanchez. Ledezma-Sanchez is the name that appears alphabetically. All right. Thank you, Ms. Sanchez-Ledezma.

Ruth Sandberg.

John Santoro. Is there a John Santoro here? No. Okay.

Angelo Smith. All right. Thank you, Mr. Smith.

Cynthia Sutter-Dominhquez. Okay.

Allan Torres.

Melanie Tucker.

Carl Paulino Valderama. Thank you, sir.

On page three we have Debra Varela. Okay.

Rosemary Villanueva.

And Charlton Zheng, or I am not sure if that's right.

Now, how many people have I not called their name that are here?

Let me start over here, ask what your name is.

MS. TONG: Khoinguyen Thi Tong.

THE COURT: Tong. Okay. Could I ask you to go outside 'cause I am going to have to read your questionnaire a little more carefully or maybe in the next five minutes?

Who else raised their hands whose name I haven't called?

MS. ARIZMENDI: Laura Arizmendi.

THE CLERK: Number 2.

THE COURT: That's number 2. All right.

Could I ask you to wait outside and we'll call you when I get a chance to read your questionnaire?

Yes, ma'am?

MS. NUNEZ-ORTEGA: Angelica Nunez-Ortega.

THE COURT: Likewise, ma'am, I will ask you to wait outside and we'll call you in in a few minutes. Okay?

(Whereupon, a discussion was held off the record between the Court and all counsel)

THE COURT: All right. Ladies and gentlemen, the -- after discussing with counsel, the Court is going to thank and excuse each of you, in part because we recognize that you're -- you've taken your time out and you've articulated a hardship in your personal case in your individual personal case, and the Court will recognize your hardship and thank and excuse you from service on this jury, and your service is satisfied for one year, okay, in the State Court. Should you get a

summons from the Federal Court, try to tell them, maybe you have the same reason will carry over. All right. Thank you very much. Have a nice holiday and we'll see you maybe again on another occasion.

(Whereupon, the prospective jurors are excused and exit the courtroom)

THE COURT: With regard to Ms. Arizmendi, her questionnaire is mostly blank. She indicates she doesn't speak English a hundred percent; although her handwriting is pretty good, she doesn't understand English. Does -- she said she doesn't understand the questions so she didn't -- because she didn't get it, she left them blank.

With regard to Ms. Arizmendi, prospective 101, does anybody want to bring her back next week or January 6th, or what do you want to do? You want to bring her in talk to her today? Why don't we do that?

And then the next one is Ortega. The next one is Ms. Tong.

Okay. Ms. Ortega, Nunez-Ortega, it doesn't appear that she has a hardship. It could be that she has something that would be -- goes to cause, or it could be that she is very familiar with that area. So we'll call her in and talk to her and have her come back on the 6th, or at least we'll see what she says.

And then Ms. Tong. All right. I think we have to talk to her. It doesn't appear there is a hardship here.

Could you -- Mr. Clerk, could you send in one at a time? How about we talk to Ms. Arizmendi first? We'll

just do them alphabetically, Arizmendi, Nunez-Ortega, and then Ms. Tong.

(Whereupon, prospective juror, Ms. Arizmendi, enters the courtroom)

THE COURT: Good afternoon, Ms. Arizmendi. You could have a seat over here if you like.

MS. ARIZMENDI: Thank you.

THE COURT: I've gone through your questionnaire and you did not mark that you asked for a hardship. But as I read -- so I didn't read it carefully. But now as I read it, you've said a couple things in here that I want to ask you about. One is you say you have -- English is not your first language; is that correct?

MS. ARIZMENDI: Yes.

THE COURT: So why don't you tell us about that?

MS. ARIZMENDI: Um, it's like I thought I couldn't make it. I understand, I guess, a little bit more than basic, but I didn't answer a lot of question there, so.

THE COURT: Okay.

And how long have you been in the United States?

MS. ARIZMENDI: Oh -- oh, gosh, um, since '76.

THE COURT: '76?

MS. ARIZMENDI: Yeah. But I went to school and then I drop, and now it's like I need more English, I know --

THE COURT: Okay.

MS. ARIZMENDI: -- I mean, to serve as a juror. I mean, I -- like that's why I stay 'cause it was

interesting and I like it, but I don't know if I can make it, you know.

THE COURT: Do I hear you saying you're interested from what you heard about the case; you think it would be interesting?

MS. ARIZMENDI: No, no, because I like this. I watch on movies all this. I mean, I like this.

THE COURT: Okay. But you're concerned that --

MS. ARIZMENDI: Yeah.

THE COURT: -- perhaps some words you may not understand?

MS. ARIZMENDI: I mean, there is a lot of questions that there was just no, and I don't like to -- that is yes or no, and I don't like to just put yes or no without understanding.

THE COURT: Okay.

MS. ARIZMENDI: I don't know if --

THE COURT: Sure. Okay.

The second thing you said in your questionnaire is that you have some -- you take medication for a medical condition.

MS. ARIZMENDI: Yeah.

THE COURT: Does that affect your ability to pay attention or to stay focused when we're in trial?

MS. ARIZMENDI: Sometimes. Because what happened is I have diabetes, and sometimes depression comes and the doctor prescribe me pills, and with all the medication it gets worse.

THE COURT: So as I am talking to you right now, you sound like you understand English and you are answering my questions and you're --

MS. ARIZMENDI: Yes. Yes, I was also about the hardship, and I was like what is he talking about. I didn't get it if I have to come January 6th or --

THE COURT: Okay.

MS. ARIZMENDI: -- or stay. So it's like --

THE COURT: Let me ask you this. The issue today is can you physically come to the dates that were on the calendar there or is it going to be a financial hardship? Will you miss money at work?

MS. ARIZMENDI: No.

THE COURT: Would it be a hardship on your family because you are not working; is that a problem?

MS. ARIZMENDI: No.

THE COURT: Do you have any medical condition that's going to prevent you from being a juror or that you have to go see a doctor between now and Valentine's Day, say?

MS. ARIZMENDI: No, not that, any appointment.

THE COURT: Okay.

And do you have any prepaid trips where you are going to go to a wedding or something like that where you have to be out of the country between now and then?

MS. ARIZMENDI: No.

THE COURT: Okay.

So I am going to say that you do have to come back

on January 6th. What you're asking for may be a different kind of consideration, but it's not a hardship. Okay?

MS. ARIZMENDI: Okay.

THE COURT: And I will ask you to return on January 6th.

MS. ARIZMENDI: So my English is not a problem?

THE COURT: We're going to talk about that between now and January 6th. We'll see what happens then. You may get selected; you may not get selected. Each of the attorneys has a chance to excuse people and they may ask me to excuse you anyway. I can't tell you right now what will happen. I will ask you to come back January 6th.

MS. ARIZMENDI: So I come here or the jury room?

THE COURT: Down there and just listen. This is Department 517. Did you take the cover sheet?

MS. ARIZMENDI: Yeah. Okay.

THE COURT: Do you have a phone number you can call if you have any questions and talk to the clerk?

MR. STECKLER: Your Honor, may I be heard just briefly? This juror, prospective juror, indicated that she didn't like just answering yes or no on the questionnaire. I am wondering if she might like the questionnaire back. Lot of those are yes or no and then please explain. She might want to fill the rest in. I don't know.

THE COURT: Okay.

Ms. Arizmendi, do you -- there's a couple things here you said you don't understand. Do you think you

understand enough to answer the question or you just didn't -- you weren't sure if you were going to have to come back?

MS. ARIZMENDI: No, no, I tried to answer, but it's like --

THE COURT: Okay.

MS. ARIZMENDI: -- I couldn't concentrate to yes or no, so it's like I leave it. And whenever it was easy for my English, I put okay.

THE COURT: Do you think you can do better or do you think you did as good as you can do?

MS. ARIZMENDI: You mean if I can try right now to answer that?

THE COURT: That's the question. Can you do better or did you do as good as you can do?

MS. ARIZMENDI: I mean, if you give me time I will try.

THE COURT: How about could you give it another -- give it a shot? I wouldn't expect you to be here after 3:30, but if you think you're done, you can go earlier.

MS. ARIZMENDI: Okay.

THE COURT: Is that okay?

MS. ARIZMENDI: Okay.

THE COURT: Then you give it back to the lady next door --

THE CLERK: I will explain it to you.

THE COURT: -- where you were as a juror.

MS. ARIZMENDI: If I don't understand, so I leave

it blank?

THE COURT: Yes. If you don't understand, you leave it the way it is.

(Whereupon, prospective juror, Ms. Nunez-Ortega, entered the courtroom)

THE COURT: Good afternoon, Ms. Nunez-Ortega. Could you -- you indicated on the back you were not asking for a hardship excuse but you're here now. Was there a particular thing you wanted to ask the Court about or tell the Court about so that it might help us to make a decision sooner than January 6th?

MS. NUNEZ-ORTEGA: Yeah. Yeah, because I contacted the Human Resources lady at my company and she said we don't get paid for the -- more than two weeks, so it would be a financial hardship. And I am also a department of one and for a company that manages construction and design, and also I don't have anyone else to cover me while I am gone.

THE COURT: Are you the only person in your household?

MS. NUNEZ-ORTEGA: No, I am married.

THE COURT: Okay. Okay. I didn't read your questionnaire carefully. Is it -- is your husband able to work and support the two of you, or is it without two incomes you're not able to meet your financial obligations?

MS. NUNEZ-ORTEGA: It would be tight. It would be tight --

THE COURT: Okay.

MS. NUNEZ-ORTEGA: -- 'cause we just got married so we're recovering from a wedding.

THE COURT: Oh, congratulations.

MS. NUNEZ-ORTEGA: Thank you.

THE COURT: Sadly, I think your answers don't describe to me what I consider a financial hardship because a financial hardship is you can't make your bills with one income and you wouldn't have an income and you would be down to the income, if it would be a financial hardship. But if it would be tight but you could do it, doesn't sound like a financial hardship.

MS. NUNEZ-ORTEGA: I think it's something I can do. But I talked to my boss, as well, and he doesn't think I can be off that long.

THE COURT: I am sympathetic to that. There is a Labor Code says they are not supposed to do anything to you if you are on jury duty.

MS. NUNEZ-ORTEGA: No, he wouldn't.

THE COURT: I guess what I am saying there is no guarantee you are going to be on the jury. The parties understand your situation. They may excuse you or they may not. You have a couple weeks to plan. You may have to tell your boss you're still in the mix, you could still be selected.

MS. NUNEZ-ORTEGA: Okay.

THE COURT: Anything else you wanted to do?

MS. NUNEZ-ORTEGA: No. I have a project starting

construction in February and that's the biggest reason why. And I am the only person. I am a department of one. That's really the biggest issue.

THE COURT: No, I understand. I am sympathetic, but I think the rules are such that bind me in this case that I can't grant your hardship excuse. Okay.

And then this last should be Ms. Tong.

(Whereupon, prospective juror, Ms. Tong, enters the courtroom)

THE COURT: Good afternoon, Ms. Tong.

MS. TONG: Hi.

THE COURT: You indicated you're not asking for a hardship excuse.

MS. TONG: Oh, I --

THE COURT: So what is it you wanted to talk to the Court about?

MS. TONG: Oh, I thought -- I think I marked the wrong place. I wanted to ask for a hardship excuse.

THE COURT: Okay. Well, you did say you're at Intel and your company would pay for jury service, so that doesn't sounds like a hardship.

MS. TONG: Yeah. I think because Intel is a big company it would pay for my time during jury. But the problem is I am looking for -- searching for a new job within Intel and I only have a limited time to do that. If I don't find a new job within a certain amount of time, it may lead to some difficulties later.

THE COURT: Mm-hm.

MS. TONG: So if I am absent for the month of January, that will be almost all the time that I have to look for a job.

THE COURT: Uh-huh. Well, we're only going to be in session four days a week and there's a day in January when we have -- is it January the 12th -- is that what it is -- the 20th. So there's a number of days when we're not in session that would --

MS. TONG: Yes.

THE COURT: -- free up -- you have free days, at least five or six days in the month of January to do that.

MS. TONG: Right. I understand that, Your Honor. But it's very hard to find a job nowadays.

THE COURT: Mm-hm.

MS. TONG: So even if I look full-time I still find it difficult. Only one day a week will be like only one fifth of the time.

THE COURT: Sure.

MS. TONG: And it will be -- it will lower my chance a lot.

THE COURT: Well, unfortunately, ma'am, I don't think that's a personal financial hardship. I am not going to grant your hardship. I will have to order that you come back on the 6th of January at 9:30. Okay?

MS. TONG: Okay. Thank you, Your Honor.

THE COURT: Thank you.

(Whereupon, all prospective jurors have exited the

courtroom)

THE COURT: All right. We're outside the presence of all the jurors. Now it's just counsel and their clients and the prosecutor.

Is there anything else we needed to do today because the Court does have law and motion tomorrow? I've got a number of things I have got to do some research on so I am adequately prepared for tomorrow's calendar. So I was hoping we wouldn't need to accomplish any other tasks today.

My recollection is that Monday, the 17th -- 16th, we've got -- we're not in session because we're doing -- we have a contested hearing on a sentencing matter and we've got a further prelim in the afternoon. So we're going to come back on Tuesday, the 17th, in the -- with a second panel and do the same process we've got today.

MS. PETTIGREW: Yes.

THE COURT: And then Wednesday, the 18th, we can do motions in the morning, but in the afternoon I have that further Marsden hearing. Maybe on Monday or Tuesday I will call the attorney and see if there's been any fruitful negotiations or discussions between counsel and the client, and maybe if that's going to be a rather brief thing we could do further motions on Wednesday afternoon. I will try to get an answer for you on that by Monday or Tuesday. All right.

MR. STECKLER: Okay. Great.

THE COURT: Anything else?

MR. STECKLER: No, thank you.
MR. BRYDEN: Nothing further.
Thank you, Your Honor.
MS. PETTIGREW: Nothing.
THE COURT: I see the prosecutor has a bunch of CD's or DVD's.
MS. PETTIGREW: I do.
THE COURT: Are you going to have those marked with the clerk?
MS. PETTIGREW: As exhibits, please.
THE COURT: Okay. Thank you very much.
We're off the record.
(Recess taken)

---ooo---

STATE OF CALIFORNIA)
) SS.
COUNTY OF ALAMEDA )

I, RONDA ROOPE, Certified Shorthand Reporter, do hereby certify:

That I am an official court reporter of the Superior Court of the State of California, and that as such I reported the proceedings had in the above-entitled matter at the time and place set forth herein;

That my stenograph notes were thereafter transcribed into typewriting under my direction, and that the foregoing pages constitute a full, true and correct transcription of my said notes.

DATED: 12-15-14

Ronda Roope
RONDA ROOPE, CSR NO. 5609

# EXHIBIT 6 (cont.)

# SSRT – Vol. 2

CALIFORNIA COURT OF APPEAL

FIRST APPELLATE DISTRICT

---oOo---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent | NO:<br><br>ALAMEDA COUNTY<br>NO: **172522 A&B** |
| vs. | |
| **JOE DANIEL MCNEELY, aka: ANTHONY LISTER, and DONEL POSTON,**<br><br>Defendants and Appellants. | COPY |

______________________________________/

**AUGMENT TO REPORTER'S TRANSCRIPT ON APPEAL**

FROM FINAL JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

HONORABLE MICHAEL GAFFEY, JUDGE

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco, CA 94102

FOR THE DEFENDANTS AND APPELLANTS:
In Propria Persona

OFFICIAL COURT REPORTER:
Ronda Roope, CSR. NO. 5609

**JURY SELECTION ONLY - DATE: 12/17/13**
**(AUGMENT) VOL: 2**
**PAGES: 45-84**

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ALAMEDA
BEFORE HONORABLE MICHAEL GAFFEY, JUDGE
DEPARTMENT 517

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs. NO: **172522 A/B**

**JOE DANIEL MCNEELY**, aka:
**ANTHONY LISTER**, and
**DONEL POSTON**,

Defendants.

________________________________/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**AUGMENT TO TRANSCRIPT ON APPEAL**
**(JURY SELECTION) - VOL. 2**
**DECEMBER 17, 2013**

Hayward Hall of Justice
Hayward, California

A P P E A R A N C E S

For the People: NANCY O'MALLEY
DISTRICT ATTORNEY
BY: STACIE PETTIGREW
Deputy District Attorney

For the Defendant **JOE DANIEL MCNEELY**: BRENDON D. WOODS
PUBLIC DEFENDER
BY: ANDREW STECKLER
Assistant Public Defender

For the Defendant **DONEL POSTON**: DAVID BRYDEN
Attorney at Law

Official Court Reporter: RONDA ROOPE
CSR NO. 5609

December 17, 2013

P R O C E E D I N G S

THE COURT: Good morning, ladies and gentlemen.

MR. STECKLER: Good morning, Your Honor.

THE COURT: Welcome to Department 517.

This is, as I said, this is Department 517. This is the Hayward Hall of Justice. This is a jury trial department for Alameda County and you've been summoned here as prospective jurors to assist in a case. We thank you for taking time out and your busy schedules to come here and participate as jurors. By law, you are not qualified TO act as a juror or serve as a juror unless several things are true. So I will just go through them now. You have to be a United States citizen. You have to be 18 years of age. You have to currently live in Alameda County. And if you have suffered a felony conviction, you have to have gone through the process of having that case dismissed and your rights restored.

So is there anybody here that thinks because of one of those four things that there could be a problem with them serving on this jury? All right. I don't see anybody.

Sometimes it comes up with students, if they're say you're going to school in another part of the state and you're very responsible; you got your jury summons at home where your parents live and you came back to serve because you got a summons here. But let's say you want to go back to somewhere in San Diego or UCLA or USC -- we

don't want to distinguish between all the great institutions in the State of California -- but that would be a common situation where we have people there -- sir, you raised your hand. What was your question?

A PROSPECTIVE JUROR: Well, I was years ago convicted of a felony.

THE COURT: We'll take a minute and talk about that individually with you separately. Okay?

A PROSPECTIVE JUROR: Okay.

THE COURT: So, presumptively --

THE CLERK: There is another hand.

THE COURT: There is another hand.

A PROSPECTIVE JUROR: I go to UCSD, but I live here.

THE COURT: We'll talk to you later today, I am sure. Okay?

A PROSPECTIVE JUROR: Okay.

THE COURT: Presumptively, then, everybody is eligible to be a juror. And in order -- that means at this point I am going to ask the clerk to administer the oath. This oath he's going the administer is saying -- you're saying you're going to answer all the questions during voir dire truthfully, whether the questions are put to you by me, or by one of the attorneys. Okay. So this is an oath that you promise you'll provide us with truthful information as we go through the voir dire process.

Okay. Mr. Clerk.

THE CLERK: If you could stand and raise your right hand please?

(Whereupon, the prospective jurors were duly sworn)

THE COURT: So we're here today to select a jury in a criminal case. Serving on a jury is both a legal obligation and a privilege as a citizen of the United States. Jury service has been an obligation that the citizen owes the Government for several hundred years. But it's more than just an obligation; it's really a part of the checks and balances in our system of government. It may not sound like something particularly exceptional or noteworthy, but if you look around the world today trial by a jury of your peers is not a right of a citizen in probably more than half of the countries of the world. We've come to understand a right to a trial by jury as a jury of your peers, and your peers are those who live in the county, because this is a State court, those who live in the county where the crime is alleged to have occurred. That's why you're here because the crimes alleged here are alleged to have occurred in Alameda County.

You're going to be taking part in something that has its roots in the legal system that was transplanted here from England in the 17th and 18th centuries, and its developed since that time on this continent. The system in America is one designed on a balance of powers and checks and balances. The colonists who founded this country had experiences with the monarchs in England and

in Europe. And the European monarchs had virtually absolute power, both at home in the countries they governed and in their colonies. And in the American colonies the English came, controlled the economy of the country, through land grants and taxation and things like that. He invaded the colonists' privacy and homes, in fact, because in times of peace he would order that they house soldiers in their homes. Not only would they have to house the soldiers, give them a place to stay; they have to feed them, provide them with grog, whatever they wanted to drink, and that can be somewhat intrusive, if you could imagine having some soldiers in your house indefinitely. Other things he restricted: Freedom of speech, freedom of religion, freedom of the press. So all these things occurred and ultimately led to the revolutionary war. And we remember that; we remember the Declaration of Independence every 4th of July. It's one of our national holidays.

After the British were defeated and were sent back, the colonists tried to have a loose association where the 13 colonies became 13 different countries. That didn't seem to work out too well. So in the course of a few years, the people and their leaders were not satisfied with that sort of loose confederation, the articles of confederation, so they set up the Constitution, which was ratified in 1787. The primary checks and balances in the U.S. Constitution were they set up a government that had three branches. The Legislative branch made the laws, the

Judicial branch, if there was a dispute between the Government or two people, those would go to the Federal courts and things would resolve. But even when they passed or enacted the Constitution, there were no restrictions on the National Government or on the State Government. There was no recognition of the rights that the colonies and the colonists had fought for to have recognized in the revolution. So over the next few years, between 1787 and 1791, they put together the Bill of Rights, which are the first 10 amendments to the United States Constitution, and they were ultimately ratified in 1791. So I don't know, I think it's important we think about these things when we come for jury duty because all these things ultimately go back to the Constitution, but not to the Constitution necessarily as much as to the Bill of Rights.

We'll all remember that the First Amendment talked about there were certain freedoms. Two freedoms of religion. There was the freedom that the Government could not establish a State religion. And also there was the freedom to have free exercise of your own religion. Those with the two freedoms of religion. They also enshrined the freedom of the speech, freedom of press, freedom to assemble, freedom to petition to redress grievances. They also had the ability -- they also said the Government in time of peace could not billet soldiers in the homes of citizens without consent.

And the Fourth Amendment, remember that's the

rights regarding protections; regarding search and seizure by the Government. They could not search your house without probable cause, and if they want to search your home they have to get a search warrant reviewed by a Magistrate.

The Fifth Amendment has certain rights that relate to the trial. The Government can't try you more than one time for one crime. That's the right to double jeopardy. There is also the right to be free from having to testify against yourself. The Government can't call you as a witness in your own case. And there's the right to Due Process of law. If the Government wants to take your liberty or your property, they have to give you Due Process of law, and if they want to take your property they got to pay you for it, give you just compensation.

The Sixth Amendment talks about you have the right to a speedy and public trial in the district where the crime was committed. You have the right to know what the accusations are, the nature of the accusation, the nature of the charge, and you have the right to the assistance of counsel.

There are other amendments of the Bill of Rights, but in general over the next few hundred years the State and Federal Courts have reviewed the Bill of Rights and applied it to the states after the Civil War in the Fourteenth Amendment.

So today, here we are in 2013. And in 2014 we're going to be considering this case. When I say we come

here then to try a criminal matter, we're going to take evidence and decide whether a violation of law has occurred. That's essentially what the jury has to decide, whether it can be proved beyond a reasonable doubt. The Legislature passed certain laws. So in our State system our Legislature in Sacramento passes the laws and then the Executive branch enforces the laws. And when it comes to criminal matters, the Executive branch is the Attorney General and the Attorney Deputy -- not the deputies, but the District Attorneys of the 58 counties. And then the courts, there are courts in all 58 counties of California that decide legal matters.

So when a crime occurs, it's investigated. And the police ultimately will investigate it, and then when they have enough evidence they think to show that not only the crime's occurred, but who did it, they would go talk to the prosecutor. And then the prosecutor, if they believe certain things are present and they have a good case, then they will file charges.

So a criminal case begins when the Government files a document in court, which we call an information. When an information is filed it's important to remember that the information is not evidence of anything. The information is simply the accusation, going back to the amendment we talked about in the Constitution. Right? You have the right to know what you're being accused of. So the document, itself, is not evidence whatsoever. The document is just the accusation. And when a person is

accused by the prosecution of a crime, they have all those rights that are in the Constitution that we just talked about or I just talked about. They have the right to counsel. They have the right to a public trial. They have the right to have their attorney question the witnesses against them. By questioning the witnesses, they test people's memories, they test credibility. All those things are there for the jury to see and decide as to whether or not the case is being proven. Also at trial there is the presumption of innocence. Unless the evidence shows the person's guilt beyond a reasonable doubt, a person is entitled to an acquittal, of being found not guilty, because the person is presumed to be innocent. This means the burden of proof is on the prosecution to prove each and every charge and any allegations to an abiding conviction and beyond a reasonable doubt. If the evidence does not prove guilt beyond a reasonable doubt, so if the People fail to meet their burden, then you must find the defendant not guilty.

We've kind of gone over why we're here, how the system works. Is there anybody that doesn't think -- that wouldn't agree with the constitutional provisions that we're hearing provided today to those who are accused and doesn't think they can follow those rules that apply to each and every case in our courts? I don't see anybody raising their hands so we're making progress here. That's a good thing.

Okay. I think I mentioned this, but if I didn't

there is another constitutional principle at trial that kind of goes with the burden of proof, that is the right against self-incrimination, the right to remain silent. At a criminal trial, the accused has the right to remain silent. He or she does not have to testify at their trial. They do not have to provide any explanation whatsoever of what might have happened on the day of the events. So sometimes when we think about it, when we're at home with our kids and we hear some racket down the end of the hall and we go down there and want to hear from both sides of the story, but jury trials are a different type of thing. Jury trial, the burden of proof is on the People, and if the defendant, and in consultation with counsel, decide we don't think the prosecution has proven their case beyond a reasonable doubt, they need not testify, they need not call witnesses, they need not present any evidence. They have that right and the jury is not to take any cue that something might be up as a result of that. You're to ignore that entirely. And if in jury deliberations somebody says, well, the guy didn't testify, you got to tell us or put a stop to that in the jury room because that's not a consideration for the jury, okay, because the Constitution protects those who are accused from that kind of speculation. If there is no evidence of it, it can't be considered because there is no evidence of it at all. It's like a vacuum there.

Okay. Is there anybody that cannot -- doesn't agree with that principle that protects those who are

accused? All right. I don't see anybody responding. That's good.

So let's go back. When charges are filed, they -- they are filed by the District Attorney of the county. Each county has an elected District Attorney. In our county, the elected District Attorney is Nancy O'Malley. She has a deputy in this court. I will invite her to introduce herself.

MS. PETTIGREW: Thank you, Your Honor.

Good morning, ladies and gentlemen. Good morning. My name is Stacie Pettigrew. I am a Deputy D.A. for Alameda County.

THE COURT: And the two people who are accused today, I will allow Mr. Steckler to introduce himself and his client.

MR. STECKLER: Thank you, Your Honor.

Hello, everyone. My name is Drew Steckler, and this is my client, Joe McNeely.

MR. MCNEELY: Good morning, ladies and gentlemen. My name is Joe McNeely. Thank you for your time and patience.

THE COURT: Mr. Bryden, you want to introduce yourself and your client?

MR. BRYDEN: Yes, Your Honor.

Good morning, ladies and gentlemen. My -- I am attorney David Bryden. It's my privilege to represent Mr. Donel Poston.

Mr. Poston, would you say hello to these folks?

MR. POSTON: Good morning, everybody. Appreciate you guys coming, as well.

THE COURT: Thank you.

Now, first of all let me say a couple things. During the course of the trial the jury is supposed to get all the information that they are going to base their decision on while we're in open court, while we're in session, with all the parties present, not just the attorneys, or the Court, or any individual party. So I admonish the attorneys not to communicate with you. If you run into them in the hallway, there's not to be any communication anytime. I mean, you can say good morning, you can say hello, but beyond that we're not to have any conversations because it -- there could be the appearance of impropriety and we don't want to have anybody suspecting that somebody got some information outside of court. And the attorneys are aware of this and they are very conscientious about that, so it kind of puts a burden on you to be aware of that, as well, and not to -- to violate that rule, as well. So that's one of rules is please don't communicate with the parties outside of court. If you have a question or a problem, you can always send a note to the clerk or to the deputy and we'll talk to you if you have a question. Try not to talk to the attorneys about it because they probably have the answer but they would be violating the rule not to do that -- or were they to do that.

But that brings up a second thing, which is

when -- you're not to investigate the case independently. You're not to get information from them independently. You're not to investigate the case yourself, independently. So you may hear about a place that you know about, you may hear about a place that you get curious about that you don't know about; you're not to go to that place, you're not to investigate further. When you get the law, you're not to go and -- we have these very powerful computers on our phones now and you can do all kinds of research, but that's not your job. The parties will provide you with the evidence during the course of the trial and the Court will provide you with the law that you need. And so beyond that that you got in court you're not to do any further investigation. Don't check stuff out on Google. Don't go on-line to look at maps, or photographs, or aerial photos, any of that stuff. If the parties think that's necessary for this case, they will provide that to you. If the parties think there is some law that's necessary to the case, they will ask me to give it to you and I will give it to you. And if there is some law that you don't think you have, rather than research it yourself, we'll give you a note; you send us a note, say we got a question about this, and we'll give you more law as is appropriate to what your question is. So don't do any investigation about the facts or about the law while you are on jury duty.

And that kind of gets me thinking about another thing. You are the people we're going to select as a

jury. Try not to go home and talk about it with your family. They will want to ask questions and things like that, and it's just easier to say judge said don't talk about it till the case is over, then you can do all the talking you want. Okay?

All right. So now that you know who the parties are, let me explain to the to you what the charges are. The events that occurred on April 5th of this year, 2013, and the charge is -- in count one is that there's a charge of homicide upon the person of Lionel Fluker on that day, and both Mr. McNeely and Mr. Poston are accused of that crime. That's in count one. Each of them is also accused of using a firearm in the course of that event. The second and third charges are Mr. McNeely is accused of trying to kill Mr. Poston and Mr. Poston is accused of trying to kill Mr. McNeely. So there is an attempted murder charged as to each of them, and they are each charged in that count with personal use of a firearm. And then there are counts four and five, and in those counts they are each accused of being a felon in possession of a firearm. So those are the five counts that are alleged in this case.

I am going to tell you something a little bit about -- just to give you a perspective of what the case may be about. You're not to consider what I am about to tell you as evidence because I am not a witness. You will hear all the evidence from the witness stand. But on April 5th of 2013, at MacArthur and Seminary in Oakland

there is a Valero gas station, and on that day two men shot at each other; in the course of their acts, an uninvolved person was shot and killed. The attorneys tell me that perhaps at the time this occurred this was in the press. It might have been -- there might have been something on TV that night or the next day. So, please, this is why I say don't go back, do any research to find out what was on TV because what's on TV isn't evidence, what's in the newspaper isn't evidence. Sometimes we read about what's in the newspaper on day one, then they make a correction on day two and the story the first day was entirely wrong. So you're to get your evidence from the trial while we're all present in court. Don't do any searches of what might have been on the press or on the news. And that goes back to why I say don't talk to your family members about the facts of the case because you may be diligent and say I understand the admonition to me is not to investigate, then you say, well, this is the murder that happened over at the Valero or shooting that happened at the Valero on this day, then the person you talked to says, oh, I saw that, let me tell you what happened. Then we end up in a bad place because we're getting into what really isn't evidence because they weren't there, only telling you what happened on the news or what might have been in the paper. So try not to talk about the facts of the case. Try to keep this focused on getting all of our evidence while we're in trial.

We're going to proceed with the trial in the

following kind of four or five steps here. We're here for jury selection. Then after jury selection we'll go into presentation of evidence. And then after presentation of evidence there is the presentation of the law by the Court and the arguments of counsel. So all the parties get to argue what they think the evidence showed after you hear the law and then the jury begins to deliberate. Okay. So that's kind of the procedure.

And many of you, I'm sure, have served before, and you understand that during pretrial motions, with the pretrial motions with the attorneys they've prepared very diligently and we've talked about how the case might proceed and how long things might take. We understand that it's almost always inconvenient for you to come down and serve as jurors and we would like to respect your time and not make it more inconvenient than it need be. So for that reason we're going to follow the following procedure. We're going to do a jury questionnaire. We're going to give you the questionnaire today, ask you to fill it out today; and then those who are able to serve on the trial, we're going to ask you to come back after the -- the Monday after New Year's, which would be January 6th, to begin the process where we ask you questions directly. Because we have a questionnaire, it's -- we hope to minimize the amount of time that it takes to ask you questions with everybody present, so we'll get as much information as we can from you on this questionnaire.

Let's see how this works here. So here's going to

be our calendar. We're going to come back on Monday, the 6th, for further jury selection after today. So between now and January 6th you won't have to come back to court. On the 7th, we're only going to be in session in the afternoon, not at 7:00 p.m., like from 1:30 or 2:00 to 4:30, okay, and then on the 8th and 9th. We'd be in session -- every Friday the Court has another calendar. The Court does law and motion. So there is no session, no jury proceedings on a Friday. The week of the 13th would be a four-day week. On the 20th, that's Martin Luther King day, so there is no court on that day. And then if it goes so long as to get into February, February 12th is Lincoln's birthday, so that's another court holiday. We pick the jury, I would think -- generally, in past experience, we have a jury before the 8th and we'd be into evidence by the 8th. I don't know how long the evidence specifically takes, but the attorneys think that it's a possibility that the case would end by the end of January. I put in another extra days just to let you know what days we're in session, because we don't really know, things can go wrong or not go as smoothly as we anticipate. And we have to take a day out to go over instructions. Usually, before we give the arguments and instructions, we want to make sure we have everything so that the parties at least think that the Court is giving you right law and, generally, they -- we have to give a lot of law given what we think the facts of this case are. So there will be some interesting arguments and legal things going on in

this case for you to consider. Once it's in the hands of the jury, we don't set any time limits on how long a jury needs to reach a verdict. So the jury needs to take as much time as they need to take to try and resolve a case. So I don't want to say we're going to be done on January -- February 3rd and if it goes over then people are upset, so I put a little bit of extra time in there so that you have time to deliberate and there's not too much pressure, time constraints.

So we understand that this could be a long trial. We're -- there is a procedure for you to ask the Court for release because of an undue financial hardship because of a trial of this length, so we're going to do that this afternoon. Undue hardship has to be on the juror, not on your boss. And it has to be kind of a financial problem, so we'll talk about that. And if you had a medical situation, it's sometimes hard to get medical appointments and this can be a critical time of handling those matters. So if there is something important medically going on, or financial hardship, or another hardship that you describe, the Court will consider it. But the Court has certain guidelines that I have to follow to determine whether or not I will grant the hardship, but you can always ask for the hardship.

So let me go over the questionnaire with you 'cause we're going to ask you to fill out the questionnaire in a few minutes here. It may at first seem somewhat daunting because there are 22 pages to the

questionnaire. But, remember, these are all questions we would ask you individually while you all sat in the jury box and listen to each other answer these questions individually, so we think it's faster to do it this way and not to -- for you not to have to hear these questions 14, 15 more times.

Okay. The front page kind of tells you you're under oath to answer the questions. Here on the back of this page is the calendar that's on the board here. So you want you to take off this page, tear this page one and two off; you will have the calendar here; you will see the dates that we'll be in session. We're generally in session from 9:30 until 12:00, and we take a morning recess. We're generally in session from 1:30 until 4:00 -- 4:30 -- I am sorry -- and we take an afternoon recess. And we're never in session on Fridays. So that's all covered on the back of page two. If you tear this off, you will know what court you got to be in. There is a phone number here, I think, for the court. Tells you the name of the case. Yeah, there is the phone number and schedule. It's all right here. So you take this with you and you will have all the information you need.

So then you will go through the questionnaire and it covers a lot of grounds. When you get to page 20 and 21, there is a list of witnesses. So we're going to ask you do you know any of the witnesses in the case. Okay? And then you can either check the -- circle somebody that you do know or you check a box that says I do not

recognize any of these names and, presumably, I don't know these people. And then you print your name and sign it. So we are able to -- and remember everything in this questionnaire is under oath 'cause you're under oath as you answer these questions. The questionnaires are not confidential. They are only seen by the parties, by the attorneys and by the Court. If someone were trying to find information on this at a later time, there would have to be a hearing. And you get notice of a hearing; you can come down and say whether or not you agree to have your information released or not. So that's what the law provides.

Okay. Then on the last page, after you do -- on the last page is the hardship. So if you are seeking a hardship -- if you are not seeking a hardship, the first box on the last page says, "I do not seek a hardship". That's easy. So if you do not seek a hardship, you fill all this out, you leave it in the jury assembly room in a box up there on the counter, and then you will come back on January 6th at 9:30, and you will go back over to the jury is assembly room on January 6th. So if you say, you know what, I could make this work, okay, that's fine, fill this out, come back on January 6th at 9:30. If you want the Court to consider a hardship, then you're going to check the lower box and say, "I ask to be considered." And then there is three reasons here. You could fill out and say I have got a problem with my employment, the financial hardship is on me, and you will tell me how I

have got a pre-paid vacation during the course of the trial, or I have got some medical situation that I have to deal with. Okay. And then after you fill the whole questionnaire out and you fill out the last page asking for a hardship, you will come back at 2:00. I will read these before you come back and I will tell you whether or not I can grant your hardship or not. Okay. So we're going to ask every person to fill out the whole questionnaire, even if you are asking for a hardship, because if the Court denies your hardship we need to have the answers to the questions. The other thing is try to fill it out and have it in the box before 1:30 so that I have time to read them all. Okay. I am sure there is -- many of them are going to be there before 1:30, but don't put it in the box after 1:30 because I never have time to read all the late ones that come in after 1:30. So two different ways to go: One is I could serve, fill it out, put it in the box, I don't want a hardship and I will be back on January 6th; that other one is I do want to be considered because of employment problem, medical problem, or I've got a prepaid -- it's not a work issue, I mean, well, you can talk about work. But, anyway, if it's a prepaid vacation, that might be one thing, and we're going to expect that you would probably show us your itinerary or something to show you got the trip lined up.

Okay. Now somebody had a question. I am not sure if I have answered it.

Yes, ma'am.

A PROSPECTIVE JUROR: I don't think I qualify. I don't fall into any of the categories. I still can't because I go back to school on the 6th.

THE COURT: Okay. So --

A PROSPECTIVE JUROR: Is that work?

A PROSPECTIVE JUROR: So did I.

THE COURT: It's not work. I thought I said if you go to school and you're just here because you got your summons and you're going to school and you're going somewhere else, I said that was an excuse.

A PROSPECTIVE JUROR: Oh, I see.

THE COURT: So is that what you're telling me now?

A PROSPECTIVE JUROR: Yeah. You said you would talk to me about it later, so I stayed.

THE COURT: Why don't you stay when everybody else goes and you don't have to fill out the questionnaire. Perhaps the -- if somebody is in school beginning in January, going back in January, stay behind and we'll talk about that. But you will get a questionnaire and you can return it to me in a few minutes, if that's what's going on.

Is there any questions about the jury questionnaire process?

Yes, ma'am.

A PROSPECTIVE JUROR: On the back of the original form there was another hardship option about being a caretaker for dependents; does that count?

THE COURT: You can put that in there. I don't

know that we have a space for it, but it might be -- put it under medical. Put it in the medical part. Okay?

All right. There's always questions so don't feel like you're going to -- you don't have to ask questions, but if you have a question it's easier to ask me than it is to ask somebody to --

A PROSPECTIVE JUROR: Where is the box physically located?

THE COURT: It's on the counter in the jury assembly room when you walk in the door. You put it in there, and they will have pens for you to -- I encourage you to go down there, fill it out. It will be more comfortable.

Yes, sir.

A PROSPECTIVE JUROR: Once we're done filling this out, we're free to go?

THE COURT: You're free to go. You don't have to come back at 2:00 unless you're asking for a hardship.

Let me look here. I have a bunch of notes of things here I am not supposed to forget to say. And there is one that I remembered earlier. I mentioned to you things that are not evidence, the accusation is not evidence, all those kinds of things.

During the course of the trial you may notice that you won't be seeing Mr. McNeely and Mr. Poston coming in and out of the doors with their attorneys because they are both in custody. Okay. So, but that's not a fact that you're to consider in deciding whether or not they're

guilty of the crimes charged. Okay. I mean, you would -- most people would think, I think, if you were accused of a murder you would be in custody. That's simply what it is. But it's not a fact that's proving guilt; it's just a fact that they were not able to pay bail. Okay. So the Constitution entitles you to reasonable bail, but they were not able to pay bail so they are in custody during the course of the trial, but that's not a fact for you to consider in determining guilt or whether the People have proven their case beyond a reasonable doubt. So don't speculate about it; don't comment on it during your deliberations.

Okay. Anything else?

Yes, sir. Did you have a question?

A PROSPECTIVE JUROR: Yes.

When -- if we were to come back on the 6th, do we get a note of some sort or pass similar to the summons that we have rights now?

THE COURT: No, you won't. That's why I am encouraging you to take this so that you can see the 6th would be the next day. And then down here it tells you 9:30. It gives you the regular schedule. And you will go to the jury assembly room, then we'll call you down here. And on that day the attorneys will have read and considered everything in your questionnaires, and they will ask questions of people. We'll put people in the box and actually go through what's more traditional voir dire. You probably seen in the old movies where they do it the

old way. Okay.

Yes, ma'am.

A PROSPECTIVE JUROR: If you are being considered for a hardship, do we stay here till two o'clock?

THE COURT: You can stay until 2:00 or go get lunch, come back at 2:00, whatever you see fit. Okay. But we do want to see you later today asking for a hardship.

Yes, ma'am.

A PROSPECTIVE JUROR: If your residency is changing out of the county mid-trial, does that eliminate you from --

THE COURT: I don't -- that's a good question. I don't know the answer. I think it's when the jury is selected. But if you're thinking of moving out of the county, why don't you come back at 2:00 and write down what's going on? Because it may be if you're moving to San Jose, that's one thing; if you're moving to L.A. that's something different. So does that make sense?

A PROSPECTIVE JUROR: Mm-hm.

THE COURT: Okay. And I will do a little research on that.

Okay. Yes, ma'am.

A PROSPECTIVE JUROR: What if you don't have an outside caregiver for your dependents?

THE COURT: Another lady asked that question. Write something down in the medical box explaining to me what you're asking me to consider.

Yes, ma'am.

A PROSPECTIVE JUROR: If you don't fall under the hardship category, we have to come on January 6th?

THE COURT: Yes.

A PROSPECTIVE JUROR: Okay.

THE COURT: Okay. There are other reasons or excuses. Today we're just doing hardships. Just because you come back on January 6th doesn't mean you will be on the jury. And you -- but you do have to come back then. We'll deal with hardships because when the attorneys read the questionnaires, if there is a different kind of excuse they may consider that all the time.

THE COURT: Yes, sir.

A PROSPECTIVE JUROR: Where do we meet at 2:00 p.m.?

THE COURT: If you just meet down there and we'll bring you all down after I talk to the attorneys. Okay?

All right. Yes, sir.

A PROSPECTIVE JUROR: Will I be able to use the washroom before we fill all this out?

THE COURT: Yes. You're fine. You can get it in in the next hour. That's fine.

A PROSPECTIVE JUROR: Well, I mean, I only need to go to the washroom. I'll put it in the next 10 minutes.

THE COURT: Well, we're going to release you right now. We're going to give you the questionnaire. You're going to walk out of here, fill it out and turn it in; is that correct?

A PROSPECTIVE JUROR: That's right. I thought we had to stay here.

THE COURT: No, no. I am encouraging you not to stay here. I think you will be more comfortable down there. There is an upstairs there; you can go to the upstairs. There is a downstairs. And that would also enable the attorneys and I to have further discussions if we need to have any.

A PROSPECTIVE JUROR: We can leave once we have it --

THE COURT: Once you have that, you can leave. Go down, fill it out. You could actually fill it out in the hallway or in that room or upstairs, however you feel, whatever you think is right.

And if that student would like to stay behind, I will talk to her.

We're going to do this one at a time. Could I ask everybody except the guy sitting in front of the bar to wait outside and we'll come in one at a time? Could I ask you to wait outside? Thank you.

(Whereupon, all prospective jurors except one exit the courtroom)

THE COURT: Okay. What's your name?

MR. VONNEGUT: Ryan Vonnegut.

THE COURT: It looks like Prospective Juror 244.

And what are you asking the Court to consider, Mr. Vonnegut?

MR. VONNEGUT: That I go back to school on January

6th.

THE COURT: Where do you go to school?

MR. VONNEGUT: Cal State East Bay.

THE COURT: How many units are you carrying in January?

MR. VONNEGUT: About 12.

THE COURT: And are they -- how many of them are day classes?

MR. VONNEGUT: Day, meaning about in the afternoon? So all three of them are.

THE COURT: All right. I will excuse you.

MR. VONNEGUT: All right. Thanks.

THE COURT: You can just leave the questionnaire on that table.

THE CLERK: Mr. Pan, number 219.

THE COURT: Good morning, sir.

What's your -- what's your request for a hardship?

MR. PAN: I go to school at Cal Poly, San Luis Obispo.

THE COURT: When to you go back to school?

MR. PAN: January 6th.

THE COURT: Okay.

Could you put your questionnaire up there and then you can go?

MR. PAN: Okay. Thank you.

THE CLERK: Ms. Wahidi, number 245.

THE COURT: All right.

Ma'am, what would you like the Court to consider

as possible hardship?

MS. WAHIDI: I am a student and I will be starting school on January 6th, and those days --

THE COURT: Where are you going to school?

MS. WAHIDI: Cal State East Bay.

THE COURT: Okay.

How many units are you taking?

MS. WAHIDI: I am doing my Master's in Health Care Management.

THE COURT: Okay.

And how many units are you taking?

MS. WAHIDI: Oh, sorry. Eight, but it's considered full-time, so.

THE COURT: Okay. All right. I will grant your hardship.

MS. WAHIDI: Thank you.

THE COURT: If you want to leave your questionnaire there, you will be excused. Okay?

MS. WAHIDI: Okay. Thank you.

THE CLERK: Mr. Castro, number 183.

THE COURT: All right, sir, what would you like the Court to consider as a possible hardship?

MR. CASTRO: I am starting on January 21st because I don't know -- because my classes start -- the classes I have is from Monday all the way to Thursday in the evening, so I don't know if it's going to interfere with my classes in college.

THE COURT: Where are you going to school?

MR. CASTRO: Chabot College.

THE COURT: And you take night classes?

MR. CASTRO: No, I take evening classes.

THE COURT: Evening?

MR. CASTRO: Yeah.

THE COURT: Meaning what?

MR. CASTRO: Like from 12:00 to -- all the way to 4:00, or from 2:00 all the way to 5:00.

THE COURT: Okay.

And that would begin on January 21?

MR. CASTRO: Yes.

THE COURT: How many units are you going to take?

MR. CASTRO: At the moment, I am taking two units.

THE COURT: How about in January, what are you going to take?

MR. CASTRO: In January, I am taking two units; that's what I am saying.

THE COURT: You're taking two units?

MR. CASTRO: I am taking two units at the moment.

THE COURT: Do you have a job? So --

MR. CASTRO: No.

THE COURT: So two units sounds like it meets once a week or twice a week.

MR. CASTRO: May you repeat the question, please?

THE COURT: Two units sounds like one class to me; is that right?

MR. CASTRO: I am taking two classes.

THE COURT: Two classes.

MR. CASTRO: One each day. But I take like around three hours more, and I need to take time to work on my assignment projects.

THE COURT: Okay. What are you studying?

MR. CASTRO: Visual meeting.

THE COURT: So you are taking two classes. What days does the first class meet?

MR. CASTRO: The first class starts on, I think on Tuesday.

THE COURT: Tuesday/Thursday or just Tuesdays?

MR. CASTRO: Tuesday. And the second class is on Thursday. So the first class is Monday, then the second class is on Tuesday. Then it repeats again for the next two days.

THE COURT: Okay. I will excuse you.

MR. CASTRO: Okay.

THE COURT: Could you put the paper up there on the table, then you can go, okay?

MR. CASTRO: Okay.

THE CLERK: Ms. Pereira, number 223.

THE COURT: Good morning, Ms. Pereira.

What would you like the Court to consider as possible hardship?

MS. PEREIRA: I return to school on Monday, the 6th.

THE COURT: Where do you go?

MS. PEREIRA: Santa Clara University.

THE COURT: How many units?

MS. PEREIRA: 16. So four classes, 16.

THE COURT: I will grant your hardship.

MS. PEREIRA: Thank you.

THE COURT: If you want to leave the questionnaire there, that will be fine.

(Whereupon, the noon recess was taken)

THE COURT: Let's go on the record.

The Court's reviewed the questionnaires submitted by the jurors today, and it looks like there's only 24 who say clearly that they are not asking for a hardship; seven didn't fill out that portion of the questionnaire, so that could be as high as 31; 43 were asking for a hardship, although about 7 of them, I think, are not clearly hardships; and then there's two that just turned in their questionnaires and -- actually, one hasn't turned in the questionnaire and one questionnaire asked for a hardship. So those numbers would be bumped up by one.

The Court's going to ask the clerk to order a jury panel for tomorrow morning, a third panel tomorrow at 50.

Is that what you asked for?

THE CLERK: Yes, Your Honor.

THE COURT: And we'll figure out tomorrow when we have them return.

All right. So I guess we should ask to have the jurors brought in and we'll go through the hardships as we did on Thursday of last week.

Any comments or anything before we go?

MS. PETTIGREW: No.

MR. STECKLER: No, thank you.

THE COURT: All right.

Can you call for the jury, the people that are over there?

On your alphabetical list, number 214 McElroy. She actually fills out the questionnaire using the last name Grant. So it's McElroy-Grant. I circled McElroy on the questionnaire so we can figure out what it was.

MR. BRYDEN: That's a questionable.

THE COURT: What did she ask for?

Yeah. She says she can't be here until the afternoon of January 6th 'cause she's coming back from somewhere that day. So I am inclined to have her come in either that day or the morning of the 7th, because we're not going to go off of her list first; we're going to have to go through the whole first panel before we get to her. And if she doesn't sit here for one day of voir dire, I don't think that's problematic, unless somebody thinks it is.

MS. PETTIGREW: No. Just don't forget we're only in session the afternoon of the 7th.

THE COURT: Okay. So I will probably talk to her.

Anybody have a thought if somebody says I am moving to San Francisco in the middle of January? Anybody want to contribute anything on that issue?

MR. STECKLER: I did not do any research.

THE COURT: I looked and couldn't find a place that gave me a specific answer to that. The person is a high school counselor or something.

MS. PETTIGREW: I don't have a strong thought either way.

MR. BRYDEN: Since I don't know the law, I guess in an abundance of caution, I guess --

THE COURT: Do you want to look at the questionnaire, figure out what you want to do down the road?

MR. BRYDEN: No. That's the smarter -- actually -- I would just say let her go so we're safe since she is not a county resident when she is rendering the verdict, but I don't really know the law.

THE COURT: Any other comments?

MR. STECKLER: That -- I mean, I have the same legal nervousness that Mr. Bryden has. I just as soon see the questionnaire and then decide my position.

THE COURT: Right. And that will give you time to provide me with whatever authorities you want to, also.

(Whereupon, the prospective jurors seeking to be excused for a hardship entered the courtroom)

THE COURT: All right. Good afternoon, ladies and gentlemen. There were a number of people that were excused this morning because they were students. So I am going to read off the names of the people whose questionnaires I reviewed, that some people left blank whether or not they were asking for a hardship. So I am

going to read off names of people that clearly and distinctly told me they wanted some kind of a hardship excuse. If your name is there, raise your hand and I will know that you're here. And then if we -- I will tell you what we're going to do at the end.

Okay. Walter Arthur. All right. Mr. Arthur's here.

Andrew Bai. Could I ask you just to stay here?

MR. BAI: Here.

THE COURT: Make it easier for me and everybody who has their back to you and you will be able to follow along, as well.

Sweena Burroughs.

MS. BURROUGHS: Here.

THE COURT: Andrew Caputo.

All right. There's no Andrew Caputo.

MR. CAPUTO: Here.

THE COURT: Oh, you are here. Sorry. I didn't hear you.

There was a Jorge Castro we excused. All right.

Jing Chiang, we already excused.

Theresa Cho.

MS. CHO: Here.

THE COURT: All right.

Stephen Clark.

MR. CLARK: Here.

THE COURT: Joseph Cornwell.

MR. CORNWELL: Here.

THE COURT: Thank you, sir.
Caroline Dickinson.
MS. DICKINSON: Here.
THE COURT: Bonifacio Garcia.
MR. GARCIA: Here.
THE COURT: Diana Gentry.
MS. GENTRY: Here.
THE COURT: Josie Gibson.
MS. GIBSON: Here.
THE COURT: Lynnette Gomez.
MS. GOMEZ: Here.
THE COURT: Kathryn Gutierrez.
MS. GUTIERREZ: Here.
THE COURT: Sadora Hayes.
MS. HAYES: Here.
THE COURT: Joshua Holbak.
MR. HOLBAK: Here.
THE COURT: Douglas Holmes.
MR. HOLMES: Here.
THE COURT: Justin Jasper.
MR. JASPER: Here.
THE COURT: (Juror No. 4).
(JUROR NO. 4): Here.
THE COURT: All right.
I think we excused Sandra Manha this morning.
THE CLERK: I have Lea Magro.
THE COURT: Oh, that was Lea Magro, correct. That was a mistake on my part.

THE COURT: Vezvi Marinas.
MS. MARINAS: Here.
THE COURT: Lori McElroy.
MS. MCELROY-GRANT: Yes, but my last name is now Grant.
THE COURT: Okay. Thank you.
Fernando Miramontes was here this morning.
Jason Pan was excused this morning.
James Paterson.
MR. PATERSON: Here.
THE COURT: All right.
Katherine Paul.
MS. PAUL: Here.
THE COURT: Jason Pease.
MR. PEASE: Here.
THE COURT: We excused Pereira.
Jennifer Perez.
MS. PEREZ: Here.
THE COURT: Curt Piper.
MR. PIPER: Here.
THE COURT: Arthur Rodriguez.
MR. RODRIGUEZ: Here.
THE COURT: Edna Roque.
MS. ROQUE: Here.
THE COURT: Efren Rulan.
MR. RULAN: Here.
THE COURT: Rodolfo Scarpati.
MS. SCARPATI: Here.

THE COURT: Suzanne Scott.
MR. SCOTT: Here.
THE COURT: Wayne Silka.
MR. SILKA: Here.
THE COURT: Isabel Siordia.
MS. SIORDIA: Here.
THE COURT: Janice Tang.
MS. TANG: Here.
THE COURT: Julie Tang.
MS. TANG: Here.
THE COURT: Serafin Tatad.
MR. TATAD: Here.
THE COURT: All right.
Nancy Towers.
MS. TOWERS: Here.
THE COURT: I think we excused Ryan Vonnegut, Farishta Wahidi.
And the last one I was going to call was Michael Wheeler.
MR. WHEELER: Here.
THE COURT: Okay.
Is there anybody who's name I have not called who is present?
What's your name?
MS. HARRISON: I haven't turned in the paper 'cause I thought --
THE COURT: Okay. So it would be impossible for me to call your name because you didn't turn in the paper.

How about you wait behind and we'll talk to you?

MS. HARRISON: Okay.

THE COURT: The Court will excuse everybody except the following people, because from my review of the questionnaires it does not appear to be a legally acceptable hardship. The names that I call now, these people will have to come back: Joshua Holbak will have to come back on Monday, January 6th; JUROR NO. 7; Lori McElroy, we'll ask you to come back on the afternoon of Tuesday, January 7th since you cannot be here on the 6th. James Paterson will have to return on January 6th. Katherine Paul, I haven't been able to find the legal answer to your question and so I will ask you to return. Janice Tang and Julie Tang will also have to return on January 6th.

Okay. Other than those people that I just named individually, you will all be excused except for the lady in the front row who is going to stay and talk to me about whether she has a questionnaire, of what we're going to do there.

Okay. So I think I named about seven people who will return on January 6th, six people will return on the 6th; one is going to come back on the 7th.

Okay. Thank you very much for your service. This will satisfy your service for the next year in State court. And you have to hope you don't get a summons from Federal court. Thank you very much. Have a great Christmas.

(Whereupon, the prospective jurors exit the courtroom)

THE COURT: All right. Are you Ms. Harrison?

MS. HARRISON: Yes.

THE COURT: Okay.

And I was intrigued by your name. You say your place of birth is Thailand. Okay. I will grant your hardship. Okay. You will be excused.

MR. BRYDEN: Sorry. What was her name?

THE COURT: Harrison.

MR. BRYDEN: Okay. Thank you.

THE COURT: She is number 199.

All right. Thank you, Ms. Harrison.

Good luck to you.

MS. HARRISON: Thank you.

THE COURT: Mm-hm.

She said she has a high-risk pregnancy. She said she had all these appointments lined up.

Good afternoon, sir.

MR. PATERSON: Just want to confirm we come back on the 6th, actual jury selection will take place on the 6th. So I am not necessarily -- James Paterson.

THE COURT: The evidence, in all likelihood, won't start before the 7th or 8th. There is no guarantee you will be on the jury. The attorneys will all see your questionnaire.

MR. PATERSON: Thanks.

THE COURT: They will see what your questions

are.

MR. PATERSON: All right. Thanks.

THE COURT: Do you want me to go down whatever it is or are you content?

MR. STECKLER: I am okay.

THE COURT: How about you, Mr. Bryden?

MR. BRYDEN: I will be content later.

THE COURT: All right.

MS. PETTIGREW: I am okay. Thank you.

(Whereupon, jury selection was concluded for the day and motions were heard following this, already transcribed in the Transcript on Appeal for 12/17/14 and not part of the augment to record on appeal)

---oOo---

STATE OF CALIFORNIA)
) SS.
COUNTY OF ALAMEDA )

I, RONDA ROOPE, Certified Shorthand Reporter, do hereby certify:

That I am an official court reporter of the Superior Court of the State of California, and that as such I reported the proceedings had in the above-entitled matter at the time and place set forth herein;

That my stenograph notes were thereafter transcribed into typewriting under my direction, and that the foregoing pages constitute a full, true and correct transcription of my said notes.

DATED: 12-15-14

Ronda Roope

RONDA ROOPE, CSR NO. 5609

# EXHIBIT 6 (cont.)

# SSRT – Vol. 3

CALIFORNIA COURT OF APPEAL

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent

NO:

ALAMEDA COUNTY
NO: **172522 A&B**

vs.

**JOE DANIEL MCNEELY, aka: ANTHONY LISTER, and DONEL POSTON,**

Defendants and Appellants.

______________________________/

COPY

REPORTER'S TRANSCRIPT ON APPEAL

FROM FINAL JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

HONORABLE MICHAEL GAFFEY, JUDGE

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco, CA 94102

FOR THE DEFENDANTS AND APPELLANTS:
In Propria Persona

OFFICIAL COURT REPORTER:
Ronda Roope, CSR. NO. 5609

**(JURY SELECTION ONLY)** **DATE: 12/18/13**
**(Augment)** **VOL: 3**
**PAGES: 85-133**

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ALAMEDA
BEFORE HONORABLE MICHAEL GAFFEY, JUDGE
DEPARTMENT 517

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs. NO: **172522 A/B**

**JOE DANIEL MCNEELY**, aka:
**ANTHONY LISTER**, and
**DONEL POSTON**,

Defendants.

________________________________/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**AUGMENT TO TRANSCRIPT ON APPEAL**
**(JURY SELECTION)**
**DECEMBER 18, 2013**

Hayward Hall of Justice
Hayward, California

A P P E A R A N C E S

For the People: NANCY O'MALLEY
DISTRICT ATTORNEY
BY: STACIE PETTIGREW
Deputy District Attorney

For the Defendant **JOE DANIEL MCNEELY:** BRENDON D. WOODS
PUBLIC DEFENDER
BY: ANDREW STECKLER
Assistant Public Defender

For the Defendant **DONEL POSTON:** DAVID BRYDEN
Attorney at Law

Official Court Reporter: RONDA ROOPE
CSR NO. 5609

December 18, 2013 A.M. Session

P R O C E E D I N G S

THE COURT: All right. We'll go back on the record in the case of McNeely and Poston.

Both counsel are present.

MR. STECKLER: Just a second.

THE COURT: And the Prosecution is present and both defendants are present.

MR. STECKLER: Thank you, Your Honor.

THE COURT: All right. Today's Wednesday, the 18th. And we're going to call for the third panel for the jury questionnaires.

Is there any -- counsel indicated that -- I heard from the clerk that Counsel wanted to talk to the Court about something.

MS. PETTIGREW: Just that when we broke yesterday we didn't determine what day you wanted this panel to come back --

THE COURT: Right.

MS. PETTIGREW: -- and I recalled that as I was mid-stream of just copying the questionnaire that we already had. I was hopeful that we could leave the questionnaire as is just because of --

THE COURT: Oh, I see what you're saying.

MS. PETTIGREW: -- hardship in changing the date and re-copying. And then I was hopeful that between Mr. Steckler, Mr. Bryden, and myself, after going through all three panels we could stipulate people that would cause

off anyway to get us down to the 75 people who could fit in this room.

THE COURT: Is that --

MS. PETTIGREW: That was my thought.

THE COURT: -- proposal accepted by Mr. McNeely?

MR. STECKLER: We'll see. I don't know.

You know, frankly, it hasn't been my practice to stip pre-voir dire for cause, but we'll see how it works out; we can try.

THE COURT: Well, we kind of have to know what we're going to do to tell them whether to come back on the 7th or the 6th.

MR. STECKLER: I understand.

MR. BRYDEN: I agree with Ms. Pettigrew. I -- this obvious -- there's obvious cause people on both sides that leap out at attorneys on these questionnaires. I haven't really gone through them to see in this particular case, but I am happy to see how many people we can eliminate to get down to 75. The other advantage, in my mind, is that the entire veneer would benefit from hearing the same voir dire. You often miss people. Often, there's people back there that you're not asking questions that hear something they want to bring up.

THE COURT: Sure.

MR. BRYDEN: There is two advantages to trying to have them all come back at the same time. I am not saying we have to push to necessarily get to 75, but some sort of accommodation could be made with extra chairs. If we even

had 80, could we --

THE COURT: Sure.

MR. BRYDEN: -- without breaking the fire code?

THE COURT: Well, that's true.

I mean, in some sense we're placing form over substance. If we go through a panel and in going through the panel we run out of jurors, we call in new jurors that didn't hear what was done before, and that happens in cases routinely. So I don't think there has to be a bright line if we can't bring in people that didn't hear what went before, so I am not going to let that be the determining factor here. Sometimes you go through a panel. You don't get enough people. You don't have your jury qualified with the ones you get in the first panel. Then you call for a second panel. Sometimes that happens, and they are not -- we're doing it this way because we have the flexibility to do it this way. But if we were to call in 75 and just start picking a jury and go through everybody in the back and not get a jury, we'd call in another 30, 10, or 20, or however many we need. So I don't know that there has to be that -- your point Mr. Bryden is a good point. It would be helpful. But able Counsel will be able to realize that those issues that came out with the first panel that the second panel hasn't heard could be incorporated into their voir dire to see if there's anything that's going to be fruitful in your inquiries. So --

MR. STECKLER: Your Honor assumes facts not in

evidence, "able counsel". I was speaking of myself, not Mr. Bryden.

THE COURT: Sure.

MR. BRYDEN: I just, bam, just like right across the chin.

MR. STECKLER: No, that was myself.

THE COURT: Sure.

No. I am just saying you will see what the issues are and people will pop up and if you think there is an issue somebody will hear it and they will give you the answer.

So my question is have you printed those questionnaires?

MS. PETTIGREW: Yes.

THE COURT: Okay.

And they currently say what day?

MS. PETTIGREW: The 6th.

THE COURT: The 6th, okay.

And what did we say yesterday, Mr. Clerk? We already have 80, don't we?

THE CLERK: Yes.

THE COURT: We already have 80. So I am not going to tell them -- I mean, I don't think we could get more than 80 people in here. We only got 75 chairs. And if we put five along the side, so whatever number we have come back today I will tell them to come back on the 6th if you all agree you're going to figure out how to weed out how many people to get it down, you know, without -- I am not

asking you to violate your client's right to the appropriate jury, but you read these questionnaires, you can see some people say, well, I don't like cops, or some people say I got problems with -- if there was one questionnaire said that I didn't like the way these people stood up and addressed counsel yesterday, well you may not want to keep that person. If you agree you don't want to keep that person, I don't think the prosecutor's going to disagree with you if that person has perhaps already made up their mind on some issue in the case. And maybe somebody else is going to say I could never agree with what a cop said and, um, she's not going to want that. And between those two, you will say this person is biased against one party, this person is biased against the other. Rather than having to bring them in, put them up there and say all this stuff and potentially poison other jurors, maybe you agree to those two people being excused. Then we would be to a place where we could get everybody in the room. But it means somewhere on the dates up here we have to pick a date, like the 30th or the 31st, for you to come in and tell me who are those people that we should contact and ask them not to come in on January 6th.

MR. BRYDEN: We could also e-mail.

THE COURT: Pardon?

MR. BRYDEN: I envisioned e-mailing Your Honor and Counsel a list of people that I thought, just by juror number or something, who I thought would be cause, and then if my list is similar, there's four agreements, then

we just not have them come back.

THE COURT: If you could work it all out by e-mail, that's fine, but sometimes looking each other in the eye and talking about what's going on, that if we do one day present in court -- I don't know if you're available on the 30th or the 31st. Could anybody -- that's one of our days that we've set for this trial. Is that a day that we could get in here and do something, either the afternoon of the 30th or the -- I think the morning, that's day Mr. Dubois' coming back, right, Mr. Clerk?

THE CLERK: Sorry?

THE COURT: December 30th Dubois' coming here on the sentencing matter. So we got a sentencing matter on that morning. But the afternoon of the 30th or morning of the 31st.

MR. BRYDEN: That's good.

MS. PETTIGREW: That would work.

THE COURT: That would also give you a chance to talk to your clients one time before the jury comes, I mean, in court. I am not saying you couldn't go see them other times.

But which would be your preference to do then, which day, the afternoon of the 30th or the morning of the 31st?

MR. BRYDEN: I vote for the 30th.

MR. STECKLER: Same.

THE COURT: Same.

Can you be here?

MS. PETTIGREW: That's fine, yes.

THE COURT: So afternoon of the 30th we'll kind of figure out who we're going to call, and that gives the clerk the 31st, maybe the 2nd and 3rd to contact the people that would be not required to come in on January the 6th. And then we could weed that number down. They'd be excused and we'd get to something like 75 or 80.

Is that proposal agreeable with the People?

MS. PETTIGREW: Yes.

THE COURT: And Mr. McNeely's counsel?

MR. STECKLER: Yes. I will try.

THE COURT: And Mr. Poston's counsel?

MR. BRYDEN: Yes.

THE COURT: All you can do is try. All right.

MR. STECKLER: Question for Your Honor.

THE COURT: Mm-hm.

MR. STECKLER: In terms of numbering them, the jurors --

THE COURT: Right.

MR. STECKLER: -- do you call -- is it -- in terms of their number, not their name of course, but do you call them just one -- the first one on the random list is number one or is the first one on the random list, that juror's tag number, does that number follow the jurors? I am just curious.

THE CLERK: We just call them by name.

MR. STECKLER: By name. Okay.

THE COURT: We'll call them in the order off the random list. We'll go off random list for Panel A, and then Panel B, and then people we see today will be Panel C, and probably least likely to get in the box.

MR. STECKLER: Okay. Thank you.

THE COURT: But we'll go off the random list for that jury.

MR. STECKLER: That answers my question.

Thank you.

THE COURT: Should we call for those jurors then?

MR. BRYDEN: Your Honor --

MR. STECKLER: I am ready.

THE COURT: All right.

THE COURT: We're off the record.

(Whereupon, the prospective jurors enter the courtroom)

THE COURT: Good morning, ladies and gentlemen. Welcome to Department 517 of the Hayward Hall of Justice. This is a jury trial department for Alameda County. And you've been summoned here as prospective jurors to try a criminal case. We thank you for taking your time out of your busy schedules and coming down here today and participating as jurors. In order to qualify, participate as a juror, several things have to be true. You have to be a citizen of the United States. You have to be 18 years of age. You have to currently live in Alameda County. And if you have not -- if you have suffered a prior felony conviction, you have to have gone

through the process to have your civil rights restored.

So is there anyone that thinks one of those four things that would disable you from being a juror that would make you not qualify, either you are not a citizen, you are not 18, you don't currently live in the county, or you have suffered a conviction and you're not sure that you have had your rights restored? Any of those apply to anybody that's in court today?

Good morning, Counsel.

All right. So that being the case -- all right. This building is set up not most friendly to aspects of the case. So sometimes when people are in custody they are in the back here and attorneys come in to talk to them. So that was an attorney here doing his job and didn't mean to disrupt the proceedings.

THE COURT: So you're all eligible to serve as jurors because you meet those four categories we talked about. So what happens now we're going to ask you to take the oath to answer all the questions put to you by Counsel or the Court truthfully, under penalty of perjury; you're under oath.

Okay. So the clerk is going to give you the oath to answer all the questions truthfully. So I'd ask you all to please stand.

THE CLERK: Could you all raise your right hand please?

(Whereupon, the prospective jury panel was duly sworn)

THE COURT: Thank you very much.

Okay. So, as I said a few minutes ago, we're here to select a criminal jury for a criminal trial. Serving as a juror has been both a legal obligation and a privilege as a citizen of the United States. Jury service has been an obligation that the citizen owes the Government for several hundred years. But it's more than just an obligation; it's really part of the checks and balances of our system of justice. It may not sound like something exceptional or noteworthy, but if you look around the world even today, trial by jury of your peers is not a right given in many countries. Perhaps fewer than half the countries provide that right. Some countries, they will not give you a right to a trial at all. Some will be a trial by a Court. Very few have a right to a trial by a jury. We've come to understand the trial by jury of your peers as to mean trial by people in the area in which the court is. So in the counties, it's trial by members of the veneer comes from the people who live in the county. If you are in Federal Court, it's the people that live in that district of the Federal Court. So our Federal district is San Francisco, San Jose, Oakland, but it goes all the way up to the border of Oregon. So you could be called from Humboldt all the way down to San Francisco or Oakland to serve on a jury trial in Federal Court. In our State Court you would only serve if you were in the county.

You're going to take part in something has its

roots in the legal system that was transplanted here from England in the 17th and 18th Centuries and has developed further while it's been on this continent. Our system is one of checks and balances. The colonists who founded this country have experiences with monarchs in Europe and, more particularly, in England. And European monarchs have virtually absolute power in their country, as well as in the colonies that they had overseas. The English king controlled the economy by giving land grants to the people that he wanted to help him develop the country, by controlling their companies that work -- did work over here and by putting taxes on the people that were here. And, in addition to that, he also said that many times he wanted the soldiers in his army to be housed in the houses of the citizens in the colonies. Many times you were told by the king you had to have one or more soldiers living in your house. You have to feed them. You have to provide them whatever they drink, they eat. Maybe you have to do their laundry for them, as well. There was many things going on at the time in the 1700's that people found perhaps untoward. The king also did not recognize that the colonists had freedom of speech, freedom of the press, freedom of religion. These things and others led to the Revolutionary War, and we probably commemorate that July 4th of every year. We have the 4th of July and celebrate 1776 when they signed the Declaration of Independence.

So after the Revolutionary War and the British

were sent back to England, the colonists started a loose form of 13 separate little countries. So all the 13 colonies that became the 13 original states were their own little countries under the Articles of Confederation. And that was ratified in 1778 by most of those states. And the last one, I think, was in 1791 -- excuse me -- 81. And they found that -- that going from a very absolute kind of government to a very loose kind of government, neither one of those worked. And so in the mid-1780's they got together in and formed the Articles of -- or formed the Constitution, which was ratified in 1787. And that set up the three branches of government that was kind of the original plan as to how we're going to have checks an balances on the Government. They said we'll have a national Legislature, they called it, that is going to make the laws, the Congress. We'll have the Executive branch, who is going to enforce the laws. And then we'll have the courts is the third branch, where the disputes over laws can be resolved.

And so that's what happened in 1787 is they ratified the Constitution. But even in 1787 when that occurred, they didn't have any checks on the Government. One of the things they realized after being under the king is, you know, governments can get out of control, they take too much power, and they sometimes tend to do things that the citizens don't agree with and don't like. So they said we're going to try to restrain the Government, and the way we're going to do that is we're

going to pass these amendments changing or adding things to the Constitution that might not otherwise have been clear. So the first 10 amendments we call the Bill of Rights and they were ratified in 1791. So the first 10 amendments set out the framework that we're going to -- that we're working with today, that we're going to abide by today.

In the First Amendment, you will remember that they said that the Government cannot restrain religion in two different ways; they cannot establish a State religion, but they cannot also restrict people from practicing their religion. They have freedom of religion to express it in the way they want to and the government doesn't have its own religion that it forces on everybody else. First Amendment also deals with freedom of speech, freedom of the press, freedom of assembly, so can you associate with people you want to to talk about issues of the day and you can also petition the Government for redress of grievances.

In the Third amendment they dealt with the issues of billeting soldiers in your house in peacetime. They said you can't do that without the consent of the person who is the homeowner.

In the Fourth Amendment you go through the search and seizure issues. You can imagine if you have the Government soldier living in your house, your freedom to not be searched in your own house was pretty limited. They are walking in and out daily in your house. So they

said under the Fourth Amendment you have to have a magistrate sign a warrant to come into your house. You have a right to be free in your possession, your premises, and your property of search without probable cause effected by a warrant.

The Fifth Amendment said you can't be tried for the same crime; they don't get to try you again for the same crime. That's the double jeopardy issue. You can't be compelled to testify against yourself at your trial and you cannot be deprived of your life, liberty, or freedom without due process of law. Due process of law, if the Government wants to take your property they have to pay you compensation. That's in the Fifth Amendment, as well.

In the Sixth Amendment gives us a right to a speedy trial, right to a jury trial in the area where you're from, and the right to the assistance of counsel at your trial. So these are all things that are in the United States Constitution.

Previously, in England, people could be thrown in jail, kept there for years, never given a date for a trial. Then maybe they'd say, okay, your trial's coming up on Monday, after you have been in jail for a year or two, and your attorney might be a couple hundred miles away in another town and you have to send a message to him to get there and be back on Monday. It didn't really seem to be fair because, essentially, your right to counsel was meaningless if you couldn't get your attorney to your trial on the day of trial and be ready to go. So they put

all these things in the Constitution to say we want to restrain the Government from abusing us; we want to have a system that's going to protect our rights over time.

Over the last 200 years then, the Federal Courts and the State Courts have reviewed the Constitution and various laws that have been made and they've come to where we are today.

Acting as a juror in a criminal case or in any case then is a right that sometimes we take for granted, much like we go vote sometimes without having read the whole voter pamphlet. We don't think about it, but it's really an important right that we can't allow to get away from us. We should be trying to participate fully in our constitutional republic by voting and by serving as jurors when we're called to serve.

So when I say we're going to try a criminal case, let me just explain to you what I think we all ought to be aware of. If something happens that's alleged to be a crime, it's investigated by the police. They take whatever information they have to the prosecuting agency. The Government in the State of California is the District Attorney's office. And the District Attorney reviews all that and makes a decision whether they are going to prosecute the case or not. And then they come to court if they are going to prosecute and they file some papers and tell the Court here's what we're going to file, here's who we're going to file charges upon, and that document is known as an information. So I am going to tell you about

the information in a minute, but when I do I want you to bear in mind that an information is not any evidence you aren't going to hear any evidence in court today. All we're going to talk about is what the issues are.

So one of those constitutional amendments says that the accused has a right to know what they are being accused of and that's why we have this document called the information. It is the Government is telling you what the charges are that they are going to file against you, what you have to defend against. It tells you the date and time of those charges. It's not evidence that anything actually occurred, so that's what I want you to bear in mind today; it's merely the accusation.

When a person is accused of a crime, all those rights come into play; the right to counsel, the right to a jury trial, the right to a jury of your peers. Your counsel has a right to confront and cross-examine the witnesses against you, to test the evidence, to test the memory of the witnesses, see if the evidence is substantial enough to prove the guilt of the accused beyond a reasonable doubt, to a moral certainty -- to an abiding conviction. If the evidence doesn't convince the jury beyond a reasonable doubt, then the guilt has not been proven and the jury has an obligation under the Constitution to find the person not guilty. All right. So if the jury hears all the evidence and after they hear the evidence and they hear the law and they discuss it they say we're not convinced beyond a reasonable doubt,

then they have to return a verdict of not guilty. On the other hand, if they hear the evidence and review the law and have heard the arguments of counsel and they believe that -- unanimously that guilt has been proven beyond a reasonable doubt, then they return a verdict of guilty.

Is there anybody that thus far is not able to understand what we're talking about in terms of a trial by a jury, the right to counsel, the right to -- the rights we've talked about so far?

You're not familiar with these, sir?

MR. ALLISON: I am familiar, but I am sorry -- I am familiar, but I can't hear good.

THE COURT: Oh, you are having a hard time hearing?

MR. ALLISON: Okay.

THE COURT: Well, we are in a rather advanced age here. Do we have one of those assisted hearing devices?

We'll get you an assisted hearing device.

MR. ALLISON: I have those already. My problem is my word recognition is not there.

THE COURT: Well, why don't you have a seat.

Could you try and get that anyway so that we can maybe -- we'll invite the gentleman, if you have a seat we'll ask you to try this out, then you can tell us if it's working, if it assists you or not. Okay?

So at a criminal trial there is -- the burden of proof is on the Government or the People in all stages of the proceedings to prove guilt beyond a reasonable doubt,

at least at the trial. And then along with that we have the presumption of innocence. Just because a person is accused doesn't prove they are guilty. Okay? And the jury has to listen to the evidence to make a decision on that.

Is there anybody that doesn't agree with the burden of proof being on the People or that the defendant is entitled to the presumption of innocence until he or she is proven guilty? All right. I don't see anybody responding to that.

There's another constitutional principle that goes along with that. At a trial a person does not have to testify against themselves. I remember telling you that. And what that means is you don't have to testify at all. The Government cannot call you as a witness. And a person who's accused could stand moot, doesn't have to respond. If the Defense believes that the Prosecution hasn't met their burden of proof to prove somebody guilty beyond a reasonable doubt, they don't have to present any evidence, they don't have to present any testimony, and the jury is not to consider that as evidence of anything in their deliberations. They are to -- so a person can't say I don't -- doesn't even have to say anything, but could just not testify, not present evidence because they believe the Prosecution didn't prove their case beyond a reasonable doubt. And they're entitled to that presumption of innocence, so they have the right to remain silent in that regard and the jury's not to consider that

as evidence of guilt.

Is there anybody that doesn't -- this isn't refreshing their memory as to what they've learned in their Government classes, or their History classes, or whatever their kind of civic responsibility to execute the law, that that's how these things work? Is there anybody doesn't agree with these principles? All right. I don't see anybody responding.

In a sense, we have to remember that jury service is a little bit different than if you're a parent and you're at home and you hear a bunch of racket down the hall, and you go down there. You have two kids fighting and you -- we kind of want to hear from both sides, figure out what happened. In a jury trial, you may not hear from both sides. You're not -- you have to base your decision only on what you hear in court. You can't base your decision on anything you think might have happened, not on speculation, and not on any silence. You are to base your opinion only on the evidence that's presented here in court.

Anybody doesn't think they can do that? All right. I don't see anybody responding affirmatively, so that's good.

In each county in the State of California -- there are 58 counties -- we have an elected District Attorney. So in Alameda County the elected District Attorney is Nancy O'Malley, and she has a deputy in court today, who I will allow to introduce herself, that's going to prosecute

this case.

MS. PETTIGREW: Good morning, ladies and gentlemen. My name is Stacie Pettigrew. I am a Deputy District Attorney for Alameda County.

THE COURT: And invite Mr. Steckler to introduce himself and his client.

MR. STECKLER: Thank you, Your Honor.

Good morning, ladies and gentlemen. My name is Drew Steckler, and this is my client Joe McNeely.

MR. MCNEELY: My name is Joe McNeely. Good morning. Thank you for being here.

THE COURT: Mr. Bryden, you want to introduce yourself and your client?

MR. BRYDEN: Thank you, Your Honor.

Good morning, ladies and gentlemen. I am attorney David Bryden. It's my privilege in this proceeding to represent my client, Donel Poston.

Mr. Poston, would you introduce yourself to these folks?

MR. POSTON: Good morning. Hi, folks.

THE COURT: Okay.

So when -- if you are out in the hallway and you see counsel, I've ordered them not to talk to you, and I am going to order you not to talk to them. The reason being is that we want everybody to get all the evidence from the witnesses that testify in the case and when everyone is present so that everybody kind of has the same information; nobody gets any special information from any

one of the parties. So if you see counsel in the hallway, you may address them, say good morning, good afternoon, but beyond that please don't engage them in conversation. The appearance that somebody else might see something going on and they may jump to the wrong conclusion and we have to have a little hearing and it kind of delays everything and it makes it uncomfortable for them, as well as for you at some point. So don't do that.

This idea that we want to receive all the evidence from the trial at the same time with everybody goes a little bit further than that, as well. We have little computers at home. We got phones that have great power to do searches. You put anything in Google and you can probably find something about something. So I am going to order that you not do those kinds of things, as well. Don't try to research the law. Don't try to research any of the facts. Don't -- if you hear about something happened at a place, if you don't normally go there, don't go there to check it out. Let's take a minute.

THE CLERK: I don't think it's going to work. It's ringing really bad.

THE COURT: Okay.

It sounds like it's ringing really bad.

THE CLERK: It wasn't ringing earlier, but closer I got to him it rang.

THE COURT: All right.

If you're patient with us, sir, I will talk to you at the end of our little presentation. Okay?

So I don't want you to talk to the counsel or witnesses who might -- you might see coming and going from court. And don't do any searches of any information, whether it be of the law, whether it be of the facts, or anything else. We'll give you everything that you need to decide this case. If the attorneys think you need photographs, they will present photographs. If they think you need any other kinds of evidence, physical evidence, they will present the physical evidence. So we'll -- between the attorneys and the Court, we'll talk about the law that we believe applies to the case, and then if the jury has further questions in deliberations they can send a question out to the Court and we'll answer those questions. So don't try to do any additional research independently because that would be unfair to one of the parties. If you're doing research, they wouldn't know that you're doing the research, they wouldn't know how to respond to it. Any research you do is not subject to cross-examination, and any evidence that's presented in court both parties have an opportunity to question the witnesses to kind of flush out what's going on and see what's really happening here. And if you're doing research on the side, nobody knows you're doing it, and they don't have a chance to test that, and they don't know how reliable it is. How many times do we read something in the paper on one day and the next day more information comes out, or they change the story, say, well, we mistold you something yesterday. And then there are the times

when you see something happen and you read about it in the paper and you go that's not what happened at all from my perspective. So we'd like to present you all the evidence in the trial and not have you influenced by anything on the outside.

If you go home and you say I am potentially going to be on this jury and somebody wants to talk to you about it, please don't talk to them about the case, because they may want to bring up stuff that has nothing to do with it. And, again, it would kind of be potentially influencing you and we don't want to have that; we want you to get everything here and your only discussions will be with other jurors in trial.

So let me talk to you about the charges in the case. There are five counts in this case. The first charge alleges the homicide or murder of a person by the name of Lionel Fluker that occurred on April the 5th of 2013. And both Mr. McNeely and Mr. Poston are charged with that crime. The second and third counts, each of Mr. McNeely and Mr. Poston are charged with attempted murder, but on each other. So one is charged with attempted murder on the other, and the other is charged with attempted murder on the other one. In all three of those counts there is an allegation of personal use of a firearm to do that. And then counts four and five, each Mr. McNeely and Mr. Poston is charged with one count of being a felon in possession of a firearm. So those are the five charges.

This case happened -- what -- now what I am going to tell you -- so those are the charges. That's the accusation. There is no evidence you've heard yet. You've just heard what the accusation is. That's what the issues of the case are going to be about.

Now what I am going to tell you is because this case might have gotten a little bit of press play, I will tell you what, that on April 5th, 2013 at a Valero gas station at the corner of MacArthur and Seminary in the city of Oakland two men shot at each other and in the course of their acts an uninvolved person was shot and killed. That's not evidence. That's just to kind of put you on notice of what you have to be aware of to avoid contact with further information. So the reason I say don't talk to family about this, because one is maybe if you saw something on the news or if you read something in the newspaper you'll get the opportunity to tell us that if you remember that. But say you haven't seen or read that, okay, and then you go and talk to your brother, sister, mother, father, whoever, spouse, and say I am on this jury and here's what the case is about, what if that person read something about it or saw it on the news and goes and Googles it and comes back and says, well, here's what it's all about? Again, we're in that problem of getting information that everybody doesn't have and it may not be reliable at all. So please don't make any research efforts. Don't try to find out about it. If you live in the neighborhood of Seminary and MacArthur and you go to

that Valero station all the time, that's fine, we're not asking you not to do that. We're just asking you not to do any investigation. Maybe it's better to go to a different gas station until the end of the trial. Don't discuss it with anybody. Say I am in a trial but I can't tell you about it. I will tell you all about it when it's over. And that's the appropriate way to handle that. Okay.

So from hearing the charges you can tell this is a serious case. And, let's see, turn this on up here. In order to get the information that the -- both -- all the parties in court, whether it's the Prosecutor, or Mr. McNeely, or Mr. Poston, they are all entitled to a fair trial. So to get the information to help them get that fair trial, we could seat 12 or 14 people up here and go through voir dire, and you'd hear many of the same questions asked over and over again. So instead of doing that, we're going to do a questionnaire for you. And we'll ask you to fill out this questionnaire this morning and then you'll have kind of two options as to what you do after you fill out the questionnaire.

Let's look at -- this is what we think our trial schedule's going to be like. We're not going to be -- after you fill out the questionnaire, you won't have to come back for the rest of 2013. Okay. If you come back, it will be in 2014. We are going to fill out the questionnaire. The attorneys will review this and they will have a lot of information that you will have given

them when you fill out this questionnaire, and they will be able to make some decisions without a very long, oral questionnaire -- oral questioning in court. So because they will have so much information off this questionnaire, we're going to limit the amount of time they have with the jury in open court. So that will make it better for you and make it so that you won't have to stay here as long.

We've talked during the motions that we've done in this case so far and the attorneys, I think, believe that the case should be done by the end of January, but there's a lot of things that you just don't know how they are going to work out so I've put a few extra days in there that I think may not occur in this trial but you have to be somewhat cautious in how you approach these things. If you fill out the questionnaire and you say I can do this trial, that's -- this time, I can work around this, we'll never be in session on Friday because on Fridays I got a calendar where we do motions and other cases, not our trial case. So Fridays we're never in session. The Monday, the 20th of January, no courts are in session in the State of California. I think all State buildings are closed because that's Martin Luther King day. And if we should get to February 12th, that's Lincoln's birthday, so all the State buildings are closed for Lincoln's birthday. So -- and then Tuesday, July -- excuse me -- January 7th, we're only in session in the afternoon. I have another hearing on that morning. So there wouldn't be any court session on January 7th in the morning. So we

anticipate -- the way the trial goes, we select a jury. The first part of jury selection is you fill this out today, then you come back on Monday, January 6th. We'll put some people in the box and the attorneys will have this questionnaire and they will go through it and talk to them about what it is they've put in here, or maybe clarify some things, and maybe there won't be a lot of questions and we'll hopefully get a jury some time the 6th, maybe on the 7th. And then after jury is selected, then we have presentation of evidence. And so witnesses are called, and they are called by both parties or all parties. And then after that there are instructions the attorneys and Court have to discuss, so we may not be in session or for a day or half a day while we go over those instructions. Then there is arguments and instructions. The law is given to you. Those are the instructions. And the arguments are the attorneys get to argue what they think the evidence was and how the facts relate to the law, and how you might want to consider the evidence in considering your verdicts. And then -- so after the evidence and the law and the arguments are heard, then the jury begins to deliberate. Once the jury starts deliberating, that's where we don't know how long it could take because the jury needs to deliberate, and consider, and talk to each other, and think about it to the extent that they find necessary. And I -- that's kind of a -- not anything you can quantify. You can't really say how long is the right amount of time. So it would be up to me

to allow you to deliberate for as long as necessary to reach a verdict, if you can reach a verdict. Okay. So that's why we put some flexibility in terms of the number of days. So that can be -- that's a couple of -- it looks like could -- if the trial were to go as long and have a long amount of deliberations, it could be up to six weeks. Right? The attorneys are not convinced that it will be that long, but I am hedging on the long side just to make sure that nobody runs into a problem. If I say it's four weeks, then it goes into the fifth week, then you have a problem. Okay.

Now, so this questionnaire will consider -- the court can excuse people if there is a hardship. And on the last page it discusses hardships. It talks about extreme personal or financial hardship. It could be that if you're the sole support of your family and you have your own business and you're not there, that might be a extreme hardship because if you are not there to support your family and you're not Bill Gates, or Donald Trump, or something like that, and sure if they sat off a week or two the world would go on for that. Everybody is not that set up when it comes to financial matters. If you have a pre-planned vacation to go to somewhere and you've got your tickets paid and you can show us that, we'll excuse you for that. And the last one would be if you have medical procedures or something like that, or something equal to that that you think you'd ask the Court for a hardship because you couldn't serve for that length of

time, you will fill out the this last page and check the second box which says I am asking for a hardship. Okay.

But, in general -- let's just go over the questionnaire for a second. The front page gives you the directions as to what you're expected to do. The second page has the calendar that's up here and the phone number of the court and the hours of court from -- generally, we start at 9:30 in the morning, we take a mid-morning break, and we go till noon. Generally, we start at 1:30 in the afternoon, we take a mid-afternoon break, and we go till 4:30.

When you get your questionnaire, I am encouraging you to tear off the first page so you will have the court number, the court name, and you will have the calendar with you. You can take that with you and you will be able to tell what days you need to be here, if you kind of put it on the back burner over the holiday.

Okay. So the questionnaire is 22 pages long. After the first two, or this page here, 22 pages long. The attorneys, again, are not trying to be unduly intrusive. They are just trying to get information that's going to help them decide whether or not you're the appropriate person to sit on this jury for their client. As you get to the -- towards the end, there's a list of all the witnesses we think will be testifying in this trial. If you know them, circle the witness that you think you know, tell us how you think you know them. If you don't know them, then you can mark this box, I don't

recognize any of the witnesses, and then you will sign -- you're answering all these questions under penalty of perjury. You've taken the oath that you will answer these all truthfully. Answer them truthfully. Then after you do that, tell us whether or not you want a hardship. Okay. If you're saying you do not want a hardship, you can fill this out, take the first page, and come back to the jury assembly room on January 6th. We don't need to see you again today or for the rest of 2013. If you're asking for a hardship, I'd ask you to fill this all out and turn it in at the jury assembly room before you go. Everybody turns it in before they leave the building. And then you come back at two o'clock today. And I will review all the questionnaires and tell you whether or not I can grant your hardship. So I will tell you today if I can grant your hardship. And if not, or if you are not asking for a hardship, you will return on January 6th. Okay?

I don't want to you feel bad. We've never had a jury who didn't have a question about those directions somehow. So if you have a question, raise your hand. And there is no need to be embarrassed.

Yes, sir, in the front row.

A PROSPECTIVE JUROR: I do have vacation plans. Is that a hardship? I can come back for and bring tickets.

THE COURT: If you think it's a hardship, you can ask for that to be considered as a hardship and we'll see.

I mean, if somebody says I want to go to Monterey one weekend here and I want to spend an extra day, I may not consider that as a hardship. If I am going to Monterey for my honeymoon or because somebody's getting married, that probably would be a hardship. But it's like I can go there any week of the year, but I am choosing to go a week while we're in this trial, that's not a hardship.

A PROSPECTIVE JUROR: But I already purchased my tickets.

THE COURT: Well we can talk about that.

Yes, sir.

A PROSPECTIVE JUROR: I have no phone.

THE COURT: Okay. We're not going to require you to call us. The phone -- the court is here only, so you can call us if you get in a bind. If you think it's a problem, come and see us at 2:00 to flush that out. But I don't know that whether you have a phone or not is going to be a problem.

There was a lady in the back who had a question.

Yes, ma'am.

A PROSPECTIVE JUROR: Um, I will be out of town, but I didn't bring my ticket with me. Can I bring my ticket?

THE COURT: Sure. We'll be here at 2:00. If you have it, sometimes they send you confirmation on your phone --

A PROSPECTIVE JUROR: Is there a fax number here? Maybe my husband could fax it.

THE COURT: I don't know. You could ask Lucille in the next room, see if that would work.

Yes, sir.

A PROSPECTIVE JUROR: Is permanent Disability considered as a hardship?

THE COURT: You'd have to write on here what you think it is and if you think it is, and then we'll discuss whether it is for the Court to recognize. Okay.

In the back row, sir.

A PROSPECTIVE JUROR: What if I have school those days and I can't make it; is that considered a hardship?

THE COURT: Okay. If you're a -- I usually cover that, but I guess I forgot to say that if you're a student who is home for Christmas and you go to school in San Diego or Santa Barbara or something, why don't you stay and we'll talk to you before we take our noon recess or before you leave to go fill out the questionnaire. So students are kind of a special category, I guess.

Does that answer your question, as well.

Okay. Anybody else have a different kind of question?

So if you are a student, you can stay and we'll talk to you. If you think you have a hardship, fill it out and come back at 2:00. If you don't think you have a hardship, fill it out and come back on January 6th.

Any -- last chance to ask a question.

A PROSPECTIVE JUROR: I just assume we'll get instructions on where to come and what to do on January

6th.

THE COURT: If you go to the jury assembly room, we'll call you down. It will be at 9:30. We'll call you down at 9:30 or soon thereafter when everybody's ready to begin. Okay?

A PROSPECTIVE JUROR: Okay.

THE COURT: All right. Very good.

Any -- yes, sir.

A PROSPECTIVE JUROR: Now, if we are not picked as a juror on that particular trial -- file, file, something like that, do we -- if we are not picked as a juror on that panel, do we -- are we excused?

THE COURT: Yes. In other words, you won't get sent to another court for another case, if that's your question.

A PROSPECTIVE JUROR: Correct.

THE COURT: You will either get picked for this case or you will be free for a year.

Okay. And the gentleman with the hearing aid, if you want to stay I will talk to you, as well.

Okay. Everyone else, you can take the questionnaire. We'll ask you to fill them out in the jury assembly room, or if you want to stand in the hallway you can do it in the hallway. Don't leave the courthouse with the questionnaire is my request. Turn it in before you go. If you're going to come back at 2:00, you don't have to stay in the building. Once you turn it in, you can go have lunch, come back, if you want, and I will see you at

2:00.

Okay. Thank you very much. Maybe we'll -- either have a good Christmas and we'll see you next year or we'll see you this afternoon.

THE COURT: You want to come up, sir.

Could you tell us what your name is?

MR. ALLISON: It's Ronald Allison.

THE COURT: All right.

And you've indicated that you have some problems hearing in the back?

MR. ALLISON: Yeah. I can't hear very well. I can hear, but the word recognition is not there.

THE COURT: All right. Do you think if -- you were sitting in like the last row of this courtroom.

MR. ALLISON: Next to the last.

THE COURT: How about if you were in the jury box, closer to where the action is, do you think you'd be able to hear?

MR. ALLISON: Well, that's one of the reasons I retired is I cannot understand what instructions are most of the time.

THE COURT: Okay.

MR. ALLISON: And if it's -- if it's other than English or an accent, I -- forget it.

THE COURT: Okay. All right.

And that's because of your loss of hearing, and the hearing aid doesn't work as well as you would like it to; is that correct?

MR. ALLISON: Well, no, it works as best as it can.

THE COURT: Sure. Okay.

It's important to hear all the evidence, so I will grant your hardship for this trial. You will be excused.

MR. ALLISON: Oh, okay.

THE COURT: Could you leave the questionnaire just on that chair there, or on the table where the D.A. is, I guess. Thank you.

Okay. Thank you, sir.

MR. ALLISON: Thank you.

THE CLERK: Calvin Chiang, number 256.

THE COURT: Mr. Chiang, what would you like the Court to consider?

MR. CHIANG: I am a student.

THE COURT: Where do you go to school?

MR. CHIANG: Pepperdine University.

THE COURT: Pepperdine, the Waves. When do you go back to school?

MR. CHIANG: My semester starts January 6th.

THE COURT: All right. If you want to leave that questionnaire there.

This is Calvin Chiang, right?

MR. CHIANG: Yeah.

THE COURT: I will grant your hardship.

If you want to leave the questionnaire on the table, you will be excused.

MR. CHIANG: Okay.

THE COURT: What are you studying?
MR. CHIANG: Finance, business.
THE COURT: Okay. You're excused.
MR. CHIANG: Okay.
THE CLERK: Mr. Louie, number 271.
THE COURT: Good morning, Mr. Louie. What would you like the Court to consider?
MR. LOUIE: So I have school at Laney. I am a full-time student, and I have to pay for the classes. I can't afford to miss those classes.
THE COURT: When do you go back to Laney?
MR. LOUIE: I go back on the 15th, I believe.
THE COURT: All right. I will grant your hardship.
If you leave the questionnaire there, you're free to go.
MR. LOUIE: All right. Thank you.
THE CLERK: Ms. Posadas, number 283.
THE COURT: Good morning, ma'am. What would you like the Court to consider as possible hardship?
MS. POSADAS: Um, well, my first week of school is the 13th of January.
THE COURT: Where do you go to school?
MS. POSADAS: DVC in Concord.
THE COURT: And how many units are you going to take there?
MS. POSADAS: About 12 to 15.
THE COURT: You're -- okay. I will grant your

hardship.

If you want to leave your questionnaire there on the table --

MS. POSADAS: Thank you.

THE COURT: -- you will be excused.

THE CLERK: Mr. Ceja, number 255.

THE COURT: Good morning, sir.

What would you like the Court to consider as a possible hardship?

MR. CEJA: Well, that I start my night -- well my school start on the 6th. If I am not there, I get dropped from the classes. Actually, I have all my classes on is that day. If I am not there, I pretty much --

THE COURT: Sure.

How many units are you taking?

MR. CEJA: I believe it's 12 and a half.

THE COURT: Okay. Where are you going?

MR. CEJA: I am going to DeAnza in Cupertino.

THE COURT: All right. I will excuse you.

MR. CEJA: Okay.

THE COURT: If you leave the questionnaire there, you will be excused.

THE CLERK: Ms. Wu, number 297.

THE COURT: Good morning, Ms. Wu.

What would you like the Court to consider as a possible hardship?

MS. WU: Um, I am a student at UC Davis, so I will be leaving; the first week of January I start school.

THE COURT: Okay.

How many units are you taking?

MS. WU: Um, I think like 16.

THE COURT: Okay. You will be excused.

This was Wu; is that right, Helen Wu?

MS. WU: Yeah.

THE COURT: Okay. You will be excused.

If you leave the questionnaire right there, you can go.

MS. WU: Thank you.

THE CLERK: Mr. Rubin, number 285.

THE COURT: Good morning, sir.

What would you like the Court to consider?

MS. WU: I am a graduate student at UC Berkeley and I'm scheduled to present at a conference on January 28th and 29th.

THE COURT: Um, when you are a graduate student, what are you -- at Berkeley, you said?

MS. WU: Yeah.

THE COURT: Good thing I didn't go to Stanford, huh?

What -- how many units and all that kind of stuff? What are you doing there, or does it work like that?

MS. WU: Yeah. It's probably something like 6, 6 units, and then working on my dissertation. But the conference is in Las Vegas; it's an important part of my work there.

THE COURT: Is it on statistics in gambling or

something?

MS. WU: No, it's on river management.

THE COURT: River management. Okay. There is a big river there.

All right. I will grant your hardship. If you want to leave the questionnaire.

MS. WU: Thank you.

THE COURT: Seven are gone out of our 45 already or 50.

THE CLERK: 50.

THE COURT: All right. We'll see what happens at 2:00.

Did you want to -- are we coming back tomorrow to do motions; is that what we're doing?

MS. PETTIGREW: Yes.

THE COURT: Okay.

Any -- and then let's just go off the record.

(Recess taken)

THE COURT: Go back on the record in the McNeely and Poston trial. Let's see. Forgot my note cards with my notes.

All right. Well, let's see where we're at here. I've got about 10 that did not ask for hardships, about 15 who didn't check the back so we know what they're asking for. So that's 25. And then the other group, I think I'm still missing two questionnaires. And there's 22 that are asking for hardship, and there's one guy that was able to prove that he had been on jury duty earlier

this year so he's going to be excused. He was on that two months ago. So that would give us somewhere between 10 and 25 additional jurors. So, do you want to just call them in, do you want me to go over who I think it is that's going to be excused before they bring them in, or do you care? I will call off the names of the people that are clearly yeses, and then if there are additional we'll ask them to raise their hand and then we'll get that. So I will just grant all these people that are asking for it. Most of them I thought were -- I thought there were one or two that were claiming they had a disability, but didn't describe what it was, but we'll grant them that because we'll have an additional 25 or something.

All right. Let's call the jury.

(Whereupon the prospective jurors enter the courtroom).

THE COURT: Do we think that's everybody out there, or do you think there's more coming?

Okay. I am going to call out the names of people who clearly asked for a hardship. Some people, when they filled out the questionnaire, did not mark the last page, and if you haven't turned in your questionnaire that would be helpful, too.

Is there anybody that's holding their questionnaire? Okay.

Okay. So we'll go through -- I will come back to yours in a minute. Okay, ma'am?

These people clearly marked that they are asking

for a hardship. Could you raise your hand or say you're here so I know you're here when I call your name out.

Davis Baltz.

MR. BALTZ: Here.

THE COURT: Okay.

Jeanne Breinlinger.

MS. BREINLINGER: Here.

THE COURT: Richard Cabico.

MR. CABICO: Here.

THE COURT: Eunsoo Choi.

MS. CHOI: Here.

THE COURT: David Chow.

MR. CHOW: Here.

THE COURT: Alvin Concepcion.

MR. CONCEPCION: Here.

THE COURT: Keith Edgar.

MR. EDGAR: Here.

THE COURT: Okay.

Gloria Jones.

MS. JONES: Present.

THE COURT: All right.

Clarence Lampley.

MR. LAMPLEY: Yes.

THE COURT: All right. John Lim.

MR. LIM: Here.

THE COURT: Brian Oliver is the person who had served on jury service two months ago, so he's excused as well.

Margaret Paris.

MS. PARIS: Here.

THE COURT: Paul Schiesser.

MR. SCHIESSER: Schiesser. Here.

THE COURT: Schiesser.

Brian Sedgeley.

MR. SEDGELEY: Here.

THE COURT: Trent Smith.

MR. SMITH: Here.

THE COURT: Erlinda Tongson.

MS. TONGSON: Here.

THE COURT: Ferdinand Valencia.

MR. VALENCIA: Here.

THE COURT: And Ligaya Yadao.

MS. YADAO: Yes.

THE COURT: All right. The Court will excuse anybody whose name I just called. Is there anybody here whose name I didn't call besides the lady here who just gave me the questionnaire? So anybody who's here, except the lady who just gave me the questionnaire, is excused; your hardship will be granted. Okay.

And is your name Ms. Bringhurst or Bringhurst?

MS. BRINGHURST: Bringhurst.

THE COURT: All right. I will grant your hardship --

MS. BRINGHURST: Thank you.

THE COURT: All right -- as well.

MR. BRYDEN: Sorry. What was the name?

THE COURT: Bringhurst, number 253.

MR. BRYDEN: Thank you.

THE COURT: So, with that, I've got 24 who did not come this afternoon, and they were not excused this morning for being students, so there's 24 left out of this group.

Does anybody want to go over the list to see or are you satisfied?

MS. PETTIGREW: I think we got them.

THE COURT: Okay. Let's go off the record.

(Whereupon, a discussion was held off the record)

THE COURT: So we'll be in recess until tomorrow. At what time you want to start, 9:30?

MR. STECKLER: That sounds great.

MS. PETTIGREW: Sure.

THE COURT: Anything else? You filed some motion. I haven't had time to read it.

MR. STECKLER: I just put it in writing so we're all on the same page, the statements of Mr. Poston that I'm proffering.

THE COURT: Oh, that you're proffering as to Mr. Poston's statements, okay.

Okay. I guess I have a question. If you're co-defendants, does that make you a party opponent? That's, I guess, a question that I haven't ever had to come up against.

MS. PETTIGREW: I can't find a case. I looked.

THE COURT: But it's an interesting --

MS. PETTIGREW: My research skills aren't great, but --

THE COURT: It it's an interesting legal theory or question. So, anyway --

MR. STECKLER: Yeah, that's the evidentiary portion.

THE COURT: Do you want all this on the record?

MR. STECKLER: No, we don't need it on the record.

THE COURT: Do you want it on the record?

MR. BRYDEN: No.

THE COURT: Why don't we do this part of the -- on the record. I do have a question. I saw your motion and I saw you're offering -- Mr. McNeely's going to offer statements of Mr. Poston, and I guess there's -- I never had a co-defendant case where that was going on. And I was wondering if there's anything out there that says is there a burden or is there a -- is there something that says that one co-defendant is a party opponent that can offer a hearsay statement of another co-defendant --

MR. STECKLER: I did think --

THE COURT: -- or is it just -- does it just come under the your ability to present a defense?

MR. STECKLER: It's my defense, and that's actually my answer. It's not in the Evidence Code, but it's in due process and the right to present a defense. I don't think there's any secret, you know -- no hiding the ball here. It's all on videotape. And we've discussed

the questionnaire. We discussed instructions. If my defense lies in -- and this has come up at the preliminary hearing and at the 995 stage hearing. The case called Quach, Q-u-a-c-h, and the -- I don't have the CALCRIM in front of me, but it's -- one of the questions we're asking of the prospective jurors, the law states -- it's number 25 on page 15, that if a defendant uses only non-deadly force, a slap or a punch, and the opponent responded with such sudden and deadly force, that the defendant could then not withdraw from the fight. And you've seen the video. Poston shoots at McNeely, then the defendant -- in my view, the defense is McNeely had the right to defend himself with deadly force, his firing back. Part of that if such with sudden and deadly force that comes from the person who's punched or slapped is unjustified. So if he's presenting a defense, Mr. Bryden, and witnesses and his testimony is that justifies his defense, his being Mr. McNeely, so part of my defense of Mr. McNeely has to be that Poston's actions were unjustified, therefore, I have to be able to impeach him and his witnesses. And it's unfortunate for Mr. Poston, but that's my position. I need to take that position on behalf of Mr. McNeely.

THE COURT: So, okay, I think I understand what you said here. I will have to go back and look at that videotape more closely to see what can be -- you're kind of suggesting that we're going to be able to see who's got the gun out first and who's reacting with force as opposed to deadly force and divide those up.

MR. STECKLER: Right. You can see, for example, in my reply brief -- I hope you have the 995's in the court file -- it sets forth, you know, where the specific second and fraction of second on the videotape, what -- you know what I think it shows. And, likewise, you have what Ms. Pettigrew's colleague, Mr. O'Connor, thinks it shows as well in their opposition to my 995. So it's all laid out there.

THE COURT: All right.

Well, that's helpful, gives me a little more to chew on.

What are you -- any comments by other counsel in this regard on this one issue?

MS. PETTIGREW: Just I don't know if we were on the record earlier, but I've looked for a case that clarifies your question and I haven't been able to find one --

THE COURT: Okay.

MS. PETTIGREW: -- in terms of whether co-defendants are party opponents for the Evidence Code section.

THE COURT: Mm-hm. All right.

MR. STECKLER: Alternatively, Ms. Pettigrew can offer the same statements --

THE COURT: She could.

MR. STECKLER: -- if she chose to.

THE COURT: If she chose to, she could, perhaps.

MR. BRYDEN: Well, I don't agree that Ms.

Pettigrew could offer everything that Mr. Steckler has in here. I mean, I am going to object to -- I can see an inference or a suggestion that Ms. Bailey, where she says I didn't see nothing else after she -- obviously, she means after I ran into the store I didn't see anything else in terms of the shoot-out. You know, maybe there's a short inference that maybe, well, I saw him flashing a gun before I went into the store. She should have said this earlier. But all this whore stuff that's later contained in the reportings is just prejudicial and cumulative.

THE COURT: Okay.

MR. BRYDEN: There's plenty of impeachment materials in terms of Mr. Poston's veracity available without getting into trials over whether -- he's never been arrested or convicted of pimping or pandering that I am aware of. I think that's just getting into trials within a trial over -- over nonsense, piling it on where he's saying, whore, bitch, and stuff like that in conversations.

THE COURT: I haven't read all these. I think this motion was just filed by Mr. Steckler this afternoon.

MR. BRYDEN: All right.

THE COURT: And I haven't read the substance of it, but it just kind of got me thinking --

MR. BRYDEN: Yeah.

THE COURT: -- about the issue is one co-defendant an opponent for the purposes of offering a statement of a

co-defendant. And I guess that along those lines he would be -- you'd be waiving Aranda-Bruton, Mr. Steckler, to the extent there was an Aranda-Bruton statement in any of position in any of these statements if you were offering them.

THE COURT: We're on the record, Brian.

Brian, we're on the record. We can't hear.

That's --

MR. STECKLER: The answer is yes.

THE COURT: So I don't know what all these statements are yet 'cause I haven't read your motion because I am just kind of getting -- trying to figure out what the groundwork is -- can you offer them? If you were to offer them, would they be admissible, or do they have to be offered by the People, I guess, is the question I am asking?

MR. STECKLER: And my short answer is, as I already stated, so that's the bigger picture non-Evidence Code, Due Process right to a fair trial answer. But I will look at Jefferson's. I will look at the Evidence Code and the annotated and see if I can find a case on point, if there is one.

THE COURT: Maybe there is; maybe there isn't. We'll have to find out and we'll do our best at that point.

Okay. So I think I understand your argument and I will go take a look at the 995 briefs by -- from you, as well as from Mr. O'Connor.

MR. STECKLER: Gentlemen, I am sorry. I think I remember now. It's CALCRIM 3471. Does that sound right possibly? It's the one where the fourth paragraph, one of the bracketed paragraphs is taken from Quach, the case I cited.

THE COURT: Okay. All right. I will take a look at those and we'll -- anything else you want to do on the record today?

MR. STECKLER: No, thank you.

MS. PETTIGREW: No.

THE COURT: All right.

We'll be in recess until 9:30 tomorrow, Thursday the 19th.

---oOo---

STATE OF CALIFORNIA)
) SS.
COUNTY OF ALAMEDA )

I, RONDA ROOPE, Certified Shorthand Reporter, do hereby certify:

That I am an official court reporter of the Superior Court of the State of California, and that as such I reported the proceedings had in the above-entitled matter at the time and place set forth herein;

That my stenograph notes were thereafter transcribed into typewriting under my direction, and that the foregoing pages constitute a full, true and correct transcription of my said notes.

DATED: 12/15/14

Ronda Roope
RONDA ROOPE, CSR NO. 5609