XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,**<br>Petitioner,<br>**v.**<br>**JASON PICKETT, Acting Warden,**<br>Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBIT 6 (cont.)

## 2nd Supplemental Reporter's Transcript, Vol. 4 of 6

CALIFORNIA COURT OF APPEAL

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent

vs.

**JOE DANIEL MCNEELY, aka: ANTHONY LISTER, and DONEL POSTON,**

Defendants and Appellants.

NO:

ALAMEDA COUNTY NO: **172522 A&B**

COPY

**AUGMENT TO REPORTER'S TRANSCRIPT ON APPEAL**

FROM FINAL JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

HONORABLE MICHAEL GAFFEY, JUDGE

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco, CA 94102

FOR THE DEFENDANTS AND APPELLANTS:
In Propria Persona

OFFICIAL COURT REPORTER:
Ronda Roope, CSR. NO. 5609

**JURY SELECTION ONLY - (Augment)**

**DATE: 1/6/14**
**VOL: 4**
**PAGES: 134-345**

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ALAMEDA
BEFORE HONORABLE MICHAEL GAFFEY, JUDGE
DEPARTMENT 517

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs. NO: **172522 A/B**

**JOE DANIEL MCNEELY**, aka:
**ANTHONY LISTER**, and
**DONEL POSTON**,

Defendants.

________________________________/

**AUGMENT TO REPORTER'S TRANSCRIPT ON APPEAL**
**JURY SELECTION - VOL. 4**
**JANUARY 6, 2014**

Hayward Hall of Justice
Hayward, California

A P P E A R A N C E S

| | |
|---|---|
| For the People: | NANCY O'MALLEY<br>DISTRICT ATTORNEY<br>BY: STACIE PETTIGREW<br>Deputy District Attorney |
| For the Defendant<br>**JOE DANIEL MCNEELY:** | BRENDON D. WOODS<br>PUBLIC DEFENDER<br>BY: ANDREW STECKLER<br>Assistant Public Defender |
| For the Defendant<br>**DONEL POSTON:** | DAVID BRYDEN<br>Attorney at Law |
| Official Court Reporter: | RONDA ROOPE<br>CSR NO. 5609 |

January 6, 2014 A.M. Session

P R O C E E D I N G S

THE COURT: We'll go back on the record in the case of People versus Joe McNeely and Donel Poston, 172522 A and B.

Could I get counsel to state their appearance for the record?

MS. PETTIGREW: Stacie Pettigrew on behalf of the People.

MR. STECKLER: Drew Steckler for Mr. McNeely, who's present.

MR. BRYDEN: David Bryden for Donel Poston.

He's present. And we're ready for trial.

THE COURT: All right.

I've got a request from the prosecutor to go on the record about some matters.

MS. PETTIGREW: Yes, Your Honor.

I provided to both Defense Counsel this morning rap sheets that I ran on potential jurors. And I separated them into two stacks; there's those jurors that were truthful and their rap sheet reflects what they stated in their questionnaire, and it's there -- the other jurors who were less than truthful in their questionnaire that I wanted to put on the record.

Number one, I think a couple of these should go for cause just straight away because they said, no, they've never been arrested and they, in fact, have misdemeanor convictions. There's others that indicated

that they had been arrested for one thing and yet there are additional things that they've been arrested for and/or convicted of, and so I don't know how you would like to deal with those. If your plan is to leave them on, I would ask that the court do any voir dire of them in that issue.

THE COURT: How many are we talking about that have failed to, I guess, as your characterization of it is, they have failed to accurately describe their criminal history?

MS. PETTIGREW: Five.

THE COURT: Five. Okay.

Are any of them in Panel A?

MS. PETTIGREW: Yes.

THE COURT: Who are they in Panel A?

MS. PETTIGREW: The first one is Olet Jackson. He's number 11 on the random list.

THE COURT: Okay.

MS. PETTIGREW: He indicated in his questionnaire that he's been --

THE COURT: Can I just get the names?

MS. PETTIGREW: Oh, I am sorry. Okay.

The second is Darlene Bowman. She's number 21 on Random A.

The third is Ronald Carlson, number 23.

The fourth is Jason Richardson, number 34 on Panel A.

And, finally, from Panel B, Sandra Manha,

M-a-n-h-a. She's number 118.

THE COURT: Coincidentally, Mr. Olet -- I don't know if it's Mr. or Miss -- entered something this morning, says there's a work status report saying -- it's a report from Kaiser saying he's been evaluated and can return to work on January 14th. It's supposed to be from his doctor. The only question I have is I didn't know that he was asking for a medical release, so we'll see what he says here.

THE CLERK: I asked him. He said it just came up.

THE COURT: It just came up, he said. Okay.

Okay. So tell me again, what is Mr. Jackson's, what's the issue there?

MS. PETTIGREW: Mr. Jackson indicated that he's been either arrested or convicted of reckless driving, which is true. He has a misdemeanor conviction for 20002. He also has a misdemeanor arrest for domestic violence, 243(e)(1). He has an arrest for an 11350. He has another arrest for an 11350, and an arrest for a 496.

THE COURT: And did he admit any of those in the questionnaire?

MS. PETTIGREW: No.

THE COURT: He didn't.

MR. STECKLER: Well, he admitted -- I mean, other than the reckless driving. I am sorry. He admitted the reckless driving.

THE COURT: Right.

Has he been convicted of any of those things?

MS. PETTIGREW: No, they were arrests.

THE COURT: And your proposal is that he should go for cause on that account?

MS. PETTIGREW: Him, not so much. I mean, I think he could be talked to because that question does lump together arrest, conviction, investigation.

THE COURT: Okay.

MS. PETTIGREW: There are two I think should go for cause.

THE COURT: Who are they -- what about Bowman?

MS. PETTIGREW: Ms. Bowman, I just wanted to flag her because on the arrest question her response was, quote, "paying bills", and her conviction is a 476 from 1977. So I don't feel strongly about her, but I just wanted to --

THE COURT: Okay.

MS. PETTIGREW: -- let the court know.

Mr. Carlson indicated in his questionnaire that he had been arrested for exposure. That is true. He was arrested for a 314 and convicted of a 647(a). But he's also been convicted of a 496 and a 476.

THE COURT: You do specifically say arrested, correct?

MS. PETTIGREW: On this one --

THE COURT: Right.

MS. PETTIGREW: -- he's been convicted of a 476

and a 496.

THE COURT: Okay.

MS. PETTIGREW: And he only disclosed the exposure.

THE COURT: How recent were those?

MS. PETTIGREW: 1980 were the 496 and 476. 1985 was the exposure.

THE COURT: That was a conviction for 647(a)?

MS. PETTIGREW: He pled down to a 647(a).

THE COURT: All right.

Then you said Richardson.

MS. PETTIGREW: Richardson, I believe, should go for cause. He stated, no, he's never been arrested or convicted of anything, and he has been convicted of an 11350 as a misdemeanor. He also was arrested as a juvenile for an 11351.5, and it looks like he was made a ward -- there was a wardship under a felony 11350. He also has a 148.9 arrest, which is false identification to a peace officer. He has a 273.5 arrest out of Martinez.

THE COURT: All right.

And you mentioned one other name.

MS. PETTIGREW: Yes, Ms. Manha. I believe she also should go for cause. She answered, no, that she had never been arrested or convicted. She's been arrested for a 647(f), a 12020, a 594, a 484, a 148, and an 11377.

THE COURT: Those are all arrests, but no convictions?

MS. PETTIGREW: Correct.

THE COURT: What number is this question on the questionnaire that calls for that answer?

MS. PETTIGREW: It's on page 11, number 6.

THE COURT: Okay.

Any response, Mr. Steckler?

MR. STECKLER: Well, we talked about a lot of different people there.

THE COURT: Sure.

When -- let me interrupt.

When did you give the Defense this information?

MS. PETTIGREW: This morning.

THE COURT: This morning, right.

MR. STECKLER: I haven't had a lot of time to read this thing. I am on a less firm ground objecting to, excusing, I believe, Mr. Richardson, who just said no. I do object, however, without further comment, to excusing any of these individuals for cause without further voir dire. I think I'm on stronger ground with regard to Mr. Jackson. I don't believe Ms. Pettigrew is requesting that Ms. Bowman be excused. And as to Mr. Carlson, he did divulge not only the most recent conviction from 1985, but the most -- arguably, the most serious and embarrassing conviction which is from 1985. Other than that, I think this is in the court's own discretion, and I will be prepared to submit it.

THE COURT: Okay.

Of the -- Mr. Bryden?

MR. BRYDEN: I don't believe any of the jurors

mentioned by Ms. Pettigrew should be excused for cause, at least facially. I haven't really looked at it. Even Richardson, if I understand it correctly, he's got a juvenile drug possession and a misdemeanor as a pretty young person. He's like in his mid-30's. Things like this, like juvenile convictions, I think in people's minds they are sealed or don't count, or you could interpret the question to mean as an adult, even though the question didn't say as an adult. So most of this is misdemeanor behavior that seems kind of old, in general, for all the People mentioned.

THE COURT: All right.

You said there's two you felt strongly about, so which are the ones you don't feel strongly about, because I take it in that regard that you're not seeking to have them excused for cause.

MS. PETTIGREW: Well, I think further inquiry is required of Mr. Jackson, Ms. Bowman, and Mr. Carlson.

THE COURT: Okay.

They are all currently going to be in the box pretty soon.

MS. PETTIGREW: Right. They all disclosed something and didn't disclose everything.

THE COURT: Mm-hm.

MS. PETTIGREW: But in terms of Mr. Richardson and Ms. Manha, they answered the question, no, I have never been arrested, accused, or convicted of a crime, and both of them have been arrested a lot.

THE COURT: Well, looking at the question number 6, the question -- the way it's typed, the question states: Other than minor traffic offenses, comma, have you or anyone close to you -- and the words, quote, "you or anyone close to you" are bolded -- ever been arrested for, accused of, charged with or convicted of a crime, or otherwise been involved in any criminal matter, either as a suspect or a defendant? The words accused -- arrested for, accused of, charged with, convicted of are all in bold and underlined. So they arguably, I suppose if one were to argue about this, could be there for double emphasis, and the single emphasis is you or anyone close to you.

Regarding Mr. Jackson, he admitted the 23103. You indicated there was a DV case, two 11350's, and a 496. How far back over time does that go on Jackson?

MS. PETTIGREW: The 496 is from 1980. The 11350 is from 1990. The second 11350 is from 2007. The 243 is from 2011.

THE COURT: And, again, with regard to Jackson, all arrests?

MS. PETTIGREW: Those are all arrests.

THE COURT: Okay.

And Bowman, she admitted arrests for "paying bills," and you indicated it was a 476.

MS. PETTIGREW: Yes.

THE COURT: Which is an insufficient funds. I don't find that with regard to Bowman that that's -- if

you want to get into it, you can. That doesn't seem to me that that's necessarily trying to avoid responsibility or be deceptive about what might have happened from something that happened in 1977. That's like 35, 40 years ago. And someone may not remember what a 476 is 35 or 40 years down the road, but remembered what happened and wrote that down. So I don't think that's in any way, shape, or form a problem that the court would address.

Carlson, I do somewhat echo what Mr. Steckler's had to say, which is the most significant criminal conduct was admitted to and the other two were not. If you want to get into that, I will allow you to.

With regard to Mr. Richardson, who is not yet on the panel, when was the 11350 misdemeanor conviction?

MS. PETTIGREW: 2001.

THE COURT: Again, the matters in juvenile court, I would say the average person's understanding of how things work, that they are not part of your criminal record, although many people would say, yeah, I had a problem as a juvenile and I got arrested as a juvenile and let it go at that and let the person you're telling figure out what it is, especially under these circumstances.

How old is Richardson?

MS. PETTIGREW: 35.

And that 11350 is as an adult. It's a misdemeanor conviction.

THE COURT: Right. That's why I am asking age of the conviction -- of this -- of Richardson's age.

And then on Manha, when are those priors or when are those arrests?

MS. PETTIGREW: The 148 and 11377 is from 1981. The 484 is from 1982. The 594 is from 1986. The 647(f) and 12020 are from 2006.

THE COURT: All right. You can ask Manha, if he ever hits the stand, about it. It would seem to me that in getting into these things you could say if you have any problems with the police or law enforcement from any other prior experiences without necessarily -- you can handle it as you see fit. However, things from the 1980's, again, are things that I don't find terribly -- you got two from 2006. Why don't you hammer away at those? And we'll let the ones from the 80's go by the wayside. I mean, I am just not sure -- I agree, you can get into those as to Manha, you can get into the adult conviction as to Richardson, you can talk to Carlson about it, you can talk to Bowman. I don't see any of these as being challenges for cause that would persuade the court at this time.

With regard to Jackson, I guess the problem I had with some of these 11350's is it's hard to know from a rap sheet if a person has 11350 like a diversion case or if it's an 11350 where they pled to something; to resolve a matter short of trial, they pled to an 11350. You're saying these are arrests?

MS. PETTIGREW: On Richardson?

THE COURT: On Jackson. I am back to the first guy. He's got an 11350 arrest from 2007 and one from

1990.

MS. PETTIGREW: Yes.

THE COURT: So sometimes -- I don't know -- sometimes people end up in a diversion program, they think all that goes away through a diversion program. I don't know enough about these particular incidents to say whether or not -- you know, I've done the Prop 36 calendar and the 1203.4 calendar, and we tell certain people certain things on those calendars about their convictions going away. You can ask about them, but I am not going to find that they are for cause at this point.

Was there anything else? You said there were other people, but I don't need to get into that because they answered accurately.

MS. PETTIGREW: They were all honest.

THE COURT: They were all honest, okay.

Anything else, Ms. Pettigrew?

MS. PETTIGREW: No.

THE COURT: Did you -- Mr. Steckler proposed two questions that the court would ask. Did you -- did he show you those?

MS. PETTIGREW: Yes.

THE COURT: Any problem with those?

MS. PETTIGREW: No.

THE COURT: Mr. Bryden, any problem with those?

MR. BRYDEN: As a matter of principal, I don't have a problem. I don't think that the evidence of the brain matter, if -- you'd elicit a response that he's

looking for by suggesting that you wouldn't be fair and impartial. I think you could reword it to say would there be something so shocking that it would affect your emotions such that you couldn't pay attention to other evidence in this case.

THE COURT: Okay.

MR. BRYDEN: Something like that, rather than -- you know, everybody's going to say they could be fair and impartial.

MR. STECKLER: That's a good point.

THE COURT: Well, my thought was to delete the line from where it says in the front of his head, put a period there, and delete the description of it. That seems to be trying the case. And say, "If you were shown somewhat graphic photographs, would that fact by itself --" so I think I am concurring with what Mr. Bryden's saying, so I am going to rephrase that question.

MR. STECKLER: I am sorry, Your Honor. I think -- well, I understood Mr. Bryden to be suggesting a different way of phrasing the follow-up, the actual question, rather than is there anything about this that would affect your ability to be fair and impartial as I've stated, because that's -- most people are just going to say, well, yeah, I could be fair and impartial. I object -- well, I don't object. I would suggest that the court keep some description of the actual injury, if not the actual words that I submitted to the court, rather than saying simply

bullet wounds to the front of the head. I think it -- under the circumstances of this case, Mr. McNeely is entitled to a jury selected with knowledge that they can be fair and impartial knowing perhaps maybe the worse fact in this case. The case I have in mind that supports my request is -- I don't have an actual cite, but maybe the court is familiar with it -- is People vs. Cash, a death penalty case that comes out of this jurisdiction in the mid-2000's. In that case, the court did not allow Mr. Plumhoff and Mr. Humera to ask jurors about -- if they knew about a prior murder, can they be -- can they consider life in deciding life or death in that case. I wouldn't analogize this to that situation. I know it's different because it's not a death case and we're not talking about a prior murder. But in that case the argument might have been, and I think it was in that court, is that telling the jurors about a murder special circumstance is pretrying the case. If that's the argument here, I would submit that under Cash this jury pool should hear about the nature of the wounds to Mr. Fluker that they are going to be asked to look at.

THE COURT: Is the -- you described the nature of the wound as the most something --

MR. STECKLER: Just now?

THE COURT: What was that? Yeah.

MR. BRYDEN: He said was the worst factor evidence.

MR. STECKLER: Perhaps.

THE COURT: Perhaps. All right.

MR. STECKLER: I am not particularly wedded to my specific words. But I think, you know, bullet wound can just be a red hole. If you say bullet wound to the jury, they could say, oh, it's a red hole.

THE COURT: Sure.

MR. STECKLER: They don't know what it actually is.

THE COURT: It's possible. It would seem to the Court, though, that perhaps the worst factor is that the person who's being shot is totally uninvolved in any of the conduct that precedes this, rather than how he looks after he's been shot, so.

MR. STECKLER: I don't -- that is a bad fact, as well, and I intend, with the Court's permission, to voir dire about that innocent bystander.

THE COURT: Okay.

Is it submitted on that then?

MR. STECKLER: I will submit it.

THE COURT: Okay.

We've got Mr. -- do we have Mr. Jackson outside?

THE CLERK: Yes, Your Honor.

THE COURT: Why don't you bring him in and let's find out what we're -- he's asking the court to do.

(Whereupon, prospective juror, Mr. Jackson, enters the courtroom)

THE COURT: This is Olet Jackson, the first guy on our list with -- with his Kaiser record here.

Good morning, sir.

MR. JACKSON: Hi, Mr. Gaffey. Good morning.

Are you Mr. Jackson?

MR. JACKSON: Yes, sir.

THE COURT: And you've brought in a letter today from Kaiser that says you were off work from December 28th until January 13th?

MR. JACKSON: Yes, I was off.

THE COURT: And then you're going to be able to return to work?

MR. JACKSON: They want me -- no, they want me to go back on the 13th or 14th to have some lab work done.

THE COURT: Is there something about this that's going to affect your ability to serve as a juror?

MR. JACKSON: Yes, sir. My blood pressure and -- and heart valve rejection is -- not are functioning right now.

THE COURT: And do you have a --

MR. JACKSON: I am not functioning right.

THE COURT: And do you have a cold?

MR. JACKSON: I am not functioning right, so the doctor --

THE COURT: Tell me what you're asking.

MR. JACKSON: I am asking to be discharged.

THE COURT: For medical reasons?

MR. JACKSON: Yes, sir.

THE COURT: All right. All right. And -- all right, sir. I will grant your medical hardship because

the doctor says that you're not -- even today, you're not ready to go back to work.

MR. JACKSON: Thank you, Judge Gaffey.

THE COURT: So I will excuse you for a medical hardship.

MR. JACKSON: Thank you, Judge Gaffey.

THE COURT: Good luck to you, Mr. Jackson. Hope you feel better.

Do you need that letter back?

MR. JACKSON: Do you guys want to keep it?

THE COURT: Is that okay?

MR. JACKSON: Yeah.

THE COURT: Okay.

Thank you, sir.

(Whereupon, Mr. Jackson was excused from jury duty and exited the courtroom)

THE COURT: Anything else we got to do before we call for the jury?

Has the jury told us they are ready?

THE CLERK: They are all outside.

One person I could never get ahold of, Laura Arizmendi. She was excused. She is not outside. We didn't have a phone number for her.

MS. PETTIGREW: Can I ask one question? Are you procedurally excusing him, because he was in the box? Are you pulling from the end, or are we sliding everybody over?

THE COURT: No. We're going to slide everybody

over because he's been excused for a hardship.

MR. STECKLER: When we pass, we're passing on the 12?

THE COURT: Correct.

MR. STECKLER: Then we select the alternates later?

THE COURT: Correct.

MR. STECKLER: Thank you.

THE COURT: Then, as I understand it, each party gets one challenge per alternate seat. So each of you would have three individual challenges and the prosecutor would have six. Hopefully, we could get that far today.

Does anybody need to take a break before we start, or can we call the jury right now?

MR. STECKLER: I am fine.

THE COURT: All right.

So we'll have everybody just fill in the seats.

Brian, maybe you want to ask them not to fill in the seats in the front and just sit in the back and then stand and then we can call them up.

THE CLERK: Sure.

THE COURT: Is that okay?

(Whereupon, the prospective jury panel enters the courtroom)

THE COURT: Good morning, ladies and gentlemen. Thank you very much for your prompt attendance. During the course of the two-week break, we've had an opportunity to go through -- do additional motions and hear additional

things and so we think we're ready to begin with voir dire. I am going to ask your indulgence and apologize to you for having a few of you stand, up but I am going to ask the clerk to begin seating the jurors who are going to be in the jury box. Soon as that happens, there will be some seats in the audience for you to sit down. Okay? So please listen for your name to be called. As the clerk calls out your name, first person will go up in the back row closest to the easel there, and then 2 through 6, and number 7 will come to the front row at this end, as well. Okay.

THE CLERK: Edwin P-e-t-e-r-s. Please take seat number one in the back row, all the way to my right please.

Danielle L-a-b-r-e-c-q-u-e.

MS. LABRECQUE: Here.

THE CLERK: Seat number two, please.

THE CLERK: (Juror No. 3), seat number three please.

THE COURT: Good morning, sir.

THE CLERK: Juan Q-u-i-n-t-a-n-a, seat number four.

Cheryl D-u-n-n, seat number five please.

(Juror No. 6), seat number 6.

Krishna P-i-d-a-m-a-l-e, seat number 7 in the front row, all the way to my right, please.

Darleene B-o-w-m-a-n, seat number 8.

Ronald C-a-r-l-s-o-n, seat number 9.

Win M-a-u-n-g, seat number 10. M-a-u-n-g.

Should I go to the next one, Your Honor?

THE COURT: Mm-hm.

THE CLERK: David B-e-n-n-e-t-t.

Angelica N-u-n-e-z-O-r-t-e-g-a, seat number 11 please.

Nicholas A-r-a-c-i-c, seat number 12.

Justin Y-u, alternate seat number one in the back row.

Jason Richardson, R-i-c-h-a-r-d-s-o-n, alternate seat number two in the back row.

And Patsy B-e-n-n-e-t-t, seat right there.

Okay. And if the people who don't a seat, you can fill in the seats that are available now.

THE COURT: Good morning, ladies and gentlemen. Thank you for your attendance. Hopefully, you all had a nice Christmas and New Year's holiday and are somewhat rested and relaxed and ready to participate in a trial if you're selected as a trial juror and focus your attention on the charges in the case and the issues that will be presented by the attorneys.

Today we're going to begin with the individual voir dire. One of the things we discussed between the last time you were here and today between the attorneys and the defendants and counsel and myself is the -- we've discussed some of the evidence. We've had time to go over some of the evidence. So I want to raise a couple questions or just put to you some general questions.

First of all, hopefully everybody's still on the same page that the burden of proof is on the People. They have to prove their case beyond a reasonable doubt. Does anybody have any problem with that? All right. I don't see anybody disagreeing with me. They have to present the evidence.

And you know that the charges are -- the most important charge perhaps in the case is the murder charge and so, obviously, somebody's been killed. In the course of a case like that, you might be asked to look at some photographs of the victim and the injuries suffered by the victim, namely, a bullet wound. So there might be photographs from the crime scene. There might also be photographs from the autopsy showing a bullet wound to the head. If there were graphic evidence, namely photographs of the crime scene or from the autopsy, is that evidence that anybody thinks might affect their ability to be a fair and impartial juror? All right. I don't see anybody responding.

Let's say you're presented with that kind of evidence, would that -- would you be able to keep that as just one piece of evidence, along with all the other evidence, and consider it with everything else and otherwise keep an open mind until you heard all the evidence and been presented with the arguments of counsel and begun your deliberations with the other jurors, so could you keep an open mind no matter what the individual pieces of evidence were and wait until you're in

deliberations to form your opinions about the case? All right. I don't see anybody disagreeing.

The way we're going to proceed is each individual party has a right to a fair trial. So the People will get an opportunity to voir dire, and then each of the defendants will have an opportunity to voir dire, and then we'll exercise -- if there's cause challenges -- there could be cause challenges or there could be peremptory challenges.

So we're going to start with the People since they have the burden of proof. And I will turn it over to Ms. Pettigrew so that she can begin her voir dire.

And, Ms. Pettigrew, as I think we discussed, you will have up to 45 minutes.

MS. PETTIGREW: Okay. Thank you, Your Honor.

THE COURT: If I could interrupt before you begin?

MS. PETTIGREW: Sure.

THE COURT: Occasionally, you might see a person coming through the courtroom, as we have Ms. Moore here. Ms. Moore is from the Public Defender's office and she is representing somebody who's in custody. So we have what amounts to jail cells in behind these walls here, so sometimes you might hear something from behind the wall, and it could be that their attorney is coming through to talk to them because they have a case in another court, and they are going to go to that other court and they want to make sure they are all prepared to have their case called. So it's nothing inappropriate. But, again, they

are attorneys on other cases and they are going to do their best not to interrupt our proceedings. Just to give you an idea what's going on. And, also, if you hear things coming from behind the door, could be that somebody sometimes -- not everybody's happy to be in jail.

Okay. Go ahead Ms. Pettigrew

MS. PETTIGREW: Good morning, Your Honor.

Good morning, ladies and gentlemen.

My name is Stacie Pettigrew. I am the Deputy D.A. of Alameda County. I represent the People of the State of California.

THE COURT: Okay. I am sorry. I am not sure, but some people's phones have these little things that make noise, so I would ask you please, if you haven't done so, please turn off your phone or turn it to silent mode at least so that we are not interrupted and disturbed. It's not anybody's fault. We're not seeking to find fault. We're just seeking to correct a problem so we're not interrupted any more this morning. So don't be upset if you have to take out your phone to help us all out.

Sorry, Ms. Pettigrew.

MS. PETTIGREW: That's okay.

I am sure everybody's in the room is wondering what more can we possibly want to know since we filled out a 22-page questionnaire. Most of the questions I will follow are simply follow-up questions to most of the questions you answered in the questionnaire. I ask your you to indulge. I know sometimes it's hard to hear if you

are sitting in the back of the courtroom. If you listen and pay attention to what the -- our questions and what the other jurors answers are, you will have an idea when you get up here, you will know more about what we're interested in knowing, and if you could listen and keep track of that, you could volunteer when you get up here. Things may go little more smoothly, even though it's the longest and most monotonous procedure.

Mr. Peters, I will start with you since you are sitting in seat number one.

You have been on a jury before; is that right?

MR. PETERS: Yes.

MS. PETTIGREW: It was a while back. And it did not reach a verdict?

MR. PETERS: Correct.

MR. PETTIGREW: Was it a hung jury or did it resolve mid-way to the process?

MR. PETERS: It was a hung jury.

MS. PETTIGREW: And was the split like pretty even, or was it just one or two people that couldn't come to an agreement?

MR. PETERS: It was close to being even.

MS. PETTIGREW: Okay.

How did you feel about that process?

MR. PETERS: Um, oh, I would rather it come to a conclusion. I mean, you know, but that's -- you know, that's how it works --

MS. PETTIGREW: Okay.

MR. PETERS: -- and I have no problem with that.

MS. PETTIGREW: So it didn't frustrate you at all?

MR. PETERS: No.

MS. PETTIGREW: Okay.

You also indicated that there was an incident where someone thought that you cut them off in traffic and it evolved into a physical altercation?

MR. PETERS: Well, it was a grabbing by the other party.

MS. PETTIGREW: Okay.

Can you tell me little bit more about that?

MR. PETERS: This occurred in Sacramento. And I was trying to make a lane change, and he left a little -- left enough space there, but was upset that he thought that space belonged to him. He chased me down with his car. He rammed the side of my car. We pulled over to exchange information. He got a little physical. His passenger calmed him down at some point and then a passerby came.

MS. PETTIGREW: Was that incident reported to the police?

MR. PETERS: No, no, just to the insurance company.

MS. PETTIGREW: Okay.

Do we have a microphone?

THE CLERK: Yes.

MS. PETTIGREW: Could I just -- I am having a

little difficulty hearing.

Okay. I am going give that to you. Is it working?

MR. PETERS: I think so.

MS. PETTIGREW: Yes?

MR. PETERS: Yeah.

MS. PETTIGREW: That's better. Okay.

So that incident was never reported to the police, didn't go through the court process?

MR. PETERS: No, it did not.

MS. PETTIGREW: How did you feel in that incident?

MR. PETERS: Well, it was certainly something I had -- that hadn't occurred to me before. But, you know, after a couple of days, I mean, I went back to work and it -- I heard nothing from the other party again. And so I -- you know, it didn't really occur to me to give it any more thought.

MS. PETTIGREW; Okay. Thank you.

Ms. Labrecque.

MS. LABRECQUE: Yes.

MS. PETTIGREW: Good morning.

MS. LABRECQUE: Good morning.

MS. PETTIGREW: You're familiar with this process?

MS. LABRECQUE: Yes, just a little.

MS. PETTIGREW: And that's from your job.

Do you think that having kind of the back -- back

scene view or, you know, knowing kind of how this process works, would make it difficult for you to be a juror?

MS. LABRECQUE: No.

MS. PETTIGREW: Okay.

Anything about the nature of this case that makes you think that maybe you don't want to be a juror?

MS. LABRECQUE: No.

MS. PETTIGREW: Okay. Thank you.

(Juror No. 3)?

JUROR NO. 3: (Juror No. 3).

MS. PETTIGREW: (Juror No. 3). Good morning.

When we get the pre-printed forms, it's not always easy to tell which name is appropriate.

So good morning, sir.

There are a few of you that are in this first panel that there was one question about the criminal justice system and what are your views on the criminal justice system, and quite a few people in the whole panel left that answer blank. And I am just wondering, having gone away for the last four weeks, and did you think about any questions from the questionnaire after you left and do you have a thought or a feeling on the criminal justice system?

JUROR NO. 3: No, I -- I really didn't answer certain questions because it was a question asked me about have a weapon or own a weapon, and I say no on that one. My wife, you know, she own a weapon and it's under her name, and my wife said it's at home, you know, it

belong to you, too. One, it's only in the residence.

MS. PETTIGREW: Some of the questions you -- you might have left blank if you didn't understand the question?

JUROR NO. 3: I understand the question if -- for me, it's to speak the language. The easier to speak the language than write.

MS. PETTIGREW: Okay.

So easier to speak than write?

JUROR NO. 3: Yes.

MS. PETTIGREW: What are your views on the criminal justice system?

JUROR NO. 3: I don't understand the question.

MS. PETTIGREW: Do you follow anything in either the news or the newspaper about court cases or things that happen in the --

JUROR NO. 3: Yeah, I saw TV. In TV, you know, you saw shows and things like that.

MS. PETTIGREW: Okay.

And setting aside the dramatic shows that are Hollywood and fake --

JUROR NO. 3: Yes.

MS. PETTIGREW: -- do you follow any -- any in the news, actual cases that have happened to people?

JUROR NO. 3: No.

MS. PETTIGREW: Okay.

JUROR NO. 3: I remember the case -- seeing a case that was a case everybody was following, we were

following.

MS. PETTIGREW: Okay.

And does something like that make you have any thoughts or feelings about court and this process that we're undertaking today?

JUROR NO. 3: No.

MS. PETTIGREW: Okay.

Do you think that you would be able to be a juror and listen to witnesses testify and come to a conclusion make a decision?

JUROR NO. 3: Oh, yes, I know I believe it, yes.

MS. PETTIGREW: Okay.

I am going to present witnesses. Defense may present witnesses, although they don't have to 'cause I have the burden of proof.

JUROR NO. 3: Yes.

MS. PETTIGREW: At the end, I am going to ask you to convict these two people of murder and make a decision. Do you think that you would have any difficulty in doing that if you feel that the case has been proved beyond a reasonable doubt?

JUROR NO. 3: No, I would not have difficulty.

MS. PETTIGREW: No difficulty?

JUROR NO. 3: No difficulty.

MS. PETTIGREW: Okay. Thank you.

Does anybody have -- think that they would have difficulty in rendering a verdict? You know, murder is a serious thing. I think we all know that. And I am going

to be asking you to convict these two people of murder. If I prove the case beyond a reasonable doubt -- when I prove the case beyond a reasonable doubt. Does anybody think that they would have difficulty in rendering a verdict of guilty. I am seeing no hands and I am seeing shaking heads. Okay. Thank you.

If you could pass the microphone to Mr. Quintana?

Good morning.

MR. QUINTANA: Good morning.

MS. PETTIGREW: You also left that question blank regarding your thoughts and views on the criminal justice system. Do you have any thoughts that you'd like to share?

MR. QUINTANA: You know, I -- I don't recall exactly what the question was about. I do recall that I left some answers blank, however, um, and it was because just suppose at the moment I really didn't have an opinion. Some of them, the questions, seemed kind of difficult, and I even thought some seemed a little contradictory, I remember noting.

Q. MS. PETTIGREW: Right.

MR. QUINTANA: But -- so I don't really have an opinion now either because I don't remember or I wasn't reflecting upon it afterwards.

MS. PETTIGREW: Okay.

You indicated that your mom and sister had both been victims of various crimes --

MR. QUINTANA: Yes.

MS. PETTIGREW: -- in the past. Did any of that go through the court process?

MR. QUINTANA: No.

MS. PETTIGREW: Just because people weren't apprehended?

MR. QUINTANA: That's right.

MS. PETTIGREW: Okay.

Is there anything about that kind of -- those instances not being resolved or anything of that nature that would make -- that gave you any viewpoint on the criminal justice system?

MR. QUINTANA: No.

MS. PETTIGREW: Okay.

And the armed robbery, that was also of your mom?

MR. QUINTANA: Yes, that's right.

MS. PETTIGREW: Okay.

Was that before you were around, or were you present?

MR. QUINTANA: Well, it was in Argentina. She lives in Argentina. And right now there's a lot of crime going on there, which is unfortunate.

MS. PETTIGREW: It's a recent thing?

MR. QUINTANA: Yeah, relatively recent. Yeah, it was probably, I think, a year or two ago, at most.

MS. PETTIGREW: Have you talked to her about that incident?

MR. QUINTANA: Yes. Mm-hm.

MS. PETTIGREW: And did that give you any sort of

views on guns or crime or --

MR. QUINTANA: Well, I mean, um, I am kind of disappointed with how I see things developing in Argentina, as far as that's concerned, you know. And, yeah, one gets, um -- I don't know -- frustrated or upset about what's going on. So, yeah, any time I hear that my mother's in danger like that it's going to bother me, yeah.

MS. PETTIGREW: Has that impacted your thoughts -- I mean, you can't pick up a newspaper, turn on the TV, or listen to the radio without hearing about the crime that's going on in our own community here.

MR. QUINTANA: Right.

MS. PETTIGREW: What are your thoughts about that? How does that affect you on a daily basis?

MR. QUINTANA: Um, I don't think I am really affected by it, certainly not here. I don't see the level of crime here as I hear like from Argentina. But maybe I just hear a lot more about that and that bothers me 'cause I have family down there.

MS. PETTIGREW: Okay.

MR. QUINTANA: But I don't think that it will affect me here.

MS. PETTIGREW: Okay. Thank you.

Ms. Dunn, what about you? Same kind of question. You can't pick up a paper, turn on the TV without hearing about kind of the violence and the crime that's going on in our community here. And by our community I am

including Oakland even though you don't live in Oakland.

MS. DUNN: Which I am glad about, thank you.

MS. PETTIGREW: How does that affect you, or does it?

MS. DUNN: I don't think it really does. It's not something that I deal with at all. So you read it in the paper. Sometimes I don't -- most of time, I don't even read the front paper, the front part of the paper.

MS. PETTIGREW: 'Cause you'd rather avoid it?

MS. DUNN: Yeah.

MS. PETTIGREW: Do you avoid it to make it go away?

MS. DUNN: No. I will read it maybe later in the day. It doesn't really affect my life, I mean, the crime going on in Oakland or any of the other cities around. I feel fairly safe. I go to Oakland frequently. We were just there last weekend, so it's not something that I feel threatens me.

MS. PETTIGREW: Okay.

No. 6), Juror 6. I butchered it. I am sorry.

Can you pronounce your name?

JUROR NO. 6: (Juror No. 6).

MS. PETTIGREW: Good morning.

There were a quite a few questions about defense and self-defense, and you wrote that one must defend himself if in danger; is that right?

JUROR NO. 6: Mm-hm.

MS. PETTIGREW: You'd agree that would be

immediate danger; it needs to be immediate in order to defend themselves?

JUROR NO. 6: Right.

MS. PETTIGREW: And what if someone creates the danger; what do you think about that?

JUROR NO. 6: Well -- well, you still have to defend yourself. I would.

MS. PETTIGREW: Okay.

JUROR NO. 6: Maybe I'd try to avoid it if I could --

MS. PETTIGREW: Okay.

JUROR NO. 6: -- if there was an opportunity.

MS. PETTIGREW: I am sorry?

JUROR NO. 6: If there was an opportunity to avoid it altogether.

MS. PETTIGREW: So there was a question about retreating versus pursuing. I think you wrote that you would rather retreat --

JUROR NO. 6: Mm-hm.

MS. PETTIGREW: -- if safety allows.

JUROR NO. 6: Yes.

MS. PETTIGREW: Okay. I am going to ask a general question at this point.

Has anybody heard of the game of chicken? And some of you have raised your hands.

And you right in front, Mr. Bennett.

MR. BENNETT: Yes.

MS. PETTIGREW: Can you pass the microphone up?

What is the game of chicken?

MR. BENNETT: The game of chicken is two people either running at themselves or each other, and whoever gives up first and moves out of the way and they lose, so.

MS. PETTIGREW: And sometimes I am thinking of a famous movie, Grease, with John Travolta; they used to do it.

MR. BENNET: With cars.

MS. PETTIGREW: With cars, yeah.

And two people making the choice to engage in this dangerous --

MR. BENNETT: Right.

MS. PETTIGREW: -- activity. And, you know, if two people are doing that and one veers out of the way -- forget who wins or loses in terms of the rules of the game, right -- but one veers out of the way and kills somebody, somebody who's watching and is, you know, just a bystander, that person can be charged with murder, right?

MR. BENNETT: Correct.

MS. PETTIGREW: What about the person who was also engaged in this game of chicken and wasn't the one who actually veered off and hit anybody, what do you think that that -- should happen to that person?

MR. BENNETT: I think they should be tried as far as their participation in that event to see if they were a potential cause of that and indirectly involved.

MS. PETTIGREW: And if the law says that when a person is engaged in dangerous behavior, knowing that it's dangerous and they engage in it, and a death occurs that person can be responsible for murder.

MR. BENNETT: Yes.

MS. BENNETT: Does anybody think that you have to be the one who actually pulled the trigger and was the actual direct cause in order to be liable or responsible for murder? Does anyone have any discomfort with that person who was engaged in this dangerous activity but wasn't the person who actually caused the death, that person also being responsible for murder? Anybody have any hesitation with that.

Mr. Yu.

MR. YU: Yeah.

MS. PETTIGREW: Mr. Bennett, would you mind passing that back?

MR. YU: Yes.

MS. PETTIGREW: Tell me your thoughts.

MR. YU: I might have a little bit on it because it's not direct. I would have to see the rules of murder to see what is the rules of murder to see what is there to -- what is the guidelines whether to judge it one way or the other.

MS. PETTIGREW: Okay.

And this we'll talk -- this is like a vacuum, right. It's not appropriate for me to get into the facts.

MR. YU: Of course.

MS. PETTIGREW: At the end, the judge is the one who's going to actually instruct you on the law, but we try to just talk about the law just in kind of a vacuum so that you can get an idea. If you're instructed that it doesn't have to be the direct cause, but simply a proximate cause, two people can cause something at the same time, what do you think about that?

MR. YU: Then it's instructions, yes.

MS. PETTIGREW: And you think you could follow the instructions?

MR. YU: Yes.

MS. PETTIGREW: Okay. I am going to stay on my movie theme 'cause I mentioned Grease. Has everyone seen the movie The Bodyguard? It's kind of old Whitney Houston/Kevin Costner, Kevin Costner as the bodyguard for Whitney Houston. And at the end of the movie one of the most climactic scenes, assassin trying to assassinate Whitney Houston. He has his gun trained on her. And here comes Kevin Costner to the rescue. I think it's through the walls. And he shoots and kills the assassin. It's a Hollywood movie and everything. And he shoots and saves the day. What happens if Mr. Costner shoots at the assassin and kills an innocent person, someone who is beyond the assassin? What is the responsibility of the assassin? The law says that person did a provocative act, the assassin created a dangerous situation for Kevin Costner to respond with deadly or dangerous force. So in that situation, even though, again, the assassin isn't the

actual killer of the person who took the stray round, the assassin would be the person held responsible because of the provocative act.

Anybody disagree with that notion, the provocative act law? Seeing no hands.

Okay. Mr. Yu, can you please pass the microphone to Mr. Richardson?

Good morning, sir.

MR. RICHARDSON: Good morning.

MS. PETTIGREW: Are you working currently?

MR. RICHARDSON: No, I am not.

MS. PETTIGREW: What type of work have you done in the past?

MR. RICHARDSON: Electrical.

MS. PETTIGREW: Electrical work?

MR. RICHARDSON: Yeah.

MS. PETTIGREW: Working in homes or businesses?

MR. RICHARDSON: Both.

MS. PETTIGREW: You wrote in -- you're also one that left that same question blank. And now we've kind of given maybe a little bit of time to think about it. Not trying to put you on the spot, but do you have any thoughts about the criminal justice system?

MR. RICHARDSON: I mean, that's why I didn't write nothing down; I don't really have any thoughts. I mean, I really couldn't come up with any conclusions myself so I left it blank. I don't really have any opinions on it.

MS. PETTIGREW: Do you have any personal

experience with the criminal justice system?

MR. RICHARDSON: Yes.

MS. PETTIGREW: And was that here in Alameda County?

MR. RICHARDSON: Yes.

MS. PETTIGREW: How did you feel you were treated?

MR. RICHARDSON: Well, as far as me, I guess I was treated pretty fair.

MS. PETTIGREW: Okay.

Do you know other people who've had experience with the system who you feel have not been treated fairly?

MR. RICHARDSON: Yes.

MS. PETTIGREW: You do?

MR. RICHARDSON: Yes.

MS. PETTIGREW: And is that one person or more than one person?

MR. RICHARDSON: More than one.

MS. PETTIGREW: Okay. There was a question in the questionnaire about whether you've ever visited a jail or a prison and you checked yes. Who -- was that one time or more than one time?

MR. RICHARDSON: Um, more than one time.

MS. PETTIGREW: And who was it that you were visiting?

MR. RICHARDSON: My uncle, my father, and other people.

MS. PETTIGREW: I am sorry?

MR. RICHARDSON: I said numerous people.

MS. PETTIGREW: Numerous people?

MR. RICHARDSON: Yeah.

MS. PETTIGREW: Do you think that those people who are -- have personal contacts, and maybe even your own personal history with the criminal justice system, do you think it would make it difficult for you to be fair in a case like this?

MR. RICHARDSON: No. No.

MS. PETTIGREW: I have the burden of proof and I take that burden, but do I start with kind of a higher burden in your mind with the people who have had the experience with the justice system?

MR. RICHARDSON: Um, I really can't say that. I can't -- I mean, can you rephrase that 'cause I don't really understand?

MS. PETTIGRFEW: Sure.

I have a job to do. I am going to present witnesses and evidence and people are going to come in and testify. Is my job harder in your mind because of the experience that you have with with the criminal justice system?

MR. RICHARDSON: No, I don't think so.

MS. PETTIGREW: You think that you can be fair?

MR. RICHARDSON: Yes.

MS. PETTIGREW: Thank you.

Ms. Bennett, good morning.

MS. BENNETT: Good morning.

MS. PETTIGREW: You work with Public Health?

MS. BENNETT: Yes.

MS. PETTIGRFEW: And what do you do?

MS. BENNETT: Um, community outreach. I do medical for pregnant women and families, children, make appointments.

MS. PETTIGREW: And when you say community outreach, do you actually go out into the community or people come to a centralized location?

MS. BENNETT: Once in a while I go out, and sometimes they come in.

MS. PETTIGREW: Okay.

You didn't leave that question about the criminal justice system blank, but you wrote NA, for not applicable. Do you have any thoughts or feelings about the criminal justice system?

THE COURT: Could you speak into the microphone?

MS. BENNETT: I've had family members -- I have a -- I am not feeling well.

MS. PETTIGREW: Okay.

MS. BENNETT: I have family members that's been in the criminal justice center, and I just, you know, whatever way it went was the way it went.

MS. PETTIGREW: Okay.

MS. BENNETT: There was nothing I could do about it.

MS. PETTIGREW: Okay.

Did you ever go to any proceedings for any of

those family members?

MS. BENNETT: No, I did not.

MS. PETTIGREW: Okay.

So you didn't watch the court process?

MS. BENNETT: No, I did not.

MS. PETTIGREW: Do you have any thought as to whether any one of them was treated fairly or unfairly?

MS. BENNETT: Well, my sister, I -- she was treated fair in my opinion, but I don't know. I heard what happened, so I don't really know what happened. But my sister really got off the case; she was convicted, but she wasn't convicted.

MS. PETTIGREW: Okay.

And nothing about that situation would impact your ability to be fair here?

MS. BENNETT: No. Right now I don't know who -- because I don't feel good at all.

MS. PETTIGREW: Okay.

MS. BENNETT: So I am just here because I was told to be here.

MS. PETTIGREW: Okay. I am not trying to put you on the spot, ma'am.

MS. BENNETT: I know.

MS. PETTIGREW: Just one final question. You were a juror in a civil case; is that right?

MS. BENNETT: Yes.

MS. PETTIGREW: And a civil case is different from a criminal case in a number of ways. But one way is that

in a civil case the jurors don't have to be unanimous when they deliberate and render their verdict. But do you remember whether or not in your case the jury was unanimous where everyone agreed or whether it was split?

MS. BENNETT: You know, I think everybody just were tired because it lasted so long that they just went on and said give them what they want.

MS. PETTIGREW: Okay.

Is there anything about that experience that would kind of impact your ability to be a juror here?

MS. BENNETT: To be honest with you, if I had to sit here a long time like I had to sit at that other one that was two or three months, no, I don't even want to do it. I am telling the truth.

MS. PETTIGREW: Okay. This won't be that long. I am not going to make any promise as to how long it will be, but the judge gave you an estimate of about six weeks, and I -- that's probably on the long side. What do you think about that amount of time?

MS. BENNETT: Honest, I don't want to do it.

MS. PETTIGREW: Okay. Thank you, Ms. Bennett.

If you could just pass it over to Mr. Aracic?

MR. ARACIC: Aracic, yes.

MS. PETTIGREW: Aracic.

Good morning, sir.

MR. ARACIC: Good morning.

MS. PETTIGREW: You're a retired lawyer?

MR. ARACIC: Yes.

MS. PETTIGRFEW: I think there is three or four in the panel; quite a few lawyers and retired lawyers. You weren't one that ever worked as a D.A. in the county, right?

MR. ARACIC: I did sign one paper as a District Attorney.

MS. PETTIGREW: Okay.

MR. ARACIC: I was appointed to represent the District Attorney in a Federal case where a guy had removed (sic) a civil action and a criminal action at the same time.

MS. PETTIGREW: Okay.

But that was the extent of your contact with -- as a D.A.?

MR. ARACIC: I represented the District Attorney many times --

MS. PETTIGREW: Okay.

MR. ARACIC: -- when he got sued in civil matters.

MS. PETTIGREW: Okay. Okay.

MR. ARACIC: And the Public Defender.

MS. PETTIGREW: Were you a trial lawyer?

MR. ARACIC: Yes.

MS. PETTIGREW: How does it feel sitting in that seat?

MR. ARACIC: I never liked this courthouse. It's awkward. It doesn't work well with sound. I tried a couple cases here, I believe.

MS. PETTIGREW: Okay.

And if you are selected as a juror in this case, you kind of know a little bit from the questionnaire what the case is about, do you have any thoughts as to whether you would be able to be fair and impartial?

MR. ARACIC: I try very -- tried very hard not to think about the case over the holidays because that's what I was told; but, no, I think I could be fair and impartial.

MS. PETTIGREW: Okay.

One thing that you wrote that drew my attention, you worked was Deputy County Counsel for --

MR. ARACIC: Almost 10 years.

MS. PETTIGREW: And you said you've known dozens of inmates through your duties as County Counsel?

MR. ARACIC: Yeah.

MS. PETTIGREW: In what capacity?

MR. ARACIC: The inmates would sue the county for medical care, or for mistreatment, or for any number of variety of things, and I would very commonly get assigned those cases to defend.

MS. PETTIGREW: Okay.

So you defended the City? So you were --

MR. ARACIC: County.

MS. PETTIGREW: County.

Not working on behalf of the inmates?

MR. ARACICV: Actually, that's when I was working for Deputy County Counsel. I also had a long practice

defending cities.

MS. PETTIGREW: Okay.

MR. ARACIC: Sometimes they were in police cases and sometimes they weren't.

MS. PETTIGREW: Anything about that work that would would impact your ability to be a juror in this case?

MR. ARACIC: I am very familiar with the system. I know how things work. I think I can be fair.

MS. PETTIGREW: Okay.

And if at the end you're given the law with which to work from, which is what the judge will give you, and it conflicts with something that you either think you remember from your work, or from law school, or whatever, could you set aside whatever you think you remember and follow the law as it's given?

MR. ARACIC: Yes.

MS. PETTIGREW: Okay. Thank you, sir.

If you could just pass it to Ms. Ortega or Nunez-Ortega.

MS. NUNEZ: Nunez.

MS. PETTIGREW: Nunez.

Good morning, ma'am.

MS. NUNEZ: Good morning.

MS. PETTIGREW: You want the crime in Oakland to stop and that will be in the back of your mind?

MS. NUNEZ: Mm-hm.

MS. PETTIGREW: I think everyone would like for

the crime in Oakland to stop. Do you think that you can set that aside and realize that this is one case and you're here to decide if I prove the case beyond a reasonable doubt?

MS. NUNEZ: It's very hard for me because I did grow up in Oakland and I have really strong ties in Oakland; they still live there. And so for me, just hearing about all the crime really gets to me, so I don't watch the news at night or in the morning because it bothers me a lot.

MS. PETTIGREW: Okay. And I understand completely. But here's the deal. These two are on trial and I have to prove that they committed a murder and various other charges.

MS. NUNEZ: Mm-hm.

MS. PETTIGREW: You are not going to let what you feel about Oakland and your wishing the crime to stop impact your ability to determine -- your ability to determine whether or not I proved my case to you?

MS. NUNEZ: Right. That wouldn't be fair to them. Unfortunately, it is something that's in the back of my head.

MS. PETTIGREW: Okay. But we all have our different life experience and we come in here with -- you know, we're not asking you to leave that at the door or your common sense.

MS. NUNEZ: Mm-hm.

MS. PETTIGREW: We're also not here to right any

wrongs, what's going on in the city of Oakland.
MS. NUNEZ: Mm-hm.
MS. PETTIGREW: We're here to decide what's going on in this case. Do you think you can do that?
MS. NUNEZ: Mm-hm.
MS. PETTIGREW: Okay. Thank you.
I am going backwards. I am all out of sorts.
Mr. Bennett, good morning.
MR. BENNETT: Yes.
MS. PETTIGREW: Your stepfather --
MR. BENNETT: Yes.
MS. PETTIGREW: -- is that someone you had contact with as a child or as an adult?
MR. BENNETT: As an adult.
MS. PETTIGREW; And did you have a lot of contact with him?
MR. BENNETT: In the last 20 years, yes.
MS. PETTIGREW: Okay.
And how recent was his case?
MR. BENNETT: Oh, it was probably 45 years ago.
MS. PETTIGREW: Okay.
MR. BENNETT: Quite a long time ago.
MS. PETTIGREW: Okay.
So your contact with him would have been once he was released?
MR. BENNETT: Yes.
MS. PETTIGREW: Okay.
Was he guilty?

MR. BENNETT: Yes.

MS. PETTIGREW: And do you think he was treated fairly?

MR. BENNETT: Yes.

MS. PETTIGREW: Sometimes I ask this question. You know, if you sit as a juror and you vote at the end to convict someone of murder and you go and you have a conversation with your stepfather, would you feel bad or feel like you had to apologize --

MR. BENNETT: No.

MS. PETTIGREW: -- for following the law and --

MR. BENNETT: No. I would be able to follow it.

MS. PETTIGREW: Okay. Thank you.

MR. BENNETT: Thank you.

MS. PETTIGREW: Mr. Carlson.

MR. CARLSON: Good morning.

MS. PETTIGREW: Good morning.

You were in the Air Force for quite a long time.

MR. CARLSON: Yes.

MS. PETTIGREW: What were your duties?

MR. CARLSON: First, I was a firefighter and then I was a truck driver.

MS. PETTIGREW: Okay.

And then you carried that over to your --

MR. CARLSON: Current job, yes.

MS. PETTIGREW: -- your civilian work --

MR. CARLSON: Yes.

MS. PETTIGREW: -- I guess is what you would

say?

MR. CARLSON: Yes.

MS. PETTIGREW: You had an incident also with the criminal justice system?

MR. CARLSON: Yes.

MS. PETTIGREW: Does that give you any feeling -- none at all?

MR. CARLSON: None at all.

MS. PETTIGREW: Recognizing -- I know that it was a long time ago, but recognizing that it was here in this county and it would have been a D.A. --

MR. CARLSON: Makes no difference.

MS. PETTIGREW: -- just like me --

MR. CARLSON: Makes no difference.

MS. PETTIGREW: Did you ever go to trial or resolve things short?

MR. CARLSON: No, plea bargain.

MS. PETTIGREW: And nothing about that experience --

MR. CARLSON: No.

MS. PETTIGREW: -- makes you think that you would --

MR. CARLSON: No.

MS. PETTIGREW: -- not be able to be fair?

MR. CARLSON: No.

MS. PETTIGREW: Your response on the criminal justice question was, "I guess it works".

MR. CARLSON: Till somebody comes up with a better

system, what else have we got, right?

MS. PETTIGREW: Okay.

And given your kind of, I don't want to say ambivalent attitude, but just a statement like that, you think you could be part of this system, and invested, and listen to witnesses --

MR. CARLSON: Sure.

MS. PETTIGREW: -- and make a decision?

MR. CARLSON: Sure.

MS. PETTIGREW: Okay. Thank you.

Ms. Bowman.

MS. BOWMAN: Good morning.

MS. PETTIGREW: Good morning.

You're involved in the volunteer work, the needle exchange?

MS. BOWMAN: Yes.

MS. PETTIGREW: How did you get involved with that?

MS. BOWMAN: Through my church. I wanted to help so I have been with them about 12 years.

MS. PETTIGREW: Okay.

And is that something that happens at your church?

MS. BOWMAN: No, it happens here in Hayward.

MS. PETTIGREW: Okay.

At some sort of a medical facility or --

MS. BOWMAN: No, at the Methodist church.

MS. PETTIGREW: Okay.

So not the church that you attend regularly, but

it happens at another church?

MS. BOWMAN: Mm-hm.

MS. PETTIGREW: Does that ever go inside of jails or prisons or -- does that ministry extend beyond just the needle exchange?

MS. BOWMAN: No, just the needle exchange.

MS. PETTIGREW: Okay.

Is there anything about your work with that organization that makes you not want to be involved with the criminal justice system?

MS. BOWMAN: No.

MS. PETTIGREW: Okay.

MS. BOWMAN: Fair is fair. You know, if -- you know, because there are people that are involved who have had problems and then there's people that -- who haven't, so it's not for me to make a judgment call on a person just because.

MS. PETTIGREW: Okay.

And that's with your work with the needle exchange?

MS. BOWMAN: Mm-hm.

MS. PETTIGREW: Here you'll be asked to make a judgment.

MS. BOWMAN: Okay.

MS. PETTIGREW: You will be asked to make a decision after all of the evidence has been presented and been instructed on the law. Do you think you could do that?

MS. BOWMAN: Yes.
MS. PETTIGREW: You indicated that you've also visited a jail with your church?
MS. BOWMAN: Yes.
MS. PETTIGREW: Was that a ministry type thing --
MS. BOWMAN: Yes.
MS. PETTIGREW: -- or just a tour?
MS. BOWMAN: No, it was my choir.
MS. PETTIGREW: What was the purpose? Were you meeting with individuals or were you doing like a presentation?
MS. BOWMAN: Our choir went.
MS. PETTIGREW: To sing?
MS. BOWMAN: Mm-hm.
MS. PETTIGREW: Okay.
So like a ministry thing again?
MS. BOWMAN: Yes.
MS. PETTIGREW: Okay.
Was that a one-time thing or multiple times?
MS. BOWMAN: Multiple times.
MS. PETTIGREW: And what did you think about that?
MS. BOWMAN: First time, it was uncomfortable. Once I got used to it, it wasn't that bad.
MS. PETTIGREW: Okay.
Is there anything about that, your having been and visited a jail, that would impact your ability at the end of this case to render a verdict?

MS. BOWMAN: No.
MS. PETTIGREW: Okay.
You have two sons?
MS. BOWMAN: Yes.
MS. PETTIGREW: What do they do?
MS. BOWMAN: I don't know what companies they work for.
MS. PETTIGREW: Okay.
MS. BOWMAN: One's in southern California. Another is in another state.
MS. PETTIGREW; And they work for random companies.
MS. BOWMAN: Yes.
MS. PETTIGREW: Do you know what type of work they do?
MS. BOWMAN: No.
MS. PETTIGREW: Okay.
One question was whether you've ever known someone who was a victim of gun violence, and you indicated that, yes, there had been someone that died in 1992.
MS. BOWMAN: Yes.
MS. PETTIGREW: Was that someone who was close to you?
MS. BOWMAN: Mm-hm.
MS. PETTIGREW: I am sorry.
Was that -- did that ever go through the court process?
MS. BOWMAN: No.

MS. PETTIGREW: Was anybody apprehended?
MS. BOWMAN: No.
MS. PETTIGREW: So it was an unsolved case?
MS. BOWMAN: Mm-hm.
MS. PETTIGRFEW; Is there anything about that -- did you witness that incident?
MS. BOWMAN: No, I didn't.
MS. PETTIGRFEW: Is there anything about that that would make it difficult for you to sit as a juror on a murder case involving guns?
MS. BOWMAN: No.
MS. PETTIGREW: Okay.
You think you could keep them completely separate?
MS. BOWMAN: Mm-hm.
MS. PETTIGREW: Okay. Thank you, Ms. Bowman
MS. BOWMAN: Thank you.
MS. PETTIGREW: Mr. Pidamale?
MR. PIDAMALE: Krishna.
MS. PETTIGREW: Did I say that right?
MR. PIDAMALE: Yeah.
MS. PETTIGREW: Good morning.
MR. PIDAMALE: Good morning.
MS. PETTIGREW: You heard me talk for going on 30 minutes now. You now know some of the issues that are going to come up in this case. Do you think you could be a fair and impartial juror?
MR. PIDAMALE; Possibly. I mean, I am not familiar with the process, so that's hopefully for a

period of time as I sit through this I will get familiar, and I think I can do a good job.

MS. PETTIGREW: You indicated in your questionnaire that you're very sympathetic.

MR. PIDAMALE: Right.

MS. PETTIGREW: Do you remember that statement?

MR. PIDAMALE: Right, right, right.

MS. PETTIGREW: And you know you are going to --

MR. PIDAMALE: Right. I --

MS. PETTIGREW: -- be here in court. Yeah?

MR. PIDAMALE: Yeah. I usually want to give a chance to people. That will -- I am little bit sympathetic usually, yeah.

MS. PETTIGREW: You say you want to give a chance to people?

MR. PIDAMALE: Yeah. I mean, if -- if that's, you know -- sometimes people make a mistake by, could be an act, by accident, or they were not aware of the consequences. I would think if a person understands that that they can be given another chance or something.

MS. PETTIGREW: Okay. Let's suppose you're selected as a juror and witnesses come in and you see all the evidence and you get to the end of the case and you think that this was an accident or the person made a mistake and should be given another chance; do you think that kind of sympathy that you recognize that you feel, in general, would make it difficult for you to convict these two of murder if I've proven the case beyond a reasonable

doubt?

MR. PIDAMALE: Yeah. If there is good evidence that's being given on the case, then I could do it.

MS. PETTIGREW: What if you also feel sympathy at the same time? Not saying you will, but what if you do? What if you feel bad for one or both of the people that are sitting here in court; do you think that that would interfere with your ability to find them guilty?

MR. PIDAMALE: I am not sure yet.

MS. PETTIGREW: Okay.

So as you sit here now you kind of have a general outlook on life where you feel sympathetic.

MR. PIDAMALE: Yeah.

MS. PETTIGREW: And people make mistakes, you want to give them another chance, and you are not sure of how that would affect your ability to render a verdict?

MR. PIDAMALE: Right. At this moment here, I mean, I would say, yeah, given all the evidence I may be able to do it, but kind of sympathy, yeah.

MS. PETTIGREW: Thank you very much, ladies and gentlemen.

THE COURT: Thank you, Ms. Pettigrew.

I think now is a good time to take our morning recess. We'll be in recess until 11:00, maybe 11:05.

I would like to have Ms. Bennett stay so I can ask her a few questions outside the presence of the other jurors. Okay. And everybody else, if you are in the jury box I ask you to return to the seat you're in, and if you

are in the audience, you can take any seat when you return.

Okay. We'll see you back at 11:05.

(Whereupon, all prospective jurors except for Ms. Bennet exit the courtroom)

THE COURT: Good morning, Ms. Bennett. Are you -- you said something that said you weren't feeling well today, and I am just wondering if that -- and I see you have a cough and I heard you had a cough. Is it beyond that; are you feeling -- is there some other medical problem that's challenging you today?

MS. BENNETT: You know, it's been coming on so I really -- you know, I don't know. I went to the doctor and I was fine then, and now this just start coming on to me and it's just getting worse.

THE COURT: And what are the symptoms you are having today?

MS. BENNETT: Mainly cough, dry throat.

THE COURT: Okay.

MS. BENNETT: You know, runny nose.

THE COURT: So is this worse than just a cold, do you think?

MS. BENNETT: You know, I think it's more than a cold. I think it's -- it's beyond a cold because I know at night when I cough I could see like little sparks coming out, so I know it's a little more than just an ordinary cold.

THE COURT: Mm-hm.

MS. BENNETT: And I am taking, you know, like Nyquil and stuff like that, but there's nothing happening.

THE COURT: All right. Well, we're going to take our recess so the court reporter can relax for a minute, and I may talk to the attorneys in the meantime, but I will ask you to come back at 11:05.

MS. BENNETT: Okay.

THE COURT: Unless the clerk comes out and tells you something different.

MR. STECKLER: Your Honor, may I make one inquiry of the Court?

THE COURT: Sure.

MR. STECKLER: And that is whether Ms. Bennett is more comfortable asking questions about her sister's situation outside the presence of the other panel members.

THE COURT: Do you have questions of her about that?

MR. STECKLER: I may -- yeah, I think I do.

THE COURT: Ms. Bennett, the attorneys have seen that on the questionnaire. The questionnaires, you answered some questions about your sister who was accused of a crime and they may have some questions about that. Would you rather have them ask those questions while you're here with nobody else?

MS. BENNETT: Yeah.

THE COURT: All right.

Go ahead, Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

Thank you, Ms. Bennett.

I just wanted to ask if there's anything that you felt uncomfortable answering that Ms. Pettigrew was asking you?

MS. BENNETT: Well, I just want to, you know, tell the truth, so if you ask me something about my sister or any members of my family I am going to feel be honest about it. It's not just my sister. I had nephews that were bad boys.

MR. STECKLER: Right.

MS. BENNETT: And my sister just -- she passed a few years ago, and she was the bad girl of the family, and my nephews were the bad boys of the family.

MR. STECKLER: Okay.

And is there anything about your experience with their lives and their encounters with the criminal justice system that will carry over here?

MS. BENNETT: I never went to court with them. I didn't want to, you know -- I just didn't want to be in that -- in that, because my sister, she was convicted of murder, but my sister only served like 80, 90 days so I think she got off really good. She was convicted of second degree murder. So that right there --

MR. STECKLER: Was that a self-defense situation; do you know?

MS. BENNETT: I -- honest to God, I don't know. I just know somebody got shot in her house and a man was

killed, and there was other people there, and this is what I was told, so I don't know, and he died.

MR. STECKLER: Okay.

And she was charged with it?

MS. BENNETT: She was charged with it.

MR. STECKLER: Okay.

Do you have any feelings about the prosecutor in her case or your nephews' cases that would lead you to be biased or have some feelings against the prosecutor here?

MS. BENNETT: I never went to court. My nephews all were killed. One was killed in Oakland. One was killed in Fresno. Like I said, it was just them. I live in Oakland, but my mailing address is Castro Valley, so I live in the area. So anything they -- going around, you know, somebody's going to say did you hear, and I will go, no, they didn't have it on my -- or that didn't happen on my corner; I don't know anything about it but what you're telling me, or I read in the paper.

MR. STECKLER: Now, these two gentlemen are, as you know, they are charged with a killing.

MS. BENNETT: Yes.

MR. STECKLER: So might you -- given that your nephews were killed, might you hold that against them in this case?

MS. BENNETT: No, because my nephews told me, "I live by the street; I am going to die in the streets", so I just took it like that. When they died, I went to the funeral and that was the end of it.

MR. STECKLER: I am very sorry that you had to go through that.

All right. Thank you, ma'am. I don't have any further questions.

THE COURT: Thank you.

THE COURT: Mr. Bryden, do you have any questions?

MR. BRYDEN: You know, Ms. Bennett, I am more concerned about your health than the sisters and the nephews. In addition to -- you appeared to be in stress a little earlier and you wrote in your questionnaire that you take some drugs, Vicodin or something.

MS. BENNETT: I take Vicodin. That's the only one that I could write down. Well, I take like four or five blood pressure pills.

MR. BRYDEN: Yeah. No, I do too sometimes, and they can affect the way you feel and perceive things. You start to concentrate just on yourself and your blood pressure sometimes, don't you?

MS. BENNETT: I think my medication probably needs to be changed because it -- you know, because of the dry mouth now. It's something I have been taking for a while and you don't know --

MR. BRYDEN: Okay.

MS. BENNETT: -- you know, you just don't know. Some days, you know, like today I feel terrible; tomorrow I might feel better. I don't know.

MR. BRYDEN: Does it affect your memory, the drugs you take?

MS. BENNETT: Yeah. Honest, I could sit here and you sit me back over in that corner right there, I am going to go to sleep --

MR. BRYDEN: Mm-hm.

MS. BENNETT: -- 'cause I sleep at work too much sometime.

MR. BRYDEN: Does your kidney hurt sometime, you get back pain from -- from your kidney?

THE COURT: Is there anything that's going to go to cause? I am somewhat sympathetic to Ms. --

MR. BRYDEN: I am done then.

THE COURT: There is limits to what I am going to allow you to get into.

MR. BRYDEN: Of course.

THE COURT: If there is something you want to talk to her about outside the presence of the jury, anything else --

MR. BRYDEN: No, I was just worried about her health; thought it easier to talk to her outside the presence of the jury.

THE COURT: We'll be in recess, ma'am, asking -- till 11:05. Ask you to come back at 11:05.

(Recess taken)

THE COURT: Good morning, ladies and gentlemen. Thank you very much.

MR. BRYDEN: One thing in the criminal law is that each of the parties in the court kind of has their own responsibilities. And one responsibility of the jury is

to essentially hear the evidence and determine if the facts shown during the trial prove beyond a reasonable doubt whether or not the accused has been proven to have committed the crime that he's accused with. Penalty and punishment is not an issue that is for the jury to consider. Some of the jury questionnaires, people might have brought that up. And this is not a death penalty case. Punishment is imposed according to the law by the Court after the jury has rendered a verdict and the Court obtains a probation report and the input of counsel as to what laws might apply to sentencing. So -- but sentencing is not anything the jury has any -- has to concern themselves about, and they are not to consider penalty or punishment during their deliberations. Okay. So that's just is something for you to consider.

Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

THE COURT: Mm-hm.

MR. STECKLER: Good morning, ladies and gentlemen, and good morning out there, as well.

I want to start by asking for a show of hands, raise your hand please if you're really happy to be here and really happy to be partaking in this? I have one; oh, several.

THE COURT: Oh, there's a few in the back here.

MR. STECKLER: Okay. That's great.

Well, I appreciate that. Thank you for your candor on that.

As to everyone else, I just want to say that I understand that not everyone wants to be here. I understand this process can be tedious at times. I understand I can fumble through my questioning at times. I just want to thank you in advance on behalf of myself and my client, Mr. Joe McNeely, thank you for your patience and indulgence. We will get through this and if you're lucky enough to be selected to be on the jury, we will get to the opening statements and the evidence soon.

I have a few questions for the entire group, 15 of you, to start. And as with Ms. Pettigrew, if you're out there it will help later on if you listen and try to follow what's going on here and that will help things go more smoothly when we get further into jury selection.

So my first question for the group, I would ask you to raise your hand if you would -- if -- and I want to refer to one of the self-defense questions in the questionnaire that you all filled out. And the question is will you be able to follow this instruction and apply this law. And it's the question that states, the law states that if a defendant uses only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant is entitled to defend himself with deadly force and was not required to stop fighting. Please raise your hand if you will be able to follow this instruction and apply this law. Everyone's hand is raised. So that's a separate question than the question that was asked in

the questionnaire, "Do you agree with it?"

The second question in this line, second and final question along this line, is two questions before that in the questionnaire. It says the law states that a person is not required to retreat. He is entitled to stand his ground and defend himself, and if reasonably necessary to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. Raise your hand if you will be able to follow that instruction and apply the law? Please raise your hand if you can. If you can't, let me know. Raise your hand high so I know you're raising your hand. If you're not raising, okay. All right.

Now, a couple other questions for the group and then I have questions for you individually. I want to ask you -- maybe I could get a volunteer or maybe more than one to answer this question. Assume the following hypothetical situation, and it's very brief. A man takes money from another person. That's it. What crime is that.

MS. DUNN: Theft.

MR. STECKLER: Okay.

And anyone else?

MR. BENNETT Robbery.

MR. STECKLER: Robbery.

And those are possible possibilities from that scenario. I am wondering is -- is it a crime? Does anyone think that that might not be a crime.

Yes, Ms. Dunn.

MS. DUNN: It would not be a crime if you gave me money. I would be taking money from you, so you would be doing it willingly.

MR. STECKLER: I might be willingly paying you back maybe?

MS. DUNN: Well, if you were giving me the money, I would be taking money from you. That was what your statement was, actually. And if I took the money from you, it wouldn't be a crime if you gave it to me. But if you did not give it to me, then, yes, it is a crime.

MR. STECKLER: So what's the missing information?

MS. DUNN: Whether or not it was willful.

MR. STECKLER: What's your state of mind maybe?

MS. DUNN: Right.

MR. STECKLER: Do you intend to deprive me of that money permanently? So for robbery or theft there has to be an intent to permanently deprive the person who is giving up the money of the money. So maybe in that situation you might think, as many of you did, that it was theft or robbery. But you don't know. Does everybody see that? Yes. Do you know whether -- how intent is proven in a case? What do you look at to find out what the intent is of the person taking the money, for example? Or anyone else?

MS. DUNN: I have no idea.

MR. BENNETT If there is a physical intent,

robbery with a gun to take the money, how you're doing it.

MR. PIDAMALE: Force.

MR. STECKLER: Okay. So the circumstances surrounding what the event is, and that's also known as circumstantial evidence. So often in criminal law you will have circumstantial evidence to prove intent and that's what you would look to as jurors.

One other example before I get to the individual questions. A man intentionally stabs another man, intentionally stabs another man, killing him; is that a crime, and if so, what crime? And that's open to anybody.

MS. DUNN: It is a crime.

MR. STECKLER: Ms. Dunn.

MS. LABRECQUE: You need more information.

JUROR NO. 3: Most information.

MR. STECKLER: You need more information?

JUROR NO. 3: Yes.

MR. STECKLER: Like what?

JUROR NO. 3: Was he attacked? He was scared for his life? I need more information.

MR. STECKLER: Okay. Before you can determine whether it's a crime or not?

JUROR NO. 3: Yes.

MR. STECKLER: More information going to the person -- the stabber's state of mind, right, his intent?

Does everybody see that? Okay.

All right. I will move on from that. Maybe we

can circle back to those examples in the individual questions.

I am going to start with Mr. Peters. And a lot of my questions have been covered both by the questionnaire that you have already filled out and by questions Ms. Pettigrew has already asked you.

Mr. Peters, I want to ask you whether -- and I think you got it from the questionnaire, in this case it involves an innocent bystander who lost his life tragically. So I'd ask you how does that fact -- how do you think that fact would affect your duty as a. --

MR. PETERS: Well, I don't know quite how to answer that, other than -- it seems to be an important fact to me that when two people get into an altercation then -- and it involves somebody else that's an innocent bystander, that it then goes to a much higher level.

MR. STECKLER: In what sense do you mean that?

MR. PETERS: Well, it's -- it involves somebody who wasn't even a part of this, and --

MR. STECKLER: Right.

MR. PETERS: And, therefore, I think the perpetrators of the actions between each other --

MR. STECKLER: Yeah, it's difficult.

MR. PETERS: It's just a bit more difficult --

MR. STECKLER: Right.

MR. PETERS: -- for me to accept that you bring someone else into an altercation can just be accepted as -- as someone who happened to be passing by at the

wrong time.

MR. STECKLER: Yeah. And that's not okay.

MR. PETERS: No, I don't think that's okay.

MR. STECKLER: And it may -- does maybe it brings it to a different --

MR. PETERS: It's like collateral damage --

MR. STECKLER: Collateral damage?

MR. PETERS: -- of something, and I don't think that's okay.

MR. STECKLER: Do you think it brings it to a different emotional space or level for you?

MR. PETERS: Yeah.

MR. STECKLER: So I guess the follow-up question I would have for you and anyone else thinking along those lines, would the fact -- these facts that there is an innocent bystander who died, would that -- for example, would that cause you to put the burden on the Defense to present evidence which is not required in a criminal case as the judge has said?

MR. PETERS: Yeah, I would probably lean more towards in that direction, but then I haven't heard too much about what the case is about, how it's proceeding.

MR. STECKLER: All right. Okay.

MR. PETERS: But I am afraid I probably would.

MR. STECKLER: All right.

Well, that you would require the Defense to present evidence?

MR. PETERS: Yeah, I think so.

MR. STECKLER: All right.

THE COURT: Do you understand that the law would never require that? Could you accept that the law would never require that?

MR. PETERS: I can understand the law would not require that.

THE COURT: Because in order for the presumption of innocence to have any real meaning --

MR. PETERS: Oh, I understand. Sure. Yeah, I understand that.

THE COURT: Okay.

MR. PETERS: Yeah, I understand that.

THE COURT: I mean --

MR. PETERS: It's something that's in the back of the -- you know, of your mind when you are considering.

THE COURT: Sure.

MR. STECKLER: How about the burden of proof and that's related to the -- I am sorry -- the standard of proof. We just talked about the burden being on the People, and it's entirely on the Prosecution, not on the Defense. And it's also a burden of proof, that of beyond a reasonable doubt, which is the highest burden of proof in the law. Okay. Would the fact that there is an innocent bystander cause you to lower the burden of proof, do you think?

MR. PETERS: No, I don't think so.

MR. STECKLER: You'd still hold the Prosecution to the standard of proof that's required in the law?

MR. PETERS: Oh, yes. Oh, sure.
MR. STECKLER: Just briefly, so your wife is retired?
MR. PETERS: Yes.
MR. STECKLER: What did she do?
MR. PETERS: She was a problem case officer for the National Credit Union Administration.
MR. STECKLER: Okay.
And you were a contracting officer and negotiator --
MR. PETERS: Yes.
MR. STECKLER: -- for quite sometime. Who did you work for?
MR. PETERS: I worked for both the Navy and the Bureau of Reclamation.
MR. STECKLER: Did you have occasion to supervise people?
MR. PETERS: Not as a supervisor, per se, no, but I did look at other people's work.
MR. STECKLER: Okay. All right. Thank you, sir.
If you could pass the microphone to Ms. Labrecque?
Good morning, ma'am.
MS. LABRECQUE: Good morning.
MR. STECKLER: So you indicated on your questionnaire about the right -- there was a question in there about a defendant in a criminal case doesn't have to testify?
MS. LABRECQUE: Correct.

MR. STECKLER: And that if a defendant in a criminal case chooses not to testify, to stand on that right, you can't -- a juror can't infer anything from that?

MS. LABRECQUE: Correct.

MR. STECKLER: And you agree with that?

MS. LABRECQUE: Yes.

MR. STECKLER: Okay.

I think you indicated that there are a number of reasons why someone would choose not to testify.

MS. LABRECQUE: I know the reasons they may not choose to, but I know we can't consider that.

MR. STECKLER: You couldn't consider it. Do you have -- do you think there are reasons why a perfectly innocent person would choose not to testify?

MS. LABRECQUE: Sure.

MR. STECKLER: And what do you have in mind?

MS. LABRECQUE: Maybe they are not comfortable taking the stand. It could be various things.

MR. STECKLER: Okay. Not comfortable. Just not comfortable speaking in public maybe?

MS. LABRECQUE: Sure. Doesn't speak well.

MR. STECKLER: Okay.

And now on self-defense you indicated that people's perceptions are different and someone may feel safe as soon as the person attacking them turns away, another might not feel safe until that person's out of eyesight. Do you recall that?

MS. LABRECQUE: Mm-hm.

MR. STECKLER: Can you elaborate what you mean by that, what you're thinking?

MS. LABRECQUE: Everyones definition of their safety is different.

MR. STECKLER: Do you think you can apply the self-defense instructions in a criminal case?

MS. LABRECQUE: Yes.

MR. STECKLER: Your contact with -- do you have contact on a regular basis with District Attorneys?

MS. LABRECQUE: No.

MR. STECKLER: All right.

Do you handle criminal cases much.

MS. LABRECQUE: No, civil.

MR. STECKLER: Have you ever handled criminal cases?

MS. LABRECQUE: Yes.

MR. STECKLER: How long ago?

MS. LABRECQUE: Two, three years.

MR. STECKLER: Three years ago?

MS. LABRECQUE: Mm-hm.

MR. STECKLER: And for how long?

MS. LABREQUE: Two years, RCD.

MR. STECKLER: And how well do you know Mr. Bryden?

MS. LABRECQUE: He's been in my courtroom.

MR. STECKLER: In RCD?

MS. LABRECQUE: No, here in Hayward.

MR. STECKLER: What do you think about the burden of proof being on the Prosecution, and only on the prosecution? Do you think that's fair?

MS. LABRECQUE: Yes.

MR. STECKLER: Why?

MS. LABRECQUE: Because they have the burden of proof; they have to prove what their saying is true.

MR. STECKLER: All right. Thank you, ma'am.

If you could pass the microphone over?

(Juror No. 3), good morning.

JUROR NO. 3: Good morning.

MR. STECKLER: Your son is a professor of some kind?

JUROR NO. 3: Yes.

MR. STECKLER: Of what?

JUROR NO. 3: The college in Salou (phonetic). It's in Phoenix, Arizona.

MR. STECKLER: Oh, in Phoenix. What subject?

JUROR NO. 3: Stock market.

MR. STECKLER: Okay. Finance?

JUROR NO. 3: Finance.

MR. STECKLER: In response to the self-defense question about if someone uses deadly force -- if someone starts a fight with non-deadly force and then the opponent responds with deadly force, you said you don't agree that the law permits the first person to use deadly force. Do you agree with that?

JUROR NO. 3: If the first person responds to the

deadly force, yeah, the second person will have to defend themself.

MR. STECKLER: The first -- the person who used non-deadly force first?

JUROR NO. 3: Yes.

MR. STECKLER: Do you think that person has a right to use deadly force?

JUROR NO. 3: Need to defend their self the best that they can.

MR. STECKLER: Okay.

And you indicated, sir, in your questionnaire that one of the things you like to do in your spare time is read.

JUROR NO. 3: Yes.

MR. STECKLER: What kind of reading do you like to do?

MR. SANCCHEZ-WEST: I read National Geographic. I read different kind of books, The Girl with the Dragon Tattoo.

MR. STECKLER: Fiction?

JUROR NO. 3: Yes.

MR. STECKLER: That's a page-turner, isn't it?

All right. If you can pass the microphone over please to Mr. Quintana?

Good morning, sir.

MR. QUINTANA: Good morning.

MR. STECKLER: Now, again, going back to the self-defense questions. I believe you indicated, sir,

that -- this is about the no duty to retreat and a person can pursue --

MR. QUINTANA: Right.

MR. STECKLER: -- their assailant.

MR. QUINTANA: Mm-hm.

MR. STECKLER: You said you don't see how pursuing an assailant would help them avoid death or bodily injury.

MR. QUINTANA: Yeah. If the choice is retreating in safety, I don't -- I don't understand how pursuing somebody could achieve their own safety.

MR. STECKLER: All right.

MR. QUINTANA: If -- you know, it's tough just reading a question like that --

MR. STECKLER: Right.

MR. QUINTANA: -- without context, I guess.

MR. STECKLER: Sure.

And sometimes it's hard to come up with examples.

MR. QUINTANA: With a scenario, yeah. Yeah, exactly.

MR. STECKLER: Let me throw something out there. I mean, is it -- can you imagine a scenario where, you know, a person is under attack and retreating, you know, might -- the attacker might continue the attack if you just retreat at that point?

MR. QUINTANA: Right.

MR. STECKLER: Whereas pursuing might cause the attacker to go away; can you imagine that?

MR. QUINTANA: Um, well, I mean that's -- you

know, that's where I was -- I understand the stand your ground, right?

MR. STECKLER: Right.

MR. QUINTANA: The pursuit of the person is just -- you know, it's a hazy difference and --

MR. STECKLER: And?

MR. QUINTANA: Again, it's the scenario. I'd need to have more information. I need to know more information behind that.

MR. STECKLER: So if --

MR. QUINTANA: I am just not seeing that about the pursuit.

So if it's the law, I mean, I think I can follow the law. But there's -- without the context, it's difficult to --

MR. STECKLER: Okay.

And I guess as a juror you have to -- and I am speaking to everyone here.

It says, "If reasonably necessary". So as a juror you would have to determine whether it's reasonably necessary.

Could you do that, do you think?

I mean, that's something that's on you guys.

MR. QUINTANA: Right.

MR. STECKLER: Okay.

Do you feel comfortable with shouldering that burden --

MR. QUINTANA: Yes, I do.

MR. STECKLER: -- determining what's reasonably necessary?

MR. QUINTANA: Sure.

MR. STECKLER: So now you're saying you can follow the law if the judge tells you what the law is?

MR. QUINTANA: That I can?

MR. STECKLER: That you can.

MR. QUINTANA: Yes.

MR. STECKLER: Thank you very much, sir.

Can you pass the microphone to Ms. Dunn?

Good morning, ma'am.

MS. DUNN: Good morning.

MR. STECKLER: So what about you and the innocent bystander situation? Is there any particular -- how does that, the fact that an innocent bystander died, affect your ability to be a juror in this case?

MS. DUNN: I don't think I understand your question.

MR. STECKLER: Okay.

Do you think you can be -- that you can fulfill your role as a juror and hold the Prosecution to her standard of proof, even though an innocent bystander died?

MS. DUNN: Certainly.

MR. STECKLER: Will you require the Prosecution to prove all elements of her case before you would find somebody guilty of a crime?

MS. DUNN: Definitely.

MR. STECKLER: And would that include both the

intent element, as well as the act element?

MS. DUNN: You know, I am not really sure what the law is on it, but if that is what the law is then that's what I would require.

MR. STECKLER: Kind of like the theft that we were talking about earlier.

MS. DUNN: Right.

MR. STECKLER: All right.

Now, following up on some police officer contact you may have had, law enforcement contact, people you may have dated in the past.

MS. DUNN: Oh. Well -- yeah, when I was young. That was a long long time ago.

MR. STECKLER: As a defense attorney, should I be concerned about that on behalf of Mr. McNeely?

MS. DUNN: Because I dated police officers? Yes.

MR. STECKLER: Well, you never know.

MS. DUNN: I am married to an engineer, so you're all right on that.

MR. STECKLER: How about the fact that you might know or recognize Judge Gaffey, do you think you could have --

MS. DUNN: Only because I recognize him. I have probably said hi to him maybe twice. I am not really sure -- I didn't know him personally. I did not even know he was a judge until I walked in the door. It's like, oh, yeah, I know him, but that's the extent of it.

MR. STECKLER: All right. Thank you very much.

You indicated that -- and this is getting back to what I think Mr. Quintana was talking about -- on number 23, you indicated, and this is the no duty to retreat question, I guess you agree that the police -- you believe the person would have more knowledge than you who wasn't there about what was right to do. What do you mean by that?

MS. DUNN: Why don't you read the entire question to me then I might understand?

MR. STECKLER: Oh, okay. This is the he's entitled to stand his ground, the person is not entitled to retreat. He is entitled to stand his ground and pursue an assailant until the threat of danger is passed. And you said you agree with that and that the person in that situation would have more knowledge than you about whether that's necessary to do.

MS. DUNN: Right, because I am not in -- I wouldn't know -- every person is different. And they would, obviously, know the person that's attacking them --

MR. STECKLER: Okay.

MS. DUNN: -- and know whether or not -- they would have to make their own decision on whether or not they need to retreat or continue. That's not something I could --

MR. STECKLER: How would you, as a juror, approach that problem? Would you try to look at the scenario or the situation from the vantage point --

MS. DUNN: Whatever evidence is provided to us.

MR. STECKLER: And try to look at the situation from the vantage of the person who was in that situation?

MS. DUNN: Exactly.

MR. STECKLER: Okay.

MS. DUNN: Exactly.

MR. STECKLER: Thank you very much, ma'am.

Good morning, (Juror No. 6).

JUROR NO. 6: Good morning.

MR. STECKLER: What are your thoughts about the right of a defendant not to take the stand?

JUROR NO. 6: I didn't hear you.

MR. STECKLER: The right of a defendant not to have to testify. You said that it's -- you agree with that, right?

JUROR NO. 6: Yes.

MR. STECKLER: Now, kind of a different question I have for you is a question -- one of the questions or several of them asked you what you thought about firearms, and you indicated you're not comfortable with them. And I understand that. Many people feel the same way. My question is on that, if you learned that a person possesses a gun, unlawfully possesses a gun, would you be able to have an open mind as to whether that person committed the separate crime of murder? Can you keep those two things separate?

JUROR NO. 6: (nods head in the affirmative).

MR. STECKLER; Yes.

JUROR NO. 6: I think so.

MR. STECKLER: And I think the judge will tell you, you have to consider the separate crimes charged, consider them separately?

JUROR NO. 6: Okay.

MR. STECKLER: And make individual determinations as to each, do you think you could do that?

JUROR NO. 6: Mm-hm.

MR. STECKLER: Okay. Thank you, ma'am.

Now, just to stay in my order, can I get the microphone to come down to Juror Number 7, Mr. Pidamale?

Good morning, sir.

MR. PIDAMALE: Good morning.

MR. STECKLER: I am going to follow up, also, the answer to the -- Ms. Pettigrew was asking you about sympathy. And in the same question I think you said that you're very sympathetic, but you also said that you're influenced by other's opinions. And how do you think that would impact your role as a juror, the fact that you are as -- do you mean that you're more easily influenced by other's opinions than other people, or what did you mean by that?

MR. PIDAMALE: I think like a context, for example, as a team, if we come to a decision --

MR. STECKLER: Right.

MR. PIDAMALE: -- on things, so I would go with the team. That's what I mean.

MR. STECKLER: Go with the team?

MR. PIDAMALE: Yeah.

MR. STECKLER: Okay.

And I think some other people might feel the same way. The judge, you know, is going to tell you -- well, he is going to instruct you that both sides, both the Prosecution and the Defense, is entitled to the individual opinion of each juror. So you're supposed to deliberate, if you are a juror, and discuss the issues and the law with the other jurors, but in the end we're entitled to your individual opinion. Do you feel comfortable in being able to follow that?

MR. PIDAMALE: Sure. When asked my own opinion, I would give my own opinion.

MR. STECKLER: What if there's a poll and 11 saying one thing and you're the only one saying the other thing, you've discussed everything with the other 11 and you don't agree with them, can you stay at one or will you necessarily join the 11?

MR. PIDAMALE: It depends how strongly I feel about my opinion.

MR. STECKLER: Okay.

Do you feel comfortable in being able to voice your thoughts and opinions in a group?

MR. PIDAMALE: If I feel strongly, yes.

MR. STECKLER: Okay, good.

You also indicated on the questionnaire that you would prefer to retreat than to pursue. But if retreating

meant death or great bodily injury and pursuing would not, would you agree that pursuing is the better option?

MR. PIDAMALE: You said retreating --

MR. STECKLER: Meant great bodily injury or dying?

MR. PIDAMALE: If I retreat, you would end up with a bodily injury, you're saying?

MR. STECKLER: Yes.

MR. PIDAMALE: Oh, okay. And pursuing is not?

MR. STECKLER: Not.

Would you agree then that pursuing is the better option?

MR. PIDAMALE: Yes, yes. In that case, yes.

THE COURT: Is this death or great bodily injury to the person involved in the set, too; or is this death or great bodily injury to a third person, uninvolved?

MR. STECKLER: I am talking about the person who's right of self-defense is in danger.

Thank you. Thank you for clarifying that, Your Honor.

Same question I had for (Juror No. 6). You're against firearms, in general.

MR. PIDAMALE: Right.

MR. STECKLER: And many people are.

If you know that a person is -- has a firearm against the law, unlawfully has a firearm, can you separately decide the question of murder? Can you keep that separate?

MR. PIDAMALE: So he used that firearm --

MR. STECKLER: Possessed it.

MR. PIDAMALE: Yeah.

He just possess it?

MR. STECKLER: Right.

Let's say maybe he used it, but we don't know under what circumstances he used it. Right? Can you have an open mind as to murder if you know that the person had a gun? Some of these are hard to think about without specifics, right?

MR. PIDAMALE: Right. That's what I was about to ask you. I may need more information on that context --

MR. STECKLER: Okay.

MR. PIDAMALE: -- to get to the -- arrive at a position.

MR. STECKLER: Thank you. That helps me.

If you could pass the microphone down to Ms. Bowman, is it?

MS. BOWMAN: Yes.

MR. STECKLER: Okay.

So did you indicate that you could not follow the law about pursuing an assailant?

MS. BOWMAN: I could follow the law. My first instinct would be to retreat.

MR. STECKLER: Right. Frankly, as would mine, okay.

So the question then is not what would you do in that situation, but how would you apply the law in a

homicide case such as this one. And if the judge tells you that's the law in California, can you apply that law?

MS. BOWMAN: Yes.

MR. STECKLER: That's the question.

MS. BOWMAN: Yes.

MR. STECKLER: You can apply that law?

MS. BOWMAN: Yes.

MR. STECKLER: Okay.

In what ways does the criminal justice system need work, in your view?

MS. BOWMAN: I think it's the -- it's not the laws that have to necessarily be changed; it's the interpretation of them.

MR. STECKLER: Okay.

MS. BOWMAN: So --

MR. STECKLER: Do you have any examples in mind?

MS. BOWMAN: No.

MR. STECKLER: Fair enough.

MS. BOWMAN: Because the way the judge may present it or the lawyers present it, and let's say as a juror I am sitting and listening to it in a whole different realm.

MR. STECKLER: Mm-hm.

MS. BOWMAN: And as a person reading the newspaper or hearing it on the news, I may say, oh, I would da-da-da-da-da.

MR. STECKLER: Right.

MS. BOWMAN: But now I have to think about how

it's presented to me in this position.

MR. STECKLER: And do you think you would be comfortable in that role?

MS. BOWMAN: Yes.

MR. STECKLER: Maybe are you talking about there's some cases out there that you've read about in the news or maybe seen on TV where you don't know all the facts; is that what you're thinking about?

MS. BOWMAN: Yes.

MR. STECKLER: Okay.

Here you would be the only person that would be in the best position to know the facts in this case, presumably.

MS. BOWMAN: I am going to listen very closely to --

MR. STECKLER: Good.

MS. BOWMAN: -- to what's being said.

MR. STECKLER: Good. I hope that's true for everybody.

You think you're the kind of person who can do that?

MS. BOWMAN: Yes.

MR. STECKLER: And will do that conscientiously?

MS. BOWMAN: Yes.

MR. STECKLER: Thank you very much, ma'am. That's all I need to know.

Good morning, sir.

MR. CARLSON: Good morning.

MR. STECKLER: Okay.
So unlike Ms. Dunn's long-ago dating relationship, your father was a police officer?
MR. CARLSON: And uncle and cousin.
MR. STECKLER: Okay.
So it goes further than that?
MR. CARLSON: Yes.
MS. STECKLER: So do you think that you could be fair to the Defense in a criminal case?
MR. CARLSON: Yes.
MR. STECKLER: If you voted -- if you came to a decision and voted not guilty in a serious case or any case, would you have any hes -- or thought that you wanted to vote not guilty, do you think you might hesitate to do that --
MR. CARLSON: No.
MR. STECKLER: -- because of what you might have to admit to your relatives?
MR. CARLSON: No. Oh, not at all. I don't have anything -- my father's been dead for many years, and my uncle is -- I don't see him anymore. They were something I grew up with and that was the extent of it.
MR. STECKLER: Okay.
And you heard us talk a little bit about no duty to retreat if a self-defense situation in California and you can pursue your assailant until the -- if reasonably necessary. Have you heard us talking about that?
MR. CARLSON: Yes.

MR. STECKLER: Because you indicated no in answer to that question; you don't agree with that law?

MR. CARLSON: Well, I don't, because if one is retreating why are you going to chase him down? Why would you not retreat yourself?

MR. STECKLER: Could you imagine a situation where a short chase might be the thing -- is the thing that would make you safe, whereas retreating right away --

MR. CARLSON: You're talking about the other person retreating first, so to chase after that person doesn't make sense to me.

MR. STECKLER: Okay.

Even for a short distance?

MR. CARLSON: Even for a short distance, no.

MR. STECKLER: Not at all?

MR. CARLSON: No.

MR. STECKLER: What if retreating you got shot in the back?

MR. CARLSON: Again, you said the other person is retreating first. So why would I want to add to the situation by chasing that person?

MR. STECKLER: Okay. Fair enough.

I am asking to you pass the microphone about Bennett.

Do you have any thoughts? I saw you shaking your head.

MR. BENNETT: I think on a short-term case that the person who could potentially harm you that you're

pursuing is going to hide behind something and wait for you to step out, I think you're going to want to make any -- every effort to eliminate any potential of you being harmed, so you may want to go inspect, go find out, instead of running away because they could just -- I think you have to be careful of that.

MR. STECKLER: Okay.

Again, you have some contacts with people in law enforcement, your son-in-law's father, and I think some other people.

MR. BENNETT: Right.

MR. STECKLER: Same question to you. Do you think you could be fair to the Defense in a criminal case?

MR. BENNETT: Very much. They're retired so -- they are the two officers.

MR. STECKLER: Okay.

And what are your thoughts about the burden of proof being entirely on the Prosecution in a criminal case? Do you have thoughts about that?

MR. BENNETT: I feel that they are responsible to present what needs to be communicated. That's where the charge is being made, and so it's their responsibility to prove, you know, beyond a shadow of a doubt.

MR. STECKLER: Or beyond a reasonable doubt. And the judge will help you define that.

MR. BENNETT: Exactly.

MR. STECKLER: Would you have any hesitation in voting not guilty if she did not meet that burden?

MR. BENNETT: No.

MR. STECKLER: What if she proved to you that one of the defendants was probably guilty, maybe more likely than not, but not to the standard of proof beyond a reasonable doubt, how do you think you would handle that situation?

MR. BENNETT; I need to be very sure of that, so I would want to make sure I felt very comfortable that it was, you know, beyond a reasonable doubt.

MR. STECKLER: Could you vote not guilty in that scenario?

MR. BENNETT: Yes.

MR. STECKLER: You could pass the microphone over. Thank you, sir.

Good morning, Ms. Nunez. You said Nunez, right?

MS. NUNEZ-SANCHEZ: Yes.

MR. STECKLER: Seems to me this might not be the case for you. Do you think you could be fair the both sides in this case?

MS. NUNEZ-SANCHEZ: I would definitely try.

MR. STECKLER: You would try.

You indicate on page 13 that you don't know if you can apply the law because there's a part of you that might be biased. What did you mean by that?

MR. NUNEZ-SANCHEZ: It goes back to just because it happened in the place I grew up in, even in the neighborhood that I was around. So I think the fact that an innocent bystander died, that it's something that could

have happened to me or my family.

MR. STECKLER: Now, you know when we see a word like biased like that -- and I think it came up a couple other places in your questionnaire. You can understand why that makes me nervous.

MS. NUNEZ-SANCHEZ: Mm-hm.

MR. STECKLER: Only you know whether you can -- you're in the best position to know whether you are likely to succeed in not being biased in a case like this. What are your thoughts?

MS. NUNEZ-SANCHEZ: I would definitely give it the best effort that I could and see the evidence, 'cause like I mentioned before, it would be unfair to them to kind of put the whole crime in Oakland on them.

MR. STECKLER: Right.

MS. NUNEZ-SANCHEZ: That's not how it works and that's why there is a system.

MR. STECKLER: Right.

MS. NUNEZ-SANCHEZ: So I would definitely make sure I saw all the evidence and then made my decision on that.

MR. STECKLER: Okay.

MS. NUNEZ-SANCHEZ: Unfortunately, like I said, just in the back of my head because of where I am.

MR. STECKLER: Because of where you?

MS. NUNEZ-SANCHEZ: Live.

MR. STECKLER: And that's something that's unique, as well. I mean, not every case is for everyone.

MS. NUNEZ-SANCHEZ: Mm-hm.

MR. STECKLER: Do you think this case might not be the case for you because it occurred in your neighborhood?

MS. NUNEZ-SANCHEZ: It occurred in the neighborhood where I would go to school and take the bus, and so --

MR. STECKLER: And you indicated that it happened in an area where you could have been the victim?

MS. NUNEZ-SANCHEZ: Mm-hm.

MR. STECKLER: Again, not everybody is situated like that; some are, some aren't. Do you think that that will cause you to be -- you know, to align more with the Prosecution?

MS. NUNEZ-SANCHEZ: I think if there wasn't an innocent bystander that got shot, I wouldn't be -- I wouldn't have bias, I think, if it was just two guys --

MR. STECKLER: Right.

MS. NUNEZ-SANCHEZ: -- shooting against each other. But, unfortunately, you think of what can happen to you and what can happen to your family.

MR. STECKLER: And there is an innocent bystander in this case.

MS. NUNEZ-SANCHEZ: Mm-hm.

MR. STECKLER: And, therefore, you would be biased; is that what I am hearing?

MS. NUNEZ-SANCHEZ: I -- yeah.

MR. STECKLER: Okay. Thank you, ma'am.

Again, there is no right or wrong answers here. Thank you so much. Your candor is much appreciated.

Mr. Aracic.

MR. ARACIC: Aracic.

MR. STECKLER: Thank you, sir. If you can take the microphone?

I am cutting short to the chase with you. Given your -- and you've indicated thousands of interactions with law enforcement officers --

MR. ARACIC: Yes, 30 years worth.

MR. STECKLER: -- over the years. What are your thoughts? Do you think you would align more with Ms. Pettigrew in a case like this?

MR. ARACIC: Ms. Pettigrew?

MR. STECKLER: I am sorry. The prosecutor.

MR. ARACIC: No. I understand what the law requires and I believe I could be fair and follow the law

MR. STECKLER: Okay.

MR. ARACIC: No one's going to be embarrassment. I don't owe anything to anybody in law enforcement.

MR. STECKLER: Okay.

By the way, getting back to what you said earlier, no problem -- there is no natural lights in these courtrooms. Is that an issue that You have? That's a problem I have.

MR. ARACIC: I think that's part of it. It's the circular nature. Courthouse in Marin County is the same way; worthless place to try a case.

MR. STECKLER: How many cases have you tried?

MR. ARACIC: I don't know. Somewhere between 20 and 30.

MR. STECKLER: Okay.

You indicated -- and this gets to the presumption of innocence, so I am glad you wrote this. The question asks you about the presumption of innocence and where you can apply it. And you said that you're aware -- you said, yes, but you're aware that the defendant's conduct has been evaluated by the police and the prosecutor and a judge before getting here.

MR. ARACIC: Absolutely.

MR. STECKLER: And that's -- I am glad you stated that and that we're talking about that now, because you know Mr. McNeely wasn't just picked out of a phone book, right?

MR. ARACIC: Absolutely. You don't get to be tried in Superior Court --

MR. STECKLER: Right.

MR. ARACIC: -- without going through a substantial process.

MR. STECKLER: And so -- and when you're hearing the charges read a few weeks ago, I am sure you're not saying I am presuming him to be innocent; you know what I mean, or maybe you were?

MR. ARACIC: Well, I -- you know, there's a difference between common sense and what the law requires. Your common sense can make you believe that because he's

here he's probably done something --

MR. STECKLER: Right.

MR. ARACIC: -- and maybe all the things he's accused of.

MR. STECKLER: Right.

MR. ARACIC: But you understand that your duty as a juror would be to wait for the evidence to come in and then see if there's evidence in support of all the elements of the crime beyond a reasonable doubt.

MR. STECKLER: Mm-hm.

So is that how -- would you apply the presumption of innocence?

MR. ARACIC: I believe I am required by my oath to do that.

MR. STECKLER: Well, you are. And it sounds like you think you can do that.

MR. ARACIC: I believe I can, yes.

MR. STECKLER: Okay. All right. Thank you, sir.

Now I think I have a couple of alternates to get to, three of them.

If you can pass it back to Mr. Yu in the back row?

Good morning, sir.

MR. YU: Good morning.

MR. STECKLER: Again, you have already answered some questions so I'll just follow up on a couple that I had.

You were, unfortunately, the victim of a crime.

MR. YU: Yes.

MR. STECKLER: And given the nature of that case or that situation, which was some time ago, and who the suspects were, do you think you can be fair and impartial in this case, given who the defendants are?

MR. YU: Yes.

MR. STECKLER: You did indicate on page four of your questionnaire that you would try to ignore any bias that you have --

MR. YU: Yes.

MR. STECKLER: -- in relation to kind of what I am talking about from your old case --

MR. YU: Yes.

MR. STECKLER: -- right, the racial bias?

MR. YU: Mm-hm.

MR. STECKLER; Do you think you can succeed in doing that? Same thing with Ms. Nunez, there is no right or wrong answers here. Only you know.

MR. YU: It's an instruction, so I am only executing an instruction.

MR. STECKLER: Okay. Thank you.

If you could pass the microphone to Mr. Richardson?

Good morning, sir.

MR. RICHARDSON: Good morning.

MR. STECKLER: So this -- what's going to be coming into evidence here, you've heard, is in a neighborhood you're familiar with or maybe even lived in.

MR. RICHARDSON: Yes.

MR. STECKLER: How would that impact your role as a juror? How would that affect you? Do you think it would be hard for you?

MR. RICHARDSON: No.

MR. STECKLER: Okay.

What are your thoughts on self-defense as we've talked about them this morning?

MR. RICHARDSON: What do you mean? What's --

MR. STECKLER: What do you think about the law in California that says that you can pursue your assailant, if reasonably necessary, in self-defense?

MR. RICHARDSON: Well, if necessary. I can't think of too many reasons why it would be necessary to pursue somebody that's a threat.

MR. STECKLER: How about a short distance?

MR. RICHARDSON: I really don't -- it really doesn't matter about the distance; it's just the why. Like why?

MR. STECKLER: It's the what?

MR. RICHARDSON: It's not about the distance. It's about the reason of why are they pursuing the threat.

MR. STECKLER: Okay.

If that's the law that the judge gives you, can you apply that law --

MR. RICHARDSON: Yeah.

MR. STECKLER; -- to the facts in this case?

MR. RICHARDSON: Yes.

MR. STECKLER: Um, the situations that you indicated where a gun was used, can you talk about that at all in the past?

MR. RICHARDSON: Like what situation? Like --

MR. STECKLER: Well, I don't know. And the reason I have to ask you about this is because it's not in the questionnaire. But the question asked you have you or a close friend or relative ever been involved in a situation in which a gun was used in a deadly or dangerous manner, and you indicated yes. So I guess what happened? But you didn't write anything so I have to ask you.

MR. RICHARDSON: Well, I have been shot myself, so.

MR. STECKLER: Okay.

MR. RICHARDSON: I mean --

MR. STECKLER: More than -- more than one time?

MR. RICHARDSON: No.

MR. STECKLER: And how did you respond to that situation?

MR. RICHARDSON: Well, I didn't really have a response. I mean, it just -- it is what it is. It's nothing I can take back, so.

MR. STECKLER: All right.

Well, thankfully you came out of it okay.

MR. RICHARDSON: Yes.

MR. STECKLER: How long ago was that?

MR. RICHARDSON: 2007.

MR. STECKLER: Did anybody get arrested?

MR. RICHARDSON: No.

MR. STECKLER: Did you make a police report?

MR. RICHARDSON: Well, yeah, everybody -- yeah.

MR. STECKLER: Okay.

MR. RICHARDSON: That's how it was.

MR. STECKLER: All right.

Did you have a gun at the time?

MR. RICHARDSON: No.

MR. STECKLER; Did you provoke it in any way?

MR. RICHARDSON: No.

MR. STECKLER: All right. Thank you, sir.

And I think I've already asked my questions of Ms. Bennett -- actually, no, just a couple other questions for you, ma'am.

THE COURT: Going to have to confine yourself to about a minute or two.

MR. STECKLER: I just have a minute.

And forgive me if Ms. Pettigrew already covered this. But your civil case, when you where a juror, there was a different standard of proof. Do you understand -- do you remember back? That was almost 20 years ago now.

MS. BENNETT: No, it's been a long, long time ago.

MR. STECKLER: But it was a civil case?

MS. BENNETT: Yes, it was.

MR. STECKLER: All right.

And do you understand that the burden is different, burden of proof is different in a criminal

case; it's higher?

MS. BENNETT: Yes.

MR. STECKLER: And that one side, the Defense side, doesn't need to present any evidence. Do you understand that?

MS. BENNETT: Yes.

MR. STECKLER: Okay. All right. Thank you very much.

And I have taken up all my time.

Thank you so much everybody.

THE COURT: All right. Thank you, Mr. Steckler.

Ladies and gentlemen, we'll take the noon recess. We're going to try and reconvene at 1:30. That's always an optimistic, so we'll try to have -- if you're here in the jury box, try to resume the seat that you're in. If you're in the audience, you can take any seat that's available. Try to be here at 1:30 and we'll try to start as soon as we can thereafter.

Please do not discuss the case among yourselves or with anybody else until the case is finally submitted to you.

(Whereupon the jurors exit the courtroom)

THE COURT: We're outside the presence of the jury.

Anything?

MS. PETTIGREW: No.

THE COURT: Anything, Mr. Bryden?

MR. BRYDEN: Judge, just curious, how would the

Court feel if rather than exercising a peremptory, our joint peremptories, Mr. Steckler and my joints as a team, if we divided them amongst us?

THE COURT: I don't know what the law is on that. Why don't you give me some time to think about that? I don't know if there's cases that say -- it seems like the Legislature has made their -- their observations clear on the law.

MR. BRYDEN: Okay.

THE COURT: I don't know if I can --

MR. BRYDEN: I can respect that.

THE COURT: -- ignore the law and do it a different way just because we might think it will be more fun to do it that way or more advantageous. Let me see if there is any cases on that. And if you have any cases you want to cite me to, we can do that.

MR. BRYDEN: I don't know that I have any cases, but Mr. Steckler wanted to talk to me during the lunch hour.

THE COURT: I can see the downside. Let's say you each get 20 joint and 5 individual, right?

MR. BRYDEN: Yes.

THE COURT: So let's say you split them 50/50.

MR. BRYDEN: We have 15 each.

THE COURT: What if you use your 15 and he's got 5 left and you want to kick a couple people, it's to your disadvantage at that point and vice verse. So it might sound appealing. I don't know if it would necessarily be

fair.

MR. BRYDEN: Kind of risky. I will work with Mr. Steckler.

THE COURT: I am not saying it's dis -- I am saying there's a downside, as well as an upside.

THE CLERK: One lady, Ms. Nester, she said she has to go with her mom, psychiatric appointment today, this afternoon. I asked her why she didn't say before. She said she just found out.

THE COURT: We can have her go and come back tomorrow at 1:30.

MR. STECKLER: That sounds fine.

THE COURT: Anything else?

MR. STECKLER: That's all.

THE COURT: Richardson didn't put in his questionnaire that he had been shot or convicted of a crime either.

MS. PETTIGREW: Right.

THE COURT: So I imagine at some point if you want to ask him some questions about that I would let you do that, if that was your request.

MS. PETTIGREW: Okay.

THE COURT: All right. We'll be in recess until 1:30.

(Whereupon, the noon recess was taken)

THE COURT: Good afternoon, ladies and gentlemen. Thank you for your being prompt today.

Mr. Bryden, I think we're about ready to start

with you.

MR. BRYDEN: Thank you, Your Honor.

THE COURT: The record can reflect that all counsel and Mr. McNeely and Mr. Poston are present.

MR. BRYDEN: Good afternoon, ladies and gentlemen. Once again, my name is David Bryden. I am the defense attorney for Donel Poston, the gentleman that's been sitting next to me. I think it's an important job. It's a lot of responsibility to defend Donel Poston from the Government's allegations of attempted murder and murder in this case. But I want to suggest to you that the most important role, the most important job in the courtroom is that of one of being a juror. It's somewhat unique to our system of justice and it's based on our shared American principles that deal with protecting individual liberty against an overreach of the Government. The right that Donel Poston has -- to a jury trial is the only right that I know of that's in both the main body of the Constitution, as well as in the Bill of Rights. And I know that it's a huge imposition on all of you. You've been summoned. It's a duty of citizenship. You come down, are kept in the dark. You're waiting for us. There's motions. You're torn away from your family, friends that you'd rather be with. But I want to tell you that the limited experience that I have had with doing jury trials, at the end many jurors feel that it was really a worthwhile process and they were proud to have served the community in the role. And I am always amazed

at the collective intelligence of a group of 12 individuals. You know, as much as I try to study the case and the facts and know about the case, 12 people are always smarter than just one individual. So I hope that you will find it a rewarding experience.

I got further bad news for you. This trial is really at least two trials. Okay. That's my first point, at least two trials. You're going to get a jury instruction that says basically that you must separately consider the evidence as it applies to Donel Poston and as it applies to Mr. McNeely. So there's two trials going on. You can decide the charges for each defendant separately. You can possibly find one of these guys guilty of one or more charges and the other one innocent or both guilty or both innocent.

First, I want to ask you, let's say Mr. Peters, would you be willing to commit to me and Mr. Poston, because I think the evidence is going the come in a little differently as to each person, and apply the evidence that comes in separately as to Donel Poston as to Mr. McNeely?

MR. PETERS: Yes.

MR. BRYDEN: Does anybody have any trouble with that concept? We can just do group because then I won't have to ask too many questions.

In other words, say, Ms. Bowman, you would commit to me that you could look at the evidence and do one trial, one discussion with the jurors later over the charges against Mr. Poston --

MS. BOWMAN: Yes.

MR. BRYDEN: -- and then one as to Mr. McNeely?

MS. BOWMAN: Yes.

MR. BRYDEN; You understand both -- one might be guilty, one might not; is that correct?

MS. BOWMAN: Yes.

MR. BRYDEN: I thank you for that.

Let -- let -- let me ask -- I will ask Mr. Aracic this one. They say justice is blind. What, sir, can you tell us when they say Lady Justice is blind, Lady Justice has those blindfolds?

MR. ARACIC: That's an interesting question. I would say that in weighing the evidence and the merits and the law on each side that justice doesn't consider who the people are involved.

MR. BRYDEN: Okay. I think that's -- I picked on you 'cause you're an attorney; I was hoping you would say that.

So you would agree with me then that -- and I think you defended police officers -- that you have to apply the law to, say, Mr. McNeely and Mr. Poston the same as if a policeman was being sued or on trial; is that correct?

MR. ARACIC: Yes.

MR. BRYDEN: Okay.

In other words, you know, it sounds kind of corny, but whether you're rich or whether you're poor, um, the law has to be applied to you fairly and evenly. And this

is what's bothering me. I am a little worried about this. I think some evidence is going to come out -- I know some evidence is going to come out that Mr. Poston has some non-violent felony convictions in his past.

But would you agree with me, Ms. Nunez-Ortega, that he has a right to, say, have the law of self-defense applied to him the same as anybody else?

MS. NUNEZ-ORTEGA: Yes. Yes, he has a right.

MR. BRYDEN: Okay.

And you commit to me that that principle, he's the one before the law as anybody else?

MS. NUNEZ-ORTEGA: Yes.

MR. BRYDEN: How about you, Mr.Carlson?

MR. CARLSON: Yes, the same.

MR. BRYDEN: You agree with that?

MR. CARLSON: Yes.

MR. BRYDEN: It doesn't bias you in some sense that --

MR. CARLSON: No.

MR. BRYDEN: -- that he'd have some convictions that is irrelevant to the charge, right?

MR. CARLSON: Correct.

MR. BRYDEN: And I know you have been asked a lot of questions.

So is everybody willing to commit to Mr. Poston to that idea, that justice in our society is blind, that the law applies to him the same as if a policeman was on trial?

Mr. Aracic?

MR. ARACIC: I am not committing to Mr. Poston or to you. I mean, my obligation is to the court and the law and the principles of American justice.

MR. BRYDEN: Okay.

MR. ARACIC: It's not a personal thing. I have no reason to like or dislike you or like or dislike him. So I am not committing to you or him anything.

MR. BRYDEN: Okay. I appreciate that. I just have to make a decision who might be the best juror for him.

MR. ARACIC: Yes.

MR. BRYDEN: So you're willing to make those commitments to the court?

MR. ARACIC: Yes, to the system.

MR. BRYDEN; And I will accept that as a commitment for Mr. Poston, who is on trial here; is that fair enough?

MR. ARACIC: You can do what you want in that regard, sir.

MR. BRYDEN: I appreciate that, Mr. Aracic.

You know, I was going to ask you, you know, sir, you defended some police officers, I guess.

MR. ARACIC: Yes.

MR. BRYDEN: You defended police officers. Have you defended police officers for shooting somebody?

MR. ARACIC: Yes.

MR. BRYDEN: Did you apply principles of

self-defense to those kind of cases?

MR. ARACIC: In a case. I can think -- I can think of one right now. There may have been more. There was no question of self-defense.

MR. BRYDEN: Oh, it wasn't a question of self-defense?

MR. ARACIC: No.

MR. BRYDEN: How did the officer come to shoot somebody?

MR. ARACIC: The man had engaged in a running gun battle with the officer through three cities and he crashed the car, was trying to escape. The officer told him to stop. The man didn't, so he shot him with a shotgun to make him stop.

MR. BRYDEN: So the officer had the right to do that?

MR. ARACIC: I won that case on summary judgment, Federal Court, sir.

MR. BRYDEN: I appreciate that. I am sure you are an excellent attorney.

So it was -- you were defending the officer though?

MR. ARACIC: Yes.

MR. BRYDEN: In some kind of civil case?

MR. ARACIC: Yes.

MR. BRYDEN: Okay.

And I see -- the officer, you didn't even bring up he was defending himself, or defending the community, or

defending others?

MR. ARACIC: He was not. He was trying to apprehend a extremely dangerous subject.

MR. BRYDEN: And that gave him the right?

MR. ARACIC: That's what was decided, yes.

MR. BRYDEN: Okay.

Well, obviously, folks, you filled out the questionnaire and you've been subjected to a couple hours of questioning and you understand that this case probably deals with the principles of self-defense to some degree. Correct? Everybody kind of gleaned that as a -- what's coming up?

In the Bay Area, I heard a lot of people talk about the Trayvon Martin case where George Zimmerman was tried. Are you guys familiar with that case? Lots of people, even though they didn't listen to all the evidence, felt the jury got it wrong. Did any of you feel that the jury got it wrong based on what you read or heard?

(Juror No. 6)?

JUROR NO. 6: I have no knowledge about that case.

THE COURT: I am thinking that based on what we saw and heard, I think we've already had the jury tell us that you only really have the best evidence if you are in the courtroom. So we don't know what the jury really saw and heard, so I don't know if that's a fair question to put somebody on the spot and ask them that.

MR. BRYDEN: Okay. He was asking for a response. I didn't want to put anybody on the spot, but it goes to how people feel about juries. But I will let that go.

Well, let me ask Ms. Labrecque, what do you recall about that case?

MS. LABRECQUE: I don't recall much about it.

MR. BRYDEN: Okay. All right.

And I am just going to ask a couple brief questions of the rest of you.

I was curious, (Juror No. 3), you read the National Geographic. Do you read the Spanish edition of that?

JUROR NO. 3: English edition.

MR. BRYDEN: So you are comfortable -- I know you're an intelligent guy, well thought-out. But you could read -- you mentioned something in your questionnaire, I thought that maybe sometimes you have problems writing out in English?

JUROR NO. 3: Yes.

MR. BRYDEN: But reading is no problem?

JUROR NO. 3: No.

MR. BRYDEN: So if we send jury instructions back you could read them?

JUROR NO. 3: Yes.

MR. BRYDEN: Your son's serving in Afghanistan, sir?

JUROR NO. 3: Yes.

MR. BRYDEN: When is he due back?

JUROR NO. 3: He is back -- he was back two years ago, or one year ago.

MR. BRYDEN: Did he see combat?

JUROR NO. 3: He was in jail, taking care of the prisoner.

MR. BRYDEN: So he didn't talk to you about combat zones or stuff like that; he was sort of behind the lines?

JUROR NO. 3: Yes. He worked in the prison.

MR. BRYDEN: Mr. Quintana, I was a little interested what you had to say about Buenos Aires or Argentina.

MR. QUINTANA: Yes.

MR. BRYDEN: Obviously, you're worried about the government crime situation down there.

MR. QUINTANA: Sure.

MR. BRYDEN: Do you feel the government should be harder on criminals down there?

MR. QUINTANA: That's a tough question. I don't know enough what's going on down there; just seeing with their economic crash an increase in crime because there is so much poverty.

MR. BRYDEN: Mm-hm.

MR. QUINTANA: And that can be violent crime, as well, even outside of the cities in the smaller towns, so.

MR. BRYDEN: Did you live in and were you familiar with Argentina during the Junta?

MR. QUINTANA: I've never lived there, no. But I remember when the Junta was taking place.

MR. BRYDEN: So I assume you have some strong strong feelings that Argentina needs to get stronger on crime or change their form of government?

MR. QUINTANA: Well, yeah, they certainly need to do something to get crime taken care of.

MR. BRYDEN: Well, okay, I appreciate that.

Now, would that be to have a stronger penal system and stronger cops, or do you think that perhaps the economic situation should be addressed such that there's not so much poverty and then not so much crime?

MR. QUINTANA: Well, I certainly think the economic situation needs to be improved. I don't have enough information to give an opinion on their laws and the police force there.

MR. BRYDEN: Okay.

I was a little worried about some of your answers again, Ms. Nunez-Ortega. And I appreciate very much your concern coming from that neighborhood and the crime level in Oakland so high because you are from that neighborhood. And you wrote that I could have been involved in this situation. Do you feel that that gives you a tendency right away to be in favor of the Prosecution in this matter?

MS. NUNEZ-ORTEGA: Yeah, by default, yes.

MR. BRYDEN: And because of that, just from the get-go, without hearing any of the evidence, you tend to

support Ms. Pettigrew's position? And there is -- I appreciate your candor. That's what we're looking for is your candor. You would be biased in this case?

MS. NUNEZ-ORTEGA: I would.

MR. BRYDEN: If it was some different set of facts, you could be fair and impartial, but here you couldn't be?

MS. NUNEZ-ORTEGA: Right.

MR. BRYDEN: Okay. I appreciate that.

Mr. Carlson, you -- you have a 9 millimeter gun?

MR. CARLSON: No.

MR. BRYDEN: Okay.

You don't keep a gun in the house?

MR. CARLSON: No, I don't keep a gun.

MR. BRYDEN: Was that Mr. Bennett, or did I read something wrong?

MR. BENNETT: (Shakes head in the negative).

MR. BRYDEN: You don't keep a gun in the house? I got that mixed up with somebody.

MR. CARLSON: (Shakes head in the negative).

MR. BRYDEN: I appreciate that. I make mistakes.

Just -- we don't have to go into this too much if you don't want to. Just a show of hands, does anybody have a close friend or family member that was addicted to drugs or brought down by drug addiction?

Okay. Yes. It's Ms. Bennett. We kind of discussed that earlier so we don't need to go all into that. It had something to do with your sister?

MS. BENNETT: Yes.

MR. BRYDEN: If there was some evidence that either one of these individuals was involved somehow in drugs or drug trading, would you hold that against them when you were deciding the issue of murder, attempted murder?

MS. BENNETT: No.

MR. BRYDEN: You could commit to the court, not to me, that you could set that aside?

MS. BENNETT: Yes.

MR. BRYDEN: And nobody else has had a bad experience with somebody using drugs? Or would you -- I will leave it at that.

I appreciate very much your being subjected to questions.

THE COURT: I think Mr. Richardson raised his hands in regards to that.

MR. BRYDEN: Oh, I am sorry, Mr. Richardson.

MR. RICHARDSON: Right here.

MR. BRYDEN: You said you had a family member or close friend that's been brought down by drugs?

MR. RICHARDSON: Uh-huh.

MR. BRYDEN: Because of that experience, do you think that you couldn't be impartial when deciding guilt on a murder charge if there was some evidence that either one of these gentlemen was somehow, at some time in the past, or -- or at the time involved with drugs themselves?

MR. RICHARDSON: Possibly.

MR. BRYDEN: Okay.

If you heard that kind of information, you wouldn't be able to put it out of your mind and decide the issue?

MR. RICHARDSON: I would be able to put it out of my mind.

MR. BRYDEN: And you would be willing to tell the Court that you can do that, or you can tell me, you see, you know, something happened to a friend of mine, he was strung out on something and so terrible, I hate drug dealers, which is fair because people do hate drug dealers and they do a lot of harm. So you can go ahead and say, hey, if you wanted to, because of that experience I had with somebody who used drugs, if I found out somebody was involved in selling drugs I couldn't give them a fair trial.

MR. BENNETT: No, I wouldn't say that.

MR. BRYDEN: Okay. All right. I appreciate that Mr. Richardson.

Anybody else?

Is there anything that one of the other attorneys asked somebody else earlier that you wanted to respond to? Is there anything you want to tell the Court?

Thank you. I appreciate your time.

THE COURT: Thank you, Mr. Bryden.

Based on our conversations during the noon recess, does anybody have any other questions of any particular

juror?

MS. PETTIGREW: I do.

THE COURT: Ms. Pettigrew, go ahead.

MS. PETTIGREW: Thank you, Your Honor.

Mr. Richardson.

MR. RICHARDSON: Yeah.

MS. PETTIGREW: At the end or towards the end of Mr. Steckler's questioning, you indicated that you've actually personally been shot?

MR. RICHARDSON: Yeah.

MS. PETTIGREW: And this is in 2006?

MR. RICHARDSON: 2007.

MS. PETTIGREW: Are you comfortable talking about the circumstances around that?

MR. RICHARDSON: Really, I would rather not.

MS. PETTIGREW: Okay.

Did it happen in Oakland?

MR. RICHARDSON: Yes.

MS. PETTIGREW: Did you make a police report?

MR. RICHARDSON: Yes.

MS. PETTIGREW: Did you know who it was who shot you?

MR. RICHARDSON: No.

MS. PETTIGREW: Were you ever asked to identify anybody?

MR. RICHARDSON: No.

MS. PETTIGREW: You're not comfortable talking about the circumstances. Is there a reason why you didn't

disclose that in the questionnaire when it asked whether you've ever been a victim of a crime or ever been a victim of gun violence?

MR. RICHARDSON: Well, I didn't put myself, personally. I just put other people. I didn't put myself, personally, because I'd rather not talk about it.

MS. PETTIGREW: Okay.

Is there anything else that you kind of failed to talk about in the questionnaire?

MR. RICHARDSON: No. It asked specifically me or somebody else, so I put somebody else.

MS. PETTIGREW: Okay.

And what about arrests? You, yourself, have had some, yes?

MR. RICHARDSON: Yes.

MS. PETTIGREW: And you went through the court process?

MR. RICHARDSON: Uh-huh.

MS. PETTIGREW: You didn't put anything like that in the questionnaire?

MR. RICHARDSON: No, 'cause that was dropped, so there was no need for me to put that in.

MS. PETTIGREW: Okay. I don't have anything further.

THE COURT: All right.

Anything, Mr. Steckler?

MR. STECKLER: No, thank you, Your Honor.

THE COURT: Mr. Bryden?

MR. BRYDEN: Um, would this be a good time for us to approach?

THE COURT: I was going to say does anybody wish to approach to discuss any challenges for cause. So if you have a discussion for a challenge for cause, you could approach.

MR. BRYDEN: Thank you.

THE COURT: All three counsel.

Before we step out of the courtroom, it's not unusual for the attorneys to have to discuss something with the Court outside the presence and the hearing of the jury. So we're just going to step behind the wall here. It has nothing to do with the Wizard of Oz or anything. We're just going to step back here. We'll talk for a minute or two, then we'll be right back. Okay.

(Discussion off the record)

THE COURT: All right. Thank you for your patience, ladies and gentlemen.

Let's see. The Court is going to thank and excuse Ms. Nunez-Ortega from service. Ma'am, you will be excused for cause from the jury panel. Okay. You will be excused for cause for one year. Okay.

And, Mr. Yu, I am going to invite you to take up seat number 11 right in front of you there.

And, Mr. Richardson, I am going to thank and excuse you for cause, as well. You will be excused for cause from service on this jury and for service for

another year. Okay?

MR. RICHARDSON: Okay.

THE COURT: Thank you. And you're excused for cause. All right.

For any who likes to keep score at a baseball game, something like that, I will tell you what we're going to do. We're -- we exercised cause challenges. Now we go to peremptory challenges. Each of the defendants has five individual peremptory challenges and they share 20 joint challenges. So together they get 30 challenges. And the People get 30. So since because the People have the burden of proof, the first challenge is with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to ask the Court to thank and excuse juror number one, Mr. Peters.

THE COURT: Thank you, Mr. Peters. Thank you for your service.

And, Ms. Bennett, I am going to ask you to take up seat number one, please.

So now the joint challenge is with the Defense.

MR. STECKLER: Thank you, Your Honor.

The Defense would like to jointly thank and ask the Court to excuse number two, Ms. Labrecque.

THE COURT: Okay.

Thank you, Ms. Labrecque. You will be excused.

Since now we only have 11 people seated in the jury box, we have to call the next four seats please.

Just so it's clear, the lady that just left, Ms. Labrecque, she's a clerk in this building in a civil department, in case you didn't figure that one out. All right. So she's probably seen this before.

Go ahead.

THE CLERK: James N-e-l-s-o-n, take seat number two in the back row.

MR. NELSON: Two, Your Honor?

THE COURT: Two, please. Yes, sir.

THE CLERK: Andrea C-h-a-m-b-e-r-l-i-n, alternate seat number one in the back row, please.

(Juror No. 4), alternate seat number two.

THE CLERK: Khoinguyen Thi T-o-n-g, alternate seat number three please. T-o-n-g, Tong.

THE COURT: Yes, ma'am.

MS. BENNETT: Can I get my water maybe once everybody gets seated? Is it down there?

Thank you.

THE COURT: All right. Good afternoon. Thank you.

Has everybody been able the hear what's gone on in court thus far and heard the questions provided Mr. Nelson, (Juror No. 5), (Juror No. 4)?

JUROR NO. 5: Somewhat

THE COURT: And Ms. Tong?

So we'll go back and I will give counsel 10 minutes with the next four prospective jurors.

MR. BRYDEN: Your Honor, may we approach briefly?

THE COURT: If you think it's an efficient thing to do, that's fine.

MR. BRYDEN: I do. I wouldn't if I didn't. I am sorry.

THE COURT: All right.

(Counsel approach the bench; discussion off the record)

THE COURT: Thank you, counsel. We'll try to get that squared away.

MR. STECKLER: Thank you.

MS. PETTIGREW: Madam court reporter prefers the microphone.

Mr. Nelson, I will go ahead and start with you.

Good afternoon.

MR. NELSON: Good afternoon.

MS. PETTIGREW: You're our lawyer who was a former D.A.?

MR. NELSON: Yes.

MS. PETTIGREW: For how long?

MR. NELSON: I was a D.A. for two and a half years.

MS. PETTIGREW: In this county?

MR. NELSON: In this county.

MS. PETTIGREW: That was quite a while ago?

MR. NELSON: It was.

MS. PETTIGREW: And you have engaged in other legal type jobs since then?

MR. NELSON: Right.

MS. PETTIGREW; Anything about your experience as a D.A. that would make it difficult for you to be fair and impartial?

MR. NELSON: I don't think so.

MS. PETTIGREW: Your -- what does your wife do?

MR. NELSON: My wife is a homemaker.

MS. PETTIGREW: Okay.

There was a recent incident regarding her.

MR. NELSON: Yes.

MS. PETTIGREW: Was that also in this county?

MR. NELSON: It was.

MS. PETTIGREW: And what about your son?

MR. NELSON: That was San Francisco, I believe.

MS. PETTIGREW: Okay.

The incident with your wife, did you participate in the court proceedings.

MR. NELSON: Other than as spectator, no.

MS. PETTIGREW: Okay.

How do you feel that was resolved?

MR. NELSON: I think under the circumstances it was the best for everybody involved, including my wife.

MS. PETTIGREW: Okay.

Any ill feelings about police, prosecutors, the system in general, given that -- I think your comment was that -- the question is, you know, what are your feelings about this, or do you feel they were treated fairly, and you said that it's too fresh to reflect.

MR. NELSON: It is fresh in my mind. I think I'm

capable of any feelings that I might have I will work on keeping them out in any decision making. But, certainly, it was within the very recent past, so I can't say that I am not at times conscious of that, but I am pretty successful about repressing any real conscious thoughts. But nothing stands out as being significantly out of hand by anyone that was involved in that process.

MS. PETTIGREW: Okay.

So you think you can compartmentalize and, I mean, recognizing the nature of these incidents are worlds apart --

MR. NELSON: Yes.

MS. PETTIGREW: You know, I just sometimes have a little hesitation when, you know, it's a representative of my office and that incident acting in the capacity as a D.A., so I just want to make sure that we're on a -- a clean slate.

MR. NELSON: Yeah, I -- my job every day is doing a lot of compartmentalizing things, separating things intellectually and emotionally, and I try my best. That's all I can do here is try my best.

MS. PETTIGREW: And you're currently in the medical malpractice field?

MR. NELSON: That's all I do is defend doctors and a few hospitals, yes, when they get sued.

MS. PETTIGREW: Okay.

I gave a couple examples this morning about some criminal law provocative act and talking about in the

movies, talking about The Bodyguard movie and the assassin is held responsible because he created a dangerous situation that caused the death of someone else. Any problem with that?

MR. NELSON: No.

MS. PETTIGREW: I know it's reaching far back in terms of the criminal law that you've dealt with, but you think you'd be okay following those?

MR. NELSON: I think so.

MS. PETTIGREW: Thank you.

If you could pass the microphone down to --

MR. NELSON: Sure.

MS. PETTIGREW: -- (Juror No. 5)?

Good afternoon.

JUROR NO. 5: Good afternoon.

MS. PETTIGREW: You also work in the legal field?

JUROR NO. 5: Yes.

MS. PETTIGREW: For a firm, as a legal assistant?

JUROR NO. 5: Correct.

MS. PETTIGREW: And what type of law do the lawyers that you assist practice? Is it --

JUROR NO. 5: Class action, remedies.

MS. PETTIGREW: Okay.

And do you ever go to court?

JUROR NO. 5: No.

MS. PETTIGREW: Okay.

Do you -- is there ever a criminal case that floats across their desk --

JUROR NO. 5: No.

MS. PETTIGREW: -- that you participate in?

Okay. So it's exclusively that.

On the question regarding the criminal justice system, you indicated that you were uncertain whether you trust the criminal justice system in Alameda County.

JUROR NO. 5: I haven't had any occasion to be that familiar with its workings.

MS. PETTIGREW: Okay.

So you're kind of right down the middle of the scale?

JUROR NO. 5: Correct.

MS. PETTIGREW: Okay.

Have you followed any cases in the newspaper or the media?

JUROR NO. 5: I have not.

MS. PETTIGREW: Okay.

And you heard some of the questions that we were asking this morning?

JUROR NO. 5: I did.

MS. PETTIGREW: And do you have any issues with any of that?

JUROR NO. 5: None that triggered that if I were asked.

MS. PETTIGREW: Okay. Let me just be specific. Do you think that only the person who actually

pulls the trigger should be responsible for a murder if the law provides that in a variety of other ways, like the provocative act doctrine, that they could be held responsible?

JUROR NO. 5: I fully accept that there can be responsibility without having pulled the trigger.

MS. PETTIGREW: And you don't have any issue with following that?

JUROR NO. 5: No.

MS. PETTIGREW: Okay.

Tell me if I am being too -- if I am prying too much. But ordinarily when we ask any other names people have used we get a different last name due to marriage. Am I prying?

JUROR NO. 5: No.

MS. PETTIGREW: Okay.

JUROR NO. 5: I belong to a living history. For the purposes of that group, we take other names. I am also divorced.

MS. PETTIGREW: Okay.

So what's the living history group? What do you do?

JUROR NO. 5: We recreate the Middle Ages. It's like the Civil War groups.

MS. PETTIGREW: Okay.

JUROR NO. 5: And you take on --

MS. PETTIGREW: That personality?

JUROR NO. 5: That personality, yes.

MS. PETTIGREW: Okay. I knew there was a story there. Thank you.

(Juror No. 4)?

JUROR NO. 4: Yes.

MS. PETTIGREW: Good afternoon?

JUROR NO. 4: Good afternoon.

MS. PETTIGREW: How are you?

JUROR NO. 4: I am doing good. Thank you.

MS. PETTIGREW: Good.

You had a negative experience with law enforcement when you were the -- it was a result of a mistaken identity?

JUROR NO. 4: Correct.

MS. PETTIGREW: And how long ago was that?

JUROR NO. 4: Quite a long time ago. I would say probably 25 years ago.

MS. PETTIFREW: Okay.

Am I remembering correctly that it was in San Francisco or was it here?

JUROR NO. 4: It was in San Mateo county.

MS. PETTIGREW: Okay.

JUROR NO. 4: But the warrant was out of San Francisco.

MS. PETTIGREW: Okay.

And you had to actually get into court to get it cleared up --

JUROR NO. 4: To clear it, yes.

MS. PETTIGREW: -- and figured out?

Is there any lasting feelings? I know that is probably not a fun thing.

JUROR NO. 4: No. 25 years ago, no, not at all.

MS. PETTIGREW: Okay. You can put that aside.

JUROR NO. 4: Yes.

MS. PETTIGREW: There was also an incident where your son was a witness in a case.

JUROR NO. 4: Mm-hm.

MS. PETTIGREW: What type of case was that?

JUROR NO. 4: It was a burglary on a vehicle.

MS. PETTIGREW: Okay.

And you indicated that you didn't like how the prosecutor interacted with your son --

JUROR NO. 4: Yes.

MS. PETTIGREW: -- in that instance?

JUROR NO. 4: Yes.

MS. PETTIGREW; : In terms of telling him what to say on the stand?

JUROR NO. 4: Correct.

MS. PETTIGREW: Did you actually sit with your son while talking to the D.A.?

JUROR NO. 4: Yes, I was in the same room with them at the time.

MS. PETTIGREW: Okay.

How long ago was that?

JUROR NO. 4: I would say probably about 8 years ago, 9 years ago.

MS. PETTIGREW: Was that here in this county?

JUROR NO. 4: No, that was in Santa Clara County.

MS. PETTIGREW: Okay.

Anything about that that would interfere with your ability to kind of look at this fresh?

JUROR NO. 4: No.

MS. PETTIGREW: I mean, I am a D.A. I, you know, could have easily --

JUROR NO. 4: Different incident, different person.

MS. PETTIGREW: Okay. Just wanted to make sure. Thank you.

And the questions that we were talking about this morning, the legal type questions, do you -- did anything raise a thought in your mind that you would have answered significantly differently?

JUROR NO. 4: For the most part, I would have to say truthfully I didn't hear all the questions being in the back row here today.

MS. PETTIGREW: Okay. Okay.

So I gave a couple of examples and I just want to make sure that you're okay with them. One is you've heard of the game of chicken.

JUROR NO. 4: Yes.

MS. PETTIGREW: Did you hear us discussing that?

JUROR NO. 4: Basically, it's a dare between two people and whoever backs out first is the chicken.

MS. PETTIGREW: Okay.

But engaging in a pretty dangerous situation.

JUROR NO. 4: Most of the time, yes.

MS. PETTIGREW: Yeah. And if one were to veer off and forget the rules or who wins the game and one veers off and kills somebody, under the law both of those individuals who participated in that deadly dangerous act can be held responsible for murder.

JUROR NO. 4: Correct.

MS. PETTIGREW: Do you agree with that?

JUROR NO. 4: Yes.

MS. PETTIGREW: Do you think you'd have any problem following that law?

JUROR NO. 4: No.

MS. PETTIGREW: Okay. Thank you.

JUROR NO. 4: You're welcome.

MS. PETTIGREW: Ms. Tong, good afternoon.

MS. TONG: Good afternoon.

MS. PETTIGREW: You have a soft voice. You're going to need to hold that closer.

Have you been able the hear everything that we've been talking about today?

MS. TONG: Yes, I have.

MS. PETTIGREW: Okay.

And what do you think about that that I was just talking about?

MS. TONG: Yes, I agree.

MS. PETTIGREW: Okay.

And you could follow that law?

MS. TONG: Yes.

MS. PETTIGREW: Okay.

Now, you've said something that a loot of people have said, that you're against people who carry guns.

MS. TONG: Right.

MS. PETTIGREW: You recognize that I have the burden of proof?

MS. TONG: Yes.

MS. PETTIGREW: And I have to prove all of the elements of all of the counts of all the crimes?

MS. TONG: Yes.

MS. PETTIGREW: Just because if you found that these two individuals were carrying a gun, you would still hold me to my burden to prove that they are guilty of murder and attempted murder?

MS. TONG: Absolutely.

MS. PETTIGREW: Thank you.

I don't have anything further.

THE COURT: All right.

Thank you, Ms. Pettigrew.

MR. STECKLER: Why don't I take the microphone from you?

Here you go, sir.

MR. NELSON: Thank you.

MR. STECKLER: Okay.

So, Mr. Nelson, what attracted you to the Prosecutor's office?

MR. NELSON: It was a job.

MR. STECKLER: How long?

MR. NELSON: I started as a clerk. I started as a clerk during law school, and I enjoyed the work, enjoyed the people, and my when I passed the bar I was offered a job and didn't have any other jobs. And that was essentially --

MR. STECKLER: Did you ever consider working criminal defense?

MR. NELSON: No.

MR. STECKLER: Okay.

Now, and there are a number of ways I can ask you this, I think, you know, you -- I can beat around the bush. I can ask a lot of questions. But I guess I will cut right to the chase and just ask you, do you think that -- as to you, do you think the Prosecutor has a leg up on the Defense?

MR. NELSON: I used to do what she -- what Ms. Pettigrew does.

MR. STECKLER: Right.

MR. NELSON: Although, over 30 years ago. Um, I understand that she's got the burden -- burden of proof on all elements against both defendants, and I know that I've got to follow, and I will follow the law if I serve, that the judge announces. I don't know that that gives her a leg up. The only thing would be some possible, just an affinity for sitting on that end of the table like I did all those years ago.

MR. STECKLER: Right. That's the only thing I am

wondering about with regard to you. I am wondering what your thoughts are on that.

MR. NELSON: I did what she did.

MR. STECKLER; Uh-huh.

MR. NELSON: I understand what she does. I understand the pressures and I understand that burden that she has. But understanding, I don't think that necessarily equates into giving a leg up or an advantage or a disadvantage to your client.

MR. STECKLER: Okay.

MR. NELSON: I certainly will try my hardest. You know about my history.

MR. STECKLER: Sure.

MR. NELSON: And I know about it, too. And I know if I serve I've got to resist any thought that I might have to do what you're suggesting by your question.

MR. NELSON: Thank you very much for answering my questions.

Can you just pass the mike down to (Juror No. 5)?

MR. NELSON: Sure.

MR. STECKLER: Good afternoon.

JUROR NO. 5: Good afternoon.

MR. STECKLER: I just have just a couple of questions.

Your roommate, who does your roommate work? For you noted director of quality.

JUROR NO. 5: Oh, she works for a company called NeuraLieve, and it's a medical device company for medical

devices to go into production in the U.S., to market it. And as it pass FDA regulations, she is the interface between the FDA and the company to make sure the device is safe and all -- that all the rules are followed.

MR. STECKLER: How long have you been roommates?

JUROR NO. 5: Four years.

MR. STECKLER: Now, jumping back in time, you were in a Military Police unit?

JUROR NO. 5: I was National Guard.

MR. STECKLER: National Guard?

JUROR NO. 5: And I was the administrative person for the Military Police unit, but I am not a military policeman.

MR. STECKLER: You weren't?

JUROR NO. 5: No. I deal with administrative actions only.

MR. STECKLER: Let me bring it a little closer to home, my question. What are your thoughts on the burden of proof being entirely on the Prosecution in a criminal case? How do you feel about that? Do you have any thoughts about that?

JUROR NO. 5: It's a tough burden. Sometimes I wonder how they ever manage it. I have never had to watch a trial to fruition to see.

MR. STECKLER: Is it fair that the entire burden is on the Prosecution, in your view?

JUROR NO. 5: It's what we decided in the very beginning. You know -- there are other things that are

decidedly less fair. Presuming guilt would certainly be no better service of justice.

MR. STECKLER: Do you think presumption of innocence is a good thing then?

JUROR NO. 5: I think it's the best possible scenario absent, you know, utter surety. We have to go with what we can prove.

MR. STECKLER: Thank you very much, ma'am. I appreciate it.

(Juror No. 4), hi.

JUROR NO. 4: Hi.

The Prosecutor, Ms. Pettigrew, was asking you about your arrest from a long, long time ago. And I guess you might have -- and correct me if I am wrong -- but you might have a unique perspective on presumption of innocence. What do you think? I don't know about unique, but some perspective on it.

JUROR NO. 4: Yes, I would say so.

MR. STECKLER: Can you describe it?

JUROR NO. 4: Pardon me?

MR. STECKLER: About the presumption of innocence in a court of law in a criminal case.

JUROR NO. 4: Based on my incident is what you're asking?

MR. STECKLER: Well, I would -- yeah, that's what brings it to mind for me with regard to you.

JUROR NO. 4: Yes. I guess in a sense my innocent -- basically, I was an innocent party. I stated

it over and over again. Unfortunately, that doesn't matter when you're being arrested. Pretty much, you're automatically guilty. They look at the paperwork and what they have in their hand whether your guilty or not, basically. So you're just presumed guilty and you're taken in and your chance is in court to basically prove you are or not.

MR. STECKLER: Did you go for a trial?

JUROR NO. 4: I had to go there for a trial, but it lasted a few minutes when the judge saw all the paperwork and realized it was a terrible error.

MR. STECKLER: You didn't have a jury trial then?

JUROR NO. 4: No.

MR. STECKLER: Okay.

Do you think you can apply the presumption of innocence? Do you think you can presume Mr. McNeely and Mr. Poston to be innocent going into this trial?

JUROR NO. 4: Um, yes, I would say so. I know nothing about the facts of the trial or have heard anything about it, so.

MR. STECKLER: If you were asked to render a verdict about it right now, guilty or not guilty on murder, what would you vote?

JUROR NO. 4: I couldn't vote, not until I've heard everything. Basically, it would not be fair to either of the gentlemen if I were to give a verdict at this point just based on a presumption.

MR. STECKLER: Devil's advocate for just a minute.

JUROR NO. 4: Pardon?

MR. STECKLER: I am going to be devil's advocate. Wouldn't you be required to vote not guilty because there is no evidence and we don't have to present any evidence? What do you think?

JUROR NO. 4: If there was no evidence being presented?

MR. STECKLER: None, whatsoever.

JUROR NO. 4: Based on what I have heard so far, I would say pretty much guilty if they were the two people that had the guns in their hand and were involved in the crime at the time.

MR. STECKLER: Okay.

So that brings me to another thing I want to talk to you, and I am glad you raised it. You indicate that if they had guns you would question why; you would be concerned of the fact that they had guns on them.

JUROR NO. 4: Yes.

MR. STECKLER: My question is the same as I had for other potential charges. Can you separate out the murder charges or attempted murder charges from the separate charge of felon in possession of a gun? Can you keep those two things separate?

JUROR NO. 4: I would think so.

MR. STECKLER: Do you think that if it were a fact that Joe McNeely, that my client -- let's get away from him -- that anyone was a felon in possession of a gun,

would you require the Prosecution to prove beyond a reasonable doubt that that person committed murder before finding him guilty of murder?

JUROR NO. 4: Yes.

MR. STECKLER: Or would you lower the burden of proof, do you think, because they -- you knew they possessed a gun and shouldn't have had one?

JUROR NO. 4: I would still basically listen to all the evidence and have the Prosecution have the burden of proof, basically, to prove to me that he is the person who's guilty of murder.

MR. STECKLER: Okay.

And, if not, you would vote?

JUROR NO. 4: And, if not, I would vote guilty -- or not guilty.

MR. STECKLER: Finally, the self-defense on stand your ground in California, the reason the pursuer assailant, if you fear for your safety, you -- you disagree with that law, but can you apply the law? What do you think?

JUROR NO. 4: What the law states and what I would do are probably two different things.

MR. STECKLER: Okay.

JUROR NO. 4: I don't see how running after a person who's trying to kill you would be the right thing to do, basically. Most likely, most people run away from bullets; they don't run towards them necessarily. So to pursue somebody who you know is, basically has a weapon

and is, you know, shooting at you, to me, just kind of sounds strange.

MR. STECKLER: All right. Okay. Thank you, sir.

Let me ask you the pass the microphone to Ms. Tong.

THE COURT: We're down to about our last minute.

MR. STECKLER: Okay.

Ma'am, can you -- good afternoon.

MS. TONG: Good afternoon.

MR. STECKLER: Can you keep the gun charge separate from the murder charge? You've heard me ask that question.

MS. TONG: I would constantly try to.

MR. STECKLER: Do you think you'd be able to?

MS. TONG: Um, I will be able to if I always keep it in mind to make sure that I separate the cases. So, I would try to, do my best to try to keep things separate.

MR. STECKLER: Okay.

And, you know, I just want to end with this with you and just ask you, to the extent that you're able, neither the judge, nor Ms. Pettigrew, Mr. Bryden, nor myself are in a position to say whether you are going to succeed. Are you going to say whether you think you're going to be able to be successful in keeping the murder charge separate from the gun charge?

MS. TONG: Yeah, I think I can.

MR. STECKLER: You think you can?

MS. TONG: The charges are serious, so I have to

be very careful what I say and decide.

MR. STECKLER: Okay. All right.

Thank you so much, ma'am. I really appreciate it.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

Ms. Tong, I will follow up with you a little bit about the guns. There is a lot of gun violence in Oakland and it is a terrible thing that you wrote that people walk around carrying guns. The concern, obviously, that the two defendants have here -- well, there is going to be evidence that they were carrying guns and probably without any sort of lawful purpose. So just knowing that, would that make you think that they were more likely than not to be guilty of murdering somebody?

MS. TONG: So before I attend this session, I tend to think that people who carry gun around more likely to commit crime, but after I came this session I understand more, and I understand more, and I understand that I need to separate facts and I need to look at evidence more closely now. I think that I can separate the two carrying a gun and murdering.

MR. BRYDEN: So if one or the other defendants raises some self-defense claim, you will take that into account?

MS. TONG: Yes.

MR. BRYDEN: You know jurors are supposed to listen to each other and take into account of everybody's views, but you also -- we have a right to have you have your own independent view after you've considered other people's points about how the evidence came in. If there is a large group and the majority, after you discussed everything with them, felt one way and you felt the other way, do you think that you could hold your ground after considering their arguments or would you be likely just the want to agree and form a consensus?

MS. TONG: Depend on how strongly I feel about the issue.

MR. BRYDEN: Okay.

I don't think I have any questions for Juror No. 4.

Juror No. 5, why were you living in England?

JUROR NO. 5: I was married at the time and my then husband was in the military stationed in Belton Hall.

MR. BRYDEN: I don't know where that is. Were you there a long time?

JUROR NO. 5: Three years.

MR. BRYDEN: So you don't know much about the English justice system?

JUROR NO. 5: No.

MR. BRYDEN: Didn't follow any cases over there?

JUROR NO. 5: No, I didn't.

MR. BRYDEN: Have you been following any cases

recently here in the United States?

JUROR NO. 5: I do not, generally.

MR. BRYDEN: Okay.

You recreate battlefield stuff from medieval times with people charging each other with weapons and those kinds of things?

JUROR NO. 5: We do full-speed, full-contact battlefield scenarios.

MR. BRYDEN: Full-contact?

JUROR NO. 5: Yes.

MR. BRYDEN: Boom. Okay.

JUROR NO. 5: Armored, weapons.

MR. BRYDEN: And is there like a king on one side and some uprising rebellious people on other side; or historical re-enactments, one side has to win because that's what happened in history?

JUROR NO. 5: We don't do re-enactments like Civil War. We do where one side won this battle and we're recreating. We tend to say we're Kingdom X and we're Kingdom Y and we're going to meet you all on the field for bragging rights.

MR. BRYDEN: Are you defending one kingdom or the other, or are you attacking the other kingdom?

JUROR NO. 5: Well, that depends on the scenario.

MR. BRYDEN: Sounds like fun. How often do you do that?

JUROR NO. 5: There is opportunity to participate

just about every week of the year on one level or another.

MR. BRYDEN: Does this take place in a big park?

JUROR NO. 5: Most of the time, yes.

MR. BRYDEN: Okay.

JUROR NO. 5: Throughout the U.S. and throughout the world.

MR. BRYDEN: So you travel quite a bit?

JUROR NO. 5: I have in the past. I don't travel quite as much. But we have activities in Johannesburg, in Taiwan; not so much in Russia and the Middle East.

MR. BRYDEN: Any concepts that some of the attorneys may have discussed that you have strong feelings about one way or the other?

JUROR NO. 5: I am comfortable with a lot, but I am playing -- playing it.

MR. BRYDEN: Thank you very much for your service. I appreciate you coming in.

Mr. Nelson, you do malpractice defense for -- you defend doctors?

MR. NELSON: I do.

MR. BRYDEN: So you must have a lot of medical knowledge by osmosis?

MR. NELSON: I don't know about osmosis, but 30 years reading a lot of medical books and talking to lot of medical experts, I have learned a little bit about it.

MR. BRYDEN: Do you have any decision one way or the other involving this young girl at Children's Hospital?

MR. NELSON: I can't talk about it. I have got an interest in it. It's better that I don't.

MR. BRYEDBN: I see. You work for an insurance company?

MR. NELSON: No, I work for my own firm, and we get case referrals from the insurance companies that insure doctors and hospitals.

MR. BRYDEN: And you're always on the defense side, really?

MR. NELSON: I am.

MR. BRYDEN: I know this sounds obvious, but your case is -- obviously, that's a preponderance of the evidence kind of standard; I mean, if there's more evidence than the other. But you used to be a District Attorney and you appreciate that there is a higher standard?

MR. NELSON: I do.

MR. BRYDEN: Now, I am going to paraphrase without consulting Ms. Pettigrew. Did you ever tell juries when you were back in the day, oh, this isn't such a high standard; jurors all the time render verdicts?

MR. NELSON: I've told them that before.

MR. BRYDEN: Okay. How do you feel? Is it a much higher standard that the D.A. has to prove rather than a plaintiff in a civil case?

MR. NELSON: In large part, it depends upon the facts. There are cases I have prosecuted that I have faint memory of and cases that I defend now where because

of the facts the burden seemed very minimal, whether it's beyond a reasonable doubt or a preponderance of the evidence. So the facts really have a lot to do with my thoughts on that.

MR. BRYDEN: Okay. I appreciate that.

Thank you, Mr. Nelson.

MR. NELSON: You're welcome.

THE COURT: Thank you, Mr. Bryden.

MR. BRYDEN: If I may consult with Mr. Steckler?

(Whereupon, both defense counsel have a discussion off the record)

MR. BRYDEN: Oh, I am done with the voir dire.

I was just consulting with Mr. Steckler.

THE COURT: No, that's okay. I was consulting with the clerk. So there we go.

If I am not mistaken here, the last challenge was to Ms. Labrecque was the Defense joint challenge, which means the challenge is back with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like the thank and ask the Court to excuse Juror number 5, Ms. Dunn.

MS. DUNN: Oh.

THE COURT: Good afternoon, Ms. Dunn. Thank you for your service. Maybe you will get chosen next year.

Juror No. 5, that means that seat is open and available for you to sit there.

And the challenge is to the Defense to exercise a joint challenge.

MR. STECKLER: Your Honor, thank you.

The Defense would like to jointly thank and ask the Court to excuse number 4, Mr. Quintana.

THE COURT: All right.

Thank you, Mr. Quintana, for your service.

Juror No. 4, I will ask you to take seat number 4, if you could move down -- no, it's Juror No. 4.

The challenge will be back with the People.

MS. PETTIGREW: The People would like to thank and ask the Court to excuse Juror Number 7, Mr. Pidamale.

THE COURT: All right, sir, thank you very much for your service.

MR. PIDAMALE: Thank you.

And, Ms. Tong, I will ask you to take up seat number 7, please.

MR. STECKLER: Just leave it there.

THE COURT: You can get your stuff.

MR. STECKLER: Well, there is a reason I am going to say that.

THE COURT: Let's not be presumptuous here.

Is it -- have you agreed -- Ms. Tong, the attorneys say they have agreed to excuse you.

MS. TONG: Oh, thank you.

THE COURT: Thank you for your service, Ms. Tong.

Is that the third challenge by the Defense?

THE CLERK: That is correct.

THE COURT: Now we only have 11 people in the box, so we are going to call four names. Now we've got

potentially -- we've got one person out of order, so the clerk is going to call a name.

THE CLERK: John Patrick K-e-n-n-e-d-y.

THE COURT: Is there a John Kennedy? Is there a Sean Kennedy? What's your name, sir?

MR. KENNEDY: Jack Kennedy.

THE COURT: Do you go by John?

MR. KENNEDY: John.

THE COURT: You're not Sean now, 'cause we have a Sean and a John?

MR. KENNEDY: I am John, yeah.

THE COURT: You're John. All right.

And, Mr. Kennedy, we're going to ask you to take a seat in the front row there, in seat number 7, all the way over here. Okay.

THE CLERK: (Juror No. 9). Sorry if I mispronounced it. Alternate seat number one in the back row, please.

Kaleb L-o-o-s-b-r-o-c-k, alternate seat number two, please.

Adam Z-e-n-t-n-e-r.

THE COURT: All right.

Ms. Pettigrew, would you like to begin?

MS. PETTIGREW: Thank you, Your Honor.

Good afternoon. Where is my new person in here?

Hi, Mr. Kennedy how are you?

MR. KENNEDY: Good.

MS. PETTIGREW: Good.

Where did that microphone go? You have it. Okay. You're one step ahead of me.

You are -- you used to work in sales?

MR. KENNEDY: I did

MS. PETTIGREW: How you long have you been retired for?

MR. KENNEDY: Probably about 15 years.

MS. PETTIGREW: Okay.

What do you like to do with your spare time now?

MR. KENNEDY: Well, I have grandkids in Detroit. I go back and watch them play ball. I enjoy the thoroughbred racehorses.

MS. PETTIGREW: Okay.

MR. KENNEDY: Hockey, sports in general. My son played a bit of hockey years ago.

MS. PETTIGREW: Nice.

There were a couple of questions that you indicated you were confused about. I think we've been talking about some of those here today; the self-defense questions and whatnot. Do you still think you have any confusion over those?

MR. KENNEDY: I can't remember the questions, themselves. They seemed to be contradictory, the way I read them.

MS. PETTIGREW: Okay. What are your general thoughts on some of the things we've been talking about today, in terms of self-defense and the provocative act murder that I talked about earlier?

MR. KENNEDY: Well, just refresh me which question you're interested in.

MS. PETTIGREW: Sure. Let me just cut straight to the chase. I gave the example of the game of chicken. Did you hear that?

MR. KENNEDY: Yes.

MS. PETTIGREW: And how two people decided to engage in this dangerous behavior, one veers off and kills some other person, both of them who engaged in that dangerous behavior can be held responsible.

MR. KENNEDY: Yes.

MS. PETTIGREW: Do you agree with that?

MR. KENNEDY: Yes.

MS. PETTIGREW: Do you think you have any problem understanding we're not talking about a game of chicken, but applying a law like that here in court?

MR. KENNEDY: Not at all.

MS. PETTIGREW: Thank you. I don't have any further questions for you.

If you can pass the microphone down to (Juror No. 9)?

Good afternoon

JUROR NO. 9: Good afternoon.

MS. PETTIGREW: You indicated with regard to the question about the criminal justice system that it works great in this country and that justice is always served. Is there anything in particular that you have followed, either in the news or the media, that gives you

that opinion?

JUROR NO. 9: I grew up the India, and so up until I was 21 and comparing to that background I -- that's my opinion that justice is fair in this country and it's much quicker, and that's where I was coming from when I answered that question.

MS. PETTIGREW: Okay.

So comparing to the justice system in India?

JUROR NO. 9: Mm-hm.

MS. PETTIGREW: Okay.

No actual cases that you followed here in this country, though?

JUROR NO. 9: Um, to remark, there is one of the -- Trayvon Martin is one of the cases, not that closely, but because it was in the headline news.

MS. PETTIGREW: Right.

JUROR NO. 9: And I did follow that case.

MS. PETTIGREW: And you indicated -- did that change your views on self-defense in any way?

JUROR NO. 9: You know, to be honest, I wasn't in the courtroom and I wasn't in the jury and I did not have all the evidence, so whatever the decision came out I thought that it was valid based upon what the jurors.

MS. PETTIGREW: Okay. So you bring up a good point. And the judge talked about it a little bit when everyone came in to fill out their questionnaires. That's why we ask people not to read the newspaper or look at the news in terms of anything in this case, because you -- if

you're selected to be jurors, you are the ones who are going to listen to the evidence and the witnesses and gather all the information.

JUROR NO. 9: Right.

MS. PETTIGREW: You think you could do that and come to a decision?

JUROR NO. 9: Of course.

MS. PETTIGREW: Okay. And -- okay. Thank you.

JUROR NO. 9: Sure.

MS. PETTIGREW: Mr. Loosbrock?

MR. LOOSBROCK: Yep.

MS. PETTIGREW: Did I say that right?

MR. LOOSBROCK: Good afternoon.

MS. PETTIGREW: You've been a juror before?

MR. LOOSBROCK: Yes.

MS. PETTIGREW: And that was in a criminal case?

MR. LOOSBROCK: Yeah.

MS. PETTIGREW: That reached a verdict?

MR. LOOSBROCK: Mm-hm.

MS. PETTIGREW: How did you find that experience?

MR. LOOSBROCK: It was interesting.

MS. PETTIGREW; In what way?

MR. LOOSBROCK: Just to understand more how not like Law and Order it is. This is not like Law and Order right now.

MS. PETTIGREW: Right. It's not?

MR. LOOSBROCK: No.

MS. PETTIGREW: But was there anything particularly good or bad about that last experience that you'd like to share?

MR. LOOSBROCK: No, it just gave me more respect for the legal system.

MS. PETTIGREW: Okay.

MR. LOOSBROCK: And what it had to do -- everything that goes into the system, itself, and the plight of the juror and what they have to do.

MS. PETTIGREW: What do you mean by that, the plight of the juror?

MR. LOOSBROCK: The impartiality. It's really hard to eliminate all impartiality and all bias because, obviously, everything culminates in who we are today. So to set that aside and play the game of logic and put your emotions in check and only be limited to those things that are presented to you as facts.

MS. PERTTIGREW: Did you have any difficulty doing that in the last case?

MR. LOOSBROCK: No.

MS. PETTIGREW: Recognizing that was a driving under the influence and this is a murder case, I guess one could make the assumption that emotions might run a little bit higher in a case such as this. Do you think that you'd be able to keep that in check and make the same impartial decision in this case?

MR. LOOSBROCK: Yeah, I would hope so.

MS. PETTIGREW: Okay. You're hesitating.

MR. LOOSBROCK: Yeah. It's just that you never know until you see the actual evidence and how your emotions run.

MS. PETTIGREW: Are you referring to what the judge said earlier about maybe a graphic picture or just in general the fact that we're talking about murder?

MR. LOOSBROCK: Yeah. I mean, until all the details are disclosed, I think murder is very severe so it's not to be taken lightly.

MS. PETTIGREW: Okay.

You have been a victim of a robbery?

MR. LOOSBROCK: Yes.

MS. PETTIGREW: And a gun was used?

MR. LOOSBROCK: Mm-hm.

MS. PETTIGREW: Anything about that situation that would -- that makes you just have such an aversion to guns or gun violence that --

MR. LOOSBROCK: Oh, I definitely have an aversion to guns after that one and staring one in the face. So, I mean -- that's my own personal thing. Like I will never use a gun. I will never own a gun. And I hope that nobody would ever use a gun on me again. But I have very little control over the world and what happens.

MS. PETTIGREW: You think you can set that aside?

MR. LOOSBROCK: Yes.

MS. PETTIGREW: Okay.

And you made the comment that, you know, guns are a machine; it's the people who use them that are faulty.

MR. LOOSBROCK: Yes.

MS. PETTIGREW: Okay. Thank you.

MR. LOOSBROCK: No problem.

MS. PETTIGREW: Mr. Zentner?

MR. ZENTNER: Yes.

MS. PETTIGREW: Did I say that right?

MR. ZENTNER: Yes. Thank you.

MS. PETTIGREW: Good afternoon.

People mispronounce mine all the time so it's important to me.

You are a student?

MR. ZENTNER: Yes.

MS. PETTIGREW: And you are majoring in U.S. history currently?

MR. ZENTNER: Yes.

MS. PETTIGREW: But you have taken some criminal justice classes before?

MR. ZENTNER: Yes. That was my original major back in community college.

MS. PETTIGREW: Okay.

What made you interested in that? Did you want to be a police officer, probation officer?

MR. ZENTNER: Well, honestly, on my mom's side of the family criminal justice is the family business.

MS. PETTIGREW: Okay. What is that? I don't have your --

MR. ZENTNER: Oh.

MS. PETTIGREW: -- your questionnaire in front of me.

MR. ZENTNER: Yeah, I am -- I have been related to law enforcement individuals.

MS. PETTIGREW; Okay.

On your mom's side?

MR. ZENTNER: On my mom's side.

MS. PETTIGREW: Kind of extended family?

MR. ZENTNER: No, immediate family.

MS. PETTIGREW: Okay.

MR. ZENTNER: Well, yeah, immediate, like as far as grandfather, uncle.

MS. PETTIGREW: Okay.

MR. ZENTNER: So pretty close family.

MS. PETTIGREW: Were they police officers?

My. grandfather was, yes.

MS. PETTIGREW: What about your uncle?

MR. ZENTNER: Um, a technician.

MS. PETTIGREW: And growing up with that kind of, you know, background, and assuming at family gatherings people talk about their work or whatnot.

MR. ZENTNER: Yeah.

MS. PETTIGREW: Okay.

So you kind of had an interest in that path and then kind of switched to U.S. History?

MR. ZENTNER: That was more my passion anyway.

MS. PETTIGREW: What do you want to do with it,

with your U.S. History degree?

MR. ZENTNER: I'd like to teach.

MS. PETTIGREW: Okay.

Is there anything you probably -- I think you actually wrote that you kind of -- initially, you trust police.

MR. ZENTNER: Yes.

MS. PETTIGREW: Is there anything about your background and your family, you know, having police officers in your family, that makes you think that you couldn't be fair in a criminal case?

MR. ZENTNER: I would try to be fair, but I am just saying I am more predisposed to trust the police and believe the police more. But I would try to be fair, yes.

MS. PETTIGREW: Okay.

You will be instructed that every witness who comes and takes an oath and takes the witness stand starts off on the same playing field. Okay?

MR. ZENTNER: Right.

MS. PETTIGREW: We don't give priests a different standard than, you know, thieves.

MR. ZENTNER: Right.

MS. PETTIGREW: In some cases you can't take into account that, but you understand what I am getting at?

MR. ZENTNER: Right. I understand.

MS. PETTIGREW: Can you place all of the witnesses on that same initial playing field and judge their

testimony by what you see here in court?

MR. ZENTNER: Yes, I believe so.

MS. PETTIGREW: You indicated that you have a negative view of Oakland, or at least that's my shorthand note that I wrote. This is a case in Oakland. I think I discussed with someone earlier today, we're not here in this courtroom to right all of the wrongs that are happening in Oakland.

MR. ZENTNER: Right. I understand.

MS. PETTIGREW: And you can judge the facts for this case?

MR. ZENTNER: Yeah, I believe so.

MS. PETTIGREW: All right. Thank you.

I don't have any further questions.

THE COURT: Thank you, Ms. Pettigrew.

Um, Mr. Steckler, go ahead.

MR. STECKLER: Thank you, Your Honor.

I will go backwards since you have the microphone this time, make it easier on everybody.

I want to follow up on your law enforcement kind of connections. I appreciate your -- your bringing that up, especially today orally, as well as you did in the questionnaire. It may be that -- well, let me just not ask it that way. Um, will you judge the testimony of a civilian witness the same way you would judge the testimony of a law enforcement witness in a criminal case?

MR. ZENTNER: Yes.

MR. STECKLER; If you had a doubt as to guilt, in

other words, the case wasn't proven to you beyond a reasonable doubt, would you hesitate in rendering a verdict of not guilty because of your familial connections?

MR. ZENTNER: I don't think so.

MR. STECKLER: No. That wouldn't be in the back of your mind somehow?

MR. ZENTNER: Probably not.

MR. STECKLER: You mentioned something about political and religious beliefs --

MR. ZENTNER: Mm-hm.

MR. STECKLER: -- and bias, that it's possible that your political and religious beliefs could guide your thought process in this case. What were you thinking about that when you said that?

MR. ZENTNER: Probably the whole guns. Because I am pro-firearm, it could possibly give a bias.

MR. STECKLER: Which way would that bias go?

MR. ZENTNER: I don't know. I just wanted to list it and put that on the table.

MR. STECKLER: The NRA support and all that stuff?

MR. ZENTNER: Yes.

MR. STECKLER: There is two questions I want to ask you about. They have both come up here this morning and this afternoon. Can you keep separate the possession of a gun charge, the unlawful possession of a gun, from the murder charges?

MR. ZENTNER: Yes.

MR. STECKLER: You can analyze the murder charge separately?

MR. ZENTNER: (Nods head in the affirmative).

MR. STECKLER: Is that yes?

MR. ZENTNER: Yes.

MR. STECKLER: And then the other separation that -- I am glad Mr. Bryden brought it up -- two separate defendants, can you analyze their two cases separately?

MR. ZENTNER: I believe I can.

MR. STECKLER: All right.

Finally, for you, sir, when you talk about the criminal justice system, you mentioned it was very effective but can be misused if not checked often.

MR. ZENTNER: Yes.

MR. STECKLER: What were you thinking about when you said that?

MR. ZENTNER: It was the same that one of the jurors said before, that it's not necessarily the laws, it's the people sometimes can misuse it. Sometimes there's corruption within the system. I mean, the system's not perfect, but it can be effective. It all depends.

MR. STECKLER: Okay. Thank you very much. I appreciate that.

Mr. Loosbrock.

MR. LOOSBROCK: Yes.

MR. STECKLER: Good afternoon, sir.

MR. LOOSBROCK: Good afternoon.

MR. STECKLER: I want to just follow up on an answer that you gave in relation to the criminal justice system; some are better at semantics than others.

MR. LOOSBROCK: Yes.

MR. STECKLER: What do you mean by that?

MR. LOOSBROCK: Laws are written and interpreted, so it's the interpretation of the law that's unique. So that's where semantics come into play. So those people that are better at semantics would actually be more receptive to that law.

MR. STECKLER: How would that --

MR. LOOSBROCK: The better written laws are, those that don't have loopholes written in semantics.

MR. STECKLER: When you're saying that, it reminds me of my talking about the word reasonable or reasonably, it's probably coming up in other instructions. Do you feel comfortable, as a juror, defining reasonable given a set of circumstances?

MR. LOOSBROCK: If a definition is provided, it depends.

MR. STECKLER: How about do you think you could pro -- define reasonable? Do you think you could provide that definition?

MR. LOOSBROCK: I think so.

MR. STECKLER: All right.

Then, finally for you, sir, the people you mentioned in Bloomington Police force and the Los Angeles

D.A. --

MR. LOOSBROCK: Yeah.

MR. STECKLER: -- any hesitation in voting not guilty based on those connections that you have if Ms. Pettigrew did not prove the case to you beyond a reasonable doubt?

MR. LOOSBROCK: No.

MR. STECKLER: Okay. Thank you very much, sir.

MR. LOOSBROCK: Thank you.

MR. STECKLER: (Juror No. 9), good afternoon.

JUROR NO. 9: Good afternoon.

MR. STECKLER: You heard me ask today whether if there was an innocent bystander victim in this homicide case, whether that would impact a person's role as a juror. Do you think that might impact your role as a juror?

JUROR NO. 9: I don't think so.

MR. STECKLER: Do you think you can apply the laws of homicide, of self-defense, of manslaughter, or whatever the judge gives, even though there is an innocent bystander in the case?

JUROR NO. 9: I think I would be fine.

MR. STECKLER: And you would hold the Prosecutor to her burden of proof?

JUROR NO. 9: Yes.

MR. STECKLER: All right.

Is there anything that I've talked to other people about, whether it be self-defense, or guns, or keeping

things separate, that you think that I should know about concerning you as a juror?

JUROR NO. 9: No, I don't believe that -- I have been sitting here all day and listening to the -- listening to the discussion and the self-defense. When I answered some of the questions over there, I was talking -- thinking more about like if I was in that situation and if I had to protect me and my kids. That was what I was thinking. And then with the discussion it enlightened me that it was pertaining to this case, so I agree with the law.

MR. STECKLER: You think that you would apply similar thought processes as you had when you filled out your questionnaire to your role as a juror in applying self-defense, in other words, try to put yourself in the position of someone?

JUROR NO. 9: Depending upon the evidence; and, of course, you want to see what made that person do whatever he or she did --

MR. STECKLER: Right.

JUROR NO. 9: -- in that situation. I would have to weigh all the evidence and the situation.

MR. STECKLER: Okay.

And you think we can count on your individual opinion?

JUROR NO. 9: Yes.

MR. STECKLER: Okay. Thank you very much, ma'am.

And then, finally, all the way over here to

Mr. Kennedy.

Good afternoon, sir.

MR. KENNEDY: Good afternoon, sir.

MR. STECKLER: What kind of work did your wife do?

MR. KENNEDY: Pardon me?

MR. STECKLER: Your wife, what kind of work?

MR. KENNEDY: She was a secretary in the Southfield School system, suburb of Detroit.

MR. STECKLER; Okay.

Are -- now, when you filled out the questionnaire on the self-defense questions, the question about stand your ground, you can pursue an assailant if reasonably necessary to secure your safety, you said that this area is very gray regarding pursuit in lieu of retreat if safety were assured. What were you thinking when you wrote that; do you remember?

MR. KENNEDY: Well, I think each individual's different. I think what you feel when your life's threatened, it's very hard to say what you would do. I think one of the previous jurors said, I think, once you feel that you've made the threat go away, I don't see any value of chasing the person that is the person that brought on the threat.

MR. STECKLER: Mm-hm.

MR. KENNEDY: And I think that probably to retreat is the better part of valor at that point, particularly if a person's armed.

MR. STECKLER: Right. And I don't necessarily

disagree with you. But the law does say that you can -- a person can pursue even if safety could have been achieved by retreating.

MR. KENNEDY: I don't quarrel with that, sir. I don't know. The law, probably like most of us here don't --

MR. STECKLER: Right.

MR. KENNEDY: -- unless it's explained to us -- if that is the law, then the law takes precedence over my personal opinion.

MR. STECKLER: Okay. All right.

Well -- well, that's really what I was getting at is that whether you would follow the law as the judge gives it, and it sounds like you say you would --

MR. KENNEDY: Oh, absolutely.

MR. STECKLER: -- on self-defense.

Okay. Thank you very much, sir.

MR. KENNEDY: You're welcome.

THE COURT: Thank you, Mr. Steckler.

Is now a good time, Madam Reporter?

Ladies and gentlemen, we'll take our afternoon recess. We'll be in recess until 3:20. If you are in the jury box, I will ask you to return there, and when we come back Mr. Bryden will get his opportunity to question everybody.

Please don't discuss the case among yourselves or with anyone else until the case is finally submitted to you.

(Recess taken)

THE COURT: All right.

Mr. Bryden, it's your pleasure.

MR. BRYDEN: Oh, thank you, Your Honor.

Mr. Kennedy, I thought your answers to some of the self-defense questions on the questionnaire were very thoughtful, explained a lot. I was going to re-ask you the one you didn't answer and you don't remember. So don't worry. It says the law states that a person who engages in mutual combat or who starts a fight has a right to self-defense only if: One, he actually in good faith tried to stop fighting; two, he indicated that he wanted to stop fighting; and, three, he gave his opponent a chance. Do you agree with that?

MR. KENNEDY: Say that again. I couldn't quite hear you, sir.

MR. BRYDEN: Oh, okay. I am sorry.

THE COURT: Do you want to maybe hand it to him since you got a copy of his questionnaire?

MR. KENNEDY: I don't have my glasses, Your Honor.

THE COURT: Oh, I am sorry.

MR. BRYDEN: I am going to read it a little louder. The law states that a person who engages in mutual combat or who starts a fight, has a right to self-defense only if: One, he actually and in good faith tried to stop the fighting; two, he indicated that he wanted to stop fighting; and, three, he gave his opponent

a chance to stop fighting. Do you agree with that rule, and why or why not?

MR. KENNEDY: Was that one of the questions that I said I didn't quite understand?

MR. BRYDEN: Yes, sir. Yeah. So I am kind of reiterating it and getting your feelings on that. It seems to be --

MR. KENNEDY: I am still confused by the question.

MR. BRYDEN: Okay.

Well, you had some ideas about everything else. This just asks you if you agree that somebody who starts a fight or is engaged in mutual combat has to stop the fighting, give the other guy a chance to stop fighting, and act in good faith in doing that before he has a right to self-defense.

MR. KENNEDY: I would say generally that -- that's a fair reading of my thoughts, yes.

MR. BRYDEN: Okay.

So, in other words, somebody who starts a fight, you agree with the reference, well, he starts something, then he has to at least attempt to stop it before he can surround himself with self-defense; you agree with that, sir?

MR. KENNEDY: That's a fair --

MR. BRYDEN: Okay.

MR. KENNEDY: -- a fair reading of my thoughts, yes.

MR. BRYDEN: Okay. Thank you.

(Juror No. 9), have you treated people for gunshot wounds or that kind of thing in your professional career as a physician?

JUROR NO. 9: Not acutely. We're not a trauma center. But we do get patients back after they have been acutely treated for for management of other medical issues.

MR. BRYDEN; And have you treated victims of crime, in general, people who have been stabbed or beaten?

JUROR NO. 9: Yes.

MR. BRYDEN: Does anything about that give you sort of a sympathy when you see how horrendous the damage can be to a victim of a crime that prevents you from being a good juror in this case?

JUROR NO. 9: I don't think so because even with the profession, it's a core value, you just try to concentrate on what that situation is, how can I make that patient better with that particular situation and treat him, rather than thinking why is he here, what happened, and what made him end up here. So that's how I look at it.

MR. BRYDEN: Have you ever had to entertain the thought of using self-defense yourself? Have you ever been attacked in some situation where you had to defend yourself?

JUROR NO. 9: Not so far.

MR. BRYDEN: I hope that stays that way,

Doctor. Appreciate that.

Mr. Loosbrock, what was it that interested me that you haven't already -- oh, you were just a juror last year, right? Do you feel like we're picking on you?

MR. LOOSBROCK: A little bit.

MR. BRYDEN: So, I mean, I think that's almost like an excuse. But you enjoyed the last experience?

MR. LOOSBROCK: Yeah, it was -- it was fine.

MR. BRYDEN: And it's so soon; you want a rest or --

MR. LOOSBROCK: That would be fine.

MR. BRYDEN: But you didn't ask to be excused 'cause you had already served?

MR. LOOSBROCK: Well, it's because it's outside of the 12-month window.

MR. BRYDEN: Oh, okay. But it's pretty soon?

MR. LOOSBROCK: Yeah, it was like two months outside of the 12-month window.

MR. BRYDEN: So I imagine you vote, register your car, and show up at every government agency and they have your name somewhere?

MR. LOOSNBROCK: Oh, yeah, I am quite certain of it.

MR. BRYDEN: Okay.

Ask Mr. Zentner, about one of your favorite TV shows, Jeopardy, do you shout out the answers?

MR. ZENTNER: Yes, I do.

MR. BRYDEN: How good are you?

MR. ZENTNER: Pretty good.
MR. BRYDEN: Okay.
Do you answer in the form of a question?
MR. ZENTNER: No.
MR. BRYDEN: Okay.
So -- in all kinds of categories you're pretty good, or mostly probably political science?
MR. ZENTNER: Political science, history, that sort of thing.
MR. BRYDEN: I see. Okay.
MR. ZENTNER: Unless it's 16th Century French Poets, then I am lost.
MR. BRYDEN: I think most of us would be.
You spoke a little bit about -- you wrote about your bias, or you say, and I absolutely agree, everybody's got a bias. I mean, we'd be crazy not to have -- run in here without life experiences and --
MR. ZENTNER: Correct.
MR. BRYDEN: -- and not have some kind of bias or way of prejudging things. But you said it was possible that your beliefs could guide your thought process, but you're not certain. What kind of bias were you alluding to?
MR. ZENTNER: Just in general. I don't -- I don't remember any specific thing, other than it could be firearm related --
MR. BRYDEN: Ah.
MR. ZENTNER: -- since it's a firearm-related

case.

MR. BRYDEN: Okay.

You wrote specifically about maybe -- I mean, you weren't saying you had a bias. But like your religious beliefs, you think that you can be -- some religions they don't -- they kind of preach that you can't judge other people. Do you have any kind of bias of that sort when you say your religious beliefs?

MR. ZENTNER: Um, I don't really mean judgment, more of a moral belief.

MR. BRYDEN: Okay.

From everything that you've heard the attorneys talking about suggesting to you that, you know, obviously this case is very serious, there's a murder. "Thou shall not kill." There's going to be a dead person sort of in the room in a sense and whatnot. Does any of that bring up something that you feel you couldn't deal with as a unbiased juror without --

MR. ZENTNER: Um --

MR. BRYDEN: -- giving these two guys a fair shake?

MR. ZENTNER: I would definitely try.

MR. BRYDEN: Okay.

Is there anything more specific? I mean -- you know, if you can try -- obviously, we're all going to try. But is there any one thing that has occurred to you from this whole voir dire that, whoa, that really might lead me to go one way or the other and not be a good juror either

for the defendant?

MR. ZENTNER: If possible, it could be the innocent bystander factor.

MR. BRYDEN: And because it could be you and it's just a shame it happened?

MR. ZENTNER: Yeah, I think that's what it would be.

MR. BRYDEN: And because of that you would be less stringent on holding Ms. Pettigrew, the prosecutor, to her burden of proof in showing that there was malice and there was a lack of justification for the behavior?

MR. ZENTNER: It's possible, but I would try not to.

MR. BRYDEN: Okay. I appreciate that.

Thank you, Mr. Zentner.

I have nothing further, Your Honor.

THE COURT: Any of the parties wish to approach?

MS. PETTIGREW: No, Your Honor.

MR. BRYDEN: No.

MR. STECKLER: No. Thank you.

THE COURT: My notes indicate Ms. Tong was the last person excused. That was a Defense joint challenge. Each side has used three challenges and the next challenge is with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to thank and ask the Court to excuse Juror Number 9, Mr. Carlson.

THE COURT: Thank you very much for your service,

sir.

And, (Juror No. 9), I will ask you to take the seat in seat number 9 in the front row.

Did I hear you say that you thought this was a very -- this was an efficient, quick system while you were asked that? I might have misunderstood that. I was encouraged, nonetheless.

JUROR NO. 9: Believe me, it's --

THE COURT: in India, it takes longer?

JUROR NO. 9: Oh, 14 to 20 years.

THE COURT: To get to trial?

JUROR NO. 9: Well, to get to trial, I would say 10 years. And after that, to get a judgment, it can go up to 20 years.

THE COURT: Okay.

But the jury isn't present the entire time, I trust, so we're grateful for that.

All right. The joint challenge then would be with the Defense.

MR. BRYDEN: Oh, I am sorry.

(Discussion off the record between both defense counsel)

MR. STECKLER: Thank you, Your Honor.

The Defense would like to thank and jointly ask the Court to excuse Juror Number 11. I believe it is Mr. Yu.

THE COURT: All right. Very well.

Thank you, Mr. Yu, for your service.

And, Mr. Loosbrock, I will ask you to take seat number 11. There we go. Thank you, sir.

Ms. Pettigrew, the next challenge will be with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to thank and ask the Court to excuse Juror Number 12, Mr. Aracic.

THE COURT: Thank you very much, Mr. Aracic.

And that means that we'll ask Mr. Zentner to take a seat in the front row there in seat number 12.

MR. STECKLER: The Defense passes, Your Honor.

THE COURT: Is that a joint pass?

MR. STECKLER: Joint pass.

THE COURT: All right.

So the A defendant, Mr. McNeely, has an opportunity to exercise a individual challenge, an individual challenge.

MR. STECKLER: Defense passes.

THE COURT: And the B defendant, Mr. Poston, has an opportunity to exercise an individual challenge.

MR. BRYDEN: Mr. Poston would ask the that the Court thank Ms. Bennett for her service and excuse her.

MS. PETTIGREW: Mr.?

MR. BRYDEN: Ms.

THE COURT: Juror Number 1.

MR. BRYDEN: Juror Number 1. I am sorry.

THE COURT: We have two Bennetts in the jury box.

MR. BRYDEN: Ms. Bennett.

THE COURT: Thank you very much for your service, ma'am. Thank you for your service, ma'am.

MS. BENNETT: Thank you.

THE COURT: All right.

And I will ask the clerk to call four additional names. The first will go in seat number one and then the next three will go in the alternate seats, one, two, three.

THE CLERK: Michael N-i-e-s, seat number one.

Mark N-o-r-e-l-l, alternate seat number one.

Nicholas J-o-h-n-s-o-n, alternate seat number two.

John H-e-r-n-a-n-d-e-z, alternate seat number three. Hernandez, John Hernandez?

MR. HERNANDEZ: Yeah.

THE COURT: All right. Thank you very much gentlemen.

Everybody's been able to hear all the questions and answers so far?

Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good afternoon. Is it Mr. --

MR. NIES: Nies.

MS. PETTIGREW: Nies.

MR. NIES: Yes.

MS. PETTIGREW: You work as a biomedical engineer?

MR. NIES: Yes, I do.

MS. PETTIGREW: Can you tell me what that is?

MR. NIES: Fix medical imaging equipment, x-ray machines.

MS. PETTIGREW: Okay.

And you indicated in your questionnaire that you don't have any strong opinions on the criminal justice system. I am assuming probably 'cause you haven't had any personal experience.

MR. NIES: No personal experience.

MS. PETTIGREW: Okay.

Have you followed any cases either in the county, in this area, or nationally in the news media?

MR. NIES: No. I even tried to avoid the one in Florida.

MS. PETTIGREW: Hard to do when it's in the headlines every day.

MR. NIES: Sure.

MS. PETTIGREW: But did you form any opinions based on that, even trying to avoid it?

MR. NIES: Um, not really. Just hoping I never had to, you know, deal with my own interpretation of stand your ground.

MS. PETTIGREW: Okay.

With that viewpoint, does that translate -- how does that translate into being asked to be a juror? That clearly is going to raise some issues of self-defense.

MR. NIES: I think I can take the instructions from the judge and apply it to the evidence.

MS. PETTIGREW: Okay.
No hesitation with that.
MR. NIES: No.
MS. PETTIGREW: Okay. Thank you.
If you could pass the microphone down to Mr. Norell?
MR. NORELL: Yes.
MS. PETTIGREW: Good afternoon.
You've been a juror before?
MR. NORELL: Yeah, about a month -- or about a year ago.
MS. PETTIGREW: You also just missed that --
MR. NORELL: Magic number, yeah.
MS. PETTIGREW: -- 12-month deadline.
Well, once we get you once, we often try to keep you again.
Remind me what was the nature of that case.
MS. PETTIGREW: It was theft, assault and theft on a bus.
MS. PETTIGREW: Anything about that experience that you found particularly frustrating, either in court or the deliberation process?
MR. NORELL: Well, I -- the only thing I -- you know, the information that we received, which is a small amount of what's going on, I was amazed at how a person could look at a videotape of the incident and have 12 people look at it and have 15 different ideas on exactly what happened; and then how they could slow it down and

have 15 more opinions; and speed it up and have 15 more opinions. So it was kind of interesting to watch that process work out.

MS. PETTIGREW: All right.

And are you talking about actually in court or once you began the deliberation process?

MR. NORELL: In the deliberation process.

MS. PETTIGREW: Okay.

And so in that case there was a video and you --

MR. NORELL: The whole thing was caught on video, yeah, in an AC Transit bus.

MS. PETTIGREW: You mentioned that people had all these different opinions, interpretations, and whatnot. You were able to reach a verdict, though?

MR. NORELL: Eventually, yes.

MS. PETTIGREW: And tell me about that process. Was it difficult to reach a verdict?

MR. NORELL: It was mind boggling, yes, to watch people that -- you know, I mean, I don't know what they see. It was amazing to hear what some people could see in that incidence, but slowing it down to almost where it was not even moving and then speed it up to so it was going so fast that everybody seemed to see -- well, not everybody, but a lot of people saw something different and, you know.

MS. PETTIGREW: Okay.

If there were similar type evidence in this case, maybe a video, maybe an audio, something of that nature,

do you think that your experience in the last case would come to bear on deliberating in this case or --

MR. NORELL: Well, I think everybody has their own opinion so they have to make their own opinion. I had mine and they had theirs and it worked itself out.

MR. NORELL: You wrote in the self-defense questions that a person has the right to defend against danger. Would you agree with me that that needs to be immediate danger?

MR. NORELL: Any kind of danger, I believe.

MS. PETTIGREW: Would you agree with me that a person can't start an incident, start a fight, start a confrontation and then with the intention of claiming self-defense?

MR. NORELL: If somebody starts something, you know, I mean -- everything gets twisted in all these words that you guys use. But if somebody starts something and then they start getting the worst end of it and they want to quit, well, you know, that's too bad, maybe they might take a beating. But I think if somebody stops, everybody needs to stop. There is no reason to continue chasing someone down the street unless you're the one who started it. I guess that's the only reason you would be chasing someone down the street.

MS. PETTIGREW: Okay. Thank you.

(Juror No. 12)?

JUROR NO. 12: Yes.

MS. PETTIGREW: Good afternoon.

JUROR NO. 12: Afternoon.

MS. PETTIGREW: You wouldn't be offended if I don't ask you any questions, will you?

JUROR NO. 12: No.

MS. PETTIGREW: Okay. Thank you.

Mr. Hernandez.

MR. HERNANDEZ: Yes.

MS. PETTIGREW: Good afternoon.

MR. HERNANDEZ: Afternoon.

MS. PETTIGREW: You also were called as a juror in a murder case; is that right?

MR. HERNANDEZ: Yes.

MS. PETTIGREW: And there was no verdict in that case; is that right?

MR. HERNANDEZ: It was deadlocked.

MS. PETTIGREW: I was asking someone earlier whether or not that was kind of an even split, whether there was one or two people that were in disagreement with the majority. What was that situation?

MR. HERNANDEZ: The panel was deadlocked 11 to 1. The one juror, who was incompetent to serve apparently -- did not change -- did not consider the evidence fully, and that's how it went.

MS. PETTIGREW: Okay.

Was it frustrating for you?

MR. HERNANDEZ: Yes.

MS. PETTIGREW: Does it make you not want to serve again?

MR. HERNANDEZ: Not necessarily.

MS. PETTIGREW: Okay.

So you recognize that that was a situation, in and of itself, and you think you could --

MR. HERNANDEZ: That was unique for that defendant and panel.

MS. PETTIGREW: Okay.

You've heard some of the things that we've been talking about today with regard to the law. I talked about the provocative act doctrine when I gave the example from the movie The Assassin (sic), and if Kevin Costner as he's coming to the rescue doesn't shoot the assassin but shoots some innocent person, that assassin is on the hook for murder. Did you hear that?

MR. HERNANDEZ: I heard most of it, yes.

MS. PETTIGREW: Do you agree with that?

MR. HERNANDEZ: Yes.

MS. PETTIGREW: And I guess, boiling it down, in that situation the assassin wouldn't have been the person who actually pulled the trigger causing the death; you're okay with that?

MR. HERNANDEZ: I don't understand.

MS. PETTIGREW: Sure.

In the example that I gave, it was Kevin Costner who shot the person, the innocent person. The assassin did not shoot that person, but the assassin would be the one responsible for that murder because he created a dangerous situation that caused Kevin Costner to

respond. Do you agree with that, that you don't have to be the actual killer, the actual one that pulled the trigger, in order to be liable for murder?

MR. HERNANDEZ: I agree to that, and I agree that it's situation-specific.

MS. PETTIGREW: Mm-hm. Okay.

So can you picture a situation where two people engage in a dangerous and deadly act, kind of the game of chicken that I was describing earlier; everyone knows that cars are dangerous, they are deadly, they can kill people. By engaging in that conduct, if someone in the process gets killed, those people are responsible for murder under California law.

MR. HERNANDEZ: Exactly.

MS. PETTIGREW: Okay. Thank you.

I don't have any further questions.

THE COURT: Thank you, Ms. Pettigrew.

Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

Guess once again it makes sense for me to go backwards. So let me get my questionnaires in order.

You can hold on to the microphone, sir. Thank you.

Good afternoon.

MR. HERNANDEZ: Good afternoon.

MR. STECKLER: You indicated that you thought -- in your questionnaire that you think that the criminal justice system is too lax. What are you thinking when you

say that?

MR. HERNANDEZ: I understand that the system can try to rehab someone. I also understand that on the other side of that there is some individuals who won't ever be rehabbed. In a situation like that, I think it's too lenient.

MR. STECKLER: All right.

In a situation where you're asked to consider the case when you have a person before you who is a -- has a prior felony conviction, okay, can you be a fair and impartial juror in that situation?

MR. HERNANDEZ: If the evidence is there to show that the prior incident was not related to the current charge.

MR. STECKLER: Just assume that the person is a felon. You don't know anything about the prior felony. You don't know when it was. You don't know what it was. Can you still make Ms. Pettigrew, the prosecutor, prove her case to you beyond a reasonable doubt before you would convict that person?

MR. HERNANDEZ: Absolutely. That's her role.

MR. STECKLER: All right.

Now, how about adding two things together, felon in possession of a gun; can you hold her to her burden of proof on a murder charge, assuming you've got a felon in possession of a gun?

MR. HERNANDEZ: Yes.

MR. STECKLER: You did have a hesitation whether

you could be fair and impartial given your feelings about crime in Oakland on your questionnaire.

MR. HERNANDEZ: Yes.

MR. STECKLER: Do you have any thoughts about that? Do you think you could be fair?

MR. HERNANDEZ: I think the crime rate in Oakland is atrocious. But, one -- I, for one, would not venture into Oakland for any reason unless I had something I had to.

MR. STECKLER: But do you think you could be fair to Mr. Poston and McNeely in a case where they are alleged to have committed crimes in Oakland?

MR. HERNANDEZ: I didn't understand.

MR. STECKLER: They are alleged to have committed crimes in Oakland, right?

MR. HERNANDEZ: Right.

MR. STECKLER: So the question asked if you thought the fact that -- any feelings about the city of Oakland that might affect your ability to be fair and impartial, and you said yes. I just want to make sure you can be fair in a case like this.

MR. HERNANDEZ: What -- this crime allegedly happened in Oakland, and there's a higher crime rate, and the two facts together would certainly color how I would feel.

MR. STECKLER: Okay.

So might you be more inclined to convict on less than reasonable doubt -- on less than, excuse me, proof

beyond a reasonable doubt?

MR. HERNANDEZ: If it's proven beyond a reasonable doubt, yes.

MR. STECKLER: What if the proof was that it probably happened? What if there was proof that my client committed murder, but the proof was that he probably did it, not that it was proof beyond a reasonable doubt, would you convict under those circumstances?

MR. HERNANDEZ: I think the standard is beyond a reasonable doubt. You'd have to hold to that standard.

MR. STECKLER; That is the standard.

I guess, getting back to your concern about crime in Oakland, would you apply a lesser standard in a case involving Oakland?

MR. HERNANDEZ: Yeah. I can't answer -- ask that again, please.

MR. STECKLER: I guess when all is said and done, what I am asking you, sir, is whether you think you could be fair to the defendants in a case like this? Do you think you can?

MR. HERNANDEZ: I believe I can. I can weigh the evidence and reach a decision --

MR. STECKLER: Okay.

MR. HERNANDEZ: -- based on the evidence.

MR. STECKLER: Thank you. I don't have any other questions for you. I am sorry to press you like that and I am sorry if I didn't speak up enough.

Okay. If you could pass the microphone to (Juror

No. 12)?

Okay.

JUROR NO. 12: Yes.

MR. STECKLER: Let me see if I have any questions for you. Just give me one moment.

Let me just ask you a kind of catch-all question. You've heard the questions I've asked everybody --

JUROR NO. 12: Yes.

MR. STECKLER: -- over the course of the day. Do you have anything, any burning desire to say anything or to anybody here based on what I have been saying?

JUROR NO. 12: No.

MR. STECKLER: Okay. You can pass the microphone to your left please? Thank you. Sorry.

So I am going backwards.

And you are Mr. Norell; is that right?

MR. NORELL: Correct.

MR. STECKLER: Okay, sir.

So there are -- you had occasion this afternoon to talk briefly with Ms. Pettigrew about some of the self-defense questions.

MR. NORELL: I had a -- I talked to her.

MS. PETTIGREW: Well, she talked to you.

MR. NORELL: Okay.

MR. STECKLER: You talked to each other.

And I will agree with you that there are a bunch of different instructions in there and a lot of words that can be interpreted different ways. Are we on the same

page?

MR. NORELL: Are you talking about the judge's instructions?

MR. STECKLER: On self-defense.

MR. NORELL: I wasn't -- that's not what I was upset about or talking about. I was talking about people looking at something and deciding, first of all, what they -- guilty or not and then putting the judge's instructions to what the we decided.

MR. STECKLER: Okay.

So you were concerned about what then, people having their --

MR. NORELL: I am just amazed at how many people could look at a tape and see so many different things on something that I thought was pretty straight-forward.

MR. STECKLER: So I guess there are two things I want to talk to you about briefly. One -- and you raised the videotape -- we know there is self-defense instructions. Videotape -- there is videotape you will hear -- see in this case, so we need to know, all of us, whether there's anything as -- based on your most recent jury experience, which wasn't that long ago, that will give you a problem deliberating with others and looking very closely and very carefully at a videotape?

MR. NORELL: I feel there's nothing in my mind that would make that a problem. I believe that there's going to be a problem just because you are going to have 12 people look at a tape and go through all that stuff.

MR. STECKLER: Okay.

MR. NORELL: I was amazed at how much longer that one piece of evidence took to swallow for everybody and get it down and finally figure out what they thought.

MR. STECKLER: Okay.

MR. NORELL: That took us probably a day and a half just to get through that part.

MR. STECKLER: Okay.

And this is a serious case. Some people say, you know, all criminal cases are serious. Are you concerned about the length of time this -- the system is taking in getting to the bottom of things in this case?

MR. NORELL: If you are asking me am I looking forward to being here for a couple of months, no, I am not looking forward to that. I mean, it's the process; there is nothing I can do about that.

MR. STECKLER: Okay.

Will you -- well, let me -- I guess my concern is since we're talking about it -- I will let self-defense go and just ask you about this. Will you express your individual opinion in the jury room?

MR. NORELL: No problem with that.

MR. STECKLER: No problem, whatsoever. Okay.

Thank you, sir.

If you could pass the microphone down to Mr. Nies?

MR. NIES: Nies.

MR. STECKLER: Sorry, sir.

MR. NIES: I am used to it.

MR. STECKLER: Okay.

So you indicated I think in response to the self-defense question the law says you can pursue your assailant until if reasonably necessary to secure your safety, and I think you said that retreating doesn't remove the threat sometimes, as in the case of a known assailant. Can you describe what you're thinking there? You're agreeing with that principle of law, it sounds like.

MR. NIES: Yeah. Well, yeah, in the immediate circumstances, if they are just retreating they might be ducking around and coming around to catch up to you in another way. I don't know that the threat is really removed.

MR. STECKLER: Just by --

MR. NIES: Running away from you.

MR. STECKLER: Okay.

MR. NIES: But I wouldn't advocate stalking them at that point either.

MR. STECKLER: Right. No, stalking is bad.

But maybe minimal pursuit is okay in your view? I don't want to put words in your mouth.

MR. NIES: Okay.

MR. STECKLER: Anyway, what you are thinking?

MR. NIES: Well, that was pretty much it. I think I said it the first time. I should have left it at that.

MR. STECKLER: I appreciate that. I should have,

as well.

Okay. Thank you very much, sir.

Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Mr. Nies, I called pretty much attention -- I take it you're not interested really in True Crime Stories, TV shows of that type; you don't follow too many criminal cases?

MR. NIES: Right.

MR. BRYDEN: You -- kind of O.J., only the real big ones?

MR. NIES: Especially not the big ones.

MR. BRYDEN: Okay.

So when you were talking about the Florida case, you really -- did you have an opinion about the outcome on that or were you trying to tune that out?

MR. NIES: Um, I think my opinion at the time was probably it took a couple of jerks to make that happen.

MR. BRYDEN: Okay.

That both the decedent, Trayvon Martin, the young man, and Zimmerman, the man that was on trial, were both sort of jerks?

MR. NIES: Yeah. They both -- I mean, you know, one cool head probably could have prevented that from happening.

MR. BRYDEN: Okay. That's fair enough.

Is it that you're not interested in this kind of

thing would make you reluctant to want to remain on this jury; is that true?

MR. NIES: That wouldn't be a reason for me to not want to be on the jury.

MR. BRYDEN: Well, that you're not that interested in criminal activity, applying the law, criminal cases, that kind of thing is not just not of interest to you?

MR. NIES: Not particularly.

MR. BRYDEN: Because of that, would you be frustrated being stuck in a trial --

MR. NIES: No.

MR. BRYDEN: -- that's going to take a few weeks to go on?

MR. NIES: No.

MR. BRYDEN: Okay.

Then I will ask Mr. Norell a few questions. I don't know -- he has a loud voice. I don't know if he needs needs the microphone.

You heard Mr. Hernandez talking about Oakland. I take it from what you do for your living you drive a lot in Oakland; is that right?

MR. NORELL: I've worked in Oakland for 35 years.

MR. BRYDEN: In the early morning?

MR. NORELL: Middle of night, morning, daytime. I have been all over.

MR. BRYDEN: Do you feel often that you are in danger? Does that put you in danger doing that kind of

work in the odd hours that you do it in?

MR. NORELL: I don't feel in danger, no.

MR. BRYDEN: Okay.

MR. NORELL: I mean, there's been a couple of times when I've thought there could be some problems down that street, but you try not to go down that street.

MR. BRYDEN: Do you carry a weapon with you for self-protection?

MR. NORELL: I carry a billy-club and a pocket knife.

MR. BRYDEN: Okay.

And if somebody were to, oh, I don't know, swing at you or something like that, would you hesitate in getting that pocket knife out?

MR. NORELL: I don't think I'd hesitate at all. The fact that he missed the first one, he may not get a second.

MR. BRYDEN: All right. You will do.

Actually, I did want to know, I was curious what your son does in jail?

MR. NORELL: My son works at the Santa Rita jail, and he works in the pod, monitoring the inmates, 12 hours on, 12 off.

MR. BRYDEN: Okay.

Does he often discuss that with you?

MR. NORELL: I mean, it's not something that we bring up. I mean, if you ask me if I asked or he asked about a certain thing every once in a while, yes, but it's

not something that we bring up.

MR. BRYDEN: Is he a deputy or is he a technician?

MR. NORELL: He is not a deputy, but he works for the jail.

MR. BRYDEN: 12-hour shifts?

MR. NORELL: They are 12-hour shifts, 12-12, 12 and 6, something like that is what he works.

MR. BRYDEN: Okay. Thank you, Mr. Norell. Appreciate that.

(Juror No. 12), what is War Raiders Guild?

MR. NORELL: World of Warcrafts. It's a form of entertainment where 25 people get together and we go and into a certain area and kill a boss.

MR. BRYDEN: I am sorry. What?

JUROR NO. 12: Kill a boss, slang term for taking down a monster that has a particular amount of health that could not be taken down by a particular person.

MR. BRYDEN: Now, is this a fantasy game on a computer?

JUROR NO. 12: Yes.

MR. BRYDEN: Oh, that's good. I am relieved to hear that.

You spend a lot of time on the computer with the video games?

JUROR NO. 12: Yes.

MR. BRYDEN: Do they often have a violent characteristic to them, these games you like? It's okay.

I am not judging you.

JUROR NO. 12: Yes, certain ones do; others do not.

MR. BRYDEN: Okay.

Do any of them involve shoot-outs?

JUROR NO. 12: Yes.

MR. BRYDEN: Do you play a particular character in some of these games with the guns?

JUROR NO. 12: Some, yes.

MR. BRYDEN: Okay.

And so have you ever in a game in a fantasy shot somebody in self-defense?

JUROR NO. 12: Yes.

MR. BRYDEN: Okay.

What during the video game would cause you to want to get a gun out and shoot somebody, even though it's fantasy?

JUROR NO. 12: A horde of zombies coming towards me.

MR. BRYDEN: But you'd agree with me legally there would be a lower standard than a horde of zombies; like say an armed man hit you, would that -- in a video game, would that justify shooting at somebody?

JUROR NO. 12: Yes.

MR. BRYDEN: Okay.

And I don't have any questions for Mr. Hernandez.

Thank you.

THE COURT: Does anybody need to approach on

challenges for cause?

MS. PETTIGREW: No, Your Honor.

MR. STECKLER: No, thank you.

MR. BRYDEN: No.

THE COURT: All right.

The next challenge is with the People.

MS. PETTIGREW: The People would like to thank and excuse Juror Number 1, Mr. Nies.

THE COURT: Thank you for your service, Mr. Nies.

And, Mr. Norell, I guess I will ask you to go down and take seat number one.

(Discussion off record between both defense counsel)

MR. STECKLER: Your Honor, thank you. The Defense would like to jointly thank and ask the Court to excuse Mr. Bennett.

THE COURT: All right.

Thank you, sir for your service, Mr. Bennett.

THE COURT: (Juror No. 12), thank you for taking seat number 10.

Next challenge is with the People.

MS. PETTIGREW: The People would like to thank and excuse Juror Number 10, Mr. Johnson.

THE COURT: Thank you, Mr. Johnson.

And I will ask Mr. Hernandez to go to seat number 10, please.

MR. STECKLER: That's the hot seat.

The Defense would like to jointly thank and ask

the Court to excuse Mr. Hernandez.

THE COURT: Thank you, Mr. Hernandez. You will be excused. You have been excused from service. The Court will thank you very much. The Court will thank you very much.

And I will ask the clerk to call four more names please.

THE CLERK: Carolyn M-c-C-o-r-k-i-n-d-a-l-e.

Take a seat over here in the front row.

Elvin H-a-y-n-e-s. Please take alternate seat number one in the back row.

Jessie R-u-e-d-a-s, alternate seat number two, R-u-e-d-a-s.

Allen T-o-r-r-e-s. Oh, sorry. I had the wrong form.

Darrold P-o-n-c-e.

THE COURT: Ponce.

THE CLERK: Ponce.

THE COURT: So Ruedas -- is there a Jessie Ruedas here? And there is no Darrold Ponce; is that right?

All right. Got to issue orders to show cause.

All right. Go ahead.

THE CLERK: Janice L-o-u-i-e.

(Juror No. 2).

THE COURT: Okay. Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good afternoon. Ms. McCorkindale.

MS. MCCORKINDALE: Yes.

MS. PETTIGREW: Good afternoon.

MS. MCCORKINDALE: Thank you. Good afternoon.

MS. PETTIGREW: Couple of questions I want to ask just about the criminal justice system and your viewpoint. And I think it's probably well taken that, you know, a lot of times if we watch the media, people that are rich and famous tend to get off, I think was what you said. Have you followed any cases locally?

MS. MCCORKINDALE: No, I haven't.

MS. PETTIGREW: Okay.

Do your views about Hollywood and the rich and famous, will that impact or affect your ability to be a juror in a case such as this?

MS. MCCORKINDALE: No, I don't believe so.

MS. PETTIGREW: Okay.

You have visited a jail before?

MS. MCCORKINDALE: Yes.

MS. PETTIGREW: What were the circumstances?

MS. MCCORKINDALE: Well, it was when I was a student down at Cal Poly, and I was majoring in dietetics and administration. So part of my course work was to go to the California Men's Colony there in, I believe, Morrow Bay, and we had to tour the kitchen as part of the food service --

MS. PETTIGREW: Okay.

MS. MCCORKINDALE: -- course.

MS. PETTIGREW: Okay.

So nothing where you're visiting a friend?

MS. MCCORKINDALE: No.

MS. PETTIGREW: Okay.

You heard us talking about kind of at length -- it's now almost 4:30 -- about, you know, the issues that are going to come up in this case. Do you think that -- did any of that raise a thought in your mind?

MS. MCCORKINDALE: No, it didn't.

MS. PETTIGREW: Do you think that you can listen to the testimony of witnesses and look at the evidence and come to a decision?

MS. MCCORKINDALE: Yes, I do.

MS. PETTIGREW: You've listened to the various people answer questions throughout the day, as well, and you know at the end of this case we're going to ask the 12 of you to deliberate and come to a conclusion if you can. You think you can do that?

MS. MCCORKINDALE: Yes, I do.

MS. PETTIGREW: Okay. Thank you.

Can you pass the microphone back to Mr. Haynes?

Good afternoon.

MR. HAYNES: Good afternoon.

MS. PETTIGREW: You work for the County?

MR. HAYNES: Yes.

MS. PETTIGREW: In any of the courthouses or in a different building?

MR. HAYNES: I work in the Administration Building.

MS. PETTIGREW: Okay.

In Oakland?

MR. HAYNES: Yeah.

MS. PETTIGREW: Okay.

You wrote in the criminal justice question, that one catch-all, that sometimes it works and sometimes it doesn't. Are you basing that on anything -- any personal experience that you have or any cases that you followed?

MR. HAYNES: Well, yeah -- or cases that I have followed, yeah.

MS. PETTIGREW: Locally or nationally?

MR. HAYNES: Mostly nationally.

MS. PETTIGREW: Okay.

So the ones that tend to hit the papers, probably ones that we've been referring to today?

MR. HAYNES: Right.

MS. PETTIGREW: How do you think that translates into your ability to be a juror?

MR. HAYNES: I don't know. I have never been a juror before.

MS. PETTIGREW: Okay.

You have never been asked to be in the situation?

MR. HAYNES: No.

MS. PETTIGREW: How do you -- how does it make you feel to be a part of the criminal justice system that you have a view that it sometimes works and it sometimes doesn't?

MR. HAYNES: How do I feel about it?

MS. PETTIGREW: Yeah.

MR. HAYNES: It's just a part of what you have to do. It's like you get called for jury duty, just like you have to file income tax returns; it's just part of the process.

MS. PETTIGREW: Okay.

You had an answer towards the end of the questionnaire, and I think the question was regarding any close friends or relatives been involved in a situation in which a gun was used in a deadly or dangerous manner. And that was not in reference to yourself; that was in reference to somebody else?

MR. HAYNES: Yeah, it was a cousin.

MS. PETTIGREW: A cousin?

MR. HAYNES: Right.

MS. PETTIGREW: And did you -- was that a close cousin?

MR. HAYNES: No.

MS. PETTIGREW: Were you aware of the circumstances of that case?

MR. HAYNES: No.

MS. PETTIGREW: Okay.

So kind of just a distant hearing through the family --

MR. HAYNES: Right.

MS. PETTIGREW: -- grapevine?

Okay. Was that here in this county?

MR. HAYNES: No.

MS. PETTIGREW: Was it in California?

MR. HAYNES: Yes.

MS. PETTIGREW: Do you have an opinion as to whether they were treated fairly?

MR. HAYNES: No, I don't.

MS. PETTIGREW: You don't have an opinion?

MR. HAYNES: No, I don't.

MS. PETTIGREW: Do you know if your cousin has an opinion on whether he or she was treated fairly?

MR. HAYNES: No, I don't.

MS. PETTIGREW: Is there anything about that situation that gives you any hesitation, whatsoever, in serving as a juror in a murder case?

MR. HAYNES: No.

MS. PETTIGREW: Okay.

At the end of this case, after I've presented witnesses and evidence, I am going to ask the jury to convict these two men of murder. Do you think that you would have any hesitation in doing that if I proved the case beyond a reasonable doubt?

MR. HAYNES: If you prove the case beyond a reasonable doubt, no.

MS. PETTIGREW: And what is reasonable doubt to you, beyond a reasonable doubt?

MR. HAYNES: Beyond a reasonable doubt means that the State has proven its case and that there is no question.

MS. PETTIGREW: Okay.

And what do you mean by no questions?

MR. HAYNES: That the evidence is so overwhelming and so -- well, nothing is airtight, but that the Defense could not even -- you know, even though the burden is not with the Defense, but that the State's evidence was so overwhelming that it couldn't be rebutted or refuted.

MS. PETTIGREW: Okay.

Did you hear some of the examples that I gave this morning?

MR. HAYNES: I was running late this morning, actually, so I probably missed it.

MS. PETTIGREW: Okay.

Did you hear me talking about the game of chicken?

MR. HAYNES: Later on, I heard you talk about it, yes.

MS. PETTIGREW: So you're familiar with a game where people will drive their cars in the direction of each other and the object of the game is to last the longest without pulling out. Disregard for a moment the winner or loser, but in a situation like that where two people engage in this deadly or dangerous conduct and someone gets killed in this process, the law sets forth the requirements of murder, but in that situation both of those people who engaged in that dangerous conduct would be held responsible. Do you have any problem with that?

MR. HAYNES: No.

MS. PETTIGREW: Okay. Thank you.

Ms. Louie, good afternoon.

MS. LOUIE: Hi.

MS. PETTIGREW: I have on my little notes, "Where to start?" You had a lot to say in the questionnaire.

MS. LOUIE: Yeah.

MS. PETTIGREW: And I think you actually thanked us at the end for giving you the opportunity to voice your concerns about the justice system, and in Oakland in particular. But a month has gone by since you filled out this questionnaire. You've heard us talking all day with the potential jurors. What's your overall thought as you sit here today? Do you think that you could give these two men a fair trial?

MS. LOUIE: Um, so I think my thought process is probably the same, you know, because I work in public health and I am a physician, so I tend to think of things on an institutional level and a population level. Um, so my thoughts would be more or less that I think that at this level it will work, but at a larger level we have failed a large segment of the population. I feel the same over a decade of being in public health and watching how politics has swayed what we do health-wise and health policy-wise. So I would try my best but, again, I think we all bring our own individual thoughts and opinions; that's what makes us people. And you want a consensus -- actually, you want not just consensus, but you want 12 people. That's why we have them altogether, because they do -- we all have different stories and opinions. I would just say I would try my best, but I bring what I bring inside.

MS. PETTIGREW: Everybody does. We don't ask you to leave that. That's why we want 12 individual people as jurors. But this isn't the forum to right any wrongs.

MS. LOUIE: Right. I understand that.

MS. PETTIGREW: This isn't the forum to change what's happening on a global, or national, or even state level. This is about whether a crime was committed and these two committed it and can you convict them. That's where I am coming from. And I want to know if you think, sitting here with your background, you could do that.

MS. LOUIE: I am not sure. I am also a Buddhist, so I am somewhat of a pacifist. That issue is hard for me, as well. So I don't know. I haven't really thought about it. I haven't served on a jury before.

MS. PETTIGREW: Okay.

MS. LOUIE: And I don't think about that.

MS. PETTIGREW: Okay. Thank you.

(Juror No. 2)?

JUROR NO. 2: That's right.

MS. PETTIGREW: Good afternoon.

JUROR NO. 2: Hello.

MS. PETTIGREW: You work as a paralegal?

JUROR NO. 2: That's right.

MS. PETTIGREW: In a firm?

JUROR NO. 2: Yes.

MS. PETTIGREW: Is there a type of law that you specialize in or --

JUROR NO. 2: Yes.

MS. PETTIGREW: A type of -- what is that?

JUROR NO. 2: 34 Act complaints.

MS. PETTIGREW: I am sorry?

JUROR NO. 2: 34 Act complaints.

MS. PETTIGREW: What is that?

JUROR NO. 2: 10-K's, 10-Q's.

MS. PETTIGREW: And you have served as a juror on a civil case?

JUROR NO. 2: Correct.

MS. PETTIGREW: How long ago was that?

JUROR NO. 2: Three years, maybe.

MS. PETTIGREW: Okay.

And in a civil case the jury doesn't have to be unanimous. Do you remember if you were unanimous or if there was a split?

JUROR NO. 2: Unanimous.

MS. PETTIGREW: Okay.

Was it very difficult to have 12 people in a room and reach a decision?

JUROR NO. 2: No.

MS. PETTIGREW: You wrote -- and I don't remember which question called for this -- but you wrote something about you would probably err on the side of assuming guilt, but you will apply the law to the evidence. And do you remember that question?

JUROR NO. 2: No.

MS. PETTIGREW: No.

JUROR NO. 2: But I am not challenging you.

MS. PETTIGREW: No. I just -- it was at the end and it was kind of a catch-all question about whether you think there was any reason why you can't be fair and impartial. And you said it's hard to answer yes or no, frustrated by the crime in Oakland and probably have a tendency to err on the side of assuming guilt, but believe I would be able to apply law to the evidence presented. How do you feel today, having listened to these various discussions that we've had today?

JUROR NO. 2: That's a good question. A lot of people commented on kind of frustrated with crime. And I understand we're not here to deal with the bigger issue of crime in Oakland. But I do come from the standpoint of being frustrated with our criminal defense system. I have little patience for habitual criminals, and that's -- but I -- I like to think that I can keep my emotional side in check.

MS. PETTIGREW: Only you can answer the question of whether you can do that.

JUROR NO. 2: Right.

MS. PETTIGREW: I think we'd all recognize or should recognize we all have some biases that we bring to the table and we'd all like to keep it separate. Do you think that you can? I mean, you've already heard that they are convicted felons.

JUROR NO. 2: Right. And -- and I find that -- I find some aspects -- I find that frustrating. And that gets back to the question of the criminal defense system.

But, yeah, I am a rule follower, so if I am told to apply this to that then I do it. I have been working at a law firm for 25 years, so I hope I can follow the rules. But then kind of going to what you said, you can't take out what is inside you --

MS. PETTIGREW: Right.

JUROR NO. 2: -- and check it; it's there.

MS. PETTIGREW: Thank you very much.

THE COURT: Mr. Steckler, I don't think we're going to finish with you this afternoon.

So we're going the take our afternoon recess, ladies and gentlemen. Tomorrow morning, the Court has three other matters in the morning so we're not going to be in session tomorrow morning. I think we told you that tomorrow we'll start at 1:30 in the afternoon. So if you are in the jury box, you will return to the seat you're in. And if you are in the audience, I will ask you to be prepared to take up a seat in the audience for tomorrow afternoon.

All right. In the meantime, don't discuss the case among yourselves or with anyone else until it's finally submitted to you. And we'll see you tomorrow afternoon. Thank you very much.

(Whereupon, the prospective jurors exit the courtroom)

THE COURT: All right. We're outside the presence of the jury. Both defendants and counsel are all present.

Mr. Steckler, you said you wanted to put something

on the record.

MR. STECKLER: Well, I wanted to make an observation and a request. I haven't spoken to Mr. Bryden about this. But as this process is playing itself out, it occurs to me that given the nature of this case, the circumstances of the antagonistic defenses, and the circumstances of this case, we're not seeing eye-to-eye on jury peremptories, and so I would propose making it 10 and 10 -- I am sorry. How would that be? It would be 10 joint and then 10 individual, 10 individual, 'cause we haven't gotten up to using all 10 joint yet.

THE COURT: Correct.

MR. STECKLER: So I would make it 10, 10, and 10, and Ms. Pettigrew gets her 30. That would be my request because that's the way it's shaping up we're very liable to easily burn through our individuals before we ever get close to using all our joints.

THE COURT: All right.

We'll -- let me -- we didn't take that up at the -- did take that up at -- didn't take that up at the end of the noon recess when we came back. I will have time to do some research tomorrow morning since we won't be in session tomorrow morning. That, at first blush may make a lot of sense. You guys have thought your case out.

MR. STECKLER: I did.

As I said, this proposal I have not run by Mr. Bryden.

THE COURT: Sure.

MR. BRYDEN: He's mentioned something similar. For the record, I do agree we have antagonistic defenses and we don't agree on the joints.

THE COURT: Okay.

Well, if I am not mistaken --

MR. STECKLER: Can I --

THE COURT: You guys are at --

MR. BRYDEN: Six.

THE COURT: Six joint, and Mr. Poston as used one individual and Mr. McNeely hasn't used any.

MR. STECKLER: Right.

THE COURT: So -- and the People have used seven total. So that's -- we got seven on each side. So let me look at the annotations of the code that talks about joint trial and we'll -- I will tell you something -- if you want, we could reconvene closer to 11:00 tomorrow to hash this out, if that's what you think is necessary.

MR. STECKLER: No, I don't think it's necessary.

THE COURT: Oh. So what do you want to do, just fly by the seat of the pants and make up your minds?

MR. STECKLER: No, 'cause I think you're either going to grant or deny it. 1:25 maybe?

THE COURT: 1:25 sounds fine.

MR. STECKLER: Does that work for Counsel?

MR. BRYDEN: Obviously, you can look into the law, as well.

MR. STECKLER: I can. So can you, because it was your initial motion this morning.

MR. BRYDEN: Well, not a motion. I bounced it.

THE COURT: I will look at something. At least I can make up my mind. If you are asking for it and both your clients ask for it, I am sure it would be less harm than if it was counsel asking for it and clients not.

But for their benefit, both Mr. McNeely and Mr. Poston, I think what I hear your attorneys saying is since there might be some conflicting -- you might have a different defense in each of your case than the other guy, you might want to lay the blame on the other guys, or you might want to lay the blame, so that being the case might be good reason for you to say I'd rather have 10 individual challenges that my attorney and I exercise separately, then we exercise 10 jointly and the other guy has 10 individual, and you cover your 30 that way rather than 20 and 5 and 5, making it 10, 10, and 10. And that wouldn't affect the number that the People have, but might make it somewhat better for you in exercising challenges separately. If you can't agree on joint challenges, you have the opportunity you and your attorney to excuse five additional people than the opposing party, or the co-defendant, I suppose. It's not the opposing party. So it's something for you to think about, and that might make a difference in the Court's ruling tomorrow is if you both agree the Court would see less of a reason to not grant your requests.

Okay. Does that make any sense to you, Mr. McNeely?

MR. MCNEELY: Yes, Your Honor.

THE COURT: Mr. Poston?

MR. POSTON: Yes, sir.

THE COURT: Okay.

So we'll see you tomorrow at 1:25.

MR. STECKLER: Thank you, Your Honor.

THE COURT: We do have this one juror who is outside that I have shown you a letter from, Mr. Loosbrock He doesn't have what I would consider to be a hardship. It's a hardship on his employer, not a hardship on him. But he works for a small start-up, and we've all had a chance to question him. I don't know if anybody -- is there any strenuous objection if I were to consider his hardship request?

MS. PETTIGREW: I object, but not strenously.

THE COURT: Okay.

MR. STECKLER: I object.

THE COURT: You object.

THE COURT: Okay. We'll leave it there.

Tell him he's got to come back tomorrow.

MS. PETTIGREW: For scheduling purposes, since we still have a few things that are outstanding in terms of ruling, no matter where we get to tomorrow can I assume we're not opening tomorrow?

THE COURT: Correct.

MS. PETTIGREW: And can we maybe address things we need rulings on tomorrow?

THE COURT: I think there's two general things; is

that --

MS. PETTIGREW: Drugs and the recorded statement at Highland, and the writings of Mr. Poston are the things that I have on my list.

THE COURT: Okay.

Well, the Court's already sent the jury home. Could have easily had them come back at 2:00. Assuming we're able to get a jury tomorrow, we can do it after the jury's been selected.

MS. PETTIGREW: Okay.

THE COURT: All right. Very well.

We'll be in recess until 1:25.

---oOo---

STATE OF CALIFORNIA)
                   )    SS.
COUNTY OF ALAMEDA  )

I, RONDA ROOPE, Certified Shorthand Reporter, do hereby certify:

That I am an official court reporter of the Superior Court of the State of California, and that as such I reported the proceedings had in the above-entitled matter at the time and place set forth herein;

That my stenograph notes were thereafter transcribed into typewriting under my direction, and that the foregoing pages constitute a full, true and correct transcription of my said notes.

DATED: 5-15-14

Ronda Roope
RONDA ROOPE, CSR NO. 5609