XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,**<br>Petitioner,<br>**v.**<br>**JASON PICKETT, Acting Warden,**<br>Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBIT 6 (cont.)

## 2nd Supplemental Reporter's Transcript, Vols. 5-6 of 6

CALIFORNIA COURT OF APPEAL

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent

NO:

ALAMEDA COUNTY NO: **172522 A&B**

vs.

**JOE DANIEL MCNEELY, aka: ANTHONY LISTER, and DONEL POSTON,**

Defendants and Appellants.

COPY

______________________________________/

**AUGMENT TO REPORTER'S TRANSCRIPT ON APPEAL**

FROM FINAL JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

HONORABLE MICHAEL GAFFEY, JUDGE

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco, CA 94102

FOR THE DEFENDANTS AND APPELLANTS:
In Propria Persona

OFFICIAL COURT REPORTER:
Ronda Roope, CSR. NO. 5609

**JURY SELECTION ONLY DATE:** **1/7/14**
**(AUGMENT) VOL:** **5**
**PAGES:** **346-455**

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ALAMEDA
BEFORE HONORABLE MICHAEL GAFFEY, JUDGE
DEPARTMENT 517

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs. NO: **172522 A/B**

**JOE DANIEL MCNEELY**, aka:
**ANTHONY LISTER**, and
**DONEL POSTON**,

Defendants.

_______________________________/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**AUGMENT TO TRANSCRIPT ON APPEAL**
**(JURY SELECTION - VOL. 5)**
**JANUARY 7, 2014**

Hayward Hall of Justice
Hayward, California

A P P E A R A N C E S

For the People: NANCY O'MALLEY
DISTRICT ATTORNEY
BY: STACIE PETTIGREW
Deputy District Attorney

For the Defendant **JOE DANIEL MCNEELY:** BRENDON D. WOODS
PUBLIC DEFENDER
BY: ANDREW STECKLER
Assistant Public Defender

For the Defendant **DONEL POSTON:** DAVID BRYDEN
Attorney at Law

Official Court Reporter: RONDA ROOPE
CSR NO. 5609

January 7, 2014 P.M. Session.

P R O C E E D I N G S

---oOo---

THE COURT: We'll go back on the record in the case of McNeely and Poston, 172522 A and B.

Could I get counsel to state their appearance for the record?

MS. PETTIGREW: Stacie Pettigrew on behalf of the People.

MR. STECKLER: Drew Steckler for Mr. McNeely, who is present.

MR. BRYDEN: David Bryden for Donel Poston.

He is present.

THE COURT: First issue I wanted to address this afternoon was the issue of your request -- of counsel's request to go -- rather than having 20 joint and 5 individual challenges each, to go to 10 joint and 10 individual challenges each. The Court has read and considered the case of People vs. Lewis, not the whole case because it's probably in excess of a hundred pages long. It's at 43 Cal.4th 415. But I've read the section dealing with -- page 490 to 493. There's four pages there dealing with the Code of Civil Procedure 231(a), and that's -- they affirmed that in that case that exercising them jointly and having 5 individual and 20 joint is the appropriate way of doing it. That was in a case where there were seemingly conflicting defenses and -- so I will -- I think the law is pretty solid that that's the

way we should conduct voir dire. I think if it's counsel's request only, I am inclined to deny it and say this is what the law provides for and we'll conduct voir dire that way. However, if Mr. McNeely and Mr. Poston individually request the Court, maybe the Court can see that there might be some reason to do it.

They're each charged with attempted murder on the other. There is some distinction as to whether or not -- I think the evidence is probably going to show that McNeely's the guy that pulled the trigger that killed Mr. Fluker. And so for that reason Mr. Poston and Mr. McNeely might have different defenses, might have different issues they want to present to the jury; they might see the jurors differently. So I can see they might want to do that, but if they are not requesting it personally I am not inclined to do that because of this case of Lewis from 2008.

MR. STECKLER: Mr. McNeely's asking for it personally.

THE COURT: Is that true, Mr. McNeely?

MR. MCNEELY: Yes, Your Honor.

THE COURT: So you understand that you got a very good attorney and he's constitutionalized, federalized all your appeal issues, he's got it under control? You realize if you do that all your protection issues might go by the wayside? So you're saying I want this and all the other issues might go by the wayside; do you understand that?

MR. MCNEELY: Just on the jury issue alone?

THE COURT: Right.

Do you understand that?

MR. MCNEELY: Yes.

THE COURT: And knowing all that, do you want to give up your rights and ask for the different procedure so that it might benefit you to have 10 individual challenges?

MR. MCNEELY: Yes.

THE COURT: All right.

And how about Mr. Poston, what does he want to do?

MR. POSTON: Sir, could you please explain to me because I am not giving up my rights?

THE COURT: All right.

The way the law says, between both parties both defendants get 20 joint challenges and 5 individuals. So that's 20 plus 5, plus 5 is 10, is 30. What the attorneys have proposed to the Court is that you exercise 10 joint challenges of which the parties agree on and then you have 10 individual challenges and Mr. McNeely has 10 individual challenges, still adding up to 30, but it gives you -- you don't have to agree with him on 20; you only have to agree with him on 10. And of the 10 you've already exercised 7. So it gives you a little more freedom to kick people off the jury that you wouldn't have any quarrel about it.

MR. POSTON: I think that's the reason why we issued the motion for severance because of the antagonistic defenses.

THE COURT: Okay.

MR. POSTON: By the same token, if this is the only leeway that we have, then I will accept it.

THE COURT: No. It has to be your request to do it.

MR. POSTON: Yes, I will request this.

THE COURT: All right.

And both counsel concur?

MR. STECKLER: Yes.

MR. BRYDEN: Yes, I'll concur.

THE COURT: All right.

Then, Mr. Clerk, we're going to go with 10 joint. And there's an additional case from Cal.App.2d where they exercised alternating challenges, each side exercising the challenge once and next time the other side did, but we're not going to make that that complicated. Just leave it you're going to have 9 individual challenges left, Mr. Bryden, for Mr. Poston.

.

MR. BRYDEN: Correct. Mm-hm.

THE COURT: You -- you've got 10 individual challenges left. And there's going to be three additional joint challenges, if I am not mistaken. Oh, four.

MS. PETTIGREW: They exercised --

THE COURT: They have used six plus one, okay.

MS. PETTIGREW: Right.

THE COURT: Okay. All right.

MS. PETTIGREW: So when we get down to it,

procedurally, I will have a preemptory, and assume they've exhausted the joint, it will go Defendant A and then Defendant B and then back to me.

THE COURT: Right.

MS. PETTIGREW: Just wanted to make sure.

THE COURT: Until the first one is -- so if A exercises an individual, then it will go back to you.

MS. PETTIGREW: Okay.

THE COURT: If A passes and B exercises an individual, it will go back to you. If they both pass, it will go back to you.

MS. PETTIGREW: Okay.

THE COURT: Does that make sense?

MS. PETTIGREW: Yes.

THE COURT: The last thing was, I think -- I was going through my notes because you had reminded me that I hadn't ruled on a number of things which I've narrowed down to three. The writings in your -- People's motions 4 and 5.

People's motion 4 deals with letters from Mr. Poston. There are excerpts of those letters on page 35 of your motion. Is that the extent of what you're asking for?

MS. PETTIGREW: I didn't bring my motions.

THE COURT: Okay.

MS. PETTIGREW: May I approach?

THE COURT: Sure.

MS. PETTIGREW: I think you've already ruled on

the letters and we're only down to the writings.

MS. PETTIGREW: Yes.

THE COURT: Those are the only two parts of them that you are asking me?

MS. PETTIGREW: Well, we went through and you told me what should be excised and I have done that. I can bring that the next -- after the break.

THE COURT: All right. I'm prepared to rule on that, as if I haven't ruled already.

There was a couple things under consideration in your motion number 5, jail writings.

MS. PETTIGREW: Yes.

THE COURT: So I can -- I think what's left under number 5, on page 6 there's three parts -- I've got them circled in red here -- and you can see what -- I've granted part of the first and third, and I would grant the total of the second.

MS. PETTIGREW: Okay.

MR. STECKLER: I am on that page.

Can you repeat what you just stated, Your Honor? I am sorry.

THE COURT: Sure.

On the first bullet the bullet, starting on line four --

MR. STECKLER: "You gotta".

THE COURT: "You gotta", I would grant her motion to allow everything except for the line, "You would have been better off with a fuckin' botched robbery attempt on

a pimp, but --" that would be excised.

MR. STECKLER: Just what you just read?

THE COURT: That would be the only part that would be excised. The rest would be admitted.

The bullet that begins at line 17 would be granted, so that would be admitted. And the bullet that begins on line 21 and a half, the first four lines would be admitted, and beginning at "'cause" would be deleted from there down.

Did you -- and I can make you a copy of this if you want to see that.

MR. STECKLER: I think I follow you.

THE COURT: Maybe Mr. Bryden.

MR. BRYDEN: I will take a copy from you -- thank you, Your Honor -- if it's not too much.

THE COURT: Sure.

Then as to the earlier page on number four, Ms. Pettigrew, the two selections you have in your motion I would grant. I don't know if you were -- I couldn't tell if you were asking for more because you did say something about redactions and Aranda-Bruton after the two selections.

MS. PETTIGREW: Yes.

THE COURT: So I didn't know if you were asking for more or just those two selections.

MS. PETTIGREW: I was.

THE COURT: The two selections as they are are fine.

MS. PETTIGREW: Okay.

THE COURT: If there's more, then I have already considered that and I have made a ruling.

MS. PETTIGREW: Yes, you have made a ruling. And I have done the actual blacked-out redactions so I will bring those after the break.

THE COURT: Okay.

MR. STECKLER: And then --

THE COURT: There was also something on the Roku box.

MR. STECKLER: Before that on the bottom of page 5 --

THE COURT: Mm-hm.

MR. STECKLER: -- bullet point "crossed the dotted line."

THE COURT: All right.

Denied. So that's not admissible.

MR. STECKLER: And then on the same -- I don't know if you want to go to the Roku box next -- but on the same topic, McNeely's motions to admit phone conversations and some writings were under submission. I don't need a ruling today on those.

THE COURT: That's what was -- my thought was I wasn't going to rule on those today.

MR. STECKLER: That's fine.

THE COURT: I was going to wait until we get a little bit --

MR. STECKLER: Yes.

THE COURT: -- until your case in chief. We can see where we are then.

MR. STECKLER: That's fine.

THE COURT: Anything else?

And, by the way, earlier I had said I didn't get a complete packet of your e-mail.

MR. STECKLER: Yes.

THE COURT: What happened is my printer ran out and I didn't realize it, so when I put more paper in the printer it printed what I was missing, so now I believe I have everything you submitted to the court.

MR. STECKLER: Okay.

THE COURT: Okay. I ran out of paper.

Yes, sir.

MR. STECKLER: So I cut you off. You were about to say something about a Roku box.

THE COURT: Right. Okay.

MR. STECKLER: That's one thing.

And then another thing is I've got some issues to take up before opening statements. I think we should do it -- we shouldn't make the jurors wait, but we might want to do it sooner rather than later.

THE COURT: All right.

We won't do opening statements today.

MR. STECKLER: Of course.

But it's in the nature of certain evidence and it's admissibility that's come to my attention.

THE COURT: Okay.

MR. STECKLER: So --

THE COURT: So maybe we'll send the jury home at 4:15, tell them we have other matters we have to take up on the record.

MR. STECKLER: Not a bad idea.

THE COURT: Is that agreeable?

MS. PETTIGREW: Sure.

THE COURT: Okay.

MR. STECKLER: Thank you.

THE COURT: Can we call for the jury?

(Whereupon, the prospective jurors enter the courtroom)

THE COURT: The next three jurors are going to be, if they are here -- oh, you want to bring in Maung, M-a-u-n-g?

THE CLERK: And the other two?

Should I bring them in first?

THE COURT: We're going to try to bring in --

THE CLERK: All three at the same time, Your Honor?

So the next three we'll seat, if they are here, are Win Thant Maung from panel one, Jessie Ruedas, and Darrold Ponce. Those are the three that didn't show when their names were called.

All three are here, Your Honor.

(Whereupon three prospective jurors, Mr. Maung, Mr. Ruedas, and Mr. Ponce, enter the courtroom)

THE COURT: Good afternoon, gentlemen. If you can

just come up behind the rail and stand there. There might have been some misunderstanding from the Court's directions, but is there a Win Maung?

MR. MAUNG: Yeah.

THE COURT: Okay.

And Jessie Ruedas?

MR. RUEDAS: Here.

THE COURT: And that must mean you're Mr. Ponce?

MR. PONCE: Yes.

THE COURT: So when you filled out the questionnaire there might have been some confusion, but you were expected to return to court yesterday. If there's something that -- nobody said they were asking for a hardship.

MR. MAUNG: Your Honor, let me explain something.

THE COURT: Hang on.

So I'm expecting that you are able to serve, and if you are not able to serve you still have an obligation to come to court and tell the Court that you cannot serve.

So let me start with you, Mr. Ponce. Is there any reason that you can't be here to serve?

MR. PONCE: No, sir.

THE COURT: Then you can wait outside and we'll call you in.

MR. PONCE: I actually had the flu. I am getting over it still.

THE COURT: You what?

MR. PONCE: I had the flu. I am still getting over it.

THE COURT: Do the parties have a problem if I send Mr. Ruedas home for the afternoon, have him come back tomorrow if we don't get a jury today; is that agreeable?

MS. PETTIGREW: No.

MR. BRYDEN: No.

THE COURT: Mr. Ruedas, you can go home and come back tomorrow unless you get a call from the clerk saying we don't need you.

Mr. Maung, what's your --

MR. MAUNG: Your Honor, I work for County of San Mateo. I am the chief engineer over there.

THE COURT: Sure.

MR. MAUNG: And there is a building, a gas leak over yesterday and Monday morning so we had to deal with that gas leak, and somehow honestly I forgot it. And then I don't remember -- I work for Sheriff's office, also; I work for county jail.

THE COURT: You don't want me to call the sheriff and say --

MR. MAUNG: Okay. So --

THE COURT: Are you prepared to serve now?

MR. MAUNG: Um, it's whatever it takes.

THE COURT: Okay. I am going to -- if you're saying -- if you don't say I can't serve for some reason, I am going ask you to wait outside or ask you to just come in. You are going to be the next guy up in the box 'cause

your name has been called. Lucky you. So we'll call the sheriff if there's a problem and tell them that you are on jury duty. And you may not last; maybe nobody wants you. I don't know. Okay?

MR. MAUNG: Yeah.

THE COURT: Is everything under control at work?

MR. MAUNG: Um, yeah.

THE COURT: Okay.

MR. MAUNG: Yeah.

THE COURT: All right. Have a seat. Have a seat. We're going to call everybody in.

THE CLERK: I can bring the rest in?

THE COURT: Everybody else can come in. Maybe you could -- that's a good seat 'cause you got the next one up.

(Whereupon, the prospective jury panel entered the courtroom)

THE COURT: Good afternoon, ladies and gentlemen. The parties and the Court have been conducting business in your absence. So I know we're getting a little bit of a late start today; however, I don't want you to think we haven't been doing anything. We actually have been accomplishing things that need to be resolved before we can go to the next stage of the trial.

After jury selection, we have to get opening statements and go to evidence so we have to consider some of the motions that have been brought by each of the parties, and perhaps I should have realized yesterday

afternoon when I released you not to bring you back till closer to 2:00. So I apologize for that. If it's anyone's fault, it's my fault that that occurred that way.

At any rate, it appears that everybody is present in the jury box.

And, Mr. Steckler, I think we had concluded with Ms. Pettigrew in the afternoon yesterday.

MR. STECKLER: I think you're right.

THE COURT: Okay.

And I think we're going 10 minutes per party, correct?

MR. STECKLER: 10 or 12 sounds about right.

Let me give Ms. McCorkindale the microphone.

So even though I have given you the microphone, ma'am -- first of all, good afternoon everybody. I have a question or two for all four of you. I just want to cover some bases. I want to start my first question. When I ask it, I am mindful of -- I am thinking back to Mr. Bryden's conversation with Mr. Norell yesterday up in seat number one, talking about Mr. Norell's deliveries and his carrying a knife and a billy-club. And this goes back to the first self-defense instruction that you were read -- given in the questionnaire. And the third element of that, basic self-defense says -- and I want to ask you four if you agree with this part of the instruction and can you apply it -- the defendant used no more force than was reasonably necessary to defend against the danger. Do you all agree with that element of the self-defense law?

MR. HAYNES: Can you repeat that?

MR. STECKLER: That the defendant, in order for it to be lawful self-defense, the defendant has to have used no more force than was reasonably necessary to defend against the danger. Does that make sense to everybody, to the four of you? And can you apply that law if you were to consider a case?

And then the second and final question I have for the four of you is -- this goes back to my very first question yesterday morning -- and I am not sure of the extent to which everybody can hear me in the back of the room -- can you -- well, the law says that if someone starts a fight, uses non-deadly force, and the opponent responded with deadly force such that the defendant could not withdraw from the fight, the defendant is entitled to use deadly force. Can you follow that instruction?

MR. HAYNES: Yes.

MS. MCCORKINDALE: Yes.

MR. RUEDAS: Yes.

MR. PONCE: Yes.

MR. STECKLER: Okay.

Ms. McCorkindale, I want to go back to another thing I talked about yesterday. But near the beginning I just want to ask you -- again, I am not sure how many in the box heard this the question -- is a man takes money from another person. The question is -- what crime is that?

MS. MCCORKINDALE: Well, I remember this was

discussed yesterday. And I think it depends on the circumstances. If it's given, then it's obviously a gift. But if it's stolen, then that's a crime.

MR. STECKLER: Right. Very good.

So is another -- are you also saying then that it depends on the state of the mind of who took the money, the state of mind of that person?

MS. MCCORKINDALE: Yes.

MR. STECKLER: Okay.

And what kind of evidence would you look to to determine that person's state of mind, do you think?

MS. MCCORKINDALE: Questions. I think just really defining if it was a gift or if it was stolen.

MR. STECKLER: You might look to all the circumstances --

MS. MCCORKINDALE: Yes.

MR. STECKLER: -- of what happened, right?

MS. MCCORKINDALE: Uh-huh.

MR. STECKLER: And that might be circumstantial evidence to prove a person's -- what's in their head?

MS. MCCORKINDALE: Mm-hm.

MR. STECKLER: Okay.

Same question. A man stabs another man intentionally, killing him. Is that a crime? Would you have enough information to answer that question.

MS. MCCORKINDALE: Well, I believe it's a crime.

MR. STECKLER: Okay.

What if -- do all -- everybody agree that that's a

crime, necessarily?

MS. MCCORKINDALE: Yes.

JUROR NO. 2: Can you repeat it please? I am sorry.

MR. STECKLER: A man stabs another man, intentionally killing him.

JUROR NO. 2: No, if it's in self-defense.

MR. STECKLER: Can you pass the microphone back please, if you would?

(Juror No. 2).

JUROR NO. 2: Right. Weren't we just discussing that, self-defense, if you don't use more force than what the other person was using. So if somebody was stabbing me --

MR. STECKLER: Right.

JUROR NO. 2: -- it seems to me I would be able to stab them back.

MR. STECKLER: And you might be stabbing that person intentionally, but it was in self defense, in other words, and then not a crime; is what you're saying?

JUROR NO. 2: Yes.

MR. STECKLER: Okay.

I am going to come back to you.

Ma'am, thank you for relinquishing the microphone.

And since you have it, (Juror No. 2), I am going to ask you a couple questions, then I will go backwards.

I want to ask you -- I want to follow up on this, what Ms. Pettigrew was asking you about when you said you

might err on the side of assuming guilt.

JUROR NO. 2: Yeah. I spent a lot of sleepless hours last night thinking about that.

MR. STECKLER: Oh, sorry.

JUROR NO. 2: That's not a very good statement, is it?

MR. STECKLER: The judge limits me to 10 minutes with the four of you, but if you want to share a little bit of what's keeping you up last night, I am all ears.

JUROR NO. 2: I won't share everything.

MR. STECKLER: Fair enough.

On the issue of presumption of innocence and how you might apply presumption of innocence and whether that would be impossible or difficult --

JUROR NO. 2: No, of course it would not be impossible. I also said yesterday that I was a rule follower, so if I am instructed to assume people are innocent until proven guilty, I will, of course, do that.

MR. STECKLER: Okay.

Do you understand -- we talked a lot about the burden of proof being beyond a reasonable doubt. Do you understand it's the prosecutor's burden to disprove self-defense beyond a reasonable doubt and can you follow that law?

JUROR NO. 2: Yes.

MR. STECKLER: In other words, it's not --

JUROR NO. 2: Because the defense is self-defense,

so she needs to prove beyond a reasonable doubt that it was not self-defense?

MR. STECKLER: Right.

Can you apply that?

JUROR NO. 2: Yes.

MR. STECKLER: Okay. All right.

And I think I understood you to say you may not agree with the right to pursue, but you can -- you're a rule follower and you can follow that instruction if that's one of the instructions. We talked a bit about the right to pursue.

JUROR NO. 2: Right. And while it's a foreign concept to me because it's not something that I would do, I can understand that people -- I would be able to apply the law.

MR. STECKLER: Okay. I appreciate that.

Can you pass the microphone over?

Good afternoon, ma'am.

MS. LOUIE: Hi.

MR. STECKLER: I think your parting words with Ms. Pettigrew yesterday was about guns and your qualms about guns and maybe in relation to your -- to a religion?

MS. LOUIE: Yes.

MR. STECKLER: Tell me, can you be fair in this case? You know a lot about this case already. Can you be fair to the defendants in this case?

MS LOUIE: Um, I think the challenge for me is applying my thoughts and beliefs about the systems as we

were talking about to the individuals. Yeah, I think I could be fair. I think if I am in a jury room and have to apply to a specific law, I can do that. Um, but I also mentioned that, again, we all bring our own experiences and so I would try my best.

MR. STECKLER: Okay.

THE COURT: Can I interrupt, Mr. Steckler?

MR. STECKLER: Yes.

THE COURT: Sorry to do that to you.

MR. STECKLER: No problem.

THE COURT: But, you know, it was -- I was watching one of those football games last night and you see a lot of things on football games and then they got these replay things now. If you were to come in, you got these announcer's up there watching the game and they are announcing the game -- and I am not saying this applied to last night, but other games -- then they go to the replay and they even have video in replay, and you go to replay and you can see the things and analyze the things -- and they even have slow motion brackets. Somebody was talking about that yesterday. But the rules are kind of the rules that apply. And while you may have certain feelings about how Oakland is very crime-ridden, it's really -- the way to change that whole thing is to change the laws, maybe to get a new police chief, things like that, or other things that the city council and the mayor can do. But, essentially, the laws -- the jury isn't here to rewrite the rules that we play by. Even the commentators in the

football game can watch the video, say well maybe we need to change this rule. They don't change the rule on the field during the game being played. They try to interpret the rule and apply the rule as it applies to that game in that particular day. And, essentially, I think that's what we're asking you to do, not to try and change the rules, not to make the rulings different as it applies in this case because of your experience, but to listen to the evidence, evaluate the evidence. Certainly, there's going to be some flexibility in the law because, as Mr. Steckler brought out, one of the issues is what's reasonably necessary under the circumstances. We don't know all the circumstances. But the jury's going to have to make a determination of what's reasonably necessary.

So can you -- can you hear the evidence, evaluate the evidence, listen to the discussions with the other jurors, apply the law to the facts without kind of going over that line, which would be to try and change what the laws are?

MS. LOUIE: Yeah. I am not here to try and change the laws. But the wiggle room is the reasonable part and that's an individual.

THE COURT: Agreed.

MS. LOUIE: So I think what you're trying to do is get a sense of where I would fall in that line, and I guess I don't know because I have never been on a jury before and had to make these kind of decisions. I would want to see beyond a reasonable doubt that they -- that

there was evidence to, you know, say that there was -- they were guilty. I mean, I guess I just -- so I -- yeah, I understand what you're saying --

THE COURT: Okay.

MS. LOUIE: -- and I would try my best.

THE COURT: Okay.

Go ahead, Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

I don't think I have any follow-up because you have been -- you were comprehensive on your questionnaire, which we discussed yesterday. And I do appreciate that.

So if you could pass the microphone over to Mr. Haynes?

Good afternoon, sir.

MR. HAYNES: Good afternoon.

MR. STECKLER: The issue of the defendant -- if a defendant doesn't testify, you can't infer anything from that, you can't use that in any way. I think you indicated you thought that seems fair.

MR. HAYNES: Yes.

MR. STECKLER: Do you have any -- would you care to elaborate on that at all. Why is it fair to you?

MR. HAYNES: Because -- just because a defendant doesn't want to testify on his on behalf doesn't make him -- it wouldn't sway me whether he is guilty or not. It doesn't tell me anything.

MR. STECKLER: Okay.

Yesterday a juror who's no longer here, I think

mentioned she thought of one reason why an innocent person would choose not to testify. Can you think of any -- any reasons why a person would choose not to testify?

MR. HAYNES: Why an innocent person wouldn't want to testify?

MR. STECKLER: Yeah.

MR. HAYNES: Because they could open themselves up to cross-examination and possibly get caught in a trap or a play, semantics.

MR. STECKLER: What about -- that's a good example. What about -- and I think the judge will instruct you on this -- the ability of a criminal defendant to rely on the state of the evidence and just look at, you know, decide the prosecutor hasn't proved the case beyond a reasonable doubt and didn't want to testify; is that a valid reason in your mind?

MR HAYNES: Yes.

MR. STECKLER: You wrote that sometimes the criminal justice system works and sometimes it doesn't. Do you have an example or two in mind of when it works or doesn't work, for example?

MR. HAYNES: Not off the top of my head. But human beings being human beings, we're flawed. Think I mentioned yesterday, nothing is air-tight, so there's always room for error. Just that there's room for improvement, so.

MR. STECKLER: The judge is human.

MR. HAYNES: Right.

MR. STECKLER: The jurors are human.

MR. HAYNES: Right.

MR. STECKLER: We're all human, so there is going to be errors.

MR. HAYNES: Right.

MR. STECKLER: And then just kind of maybe globally -- there's been a lot of talk about self-defense, and there are several self-defense questions in the questionnaire. And setting aside whether you agree with all of those laws, can you follow the self-defense laws as the judge gives them to you?

MR. HAYNES: Yes.

MR. STECKLER: All right.

And then finally, sir, on page -- there was a -- a part early in the questionnaire where you're asked to circle if you know anybody relating to mental health, law, psychology, law enforcement. You circled all those and a couple others.

MR. HAYNES: Well, I have a sister who works for 911.

MR. STECKLER: Okay.

MR. HAYNES: There are a couple friends of the family who work as a mediator, who work as mediators for Family Court in Alameda County.

MR. STECKLER: Okay. I see what you are talking about. Thank you very much.

If you could just pass the microphone forward to Ms. McCorkindale?

Let me see if I have another question for you. Just one, I guess, because a lot has been covered and you were comprehensive on your questionnaire, as well.

The judge, way back in December, told every panel, and I think your panel as well, that you'll see the lawyers, Mr. Bryden and me, come to court and our clients won't be with us so you can figure out they are in custody. You are not going to use that against either defendant, are you?

MS. MCCORKINDALE: No.

MR. STECKLER: Or consider that as evidence in any way?

MS. MCCORKINDALE: No. I work across the street, so.

MR. STECKLER: Right.

MS. MCCORKINDALE: But, you know, I am pretty -- you know, I know when to speak to somebody and when not to.

MR. STECKLER: Okay. All right. Thank you very much, ma'am. I appreciate it.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

Good afternoon, ladies and gentlemen. I really want Donel Poston to have the advantage of a jury here that pays very close attention to the evidence and then carefully applies that evidence to the law that Judge

Gaffey's going to instruct you with. So it's not my intention really to ask embarrassing questions, but -- but I have to because I have a duty to Mr. Poston.

So one concern I had with you, Ms. McCorkindale, is you answered a question that you're currently taking a medication that may affect your concentration or -- and/or your memory; is that right?

MS. MCCORKINDALE: Yes. Excuse me. I am a Type 1 diabetic and I have had a had it since I was four years old, and so it's been 47 years. Now you know how old I am, but --

MR. BRYDEN: I would have guessed younger.

MS. MCCORKINDALE: Um, but, you know, I actually had a very low blood sugar when Ms. Pettigrew was interviewing me and I was able to perform. So when I have to, I know I can get through it. And, unfortunately, I usually carry things with me, but I didn't have anything, but now I do, so.

MR. BRYDEN: Okay.

So it's such a chronic condition then, you've stabilized and you deal with it. You don't think I should be worried that you won't be able to participate in jury deliberations or pay attention to witnesses or watch a video?

MS. MCCORKINDALE: No.

MR. BRYDEN: Okay.

MS. MCCORKINDALE: Not at all.

MR. BRYDEN: Okay. Good.

But I am glad you put it down so we got that.

You wrote in response to a question about self-defense that -- well, to quote, you said if your life is in jeopardy I would defend myself but not with a gun. And I found that kind of curious. Let me just ask you a hypothetical on that. Are you so against guns that you would just -- you would allow yourself to be killed before you'd use one?

MS. MCCORKINDALE: Probably not.

MR. BRYDEN: Okay.

What if somebody you knew had a weapon on them, struck you, tried to bring you down to the ground, and you had access to a gun, would you use it then.

MS. MCCORKINDALE: I don't believe so.

MR. BRYDEN: Okay. And why is that?

MS. MCCORKINDALE: Just because I would -- I just don't like violence.

MR. BRYDEN: Mm-hm.

MS. MCCORKINDALE: And I would hope that there would be a witness who would call the police. And my feeling is that this is something the police should be handling, not myself.

MR. BRYDEN: Sure. I agree with you. But they are not always there.

MS. MCCORKINDALE: I know.

MR. BRYDEN: You probably you have never been attacked --

MS. MCCORKINDALE: Hm.

MR. BRYDEN: -- or been subjected to something not through your fault; you know, you are just an innocent person. You have never been attacked or had someone back in school fight with you or anything?

MS. MCCORKINDALE: No. I was a good kid.

MR. BRYDEN: Well, do you think everybody that's attacked is somehow a bad person? You'd agree with me that occasionally innocent people are victims of violence, right?

MS. MCCORKINDALE: Oh, yes.

MR. BRYDEN: Okay. Let's see. What did I have for Mr. Haynes? Not much, Mr. Haynes.

You said you couldn't give an example to Mr. Steckler of when the system doesn't work, the criminal justice system. Were you familiar with the case involving the defendant Zimmerman in Florida and the decedent, the victim in that case was Trayvon Martin out of Florida?

MR. HAYNES: I was familiar with it, yes.

MR. BRYDEN: Okay.

Would you consider that to be an example of a case where justice really wasn't served because Mr. Zimmerman walked?

MR. HAYNES: I would, yeah.

MR. BRYDEN: Is that because Zimmerman had a gun and the other person was unarmed?

MR. HAYNES: That's part of it.

MR. BRYDEN: Would you have felt differently about that case, hypothetically, if the decedent had had a gun

and you knew that he initiated the attack by striking Mr. Zimmerman?

MR. HAYNES: Repeat the question.

MR. BRYDEN: Would you feel differently about that case, hypothetically, if you learned that the young man who unfortunately died, Trayvon Martin, was actually armed himself and initiated the combat by striking Zimmerman first with his fist, would that change the equation to you?

MR. HAYNES: And somehow Zimmerman got his gun?

MR. BRYDEN: No, Zimmerman -- they are both armed.

MR. HAYNES: Okay.

MR. BRYDEN: If they were both armed and the decedent had struck Mr. Zimmerman, would that change your opinion about the outcome? Would you have gone along with the jury then?

MR. HAYNES: That's a tough question because those kinds of hypotheticals, it's -- well, it's kind of a tricky area, but it might have -- I might have.

MR. BRYDEN: I got to agree with you, hypotheticals are really not fair, are they, because that's not what you learned about the case, are they?

MR. HAYNES: Right.

MR. BRYDEN: Okay.

Let me ask Mr. Dr. Louie. Doctor, have you ever treated gunshot wound victims?

MS. LOUIE: No, I have not.

MR. BRYDEN: Victims of violence, as a physician?

MS. LOUIE: Yes.
MR. BRYDEN: Okay.
And I think you expressed yourself, you were -- you're worried about being a juror because you want to have an unbiased approach, but you have certain biases against people that have violent backgrounds or are accused of crimes, right?
MS. LOUIE: No, I don't know that that's the case. I think it's much more complex. And I am actually not sure whether, you know, I would have biases one way or the other. I just -- I have been part of a government system where we do policy, where we talk about how prisoners are treated medically, and so I just have a lot of different thoughts over time that I have accumulated on it.
MR. BRYDEN: You don't feel that prisoners -- the criminal justice treats all prisoners very well; is that a correct statement of yours?
MS. LOUIE: I think we're trying to change that and that's part of my role.
MR. BRYDEN: You work in that area, right?
MS. LOUIE: My area of work is influenza, and I help the prison system for the state and local jails with containing outbreaks, and giving treatment and advice on when to move and not to move, and things like that, as well as other communicable diseases. That's one of the things I do.
MR. BRYDEN: Sounds pretty valuable.
Other than your medical application, are you

involved with prison reform politically?

MS. LOUIE: No.

MR. BRYDEN: Thank you, Doctor. I appreciate that.

(Juror No. 2), you told Mr. Steckler this afternoon that you are a rule follower, and that's good 'cause we're asking that you apply the facts as you ascertain them to the rules. Just -- the following thing, in general, let me just say this. Obviously, it's the law before you can convict somebody, brand them a criminal, that all 12 jurors have to agree. But it is legal in some instances if after considering each individual juror's opinions on what the facts are and attempt to apply the law that there could be a split of opinion among the group. And my concerns with when you say I'm a follower is this, what if the majority of people disagreed with you and after you've carefully considered all 11 of your fellow jurors argued but you are still not convinced one way or the other, but you feel that you have followed the rules and you've applied the facts as you've ascertained them, would you be able to resist a group movement towards consensus because you want to go home or because you are a follower, or could you stand by your principles and hold your own opinion?

JUROR NO. 2: Well, I think being a rule follower is not the same as being a follower --

MR. BRYDEN: Mm-hm.

JUROR NO. 2: -- as the way I think you're

defining follower.

MR. BRYDEN: Okay. I didn't mean to define it. I just want to know how you feel about that, about yourself. I am not suggesting you're a follower. I am just asking.

JUROR NO. 2: If I feel that I have done what I am instructed to do and that I have applied the facts to the law correctly, yeah, I mean people are not going to convince me to change my opinion unless somebody can point out to me that my interpretation has been flawed.

MR. BRYDEN: Okay.

And you're willing to accept other people's opinions, obviously; you're not so prideful that once you've come to a conclusion, somebody comes up with a good point, you're going to reconsider things; is that right, (Juror No. 2)?

JUROR NO. 2: That's right.

MR. BRYDEN: Okay. I appreciate that.

Thank you very much, the four of you.

THE COURT: Thank you, Mr. Bryden.

Does any party wish to approach regarding challenges for cause?

MS. PETTIGREW: No, Your Honor.

MR. STECKLER: No, thank you.

MR. BRYDEN: No, Your Honor.

MR. STECKLER: Is it Defense?

THE COURT: I am thinking it's back to the People --

THE CLERK: It's the People, Your Honor.

THE COURT: -- because I have six challenges on each side, or seven challenges on each side. That means it's back to the People's challenge.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to thank and excuse Juror Number 1, Mr. Norell.

THE COURT: All right. Thank you, sir.

MR. NORELL: I won't go. Awe.

THE COURT: All right. Thank you for your service and maybe we'll see you again.

And, Mr. Haynes, I will ask you to go down to seat number one please.

MR. BRYDEN: Your Honor, we're going to pass on the joint.

THE COURT: All right.

The individual challenge as to Mr. McNeely.

MR. STECKLER: The Defense would like to thank and ask the Court to excuse Number 2, Mr. Nelson.

THE COURT: Thank you very much, sir, for your service.

MR. NELSON: Thank you, Your Honor.

THE COURT: And, Ms. Louie, I will ask you to go down to seat number two please, same seats that you were in relation to each other before.

That would mean the challenge is back with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like the Court to thank and

excuse Juror Number 2, Ms. Louie.

THE COURT: Thank you, Ms. Louie.

MR. STECKLER: The Defense passes jointly, Your Honor.

THE COURT: All right.

MR. STECKLER: Can we just have a moment?

(Discussion off the record between both defense counsel)

MR. STECKLER: Defense passes.

THE COURT: Hang on. It would seem to me that after the People have exercised that there's a joint passed, you've exercised one, he's exercised one, I am thinking maybe we should be going back and forth between the two of you.

MR. STECKLER: Okay.

THE COURT: So it should be Mr. Bryden's challenge before yours so you don't have to use up all of your individuals before he uses any of his individuals. So go to Mr. Bryden's first.

MR. BRYDEN: And, Your Honor, Mr. Poston would like to thank Ms. McCorkindale for her service to the community and ask that the Court excuse her.

THE COURT: Thank you for your service, Ms. McCorkindale.

MS. MCCORKINDALE: Thank you.

THE COURT: All right. I will ask the clerk to call four more names.

THE CLERK: Win Thant M-a-u-n-g. Please take seat

number 10 in the front row please.

Darrold Dwayne P-o-n-c-e. Please take alternate seat number one in the back row.

Robyn J-a-g-u-s-t. Please take alternate seat number two.

And Diane R-a-c-h-e-l, alternate seat number three please.

THE COURT: Good afternoon.

Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good afternoon, ladies and gentlemen.

Mr. Maung and Mr. Ponce, or Ponce.

MR. PONCE: Either one.

MS. PETTIGREW: Which do you prefer?

MR. PONCE: Ponce.

MS. PETTIGREW: Ponce. Good afternoon.

Since you weren't with us yesterday, I may repeat just a few of my questions that I had yesterday just to kind of catch you up, I guess. But you've seen a little bit here in terms of the questioning and how this is going.

Mr. Maung, since you have the microphone I will start with you. Do you have any personal or religious beliefs that make it difficult for you to sit in judgment of somebody?

MR. MAUNG: Um, I don't think so.

MS. PETTIGREW: Okay.

MR. MAUNG: No.

MS. PETTIGREW: So throughout the trial I will call witnesses, we'll present evidence. At the end of the trial I am going to be asking you to convict these two men of murder and various other charges. Do you think you would have any difficulty doing that if I prove the case beyond a reasonable doubt?

MR. MAUNG: Um, that's going to be kind of like -- I don't know. Going to be hard for me. I'm a Buddhist, so I am -- in terms of the Buddhist, I don't want anybody life and death to take a responsible because of me.

MS. PETTIGREW: Okay.

MR. MAUNG: You know, so it's kind of like hard for me.

MS. PETTIGREW: And does that go back to your religious beliefs?

MR. MAUNG: Yeah.

MS. PETTIGREW: So are you saying that if I prove the case beyond a reasonable doubt you would still have difficulty in finding them guilty of murder?

MR. MAUNG: Yes.

MS. PETTIGREW: Okay. Thank you.

Mr. Ponce, same question to you. You know we're going to present evidence and witnesses and at the end, you know -- I mean, this is a murder case. It's serious, serious issues. But I am going to ask you to convict them of murder. Do you think you would have any difficulty with that?

MR. PONCE: No, ma'am.

MS. PETTIGREW: Okay.

I gave a couple of examples yesterday about some laws, some things that we didn't talk about in the questionnaire. And have you ever heard of the game of chicken?

MR. PONCE: Yes, ma'am.

MS. PETTIGREW: Where two cars drive at each other and the object of the game is one veers off and that one is the loser --

MR. PONCE: Right.

MS. PETTIGREW: -- of the game.

Assume a situation -- forget winning and losing -- but if one person in this game veers off and kills somebody, the law says both of those people have engaged in dangerous and deadly behavior, knowing that it's dangerous and a death has occurred, both of those driver's regardless of which one actually killed the person can be held responsible for murder. Do you agree with that?

MR. PONCE: Yes, ma'am.

MS. PETTIGREW: Any problem following that?

MR. PONCE: No, ma'am.

MS. PETTIGREW: Another example that I gave yesterday was there's a doctrine in the law called provocative act, and I gave the example -- did you see The Bodyguard, the movie The Bodyguard, with Kevin Costner and Whitney Houston?

MR. PONCE: Yes, ma'am.

MS. PETTIGREW: At the end of the movie the

assassin in the woods, gun trained on Whitney Houston, here comes Kevin Costner to the rescue, shoots the assassin, and all's well that ends well in Hollywood. But assuming for a moment he misses the assassin and kills that innocent person, the law says that assassin can be held responsible because he created the dangerous situation that caused the death of the innocent person. Do you have any problem with that?

MR. PONCE: No, ma'am.

MS. PETTIGREW; Okay.

There was a question in the questionnaire, and a lot of people left this blank, which is what is your opinion on the effectiveness of the criminal justice system. Do you have any opinion at all? I know some of these questions were kind of sprung on you at the moment, but have you had a chance to think about it at all.

MR. PONCE: Well, I do believe in the justice system, but there has been cases in which I have been involved with, or I know somebody that's been involved with, where it didn't come out so well for them.

MS. PETTIGREW: Okay.

MR. PONCE: I don't think it's as well, but I do believe in it and that's why I am here today.

MS. PETTIGREW: Okay.

In the cases that you're talking about, are those cases that are personal to you or cases that maybe you followed in the --

MR. PONCE: Personal. Personal.

MS. PETTIGREW: Okay.
And would you be comfortable talking about that at all?
MR. PONCE: Well, I had a relative that was jumped and money was taken. They were actually hurt permanently from a blow to the head.
MS. PETTIGREW: Oh.
MR. PONCE: So, you know, they never really caught the person that did it.
MS. PETTIGREW: Okay.
MR. PONCE: So, you know, I can't judge who or, you know -- who it was.
MS. PETTIGREW: So it wasn't a situation that got into court and then didn't resolve properly?
MR. PONCE: No, no.
MS. PETTIGREW: It was a situation where no one was caught?
MR. PONCE: No one was ever caught.
MS. PETTIGREW: Do you think that that experience might have any impact on your ability to come in, listen to evidence, and render a verdict in a case like this?
MR. PONCE: No.
MS. PETTIGREW: Okay.
And there are a lot of questions -- questions about self-defense in the square and you left most of those blank. Have you had a chance to think about any of those? I know --
MR. PONCE: Not really --

MS. PETTIGREW: -- it's been the holiday, so I wouldn't expect you to be thinking about it.

MR. PONCE: That's why I wasn't here yesterday.

MS. PETTIGREW: Okay. I will leave that. I am sure the defense attorneys have some questions about that.

MR. PONCE: Okay.

MS. PETTIGREW: Thank you.

Ms. Jagust.

MS. JAGUST: Jagust.

MS. PETTIGREW: Jagust. I apologize.

How are you?

MS. JAGUST: Fine, thank you.

MS. PETTIGREW: Good.

If you sat -- you sat as a juror on an attempted murder case?

MS. JAGUST: Yes, I did.

MS. PETTIGREW: How long ago was that?

MS. JAGUST: 30 years.

MS. PETTIGREW: Oh, a long time ago.

MS. JAGUST: Yes.

MS. PETTIGREW: You reached a verdict?

MS. JAGUST: Yes.

MS. PETTIGREW: Tell me what you thought about that process. Was it anything particularly good, particularly bad?

MS. JAGUST: Um, it lasted a week. It was a bit of learning experience. I learned more about the court system and things, even though I worked in the court

system previously for one year when I was first out of college. We agreed that the defendant was guilty, but we had questions about it just because we were instructed -- we got all the instructions, but the defendant never went on the witness stand and they did not introduce the gun, so we were curious why, but we weren't told.

MS. PETTIGREW: Okay.

You heard a couple of questions of various people that that's the law.

MS. JAGUST: Right.

MS. PETTIGREW: Do you think that you -- I mean, can you set that aside --

MS. JAGUST: Of course.

MS. PETTIGREW: -- and not let it come into your deliberations?

MS. JAGUST: Yes.

MS. PETTIGREW: Okay.

One of the self-defense questions you said, quote, "I think a person should realize that if they use force against someone the other may use force back." And there have been a couple questions particularly at the end of the day yesterday. Do you understand it has to be reasonable force?

MS. JAGUST: Yes.

MS. PETTIGREW: Proportional force?

MS. JAGUST: Yes.

MS. PETTIGREW: Do you think that if someone gets punched they should be able to use deadly force in

response?

MS. JAGUST: If they got punched?

MS. PETTIGREW: Yes.

MS. JAGUST: If it was a punch trying to kill them maybe. But if it's just a punch in the arm or something like get out of my way -- but I don't know if you can punch someone in the head or something and kill them. So if someone was trying to kill you, then I guess you could use force back.

MS. PETTIGREW: Okay. Thank you.

Ms. -- is it Rachel or Rachel?

MS. RACHEL: Rachel.

MS. PETTIGREW: Rachel.

Good afternoon.

MS. RACHEL: Hi.

MS. PETTIGREW: You have a fun job.

MS. RACHEL: Yeah, I do.

MS. PETTIGREW: Teaching acting or actually acting?

MS. RACHEL: Both. I perform and I teach improvisation.

MS. PETTIGREW: Okay. That's great.

I have a question for you 'cause it's kind of the last catch-all question of the questionnaire was, you know, can you think of any reason why you can't be fair? And you mentioned the fact that if these two were carrying guns and shouldn't have been in the first place that you might have some negative feelings.

MS. RACHEL: Oh, yeah. I don't think that -- after listening to everybody the last couple days, I don't think that would interfere with me being able to be fair.

MS. PETTIGREW: Okay.

MS. RACHEL: So I think, you know, just I might have an attitude that they shouldn't have been carrying guns if they weren't supposed to, but I could be fair.

MS. PETTIGREW: Thank you.

THE COURT: Thank you, Ms. Pettigrew.

Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

So here's what I propose for the next three minutes. I will sit there and you stand here and you improv for the defense attorney asking voir dire questions.

MS. RACHEL: Okay.

MR. STECKLER: Bet you could do it. Bet you could do a better job than I could, maybe.

She didn't deny it. I wouldn't either.

So moving on from that. So just to nail down that last point about what Ms. Pettigrew was asking you about, guns and these men --

MS. RACHEL: Mm-hm.

MR. STECKLER: -- because you did indicate you wouldn't look too kindly on them. I guess this gets back to the question I asked several times yesterday of some other people.

MS. RACHEL: Mm-hm.

MR. STECKLER: Can you separate out the question of proof on the charges of murder and attempted murder from felon in possession of a gun?

MS. RACHEL: Of course, yes.

MR. STECKLER: Keep those separate?

MS. RACHEL: Mm-hm.

MR. STECKLER: On self-defense, one of the things you indicated there was -- and you honed in on the word reasonable. First of all, as a juror, would you be comfortable in trying to lend or give definition to the meaning reasonable given the set of facts that you will hear?

MS. RACHEL: Yeah. Yeah, of course. Yeah, I don't know if I could do it right now because I am assuming we'll go into that really deep if we're chosen.

MR. STECKLER: Right.

MS. RACHEL: But, yeah, I am completely confident that once I hear everything I will be able to do it.

MR. STECKLER: I am sure you can. My follow-up question is another part of your answer is you said it would be tricky to prove.

MS. RACHEL: Yeah.

MR. STECKLER: And I just want to follow-up on that language --

MS. RACHEL: Mm-hm.

MR. STECKLER: -- just to make sure, that the Defense does not need to prove anything --

MS. RACHEL: Right.

MR. STECKLER: -- about the self-defense, but that the Prosecution needs to prove that it wasn't.

MS. RACHEL: I think when I answered the question I was thinking the scenario where two people were alone and something happened and one person said it was self-defense, and I was thinking that area would be hard to prove; that's all.

MR. STECKLER: Mm-hm. Okay. Hard for which side? Did you have a side in mind when you said that?

MS. RACHEL: Oh, I would say if someone said I killed that person because it was self-defense, that would be difficult to prove.

MR. STECKLER: Mm-hm. Okay.

MS. RACHEL: That's it. I understand the law now, but that was my thought process right then --

MR. STECKLER: At the time --

MS. RACHEL: Yeah.

MS. STECKLER: Okay.

And the -- unfortunately, you had a, I guess a friend's boyfriend who was the victim of a crime?

MS. RACHEL: Mm-hm.

MR. STECKLER: And that crime involved a gun?

MS. RACHEL: Mm-hm.

MR. STECKLER: Are you able to keep that incident separate --

MS. RACHEL: Yeah.

MS. STECKLER: -- from this trial if you were to

be a juror?

MS. RACHEL: Of course.

MR. STECKLER: Thank you.

If you could pass the microphone over one?

Ms. Jagust.

MS. JAGUST: Jagust.

MR. STECKLER: She clarified if I was paying attention.

MR. JAGUST: That's okay.

MR. STECKLER: I know that. Sorry.

Can you tell me just generally what you did as a juvenile probation aid? What does that entail?

MS. JAGUST: Um, I was given a caseload. I would go to court with the probationer when they were arraigned. I was assigned to do the case history. So I would interview the student. I'd interview the family. I'd interview the teachers. I'd write up a report, present it to the judge. And then if the child was put on probation, then they would see me, or I would visit them at their home if they were -- or if they were held in custody, I might visit them at jail, or they would come to me.

MR. STECKLER: Okay.

And did you work in conjunction with the -- a defense attorney at all or --

MS. JAGUST: I met attorneys. I was supervised by the head probation officer, but I met a number of attorneys.

MR. STECKLER: How long did you do that job for?

MS. JAGUST: One year. It was a training job. It was in the CETA job, Comprehensive Education Training Act.

MR. STECKLER: Okay.

Did you enjoy it?

MS. JAGUST: Very much so.

MR. STECKLER: Following up on your prior jury service, it's still unclear to me what question you, as a juror, had about the fact in that case that the defendant didn't testify. Was that something that came up that you raised, that somebody brought up?

MS. JAGUST: No. I'd never been in a courtroom before, and this was before a lot of these Law and Order shows. I just thought that everyone got up on the stand and testified. And it was a teenager. This was a teenage drug war in San Francisco. And it was attempted murder with a gun. And we were never shown the gun, although we were shown the bullet wounds. And the defendant never testified. So we just thought, oh, I wonder why he didn't testify.

MR. STECKLER: And that came up in deliberations?

MS. JAGUST: It might have. This is 30 years ago. But I -- that's what I remember, that the defendant did not testify.

MR. STECKLER: Do you remember -- I mean, it's possible you remember because the judge --

MS. JAGUST: It could be --

MR. STECKLER: Sorry. Go ahead.

MS. JAGUST: No. We talked about that and some people were asked that sometimes a defendant doesn't testify and we should not assume the reason.

MR. STECKLER: Okay.

And you can follow that instruction --

MS. JAGUST: Yes, I can.

MR. STECKLER: -- because we're post all the cop shows and --

MS. JAGUST: I am sorry. Yes.

THE COURT: Can I interrupt again? You two keep talking over each other and maybe our --

MS. JAGUST: I am sorry.

THE COURT: No, that's okay. It's easier for the court reporter to get everybody's questions and answers. That's the case.

MR. STECKLER: Do you think you could apply the self-defense instructions as a juror?

MS. JAGUST: Yes.

MR. STECKLER: Okay. All right.

I think I have asked you enough questions. Thank you very much.

Good afternoon.

MR. PONCE: Hi.

THE COURT: You have three minutes, Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

What are your thoughts on self-defense?

MR. PONCE: If I am -- my personal self, if I am

attacked I would protect myself anywhere, means -- anyhow, anywhere. Now I am just saying my hand, my feet. I would not have a gun 'cause I don't like guns.

MR. STECKLER: Right.

MR. PONCE: But usually just saying self-defense, if that's the only way it happens, then that's the way it happens. If a gun comes out, then I back off; I would back off.

MR. STECKLER: Because you wouldn't have a gun?

MR. PONCE: No. It's just that I know that I would have no way of beating somebody with a gun.

MR. STECKLER: Right. Okay.

Can you follow -- I have asked others about the law that says if, you know, you start a fight with your hands -- and Ms. Pettigrew was asking about this too -- if you start a fight with your hands and the other person uses deadly force, say a gun, you can then use deadly force. Do you agree with that law?

MR. PONCE: Yes.

MR. STECKLER: Can you apply that law in this case?

MR. PONCE: Sure.

MR. STECKLER: Firearms, you said, are bad news?

MR. PONCE: Yes.

MR. STECKLER: You just don't believe in them?

MR. PONCE: No.

MR. STECKLER: Can you separate out the fact that someone owns and possesses a firearm from the question of

whether they committed murder or not?

MR. PONCE: Sure.

MR. STECKLER: Can you keep those separate?

MR. PONCE: Sure.

MR. STECKLER: Okay.

Can you hold the prosecutor to her burden of proof?

MR. PONCE: Sure.

MR. STECKLER: If she proves the case to you that they're probably guilty, say to this level of proof, but beyond a reasonable doubt is up here, so it doesn't reach beyond a reasonable doubt, how would you vote? (indicating)

MR. PONCE: Not guilty.

MR. STECKLER: Thank you very much, sir.

If you could pass the microphone forward to Mr. Maung down here?

You indicated -- I think I have about 15 seconds -- something about possible, I don't know if it's bias, but not understanding culture and language. And I am wondering that you meant by that, culture and social --

MR. MAUNG: Um, I am a very strong religion person, and the culture me is like -- I am immigrant here about 10 years ago. I still learning that, you know, that maybe African-American and Caucasian, they have their different culture --

MR. STECKLER: Right.

MS. MAUNG; And they have their own language that

they speak, and I am still trying to learn it, so that's my meaning.

MR. STECKLER: Just understanding the language or ways of speaking?

MR. MAUNG: Yeah.

MR. STECKLER: But are you -- are you biased against -- do you think that you could be fair in a trial where the defendants are African-American?

MR. MAUNG: Oh, yeah.

MR. STECKLER: Okay.

MR. MAUNG: I would be, yeah. But --

MR. STECKLER: Finally, I just -- both your parents were advocates; they were lawyers?

MR. MAUNG: Yeah, my father and mother's a lawyer.

MR. STECKLER: What kinds of law?

MR. MAUNG: Civil, criminal.

MR. STECKLER: What's that?

MR. MAUNG: Civil.

MR. STECKLER: And criminal?

MR. MAUNG: And criminal.

MR. STECKLER: Where?

MR. MAUNG: In Burma. I came from Burma, so I am Burmese.

MR. STECKLER: Criminal law, were they prosecutors or defense attorneys?

MR. MAUNG: Defense.

MR. STECKLER: Both of them?

MR. MAUNG: Both of them, yeah.

MR. STECKLER: Okay.

Anything about that in relationship with your parents that maybe gives one side or the other an advantage or disadvantage?

MR. MAUNG: It's -- no, nothing to do with my parents. My religion is a strong religion. I don't want, you know, it's that somebody that going to have like a big punishment because of me, you know, even though this is a right and wrong, and I don't want carry that burden to the next life. You know, that's our -- our Buddhist belief, so.

MR. STECKLER: I understand.

MR. MAUNG: Yeah.

MR. STECKLER: Okay. Thank you very much, sir.

MR. MAUNG: You're welcome.

THE COURT: Before Mr. Bryden gets up there, let me ask you a question. If the Court asks you to say is something true or not true so then the Court can make a decision on whatever happens after that, so you're not asked to judge a person in their character; you're -- a juror is asked to decide are certain facts true or not true. They -- the Government in the United States accuses people of crimes and then the question is do they have enough evidence to prove that they committed those crimes. And the juror's asked to say, yes, there was enough evidence, or, no, there wasn't enough evidence to prove that beyond a reasonable doubt. So, in essence, the

judgment is to say whether or not the Government proved their case. Does that make a difference in your Buddhist belief, do you think?

MR. MAUNG: Um, it's -- it's my -- it's my -- my belief is -- is whether it is true or not, if you -- because I am not saying that they are -- they are going to the -- I mean, forgive me, if this is a death penalty --

THE COURT: This is not a death penalty.

MR. MAUNG: I don't know.

THE COURT: Maybe you weren't here yesterday, so we said it's not a death penalty.

MR. MAUNG; So if -- that make me feel better, a lot feel better. Yeah, so -- I agree with the courts, and I agree with the judge, and I agree with the law. I only stand on the right and wrong. I know which one's right and which one's wrong. I know how to differentiate between these two as long as my decision don't hurt somebody that it -- that didn't committed the crime or he's not on the wrong side because of my position, that's all my point would be is.

THE COURT: Okay. Thank you.

MR. MAUNG: I don't want that decision make.

THE COURT: All right.

Mr. Bryden.

MR. BRYDEN: Oh, thank you, Your Honor.

Good afternoon, Mr. Maung.

I got to admit I made a big mistake 'cause you didn't show up yesterday and I misplaced your

questionnaire, so you're a bit of a mystery.

THE COURT: Hang on. You can take --

MR. BRYDEN: I am not going to absorb it all. I make notes, but I appreciate that.

Thank you, Your Honor.

THE COURT: Sure.

MR. BRYDEN: So Burma's Myanmar now?

MR. MAUNG: Myanmar.

MR. BRYDEN: Are you following the political changes there?

MR. MAUNG: Yeah, pretty much.

MR. BRYDEN: And your folks are still back there practicing law?

MR. MAUNG: My mom retired. Yeah, she retired. I'd say about -- since my dad passed away.

MR. BRYDEN: Mm-hm.

MR. MAUNG: When I get here, United States, only two weeks my dad passed away. So since then my mom -- I don't even get a chance to go see my dad.

MR. BRYDEN: Does your mom support the new democracy there?

MR. MAUNG: Yeah.

MR. BRYDEN: Or did she prefer the Hunica (phonetic)?

MR. MAUNG: Oh, yeah, the democracy.

MR. BRYDEN: Now that you know, sir, that this isn't a death penalty case, do you think that you would be able to be an unbiased, fair, impartial juror?

MR. MAUNG: I can do that.
MR. BRYDEN: Yeah?
MR. MAUNG: Yeah.
MR. BRYDEN: And I am -- you know, obviously you're an intelligent person. And I forget what you wrote in your questionnaire. Are you comfortable with reading English?
MR. MAUNG: Yeah.
MR. BRYDEN: What's the language in Myanmar?
MR. MAUNG: Burmese.
MR. BRYDEN: Burmese?
MR. MAUNG: They call it Myanmar.
MR. BRYDEN: So you have heard of other Buddhists serving on juries?
MR. MAUNG: Yes.
MR. BRYDEN: They fully participated?
MR. MAUNG: It's a different belief. How they believe and how I believe are different, even though it's the same Buddhist.
MR. BRYDEN: You have a slightly different take on Buddhism?
MR. MAUNG: It's not very -- it's not totally different. Chinese call it Chinese Buddhist; Myanmar call it Myanmar Buddhist; and Vietnam, it's a different Buddhist. They are similar, but different each other, yeah.
MR. BRYDEN: Mr. Ponce, you weren't here yesterday either, but it is -- it was pointed out by Ms. Pettigrew

you didn't answer any of the self-defense questions, and Mr. Steckler brought it out that, well, you probably would never use a gun in self-defense. You believe in self-defense, but up to a point, right? So are you saying to defend yourself you never can use deadly force?

MR. PONCE: Not with a gun.

MR. BRYDEN: Never with a gun?

MR. PONCE: Never with a gun.

MR. BRYDEN: So, because of that, if there were facts that were brought to your attention where there were two armed men involved, and both of them to some degree claiming self-defense against the other, then you could not possibly see a situation where that's possible, no matter what the judge reads you in terms of the law; is that right?

MR. PONCE: As being self-defense?

MR. BRYDEN: Yeah, 'cause guns are involved.

MR. PONCE: Well, that's up to the individual, I would think. I don't have -- what I think about it is not what they think about it. I mean, they had the guns, not me.

MR. BRYDEN: So it's not you?

MR. PONCE: Right.

MR. BRYDEN: But would you then say somebody else has the right to arm themselves against an armed person?

MR. PONCE: No.

MR. BRYDEN: No?

MR. PONCE: No.

MR. BRYDEN: You never see somebody having the right to use a gun, not you, somebody else?

MR. PONCE: Not me -- somebody else, yeah. If that's what they want, that's what they want.

MR. BRYDEN: Well, what if it's the law that they could do that?

MR. PONCE: Well, it's not the law, so.

MR. BRYDEN: It's not the law.

What if the judge instructed you you have -- in certain circumstances if you reasonably needed to use deadly force you could use deadly force to protect yourself? If he said that was the law, would you say, no, I can't follow that because it's a gun?

MR. PONCE: No. If it's the law, I could do it.

MR. BRYDEN: I think I see what you're saying. But, personally, you're sort of biased against anybody who sort of uses a gun, then comes along later and says, oh, it's self-defense?

MR. PONCE: Yeah.

MR. BRYDEN: Because of that, you wouldn't be a fair, impartial -- you weren't here yesterday. There is a lot of self-defense issues, and it involves a gun, involves two guns. You are going to have evidence about two guys being armed. Do you think in that situation you could segregate yourself from your personal beliefs and follow the law, or is that the sort of case where -- and this is the time to be frank with me -- you would say I can't be impartial because I believe nobody can use guns

to defend themself?

MR. PONCE: Right, I don't think they should be able.

MR. BRYDEN: Okay.

And because of that you have a bias in this sort of case that involves guns and self-defense?

MR. PONCE: Any case that involves -- in any case, that's fine.

MR. BRYDEN: Okay. I appreciate that.

Ms. Jagust, you served the community as a drug counselor; is that correct?

MS. JAGUST: Yes.

MR. BRYDEN: Yeah.

So, obviously, you see people whose lives have been fairly ruined by the use of addictive substances?

MS. JAGUST: Oh, most of the -- when I was a drug counselor, it was with teenagers, and it was kind of prescription drugs. So I didn't see -- it was short-term. But I've seen drugs hurt other people's lives.

MR. BRYDEN: But the teenagers haven't been hooked on that stuff to have it ruined, in your opinion?

MS. JAGUST: Well, we were a short-term drug treatment center, and once they were -- went to court and were sentenced then I didn't see them after that.

MR. BRYDEN: Okay. There's going to be some evidence -- this is what concerns me, why I brought it up in this trial -- about my client, Donel Poston, has a past conviction, maybe even more, for possession of drugs for

sale. Is that the kind of information that would cause an emotional reaction in you such that you wouldn't be able to follow the law of self-defense in this case, which is about murder and not about drugs?

MS. JAGUST: I can follow -- follow the law.

MR. BRYDEN: Okay. That's not going to -- that kind of information is not going to shock you or --

MS. JAGUST: No.

MR. BRYDEN: I appreciate that.

And then we have Ms. Rachel. I really don't -- have you been on stage in the area?

MS. RACHEL: Yeah. Don't feel like announcing it right here, but --

MR. BRYDEN: Okay.

I was going to give you a chance to plug your next show.

MS. RACHEL: No, that's all right.

MR. BRYDEN: Thank you. I appreciate it.

THE COURT: Thank you, Mr. Bryden.

Mr. Ponce, I got a question for you. When I was listening to your answers, it sounded like initially you said you'd never touch a gun, even in self-defense, you'd kind of back away when there was a gun involved. Then you kind of came around a little later to say you didn't think you could be fair. We kind of did a little thing, maybe it was earlier on. Did you hear the kind of the synopsis I gave on the first day of the trial?

MR. PONCE: I don't recall.

THE COURT: That there's a gas station and two people have guns --

MR. PONCE: Ah, yes.

THE COURT: So are you saying that you can't be fair in that kind of a case, or you can't be fair when anybody has a gun, or you don't think a gun's for you? I wasn't sure what you were getting at.

MR. PONCE: They shouldn't be for anybody.

THE COURT: Okay.

MR. PONCE: I mean, I don't know the scenario, whatever happened with these gentlemen --

THE COURT: Okay.

MR. PONCE: -- that caused them to have this beef between each other.

THE COURT: Sure. Nobody knows. We haven't had a trial.

MR. PONCE: But to use a gun, you know, it's -- you know, it shouldn't be right.

THE COURT: Okay.

So let me ask you this, though. If everybody out here said, well, I don't like guns, then if you used a gun and everybody said that, could we ever get a jury of people to try cases if nobody likes guns anymore?

MR. PONCE: No.

THE COURT: No.

So the question is can you put aside your feelings, not liking guns, so that, you know, if you think you can then you can be a fair juror, then we can consider

you as a juror. If you say, no, I could never be fair if a case involves a gun because I am so outraged by guns, then we're in a different situation. But you kind of see the quandary we're in here?

MR. PONCE: I understand.

THE COURT: We like to get people that think -- kind of a lot of people here said, you know, there's things that they have in their lives have gone on. Doesn't sound like you got a problem with guns. You just don't like them. You haven't been a victim of gun violence or anything?

MR. PONCE: No.

THE COURT: So what's your answer to the question?

MR. PONCE: I would probably be fair.

THE COURT: At a trial?

MR. PONCE: At a trial.

THE COURT: And the fact that there is guns involved --

MR. PONCE: And put my feelings aside.

THE COURT: Okay. And consider all the evidence together?

MR. PONCE: Considering all the evidence throughout the whole trial.

THE COURT: Could you listen to the deliberations of all the jurors?

MR. PONCE: Sure.

THE COURT: Take all their considerations in before you form your final opinion?

MR. PONCE: Sure.

THE COURT: All right. Thank you, sir.

Does anybody want to approach?

MR. BRYDEN: Yes, if we may.

THE COURT: Okay.

(Counsel approach the bench; discussion off the record)

THE COURT: We're back to the People, as I look at my notes. Is that correct? All right. It's the People's challenge, Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to thank and ask the Court to excuse Juror Number 10, Mr. Maung.

THE COURT: Thank you, Mr. Maung.

Mr. Ponce, I will ask you to take up the seat in the front row please.

MR. BRYDEN: Your Honor, I believe we don't have a joint and we're going to pass.

MR. STECKLER: That's correct.

THE COURT: So it's a joint pass.

And then the last challenge was by Mr. Poston, so it's yours, Mr. McNeely.

MR. STECKLER: We pass.

THE COURT: As an individual and a joint?

MR. STECKLER: Yes.

THE COURT: Okay.

THE COURT: Then it goes to Mr. Poston.

MR. BRYDEN: Your Honor, Mr. Poston and I would

ask the Court to thank Mr. Ponce for his service and excuse him today.

THE COURT: All right.

Mr. Ponce, thank you for your service. You will be excused.

And, Ms. Jagust, I will ask you to go down to seat number 10 please.

Ms. Pettigrew.

MS. PETTIGREW: It's a hot seat. The People would like to thank and ask the Court to excuse Juror Number 10, Ms. Jagust.

THE COURT: Thank you, Ms. Jagust.

And, Ms. Rachel, I will ask you to take seat number 10.

MR. STECKLER: So jointly we pass.

THE COURT: Okay.

So now I think we're going to McNeely as the next individual challenge.

MR. STECKLER: The Defense would like to thank and ask the Court to excuse Mr. Zentner, number 12.

THE COURT: Thank you, Mr. Zentner, for your service.

MR. ZENTNER: Thank you.

THE COURT: Ladies and gentlemen, we're going to take our afternoon recess and keep you all in suspense as to knowing who is the next four people that are going to come up here.

Please don't discuss the case among yourselves or

with anyone else until the case is finally submitted to you.

And we'll see you at, try to reconvene at 3:15. Okay?

(Recess taken)

THE COURT: Mr. Zentner's been excused, right?

THE CLERK: Yes, Your Honor.

THE COURT: All right.

I am going ask the clerk to call the next four names please.

THE CLERK: Diosdado D-e-L-u-n-a. Please take seat number 12 in the front row.

Michael B-a-r-r-e-t-t, alternate seat number one in the back row.

(Juror No. 12), alternate seat number two please.

And (Juror No. 7), alternate seat number three please.

THE COURT: Good afternoon.

Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good afternoon.

Mr. De Luna, good afternoon. I will start with you.

Have you been able to hear everything that we've been talking about as you sat in the back?

MR. DE LUNA: Yes, ma'am.

MS. PETTIGREW: Did any of the questions that we've asked in the last couple of days raise a thought in

your mind?
MR. DE LUNA: No.
MS. PETTIGREW: Okay.
You -- did you hear the examples that I gave?
MR. DE LUNA: Yes, I did.
MS. PETTIGREW: Okay.
And do you agree that under those circumstances those people can be held responsible for murder?
MR. DE LUNA: Yes.
MS. PETTIGREW: Okay.
Do you have any thought that you can't be a fair and impartial juror?
MR. DE LUNA: No.
MS. PETTIGREW: Okay. Thank you, sir.
If you could pass the microphone back to Mr. Barrett?
MR. BARRETT: Hi.
MS. PETTIGREW: Good afternoon. You kind of have family on both sides of the criminal justice system. Grew up with a dad as a Public Defender?
MR. BARRETT: Mm-hm.
MS. PETTIGREW: Was that locally or --
MR. BARRETT: State of Washington.
MS. PETTIGREW: And your aunt actually worked in my office?
MR. BARRETT: Yes.
MS. PETTIGREW: Does that put you right in the middle, or do you have any sort of leanings one way or the

other?

MR. BARRETT: It doesn't factor in. Thanksgiving's fun, but that's about it.

MS. PETTIGREW: I can imagine.

One answer to the kind of catch-all question about the criminal justice system, you -- you said that it has the overall -- or overall the appearance of justice happens more often than not. What do you mean by that?

MR. BARRETT: Um, especially in the town where I grew up in Washington, you get a lot of pleas; everyone just kind of moves through the system. It's not -- things generally work, but you see people that fall through the cracks on both sides.

MS. PETTIGREW: So do you think that's justice?

MR. BARRETT: I think it's the closest approximation we can come up with.

MS. PETTIGREW: All right.

And you've also sat and listened for two days now to all of our questions. What do you think about your ability to be a juror in a case like this?

MR. BARRETT: Um, don't have any explicit problems with it.

MS. PETTIGREW: Okay.

Any implicit problems?

MR. BARRETT: No. Um, the -- um -- this will probably more come up with the defense attorneys, but the idea behind intent and reasonable doubt, both seem, especially in the legal possession of a firearm as it

relates to murder or attempted murder, is kind of a problematic issue for me.

MS. PETTIGREW: Okay.

Thinking that I can't establish the burden, or you think that just the fact that they had guns means they intended to use them, or --

MR. BARRETT: Yeah.

MS. PETTIGREW: Okay.

MR. BARRETT: I see, you know, a kind of slippery slope gateway drug scenario there.

MS. PETTIGREW: Interesting. I will let them follow up on that.

Maybe you could pass the microphone to (Juror No. 12)?

Good afternoon.

JUROR NO. 12: Good afternoon.

You were in the Navy for a long time?

JUROR NO. 12: Yes, 22 years.

MS. PETTIGREW: And retired from there?

JUROR NO. 12: Yes.

MS. PETTIGREW: Your answer on the criminal justice system was, "Like all programs, it needs work, but overall it's great."

JUROR NO. 12: Yes.

MS. PETTIGREW: Do you come to that conclusion based on your family that's in law enforcement, or any personal experiences, or just things you follow in the news, or kind of all of the above?

JUROR NO. 12: Basically, all of the above. Just life experience. You know, you tend to hear and see things that as you grow up, teach you more about your judicial system. So, basically, life experiences.

MS. PETTIGREW: Okay.

There was a question about anyone you know having used a gun in a deadly or dangerous manner. And I think you said your brother and brother-in-law. Is that in their role as officers?

JUROR NO. 12: Yes.

MS. PETTIGREW: Do you have any strong feelings about firearms or the things we've been talking about that make you think maybe this isn't the case for you or --

JUROR NO. 12: No. I own firearms and I have been trained through the military through the use of firearms.

MS. PETTIGREW: Okay.

And the examples that I gave yesterday, as corny as they might be 'cause they are from movies, do you have any strong feelings one way or the other, the provocative act doctrine and the assassin being held responsible for creating that deadly situation?

JUROR NO. 12: No.

MS. PETTIGREW: And my favorite chicken example?

JUROR NO. 12: No, I have no problem with it.

MS. PETTIGREW: And you can follow the law?

JUROR NO. 12: Yes, I can.

MS. PETTIGREW: Thank you.

If you could pass the microphone to (Juror No. 7)? Good afternoon.

JUROR NO. 7: Hi. It's (Juror No. 7), actually.

MS. PETTIGREW: Sorry.

JUROR NO. 7: That's okay. It usually comes out (Juror No. 7).

MS. PETTIGREW: I said yesterday I hate it when people mispronounce mine.

You have been a juror actually three times?

JUROR NO. 7: Actually, more than that, but you only have three spots.

MS. PETTIGREW: How many times?

JUROR NO. 7: I am guessing four or five throughout my adult.

MS. PETTIGREW: Like I said yesterday, once you are in we like to keep you coming back.

Did they all reach a verdict?

JUROR NO. 7: You know, I was thinking about that today, and I am thinking that the last case that I was would be the domestic abuse case. I believe they settled before we actually had to remain together and look at the testimony.

MS. PETTIGREW: Okay.

But in terms of all of the cases where you actually sat as a juror and deliberated, there was a verdict in all those cases?

JUROR NO. 7: Yes.

MS. PETTIGREW: And how do you feel about being

here for the fifth or sixth time?

JUROR NO. 7: Um, you know, I believe in doing my civic duty, obviously, and I think about if for some reason I were, you know, in the position of someone in this courtroom I would want someone like me to, you know, be part of the process. So I believe in the process. It's not always convenient, but so it's interesting.

MS. PETTIGREW: Okay.

JUROR NO. 7: I can say that. And particularly a -- the capital murder trial that I was on was very interesting.

MS. PETTIGREW: Okay.

Anything about what we've been talking about over the last two days that you have a strong feeling about one way or the other?

JUROR NO. 7: No. This type of case is a different -- you know, we're talking about different laws and everything, but the same principles in terms of our jobs as jurors apply, so I don't really have, you know, anything that stands out.

MS. PETTIGREW: Great.

Thank you very much.

THE COURT: Thank you, Ms. Pettigrew.

Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

Good afternoon there --

JUROR NO. 7: Hi.

MR. STECKLER: -- (Juror No. 7).

Just think, for every day you parked, a dollar off. For all the juries you served on, just think how much money you saved.

JUROR NO. 7: It's not cheap parking. I took BART to Oakland, which kind of added up.

MR. STECKLER: Okay.

JUROR NO. 7: We won't even go into taking BART and trying to find a parking place and -- yeah.

MR. STECKLER: Okay.

You -- I guess I should ask why would you want you to be a juror if you were -- if you had a case.

JUROR NO. 7: That's a good question, I suppose. Um, I think because I believe that when given the instructions about what our responsibilities are according to the law that I can process those and put aside if I had strong personal feelings one way or the other, that those aren't to be taken into account. For my job, I am an analyst.

MR. STECKLER: Right.

JUROR NO. 7: So, you know, we need to search for information, evaluate that information, and not put our own personal biases upon that information. And so being able to sort of think in that analytical way, I think is helpful for probably both sides.

MR. STECKLER: Good. Good.

Um, and you've had a number of criminal cases so I would imagine you have a pretty solid idea of what proof beyond a reasonable doubt means.

JUROR NO. 7: Yes. And I appreciate -- after my experiences, I appreciate the efforts, you know, by the judges in all the cases that I have been on and the attorneys to explain our roles --

MR. STECKLER: Mm-hm.

JUROR NO. 7: -- because some of this is not easy. And we've talked about semantics and definitions, and I have been impressed on how well the instructions have been given and if we've had questions that, you know, we get good responses back in terms of interpretation of our instructions. Because the one thing I remember that impresses me is proof beyond a reasonable doubt is like real different, regardless of what you might think.

MR. STECKLER: Right.

JUROR NO. 7: Because -- but -- and the point that Your Honor made when we first came in, that everything's based upon what we're going to hear in this room and not what we know of outside of this room necessarily -- I mean, we all bring our experiences, but in terms of evidence that it's what we hear in this room.

MR. STECKLER: That all sounds good.

On the jury service that you didn't list, were you ever the foreperson?

JUROR NO. 7: No, I have never been the foreperson.

MR. STECKLER: And then finally, the main question you answered about self-defense you indicated that the third element, defendant used no more force than was

reasonably necessary, you said it was especially important, or you thought so. Do you remember that?

JUROR NO. 7: I don't exactly remember.

MR. STECKLER: Oh, okay.

JUROR NO. 7: I do remember when looking at that, you know, that the -- having not thought about self-defense before, you get kind of hit cold when you're sitting in there trying to complete a multiple-page --

MR. STECKLER: Right.

JUROR NO. 7: -- thing. But I guess maybe I meant the taking into account what that reasonable responsive force is is an important fact.

MR. STECKLER: Right.

JUROR NO. 7: That it shouldn't exceed the force that was applied.

MR. STECKLER: Yes, it does. It does make sense.

Thank you very much, ma'am.

If I could ask you to pass the microphone to -- Mr. -- (Juror No. 12)? Thank You.

Good afternoon, sir.

JUROR NO. 12: Good afternoon.

MR. STECKLER: Should I be concerned about, or Mr. McNeely have any concern about your relationship with your sister-in-law, or your brother, or your brother-in-law who work in law enforcement?

JUROR NO. 12: What do you mean by concerned?

MR. STECKLER: Well, concerned -- in other words, do you align yourself more with the Prosecution in a

criminal case because of those relationships?

JUROR NO. 12: I don't believe so, no.

MR. STECKLER: Okay.

And then you indicated that your brother-in-law was -- and your brother were involved in situations where guns were used in self-defense?

JUROR NO. 12: Yes.

MR. STECKLER: Anything about that situation that might carry over here; do you know?

JUROR NO. 12: Um, I don't believe so, 'cause I don't know their details.

MR. STECKLER: Okay.

JUROR NO. 12: They are not allowed to, you know, talk about it. Just when we have family dinners and everything, we just talk about whatever comes up.

MR. STECKLER: All right.

Are you comfortable setting that aside if there is any kind of information there and just focusing on the facts in this case? Would you be able to do that?

JUROR NO. 12: I believe I can, yes.

MR. STECKLER: Okay.

You did indicate that your personal beliefs might get in the way of your being able to follow the law.

JUROR NO. 12: Well, not follow the law.

MR. STECKLER: Or applied to instructions?

JUROR NO. 12: Well, my personal belief is basically on cause and effect. If things are not done in a certain way, then the outcome can always change.

MR. STECKLER: Right.

So what do you mean by that in relation to a trial, for example?

JUROR NO. 12: Well, in relation to -- well, if you have the -- well, you have the law that basically gives you your guidelines, this is what the law is.

MR. STECKLER: Right.

JUROR NO. 12: But you always have situations. Adrenaline can kick in, you don't know all the facts, things in that nature can change the outcome of anything. Even a simple argument can always be changed by a -- one word --

MR. STECKLER: Right.

JUROR NO. 12: -- or one action. So there's always a different cause and effect.

MR. STECKLER: Okay.

So you're talking about the facts that you might hear in this case?

JUROR NO. 12: Right.

MR. STECKLER: Right.

Thank you very much, sir.

If I can ask you to pass the microphone over to Mr. Barrett, is it?

MR. BARRETT: Yes.

MR. STECKLER: Okay.

So you basically telegraphed to me what I need to be talking to you about. What's problematic here potentially about guns?

MR. BARRETT: Um, not guns, per se, just the intent to legally -- illegally obtain and possess a firearm --

MR. STECKLER: Okay.

MR. BARRETT: -- to me, signifies a further intent to use it.

MR. STECKLER: Okay. That's the slippery slope you may be talking about. All right.

Well, then I guess I should ask you directly then. You know, you've got -- the judge will tell you you have to consider the charges separate. So let's just assume you decide and the facts are that someone is a felon in possession of a gun; that's decided. And then in a separate area you've got to decide whether he committed murder, and murder requires an act and intent or malice, a particular state of mind. Are you able to separate those two things, the gun possession and the murder?

MR. BARRETT: As two separate charges, yes.

MR. STECKLER: You are --

MR. BARRETT: But I also see a path for the Prosecution to almost entirely prove intent in that sense.

MR. STECKLER: Well, I mean, let's follow this. Let's take a hypothetical example. Let's say the prosecutor proves to you in a case that someone possessed a gun, they are a felon in possession of a gun. And let's say the facts were that five guys had -- each had sub-machine guns and were about to fire at that guy, and

so in response that guy took his gun and fired back to get away.

MR. BARRETT: Sure.

MR. STECKLER: What are you telling me?

MR. BARRETT: Setting aside the problematic nature of hypotheticals, I think that in that sense it seems reasonable, yes.

MR. STECKLER: Okay.

But I guess in your mind you're thinking on balance you would be more inclined to find maybe a malicious intent, an intent to commit murder, just because they had guns?

MR. BARRETT: Not explicitly murder, but yes.

MR. STECKLER: Okay.

What would your dad say about that? Just kidding. You don't have to answer that.

Okay. And then on self-defense, you indicated that -- on just the basic self-defense you said that actual and perceived threat are two different things in your view.

MR. BARRETT: Yes.

MR. STECKLER: Can you elaborate on that a little bit, what you meant?

MR. BARRETT: Sort of going off of his cause and effect. The -- the threat that I perceive might not necessarily be the threat that is there; so one potentially reaching for what looks like a weapon could be reaching for something completely different, a cell phone

possibly.

MR. STECKLER: All right.

MR. BARRETT: But that factors into intent more than anything else.

MR. STECKLER: Okay.

MR. BARRETT: So that, you know, omniscient perspective might see something completely different than someone who feels the action might be taken against them; the perception there is what takes precedence.

MR. STECKLER: That sounds right. I appreciate your answering my questions, sir.

If you can pass the microphone forward?

THE COURT: You have about a minute, Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

You indicated that because of your personal beliefs it might be hard to be fair and impartial.

MR. DE LUNA: Yes.

MR. STECKLER: Is that right?

MR. DE LUNA: Yes.

MR. STECKLER: What do you mean by that?

MR. DE LUNA: Because when carrying a gun, your intent to kill somebody --

MR. STECKLER: I am sorry?

MR. DE LUNA: By carrying the gun, your intent to kill somebody or use the gun to harm people.

MR. DE LUNA: So it sounds like your biased for the Prosecution?

MR. DE LUNA: Yes, I think so.

MR. STECKLER: All right.

Well, I am out of time. If Mr. Bryden has any questions for you, I will let him ask them.

MR. BRYDEN: Good afternoon, Mr. De Luna. I certainly do appreciate your candor with us. And I don't want to put words in your mouth. So if, hypothetically, you heard a case about carrying -- people carrying guns, that tends to make you think it's more likely than not that they had the mental state to commit murder; is that correct?

MR. DE LUNA: Seems like that.

MR. BRYDEN: And because of that, this case is -- you're going to get evidence that I believe that both Mr. McNeely and Mr. Poston carried a gun, and just that fact alone makes you more inclined to think they're guilty of, say, attempted murder/murder than not; is that right?

MR. DE LUNA: Not really.

MR. BRYDEN: No.

But the idea of people having guns creates a bias in your mind against them?

MR. DE LUNA: Yes, unless they are authorized to carry the guns.

MR. BRYDEN: So if somebody isn't authorized -- you wrote that -- you indicated -- you wrote that you felt guns were good for self-defense. I don't know if you recall.

MR. DE LUNA: No.

MR. BRYDEN: You don't recall that?

MR. DE LUNA: I don't recall that.

MR. BRYDEN: Okay.

Do you think you sustained enough just sitting there, just through all this voir dire, that you are more for the Prosecution than a blank slate; for instance, that you're more decided that from what you've heard just from the voir dire it's more likely than not that these two guys are guilty of them?

MR. DE LUNA: I will form the evidence.

MR. BRYDEN: Okay.

Do you -- if it came out that my client, Mr. Poston, he was convicted of a felony, let's say drug possession, or sales, or forgery, something like that that made it illegal for him to carry a gun, would that tend to bias you in trying to determine whether or not he attempted to murder somebody?

MR. DE LUNA: Yes.

MR. BRYDEN: And if that came out, you couldn't be fair and impartial to Donel Poston, correct?

MR. DE LUNA: Not at all.

MR. BRYDEN: Okay.

Let me ask Mr. Barrett a couple questions.

I am happy to see you here, sir. You're the chance to say something positive about Oakland. We've heard some negative stuff.

You are the manager of Plum restaurant?

MR. BARRETT: One of them, yes.

MR. BRYDEN: What's going on in Oakland? We have all these new bars and restaurants. Are people coming in?
MR. BARRETT: Yes. There's a lot of investor and possibly problematic gentrification, but sometimes those go hand-in-hand.
MR. BRYDEN; What's problematic about the gentrification?
MR. BARRETT: Raising rent prices, pushing people out of neighborhoods they have lived in for years.
MR. BRYDEN: You have lived in Oakland for a long time?
MR. BARRETT: Nope. Just three years.
MR. BRYDEN: Oh, okay.
MR. BARRETT: I am part of the problem.
MR. BRYDEN: I thought I saw 15 -- oh, it says 1.5 years. Okay.
Before that, you were in Walla Walla?
MR. BARRETT: That's where I grew up, yeah.
MR. BRYDEN: And a couple other places. Quite a culture shock coming from eastern Washington to Oakland?
MR. BARRETT: Ehh.
MR. BRYDEN: No?
MR. BARRETT: Well, yes.
MR. BRYDEN: Besides the eastern Washington and onions, it's near Idaho, rural area. Lot of gun carrying going on, right?
MR. BARRETT: Yeah.

MR. BRYDEN; So you have seen people with guns?

MR. BARRETT: Yeah.

MR. BRYDEN: And that doesn't bother you?

MR. BARRETT: No.

MR. BRYDEN; Okay. I appreciate that, Mr. Barrett.

Let me ask (Juror No. 12). I notice that you like the western movies.

JUROR NO. 12: Yes.

MR. BRYDEN: So that's like -- I am just imagining hopefully that's like John Wayne squaring off and Clint Eastwood and the draw kind of thing?

JUROR NO. 12: Actually, the Indian. I do the Native American side.

MR. BRYDEN: So you're rooting against Custer.

You know, there is not that many movies like that.

JUROR NO. 12: I know. They are very hard to find.

MR. BRYDEN: So what's one of the westerns that you like?

JUROR NO. 12: I like Sitting Bull. I like Geronimo, take all three of them. I prefer the black-and-white 1950'S version, though, more than I did the earlier later ones.

MR. BRYDEN: You're certainly sympathetic then to the idea that the Indians had a right to defend themselves with deadly force against the cowboys, huh?

JUROR NO. 12: Yes.

MR. BRYDEN: So if you're attacked by cowboys, you can shoot arrows or guns back at them, right?

JUROR NO. 12: (Nods head in the affirmative).

MR. BRYDEN: No problem with that. I appreciate that.

I don't think I have ever seen Geronimo. I am going to write that down. I will put that in my cue.

What did I have for (Juror No. 7)? Oh -- you know -- (Juror No. 7). Excuse me.

JUROR NO. 7: That's okay.

MR. BRYDEN: I think Steckler said everything he needed. Is there anything that you've heard some other attorney ask somebody that you wanted to respond to?

JUROR NO. 7: Not that I can think of.

MR. BRYDEN: Okay. Thank you, (Juror No. 7).

THE COURT: Does anybody want to approach?

MR. STECKLER: Yes.

MS. PETTIGREW: No, thank you, Your Honor.

MR. BRYDEN: No.

THE COURT: Okay.

MR. STECKLER: Yes.

(Counsel approach the bench; discussion off the record)

THE COURT: All right.

The next peremptory challenge is with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to thank and ask the Court to excuse Juror Number 10, Ms. Rachel.

THE COURT: Thank you, Ms. Rachel.

MS. RACHEL: Thank you.

THE COURT: Mr. De Luna, sorry, you got to stay in that front row. That's an alternate seat in the back row. And you can -- hang on. Well, we'll maybe move you somewhere else.

So now the first -- the next peremptory challenge is, we'll offer a joint peremptory challenge if anybody has a joint challenge.

MR. BRYDEN: Your Honor, I believe that the Defense has a joint peremptory challenge. And we would ask to thank and excuse the Juror Number 12, Mr. De Luna.

THE COURT: All right.

Thank you, Mr. De Luna, for your service. You will be excused.

And now, (Juror No. 12), we'll ask you to go to the front row.

And the challenge goes back to the People.

MS. PETTIGREW: People would like the thank and ask the Court to excuse Juror Number 7, Mr. Kennedy.

THE COURT: Thank you, Mr. Kennedy, for your service.

MR. KENNEDY: Thank you, Judge.

THE COURT: Mm-hm.

MR. STECKLER: The joint challenge for the Defense would be of Mr. Barrett.

THE COURT: All right.

Thank you, Mr. Barrett, for your service.

THE COURT: And I'd ask the clerk to call the next three names.

THE CLERK: (Juror No. 10), seat number 10 in the front row please.

Alexandre A-n-g-u-e-l-o-u-c-h, alternate seat number one in the back row please.

Matthew B-a-s-u-r-t-o.

And Mark M-e-n-k-e, alternate seat number three please.

THE COURT: Okay.

Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good afternoon. (Juror No. 10)?

JUROR NO. 10: Yes. Very good.

MS. PETTIGREW: Do most people say (Juror No. 10)?

JUROR NO. 10: Yes, they do.

MS. PETTIGREW: Have you been able to hear what we've been talking about?

JUROR NO. 10: Yes, I have.

MS. PETTIGREW: I don't want to repeat anything.

JUROR NO. 10: I have heard everything.

MS. PETTIGREW: You know what we're getting at. Do you have any strong thoughts, feelings, opinions that make you think you might not be fair, impartial in a case like this?

JUROR NO. 10: No, I don't.

MS. PETTIGREW: Okay.
You have been a juror on a civil case?
JUROR NO. 10: Yes.
MS. PETTIGREW: What was the nature of that?
JUROR NO. 10: It was a slip-and-fall.
MS. PETTIGREW: Okay.
Were you able to reach a verdict?
JUROR NO. 10: Yes, we did.
MS. PETTIGREW: And even though you didn't have to be unanimous in a civil case, were you unanimous?
JUROR NO. 10: We were unanimous.
MS. PETTIGREW: Nothing particularly --
JUROR NO. 10: It was proven without a reasonable doubt.
MS. PETTIGREW: At first I read it was you had a child who witnessed something, but you, as a 13-year-old --
JUROR NO. 10: Yes.
MS. PETTIGREW: -- witnessed a shooting?
JUROR NO. 10: Mm-hm, I did.
MS. PETTIGREW: And you put such detail in here. It's not something you forgot?
JUROR NO. 10: You know, actually, I hadn't even thought about it until I did the questionnaire and it just popped up.
MS. PETTIGREW: Okay.
Anything about that situation that would carry over into here, given that we're dealing with guns?

JUROR NO. 10: No, I don't think so.

MS. PETTIGREW: Okay. Thank you.

JUROR NO. 10: You're welcome.

MS. PETTIGREW: If you could pass that back to Mr. --

MR. ANGUELOUCH: Anguelouch.

MS. PETTIGREW: -- Anguelouch?

Good afternoon, sir.

MR. ANGUELOUCH: Good afternoon.

MS. PETTIGREW: You have participated in a program called Get on the Bus?

MR. ANGUELOUCH: No. I just donated a small amount of money.

MS. PETTIGREW: Just donated, okay.

Was that a long time ago?

MR. ANGUELOUCH: No. Actually, the last couple of years.

MS. PETTIGREW: How did you become familiar with it?

MR. ANGUELOUCH: Well, I just saw a news report on Yahoo with pictures of basically that's a busing program of people that travel to prisons to visit their parents, for kids that travel, and I know that in some instances actually those people don't have any money. And my wife talks about it a lot through work, sometimes those children of the families of the criminals are actually very poor and that's actually a lot of money. So, you know, I thought that's a very good thing cause for --

MS. PETTIGREW: What does your wife do?
MR. ANGUELOUCH: She works at a community clinic.
MS. PETTIGREW: Okay.
As a nurse practitioner?
MR. ANGUELOUCH: Yes.
MS. PETTIGREW: I couldn't understand my own note.
You've also heard everything I have been talking about. Do you think that you have any strong feelings about guns, self-defense, anything of that nature?
MR. ANGUELOUCH: No. I kind of thought about it what I wrote before, and I wrote I have strong feelings about illegal guns, but it's -- but I don't have anything against the guns proper, so.
MS. PETTIGREW: Okay.
And when you say illegal guns, are you talking about just illegally possessed or --
MR. ANGUELOUCH: Yes.
MS. PETTIGREW: Okay.
So in this situation you've already heard that they were illegally possessing them at the time of this. Do you think that would --
MR. ANGUELOUCH: Well, there was a question in the questionnaire about what is your attitude towards guns, and that I answered that in that fashion. It's just the answer to the questionnaire.
MS. PETTIGREW: Sure. But now you sat here for a couple days and you know kind of what some of the issues

are that are going to come up. Do you think that that will influence your ability to sit as a juror in a case like this?

MR. ANGUELOUCH: I will try to be analytical, and I will try to be responsive to the particulars of the case, and I will try to separate those two cases of murder and the gun possession and to be as fair as possible.

MS. PETTIGREW: Okay. I will let them follow up.

Thank you. If you could pass it to Mr. Basurto?

Did I say that right?

MR. BASURTO: Yeah. Thank you.

MS. PETTIGREW: Good afternoon.

MR. BASURTO: Good afternoon.

MS. PETTIGREW: Your sister who had some issues with the criminal justice system --

MR. BASURTO: Yes.

MS. PETTIGREW: -- do you -- were you living in the same house at the time that happened?

MR. BASURTO: Um, I was actually in the military then, just got out, and then that's when it happened.

MS. PETTIGREW: Okay.

Did you talk to her about it?

MR. BASURTO: Um, while in the military?

MS. PETTIGREW: When it happened or --

MR. BASURTO: Yeah, obviously, before or -- before, yeah.

MS. PETTIGREW: Did she think she was treated fairly?

MR. BASURTO: No.

MS. PETTIGREW: Do you think she was treated fairly?

MR. BASURTO: Um, it's hard. I was -- they were trying to keep me out of the courts and everything so I didn't really get all the details, but I can't say yes or no. I don't know if -- going by what she said, no.

MS. PETTIGREW: Okay.

Did that situation influence your view at all of the criminal justice system?

MR. BASURTO: Just that I didn't want to be part of it, I guess.

MS. PETTIGREW: Okay.

MR. BASURTO: As far as being involved in it or --

MS. PETTIGREW: Like as a defendant or --

MR. BASURTO: Yeah.

MS. PETTIGREW: What about as a juror? I mean, it's part of it.

MR. BASURTO: Yeah, it is part of it. I guess that sums everything. I mean, if I have to, I have to, but it's not something comfortable.

MS. PETTIGREW: Okay.

Because of that personal experience, 'cause I don't know that anybody thinks this is comfortable?

MR. BASURTO: Yeah. No, just probably what she went through from Virginia, too, Texas, you know, just the whole court systems because it's Federal. So it wasn't -- it didn't seem comfortable and, obviously, for her it

wasn't.

MS. PETTIGREW: Okay.

MR. BASURTO: So it's something I think about.

MS. PETTIGREW: Murder's not comfortable, and, you know, I mean, to say the least. So I guess I just need to know, bottom line, do you think that that would be in the back of your head or can you set it aside, listen to the evidence and decide if I have proven the case?

MR. BASURTO: Well, it's two different cases, so I would say I could --

MS. PETTIGREW: Okay.

MR. BASURTO: -- separate the two. It's two completely different --

MS. PETTIGREW: Okay.

Would you in the back of your mind have any thought to penalty or punishment, which is not supposed to be considered by you at all?

MR. BASURTO: No, because it's not considered by me.

MS. PETTIGREW: Okay. Thank you.

Mr. Menke.

MR. MENKE: Yes.

MS. PETTIGREW: Good afternoon.

You were an alternate juror in a DUI case?

MR. MENKE: Right.

MS. PETTIGREW: So you never actually got to deliberate?

MR. MENKE: No. And there was a mistrial, so it

never even got that far.

MS. PETTIGREW: Okay.

Mistrial during evidence?

MR. MENKE: Yes.

MS. PETTIGREW: Okay.

Anything about that -- and I am assuming if it was a DUI case it was relatively short in duration.

MR. MENKE: We were only there a couple of days, and I guess there was some procedural error and they declared a mistrial. It seemed like a waste of time, but other than that.

MS. PETTIGREW: Anything about that that was so frustrating that makes you not want to do it again?

MR. MENKE: No, I am fine.

MS. PETTIGREW: Okay.

You've listened to what we've been talking about. Do you have any strong thoughts or opinions on the issues that we've been raising?

MR. MENKE: No, I have been following them.

MS. PETTIGREW: Okay, great. I don't have any other questions.

Thank you.

THE COURT: Mr. Steckler.

MR. STECKLER: Thank you.

Good afternoon, sir.

MR. MENKE: Hi.

MR. STECKLER: So I guess you know at this point in the proceedings, assuming you've been listening, and I

assume you have, you've heard me say a lot, probably way more than I should have said. Are there any concerns you think I should have about you as a juror or that Mr. McNeely should have about you as a potential juror on this case?

MR. MENKE: No, I don't think so. I guess one of the questions you asked was feelings about guns, and I guess if I had my druthers the law would not allow people to own handguns or assault weapons, but I understand that the law does allow those so I can separate that.

MR. STECKLER: Okay.

But the law doesn't allow felons to have a gun. And so can you separate out the fact that a person might be a felon, have a felony conviction, and possess a gun from your duty to consider a separate charge of murder and attempted murder?

MR. MENKE: Yes, I could separate them.

MR. STECKLER: And unlike the gentlemen from Washington with the beard, can you separately decide the issue of intent or malice on a murder charge separate from the intent to possess a gun, keep those two things separate?

MR. MENKE: Yeah, I think I can. I mean, it's all facts and circumstances, but yeah, I'd have to.

MR. STECKLER: How com -- would you -- would you say you'd be comfortable with holding the prosecutor to her burden of proof to disprove self-defense in a self-defense case?

MR. MENKE: I am not sure that that's her responsibility to disprove self-defense.

THE COURT: The instructions will tell you that it is. That is the law.

MR. MENKE: Okay.

THE COURT: The prosecutor has to prove not only the crime occurred, the person that committed the act had the right mental state, but also did not act in self-defense. So that entire burden is on the People.

MR. MENKE: Well, I --

THE COURT: So can you?

MR. MENKE: I think I can follow the instruction.

THE COURT: Okay.

MR. STECKLER: Okay. And thank you.

That's all I -- that's really what I am getting at. So I appreciate it, sir. Thank you so much.

So following up -- you're not Mr. Scribner, are you, because there is no Mr. Scribner here today?

Mr. Basurto.

MR. BASURTO: Yes.

MR. STECKLER: Two cases -- you said here, two separate cases -- actually, getting back to something Mr. Bryden said yesterday, there is actually three separate cases, your sister's case, Mr. McNeely's case, and Mr. Poston's case. Can you separately decide guilt or innocence as to Mr. Poston and Mr. McNeely, or are you going to loop them together?

MR. BASURTO: No, they are separate cases.

MR. STECKLER: I don't mean that as a connection to you. I am just --

MR. BASURTO: No, they are two separate cases.

MR. STECKLER: All right. I don't think I have any further questions for you, sir. Thank you so much.

Good afternoon, sir.

MR. ANGUELOUCH: Good afternoon.

MR. STECKLER: You indicated on the self-defense, one of the self-defense questions that at sometimes it's not easy to understand if it's safe to retreat while engaged in a struggle. Do you recall that?

MR. ANGUELOUCH: No, I don't recall that.

MR. STECKLER: It was in response to the question about -- that says that the law says a person is not required to retreat, but he may pursue an assailant if reasonably necessary until he's safe.

MR. ANGUELOUCH: All right.

MR. STECKLER: So it sounds like you agree with that?

MR. ANGUELOUCH: I can see some circumstances where it might actually be necessary. So if that's what I said, I actually do agree with it.

MR. STECKLER: You agree with yourself?

MR. ANGUELOUCH: I agree with myself.

MR. STECKLER: Okay. Well, that's good.

And the strong feelings you have about guns, I think you got into this and I am satisfied, I think -- and

tell me if I shouldn't be -- that you can keep separate your feelings about guns and your ability to decide guilt or innocence on the murder charges.

MR. ANGUELOUCH: I think so. I think that was a response to a more sort of world view, but I will try to be objective as I can.

MR. STECKLER: What kind of law did or does your mom teach or practice?

MR. ANGUELOUCH: She's retired. She was a like a legal representative for the university, so it's more labor-related laws and --

MR. STECKLER: In Russia?

MR. ANGUELOUCH: Yes.

MR. STECKLER: Okay.

So no criminal law?

MR. ANGUELOUCH: No.

MR. STECKLER: And what attracted you -- I don't know if you covered this with Ms. Pettigrew or she covered it with you. Why -- what attracted you first to Get on the Bus as a donation recipient?

MS. ANGUELOUCH: Well, this, kind of as I mentioned it, my wife works with low-income families and just she talks a lot about the pain in the community. And I think that's actually a manifestation of, you know, like I said, these kids are so poor that they cannot get $75 to go get to state prisons to see their parents for years. So that's just sad.

MR. STECKLER: Yeah, it is. Thank you very much,

sir.
Can you pass the microphone forward?
Good afternoon, ma'am.
JUROR NO. 10: Good afternoon.
MR. STECKLER: Now, you zeroed in on the word reasonably on the questionnaire about self-defense, one of the questions about self-defense. You indicated that you agree with the basic law of self-defense, but you have a question about quote/unquote "reasonably"; this can be different for many people. I think that's a true statement. I understand that. This is something I talked about with a couple of other prospective jurors yesterday. As a juror, do you think you can apply the concept of reasonableness given a certain set of facts?
JUROR NO. 10: Yes.
MR. STECKLER: You're comfortable doing that?
JUROR NO. 10: Yes.
MR. STECKLER: Are you comfortable expressing your individual opinion as to that?
JUROR NO. 10: Yes, I am.
MR. STECKLER: And you also indicated -- I don't know if you recall this -- but that it might be necessary to engage in pursuit to be safe?
JUROR NO. 10: Yes.
MR. STECKLER: Do you believe that?
JUROR NO. 10: I do believe that.
MR. STECKLER: All right. Thank you, ma'am.
I have no further questions.

JUROR NO. 10: You're welcome.

THE COURT: Mr. Bryden.

MR. BRYDEN: Okay. Thank you.

I got to be frank with you, (Juror No. 10), I am reading your questionnaire and I am at a loss what to ask you. You got an interesting job. You work out, I guess, at Club Sport. Your husband's an executive. Two grown children. You got great jobs. You live in Pleasanton. What's wrong with your life?

JUROR NO. 10: I know, but we've worked hard to get this life.

MR. BRYDEN: I can appreciate that.

Do you sometimes go to the fair every year?

JUROR NO. 10: Sometimes my daughter and I volunteer at the fair.

MR. BRYDEN: What booth?

JUROR NO. 10: Usually in the small animals and in the science building with all the Legos.

MR. BRYDEN: She is like in 11th grade now?

JUROR NO. 10: Yes.

MR. BRYDEN: She still wants to go to the fair?

JUROR NO. 10: Now, they do. The teenagers like to go. But she does a lot of volunteer work.

MR. BRYDEN: That's good. I like the small animals and 4-H cakes and all that. I don't go to Club Sport.

JUROR NO. 10: Come join us.

MR. BRYDEN: It could do me a lot of good, I am

sure.

When you were a kid, you saw somebody getting shot?

JUROR NO. 10: I did.

MR. BRYDEN: Was that a very graphic thing, or was it a warning shot?

JUROR NO. 10: I lived in a neighborhood that was very mixed, lower income. The kids played kickball in the back alleys. And there was just separate groups. I guess now you might label them gangs. We called them just groups that you hung out with. And there was one, they were a little bit more risk-takers, did a few more things than the rest of us would have thought, ever thought of doing. And there was one boy, in particular, that was constantly pushing -- you know, he was constantly being -- and what he did was he trespassed, and it was a neighbor probably two blocks away, and he came out with his gun, and he warned him, and the kid kept pushing, "You can't do anything to me", and he fired a shot and then everybody scattered.

MR. BRYDEN: Okay.

JUROR NO. 10: So I think back then you could -- I mean, he was in lawful possession of a gun, protecting his property.

MR. BRYDEN: Sounds like the kid wasn't hurt?

JUROR NO. 10: No, he wasn't. He was not hit.

MR. BRYDEN: Just want to make sure you never seen anybody hit with bullets and all that kind of --

JUROR NO. 10: Not in person, no.

MR. BRYDEN: That sounds all kind of innocent.

Let me ask Mr. Anguelouch, you're an interesting individual to us because you decided as an adult to come to the United States.

MR. ANGUELOUCH: Yes.

MR. BRYDEN: Why did you come to the United States?

MR. ANGUELOUCH: To complete my education, higher education.

MR. BRYDEN: Oh, okay.

So where did you go when you came to the United States to complete your higher education?

MR. ANGUELOUCH: Brown University in Rhode Island.

MR. BRYDEN: Huh?

MR. ANGUELOUCH: Brown University in Rhode Island, and many other places too.

MR. BRYDEN; And you decided to stay?

MR. ANGUELOUCH: Yes.

MR. BRYDEN: Are you attracted to any of our principles?

MR. ANGUELOUCH: Very much so.

MR. BRYDEN: And the government, very much different than Russia.

MR. ANGUELOUCH: Yes.

MR. BRYDEN: So you obviously decided to stay. And, obviously, you contribute to our country in a

lot of ways. You -- I think everybody agrees with you that we're strongly opposed to people shouldn't have guns. That's just a regular thing. And I certainly understand that we all agree that lots of people just shouldn't have guns. But from what I understand from what you said to Mr. Steckler is you would agree that everybody has a right to self-defense?

MR. ANGUELOUCH: Yes.

MR. BRYDEN: And even if somebody didn't have a right to use a gun, you could see, couldn't you, a situation where they could respond to deadly force if they were attacked; is that right?

MR. ANGUELOUCH: Yes.

MR. BRYDEN: So just because somebody has a gun doesn't mean that they can't use deadly force if they were provoked, if an aggressor hit them, or shot at them, something like that?

MR. ANGUELOUCH: It deserves consideration.

MR. BRYDEN: I wanted to just ask Mr. Basurto a question. You indicate you're a sports fan. Do you like baseball or football better?

MR. BASURTO: Football.

MR. BRYDEN: Why?

MR. BASURTO: It's more entertaining to watch.

MR. BRYDEN: Okay.

Do you like all sports, or are you mostly into the football?

MR. BASURTO: All sports. Probably not hockey too

much.

MR. BRYDEN: Okay. All right.

Do you watch baseball, also?

MR. BASURTO: Um, some of the highlights.

MR. BRYDEN: Okay. So it's mostly football.

And, Mr. Menke, what was the -- Mr. Menke indicated, not these same words, sir, but you didn't like the outcome of the Zimmerman case; is that correct?

MR. MENKE: I guess I just got questioned about it, but -- I was questioned about it, but I wasn't close enough to it and didn't follow it closely enough to have --

MR. BRYDEN: What?

MR. MENKE: -- I guess to know it wasn't right. I guess the concern I had with it was that there had appearance at least of, I guess I'd say stalking or almost harassment on his part, so I guess that was my issue with that one.

MR. BRYDEN: And he shot an unarmed man?

MR. MENKE: Yes.

MR. BRYDEN: That's part of it.

Okay. In this particular case you'll find, I think the evidence will come in that both men were armed.

MR. MENKE: Mm-hm.

MR. BRYDEN: So, given that, would that allow you to look at this case differently than say the Zimmerman case?

MR. MENKE: Yeah, I think it's different, sure.
MR. BRYDEN: Mr. Menke, do you work in San Ramon at the big complex there?
MR. MENKE: Yes.
MR. BRYDEN: Okay.
So you drive every day --
MR. MENKE: Yes.
MR. BRYDEN: -- from Piedmont to San Ramon?
MR. MENKE: Yes.
MR. BRYDEN: All right. Thank you.
I have no other questions.
THE COURT: Thank you, Mr. Bryden.
Anybody need to approach on challenges for cause?
MS. PETTIGREW: No, thank you, Your Honor.
MR. BRYDEN: None.
MR. STECKLER: No, thanks.
THE COURT: All right.
Next peremptory challenge then is with the People.
MS. PETTIGREW: People pass.
THE COURT: Then the next joint challenge would be with the Defense.
MR. BRYDEN: If you could just give us a moment?
(Whereupon, both defense counsel have a discussion off the record)
MR. BRYDEN: My understanding is there's no joint Defense peremptory challenge.
THE COURT: So there's a pass on the joints.
MR. BRYDEN: Yes.

THE COURT: And then the next individual challenge is with Mr. Poston.

MR. BRYDEN: If I could just have a moment?

(Discussion off the record between Mr. Bryden and Mr. Poston)

MR. BRYDEN: No, we pass.

THE COURT: And then it goes to Mr. McNeely.

MR. STECKLER: Don't mean to spoil the party, but the Defense would like to thank and excuse Ms. Bowman, Juror Number 8.

THE COURT: Thank you, Ms. Bowman, for your service.

MS. BOWMAN: Thank you.

THE COURT: So that's Mr. McNeely's third individual challenge.

And thank you very much, Mr. Anguelouch, you're in number 8 now.

The challenge is back to the People.

MS. PETTIGREW: People would like to thank and ask the Court to excuse Juror Number 8, Mr. Anguelouch.

THE COURT: All right. Thank you, sir.

So now we have Mr. Basurto in seat number 8.

We'll go back to a joint challenge, if there is one.

MR. STECKLER: Jointly, we pass.

THE COURT: All right. So there's a joint pass.

I think since Mr. McNeely exercised the last challenge, we'd go to Mr. Poston.

MR. BRYDEN: Okay. Your Honor, Mr. Poston would like the Court to thank Mr. Loosbrock for his service and excuse him.

THE COURT: Thank you, Mr. Loosbrock --

MR. LOOSBROCK: Thank you.

THE COURT: -- for your service.

Mr. Menke's already there. Okay.

I -- it must be a long day here and we've only been here since 1:30 or so.

That means it goes back to the People.

MS. PETTIGREW: People pass.

THE COURT: People pass.

Then it would go back to the joint challenge.

MR. STECKLER: Jointly, we pass.

THE COURT: Since Mr. Poston exercised the last Defense challenge individually, we'll go to Mr. McNeely.

MR. STECKLER: The Defense would like to thank and ask the Court to excuse Mr. Menke.

THE COURT: Thank you, Mr. Menke.

All right. Given the hour of the day, I am going to -- there's a few more things the attorneys and the Court need to discuss this afternoon, so we're going to take our afternoon recess.

The clerk informs me that tomorrow we have a sentencing, but I think we can start at 9:30 tomorrow because apparently that case may be continued. Let me -- you know, it may be penny wise and pound foolish. Let me talk to the attorneys for a minute before I release you

for the day. Okay?

(Counsel approach the bench; discussion off the record)

THE COURT: All right.

Ladies and gentlemen, we think that we're fairly close. We got a -- we still got to get the 12 jurors and then we're going to have three alternates because the duration of the trial we think we'll have three alternates for this trial. The anticipation would be that tomorrow we could get a jury in the morning and we would start with opening statements at 2:00 in the afternoon. Regardless of what time of the morning we were to get a jury and the alternates, wouldn't go till 2:00 because there is a little bit of work that goes into getting ready for opening statements and preparing, and there could be things that aren't always -- it's just there's a lot of things they don't teach you in law school that go into conducting a trial. So regardless of what time we get a jury tomorrow morning, assuming we do, we would go till 2:00 in the afternoon. Might have a little extra longer noon recess, or not. If we go right up till noon, then it would go to 2:00. Couple minutes after noon, we'll go till 2:00. If we're done at 10:30, we'll go till 2:00. But assuming we get a jury in that time frame, we'll start with opening statements in the afternoon. Anticipating that, we can hopefully get a jury in the morning. Okay. That kind of tells you where we're at.

In the meantime, please don't discuss this case

among yourselves or with anyone else until it's finally submitted to you. And we'll ask you all to return tomorrow morning at, let's say 9:30 is the cautious approach we do here since our sentencing is not going to interrupt our affairs. We have a few things to cover between 9:00 and 9:30 in the morning, so we'll start with the jury at 9:30. If you are in the jury box, I will ask you to return to the seat you're presently in. And if you are in the audience, you can take any seat that's available.

All right. Please don't discuss the case among yourselves or with anyone else. See you tomorrow.

(Whereupon, the prospective jurors exit the courtroom)

THE COURT: The -- we'll be in recess until tomorrow. However, there was one thing I did want to put on the record. At -- we went to the sidebar and had a bench conference between Counsel and the Court regarding the jury selection and challenges for cause. The first was regarding Mr. Ponce. And was there anything that anybody wanted to put on the record about that?

MR. BRYDEN: I believe I asked for the cause challenge.

THE COURT: Right.

MR. BRYDEN: And it was based on what I felt was his statement that he couldn't be impartial.

THE COURT: Right.

And the Court considered Mr. Ponce's answers to

you and then had engaged in some further questions with Mr. Ponce and felt that he was rehabilitated, and that he understood, and that while he personally may not like guns and would not use a gun, even in self-defense, that he could set that aside and not let that influence his decision in reaching a verdict in this case. And so for that reason I denied your challenge for cause.

The second juror was Mr. De Luna. And both counsel I think had asked the Court to consider excusing for cause Mr. De Luna. Is that --

MR. STECKLER: That's correct, yes.

THE COURT: Okay.

And anything you wanted to add to the record or not?

MR. STECKLER: No. I think the record -- not to the record, but he stated -- he said he could not be impartial. He said he would be partial to the Prosecution when he answered my question.

THE COURT: Okay.

MR. STECKLER: And based on that I asked that he be released for cause.

THE COURT: Okay.

Mr. Bryden.

MR. BRYDEN: And I joined in the motion.

THE COURT: Okay.

When the Court listened to Mr. De Luna's answers, it seemed as though he was somewhat on both sides of the fence primarily related to guns, firearms. And when the

Court read his answers in the questionnaire, he indicated he thought firearms were a good thing when they were used in self-defense and they were not such a good thing when used to commit a crime, and that seemed to the Court that was kind of the crux of the issue with Mr. De Luna's answers. And so for that reason that seemed to me to be the answer that was the appropriate answer, that if you are using a gun in self-defense, that's okay, and if you're using a gun to commit a crime, that's not okay. And so for that reason the Court wouldn't grant the cause challenge as to Mr. De Luna.

Was there anything else you want to put on as to challenges only?

MR. STECKLER: No, thank you.

THE COURT: Okay.

I'd ask counsel to be here as close to 9:00 or 9:15 as possible.

Mr. Steckler has handed me a paper with four things he would like to cover before we get to opening statements. So I think we can handle that in 15 minutes.

MR. STECKLER: Great.

THE COURT: So if you are here at 9:15, we'll be able to cover that.

MR. STECKLER: The fourth thing on there, I was just going to show them some photos.

THE COURT: Okay.

MR. STECKLER: And I can do that right now.

THE COURT: Anything else before we go off the

record?

MS. PETTIGREW: Just the drugs. It would just be nice to know if that's admissible or not before I prepare for opening.

THE COURT: I thought I ruled on that this morning. I guess I haven't in light of the statements that are coming in, or the evidence that's coming in.

The Court thinks that the -- rules that the Roku box and its contents are admissible. If there is something, you bring it in, and Mr. Steckler looks at it and says that isn't covered in one of the reports or something, so there's something unusual that we don't know about, he can raise that issue. But, in general, these were items that were seized pursuant to a search warrant, as I recall, in the car that Mr. McNeely drove away from the scene, is that correct, or are these the things that were in the car that were taken to the hospital?

MR. STECKLER: The latter.

THE COURT: Okay.

The one with Mr. Muhammad's car?

MR. STECKLER: Yes.

THE COURT: Okay.

So those would be -- the box and its contents would be admissible in the People's case in chief.

MS. PETTIGREW: Thank you.

THE COURT: All right.

MR. STECKLER: Thank you.

THE COURT: Mm-hm.

We'll go off the record.

---oOo---

STATE OF CALIFORNIA)
) SS.
COUNTY OF ALAMEDA )

I, RONDA ROOPE, Certified Shorthand Reporter, do hereby certify:

That I am an official court reporter of the Superior Court of the State of California, and that as such I reported the proceedings had in the above-entitled matter at the time and place set forth herein;

That my stenograph notes were thereafter transcribed into typewriting under my direction, and that the foregoing pages constitute a full, true and correct transcription of my said notes.

DATED: 12/15/14

Ronda Roope
RONDA ROOPE, CSR NO. 5609

# EXHIBIT 6 (cont.)

# SSRT – Vol. 6

CALIFORNIA COURT OF APPEAL

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent

vs.

**JOE DANIEL MCNEELY, aka: ANTHONY LISTER, and DONEL POSTON,**

Defendants and Appellants.

_______________________________________/

NO:

ALAMEDA COUNTY
NO: **172522 A&B**

COPY

**AUGMENT TO REPORTER'S TRANSCRIPT ON APPEAL**

FROM FINAL JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

HONORABLE MICHAEL GAFFEY, JUDGE

FOR THE PLAINTIFF AND RESPONDENT:
KAMALA HARRIS
Attorney General of California
6000 STATE BUILDING
San Francisco, CA 94102

FOR THE DEFENDANTS AND APPELLANTS:
In Propria Persona

OFFICIAL COURT REPORTER:
Ronda Roope, CSR. NO. 5609

**JURY SELECTION ONLY - DATE: 1/8/14**
**(Augment) VOL: 6**
**PAGES: 456-537**

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ALAMEDA
BEFORE HONORABLE MICHAEL GAFFEY, JUDGE
DEPARTMENT 517

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs. NO: **172522 A/B**

**JOE DANIEL MCNEELY**, aka:
**ANTHONY LISTER**, and
**DONEL POSTON**,

Defendants.

_________________________________/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**AUGMENT TO TRANSCRIPT ON APPEAL**
**(JURY SELECTION - VOL. 6)**
**JANUARY 8, 2014**

Hayward Hall of Justice
Hayward, California

A P P E A R A N C E S

For the People: NANCY O'MALLEY
DISTRICT ATTORNEY
BY: STACIE PETTIGREW
Deputy District Attorney

For the Defendant **JOE DANIEL MCNEELY:** BRENDON D. WOODS
PUBLIC DEFENDER
BY: ANDREW STECKLER
Assistant Public Defender

For the Defendant **DONEL POSTON:** DAVID BRYDEN
Attorney at Law

Official Court Reporter: RONDA ROOPE
CSR NO. 5609

January 8, 2014

P R O C E E D I N G S

**(JURY SELECTION ONLY)**

(Whereupon, the prospective jurors enter the courtroom)

THE COURT: Is there a Mr. Ruedas here, Jessie Ruedas? He'd been sick earlier and we released him until today. Okay. See if he shows.

THE COURT: Counsel, is there any objection if we begin with the seating of the people even though we have a couple of jurors who are running a little bit late?

MR. STECKLER: No objection.

MS. PETTIGREW: No objection.

MR. BRYDEN: I will try to follow that.

THE COURT: Okay.

So I think we're waiting for Mr. Haynes in the back row, but we have four seats that we could kind of begin the process.

All right. Mr. Clerk.

THE CLERK: James A-l-v-a-r-e-z, Alvarez.

THE COURT: All right. Contact him.

THE CLERK: Sorry if I mispronounce that, Swaranaltha S-r-i-d-h-a-r.

THE COURT: All right. We're going to issue orders to show cause when these people aren't here today, as we have with the other people who didn't show.

THE CLERK: Holly G-a-l-l-a-w-a-y, please take seat number 11 in the front row.

James P-a-t-e-r-s-o-n, alternate number one in the back row please.

Lori M-c-E-l-r-o-y, alternate seat number two please, Ms. McElroy.

MS. MCELROY-GRANT: Okay.

THE CLERK: Benita S-n-a-v-e-l-y, alternate seat number three please.

THE COURT: All right.

Ladies and gentlemen, have any of you had -- if you've had a problem hearing or following along with what we've done the last couple days here, could you please raise your hand? Not seeing anybody raise their hand.

Go ahead, Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good morning, ladies and gentlemen.

Ms. Gallaway.

MS. GALLAWAY: Yeah.

MS. PETTIGREW: I will start with you. You're a high school teacher?

MS. GALLAWAY: Yes.

MS. PETTIGREW: What age group do you teach?

MS. GALLAWAY: Um, I teach anywhere from freshman to seniors.

MS. PETTIGREW: What subject matter?

MS. GALLAWAY: Health and life skills.

MS. PETTIGREW: Okay.

I imagine as a high school teacher you deal with people who get in conflicts from time to time?

MS. GALLAWAY: Yes.

MS. PETTIGREW: Have you ever witnessed a physical altercation?

MS. GALLAWAY: No.

MS. PETTIGREW: Okay.

So most of the time it's just been verbal within the classroom or whatnot?

MS. GALLAWAY: Yeah.

MS. PETTIGREW: What about outside the classroom?

MS. GALLAWAY: There have been fights on campus, but fortunately we haven't had any within a couple of years, at least that I've heard of.

MS. PETTIGREW: Okay.

And none involving weapons of any kind that you're aware of?

MS. GALLAWAY: No.

MS. PETTIGREW: You sat as a juror on a civil case?

MS. GALLAWAY: Yeah.

MS. PETTIGREW: Can you remind me what the nature of that was?

MS. GALLAWAY: I think it was suing for damages.

MS. PETTIGREW: Okay.

MS. GALLAWAY: It was when I was 18 years old, so it was a while ago.

MS. PETTIGREW: And in a civil case the jury doesn't have to be unanimous. Do you remember if the jury

was unanimous?

MS. GALLAWAY: We were.

MS. PETTIGREW: Okay.

So nothing real frustrating --

MS. GALLAWAY: No.

MS. PETTIGREW: -- or conflicting about that?

MS. GALLAWAY: No.

MS. PETTIGREW: Okay.

You have heard for a few days now talk about self-defense and various theories of murder, and I gave some examples of provocative act and doing a dangerous act. Any problem with any of that?

MS. GALLAWAY: No, I don't have a problem with any of it. The Defense may be concerned about the fact that I have some questions about why somebody would carry an illegal weapon, and I was a little confused about retreating versus pursuing to lessen the threat; that didn't seem to make sense to me, so.

MS. PETTIGREW: Okay.

MS. GALLAWAY: But that's the only question that came up in my mind.

MS. PETTIGREW: Okay.

But in terms of listening to all of the conversation over the last few days, you think you could listen to the testimony, take the instructions that the judge gives you and follow those instructions?

MS. GALLAWAY: Yes.

MS. PETTIGREW: Thank you.

If you could pass the microphone back to Mr. Paterson?

Good morning.

MR. PATERSON: Good morning.

MS. PETTIGREW: I have down here that you had requested a hardship. Is that -- what is the situation now?

MS. PATERSON: I mean, I don't -- I simply have a lot going on. I am sure a lot of other people, as well. There's reorganizations going on at my company and it's that's the situation.

MS. PETTIGREW: Do you think that -- I think that we've given a real long estimate in terms of how long the trial will be, but recognizing that, that you might be out of here well before February --

MR. PATERSON: Mm-hm.

MS. PETTIGREW: Do you think you could leave work at work and listen to the testimony and --

MR. PATERSON: I do.

MS. PETTIGREW: -- be fully engaged?

MR. PATERSON: Yes.

MS. PETTIGREW: Okay. Thank you.

Tell me about the Garden Project.

MR. PATERSON: Sure.

It was it was an organization that was associated with San Bruno County jail, and I worked with former prisoners from the county jail trying to give them life skills through gardening after they left the jail.

MS. PETTIGREW: How did you get involved with that?

MR. PATERSON: I got involved with that through a roommate of mine from college.

MS. PETTIGREW: Ah, okay.

And were you actively involved, or was it a monetary donation?

MR. PATERSON: I was actively involved.

MS. PETTIGREW: Okay.

Did that give you any sort of large views on the criminal justice system, or incarceration, or anything like that?

MR. PATERSON: Um, you know, I -- I think I sort of have the same views that I have when I went in. I think recidivism is a huge issue, and that was -- I still think it is, and so that was why I got involved.

MS. PETTIGREW: Okay.

Anything about your involvement with that organization that would impact your ability to render a verdict in this case?

MR. PATERSON: I don't think so.

MS. PETTIGREW: Okay. Thank you.

Ms. Grant?

MS. MCELROY-GRANT: Yes.

MS. PETTIGREW: Sorry. We go off old records sometimes.

MS. MCELROY-GRANT: Yes.

MS. PETTIGREW: Good morning.

MS. MCELROY-GRANT: Good morning.

MS. PETTIGREW: You work at Lawrence Livermore?

MS. MCELROY-GRANT: That's correct.

MS. PETTIGREW: Someone else who does, as well. I am just looking at my notes. Yes.

Do you know each other?

MS. MCELROY-GRANT: No.

MS. PETTIGREW: Sometimes it happens. Sometimes it happens so we just want to know it if you do.

You've also been listening to everything over the last couple days.

MS. MCELROY-GRANT: I wasn't here on Monday.

MS. PETTIGREW: On Monday, yesterday afternoon, there was also a gentleman who hadn't been present on Monday and I gave a couple of examples from movies, talking about provocative act and the game of chicken, two people agreeing to engage in this deadly dangerous situation and someone dies as a result, they can both be held responsible for murder, regardless of which person actually killed that person.

Any issue with any of those?

MS. MCELROY-GRANT: No.

MS. PETTIGREW: Okay.

Anything yesterday that was talked about that raised a thought in your mind that you would have answered differently or had a strong opinion about?

MS. MCELROY-GRANT: No.

MS. PETTIGREW: Thank you.

Ms. Snavely.

MS. SNAVELY: Yes.

MS. PETTIGREW: Good morning.

MS. SNAVELY: Good morning.

MS. PETTIGREW: You're retired?

MS. SNAVELY: Yes.

MS. PETTIGREW: What do you do in your free time now?

MS. SNAVELY: I train in martial arts and go over my mom's place to see how she's doing. It's about an hour from here.

MS. PETTIGREW: You enjoy your free time?

MS. SNAVELY: Yes.

MS. PETTIGREW: Good.

In your training in martial arts, do you actually spar with people?

MS. SNAVELY: Yes, I do.

MS. PETTIGREW: In a gym or --

MS. SNAVELY: Yes, studio, gym.

MS. PETTIGREW: Okay, a studio.

And is there teachings about self-defense within your training?

MS. SNAVELY: Yes.

MS. PETTIGREW: And are you taught to use your skills only in defensive situations?

MS. SNAVELY: Yes. We are not supposed to use it actually, I mean, except for when you really have to, and that's it.

MS. PETTIGREW: Have you ever had to outside of training in the studio?

MS. SNAVELY: No, never have.

MS. PETTIGREW: Okay.

MS. SNAVELY: And if any situation arises, actually, you're supposed to kind of diffuse anything that happens or walk away.

MS. PETTIGREW: Okay.

Do you think that your training in that aspect of self-defense, if it in some way conflicted with the law on self-defense, do you think you could set aside your views or your teachings and follow the law?

MS. SNAVELY: Yes, I can.

MS. PETTIGREW: Okay. Thank you.

I don't have any further questions.

MR. STECKLER: Good morning, everyone.

Can I take the microphone, please?

Would -- do any of the four of you object strenuously if I didn't have many questions or any questions for you? No. Okay, good.

Couple of you I did have some questions for, though.

Ms. Gallaway, good morning.

MS. GALLAWAY: Good morning.

MR. STECKLER: There are a couple places on your questionnaire that caused ma to have a concern whether you could be fair to the defendant in a criminal case, in this case.

MS. GALLAWAY: Okay.

MR. STECKLER: So you said that it might be hard for you to not let sympathy play a role in a homicide trial. You do feel sympathy for the innocent victim?

MS. GALLAWAY: I do. That's something that stands out in my mind when I first filled out that questionnaire.

MR. STECKLER: The innocent bystander victim in this case?

MS. GALLAWAY: Yeah.

MR. STECKLER: And you think that firearms are the cause of too many innocent deaths?

MS. GALLAWAY: Yes.

MR. STECKLER: All right.

And you -- at the end of the questionnaire, you said that when asked if you can be fair and impartial in this case, um, whether there's any reason why you could not be, you said yes, and the nature of this case makes you uncomfortable; is that right?

MS. GALLAWAY: It does.

MR. STECKLER: Okay.

So there might be another criminal case that you could sit on, but it sounds like in your mind this is not the case for you to be fair to both sides. Do I have that right?

MS. GALLAWAY: That's true.

MR. STECKLER: Okay. Thank you, ma'am.

Can I ask you to pass the microphone back to Mr. --

THE COURT: Could I interrupt for a sec.

Let me ask you a question. If I could go back to Ms. Gallaway because I want to give Mr. Steckler an opportunity to ask more questions if I get a different answer from you.

MR. STECKLER: Thank you.

THE COURT: Sometimes we fill these questionnaires out -- well, in every case we fill them out before we have this voir dire in court.

MS. GALLAWAY: Right.

THE COURT: You might have more information and perspective now after you filled this out. What would your answer be today after you filled out this?

MS. GALLAWAY: I think when I filled it out that day, I just had a very emotional reaction when I heard there was an innocent victim. I understand what the law is and I understand hearing facts, and I didn't have all the facts when I filled out the questionnaire.

THE COURT: And we still don't have all the facts. We don't have any of the facts.

MS. GALLAWAY: Exactly. So I totally understand that that's a big part of the process, and I respect the criminal justice process so I can be fair. Just like somebody else said, I follow the rules. So I know how to follow the rules. However, the nature of the case just brought on some emotions for me, for whatever reasons, and I think partly because I am in the realm of prevention and I think my job is to educate to prevent certain things

from happening in people's lives. So I think that's kind of where I was coming from.

THE COURT: ` So today as you sit here --

MS. GALLAWAY: Mm-hm.

THE COURT: -- if you were asked that question today, question is is there any reason you can think of you cannot sit as a fair and impartial juror in this case, what would you answer to that today?

MS. GALLAWAY: Other than just my emotions, no, that I can be fair.

THE COURT: Okay.

You think your emotions are the kind of thing that are going to prevent you from executing your oath to well and truly try the case, to hear the evidence and base your decision on the evidence and not your emotions, but on the evidence that's presented to you and the facts and the law that are presented?

MS. GALLAWAY: No. I mean, I can separate the two.

THE COURT: Okay. All right.

Sorry, Mr. Steckler, to interrupt.

But if you want to question further, you're free to do so.

MR. STECKLER: I do. Thank you.

You know there are no right or wrong answers here?

MS. GALLAWAY: Right.

MR. STECKLER: And I didn't want to put words in your mouth and I didn't think I was doing that.

THE COURT: And I was --

MS. GALLAWAY: No.

THE COURT: And I wasn't suggesting that you were doing that.

MR. STECKLER: No.

But with respect -- the judge might have more stature in this room than I do, and so I don't want you to think that you need to answer his questions in a certain way either.

MS. GALLAWAY: Okay.

MR. STECKLER: Right.

So when I asked you this part of the questionnaire, whether this is the case for you, I thought when you answered my questions you were talking about how you feel today; were you?

MS. GALLAWAY: Well, yeah, I am kind of conflicted because sitting in the audience I don't feel like it is the case for me.

MR. STECKLER: Right?

MS. GALLAWAY: I know how to be fair. As a teacher, I pride myself on being fair.

MR. STECKLER: Just so you know, again, there are no right or wrong answers here and you're not being maligned as a person in any way, whatsoever, if this isn't the case for you because there is an innocent bystander who died from gunfire. So only you know. The judge doesn't know. I don't know. Do you think you can be fair to both sides in this case?

MS. GALLAWAY: No.

MR. STECKLER: Okay.

Can you pass the microphone back to Mr. Paterson?

Just quickly, what is your connection to either Colorado or to Michael Bennett, curious?

MR. PATERSON: My college roommate's his brother.

MR. STECKLER: Got it. Thank you.

Can you pass the microphone to Ms. Grant?

There's some connection, ma'am, to law enforcement both with what your husband has done for many, many years and perhaps some friends of yours?

MS. MCELROY-GRANT: That's correct.

MR. STECKLER: Based on that, do you think you can be fair to both sides in a criminal case?

MS. MCELROY-GRANT: Yes, I think I can be fair.

MR. STECKLER: And I don't have any questions for Ms. Snavely. Thank you so much.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

You know, Ms. Gallaway, I think every right-thinking person in this room would have a natural emotional reaction to something about an innocent bystander --

MS. GALLAWAY: Right.

MR. BRYDEN: -- being killed. Nobody likes that.

That's just wrong, correct?

MS. GALLAWAY: Right.

MR. BRYDEN: So I think everybody agrees with you. But, despite that, wouldn't you agree with me that the issue here for me is whether or not my client, Donel Poston, is liable for that, is responsible for that; is that correct?

MS. GALLAWAY: Right.

MR. BRYDEN: So you could divorce the obvious sympathy you would have for the decedent here and focus on the issues, whether or not the Prosecution has met its burden of proof that he is somehow responsible, correct?

MS. GALLAWAY: Right.

MR. BRYDEN: And you could be unbiased in doing that, right.

MS. GALLAWAY: Right.

MR. BRYDEN: You know, I was interested because you -- you did serve as a juror in a civil case one time.

MS. GALLAWAY: Mm-hm.

MR. BRYDEN: You have never done a criminal case?

MS. GALLAWAY: No.

MR BRYDEN: Okay.

You got an instruction on preponderance of the evidence in that case, if you may recall, where maybe the judge said that there's slightly more evidence on one side or the other, then you have to go for that side, kind of weigh the evidence, correct?

MS. GALLAWAY: I guess I don't really remember.

MR. BRYDEN: Okay. Oh, okay. Well, I am clumsily bringing up the point that in this case a lot more is at stake than money or where we apply the preponderance of the evidence. In this case, it's even beyond what we call clear and convincing evidence. The Prosecutor has to prove beyond a reasonable doubt, not an imaginary doubt; but if you have a reasonable doubt that, say, Donel Poston here is guilty for murder/attempted murder, you have to find for Donel Poston. Can you assure me you could do that?

MS. GALLAWAY: Yes.

MR. BRYDEN: Okay.

Your fiance wants to be a cop, right?

MS. GALLAWAY: Yes.

MR. BRYDEN: How do you feel about that?

MS. GALLAWAY: I'm -- I feel very proud of him for wanting to do that.

MR. BRYDEN: Do you worry about the dangers?

MS. GALLAWAY: I try not to think about it. It's still in process.

MR. BRYDEN: I am sorry?

MS. GALLAWAY: It's still in process, so we're not there yet. I am going to cross that bridge when I get there. Right?

MR. BRYDEN: Well, you would expect him to defend himself; if somebody were to punch him or hit him, he could respond back with force, right?

MS. GALLAWAY: Yes, I would expect that. There is a lot of training that goes into how that's handled properly.

MR. BRYDEN: And you're going to feel a little bit better about the fact that when he is a police officer he's going to be carrying a sidearm, right?

MS. GALLAWAY: Yes.

MR. BRYDEN: Okay.

Oh, let's see. Mr. Paterson, I wanted to thank you. I thought you were very expressive on your ideas on self-defense, so I can't think of -- did I see here that you lived -- you know, I don't really have any questions. I'd ask you about Taiwan or Hong Kong, but I will move on to Ms. McElroy-Grant.

And I am just going to repeat something because you said you weren't here Sunday -- I mean Monday, you weren't here at the beginning. I don't know if I mentioned this. But if you were a juror in this case, you'll get an instruction, I believe, that each of these two defendants is entitled to your decision separately. The evidence that's going to be in this case is going to be much the same evidence, but you have to weigh each person's liability or non-liability separately.

Do you understand that?

MS. MCELROY-GRANT: Yes, I do.

MR. BRYDEN: So in this case where we're talking about attempted murder and murder, there could be a variety of different outcomes; do you agree?

MS. MCELROY-GRANT: Yes.

MR. BRYDEN: Just because one might be guilty, the other one might not be, and vice verse, correct?

MS. MCELROY-GRANT: That's right.

MR. BRYDEN: And so you could commit to the fact that this is more complex than one person on trial; it's like at least two trials?

MS. MCELROY-GRANT: I understand.

MR. BRYDEN: Okay. Thank you. I appreciate that.

Being retired then, Ms. Snavely, is it -- is it that you kind of want to be here in some sense, or do you kind of -- something very interesting to do, or would you rather spend your time -- I know most people working don't want to be here.

MS. SNAVELY: Either way.

MR. BRYDEN: Hm?

MS. SNAVELY: Either way's fine.

MR. BRYDEN: Either way's fine.

I remember we excused one juror the other day and she seemed disappointed, and then others seemed gleeful. So I am just wondering from the perspective of somebody who is not working, has lot of activities to do --

MS. SNAVELY: I do have a lot of activities, but this would be my civic duty.

MR. BRYDEN: All right. I appreciate that.

Thank you so much, folks.

THE COURT: Thank you, Mr. Bryden.

There was a time back before I had gray hair when

I was trying cases there used to be court-watchers that would come in and watch trials. I remember distinctly up in Oakland seeing some of the retired people; some of the retired guys would come down to court and just sit and watch because there was a lot going on in those courts. I am not sure it's happens very much anymore. So, of course, anybody who is excused is always happy to come and see what they would learn by watching the trial if they choose to do so. However, that's for you to decide how to spend your own time.

Does anybody want to approach for cause?

MR. BRYDEN: Yes.

THE COURT: Any particular -- would I be over-stepping myself to say we're talking about seat number 11?

MR. STECKLER: You're not.

THE COURT: Okay.

I am going to thank and excuse Ms. Gallaway.

Okay. Thank you for your service, ma'am.

Any other reason to approach for cause?

MR. STECKLER: No.

MS. PETTIGREW: No, Your Honor.

THE COURT: All right.

I will ask Mr. Paterson to take up seat number 11 please.

I think the challenge is with the People.

MS. PETTIGREW: And we're assuming seat one will be filled by Mr. Haynes.

THE CLERK: I have a number, but I was waiting for this so I can go in the back and call him.

THE COURT: Okay. Let's -- this is a problem sometimes, ladies and gentlemen, but it's a good example as to why it's hard to get everything perfect in a trial. And we're only as strong in -- sometimes as the weakest link, right? If somebody doesn't show, we can't really proceed. The proceedings is actually -- I am going to take a recess now. I am going to ask the clerk to try and contact Juror number 1. He hasn't had time to do that. And if we don't get a call, we're going to have to talk to the attorneys about what we're going to do. So we're going to take a recess now until 10:15 so we can work this out, because we have the -- you can really only exercise the challenge if you know who the 12 people in the box are. If this person doesn't come, it would skew the process to say -- so we're not asking you to hold it against him if he does show up. I am just saying you can see where we get ourselves in a bind here and we have to kind of do it in a legally appropriate way.

So we'll take a recess for 15 minutes and hopefully we can make further progress in 15 minutes.

Please don't discuss the case until it's finally submitted to you.

(Whereupon, the prospective jurors exit the courtroom and a brief recess was taken)

THE COURT: All right. It's a little bit after 10:15. Juror number 1, who -- Mr. Haynes, all the other

jurors showed up at 9:30. Well, not all the other jurors showed up at 9:30, but other than Mr. Haynes everyone in the box showed up at 9:30. And so now we reached the point where we have prospective jurors seated and to be seated and there's an opportunity to exercise challenges. I am not sure. The clerk has tried to reach Mr. Haynes. He's called him at his work phone and his home number, according to the clerk, and not received an answer. We don't have any other way to reach him. So I don't know what -- I am really not asking -- if you have any input, I will take it, but my thought is we take one of these prospective jurors and seat them in seat number one. And we can have one juror who doesn't -- can't have a juror who doesn't come to court when everybody knows what time and place to be, we can't have that juror kind of holding the court and the case hostage while we try to deal with that person. So how we deal with Mr. Haynes in the future, I don't know we have to get to right now. But right now I am going to seat one of the prospective -- alternate prospective jurors. In seat number 1 there would be a new person, who would be Ms. McElroy-Grant would be in seat number one; Mr. Paterson would be in seat number 11, and we'd have our 12 jurors. If Mr. Haynes shows up later today, we'll have to address that -- maybe we put him back in the cue, maybe we excuse him because he's not trustworthy in terms of his time being here. I don't know. But I don't think we need to make a decision on that at this point. All I know now is we're going to

proceed with a jury, and in order for the People to exercise a challenge to the veneer we need to have 12 people there, and we can't hold an empty seat on a hope and a prayer as to what would happen.

Anything anybody wants to put on the record.

Mr. Steckler?

MR. STECKLER: Submitted.

THE COURT: Mr. Bryden?

MR. BRYDEN: No, thank you.

THE COURT: Ms. --

MS. PETTIGREW: Submitted.

THE CLERK: I called the other jurors' names. None of the other ones are here except for Ruedas.

THE COURT: Okay.

(Whereupon, the prospective jurors enter the courtroom)

THE COURT: All right. Thank you, ladies and gentlemen.

Ms. McElroy-Grant, I am going to order that you take seat number one please.

And the challenge is with the People.

MS. PETTIGREW: Thank you, Your Honor.

The People would like the thank and ask the Court to excuse Juror number 11, Mr. Paterson.

THE COURT: Thank you, Mr. Paterson, for your service.

And, Ms. Snavely, could you take seat number 11 please?

MR. STECKLER: The -- is it a joint?

MR. BRYDEN: Yes, it's a joint.

MR. STECKLER: The Defense would like to jointly ask the Court to excuse Juror number 1.

THE COURT: All right.

Thank you very much for your service, Ms. McElroy. Ms. McElroy-Grant will be excused.

I will ask the clerk to call the next four names please.

THE CLERK: Jessie R-u-e-d-a-s, please take seat number one.

(Juror No. 1), please take alternate seat number one in the back row.

(Juror No. 11), alternate seat number two please.

And Marcos Z-e-p-e-d-a. Zepeda? Zepeda?

THE COURT: Marcos Zepeda. All right.

THE CLERK: Sandra M-a-n-h-a.

THE COURT: The other day you had a request to be excused for a day or so for health reasons.

Are you feeling better now to serve as a juror?

MR. RUEDAS: Yeah.

THE COURT: We don't really want you to get everybody sick on the jury. You think you're well enough not to have that problem, not only for their sake, but we don't want to have a problem where a bunch of people are sick and that delays the trial.

MR. RUEDAS: I am okay.

THE COURT: You're satisfied you're all right?

MR. RUEDAS: Yeah.

THE COURT: Okay.

Ms. Pettigrew.

MS. PETTIGREW: Good morning, Mr. Ruedas and the other three that joined us.

Can I get you to pass the microphone down please?

So you might consider yourself lucky having been able to avoid the last day an a half of question-and-answer and listening from the back of the room, but there's a couple things, couple concepts that I just want to cover that I've covered in the last couple days and get your feelings on them.

Have you ever heard of the game of chicken?

MR. RUEDAS: No.

MS. PETTIGREW: Okay.

Did you watch the movie Grease with John Travolta?

MR. RUEDAS: Yeah.

MS. PETTIGREW: Where they drive cars at each other?

MR. RUEDAS: Oh, okay.

MS. PETTIGREW: And the object is to -- actually, I think in that one maybe they were just racing. In any event, game of chicken, two people driving cars at each other and the object is to be the last one to pull out of the way. Forget whether there's a winner or loser, but imagine that situation where two people have chosen to engage in that situation; one pulls off and kills an innocent person that's standing by. The law says that

those two people, having engaged in that deadly and dangerous conduct that is dangerous to human life, if a death occurs in the process, both of those people can be held liable for that person's murder, whether or not they were the one who actually killed them. So the person who didn't actually hit the innocent bystander would also be on the hook. Do you agree with that?

MR. RUEDAS: I don't agree with that.

MS. PETTIGREW: Okay.

Just, in general, you think that the person who didn't actually hit the person wouldn't be liable?

MR. RUEDAS: All right. I am kind of confused.

MS. PETTIGREW: Sure.

MR. RUEDAS: Can you repeat that question?

MS. PETTIGREW: Sure.

You have the concept, two people driving their cars in the direction of each other and they both know that the object of the game is to veer off at the last minute.

MR. RUEDAS: Okay.

MS. PETTIGREW: And forget whether one wins or doesn't, but one who veers off, kills an innocent person, both people who engaged in that game, that dangerous deadly game with deadly weapons, those being the cars that they were driving at each other, are responsible for that person's death, whether or not they both hit him or one or the other hit him. Do you understand what I am getting at?

MR. RUEDAS: Yeah. Um, just really confused, nervous. Sorry.

MS. PETTIGREW: It's okay.

MR. RUEDAS: So you're asking me if I think they should both be tried for that --

MS. PETTIGREW: Yeah.

MR. RUEDAS: -- or just one person?

MS. PETTIGREW: Yeah.

MR. RUEDAS: Um, I think just the one person.

MS. PETTIGREW: If the law said that both of them are responsible, what do you think?

MR. RUEDAS: I agree with that. That's fine, yeah.

MS. PETTIGREW; Would you be hesitant, though, on the person who didn't actually inflict the fatal blow?

MR. RUEDAS: Yeah, I would.

MS. PETTIGREW: You would.

So if I proved the case that one of these guys inflicted the fatal blow and the other didn't, but the law that you were given said both of them, because of one law or another, the law I have just given, is responsible, would you not convict because you think that you have to be the person who actually pulled the trigger?

THE COURT: Are you changing the hypothetical now? Because your first hypothetical was about two people in a car. Your intent might be different if you have two people in a car. Are you changing the hypothetical to two people with guns now?

MS. PETTIGREW: Yes.

THE COURT: Do you see the difference -- there might be a difference between two people with cars and two people with guns, right? Do you draw a distinction there, Mr. Ruedas?

MR. RUEDAS: Yeah. I am just trying to understand the question because I am -- I am nervous.

THE COURT: Let me ask you a different question. You -- maybe you've seen some of those old westerns where there's a shoot-out in the middle of town between two gunmen, right. Usually in those movies no innocent bystanders get hurt. They're usually peeping from behind the glass, which somehow protects them from getting shot during the shoot-out, or maybe they just don't stand in the line of fire. But in that kind of case two people are doing something that's a little bit more strenuous than driving cars and getting in a speed race, which can be dangerous, not to minimize that, but can you see there's -- they have a different thought process going on; they clearly intend to try and shoot kill somebody?

MR. RUEDAS: Yeah.

THE COURT: And if some innocent person gets killed, how about under those circumstances, does that -- what do you think about that?

MR. RUEDAS: Well, I think that if -- yeah, I don't think that they both should go down because of it. I think whoever -- whoever's bullet it was, or whoever, I guess --

THE COURT: Okay.
MR. RUEDAS: -- that person's responsible.
MS. PETTIGREW: Okay. Thank you.
If you could pass the microphone down?
(Juror No. 1), good morning.
JUROR NO. 1: Good morning.
MS. PETTIGREW: There you go. Maybe it wasn't on before.
You studied law in China?
JUROR NO. 1: Yes.
MS. PETTIGREW: With what goal?
JUROR NO. 1: Just want to, you know, get a job at a courthouse in different legal systems.
MS. PETTIGREW: Okay.
And did you get a job in a courthouse?
JUROR NO. 1: Yes, I did.
MS. PETTIGREW: In China or here?
JUROR NO. 1: China.
MS. PETTIGREW: Okay.
What was your job?
THE COURT: We're going to change the battery because when it starts breaking up --
MS. PETTIGREW: What was your job in China?
JUROR NO. 1: Um, at that time I was like what that lady is doing, like reporter.
MS. PETTIGREW: Uh-huh. Taking down what people say in court?
JUROR NO. 1: Right, right, right.

MS. PETTIGREW; Okay.
Did you ever have any aspiration to be a lawyer?
JUROR NO. 1: Um, I thought about that, but, um, I didn't do it.
MS. PETTIGREW: Okay.
Too much school?
JUROR NO. 1: Um, actually it's different system, so you start working for the court, start with the lady, and then later on you will take the test like similar to the Bar examination, and then you can become a judge and, you know, go to that ground, and --
MS. PETTIGREW: Okay.
I imagine the system there is much different from the system here.
JUROR NO. 1: Yes.
MS. PETTIGREW: Do you have any strong views about our system here?
JUROR NO. 1: I will consider myself a law follower, so whatever the law says, then I will follow it. Um, I was here yesterday and that lady from India, she said, you know, here is more efficient and there it is like 20 years. I would say in China it's much shorter, so the Government can do whatever they want. So -- but in terms of fairness, I think here is more fair. That's my observation.
MS. PETTIGREW: Okay.
Do you think after listening to all the conversations that we've had in the last couple of days

that you could sit as a juror on this case and reach a verdict?

JUROR NO. 1: Yes.

MS. PETTIGREW: Okay.

Do you have any hesitation that if I proved this case beyond a reasonable doubt that these two committed murder, would you be able to render a guilty verdict?

JUROR NO. 1: Yes.

MS. PETTIGREW: Thank you.

(Juror No. 1), if you could pass the microphone to (Juror No. 11)?

JUROR NO. 11: Good morning.

MS. PETTIGREW: A nurse educator; what does that mean, training nurses?

JUROR NO. 11: So my specialty is pediatric oncology, and I work associated with that unit, although I do a lot of education. I also train and maintain nurse competencies, and I also do family teaching, getting the family ready to go home after the diagnosis.

MS PETTIGREW: Wow. So you deal with long-term illness as to acute trauma?

JUROR NO. 11: Sure. Yes.

MS. PETTIGREW: Okay.

In your training or experience leading up to your current position, did you ever work in an emergency room or trauma center?

JUROR NO. 11: Uh-uh.

MS. PETTIGREW: Okay.

You said on the criminal justice system you believe in the process but it could be streamlined. I will bet you really believe it after sitting here for three days.

JUROR NO. 11: I do, yes.

MS. PETTIGREW: Like I said in the very beginning when I started, this is kind of the most lengthy part of the process, or what probably some call the most boring part. Do you think you could sit as a juror on a case like this?

JUROR NO. 11: Oh, yeah, absolutely. I am more of the, we shall pack a PB&J, take a half an hour lunch, and get on with it. Absolutely, yes.

MS. PETTIGREW: And the examples, various examples I have given, do you have any issues with those?

JUROR NO. 11: No.

MS. PETTIGREW: Okay. Thank you.

Ms. Manha.

MS. MANHA: Yeah.

MS. PETTIGREW: Good morning.

MS. MANHA: Good morning.

MS. PETTIGREW: You said that the criminal justice system needs work. What is that based on?

MS. MANHA: It's based on my daughter was jumped at the age of 13 and the police officers did nothing for four days, and the people who jumped her got away with it, so.

MS. PETTIGREW: Did you or she know who --

MS. MANHA: Oh, yeah.
MS. PETTIGREW: -- the people are?
MS. MANHA: We know where they live. We know who they were. The police knew who they were. And they waited four days to get witnesses and they were gone, so.
MS. PETTIGREW: Does that give you an overall view of the justice system that you don't want to be a part of it?
MS. MANHA: Yes and no.
MS. PETTIGREW: Okay.
MS. MANHA: It has its good points; it has its bad points, just like everything else.
MS. PETTIGREW: Okay.
There was a question in the questionnaire about whether you or anyone else close to you had ever been arrested for a crime. Do you remember those questions?
MS. MANHA: Mm-hm.
MS. PETTIGREW: Have you?
MS. MANHA: Years ago.
MS. PETTIGREW: Okay.
And yet you didn't write that in the questionnaire?
MS. MANHA: No, I didn't.
MS. PETTIGREW: Is there a reason for that?
MS. MANHA: Probably I forgot about it.
MS. PETTIGREW: Okay.
I don't have any further questions.

THE COURT: Thank you, Ms. Pettigrew.

Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

If I could just have a moment?

(Whereupon a discussion you was held off the record between all counsel)

MR. STECKLER: Thank you, Your Honor.

Let me go right to -- where is the mike? Can I ask you to pass the microphone two people down to (Juror No. 1)?

Good morning, sir.

JUROR NO. 1: Good morning.

MR. STECKLER: So I want to go back to the language you used both in your questionnaire and this morning, that you will follow whatever the law states. Do you recall me the last couple days talking to some other jurors about the word reasonable or reasonably?

JUROR NO. 1: Yeah, I was here the last two days and heard about the questions.

MR. STECKLER: Okay.

The question I have for you is so there are going to be several instructions, not just on self-defense, but self-defense for example, that are going to ask you to -- that are going to ask you to define a word and to apply it, and to apply the word like "reasonably" to a set of maybe some complex or complicated set of facts. What do you think about how you would approach that? Do you think you could do something like that?

JUROR NO. 1: I think I can. It all depends on the scenario and instructions given.

MR. STECKLER: Okay. All right.

And then how about whether you would render your own verdict. In other words, both sides are entitled to the individual opinion of all 12 jurors who decide this case. Are you that type of person who would just go with the majority, no matter what?

JUROR NO. 1: No. I will analyze the case individually. I don't -- you know -- I don't go with the flow.

MR. STECKLER: But you may, depending on what they say?

JUROR NO. 1: Right. Right. I can hear their opinion, but I will do my own analysis.

MR. STECKLER: Okay, good.

And you're okay -- you just noted something on the questionnaire that English is not your first language. Are you okay with the English that's been spoken so far?

JUROR NO. 1: Yes, I'm okay. What I am saying is that sometime I just don't understand the slang, probably in a movie, The Bodyguard, that's all. I am fine with daily conversations.

MR. STECKLER: I haven't seen The Bodyguard either, so that's all right.

And then the thought about guns, some people may agree with you that some people should not own guns. Are you able to set that thought aside and decide the question

of murder --

JUROR NO. 1: Yes.

MR. STECKLER: -- separately?

JUROR NO. 1: Yes.

MR. STECKLER; Can you hold Ms. Pettigrew to the burden of proof of proof beyond a reasonable doubt?

JUROR NO. 1: Yes.

MR. STECKLER: If she does not -- if she presents some evidence or enough evidence to make you think that Mr. McNeely probably committed murder, right, but doesn't convince you to a higher standard of beyond a reasonable doubt, would you hesitate to vote not guilty in that situation?

JUROR NO. 1: Can you rephrase your question?

MR. STECKLER: Okay. Sure. It gets a little complicated.

So the proof that she presents, the evidence that she presents leads you to think that my client probably did it, probably is guilty of murder --

JUROR NO. 1: Mm-hm.

MR. STECKLER: -- but is not proved beyond a reasonable doubt, if that's the case would you vote not guilty?

JUROR NO. 1: I would vote not guilty.

MR. STECKLER: You would?

JUROR NO. 1: If I cannot prove it based on my analysis, if not beyond reasonably doubt, then I would won't vote the defendants guilty.

MR. STECKLER: Thank you very much, sir.

Can you pass the microphone over to (Juror No. 11)?

Did you stick with Sarah in the non-Vinnie years when it was Sarah and No-name, or are you -- were you not listening?

JUROR NO. 11: I suppose I was listening on and off.

MR. STECKLER: Do you prefer Vinnie or No-name?

JUROR NO. 11: I guess I would have to go with Vinnie.

MR. STECKLER: So you've got some law enforcement connection?

JUROR NO. 11: Peripherally.

MR. STECKLER: Peripherally.

Any hesitation in your mind whether you could be fair to the Defense in a criminal case, given those --

JUROR NO. 11: Absolutely not.

MR. STECKLER: And self-defense and the right to pursue, can you follow the law if it's the law, as you'll hear, that a person who's being attacked may pursue if it's reasonably necessary to reach safety?

JUROR NO. 11: Yeah, absolutely. In retrospect, as I thought about that question a lot, I can come up with instances where that might be necessary, so yes.

MR. STECKLER: I don't think I have any other questions for the other jurors or (Juror No. 11).

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

Good morning, Mr. Ruedas. Sorry we're going to pick on you again today. But, you know what, I don't blame you for being confused about this analogy of car racing and a game named chicken where supposedly people agree to do something dangerous. I think the judge had give better analogy about the facts as they are going to come in on this case, the western movie.

Would you agree with me that if a man with a gun hit with his fist another man, that man would have a right -- and the man who hit the other man drew his gun, the other man would have a right to draw his gun too?

MR. RUEDAS: I agree with that.

MR. BRYDEN: Like the old west movies, right? I mean, if somebody draws on you, you can shoot back, right? Correct?

MR. RUEDAS: Yeah.

MR. BRYDEN: And then you wouldn't necessarily be liable?

MR. RUEDAS: (Witness nods head in the affirmative).

You're feeling better? I know you have been through all that, so you're getting strong. Did you have that Swine flu? I was reading about that today.

MS. MANHA: No, I don't think it was Swine flu.

MR. BRYDEN: Okay. I won't follow up on that.

(Juror No. 1), again, I had the same concern maybe

as Steckler because you brought it up a couple times in your questionnaire, although I understood the questionnaire, English is not your first language; you're not familiar with some of the terms. Did you feel that -- and I am trying to talk a little fast right now -- that you followed everything that's been going on --

JUROR NO. 1: Yes.

MR. BRYDEN: -- for the last couple of days?

JUROR NO. 1: Yes.

MR. BRYDEN: And you can read pretty well --

JUROR NO. 1: Yes.

MR. BRYDEN: -- all that?

So you just brought it up, but I shouldn't be concerned about it?

JUROR NO. 1: You should be okay.

MR. BRYDEN: Okay.

This is an entirely unfair question 'cause I couldn't answer it, but you were an official, I guess, in the courts in China. Do you have any ideas about comparative legal systems, how you compare the American system to the Chinese?

JUROR NO. 1: Um --

MR. BRYDEN: What's the differences or what's the same?

JUROR NO. 1: As I said earlier, things in terms of fairness, I think here is more fair than the system in China in terms of criminal case. In China, they can get a case done and get sentenced to jail in couple months from,

you know, the crime happened, so.

MR. BRYDEN: And, certainly, you don't have a right to a jury, right?

JUROR NO. 1: Um, they are the jury system, but to me it's -- it's not working, so.

MR. BRYDEN: Why is that? Do they actually have people come in from the town or village -- what city were you in?

JUROR NO. 1: Guangzhou, China, the southern part of China.

THE COURT: Mr. Bryden, I apologize, but we've been at this some time. If this is going to help with the cause challenge, it's an appropriate question. I don't see how that's going to help me with the cause challenge.

MR. BRYDEN: I also thought I could exercise by peremptories.

THE COURT: You can exercise peremptories. I think the rule says the questions got to go to cause. So if there's some --

MR. BRYDEN: Oh.

You are a U.S. citizen?

JUROR NO. 1: Yes.

THE COURT: I am giving you greater leeway than that. And I want to get to the jury.

MR. BRYDEN: I am sorry. I spend so much time --

THE COURT: It's very interesting and maybe we can have a conversation at a later time about comparative law. But if he can apply the law in the United States, that's

where we're going.

MR. BRYDEN: I am assured that --

THE COURT: And I am not trying to -- I just like to be a little more efficient. And I am not trying to say that -- suggest anything about (Juror No. 1), but I think he's answered the questions you're trying to get at.

MR. BRYDEN: Yes, he has.

THE COURT: All right. Thank you.

MR. BRYDEN: Thank you, (Juror No. 1).

JUROR NO. 1: No problem.

MR. BRYDEN: (Juror No. 11), what does a nurse educator do?

JUROR NO. 11: Well, I am a clinical nurse educator, so my work is mostly on the unit level where I work as sometimes a expert for the nurses and, say, sort of someone else they can call if they have questions or need help with something they can't do on their own. And I also maintain their competencies, as far as holding classes and that kind of stuff. And then I teach families before they are -- before they go home about their diagnosis and how to take care of their child at home.

MR. BRYDEN: Have you taught nurses about how to be a surgical operating room nurse?

JUROR NO. 11: No, I am not a operating room nurse. I am an oncology nurse.

MR. BRYDEN: Thank you.

Ms. Manha, you were kind of reluctant I think to express yourself on these self-defense concepts. On the

questionnaires, there were several questions. One of them you left blank. I am just going to ask it again, if I could. The question was the law states that a defendant acts in lawful self-defense if the defendant reasonably believed that he was in imminent danger of being killed or suffered great bodily injury; two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against the danger; and, three, that the defendant used no more force than was reasonably necessary to defend against the danger. Those three things. Then the question was asked, what do you think about the law? Do you have any feelings one way or the other about that embodiment or the right to self-defense?

MS. MANHA: Everybody has the right to self-defense.

MR. BRYDEN: Do you agree that people, if sufficiently in danger of suffering death or great bodily injury, that they can use deadly force in response?

MS. MANHA: Yes.

MR. BRYDEN: Okay. Thank you.

No other questions.

THE COURT: Okay. Thank you, Mr. Bryden.

All right. The Court is going to thank and excuse Mr. Ruedas. Thank you for your service, sir.

(Juror No. 1), can you grab seat number one please?

I think we're back to the People with the challenges for cause.

MS. PETTIGREW: Thank you, Your Honor.

The People would like to thank and ask the Court to excuse Juror Number 11, Ms. Snavely.

THE COURT: (Juror No. 11), you can go to seat number 11.

The joint challenge to the Defense.

MR. BRYDEN: Your Honor, it's my understanding we would pass on the joint.

MR. STECKLER: Yes.

THE COURT: Okay.

And now -- I forgot to put a little checkmark as to who's got the next individual.

Mr. Clerk?

THE CLERK: Mr. Poston.

THE COURT: Mr. Poston's got the next individual challenge.

MR. BRYDEN: May I just have a minute?

THE COURT: Sure.

(Whereupon a discussion was held off the record between Mr. Bryden and Mr. Poston)

MR. BRYDEN: Your Honor, Mr. Poston and I would like the Court to thank Mr. Basurto, Juror Number 8, for his service.

THE COURT: Thank you for your service, sir. You're excused for another year then.

Ms. Manha, I will ask you to take seat number 8.

Challenge will go back to the People.

MS. PETTIGREW: The People would like to thank and

ask the Court to excuse Ms. Manha.

THE COURT: Thank you, Ms. Manha, for your service, albeit brief.

MS. MANHA: Yes.

MR. BRYDEN: Could we approach just for a second, Your Honor?

THE COURT: You may. Yes. That will be fine.

(Counsel approach the bench; discussion off the record)

THE COURT: Next four names.

THE CLERK: Kristen J-e-n-s-e-n. Jensen, J-e-n-s-e-n. Please take seat number 8 in the front row.

Sheryl T-h-r-e-l-k-e-l-d, alternate seat number one in the back row.

J. Roldan P-a-g-u-i-a, alternate seat number two please.

(Juror No. 8), alternate seat number three.

THE COURT: Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good morning.

Ms. Jensen, start with you. I think you can tell we're as interested as all of you in kind of streamlining things.

You're a lawyer?

MS. JENSEN: I am.

MS. PETTIGREW: Have you ever worked -- have you ever done any trial work?

MS. JENSEN: Yes.

MS. PETTIGREW: Do you currently do trial work?

MS. JENSEN: Yes.

MS. PETTIGREW: You're a City Attorney for San Francisco. What general area is that?

MS. JENSEN: I am the head of litigation. I don't do criminal work.

MS. PETTIGREW: Did you ever have any sort of interest in criminal while in law school?

MS. JENSEN: Sure. I took criminal law.

MS. PETTIGREW: Any thought you would maybe go into this kind of work?

MS. JENSEN: I did think about it.

MS. PETTIGREW: If you were going to, did you have a leaning towards one side or the other?

MS. JENSEN: No. That's why I moved to another direction because I wasn't sure which side I would want to be on.

MS. PETTIGREW: Okay.

So no type of clerkships or internships that focused on criminal law?

MS. JENSEN: No.

MS. PETTIGREW: Okay.

Your son had an incident that was a bad experience with the police?

MS. JENSEN: Yes.

MS. PETTIGREW: And did you observe it, or did he tell you about it?

MS. JENSEN: No. It was in New Orleans and, unfortunately, the police department lived up to their reputation.

MS. PETTIGREW: Okay.

Did anything go through the criminal justice system back there?

MS. JENSEN: The charges were dropped.

MS. PETTIGREW: Were you present in any of the circumstances?

MS. JENSEN: No, I was not.

MS. PETTIGREW: Okay.

Anything about that situation that bleeds over into your view of the criminal justice system here?

MS. JENSEN: Only in New Orleans.

MS. PETTIGREW: Okay.

So you, again, like many, have said you can compartmentalize?

MS. JENSEN: Yes.

MS. PETTIGREW: You had a quote that standing your ground is not reasonable in every situation, such as when third parties are in danger. Obviously, in the course of the last few days you kind of see where this is going, and I think the defense is going to want is to know how you feel about that now. Do you think it's something that you could set aside and compartmentalize, or are you more like the woman that was excused this morning, that this just isn't the case for her?

MS. JENSEN: It's my personal view, not my legal

view. I know the law says something else, but I read the question as being what is your personal view on this.

MS. PETTIGREW: Okay.

MS. JENSEN: And my personal view is that it's not always reasonable, but I understand that the law says something else.

MS. PETTIGREW: Okay.

And the examples that I have given the last couple days, whether they are good or bad, did you understand them?

MS. JENSEN: Yes. And I thought they were good examples.

MS. PETTIGREW: Thank you.

And can you follow them?

MS. JENSEN: Absolutely.

MS. PETTIGREW: The law, that is?

MS. JENSEN: Yes.

MS. PETTIGREW: The legal principles that I was talking about?

MS. JENSEN: Yes.

MS. PETTIGREW: Thank you.

If you could pass the microphone back to Ms. Threlkeld?

MS. THRELKELD: Very good.

MS. PETTIGREW: Really?

MS. THRELKELD: Yeah.

MS. PETTIGREW: Okay. Just pronounced it exactly as it looks.

Good morning.

MS. THRELKELD: Good morning.

MS. PETTIGREW: You have been a juror before?

MS. THRELKELD: Yes.

MS. PETTIGREW: Was that here in this county?

MS. THRELKELD: It -- yes.

MS. PETTIGREW: And it was a misdemeanor resisting arrest?

MS. THRELKELD: Yeah.

MS. PETTIGREW: Okay.

Were you able to reach a verdict?

MS. THRELKELD: Yes.

MS. PETTIGREW: And that deliberation process, did you find it difficult being in a room of 12 people and trying to agree?

MS. THRELKELD: No.

MS. PETTIGREW: Okay.

Was -- a lot of times in misdemeanor cases there is no video and fingerprints and DNA.

MS. THRELKELD: Right.

MS. PETTIGREW: Kind of just one word against the other?

MS. THRELKELD: Exactly.

MS. PETTIGREW: Oftentimes -- and did you find that aspect difficult in any way --

MS. THRELKELD: No.

MS. PETTIGREW: -- trying to figure out who was telling the truth?

MS. THRELKELD: No.
MS. PETTIGREW: Okay.
You also, in a similar vein, said that you would not stand your ground if someone could get hurt. Again, you've heard over the last couple of days the general --
MS. THRELKELD: Yeah.
MS. PETTIGREW: -- things that are going to come up in this case. Do you think that you can compartmentalize and listen to the facts and view the evidence?
MS. THRELKELD: Yes.
MS. PETTIGREW: Okay.
And you have listened to everybody who looks like they might be on the jury; you think you could work together with them --
MS. THRELKELD: Yes.
MS. PETTIGREW: -- and come to a verdict?
MS. THRELKELD: Yes.
MS. PETTIGREW: Thank you.
If you could pass the microphone?
Mr. Paguia.
MS. PAGUIA: Paguia.
MS. PETTIGREW: Excuse me. Good morning.
MR. PAGUIA: Good morning.
MS. PETTIGREW: You said the criminal justice system works most of the time. What did you have in mind about the other times?
MR. PAGUIA: Well, the other times it's not a

matter of considering it tilted against the poor, but I've seen some cases where if you were wealthy it may be tilted in your favor.

MS. PETTIGREW: Okay.

And are you talking personal experience or kinds of things that we probably all can think of that that have been in the media.

MR. PAGUIA: Things in the media over the past several years or so.

MS. PETTIGREW: Okay.

Is that something that has shaped your views of the criminal justice system, in general?

MR. PAGUIA: No. I think, like I mentioned, it does work quite well most of the time.

MS. PETTIGREW: Okay.

MR. PAGUIA: It's just a matter of if you're privileged or you're wealthy, you can kind of turn the tide --

MS. PETTIGREW: Okay.

MR. PAGUIA: -- towards you a little better.

MS. PETTIGREW: Do you think that, you know, if there's no evidence that either of these two are wealthy or famous that that would impact your ability to deliberate and come to a decision in this case?

MR. PAGUIA: No, not at all.

MS. PETTIGREW: Okay.

You've said that no more force in the -- using no more force than reasonably necessary is not easily

quantified.

MR. PAGUIA: Correct.

MS. PETTIGREW: Do you think that someone who is punched can respond with dead a deadly weapon?

MR. PAGUIA: Under certain circumstances, yes.

MS. PETTIGREW: What circumstances might those be?

MR. PAGUIA: That's when if you are not certain that the punch, itself, will be the end of it; if there's a possibility of escalation, then I think you should be able to defend yourself to ensure your safety.

MS. PETTIGREW: Okay.

And do you think that means shooting someone multiple times at point blank range?

MR. PAGUIA: If that's what it takes to ensure your safety, yes.

MS. PETTIGREW: How are you going to make the decision what's going on in either person's mind?

MR. PAGUIA: That will have to be determined when I see the facts.

MS. PETTIGREW: Okay.

You know, we haven't come up with the things that they have on CSI and some of these shows where you can actually see what's going on inside someone's mind. Sometimes you have to look at the surrounding circumstances --

MR. PAGUIA: Exactly.

MS. PETTIGREW: -- to determine intent.

MR. PAGUIA: Yes.

MS. PETTIGREW: Do you think you could do that?

MR. PAGUIA: Yes.

MS. PETTIGREW: Okay. Thank you.

(Juror No. 8), good morning.

JUROR NO. 8: Hi.

MS. PETTIGREW: We asked a general question about your feelings about Oakland, and I saw you had written something and then crossed it out. Are you comfortable sharing with us what your general feelings are on -- about the city of Oakland?

JUROR NO. 8: I just feel it could be probably policed more.

MS. PETTIGREW: Okay. I think probably most people would agree with you.

Do you think that that will have any impact on your ability to be a juror in this case that happened in Oakland?

JUROR NO. 8: I don't believe so.

MS. PETTIGREW: Okay.

You indicated that the process seems fair, the criminal justice system and the process seems fair; do you agree with that?

JUROR NO. 8: For the most -- yes.

MS. PETTIGREW: Is that based on anything personal that you've experienced or witnessed, or just the media again.

JUROR NO. 8: Neither.

MS. PETTIGREW: Okay.

What is it based on.

JUROR NO. 8: I just -- I just assumed it was fair.

MS. PETTIGREW: Okay.

JUROR NO. 8: And if it wasn't and if something needed to be changed about the law, that something would be in the process to effectively bring that law forward and correct the situation.

MS. PETTIGREW: Okay.

Do you think that -- I have been giving some examples over the last couple days about provocative act.

THE COURT: Hang on a second. We're going to get the juror -- the clerk is getting some water for her. I have some cough drops here. Do you need those, too? I will have the clerk give you one.

All right. Go ahead. Thank you.

MS. PETTIGREW: Okay.

About provocative act and two people engaging in deadly and dangerous situations that take the life of an innocent person, do you have any issues with those examples?

JUROR NO. 8: I don't believe I do.

MS. PETTIGREW: Okay. Thank you.

I don't have any further questions.

THE COURT: Thank you, Ms. Pettigrew.

MR. STECKLER: You can keep the microphone. I will start with you, (Juror No. 8).

Good morning.

JUROR NO. 8: Hi.

MR. STECKLER: Hi.

I, too, zeroed in on the major cross-out you made on your first page. And so your thoughts about crime in Oakland, when you first said you thought you might not be able to be fair in this case or it might impact your ability to be fair, which way was that heading in favor of, the Prosecution, do you think?

JUROR NO. 8: I agree, sir.

MR. STECKLER: And what do you think -- I mean, what do you think now? You've heard -- I don't want to talk any more than necessary and I know nobody else wants me to either. You've heard me say a lot of things and ask a lot of questions. Based on all of that, do you think you can be fair to the Defense in this case?

JUROR NO. 8: I will definitely try.

MR. STECKLER: Okay. All right. Well, good.

The exhibits that you've created for use in court, were those for criminal cases or for civil cases?

JUROR NO. 8: Civil.

MR. STECKLER: Do you think you can follow the law that says that if someone starts a fight with non-deadly force, the opponent uses deadly force, the person who started the fight can then use deadly force? Can you follow that law?

JUROR NO. 8: I believe so.

MR. STECKLER: Okay. Thank you.

Can you pass the microphone over to Mr. Paguia?

MR. PAGUIA: Paguia.

MR. STECKLER: Paguia. Thank you.

So I have to zero in -- or I don't have to, but I'd like to zero in on where Ms. Pettigrew was asking you about a scenario where someone's punched and then their -- the response is a lot of shots at point-blank range. Do you remember her asking you about that?

MR. PAGUIA: Yes, I do.

MR. STECKLER: And I think you said -- one of the things you said, you have to look at all the facts before you could really answer that question; is that fair?

MR. PAGUIA: Yes, that's fair.

MR. STECKLER: Now we're going on whether you can quantify the third element of that reasonable doubt instruction, right, that you said it's not easily quantified whether a response was reasonably necessary, right?

MR. PAGUIA: Correct.

MR. STECKLER: Do you think you would have an open mind as to whether the Prosecutor's scenario of all those shots at point-blank range, do you have an open mind in that scenario as to whether that was unnecessary and unreasonable; is that possible in your mind?

MR. PAGUIA: I have an open mind to both sides at this point.

MR. STECKLER: Okay. Good. Good.

What -- what is your sister studying?

MR. PAGUIA: My sister?

MR. STECKLER: She's a student. Did I get that right?

MR. PAGUIA: No, I don't have a sister that's studying. They are older than me, so.

MR. STECKLER: Okay. I am sorry then.

All right. I don't have any other questions for you. Thank you, sir. I appreciate that.

MR. PAGUIA: Okay.

MR. STECKLER: Good morning, ma'am.

MS. THRELKELD: Good morning.

MR. STECKLER: I just want to follow up. You indicated that if you were in the situation you would not stand your ground, and hopefully you will never be in that kind of situation.

MS. THRELKELD: Right.

MR. STECKLER: Can you apply the law -- the law of California that says you may stand your ground and pursue, if necessary?

MS. THRELKELD: Yes.

MR. STECKLER: You can apply that?

MS. THRELKELD: Yes.

MR. STECKLER: All right.

And then if you can give the microphone to Ms. Jensen in seat number 8? Thank you.

Good morning, ma'am.

MS. JENSEN: Good morning.

MR. STECKLER: As a result of your friends, one or

maybe both of whom were the victim of gun violence --

MS. JENSEN: Yes.

MR. STECKLER: -- do you think you can be fair in a case like this where there is gun violence?

MS. JENSEN: It wasn't gun violence. They were both robbed at gunpoint, but neither of them was hurt. But, yes.

MR. STECKLER: I would consider that a violent act, but thankfully it wasn't fired. But, nevertheless, there were guns. Would there be any carry over to this case?

MS. JENSEN: No.

MR. STECKLER: Do you think you can be fair and impartial to both sides?

MS. JENSEN: Yeah.

MR. STECKLER: Thank you very much.

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

Brenda Harbin-Forte, she hears a lot of criminal cases here. Do you discuss those cases with her?

MS. JENSEN: I don't. In fact, I haven't spoken to her in many years. We worked together quite a long time ago.

MR. BRYDEN: Where were you working?

MS. JENSEN: A firm that doesn't exist anymore. It was called Thelan, Marshal, Johnson, and Bridges. She was a partner. I was an associate there.

MR. BRYDEN: Did you hear any questions to any of the other jurors that you feel you need to respond to?

MS. JENSEN: No.

MR. BRYDEN: I am going to ask this. It doesn't really go to cause. You're retired now, right?

MS. SNAVELY: Yes.

MR. BRYDEN: So you have time?

MS. SNAVELY: Plenty of time.

MR. BRYDEN: You wouldn't mind being on this jury?

MS. SNAVELY: No.

MR. BRYDEN: And I have no questions for you, Mr. Paguia, or you, (Juror No. 8). Thank you.

THE COURT: Thank you, Mr. Bryden.

Does anybody need to approach?

MS. PETTIGREW: No, thank you.

MR. STECKLER: No, thank you.

THE COURT: Mr. Bryden?

MR. BRYDEN: No, I don't want to approach.

Thank you.

THE COURT: All right. Thank you very much.

My notes would indicate that the challenge is with Mr. McNeely -- well, it could be joint first or it could be Mr. McNeely's whatever -- if you have a joint.

MR. STECKLER: We pass jointly.

THE COURT: All right.

MR. STECKLER: Is it McNeely?

THE COURT: Then it would be McNeely, yes.

MR. STECKLER: The Defense would like to thank and ask the Court to excuse Ms. Jensen.

THE COURT: Thank you, Ms. Jensen, for your service.

And if I am not mistaken, Judge Harbin-Forte is right across the hall if you want to stick your head in.

MS. JENSEN: Yes, she is. Thank you.

THE COURT: Ms. Snavely, can I ask you to take seat number 8 please?

THE COURT: The challenge is back with the People.

MS. PETTIGREW: Can I have one moment, Your Honor?

THE COURT: You may.

MS. PETTIGREW: The People would like to thank and excuse Ms. Threlkeld.

THE COURT: Thank you for your service, Ms. Threlkeld.

MS. THRELKELD: Awe.

THE COURT: Thank you very much for your service, Ms. Threlkeld.

Thank you, Mr. Paguia.

MR. PAGUIA: Paguia.

THE COURT: The challenge is back to the Defense.

MR. BRYDEN: I believe that the Defense will pass jointly.

THE COURT: All right.

So then the next individual challenge would be with Mr. Poston.

MR. BRYDEN: Mr. Poston passes.

THE COURT: And the next individual challenge would be with Mr. McNeely.

MR. STECKLER: The Defense passes.

THE COURT: So as I -- if I understand correctly, we've had a joint pass and an individual pass from Mr. Poston and an individual pass from Mr. McNeely.

That makes the challenge with the People.

MS. PETTIGREW: People would like to thank and ask the Court to excuse Mr. Paguia.

THE COURT: Thank you, Mr. Paguia.

(Juror No. 8), I will ask you to take seat number 8 please.

It will be a joint challenge then for the Defense.

(Whereupon, a discussion was held off the record between both defense counsel)

THE COURT: Ma'am, the clerk will show you where there is a restroom just behind in the jury room if you'd like to take a break.

How about we take -- let's take a 12-minute recess until 11:25. All right. If you are in the jury box, I will ask you the return at 11:25. And if you are in the audience, please return to your seat in audience.

(Recess taken)

THE COURT: All right. Any reason not to call the jury?

MS. PETTIGREW: No.

THE COURT: Okay.

MR. BRYDEN: Well, are you going to -- well, I was a little worried. We were all a little worried about (Juror No. 5).

THE COURT: How did she appear, Mr. Clerk?

THE CLERK: She seemed okay when she left.

THE COURT: Well, we can ask her. I will ask her if she's okay.

(Whereupon, the prospective jurors enter the courtroom)

THE COURT: Are you doing okay now, (Juror No. 5)?

JUROR NO. 5: I am fine. Thank you.

THE COURT: Is there any medical condition you think related to -- you had a little bout of coughing. Sometimes it's just something bothering your throat, you get a particle in your throat, can't stop coughing. Sometimes it's happens to me.

JUROR NO. 5: I think it was just a brief moment thing.

THE COURT: Sure. Well, if a problem -- we don't want to put you out and keep you here, but if you don't think it's a problem we're happy to go on.

Mr. Clerk, can we call the next four names please?

THE CLERK: We only have three seats, Your Honor.

THE COURT: Oh, all right.

We have Defense challenge. There was going to be a potential Defense challenge.

MR. STECKLER: Jointly, we pass.

THE COURT: Okay. There is a joint pass.

I think it is then Mr. Poston's next individual challenge.

MR. BRYDEN: Mr. Poston passes.

THE COURT: All right.

Then it could be a potential challenge by Mr. McNeely.

MR. STECKLER: Who passes.

THE COURT: So, again, we're at the challenge will go back to the People then. We've had the Defense jointly pass and individually pass.

MS. PETTIGREW: People pass.

THE COURT: All right.

Ladies and gentlemen, so the 12 persons who are currently in the jury box will be the jury.

How about we -- why don't we swear the jury right now?

Ladies and gentlemen, may I -- previously, you have taken an oath to promise to tell the truth. Now you're taking an oath to hear the evidence, consider the law, and render a true and just verdict.

Okay. Is there anybody that can't do that in the course of this trial?

All right. I will ask you all to rise and we'll take the oath.

THE CLERK: Raise your right hand please.

(Whereupon, the 12 selected jurors were duly

sworn)

THE CLERK: Thank you. Please be seated.

THE COURT: All right.

Going to call three names for the three alternates. Okay?

THE CLERK: (Alternate Juror No. 2), please take alternate seat number one.

Lucy C-h-e-n, alternate seat number two.

And Daniel S-a-l-z-e-r, alternate seat number three.

THE COURT: I think your chair's kind of stashed around the corner there, Mr. Salzer.

All right. Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good morning. Still morning. Almost afternoon, but morning.

So you now all three know that we have a jury. You would be serving as alternates, and what that means is you come and go and listen to all the evidence just the same and if at some point in time someone's ill or needs a replacement, that would be your role, whether that's during the actual trial or during the deliberation process.

Do any of you think that you would have any difficulty fulfilling that role?

Mr. Salzer?

MR. SALZER: No.

MS. PETTIGREW: Sometimes people have served as

alternates in the past and are a little frustrated at not getting to participate in the actual deliberation process. But I still think everybody at least ends up feeling that the jury system, the jury trial process was a good process. The three of you -- this is kind of a joint question -- is there anything over the last couple of days that hearing the issues that have been raised that raised a strong thought in your mind that you'd answer differently just at the outset that you can think of.

No.

MR. SALZER: I am not sure if I could be impartial.

MS. PETTIGREW: Okay.

Do you still have the microphone?

MR. SALZER: I said in my questionnaire that I have pretty strong views on guns and people that carry them. And I -- I am not sure if I want to judge because I'm not -- I don't know. I feel very biased in this.

MS. PETTIGREW: Against the defendants already?

MR. SALZER: Yes.

MS. PETTIGREW: And there's probably nothing that I could say or the judge could say that could set those biases aside?

MR. SALZER: I don't know. After hearing this for three days, no.

THE COURT: All right. I will excuse Mr. Salzer for cause.

MS. PETTIGREW: Thank you.

THE COURT: Thank you, sir.

Can we call one more name please?

THE CLERK: (Alternate Juror No. 1).

MS. PETTIGREW: Good morning.

ALTERNATE JUROR NO. 1: Hi.

MS. PETTIGREW: Did he leave the microphone? Okay. Just wanted to make sure.

Same question to you, since you're sitting here, do you think that you can be fair and impartial in a case like this?

ALTERNATE JUROR NO. 1: Yes.

MS. PETTIGREW: Okay. You heard kind of the issues that have been raised over the last few days. Do you have any strong thoughts or feelings that you would have wanted to answer differently to any of the questions asked?

ALTERNATE JUROR NO. 1: No.

MS. PETTIGREW: Okay.

I know that you share the same view that a lot of people do, that guns are bad. Do you think that you can keep that separate from the question that you're asked to decide, and that is whether these two defendants are guilty of murder?

ALTERNATE JUROR NO. 1: Yes.

MS. PETTIGREW: Thank you.

If you could just pass it over to Ms. Chen?

Good morning.

MS. CHEN: Good morning.

MS. PETTIGREW: You're a former litigation consultant?

MS. CHEN: Yes.

MS. PETTIGREW: What did you do? What was your job?

MS. CHEN: Economic damages for mostly intellectual property cases.

MS. PETTIGREW: So you worked with a lot of lawyers?

MS. CHEN: Yes.

MS. PETTIGREW: But that was in a non-criminal setting?

MS. CHEN: Yes, that's correct.

MS. PETTIGREW: Anything from your former work would you think would make it difficult for you to be a juror in a case like this?

MS. CHEN: No.

MS. PETTIGREW: You're fed up with Oakland crime?

MS. CHEN: Yes.

MS. PETTIGREW: Lot of people are.

MS. CHEN: Yes.

MS. PETTIGREW: Can you compartmentalize and take this case for what it is, the evidence as it comes in, the witnesses as they testify, and decide -- hold me to my burden to prove them guilty beyond a reasonable doubt?

MS. CHEN: I will definitely try.

MS. PETTIGREW: Also had a comment about the fact

that our society is so full of guns that an innocent bystander gets killed. You've heard us talk and you know a framework of what this case is about. Again, do you think that you can be fair and hold me to my burden of proof?

MS. CHEN: Yes, I will try.

MS. PETTIGREW: Thank you.

If you could pass the microphone to (Alternate Juror No. 2)?

Good morning.

ALTERNATE JUROR NO. 2: Good morning.

MS. PETTIGREW: You said that guns are okay as long as you follow the law. And that's my shorthand; I don't know if that's an exact quote from you. But you've heard over the last couple days that they're convicted felons, they weren't lawfully in possession of these guns. Do you think you can separate out that fact from whether they're guilty of murder?

ALTERNATE JUROR NO. 2: Yes.

MS. PETTIGREW: And hold me to the burden of proving them guilty?

ALTERNATE JUROR NO. 2: Yes.

THE COURT: About one minute.

MS. PETTIGREW: I am sorry?

THE COURT: You have about one minute.

MS. PETTIGREW: Thank you.

And for the criminal justice system, you said you need more knowledge, need to know more about it to have an

opinion.

ALTERNATE JUROR NO. 2: When I filled that out, I was just getting over the flu.

MS. PETTIGREW: Okay.

ALTERNATE JUROR NO. 2: And I was having a hard time comprehending any -- but I -- I feel a lot better now. But I -- in listening over the last few days, I'm -- you know, I think our system is a great system.

MS. PETTIGREW: Okay.

And you think you could be fair?

ALTERNATE JUROR NO. 2: Definitely.

MS. PETTIGREW: Thank you.

I don't have any further questions.

THE COURT: Mr. Steckler.

MR. STECKLER: Thank you.

You have even listening to me ask questions over three days. You still think it's a great system?

ALTERNATE JUROR NO. 2: I do.

MR. STECKLER: Couple -- I want to follow up on a couple of your self-defense area answers in your questionnaire. On the -- you've heard me talk about the law that says you have a right to stand your ground and pursue if necessary --

ALTERNATE JUROR NO. 2: Mm-hm.

MR. STECKLER: -- for your safety. And you indicated that that might be a personal feeling of yours that it's always best to walk away. What do you think now?

ALTERNATE JUROR NO. 2: Um, I think that there might be a situation where you have to stay and defend yourself.

MR. STECKLER: And can you apply the law that says you can pursue, if necessary?

ALTERNATE JUROR NO. 2: Yes.

MR. STECKLER: Are you going to have your friend -- I am not sure how long ago it was -- who was tragically killed by a gunfight, is that something that's going to be in your mind in hearing evidence in a case like this?

ALTERNATE JUROR NO. 2: Oh, no, not at all.

MR. STECKLER: Okay.

ALTERNATE JUROR NO. 2: That was an accident.

MR. STECKLER: Right. But it might affect you in a certain way, and I don't want to --

ALTERNATE JUROR NO. 2: Oh, no. No.

MR. STECKLER; How long ago was that?

ALTERNATE JUROR NO. 2: 35 years ago.

MR. STECKLER: Okay.

So you think you could be fair to both sides, to both sides in this case?

ALTERNATE JUROR NO. 2: Very.

MR. STECKLER: Have an open mind?

ALTERNATE JUROR NO. 2: Yes.

MR. STECKLER: You could deliberate with the other jurors?

ALTERNATE JUROR NO. 2: Yes.

MR. STECKLER: You think you could bring your own opinion to the table on jury deliberations?

ALTERNATE JUROR NO. 2: I would listen to what the law is and apply the law to the evidence --

MR. STECKLER: Right.

ALTERNATE JUROR NO. 2: -- and put it altogether and be fair.

MR. STECKLER: All right.

And how do you think you would act in a group of 11 others in discussing the law and the evidence?

ALTERNATE JUROR NO. 2: I -- I am not sure what you mean by that.

MR. STECKLER: Will you just follow the group or --

ALTERNATE JUROR NO. 2: Oh, no. I would have --

MR. STECKLER: -- or will you be able to express your opinion?

ALTERNATE JUROR NO. 2: I would be able to express my opinion definitely.

MR. STECKLER: Great. Great to know.

Will you pass the microphone over to Ms. Chen?

Good morning, ma'am.

MS. CHEN: Good morning.

MR. STECKLER: There were a number of answers in your questionnaire that made me wonder whether this is the case for you.

MS. CHEN: Mm-hm.

MR. STECKLER: What do you think?

MS. CHEN: If I were you, I would probably agree.

MR. STECKLER: If you were me --

MS. CHEN: Mm-hm.

MR. STECKLER: -- representing Mr. McNeely --

MS. CHEN: Right.

MR. STECKLER: -- you would agree?

MS. CHEN: Right.

MR. STECKLER: Sounds like you might be biased in favor of the Prosecution in a case like this?

MS. CHEN: Um, I mean, if I were in a jury I would certainly be -- I would try to be neutral and hear all the evidence. But just, you know, I did hear this case in the news before so I was familiar with it, and coming in here getting all the information, obviously, I have a certain opinion. But, as a juror, I would try to be neutral.

MR. STECKLER: Right.

MS. CHEN: Because that's my civic duty is to be neutral and hear all the evidence.

MR. STECKLER: Right. And that's good.

But you did put some things down and you're expressing some opinions this morning that -- sounds like you're wondering whether you could, in fact, be neutral given what you've heard about this case and what you know about this case.

MS. CHEN: Right. I mean, I will try. I mean, I think everyone has said everyone comes in with their kind of biases. I mean, especially living in Oakland; there's

so many -- unfortunately, this happens a lot in Oakland where an innocent bystander gets killed.

MR. STECKLER: Right.

MS. CHEN: So it's just really upsetting to hear about. Obviously, you try to set all that aside but -- yeah, and you try to compartmentalize. But when you are in a situation, you see pictures of a person, bullet in the head, I don't know how I would feel about that.

MR. STECKLER: Let's get back to that.

The judge talked about that Monday morning first thing; you're going to see pictures of just that, of a pretty gruesome head wound. Can you see that and --

MS. CHEN: I think that I would be upset, honestly. If I see that on a movie, I can't look, so.

MR. STECKLER: Okay.

MS. CHEN: I will try, but I think I would probably be upset.

MR. STECKLER: And then that might make you unable to assess the evidence and participate?

MS. CHEN: Like I said, I will try, but.

MR. STECKLER: You keep coming back to that. I am concerned when you say I will try. I would think -- make some of us think you can be fair; I am not so sure you think you can be fair. Do you --

MS. CHEN: I mean, if you want me to be completely honest, then yes, no, maybe I cannot be fair.

MR. STECKLER; Honesty is exactly --

MS. CHEN: If I am given the task of being a

juror, then I would definitely try my hardest, but I am saying -- you know what I am saying.

MR. STECKLER: Yes, I do.

MS. CHEN: If you decide I am going to be a juror, I would definitely try, but it would be hard for me, I think.

MR. STECKLER: I think I heard you in that answer say what you honestly thought, so thank you very much.

Is it lay or lie?

ALTERNATE JUROR NO. 1: Lie.

MR. STECKLER: Good morning, ma'am.

ALTERNATE JUROR NO. 1: Good morning.

MR. STECKLER: Did you study in Taiwan?

ALTERNATE JUROR NO. 1: No. I was a Chinese student. I was actually there as a missionary.

MR. STECKLER: I was wondering what you did study.

ALTERNATE JUROR NO. 1: Just Chinese.

MR. STECKLER: Okay. Just briefly. You wrote in your questionnaire in self-defense --

THE COURT: 30 seconds. I am sorry, but 30 seconds.

MR. STECKLER: Thank you.

-- there might be some issue with defining what's reasonably necessary.

ALTERNATE JUROR NO. 1: Yes.

MR. STECKLER: Do you think you can lend definition to that in a case? In other words, define reasonably necessary if you were given a set of facts?

ALTERNATE JUROR NO. 1: Yes.

MR. STECKLER: Okay. Thank you very much, ma'am.

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: Thank you, Your Honor.

Ms. Chen, in a sense we start at the beginning of the trial before any evidence, the defendants are way ahead; that's because you haven't heard any evidence and the Prosecution has the burden of proof to not only show you all the elements beyond a reasonable doubt, but to also disprove or show you that there was no justification or self-defense that led to this tragedy.

Now, I know you've read a lot about the case and you saw it on TV and it shocks you. So isn't it true as we start out, Mr. Poston isn't ahead, the Prosecutor's ahead because of what you know about the case and your bias?

MS. CHEN: I mean, I can't help what I saw on the news before I was chosen to be part of this jury, so.

MR. BRYDEN: I think everything -- I appreciate your candor. Everything's -- I just want to -- the census that I am getting is it's true then, because of what you know, and I think being a good citizen means you read the papers and watch the news, and you're right, that you're starting out, though, with a bias not for them, but for the Prosecution, right?

MS. CHEN: Just based on all the information that

I saw on the news, without knowing anything else, yes --

MR. BRYDEN: Mm-hm.

MS. CHEN: -- that's probably true.

MR. BRYDEN: Okay.

And I read your questionnaire, (Alternate Juror No. 3), and I don't have anything else.

And I read your questionnaire, (Alternate Juror No. 1). I appreciate your service. Thank you.

THE COURT: Ms. Chen, you said two things that concern me. One is that you said you'd be upset by photographs. Do you think if you were upset by something that was depicted in a photograph that you would not be able to consider all the other evidence, that it would be so troubling?

MS. CHEN: No, I don't think it would be that troubling.

THE COURT: Okay.

But you're a sensitive person?

MS. CHEN: I am a sensitive person, yes.

THE COURT: Okay.

And early on I think I said you have to accept all the evidence presented in the court and not consider your -- anything that you've -- if you've seen something about it in the newspaper or seen perhaps a clip on TV, would you be considering those things if you were to serve as a juror?

MS. CHEN: No.

THE COURT: Could you consider only the evidence

presented in court?

MS. CHEN: Yeah. So if I was a juror, I would do my civic duty and ignore everything in my mind, everything else that I've seen, yes.

THE COURT: Okay. All right.

Any challenge for cause?

MS. PETTIGREW: No.

MR. STECKLER: Yes.

MR. BRYDEN: Yes.

THE COURT: All right. Denied. Based on what I've heard, I am going to deny the motion.

The first challenge is with the People, peremptory challenge.

MS. PETTIGREW: The People pass.

THE COURT: Each defendant has three individual challenges and the People have six 'cause they get the total the Defense has.

First individual challenge as to Mr. McNeely.

MR. STECKLER: Ms. Chen.

THE COURT: Thank you, Ms. Chen. You will be excused.

Can you call one more name?

THE CLERK: Cynthia P-e-t-t-i-t.

THE COURT: Okay. You have two minutes.

MS. PETTIGREW: Thank you.

Good morning.

MS. PETTIT: Good morning.

MS. PETTIGREW: Not to put you on the spot, and I

am not going to belabor the point, but you've heard everything?

MS. PETTIT: Yes.

MS. PETTIGREW: And you understand from listening to the last exchange why she was excused?

MS. PETTIT: Yes.

MS. PETTIGREW: Do you think that you can be fair and impartial in a case like this?

MS. PETTIT: Yes.

MS. PETTIGREW: You did have one slight hesitation with the fact that they were felons and had guns. Do you think after -- after listening to this and realizing what the law is, that that is a separate issue from whether they committed a murder --

MS. PETTIT: Yes. That's a separate issue, yes.

MS. PETTIGREW: And you can hold me to my burden of proof?

MS. PETTIT: Absolutely.

MS. PETTIGREW: Thank you.

I don't have any further questions.

THE COURT: Mr. Steckler.

MR. STECKLER: Thank you, Your Honor.

Good morning, ma'am.

MS. PETTIT: Good morning.

MR. STECKLER: So cases like this are why you don't go to Oakland, you said?

MS. PETTIT: Correct. Things that happen, yes.

MR. STECKLER: When you said yes, that might

affect your ability to be fair and impartial, so I am wondering, based on that, and based on when you say your first thought is that if they are felons why do they have guns, and that you wonder whether you can be fair and impartial, I guess I am wondering as you sit here now, having gone through listening to the questions and a lot of discussion, do you think you can be fair and impartial to both sides?

MS. PETTIT: Yes, I do.

MR. STECKLER: You do.

MS. PETTIT: Yes.

MR. STECKLER: Okay.

The -- there were two pages about firearms that you left blank on the questionnaire. Was that because you might have just missed that -- those pages?

MR. PETTIT: Possibly.

MR. STECKLER: Okay.

What are your thoughts about firearms, if you have any?

MR. PETTIT: I believe that one should be able to possess one legally.

MR. STECKLER: Okay.

MS. PETTIT: And defend themselves if they need to.

MR. STECKLER: All right.

And if they possess them one illegally, can you separately decide whether they committed murder or not?

MS. PETTIT: Yes.

MR. STECKLER: Okay.

You're sure about that?

MS. PETTIT: Yes.

MR. STECKLER: Okay. All right.

MS. PETTIT: I was just thinking about your question. Yes.

MR. STECKLER: Okay.

Thank you very much, ma'am.

THE COURT: Thank you, Mr. Steckler.

Mr. Bryden.

MR. BRYDEN: I don't have any questions for Ms. Pettit. That's how you pronounce it?

MS. PETTIT: Pettit.

MR. BRYDEN: Pettit. Excuse me.

Thank you, ma'am.

THE COURT: Any challenge for cause as to Alternate Number 2?

MS. PETTIGREW: No, Your Honor.

MR. BRYDEN: No, Your Honor.

MR. STECKLER: No.

THE COURT: All right.

The challenge is back to the People.

MS. PETTIGREW: People pass.

THE COURT: The individual challenge goes to, I think, Mr. Poston now.

MR. BRYDEN: Mr. Poston passes.

THE COURT: Mr. McNeely then.

MR. STECKLER: We would ask Ms. Pettit to be

excused.

THE COURT: Thank you, Ms. Pettit.

THE COURT: Call one more name.

THE CLERK: (Alternate Juror No. 3).

THE COURT: Good morning, sir.

ALTERNATE JUROR NO. 3: Good morning.

THE COURT: Ms. Pettigrew.

MS. PETTIGREW: Thank you, Your Honor.

Good morning.

ALTERNATE JUROR NO. 3: Good morning.

MS. PETTIGREW: You say that guns don't kill people; people kill people.

ALTERNATE JUROR NO. 3: That's correct.

MS. PETTIGREW: It is correct.

You've heard kind of the issues that we have raised over the last couple days about firearms and everything else.

ALTERNATE JUROR NO. 3: Yes.

MS. PETTIGREW: Do you think that you could be fair in a case like this?

ALTERNATE JUROR NO. 3: Absolutely.

MS. PETTIGREW: Okay.

You didn't have any strong, or at least express any strong opinions on any of the self-defense questions. Again, after listening to kind of the back-and-forth over the last few days, is there anything that we should know?

ALTERNATE JUROR NO. 3: No. I believe that a

person should be able to defend themselves if they are being attacked in any way, shape, or form and stop the violence.

MS. PETTIGREW: Okay.

If a person is attacked by way of just a punch, should the other person be able to respond with deadly force?

ALTERNATE JUROR NO. 3: Not necessarily, no.

MS. PETTIGREW: Okay.

Could you consider the circumstances, all the circumstances surrounding it in rendering an opinion?

ALTERNATE JUROR NO. 3: Yeah, I believe so.

MS. PETTIGREW: And the only thing that makes me question is because you said a person should be able to defend themselves in any way, shape, or form, which is why I asked the follow-up question.

ALTERNATE JUROR NO. 3: I understand that.

MS. PETTIGREW; Was that a figure of speech?

ALTERNATE JUROR NO. 3: Yes, basically a figure of speech. If you're punched, you should retaliate with a punch, not with a knife or something like that.

MS. PETTIGREW: You've heard the phrase you can't bring a knife to a fist-fight, or you can't bring a gun to a fist-fight?

ALTERNATE JUROR NO. 3: Yes.

MS. PETTIGREW: Do you agree with that?

ALTERNATE JUROR NO. 3: Yes.

MS. PETTIGREW: Thank you.

THE COURT: Mr. Steckler.

MR. STECKLER: Good morning, (Alternate Juror No. 3).

ALTERNATE JUROR NO. 3: Good morning.

MR. STECKLER: You've heard me over almost three days now.

ALTERNATE JUROR NO. 3: Mm-hm.

MR. STECKLER: Should I be concerned about you as a juror for any reason?

ALTERNATE JUROR NO. 3: I don't think so.

MR. STECKLER: Okay. Thank you.

No further questions.

THE COURT: Mr. Steckler -- Mr. Bryden.

MR. BRYDEN: I don't have any questions.

Thank you, Your Honor.

THE COURT: Is there a challenge for cause as to seat number two?

MS. PETTIGREW: No, Your Honor.

MR. BRYDEN: No.

MR. STECKLER: No.

THE COURT: The peremptory challenges are with the People.

MS. PETTIGREW: People pass.

THE COURT: The -- let's see, we go back to Mr. Poston.

MR. BRYDEN: Poston passes.

THE COURT: We'll go back to Mr. McNeely.

MR. STECKLER: Pass.

THE COURT: All right.

Mr. Clerk, can we swear the three alternates?

THE CLERK: Can the three alternates jurors stand and raise your right hand please?

//

//

(Whereupon, the three alternate jurors were duly sworn).

(This ends the jury selection requested in the order to augment the transcript on appeal. The remainder of the proceedings of this day were previously transcribed in the Transcript on Appeal dated 1/8/14)

---oOo---

STATE OF CALIFORNIA)
                   )   SS.
COUNTY OF ALAMEDA  )

I, RONDA ROOPE, Certified Shorthand Reporter, do hereby certify:

That I am an official court reporter of the Superior Court of the State of California, and that as such I reported the proceedings had in the above-entitled matter at the time and place set forth herein;

That my stenograph notes were thereafter transcribed into typewriting under my direction, and that the foregoing pages constitute a full, true and correct transcription of my said notes.

DATED: 12-15-14

Ronda Roope
RONDA ROOPE, CSR NO. 5609