XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,**<br>Petitioner,<br>**v.**<br>**JASON PICKETT, Acting Warden,**<br>Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBITS 8-11

**8 Appellant's Opening Brief**
**9 Respondent's Brief**
**10 Appellant's Reply Brief**
**11 CA Court of Appeal Opinion**

COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST DISTRICT, DIVISION FIVE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DONEL POSTON,<br><br>Defendant and Appellant. | Appeal No. A141557<br><br>Alameda No. 172522B |

**APPELLANT DONEL POSTON'S OPENING BRIEF**

Appeal from the Judgment of the Superior Court
Alameda County, State of California

HONORABLE MICHAEL GAFFEY, TRIAL JUDGE

RANDI COVIN
State Bar #168422
P.O. Box 1120
Willits, CA. 95490
Telephone: (707) 459-2456
Facsimile: (707) 459-2147
e-mail address: rcovin13@gmail.com

Attorney for Appellant
DONEL POSTON

By Appointment of the Court of Appeal Under the First District Appellate Project's Independent Case System

# TOPICAL INDEX


TABLE OF AUTHORITIES .......... 6

STATEMENT OF APPEALABILITY .......... 18

INTRODUCTION .......... 19

STATEMENT OF THE CASE .......... 23

STATEMENT OF FACTS .......... 25

I. POSTON ARMED HIMSELF FOR SELF-DEFENSE .......... 25

II. MCNEELY ATTACKED POSTON .......... 28

III. MCNEELY KILLED FLUKER .......... 36

IV. THE SHOOTING WAS CAUGHT ON SURVEILLANCE VIDEO .......... 37

V. POLICE OFFICERS SEARCHED MUHAMMAD'S CAR, MCNEELY'S CAR, AND POSTON'S HOME .......... 38

VI. POSTON'S OUT-OF-COURT STATEMENTS WERE ADMITTED TO IMPEACH HIS CREDIBILITY AND COUNTER HIS CLAIM OF SELF-DEFENSE .......... 40

VII. EXPERT WITNESSES TESTIFIED ABOUT GUNS, DRUGS, AND STREET TERMINOLOGY .......... 53

ARGUMENT .......... 58

I. POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE .......... 58

A. LEGAL BACKGROUND .......... 58

B. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN SELF-DEFENSE .......... 61

C. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN THE HEAT OF PASSION ON ADEQUATE PROVOCATION .......... 71

D. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON INITIATED A CHAIN OF EVENTS THAT PROXIMATELY CAUSED LIONEL FLUKER'S DEATH .......... 74

II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL .......... 84

A. FACTUAL BACKGROUND ............................ 84

B. EVIDENCE OF PIMPING WAS SUBSTANTIALLY MORE PREJUDICIAL THAN PROBATIVE AND SHOULD HAVE BEEN EXCLUDED UNDER EVIDENCE CODE SECTION 352 .................... 87

C. THE ERROR REQUIRES REVERSAL............ 91

III. THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE................................ 93

A. FACTUAL BACKGROUND ............................ 93

B. CALCRIM NO. 3471 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ....................................................... 95

C. THE INSTRUCTIONAL ERROR VIOLATED POSTON'S CONSTITUTIONAL RIGHT TO JURY TRIAL, DUE PROCESS, AND TO PRESENT A DEFENSE .................................... 96

D. THE ERROR REQUIRES REVERSAL............ 99

IV. THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE............................................ 101

A. FACTUAL BACKGROUND ........................... 101

B. CALCRIM NO. 560 AS GIVEN UNCONSTITUTIONALLY OMITTED AN ELEMENT OF PROVOCATIVE ACT MURDER ................................................ 104

C. THE ERROR REQUIRES REVERSAL........... 107

V. PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL.................................. 109

A. LEGAL BACKGROUND................................ 109

B. FACTUAL BACKGROUND ........................... 112

C. THE PROSECUTOR COMMITTED PERVASIVE, PREJUDICIAL MISCONDUCT BY APPEALING TO THE JURORS' EMOTIONS, RACIAL BIAS, AND FEAR OF RANDOM STREET VIOLENCE; ATTACKING POSTON'S CHARACTER; AND MISLEADING THE JURORS, VIOLATING DUE PROCESS AND REQUIRING REVERSAL...................... 118

VI. POSTON JOINS IN AND ADOPTS BY REFERENCE MCNEELY'S ARGUMENT I: THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS.............................. 130

VII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL ................ 135

CONCLUSION........................................................................ 138

WORD COUNT CERTIFICATE.................................................... 139

DECLARATION OF SERVICE

* * * * * *

# TABLE OF AUTHORITIES

## CASES

*Baldwin v. Blackburn*
(5th Cir. 1981) 653 F.2d 942 .......... 99

*Boyde v. California*
(1990) 494 U.S. 370 .......... 93, 98

*Brown v. United States*
(1921) 256 U.S. 335 .......... 63

*Chambers v. Mississippi*
(1973) 410 U.S. 284 .......... 93, 101, 104

*Chapman v. California*
(1967) 368 U.S. 18 .......... 91, 92, 99, 108

*Chapman v. California,*
*supra,* 386 U.S. .......... 107, 129

*Crane v. Kentucky*
(1986) 476 U.S. 63 .......... 93, 97, 101, 104

*Darden v. Wainwright*
(1986) 477 U.S. 168 .......... 109

*Donnelly v. DeChristoforo*
(1974) 416 U.S. 637 .......... 109, 129

*Estelle v. McGuire*
(1991) 502 U.S. 62 .......... passim

*Ho v. Carey*
(9th Cir. 2003) 332 F.3d 587 .......... 98

*In re Aurelio R.*
(1985) 167 Cal.App.3d 52 .......... 106

*In re Christian S.*
(1994) 7 Cal.4th 768 .......... 59

*In re Winship*
(1970) 397 U.S. 358 .................................................................. passim

*Jackson v. Virginia*
(1979) 443 U.S. 307 .................................................................. 58

*Lincoln v. Sunn*
(9th Cir. 1987) 807 F.2d 805 .................................................... 135

*Mak v. Blodgett*
(9th Cir. 1992) 970 F.2d 614 .................................................... 135

*McKinney v. Rees*
(9th Cir. 1993) 993 F.2d 1378 .............................................. 84, 91

*McKleskey v. Kemp*
(1987) 481 U.S. 279 ........................................................ 109, 118

*Middleton v. McNeil*
(2004) 541 U.S. 433 .............................................. 93, 96, 101, 104

*Moore v. Morton*
(3rd Cir. 2001) 255 F.3d 95 ...................................................... 118

*Mullaney v. Wilbur*
(1975) 421 U.S. 684 .................................................................. 60

*Neder v. United States*
(1999) 537 U.S. 1 .................................................................... 107

*People v. Albarran*
(2007) 149 Cal.App.4th 214 ........................................................ 91

*People v. Baldwin*
(2006) 142 Cal.App.4th 1416 .............................................. 127, 128

*People v. Barnes*
(1986) 42 Cal.3d 284 .................................................................. 58

*People v. Barton*
(1995) 12 Cal.4th 186 ................................................................ 95

*People v. Beltran*
(2013) 56 Cal.4th 935 ........................................................ 59, 60, 73

*People v. Bolton*
(1979) 23 Cal.3d 208 ........................................................ 111

*People v. Breverman*
(1998) 19 Cal.4th 142 ........................................................ 72

*People v. Bryant, Smith & Wheeler*
(2014) 60 Cal.4th 335 ........................................................ 130

*People v. Caldwell*
(1984) 36 Cal.3d 210 ........................................................ 105

*People v. Cardenas,*
*supra,* 31 Cal.3d 897 ........................................................ 91

*People v. Castro*
(1985) 38 Cal.3d 301 ........................................................ 87

*People v. Catley*
(2007) 148 Cal.App.4th 500 ........................................................ 127

*People v. Cervantes*
(2001) 26 Cal.4th 860 ........................................................ passim

*People v. Clark*
(2011) 52 Cal.4th 856 ........................................................ 87, 88

*People v. Concha*
(2009) 47 Cal.4th 653 ........................................................ 75, 104

*People v. Cross*
(2008) 45 Cal.4th 58 ........................................................ 93, 95

*People v. Cudjo*
(1993) 6 Cal.4th 585 ........................................................ 109, 118

*People v. Curtis*
(1994) 30 Cal.App.4th 1337 ........................................................ 71, 74

*People v. Dennis*
(1998) 17 Cal.4th 468 .................................................................. 127

*People v. Elmore*
(2014) 59 Cal.4th 121 ........................................................... 59, 129

*People v. Flood*
(1998) 18 Cal.4th 470 ......................................................... 101, 107

*People v. Flood*,
*supra*, 18 Cal.4th 4at .................................................................. 104

*People v. Freeman*
(1988) 46 Cal.3d 419 ...................................................................... 89

*People v. Gilbert*
(1965) 63 Cal. 2d 690 ........................................................... 76, 105

*People v. Gonzalez*
(2012) 54 Cal.4th 643 ............................................................ passim

*People v. Guiton*
(1993) 4 Cal.4th 1116 ..................................................................... 95

*People v. Gutierrez*
(2003) 112 Cal.App.4th 704 ........................................................... 72

*People v. Hansen*
(1997) 59 Cal.App.4th 473 ........................................................... 105

*People v. Harris*
(1989) 47 Cal.3d 1047 ................................................................... 109

*People v. Herring*
(1993) 20 Cal.App.4th 1066 ................................................ 118, 119

*People v. Hill*
(1998) 17 Cal.4th 800 ............................................................ passim

*People v. Jackson*
(2014) 58 Cal.4th 724 ....................................................... 63, 65, 95

*People v. Jaimez*
(1986) 184 Cal.App.3d 146 ........................................................ 87

*People v. Jones*
(1970) 7 Cal.App.3d 358 ........................................................ 119

*People v. Kainzrants*
(1996) 45 Cal.App.4th 1068 ........................................................ 105

*People v. Karapetyan*
(2003) 106 Cal.App.4th 609 ........................................................ 105

*People v. Keeper*
(2011) 192 Cal.App.4th 511 ........................................................ 127

*People v. King*
(1978) 22 Cal.3d 12 ........................................................ 64, 126

*People v. Knoeller*
(2007) 41 Cal.4th 139 ........................................................ 58

*People v. Lambert*
(1975) 52 Cal.App.3d 905 ........................................................ 119

*People v. Lasko*
(2000) 23 Cal.4th 101 ........................................................ 72

*People v. Lavergne*
(1971) 4 Cal.3d 735 ........................................................ 90

*People v. Lee*
(1999) 20 Cal.4th 47 ........................................................ 73

*People v. Lenart*
(2004) 32 Cal.4th 1107 ........................................................ 59, 72

*People v. Levitt*
(1984) 156 Cal.App.3d 500 ........................................................ 60, 71, 74

*People v. Lima*
(2004) 118 Cal.App.4th 259 ........................................................ 105

*People v. Mai*
(1994) 22 Cal.App.4th 117 .......................................................... 106

*People v. Manriquez*
(2005) 37 Cal.4th 547 .................................................................. 59

*People v. Marshall*
(1997) 15 Cal.4th 1 ...................................................................... 95

*People v. Massie*
(1967) 66 Cal.2d 899 .................................................................. 130

*People v. Mathews*
(1979) 91 Cal.App.3d 1018 ...................................................... 71, 74

*People v. McCoy*
(2001) 25 Cal.4th 1111 ................................................................ 59

*People v. Mejia*
(2012) 211 Cal.App.4th 586 ........................................................ 105

*People v. Mil*
(2012) 53 Cal.4th 400 ........................................... 92, 99, 108, 129

*People v. Millbrook*
(2014) 222 Cal.App.4th 1122 ........................................................ 72

*People v. Mitchell*
(1939) 14 Cal.2d 237 .................................................................... 72

*People v. Moore*
(2011) 51 Cal.4th 1104 ................................................................ 65

*People v. Najera*
(2006) 138 Cal.App.4th 212 ........................................................ 119

*People v. Partida*
(2005) 37 Cal.4th 428 .................................................................. 91

*People v. Pitts*
(1990) 223 Cal.App.3d 606 ........................................................ 110

*People v. Randle*
(2005) 35 Cal.4th 987 ........................................................ 64, 126

*People v. Rhodes*
(2005) 129 Cal.App.4th 1339 ........................................ 64, 96, 126

*People v. Rios*
(2000) 23 Cal.4th 450 ............................................................... 60

*People v. Roberts*
(1992) 2 Cal.4th 271 .................................................... 75, 76, 105

*People v. Robinson*
(1964) 61 Cal.2d 373 ................................................................ 66

*People v. Roldan*
(2005) 35 Cal.4th 646 ............................................................... 91

*People v. Ross*
(2007) 155 Cal.App.4th 1033 ................................. 63, 64, 95, 127

*People v. Sanchez*
(2001) 26 Cal.4th 834 ......................................................... passim

*People v. Sanchez*
(2014) 228 Cal.App.4th 1517 .................................................. 118

*People v. Soojian*
(2010) 190 Cal.App.4th 491 ......................................... 92, 100, 129

*People v. Steele*
(2002) 27 Cal.4th 1230 .............................................................. 72

*People v. Superior Court (Bennett)*
223 Cal.App.3d 1166 ............................................................... 106

*People v. Thomas*
(2013) 218 Cal.App.4th 630 ...................................................... 72

*People v. Tran*
(2011) 51 Cal.4th 1040 .............................................................. 91

*People v. Turner*
(1984) 37 Cal.3d 302 .................................................................. 130

*People v. Valenzuela*
(2011) 199 Cal.App.4th 1214 ................................................. 63, 95

*People v. Vasquez*
(2006) 136 Cal.App.4th 1176 ............................................... 64, 126

*People v. Villegas*
(2001) 92 Cal.App.4th 1217 ......................................................... 69

*People v. Washington*
(1965) 62 Cal.2d 777 ..................................................................... 76

*People v. Wheeler*
(1992) 4 Cal.4th 284 ............................................................. 87, 88

*People v. Williams*
(1998) 17 Cal.4th 148 .................................................................. 111

*People v. Zarazua*
(2008) 162 Cal.App.4th 1348 ..................................................... 105

*Sons v. Superior Court*
(2004) 125 Cal.App.4th 110 ....................................................... 127

*Sullivan v. Louisiana*
(1993) 508 U.S. 275 ............................................. 93, 97, 101, 104

*Suniga v. Bunnell*
(9th Cir. 1993) 998 F.2d 664 ......................................................... 99

*Taylor v. Superior Court*
(1970) 3 Cal.3d 578 ..................................................................... 105

*United States v. Cabrera and Mulgado*
(9th Cir. 2000) 222 F.3d 590 .............................................. 109, 118

*United States v. Mayfield*
(9th Cir. 1999) 189 F.3d 895 .............................................. 130, 131

*United States v, McLister*
(9th Cir. 1979) 608 F.2d 785 .................... 135

*United States v. Romanello*
(5th Cir. 1984) 726 F.2d 173 .................... 130, 131

*United States v. Rucher*
(11th Cir. 1990) 915 F.2d 1511 .................... 130, 131

*United States v. Tootick*
(9th Cir. 1991) 952 F.2d 1078 .................... 130, 131

*Winfred D. v. Michelin North America, Inc*.
(2008) 165 Cal.App.4th 1011 .................... 90

*Wooten v. Superior Court*
(2001) 93 Cal.App.4th 422 .................... 89

*Zafiro v. United States*
(1993) 506 U.S. 534 .................... 130

**CONSTITUTIONS**

Cal. Const., art I, §§ 15 .................... 58, 84, 93, 101, 109, 130
16 .................... 93, 101

U.S. Const., amends. VI .................... 93, 101
XIV .................... 58, 84, 93, 101, 109, 130

**STATUTES**

Evid Code, §§ 351.5 .................... 87
352 .................... passim
402 .................... 30
1102 .................... 90
1103 .................... 90
1108 .................... 90
1109 .................... 90

Health & Saf. Code, §§ 11351.5 ........ 85
11352 ........ 85
11360 ........ 85

Pen. Code, §§ 187 ........ 23-24, 58
188 ........ 58
189 ........ 79
192 ........ 59, 72
197 ........ 59
199 ........ 59
206 ........ 58
245, subd. (b) ........ 23
266h ........ 87, 89
459 ........ 85
470 ........ 85
475, subd. a) ........ 85
476 ........ 85
647, subd. (b) ........ 89
664 ........ 23-24
667.5, subd. (b) ........ 24
1098 ........ 130
1237 ........ 18
12022.5, subd. (a) ........ 24
12022.7, subd. (a) ........ 24
12022.53 ........ 24
13519.4 ........ 103

**OTHER AUTHORITIES**

Cal. Rules of Court, rules 8.200(a)(5) ........ 130
8.360 ........ 139

CALCRIM Nos. 316 ........ 87
505 ........ 93
560 ........ 21, 101, 104, 107
3471 ........ 98

CALJIC No. 5.30 .......................................................................... 93

Charisse Jones, Shifting: The Double Lives of Black Women in America, Harper e-book (2003) ............................................ 122

Eli Wolfe, Blowing Racial Dog Whistles: Berkeley Prof Blasts Conservatives For "Coded Messages," http://alumni.berkeley.edu/california-magazine/just-in/2014-02-25/blowing-racial-dog-whistles-berkeley-prof-blasts............ 120

http://www.drugabuse.gov/publications/drugfacts/mdma-ecstasy-or-molly .......................................................................... 28

Ian Haney Lopez, Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class, Oxford University Press (2014)........................................ 120

Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html. ........................ 121

John R. Rockford, African American Vernacular English, Blackwell Publishers (1999)................................................121-124

Marguerite Rigoglioso, Stanford News (Dec. 2, 2014) http://news.stanford.edu/news/2014/december/vernacular-trial-testimony-120214.html. ...................................................... 123

Sarah D. Sparks, Students Learn to 'Toggle' Between Dialects, Education Week (Sept. 10, 2014) http://www.edweek.org/ew/articles/2014/09/10/03dialect.h34.html?qs=students+learn+to+toggle+between+dialects............ 123

Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black .........................................121-124

Urban Dictionary, Dog Whistle, http://www.urbandictionary.com/define.php?term=dog+whistle .......................................................................................... 120

Wikipedia,
http://en.wikipedia.org/wiki/Jim_Jones_%28rapper%29. ............ 29

* * * * * *

COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST DISTRICT, DIVISION FIVE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DONEL POSTON,<br><br>Defendant and Appellant. | Appeal No. A141557<br><br>Alameda No. 172522B |

**APPELLANT POSTON'S OPENING BRIEF**

* * * * * *

STATEMENT OF APPEALABILITY

This appeal is from a judgment of conviction after jury trial which finally disposes of all the issues between the parties and is appealable pursuant to Penal Code section 1237.[1]

* * * * * *

[1] All further statutory references are to the Penal Code unless otherwise noted.

INTRODUCTION

This is an unusual case in which the charged shooting was captured on surveillance videos and the undisputed facts show a textbook case of self-defense. Appellant, Donel Poston, had an unplanned encounter with co-appellant, Joe McNeely, at a little after 10 p.m. on April 5, 2013, at a Valero gas station in East Oakland.

The surveillance videos show that McNeely started a quarrel with Poston - talking and gesturing aggressively, then slapping or punching and simultaneously tripping Poston, causing him to fall to the ground. The videos show McNeely reaching inside his jacket and holding what appears to be a gun as Poston starts to get up. Poston pulls out his own gun and rapidly fires multiple shots at McNeely, then runs when McNeely goes down. McNeely gets up and follows Poston, shooting at him repeatedly as he runs away, hitting and killing Lionel Fluker, an innocent bystander.

Poston and McNeely were both charged, tried, and convicted of the second-degree murder of Fluker and the attempted murder of each other. Faced with Poston's seemingly irrefutable claim of self-defense, the prosecutor managed to obtain guilty verdicts by

portraying Poston as a "thug" and a "pimp" who did not look like the "true picture" of a crime victim acting in self-defense.

The prosecutor presented a mountain of Poston's irrelevant and inflammatory out-of-court statements in African American Vernacular English ("AAVE") in rap lyrics, letters, jail phone calls, and YouTube videos he produced. As Poston lamented to his mother in one of the jail phone calls, the prosecutor was twisting his words, managing to make even his protestations of innocence sound incriminating.

Poston's convictions of the second degree murder of Fluker and the attempted murder of McNeely are not supported by sufficient evidence and violate due process. There was insufficient evidence of malice aforethought to overcome compelling evidence that Poston acted in self-defense and/or in the heat of passion on adequate provocation. Thus Poston's convictions of murder and attempted murder should be reversed.

Poston's conviction of murder should also be reversed for insufficient evidence because he did not initiate the chain of events proximately causing Fluker's death - McNeely did - and McNeely's criminal act of shooting at Poston in retaliation was an independent intervening cause. Thus, the provocative act doctrine does not apply

and Poston is not legally responsible for McNeely's fatal shooting of Fluker.

Multiple trial errors also require reversal. Admission of the extensive, inflammatory evidence of Poston's largely irrelevant out-of-court statements about pimping, "hoes" and "bitches" to impeach his credibility was an abuse of the trial court's discretion which violated due process.

The trial court also erred in instructing the jury on mutual combat in accord with CALCRIM No. 3471 without any support in the evidence. "Mutual combat" requires an express or implied agreement to fight before the first blow is struck. Here, there was no evidence of any agreement or intent to fight on Poston's part until McNeely knocked him down and reached for his gun. The unsupported instruction allowed the jurors to reject Poston's compelling claim of self-defense and convict him based on the prosecutor's pervasive and misleading descriptions of McNeely's attack on Poston as a "gun battle."

Compounding the error, the provocative act murder instruction, CALCRIM No. 560, omitted a crucial element – that the defendant *initiated* the chain of events proximately causing death.

Tying all the errors together, the prosecutor committed pervasive, prejudicial misconduct, repeatedly appealing to racial bias and fear of random street violence, both in her questioning of Poston and in her closing argument, portraying Poston as a "thug" and a "pimp" who called women "bitches" and "hoes."

Faced with a seemingly dispositive video showing that Poston shot McNeely in self-defense, the prosecutor obtained convictions by attacking Poston's character and twisting his words, even arguing that switching between African American Vernacular English with his friends and family and Standard English in court supposedly showed he was lying about his defense.

McNeely's counsel also contributed to the unfairness of the trial. The defenses of McNeely and Poston were antagonistic and irreconcilable. The trial court abused its discretion in denying severance at the outset. The conflicts between the two defendants, each charged with the attempted murder of the other, played themselves out throughout the pretrial and trial proceedings. The joint trial was fundamentally unfair.

Poston had a right to stand his ground and defend himself against McNeely's unprovoked and potentially deadly assault,

regardless of any unrelated crimes or character flaws. One need not be a perfect victim to act in self-defense or in the heat of passion. Absent the multiple, serious errors, a more favorable outcome was reasonably possible - in fact, it seems almost certain. The cumulative effect of the errors violated due process and the judgment should be reversed.

* * * * * *

## STATEMENT OF THE CASE

Donel Poston and Joe McNeely were jointly tried on an amended information charging them both with the murder of Lionel Fluker. (1 CT 24; count one; § 187, subd. (a).) The information also charged Poston and McNeely with attempted murder of each other and possession of a firearm by a felon. (1 CT 27-33; 3 CT 776, 778; counts two through five; §§ 187, subd. (a), 245, subd. (b), 664, and 29800, subd. (a)(1).)[2]

---

[2] Initially, Poston and McNeely were charged separately. (See 1 Supp. CT 1603-1615; 1 CT 1-14.) The prosecutor's motions to dismiss the separate case against Poston and amend the complaint against McNeely to add the same charges against Poston were granted. (1 Supp. CT 1731; 1 CT 1-32.) That amended information charged both defendants with assault with a semiautomatic firearm on each other in counts four and five. (1 CT 30-32; 5 CT 1460.) Those counts were later dismissed on motion of the prosecution and counts

The information alleged that both Poston and McNeely personally and intentionally discharged a firearm causing great bodily injury and death within the meaning of sections 12022.5, subdivision (a), 12022.7, subdivision (a), and 12022.53 subdivisions (b), (c), (d), and (g). (1 CT 25-28; counts two and three; §§ 187, subd. (a), 664.)

The information also alleged six prior convictions with four prior prison terms as to Poston and nine prior convictions with two prior prison terms as to McNeely. (1 CT 34-41; § 667.5, subd. (b).)

Jury trial commenced on January 8, 2014. (3 CT 739; 5 CT 1421.)

On February 3, 2014, the jury found Poston and McNeely guilty on all counts and found true the section 12022.53, subdivision (d), allegations. (3 CT 873-876, 887-890; 6 RT 1471-1474, 1483-1487.)

On March 21, 2014, the trial court denied Poston's motion for new trial, denied probation, and sentenced both defendants to aggregate terms of 72 years to life in prison. (3 CT 887-891; 6 CT 1483-1487.)

---

six and seven were renumbered counts four and five, respectively. (3 CT 776, 778; 5 CT 1462.)

Poston's timely notice of appeal was filed that same date, March 21, 2014, and McNeely's, on March 24, 2014. (4 CT 927; 6 CT 1531.)

* * * * * *

STATEMENT OF FACTS

**I. POSTON ARMED HIMSELF FOR SELF-DEFENSE.**

Appellant Donel Poston testified that he grew up in Oakland and owned a home in the Seminary District, half a mile from the Valero gas station where the charged shooting occurred. (18 RT 1516-1517; 19 RT 1749.) Poston has had some brushes with the law. In 2003, he was convicted of possession of crack cocaine for sale. (18 RT 1517.) In 2007, he was convicted of evading the police - a Vehicle Code violation. (18 RT 1518.) In 2008, he was convicted of possession of counterfeit checks. (18 RT 1518.) In 2010, he was convicted of commercial burglary in connection with counterfeit checks. (18 RT 1519.) None of these incidents involved any guns or violence. (18 RT 1516-1520.)

Poston is a professional writer, photographer, screen printer, and videographer who produced 355 episodes of the "Dondiditliveshowww," which is available on the internet. (13 RT

869-870; 18 RT 1520, 1523; 19 RT 1640.) The show features live music, interviews, and comedy sketches. (13 RT 870; 18 RT 1520, 1524.) A few episodes feature flashing rolls of money and prop guns - real guns that are inoperable - with Poston portraying a gangster rapper. (18 RT 1523; 19 RT 1609, 1631, 1663, 1751.) In one episode, Poston portrays a homeless person living in a cardboard box. (19 RT 1617.)

One night in June 2012, less than a year before the charged shooting, Poston came home late after recording a show and called his girlfriend, Tamena Bailey, to come over. (18 RT 1524-1525.) He and Bailey were awakened in the middle of the night when an intruder came in the bedroom window and said, "Don't nobody fucking move, I got a gun." (18 RT 1525.)

Poston did not have a gun and was "scared to death . . . ." (18 RT 1525-1526.) He reacted instinctively, throwing a blanket over the intruder's head. (18 RT 1526.) Poston turned on the light and tried to pull off the intruder's mask and wig. (18 RT 1526.) He was shot in the chest and thought he was dying. (18 RT 1526-1527.) He and Bailey testified that she helped him to the car and drove him to the

hospital, where he spent a month or more convalescing. (18 RT 1398, 1527-1528; 19 RT 1720.)

After his release from the hospital, Poston continued his "hard recovery" with the help of physical and psychological therapy. (18 RT 1398, 1528-1529.) According to Bailey, he was more cautious and nervous than before; "[l]ike, after getting shot, you can't trust nobody." (18 RT 1399.) Poston testified that he was scared after being shot; he had trouble sleeping and, when he did sleep, he had nightmares. (18 RT 1529.) Staying in the same house where he had almost been killed was difficult but Poston did not feel he could move away because he had children in Oakland and a move was "financially impossible." (18 RT 1529-1530.)

By November 2012, Poston was back at work. (18 RT 1530.) He had to be out at all hours of the night and morning at his studio, screen printing T-shirts, sometimes carrying large amounts of cash from customers. (18 RT 1530.) He bought a .40 caliber handgun for protection. (18 RT 1530; 19 RT 1607.) The gun held 15 rounds of ammunition. (18 RT 1531.)

Poston knew it was illegal for him to carry a gun because he was a convicted felon. (18 RT 1531.) But he felt that was what he

had to do to protect himself. (18 RT 1531.) He carried the gun on his way to work the evening of April 5, 2013, because, "it's nighttime, it's Friday night in Oakland, it is crazy. . . . [T]here is a war going on out there . . . ." (19 RT 1612.)

## II. MCNEELY ATTACKED POSTON.

Poston and Bailey drove to the Valero gas station at Seminary Avenue and MacArthur Boulevard the evening of April 5, 2013, to buy some cigars. (18 RT 1535; 19 RT 1709.) When they pulled up at the gas station, Poston saw McNeely, whom he knew as "Two Gun Joe." (18 RT 1534-1535.)

Poston went inside the store and asked someone he knew in there where he could buy some "Mollies" - a party drug Poston sometimes used to bribe his way backstage at concerts to get interviews for his show. (15 RT 1058-1059; 18 RT 1536-1537; 19 RT 1711; see also http://www.drugabuse.gov/publications/drugfacts/mdma-ecstasy-or-molly ["Molly" is methylenedioxymethamphetamine, also called "MDMA" or "Ecstasy"].) The man Poston asked said he might know someone who had Mollies. (18 RT 1537.)

Poston went back outside and was talking to Bailey when McNeely came up behind him and said, "I got some." (18 RT 1538.) McNeely gave Poston an "outrageous price," which Poston declined, then McNeely said he would "cut [Poston] a deal." (18 RT 1538.) Poston testified that he bought two Mollies from McNeely, then happily danc[ed] into the store, telling the guys in the store about his show and the interview he hoped to get with Jim Jones, a well-known rapper. (18 RT 1539-1540; see also http://en.wikipedia.org/wiki/Jim_Jones_%28rapper%29.)

McNeely said something like "[y]ou think you're all that," opening his jacket and showing a gun in his left inside jacket pocket. (18 RT 1540-1541, 1559; see also Pros. Exh. 9 [surveillance videos].) Poston said, "[w]hat ever you driving this car, I don't want a ride," and gestured with his hands as if to say, "I'm out of here." (18 RT 1542.) McNeely started "ranting" at Poston. (18 RT 1542.) He said: "Bitch ass nigger ain't even from Seminary," and "that's why I keep my strap

///

///

//

up, bitch ass niggas like you." (18 RT 1543, 1560; 19 RT 1723-1724.)[3] "Strap" means gun. (19 RT 1724.)

When Poston argued back, McNeely said, "I'll slap the shit out of you," and threw his cup down. (18 RT 1543-1544.) Poston said something like, "[d]amn, you going to slap Don Dotta," looking back at the guy in the store as if to say, "[c]an you believe this?" (18 RT 1544.)

McNeely continued to yell at Poston. (18 RT 1544-1545.) Then he slapped or punched Poston in the face, tripping

---

[3] McNeely suggests that it was Poston who said to him: "[Y]ou're not from Seminary," citing the prosecutor's argument at the Evidence Code section 402 hearing. (McNeely AOB 70; 18 RT 1568-1569.) McNeely is mistaken. On the cited transcript pages the prosecutor argues for impeachment of Poston with his prior conduct possessing marijuana for sale in part to show a possible explanation for why the altercation between him and McNeely escalated to a shooting. (18 RT 1568-1569.)

The prosecutor's ambiguous reference to someone saying "you're not from Seminary" must have been meant to indicate that McNeely said it. (18 RT 1568-1569.) The only evidence of a statement, "you're not from Seminary," is the testimony of Poston and Bailey that McNeely said it. (18 RT 1407, 1463, 1508, 1543; 19 RT 1723-1724.) Later, in her cross-examination of Poston and her direct examination of Police Lieutenant Tony Jones on rebuttal, the prosecutor makes clear she knew it was McNeely who said Poston was not from Seminary. (19 RT 1639, 1814.)

him at the same time. (18 RT 1545, 1561; 19 RT 1730-1731; Pros. Exh. 9.) As Poston fell backwards, he grabbed the camera he always wore around his neck and looked over his shoulder toward Bailey. (18 RT 1546, 1561.) He saw McNeely reaching inside his jacket and thought he was about to get shot. (18 RT 1546, 1561.)

Poston was afraid for his life. (19 RT 1638.) He only had one or two seconds to think. (19 RT 1756.) He pulled out his gun and started shooting, "rapid fire," at McNeely. (18 RT 1546; 19 RT 1756.) He did not intend to kill McNeely - just to disable him. (18 RT 1547.) He aimed at McNeely's arms and legs. (18 RT 1547; 19 RT 1736-1743.)

Poston stopped shooting when McNeely fell. (18 RT 1548.) Poston's gun did not jam and the clip was not empty - there were still bullets left. (18 RT 1549; 19 RT 1743-1744.) He stopped shooting because he did not want to kill McNeely, blow up the gas pumps, or hurt anybody else. (18 RT 1549; 19 RT 1656.) He "shot until [he] felt it was safe to escape." (19 RT 1657.) As soon as McNeely was down, Poston stopped shooting and ran away. (18 RT 1549-1550.) But McNeely did not stay down. (18 RT 1551.) He got up and ran after Poston, shooting toward Seminary Avenue. (18 RT 1551-1552.)

Eutiquio Garcia-Chavez, the janitor at the Valero station, told the police and testified that he heard gunshots and saw McNeely chasing another man, shooting at his back. (15 RT 934-937, 972-973; 17 RT 1319-1322; Def. Exhs. T-1 [recording], T-2 [transcription].) The runner tried to jump a fence but could not get over. (15 RT 966.)

The police officers did not ask Garcia-Chavez about the runner's hands and he did not bring it up himself, but he testified that the runner turned toward McNeely and made a hand gesture as if to say "stop already" - both hands out with the palms facing forward. (15 RT 940, 966; 17 RT 1323-1324, 1326, 1346-1347; Def. Exhs. T-1, T-2.) McNeely turned and went back toward the gas station. (15 RT 941, 965-966, 971.)

Poston testified that he had dropped his gun and his cell phone somewhere along the way and had his hands up. (18 RT 1551-1552; 19 RT 1745-1746.) About five days later, he went down to Los Angeles for a few months; he was "on the run" because he knew what he had done was wrong. (19 RT 1615-1616, 1664, 1748.) He was arrested in Oakland on June 14, 2013. (13 RT 858-861; 16 RT 1133; 19 RT 1616, 1666.)

Bailey testified that she and Poston went to the Valero gas station for cigars. (18 RT 1401.) Poston's investigator, Walter Stannard, testified that Bailey told him they went there to buy "weed," but she testified that they only went to buy cigars. (18 RT 1426; 19 RT 1797-1798.) Poston agreed, explaining that he had a medical cannabis card and did not have to buy marijuana on the street. (18 RT 1535.)

Bailey testified that she and Poston did not discuss McNeely before going to the gas station. (18 RT 1401.) Nor did Poston indicate in any way that he was going to meet someone. (18 RT 1402.) They were just going to get some cigars. (18 RT 1402.)

Poston was wearing his camera on a strap across his shoulder, as he always did - "[a]bout 24 hours a day." (18 RT 1403.) Bailey did not notice McNeely until he was yelling at Poston. (18 RT 1405-1406.) That made her nervous. (18 RT 1411.) McNeely was "calling [Poston] names," saying he was not from the neighborhood. (18 RT 1407, 1463.) He said Poston was a "bitch ass nigger" and "thought he was all that." (18 RT 1508.)

McNeely kept opening his jacket. (18 RT 1409-1410, 1412.) Bailey saw something that looked like a gun handle. (18 RT 1412-

1413.) Stannard testified that Bailey told him she saw the butt of a semiautomatic pistol. (19 RT 1797.) Bailey testified that she was not very familiar with guns and was not sure what she saw but there were two pieces - one in the inside pocket and one lower. (18 RT 1467, 1470-1476.) It could have been two guns. (18 RT 1509.)

Bailey saw McNeely throw down his cup and heard him say he was "going to slap" Poston. (18 RT 1413-1414.) Poston responded to the effect that McNeely was not going to slap him. (18 RT 1479.) He may have said something like "you don't slap Don Dotta," a nickname he sometimes used. (18 RT 1479-1480.)

When McNeely slapped or punched Poston, Bailey jumped out of the car and ran in the store because she did not know if McNeely was going to shoot them. (18 RT 1414-1415.) She told Stannard that McNeely hit Poston so hard she heard the contact. (19 RT 1797.) She said Mr. Poston fell down, got up, and started to run. (19 RT 1797.) Ms. Bailey testified that she was already inside the store, did not see anything after the slap, and did not hear the slap, but she did hear the shots from inside the store. (18 RT 1415; 19 RT 1797.)

McNeely did not testify. His friend Ansar Muhammad testified that was he was at the Valero station at around 10 p.m. on April 5,

2013, and spoke to McNeely before going in the store. (12 RT 612-613, 616.) The Valero store did not have what he wanted so he walked across the street to a liquor store, then walked back to his car in the Valero parking lot. (12 RT 616-617, 631.)

Muhammad never heard any gunshots but, as he was about to leave, he noticed a "commotion" at the Valero station. (12 RT 617-618, 633.) McNeely said he had been shot and asked Muhammad to take him to the hospital. (12 RT 620.) But McNeely did not get in Muhammad's car; he got in his own car and drove off, parking near Muhammad's girlfriend's house on 65th Avenue. (12 RT 620-622.) Muhammad followed and took McNeely to the hospital from there. (12 RT 622, 632.)

Highland Hospital trauma surgeon Nancy Parks testified that McNeely was treated for six gunshot wounds in his thighs, scrotum, armpit and back. (17 RT 1279-1287.) A urologist later removed a bullet from the base of McNeely's penis. (17 RT 1287.)

Shannon Ellis testified that she was driving near Seminary Avenue in Oakland some time after 10 p.m. on April 5, 2013. (12 RT 543-544.) She saw a car parked on the side of the road with the lights on, the motor running and the driver in an odd position. (12 RT 545-

547, 560.) Ellis stopped to see if the driver needed help and discovered Lionel Fluker, apparently dead from a gunshot wound to the head. (12 RT 547-548.) She flagged down Officer William Febel, who confirmed that Fluker was dead. (12 RT 572-574.) Sarah Hudson testified that Fluker, her friend, was on his way home from her house shortly after 10 p.m. on April 5, 2013. (12 RT 538-542.)

## III. MCNEELY KILLED FLUKER.

Pathologist, Paul Herrmann, M.D., testified that a gunshot wound to the head was indeed the cause of Fluker's death. (13 RT 808, 818.) Dr. Herrmann retrieved a 9 mm bullet from the inside of Fluker's skull. (13 RT 815-816; 16 RT 1224, 1226.)

Crime Scene Technician, Christine Middleton, testified that two different calibers of bullet casings were found at the crime scene: eight 9 mm casings and ten .40 caliber casings. (12 RT 665, 679-681.)

It was undisputed at trial that McNeely's handgun fired the 9 mm bullets and casings and that Poston's handgun fired the .40 caliber bullets and casings. (11 RT 496, 505, 519; 20 RT 1887-1888, 1920.) It was undisputed that McNeely fired the bullet that killed Fluker. (11 RT 494, 508, 529; 20 RT 1881, 1903.)

## IV. THE SHOOTING WAS CAUGHT ON SURVEILLANCE VIDEO.

Officer Febel, Officer Eriberto Perez-Angeles, and Officer Richard Vass all viewed surveillance videos from the Valero gas station on the night of April 5, 2013. (12 RT 578-579; 13 RT 831-833; 16 RT 1128, 1130.) The Valero videos were repeatedly played for the jury. (12 RT 578-579, 629, 704-707; 15 RT 983; 16 RT 1089, 1128, 1130; Pros. Exh. 8.)

Valero camera 11 shows McNeely opening his jacket while talking to Poston. (Pros. Exh. 8, file 4_11_R_20130405100000PM.dav at 10:12:21-22.) At 10:12:28 to 10:12:29, McNeely approaches Poston, getting right in his face. At 10:12:30, McNeely punches or slaps Poston in the face or head with his right hand while placing his left foot behind Poston's right foot. At 10:12:31, Poston falls backwards with both hands on the ground.

Valero camera 13 shows McNeely reaching inside his jacket with his right hand as Poston gets up. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 33.) McNeely has what

///

//

appears to be a gun in his right hand before Poston fires his first shot. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 34.)[4]

## V. POLICE OFFICERS SEARCHED MUHAMMAD'S CAR, MCNEELY'S CAR, AND POSTON'S HOME.

Within a few hours after the shooting, Oakland Police Evidence Technician Meeke Hoang watched as two police officers searched Muhammad's car near Highland Hospital and removed a duffel bag containing a cardboard box. (16 RT 1176-1184.) Inside the box were plastic bags of marijuana, methamphetamine tablets, and a digital scale. (15 RT 1040-1046; 16 RT 1090-1091.)

---

[4] McNeely apparently disagrees, stating that he reached for his gun at 10:12:37 and 10:12:38, and that, "[a]t 10:12:39 and 10:12:40, McNeely inserts the magazine into his gun as he is standing up." (McNeely AOB 17.) The surveillance videos do not support McNeely's interpretation. Camera 13 shows McNeely reaching for his gun at 10:12:34, before Poston fires his first shot. (Pros. Exhs. 8, 9; 11 RT 525.) The prosecutor agreed with Poston's description. (11 RT 498.) The video does not show clearly what McNeely was doing before he got up and started shooting. He may have been putting the magazine in the gun as McNeely claims but it is impossible to tell from the video. McNeely did not testify. Poston joins McNeely's request that the Court view the surveillance videos for itself.

Poston has omitted descriptions of the AC Transit and Mills College surveillance videos as they are not relevant to any issues on appeal. (See 13 RT 736-746, 754, 763; 15 RT 976-991; 17 RT 1302-1315; Pros Exhs. 9, 12; Def. Exh. S.)

On April 6, 2013, Oakland Police Evidence Technician Jeffrey Haymon searched McNeely's car. (12 RT 651-653, 657-658, 663; 15 RT 1000, 1002, 1007.) Haymon found "indicia" of McNeely, marijuana packaged in small plastic wraps, and "suspected Ecstasy" capsules and tablets which turned out to be methamphetamine. (15 RT 1000, 1042, 1046-1049, 1052, 1055, 1058-1061.)

On June 14, 2013, police officers searched Poston's home. (13 RT 861-863, 876-888.) In one bedroom, Officer Steve Valle found indicia of Nicholas Bosworth, Poston's housemate, and a .40 caliber handgun. (13 RT 864-865.)

In what appeared to be Poston's bedroom, Officer Anthony Tedesco found .40 caliber ammunition, hand-written rap lyrics, and blank check paper, which Poston testified was used in his business. (13 RT 875, 882, 888; 19 RT 1619, 1789.) In a third room, officers found what appeared to be a credit card manufacturing machine, blank credit cards, and credit cards in various names. (19 RT 1787-1788.) Oakland Police Lieutenant Tony Jones testified that such items are used to commit credit card fraud. (19 RT 1815-1817.) Poston denied any knowledge of the credit cards and machine. (19 RT 1619-1624.)

## VI. POSTON'S OUT-OF-COURT STATEMENTS WERE ADMITTED TO IMPEACH HIS CREDIBILITY AND COUNTER HIS CLAIM OF SELF-DEFENSE.

Officer Perez-Angeles and Sergeant James Gantt interviewed Poston after his arrest and then transported him to the jail. (19 RT 1780-1781.) Poston asked about the charges. (19 RT 1781.) When he was told he was being charged with attempted murder, Poston said he was not trying to kill McNeely; he was just trying to get McNeely off of him. (19 RT 1781-1782.)

On July 8, 2013, Sheriff's Technician Tina Key intercepted a letter from Poston to Bosworth stating that he would find out the identity of a woman who e-mailed the police and identified him as having shot someone. (16 RT 1105, 1109; Pros. Exh. 25.) On July 24, 2013, Key intercepted a letter from Poston to Jon Owens suggesting that a woman had incriminated him. (16 RT 1110, 1112; Pros. Exh. 26.)

In the second letter, Poston talked about all the songs he had written, some of which had been confiscated in a cell search. (16 RT 1111-1112.) He said he planned to assert his speedy trial rights and "forc[e] they hand," because "I ain't did shit but stand my ground." (16 RT 1112.)

Key forwarded Poston's letters to Officer Perez-Angeles, who then searched Poston's cell because he believed witnesses might be in danger. (16 RT 1128-1129, 1133.) Officer Perez-Angeles seized four pages of rap lyrics from Poston's cell. (16 RT 1134-1135; Pros. Exh. 30.) The rap lyrics stated:

> [Page 1]
>
> You got to be higher than Richard Pryor . . . wit a prior. If you think you gonna to fire on a nigga and get away with it, that'll be the day when hell freezes over, dondidit, don't get it. That's why I pack this pistola - gone off cola, probably off a molly. You almost got bodied, instead caught you a body. I'm swift on my toes. Niggas in my circle keep them 40s real close concealed in they clothes, and never lose composure, make a nigga see the light over exposure. Wit 5 Bingo-Jingo from the dondiditliveshow. It's all self-defense under the proper pretense.

(16 RT 1135-1136.)

> [Page 2]
>
> I am 37 and countin'. Ya 38 and down. Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda, but I just popped a nigger and my BM e-mailing investigators. Consider that snitchin but I ain't trippin. . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings. Bottom line to that, I ain't dealing. . . . If God is willing when this soap opera over I'll have All My Children - Days of our Life. Hustling all night, married to the game, and the streets is my wife.

(16 RT 1136.)

> [Page 3]
>
> Niggas hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses. What you got them guns for if you ain't using 'em. Better start shootin dem nigger to left just a faggot. When ya see nigga at, I'm ya best dog. I'm the pick of the litter. Won't hesitate to make the K go cray, Dirty Dada Nigga. Yeah, make my day. Strip the Nigger down to his birthday suit. All about you. You got brand new shoes. I got no commissary. Tom, Dick, and Hairy sleeping on my fucking couch. Must a forgot I'm the reason . . . in the house.

(16 RT 1136-1137.)

> [Page 4]
>
> Yea, the game is deep. We are the lost sheep. It's the irony of the info age, them little niggas showing choppas [assault rifles] on they Facebook page. Assemblin' a Glock [brand of firearm] on their me-ma porch, let that thing rang like it was the 4th. . . . Fuck you. Fuck you, pal. I ain't having that. Don't never leave the house without my strap [firearm].

(16 RT 1137 [Officer Perez-Angeles's definitions in brackets].)

The prosecutor played a Youtube video of one episode of Poston's internet show, Donditliveshowww, showing Poston with cash and two guns. (16 RT 1086; Pros. Exh. 24A [recording], 24B [transcription].) In the redacted audio portion, Poston says:

> It's the Dondititliveshowww. I am Don Dada. I have done did it. And it is a done deal. You know what I'm sayin'? But if you come around this motherfucker, I'm playing with little sure things - these little dumb dumb - they gonna, they gonna just - they gonna put it right in the uh, in the snub nose in my

> motherfuckin' pocket. You know what I'm sayin'? I'm not gonna keep on playing with these dudes man. This is Don Dada.

(Pros. Exh. 24A, 24B.)

Sergeant Gantt testified that he viewed multiple episodes of the Dondiditliveshowww and only this one had any evidentiary value. (16 RT 1101.) In some of the episodes, Poston played a character - a different persona. (16 RT 1101.)

The prosecutor also played numerous recorded phone calls Poston made from the jail to his mother, Bailey, and an "unknown male," apparently his brother Robbie. (19 RT 1625, 1628; Pros. Exhs. 32 [recording], 32A [transcription].) In a June 19, 2013, call to an unknown male, Poston talked about his "bitches" - his "hoe-bo, [his] hoe-bo, [and] [his] hoe-bitch . . . ." (Pros. Exh. 32A at p. 1.)

Poston complained that he had "just paid the bitch phone bill" when he wanted "the bitch to pay [his] way." (Pros. Exh. 32A at p. 1.) The unknown male said, "(Unintelligible) a old pimp is a new pimp." (Pros. Exh. 32A at p. 1.) Poston said there was only one friend he wanted to have his "bitch" because "that's the only nigga gonna make sure I'm eating" instead of just "fuck[ing] on the bitch." (Pros. Exh. 32A at p. 2.)

In a June 19, 2013, phone call to an unknown male, Poston said, "I ain't never been too proud to beg from a bitch in my life, Robbie. . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my hoe-bos, all my baby mamas, I'm finna call my one baby mama right now." (Pros. Exh. 32A at p. 3.)

In a June 22, 2013, phone call to an unknown male, Poston said he had asked Bailey what she was doing and she said she was sitting in the bed. (Pros. Exh. 32A at p. 4.) Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner." (Pros. Exh. 32A at p. 4-5.)

In a June 29, 2013, phone call to an unknown male, Poston said his lawyer told him "this is in the bag. We got this." (Pros. Exh. 32A at p. 6.) He said: "On self defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity. You feel me?" (Pros. Exh. 32A at p. 6.)

In a July 1, 2013, phone call to his mother, Poston said: "I'm not even trying to say that I wasn't there no more. . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law

book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're gonna see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag." (Pros. Exh. 32A at p. 8.)

In a July 14, 2013, phone call to his mother, Poston asked if "Sharan" was coming to court. (Pros. Exh. 32A at p. 10.) When his mother said she was, Poston said to tell Bailey something else. (Pros. Exh. 32A at p. 10.) In a July 16, 2013, phone call to Bailey, Poston said he did not tell her not to go to court because of another woman. (Pros. Exh. 32A at p. 11.) He said he kept getting mad at Bailey for asking "stupid questions" because "I be trying to keep it, I'm trying to keep it, I mean these phone calls is being recorded, you know what I'm saying? So if I say too much then I'm giving up my fucking game though . . . ." (Pros. Exh. 32A at p. 12.)

A moment later, Poston said he was not cussing out Bailey, he was not mad, he was just "under a lot of duress right now," but he was

"happy as a faggot in a dick farm . . . ." (Pros. Exh. 32A at p. 13.) He told Bailey to cooperate with his investigator. (Pros. Exh. 32A at p. 13.)

In a July 22, 2013, phone call to Robbie, Poston said his lawyer was mad at him: "Ah man, that man mad as a motherfucker. That nigga seen all that money on Youtube. That nigga mad as a motherfucker. That nigga, everytime I come, the first thing he says, 'That's a lot of money.' I swear to God. Everytime that nigga see me, that nigga be like, "That's a lot of money. You're tripping.' I'm like 'hey man that shit is gone in the wind. I mean I need you right now. What could we do.' He's like 'no.' I'm like 'yeah man.' He like 'man, are you sure?" I'm like 'look, check this out nigga. I was on the run for 90 days. Man, hotels, hoes, you name it I did it nigga." (Pros. Exh. 32A at pp. 17-18.)

In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. (Pros. Exh. 32A at p. 19.) Poston's mother expressed concerns about Bailey's reliability. (Pros. Exh. 32A at p. 19.) Poston said: "This is my bitch, mommy. . . . . My bitch, mommy. Listen to me. That lay, she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to

me, 'cause you not. I'm the one fucking her mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" (Pros. Exh. 32A at p. 20.)

A moment later, Poston said again that Bailey would do what he told her to do. (Pros. Exh. 32A at p. 21.) Otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that?' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't. . . . [If I marry anyone,] I'm gonna marry Sharan, you feel me? And that's 'cause I need her smarts. I don't need a dumb broad who don't even know how to work the internet in 2013." (Pros. Exh. 32A at p. 22.)

Poston's mother told him to "reverse [his] whole attitude about this aggressiveness," and stop calling Bailey "bitch." (Pros. Exh. 32A at p. 21.) Poston explained that Bailey was his "bitch" and Sharan was his woman. (Pros. Exh. 32A at p. 22.)

In an August 21, 2013, phone call to his mother, Poston said he was "shook up" about the paperwork he had gotten showing that the

prosecutor had two letters confiscated from his house. (Pros. Exh. 32A at p. 24.) He had not said anything incriminating but they were "trying to take [his] statement and twist it" to fit their theory of the case. (Pros. Exh. 32A at p. 24-25.) They were "trying to use it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? . . . Just having an optimistic attitude. But in their eyes, that may be an aggressive front." (Pros. Exh. 32A at p. 26.)

Poston's mother asked if they were going to show the video because "the video itself will show who the aggressor is. The video will show you never touched the man." (Pros. Exh. 32A at p. 25.) Poston responded: "Okay, so then, this is a valid point they raised the other day. You can't bring a knife to a gun fight. Okay? . . . See how slick they are with that shit? You feel me? . . . No. No, no, no, no. Not a knife. They said you can't bring a knife to a fistfight." (Pros. Exh. 32A at p. 25.)

Poston complained that someone had taken his clothes from his house, including the suit he had intended to wear for his trial. (Pros. Exh. 32A at p. 30.) He said he had been "on the run" and did not have money for bills at his house even though he still had a prostitute.

(Pros. Exh. 32A at p. 31.) When his mother protested at his mention of a prostitute, Poston said, "I'm the one in here doing time. Do you think I'm gonna incriminate myself?" (Pros. Exh. 32A at p. 32.)

In an August 31, 2013, phone call to his mother, Poston again brought up the suit he wanted to wear for his testimony. (Pros. Exh. 32A at p. 35.) He said he wanted more comfortable clothes to wear in court "until it was time for me to actually go perform." (Pros. Exh. 32A at p. 35.) He told his mother how he had been trying to instruct Bailey about how to dress and groom herself for court. (Pros. Exh. 32A at pp. 38-39.) Poston agreed when his mother said Bailey "needs to tell the truth" - the same thing she had told Poston's attorney. (Pros. Exh. 32A at p. 39.)

Poston's mother said: "She don't need to put nothing on it. She needs to tell the truth, Donnie." (Pros. Exh. 32A at p. 39.) Poston responded: "Exactly. That's what I told her, mommy." (Pros. Exh. 32A at p. 39.) Poston and his mother shared concerns about Bailey's poor grooming, body odor, and lack of intelligence. (Pros. Exh. 32A at pp. 39-40.) Poston said, "Man they gonna eat this bitch alive." (Pros. Exh. 32A at p. 40.)

Poston said he was going to practice his testimony: "I was like I'm going in here, and I need to have my full, I will not say one ghetto-ebonic-slur, will not come out of my mouth. All the articulate shit that I've learned in my 37 years, all the positive things and attributes that I got to say about myself, will truly be honed out today. You feel me? I mean, you know, I mean man, 'cause I just, I have to paint a different portrait than what . . . ." (Pros. Exh. 32A at p. 41.) He asked: "You know what they always say, mommy? Proper preparation prevents poor performance. You feel me?" (Pros. Exh. 32A at p. 42.)

In a September 5, 2013, phone call to his mother, Poston said he was not saying he was not there - that was not his defense. (Pros. Exh. 32A at p. 45.) Then he chastised himself for talking about his legal strategy on the recorded phone call. (Pros. Exh. 32A at p. 45.)

In a September 14, 2013, phone call to Bailey, Poston said he was trying to figure out the best strategy for winning his case. (Pros. Exh. 32A at p. 48.)

Based on the recorded phone calls, the prosecutor asked Poston on cross-examination: "[Y]ou've been practicing your performance

for this case, right?" (19 RT 1625.) And, "you only need to practice if it's not the truth, right?" (19 RT 1625.) The prosecutor continued:

> Q: [Y]ou're trying to get over on this jury, aren't you?
>
> A: No, ma'am.
>
> Q: Didn't you tell your mom that you wanted to save your good suit for when it was time for you to perform?"
>
> A: Ma'am, maybe only a metaphor.
>
> Q: Well, didn't you also tell your mom you have to paint a different picture, a different portrait for this jury?
>
> A: Yes, ma'am, especially if you're going to paint one picture.
>
> Q: Well, the picture that you are on the streets is what you're afraid of, right?
>
> A: Hmm, I don't get it.
>
> Q: Well, the picture that you are out on the streets as a hard-core thug, into guns, and being a gangster?
>
> A: No, ma'am.

(19 RT 1627-1628.)

The prosecutor suggested that Poston fabricated his defense of self-defense when incriminating letters were seized from his jail cell in which he admitted he was there at the Valero and dropped his hat when he ran away. (19 RT 1643.) She asked, "You've read a lot of cases about self-defense, haven't you?" and "[y]ou know exactly what

you need to say in order to try and prevail on a claim of self-defense?" (19 RT 1643.)

The prosecutor asked Poston if he was a pimp, quoting statements he made about "hoes" and prostitutes. (19 RT 1653-1654.) She asked Poston about a letter to his brother stating, "[t]hat last weed I gave you came from out a ho ass. She turned a date for two zips and a hundred dollars." (19 RT 1654.) The "ho" Poston talked about in jail calls was Brianna Howard, the young woman who was with him when he was arrested. (17 RT 1353-1354; 19 RT 1666.)

McNeely's attorney played additional jail phone calls during his cross-examination of Poston, further emphasizing Poston's discussion of "hoes," and "bitches." (19 RT 1675-1693, 1758-1759; Def. Exhs. P, P-1, Z, AA, BB.) In a June 16, 2013, phone call, Poston said:

> But the Ho-Bitch need to go on about her way, though. You feel me? She can get down to LA with her friends and shit you know what I mean, she can get back to working where she belongs . . . you know what I mean but she can get down there with their friends and shit, she can turn some dates down there, do what she need to do, and get back in the mix. She got a few tricks that we was leaning on, you feel me. A thousand here. A thousand there. She'll be alright.

(Def. Exh. P-1 at p. 3.)

In a June 22, 2013, phone call, Poston and Bailey discussed another woman:

Bailey: What did you . . . still trying to hold onto her for?

Poston: Hold onto her, bitch, I ain't holding onto nothing except my motherfucking pocketbook, what you talking about?

Bailey: But you talking about you wish you had her number, You don't even need her number.

Poston: Yeah, bitch, 'cause I need all she got to offer me! What you mean? That bitch sockin it to my pocket like the Chinese stock market, bitch, you got nothing to give me right now, what the fuck you mean?! What you talking about? You ain't taking no contributions, no donations. What you talking about? When did you stop taking contributions and donations?

(Def. Exh. P-1 at p. 5.)

McNeely also played more of Poston's Youtube videos talking about the Seminary neighborhood, the "kill zone," where most East Oakland murders occur, Poston's book, "A Day in the Life of a Hustler," and rap lyrics Poston wrote. (19 RT 1696-1709.)

## VII. EXPERT WITNESSES TESTIFIED ABOUT GUNS, DRUGS, AND STREET TERMINOLOGY.

Prosecution criminalist Susan Molloy testified as a firearm expert that the gun found in what appeared to be Bosworth's bedroom in Poston's house could not have fired the bullets recovered at the Valero station. (13 RT 864-865; 16 RT 1231.) According to Molloy, one of the bullets found in what appeared to be Poston's bedroom had

been cycled through the same unknown gun as two of the .40 caliber cartridge cases found at the Valero station. (13 RT 880-885; 16 RT 1233.)

Prosecution criminalist Waliana Dieu testified that there had been a significant drop in Ecstasy samples seen in the police lab in the previous two years. (15 RT 1027, 1060.) All the recent items which appeared to be Ecstasy had turned out to be methamphetamine. (15 RT 1060.) The methamphetamine capsules and tablets found in McNeely's car and duffel bag appeared to be Ecstasy. (15 RT 1060-1061.)

Sergeant Gantt testified as an expert in controlled substances that Valero camera 13 showed an attempted drug transaction at 10:07:45 p.m. (16 RT 1079-1084, 1090-1091; Pros. Exh. 8.) According to Sergeant Gantt, McNeely offered Poston drugs packaged for sale but Poston declined, perhaps because the package

///

///

///

//

was too small. (16 RT 1090-1091.)[5] Gantt testified that all the packages of drugs found in McNeely's car were possessed for sale. (16 RT 1091-1094.)

Lieutenant Jones testified, apparently as an expert in East Oakland street terminology and culture. (19 RT 1799-1828.)[6] He identified some men on one of Mr. Poston's Dondiditliveshowww Youtube videos as people he knew from the Seminary neighborhood -

---

[5] Again, Poston disagrees with McNeely's interpretation of the evidence. McNeely states that, in Sergeant Gantt's opinion, "McNeely showed Poston a bagged quantity of marijuana, but Poston declined it." (McNeely AOB 9.) In fact, Sergeant Gantt testified that McNeely showed Poston a small plastic bag containing "some type of narcotics." (16 RT 1069, 1090-1091, 1093.)

The "narcotics" in evidence which were presented to Gantt consisted of both marijuana and methamphetamine pills that looked like Ecstasy. (15 RT 1040-1049, 1052, 1055, 1058-1061; 16 RT 1090-1091.) There is no indication in the record that Gantt thought McNeely was offering Poston marijuana, as McNeely claims, rather than apparent Ecstasy pills, as Poston testified. (18 RT 1568-1573; 19 RT 1715-1718, 1764-1768; McNeely AOB 68-74.) Sergeant Gantt's testimony indicates that he only saw a baggie and had no idea what type of drug was in it.

[6] The prosecutor did not expressly offer Lieutenant Jones as an expert but he elicited extensive testimony about Jones' experience, expertise, and opinions. Poston's attorney objected that the testimony was improper rebuttal. (19 RT 1809-1811.) The prosecutor offered to qualify Jones as an expert but the trial court overruled Poston's objection and no one challenged Jones' expertise. (19 RT 1810-1811.)

from the "street life." (19 RT 1811-1813, 1828.) He said, "[l]ive by the gun and die by the streets" means that "you are in the streets and you . . .play with guns, or you are constantly doing things with guns that eventually the streets are going to catch up with you and you're going to die." (19 RT 1818.) There are also people called "studio gangstas." (19 RT 1825.) A "studio gangsta" is a "fake gangsta, like a person that carries himself like a gangsta, but they're really not." (19 RT 1825.)

Lieutenant Jones testified that it would be an insult to Poston for someone to tell him he was not from Seminary. (19 RT 1814.) If Poston were to walk away from such an insult, he would be "viewed as a punk," opening the door to further harassment. (19 RT 1814-1815.)

Lieutenant Jones testified that to "fire on" someone means to punch them or shoot at them, depending on the context. (19 RT 1817, 1827.) "Shine" means reputation. (19 RT 1819.) Rap lyrics found in Poston's jail cell mean "you got to be high or crazy to think you can punch me and get away with it" and "you almost got killed, and . . . instead . . . you killed somebody." (19 RT 1818.)

Respect is important to young men in Oakland and Lieutenant Jones has investigated a lot of murders committed because someone felt that they were disrespected. (19 RT 1821.) When one grown man slaps another man in the face, it is very disrespectful. (19 RT 1822.) According to the lieutenant, the second man could not just walk away without losing his street credibility. (19 RT 1822.) Lieutenant Jones acknowledged that, if a man slapped him, knocking him to the ground, then drew a gun on him, he would pull out his gun too. (19 RT 1825.)

* * * * * *

## ARGUMENT

### I. POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

Poston's convictions of murder and attempted murder violate due process and should be reversed because they are not supported by sufficient evidence; no rational juror could have found proof beyond a reasonable doubt that Poston did not act in self-defense or in the heat of passion on adequate provocation, nor that he initiated a chain of events which proximately caused Fluker's death. (U.S. Const., amend. XIV; Cal. Const., art. I, § 15; § 206; *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

#### A. LEGAL BACKGROUND.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187.) When the charge is murder, malice may be express or implied: "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188; see also *People v. Knoeller* (2007) 41 Cal.4th 139, 151-152 [malice is implied when a person willfully does

an act, the natural and probable consequence of which are dangerous to human life, and the person knowingly acts with conscious disregard for life].) When the charge is attempted murder, the prosecution must prove express malice aforethought: intent to kill unlawfully. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1126; *In re Christian S.* (1994) 7 Cal.4th 768, 778-779.)

Whether the charge is murder or attempted murder, malice is negated by evidence that the defendant acted in the actual belief in the need for self-defense or in the heat of passion on adequate provocation. (§ 192; *People v. Beltran* (2013) 56 Cal.4th 935, 941-942; *People v. Manriquez* (2005) 37 Cal.4th 547, 581.) If the defendant's belief in the need to use deadly force in self-defense was reasonable, the complete defense of self-defense requires a complete acquittal; the homicide or attempted homicide was justifiable and no crime was committed. (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134; *In re Christian S., supra*, at p. 783; see also §§ 197, 199.)

If the defendant's belief was unreasonable, the partial defense of imperfect self-defense mitigates the offense to voluntary manslaughter or attempted voluntary manslaughter. (*In re Christian S., supra, at p. 783*; accord *People v. Manriquez, supra,* 37 Cal.4th at p. 581; *People*

*v. McCoy* (2001) 25 Cal.4th 1111, 1116.) Heat of passion on adequate provocation also mitigates the offense to voluntary manslaughter or attempted voluntary manslaughter. (*People v. Beltran, supra*, 56 Cal.4th at p. 942.)

Where the evidence raises the issues of self-defense and/or heat of passion, the prosecution bears the burden of proving beyond a reasonable doubt that none of these complete or partial defenses apply in order to establish malice. (*People v. Rios* (2000) 23 Cal.4th 450, 462; *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704.) If uncontroverted evidence establishes all the elements of the complete or partial defense, the defense is established as a matter of law. (See *People v. Levitt* (1984) 156 Cal.App.3d 500, 509.)

A defendant who did not actually kill a decedent may be guilty of murder or manslaughter, depending on his mental state, if his provocative act initiated a chain of events, proximately causing the victim's death. (*People v. Cervantes* (2001) 26 Cal.4th 860, 866-867; *People v. Sanchez* (2001) 26 Cal.4th 834, 846-848.) The prosecution bears the burden of proving proximate causation. (*Ibid*.)

Here, no rational juror could have found proof beyond a reasonable doubt that Poston intended to kill McNeely unlawfully --

that he did not shoot McNeely in the actual belief in the need for self defense, whether reasonable or not, nor in the heat of passion on adequate provocation. And no rational juror could have found proof beyond a reasonable doubt that Poston initiated a chain of events which proximately caused Fluker's death. Thus, Poston's convictions of murder and attempted murder should be reversed.

B. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN SELF-DEFENSE.

Poston's convictions of murder and attempted murder should be reversed because no rational juror could have found proof beyond a reasonable doubt that he did not act in self-defense. The surveillance videos indisputably show that McNeely started a verbal altercation with Poston, hit him in the face and tripped him, knocking him to the ground, then pulled out a gun while Poston was getting up.

Valero Camera 11 shows McNeely repeatedly opening his jacket while talking to Poston. (Pros. Exh. 8, file 4_11_R_20130405100000PM.dav at 10:12:21-22.) At 10:12:28 to 10:12:29, McNeely approaches Poston, getting right in his face, talking and gesturing aggressively. At 10:12:30, McNeely punches or slaps Poston in the face or head with his right hand while placing his

left foot behind Poston's right foot. At 10:12:31, Poston falls backwards with both hands on the ground.

Valero camera 13 shows McNeely reaching inside his jacket with his right hand as Poston gets up. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 33; 11 RT 498.) McNeely has what appears to be a gun in his right hand before Poston fires his first shot. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 34.)

Poston and Bailey both testified that McNeely initiated the incident by insulting, "ranting," and yelling at Poston. (18 RT 1410-1411, 1540-1545, 1559-1560; 19 RT 1723-1724.) Both Poston and Bailey saw McNeely's gun when he repeatedly opened his jacket and said he kept "a strap for bitch-ass niggers" like Poston. (18 RT 1412-1413, 1507-1508, 1541; 19 RT 1722-1723.) McNeely threatened to slap Poston, then threw down the cup he was holding and punched or slapped Poston to the ground. (18 RT 1545, 1561; 19 RT 1730-1731.)

Poston testified that, as he got up from the ground, he saw McNeely reach inside his jacket. (18 RT 1546, 1561.) Poston thought he was about to get shot and feared for his life. (18 RT 1546, 1561; 19 RT 1638.) He had been shot before. (18 RT 1526-1527.)

Poston only had one or two seconds to think. (19 RT 1756; see also *Brown v. United States* (1921) 256 U.S. 335, 343 ["Detached reflection cannot be demanded in the presence of an uplifted knife"].) He pulled out his gun and started shooting, "rapid fire," at McNeely, then ran when McNeely went down. (18 RT 1548; 19 RT 1657.) McNeely did in fact have a gun and fired it repeatedly as Poston ran away, hitting Fluker. (11 RT 494, 496, 505, 508, 519, 529; 15 RT 934-937, 972-973; 18 RT 1551-1552; 20 RT 1881, 1903.)

Despite this textbook case of self-defense, the prosecutor argued that Poston was guilty of murder and attempted murder because he and McNeely both "chose to engage in this gun battle at the public gas station, on a busy street, in front of all these people . . . ." (20 RT 1864.) Contrary to the prosecutor's claim, Poston was not guilty of murder or attempted murder based on voluntary participation in a gun battle - mutual combat.

"Mutual combat" means "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 [court's emphasis]; accord *People v. Jackson* (2014) 58 Cal.4th 724, 760; *People v. Valenzuela* (2011) 199

Cal.App.4th 1214, 1233-1234.) Once the first blow is struck, the victim is entitled to stand his ground and strike back in self-defense. (*People v. Ross, supra,* at p. 1044 and fn. 13; accord *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1346.)

Indeed, even a felon is entitled to stand his ground and, if necessary, use a firearm in self-defense, even if it is unlawful for him to possess the firearm more than momentarily and even if he instigated a quarrel, as long as his adversary was the first to use unlawful force. (*People v. King* (1978) 22 Cal.3d 12, 24; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180; *People v. Rhodes, supra,* 129 Cal.App.4th at p. 1346; cf. *People v. Randle* (2005) 35 Cal.4th 987, 992 [defendant was entitled to jury instruction on imperfect defense of another for unreasonable use of deadly force in defense of another, though he instigated the quarrel by criminal but not assaultive conduct].)

Here there was no evidence whatsoever that Poston agreed or intended to engage in mutual combat. The surveillance videos and the testimony of Poston and Bailey showed that McNeely instigated the quarrel, escalated it, and unlawfully assaulted Poston, as the prosecutor necessarily conceded. (20 RT 1867, 1884-1885, 1888.)

There was no evidence whatsoever that Poston expressly or impliedly agreed to fight McNeely before McNeely struck the first blow.

Thus, there was no evidence of mutual combat. (Compare *People v. Jackson* (2014) 58 Cal.4th 724, 760-761 [evidence of prior fights between two prison gangs coupled with "very unusual behavior" - members of both gangs "milling around" the yard while all other prisoners had vacated the area - gave rise to an inference of mutual combat - fighting "pursuant to mutual intention, consent or agreement preceding the initiation of hostilities"]; *People v. Moore* (2011) 51 Cal.4th 1104, 1136 ["where the prosecution's evidence show[ed] a jailhouse scuffle, the scene as witnessed [did] not suggest defendant may have been acting in self-defense, and defendant present[ed] no evidence in mitigation," mutual combat supported a finding of criminal assault]; *People v. Sanchez, supra*, 26 Cal.4th at pp. 851-854 [both defendants were equally culpable because they engaged in a "gun battle" - "simultaneous attempts to murder one another in a preplanned blaze of gunfire"]; see also Arguments IV [the trial court erred prejudicially in instructing on mutual combat without substantial evidence] and V [the trial court erred prejudicially in failing to instruct that the provocative act doctrine applies only when

the defendant *initiated* a chain of events proximately causing the victim's death].)

The prosecutor argued that this was not a true case of self-defense because Poston fired the first shots and did not wait around to talk to the police, but fled the city and "dumped the gun." (20 RT 1892, 1896, 1898.) The prosecutor also argued that the video showed Poston had no fear - "you can see that from his continued interaction with McNeely" before the first blow was struck. (20 RT 1896.)

Any consciousness of guilt in fleeing the scene, leaving the city, and dumping the gun, if he did so, is adequately explained by the fact that Poston was a felon with a firearm, involved in a shooting, who did not trust the police. (19 RT 1642; cf. *People v. Robinson* (1964) 61 Cal.2d 373, 400-401 [even if the defendant's inconsistent statements showed a consciousness of guilt, they were not necessarily incriminating; in the absence of any other independent, incriminating evidence, the Supreme Court asked, guilt "in regard to what?"].) There was no evidence Poston even knew Fluker had been killed when he ran from McNeely.

Any lack of fear before McNeely punched or slapped Poston, tripped him, and reached for a gun is irrelevant. Poston's testimony

and the surveillance videos are uncontroverted evidence that Poston was afraid for his life at the moment he shot McNeely.

According to the prosecutor, Poston "contrived this defense" after being questioned by the police, while his later statements showed that his true motive was revenge for disrespect. (20 RT 1897-1898.) On the contrary, Poston's statements during his arrest and in letters, jail phone calls, rap lyrics, and YouTube videos are all consistent with the surveillance videos and the testimony of Poston and Bailey. All of that evidence established as a matter of law that Poston acted reasonably in self-defense.

When Poston was told he was being charged with attempted murder, he said he was just trying to get McNeely off of him. (19 RT 1781-1782.) In a letter found in his jail cell, Poston said he planned to assert his speedy trial rights and "force they hand," because "I ain't did shit but stand my ground." (16 RT 1112.)

In rap lyrics found in his jail cell, Poston wrote that he carried a gun so no one could fire on him and get away with it - "It's all self-defense under the proper pretense." (16 RT 1135-1136.) He bragged that his 40 ounce bullets "made that 9 sit down." (16 RT 1136.) He wrote that "little niggas" fired guns from their grandmother's porch

but "I ain't having that. Don't never leave the house without my strap." (16 RT 1137.) In a YouTube video, Poston warned, "if you come around this motherfucker," I have a loaded gun, and "I'm not gonna keep on playing with these dudes man." (Pros. Exh. 24A, 24B.)

In phone calls from the jail, Poston repeatedly expressed confidence in his defense of self-defense because everything he read "fit my shit to the maximum capacity." (Pros. Exh. 32A at p. 6.) A case Poston had read upheld self-defense where the defendant stood his ground because he could not safely drive away. (Pros. Exh. 32A at p. 6.) Poston told his mother: "Godammit if that ain't my shit down to a fucking tee." (Pros. Exh. 32A at p. 8.)

Poston worried after seeing the discovery that the prosecutor was trying to twist his words and use his optimistic attitude against him. (Pros. Exh. 32A at pp. 24-26.) That is exactly what happened. While Poston clearly said that the materials he read about self-defense fit his case, the prosecutor suggested he was trying to fit his case to the materials. (19 RT 1643, 1757; Pros. Exh. 32A at pp. 6, 8.)

When Poston talked about preparing for his testimony and wearing a suit, the prosecutor suggested his use of the words

"practice," "perform," and "strategy" showed he was lying to the jury. (19 RT 1625-1628; Pros. Exh. 32A at pp. 41-42.) When he said he had to avoid using "ghetto-ebonic-slur[s]," and he had to "paint a different portrait" for the jury, the prosecutor suggested the portrait he was trying to counter was him "out on the streets as a hard-core thug, into guns, and being a gangster." (19 RT 1628; Pros. Exh. 32A at p. 41.)

Similarly, while Poston clearly said he told Bailey to tell the truth, the prosecutor suggested he told her to lie on his behalf. (16 RT 1648-1650; Pros. Exh. 32A at pp. 38-39.) The prosecutor even tried to use it against Poston when he quoted her as saying, "you can't bring a knife to a fistfight," as if Poston's expression of concern about the prosecutor's legal theory was some kind of admission. (19 RT 1661-1662; Pros. Exh. 32A at p. 25.)

Uncontroverted evidence established that McNeely showed Poston his gun while threatening him and behaving aggressively. The video shows that McNeely was reaching for his gun as Poston started to get up and that he had the gun in his hand before Poston fired a shot. (Compare *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1225-1226 [defendant was not entitled to use deadly force because the

uncontroverted evidence showed that his adversary did not have a gun].)

Poston's out-of-court statements - the main evidence the prosecution presented to prove unlawful intent - had little or no probative value and should not even have been admitted. (See Argument III, *post*). Poston's statements are entirely consistent with self-defense. The statements are not incriminating but they helped the prosecution case by suggesting that Poston was a "pimp" and a "thug" who associated with other thugs - not a law abiding citizen entitled to defend himself from an unlawful attack. The statements served only to alarm the jurors with colorful language, profanity, and the specter of random street violence.

Lieutenant Jones testified that he knew some of the people in some of Poston's YouTube videos from "the street life." (19 RT 1811-1813, 1828.) He testified that it would be an insult for someone to tell Poston he was not from Seminary and he could not walk away from such an insult without being "viewed as a punk." (19 RT 1814-1815.) According to Lieutenant Jones, Mr. Poston could not let another man get away with slapping him in the face without losing street credibility. (19 RT 1822.) As Lieutenant Jones acknowledged,

however, he would pull out his gun too if a man slapped him, knocking him to the ground, then drew a gun on him. (19 RT 1825.) Indeed, any reasonable person might do so in the same circumstances.

The uncontroverted evidence established all the elements of perfect self-defense, which applies to any responsibility Poston might otherwise have had for McNeely's accidental shooting of Fluker, as well as for Poston's shooting of McNeely. (See *People v. Levitt*, *supra*, 156 Cal.App.3d at pp. 507-508; *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357; *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1023-1024.)

But even if Poston's resort to deadly force was unreasonable, he could lawfully be convicted of voluntary manslaughter and attempted voluntary manslaughter at most. His convictions of murder and attempted murder are not supported by sufficient evidence and should be reversed.

C. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN THE HEAT OF PASSION ON ADEQUATE PROVOCATION.

Poston's convictions of murder and attempted murder should be reversed for the additional reason that no rational juror could have found proof beyond a reasonable doubt that he did not act in the heat

of passion on adequate provocation. Whether the charge is murder or attempted murder, malice is negated by evidence that the defendant acted upon a sudden quarrel in the heat of passion. (§ 192; *People v. Lenart*, *supra*, at p. 1126; *People v. Steele* (2002) 27 Cal.4th 1230, 1252; *People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Breverman* (1998) 19 Cal.4th 142, 163; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708-709.)

The passion aroused may be anger, rage, fear, or any "[v]iolent, intense, high wrought or enthusiastic emotion … other than revenge." (*People v. Breverman*, *supra*, at p. 163 [citations and internal quotation marks omitted]; see also *People v. Mitchell* (1939) 14 Cal.2d 237, 252 [heat of passion may be based on fear, rather than rage]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 [heat of passion may be based on a fear that did not rise to the level required to establish self-defense]; *People v. Thomas* (2013) 218 Cal.App.4th 630, 646 [failure to instruct on heat of passion was prejudicial error where the defendant testified that he shot the attacking victim because he was afraid; although the facts may have fit more precisely with imperfect self-defense, they also supported heat of passion due to a sudden quarrel].)

The Supreme Court recently reaffirmed that "heat of passion arises when at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 59 [citation and internal quotation marks omitted]; accord *People v. Beltran, supra*, 56 Cal.4th at p. 957.)

It is not necessary that the provocation would cause a reasonable person to kill; an unnecessary killing is always unreasonable. (*People v. Beltran, supra*, at pp. 952-958.) If the provocation would have caused a reasonable person to ash rashly from passion and not from judgment, the offense is mitigated to voluntary manslaughter or attempted voluntary manslaughter. (*Ibid*.)

McNeely insulted, ranted, and yelled right in Poston's face, calling him a "bitch ass nigger," while gesturing aggressively, punched or slapped Poston in the face, knocking him to the ground, then pulled out a handgun. Poston reacted to the dangerous and provocative situation in which he found himself. The uncontroverted evidence establishes as a matter of law that he acted in self-defense.

In addition, McNeely's extreme provocation caused him to act from passion - fear for his life - which negated malice. No rational juror could have found otherwise and Poston's convictions of murder and attempted murder should be reversed.

D. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON INITIATED A CHAIN OF EVENTS THAT PROXIMATELY CAUSED LIONEL FLUKER'S DEATH.

As explained, *ante*, Poston's conviction of murder should be reversed because he shot McNeely in self-defense and/or in the heat of passion and that mental state transferred to Fluker - McNeely's unintended victim. (See *People v. Levitt, supra*, 156 Cal.App.3d at pp. 507-508; *People v. Curtis, supra,* 30 Cal.App.4th at p. 1357; *People v. Mathews, supra*, 91 Cal.App.3d at pp. 1023-1024.) In addition, no rational juror could have found proof beyond a reasonable doubt that Poston initiated a chain of events that proximately caused Fluker's death.

As Poston explained, a defendant who did not actually kill a decedent may be guilty of murder or manslaughter, depending on his mental state, if his provocative act initiated a chain of events, proximately causing the victim's death. (*People v. Cervantes, supra*,

26 Cal.4th at pp. 866-867; *People v. Sanchez*, *supra*, 26 Cal.4th at pp. 846-848; accord *People v. Concha* (2009) 47 Cal.4th 653, 663.) If he acted with malice, he could be guilty of first or second degree murder. (*People v. Concha*, *supra*, at p. 663; *People v. Cervantes*, *supra*, at p. 873.) If he acted without malice, he might be guilty of manslaughter, even if the actual killer was guilty of murder. (*Ibid*.)

A provocative act is a proximate cause of a killing by another if the killing was a natural and probable consequence of the defendant's act. (*People v. Cervantes, supra*, at pp. 871-872; *People v. Roberts* (1992) 2 Cal.4th 271, 319-321.) A natural and probable consequence is one which is reasonably foreseeable. (*Ibid*.) An intervening cause relieves the defendant of liability if it is independent - "an extraordinary and abnormal occurrence," or "[t]he free, deliberate, and informed intervention of a second person, who intends to exploit the situation created by the first, but is not acting in concert with him . . . ." (*People v. Cervantes*, *supra*, 26 Cal.4th at p. 871.)

The Supreme Court has explained that "there is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a

court may properly decide that no rational trier of fact could find the needed nexus." (*People v. Roberts, supra*, 2 Cal.4th at p. 328, fn. 11; accord *People v. Cervantes, supra*, at pp. 871-872.)

Although the provocative act doctrine is not limited to gun battles, that is its primary and traditional application. (See *People v. Cervantes, supra*, 26 Cal.4th at p. 867; *People v. Gonzalez* (2012) 54 Cal.4th 643, 655.) The Supreme Court held in *People v. Washington* (1965) 62 Cal.2d 777, 781, that the felony-murder rule does not apply to a killing by the victim of a robbery, but only to a killing by the robber or an accomplice. The court noted that, in addition to vicarious liability as aiders and abettors or co-conspirators, "[d]efendants who initiate gun battles may also be guilty of murder if their victims resist and kill." (*Id*. at p. 782; accord *People v. Gilbert* (1965) 63 Cal. 2d 690, 704-705.)

In the companion cases of *Cervantes* and *Sanchez*, the Supreme Court addressed the limits of proximate causation in the context of gang warfare, distinguishing between a gun battle - mutual combat - and retaliatory shootings. (See *People v. Cervantes, supra*, 26 Cal.4th at pp. 867-874; *People v. Sanchez, supra*, 26 Cal.4th at pp. 845-854 and conc. opns. of Kennard, J., and Werdegar, J., pp. 854-859.)

In *Cervantes*, the court found insufficient evidence to support the defendant's conviction of murder for a gang shooting based on the provocative act doctrine. (*People v. Cervantes, supra*, at pp. 872-873.) The defendant, a gang member, was talking to a girl associated with another gang and called her a "ho" when she spurned him, "leading to an exchange of crude insults." (*People v. Cervantes, supra*, 26 Cal.4th at p. 863.)

A member of the other gang pulled out a gun and threatened to "cap [defendant's] ass." (*Ibid*.) The defendant responded by pulling out his own gun. (*Ibid*.) When another member of the rival gang tried to intervene, touching the defendant on the shoulder to separate the two, the defendant shot him, inflicting a non-fatal wound. (*Ibid*.)

A fight erupted and gang challenges were exchanged. (*Ibid*.) The defendant fled. (*Ibid*.) A moment or two later at most, members of the rival gang shot and killed a member of the defendant's gang. (*Ibid*.) The defendant was convicted of provocative act murder. (*Id*. at p. 865.)

The Court of Appeal affirmed but the California Supreme Court reversed, holding that the act of the actual killers was an independent intervening cause, relieving the defendant of criminal responsibility

for the murder. (*Id*. at pp. 866, 874.) First, the Court observed that the defendant was not the initial aggressor. (Id. at p. 872.) The first rival gang member was the initial aggressor, having instigated the quarrel leading to the defendant's shooting of the second rival gang member by pulling out a gun and threatening to kill the defendant. (*People v. Cervantes, supra,* 26 Cal.4th at p. 872.)

The court noted that the prosecution had never argued the defendant's verbal insult to the girl was sufficiently provocative to support a murder conviction. (Id. at p. 872, fn. 12.) The Supreme Court apparently assumed it was not. (*Id*. at p. 872, fn. 12.)

The court also noted several other circumstances indicating that the chain of causation was too tenuous to impose criminal liability. There was no evidence the killers were present and witnessed the defendant's provocative act. (*Ibid*.) The defendant was not present when the fatal shooting occurred - he had already run off. (*Ibid*.) The killers did not shoot at the defendant or an accomplice but rather at another gang member. (*Id*. at pp. 872-873.)

The killers were not shooting in self-defense but in retaliation. (*Id*. at p. 873.) And they were not acting unconsciously or reflexively. (*Ibid*.) On the contrary, their acts "were themselves criminal,

felonious, and perpetrated with malice aforethought." (*Id*. at p. 874.) They "intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him, a circumstance that is normally held to relieve the first actor [defendant] of criminal responsibility." (*People v. Cervantes, supra*, 26 Cal.4th at p. 874 [court's insertions, citation omitted].) Thus, the defendant's provocative act was not the proximate cause of the charged murder and the judgment was reversed for insufficient evidence. (*Ibid*.)

In *Sanchez*, the Supreme Court affirmed the defendant's conviction of murder based on concurrent causation without addressing the provocative act doctrine. (*People v. Sanchez, supra*, 26 Cal.4th at pp. 845-854, and conc. opn. of Werdegar, J., at pp. 858-859.) The defendant had engaged a gang rival in a gun battle during which an innocent bystander was killed. (*Id*. at pp. 840-842.) It could not be determined which shooter had hit and killed the victim. (*Id*. at pp. 842, 845.) The jurors were instructed on deliberation and premeditation, first degree murder by discharging a firearm from a motor vehicle, provocative act murder, concurrent causation, and transferred intent. (*Id*. at pp. 843-845; see also § 189.) Both defendants were convicted of first degree murder. (*Id*. at p. 844.)

The Court of Appeal reversed, finding "no theories under which the jury could have found both defendant[s] . . . guilty of first degree murder. (*Ibid*.) The court rejected the notion that the defendants' separate acts could be concurrent causes and concluded that the rival's deliberate and premeditated attempt to kill the defendant had broken the chain of causation, precluding the defendant's conviction of provocative act murder. (*People v. Sanchez*, *supra*, 26 Cal.4th at p. 844.)

The Supreme Court reversed without addressing the provocative act doctrine. (*Id*. at pp. 848-854.) The court held that the defendant's deliberate attempt to kill his rival was a substantial concurrent and proximate cause of the victim's death. (*Id*. at pp. 845-849.) The "mutual planning of one another's murder" supported a finding of premeditation as to both shooters. (*Id*. at p. 850.) The defendant's first degree murder conviction could also be upheld based on his admission to intentionally discharging a firearm from a motor vehicle. (*Id*. at p. 851, fn. 10.) The Supreme Court concluded that the verdict was based on one of these valid theories and not on an improper application of the provocative act doctrine. (*Id*. at pp. 851-852.)

In a concurring opinion quoted with approval by the majority, Justice Kennard wrote: "Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . Because defendant and [his rival] had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for [the victim's] death, without regard to which of them actually fired the bullet that struck and killed [the victim]." (*Id*. at p. 854 and conc. opn of Kennard J., at p. 856.)

In a separate concurring opinion, Justice Werdegar voted with Justice Kennard to affirm the murder conviction under the provocative act doctrine; the defendant's deliberate attempt to murder his rival by shooting at him from a motor vehicle instigated the gun battle that killed the victim. (*Id*. at pp. 858-859.) Because the accidental shooting of a bystander was reasonably foreseeable, the defendant proximately caused the victim's death regardless of which shooter had actually hit him. (*Id*. at pp. 855-859.)

This case is much more like *Cervantes* than *Sanchez*. Poston did not instigate the quarrel that resulted in Fluker's death. He did not initiate a gun battle. He was not the initial aggressor. Rather, he reacted to McNeely's provocative acts of insulting and yelling at him, punching or slapping and tripping him to the ground, and pulling out a gun.

Moreover, as in *Cervantes*, McNeely did not shoot back in self-defense; he did not start shooting until Poston was already running away. He followed Poston down the street and repeatedly shot at his back, deliberately trying to kill him in retaliation. Like the killers in *Cervantes*, McNeely intended to exploit the situation and was not acting in concert with Poston, "a circumstance that is normally held to relieve the first actor [defendant] of criminal responsibility." (See *People v. Cervantes, supra*, 26 Cal.4th at p. 874.) Thus, as in *Cervantes*, Poston's act of shooting at McNeely did not initiate a chain of events that proximately caused McNeely to shoot Fluker.

Unlike *Sanchez,* we are faced with a situation here in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the defendant. This was not a gun battle for the same reason it was not mutual combat; Poston never

agreed or intended to fight until after McNeely unlawfully assaulted him and reached for his gun. McNeely was the one who instigated the quarrel and provoked Poston into shooting in self-defense.

Moreover, McNeely's deliberate, felonious, retaliatory shooting, not acting in concert with Poston, was an independent intervening cause, cutting off Poston's liability for Fluker's murder. As in *Cervantes*, "the evidence is insufficient as a matter of law to establish the requisite proximate causation to hold defendant liable for murder." (*Id*. at p. 874.) For all of the foregoing reasons, Poston's convictions of murder and attempted murder should be reversed.

* * * * * *

## II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL.

The trial court abused its discretion in admitting extensive, inflammatory evidence of Poston's out-of-court statements regarding pimping and prostitution to impeach his credibility, violating due process and requiring reversal. (U.S. Const., amend. XIV; Cal. Const., art. I, § 15; Evid. Code, § 352; *Estelle v. McGuire* (1991) 502 U.S. 62, 75; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378.)

### A. <u>FACTUAL BACKGROUND.</u>

McNeely moved in limine to admit evidence of Poston's out-of-court statements regarding pimping and prostitution in recorded phone calls from the jail to impeach his credibility as a witness. (5 RT 181; Defendant Joe McNeely's Proffer of Defendant Donel Poston's Statements, filed Dec. 18, 2013.) Poston's attorney objected that "all this whore stuff . . . is just prejudicial and cumulative. . . . There's plenty of impeachment materials in terms of Mr. Poston's veracity available without getting into trials over whether - he's never been arrested or convicted of pimping or pandering that I am aware of. I

think that's just getting into trials within a trial over - over nonsense, piling it on where he's saying whore, bitch, and stuff like that in conversations." (5 RT 185.)

The prosecutor moved in limine to impeach Poston with eight prior convictions of crimes of moral turpitude - transportation of a controlled substance, sale of a controlled substance, forgery, possession for sale of a controlled substance, evading police, and burglary - to impeach Poston's credibility should he decide to testify. (People's Motions in Limine at p. 8; §§ 459, 470, 475, subd. (a), 476; Health & Saf. Code, §§ 11351.3, 11352, 11360; Veh. Code, § 2800.2.) No arrests or convictions for pimping or pandering were included in the motion.

McNeely argued that Poston's statements about pimping and "hoes" were admissible to impeach his credibility and Bailey's. (8 RT 396-397.) Poston objected: "Well, Mr. Poston's not on trial for being a pimp. This is obviously just an attempt to create some sort of prejudice in terms of an emotional reaction that he's not a good person, he calls women hoes and bitches. It's uncharged conduct. I have separately filed a motion asking, that I think has largely been granted in the context of your dealing with [the prosecutor's] motions,

not to impeach him with uncharged conduct. So this - this kind of thing, that he alludes to being a pimp, so therefore he's a pimp, so therefore he controls Ms. Bailey and, therefore, Ms. Bailey is lying, is very tenuous. The probative value as to Ms. Bailey's credibility or as to Mr. Poston's credibility is weak compared to the unnecessary prejudicial effect." (8 RT 399-400.)

The prosecutor later argued for admission of evidence of pimping: "It's relevant to his credibility, it's relevant to his illegitimate lifestyle, it's relevant to the fact that drugs, and guns, and pimping, it's all a lack of self-defense, his state of mind, and implied malice." (18 RT 1575.)

Poston objected that rap lyrics and casual use of words like "ho" and "pimp" did not prove the crime of pimping - "procuring somebody for a sexual favor for money" - and did not impeach his credibility. (18 RT 1576.) It was just an attack on Poston's character. (18 RT 1576.)

The trial court ruled that the evidence was admissible to counter Poston's testimony that he went to college, produced videos, and was a legitimate businessman. (18 RT 1576-1579.) Extensive evidence of

Poston's statements about "hoes," "bitches," and pimping was admitted, as described, *ante*, at pages 25-35.

The jury was instructed in accord with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, or committed other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. [¶] The fact of a conviction or other misconduct does not necessarily destroy or impair a witness's credibility. [¶] It's up to you to decide the weight of that fact and whether that fact makes the witness less believable." (6 CT 1467.43; 20 RT 1994; CALCRIM No. 316.)

B. EVIDENCE OF PIMPING WAS SUBSTANTIALLY MORE PREJUDICIAL THAN PROBATIVE AND SHOULD HAVE BEEN EXCLUDED UNDER EVIDENCE CODE SECTION 352.

It is well-settled that a witness's credibility may be impeached by evidence of a prior conviction or uncharged conduct showing moral turpitude, subject to Evidence Code section 352 balancing. (See *People v. Clark* (2011) 52 Cal.4th 856, 931-932; *People v. Wheeler* (1992) 4 Cal.4th 284, 296-297; *People v. Castro* (1985) 38 Cal.3d 301, 314-316; see also Evid. Code, § 351.5.) Pimping is a crime involving moral turpitude. (§ 266h; *People v. Jaimez* (1986) 184 Cal.App.3d 146, 150.)

The Supreme Court explained in *Wheeler* that the probative value of impeachment evidence is reduced and the prejudicial effect, increased, when there is only evidence of conduct and not a felony conviction:

> Problems of proof, unfair surprise, and moral turpitude are minimized when felony convictions are the sole proffered basis for impeachment. A felony conviction reliably establishes that the witness committed corresponding criminal acts; a party or witness is unlikely to be surprised by use of felony convictions for impeachment; and the court must determine moral turpitude solely from the 'least adjudicated elements of the conviction.'

(*People v. Wheeler, supra*, 4 Cal.4th at p. 297, fn. 7.)

When the proposed impeachment does not include a felony conviction, "fairness, efficiency, and moral turpitude become more complicated issues." (*People v. Wheeler, supra*, 4 Cal.4th at p. 297, fn. 7.) Evidence of misconduct without a felony conviction "generally is less probative of immoral character or dishonesty." (*People v. Clark, supra*, 52 Cal.4th at p. 931.) Courts should take these factors into consideration "when deciding under Evidence Code section 352 whether to admit evidence other than felony convictions for impeachment." (*People v. Wheeler, supra,* at p, 297, fn. 7; accord *People v. Clark, supra,* at pp. 931-932.)

Poston has no prior convictions of pimping - knowingly deriving financial support from a prostitute's earnings. (See § 266h.) "Prostitution" means performing lewd acts, including physical contact with a customer, for money. (§ 647, subd. (b); *Wooten v. Superior Court* (2001) 93 Cal.App.4th 422, 428.) "Lewd acts" means "touching of the genitals, buttocks, or female breast, for the purpose of sexual arousal, gratification, annoyance or offense . . . ." (*Wooten v. Superior Court*, *supra*, 93 Cal.App.4th at p. 428; accord *People v. Freeman* (1988) 46 Cal.3d 419, 424.)

The jury was not instructed on the meaning of "pimping" and "prostitution." Poston's out-of-court statements did not establish all the elements of the offense. There was insufficient evidence that Bailey, Howard, or any other woman committed lewd acts - physical contact with a customer involving the genitals, breasts, or buttocks of one of them - for money which she gave to Poston. The statements only established that Poston calls women "bitches" and "hoes" and "begs" money from them sometimes. (See Statement of Facts, *ante*, at pp. 25-35; 19 RT 1653-1654, 1666, 1675-1693, 1758-1759; Pros. Exh. 32A at pp. 1, 3-6, 17-18, 20, 22, 32, 40; Def. Exhs. P, P-1.)

Moreover, evidence that Poston may have committed the crime of pimping was a collateral matter with little probative value as to his credibility. Collateral matters are admissible for impeachment purposes, subject to Evidence Code section 352, but "the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury." (*People v. Lavergne* (1971) 4 Cal.3d 735, 742; accord *Winfred D. v. Michelin North America, Inc*. (2008) 165 Cal.App.4th 1011, 1029-1033.) And a party cannot make a collateral matter relevant by deliberately eliciting "something to be contradicted." (*Ibid*.)

Poston had already admitted prior convictions for possession of crack cocaine for sale, evading the police, possession of counterfeit checks, and commercial burglary on direct examination. (18 RT 1517-1519.) Those prior convictions provided plenty of ammunition to impeach his credibility. Ambiguous references to pimping, "bitches," and "hoes" served only to inflame the jurors' passions against a bad character who mistreated women. (See also Evid. Code, S 1101, subd. (a) ["Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person’s character or a trait of his or her character (whether in the form of an opinion, evidence of

reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion"].) Admission of the inflammatory evidence was an abuse of the trial court's discretion under Evidence Code section 352.

C. THE ERROR REQUIRES REVERSAL.

The unconstitutional admission of extensive, inflammatory evidence about pimping, "hoes," and "bitches," requires reversal because it rendered Poston's trial fundamentally unfair in violation of due process and cannot be shown harmless beyond a reasonable doubt. (See *Estelle v. McGuire, supra*, 502 U.S. at p. 75; *Chapman v. California* (1967) 368 U.S. 18, 24; *McKinney v. Rees, supra*, 993 F.2d 1378; *People v. Partida* (2005) 37 Cal.4th 428, 435-436; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.)

Evidence of uncharged crimes is one of the most prejudicial types of evidence which can be presented because it frightens jurors and suggests bad character. (*People v. Roldan* (2005) 35 Cal.4th 646, 705; *People v. Cardenas, supra,* 31 Cal.3d 897 at pp. 904-905; see also *People v. Tran* (2011) 51 Cal.4th 1040, 1047 ["Without a doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial"].) Evidence of an uncharged sex crime is

especially prejudicial, especially in a non-sex-offense case. The prosecutor argued repeatedly that Poston was a bad character, as shown by his out-of-court statements.

At least one juror could have had a reasonable doubt whether Poston was guilty of murder and attempted murder if the prejudicial pimping evidence had been excluded. (See *People v. Mil* (2012) 53 Cal.4th 400, 417, 419 [reversing for instructional error in omitting an element of the offense under *Chapman* because "a rational juror, given proper instruction, could have had a reasonable doubt whether" the omitted element was proven]; cf. *People v. Soojian* (2010) 190 Cal.App.4th 491, 521 [prejudice is shown under state law *Watson* standard if a single juror would likely have changed his or her mind because persuasive authority and common sense compel "the conclusion that a hung jury is a more favorable result than a guilty verdict"].) The pimping evidence was prejudicial under any standard and the judgment should be reversed.

* * * * * *

## III. THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.

The trial court erred prejudicially in instructing on mutual combat in accord with CALCRIM No. 3471, violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (U.S. Const., amend. XIV; Cal. Const., art. I, §§ 15, 16; see also *Middleton v. McNeil* (2004) 541 U.S. 433, 437; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Crane v. Kentucky* (1986) 476 U.S. 63, 690.); *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *Boyde v. California* (1990) 494 U.S. 370, 380; *Chambers v. Mississippi* (1973) 410 U.S. 284; *In re Winship* (1970) 397 U.S. 358, 364; *People v. Cross* (2008) 45 Cal.4th 58, 67.)

### A. <u>FACTUAL BACKGROUND.</u>

The trial court instructed generally on self-defense in accord with CALJIC No. 5.30 and CALCRIM No. 505. (6 CT 1467.52, 1467.57-1467.60; 20 RT 2000-2005.) The court also instructed on mutual combat as a limitation on self-defense in accord with CALCRIM No. 3471 as follows:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

1. He actually and in good faith tried to stop fighting;

2. He indicated, by word or conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

(6 CT 1467.53-1467.54; 20 RT 2001-2002.)

The prosecutor argued pervasively that Poston did not have a right to self-defense because he engaged in mutual combat - a gun battle. (20 RT 1864-1866, 1872, 1883, 1887, 1890, 1901, 1963-1968, 1971.)

B. CALCRIM NO. 3471 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

It is error to give an instruction, even if correct, which is not supported by substantial evidence. (*People v. Cross, supra,* 45 Cal.4th at p. 67; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1131 ["unsupported theories should not be presented to the jury"]; accord *People v. Marshall* (1997) 15 Cal.4th 1, 40.) "Substantial evidence" "is evidence sufficient to deserve consideration by the jury, that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [citation and internal quotation marks omitted].)

As explained in Argument I, *ante*, "mutual combat" means "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross, supra,*155 Cal.App.4th at p. 1045 [court's emphasis]; accord *People v. Jackson, supra,* 58 Cal.4th at p. 760; *People v. Valenzuela, supra*, 199 Cal.App.4th at pp. 1233-1234.) Once the first blow is struck, the victim is entitled to stand his ground and strike back in self-defense; the mutual combat exception to self-defense does not apply. (*People v. Ross, supra*, 155 Cal.App.4th at p.

1044 and fn. 13; accord *People v. Rhodes*, *supra*, 129 Cal.App.4th at p. 1346.)

Here, there was insufficient evidence that Poston expressly or impliedly agreed to fight with McNeely before McNeely struck the first blow. The surveillance video makes clear that McNeely was the initial aggressor, as the prosecutor acknowledged. Poston and Bailey testified that McNeely instigated the whole quarrel, insulting, threatening, and yelling at Poston before striking the first unlawful blow. There was no evidence of a prearranged meeting. Rather, it was undisputed that the encounter was spontaneous.

No rational juror could have found proof beyond a reasonable doubt that Poston shot McNeely pursuant to a pre-existing agreement to fight, rather than in self-defense. Thus, CALCRIM No. 3471 was not supported by substantial evidence and should not have been given.

C. THE INSTRUCTIONAL ERROR VIOLATED POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, DUE PROCESS, AND TO PRESENT A DEFENSE.

Both the Sixth Amendment and Due Process guarantee a reliable jury determination of every factual question material to a criminal defendant's guilt. (*Middleton v. McNeil, supra,* 541 U.S. at p. 437; *In re Winship, supra,* 397 U.S. at p. 364.) Thus, the jury

instructions cannot constitutionally remove a material, factual issue from the jury's determination or otherwise lower the prosecution's burden of proof. (See *ibid*.) Nor can the instructions impinge on a defendant's constitutional right to present a complete defense. (*Ibid*.; see also *Sullivan v. Louisiana, supra*, 508 U.S. at pp. 277-278; *Crane, supra*, 476 U.S. at p. 690.)

CALCRIM No. 3471 removed a material factual issue from the jury's determination, lowered the prosecution's burden of proof, and impinged on Poston's defense. That defense was self-defense and it was compelling. Poston believes it was so compelling no reasonable juror could have found proof beyond a reasonable doubt that he did not act in self-defense, as explained, *ante*. For the same reasons, no reasonable juror could have found proof beyond a reasonable doubt that Poston engaged in mutual combat and CALCRIM No. 3471 should not have been given.

CALCRIM No. 3471 told the jurors Poston did not have a right to self-defense if he "engage[d] in mutual combat" and did not try to withdraw from the fight before shooting. (6 CT 1467.53; 20 RT 2001.) The instruction defined "mutual combat" as a fight that "began or continued by mutual consent or agreement," express or implied. (6

CT 1467.53; 20 RT 2002.) Although it stated the agreement to fight "must occur before the claim to self-defense arose," a reasonable juror could well have believed that Poston's decision to shoot McNeely instead of "walking away," showed an agreement to fight before the claim to self-defense arose," as the prosecutor argued. (6 CT 1467.53-1467.54; 20 RT 1895, 1897, 2001-2002; see also *Boyde v. California* (1990) 494 U.S. 370, 380 [when an instruction is ambiguous, the question is “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence”].) But to constitute mutual combat, the agreement to fight had to come before the first blow - McNeely's blow - was struck.

CALCRIM 3471 incorrectly suggested that Poston engaged in mutual combat and did not have a right to self-defense if he expressly or impliedly agreed to continue the fight McNeely started, even if he reasonably believed his life was in imminent danger. The instruction and the prosecutor's pervasive argument virtually compelled rejection of Poston's defense. (Cf. *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, 596 [reversing denial of writ because instructions permitted conviction of second-degree murder even if the defendant acted in

self-defense]; *Suniga v. Bunnell* (9th Cir. 1993) 998 F.2d 664, 669-670 [erroneous jury instructions required reversal because they permitted conviction on a theory which precluded consideration of relevant defenses]; *Baldwin v. Blackburn* (5th Cir. 1981) 653 F.2d 942, 949 [“If the instructions given the jury are likely to cause an imprecise, arbitrary or insupportable finding of guilt” the conviction violates due process].) The instruction violated Poston's constitutional rights to jury trial, due process, and to present a defense.

D. THE ERROR REQUIRES REVERSAL.

The unconstitutional instruction requires reversal because it rendered Poston's trial fundamentally unfair in violation of due process and cannot be shown harmless beyond a reasonable doubt. (See *Estelle v. McGuire, supra,* 502 U.S. at p. 75; *Chapman v. California, supra,* 368 U.S. at p. 24.) Without the mutual combat exception, Poston's claim of self-defense was compelling - virtually irrefutable. The prosecutor argued extensively that Poston did not have a right to self-defense because he engaged in a gun battle.

Absent CALCRIM No. 3471, it is at least reasonably possible that at least one juror would have had a reasonable doubt as to Poston's guilt. (See *People v. Mil, supra,* 53 Cal.4th 400 at p. 419;

*People v. Soojian*, *supra*, 190 Cal.App.4th at p. 521.) The judgment should be reversed.

* * * * * *

## IV. THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.

In addition to its erroneous and unsupported instruction on mutual combat, the trial court erred prejudicially in omitting instruction on an element of provocative act murder - that the chain of events proximately causing the victim's death must have been initiated by the defendant - violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (U.S. Const., amend. XIV; Cal. Const., art. I, §§ 15, 16; see also *Middleton v. McNeil, supra*, 541 U.S. at p. 437; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Crane v. Kentucky, supra*, 476 U.S. at p. 69.); *Estelle v. McGuire, supra*, 502 U.S. at p. 72; *Chambers v. Mississippi, supra*, 410 U.S. 284; *In re Winship, supra*, 397 U.S. at p. 364; *People v. Gonzalez, supra*, 54 Cal.4th at pp. 662-663; *People v. Flood* (1998) 18 Cal.4th 470, 479-480.)

### A. <u>FACTUAL BACKGROUND.</u>

The trial court instructed on provocative act murder in accord with a modified version of CALCRIM No. 560 as follows:

Donel Poston is charged in Count 1 with the murder of Lionel Fluker.

A person can be guilty of murder under the provocative act doctrine, if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot.

The provocative act murder doctrine focuses on the provocateur's conduct and his knowing his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet.

The elements of a provocative act murder are more fully explained below.

To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that:

1. Donel Poston intentionally committed a provocative act;

2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for human life;

3. In response to Poston's provocative act, McNeely killed Fluker; AND

4. Lionel Fluker's death was the natural and probable consequence of the defendant's provocative act.

A provocative act is an act:

1. That goes beyond what is necessary to accomplish the crime; AND

2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

In order to prove that Lionel Fluker's death was the natural and

probable consequence of the defendant's provocative act, the People must prove that:

1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act could begin a chain of events resulting in someone's death;

2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND

3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act.

A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death.

A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else. An independent criminal act is a free, deliberate, and informed criminal act by a person who is not acting with the defendant.

The People allege that Donel Poston committed the following provocative acts:

- Drawing a loaded .40 caliber semiautomatic gun
- Shooting Joe McNeely multiple times

You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another.

You do not all have to agree on which provocative act Donel Poston committed.

(6 CT 1467.63-1467.65; 20 RT 2007-2009.)

B. CALCRIM 560 AS GIVEN UNCONSTITUTIONALLY OMITTED AN ELEMENT OF PROVOCATIVE ACT MURDER.

A criminal defendant has a state and federal constitutional right to a jury determination of every material issue. (*Middleton v. McNeil, supra*, 541 U.S. at p. 437; *Sullivan v. Louisiana, supra*, 508 U.S. at pp. 277-278; *Crane v. Kentucky, supra*, 476 U.S. at p. 69; *Estelle v. McGuire, supra*, 502 U.S. at p. 72; *Chambers v. Mississippi, supra*, 410 U.S. 284; *In re Winship, supra*, 397 U.S. at p. 364; *People v. Gonzalez, supra*, 54 Cal.4th at pp. 662-663; *People v. Flood, supra*, 18 Cal.4th 4at pp. 479-480.) Accordingly, a trial court must correctly instruct on every element of the offense, even without a request. (*Ibid*.)

As explained, *ante*, the provocative act murder doctrine permits conviction of a defendant who did not actually kill a decedent if his provocative act initiated a chain of events, proximately causing the victim's death. (See *People v. Concha*, *supra*, 47 Cal.4th at p. 663; *People v. Cervantes, supra*, 26 Cal.4th at p. 866; *People v. Sanchez, supra*, 26 Cal.4th at pp. 846-848.) CALCRIM No. 560 did not require evidence that Poston initiated the chain of events causing Fluker's death - an element of provocative act murder.

No case appears to have expressly held that initiating the chain of events is an element of provocative act murder. In *Cervantes*, the Supreme Court noted in finding insufficient evidence of provocative act murder that the defendant was not the initial aggressor. (*People v. Cervantes*, *supra*, 26 Cal.4th at p. 872.) The court did not have to decide whether this factor alone required reversal for insufficient evidence because there were also other critical facts negating proximate causation. (*Id.* at pp. 872-873.)

In every provocative act murder case Poston could find, the defendant did initiate the chain of events leading to the victim's death, sometimes in concert with one or more accomplices. (See, e.g., *People v. Gonzalez* (2012) 54 Cal.4th 643, 656; *People v. Sanchez, supra*, 26 Cal.4th at pp. 849-850; *People v. Roberts* (1992) 2 Cal.4th 271, 321; *People v. Caldwell* (1984) 36 Cal.3d 210, 219-220; *Taylor v. Superior Court* (1970) 3 Cal.3d 578, 584; *People v. Gilbert, supra*, 63 Cal.2d at 703-704; *People v. Mejia* (2012) 211 Cal.App.4th 586, 615-616, 618; *People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1362; *People v. Lima* (2004) 118 Cal.App.4th 259, 268; *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 618-619; *People v. Hansen* (1997) 59 Cal.App.4th 473, 481; *People v. Kainzrants* (1996) 45

Cal.App.4th 1068, 1079; *People v. Mai* (1994) 22 Cal.App.4th 117, 127; *People v. Superior Court (Bennett)* 223 Cal.App.3d 1166, 1172-1173; *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 59.)

Poston could find no case upholding a murder conviction under the provocative act doctrine where the defendant did not initiate the chain of events and was less culpable than the actual killer. In *Sanchez*, the Supreme Court quoted Justice Kennard's concurring opinion with approval:

> Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . Because defendant and [his rival] had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for [the victim's] death, without regard to which of them actually fired the bullet that struck and killed [the victim].

(*People v. Sanchez, supra*, 26 Cal.4th at p. 854.)

Here, Poston and McNeely did not have equally culpable mental states and did not engage in precisely the same conduct at the same time. There was no evidence Poston had a preexisting intent to fight or shoot McNeely. Rather, the uncontroverted evidence showed that he started carrying a gun for self-protection after being shot in the chest. He had his gun with him when he went to the Valero station

because "it's nighttime, it's Friday night in Oakland, it is crazy. . . . [T]here is a war going on out there . . . ." (19 RT 1612.)

Poston's shooting of McNeely was a spontaneous response to McNeely's provocative acts. McNeely was significantly more culpable because he instigated and escalated the quarrel. He was the first to use physical force, and he apparently intended to use potentially lethal force from the outset - after knocking Poston to the ground, he reached for his gun while Poston was still getting up. Because Poston did not initiate the chain of events and was not as culpable as the actual killer, he could not be liable for Fluker's murder under the provocative acts doctrine.

CALCRIM No. 560 as given omitted a key element of provocative act murder, violating Poston's constitutional rights to jury trial, to due process, and to present a defense.

C. <u>THE ERROR REQUIRES REVERSAL.</u>

The omission of instruction on an element of the offense requires reversal because it cannot be shown harmless beyond a reasonable doubt. (See *Neder v. United States* (1999) 537 U.S. 1, 8, 15; *Chapman v. California, supra*, 386 U.S. at p. 24; *People v. Gonzalez, supra,* 54 Cal.4th at pp. 662-663; *People v. Flood, supra,*

18 Cal.4th at pp. 479-480; see also *People v. Mil*, *supra*, 53 Cal.4th at pp. 417, 419 [reversing for instructional error in omitting an element of the offense under *Chapman* because "a rational juror, given proper instruction, could have had a reasonable doubt whether" the omitted element was proven].)

Poston did not initiate anything - McNeely did. Poston was only reacting to McNeely's provocative acts. Had the jury been properly instructed that Poston could be found guilty of provocative act murder only if he initiated the chain of events leading to Fluker's death, a more favorable outcome was at least reasonably possible. As with the unconstitutional instruction on mutual combat, a more favorable outcome was almost certain absent the error. At least one juror could well have had a reasonable doubt as to Poston's guilt of murder and the judgment should be reversed.

* * * * * *

## V. PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL.

The prosecutor committed pervasive, prejudicial misconduct by appealing to the jurors' emotions, racial bias, and fear of random street violence; attacking Poston's character; and misleading the jurors, violating due process. (U.S. Const., amend. XIV; Cal. Const., art. I, § 15; *McKleskey v. Kemp* (1987) 481 U.S. 279, 309; *Darden v. Wainwright* (1986) 477 U.S. 168, 179-180; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637; *United States v. Cabrera and Mulgado* (9th Cir. 2000) 222 F.3d 590, 594; *People v. Hill* (1998) 17 Cal.4th 800; *People v. Cudjo* (1993) 6 Cal.4th 585, 625; *People v. Harris* (1989) 47 Cal.3d 1047, 1083-1084.)

### A. <u>LEGAL BACKGROUND.</u>

A prosecutor's improper behavior constitutes misconduct under state law if it "involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Hill, supra*, at p. 819.) Prosecutorial misconduct violates the United States Constitution if it violates a specific constitutional right or renders the trial fundamentally unfair in violation of due process. (*Ibid*.; see also *Darden v. Wainwright, supra*, at pp. 179-180; *Donnelly v.*

*DeChristoforo, supra*, 416 U.S. 637; *Estelle v. McGuire, supra*, 502 U.S. at p. 72.)

As the California Supreme Court reaffirmed in *Hill*, a prosecutor's bad faith need not be shown to establish misconduct: "[i]njury to appellant is nonetheless an injury because it was committed inadvertently rather than intentionally." (*People v. Hill, supra*, 17 Cal.4th at p. 822.) In such cases, "a more apt description of the transgression is prosecutorial error." (*Id*. at p. 823, fn. 1.) Prosecutorial misconduct or error during argument is particularly serious because "[a] prosecutor's closing argument is an especially critical period of trial" and the words of the "official representative of the People" carry great weight. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 694.)

As a general rule, there must be a specific objection and request for admonition to preserve a claim of prosecutorial misconduct for appellate review unless an objection and request for admonition would have been futile. (*People v. Hill, supra*, 17 Cal.4th at p. 820.) But the failure to timely object and request an admonition is excused if it would have been futile or an admonition could not have cured the harm. (*People v. Hill, supra*, 17 Cal.4th at pp. 820-821.)

Here, objections would have been futile because the misconduct was pervasive and admonitions could not have cured the harm; the bell could not be unrung. (See *People v. Hall*, *supra*, 17 Cal.4th at p. 820 [excusing failure to object to prejudicial prosecutorial misconduct because bell could not be unrung]; *People v. Bolton* (1979) 23 Cal.3d 208, 215, fn. 5 [objection to prosecutor's improper argument and admonition to ignore it "often serves but to rub it in"].)

Moreover, this Court has the authority to reach the merits of the claim regardless of any perceived forfeiture. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, n. 6.) As the Supreme Court explained in *Williams*: "Surely, the fact that a party may forfeit the right to present a claim of error to the appellate court if he did not do enough to prevent or correct the claimed error in the trial court does not compel the conclusion that, by operation of his default, the appellate court is deprived of authority in the premises. An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams, supra*, 17 Cal.4th at p. 161, n. 6 [citations and internal quotation marks omitted].)

As explained below, the prosecutor's misconduct was a deceptive way to persuade the jurors which rendered Poston's trial fundamentally unfair in violation of due process and requires reversal.

B. FACTUAL BACKGROUND.

In her opening statement, the prosecutor referred to the charged offenses as "a shoot-out as if it were the wild wild west." (11 RT 483.) As the result of the defendants' "gun battle," an "innocent passerby" was shot dead. (11 RT 484.) The "gun-battle" theme was repeated throughout the trial.

In her cross-examination of Poston, the prosecutor suggested that Poston's desire for a nice suit to wear for his testimony and his references to "practicing" for that "performance" showed that he was lying. (19 RT 1625-1629.) She asked: "[Y]ou're trying to get over on this jury, aren't you? (19 RT 1627.)

She suggested that Poston's alternating use of African American Vernacular English in rap lyrics, YouTube videos, letters, and phone calls from the jail, and Standard English in court showed that he was lying. (19 RT 1628.) And she suggested that, "out on the streets," Poston was "a hard-core thug, into guns, and being a gangster[.]" (19 RT 1628.)

The prosecutor asked Poston about some of his rap lyrics, suggesting that they refuted his claim of self-defense:

> I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life[.]

(19 RT 1640.)

> You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a nigga and get away with it."

(19 RT 1641.)

Poston asked the prosecutor whether she understood "African-American vernacular from the street perspective." (19 RT 1642.) He explained that his rap lyrics and other writings are "artistic endeavors," reflecting all of the things he had seen growing up in East Oakland, not necessarily things he had done. (19 RT 1640.)

The prosecutor played Poston's recorded phone calls from the jail, emphasizing that he lied to Bailey and called her a "bitch." (19 RT 1647-1648.) She played phone calls in which Poston and his mother talked about Bailey, her vulnerability on cross-examination, and the need for her to tell the truth. (19 RT 1650.)

The prosecutor emphasized Poston's use of the words "ho," "pimp," and "prostitute," quoting some of the most offensive and

inflammatory statements in the jail calls, such as: "That last weed I gave you came from out a ho ass." (19 RT 1654-1666; Pros. Exh. 32A at pp. 1-2.)

The prosecutor questioned Poston about his quoting of her statement in a prior court proceeding that you can't bring "a knife to a fistfight," suggesting that Poston's use of the expression in a jail phone call was an admission of guilt. (19 RT 1661-1662.) She questioned him about a jail call in which he said he spent all the money in the YouTube video on hotels and "hos." (19 RT 1665.)

The prosecutor argued to the jury that in a true case of self-defense, "the person who had to use force because they were instantly about to die, calls the police. They wait for the police. They are waiting on their porch with a smoking gun. 'Yeah, I had to kill him, and you know what, I would do it again tomorrow, because my life was in danger.' That's the true picture of self-defense. Not what you have here." (20 RT 1892.)

The prosecutor argued:

> There is no clearer picture of what was going on in [Poston's] mind than his own words. You know, normal people, law-abiding citizens, don't go into an altercation with someone with the state of mind of, "Disrespect me and you're going to find yourself six feet under."

(20 RT 1897.)

> With respect to Mr. Poston, he fled the scene, he left Oakland. He said repeatedly in the jail calls he was on the run. Not the state of mind and not the use of phrasing that innocent, justified people use. And he also dumped the gun.

(20 RT 1898.)

> [T]here were a variety of jail calls that we listened to with [Poston] talking to his girlfriend, with him talking to his mom about his girlfriend, and what she should say. And, you know that, hmm, he tried to get her to lie for him.

(20 RT 1898.)

> With respect to Mr. Poston's testimony, you know when you tell the truth. The truth is the truth. You don't have to practice it, you don't have to perform it. And you heard in a variety of jail calls from him how much of the story he was trying to sell all of you. He was performing, and he was trying to paint a portrait of himself that's different than the portrait that you've seen in the video, in the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew that you couldn't see that. [¶] So he was practiced, he was prepared, he stayed calm.

(20 RT 1899.)

In her rebuttal argument the prosecutor returned to her "gun battle" theme, explaining that if it is a gun battle, it is murder:

> You know, [McNeely's counsel] counted how many times I used the word "gun battle" [more than 15 according to McNeely's counsel] and I submit to you that's because that is the position that I'm taking. This was a gun battle. And that's why you have implied malice, and that's why it's murder.

> But you have to ask yourselves, why is the defense so afraid of it being a gun battle? Why spend so much time talking about it's not a gun battle? Why did they not want you to find that it was a gun battle? Because a gun battle equals murder, and then you're done because you're looking at their state of mind at the time that this starts. A gun battle equals murder for both defendants, and they're both equally guilty.

(20 RT 1909, 1962-1965, 1971.)

Then the prosecutor explained that people like McNeely and Poston walk around ready for gun battles, disregarding the safety of innocent bystanders:

> You know, this world is a world that I would hope and imagine is unfamiliar to all of you. It's a world that you've gotten a glimpse of, but it's a world that you heard yesterday from Lieutenant Jones, now they're not playing by any rules. But there are some things that are expected. Both of them were a part of this world. Both of them went to this gas station that is known for crime, it's known for shootings, it's known for murders.
>
> McNeely went there with drugs for sale. McNeely is the one walking up to this car, that car, and another car, talking to people in the parking lot of a gas station. So he's a drug dealer. He's in this world.
>
> Mr. Poston clearly is in this world, a self-professed person who promotes his videos and whatnot. Both of them knew they couldn't walk away. That's just not how it happens. That's not how you walk away and save face and have any respect.
>
> But these days, they don't settle disputes with fists, they settle them with guns. You know, I don't know if Mr. Poston could see Mr. McNeely was armed. I would submit to you it's not important. Each of them knew that the other was armed.

> You know, I'm reminded of a friend of mine and a story he told me, his little brother was going off to college. And I shouldn't say little, his younger brother, he's huge, ginormous. My friend sits him down and he says, "Look, if you are ever out, whether it's a party, or a game, or restaurant or wherever, and some little guy wants to pick a fight with you, you have to know that he has an equalizer of some sort, he has some sort of weapon. Because what little guy is going to pick a fight with you, this big strapping football player?"
>
> That's what's (sic) it's like on the streets of Oakland now. You've got all these little guys running around, but they're all armed, making them feel like big men. And that's what happened in this case. These guys were going to shoot it out, and that - and who cares about who was left in their wake? Who cares what innocent people are in the way?

(20 RT 1966-1967.)

The prosecutor argued that Poston's alternating use of African-American Vernacular English in the jail calls and Standard English on the witness stand showed that he was lying:

> You have heard a lot of our evidence about Mr. Poston and his world. You heard a lot of jail calls where he is not speaking in the same calm, controlled manner that he's speaking here in court. And that's why you heard the other jail call, where he's talking about the fact that he needs to paint a different portrait for you and put on a performance. Because if you see the real him, you'll know the verdict that is required.

(20 RT 1971.)

Finally, the prosecutor argued that Poston's rap lyrics showed he did not feel badly about Fluker's death:

> There is no evidence that [Poston] feels badly about what happened to Mr. Fluker. The evidence is actually contrary to that. Because the only rap that he wrote regarding this incident was boastful. It was bragging. It was, "I wish I coulda, shoulda, woulda killed him."
>
> The argument seems to be that this, on one hand or another, is perfectly acceptable behavior. And that's offensive. Because what is Lionel Fluker? Just collateral damage? Your verdict will not bring him back to the family who loved him. It will not restore any social order or change things in the area of Seminary and MacArthur, but holding them accountable for what they did will bring some sort of justice. And so I trust you now, and I leave it in your hands to do justice.

(20 RT 1972.)

### C. THE PROSECUTOR COMMITTED PERVASIVE, PREJUDICIAL MISCONDUCT BY APPEALING TO THE JURORS' EMOTIONS, RACIAL BIAS, AND FEAR OF RANDOM STREET VIOLENCE; ATTACKING POSTON'S CHARACTER; AND MISLEADING THE JURORS, VIOLATING DUE PROCESS AND REQUIRING REVERSAL.

It is misconduct to appeal to the jurors' emotions. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.) In particular, it is misconduct to appeal to racial bias. (*McKleskey v. Kemp, supra*, 481 U.S. at p. 309; *Moore v. Morton* (3rd Cir. 2001) 255 F.3d 95, 113-114; *People v. Cudjo, supra*, 6 Cal.4th at p. 625; *United States v. Cabrera and Mulgado, supra*, 222 F.3d at p. 594; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1074.) And it is misconduct to appeal to

the jurors' fear of being crime victims. (*People v. Lambert* (1975) 52 Cal.App.3d 905, 910; *People v. Jones* (1970) 7 Cal.App.3d 358, 363.)

It is misconduct to attack the defendant's character. (*People v. Sanchez*, *supra*, at pp. 1532-1533; *People v. Herring*, *supra*, at pp. 1074.) It is misconduct to use deceptive methods to try to persuade the jurors - to mislead them. (*People v. Najera* (2006) 138 Cal.App.4th 212, 220-221.)

Here, the prosecutor committed pervasive misconduct throughout the trial. Her whole theory of the case was that Poston was guilty of murder and attempted murder, despite the undisputed fact that McNeely was the armed aggressor, because he was a bad character - a "thug" and a "pimp" - who did not talk or behave like she thought an innocent person would. (20 RT 1897-1899, 1966-1967, 1971-1972.)

The prosecutor appealed to the jurors' fear of random street violence - of being crime victims - with repeated references to a gun battle and both defendants' disregard for the safety of innocent bystanders. The argument was misleading and unfair because there was no evidence Poston agreed or intended to engage in mutual

combat or a gun battle before McNeely struck the first blow. Rather all the evidence showed that Poston acted in self-defense.

The prosecutor emphasized Poston's references to pimping and "hoes." (19 RT 1954-1966.) As Poston has explained, references to pimping and "hoes" were irrelevant and inflammatory, and the prosecutor used them unfairly to attack Poston's character and portray him as the kind of person who would deliberately instigate a shooting and then claim self-defense. (See Argument II, *ante*.)

The prosecutor appealed to conscious and unconscious racial bias by repeatedly called Poston a "thug" - a racial "dog whistle," akin to using the N word. (See, e.g., Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle [a "dog whistle" is "a type of strategy of communication that sends a message that the general population will take a certain meaning from, but a certain group that is "in the know" will take away the secret, intended message. Often involves code words]; Ian Haney Lopez, Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class, Oxford University Press (2014); Eli Wolfe, Blowing Racial Dog Whistles: Berkeley Prof Blasts Conservatives For "Coded Messages,"

http://alumni.berkeley.edu/california-magazine/just-in/2014-02-25/blowing-racial-dog-whistles-berkeley-prof-blasts; Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html.)

The prosecutor also appealed to racial bias by emphasizing Poston's use of African-American Vernacular English. (See, e.g., John R. Rickford, African American Vernacular English, Blackwell Publishers (1999) at pp. 283-284 [discussing negative attitudes toward AAVE]; Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black [discussing the conscious and unconscious racism underlying disdain for AAVE].)

As if that was not bad enough, the prosecutor argued that Poston's alternating use of AAVE with friends and family and Standard English on the witness stand showed that he was trying to fool the jury. In fact, it is very common for African-Americans and others to switch between standard English and their native language or dialect - a phenomenon called "code-switching." (See, e.g., Rickford,

at pp. 340-342, Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black.) Tami Winfrey Harris explains:

> I am a black woman with fairly race neutral diction, meaning if you can't see me, you may not be able to pinpoint my race from my speech. Many black people do, however, have some degree of accent that is recognizable as African-American. . . .
>
> There is absolutely nothing wrong with having a black accent, except that in a society where whiteness is normative, a black accent is judged as less desirable. Making a call without your "white" voice on could mean the loss of a job, an apartment, any a number of opportunities. So, as a matter of survival, upwardly mobile blacks learn to effortlessly code switch, that is unconsciously modify speech to slip from one culture to another. Many of us reserve speech with ethnic markers for conversations with other people of our ethnicity.

(Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black; see also Charisse Jones, Shifting: The Double Lives of Black Women in America, Harper e-book (2003) at p. 108 [Black women learn to code switch from an early age: "They shift 'white' at the office, in the classroom, when addressing the community board during the public forum; and they shift 'black' at church, during book club meetings, among family and friends"].)

Indeed, prominent educators advocate teaching African American children to code switch as a way of mastering Standard

English and accessing more opportunities for advancement. (See, e.g., Rickford, at pp. 283-345; Sarah D. Sparks, Students Learn to 'Toggle' Between Dialects, Education Week (Sept. 10, 2014), http://www.edweek.org/ew/articles/2014/09/10/03dialect.h34.html?qs =students+learn+to+toggle+between+dialects.)

When Africans Americans speak AAVE with white people, they tend to be negatively judged and disbelieved. (See, e.g., Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black; Marguerite Rigoglioso, Stanford Linguist Says Prejudice Toward African American Dialect Can Result in Unfair Rulings, Stanford News (Dec. 2, 2014) [quoting Professor Rickford], http://news.stanford.edu/news/2014/december/vernacular-trial-testimony-120214.html.) But if they are observed code-switching, they may be negatively judged and disbelieved anyway. (See Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black.)

Again, Harris explains:

> African Americans face a conundrum . . . . Black vernacular English is unacceptable. Standard English spoken with an accent common to black Americans is unacceptable. And being able to move smoothly between the speech patterns of the black

> community and those of the broader white community is suspicious.

(Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black.)

Poston knew his mostly white and Asian jury would not judge him fairly if he spoke AAVE. He told his mother in a jail call that "not one ghetto-ebonic-slur" would come out of his mouth on the witness stand so that the jurors would get a favorable picture of him. (Pros. Exh. 32A at p. 41; see also Rickford, at pp. 320-325, 334-335 [Ebonics - a word derived from the words "Ebony" and "phonics" - means essentially the same thing as AAVE].) He knew he had to counter the picture the prosecutor would try to paint of him as a "thug." (19 RT 1627-1628.)

Indeed the prosecutor explicitly told the jurors that the picture of Poston she was presenting was of a "hardcore thug, into guns, and being a gangster." (19 RT 1628.) Poston lamented to his mother that he had not said anything incriminating but the prosecutor was trying to twist his words, even using his protestations of innocence as proof of his guilt because "maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit,

you feel me? . . . Just having an optimistic attitude. But in their eyes, that may be an aggressive front." (Pros. Exh. 32A at p. 26.)

One can imagine Poston's distress as he saw the prosecutor decimate his textbook case of self-defense by twisting his words and portraying him as a violent thug, despite the absence of evidence of any prior violence. One can imagine his frustration when he told his mother about the prosecutor's statement at a prior hearing that you can't bring a knife to a fistfight, then the prosecutor argued that his expression of concern about the prosecutor's assertion was somehow an admission of guilt. (Pros. Exh. 32A at p. 25; 19 RT 1661-1662.) One can imagine his frustration when the prosecutor argued his and his mothers' statements that Bailey must tell the truth showed that they were pressuring Bailey to lie. (19 RT 1648-1650; Pros. Exh. 32A at pp. 19-22, 37-40.)

The prosecutor repeatedly twisted Poston's words to make them seem incriminating. She quoted his rap lyrics - "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life." She argued that these words showed a murderous state of mind despite the fact that the actual

words state that Poston is not one to fight. Rather, he takes flight. But if you cross a line, he will defend himself. (19 RT 1640.)

Poston astutely asked the prosecutor: "[M]a'am, . . . do you understand African-American vernacular from the street perspective?" (19 RT 1641-1642.) It seems clear she did not. Maybe she thought AAVE was a code for deception where everything Poston said meant its opposite. Poston said he had a strong claim of self-defense; the prosecutor argued it was an admission that he did not act in self-defense. (19 RT 1633; 20 RT 1897; Pros. Exh. 32A at p. 8.) Poston said he told Bailey to tell the truth; the prosecutor argued it was an admission that he pressured Bailey to lie. (19 RT 1650; 20 RT 1898; Pros. Exh. 32A at p. 39.) The prosecutor's repeated twisting of Poston's words in an attempt to incriminate him was misleading and unfair.

The prosecutor's argument that Poston's failure to run away before the shooting refuted his self-defense claim was also misleading and unfair. (19 RT 1634-1639; 20 RT 1892, 1898.) Poston had no duty to retreat. (See *People v. Randle, supra,* 35 Cal.4th at p. 992; *People v. King, supra,* 22 Cal.3d at p. 24; *People v. Vasquez, supra,* 136 Cal.App.4th at pp. 1179-1180; *People v. Rhodes, supra,* 129

Cal.App.4th at p. 1346; *People v. Ross, supra*, 155 Cal.App.4th at p. 1044 and fn. 13.) He was in a public place where he had every right to be when McNeely started a quarrel, escalated it, knocked Poston down, and pulled out a gun. Poston had every right to defend himself. His failure to run away before he was assaulted says nothing about his claim of self-defense and the prosecutor's repeated suggestion that it did was a deceptive and reprehensible way to try to persuade the jury - it was misconduct.

The prosecutor's argument that Poston's references to "practicing" for his "performance" on the witness stand meant that he was lying, "trying to get over on this jury," was misleading and unfair. (19 RT 1627, 1633; 20 RT 1899; Pros. Exh. 32A at pp. 35, 41-42.) It is hardly unusual to refer to a witness's testimony as "performance." (See, e.g., *People v. Dennis* (1998) 17 Cal.4th 468, 527, fn. 12; *People v. Keeper* (2011) 192 Cal.App.4th 511, 520, fn. 2; *People v. Catley* (2007) 148 Cal.App.4th 500, 506-507; *People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421; *Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 119-120.) Indeed, the word "perform" is commonly used in reference to the duties of all courtroom actors - witnesses,

judges, lawyers, and jurors. (See *People v. Baldwin*, *supra*, at p. 1421.)

Poston knew he had to perform well on the witness stand, meaning no "ghetto-ebonic-slur[s], if he was to be believed. (Pros. Exh. 32A at p. 41.) He knew he had to practice speaking in a way the jurors could understand. He knew the prosecutor would do her best to trip him up and twist his words, using them to portray him as a pimp and a thug, not a "normal" person, not a "law-abiding citizen[]."

According to the prosecutor, a true case of self-defense exists only where the law-abiding citizen "wait[s] for the police. They are waiting on their porch with a smoking gun." (20 RT 1892.) Poston did not have the "state of mind [nor] the "use of phrasing that innocent, justified people use." (20 RT 1898.) He was "performing , and he was trying to paint a portrait of himself that's different than the portrait that you see in the video, and the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew you couldn't see that." (20 RT 1899.)

Contrary to the prosecutor's argument, one need not wait around for the police in order to establish the defense of self-defense. One need not be a law-abiding citizen. One need not speak Standard

English or any English. All that is required is that the accused honestly and reasonably believed in the imminent need to use deadly force in self-defense. (See *People v. Elmore, supra,* 59 Cal.4th at pp. 133-134)

The prosecutor did not and could not prove Poston's guilt of murder and attempted murder beyond a reasonable doubt in view of the uncontroverted evidence - the surveillance videos and Poston's testimony. Utterly lacking relevant evidence, she persuaded the jury by appealing to their emotions, attacking Poston's character, and misleading the jury in several crucial respects.

The pervasive misconduct rendered Poston's trial fundamentally unfair in violation of due process. (See *Donnelly v. DeChristoforo, supra*, 416 U.S. 637; *People v. Hill, supra*, 17 Cal.4th 800.) A reasonable juror could and likely would have had a reasonable doubt as to Poston's guilt if not for the misconduct. (See *Chapman v. California*, *supra,* 386 U.S. at p. 24; *People v. Mil, supra,* 53 Cal.4th 400 at p. 419; *People v. Hill, supra*, 17 Cal.4th at pp. 844-845; *People v. Soojian, supra,* 190 Cal.App.4th at p. 521.) Thus, the judgment should be reversed.

* * * * * *

## VI. POSTON JOINS IN AND ADOPTS BY REFERENCE MCNEELY'S ARGUMENT I: THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS.

Poston joins in and adopts by reference McNeely's Argument I: the trial court abused its discretion in denying Poston's severance motion and the joint trial was fundamentally unfair in violation of due process. (McNeely AOB 18-44; see also U.S. Const., amend. XIV*;* Cal. Const., art. I, § 15*;* § 1098; Cal. Rules of Court, rule 8.200 (a)(5); *Zafiro v. United States* (1993) 506 U.S. 534; *United States v. Mayfield* (9th Cir. 1999) 189 F.3d 895; *United States v. Rucher* (11th Cir. 1990) 915 F.2d 1511; *United States v. Romanello* (5th Cir. 1984) 726 F.2d 173; *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078; *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335; *People v. Turner* (1984) 37 Cal.3d 302, 312-313; *People v. Massie* (1967) 66 Cal.2d 899, 916-917.)

In addition to the points made by McNeely, Poston's case should have been severed from McNeely's based on antagonistic defenses because each defendant was charged with the attempted murder of the other and their defenses were so antagonistic that the

two defendants battled each other through their respective counsel repeatedly throughout the trial.

Poston could find no case where jointly tried defendants were charged with violent crimes against each other. As his trial attorney argued, this was a unique case in that respect. (2 RT 114.) Poston and McNeely were forced into the roles of both victim and perpetrator as to each other. Each had to prove that the other was solely responsible for the entire incident and that each acted in self-defense.

The jurors could not logically have accepted both defenses. (Cf. *United States v. Mayfield, supra*, 189 F.3d 895; *United States v. Rucher, supra*, 915 F.2d 1511; *United States v. Romanello, supra*, 726 F.2d 173; *United States v. Tootick, supra*, 952 F.2d 1078.) Thus, the great potential for prejudice was apparent from the outset and the trial court should have granted severance.

Moreover, the two defense attorneys' contentious presentation of the antagonistic and irreconcilable defenses rendered the joint trial fundamentally unfair in violation of due process. McNeely was the one to proffer Poston's recorded telephone calls; at the pretrial motion hearing, the prosecutor stated she did not intend to present any of the

calls at that time. (2 RT 156-157.) The prosecutor later decided to present numerous recorded calls.

McNeely objected to Poston's proffer of evidence that he had previously been shot and had received psychological counseling for his resulting fear. (2 RT 166-170.) He joined the prosecutor's motion to admit Poston's YouTube video, explaining that "the statements that are made in the video undermine Poston's self-defense state of mind as expected in this case. And as I stated yesterday, that's a necessary showing that Mr. McNeely needs to make to defend his case." (6 RT 280.)

McNeely objected to admission of Poston's statement to Sergeant Gantt that he was just trying to get McNeely off of him. (6 RT 300-301.) He moved to admit multiple statements of Poston in jail calls and various writings over Poston's objection. (7 RT 369-370.) He argued without evidentiary support that Poston told Bailey what to say. (7 RT 388-389.) Eventually the prosecutor joined in McNeely's motion. (8 RT 400.)

During jury selection, both defendants requested additional separate peremptory challenges because of their antagonistic defenses. (9 RT 448; 10 RT 453.) In his opening statement, McNeely's attorney

stated that McNeely was another victim of Poston, in addition to Fluker. (11 RT 506-507.) Poston's attorney stated that McNeely was the instigator and Poston was only defending himself. (11 RT 523-529.)

McNeely's cross-examination of Bailey and Poston was more extensive and adversarial than the prosecutor's cross-examination. (18 RT 1417-1442, 1444-1505; 19 RT 1603-1670, 1673-1752, 1758-1759.) McNeely's attorney cross-examined both Bailey and Poston about their relationship, Poston's other sexual relationships, Poston's verbal abuse (i.e., "shut up, bitch"), his uncharged petty crimes, and his relationship to prostitutes, repeatedly referring to pimping and hoes. (18 RT 1457; 19 RT 1677-1681, 1688-1692, 1695-1696, 1698-1708, 1750-1751, 1758-1759.)

In his closing argument, McNeely's attorney blamed Poston for Fluker's death. (20 RT 1903.) Like the prosecutor, McNeely unfairly argued that Poston's quoting of the prosecutor about bringing a knife to a fist fight was an admission of guilt. (20 RT 1904.) He called Poston and Bailey liars and told the jurors not to trust them or Poston's "team." (20 RT 1906, 1915-1910.) He asked: "Would you buy something over the internet from either Ms. Bailey or Mr. Poston, and

send money to them through PayPal? If not, throw out their testimony." (20 RT 1919.)

This was a unique case in which the defendants were charged with attempting to murder each other. The prosecutor's pervasive "gun-battle" theme seriously impaired Poston's defense. McNeely's extensive, vicious attacks on Poston's character removed any chance of a fair trial. For all of the foregoing reasons and those stated in McNeely's opening brief, the trial court's denial of severance was an abuse of discretion and the joint trial was fundamentally unfair in violation of due process. The judgment should be reversed.

* * * * * *

## VII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

Poston believes that each and every error was prejudicial but, even if the Court disagrees, the cumulative effect of the errors rendered the trial fundamentally unfair in violation of due process. (See, e.g., *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622 [cumulative prejudice required affirmance of order granting petition for writ of habeas corpus]; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814, fn. 6 [cumulative errors may result in unfair trial in violation of due process]; accord *United States v, McLister* (9th Cir. 1979) 608 F.2d 785, 788; see also *People v. Hill* (1998) 17 Cal.4th 800, 845-847 [cumulative effect of multiple errors resulted in miscarriage of justice, requiring reversal under California Constitution].)

At first glance, Poston's convictions are mystifying. Having recently survived a potentially fatal gunshot wound inflicted by an unidentified burglar, Poston armed himself for self-protection. He lived in the same rough area of East Oakland where he grew up, an area where everyone was armed and shootings were a common occurrence, as the prosecutor herself explained. (20 RT 1967.)

Poston stopped at a gas station on his way to work, and was unexpectedly attacked by McNeely. The surveillance video shows

that McNeely started a quarrel, knocked Poston to the ground, and reached for a gun before Poston fired a shot, as the prosecutor acknowledged. The evidence was insufficient to support Poston's convictions, as explained, *ante*.

The prosecutor won convictions despite clear evidence of self-defense by exploiting the jurors' conscious and unconscious racism and fear of street violence. She and McNeely's attorney persuaded the trial court to admit voluminous out-of-court statements by Poston talking about "pimps" and "bitches" and "hoes" in AAVE. The prosecutor unfairly twisted Poston's words to make him sound guilty and argued that he was guilty because he did not talk or act like an innocent person would and that his code-switching showed he was lying.

The prosecutor unfairly argued that Poston was guilty because he engaged in mutual combat and a gun battle despite uncontroverted evidence that it was McNeely who initiated everything. The trial court's erroneous instructions supported the misleading argument and eviscerated Poston's defense. Finally, the joint trial with McNeely resulted in a second attorney helping the prosecutor to attack Poston's character and deflect from the seemingly dispositive video.

Poston was convicted of murder and attempted murder because he was an African American man who spoke African American Vernacular English as well as Standard English, who lived in a high crime area, who associated with gangsters and prostitutes, and who talked with his mother on the jail phone about his relief in finding that the law of self-defense fit his case "to a T."

Had Poston been tried separately; had all the irrelevant and inflammatory evidence been excluded; had the jurors been correctly instructed; and had the prosecutor not committed pervasive misconduct, a more favorable result was reasonably possible and probable. Cumulative prejudice rendered the trial fundamentally unfair in violation of due process and the judgment should be reversed.

* * * * * *

## CONCLUSION

For all of the foregoing reasons, the judgment should be reversed.

DATED: August 7, 2015

Respectfully submitted,

/s/ Randi Covin

Attorney for Appellant
DONEL POSTON

WORD COUNT CERTIFICATE

I certify pursuant to California Rules of Court, rule 8.360, that, according to my word processing program, this Appellant's Opening Brief contains 24,733 words, excluding the tables and this certificate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 7th day of August, 2015, at Willits, California.

______________________________
Randi Covin

-

-

## DECLARATION OF SERVICE

I, Randi Covin, declare that I am over 18 years of age and not a party to this action. My business address is P.O. Box 1120, Willits, California, 95490. On August 7, 2015, I served true and correct copies of **APPELLANT POSTON'S OPENING BRIEF** ON:

Mr. Donel Poston
AT2512
High Desert State Prison
PO Box 3030
Susanville, CA. 96127

Mr. David Bryden
Attorney at Law
160 Franklin St.
Oakland, CA. 94607

District Attorney
1225 Fallon St.
Oakland, CA. 94612

Alameda County Courts
Att: Hon. Michael Gaffey
1225 Fallon St.
Oakland, CA. 94612

Public Defender
1401 Lakeside Dr., Ste 400
Oakland, CA. 94612

by depositing such copies in the U.S. Mail, addressed as indicated above, postage pre-paid, at Willits, California. I also transmitted a PDF version of **APPELLANT POSTON'S OPENING BRIEF** by Truefiling e-service to:

Attorney General
SFAG.Docketin@doj.ca.gov

First District Appellate Project
Eservice@fdap.org

Philip Brooks
philipmbrooks@gmail.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 7, 2015, at Willits, California.

/s/ Randi Covin

# EXHIBIT 9

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

**v.**

**JOE McNEELY & DONEL POSTON,**

Defendants and Appellants.

Case No. A141557

Alameda County Superior Court, Case Nos. C172522A, C172522B
The Honorable Michael J. Gaffey, Judge

**RESPONDENT'S BRIEF**

KAMALA D. HARRIS
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
JEFFREY M. LAURENCE
Senior Assistant Attorney General
RENÉ A. CHACÓN
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-1308
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

## TABLE OF CONTENTS

**Page**

Statement of the Case ........ 17

Statement of Facts ........ 18

A. The prosecutor's case ........ 18

B. McNeely's case ........ 26

C. Poston's case ........ 28

D. McNeely's rebuttal ........ 41

E. The prosecutor's rebuttal ........ 43

Argument ........ 45

I. The trial court properly denied Poston's severance motion (McNeely's Argument I; Poston's Argument VI) ........ 45

A. Procedural history ........ 46

B. Legal principles ........ 48

C. McNeely forfeited this claim ........ 51

D. Appellants' defenses did not prejudicially suggest that both were guilty ........ 52

E. Any error in failing to sever the trial was harmless and there was no denial of due process ........ 61

II. The trial court properly instructed the jury pursuant to CALCRIM No. 3472 (McNeely's Argument II) ........ 63

A. Standard of review ........ 64

B. McNeely forfeited this claim by failing to object ........ 66

C. When read together, CALCRIM Nos. 3471 and 3472 correctly conveyed the law ........ 67

D. *People v. Ramirez* is distinguishable ........ 70

E. Any error was harmless ........ 78

III. McNeely's trial counsel was not ineffective for failing to object to CALCRIM No. 3472 (McNeely's Argument III) ........ 80

**TABLE OF CONTENTS**
(continued)

**Page**

IV. The trial court properly excluded Poston's prior arrests for possessing marijuana for sale (McNeely's Argument IV) ... 81
A. Standard of review ... 82
B. Procedural history ... 83
C. Poston's prior history of selling marijuana did not prove that he was a drug dealing rival to McNeely ... 87
D. Any error was harmless because the evidence would not have proven that McNeely acted in self-defense ... 89
V. Poston's murder and attempted murder convictions were supported by substantial evidence (Poston's Argument I) ... 92
A. There was substantial evidence that Poston did not act in self-defense ... 93
B. There was substantial evidence that Poston did not act under the heat of passion ... 98
C. There was substantial evidence that Poston committed a provocative act ... 100
VI. The trial court properly admitted Poston's admissions regarding pimping and prostitution (Poston's argument II) ... 103
A. Procedural background ... 103
B. Standard of review ... 106
C. The trial court acted within its discretion ... 107
D. Any error was harmless ... 110
VII. The trial court properly instructed the jury on mutual combat pursuant to CALCRIM No. 3471 (Poston's Argument III) ... 116
A. Poston forfeited this claim by failing to object ... 117
B. The instruction was supported by substantial evidence ... 119

**TABLE OF CONTENTS**
(continued)

**Page**


C. Any error was harmless because the trial court instructed the jury to ignore instructions that did not apply ..... 124

VIII. The trial court properly instructed the jury on provocative act murder (Poston's Argument IV) ..... 125

A. Procedural history ..... 126

B. Poston forfeited this claim by failing to object on the ground raised here ..... 129

C. There is no requirement that the defendant initiate the chain of events proximately causing the victim's death ..... 131

IX. There was not prosecutorial error (Poston's argument V) ..... 134

A. Standard of review ..... 135

B. Poston forfeited this claim by failing to object or request an admonition ..... 135

C. The prosecutor did not engage in deceptive or reprehensible behavior ..... 137

X. There were neither multiple errors nor cumulative prejudice (McNeely's Argument V; Poston's Argument VII) ..... 141

Conclusion ..... 144

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Boyde v. California*
(1990) 494 U.S. 370 .......... 65

*Bruton v. United States*
(1968) 391 U.S. 123 .......... 46

*Chambers v. Mississippi*
(1973) 410 U.S. 284 .......... 143

*Chapman v. California*
(1967) 386 U.S. 18 .......... *passim*

*Collins v. Runnels*
(9th Cir. 2010) 580 F.Supp.2d 1000 (E.D. Cal. 2008) .......... 59

*Cupp v. Naughten*
(1973) 414 U.S. 141 .......... 64, 65

*Estelle v. McGuire*
(1991) 502 U.S. 62 .......... *passim*

*In re Christian S.*
(1994) 7 Cal.4th 768 .......... 98

*In re Mark C.*
(1992) 7 Cal.App.4th 433 .......... 82

*In re Ricky H.*
(1992) 10 Cal.App.4th 552 .......... 119, 130, 137

*In re Riva M.*
(1991) 235 Cal.App.3d 403 .......... 130

*In re Winship*
(1970) 397 U.S. 358 .......... 123

*Middleton v. McNeil*
(2004) 541 U.S. 433 .......... 65, 123

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Mullaney v. Wilbur*
(1975) 421 U.S. 684 .................................................................. 100

*Neder v. United States*
(1999) 527 U.S. 1 .................................................................. 83, 92

*People v. Andersen*
(1994) 26 Cal.App.4th 1241 .......................................... 67, 118, 130, 137

*People v. Anderson*
(1987) 43 Cal.3d 1104 .................................................................. 49

*People v. Aranda*
(1965) 63 Cal.2d 518 .................................................................. 46

*People v. Bittaker*
(1989) 48 Cal.3d 1046 .................................................................. 115

*People v. Blakeley*
(2000) 23 Cal.4th 82 .................................................................. 97

*People v. Bolin*
(1998) 18 Cal. 4th 297 .......................................... 52, 66, 118, 129

*People v. Box*
(2000) 23 Cal.4th 1153 .................................................................. 54

*People v. Bradford*
(1997) 14 Cal.4th 1005 .................................................................. 143

*People v. Brady*
(2010) 50 Cal.4th 547 .................................................................. 74

*People v. Branch*
(2001) 91 Cal.App.4th 274 .................................................................. 88

*People v. Briscoe*
(2001) 92 Cal.App.4th 568 .......................................... 100, 101, 102

## TABLE OF AUTHORITIES
## (continued)

**Page**

*People v. Brown*
(1985) 40 Cal.3d 512 .................................................................. 77

*People v. Brown*
(2003) 31 Cal.4th 518 ............................................................ 83, 89, 135

*People v. Cain*
(1995) 10 Cal. 4th 1 .............................................................. 66, 143

*People v. Campbell*
(1994) 25 Cal.App.4th 402 ...................................................... 119, 124

*People v. Cervantes*
(2001) 26 Cal.4th 860 .................................................................. *passim*

*People v. Clair*
(1992) 2 Cal. 4th 629 .................................................................. 64

*People v. Clark*
(1982) 130 Cal.App.3d 371 .......................................................... 97

*People v. Clark*
(2011) 52 Cal.4th 856 .................................................................. 107

*People v. Cleveland*
(2004) 32 Cal.4th 704 .............................................................. 49, 52

*People v. Coffman*
(2004) 34 Cal.4th 1 .................................................................. 50, 60

*People v. Concha*
(2009) 47 Cal.4th 653 .................................................................. 133

*People v. Cook*
(2006) 39 Cal.4th 566 .................................................................. 93

*People v. Cudjo*
(1993) 6 Cal.4th 585 .................................................................. 83

## TABLE OF AUTHORITIES
## (continued)

**Page**

*People v. Cummings*
(1993) 4 Cal.4th 1233 .......... 54, 55, 56

*People v. Davis*
(1965) 63 Cal.2d 648 .......... 97

*People v. Davis*
(2005) 36 Cal.4th 510 .......... 136

*People v. Doolin*
(2009) 45 Cal.4th 390 .......... 110

*People v. Dowdell*
(2014) 227 Cal.App.4th 1388 .......... 124

*People v. Duran*
(2002) 97 Cal.App.4th 1448 .......... 106

*People v. Enraca*
(2012) 53 Cal.4th 735 .......... 76, 94

*People v. Espinoza*
(1992) 3 Cal.4th 806 .......... 135

*People v. Farnam*
(2002) 28 Cal.4th 107 .......... 66, 118, 129

*People v. Fosselman*
(1983) 33 Cal.3d 572 .......... 138

*People v. Fuiava*
(2012) 53 Cal.4th 622 .......... 129, 130

*People v. Grant*
(1988) 45 Cal.3d 829 .......... 77

*People v. Green*
(1995) 34 Cal.App.4th 165 .......... 83

## TABLE OF AUTHORITIES
## (continued)

Page

*People v. Guiton*
(1993) 4 Cal.4th 1116 .................... 119

*People v. Hajek*
(2014) 58 Cal.4th 1144 .................... 75

*People v. Hardy*
(1992) 2 Cal.4th 86 .................... *passim*

*People v. Hecker*
(1895) 109 Cal. 451 .................... 67

*People v. Hill*
(1998) 17 Cal.4th 800 .................... 135, 136, 141, 142

*People v. Hinshaw*
(1924) 194 Cal. 1 .................... 76

*People v. Humphrey*
(1996) 13 Cal.4th 1073 .................... 93

*People v. Jaimez*
(1986) 184 Cal.App.3d 146 .................... 106, 107

*People v. Jeffers*
(1996) 41 Cal.App.4th 917 .................... 120

*People v. Karis*
(1988) 46 Cal.3d 612 .................... 110

*People v. Kelly*
(1992) 1 Cal.4th 495 .................... 66, 70

*People v. Keys*
(1944) 62 Cal.App.2d 903 .................... 79

*People v. Kipp*
(2001) 26 Cal.4th 1100 .................... 136

**TABLE OF AUTHORITIES
(continued)**

**Page**

*People v. Kronemeyer*
(1987) 189 Cal.App.3d 314 .......... 142

*People v. Lambert*
(1975) 52 Cal.App.3d 905 .......... 138

*People v. Larsen*
(2012) 205 Cal.App.4th 810 .......... 119, 123

*People v. Ledesma*
(2006) 39 Cal.4th 641 .......... *passim*

*People v. Letner*
(2010) 50 Cal.4th 99 .......... 62

*People v. Lewis*
(2001) 25 Cal.4th 610 .......... 93, 96

*People v. Lewis*
(2001) 26 Cal.4th 334 .......... 115

*People v. Lucas*
(1958) 160 Cal.App.2d 305 .......... 79

*People v. Lucas*
(2014) 60 Cal.4th 153 .......... 71, 76

*People v. Luparello*
(1986) 187 Cal.App.3d 410 .......... 138, 139, 140

*People v. Marks*
(2003) 31 Cal.4th 197 .......... 115

*People v. Martinez*
(2010) 47 Cal.4th 911 .......... 54

*People v. Massie*
(1967) 66 Cal.2d 899 .......... 49

**TABLE OF AUTHORITIES
(continued)**

Page

*People v. Maury*
(2003) 30 Cal.4th 342 .......... 51, 52

*People v. Medina*
(1996) 11 Cal.4th 694 .......... 137

*People v. Mehserle*
(2012) 206 Cal.App.4th 1125 .......... 65

*People v. Mejia*
(2012) 211 Cal.App.4th 586 .......... 133

*People v. Mendoza*
(2011) 52 Cal.4th 1056 .......... *passim*

*People v. Minifie*
(1996) 13 Cal.4th 1055 .......... 107, 110

*People v. Mitcham*
(1992) 1 Cal.4th 1027 .......... 51, 52

*People v. Morganti*
(1996) 43 Cal.App.4th 643 .......... 50

*People v. Nguyen*
(2010) 184 Cal.App.4th 1096 .......... 110

*People v. Ortiz*
(1978) 22 Cal.3d 38 .......... 50, 61, 62

*People v. Padilla*
(2002) 103 Cal.App.4th 675 .......... 99, 100

*People v. Perez*
(2010) 50 Cal.4th 222 .......... 93

*People v. Pinholster*
(1992) 1 Cal.4th 865 .......... 51, 62, 79

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*People v. Ponce*
(1996) 44 Cal.App.4th 1380 .......... 69, 70

*People v. Price*
(1992) 1 Cal.4th 324 .......... 80

*People v. Partida*
(2005) 37 Cal.4th 428 .......... 83, 89

*People v. Quach*
(2004) 116 Cal.App.4th 294 .......... *passim*

*People v. Ramirez*
(2015) 233 Cal.App.4th 940 .......... *passim*

*People v. Rios*
(2000) 23 Cal.4th 450 .......... 98

*People v. Rogers*
(2006) 39 Cal.4th 826 .......... 124

*People v. Ross*
(2007) 155 Cal.App.4th 1033 .......... 97, 120

*People v. Sanchez*
(2001) 26 Cal.4th 834 .......... 131

*People v. Sanchez*
(2014) 228 Cal.App.4th 1517 .......... 138

*People v. Sanders*
(1995) 11 Cal.4th 475 .......... 86

*People v. Sawyer*
(1967) 256 Cal.App.2d 66 .......... 68

*People v. Souza*
(2012) 54 Cal.4th 90 .......... 56

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*People v. Stanley*
(1995) 10 Cal.4th 764 ........................................ 118, 130, 137

*People v. Turner*
(1984) 37 Cal.3d 302 ........................................ 49

*People v. Turner*
(2004) 34 Cal.4th 406 ........................................ 136

*People v. Vieira*
(2005) 35 Cal.4th 264 ........................................ 82, 88, 89

*People v. Viramontes*
(2001) 93 Cal.App.4th 1256 ........................................ 93

*People v. Waidla*
(2000) 22 Cal.4th 690 ........................................ 107

*People v. Watson*
(1956) 46 Cal.2d 818 ........................................ 83, 115

*People v. Welch*
(1999) 20 Cal.4th 701 ........................................ 83, 91

*People v. Wheeler*
(1992) 4 Cal.4th 284 ........................................ 106

*People v. Whitmer*
(2014) 59 Cal. 4th 733 ........................................ 142

*People v. Wickliffe*
(1986) 183 Cal.App.3d 37 ........................................ 48

*People v. Willaims*
(2010) 49 Cal.4th 405 ........................................ 51

*People v. Williams*
(1997) 16 Cal.4th 153 ........................................ 83

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*People v. Williams*
(1998) 17 Cal.4th 148 .............................................................. 137

*People v. Wright*
(1985) 39 Cal.3d 576 .............................................................. 98

*People v. Young*
(2005) 34 Cal.4th 1149 .............................................................. 93

*Sandstrom v. Montana*
(1979) 442 U.S. 510 .............................................................. 65

*Strickland v. Washington*
(1984) 466 U.S. 668 .............................................................. 80, 81

*United States v. Blankenship*
(11th Cir. 2004) 382 F.3d 1110 .............................................................. 58

*United States v. Mayfield*
(9th Cir.) 189 F.3d 895 .............................................................. 58, 59

*United States v. Romanello*
(5th Cir. 1984) 726 F.2d 173 .............................................................. 58

*United States v. Rucker*
(11th Cir. 1990) 915 F.2d 1511 .............................................................. 58

*United States v. Tootick*
(9th Cir. 1991) 952 F.2d 1078 .............................................................. 58, 59

*United States v. Ziperstein*
(7th Cir. 1979) 601 F.2d 281 .............................................................. 45

*Zafiro v. United States*
(1993) 506 U.S. 534 .............................................................. 49, 52

# TABLE OF AUTHORITIES
(continued)

**Page**

**STATUTES**

Evidence Code
§ 351 .... 82
§ 352 .... *passim*
§ 354 .... 115
§ 354, subd. (a) .... 82

Penal Code
§ 187, subd. (a) .... 17, 93
§ 188 .... 93
§ 245, subd. (b) .... 17
§ 664 .... 17
§ 667.5, subd. (b) .... 17
§ 954 .... 48
§ 1098 .... 48, 52
§ 1259 .... 67, 118, 130, 137
§ 12022.53, subd. (d) .... 17
§ 29800, subd. (a)(1) .... 17

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Fourteenth Amendment .... 86, 142

**OTHER AUTHORITIES**

1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000)
Defenses
§ 75 .... 67

17A Cal.Jur. 3d Criminal Law: Crimes Against the Person
§ 153 .... 68

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

CALCRIM, Judicial Council of California, Criminal Jury Instructions
No. 200 .......... 120, 123, 124
No. 316 .......... 106, 115
No. 505 .......... 53, 54, 96
No. 522 .......... 100
No. 560 .......... *passim*
No. 570 .......... 99
No. 3471 .......... *passim*
No. 3472 .......... *passim*
No. 3474 .......... *passim*

California Jury Instructions, Criminal
No. 3.40 .......... 131
No. 5.30 .......... 53, 54
No. 5.31 .......... 96, 124, 142, 143

## STATEMENT OF THE CASE

On October 10, 2013, the Alameda County District Attorney filed an information charging appellants with seven counts. (1 CT 24–41.) **Count one** charged appellants with the murder of Lionel Fluker (Pen. Code, § 187, subd. (a)),[1] with enhancements for the personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). (1 CT 24–26.) **Counts two and three** charged appellants with the attempted murder of one another (§§ 187, subd. (a), 664), with enhancements for the personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). (1 CT 27–29.) **Counts four and five** charged appellants with assault on one another with a semiautomatic firearm (§ 245, subd. (b)). (1 CT 30–32.) **Counts six and seven** charged appellants with possession of a firearm by a felon (§ 29800, subd. (a)(1)). (1 CT 32–34.) The information also alleged that McNeely had nine prior convictions and two prison priors (§ 667.5, subd. (b)); Poston had six prior convictions and four prison priors (§ 667.5, subd. (b)). (1 CT 34–41.)

The parties presented opening statements on January 8, 2014. (3 CT 739.) The prosecutor submitted evidence from January 9–21, 2014. (3 CT 742, 763.) Appellants presented evidence from January 22–28, 2014. (3 CT 765–769, 773, 775.) On January 28, 2014, the prosecutor called one rebuttal witness. (3 CT 775–776.)

Also on January 28, 2014, the trial court granted the prosecutor's motion to dismiss counts four and five. (3 CT 776.) The trial court renumbered counts six and seven as counts four and five, respectively. (3 CT 778; 5 CT 1462.)

---

[1] Further statutory references are t0o the Penal Code unless otherwise indicated.

On February 3, 2015, the jury found appellants guilty as charged and it found the firearm enhancements true. (3 CT 873–876; 6 CT 1471–1474; 20 RT 2042–2045.) The trial court did not make findings on the prison priors.[2]

On March 21, 2014, the trial court sentenced each appellant to 72 years to life. (3 CT 887–891; 6 CT 1483–1487; 21 RT 27–29.[3])

Poston and McNeely filed notices of appeal on March 21 and 24, 2014, respectively. (4 CT 927; 6 CT 1531.)

## STATEMENT OF FACTS

### A. The Prosecutor's Case

Shortly after 10:00 p.m. on April 5, 2013, McNeely parked at a Valero gas station and filled his tan Mazda with gas. The gas station was located in east Oakland at the intersection of MacArthur Boulevard and Seminary Avenue and across the street from Mills College. It was a busy area with heavy traffic on both streets and numerous pedestrians and open businesses. (12 RT 663; 13 RT 829; 15 RT 1002–1012.)

McNeely had a blue duffel bag in his car which contained 30 baggies of marijuana that was packaged for sale, methamphetamine pills which may have been fabricated to look like ecstasy (MDMA), and a digital scale. (12 RT 623, 628; 15 RT 1037, 1041–1049, 1058–1059; 16 RT 1092, 1181, 1184; Exh. 1-E-14.) Separately, in the front passenger seat, McNeely also had a metal drink container containing 5.43 ounces of marijuana, a bottle of

---

[2] According to McNeely, "The allegations of prior convictions were found true by the court." (MAOB 2.) Poston does not indicate whether or how the prison priors were adjudicated. (PAOB 24.) Respondent could not find any indication the trial court made findings on the prison priors; they were not mentioned at sentencing; and they were not noted in the abstracts of judgment. (3 CT 887–891; 6 CT 1483–1487.)

[3] Respondent will refer to the Reporter's Transcript for sentencing on March 21, 2014, as Volume 21.

Patron tequila, and a bottle of Hennessy Cognac. (15 RT 1010–1012, 1020–1024; 16 RT 1092.) McNeely was wearing a white hat and a black leather jacket. Inside his inner right jacket pocket McNeely had an unloaded 9 mm semiautomatic handgun and, in his inner left jacket pocket, he had a loaded magazine. After he put gas in his car, McNeely walked around the gas station and talked to a few people. He was likely trying to sell drugs. (12 RT 636–637, 679; 16 RT 1222–1230; Exh. 8.)

Poston lived less than a quarter mile from the gas station. Poston and his girlfriend, Tamena (Mena) Bailey, drove to the gas station to buy marijuana. At 10:07 p.m., Poston parked Bailey's Lexus in front of the gas station mini market—just a few feet from McNeely's car. Bailey remained in the front passenger seat while Poston got out of the car. Poston had an SLR camera inside a case; the case strap was over his right shoulder; and the case rested against his left hip. Poston also had a loaded .40 caliber semiautomatic handgun inside his right waistband. Poston went into the market to buy cigars that could be used as rolling paper for marijuana. (12 RT 679–681, 703; 13 RT 855–856; 15 RT 985; 16 RT 1171, 1222–1230.)

After Poston came out of the market, he spoke to McNeely. They walked over to McNeely's car and McNeely offered Poston a bag of marijuana. However, Poston turned it down and walked back to the market. (16 RT 1089–1091, 1098.)

McNeely joined Poston and they stood between the market doors and the Lexus's front passenger door. McNeely was upset and began berating Poston. Poston tried to turn away and ignore him, but McNeely became more annoyed. Bailey had her window down and tried to talk to the men—perhaps to calm down McNeely. McNeely paced around and repeatedly grabbed the lapels of his jacket out of frustration. McNeely threw a cup onto the ground. He went up close to Poston and continued to talk belligerently. (13 RT 837; Exhs. 8, 12.)

At 10:12:31 p.m., McNeely used his right hand to forcefully slap the left side of Poston's face. McNeely simultaneously stuck out his left leg so when Poston staggered to his right, he tripped over that leg. McNeely probably intended to trip Poston to the ground, but Poston only stumbled and quickly regained his balance. As he straightened back up, Poston used his right hand to remove his handgun from his waistband. (13 RT 837; Exhs. 8, 12.)

Bailey exited her car and ran into the market for shelter. Poston's momentum carried him several feet out in front of the Lexus. McNeely took a couple of steps to his left to stay close to Poston, and then stepped just in front of the Lexus. Just as McNeely pulled out the magazine from his left inside jacket pocket, Poston fired three or four shots at McNeely. McNeely fell backward to the ground, scrambled backward so he was in front of his car's front passenger side tire, and dropped the magazine. Poston walked toward McNeely and came within six feet of him as he fired additional shots for a total of 10 shots. Poston's gun ran out of bullets (or jammed); he pulled the trigger two or three more times, but the gun did not fire. (12 RT 680; 13 RT 740–741, 758, 837; 15 RT 936, 998; Exhs. 8, 12.)

Six of Poston's bullets struck McNeely. Nevertheless, McNeely got up on one knee; pulled his handgun out of his right jacket pocket; picked up the magazine he had dropped; and loaded the magazine into the gun.[4]

---

[4] On appeal, Poston repeats his claim that McNeely drew his gun before Poston fired any shots. (PAOB 37–38, 62 & fn. 4.) And Poston is correct that the prosecutor also argued that McNeely drew his gun before Poston fired a shot. (PAOB 38, fn. 4, citing 11 RT 498; see 20 RT 1893 [prosecutor's closing argument].) Respondent believes, however, that the video shows that McNeely took the *magazine* out of his left jacket pocket. That is, at 10:12:34 p.m., a fraction of a second before Poston began shooting, McNeely removed the gun *magazine*, not the gun. It was not until five seconds later, at 10:12:39 p.m., that McNeely reached into his (continued…)

Poston ran away and McNeely got up and chased him. McNeely immediately fired five shots at Poston's back. Poston ran 94 feet north through the gas station lot. McNeely fired another shot and then Poston ran north on Seminary Avenue. McNeely stopped in front of Mill's Hoagie Shop and fired two last shots at Poston. None of the bullets struck Poston. (12 RT 681; 13 RT 742, 753, 758–759, 771; 15 RT 936–942, 958, 960, 965, 971, 973; 16 RT 1254–1255; Exhs. 8, 12; see 15 RT 922–923.)

However, Lionel Fluker had been driving his blue BMW south on Seminary Avenue. He heard the initial gunshots, pulled over to the right side of the road, and put both feet on the brake. One of McNeely's last two

(…continued)
right jacket pocket and pulled out his gun. (Exh. 8.) That is clear because Poston's initial shots caused McNeely to fall backward, dropping the object he initially took out of his left jacket pocket. (Exh. 8; see 19 RT 1771–1774 [McNeely sought permission to question Detective Perez-Angeles about his testimony at the preliminary hearing that McNeely told him he had a clip in his left jacket pocket]; 21 RT 8.) At 10:12:39 p.m., McNeely reached into his right jacket pocket with his left hand; pulled out the gun; switched the gun into his right hand; reached to the ground with his left hand; picked up the magazine; and put the magazine into the gun. (Exh. 8.) The most convincing evidence that McNeely initially took out the magazine—and not the gun—is that the video shows McNeely dropping the first object he took out of his pocket. Five seconds later it shows him picking something up and, in one continuous action, immediately loading it into his gun. So it must have been the magazine. (Exh. 8.) Tellingly, Poston makes little effort to describe what the video shows after McNeely purportedly took out his gun. (PAOB 37–38 & fn. 4.) That is because the video shows that McNeely actually took out his gun *after* Poston fired the last of his 10 shots. (Exh. 8.) Of course, Poston could still reasonably argue that he believed McNeely was reaching for his gun, but his case was weaker if he shot McNeely before he drew his gun. As for McNeely, his summary of the video ignores that he pulled out and dropped the magazine. McNeely indicates that he drew his gun at 10:12:38 p.m.; he picked up "something" at 10:12:39 p.m.; and then he loaded the magazine into his gun. (MAOB 17.) Respondent joins appellants' requests that this Court view the video for itself. (See PAOB 38, fn. 4; MAOB 16, fn. 16.)

or three shots went through Fluker's windshield and struck him in the center of his forehead. The bullet passed through his brain and lodged at the back of his skull. He died almost instantly. (12 RT 542, 545–549, 570, 689; 13 RT 814–815, 817–818; 16 RT 1170, 1250–1251.)

A few minutes later a motorist stopped to see if Fluker needed assistance. She went up to his car and saw that Fluker was dead and part of his brain had spilled out of the wound. At 10:23 p.m., the motorist flagged down a police officer who was responding to the shooting. The officer put the BMW in park; turned off the ignition; and secured the scene. (12 RT 545–549, 552, 559–560, 568–575, 591–592, 596–597, 672–675.)

Meanwhile, Poston ran away; Bailey drove off; and McNeely jogged back to his car. After McNeely got into the driver's seat, his friend, Ansar Muhammad, approached him. Muhammad had arrived at the gas station 15 minutes earlier; had walked across the street; had returned to his car just before the shooting; and approached McNeely when he saw him return to his car. Muhammad agreed to use his own car to follow McNeely. McNeely drove half mile in the opposite direction of Highland Hospital. McNeely parked his Mazda in front of Muhammad's girlfriend's house and somehow disposed of his gun. He moved the blue bag of drugs into the rear seat of Muhammad's car and got into the passenger seat. Muhammad drove McNeely to Highland Hospital. (12 RT 611–615, 619–624, 628–632, 648 651–653, 661, 699, 703; 13 RT 791, 794–795, 823; 15 RT 956; 16 RT 1180–1181, 1184, 1190; Exhs. 1-E-1, H, L.)

Muhammad was detained by Deputy Sheriffs and McNeely was treated for his injuries. (12 RT 624–625.) McNeely had gunshot wounds to his left and right thighs, his scrotum, his left armpit, his left shoulder, and his left upper back. He did not require surgery at that time. A nurse found a fired bullet in McNeely's stretcher and she gave it to a police officer. (13 RT 771, 776–777; 16 RT 1143, 1187; Exh. 5.) Afterward, McNeely was in

pain, but fully conscious. He lied to Oakland Reserve Police Officer Bruce Asbelle, saying that "he had been walking down [Seminary Avenue] . . . and that he had heard a series of gunshots; he felt their impact and he fell down." McNeely said he did not see the person who shot him. (13 RT 772, 774, 799–800, 802.) A little later, Oakland homicide detectives Herb Webber and Steve Bang also interviewed McNeely at the hospital. At that point, McNeely was suffering substantial pain. McNeely again said he had simply been walking down the street alone near the Valero gas station when he was shot. (13 RT 780–785, 796, 798–799; Exhs. 14, I; Supp. CT 1763–1767.)

An Oakland Police Officer questioned Muhammad. Muhammad lied and said he had been driving down the street when he saw McNeely; he picked up McNeely and drove him straight to the hospital. (12 RT 624–625, 644–647.) Muhammad was taken to the Oakland Police station and an officer told him that someone had died in the incident. Then Muhammad admitted that he came upon McNeely at the gas station, followed him to his girlfriend's house, and then drove him to the hospital. (12 RT 625–626, 647–650.)

Oakland Police Officers questioned Eutiquio Garcia-Chavez, who was working as a janitor at the gas station when the shooting occurred. Garcia described seeing part of the shooting. He looked at a photo lineup at the police station and identified McNeely as the shooter. He said he was 50 percent sure of his identification. (15 RT 934–945; 16 RT 1161–1164; Exh. 4; see 15 RT 973 [Garcia identified McNeely at trial].)

Within a few days, Poston fled to Los Angeles. He returned to Oakland three months later and was arrested soon thereafter, on June 14, 2014. (13 RT 855, 860, 877; 16 RT 1133, 1157.)

Police searched Poston's home and, in a back bedroom, they found two credit card embossing machines, blank check paper, stolen

identification cards and licenses, social security and account numbers, and stolen gift cards. A gun magazine was hidden in Poston's bedroom closet. One of the .40 caliber cartridges in that magazine, and two of the .40 caliber casings found at the crime scene, had previously been cycled through the same gun. There was also a .40 caliber semiautomatic handgun on the bed in Nicholas Bosworth's bedroom. However, it was not used in the crime charged. (13 RT 861–865, 870, 878, 880, 882, 887; 16 RT 1160, 1231–1233.)

On July 8, 2013, deputy sheriffs intercepted a letter that Poston mailed from jail. The letter was addressed to Nicholas Bosworth at Poston's house. Poston wrote, "Tell wuzzie to go tell them niggas that on 72nd went to prelim today . . . . Some bitch e-mailed the police, I'll find out once I put this discovery motion in on the 17 who that is, my phone #, the Done Did It Live Show, and our address and told the police I shot someone—somebody 2 weeks before! WHOA! E-mailed—I think it's Saran, but I don't know. Call that faggot, bitch she Dert best friend, XXX-9164. Check this out! They said the niggas at that house only wear 'True Religion,' so they link that . . . with the Tru hat I lost when I was running away! . . . . They found a bullet casing inside this nigga gurney at the hospital." (16 RT 1104–1109; Exh. 25; see 16 RT 1133, 1174 [Oakland Police Officer Eriverto Perez-Angeles testified that the letter was intended to get Poston's associates to find the woman who snitched on him so she could be hurt or dissuaded].)

Poston mailed another letter that was intercepted on July 24, 2013. It was addressed to Jon Owens on 50th Avenue in Oakland: "If I beat the attempt then clearly I'm guilty of having a sling-shot. Glad them wasn't my batteries [bullets] they found in that nigga. Plus this stupid ass nigga got to the hospital and had a used battery that came tumbling out!!! That cleared me of the M[urder]. Wipe the sweat off of that. Dumb ass nigga.

Should've stayed my ass in L.A. Plus my Faggot Ass BM/the black one across, this bitch done gave up the ghost and shed light on the dark." (16 RT 1111–1112; Exh. 26.) "I'm going speedy, forcing they hand, cuz I ain't did shit but stand my ground." (16 RT 1112; Exh. 26.)

Based on the threatening letter, Oakland Police Officer Eriverto Perez-Angeles obtained a warrant and searched Poston's jail cell on July 24, 2013. He seized several writings including four pages marked as Exhibit 30. (16 RT 1133–1135, 1174.) The first page of writings included: "'I pack this pisotla—gone off cola, probably off a molly. You [McNeely] almost got bodied [killed], instead caught you a body [killed someone]. I'm swift on my toes. Niggas in my circle keep them 40's [caliber] real close concealed in they clothes . . . . It's all self-defense under the proper pretense.'" (16 RT 1136; Exh. 30.)

On page two Poston wrote: "'I am 37 and countin'. Ya [McNeely] 38 and down. Them 40 oz bullets made that 9 [mm] sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em.'" (16 RT 1136; Exh. 30.) On page three Poston wrote: "'What you got them guns for if you ain't using 'em.'" (16 RT 1137; Exh. 30.) On page four Poston wrote: "'Assemblin' a Glock on their me-ma porch, let that thing rang like it was the 4th . . . . Don't ever leave the house without my strap [firearm].'" (16 RT 1137; Exh. 30.)

At trial, the prosecutor played some of Poston's "Done Did It Live" YouTube videos for the jury. In one of them, Poston talked like a gangster and made threats. A large amount of cash and two Glock semiautomatic handguns—one with an illegal extended magazine containing 13 bullets—were visible on the table. However, the Glocks could not have fired the .40

caliber bullets fired by Poston in the crimes charged. (16 RT 1086–1088, 1094–1095, 1100–1101, 1155–1156, 1234–1235, 1241, 1250.)

### B. McNeely's Case

**Dr. Nancy Parks** testified she was a general and trauma surgeon at Highland Hospital. McNeely arrived at the hospital at 11:00 p.m. on April 5, 2013. Parks examined McNeely and determined he had six gunshot wounds, but he was thinking and speaking normally. (17 RT 1279, 1281, 1286, 1301.) McNeely had two gunshot wounds to his right front thigh; one gunshot wound to the left inner thigh; a gunshot wound to the left front armpit; a gunshot wound to the left upper mid-back; and an entry and exit gunshot wound to the left half of the scrotum. (17 RT 1283–1286.) Several months later in August, surgery was performed to remove a bullet from the base of McNeely's penis. None of the wounds were life threatening; his vital signs always remained stable and he was always alert and able to talk coherently. (17 RT 1287.) McNeely's toxicology screen was negative for drugs, but he was not tested for marijuana. (17 RT 1288–1289.)

On the prosecutor's cross-examination, Dr. Parks testified that McNeely had the top score on the Glasgow Coma score, which meant he was as aware and oriented as the average uninjured person. He had no shortness of breath or chest pain. He did not require surgery at that time. In his initial history, McNeely denied using tobacco, marijuana, or illegal drugs. (17 RT 1291–1293, 1297.)

On Poston's cross-examination, Dr. Parks testified she did not know if the toxicology screen tested for MDMA. McNeely was discharged on April 8, 2013, after two full days. (17 RT 1299.)

**Nibiece Robinson** testified that he was the director of security at Mills College. There were security cameras aimed at Seminary Avenue and MacArthur Boulevard. Oakland Police Officers contacted him and an

employee isolated footage for 10:00 to 10:30 p.m. on April 5, 2013. The footage was played for the jury and the Valero gas station was visible in the frame. (17 RT 1302–1307; Exh. S.) At 10:12:39 p.m. there was a man walking on the sidewalk across the street northbound. There was also a man standing in front of Mills Hoagie Shop. (17 RT 1312.) At 10:13:44 p.m. there were two men running. At 10:44 p.m., Mills Hoagie Shop was center screen; there was a man walking and waving and another man running. (17 RT 1311–1315.)

**Oakland Police Officer Steven Bang** testified he and Officer Daniel Cornejo spent 15 minutes interviewing Eutiquio Garcia-Chavez on April 6, 2013. Garcia identified the shooter in a photograph and spoke of another person running up Seminary. Garcia did not say anything about the runner putting his hands out or doing a shrug or a zigzag. (17 RT 1317–1325; Exh. T.) Garcia "went from saying . . . that was the shooter, and then he said he wasn't completely, completely sure, and then he said about 50 percent sure . . . ." (17 RT 1327.) Garcia said the runner crossed Seminary and tried to jump a fence on the other side. (17 RT 1330.)

**Oakland Police Officer Daniel Cornejo-Valdavi** testified he was dispatched to the Valero gas station on April 5, 2013, and arrived at 10:30 p.m. He spoke to Eutiquio Chavez-Garcia in Spanish for 20 to 30 minutes in the parking lot at the rear of the gas station. Chavez said one individual had a handgun and the other ran from him northbound on Seminary. The gun was a revolver. Chavez did not say anything about the runner holding his hands out or running in a zigzag. Chavez said he saw a gun in the shooter's hand. If Chavez had told him he saw something in the runner's hand, Cornejo would have written that in his report. (17 RT 1339–1348.)

**Oakland Police Officer Julie Yu** testified that, at 5:00 p.m. on June 14, 2013, he was the passenger in a patrol car being driven by Officer Lancaster. They heard a call about a surveillance team following a vehicle

on the freeway. The call said it was possibly an attempted murder suspect in the vehicle. They drove on Highway 580, exited at 106th Avenue, and then heard that undercover units and marked police cars had already detained the vehicle. When they arrived he saw a silver four-door Chrysler 300 with an Arizona license plate pulled over. There was a driver and a passenger in the rear passenger seat. He detained the passenger, Brehnna [Brianna] Howard. But he eventually released her at the scene. (17 RT 1349–1355.)

**Deon Thompson-Goolsby** testified he was an investigator at the Alameda County Public Defender's Office. He visited Mills College four times for this case. He obtained a surveillance video in September 2013 from Mary Spikes in the Mills College legal department. He forwarded the videotape to McNeely's counsel. On January 10, 2014, he photographed and measured [McNeely's] black jacket at the Oakland courthouse. There was an inside chest pocket on each side. They measured seven inches high and six inches wide. (17 RT 1357–1363; Exhs. 11, V.)

### C. Poston's Case

**Oakland Police Officer William Febel** testified he had been trained to shoot someone in the head to neutralize them. The disadvantage of shooting someone's thigh is that the subject can still pose an immediate danger. A couple of gunshots in the leg might not stop the threat. (12 RT 603–604.)

**Tamena Bailey** testified she had lived in east Oakland her whole life. She was charged with drug possession in 2003, but the charge was dismissed. She had been Poston's girlfriend for two years. She stayed at his house four or five times per week. She had not seen Poston playing with guns or talking about guns often and he did not keep a lot of guns in the house. She was familiar with the "Done Did It Live" show. It was about rappers and life and was for entertainment. Poston would host, talk,

and give interviews. She did not see guns and money in many of the videos she had seen. Poston made the show and also made T-shirts. He often carried a camera and took many pictures. He put them up all over the walls of his house. (18 RT 1392–1395.)

One night in June 2012, she was sleeping over Poston's house and she heard a sound on the roof. Someone came through the window and pointed a gun in her face. She screamed, jumped out of bed, and crawled under the bed. Poston woke up and tried to defend her, but he was shot. Poston did not have a gun in that room. She knew Poston was shot because he said, "'Baby, I'm shot.'" She came out from under the bed; put a sheet on the floor; put him on the sheet; and took him to the hospital. He was in the hospital for over a month. Afterward, Poston was "nervous" and "just a little more cautious, and watching his surrounding[s]." (18 RT 1397–1400.)

Bailey spent all of April 5, 2013, with Poston. They drove to the Valero gas station in her green Lexus in order to buy cigars. Poston had the habit of carrying cameras around all the time. That night Poston had a camera in a case with the strap around his neck. According to her memory and the video, her car arrived at the Valero gas station at 10:06 p.m. She was in the front passenger seat. Poston got out of the driver door and went into the store for cigars. After he came out, he spoke to a man in a white hat, but she did not hear what they were saying. They were standing in front of the market doors. The other man was upset and yelling. The man called Poston names and said he was not from a certain neighborhood. She did not recall the man saying something to her. (18 RT 1400–1409; Exh. 16.) The man in the white hat said "he was a 'Bitch ass nigger,' and he thought he was all that." (18 RT 1508.)

Poston walked away from the man at 10:11:12 p.m. She was "nervous from the time [t]hey started yelling." She saw the handle of a gun

in the man's inside jacket pocket when he opened his jacket. He opened his jacket three or more times and she saw it every time. The man threw down a cup. The man said he was going to slap Poston. As he raised his hand to slap Poston, she jumped out of her car and ran into the store. "It was powerful. It was a serious slap." After the incident she visited Poston at Santa Rita Jail. Poston urged her to speak to the police about the case. (18 RT 1409–1416.)

On the prosecutor's cross-examination, Bailey testified that her vision was not clear; she had needed glasses to see her whole life; but she had only started wearing glasses a month before trial. Poston was not the father of any of her children. But she called him "Daddy" "[b]ecause he's the Daddy." Her children were 16, 12, and seven, but she stayed at Poston's house four to five times a week; he never stayed at her house. She visited Poston at Santa Rita Jail twice a week. (18 RT 1417–1422.) They did not go to the Valero gas station to buy marijuana; they went to buy Backwoods cigars. They were at Poston's home before they drove to the Valero gas station. (18 RT 1426.)

Bailey testified she had never seen Poston with a gun. (18 RT 1429.) She did not say anything to Poston about the fact that she saw a gun in the man's jacket three times. After the gunshots, Poston ran away. She drove off alone. She tried to call him that night or the next morning, but she did not recall whether she reached him. She saw him that night or the next morning. She continued seeing him until he was arrested. When she ran into the store, an employee told her to go into a different room inside the store for safety. (18 RT 1433–1441.)

On McNeely's cross-examination, Bailey testified she had never seen Poston hold a gun. She had not seen a "Done Did It Live" video that showed guns except at the preliminary hearing. She had no idea Poston had a loaded .40 caliber weapon when she was with him at the gas station. (18

RT 1449–1451.) Their plan was not to go to the gas station to get marijuana. She did not tell Poston's counsel and his investigator that they went to get marijuana. Poston did not have other girlfriends. He might have said, "'Shut up, bitch'" to her a couple of times. She had never seen McNeely before the shooting. However, she believed that Dyon, the father of two of her children, knew McNeely. Bailey then acknowledged that she had known McNeely, but she had not seen him in 15 years. McNeely did not say anything to her when she was in her car. (18 RT 1456–1461.)

Bailey testified that, in the 2012 incident, the shooter had on a gas mask. Poston did not bring anything back from the market in the gas station. She knew that a clip fits into a gun. In her testimony at the preliminary hearing, she said that she saw a clip in the inside jacket pocket and she saw the gun down lower on McNeely's hip. (18 RT 1462–1467.) She remembered seeing "two things on him, something in his waist and something on his hip." The handle was sticking out of the jacket pocket. She testified at the preliminary hearing that the clip was in the jacket pocket and she saw it when McNeely opened his jacket. (18 RT 1470–1479.)

McNeely said he would slap Poston two minutes before he actually did so. Poston said, "'You're not going to slap me.'" She did not run inside the store because she was aware that Poston had a firearm. They did not have any illegal drugs inside her car. (18 RT 1479, 1482.) She came out of the store and drove away. Her son had her cell phone; she did not look for Poston that night. She saw him the next day. She did not ask him about what had happened the night before. Sometime after the shooting, but before he was arrested, Poston went to Los Angeles on business. (18 RT 1483–1488.)

Bailey helped Poston by keeping the "Done Did It Live Show" online while Poston was in jail. "Sem City" was a nickname for the Seminary neighborhood. She had a phone conversation with Poston on June 29,

2013—two weeks after he was arrested. She did not recall him telling her that her talking to his lawyer was the way he would beat the case. (18 RT 1503–1505.)

**Poston** testified he was eager to testify because he felt that what he did was justified. He was 37 years old and grew up in Oakland. He lived on 55th Avenue for 20 years; it was less than half a mile from the Valero gas station. (18 RT 1515–1516.) He suffered several criminal convictions: possession of cocaine base for sale in May 2003; evading the police in May 2007; possession of counterfeit check paper in September 2008; and burglary in November 2010. (18 RT 1517–1519.) He had known his girlfriend, Tamena Bailey, for almost three years. She came to his house more than he went to hers because he did not want "to be invasive of" of her teenage daughter's privacy. (18 RT 1523–1524.)

The "Done Did It Live" videos were a sketch comedy that he performed to promote his books, photography business, and his T-shirt screen printing business. He had produced 355 of the videos, and less than one percent depicted a real or fake gun. He also wrote rap lyrics, poetry, and was working on three novels. (18 RT 1520, 1523.)

An intruder climbed into his bedroom window in the middle of the night on June 26, 2012. The intruder said, "'Don't nobody fucking move, I got a gun.'" Poston did not have a gun. (18 RT 1522, 1525.) Bailey got on the floor. He threw the comforter over the intruder's head. Then he got up and put the light on. He saw that the intruder had on a gas mask and wig. He tried to take off the wig, but the intruder shot him in his chest. He bled profusely and Bailey drove him to Highland Hospital. He was in the hospital for 30 days. Afterward, he received therapy because the intruder was never caught and he was having nightmares. (18 RT 1526–1529.)

Poston testified that, in November 2012, he obtained the .40 caliber gun he used at the Valero gas station. He wanted it for protection because

he was out at his studio late at night and T-shirt customers sometimes brought large amounts of cash. The gun held 14 rounds in the magazine and one in the chamber. He knew that, as a convicted felon, it was "wrong" to carry a gun. (18 RT 1530–1531.)

He met McNeely in 2003 and he knew many people who knew McNeely. He knew McNeely by the nickname, "Two Gun Joe." A couple of friends and some people in the neighborhood called McNeely that. (18 RT 1533–1534.)

Poston went to the Valero gas station to buy Backwoods cigars and to inquire about obtaining some "mollies" (MDMA). He did not pull up to a pump. He had his DSLR camera strapped around his shoulder when he went into the store. He might have purchased one Backwoods cigar. While doing so, he inquired of other patrons if they knew anyone with mollies. He sometimes used mollies and marijuana to bribe security guards so he could get back stage to interview stars. (18 RT 1535–1539.)

A man in the store advised McNeely that Poston was looking for mollies. McNeely approached Poston while he was talking to Bailey. McNeely said, "'I got some.'" They negotiated and agreed on a price and then walked to McNeely's car to see what he had. Poston bought two mollies in a hand to hand transaction. (18 RT 1538–1539.)

Poston walked back to the store and talked to the men inside the store about his "TV show." McNeely came up to him and said, "'You think you all that.'" Poston did not know what he was talking about. McNeely opened his jacket and showed Poston the gun he had in his left inside jacket pocket. Poston felt threatened by the gun and McNeely continued ranting and making threats in a loud voice. (18 RT 1540–1542.)

Poston walked to the Lexus driver door, but McNeely said, "'No bitch ass, ain't even from Seminary.'" Poston replied, "'My father be driving AC Transit since 1976 . . . . Badge number 604. I've been around here for

a long time. Seminary bus terminal is at Seminary and San Leandro.'" Then he walked away. Poston debated getting in the Lexus, but he was afraid McNeely would shoot at him and that would put Bailey in danger. McNeely said, "'I'll slap the shit out of you.'" Then McNeely threw down a cup. (18 RT 1543–1544.)

McNeely got up close to Poston and hit him hard. Poston began to run away, but McNeely tripped him and he lost his balance. He looked over his shoulder to see where McNeely was and he saw McNeely reaching into his inside pocket. He believed McNeely was going to shoot him. He saw a weapon in McNeely's hand. He pulled out his gun and shot McNeely. He fired his shots at the arm that was holding the gun. He did not intend to kill McNeely. (18 RT 1545–1547.)

Poston testified that, after he first shot McNeely, McNeely cringed and fell by his car in front of pump number five. Poston could have kept shooting, but he stopped when he saw McNeely hit the ground. Then he may have run behind the car. Poston did not stop shooting because he ran out of bullets or because the gun jammed. He had more bullets and, if the gun had jammed, he would have cleared the malfunction by racking the slide. (18 RT 1548–1549.)

Poston ran toward Seminary Avenue and dropped his gun because he was afraid. McNeely was shooting at him as he ran so he ran left and right. When he got to the middle of street he turned around and McNeely was still shooting at him. He put his hands out to the side at shoulder level and showed his hands to indicate he was no longer armed. (18 RT 1550–1552.)

Poston testified that he did not go to the Valero gas station with any intent to hurt McNeely or Lionel Fluker. "I wasn't intending to kill him . . . . I was defending myself." (18 RT 1552, 1558.) He believed McNeely would have killed him if he had not shot him first. He remembered the last time someone pulled out a gun and tried to kill him, so he thought this time

would be the same. "I mean, why pull a gun out on me if you ain't going to kill me?" He did not report the incident to police because he was scared. (18 RT 1553–1554.)

While viewing the video, Poston testified that, at 10:11:52–53 p.m., McNeely opened his jacket. That was the second time he saw McNeely's gun. McNeely said, "'That's why I keep my strap up, bitch ass niggas like you.'" Poston walked away from McNeely because he really wanted to defuse the situation. After he was hit, Poston looked over his shoulder and saw McNeely reaching for his gun. He grabbed his camera to stop it from swinging around. At 10:12:34 there was a gun in McNeely's hand, but Poston had not yet fired a shot. Then Poston fired the first shot. There was something glowing in McNeely's hand, which was McNeely shooting the radiator of Bailey's car. (18 RT 1559–1562.)

On the prosecutor's cross-examination, Poston testified, "I've had guns in my prior history." He hunted when he lived in Alabama during seventh and eighth grades. He could not estimate when he first held a gun in Oakland. He did not possess the two guns on the YouTube video. "I didn't own, I just was using them for props. And they weren't real guns. They were just, let's say, guns with no firing pins." But even though they were inoperable, it was still illegal for him to have them. He had only fired one or two guns in his life. He bought the .40 caliber gun he used on McNeely on the street "[f]rom an unknown person" in November 2012. Someone with experience with guns bought him ammunition because, at that time, he had very limited experience with guns. (19 RT 1604–1608, 1630.)

Poston acknowledged he was arrested for possessing a gun in 2000. He was arrested in 2006 for possessing three rifles. He told the officer he thought the guns were fake because they did not fire. He was also arrested

for stealing a bicycle at gunpoint in 1996, but he did not actually have a gun. (19 RT 1608–1609.)

Poston took target practice at Target Masters in Milpitas. When he did so, he signed a form indicating he was not a convicted felon and was not prohibited from possessing a gun. He bought ammunition from the range to shoot their gun. When he carried a gun, he kept it concealed. (19 RT 1610–1611.)

Poston explained, "[T]here is a war going on out there [in Oakland and] . . . there is a killer on the loose to kill me . . . that didn't get apprehended, . . . that shot me several times and left me bleeding on the floor." However, Poston acknowledged he did not know if the shooter specifically targeted him or if he was the victim of random violence. Moreover, he continued to live in that house and had his five daughters and girlfriend stay at that house. He previously testified it was financially impossible for him to move away from Oakland and the $10,000 shown in his YouTube video "[d]oesn't have to be mine." Nevertheless, he was financially able to go on the run for 90 days after the shooting. (19 RT 1612–1618, 1664.) He came back to Oakland a day or two before he was arrested on June 14, 2013. (19 RT 1666.)

Poston testified that he was a legitimate business man. However, in 2008, he had a felony conviction for possession of traveler's check paper. When he was arrested in June 2013, he also had hundreds of pages of check paper. But he legitimately had that because he only used it to write out receipts on the check stubs. He did not recognize or own the credit card embossing machine shown in Exhibit 33 and he did not know if it was used to make identifications. He did not steal the gift cards that were seized from his house. (19 RT 1618–1620.)

Poston acknowledged his business cards were in with the gift cards, but "they may have threw my business cards in there." He did not know

the people whose names were on multiple forms of identification. "I only live in one room in my house. I have other roommates in my house . . . ." His testimony was not that he did not have any idea what was going on in his house, but "that I do not have any of that stuff." (19 RT 1621–1624) Poston acknowledged he previously sold drugs. (19 RT 1627.)

Poston acknowledged he told his mother he wanted to save his good suit for when he "performed" in court, but it was a metaphor. He also told her he needed to paint a different picture for the jury. He had been practicing his courtroom performance "[a]ll my life." (19 RT 1628, 1630.) He wrote a song about the shooting that was a summation of the supplemental police report. He was not bragging when he wrote, "'Them 40-ounce bullets made that nine [McNeely's 9 mm bullets] sit down, the sad part about it, you'll never see the town.'" He also wrote, "'Under the right pretext, it's all self-defense.'" (19 RT 1632–1633.) Poston acknowledged he had been brushing up on the law of self-defense. (19 RT 1643.)

Poston testified that he ran across Seminary Avenue, but he did not try to jump the fence on the other side of the street. He put out his hands like Garcia-Chavez testified. He did not know where he dropped his gun. McNeely flashed his gun at him, but it was not a surprise because he already knew his name was Two Gun Joe. Even though he described Oakland as a war zone, Poston did not know that a simple fight could quickly turn to gunplay. (19 RT 1633, 1635, 1637.) When he was arrested, Poston claimed he did not know anything about what the officers were talking about. He told the officers, "'It wasn't me.'" (19 RT 1642–1643.)

He was familiar with the Valero gas station; he went there often; and he knew that marijuana was sold there. But he did not know that people there sometimes had guns and there had been shootings there. (19 RT 1644.) He told his mother to tell Bailey not to go to court because he had

another girl there. In another call, he lied to Bailey and told her that another girl being there was not the reason he did not want her to come to court. He sometimes lied to Bailey and told her what to do. He called Bailey "bitch" "all the time." He did not tell Bailey what to say, but he did ask her what she was going to testify. In a jail call he told his mother that Bailey would do anything he told her to. He and his mother both told Bailey how she had to perform in this case. (19 RT 1647–1650.)

Poston agreed, "In one of the calls we just listened to, you referred to the fact that Tamena [Bailey] knew you had prostitutes . . . ." However, Poston maintained he was not a pimp. He wrote to his brother, Robert Samuels, "'That last weed I gave you came from out a ho ass. She turned a date for two zips and a hundred dollars." However, just because he described what the woman did, that did not make him a pimp. He was also not talking about a prostitute when he wrote to his brother that Bailey knew he had a prostitute. (19 RT 1652–1654.) The prostitute he referred to in the jail call was the same prostitute he was with when he was arrested. He brought her from Los Angeles and he took care of her in a way that she would be financially beneficial to him. (19 RT 1666.)

Poston testified, "'Why would he [McNeely] pull a gun if he wasn't intending to kill me,'" but that did not apply to him because he took out his gun in self-defense. He only shot at McNeely until he felt it was safe to escape. He tried to shoot specific areas. "When I seen him fall, I seen that he was incapable of injuring me, so I left." "I could have kept shooting, I had more bullets in my gun." In a jail call he told his mother it was a valid point that "you can't bring a knife to a gunfight." (19 RT 1657–1659.) Poston testified, "After I looked over the videotape, ma'am, he pulled his gun out first, which made me react." (19 RT 1662.) When asked, "[Y]ou were on the run because you knew what you did was wrong?" Poston replied, "Yes, ma'am, correct." (19 RT 1664.)

On McNeely's cross-examination, Poston testified that the night after he was arrested he told his mother it was a matter of self-defense. (19 RT 1676) He called Brianna Howard—the woman he was with when he was arrested—his "ho-bitch." She did not make much money for him. "Not enough to call myself a pimp . . . ." He did not know what she did to earn him money. "I wasn't at her dates when she turned them." Poston clarified that Howard was a good companion, but she never gave him any money. She turned dates, but she got to keep her money. She earned "a thousand here, a thousand there" for herself. He called her "ho-bitch" because she slept around; he had sex with her himself. (19 RT 1678–1681.)

Poston joked to Bailey, "'I should have put you out on the track, ho'ing.'" When Bailey complained about Howard, Poston told her "she was on the track ho'ing." That meant Howard was on the Internet trying to have a social date with someone. (19 RT 1691, 1693.)

Poston called his brother Robby from jail on June 16, 2013. He did not tell Robby that he was not at the crime scene. After listening to the recording, Poston admitted he told Robby he was not there, but that was just to keep him "in the blind." (19 RT 1682–1683.) On June 29, 2013, Poston told his brother he had been doing all his homework on the law of self-defense. He spoke to Bailey on June 29, 2013. His reference to "'whoopdie'" was to his case, not his gun. He was not telling Bailey to tell his lawyer she saw the gun; he just wanted her to speak to his lawyer about his case. Poston also spoke to Bailey on July 3, 2013. He told her he mailed her written instructions and that she should follow them verbatim. (19 RT 1685–1690.)

On July 16, 2013, Poston called Bailey from jail and told her he was going to use her to beat the case. "Sem City" was the Seminary neighborhood. (19 RT 1695–1697.) His mother gave him his house two years before he was arrested. He had no idea what the big machine found

in his house was. He had been in Los Angeles for 90 days and had just returned before he was arrested. His lyric, "'[T]he forty made the nine sit down'" was "a summation of what happened." (19 RT 1700–1703.)

While watching the video, Poston testified that, at 10:07:58 p.m., he took a silver bag from McNeely. But he gave it back to McNeely. (19 RT 1711–1712.) At 10:08:36 p.m., he came out of the back of his car and walked over to McNeely's car because he had been informed McNeely had mollies. (19 RT 1714–1715.) At 10:09:25 p.m., he did a little dance because things were going well and they had an agreement. (19 RT 1717–1718.)

Poston had his .40 caliber handgun in his right waistband. He practiced shooting at the range with that gun 15 to 20 times from November 2012 to April 2013. However, Bailey did not know he carried a gun. (19 RT 1719–1721.) There was never a time that McNeely showed him his gun and the gun was also visible to the camera. He had done his homework on the legal principles of self-defense, but he did not know that McNeely threatening him would help his case. (19 RT 1725, 1729.)

His camera was on the left side of his body. Poston did not know whether McNeely slapped or punched him, but in a jail call he said, "'He slapped the shit out of me, how is he the victim?'" (19 RT 1729, 1731.) He did not pull out his gun and he was not holding his gun at 10:12:32 p.m. McNeely was also not reaching for anything. (19 RT 1733.) At that point, he had seen that McNeely was carrying a gun; McNeely had threatened him with the gun; and McNeely had just slapped him. Yet he reached for his camera. (19 RT 1735.) When he shot at McNeely he aimed for his right arm which was the one that reached into his pocket and was holding the gun. But the bullet struck McNeely's left arm. (19 RT 1736–1737.)

After McNeely fell down he had something in his left hand. McNeely then shot the Lexus's radiator. Poston thought McNeely shot the radiator

because the car was smoking. The smoke was not gun smoke. Bailey had the radiator repaired. (19 RT 1738–1740.) He did not put a bullet through McNeely's hat. McNeely did not drop a magazine on the ground and Poston did not know if McNeely dropped anything on the ground. (19 RT 1741–1742.) At 10:12:37 p.m., he ran closer to McNeely and shot at his body, specifically his arm in front of his chest. His gun did not jam; it was just time to retreat. He dropped his gun because he was scared. (19 RT 1743–1745.) He went to Los Angeles five days after the shooting. Bailey joined him later to visit. (19 RT 1748.)

On redirect examination, Poston testified he never told Bailey to testify she saw McNeely with a gun. (19 RT 1755.)

On McNeely's recross-examination, Poston testified that, in a jail call to a friend, the friend asked why he was "still trying to hold onto her [Brianna Howard] for?'" Poston replied, "'Hold onto her, bitch, I ain't holding onto nothing except my mother-fucking pocketbook . . . . I need all she got to offer me . . . . That bitch socking it to my pocket like the Chinese stock market, bitch.'" (19 RT 1758–1759.)

**Oakland Police Officer Eriberto Perez-Angeles** testified that he and Officer Gantt interviewed McNeely after the shooting. McNeely told him he had a 9 mm handgun. He also interviewed Poston. After the interview, Poston asked him what he was being charged with. He told Poston attempted murder. Poston said he had not been trying to kill McNeely, "just trying to get him off of him." (19 RT 1778–1782.)

**D. McNeely's Rebuttal**

**San Francisco Police Officer Christine McCormick** testified that, on January 18, 2003, she contacted Bailey and recovered three little bundles of cocaine base from her right bra area. (18 RT 1513.)

**Oakland Police Officer Eriberto Perez-Angeles** testified that he testified at the preliminary hearing on September 26, 2013. McNeely's

counsel asked him about a gun and a clip. He testified that McNeely told him he had a clip in his left jacket pocket.[5] He recovered some items from a rear lower room in Poston's house. (19 RT 1783–1784.)

On the prosecutor's cross-examination, Perez-Angeles testified he was present for the search of Poston's house. He identified two credit card manufacturing machines that were found in the lower rear room. In the same room officers found: an orange, blue, red, and silver striped bag with blank Visa gift cards; a black bag with some papers and credit cards with various names; and a small box containing paperwork, mail, credit cards, identification cards with various people's names, blank debit cards, and a variety of identification cards and credit cards in the name of Brianna Howard. In Poston's bedroom officers found a brown paper bag containing blank check paper and also a magazine clip inside the closet. (19 RT 1786–1790.)

**Walter Stannard** testified that he worked as a private investigator for Poston. He interviewed Tamena Bailey on July 19, 2013. She told him she saw a large man [McNeely] wearing a leather jacket and a hat talking to Poston at the Valero gas station. Bailey said she saw the butt of a semiautomatic pistol. She did not say anything about seeing a clip or a magazine. She said she and Poston had driven from San Francisco to the Valero gas station to buy marijuana.[6] (19 RT 1793–1797.)

---

[5] This testimony was intended to show that Bailey got the idea to testify that she saw a clip in McNeely's jacket pocket from Officer Perez-Angeles' testimony.

[6] This testimony was also intended to show that Bailey only claimed to have seen the gun magazine after she heard Officer Perez-Angeles testify at the preliminary hearing. It also impeached Poston's testimony that he and Bailey drove from his house to the Valero gas station to buy cigarettes.

### E. The Prosecutor's Rebuttal

**Oakland Police Lieutenant Tony Jones** testified that "Sem City" was a nickname for the Seminary neighborhood only in the context of drug-dealing. Law-abiding citizens did not use that nickname. "The reason there is a lot of violence on drug turfs is because drug dealers and drug dealer associates have to protect that turf. If people don't respect you, they'll just come take it from you . . . ." (19 RT 1806–1807.)

The jury was shown a video, Exhibit Y. The main speaker was Lamasta "Tubey" Pearson. Another person was Germane "Maine" Thomas. Another person was Lamar "Binky" Burnett. The voice of the cameraman belonged to Poston. In the world portrayed on the video, it would have been insulting to Poston if someone had told him he was not from Seminary. The video showed that Poston "clearly t[ook] pride in being from Seminary. And for someone to say that you ain't from Seminary, it's disrespectful and insulting." If Poston had simply walked away afterward, "He would be viewed as a punk." And the other person would continue to harass him. (19 RT 1812–1814.)

When someone in the video referred to "slide" or "sliders," he was referring to credit card fraud. Slider fraud is committed when confederates in retail stores collect credit card numbers from customers' cards. Someone steals a bunch of blank gift cards from a store. They rub off the gift card number and emboss it with the stolen names and credit card numbers. They also put that information on the magnetic strip. They thereby turn the stolen gift cards into fraudulent credit cards which they use to buy legitimate gift cards which can never be traced back to the thieves. There were gift cards inside the orange, blue, and red multicolored bag found in Poston's house. Several of the blank gift cards in the black bag appeared to be ready to be embossed and turned into fraudulent credit cards. (19 RT 1815–1816.)

Officer Jones recognized Poston's lyric, "'You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a nigga and get away with it.'" It meant someone would need to "be high or crazy to think that you can punch me and get away with it." The phrase, "'You almost got bodied, instead caught you a body,'" meant you almost were killed, but instead you killed someone. Zips were ounces of marijuana, cocaine, or heroin. To "fire on" someone meant to punch them. "Turning a date" was when a prostitute had sex with a john. In the phrase, "disrespect my shine," "shine" meant "reputation, everything that is good about me . . . ." "Philthy" was Philthy Rich, an Oakland rapper. "Mone" was Ramon Brown, a man from Seminary. "Weezy" was Wendell Stevens, a man from Seminary who was killed in the Oakland drug war. "Jody-Bo" was Matt Woodfox, a man from Seminary who was shot and killed by Oakland Police Officers. (19 RT 1817–1820.)

According to the rules of the street in Oakland, if a man disrespects another man in front of his girlfriend, he will lose credibility with that woman if he just walks away. If he did so in front of two people he knew, he would risk being labeled a punk. It would be more degrading for a man to be slapped by another man than to be punched because a punch is what men do and it is like combat. Getting up in someone's face and personal space could be disrespectful. A man could not just walk away from that and keep his credibility. (19 RT 1822.)

On Poston's cross-examination, Officer Jones testified that, if one man slapped a second man so hard it almost knocked him to the ground; and then the first man drew a gun; the second man would probably also pull out his gun. Officer Jones would do the same if he were in the second man's position. (19 RT 1825.) On McNeely's cross-examination, Jones testified that "fire on" meant to punch, not slap. (19 RT 1828.)

## ARGUMENT

### I. The Trial Court Properly Denied Poston's Severance Motion (McNeely's Argument I; Poston's Argument VI)

The trial court denied Poston's motion to sever the trial based on antagonistic defenses. On appeal, McNeely claims that "the trial court abused its discretion . . . because if the jurors accepted Poston's defense, they could not acquit Mr. McNeely." (MAOB 40, citing *United States v. Ziperstein* (7th Cir. 1979) 601 F.2d 281, 285.) Further, "the jury could not acquit one defendant without disbelieving, and convicting, the codefendant." (MAOB 41.) However, McNeely has forfeited this claim by failing to move for severance in the trial court.

Ironically, Poston joins *McNeely's* argument even though it was Poston who moved for severance and preserved his claim for appeal. Poston contends that his and McNeely's case should have been severed "because each defendant was charged with the attempted murder of the other and their defenses were so antagonistic that the two defendants battled each other through their respective counsel repeatedly throughout the trial." (PAOB 130–131.)

However, both of appellants' claims fail on the merits because codefendants routinely blame each other for the crimes charged and that is not a sufficient reason to require severance. Contrary to appellants' arguments, their defense theories did not preclude the jury from finding one or both of them not guilty.

As for McNeely's self-defense claim, there was no dispute that Poston fired his gun first. Likewise, Poston had a viable self-defense claim because the video clearly showed that McNeely reached into his jacket—and Poston could reasonably assume he was reaching for a gun—before Poston fired a shot. Therefore, the jury could have found either or both

appellants acted in self-defense and were not guilty of attempted murder or murder.

### A. Procedural History

Poston filed a written motion to sever the trial. (5 CT 1388–1391.) Poston contended that appellants' defenses were inconsistent, and that he would be prejudiced by McNeely helping the prosecution—particularly with regard to impeaching Tamena Bailey. (5 CT 1391.)

McNeely did not file a written motion and, at the hearing, McNeely's defense counsel did not ask for severance. He stated, "I am submitting the issue of joinder and severance to Your honor's sound discretion." (2 RT 108.) Counsel did not say anything else during the hearing except to agree that there were no *Aranda-Bruton* issues. (2 RT 113; see *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.)

Poston argued at the hearing: "Here you have both men claiming a reasonable belief, need to use violent deadly force against each other in self-defense. It puts them against each other. It's a huge conflict . . . ." (2 RT 108.)

The prosecutor argued, "I don't necessarily agree with the assertion that these are necessarily antagonistic defenses. I think that they can both claim self-defense . . . ." (2 RT 108–109.) "[E]ven if you were to assume that they are antagonistic defenses, that does not, per se, require severance[. E]ven if the defendants are hostile or attempt to cast the blame on each other, it doesn't require severance. There is an absolute preference for joinder, especially in a situation like this where both defendants are charged with having committed common crimes involving common events, common victims. There would be essentially the exact same evidence that would be required to be presented if we were to separate."

The prosecutor quoted *People v. Hardy* (1992) 2 Cal.4th 86, 167–168: "'To obtain severance on the ground of conflicting defenses, it must be

demonstrated that the conflict is so prejudicial that the defenses are irreconcilable and the jury will unjustifiably infer that this conflict, alone, demonstrates that both are guilty.'" (2 RT 109.) The prosecutor added, "I don't think we have anything close to that here . . . . [T]he jury could side with both defendants and find that at various points in time each of them had a right to self-defense; or they could split . . . ." (2 RT 110.)

Poston argued, "I find it inconceivable that both Mr. Poston and Mr. McNeely, because they have two different perceptions of what occurred at what times, could both possibly be found not guilty by a jury . . . . [T]he jury can adopt Mr. Poston's versions of events or Mr. McNeely's versions of events, but not both versions and exculpate both men. That's why it's a[n] irreconcilable conflict and antagonistic defense[s]." (2 RT 110–111.) Poston added, "I think one of these individuals ha[d] the right to use deadly force in this situation, but not both of them." (2 RT 111.)

The prosecutor argued that, "if the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials would appear to be mandatory in almost every case." All of the severance cases "recognize that in these cases defendants are going to point to each other . . . ." (2 RT 112.) The prosecutor and parties agreed that there were no *Aranda-Bruton* issue. (2 RT 113.) Poston argued, "This is unique where a defendant is accused of attempted murder of the co-defendant. That is extremely antagonistic and irreconcilable in terms of defenses." (2 RT 114.)

The trial court ruled: "The charged offenses . . . have a common element of substantial importance. We have the same victim in count one. The victims in counts two and three are each of the defendants, respectively . . . . So it's the same crime scene. They are both participants in the same course of conduct . . . . So I see these as different defenses or different perspectives of the same event, but not what the law would consider

irreconcilable or antagonistic defenses. The law does favor joinder . . . . [T]he same elements would be presented at two trials, the court does not find that Mr. Poston would be denied a fair trial and will deny his motion for severance. And to the extent that affects Mr. McNeely, that would be the ruling as well . . . . The Court is additionally considering that there are no *Aranda-Bruton* issues, and most cases are severed on the basis of *Aranada-Bruton*." (2 RT 115–116.)

### B. Legal Principles

Section 954 provides, in part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

Section 1098 provides:

> When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a separate trial for each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial.

In *People v. Wickliffe* (1986) 183 Cal.App.3d 37, the court held a joint trial of two defendants for crimes arising out of the same transaction was proper even though the defendants were charged with distinct offenses. The *Wickliffe* court concluded that where the defendants are charged with distinct crimes, but all of the charges arose out of the same transaction

involving the same victim, the same evidence would be admitted at either a joint or a separate trial. (*Id.* at pp. 40–41.)

A joint trial is preferred when available. (*People v. Cleveland* (2004) 32 Cal.4th 704, 725–726.) However, trials of codefendants may be severed "'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*People v. Turner* (1984) 37 Cal.3d 302, 312, quoting *People v. Massie* (1967) 66 Cal.2d 899, 917, and overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115.)

"Mutually antagonistic defenses are not prejudicial per se . . . . We believe that, when defendants properly have been joined . . . [severance should be granted] only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant . . . . When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. [Citation.] Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [Citation.] Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial . . . . When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." (*Zafiro v. United States* (1993) 506 U.S. 534, 538–539.)

"""Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*." [Citation.] If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case" . . . . [A]lthough it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly. Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.'" (*People v. Coffman* (2004) 34 Cal.4th 1, 41, quoting *People v. Hardy*, *supra*, 2 Cal.4th at p. 168; last italics added by *Coffman*.) "When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*People v. Coffman*, *supra*, at p. 41.)

Thus, absent irreconcilable defenses that prejudicially suggest *both* defendants are guilty, a trial court retains discretion to order a joint trial, and a ruling on a motion for separate trials is reviewed under the abuse of discretion standard. (See *People v. Coffman*, *supra*, 34 Cal.4th at p. 41; *People v. Morganti* (1996) 43 Cal.App.4th 643, 671.)

When a trial court erroneously denies a severance motion, the appellate court will reverse only if it is reasonably probable the defendant would have obtained a more favorable result at a separate trial. (*People v. Ortiz* (1978) 22 Cal.3d 38, 44–48.) However, when a trial court properly

denies a severance motion, but the trial nevertheless results in an unfair trial in violation of due process, the judgment must be reversed. (*People v. Pinholster* (1992) 1 Cal.4th 865, 933, overruled on another ground in *People v. Willaims* (2010) 49 Cal.4th 405, 459.)

**C. McNeely Forfeited This Claim**

McNeely forfeited this claim by failing to request severance. (See *People v. Maury* (2003) 30 Cal.4th 342, 392; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048.) He made neither a written motion nor an oral request for separate trials; he merely submitted the issue to the court's discretion. By submitting the matter, McNeely declined to take a position and agreed to abide by whatever the trial court decided. Therefore, he cannot claim error now.[7] (See *ibid.*)

On appeal, McNeely has not cited anywhere in the record where he made either an explicit or implicit request for severance. In fact, trial counsel may have determined that McNeely had a better chance of prevailing in a joint trial—especially if Poston testified and was impeached. After all, Poston fired ten shots at McNeely—and struck him six times—before McNeely fired a shot. So the jury might have found McNeely more sympathetic when juxtaposed with Poston.

Accordingly, McNeely may have made a tactical decision not to request severance. Furthermore, he may have decided not to request a joint trial because that would have only strengthened Poston's argument that a joint trial would prejudice him—thereby increasing the chances of severance. Therefore, McNeely not only forfeited this claim on appeal, he cannot prevail on a claim of ineffective assistance of counsel because the

[7] If this Court considers and rejects the merits of appellants' claim, respondent respectfully requests that it also expressly rule that McNeely forfeited this claim since that would bar him from raising it in a federal habeas petition.

decision to seek neither severance nor joinder was a reasonable tactical decision. (See *People v. Maury*, *supra*, 30 Cal.4th at p. 392 [holding that trial courts have no sua sponte duty to sever actions "and defendant's failure to request a severance waives the matter on appeal"]; *People v. Mitcham*, *supra*, 1 Cal.4th at p. 1048 [failure to join in codefendant's motion to sever trial forfeits issue on appeal]; *People v. Bolin* (1998) 18 Cal. 4th 297, 317 [defendant cannot prevail on claim of ineffective assistance where trial counsel may have made "an informed tactical choice within the range of reasonable competence"].)

### D. Appellants' Defenses Did Not Prejudicially Suggest That Both Were Guilty

Even if McNeely did not forfeit this claim by failing to request severance, his claims fails on the merits—as does Poston's. Appellants contend that they should have been tried separately because they had antagonistic defenses. However, it does not appear that any California court has ever held that a trial court erroneously denied severance on the basis of antagonistic defenses. (See *People v. Hardy*, *supra*, 2 Cal.4th at p. 168; see also *Zafiro v. United States*, *supra*, 506 U.S. at pp. 538–539; MAOB 29.)

It is well established that the law prefers joint trials. (*People v. Cleveland*, *supra*, 32 Cal.4th at pp. 725–726; § 1098.) Here, there were several reasons why trying appellants together was justified. They both engaged in the same transaction and occurrence. Both felons illegally carried semiautomatic firearms to the gas station. They engaged in an illegal drug negotiation—if not an actual sale—with each other. McNeely initiated the violence with a slap. Poston elevated the conflict by drawing his gun. And there is no question that the innocent victim would not have been killed without both appellants' improper actions. That is, McNeely was the proximate cause because he shot Fluker. But McNeely would not

have done so if Poston had not first provoked him by shooting McNeely six times.

Appellants are correct that this case is unusual in that they were not only charged with crimes against a separate victim, but also against each other. Indeed, McNeely contends that no published California case "dealt with mutually exclusive defenses like those in the present case." (MAOB 29.) However, unlike most trials, there was a video of the shooting, so the jury could sort out the facts for itself.

Poston's self-defense theory was that McNeely initiated the conflict by slapping him; then Poston saw McNeely reach for his gun, so Poston reached for his and was just lucky to fire first. Poston argued that he acted in perfect self-defense against McNeely. That was a complete defense to the attempted murder charge; it completely negated the implied malice that could be transferred to the murder and manslaughter charges; and it was a complete defense to the provocative act theory of liability. (See CALJIC No. 5.30 [Self-Defense Against Assault]; CALCRIM No. 505 [Justifiable Homicide]; CALCRIM No. 560 [Homicide: Provocative Act by Defendant]; 3 CT 830, 835–838, 841–843.)

Likewise, McNeely's self-defense theory was that Poston elevated the conflict from fisticuffs to lethal weapons by drawing his gun first. McNeely acted in perfect self-defense by shooting at Poston after Poston fired at him 10 times and struck him six times. Again, if McNeely acted in perfect self-defense, he was not liable for either the attempted murder or the murder of Fluker.

Thus, both appellants' defense theories would have been the same regardless of whether they had been charged with attempting to murder one another. Regardless of that charge, they still needed to prove they acted in self-defense to escape liability for Fluker's murder. Therefore, the fact that appellants were charged with attempting to murder one another did not

change anything about their defenses or how the case was prosecuted. To prove the murder, the prosecutor still had to prove that neither appellant acted in self-defense toward the other; that McNeely acted with implied malice; and that Poston committed a provocative act and knew the natural and probable consequences would be dangerous to human life. (See CALJIC No. 5.30; CALCRIM Nos. 505, 560; 3 CT 830, 835–838, 841–843.)

Appellants contend that their defenses were inconsistent because they had an incentive to blame each other for the attempted murder and murder. However, codefendants often have an incentive to shift the blame to the other. Absent a showing of prejudicial circumstances, that has never been held to require separate trials. (See *People v. Box* (2000) 23 Cal.4th 1153, 1196, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948 fn. 10 ["contrary to defendant's assertion, severance was not required merely because it was anticipated defendants would attempt to shift responsibility for the capital crimes to each other."].)

As our Supreme Court noted in *People v. Cummings*, "That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials . . . . That each was involved in the incident was undisputed, however, and the prosecution had offered evidence sufficient to support verdicts convicting both defendants. As the People observe, this was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was that person. Here the prosecution theory was that both defendants participated in, and were guilty of, the murder. Most of the additional evidence each defendant offered to support his attempt to shift blame to the other would have been admissible had the prosecution sought to offer it. In these circumstances there was no abuse of discretion in denying complete

severance and no prejudice as a result of joint trial on the murder charge . . . ." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287–1288.[8])

All of the same considerations apply here. Both appellants were involved in the murder and attempted murders. There was sufficient evidence to convict each of them independently. This was not a case where only one of them could be guilty: McNeely's self-defense claim failed because he shot at Poston after the danger had passed; and Poston's self-defense claim failed because he elevated the conflict to lethal force after receiving a single slap and trip. Thus, the prosecution did not leave it to appellants to convince the jury that the other was guilty.

Notably, Poston could have made a plausible self-defense claim based on his assertion that he knew McNeely was armed. However, he muddied that defense by repeatedly lying about the encounter. In particular, Poston lied when he testified that he drew his weapon in response to seeing McNeely reach for his gun. The video clearly showed that Poston drew his weapon immediately after the slap, and not after seeing McNeely go for his gun. The video also refuted Poston's claim that McNeely had a gun in his hand before Poston fired a shot. Rather, McNeely pulled out the magazine to his gun. (18 RT 1562; Exh. 8.)

The video also refuted Poston's ludicrous claim that McNeely fired at Poston before Poston finished shooting. According to Poston, McNeely's bullet struck the Lexus's radiator. Poston also lied and said that Bailey had to have the radiator repaired. (18 RT 1551, 1562; 19 RT 1738–1740.) However, the "steam" was obviously gun smoke. And the video clearly showed that it was only after Poston fired his last shot that McNeely pulled

---

[8] There were separate juries in *People v. Cummings*. However, that does not make the holding any less relevant to the present matter. Here, neither appellant has suggested that the purported prejudice from a joint trial was the type that could have been cured by separate juries.

the gun out of his right jacket pocket, picked up the dropped magazine, and loaded the magazine into his gun.[9] Thus, to the extent McNeely could argue that Poston gave incriminating testimony that would not have been presented at a separate trial, it made no difference. Poston's testimony was not credible in light of the video.

Moreover, almost all of the other evidence appellants offered to blame the other would have been admissible had the prosecution sought to offer it. Thus, as in *People v. Cummings*, there was no abuse of discretion in denying Poston's severance motion and no prejudice as a result of the joint trial. (See *People v. Cummings*, *supra*, 4 Cal.4th at pp. 1287–1288.)

*People v. Souza* (2012) 54 Cal.4th 90 is instructive. There, the defendant sought to sever his trial from that of his co-defendant because he expected that each would defend the case by claiming the other was the actual shooter. (*Id.* at p. 108.) (Here, of course, McNeely conceded he was the actual shooter, but claimed he was provoked by Poston.) Our Supreme Court concluded the court did not abuse its discretion in denying severance: "'[I]f the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case."' [Citations.] [¶] 'Thus, "[a]ntagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other." [Citation.]' [Citation.] '"Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are

[9] Poston's arguably detrimental testimony that McNeely sold him "mollies" was cumulative of Officer James Gantt's testimony that a video showed that McNeely tried to sell Poston drugs. (16 RT 1090–1091.)

guilty.''''' (*Id.* at pp. 110–111, some italics added.) Consequently, the court reasoned that "[i]f 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.'" (*Id.* at p. 111.)

Likewise, here, there is no reason to believe the jury found appellants guilty solely on the basis of antagonistic defenses. As previously noted, there was sufficient independent evidence against appellants that it could not be said that it was the conflict between appellants' defenses which alone demonstrated their guilt. For example, Poston admitted that he shot McNeely six times. And McNeely admitted that he shot at Poston eight times and unintentionally killed Fluker.

Nevertheless, Poston argues that, because appellants were charged with the attempted murder of the other, "their defenses were so antagonistic that the two defendants battled each other through their respective counsel repeatedly throughout trial." (PAOB 130–131.) Poston also contends that his right to due process was violated because McNeely's counsel acted as a second prosecutor. (PAOB 131–134.) However, it is common for defendants to attack one another. The fact that appellants were charged with crimes against each other did not change the fact that they each needed to prove self-defense. And our Supreme Court has squarely held that, even when defendants are hostile toward one another or try to cast blame on each other, that does not require severance. (See *People v. Hardy*, *supra*, 2 Cal.4th at p. 168.) Moreover, Poston does not cite any evidence elicited by McNeely that could not have been introduced by the prosecutor in a separate trial.

McNeely discusses (and Poston cites) four cases from the United States Courts of Appeals for the proposition that defendants should not be tried together when they have "mutually exclusive defenses" and when "[t]he jurors could not logically have accepted both defenses." (MAOB

31–37; PAOB 131, citing *United States v. Mayfield* (9th Cir.) 189 F.3d 895; *United States v. Rucker* (11th Cir. 1990) 915 F.2d 1511, overruled by *United States v. Blankenship* (11th Cir. 2004) 382 F.3d 1110, 1122 fn. 23; *United States v. Romanello* (5th Cir. 1984) 726 F.2d 173; *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078.) But those cases are not binding on this Court and they do not support the proposition that it is impermissible to jointly try defendants unless their defense theories logically permit the jury to find both defendants not guilty.

For example, this was not a case where one defendant told "gruesome and outlandish tales about the exclusive guilt of the 'other' defendant." (MAOB 32, citing *United States v. Tootick*, *supra*, 952 F.2d at p. 1082.) Nor is McNeely correct that "each defense attorney portrayed the other defendant as the sole perpetrator of the crime . . . ." (MAOB 33, citing *Tootick* at pp. 1083–1086.) While Poston emphasized that McNeely initiated the confrontation with a slap, that hardly suggested that Poston was the sole perpetrator. The jury could see that Poston fired ten bullets at McNeely before he could even load his gun. Likewise, McNeely certainly tried to impeach Poston and Bailey, but he did not mislead or confuse the jury about the facts of the case.

Appellants' reliance on *United States v. Rucker*, *supra*, 915 F.2d 1511 is also misplaced. (MAOB 33–34.) Appellants fail to acknowledge that the holding—"'[T]he trial judge should have realized that the Ruckers would present unavoidably antagonistic defenses and ordered separate trials'"—was overruled by *United States v. Blankenship*, *supra*, 382 F.3d at p. 1122 fn. 23. *Blankenship* also overruled a prior case that held, "severance is required if 'the jury, in order to believe the core of testimony offered on behalf of [a] defendant must necessarily disbelieve the testimony offered on behalf of his co-defendant.'" (*Ibid.*) That was essentially the same holding as another case cited by appellants, *United States v. Romanello*, *supra*, 726

F.2d at page 177. And, again, that was not the case here. The jury could have believed both appellants' self-defense theories—if not necessarily Poston's factual claim that McNeely drew his weapon first.

Likewise, appellants cite *United States v. Mayfield*, *supra*, 189 F.3d 895 without acknowledging its holding was called into question by *Collins v. Runnels* (9th Cir. 2010) 580 F.Supp.2d 1000, 1014 (E.D. Cal. 2008), aff'd, 603 F.3d 1127 (9th Cir. 2010). *Collins* observed, "In case after case since *Tootick*, the court has complicated the issue by continuing to cite earlier dicta for the proposition that prejudice is established where a defendant demonstrates that the core of his defense is irreconcilable with the core of his codefendant's defense, such that the jury cannot acquit one without finding the other guilty. *See United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996); *see also United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999). The *Throckmorton-Mayfield* line of cases notwithstanding, the holding in *Tootick* that clear and manifest prejudice must actually be shown remains good law as it has never been overruled en banc." (*Ibid.*)

As discussed above, codefendants often blame each other for the crimes charged. But that rarely makes it impossible for the jury to sort out the evidence and make an unbiased determination regarding both defenses. Severance is not required whenever defendants cast blame on each other. (See, e.g., *People v. Hardy*, *supra*, 2 Cal.4th at p. 168.) Severance may be required when prejudice is clear, such as when one of the defendants must have committed the crime, and the prosecution essentially leaves it to the defendants to prove each other guilty. But that was not the case here.

In fact, the jury could have found both appellants not guilty. The prosecutor had to disprove appellants' self-defense claims beyond a reasonable doubt. So it would have been sufficient for appellants to cast doubt on the prosecutor's theory of the crimes. Thus, the jury could have

believed that Poston might have acted in self-defense because McNeely hit him; Poston believed McNeely's nickname was "Two Gun Joe"; and Poston saw McNeely provocatively reach into his pocket before Poston fired the first shot. None of those facts were denied by McNeely or contradicted by the video.

Likewise, the jury could have believed McNeely's self-defense claim because he did not reach for his gun magazine until after he saw that Poston had drawn his weapon; and he retrieved his gun from his coat pocket only after Poston shot at him 10 times. Moreover, Poston's claim that he could have fired more shots supported McNeely's claim that he chased and fired at Poston because McNeely believed he was still in danger. In other words, Poston's testimony actually helped McNeely's defense. Thus, the jury could have believed both appellants' self-defense claims.

The only incompatibility in appellants' defenses was that Poston lied that McNeely pulled out his gun first. However, because the video showed otherwise, McNeely was probably helped by Poston's false testimony because it made McNeely's defense seem more credible in comparison. Likewise, Poston lied when he said his gun did not jam or run out of bullets. But if the jury chose to believe that dubious assertion, that also helped McNeely because it supported his claim that he was still in danger when he shot at Poston. Thus, appellants' defenses were not so incompatible that trying them together caused the jury to "'unjustifiably infer that this conflict *alone* demonstrates that both are guilty.'" (*People v. Coffman*, *supra*, 34 Cal.4th at p. 41.) Similarly, the fact that there was sufficient independent evidence to convict each appellant demonstrated that their convictions were not solely the result of antagonistic defenses and, therefore, severance was not required. (See *ibid.*)

### E. Any Error in Failing to Sever the Trial Was Harmless and There Was No Denial of Due Process

Even if the trial court erroneously denied the severance motion, it is not reasonably probable appellants would have obtained a more favorable result at a separate trial. (*People v. Ortiz*, *supra*, 22 Cal.3d at pp. 44–48.) If Poston had received a separate trial, he would have faced the same evidence. If McNeely had received a separate trial, the only difference would have been the absence of Poston's testimony. However, because Poston repeatedly gave false testimony, and his attempts to cast blame on McNeely were refuted by the video—e.g., by claiming McNeely drew his gun first—Poston's testimony actually made McNeely look more credible by comparison.

As for Poston's testimony that McNeely tried to intimidate him by showing his gun three separate times, Poston also acknowledged that, conveniently, the video camera did not catch any of those purported displays. (19 RT 1725.) Likewise, Bailey's testimony that she saw that McNeely was armed was not credible. Bailey's testimony was undermined by other evidence that she only claimed to see McNeely's separate gun and magazine after she heard Officer Perez-Angeles testify about that at the preliminary hearing. (19 RT 1783–1784, 1797; see 18 RT 1467; 18 RT 1971–1974.) And, in any case, Bailey acknowledged that she did not pass that information on to Poston (18 RT 1433), so it could not have affected Poston's state of mind.

The evidence supporting Poston's attempted murder conviction was strong because the video showed that he reached for his gun first, and that was not justified by having been slapped a single time. Poston shot at McNeely ten times before McNeely managed to remove his gun from his pocket. Moreover, Poston would have fired more shots if his gun did not run out of bullets or jam. The evidence supporting Poston's murder

conviction was also strong because shooting McNeely 10 times was a provocative act, and it was foreseeable that it would prod McNeely to commit a dangerous act—especially since Poston claimed to know that McNeely was armed.

Likewise, the evidence showed that McNeely did not act in self-defense. He clearly attempted to kill Poston by firing at him eight times even though Poston's gun had stopped working and he had turned his back and run away. It was also not disputed that McNeely fired the bullet that killed Fluker. He was liable for that murder because his intent to kill Poston transferred to Fluker. Accordingly, even if the trial court should have granted the severance motion, it is not reasonably likely either appellant would have received more favorable results in separate trials. (See *People v. Ortiz*, *supra*, 22 Cal.3d at pp. 44–48.)

Lastly, regardless of whether the trial court properly denied the severance motion, appellants received a fair trial. (See *People v. Pinholster*, *supra*, 1 Cal.4th at p. 933; *People v. Letner* (2010) 50 Cal.4th 99, 150 [joinder violates due process when it results in "gross unfairness"].) As noted above, the evidence against appellants was strong. The jury convicted appellants for that reason, not because appellants cast blame on one another. Almost the same evidence would have been presented in separate trials. There was no evidence that the jury was confused by appellants' competing defenses or attempts to shift blame. Appellants were permitted to present full defenses. And neither was prejudiced by the inclusion or exclusion of evidence due to the presence of the other. Thus, for all the foregoing reasons, there was no violation of appellants' due process rights. (See *ibid.*)

## II. The Trial Court Properly Instructed the Jury Pursuant to CALCRIM No. 3472 (McNeely's Argument II)

Pursuant to CALCRIM No. 3471 [Right to Self-Defense], the trial court instructed the jury: "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting." (3 CT 831–832; see 2 CT 475 [prosecutor requested instruction]; 3 CT 759 [requested by McNeely].)

Pursuant to CALCRIM No. 3472 [Right to Self-Defense May not be Contrived], the trial court instructed the jury: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (3 CT 832; see 2 CT 475 [prosecutor requested instruction].)

Relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), McNeely contends that CALCRIM No. 3472 was a misstatement of the law because it negated the portion of CALCRIM No. 3471 quoted above. Respondent disagrees. McNeely forfeited his right to complain on appeal because he did not object at trial. Moreover, *Ramirez* is distinguishable. There, the prosecutor repeatedly misstated the meaning of CALCRIM No. 3471, arguing that if the defendant provoked the fight, self-defense was unavailable under any circumstances. In other words, she argued that the bar on self-defense in CALCRIM No. 3472 trumped the self-defense provision in CALCRIM No. 3471.

In fact, when read together, the two instructions conveyed that a defendant could not provoke a nonlethal fight or quarrel and then respond with either nonlethal or lethal force in self-defense. However, if the

defendant provoked a nonlethal fight or quarrel, and the opponent immediately responded with lethal force, the defendant did have the right to respond with lethal force in self-defense. Put another way, CALCRIM Nos. 3471 and 3472 were reconcilable in a straightforward way, and the jury would not have arbitrarily decided to follow CALCRIM No. 3472, but not CALCRIM No. 3471.

Furthermore, contrary to McNeely's argument, the prosecutor never suggested that McNeely lost the right to act in self-defense because he was the initial aggressor. She argued both appellants engaged in mutual combat. (20 RT 1872, 1893, 1963, 1965.) Moreover, McNeely did not shoot in self-defense because Poston's gun had already stopped working and Poston had already fled, so McNeely was no longer in any danger. (20 RT 1885, 1896, 1966, 1968.) For the same reasons, any error was harmless beyond a reasonable doubt because, under proper instructions, the jury would not have believed that McNeely shot at Poston in self-defense, i.e., because he believed he was in imminent danger of death or great bodily injury. (See CALCRIM No. 3474 [Right to Self-Defense When Danger No Longer Exists or Attacker is Disabled]; 3 CT 833.)

**A. Standard of Review**

"It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten* [1973] 414 U.S. [141,] 147. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; see *People v. Clair* (1992) 2 Cal. 4th 629, 663 [declaring that California already followed the reasonable likelihood rule and deeming it "proper for examining instructions under California law."].)

Even facially inaccurate or inapplicable instructions are not erroneous if there is no reasonable likelihood that the jury improperly relied on them. (See *People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1155.) "Faced with a claim of instructional error, we are obligated to consider whether it was reasonably likely any allegedly erroneous instruction would have led the jury to misapply the law . . . . We are also obligated to regard the jury as intelligent and capable of understanding and correlating all instructions hey are given." (*Ibid.*)

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. See *Sandstrom v. Montana*, 442 U.S. 510, 520–521 (1979). Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is '"whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."' *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72, (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). '"[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."' *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp*, *supra*, at 146–147). If the charge as a whole is ambiguous, the question is whether there is a '"reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' *Estelle*, *supra*, at p. 72 (quoting *Boyde*, *supra*, at 380)." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.)

"Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde v. California* (1990) 494 U.S. 370, 380–

381.) In determining whether an instruction misled the jury, "we have considered the specific language challenged, the instructions as a whole and the jury's findings." (*People v. Cain* (1995) 10 Cal. 4th 1, 36.)

Reversal is warranted only if it is reasonably likely that the jury instructions as a whole provided the jury with an inaccurate understanding of the applicable law. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526.)

An erroneous instruction regarding the defense theory of the case is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Quach* (2004) 116 Cal.App.4th 294, 303 (*Quach*).)

**B. McNeely Forfeited This Claim by Failing to Object**

A claim of instructional error is generally not cognizable on appeal if the defendant fails to object to the instruction at trial or fails to request a modification or clarification. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097, fn. 29.) When the trial court discusses jury instructions with counsel and defense counsel agrees that evidence supports an instruction and does not object to the court's proposed wording, any claim of error is forfeited. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 326; see *People v. Farnam* (2002) 28 Cal.4th 107, 165.) Here, McNeely acknowledges that he did not object or request modification. (MAOB 64–65.) He did not object when the trial court indicated it would instruct the jury with CALCRIM No. 3471 (19 RT 1842), and he did not object when the trial court stated it would give CALCRIM Nos. 3471, 3472, and 3474 on self-defense (19 RT 1850).[10]

[10] Prior to trial, McNeely indicated his defense was based on the principle set forth in CALCRIM No. 3471. Defense counsel argued, "[I]f a defendant uses only non-deadly force, a slap or a punch, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight . . . [t]hen the defendant . . . had the right to defend himself with deadly force . . . ." (5 RT 183; see also 5 RT 187.)

Therefore, McNeely forfeited his claim that CALCRIM No. 3472 was erroneous. (See *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1097, fn. 29.)

McNeely suggests that the purported error violated his substantial rights and that, pursuant to section 1259, this Court should consider his claim. (MAOB 51.) However, there is no need to do so because the instructions were correct and not misleading. (See *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)[11] Furthermore, as discussed below, even if there was error, it was not prejudicial. (See *ibid.* ["Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was."].)

### C. When Read Together, CALCRIM Nos. 3471 and 3472 Correctly Conveyed the Law

The general rules on initial aggressors and self-defense were summarized in *Quach*, *supra*, 116 Cal.App.4th 294: "'Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force . . . . If the victim uses such force, the aggressor's right of self-defense arises . . . .' (1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Defenses § 75, p. 410), or its corollary, 'If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense.' (*People v. Hecker* (1895)

---

[11] McNeely's claim that defense counsel's failure to object constituted ineffective assistance is discussed in the next argument.

109 Cal. 451, 463–464.)" (*Id.* at pp. 301–302.) This language closely tracks CALCRIM No. 3471.

*Quach* also quoted *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75, fn. 2 for a related principle: "'"Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself is not immediately available to him, but, instead he must first decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest *unless the attack is so sudden and perilous that he cannot withdraw* . . . ."'" (*Quach*, *supra*, 116 Cal.App.4th at p. 302, italics in *People v. Sawyer*.) This language closely tracks the combination of CALCRIM Nos. 3471 and 3472.

Similarly, California Jurisprudence put it this way: "An accused who was the first wrongdoer, but whose unlawful act was not felonious, as, for example, a simple assault or a mere trespass, must decline further struggle and withdraw before he or she is entitled to act in self-defense unless the counterattack is so sudden and perilous that no opportunity is given to decline or make known his or her willingness to decline further strife. In such cases the provocation for deadly counterattack is inadequate, and if the other by his or her own unlawful act deprives the first wrongdoer of the opportunity to decline deadly strife, the fault lies not with the slayer but with the slain." (17A Cal.Jur. 3d Criminal Law: Crimes Against the Person § 153, footnotes omitted.)

It is well established that jury instructions are read together as a whole. (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.) When read together, the foregoing principles were properly conveyed by CALCRIM Nos. 3471 and 3472.

CALCRIM No. 3472 advised, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Read in isolation, CALCRIM No. 3472 seems to establish an absolute bar on self-defense for initial aggressors. But CALCRIM No. 3471 added an exception. It explained that an initial aggressor regained the right to self-defense if the defendant tried to stop fighting, conveyed that desire to the victim, and he gave the victim a chance to stop fighting. Moreover, "If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting." (CALCRIM No. 3471.) Taken together, the instructions correctly explained that a defendant who initiated or provoked a fight could not claim self-defense *unless* he unambiguously attempted to stop fighting. Furthermore, if the victim responded with such sudden and deadly force that the defendant had no opportunity to withdraw, the defendant could use lethal force in self-defense.

Here, the instructions pursuant to CALCRIM Nos. 3471 and 3472 were not only correct because they properly stated the law, but also because they were supported by substantial evidence. (See *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 ["a trial judge must only give those instructions which are supported by substantial evidence"].) McNeely undoubtedly initiated the physical fight by slapping and tripping Poston. Slapping Poston was particularly disrespectful and provocative. (See 18 RT 1822.) McNeely also took two steps to his left to initially stay close to Poston. He was undoubtedly preparing to continue the fight (but Poston jogged away while pulling out his gun). Thus, the jury could have easily concluded that McNeely tried to provoke a fight. (See 18 RT 1825.) Therefore, the instructions were legally correct; they did not mislead the jury; and they

were supported by substantial evidence. There was no error. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72; *People v. Kelly*, *supra*, 1 Cal.4th at pp. 525–526; *People v. Ponce*, *supra*, 44 Cal.App.4th at p. 1386.)

### D. *People v. Ramirez* Is Distinguishable

In *Ramirez*, the two defendants and another gang member went to an apartment complex in a rival gang's territory to speak to a rival gang member about that gang's harassment. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 944.) The defendants confronted six or seven rival gang members. (*Ibid.*) There was conflicting evidence about who provoked who, but a fistfight broke out. (*Id.* at pp. 944–945.) One of the defendants claimed he saw a rival display a gun. The defendant drew his own gun and fatally shot the rival. (*Id.* at p. 945.) The trial court instructed the jury with CALCRIM Nos. 3471 and 3472. And the prosecutor erroneously argued that, pursuant to CALCRIM No. 3472, the defendants could not claim self-defense under any circumstances because they provoked the fight. (*Id.* at pp. 945–946.)

On appeal, the defendants claimed that the trial court erred by giving that instruction because it deprived them of their self-defense theory. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 944.) The court majority agreed, finding that if the defendants intended to start a non-lethal fight, they had the right to use self-defense when the victims responded with lethal force. (*Id.* at pp. 947–948.)

McNeely contends that *Ramirez* held that CALCRIM No. 3472 conflicted with CALCRIM No. 3471. (MAOB 45.) He is mistaken. First, *Ramirez* acknowledged that CALCRIM No. 3472 "states a correct rule of law in appropriate circumstances" (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947), and thus, for example, "a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance." (*Ibid.*) Here, again, the

jury was properly instructed under CALCRIM No. 3471 that "if [McNeely] used only non-deadly force, and the opponent responded with such sudden and deadly force that [he] could not withdraw from the fight, then [he] had the right to defend himself with deadly force . . . ." (3 RT 832.)

Second, *Ramirez* is distinguishable. In that case, in which the victim pulled out a gun to finish the fistfight that the defendants intended to provoke, the prosecutor repeatedly misstated the law of self-defense and misled the jury by arguing, based on the language of CALCRIM No. 3472, that even if the jury believed the defendants sought to provoke only a fistfight, their intent to use force meant they forfeited any claim of self-defense. (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 943, 945–946.) The *Ramirez* prosecutor repeatedly emphasized that it did not matter whether, under CALCRIM No. 3471, the victim "escalated a nondeadly conflict to deadly proportions." (*Id.* at p. 950.)

In other words, the prosecutor relied on CALCRIM No. 3472 to argue an incorrect theory, i.e., that the defendant *permanently* forfeited his right to act in self-defense because he provoked the fight. The *Ramirez* court properly considered the prosecutor's argument in assessing whether the jury instructions misled the jury. (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 946–947; see *People v. Lucas* (2014) 60 Cal.4th 153, 289, disapproved on another ground in *People v. Romero* (2015) 62 Cal.4th 1, 53.)

The court observed, "The prosecutor highlighted the instruction in closing argument. The prosecutor argued it precluded any claim of self-defense even if defendants only instigated a fistfight." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 946.) "The prosecutor argued *repeatedly* based on the plain terms of this instruction that even if the jury believed defendants sought to provoke only a fistfight, their bare intent 'to use force' as stated in the instruction—even nondeadly fisticuffs—meant they forfeited a claim of imperfect self-defense." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 943,

italics added.) The prosecutor specifically argued that the defendants likely intended to start only a fistfight, but they still had no right to self-defense "in all possible circumstances," including when the victims were armed with handguns and attempted to use them. (*Id.* at pp. 945–946.) Finally, the prosecutor argued, "that whatever defendants claimed occurred, 'it doesn't matter because of that, of [CALCRIM No.] 3472.'" (*Id.* at p. 949.)

Here, on the other hand, the prosecutor argued that McNeely was the initial aggressor, but she never suggested that was the reason he forfeited the right to act in self-defense. Rather, she argued that McNeely lost his right to claim self-defense because he and Poston drew their guns *at the same time*[12] (20 RT 1872, 1893, 1963, 1965) and because McNeely shot at Poston eight times *after* Poston's gun stopped working and after he had turned around and fled (20 RT 1885, 1896, 1966, 1968). Thus, McNeely began the escalation to deadly force at essentially the same time as Poston, and he used deadly force *after* the danger had passed. Therefore, the prosecutor correctly argued that he had no right to claim self-defense. (See *Quach*, *supra*, 116 Cal.App.4th at p. 302.)

Nevertheless, McNeely insists that the prosecutor "argued that Mr. McNeely had no right of self-defense because he was the initial aggressor . . . ." (MAOB 54–55, quoting 20 RT 1884–1885; see also MAOB 55, quoting 20 RT 1888.) However, the prosecutor's argument quoted by

---

[12] As noted above, respondent believes the video showed that Poston drew his gun first. McNeely pulled the gun magazine from his pocket a second later. Because McNeely's view of Poston's gun was blocked by Poston's body, and because McNeely retrieved the magazine in a nonchalant fashion, it seems likely that McNeely did not realize that Poston had already drawn his gun. Obviously, McNeely's retrieval of the magazine was the first step in preparing to use lethal force. Thus, the prosecutor was correct that both men went for their firearms independently and, essentially, simultaneously.

McNeely does not support his assertion. The prosecutor argued that McNeely was the aggressor and he escalated the situation by yelling, gesturing, getting in Poston's face, throwing down a cup, and then slapping Poston.[13] The prosecutor, of course, was correct in her description. Nowhere in appellant's quotation did the prosecutor even mention McNeely's self-defense theory. (See *ibid.*) Nonetheless, immediately after the quote, McNeely asserts, "Thus in arguing that Mr. McNeely was not entitled to claim self-defense . . . ." (MAOB 55.)

McNeely then tries to conflate the prosecutor's argument that McNeely was the aggressor with a passing reference to CALCRIM No. 3472 and her general argument that self-defense did not apply. (MAOB 56, quoting 20 RT 1895–1896.) However, contrary to McNeely's argument, there was nothing improper or misleading about the prosecutor's argument that self-defense could not be contrived. Unlike in *Ramirez*, the prosecutor

---

[13] McNeely argued at trial that he did not want to start a gun fight because his gun's magazine was not in his gun. Therefore, he would be at a disadvantage because he would have to load the magazine gun before he could fire. In fact, that is precisely why McNeely initiated the fight with his hand or fist. The prosecutor's theory was that appellants knew each other was armed and they intended to engage in mutual combat. But since McNeely knew he had to load his weapon before he could use it, he knew he was at a disadvantage if Poston drew first. Therefore, he caught Poston off-guard by slapping and tripping him. McNeely apparently believed that by initiating the fight and putting Poston on the defensive, he could buy himself more time to load his gun. He just did not anticipate that Poston would not fall down and, as Poston regained his balance, he would quickly grab his gun, run a short distance away from McNeely, and immediately fire on him. It also appears that McNeely misjudged the situation because his view of Poston's right hand was blocked by Poston's body, so he did not see Poston grab his gun. That interpretation is further supported by the fact that McNeely did not react as quickly as one would expect if he had seen a gun in Poston's hand. As a result, McNeely thought he had more time than he did, and he did not go to remove the clip from his jacket until Poston was already preparing to fire.

never argued that McNeely forfeited the right to act in self-defense even if Poston was the one who escalated to lethal force. On the contrary, the prosecutor's theory was that McNeely simultaneously pulled out his gun. Because that was the prosecutor's theory, there was no reason or factual basis for her to argue that, if Poston escalated to lethal force, McNeely had no right to respond with lethal force because he was the initial aggressor.

Here, like the trial court in *Ramirez*, the court gave CALCRIM No. 3471, which properly stated the principle that if the defendant starts a fight with nonlethal force, and the victim suddenly escalates by using deadly force, the defendant has the right to use deadly force in self-defense. Unlike the prosecutor in *Ramirez*, the prosecutor did not tell the jury it did not matter whether, under CALCRIM No. 3471, the victims escalated a nondeadly conflict to deadly proportions. (See *Ramirez*, *supra*, 233 Cal.App.4th at p. 950.) This Court presumes the jurors understood and followed the court's instructions under CALCRIM No. 3471 (see *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut that presumption.

Furthermore, in *Ramirez*, defense counsel argued that the defendants had the right to act in self-defense. But their proper argument was undermined by the prosecutor's misleading argument: "Relying on CALCRIM No. 3471, defense counsel argued in closing argument that the lesser charge of manslaughter might apply, but insisted [codefendant] Armando regained a right to defend himself against murder charges if he truly believed Rivera suddenly escalated the fistfight to a gunfight. The prosecutor, however, invoked CALCRIM No. 3472, arguing, '[Y]ou cannot have the princip[le] to mitigate from murder to voluntary manslaughter . . . when you are the one who created the circumstances to begin with. It makes sense. It's fair. It's just. More importantly, it's the law.' The jury's copy of the jury instructions reflects that in reaching its verdict, the

jury circled CALCRIM No. 3472." (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 946–947.)

Here, on the other hand, defense counsels' arguments for self-defense were not improperly undermined by the prosecutor's incorrect representation of the law. Defense counsel specifically argued that, pursuant to CALCRIM No. 3471, McNeely had the right to respond with deadly force because he did not have time to withdraw. (20 RT 1929–1930.) Defense counsel also expressly argued that CALCRIM No. 3472 did not apply because McNeely did not provoke the fight as an excuse to use force. (20 RT 1929–1930.)

Because this Court "presume[s] that jurors are intelligent individuals who are capable of understanding instructions and applying them to the facts of the case before them" (*People v. Hajek* (2014) 58 Cal.4th 1144, 1246), it should find that the jury understood how CALCRIM Nos. 3471 and 3472 complimented each other and applied here. CALCRIM No. 3472 states that an initial aggressor has no right to act in self-defense. CALCRIM No. 3471 explains that an initial aggressor regains the right to act in self-defense when the initial victim escalates to deadly force. The jury could either interpret them as being contradictory or complimentary rules.

A reasonably intelligent jury would not accept that the trial court instructed them with incompatible instructions. Rather, it would consider how it could reconcile the instructions. Obviously, the way to do that is to think of CALCRIM No. 3472 as providing the general rule precluding self-defense for initial aggressors. CALCRIM No. 3471 provides an exception to that rule when certain conditions are met.

As pointed out by the *Ramirez* dissent, our Supreme Court has twice approved the language of CALCRIM No. 3472 as expressed in its predecessor instructions. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 956, dis.

opn., Fybel, J., citing *People v. Enraca* (2012) 53 Cal.4th 735, 761–762 and *People v. Hinshaw* (1924) 194 Cal. 1, 26.) The *Ramirez* dissent also correctly pointed out that CALCRIM Nos. 3471 and 3472 adequately conveyed the state of the law: (*Ramirez*, *supra*, 233 Cal.App.4th at p. 956, dis. opn., Fybel, J. ["The evidence supported the trial court in the instant case instructing the jury with CALCRIM No. 3472 and also with CALCRIM No. 3471, which . . . addresses self-defense in the context of mutual combat or initial aggressors."].)

It is true that *Ramirez* found that the prosecutor was justified in his mistake because he was following the instructions. (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 947–948.) However, instructions are not judged in isolation. One sentence of an instruction, taken out of context, may interpreted incorrectly. While the entire instruction, or several instructions, may be correct when taken together. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.) Moreover, as discussed above, the parties' arguments often make the difference between whether instructions are interpreted correctly. (See *People v. Lucas*, *supra*, 60 Cal.4th at p. 289.) The prosecutor's argument in *Ramirez* was likely to cause the jury to misapply the law. The prosecutor's argument here was not.

It is also true that *Ramirez* found that the misleading instruction pursuant to CALCRIM No. 3472 was not cured by the correct rule of law stated in CALCRIM No. 3471. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 949.) But it based that determination on the fact that "the prosecutor repeatedly emphasized to the jury" that the two instructions did not harmonize, and that CALCRIM No. 3472 forestalled the self-defense provision in CALCRIM No. 3471. (*Id.* at p. 950.) Again, that did not happen here.

In *Ramirez*, the prosecutor not only argued an incorrect interpretation of the law, she argued in rebuttal that defense counsels' proper

interpretation was wrong. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 948.) Again, that did not happen here. Because the prosecutor did not make any misleading arguments, CALCRIM Nos. 3471 and 3472 worked together to convey the correct law, i.e., that McNeely could not provoke a fight and then claim self-defense *unless* he used non-lethal force, Poston responded with lethal force, and McNeely tried to withdraw if possible. (See *Ramirez*, *supra*, 233 Cal.App.4th at p. 956, dis. opn., Fybel, J. ["It appears the majority would modify CALCRIM No. 3472 to do no more than restate principles that *were* given to this jury in the form of CALCRIM No. 3471."].) In sum, this matter is distinguishable from *Ramirez* because that court explicitly based its holding on the *potentially* misleading language of CALCRIM No. 3472 *and* "the prosecutor's forceful argument" to ignore the qualification added by CALCRIM No. 3471. (*Id.* at p. 952.)

Furthermore, this matter is similar to how our Supreme Court handled a potentially misleading instruction on the discretion to impose the death penalty. In *People v. Brown* (1985) 40 Cal.3d 512, reversed by *California v. Brown* (1987) 479 U.S. 538, 543, and *People v. Grant* (1988) 45 Cal.3d 829, the court determined that the instruction was potentially misleading and, in the future, should be clarified. (*Brown*, *supra*, at p. 554, fn. 17.) But for trials that took place before the instruction was modified, the court would evaluate potential error on a case-by-case basis. (*People v. Grant*, *supra*, 45 Cal.3d at pp. 854–855.) In determining whether the instruction misled the jury, the court would consider the totality of the penalty instructions as well as the nature of the arguments made to the jury. (*Ibid.*) In *People v. Grant*, the court concluded that, under the totality of the circumstances, there was no instructional error. (*Id.* at p. 855.) Indeed, it does not appear that the court ever had reason to find that the potentially misleading instruction was erroneous when considered with other penalty instructions.

Likewise, in the present circumstance, it might be good policy to amend CALCRIM No. 3472 so that it is clear, independent of CALCRIM No. 3471, that defendants may, under certain circumstances, regain the right to self-defense when the victim escalates to deadly force. But here, the totality of the instructions on self-defense, as well as the arguments by the prosecutor and defense counsel, were such that it is not reasonably likely that the jury misapplied the law. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.)

**E. Any Error Was Harmless**

McNeely contends that "it is not possible to say that the jury would have rejected his defense if they had been properly instructed." (MAOB 65.) Respondent disagrees. Even if the trial court erred by instructing the jury pursuant to CALCRIM No. 3472, it was harmless because the evidence clearly showed that McNeely did not act in self-defense. Therefore, even if the trial court had not instructed the jury with CALCRIM No. 3472, the jury would have still found McNeely guilty of attempted murder and murder.

McNeely's defense theory was that he had the right to shoot Poston in self-defense because Poston unnecessarily and illegally elevated the confrontation to lethal force. McNeely's argument fails for three reasons. First, as the prosecutor argued, appellants engaged in mutual combat and thereby forfeited any claim of self-defense. (See CALCRIM No. 3471; 3 CT 831–832.)

Second, McNeely went for his gun magazine before Poston shot him, so Poston did not elevate to lethal force unilaterally. McNeely contends that his hands were empty when Poston began to shoot him. (MAOB 16–17.) That is true to a point. Camera 11 shows that McNeely had his hands to his side after he slapped and tripped Poston. (Exh. 8.) However, when the view switches to camera 13, it shows that McNeely reached into his

pocket and removed his gun magazine a fraction of a second before Poston shot him. (Exh. 8; see fn. 4, *supra*.) Therefore, the jury could have found that McNeely forfeited his right to claim self-defense when he went for his gun magazine in preparation for using his gun.

Third, and most importantly, McNeely did not have the right to use deadly force in self-defense *after* the danger had passed. "The right to use force in self-defense or defense of another continues *only as long as the danger exists* or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." (CALCRIM No. 3474, italics added; 3 CT 833; see *People v. Pinholster*, *supra*, 1 Cal.4th at p. 966 [the right of self-defense is limited to the use of such force as is reasonable under the circumstances and does not extend beyond the time of real or apparent danger]; *People v. Lucas* (1958) 160 Cal.App.2d 305, 310 [measures of self-defense cannot continue after the assailant is disabled]; *People v. Keys* (1944) 62 Cal.App.2d 903, 916 [self-defense is no longer justified when the danger has passed and is no longer imminent].)

Here, the video and other evidence clearly showed that Poston's gun ran out of bullets or jammed. (Exh. 8.) Therefore, he no longer posed a threat of death or great bodily injury. (13 RT 758; 15 RT 973; 18 RT 1550–1551.) Moreover, Poston turned around and ran away before McNeely fired eight bullets at his back. Because McNeely was no longer in danger, he no longer had the right to use deadly force in self-defense. Therefore, even if the trial court had not instructed the jury with CALCRIM No. 3472, the jury still would not have found that McNeely reasonably or unreasonably believed he needed to shoot Poston to protect himself. Accordingly, any error was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Quach*, *supra*, 116 Cal.App.4th at p. 303; *Ramirez*, *supra*, 233 Cal.App.4th at p. 953.)

## III. McNeely's Trial Counsel Was Not Ineffective for Failing to Object to CALCRIM No. 3472 (McNeely's Argument III)

McNeely claims his trial counsel provided ineffective assistance because, as discussed in Argument II, he did not object to the instruction pursuant to CALCRIM No. 3472. (MAOB 64–66.) But as previously discussed, the instruction was proper when read along with CALCRIM No. 3471. So there was no basis for trial counsel to object. Moreover, the instruction was supported by substantial evidence that McNeely intended to provoke a fight. It was a certainty that, by slapping and tripping Poston, Poston would retaliate in some way. Moreover, McNeely showed his intention to use Poston's response as an excuse to use force when, less than two seconds after striking Poston, McNeely reached for his gun magazine. (Exh. 8.) Therefore, the instruction was legally correct and applicable, and trial counsel's failure to object did not fall below professional norms. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687; See *People v. Price* (1992) 1 Cal.4th 324, 387 [counsel not ineffective for failing to make futile objections].)

Likewise, for the reasons discussed in Argument II-E, any deficient performance was not prejudicial. First, it is unlikely the trial court would have agreed to omit CALCRIM No. 3472 if defense counsel had objected. After all, even *Ramirez* acknowledges that the instruction 3472 "states a correct rule of law in appropriate circumstances." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.)

More importantly, it would have made no difference in the verdicts if the trial court had omitted CALCRIM No. 3472 or modified it to make it clearer that, even if McNeely was the initial aggressor, he could use deadly force in self-defense if Poston elevated the fight to deadly force first. CALCRIM No. 3474 still required that the jury find that McNeely did not

act in self-defense if the danger had already ceased to exist. (See 3 CT 833.) It was clear from the video that was the case. McNeely fired eight bullets at Poston's back after Poston's gun stopped working and after Poston had turned and fled. Therefore, McNeely did not receive ineffective assistance because it is not reasonably probable McNeely would have obtained a more favorable result if the trial court had omitted or modified CALCRIM No. 3472. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 693, 696.)

## IV. THE TRIAL COURT PROPERLY EXCLUDED POSTON'S PRIOR ARRESTS FOR POSSESSING MARIJUANA FOR SALE (MCNEELY'S ARGUMENT IV)

McNeely contends that "the trial court's ruling prohibiting him from presenting evidence of Mr. Poston's background and history of possessing marijuana for the purpose of sale in the very neighborhood where the charged crimes in this case took place denied him his Sixth Amendment right to confront and cross-examine Mr. Poston, and thus also denied him his right to due process of law under the Fourteenth Amendment." (MAOB 67–68.) According to McNeely, "Poston had a strong motive to shoot Mr. McNeely[] in order for Poston to maintain dominance of the marijuana dealing activity in the area where the shooting occurred." (MAOB 76.)

Respondent disagrees. Evidence that Poston was arrested (but not convicted) for possessing marijuana for sale four, 17, and 18 years earlier did not come close to proving that Poston was a drug dealer at the time of the shootings. Likewise, McNeely's assertion that Poston wanted to maintain his drug turf around the gas station was pure speculation. The evidence showed only that *McNeely* possessed methamphetamine and marijuana for sale and tried to sell drugs to people at the gas station—including Poston.

For the same reasons, any error in excluding the evidence of remote arrests was harmless because that evidence would not have proven that Poston was a drug dealer who was protecting his turf. And even if it did, that would have only helped the prosecutor prove appellants were rival drug dealers who engaged in mutual combat, i.e., it would have precluded both appellants' self-defense claims. Likewise, that evidence would not have changed the fact that, regardless of Poston's motive, McNeely started the fight.[14] Nor would it have changed the fact that McNeely did not have a viable self-defense claim because he shot at Poston after all danger had passed.

**A. Standard of Review**

"The overriding rule on review is stated in Evidence Code section 354, subdivision (a): A judgment shall not be reversed by reason of erroneous exclusion of evidence unless a miscarriage of justice is shown and it appears of record that '[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means . . . .' (Evid. Code, § 354, subd. (a).)" (*In re Mark C.* (1992) 7 Cal.App.4th 433, 442–444.)

Relevant evidence is admissible (Evid. Code, § 351) but may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

A claim of erroneous exclusion of admissible evidence is reviewed for an abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) "'A

[14] Tellingly, McNeely moved in limine to exclude as irrelevant evidence of his own possession of marijuana for sale at the gas station since he planned to concede at trial that he was the initial aggressor. (1 RT 44–45; see 7 RT 362–363.)

trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.' [Citation.]" (*People v. Green* (1995) 34 Cal.App.4th 165, 182–183; *People v. Williams* (1997) 16 Cal.4th 153, 213.)

The court's ruling excluding evidence violates due process only if it rendered the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 438–439.) "Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545.)

The erroneous exclusion of evidence is reviewed for harmlessness under the state standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Welch* (1999) 20 Cal.4th 701, 749; see also *People v. Cudjo* (1993) 6 Cal.4th 585, 611.) The exclusion of evidence that violates the federal constitution is subject to the *Chapman* harmlessness standard. (*Neder v. United States* (1999) 527 U.S. 1, 18.)

**B. Procedural History**

The prosecutor moved, in limine, to impeach Poston with eight felony convictions including a 1999 conviction for the sale of a controlled substance and a 2003 felony conviction for possession of cocaine base for sale. She also sought to impeach Poston with nine acts involving moral turpitude, including possession of a controlled substance for sale in 2005 and possession of marijuana for sale in 1995, 1996, and 2009. (2 CT 504–506.)

Prior to the opening of evidence, McNeely made an oral motion to disclose a confidential informant. (11 RT 530.) According to McNeely,

someone gave information that Poston was trying to take over the territory around the shooting for drugs sales. McNeely argued that if he could call a witness who would testify that Poston was "selling drugs in the area of Seminary and MacArthur, that completely undermines his [Poston's] self-defense claim . . . ." The trial court deferred its ruling. (11 RT 531, 533.)

Later, during the prosecutor's case, McNeely argued that the confidential informant might have information about what Poston was doing at the gas station and why he shot McNeely. (14 RT 902.) McNeely argued the confidential informant might be able to indicate that Poston was trying to take over the territory at Seminary Avenue and MacArthur Boulevard. (14 RT 905.) McNeely argued it was irrelevant that the confidential informant was not a percipient witness; he might have information about Poston's motive, why he was hanging out at the gas station, and why he was armed. (14 RT 906.)

A little later, the trial court noted for the record that it had held an in camera meeting. It found the confidential informant had no personal knowledge that Poston used to loiter in the area or was trying to take over drug territory. (17 RT 1270.) The trial court denied the motion to disclose the confidential informant because he did not have information that would lead to exoneration. (17 RT 1271.)

Oakland Police Officer James Gantt testified, "“McNeely was in the left rear passenger door area. He appeared to have a baggie, a plastic sandwich baggie, containing some type of narcotics . . . . When Mr. Poston came over, they appeared to have a brief conversation . . . . [McNeely] then appeared to be digging in the bag, then actually tr[ied] to show Mr. Poston what he had in the bag. It's going to be my opinion that a narcotics transaction did not take place, for whatever reason." (16 RT 1090.)

After Poston completed his direct testimony, the prosecutor sought permission to use the three instances of possessing marijuana for sale to

impeach Poston and to explain "how this escalated to where it was." (18 RT 1568.) When McNeely said, "'You're not from Seminary'" it was "absolutely [a] throw-down challenge." "[I]t goes to the issue of implied malice, the fact that they're both armed, the fact they both knew each other was armed. And that: 'You're not from Seminary,' is an absolute escalation to a gun battle." (18 RT 1569.) McNeely added that he thought Poston's possession of marijuana for sale was relevant to explain why things escalated when McNeely and Poston went to the other side of McNeely's car (to negotiate a drug sale). (18 RT 1569–1570.)

In a written ruling, the trial court tentatively denied the prosecutor's motion to impeach Poston with his three arrests for possession of marijuana for sale. "As of the time of this ruling, the court does not see the relevance of any such prior conduct." (5 CT 1452.)

After Poston testified, McNeely requested permission to ask about Poston's possessions of marijuana for sale, particularly the one in 2009, which was the most recent and took place in the area of the crimes charged. (19 RT 1763–1764.) McNeely's theory was that Poston shot at McNeely because he saw McNeely's marijuana and was protecting his turf. (19 RT 1764–1765.) McNeely argued that, prior to the confrontation, he said something about Seminary to Poston to indicate it was his turf. Poston argued that there was no evidence that he saw McNeely's marijuana, reacted to seeing the marijuana, or that it was somehow related to Poston's prior possession of marijuana for sale. (19 RT 1766.) He added, "The whole videotape, everything I've seen, shows McNeely being the aggressor." (19 RT 1767.)

The prosecutor argued the evidence was admissible for the reasons given by McNeely as well as for impeachment, since selling marijuana was a crime of moral turpitude. The trial court renewed it prior ruling excluding the evidence because the video showed that, "if anybody is selling the dope

here, it's McNeely. I don't know if we can infer, because at a later time they find him with a box of dope, that necessarily Mr. Poston sees it. It seems to be a somewhat of a jump that the Court doesn't feel there is enough of a factual basis upon which to make that, that jump." (19 RT 1767–1968; see 2 CT 505.)

McNeely replied, "I'm not quarreling with the ruling, but . . . it's not that Mr. Poston was out there selling marijuana, it's that he would react in a certain way to someone who he sees that he thinks is doing that, or is doing that." Poston "has [a] motive, other than self-defense, to pull out his loaded .40-caliber weapon and shoot Mr. McNeely."[15] (19 RT 1768.) The trial court renewed its ruling excluding the evidence. (19 RT 1769.)

---

[15] McNeely claims that the exclusion of the marijuana evidence was also error under the Sixth and Fourteenth Amendments of the United States Constitution. However, he did not present an argument based on these provisions below. Generally, that would forfeit his right to do so for the first time on appeal. (*People v. Sanders* (1995) 11 Cal.4th 475, 510.) However, prior to trial, McNeely moved to "federalize" his objections. (2 CT 469–470; 4 RT 147.) The trial court granted the motion as to both appellants. (4 RT 148.) During further discussion, however, the trial court clarified that it wanted the attorneys to "articulate as to what it is so we're clear as to what it is . . . . If you're saying it's a due process objection . . . ." (*Ibid.*) It seems clear that McNeely intended that a state law objection would be also taken as an objection on any corresponding federal ground. But it is not clear that the trial court intended that. When McNeely explained that he would want an Evidence Code section 352 objection to also be construed as a due process objection, the trial court agreed. (*Ibid.*) But then the trial court immediately noted that a different objection did not include a federal basis and suggested that McNeely needed to expressly add that ground. (4 RT 149.) So it does not appear that the trial court intended that objections on state law grounds would preserve any related federal basis. In the current instance, it does not appear that McNeely articulated *any* particular legal ground for admitting the evidence, except, perhaps, relevance to Poston's motive. Therefore, McNeely arguably forfeited this claim by failing to state a federal constitutional ground for his request to admit the evidence. (See *People v. Sanders*, *supra*, 11 Cal.4th at p. 510.)

### C. Poston's Prior History of Selling Marijuana Did Not Prove That He Was a Drug Dealing Rival to McNeely

McNeely contends that the trial court should have allowed him to elicit evidence of Poston's prior arrests for possessing marijuana for sale because (1) "there was amply sufficient evidence in the record to support an inference that Mr. Poston either knew or believed that Mr. McNeely was selling marijuana" (MAOB 73); (2) "if Mr. Poston was also selling illicit drugs—and particularly marijuana—in the Seminary area . . . Mr. Poston would have a motive to shoot Mr. McNeely" (MAOB 74); and (3) "Poston had a strong motive to shoot Mr. McNeely, in order for Poston to maintain dominance of the marijuana dealing activity in the area where the shooting occurred" (MAOB 76).

Respondent concedes that Poston *may* have known that McNeely had marijuana for sale because Poston *may* have tried to buy marijuana from McNeely. (See 19 RT 1797 [Poston's private investigator testified that Bailey told him that she and Poston went to the gas station to buy marijuana].) However, there was no credible evidence that Poston was also engaged in marijuana sales. The evidence of arrests from 17 and 18 years earlier helped prove only that the arrest from four years earlier was not a fluke. Even so, evidence that Poston possessed marijuana for sale in 2009 did not prove that he possessed marijuana for sale at a specific time and place in 2013.

And it was even more speculative that the gas station was Poston's turf and he wanted to protect it from McNeely's encroachment. The fact that the 2009 arrest occurred near the gas station did not prove that Poston still sold marijuana in that area. And it certainly did not prove that he was a big time drug dealer who could maintain his own turf and exclude others, presumably including gangs. Indeed, the fact that Poston was only arrested—but not convicted—for possessing marijuana for sale suggested

that he was not much of a drug dealer and unlikely to be the sort to control territory. Moreover, Bailey initially admitted that she and Poston went to the gas station to buy marijuana for personal use; that suggested that Poston was not dealing marijuana at that time. (19 RT 1797; see 18 RT 1401, 1405, 1426 [Bailey testified they went to the gas station to buy Backwoods cigars (which were commonly used as rolling paper for marijuana)]; 18 RT 1535–1537 [Poston testified to the same].)

Not only did the evidence lack probative value, it was prejudicial to Poston. Pursuant to Evidence Code section 352, the probative value of evidence of prior conduct to prove intent "must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.) Here, the evidence was inflammatory because, when combined with the prior felony convictions, they could put too much focus on Poston's bad character. The evidence could have confused the issue by unjustifiably suggesting that Poston was a rival drug dealer. Moreover, the arrests would have presumably been proven by police reports, but the actual conduct would have been left to speculation. And two out of the three arrests were very remote. Even the most recent conduct was years earlier and lacked probative value. Therefore, the trial court acted within its discretion to exclude the evidence as prejudicial. (See *People v. Vieira*, *supra*, 35 Cal.4th at p. 292.)

Finally, the trial court properly excluded the prior possessions for sale for purposes of impeachment. Poston eventually admitted four felonies, and arrests without convictions were less reliable and less probative. Moreover, two of the arrests were quite remote, occurring 17 and 18 years before the crimes charged. Even the most recent arrest, in 2009, was

somewhat remote and, again, did not even result in a conviction. Therefore, the trial court acted within its discretion to exclude that evidence for impeachment. (See Evid. Code, § 352; *People v. Ledesma* (2006) 39 Cal.4th 641, 705 ["A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"].)

In short, evidence of Poston's prior marijuana dealing was not probative of his drug dealing at the time of the shooting; it did not prove that he was trying to protect his drug turf from McNeely; it was prejudicial; and it was cumulative for impeachment. Therefore, the trial court did not abuse its discretion by excluding it. (See *People v. Vieira*, *supra*, 35 Cal.4th at p. 292.) For the same reasons, the exclusion of that evidence did not deprive McNeely of any constitutional rights. (See *People v. Partida*, *supra*, 37 Cal.4th at pp. 438–439; *People v. Brown*, *supra*, 31 Cal.4th at p. 545.)

### D. Any Error Was Harmless Because the Evidence Would Not Have Proven That McNeely Acted in Self-Defense

There are at least five reasons why any error in excluding the prior marijuana sales was harmless. First, the evidence that Poston had been arrested for selling marijuana would not have proved he was a drug dealer protecting his turf. As discussed above, remote arrests for possessing marijuana for sale did not prove that Poston was a drug dealer at the time of the crimes charged; would not have proved that the gas station was his turf; and would not have proved that the fight was about turf. Therefore, even if the evidence had been admitted, it would not have helped McNeely prove he acted in self-defense.

Second, even if the evidence somehow convinced the jury that Poston had the motive to protect his turf, that would have only supported the prosecutor's theory that appellants engaged in mutual combat. The prosecutor argued that the evidence showed Poston was a drug dealer and when McNeely said, "'You're not from Seminary'" it was "absolutely [a] throw-down challenge." "[T]hey both knew each other was armed. And that: 'You're not from Seminary,' is an absolute escalation to a gun battle." Therefore, the excluded evidence would have actually helped disprove McNeely's (and Poston's) self-defense claims. (See CALCRIM No. 3471.)

Third, even if the evidence would have convinced the jury that Poston was still selling marijuana, it would have still believed that *McNeely* was the one who was protected his turf and started the fight. The evidence showed that McNeely had substantial marijuana packaged for sale, as well as several pills of methamphetamine. A video showed that, prior to meeting with Poston, McNeely approached several people at the gas station and tried to sell them drugs. (See 19 RT 1767.) And Poston attempted to buy drugs from McNeely, which was hardly the act of a rival drug dealer.[16] Another video showed that McNeely was agitated, paced around, threw a cup on the ground, got up close to Poston's face, and slapped and tripped Poston. (Exh. 8; see 19 RT 1767 [at hearing on admitting evidence, Poston argued, "The whole videotape, everything I've seen, shows McNeely being the aggressor."].)

[16] Poston testified that he bought "mollies" (MDMA) from McNeely. (18 RT 1539.) McNeely claims "there was no evidence of the existence of any such drug either in Poston's possession or in Mr. McNeely's possession or in Mr. McNeely's car." (MAOB 74.) However, Poston's testimony was evidence. More importantly, there was testimony that methamphetamine pills, like the ones possessed by McNeely, were often sold as and mistaken for mollies. (15 RT 1058–1059; see 7 RT 362.)

McNeely contends he reasonably argued at trial that "Poston had a strong motive to shoot Mr. McNeely's, in order for Poston to maintain dominance of the marijuana dealing activity in the area where the shooting occurred." (MAOB 76.) However, McNeely never explains why, if Poston had such a strong motive, he stood around passively while McNeely acted aggressively. Nor does he explain why Poston's purported motive was relevant even though McNeely conceded that he initiated the fight by slapping and tripping Poston. (See 1 RT 44.) Therefore, because McNeely was the initial aggressor, and—unlike Poston—certainly was a drug dealer, evidence that Poston was potentially McNeely's rival could have only helped show that *McNeely* initiated the fight to protect *his* territory.

Fourth, evidence of Poston's purported motive would not have changed the fact that McNeely shot at Poston after Poston's gun became inoperable; after Poston had turned and fled; and when McNeely was no longer in danger. (Exh. 8.) Thus, regardless of whether Poston's motive was mutual combat over drug turf, or retaliation for being slapped and tripped, the proffered evidence would not have proven that McNeely acted in self-defense when he shot at Poston after he had already turned around and fled. (See CALCRIM No. 3474.)

Finally, evidence that Poston was *arrested* for possession of marijuana for sale three times many years earlier would not have undermined Poston's credibility any more than had already been done. Poston had already been impeached with four felony *convictions* (18 RT 1517–1519), and he lied so blatantly in his testimony (see Argument VI-D) that the excluded evidence could not have made him appreciably less credible. Therefore, it is not reasonably probable that McNeely would have obtained a more favorable result if the trial court had admitted evidence of Poston's prior arrests for possession of marijuana for sale. (See *People v. Welch*, *supra*, 20 Cal.4th at p. 749.) Likewise, even if the alleged error

somehow violated McNeely's federal constitutional rights to confrontation and due process, it was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Neder v. United States*, *supra*, 527 U.S. at p. 18.)

## V. Poston's Murder and Attempted Murder Convictions Were Supported by Substantial Evidence (Poston's Argument I)

Poston contends that his "convictions of murder and attempted murder violate due process and should be reversed because they are not supported by sufficient evidence; no rational juror could have found proof beyond a reasonable doubt that Poston did not act in self-defense or in the heat of passion on adequate provocation, nor that he initiated a chain of events which proximately caused Fluker's death." (PAOB 58.) Respondent disagrees.

The video showed that Poston responded to McNeely's nonlethal slap and trip with lethal force. By doing so, Poston forfeited his right to claim self-defense. Likewise, there was substantial evidence that appellants engaged in mutual combat which precluded using self-defense as a defense. There was also substantial evidence that Poston did not act out of heat of passion. The jury could reasonably find that being slapped and tripped was not sufficient provocation to cause a person of average disposition to feel such passion that he would resort to lethal force. And, again, the jury could have rejected the defense of provocation because appellants engaged in mutual combat. Finally, there was substantial evidence that Poston committed provocative act murder. The video showed that Poston shot at McNeely 10 times and his bullets struck McNeely six times. The jury could reasonably find that shooting McNeely was a provocative act; that Poston knew that McNeely was armed; and that Poston knew that shooting McNeely would produce a life-threatening response.

### A. There Was Substantial Evidence That Poston Did Not Act in Self-Defense

Poston contends that the evidence proved that he acted in self-defense and there was no evidence that he and McNeely engaged in mutual combat. (PAOB 63–65.) Respondent disagrees.

To evaluate a claim of insufficiency of the evidence, this Court "examine[s] the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." (*People v. Lewis* (2001) 25 Cal.4th 610, 642.) This Court does not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Second degree murder is the unlawful killing of a human being with malice aforethought, which can be either express or implied. (§§ 187, subd. (a), 188.) Express malice is the intent to unlawfully kill. (*People v. Perez* (2010) 50 Cal.4th 222, 233, fn. 7.) Malice is implied "when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

"Self-defense requires an actual and reasonable belief in the need to defend against an imminent danger of death or great bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) If, however, the killer actually, but unreasonably, believed in the need to defend him or herself from imminent death or great bodily injury, the theory of 'imperfect self defense' applies to negate malice. (*Ibid.*) The crime committed is thus manslaughter, not murder. (*Ibid.*)" (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261.)

Respondent agrees with Poston's trial testimony that McNeely slapped and tripped him. (18 RT 1545–1546; 19 RT 1730–1731; Exh. 8.) Citing his testimony from trial, Poston goes on to claim that "as he got up from the ground, he saw McNeely reach inside his jacket." (PAOB 62, citing 18 RT 1545–1546, 1561 [Poston testified he looked over his shoulder and saw McNeely reaching for his gun].) "Poston thought he was going to get shot and feared for his life." (PAOB 62.) "He pulled out his gun and started shooting . . . ." (PAOB 63.) According to Poston, this was a "textbook case of self-defense." (PAOB 63.) However, the video shows that Poston's account is inaccurate.

Contrary to Poston's version, the video shows that Poston did not fall down—though he may have lightly touch the ground with his hands. More importantly, he did not look over his shoulder and he did not see McNeely reach into his jacket before he reached for his own gun. (Exh. 8.) The view from camera 11 shows that, after initially stumbling, Poston grabbed his gun from his right waistband and jogged forward. At the same time, McNeely took two steps laterally to his left to try to stay close to Poston. *McNeely's hands remained at his sides*.

It was not until the view switched to camera 13 that McNeely began to reach for the gun magazine in his inside left jacket pocket. However, before he did so, Poston's head briefly passed by and then he briefly went off screen. Then Poston's hand was raised into view and he started firing his gun. McNeely reached into his jacket pocket a fraction of a second before Poston began shooting. Taken together, it is clear that Poston took out his gun first. Moreover, Poston started shooting so soon after McNeely reached into his pocket that he must have decided to shoot before McNeely actually did so. Further, Poston could not pull out his gun and then claim self-defense when McNeely responded by reaching for his. (See *People v. Enraca*, *supra*, 53 Cal.4th at pp. 761–762.)

Poston contends that camera 11 showed that, after McNeely punched or slapped him and tripped him, he fell "backwards with both hands on the ground." (PAOB 37, 62.) In fact, the video showed that Poston stumbled *forward* and probably lightly touched the ground with both hands. More importantly, Poston ignores the fact that he immediately regained his balance, and before he straightened up, he grabbed his gun with his right hand. (Exh. 8.) At trial, Poston claimed he reached for his camera which had swung on its strap to the right side of his body. (18 RT 1539, 1561; 19 RT 1729, 1735.) However, the video shows that Poston's camera was still on the left side of his body. (Exh. 8; see 19 RT 1729; 20 RT 1904–1905.)

Poston claims that "camera 13 shows McNeely reaching inside his jacket with his right hand as Poston gets up . . . . McNeely has what appears to be a gun in his right hand before Poston fires his first shot." (PAOB 38–39, 62 & fn. 4, citing Exh. 8 at 10:12:33–34 p.m.) Respondent agrees that McNeely reached into his left jacket pocket, but Poston had already drawn his gun—as seen on camera 11. Moreover, McNeely pulled out the magazine—not the gun—a small fraction of a second before Poston fired his first shot. (Exh. 8.)

Respondent believes that the interval between McNeely taking out the magazine, and Poston firing the shot, was too short for Poston to have seen and processed what McNeely had retrieved. Thus, Poston may have fired his gun because he had already decided to do so after the slap. Or he may have fired his gun because he saw McNeely reach into his pocket. But he did not fire his gun because of what he may have seen pulled from McNeely's jacket pocket.

Of course, the jury could have determined that Poston reasonably believed that McNeely was reaching for a gun. However, Poston provoked that response by pointing his gun at McNeely first. The jury could have also reasonably believed that Poston made up his mind to shoot McNeely

when he grabbed his own gun. In that case, it could have determined that Poston did not think he faced imminent harm; he just wanted to shoot McNeely for slapping and tripping him. Moreover, the jury could infer from the fact that Poston fired 10 shots, and wanted to fire more, that he intended to kill McNeely—not just defend himself. Indeed, if Poston merely wanted to defend himself, he could have stopped firing after he shot McNeely two or three times and could have told McNeely to surrender. Instead, he fired every bullet he could. Thus, the jury could determine that Poston used more force than was reasonable and, therefore, self-defense was not available to him. (See CALJIC No. 5.31 [Assault with Fists—When Use of Deadly Weapon Not Justified]; CALCRIM No. 505; 3 CT 831, 836.) Alternatively, the jury could have determined that Poston saw that McNeely pulled a nonlethal gun magazine from his pocket and he decided to shoot McNeely anyway. Therefore, substantial evidence supported the attempted murder conviction. (*People v. Lewis*, *supra*, 25 Cal.4th at p. 642.)

There was yet another related way that the jury could have properly found that Poston did not act in self-defense. The prosecutor repeatedly argued that appellants engaged in mutual combat. (20 RT 1865, 1872, 1963, 1965; see 18 RT 1569 [at a hearing the prosecutor argued that when McNeely said, "'You're not from Seminary'" it was "absolutely [a] throw-down challenge." "[I]t goes to the issue of implied malice, the fact that they're both armed, the fact they both knew each other was armed. And that: 'You're not from Seminary,' is an absolute escalation to a gun battle."].)

Pursuant to CALCRIM No. 3471, the trial court instructed the jury, "A fight is mutual combat when it began or continued by mu[t]ual consent or agreement." Appellants had the right to claim self-defense only if they tried to stop fighting. (See 3 CT 831–832.) Here, of course, neither

appellant tried to stop fighting. So the question was whether they made an express or implied agreement to engage in a mutual fight. "'[M]utual combat' means not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045, italics omitted.) Here, the jury could find that appellants engaged in mutual combat for the reasons discussed in Argument VII-B. In short, appellants talked for a little while beforehand; they had some type of disagreement over a drug transaction; they knew each other was armed; and they jockeyed with each other to see who would strike first. McNeely slapped and tripped Poston to get an advantage in the fight. And Poston knew exactly how he was going to respond—by immediately taking out his gun.

A claim of self-defense normally raises questions of fact for the jury to resolve. (*People v. Davis* (1965) 63 Cal.2d 648, 655.) "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 379, abrogated on another point by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) Here, substantial evidence supported the jury's rejection of Poston's self-defense claim. Therefore, this Court should not find that Poston acted in self-defense as a matter of law. (See *ibid.*)

Finally, there was also substantial evidence that Poston did not act in unreasonable self-defense. "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because

the defendant actually but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771; *People v. Rios* (2000) 23 Cal.4th 450, 460–461.) The prosecution bears the burden of disproving imperfect self-defense beyond a reasonable doubt. (*Rios*, at pp. 460–462.) The test on appeal, however, is whether substantial evidence supported the verdict, not whether the evidence proved guilt beyond a reasonable doubt. (*People v. Wright* (1985) 39 Cal.3d 576, 592.)

Here, there was sufficient evidence for the jury to find that Poston did not act in the unreasonable but good-faith belief that he was in imminent danger of death or great bodily injury. Again, the jury could have determined from the evidence that Poston and McNeely had an implicit agreement to engage in mutual combat. The jury could have concluded that Poston decided to shoot and kill McNeely the moment McNeely slapped and tripped him. The jury could have even found that Poston thought McNeely was reaching for his gun before Poston shot him. But that did not matter because Poston took out his gun first. Poston could not provoke McNeely to take out his gun in self-defense and then use that as an excuse to shoot McNeely in self-defense. Thus, there was substantial evidence to support the jury's determination that Poston did not act in imperfect self-defense. (See *People v. Wright*, *supra*, 39 Cal.3d at p. 592.)

### B. There Was Substantial Evidence That Poston Did Not Act under the Heat of Passion

A defendant who commits an intentional unlawful killing which would otherwise be murder is guilty only of voluntary manslaughter if he acted out of provocation, i.e., in a sudden quarrel or heat of passion. Provocation involves a mental state which negate malice, an essential element of murder. (*People v. Rios*, *supra*, 23 Cal.4th at pp. 460–461.)

The prosecution bears the burden of disproving provocation. (*Id.* at pp. 460–462.)

"The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective. [Citations.] '[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless . . . the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable [person].' [Citation.]" (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

Poston contends that "no rational juror could have found proof beyond a reasonable doubt that he did not act in the heat of passion on adequate provocation." (PAOB 71–72.) Poston also asserts, "McNeely insulted, ranted, and yelled right in Poston's face, calling him a 'bitch ass nigger,' while gesturing aggressively, punched or slapped Poston in the face, knocking him to the ground, then pulled out a handgun . . . . McNeely's extreme provocation caused him to act from passion—fear for his life—which negated malice." (PAOB 74.) But contrary to Poston's argument, the video shows that Poston went for his gun first. Therefore, Poston's claim that his passion and fear for his life was stoked by seeing McNeely's handgun is unsupported.

In fact, Poston reached for his gun immediately after being slapped and tripped. The jury could have determined that Poston decided to shoot and kill McNeely at that moment. Indeed, Poston started shooting McNeely so soon after McNeely reached into his pocket that he must have decided to do so before McNeely took out the magazine. Contrary to Poston's argument that the evidence showed provocation as a matter of law, the jury could have reasonably determined that a person with an average disposition would not have decided to shoot and kill someone merely because that person slapped and tripped him. (See CALCRIM No. 570; 3

CT 845; see CALCRIM No. 522; 3 CT 840.) Rather, Poston made a calculated decision to shoot McNeely because he had disrespected him—either because he refused to offer his drugs at a reasonable price in the failed drug transaction, or because McNeely talked to him condescendingly in front of his girlfriend, or because of the slap. Therefore, the jury could have reasonably concluded that Poston did not act out of passion. (See *People v. Padilla*, *supra*, 103 Cal.App.4th at p. 678; see *Mullaney v. Wilbur* (1975) 421 U.S. 684, 701–704 [as long as the jury is instructed that the prosecution bears the burden of proving that the defendant did not act in a heat of passion or in imperfect self-defense, the defendant's federal due process rights are satisfied].)

### C. There Was Substantial Evidence That Poston Committed a Provocative Act

Poston contends that his second-degree provocative act murder conviction was not supported by substantial evidence. (PAOB 74–83.) Respondent disagrees.

"To constitute the actus reus of provocative act murder, the defendant must commit an act that provokes a third party to fire a fatal shot. The mens rea element is satisfied if the defendant knows that his or her provocative act has a high probability—not merely a foreseeable possibility—of eliciting a life—threatening response from the person who actually fires the fatal bullet. [Citations.]" (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 582.) "The prosecution must establish that the defendant committed a provocative act." (*Ibid.*, fn. omitted.)

"Unless the defendant's conduct is sufficiently provocative of a lethal response, it cannot support the finding of implied malice necessary for a verdict of guilt on a charge of murder. [Citations.] Thus, a central inquiry in determining a defendant's criminal liability for a killing committed by a resisting victim is whether the defendant's conduct was sufficiently

provocative of lethal resistance to support a finding of implied malice. [Citations.]

"The prosecutor must also establish that the defendant's conduct proximately caused the killing. Courts use traditional notions of concurrent and proximate cause in order to determine whether the killing was the result of the defendant's conduct. [Citations.] To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical. [Citations.]

"The timing of the events is critical. By necessity, the provocative act must occur before a victim may make a lethal response. [Citation.] There may be more than one act constituting the proximate cause of the killing. [Citations.] If the defendant commits several acts but only one of them actually provoked a lethal response, only that act may constitute the provocative act on which culpability for provocative act murder can be based. [Citations.] When the chain of causation is somewhat attenuated, the jury decides whether murder liability attaches or not. [Citations.]" (*People v. Briscoe*, *supra*, 92 Cal.App.4th at p. 584, fn. omitted.)

Here, Poston contends that there was not substantial evidence that he committed provocative act murder. However, Poston's argument is essentially that he was not liable because he acted in self-defense. (PAOB 74–83.) But for the reasons discussed above, that is not the case. (See CALCRIM No. 560 [Homicide: Provocative Act by Defendant]; 3 CT 841–843.)

Poston compares his case to *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*). However, that case is easily distinguishable. There, the court found that the gang member's insult of a girl associated with another gang was not the proximate cause of a subsequent shooting and subsequent murder. (*Id.* at pp. 863, 872 & fn. 12.) "Defendant was not the initial

aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered." (*Id.* at p. 872, fns. omitted.) Here, of course, Poston shot at McNeely 10 times; he did not merely hurl an insult. And it was McNeely—the person who was shot—who responded. That is far different from *Cervantes*, where someone other than the defendant shot someone, and then someone else killed the victim in retaliation.

Poston also contends, "McNeely's deliberate, felonious, retaliatory shooting, not acting in concert with Poston, was an independent intervening cause, cutting off Poston's liability for Fluker's murder." (PAOB 83.) However, a retaliatory shooting is precisely the type of response that the provocative act doctrine is intended to punish. Indeed, "The provocative act murder doctrine has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct . . . ." (*People v. Certvantes*, *supra*, 26 Cal.4th at p. 867.) Poston offers no authority for the proposition that the immediate retaliation by the person the defendant shot is an independent or intervening cause. Thus, there was substantial evidence that Poston provoked a foreseeable lethal response. (See *People v. Briscoe*, *supra*, 92 Cal.App.4th at p. 582.)

## VI. The Trial Court Properly Admitted Poston's Admissions Regarding Pimping and Prostitution (Poston's Argument II)

Poston contends, "The trial court abused its discretion in admitting extensive, inflammatory evidence of Poston's out-of-court statements regarding pimping and prostitution to impeach his credibility, violating due process and requiring reversal." (PAOB 84.) Poston is mistaken. The evidence was admissible for impeachment because pimping is a crime of moral turpitude. The evidence was proven reliable because Poston corroborated his pimping activity in his testimony. And the evidence was more probative than prejudicial because it was recent; Poston lived with his prostitute, Brianna Howard, while he was on the run from law enforcement; and it shed light on how Poston may have influenced the testimony of Poston's girlfriend, Tamena Bailey—appellant's main witness beside himself. Moreover, any error was harmless because the evidence was minor; Poston's testimony was impeached with four felony convictions (18 RT 1517–1519) as well as the transparency of his own false testimony; and the jury certainly based its verdicts on what it saw in the video of the shooting.

### A. Procedural Background

The prosecutor moved in limine to impeach Poston with eight felony convictions and nine acts involving moral turpitude. (2 CT 504–506.) She also sought to admit Poston's jail writings as admissions. One said, "'I'm a pimp . . . I'm a motherfuckin hitter.'" (2 CT 501–502.)

In order to impeach Poston's credibility, McNeely moved to admit Poston's jail calls. (1 RT 181–184.) Poston objected to admitting evidence of his pimping: "[A]ll this whore stuff that's later contained in the reportings is just prejudicial and cumulative . . . . [¶] There's plenty of impeachment materials in terms of Mr. Poston's veracity available without

getting into trials . . . . [H]e's never been arrested or convicted of pimping or pandering that I am aware of. I think that's just getting into trials within a trial over—over nonsense, piling it on where he's saying whore, bitch, and stuff like that in conversations." (5 RT 185.)

Later, McNeely renewed his request to admit Poston's jail calls for impeachment. (8 RT 396.) Each call dealt with Poston referring to people as hoes and bitches and might show he was a pimp. McNeely argued that when Poston was arrested in June, there was a woman in the car with him. Poston admitted in two jail calls that he was pimping her. (8 RT 397.) McNeely also argued that Tamena Bailey was with Poston at the Valero Gas Station and she might have been prostituting for him. (8 RT 398.) McNeely sought to admit Poston's calls from June 16 and 22, 2013, in which he referred to hoes and bitches. Poston argued he was "not on trial for being a pimp. This is obviously just an attempt to create some sort of prejudice in terms of an emotional reaction . . . ." (8 RT 399.) Poston continued, the fact "that he alludes to being a pimp, so therefore he's a pimp, so therefore he controls Ms. Bailey and, therefore, Ms. Bailey is lying, is very tenuous." McNeely reasserted that pimping was a crime of moral turpitude and it was admissible for impeachment. The prosecutor also argued it was admissible to impeach both Poston and Bailey. (8 RT 400.) The trial court deferred its ruling. (8 RT 401.)

During a break from Bailey's testimony, the prosecutor noted the trial court never made a final ruling regarding the admissibility of evidence that Poston was pimping. The trial court indicated the matter could be taken up when Poston testified. (18 RT 1443.)

After Poston completed his direct testimony, the prosecutor again raised the pimping issue. She argued, "I think that is relevant on two grounds: Number one, . . . Mr. Poston has left us with the impression that he is completely legitimate, and he is not. Pimping also comes with

intimidation, and guns, and goes directly to a lack of self-defense." (18 RT 1574–1575.) "And it also is relevant on [the] secondary ground to whether Tamena Bailey was under any sort of influence, different from just being his girlfriend, to testify falsely on his behalf." (18 RT 1575.)

The trial court agreed, "[H]e's indicated he has a legitimate life and lifestyle, and business enterprises." (18 RT 1576.) The trial court ruled that no rap lyrics about pimping would be admitted. Poston's jail calls admitting he was a pimp and that he put someone on the street was admissible. (18 RT 1579.) The trial court deferred its ruling on a letter to Poston's brother regarding pimping. Poston's phone calls to his mother indicating Bailey would say whatever Poston told her to say was admissible. (18 RT 1580.)

McNeely moved to admit jail calls in which Poston referred to his "'Ho bitch,' and making money off of her, and how she's his pocket book." (18 RT 1581.) He also sought permission to admit four or five phone calls showing Poston beat down Bailey and then built her back up. (18 RT 1581–1582.) The trial court ruled the calls admissible. (18 RT 1595–1596.)

The next day the trial court issued a written order. "The Court . . . having considered the evidence proffered for impeachment, and having considered the interests to be balanced under Evidence Code section 352, finds the confrontation of Mr. Poston with some matters to test his credibility is more probative than prejudicial and rules that the following matters may be explored in cross-examination, as they directly relate to Mr. Poston's credibility . . . .[:] pimping or prostitution activities by women, i.e., Ho-Bitches, dates, tricks, putting money in my pockets, etc." (5 CT 1452.)

During the prosecutor's cross-examination, Poston again testified he was a legitimate businessman. (18 RT 1618.) Poston's testimony about pimping and telling Tamena Bailey what to testify is discussed below.

Prior to deliberations, the trial court instructed the jury pursuant to CALCRIM No. 316 [Additional Instructions on Witness Credibility—Other Conduct]: "If you find that a witness has been convicted of a felony, or committed other misconduct, you may consider that fact only in evaluating [the] credibility of the witness's testimony. The fact of a conviction or other misconduct[] does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." (3 CT 821.)

**B. Standard of Review**

"Pimping and pandering involve the corruption of others. The perpetrator of these offenses encourages, or profits from, the commission of crimes by others. The offenses evidence a 'readiness to do evil' [citation] and are 'extremely repugnant to accepted moral standards.' [Citation.] Accordingly, . . . pimping and pandering are crimes of moral turpitude." (*People v. Jaimez* (1986) 184 Cal.App.3d 146, 148–150.) A prior conviction involving moral turpitude must be evaluated pursuant to Evidence Code section 352. (*Id.* at p. 149.)

Prior misdemeanor conduct involving moral turpitude is also admissible impeachment evidence. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–296, superseded by statute on another point in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459–1460.) The belief is that "[m]isconduct involving moral turpitude may suggest a willingness to lie." (*Wheeler*, at p. 295.) Therefore, such evidence is routinely deemed relevant to credibility determinations, subject to a trial court's broad discretion under Evidence Code section 352. (*Id.* at p. 296.)

"'[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"Ruling under Evidence Code section 352 come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070; see *People v. Waidla* (2000) 22 Cal.4th 690, 714 [abuse of discretion is a ruling """outside the bounds of reason."""]; *People v. Clark*, *supra*, 52 Cal.4th at p. 932.)

**C. The Trial Court Acted within Its Discretion**

Evidence that Poston was a pimp was admissible and probative of Poston's credibility because pimping is a crime of moral turpitude. (See *People v. Jaimez*, *supra*, 184 Cal.App.3d at pp. 148–150.) That evidence was also probative of Poston's control over women, particularly his main witness, Tamena Bailey. Moreover, the evidence was proven to be reliable because Poston essentially admitted that he engaged in pimping—at least on a small scale. In particular, Poston admitted that he wrote a letter

"referr[ing] to the fact that Tamena [Bailey] knew [he] had prostitutes . . . ." (18 RT 1652–1653.) Poston admitted that he wrote a letter to his brother indicating, "'That last weed I gave you came from out a ho ass. She turned a date for two zips and a hundred dollars." (18 RT 1654; see 19 RT 1818 [Oakland Police Lieutenant Tony Jones testified that "zips" were ounces of marijuana, cocaine, and heroin].)

Poston admitted that the prostitute he referred to in the jail call, Brianna Howard, was the same prostitute he stayed with in Los Angeles and was arrested with. Poston admitted that he took care of her in a way that she would be financially beneficial to him. (18 RT 1666.)

Poston claimed that Howard did not earn him enough money to call himself a pimp, but she did earn him some money. Poston lied and claimed he did not know what she did to earn him money. But he acknowledged she went on "dates." (18 RT 1678–1679; see 19 RT 1819 [Oakland Police Lieutenant Tony Jones testified that "turning a date" was when a prostitute had sex with a john].) Moreover, Poston admitted that Howard earned "a thousand here, a thousand there," but disingenuously claimed that—even though they were together in Los Angeles for three months—she did not share the money with him. (18 RT 1679–1680.)

Poston joked to Bailey, "'I should have put you out on the track, ho'ing.'" (18 RT 1691.) When Bailey complained about "a bitch" [probably Howard], he told her "she was on the track ho'ing." (18 RT 1693.) In a jail call to a friend, the friend asked why Poston was "still trying to hold onto her [Howard] for?'" Poston replied, "'Hold onto her, bitch, I ain't holding onto nothing except my mother-fucking pocketbook . . . . I need all she got to offer me . . . . That bitch socking it to my pocket like the Chinese stock market, bitch.'" (18 RT 1758–1759.)

Poston not only admitted that he engaged in pimping activities, that evidence was also relevant to show that Poston used and controlled

women/prostitutes, and that he specifically told Tamena Bailey what to say when she testified. (See 18 RT 1419 [Bailey testified that she called Poston "Daddy" even though he was not the father of her children "[b]ecause he's the Daddy."].) In particular, Poston wanted Bailey to testify that she saw McNeely flash his gun several times because that would help his self-defense claim.[17] (See 18 RT 1470–1471, 1476.) For example, Poston admitted that he lied to Bailey and he told her what to do. He called Bailey "bitch" "all the time." (18 RT 1648; see 18 RT 1457.) Poston told his mother that Bailey would do anything he told her to. (18 RT 1649.) Poston admitted that he and his mother both told Bailey how she had to perform in this case. (18 RT 1650.) On June 29, 2013, Poston told Baily something about "whoopdie." Poston disingenuously claimed that he was referencing his case and not telling Bailey to tell his lawyer she saw McNeely's gun. (18 RT 1686–1687.) On July 3, 2013, Poston told Bailey he mailed her written instructions and she should follow them verbatim. (18 RT 1689–1690.) On July 16, 2013, Poston told Bailey he was going to use her to beat the case. (18 RT 1695–1696.)

In sum, Poston's own testimony confirmed that he engaged in pimping activity and exercised control over Howard and Bailey. Therefore, the jail calls and writings were reliable and probative of both Poston's and Bailey's credibility. In fact, the evidence was particularly probative because it went to the credibility of Poston's two main witnesses. The evidence was also relevant and reliable because it was quite recent.

Moreover, the evidence was not more prejudicial than probative. "The 'prejudice' referred to in Evidence Code section 352 applies to

[17] The video seems to show McNeely reaching deep into his pocket to retrieve his gun. (Exh. 8.) It is doubtful it or the magazine would have been visible even if McNeely opened his coat—which the videos never showed. (See 17 RT 1360–1361; 19 RT 1725.)

evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "'[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Here, the prejudice did not outweigh the probity because asking Poston about a few jail calls and writings did not consume an undue amount of time. It did not confuse or mislead the jury. And the pimping evidence was not more inflammatory than the crimes charged. (See Evid. Code, § 352; *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.) Therefore, the jury would not have found Poston guilty of murder and attempted murder just to punish him for some small-time pimping. (See *People v. Doolin*, *supra*, 45 Cal.4th at p. 439.) Accordingly, the trial court did not abuse its discretion by admitting the evidence. (See *People v. Minifie*, *supra*, 13 Cal.4th at p. 1070.)

**D. Any Error Was Harmless**

Even if the trial court erroneously admitted the pimping evidence, it was harmless because, as noted above, the jury would not have convicted Poston of murder and attempted murder just to punish him for pimping. On the contrary, the jury must have primarily relied on the video which showed the entirety of Poston's role in the crimes charged.

To the extent the evidence should not have been admitted for impeachment, doing so was harmless because Poston's credibility was impeached by other evidence. In particular, Poston's testimony was

impeached with four prior convictions: possession of cocaine base for sale in May 2003; evading the police in May 2007; possession of counterfeit check paper in September 2008; and burglary in November 2010. (18 RT 1517–1519.) Poston admitted it was "wrong" for him, as a convicted felon, to carry a firearm. (18 RT 1531.) Poston also lied to the police about not being at the crime scene. (19 RT 1642–1643; see 19 RT 1683.)

It must have also been crystal clear to the jury that Poston repeatedly lied during his testimony. For example, Poston testified that he and Bailey went to the gas station to buy cigars. (18 RT 1535, 1537.) But Bailey previously told an investigator they went there to buy marijuana. (19 RT 1797.)

Poston testified that after McNeely tripped him, he looked over his shoulder and saw McNeely reaching into his pocket and then he saw that McNeely was holding a gun. (18 RT 1545–1546, 1561–1562.) However, the video shows that McNeely kept his hands at his side while Poston grabbed his gun. Moreover, McNeely did not remove the gun from his jacket pocket until after Poston had fired all 10 shots. (Exh. 8.)

Poston wanted the jury to believe that McNeely pulled his gun out of his left pocket because the video showed that McNeely reached into that pocket first. Accordingly, Poston testified that, before the shooting, McNeely opened his jacket and showed him the gun in his left pocket. (18 RT 1541.) However, the video showed that McNeely pulled the gun *magazine* from his left pocket. He pulled his gun from his right pocket after Poston fired all 10 shots. (Exh. 8.)

Poston testified that McNeely shot Bailey's Lexus's radiator before Poston finished shooting. He also claimed that Bailey had the radiator repaired. (18 RT 1562; 19 RT 1738–1740.) That was also meant to corroborate Poston's theory that McNeely was armed at the same time as Poston. However, the video shows that McNeely pulled out his gun after

Poston finished shooting. And the smoke was from gunfire—not steam from a damaged radiator. Moreover, tellingly, no evidence of the potentially exonerating evidence of the repair to the Lexus was presented.

Poston testified that he tried to shoot McNeely's lower body and right shooting arm because he did not want to kill him. (18 RT 1546–1547; 19 RT 1736–1737.) But McNeely actually suffered wounds to his left shoulder, upper back, and armpit. (13 RT 771.)

Poston testified that he stopped shooting because he saw McNeely hit the ground, not because his gun jammed or ran out of bullets. (18 RT 1548–1549; 19 RT 1743–1744.) "When I seen him fall, I seen that he was incapable of injuring me, so I left." (19 RT 1657.) However, the video clearly shows that Poston continued to try to shoot, and his gun simply did not fire. Moreover, the video shows that Poston ran when he saw McNeely take out his gun and load the magazine. (Exh. 8; see 19 RT 1745 [Poston testified he dropped his gun because he was scared].) Thus, contrary to Poston's claim that he stopped shooting when he felt safe, he ran because he was in danger. If Poston had the ability to fire his gun, that would have been the time to do so.

Poston testified that he grabbed his camera—not his gun—immediately after McNeely slapped and tripped him. (18 RT 1561.) Later, he testified he did not reach for anything. (19 RT 1733.) However, Poston admitted he kept his gun in his right waistband. (19 RT 1719.) And the video shows that the camera remained on the left side of his body when Poston reached for the gun on his *right* hip. (Exh. 8.)

Poston testified that he did not possess the two handguns shown in one of his "Done Did It Live" videos. And they were not real guns because they did not have firing pins. (19 RT 1606.) But even if he did not own those guns, he certainly possessed them sine he admitted he "used" them to make the video. And it was dubious that he really took the trouble to

disable the guns or find guns without firing pins. Indeed, Poston acknowledged that, even if the guns were inoperable, it was still illegal for him to have them. (19 RT 1630.)

Poston acknowledged that he was arrested for possessing guns in 1996, 2000, and 2006. But he claimed he did not actually have the gun or the guns did not work. (19 RT 1608–1609.) That was also dubious.

Poston claimed that he carried a gun because he lived in fear after he was shot in his house. He did not move from the house because he could not afford to. (19 RT 1612, 1614.) But when questioned about the large amount of cash in one of his videos, he answered squirrelly: “Doesn’t have to be mine.” (19 RT 1614.) Likewise, Poston could not explain how he could afford to be on the run for three months. (19 RT 1616.)

Poston testified that he was a legitimate businessman. But he disingenuously claimed that he possessed hundreds of pages of blank check paper when he was arrested because he used the check stubs to write receipts. (19 RT 1618–1619.)

Poston acknowledged that credit card embossing machines, numerous gift cards, stolen identification cards, and lists of account information were found in his house. But he claimed he had nothing to do with any illegal activity that might have been taking place in his house. (19 RT 1620–1624, 1700.) That was dubious.

Poston testified that he dropped his gun while running from the gas station, but he did not recall where. (19 RT 1633.) However, if the gun was still operable, and McNeely was chasing and shooting at him, the last thing he would have done was drop his only means of defense. Moreover, the gun was never found. So it was much more likely that Poston disposed of the gun later.

Even though he described Oakland as a warzone, Poston claimed he did not know that a simple fight could quickly turn to gunplay. (19 RT 1637.) That was not believable.

Poston acknowledged that he earlier testified that McNeely had no reason to "'pull a gun if he wasn't intending to kill me,'" but that did not apply to him because he took out his gun in self-defense. (19 RT 1657.) However, the video showed that Poston pulled out his gun first and, of course, did use it.

Poston began his testimony by saying he was eager to testify because what he did was "justified." (18 RT 1516.) However, on cross-examination, Poston admitted he went on the run because he knew what he did "was wrong." (19 RT 1664.)

Poston denied calling his brother from jail and telling him that he was not at the crime scene. But after listening to the recording, Poston admitted he told his brother he was not there. (19 RT 1682–1683.)

Poston testified that he carried his gun concealed often; went to the shooting range frequently; and he spent five nights a week with Bailey—presumably undressing in the process. But he contended she did not know he carried a gun. (18 RT 1422, 1524; 19 RT 1720–1721.) That was not believable. As the prosecutor theorized, Bailey ran into the gas station market when the argument heated up because she knew that Poston had a gun.

Poston's defense was also undermined by Bailey's lies and evidence that Poston put her up to it. In particular, Bailey testified that she saw McNeely's gun three times while he was talking to Poston. (18 RT 1413.) But that assertion was undermined by evidence that she only mentioned separately seeing McNeely's gun and magazine at the preliminary hearing after she heard testimony that McNeely had the magazine in his jacket pocket. (18 RT 1467–1476; 19 RT 1783–1784, 1797.) Bailey also lied that

she and Poston drove to the gas station to buy cigars. (18 RT 1405, 1426, 1457.) She previously told an investigator they drove there to buy marijuana. (19 RT 1797.) Bailey also lied when she initially testified that she had never met McNeely before the shooting. (18 RT 1458–1460.)

More generally, Poston's defense was premised on the notion that McNeely drew his gun first or simultaneously. (11 RT 525.) Poston also claimed that he did not try to kill McNeely as shown by the fact that he only shot at McNeely's lower body and he stopped shooting once McNeely fell down—not because his gun jammed or ran out of bullets. (11 RT 526.) However, the video showed that Poston drew his gun first, and in response to nothing more than a slap and a trip. Likewise, the video showed that Poston did not voluntarily stop shooting; he continued to try to fire his gun, but it did not work. (Exh. 8.) And Poston did not merely try to wound McNeely by shooting his legs. McNeely suffered wounds to his armpit, shoulder, and upper back.

Finally, any error in admitting the impeachment evidence was mitigated by the instruction that the jury could only use the evidence to evaluate Poston's credibility. (CALCRIM No. 316; 3 CT 821.) This Court assumes the jury understood and followed the law. (See *People v. Lewis* (2001) 26 Cal.4th 334, 390 [appellate court presumes that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions.].)

For all of the foregoing reasons, it is not reasonably probable that Poston would have received a more favorable result if the trial court had excluded the evidence of Poston's pimping activity. (See Evid. Code, § 354; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1099, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919 [erroneous admission of conduct evidence for impeachment is subject to the state test for harmlessness]; *People v. Marks* (2003) 31 Cal.4th 197, 227, 229.)

## VII. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON MUTUAL COMBAT PURSUANT TO CALCRIM NO. 3471 (POSTON'S ARGUMENT III)

Poston contends that there was not substantial evidence that appellants engaged in mutual combat. Therefore, it was error for the trial court to instruct the jury, pursuant to CALCRIM No. 3471 [Right to Self-Defense: Mutual Combat or Initial Aggressor], that defendants who engaged in mutual combat were unable to claim self-defense except in limited circumstances.[18] (PAOB 93–96.) Respondent disagrees.

Poston testified that McNeely showed him his gun. The evidence suggested that McNeely also knew that Poston was armed. Tamena Bailey and Poston testified that McNeely became increasingly hostile and challenged Poston's street credentials by asserting Poston was not from the Seminary neighborhood. Poston could have left the scene, but chose to

---

[18] The instruction pursuant to CALCRIM No. 3471 provided:

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

"3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

"A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (3 CT 831–832.)

stay. That was substantial evidence that the jury could use to infer that Poston wanted to stay and engage in a mutual fight.

Moreover, the video showed that, after McNeely slapped and tripped Poston, Poston immediately drew his gun and McNeely immediately took out his gun magazine to load his gun. That supported the inference that both appellants anticipated and prepared for a gun fight. As Poston's trial counsel conceded, "It's a gunfight." (20 RT 1955.) And after McNeely fired at Poston five times, Poston turned and held out his hands to say he did not want to fight anymore. That suggested they had engaged in a gunfight by mutual agreement and Poston knew he could withdraw from that agreement showing he no longer had a gun. Therefore, the jury could infer that appellants had an implied agreement to engage in mutual combat.

In addition, Poston forfeited this claim by failing to object to the instruction and failing to request that the trial court delete the paragraph about mutual combat. Any error was also harmless because the jury would have ignored the instruction if it was not supported by substantial evidence. That was more likely here because the jury would have understood that the instruction was given, at least in part, for McNeely's benefit since his defense was based on the portion of the instruction that dealt with self-defense by initial aggressors. (See 3 CT 759 [McNeely requested the instruction].)

### A. Poston Forfeited This Claim by Failing to Object

A claim of instructional error is generally not cognizable on appeal if the defendant fails to object to the instruction at trial or fails to request a modification or clarification. (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1097, fn. 29.) When the trial court discusses jury instructions with counsel and defense counsel agrees that evidence supports an instruction and does not object to the court's proposed wording, any claim of error is forfeited.

(*People v. Bolin*, *supra*, 18 Cal.4th at p. 326; see *People v. Farnam*, *supra*, 28 Cal.4th at p. 165.)

Here, the prosecutor and McNeely filed written proposed jury instructions which included requests that the jury be instructed pursuant to CALCRIM No. 3471.[19] (2 CT 475; 3 CT 759.) Poston filed motions to instruct the jury with two unrelated special instructions. (5 CT 1432, 1457.) However, it does not appear that Poston submitted a proposal for general instructions. Nor did Poston file a written motion opposing any instructions.

At the hearing on jury instructions, Poston did not object when the trial court indicated it would instruct the jury with CALCRIM No. 3471 (19 RT 1842), and he did not object when the trial court stated it would give CALCRIM Nos. 3471, 3472, and 3474 on self-defense (19 RT 1850). Therefore, Poston forfeited his claim that it was error to instruct the jury pursuant to CALCRIM No. 3471. (See *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1097, fn. 29.)

Poston does not address the fact that he failed to object—either by claiming it was ineffective assistance or requesting this Court to reach the merits pursuant to section 1259. (See *People v. Andersen*, *supra*, 26 Cal.App.4th at p. 1249 ["Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ."].) Therefore, this Court should also find that he forfeited those alternative claims.[20] (*People v.*

---

[19] McNeely claimed in Argument II that the trial court should not have instructed the jury pursuant to CALCRIM No. 3472 because it conflicted with CALCRIM No. 3471.

[20] If this Court considers and rejects the merits of Poston's claim, respondent requests that it expressly find forfeiture so that Poston is barred from raising this claim in a federal habeas petition.

*Stanley* (1995) 10 Cal.4th 764, 793; *In re Ricky H.* (1992) 10 Cal.App.4th 552, 562 ["an appellate court will generally decline to consider any questions not raised in the opening brief"].)

### B. The Instruction Was Supported by Substantial Evidence

Poston contends that "there was insufficient evidence that Poston expressly or impliedly agreed to fight with McNeely before McNeely struck the first blow." (PAOB 96.) However, circumstantial evidence suggested there was an implied agreement to fight.

"[W]here there is insufficient evidence to support one of the prosecution's theories, it is error for the trial court to instruct on it, and the error requires reversal if it is reasonably probable the jury relied solely on these factually unsupported instructions to convict the defendant."[21] (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

As a preliminarily matter, trial courts usually only instruct juries on legal theories that are supported by substantial evidence. (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 823.) However, when there is more than one defendant, some instructions may not apply to all defendants. Here, McNeely requested the instruction pursuant to CALCRIM No. 3471 because it explained that even if he started the fight, he could act in self-defense if Poston escalated to lethal force and McNeely did not have time to withdraw.

The Bench Notes for CALCRIM No. 3471 provide, in part, "The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense." Therefore, because McNeely

---

[21] Respondent incorporates by reference its Standard of Review summary from Argument II-A.

requested the instruction, the trial court was obliged to give it. (See *People v. Jeffers* (1996) 41 Cal.App.4th 917, 924–925.) To the extent Poston may complain that the instruction was not modified to indicate it applied only to McNeely, he forfeited that claim by failing to request the modification. (See *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1097, fn. 29.)

Moreover, Poston cannot show that the instruction caused the jury to misapply the law (see *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72) because the jury was instructed, pursuant to CALCRIM No. 200, that "some of these instructions may not apply. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (3 CT 802.) Therefore, the jury did not think it had to use the challenged instruction just because it received it.

It is true, as Poston points out (PAOB 94, 98), that the prosecutor repeatedly argued that the fight was mutual combat. However, the jury was still free to agree or disagree with that argument. If it agreed, it could use the challenged instruction. If it did not, it could disregard it pursuant to CALCRIM No. 200. Thus, there is not a reasonable likelihood that the instructions as a whole caused the jury to misapply the law. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.)

In addition to the fact that the jury could disregard any instruction that did not apply to its factual finding, substantial evidence also supported instructing the jury with the section of CALCRIM No. 3471 concerning mutual combat. Contrary to Poston's argument, there was substantial evidence that Poston and McNeely made an implied agreement to fight prior to when McNeely slapped Poston. (See *People v. Ross*, *supra*, 155 Cal.App.4th at p. 1045 ["[A]s used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." Italics in original.].)

Poston testified that, right after McNeely started haranguing him, McNeely showed Poston that he was armed. (19 RT 1541.) Of course, Poston was also armed and McNeely likely was aware of that, too. Poston testified he tried to get away from McNeely and he walked to the driver's door of Bailey's Lexus. McNeely said, "'No bitch ass, ain't even from Seminary.'" Poston replied, "'My father be driving AC Transit since 1976 . . . . Badge number 604. I've been around here for a long time. Seminary bus terminal is at Seminary and San Leandro.'" Poston claimed that he debated getting into the car, but he was afraid McNeely would shoot at him and that would put Bailey in danger. So Poston walked away. (18 RT 1543.)

That testimony showed two things. First, by claiming that he was worried that McNeely would shoot him and Bailey if he got into the car, Poston indicated that he already believed McNeely was likely to use his gun. Second, the jury could infer that Poston chose to not get into the car and drive away, and chose not to walk away from the gas station, because walking away would make him look like a coward and a wimp. So Poston decided to stay and have a gunfight with McNeely.

Oakland Police Lieutenant Tony Jones testified that one of Poston's "Done Did It Live" videos showed that Poston "clearly t[ook] pride in being from Seminary. And for someone to say that you ain't from Seminary, it's disrespectful and insulting." If Poston had simply walked away afterward, "He would be viewed as a punk." (See 19 RT 1814.) Furthermore, according to the rules of the street in Oakland, if a man disrespected another man in front of his girlfriend, and the man just walked away, he would lose credibility with that woman. (19 RT 1822.) If he did so in front of two people he knew (such as the men at the door of the market), he would risk being labeled a punk. Getting up in someone's face

and personal space could also be disrespectful. A man could not just walk away and keep his credibility. (*Ibid.*)

As the prosecutor argued, "You also know that his (Poston's) conduct wasn't justified or mitigated because he had a host of other options. He also could have walked away. Maybe that's not what you do in the Seminary area, or on the streets of Oakland, but reasonable people, that's an option, you walk away . . . . You get in your car and you drive away." (20 RT 1895.) Thus, as the prosecutor explained, there was substantial evidence that Poston chose to stay and accept McNeely's challenge.

The video showed that Poston grabbed his gun immediately after McNeely slapped and tripped him—before he had even fully regained his balance. It was literally a second between when McNeely tripped Poston and when Poston reached for his gun. (Exh. 8 at 10:12:31–32 p.m.) One or two seconds later McNeely reached for his magazine to prepare to use his gun. (Exh. 8 at 10:12:33 p.m.) The jury could infer that both men reached for their guns so quickly because they had already anticipated and mentally prepared for a gunfight and it was just a matter of waiting to see who would start it. (See 20 RT 1955 [Poston's trial counsel conceded, "It's a gunfight."].)

Poston also testified that, after he stopped shooting at McNeely, he ran into the middle of the street. He turned around and McNeely was still shooting at him. So Poston showed his hands to indicate he was no longer armed. (18 RT 1551.) He put his hands out to the side at shoulder level. (18 RT 1552.) Likewise, Eutiquio Garcia-Chavez testified that he witnessed the end of the incident. He saw the runner (Poston) run onto Seminary Avenue. Poston stopped, and showed his hands to McNeely to indicate he did not have a gun. (15 RT 936, 940–941.)

The jury could have reasonably interpreted that testimony as meaning that Poston was signaling his desire to stop the mutual fight. After all, if

there was no implied agreement, and McNeely just wanted to kill Poston, he would have continued shooting at Poston when he stopped and showed his hands. However, if there was an implied agreement to have a gunfight, and Poston showed that he no longer had a gun, then the jury could infer that showing his hands was Poston's way of withdrawing from the mutual combat.

Thus, for the reasons discussed above, there was substantial evidence that Poston and McNeely had an implied agreement to fight. Accordingly, the trial court properly instructed the jury pursuant to CALRIM No. 3471. (See *People v. Larsen*, *supra*, 205 Cal.App.4th at p. 823.)

Finally, Poston contends that the instruction violated his federal constitutional rights to due process and to present a complete defense because it "remove[d] a material, factual issue from the jury's determination or otherwise lower[ed] the prosecution's burden of proof." (PAOB 97, citing *Middleton v. McNeil*, *supra*, 541 U.S. at p. 437 and *In re Winship* (1970) 397 U.S. 358, 364.) In fact, the instruction merely explained when a defendant who engaged in mutual combat could claim self-defense. It was a permissive instruction which the jury could use if it saw fit. (See 3 CT 802; CALCRIM No. 200 [trial court instructed jury that "some of these instructions may not apply."].) Contrary to Poston's argument, it did not direct the jury to find that Poston engaged in mutual combat, and it did not remove Poston's ability to claim the evidence showed he acted in self-defense. So there was no violation of Poston's federal constitutional rights. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72 [issue is '"whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."'].)

### C. Any Error Was Harmless Because the Trial Court Instructed the Jury to Ignore Instructions That Did Not Apply

Even if it was error to instruct the jury pursuant to CALCRIM No. 3471, it was harmless. As discussed above, the trial court also instructed the jury that all instructions might not apply. The jury also understood that some instructions might have been given because they applied to one defendant, but not the other. Thus, a reasonably intelligent jury would have realized that McNeely based his defense theory on CALCRIM No. 3471, i.e., that he was the initial aggressor, but he regained the right to act in self-defense because Poston elevated the conflict to lethal force. Therefore, the jury would have understood that the instruction was given on McNeely's behalf and not necessarily as an endorsement of the prosecutor's theory that appellants engaged in mutual combat.

But even if the jury relied on the mutual combat theory, Poston has not shown it was likely that the jury based that determination on the jury instruction rather than the facts. After all, the trial court instructed the jury to determine the facts first, and then use whatever instructions applied to those facts. (3 CT 802; CALCRIM No. 200.)

In addition, because the video showed that Poston immediately escalated the fight to lethal force, the jury would have rejected his self-defense claim regardless of whether it considered the challenged instruction. (See CALJIC No. 5.31 [Assault with Fists—When Use of Deadly Weapon Not Justified].) Any error was also harmless for the reasons discussed in Argument VI-D and incorporated here by reference. Therefore, it is not reasonably probable Poston would have received a more favorable result if the trial court had not instructed the jury pursuant to CALCRIM No. 3471. (See *People v. Campbell*, *supra*, 25 Cal.App.4th at p. 408; *People v. Rogers* (2006) 39 Cal.4th 826, 884; *People v. Dowdell*

(2014) 227 Cal.App.4th 1388, 1420.) Moreover, even if the purported error violated Poston's federal constitutional rights, any error was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Quach*, *supra*, 116 Cal.App.4th at p. 303.)

## VIII. The Trial Court Properly Instructed the Jury on Provocative Act Murder (Poston's Argument IV)

The trial court instructed the jury on provocative act murder pursuant to CALCRIM No. 560 [Homicide: Provocative Act by Defendant]. (3 CT 841–843.) Poston contends the pattern instruction omitted an element of the crime and should have required the jury to find "that the chain of events proximately causing the victim's death must have been initiated by the defendant . . . ." (PAOB 101.) According to Poston, if the jury had been properly instructed, it would have found him not guilty of murder because McNeely started the chain of events by slapping and tripping Poston. (PAOB 106–107.) Respondent disagrees.

First, Poston forfeited this claim by failing to object to the instruction on the ground raised here. Second, the law properly assigns liability on the basis of substantial culpability and foreseeability, not on the basis of who started the chain of causation. The chain may go back through multiple actions and reactions. So, for example, McNeely shot at Poston because Poston shot at him. Poston shot McNeely because McNeely hit him. And McNeely might have hit Poston because Poston reneged on a drug deal. But, of course, no one would say that Poston was responsible for Fluker's murder because he changed his mind about buying drugs. Rather, the law and CALCRIM No. 560 hold a defendant responsible for murder when his action was a substantial factor in the chain *and* he could have foreseen that his action was likely to lead to someone's death.

Contrary to Poston's argument, the question of who acted first is of relatively minor importance. The real issue is who committed an act that he

should have known was likely to not only produce a deadly response, but was likely to result in someone's death. Thus, the law reasonably limits liability to the defendant who committed a provocative act that foreseeably lead to death. It does not matter if the provocative act was preceded by another instigating act if that prior act was minor. Here, Poston could not claim self-defense because he was not justified in shooting McNeely 10 times in response to being slapped and tripped. And it was foreseeable that, by shooting an armed man, Poston would provoke McNeely to shoot back and likely cause someone's death.

### A. Procedural History

The prosecutor and McNeely filed written proposed jury instructions which included requests that the jury be instructed pursuant to CALCRIM No. 560. (2 CT 474; 3 CT 757–758.) McNeely also requested that the trial court add a special paragraph to the instruction. (3 CT 758; 19 RT 1848.) Poston filed motions to instruct the jury with two unrelated special instructions. (5 CT 1432, 1457.) However, it does not appear that Poston submitted a proposal for general instructions.

At the hearing on jury instructions, Poston objected to the request McNeely made in chambers that the instruction specifically list which of Poston's acts could qualify as provocative acts. (19 RT 1843.) Poston added that "if the Court is inclined to accept [McNeely's] suggestion that the specifics that constitute, perhaps theoretically, an attempted murder of Joe McNeely, that is, drawing a weapon, shooting a weapon, that you would add some language, 'unless those acts were justified in self-defense.'" (19 RT 1844; see 19 RT 1848 [at the end of the hearing, Poston submitted on the matter].)

Poston also requested that the trial court include the portion of the pattern instruction that provided, "'A defendant is not guilty of murder if the killing of Lionel Fluker was caused solely by the independent criminal

act of someone else. And an independent criminal act is an independent criminal act by a person who is not acting with the defendant.'" (19 RT 1844.) Poston concluded, "So those two things are . . . my main concern with CALCRIM No. 560." (*Ibid.*)

The trial court stated it would look at *Cervantes*, *supra*, 26 Cal.4th at page 874 before deciding whether to give the bracketed portion of the instruction that Poston requested. (19 RT 1846, 1848.)

The trial court resumed the hearing the next day. It ruled that it would not give the bracketed paragraph requested by Poston. (20 RT 1974–1975.) However, the next day it reversed itself and put the paragraph into the instruction. (20 RT 1977–1978; see 3 CT 843.) McNeely objected and the trial court overruled the objection. (20 RT 1978–1979.)

Respondent could not find a final ruling on McNeely's requests for a special paragraph and for a list of Poston's potentially provocative acts. However, the instruction that was given did not have the special paragraph. It did list two specific acts that the jury could find were provocative acts. (3 CT 843.)

The trial court instructed the jury pursuant to CALCRIM No. 560:

> Donel Poston is charged in Count 1 with the murder of Lionel Fluker. [¶] A person can be guilty of murder under the provocative act doctrine if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot. The provocative act murder doctrine focuses on the provocateur's *conduct* and his *knowing* his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet. [¶] The elements of a provocative act murder are more fully explained below.
>
> To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that:
>
> 1. Donel Poston intentionally committed a provocative act;

2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life, and then acted with conscious disregard for life;

3. In response to Poston's provocative act, McNeely killed Lionel Fluker; AND

4. Lionel Fluker's death was a natural and probable consequence of Poston's provocative act.

A provocative act is an act:

1. That goes beyond what is necessary to accomplish the crime;

AND

2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

In order to prove that Lionel Fluker's death was the *natural and probable consequence* of the defendant's provocative act, the People must prove that:

1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act could begin a chain of events resulting in someone's death;

2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND

3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act.

A *substantial* factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death.

A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else. An *independent criminal* act is a free, deliberate, and informed criminal act by a person who is not acting with the defendant.

> The People allege that Donel Poston committed the following provocative acts:
>
> - Drawing a loaded .40 caliber semiautomatic gun
> - Shooting Joe McNeely multiple times
>
> You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another.
>
> You do not all have to agree on which provocative act Donel Poston committed.

(3 CT 841–843, italics in original.]

### B. Poston Forfeited This Claim by Failing to Object on the Ground Raised Here

Poston forfeited the current claim of instructional error by failing to object on the same ground raised here. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 670 (*Fuiava*); *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1097, fn. 29; *People v. Bolin*, *supra*, 18 Cal.4th at p. 326; see *People v. Farnam*, *supra*, 28 Cal.4th at p. 165.) As noted above, Poston requested a specific bracketed portion of the pattern instruction and the trial court granted that request. The trial court denied McNeely's request for a special paragraph, but Poston never joined that request.

Poston also objected to McNeely's request that the instruction specify two possible provocative acts. However, he argued that if the court granted that request, it should also include language indicating the jury should not find they were provocative acts if Poston acted in self-defense. The trial court included the two specific acts and it included the language about self-defense requested by Poston. (19 RT 1844.) Thus, the trial court basically modified the instruction in every way Poston asked it to.

More importantly, Poston never requested that the trial court modify the instruction the way he now claims should have been done. Failure to make "'a timely and specific objection on the ground sought to be urged on appeal'" forfeits review of any appellate contention based on that ground. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 670.) Here, Poston never claimed that the pattern instruction lacked an element of the crime. And he never asked the trial court to instruct the jury "that the chain of events proximately causing the victim's death must have been initiated by the defendant . . . ." (PAOB 101.) Therefore, Poston has forfeited this claim on appeal. (*Fuiava*, at p. 670; see *In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412 ["As a general rule, a party is precluded from urging on appeal any point not raised in the trial court . . . . Any other rule would '"'permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.'" [Citations.]' [Citation.]"].)

Poston does not address the fact that he failed to object on the ground raised on appeal—either by claiming it was ineffective assistance or requesting this Court to reach the merits pursuant to section 1259. (See *People v. Andersen*, *supra*, 26 Cal.App.4th at p. 1249.) Therefore, this Court should also find that he forfeited those alternative claims.[22] (*People v. Stanley*, *supra*, 10 Cal.4th 764, 793; *In re Ricky H.*, *supra*, 10 Cal.App.4th 552, 562 ["an appellate court will generally decline to consider any questions not raised in the opening brief"].)

---

[22] If this Court considers and rejects the merits of Poston's claim, respondent requests that it expressly find forfeiture so that Poston is barred from raising this claim in a federal habeas petition.

### C. There Is No Requirement That the Defendant Initiate the Chain of Events Proximately Causing the Victim's Death

"The provocative act murder doctrine has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct, and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander." (*Cervantes*, *supra*, 26 Cal.4th at p. 867.)

"In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' (See CALJIC No. 3.40.) In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.'" (*Cervantes*, *supra*, 26 Cal.4th at p. 866, brackets in original.)

Poston contends that the instruction pursuant to CALCRIM No. 560 omitted the element "that the chain of events proximately causing the victim's death must have been initiated by the defendant . . . ." (PAOB 101, 104, citing *People v. Concha* (2009) 47 Cal.4th 653, 663, *Cervantes*, *supra*, 26 Cal.4th at p. 866, and *People v. Sanchez* (2001) 26 Cal.4th 834, 846–848.) However, none of the cases cited by Poston support his proposition. Indeed, Poston immediately concedes, "No case appears to have expressly held that initiating the chain of events is an element of provocative act murder." (PAOB 105.)

In fact, *Cervantes*—the case discussed at trial—disproves Poston's point. In *Cervantes*, there was a gang party and, while there, the defendant invited a woman to go to another party. She declined and he called her a

"ho." Cisneros—a member of a gang that was allied with the defendant's gang—approached and told the defendant not to disrespect his homegirl. Linares from the same allied gang tried to defuse the situation, but Cisneros drew a gun and threatened the defendant. The defendant responded by brandishing a handgun of his own, which prompted Linares to intervene again, pushing or touching the defendant on the shoulder in an effort to separate him from Cisneros. In response, the defendant shot Linares through the arm and chest. A short time later, a group from the allied gang spotted someone from the defendant's gang and shot and killed him. (*Cervantes*, *supra*, 26 Cal.4th at p. 863.)

The court determined that Cisneros was the initial aggressor because he confronted the defendant and was the first one to draw a gun. (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fn. 12.) And the court referred to the defendant's shooting of Linares as the provocative act. (*Cervantes*, *supra*, 26 Cal.4th at p. 872.) However, it ultimately held that the provocative murder act doctrine did not apply. (*Ibid.*) The evidence "failed to establish the essential element of proximate causation. The facts of this case are distinguishable from the classic provocative act murder case in a number of respects. Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that [the] murderers were even present at the scene of the provocative act . . . ." (*Ibid.*, fns. omitted)

*Cervantes* is relevant to the present matter because that court specifically noted that the defendant "was not the initial aggressor in the incident that gave rise to the provocative act." (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fn. omitted.) But that was *not* "the critical fact that distinguishe[d] this case from other provocative act murder cases." (*Ibid.*) The critical factor was that "the actual murderers were not responding to

[the] defendant's provocative act by shooting back at him or an accomplice, in the course of which someone was killed." (*Id.* at pp. 872–873.)

Of course, here, McNeely *did* shoot back at Poston after Poston performed a provocative act. More importantly, *Cervantes* expressly held that Cisneros was the initial aggressor because he confronted the defendant over his insulting remark to the woman and also because Cisneros was the first one to brandish a gun. (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fn. 12.) Thus, the court distinguished between the person who initiated the chain of events (Cisneros) and the person who committed the provocative act (the defendant). And again, the court expressly stated that distinction was *not* the critical reason why the provocative act doctrine did not apply. (*Id.* at pp. 872–873.) That analysis squarely refutes Poston's contention that the defendant must always commit a provocative act *and* initiate the chain of events that proximately caused the victim's death. (PAOB 104.)

Poston also contends that "[i]n every provocative act murder case Poston could find, the defendant did initiate the chain of events leading to the victim's death, sometimes in concert with one or more accomplices." (PAOB 105–106 [collecting cases].) It is unclear how Poston can insist that only the defendant who initiated the chain of events can be held liable at the same time that he acknowledges that the provocative murder doctrine can apply to multiple accomplices. Accomplices do not often act simultaneously. If one accomplice shoots first and the second accomplice joins in a few seconds later, the second accomplice did not initiate the chain of events. Yet Poston acknowledges the second accomplice can still be found liable under the provocative act doctrine. (See, e.g., *People v. Concha*, *supra*, 47 Cal.4th at p. 658 [one or more of three accomplices started stabbing the victim]; *People v. Mejia* (2012) 211 Cal.App.4th 586, 597 [multiple defendants broke windows, and accomplice who entered a window was shot and killed by resident who was the target of the assault];

CALCRIM No. 560 ["A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death."].)

In any case, the bigger problem with Poston's theory is that it would be impossible to apply. The question of who "initiated the chain of events" cannot be answered without further guidelines. Here, one could say McNeely initiated the chain of events by slapping Poston. But maybe Poston initiated the chain of events by saying something offensive to McNeely. The point is, it is sometimes difficult to agree on what words or acts really initiated the chain of events. That is why the law focuses on the substantial event that is likely to produce a lethal response and can foreseeably result in a death. That definition is far more relevant and reliable than the sometimes arbitrary question of who started the fight. Accordingly, there was no reason to require the jury to find that Poston initiated the chain of events and the trial court properly instructed the jury on the elements of provocative act murder. (See CALCRIM No. 560; *Cervantes*, *supra*, 26 Cal.4th at pp. 872–874.)

## IX. THERE WAS NOT PROSECUTORIAL ERROR (POSTON'S ARGUMENT V)

Poston contends, "The prosecutor committed pervasive, prejudicial misconduct by appealing to the jurors' emotions, racial bias, and fear of random street violence; attacking Poston's character; and misleading the jurors, violating due process." (PAOB 109.) Respondent disagrees. Poston did not object to any of the prosecutor's alleged misconduct, so he forfeited this claim on appeal. Moreover, the fact that neither Poston nor McNeely lodged a single objection belies Poston's claim that the prosecutor's misconduct was pervasive. The prosecutor did not use deceptive or reprehensible tactics, and Poston's trial was not rendered

fundamentally unfair. Nor has Poston shown that the jury likely applied the prosecutor's purportedly misleading comments in an improper manner.

### A. Standard of Review

"A prosecutor's conduct violates the federal Constitution only when it is ""'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citations.] A prosecutor's conduct that does not rise to the level of a constitutional violation will constitute misconduct under state law only if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citation.] A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 819; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.)

"'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown*, *supra*, 31 Cal.4th at pp. 553–554.)

### B. Poston Forfeited This Claim by Failing to Object Or Request an Admonition

"Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. [Citations.]" (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 726.) To preserve a claim that prosecutorial misconduct deprived a defendant of federal constitutional rights, the defendant must

object on that ground at trial. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130.)

Here, Poston acknowledges that he did not object to a single instance of misconduct. Rather, he claims that "objections would have been futile because the misconduct was pervasive and admonitions could not have cured the harm; the bell could not be unrung." (PAOB 111.) Poston's argument is not persuasive. Notably, McNeely was also African-American and represented by capable counsel, and he also did not object to any of the prosecutor's arguments as misleading or racially biased. More importantly, Poston offers no authority for the proposition that he could refrain from objecting to a pervasive pattern of misconduct and then, after receiving an unfavorable result at trial, raise that issue on appeal.

A defendant is not required to make repeated objections when there is a pattern of antagonism that would indicate that future objections would be futile. (See *People v. Hill*, *supra*, 17 Cal.4th at pp. 820–821; *People v. Turner* (2004) 34 Cal.4th 406, 431.) However, Poston cannot show such a pattern because he did not object even once and there were no overruled objections to suggest that objecting would be futile. Indeed, the parties and trial court seemed to get along very well and conducted themselves respectfully throughout trial. Respondent saw nothing in the record that would have even suggested that the trial court was unwilling to fairly consider claims of prosecutorial misconduct.

Furthermore, Poston has not shown that the purported harm from the prosecutor's arguments could not have been cured by potentially successful objections and instructions to disregard the prosecutor's comments. (See *People v. Davis* (2005) 36 Cal.4th 510, 551; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 726; *People v. Medina* (1996) 11 Cal.4th 694, 761.) While objecting and requesting an admonition can sometimes serve to reinforce a misleading argument, Poston offers no explanation why he could not object

at a sidebar in order to preclude further misconduct (and preserve the issue for appeal).

Poston argues this Court should reach his claim because it has the authority to do so. But he does not give any particular reason why this Court should exercise its discretion to ignore the forfeiture rule. (PAOB 111, citing *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) This was not a case where the prosecutor made flagrantly deceptive and reprehensible arguments. Nor does Poston argue that the prosecutor's misconduct was so egregious that trial counsel had to have been ineffective for failing to object.[23] And since, as discussed below, there was no prosecutorial misconduct, there was no violation of appellant's substantial rights. (See § 1259; *People v. Andersen*, *supra*, 26 Cal.App.4th at p. 1249.) Thus, there is no reason for this Court to disregard the general rule that Poston's failure to object in the trial court and request an admonition forfeited the issue on appeal.[24] (See *People v. Ledesma*, *supra*, 39 Cal.4th at p. 726.)

### C. The Prosecutor Did Not Engage in Deceptive Or Reprehensible Behavior

Poston contends that, because he was innocent and only responded to McNeely's armed aggression, the prosecutor resorted to deceptive and misleading methods: She attacked Poston's character; she appealed to the jury's conscious and unconscious racial biases; and she played on the jury's fear of random street violence. (PAOB 119–120.) In fact, the prosecutor

[23] Poston has forfeited his right to claim that trial counsel's failure to object was ineffective assistance. (See *People v. Stanley*, *supra*, 10 Cal.4th 764, 793; *In re Ricky H.*, *supra*, 10 Cal.App.4th 552, 562.)

[24] If this Court considers and rejects the merits of Poston's claim, respondent respectfully requests that it also expressly rule that he forfeited this claim since that would bar him from raising it in a federal habeas petition.

tried to convict Poston because he responded to a slap and a trip with ten shots from an illegally possessed semiautomatic handgun.

It is misconduct for a prosecutor to speculate about a defendant's bad character; arguments must be based on reasonable inferences from the evidence. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1533.) Poston argues the prosecutor characterized him as "a bad character—a 'thug' and a 'pimp'—who did not talk or behave like she thought an innocent person would." (PAOB 114, 119–120.) However, the prosecutor used the fact that Poston was a pimp with the trial court's permission. And as discussed in Argument VI, that evidence was properly admitted to impeach Poston's testimony and to show that he controlled women, particularly his main witness, Tamena Bailey.

Likewise, it was a standard prosecutorial tactic to show that Poston "did not behave like an innocent person would" to prove consciousness of guilt. Poston not only fled the scene, he admitted he was on the run from law enforcement for three months. The prosecutor could legitimately argue that was not the typical behavior of a person who acted in self-defense. (See *People v. Ledesma*, *supra*, 39 Cal. 4th at p. 726 [prosecutor was entitled to "make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence."].)

It is misconduct for a prosecutor to make inflammatory remarks in closing argument for the purpose of appealing to the jurors' fears or emotions. (*People v. Fosselman* (1983) 33 Cal.3d 572, 580–581; *People v. Lambert* (1975) 52 Cal.App.3d 905, 910; but see *People v. Luparello* (1986) 187 Cal.App.3d 410, 429 [mere reference to evidence is not an impassioned plea aimed at the jury's fears and anxieties].) Poston contends, "The prosecutor appealed to the jurors' fear of random street violence—of being crime victims—with repeated references to a gun battle

and both defendants' disregard for the safety of innocent bystanders." (PAOB 119.)

However, the prosecutor's theory that appellants engaged in mutual combat was a legitimate strategy to defeat Poston's self-defense claim. Likewise, the prosecutor was entitled to emphasize the danger posed by appellants firing 18 shots in a heavily populated and bustling area because McNeely's murder charge was premised on implied malice. Similarly, Poston's murder conviction required that he "knew that the natural and probable consequences of [his] provocative act were dangerous to human life, and then acted with conscious disregard for life." (CALCRIM No. 560.) Thus, the prosecutor's arguments were fair comments on the relevant evidence rather than appeals to fear and emotion. (See *People v. Luparello*, *supra*, 187 Cal.App.3d at p. 420.)

Poston testified that he saved his good suit for when "it was time for [him] to perform." He also told his mother he had "to paint a different picture, a different portrait for th[e] jury." (19 RT 1628.) The prosecutor asked Poston if he was afraid that the jury would see the picture of him as "out on the streets as a hard-core thug, into guns, and being a gangster?" Poston replied, "No, ma'am." (*Ibid.*) Poston argues, "The prosecutor appealed to conscious and unconscious racial bias by repeatedly call[ing] Poston a 'thug'—a racial 'dog whistle,' akin to using the N word." (PAOB 120, 124, citing 19 RT 1628.) However, Poston offers only one citation to the record to support his claim that the prosecutor repeatedly referred to Poston as a "thug."

Moreover, the prosecutor did not "explicitly t[ell] the jurors that" Poston was a thug. (See PAOB 124.) She asked him if he was trying to dispel that image and he said he was not. That was legitimate inquiry because Poston made statements during jail calls that suggested he intended to paint a picture that was different than reality. Furthermore, the term

"thug" has a long history and has been used in various contexts with and without regard for a variety of ethnic backgrounds. It is not reserved for use with African-Americans and it is not a code word for racial preconceptions.

Poston contends that it was misleading and unfair to question him about preparing to "perform" during his testimony. "It is hardly unusual to refer to a witness's testimony as 'performance.'" (PAOB 127–128.) However, Poston's jail calls did not merely describe his preparation to put on a good performance. They gave the distinct impression that Poston was preparing to give a *misleading* performance. For example, Poston specifically told his mother he needed to paint a different picture for the jury. (19 RT 1628.) And again, the prosecutor was entitled to *question* Poston about what he meant. She did not make argument that was unsupported by the evidence. Moreover, Poston astutely testified that he did not prepare to paint a different picture than the truth; just a different picture than the prosecutor was presenting. (*Ibid.*)

Poston complains, "The prosecutor repeatedly twisted Poston's words to make them seem incriminating." (PAOB 125–126.) But Poston merely cites the prosecutor's questioning of Poston, not argument. The prosecutor was entitled to ask Poston what his rap lyrics and jail calls meant, and Poston was permitted to explain what he meant.

Poston maintains that it was misleading and unfair for the prosecutor to argue that Poston's failure to run away before the shooting refuted his self-defense claim. Poston insists he had the right to be in the gas station and he had no duty to retreat. (PAOB 126–127.) Nevertheless, it was permissible for the prosecutor to argue inferences from the evidence. Poston claimed that McNeely threatened him and showed him his gun and that made Poston afraid. Just because Poston had the right to stay at the gas station did not mean that his choice to do so was meaningless. The

prosecutor properly argued that most people would retreat from a man who was threatening them with a gun. Poston's decision to stay helped show that he made an implied agreement to engage in mutual combat. (See *People v. Ledesma*, *supra*, 39 Cal.4th at p. 726 [prosecutor was entitled to "make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence."].)

Finally, Poston argues that the prosecutor "could not prove Poston's guilt of murder and attempted murder beyond a reasonable doubt in view of the uncontroverted evidence," so she consciously chose to "persuade the jury by appealing to their emotions, attacking Poston's character, and misleading the jury in several crucial respects." (PAOB 129.) However, for the reasons discussed above, the prosecutor did not engage in misconduct. Moreover, the jury could find that Poston did not act in self-defense because he drew his gun in response to a minor battery. Likewise, he was liable for provocative act murder because he knew that McNeely was armed, and he knew it was likely that shooting McNeely would result in a response that would be dangerous to human life. Accordingly, the prosecutor did not engage in such egregious conduct that it rendered Poston's trial unfair and deprived him of due process. (See *People v. Hill*, *supra*, 17 Cal.4th at p. 819.)

## X. There Were Neither Multiple Errors nor Cumulative Prejudice (McNeely's Argument V; Poston's Argument VII)

Appellants contend that, even if none of their individual claims of error were prejudicial, they were cumulatively prejudicial. (MAOB 83–84; PAOB 135–137.) Respondent disagrees. There were no errors, so there was no prejudice to cumulate. Moreover, contrary to appellants' arguments, neither acted in self-defense. In response to being slapped and tripped, Poston immediately reached for his gun and shot at McNeely 10

times. Poston did not act in self-defense because McNeely's assault was insufficient to justify Poston's escalation to lethal force. (See CALJIC No. 5.31 [Assault with Fists—When Use of Deadly Weapon Not Justified]; 3 CT 831.) Likewise, McNeely had no right to act in self-defense because he fired eight shots after the danger posed by Poston had passed.

The due process clause of the Fourteenth Amendment entitles an appellant to a fair trial, but not a perfect one. (*People v. Hill*, *supra*, 17 Cal.4th at pp. 844–847 [multiple errors can have "a negative synergistic effect" resulting in an unfair trial].) Our Supreme Court has explained that it "will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Id.* at p. 844.) When a defendant relies upon the cumulative error doctrine, "the litmus test is whether defendant received due process and a fair trial." (*People v. Kronemeyer* (1987) 189 Cal.App.3d 314, 349, disapproved on another ground in *People v. Whitmer* (2014) 59 Cal. 4th 733, 742.) Any claim based upon cumulative errors must be assessed "to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid.*)

Here, if this Court agrees with appellants' claim that they should have received separate trials, or Poston's claim that there was insufficient evidence to support his convictions, reversal is required. If this Court rejects those claims, there was no prejudice to cumulate with other purported errors.

McNeely asserts that "the interlocking nature of the errors argued above is clear, because each one directly affected appellant's defense of self-defense [and] . . . undercut the presentation of appellant's defense and his right to a fair trial." (MAOB 84.) But the only two potential errors that could be cumulated were the instruction on contrived self-defense and the exclusion of evidence that Poston had a history of possessing marijuana for sale. Neither purported error, however, would have changed the fact that

self-defense was unavailable to McNeely because he shot at Poston (and Fluker) after the danger had passed.

Poston argues that his "convictions are mystifying" and "[t]he prosecution won convictions despite clear evidence of self-defense by exploiting the jurors' conscious and unconscious racism and fear of street violence." (PAOB 135–136.) However, as discussed in Argument IX, there was no prosecutorial misconduct. Self-defense was unavailable to Poston because he used lethal force in response to a nonlethal assault. (CALJIC No. 5.31.) Therefore, Poston would not have received a more favorable result even if jury instructions on mutual combat and provocative act murder had been omitted or modified; even if evidence that he was a pimp had been excluded; and even if there had been no prosecutorial error.

Therefore, even if there were multiple errors, it is not reasonably probable appellants would have received a better result absent those errors. (See *Chambers v. Mississippi* (1973) 410 U.S. 284, 302–303 [cumulative errors assessed for due process and whether there was a fair trial]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [rejecting claim of cumulative prejudice because there was only one error and it was not prejudicial]; *People v. Cain*, *supra*, 10 Cal.4th at p. 82 [multiple minor errors not prejudicial because a defendant is entitled to a fair trial, not a perfect one].)

## CONCLUSION

Accordingly, respondent respectfully requests that the judgments be affirmed.

Dated: January 19, 2016

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
RENÉ A. CHACÓN
Supervising Deputy Attorney General
JEFFREY M. LAURENCE
Senior Assistant Attorney General

*/s/ David M. Baskind*
DAVID M. BASKIND
Deputy Attorney General
*Attorneys for Respondent*

DMB:er
SF2014409079
20807712.doc

**CERTIFICATE OF COMPLIANCE**

I certify that the attached RESPONDENT'S BRIEF uses a 13-point Times New Roman font and contains 41,783 words.

Dated: January 19, 2016

KAMALA D. HARRIS
Attorney General of California

*/s/ David M. Baskind*
DAVID M. BASKIND
Deputy Attorney General
*Attorneys for Respondent*

# DECLARATION OF SERVICE BY E-MAIL and U.S. Mail

Case Name: ***People v. McNeely & Poston***
No.: **A141557**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On January 19, 2016, I served the attached **RESPONDENT'S BRIEF** by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

Philip Morgan Brooks
Attorney at Law
1442-A Walnut Avenue - PMB 233
Berkeley, CA 94709
**Served electronically via TrueFiling.com**
*Attorney for Appellant McNeely*

Randi Covin
Attorney at Law
P.O. Box 1120
Willits, CA 95490
**Served electronically via TrueFiling.com**
*Attorney for Appellant Poston*

First District Appellate Project
Attn.: Executive Director
475 Fourteenth Street, Suite 650
Oakland, CA 94612
**Served electronically via TrueFiling.com**

The Honorable Nancy O'Malley
District Attorney
Alameda County District Attorney's Office
1225 Fallon Street, Room 900
Oakland, CA 94612-4203
**Served via E-mail Address**:
ACDAdocket@acgov.org

County of Alameda
Criminal Division
Rene C. Davidson Courthouse
Superior Court of California
1225 Fallon Street, Room 107
Oakland, CA 94612-4293

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on January 19, 2016, at San Francisco, California.

| E. Rios | /s/ E. Rios |
|---|---|
| Declarant | Signature |

SF2014409079 / 20807942.doc

# EXHIBIT 10

COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST DISTRICT, DIVISION FIVE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DONEL POSTON,<br><br>Defendant and Appellant. | Appeal No.<br>A141557<br><br>Alameda<br>No. 172522B |

**APPELLANT POSTON'S REPLY BRIEF**

Appeal from the Judgment of the Superior Court
Alameda County, State of California

HONORABLE MICHAEL GAFFEY, TRIAL JUDGE

RANDI COVIN
State Bar #168422
P.O. Box 1120
Willits, CA. 95490
Telephone: (707) 459-2456
Facsimile: (707) 459-2147
e-mail address: rcovin13@gmail.com

Attorney for Appellant
DONEL POSTON

By Appointment of the Court of
Appeal Under the First District
Appellate Project's Independent Case
System

# TOPICAL INDEX

TABLE OF AUTHORITIES ........................................................ 4

ARGUMENT ........................................................................ 11

I. POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE ........................................ 11

A. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN SELF-DEFENSE ................. 13

B. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN THE HEAT OF PASSION ON ADEQUATE PROVOCATION ............................................. 25

C. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON INITIATED A CHAIN OF EVENTS THAT PROXIMATELY CAUSED LIONEL FLUKER'S DEATH ............................ 27

II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL .................. 32

III. THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE ................................ 36

IV. THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE ................................................ 39

V. PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL ..................................... 43

VI. POSTON JOINS IN AND ADOPTS BY REFERENCE MCNEELY'S ARGUMENT I: THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS ................................ 49

VII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL .................. 51

CONCLUSION ........................................................................ 53

WORD COUNT CERTIFICATE ...................................................... 54

DECLARATION OF SERVICE

TABLE OF AUTHORITIES

**CASES**

*Berube v. Conley*
(1st Cir. 2007) 506 F.3d 79 .................................................... 16-17

*Boyde v. California*
(1990) 494 U.S. 370 ................................................................ 36

*Chambers v. Mississippi*
(1973) 410 U.S. 284 ........................................................... 36, 39

*Chapman v. California*
(1967) 368 U.S. 18 ............................................................. 37, 40

*Chapman v. California*,
*supra*, 386 U.S. ..................................................................... 48

*Crane v. Kentucky*
(1986) 476 U.S. 63 ............................................................. 36, 39

*Darden v. Wainwright*
(1986) 477 U.S. 168 ................................................................ 43

*Donnelly v. DeChristoforo*
(1974) 416 U.S. 637 ........................................................... 43, 48

*Estelle v. McGuire*
(1991) 502 U.S. 62 ........................................................ 32, 36, 39

*Evans-Smith v. Taylor*
(4th Cir. 1994) 19 F.3d 899 ................................................. 20, 23

*In re Christian S.*
(1994) 7 Cal.4th 768 ................................................................ 24

*In re Winship*
(1970) 397 U.S. 358 ........................................................... 36, 39

*Jackson v. Virginia*
(1979) 443 U.S. 307 ........................................................... 12, 19

*Lincoln v. Sunn*
(9th Cir. 1987) 807 F.2d 805 .......... 51

*Mak v. Blodgett*
(9th Cir. 1992) 970 F.2d 614 .......... 51

*McKinney v. Rees*
(9th Cir. 1993) 993 F.2d 1378 .......... 32

*McKleskey v. Kemp*
(1987) 481 U.S. 279 .......... 43-44

*McLenagan v. Karnes*
(4th Cir. 1994) 27 F.3d 1002 .......... 16

*Middleton v. McNeil*
(2004) 541 U.S. 433 .......... 36, 39

*Moore v. Morton*
(3rd Cir. 2001) 255 F.3d 95 .......... 44

*Mullaney v. Wilbur*
(1975) 421 U.S. 684 .......... 19

*O'Laughlin v. O'Brien*
(1st Cir. 2009) 568 F.3d 287 .......... 20, 23

*People v. Barnes*
(1986) 42 Cal.3d 284 .......... 12, 19

*People v. Beeman*
(1984) 35 Cal.3d 547 .......... 41

*People v. Beltran*
(2013) 56 Cal.4th 935 .......... 25-26

*People v. Breverman*
(1998) 19 Cal.4th 142 .......... 26

*People v. Bryant, Smith & Wheeler*
(2014) 60 Cal.4th 335 .......... 49

*People v. Cervantes*
(2001) 26 Cal.4th 860 .......... passim

*People v. Cross*
(2008) 45 Cal.4th 58 .......... 36

*People v. Cudjo*
(1993) 6 Cal.4th 585 .......... 43-44

*People v. Doolin*
(2009) 45 Cal.4th 390 .......... 34-35

*People v. Flood*
(1998) 18 Cal.4th 470 .......... 39

*People v. Franco*
(2009) 180 Cal.App.4th 713 .......... 37, 40

*People v. Gonzalez,*
*supra,* 54 Cal.4th .......... 39

*People v. Harris*
(1989) 47 Cal.3d 1047 .......... 43

*People v. Herring*
(1993) 20 Cal.App.4th 1066 .......... 44

*People v. Hill*
(1998) 17 Cal.4th 800 .......... 43, 48, 51

*People v. Jones*
(1970) 7 Cal.App.3d 358 .......... 44

*People v. King*
(1978) 22 Cal.3d 12 .......... 21

*People v. Lambert*
(1975) 52 Cal.App.3d 905 .......... 44

*People v. Levitt*
(1984) 156 Cal.App.3d 500 .......... 19

*People v. Massie*
(1967) 66 Cal.2d 899 ........................................................................ 49

*People v. McCoy*
(2001) 25 Cal.4th 1111 ..................................................................... 41

*People v. Mil*
(2012) 53 Cal.4th 400 ............................................................ 37, 40, 48

*People v. Millbrook*
(2014) 222 Cal.App.4th 1122 ............................................................ 26

*People v. Mitchell*
(1939) 14 Cal.2d 237 ........................................................................ 26

*People v. Moore*
(2011) 51 Cal.4th 386 ............................................................... 20, 23

*People v. Najera*
(2006) 138 Cal.App.4th 212 .............................................................. 44

*People v. Randle*
(2005) 35 Cal.4th 987 ........................................................................ 21

*People v. Rhodes,*
*supra*, 129 Cal.App.4th ..................................................................... 21

*People v. Rios*
(2000) 23 Cal.4th 450 ........................................................................ 19

*People v. Sanchez*
(2001) 26 Cal.4th 834 ........................................................... 23, 29-30

*People v. Sanchez*
(2014) 228 Cal.App.4th 1517 ............................................................ 44

*People v. Seumanu*
(2015) 61 Cal.4th 1293 ..................................................................... 45

*People v. Sifuentes*
(2011) 195 Cal.App.4th 1410 ...................................................... 20, 23

*People v. Soojian*
(2010) 190 Cal.App.4th 491 .......................................................... 48

*People v. Thomas*
(2013) 218 Cal.App.4th 630 .......................................................... 26

*People v. Tully*
(2012) 54 Cal.4th 952 .................................................................. 45

*People v. Turner*
(1984) 37 Cal.3d 302 .................................................................... 49

*People v. Vasquez*
(2006) 136 Cal.App.4th 1176 ........................................................ 21

*People v. Villegas*
(2001) 92 Cal.App.4th 1217 .......................................................... 17

*Sullivan v. Louisiana*
(1993) 508 U.S. 275 ............................................................... 36, 39

*United States v. Cabrera and Mulgado*
(9th Cir. 2000) 222 F.3d 590 ...................................................43-44

*United States v. Mayfield*
(9th Cir. 1999) 189 F.3d 895 ......................................................... 49

*United States v, McLister*
(9th Cir. 1979) 608 F.2d 785 ......................................................... 51

*United States v. Ortiz*
(9th Cir. 2004) 362 F.3d 1274 ....................................................... 45

*United States v. Piva*
(1st Cir. 1989) 870 F.2d 753 ......................................................... 45

*United States v. Romanello*
(5th Cir. 1984) 726 F.2d 173 ......................................................... 49

*United States v. Rucher*
(11th Cir. 1990) 915 F.2d 1511 ..................................................... 49

*United States v. Rudberg*
(9th Cir. 1997) 122 F.3d 1199 ........................................................ 45

*United States v. Tootick*
(9th Cir. 1991) 952 F.2d 1078 ........................................................ 49

*Zafiro v. United States*
(1993) 506 U.S. 534 ........................................................................ 49

**CONSTITUTIONS**

Cal. Const., art I, §§ 15 ................................................................ passim
16 ........................................................................ 36, 39

U.S. Const., amend. XIV ............................................................. passim

**STATUTES**

Evid Code, § 352 .......................................................................... 32

Pen. Code, §§ 31 ............................................................................ 41
187 ........................................................................ 12
188 ........................................................................ 12
198.5 ..................................................................... 22
1098 ...................................................................... 49
1111 ...................................................................... 41
1259 ................................................................ 37, 40

**OTHER AUTHORITIES**

Cal. Rules of Court, rules 8.200(a)(5) ............................................... 49
8.360 ........................................................ 54

CALCRIM No. 3471 ..................................................................... 36-37

Charisse Jones, Shifting: The Double Lives of Black Women
in America, Harper e-book (2003) ................................................ 46

Eli Wolfe, Blowing Racial Dog Whistles: Berkeley Prof Blasts Conservatives For "Coded Messages," http://alumni.berkeley.edu/california-magazine/just-in/2014-02-25/blowing-racial-dog-whistles-berkeley-prof-blasts .............. 46

Force Science Institute, Important New Reaction-Time Study Addresses What's "Reasonable," http://www.forcescience.org/fsnews/178.html .............................. 18

Ian Haney Lopez, Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class, Oxford University Press (2014) .......................................... 46

J. Pete Blair, Joycelyn Pollock, Don Montague, Terry Nichols, John Curnutt, and David Burns, Reasonableness and Reaction Time, Vol. 14 Police Quarterly No. 4 (2011) 323, 334 ............................................................................................ 18

Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html. .......................... 46

John R. Rickford, African American Vernacular English, Blackwell Publishers (1999) .................................................. 46-47

New Reaction-Time Study Addresses What's "Reasonable" in Armed-Suspect Encounters, https://www.policeone.com/Officer-Safety/articles/3705348-New-reaction-time-study-addresses-whats-reasonable-in-armed-suspect-encounters/ ..................................................... 18-19

Sarah D. Sparks, Students Learn to 'Toggle' Between Dialects, Education Week (Sept. 10, 2014) http://www.edweek.org/ew/articles/2014/09/10/03dialect.h34.html?qs=students+learn+to+toggle+between+dialects. ............. 47

Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black .................................................. 47

COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST DISTRICT, DIVISION FIVE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | Appeal No. A141557 |
| Plaintiff and Respondent, | Alameda No. 172522B |
| v. | |
| DONEL POSTON, | |
| Defendant and Appellant. | |

**APPELLANT POSTON'S REPLY BRIEF**

* * * * * *

ARGUMENT

**I. POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.**

Poston argued in his opening brief that his convictions of murder and attempted murder violate due process and should be reversed because they are not supported by sufficient evidence; no rational juror could have found proof beyond a reasonable doubt that Poston did not act in self-defense or in the heat of passion on adequate provocation, nor that he initiated a chain of events which proximately caused Fluker's death. (AOB 58-83; U.S. Const., amend. XIV; Cal.

Const., art. I, § 15; §§ 187-188; *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

Respondent concedes that McNeely started a quarrel with Poston and escalated it by slapping and tripping Poston, knocking him at least partway down to the ground. (RB 19-20, 69, 82, 91.) McNeely agrees and so did the prosecutor; it was and is undisputed that McNeely was the aggressor. (McNeely AOB 41, 46-48, 54-55; McNeely ARB 26, 30; 1 RT 44; 20 RT 1888.) As respondent explains, the surveillance video makes clear that Poston "stood around passively while McNeely acted aggressively." (RB 91.)

Respondent concedes that McNeely reached for his ammunition magazine, if not his gun, just "a second" after Poston drew his gun in response to McNeely's unprovoked assault. (RB 72 and fn. 12.) Respondent concedes that "Poston had a viable self-defense claim because the video clearly showed that McNeely reached into his jacket - and Poston could reasonably assume he was reaching for a gun - before Poston fired a shot." (RB 45, 78.)

Respondent concedes that McNeely's retrieval of the magazine was "[o]bviously . . . the first step in preparing to use lethal force," and that McNeely must have intended to use lethal force from the

outset because he drew the magazine less than two seconds after slapping Poston. (RB 72, 80.) Respondent reasonably postulates that McNeely knocked Poston down to give himself time to load his gun. (RB 73, fn. 13.)

Nevertheless, respondent argues that Poston's convictions of murder and attempted murder are supported by sufficient evidence because the jury could have found that Poston's use of lethal force was an unreasonable response to McNeely's slap; that Poston shot McNeely for revenge rather than in self-defense or in the heat of passion; that Poston's failure to run away from McNeely showed an implied agreement to engage in mutual combat; that McNeely's slap would not have provoked a reasonable person to respond with lethal force; and that Poston committed a provocative act knowing it would "produce a life-threatening response." (RB 95-96.) These contentions should be rejected and the judgment should be reversed.

## A. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN SELF-DEFENSE.

Respondent's concessions demonstrate that no rational juror could have found proof beyond a reasonable doubt that Poston did not act in self-defense. (RB 19-20, 60, 69, 91.) Respondent

acknowledges that Poston had a "viable self-defense claim" based on the surveillance video. (RB 45.) Poston agrees he had a viable defense. He had a compelling and seemingly irrefutable defense which most likely would have prevailed had the prosecutor not persuaded the jurors he was a bad character, not a "normal" person or "law-abiding citizen." (20 RT 1897.)

The prosecutor read Poston's rap lyrics and recorded jail calls about "hos" and "bitches" and asserted that Poston was a "pimp" and a "hard-core thug" who was part of "a world" described by Oakland Police Department gang expert, Lieutenant Tony Jones. (19 RT 1625-1629, 1640-1641, 1647-1648, 1650, 1654-1666, 1799-1828; 20 RT 1892, 1897-1899, 1966-1967, 1971-1972.) The prosecutor argued that Poston did not use the "phrasing that innocent, justified people use," and did not fit the "true picture of self-defense," where "normal people," "law-abiding citizens," wait for the police with the "smoking gun" in hand. (20 RT 1892, 1898.)

Respondent avoids reliance on that challenged evidence and argument to refute Poston's self-defense claim, arguing instead that Poston "muddied the defense" by lying on the witness stand. (RB 55.) Respondent points to Poston's testimony that he drew his weapon in

response to seeing McNeely's gun and that McNeely shot a hole in the radiator of Poston's car. (RB 55.)

In a way, both the prosecutor and respondent are correct - Poston muddied the waters of his defense by making statements on and off the witness stand which were effectively used against him. Poston's out-of-court statements did not contradict his self-defense claim but they made him appear unsavory and unsympathetic. On the witness stand, Poston may have appeared dishonest in at least some of his responses - for instance, denying knowledge of indicia of credit card fraud found in his bedroom, and asserting on cross-examination that a "ho" is a "garden tool." (19 RT 1619-1624, 1653.)

Poston may have been reluctant to admit uncharged crimes but his statements and testimony about the shooting are substantially consistent with the video evidence. As respondent acknowledges, the action preceding the shooting developed incrementally in seconds and fractions of seconds. (RB 72, 80; 19 RT 1756.) Poston testified that he acted instinctively, in fear for his life. (18 RT 1550; 19 RT 1662-1663.) He knew McNeely had a gun and saw or sensed he was reaching for it. (19 RT 1662.)

It is an undisputed fact that McNeely was reaching for something - either the gun itself or the magazine - less than two seconds after slapping and tripping Poston. (RB 80.) Respondent acknowledges that the prosecutor argued McNeely was reaching for a gun. (RB 20, fn. 4; 11 RT 498; 20 RT 1893.) Still, respondent may be correct that McNeely was only reaching for the magazine - the video is not dispositive and McNeely did not testify. Either way, Poston acted reasonably in self-defense.

Respondent concedes that Poston could reasonably have assumed McNeely was reaching for a gun; that McNeely must have intended to use lethal force at the outset; and that McNeely was at most one quick step away from loading the gun and shooting. It is difficult to see how respondent can make these concessions and still argue that Poston's resort to lethal force was unreasonable under the circumstances. (Cf. *Berube v. Conley* (1st Cir. 2007) 506 F.3d 79, 85 [police officer's use of lethal force was reasonable because suspect was armed and she had to make a split second decision]; *McLenagan v. Karnes* (4th Cir. 1994) 27 F.3d 1002, 1007-1008 [police officer's use of lethal force was reasonable because he reasonably believed suspect had a gun and he had "no time to consider anything at all" -

except his immediate safety]; compare *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1225-1226 [defendant was not entitled to use deadly force because the uncontroverted evidence showed that his adversary did not have a gun].)

Poston knew McNeely had a gun and he had to make a split second decision. He had no time to consider anything but his immediate safety. He could not be expected to "perfectly calibrate the amount of force required to protect [himself]." (Cf. *Berube v. Conley, supra*, 506 F.3d at p. 85 [police officer acted reasonably in continuing to shoot at downed suspect because she could not be expected "to perfectly calibrate the amount of force required to protect herself"].) Respondent's claim that Poston would have stopped firing sooner if he was just defending himself is unconvincing. (RB 96.)

No rational juror could have found proof beyond a reasonable doubt that Poston's response to McNeely's attack was unreasonable and, if they did, Poston still could not be found guilty of murder, but only voluntary manslaughter at most.

No rational juror could have found proof beyond a reasonable doubt that Poston shot McNeely in retaliation rather than in self-defense. (RB 95-96.) Respondent argues there was insufficient time

for Poston to see McNeely reach for the gun and process that information in the second or two before he started shooting. (RB 94-95.) Thus, according to respondent, Poston must have decided to shoot McNeely immediately after the slap, in retaliation rather than self defense. (RB 95.)

But there was no expert testimony at trial regarding reaction times in similar situations. Nor does respondent cite any cases, studies, or articles suggesting that Poston could not have reacted instinctively to save his own life in a second or two. (But see J. Pete Blair, Joycelyn Pollock, Don Montague, Terry Nichols, John Curnutt, and David Burns, Reasonableness and Reaction Time, Vol. 14 Police Quarterly No. 4 (2011) 323, 334 [study of firing/reaction times: the police officers studied responded to armed suspects in 0.38 - 0.40 seconds from suspect's movement to officer's gun firing].)[1]

---

[1] The Police Quarterly article is submitted as Exhibit A to Poston's Requeast for Judicial Notice because it is not freely available online nor presumably in a typical law library and appears to be the most recent and reputable study on reaction time available, cited by other law enforcement websites and articles. (See, e.g., Force Science Institute, Important New Reaction-Time Study Addresses What's "Reasonable" in Armed-Suspect Encounters, Force Science News #178, http://www.forcescience.org/fsnews/178.html; New Reaction-Time Study Addresses What's "Reasonable" in Armed-Suspect Encounters, https://www.policeone.com/Officer-

Moreover, respondent suggests that Poston could have formed an intention to retaliate in the second or two after McNeely knocked him down and before McNeely reached for his gun or magazine. It seems illogical that Poston could have formed an intention to retaliate in a second or two but could not have seen McNeely reaching for his gun and reacted instinctively in a second or two.

Respondent acknowledges the prosecution's burden of proving beyond a reasonable doubt that Poston did not act reasonably or unreasonably in self-defense. (RB 59, 99; see also *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704; *People v. Rios* (2000) 23 Cal.4th 450, 462; *People v. Levitt* (1984) 156 Cal.App.3d 500, 509.) On appeal, the judgment must be supported by substantial evidence that Poston did not act reasonably or unreasonably in self-defense. (*Ibid*.; see also *Jackson v. Virginia, supra*, 443 U.S. at p. 319; *People v. Barnes, supra*, 42 Cal.3d at p. 303.)

Respondent's suggestion that Poston decided to retaliate after McNeely slapped him is a mere speculative possibility, unsupported

---

Safety/articles/3705348-New-reaction-time-study-addresses-whats-reasonable-in-armed-suspect-encounters/.) Had the prosecutor made an argument about reaction time at trial, Poston could have presented expert testimony to refute it.

by substantial evidence. (See *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1419 [finding insufficient evidence to support conviction of unlawful possession of a firearm; "The possibility Sifuentes might have had the right to exercise control over the gun does not by itself provide a basis to infer he had the right to control it"]; *O'Laughlin v. O'Brien* (1st Cir. 2009) 568 F.3d 287, 303-304 [circumstantial evidence susceptible to conflicting inferences was insufficient to support the judgment]; *Evans-Smith v. Taylor* (4th Cir. 1994) 19 F.3d 899, 900-910 [same]; cf. *People v. Moore* (2011) 51 Cal.4th 386, 406 [speculation was insufficient to establish prejudicial error; "That an event *could* have happened . . . does not by itself support a deduction or inference it did happen"].) No rational juror could have found proof beyond a reasonable doubt that Poston shot McNeely in retaliation for the slap rather than in self-defense.

No rational juror could have found proof beyond a reasonable doubt that Poston intended to engage in mutual combat before McNeely slapped him. Respondent acknowledges that mutual combat means "not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities." (RB 97, quoting *People v. Ross* (2007) 155 Cal.App.4th

1033, 1045.) Like the prosecutor, respondent argues that Poston's failure to flee before McNeely slapped him showed an intention to fight. (RB 97, 121; 20 RT 1896.)

But Poston had no reason to flee before McNeely became aggressive and, after that point, Poston did not feel he could safely flee because he believed McNeely had a gun. (18 RT 1543.) Moreover, Poston had no duty to flee, as respondent acknowledges. (RB 140-141.)

As explained in Poston's opening brief, even a felon is entitled to stand his ground and, if necessary, use a firearm in self-defense, even if it is unlawful for him to possess the firearm more than momentarily and even if he instigated a quarrel, as long as his adversary was the first to use unlawful force. (AOB 64; see also *People v. King* (1978) 22 Cal.3d 12, 24; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180; *People v. Rhodes, supra,* 129 Cal.App.4th at p. 1346; cf. *People v. Randle* (2005) 35 Cal.4th 987, 992 [defendant was entitled to jury instruction on imperfect defense of another for unreasonable use of deadly force in defense of another, though he instigated the quarrel by criminal but not assaultive conduct].)

Here, Poston did not instigate the quarrel - McNeely did. Poston did not escalate the quarrel - McNeely did. Poston did not react aggressively to McNeely's verbal and physical aggression until after the slap. As respondent concedes, Poston stood by passively until that point while McNeely alone acted aggressively: "McNeely paced around and repeatedly grabbed the lapels of his jacket out of frustration. McNeely threw a cup on the ground. He went up close to Poston and continued to talk belligerently." (RB 19, 91.) Then McNeely "forcefully" slapped Poston's face and tripped him, as respondent explains. (RB 20.)

If an assault victim's failure to flee could show intent to engage in mutual combat, there would no longer be any right to stand one's ground except perhaps in one's home. (See § 198.5 [homeowner who uses deadly force against intruder is presumed to have acted in self-defense].) Poston's failure to flee before the slap cannot defeat his self-defense claim.

Poston's gesture of holding his hands up as if to say "stop already" says little about his intent before McNeely slapped him, pulled out a gun, and shot at Poston's back as he ran down the street. (15 RT 936, 940-941.) It is possible Poston meant to withdraw from a

prior agreement to fight, as respondent suggests. (RB 122.) It is equally possible and more likely considering all the evidence that he simply meant: "Stop shooting - I dropped the gun and I am no longer a threat to you." (See also *People v. Sifuentes, supra,* 195 Cal.App.4th at p. 1419 [finding insufficient evidence to support conviction of unlawful possession of a firearm; "The possibility Sifuentes might have had the right to exercise control over the gun does not by itself provide a basis to infer he had the right to control it"]; *O'Laughlin v. O'Brien, supra,* 568 F.3d at pp. 303-304 [circumstantial evidence susceptible to conflicting inferences was insufficient to support the judgment]; *Evans-Smith v. Taylor, supra,* 19 F.3d at pp. 900-910 [same].)

This was not a case of mutual combat. There was nothing mutual about it. Poston's behavior did not suggest in any way that he intended to fight McNeely before McNeely's initiation of hostilities. (Compare *People v. Moore, supra,* 51 Cal.4th at p. 1136 ["where the prosecution's evidence show[ed] a jailhouse scuffle, the scene as witnessed [did] not suggest defendant may have been acting in self-defense, and defendant present[ed] no evidence in mitigation," mutual combat supported a finding of criminal assault]; *People v. Sanchez*

(2001) 26 Cal.4th 834, 851-854 [both defendants were equally culpable because they engaged in a "gun battle" - "simultaneous attempts to murder one another in a preplanned blaze of gunfire"].)

At most, Poston's behavior and subsequent statements arguably demonstrate a prior intention to stand his ground and defend himself if attacked. A person who intends to kill in self-defense if sufficiently threatened does not intend to kill unlawfully and cannot be guilty of murder or attempted murder. (See *In re Christian S.* (1994) 7 Cal.4th 768, 779 [murder requires proof of intent to kill unlawfully - not in self-defense].)

Respondent concedes Poston could reasonably have believed McNeely was reaching for a gun and intended to use lethal force. (RB 45, 72, fn. 12, 95.) No rational juror could have found proof beyond a reasonable doubt that Poston intended to engage in mutual combat before McNeely slapped him and knocked him down. There was insufficient evidence that Poston did not act reasonably or unreasonably in self-defense and his convictions of murder and attempted murder should be reversed.

///

//

B. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN THE HEAT OF PASSION ON ADEQUATE PROVOCATION.

Respondent does not dispute that "McNeely insulted, ranted, and yelled right in Poston's face, calling him a 'bitch ass nigger,' while gesturing aggressively, punched or slapped Poston in the face, knocking him to the ground, then pulled out a handgun." (RB 99; Poston AOB 73.) Respondent argues that Poston could not have acted in the heat of passion on adequate provocation because "the video shows that Poston went for his gun first." (RB 99.)

But, even the prosecution expert, Oakland Police Lieutenant Tony Jones, acknowledged that he would have pulled out a gun too in these circumstances. (19 RT 1825.) Any reasonable person might have done so.

Respondent ignores *People v. Beltran* (2013) 56 Cal.4th 935, arguing that a reasonable person "would not have decided to shoot and kill someone merely because that person slapped and tripped him. (RB 99.) Of course, a reasonable person might very well have shot if he knew the person who slapped and tripped him had a gun in his pocket.

Moreover, as Poston explained, it is not necessary that the provocation would cause a reasonable person to kill; an unnecessary killing is always unreasonable. (AOB 73; *People v. Beltran, supra*, at pp. 952-958.) If the provocation would have caused a reasonable person to act rashly from passion and not from judgment, the offense is mitigated to voluntary manslaughter or attempted voluntary manslaughter. (*Ibid*.)

The uncontroverted evidence establishes as a matter of law that Poston acted in self-defense. In addition, McNeely's extreme provocation caused Poston to act from passion - fear for his life - which negated malice. (See *People v. Breverman* (1998) 19 Cal.4th 142, 163 [heat of passion may be based on anger, rage, fear, or any "[v]iolent, intense, high wrought or enthusiastic emotion … other than revenge"]; *People v. Mitchell* (1939) 14 Cal.2d 237, 252 [heat of passion may be based on fear, rather than rage]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 [heat of passion may be based on a fear that did not rise to the level required to establish self-defense]; *People v. Thomas* (2013) 218 Cal.App.4th 630, 646 [failure to instruct on heat of passion was prejudicial error where the defendant testified that he shot the attacking victim because he was afraid; although the

facts may have fit more precisely with imperfect self-defense, they also supported heat of passion due to a sudden quarrel].) No rational juror could have found otherwise and Poston's convictions of murder and attempted murder should be reversed.

C. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON INITIATED A CHAIN OF EVENTS THAT PROXIMATELY CAUSED LIONEL FLUKER'S DEATH.

Respondent attempts to distinguish this case from *People v. Cervantes* (2001) 26 Cal.4th 860, arguing that Poston did not merely "hurl an insult," he shot McNeely, who then shot Fluker. (RB 102.) The defendant in *Cervantes* did not merely hurl an insult either. Like Poston, he pulled out a gun and shot someone he perceived as a threat. (*People v. Cervantes, supra*, at p. 863.)

Neither the defendant's crude insult at the beginning of the encounter in *Cervantes* nor his shooting of a rival gang member was considered a provocative act proximately causing the shooting death of a member of the defendant's gang by members of the rival gang for several reasons. (*Id*. at pp. 872-874.) Like Poston, the defendant in *Cervantes* was not the initial aggressor. (*Id*. at p. 872.) Like

McNeely, the killers in *Cervantes* were not shooting in self-defense, but in retaliation. (*People v. Cervantes, supra*, 26 Cal.4th at p. 873.)

Like McNeely, the killers in *Cervantes* were not acting unconsciously or reflexively. (*Ibid*.) On the contrary, their acts "were themselves criminal, felonious, and perpetrated with malice aforethought." (*Id*. at p. 874.) They "intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him, a circumstance that is normally held to relieve the first actor [defendant] of criminal responsibility." (*Ibid*. [court's insertions, citation omitted].) Thus, the defendant's act of shooting was not the proximate cause of the charged murder and the judgment was reversed for insufficient evidence. (*Ibid*.)

Similarly here, McNeely was the initial aggressor. McNeely's acts were themselves criminal, felonious, and perpetrated with malice aforethought. McNeely intended to exploit the situation and was not acting in concert with Poston, a circumstance that relieves Poston of criminal responsibility for McNeely's fatal shooting of Fluker.

No two cases are exactly alike and *Cervantes* did also involve some circumstances not present in this case, as respondent points out. (RB 101-102.) The killers there did not include the person the

defendant had shot and the defendant was not present when the retaliatory killing occurred. Here, on the other hand, there were no third party killers - just McNeely. And Poston was arguably still "present" when McNeely shot Fluker, though it was undisputed that he was running away. These differences are insufficient to compel a different result in this case than in *Cervantes*.

Respondent ignores *Sanchez* - the companion case to *Cervantes* - in which the Supreme Court found it significant that it was "not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . Because defendant and [his rival] had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for [the victim's] death, without regard to which of them actually fired the bullet that struck and killed [the victim]." (AOB 81; *People v. Sanchez, supra*, 26 Cal.4th at p. 854 and conc. opn of Kennard J., at p. 856.)

Respondent suggests that Poston instigated a gun battle, quoting *Cervantes*: "The provocative act murder doctrine has traditionally

been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct . . . ." (RB 102; *People v. Cervantes, supra*, 26 Cal.4th at p. 867.) But the Supreme Court held that the provocative act murder doctrine did not apply in that case despite the fact that the defendant there fired first. (*Id*. at pp. 872-874.) The defendant's act of shooting did not instigate the gun battle in *Cervantes* because it was in response to provocative acts by other people who were not acting in concert with the defendant. (*Ibid*.)

Similarly, Poston's act of shooting did not instigate a gun battle because it was in response to McNeely's unlawful, armed assault. This case presents the precise scenario the Supreme Court was not addressing in *Sanchez*. McNeely's mental state was substantially more culpable than Poston's. McNeely was the initial aggressor who apparently intended to use lethal force when he assaulted Poston without provocation and then fired at Poston's back as he ran away.

McNeely and Poston did not engage in precisely the same conduct at the same time as in *Sanchez*. (*People v. Sanchez, supra*, 26 Cal.4th at p. 854, 856.) Rather McNeely instigated the gun battle,

Poston responded in self-defense, then McNeely fired wildly down the street at Poston's back, killing Fluker. As in *Cervantes*, "the evidence is insufficient as a matter of law to establish the requisite proximate causation to hold defendant liable for murder." (*People v. Cervantes, supra*, 26 Cal.4th at p. 874.) Poston's convictions of murder and attempted murder should be reversed.

* * * * * *

## II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL.

Poston argued that the trial court abused its discretion in admitting extensive, inflammatory evidence of Poston's out-of-court statements regarding pimping and prostitution to impeach his credibility, violating due process and requiring reversal. (AOB 84-92; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; Evid. Code, § 352; *Estelle v. McGuire* (1991) 502 U.S. 62, 75; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378.)

Respondent counters that the evidence was more probative than prejudicial because it "shed light on how Poston may have influenced" Bailey's testimony, and that any error was harmless. (RB 103-115.) These contentions should be rejected and the judgment should be reversed.

Contrary to respondent's claim, evidence that Poston called women "bitches" and "hos," associated with prostitutes, and may have received money from them was not more probative than prejudicial. No evidence was presented regarding typical relationships between

pimps and prostitutes. Thus, even if Poston was Bailey's pimp, the jurors could not decide based on that "fact" that Poston controlled Bailey's testimony.

Respondent argues nonsensically that Poston's testimony about pimping and prostitution on cross-examination validated the trial court's admission of the out-of-court statements. (RB 107-109.) Of course, had all evidence of pimping and prostitution been excluded per Poston's request, the prosecutor could not have cross-examined Poston about it and the jurors would not have heard about it at all.

Respondent argues that the pimping and prostitution evidence was not unduly prejudicial, quoting *People v. Doolin* (2009) 45 Cal.4th 390, 439:

> [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.

(RB 110.)

Poston agrees with *Doolin*. That is precisely why the pimping and prostitution evidence here should have been excluded: it was of such nature as to inflame the emotions of the

jury, motivating them to use it for the illegitimate purpose of concluding that Poston was guilty because he was a bad character who mistreated women.

Unlike the evidence pertaining to prostitution in *Doolin*, the evidence here had no significant probative value - it was completely irrelevant to the charged offenses and was admitted only to impeach Poston's credibility in general with conduct showing moral turpitude. In *Doolin*, however, evidence that a defendant accused of deliberately murdering prostitutes hated prostitutes was highly probative and necessary to rebut his testimony that he had nothing against prostitutes and had never consorted with one. (*People v. Doolin, supra*, 45 Cal.4th at pp. 400, 439.)

In *Doolin*, the challenged evidence of the defendant's prior statements disparaging prostitutes and prior conduct in mistreating his girlfriends was "unpleasant" but it "paled in comparison to the testimony from four witnesses that defendant tried to kill them." (*Id*. at pp. 435-439.)

Here, on the other hand, extensive evidence of Poston's offensive and inflammatory statements about "bitches" and hos," including some shockingly offensive statements to Poston's own

mother, must have colored the jurors' perceptions of Poston's responsibility for the charged shooting as to which even respondent acknowledges Poston had a "plausible self-defense claim." (RB 55.) Unlike *Doolin*, the prostitution evidence here was the most inflammatory evidence presented.

Respondent argues that any error was harmless because "the jury would not have convicted Poston of murder and attempted murder just to punish him for pimping. On the contrary, the jury must have primarily relied on the video which showed the entirety of Poston's role in the crimes charged." (RB 110.)

The video showed that McNeely attacked Poston without provocation, then, after knocking Poston down, reached in his jacket for a gun or magazine. Had the jury relied primarily on the video, it could not have convicted Poston. The jury convicted Poston despite the video because the prosecutor portrayed him as a "pimp" and a "thug" who spoke about women in an offensive and shocking way even to his own mother. Admission of the pimping evidence was prejudicial under any standard and the judgment should be reversed.

* * * * * *

## III. THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.

Poston argued that the trial court erred prejudicially in instructing on mutual combat in accord with CALCRIM No. 3471, violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (AOB 93-100; U.S. Const., amend. XIV; Cal. Const., art. I, §§ 15, 16; see also *Middleton v. McNeil* (2004) 541 U.S. 433, 437; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Crane v. Kentucky* (1986) 476 U.S. 63, 690.); *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *Boyde v. California* (1990) 494 U.S. 370, 380; *Chambers v. Mississippi* (1973) 410 U.S. 284; *In re Winship* (1970) 397 U.S. 358, 364; *People v. Cross* (2008) 45 Cal.4th 58, 67.)

Respondent argues again that Poston's failure to flee before McNeely slapped him, the rapidity with which he pulled out his gun, and his gesture of holding out his hands from down the street show his intent to engage in mutual combat. (RB 117.) Poston has already addressed these claims and no further discussion appears necessary. (See Argument I, *ante*.)

Respondent's argument that Poston forfeited his claim of instructional error does seem to require a brief reply. (RB 117-119.) As respondent acknowledges, section 1259 authorizes appellate review of any instruction given, "even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (RB 118.)

CALCRIM No. 3471 clearly affected Poston's substantial rights because at least one juror could have had a reasonable doubt as to his guilt of murder and attempted murder absent instruction on mutual combat. (See *Chapman v. California* (1967) 368 U.S. 18, 24 [a constitutional error requires reversal if it cannot be shown harmless beyond a reasonable doubt - if there is a reasonable chance of a more favorable outcome absent the error]; *People v. Mil* (2012) 53 Cal.4th 400, 417, 419 [reversing for instructional error in omitting an element of the offense under *Chapman* because "a rational juror, given proper instruction, could have had a reasonable doubt whether" the omitted element was proven]; *People v. Franco* (2009) 180 Cal.App.4th 713, 719 [a claim of instructional error affects the defendant's substantial rights under § 1259 and is cognizable on appeal despite failure to object if "the asserted error would result in prejudice if error it was"].)

Mutual combat - a "gunfight" - was the prosecutor's pervasive theme and theory of the case, as respondent acknowledges. (RB 139.) The prosecutor's argument suggested that Poston engaged in mutual combat and, thus, that he could not claim self-defense, even if he did not agree or intend to fight until after McNeely slapped him. (20 RT 1864-1866, 1872, 1883, 1887, 1890, 1901, 1963-1968, 1971.)

Without the mutual combat instruction a juror could well have had a reasonable doubt whether Poston acted with malice instead of an actual belief in the need to use lethal force in self-defense, whether reasonable or not. The instructional error was not forfeited and the judgment should be reversed.

* * * * * *

## IV. THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.

Poston argued that the trial court erred prejudicially in omitting instruction on an element of provocative act murder - that the chain of events proximately causing the victim's death must have been initiated by the defendant - violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (AOB 101-108; U.S. Const., amend. XIV; Cal. Const., art. I, §§ 15, 16; see also *Middleton v. McNeil, supra,* 541 U.S. at p. 437; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Crane v. Kentucky, supra,* 476 U.S. at p. 69.); *Estelle v. McGuire, supra*, 502 U.S. at p. 72; *Chambers v. Mississippi, supra*, 410 U.S. 284; *In re Winship, supra*, 397 U.S. at p. 364; *People v. Gonzalez, supra*, 54 Cal.4th at pp. 662-663; *People v. Flood* (1998) 18 Cal.4th 470, 479-480.)

Respondent argues again that the instructional error was forfeited, and also that the provocative act murder doctrine applies to anyone who commits an act which was a substantial factor in causing the foreseeable death of another regardless of whether or not the

defendant initiated the chain of events. (RB 126-134.) These contentions should be rejected and the judgment should be reversed.

Again, there was no forfeiture because any error would affect Poston's substantial rights - it would be prejudicial. It was undisputed that Poston did not initiate the chain of events leading to Fluker's death. McNeely did. (See § 1259; *Chapman v. California, supra*, 368 U.S. at p. 24; *People v. Mil, supra*, 53 Cal.4th at p. 419; *People v. Franco, supra*, 180 Cal.App.4th at p. 719; Argument III, *ante*.)

Respondent argues that *Cervantes* disproves Poston's claim of instructional error because the defendant there was not the initial aggressor and the Supreme Court did not find that point dispositive. (RB 132-133; *People v. Cervantes, supra*, 26 Cal.4th at pp. 872-873.) Poston disagrees with respondent's interpretation of *Cervantes*.

The Supreme Court may have failed to address Poston's claim because the parties in *Cervantes* did not raise it and/or because it was not necessary to the decision - multiple factors made clear that the defendant's act was not the proximate cause of the victim's death. (*Ibid*.) Multiple factors so indicate here as well. But, if and when the Supreme Court is faced with the question whether initiating the chain

of events is an element of provocative act murder, the court could decide in Poston's favor without disapproving *Cervantes*.

Respondent acknowledges Poston's collection of provocative act murder cases in which the defendant was the initial aggressor. Apparently, like Poston, respondent could find no such cases where the defendant was not the initial aggressor. (AOB 105-106; RB 133.)

Respondent argues that even the cases cited by Poston disprove his claim because they show the provocative act murder doctrine can be applied to multiple accomplices. (RB 133.) Of course, accomplices are legally responsible for each other's acts. (See, e.g., §§ 31, 1111; *People v. McCoy* (2001) 25 Cal.4th 1111, 1118; *People v. Beeman* (1984) 35 Cal.3d 547, 560.) Thus it makes no difference whether the act initiating the chain of events was performed by one accomplice or another. But two actors are generally not held responsible for each other's acts if they are not acting in concert, as *Cervantes* makes clear. (See *People v. Cervantes, supra*, 26 Cal.4th at pp. 873-874.)

Respondent argues it would be difficult to agree on "what words or acts really initiated the chain of events." (RB 134.) Again Poston disagrees. The act initiating the chain of events is the first

unlawful act in the chain. In *Cervantes*, it was not the defendant's insults which initiated the chain but the rival gang member's armed threat. (*People v. Cervantes, supra*, 26 Cal.4th at p. 872 and fn. 12.) Even if Poston had said something offensive to McNeely, as respondent suggests, *Cervantes* makes clear that offensive words cannot be the initiating act unless perhaps if they constituted a criminal threat. (RB 134; *ibid*.) Moreover, there was no evidence whatsoever that Poston said something offensive which provoked McNeely.

It is possible it might be difficult in some unusual future case to discern which act initiated a lethal chain of events but it is not difficult in this case. McNeely initiated the chain of events by assaulting Poston without provocation. At least one juror could well have had a reasonable doubt as to Poston's guilt of murder if instructed that a non-killer must have initiated the chain of events leading to death to be held responsible under the provocative act murder doctrine. Thus, the judgment should be reversed.

* * * * * *

## V. PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL.

Poston argued that the prosecutor committed pervasive, prejudicial misconduct by appealing to the jurors' emotions, racial bias, and fear of random street violence; attacking Poston's character; and misleading the jurors, violating due process. (AOB 109-128; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; *McKleskey v. Kemp* (1987) 481 U.S. 279, 309; *Darden v. Wainwright* (1986) 477 U.S. 168, 179-180; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637; *United States v. Cabrera and Mulgado* (9th Cir. 2000) 222 F.3d 590, 594; *People v. Hill* (1998) 17 Cal.4th 800; *People v. Cudjo* (1993) 6 Cal.4th 585, 625; *People v. Harris* (1989) 47 Cal.3d 1047, 1083-1084.)

Respondent argues that the claim was forfeited; that there was no misconduct; and that there was no prejudice. (RB 134-140.) These contentions should be rejected and the judgment should be reversed.

Respondent argues this Court should not reach the merits of Poston's claim because there were no objections and "[t]his was not a

case where the prosecutor made flagrantly deceptive and reprehensible arguments." (RB 137.) Poston disagrees.

As explained in Poston's opening brief, the prosecutor committed pervasive misconduct by using deception and consciously or unconsciously racist attacks on Poston's character to overcome compelling video evidence of McNeely's assault and Poston's defensive response. (AOB 119-129; see also *McKleskey v. Kemp* (1987) 481 U.S. 279, 309; *People v. Cudjo* (1993) 6 Cal.4th 585, 625; *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529; *People v. Najera* (2006) 138 Cal.App.4th 212, 220-221; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1074 *People v. Lambert* (1975) 52 Cal.App.3d 905, 910; *People v. Jones* (1970) 7 Cal.App.3d 358, 363; *Moore v. Morton* (3rd Cir. 2001) 255 F.3d 95, 113-114; *United States v. Cabrera and Mulgado* (9th Cir. 2000) 222 F.3d 590, 594.)

As Poston explained, it was deceptive for the prosecutor to repeatedly refer to the charged shooting as a "gun battle" when it was and is undisputed that McNeely initiated the confrontation. (AOB 119, 124, 127.) McNeely began acting aggressively and unilaterally escalated the incident to a physical assault. Respondent acknowledges that McNeely apparently intended to use lethal force all along,

knocking Poston down to give himself time to load his gun. (RB 72-73 and fns. 12 and 13.)

There was no substantial evidence that Poston intended to fight McNeely before the assault, as explained, *ante*. Thus the repeated references to gun battles was a deceptive and reprehensible attempt to persuade the jurors by alarming them and inflaming their passions.

Respondent argues incorrectly that the prosecutor's questions on her cross-examination of Poston cannot support a claim of misconduct because the questions were not argument. (RB 139-140.)

A prosecutor can commit misconduct in her questioning of witnesses as well as in her argument. (See, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1348; *People v. Tully* (2012) 54 Cal.4th 952, 1035; *United States v. Ortiz* (9th Cir. 2004) 362 F.3d 1274, 1279; *United States v. Rudberg* (9th Cir. 1997) 122 F.3d 1199, 1200-1205; *United States v. Piva* (1st Cir. 1989) 870 F.2d 753, 760.) It is misconduct for the prosecutor to try to elicit inadmissible evidence or to persuade the jury unfairly by insinuation. (See *People v. Seumanu, supra*, 61 Cal.4th at p. 1348; *People v. Tully, supra*, 54 Cal.4th at p. 1035; *United States v. Ortiz, supra*, 362 F.3d at p. 1279; *United States v. Rudberg, supra*, 122 F.3d at pp. 1200-1205; *United States v.*

*Piva, supra,* 870 F.2d at p. 760.) It makes little difference whether the prosecutor called Poston a "hard-core thug" in her cross-examination of him or in her closing argument. (19 RT 1628.)

Respondent cites no authority for its contention that "thug" has no racial or ethic connotations. (RB 140; compare Ian Haney Lopez, Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class, Oxford University Press (2014); Eli Wolfe, Blowing Racial Dog Whistles: Berkeley Prof Blasts Conservatives For "Coded Messages," http://alumni.berkeley.edu/california-magazine/just-in/2014-02-25/blowing-racial-dog-whistles-berkeley-prof-blasts; Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html.)

Respondent completely ignores the prosecutor's emphasis on Poston's use of African-American Vernacular English ("AAVE") and her unfair argument that his alternating use of AAVE with his friends and family and Standard English on the witness stand showed that he was lying and was trying to "get over on the jury." (AOB 121-124; RB 127-141; 19 RT 1627; see also Charisse Jones, Shifting: The

Double Lives of Black Women in America, Harper e-book (2003) at p. 108; John R. Rickford, African American Vernacular English, Blackwell Publishers (1999) at pp. 283-284, 340-342; Sarah D. Sparks, Students Learn to 'Toggle' Between Dialects, Education Week (Sept. 10, 2014), http://www.edweek.org/ew/articles/2014/09/10/03dialect.h34.html?qs=students+learn+to+toggle+between+dialects; Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black.)

Respondent also ignores the prosecutor's arguments and insinuations that Poston's statements meant the exact opposite of their plain meaning, as if AAVE was a secret code for deception. (AOB 124-126; 19 RT 1633, 1640-1642, 1648-1650, 1661-1662; 20 RT 1897-1898; Pros. Exh. 32A at pp. 19-22, 25-26, 37-40.) As Poston explained, the prosecutor's repeated twisting of his words in an attempt to incriminate him was misleading and unfair.

Faced with a seemingly irrefutable case of self-defense on videotape, the prosecutor persuaded the jurors that Poston should be convicted because he was a bad character, a pimp and a thug who did

not talk or act like she thought an innocent person would. The pervasive misconduct rendered Poston's trial fundamentally unfair in violation of due process. (See *Donnelly v. DeChristoforo, supra,* 416 U.S. 637; *People v. Hill, supra,* 17 Cal.4th 800.)

A reasonable juror could and likely would have had a reasonable doubt as to Poston's guilt if not for the misconduct. (See *Chapman v. California*, *supra,* 386 U.S. at p. 24; *People v. Mil, supra,* 53 Cal.4th 400 at p. 419; *People v. Hill, supra*, 17 Cal.4th at pp. 844-845; *People v. Soojian* (2010) 190 Cal.App.4th 491, 521.) Thus, the judgment should be reversed.

* * * * * *

## VI. POSTON JOINS IN AND ADOPTS BY REFERENCE MCNEELY'S ARGUMENT I: THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS.

Poston joined in and supplemented McNeely's Argument I: the trial court abused its discretion in denying Poston's severance motion and the joint trial was fundamentally unfair in violation of due process. (AOB 130-134; McNeely AOB 18-44; see also U.S. Const., amend. XIV; Cal. Const., art. I, § 15; § 1098; Cal. Rules of Court, rule 8.200 (a)(5); *Zafiro v. United States* (1993) 506 U.S. 534; *United States v. Mayfield* (9th Cir. 1999) 189 F.3d 895; *United States v. Rucher* (11th Cir. 1990) 915 F.2d 1511; *United States v. Romanello* (5th Cir. 1984) 726 F.2d 173; *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078; *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335; *People v. Turner* (1984) 37 Cal.3d 302, 312-313; *People v. Massie* (1967) 66 Cal.2d 899, 916-917.)

Respondent counters that Poston and McNeely's defenses were not antagonistic enough to require severance and that the joint trial was not grossly unfair. (RB 45-62.) On the contrary, severance was required and the joint trial was grossly and fundamentally unfair in

violation of due process. Respondent raises no points requiring further discussion. The judgment should be reversed.

* * * * * *

## VII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

Poston argued that the cumulative effect of the errors rendered the trial fundamentally unfair in violation of due process. (AOB 135-137; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; see also *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814, fn. 6; accord *United States v, McLister* (9th Cir. 1979) 608 F.2d 785, 788; see also *People v. Hill* (1998) 17 Cal.4th 800, 845-847 [cumulative effect of multiple errors resulted in miscarriage of justice, requiring reversal under California Constitution].)

Respondent counters that there were no errors and no prejudice. (RB 141-143.) Contrary to respondent's claims, cumulative prejudice violates due process and requires reversal.

As Poston explained, the prosecutor won convictions despite clear evidence of self-defense by exploiting the jurors' conscious and unconscious racism and fear of street violence. She and McNeely's attorney persuaded the trial court to admit voluminous out-of-court statements by Poston talking about "pimps" and "bitches" and "hoes" in AAVE. The prosecutor unfairly twisted Poston's words to make him sound guilty and argued that he was guilty because he did not talk

or act like an innocent person would and that his code-switching showed he was lying.

The prosecutor unfairly argued that Poston was guilty because he engaged in mutual combat and a gun battle despite uncontroverted evidence that it was McNeely who initiated everything. The trial court's erroneous instructions supported the misleading argument and eviscerated Poston's defense. Finally, the joint trial with McNeely resulted in a second attorney helping the prosecutor to attack Poston's character and deflect from the seemingly dispositive video.

As Poston explained, he was convicted of murder and attempted murder because he was an African American man who spoke African American Vernacular English as well as Standard English, who lived in a high crime area, who associated with gangsters and prostitutes, and who talked with his mother on the jail phone about "bitches" and "hoes" and expressed relief in finding that the law of self-defense fit his case "to a T."

Absent all of the errors, a more favorable result was reasonably possible and probable. Cumulative prejudice rendered the trial fundamentally unfair in violation of due process and the judgment should be reversed.

CONCLUSION

For all of the foregoing reasons, the judgment should be reversed.

DATED: March 28, 2016 Respectfully submitted,

/s/ Randi Covin

Attorney for Appellant
DONEL POSTON

WORD COUNT CERTIFICATE

I certify pursuant to California Rules of Court, rule 8.360, that, according to my word processing program, this Appellant's Opening Brief contains 7,766 words, excluding the tables and this certificate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of March, 2016, at Willits, California.

/s/ Randi Covin

# DECLARATION OF SERVICE

I, Randi Covin, declare that I am over 18 years of age and not a party to this action. My business address is P.O. Box 1120, Willits, California, 95490. On March 28, 2016, I served true and correct copies of **APPELLANT POSTON'S REPLY BRIEF** ON:

Mr. Donel Poston
AT2512
High Desert State Prison
PO Box 3030
Susanville, CA. 96127

Mr. David Bryden
Attorney at Law
160 Franklin St.
Oakland, CA. 94607

District Attorney
1225 Fallon St.
Oakland, CA. 94612

Alameda County Courts
Att: Hon. Michael Gaffey
1225 Fallon St.
Oakland, CA. 94612

Public Defender
1401 Lakeside Dr., Ste 400
Oakland, CA. 94612

by depositing such copies in the U.S. Mail, addressed as indicated above, postage pre-paid, at Willits, California.

I also transmitted a PDF version of **APPELLANT POSTON'S REPLY BRIEF** by Truefiling e-service to:

Attorney General
SFAG.Docketin@doj.ca.gov

First District Appellate Project
Eservice@fdap.org

Philip Brooks
philipmbrooks@gmail.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 28, 2016, at Willits, California.

/s/ Randi Covin

# EXHIBIT 11

Filed 1/6/17 P. v. McNeely CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>JOE McNEELY et al. ,<br>Defendants and Appellants. | A141557<br><br>(Alameda County<br>Super. Ct. No. 172522A, 172522B) |

After an unconsummated drug transaction at a gas station, a dispute arose between appellants Joe McNeely and Donel Poston. The argument turned physical and then deadly. McNeely struck Poston with his hand, and both men reached for the semiautomatic handguns they were carrying. Poston fired first and shot McNeely six times, and McNeely returned fire as Poston fled. Lionel Fluker was killed by a stray bullet from McNeely's gun as he was driving by on his way home from a friend's house.

A jury convicted both McNeely and Poston of the second degree murder of Fluker, the attempted murder of each other, and firearm possession by a felon, and found true allegations that each had personally discharged a firearm causing great bodily injury or death in connection with the murder and attempted murder counts. (Pen. Code, §§ 187, subd. (a), 664/187, 29800, subd. (a)(1), 12022.53, subd. (d).)[1] The case before us thus presents an unusual scenario: two co-defendants who are also the victims of crimes committed by the other.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

On appeal, McNeely contends (1) the trial court should have granted Poston's motion to sever and ordered separate trials; (2) the trial court erred by instructing the jury on CALCRIM No. 3472 regarding a contrived theory of self-defense, and counsel was ineffective to the extent this argument was forfeited by the failure to object at trial; and (3) he was prejudiced by the exclusion of evidence that Poston had a history of possessing marijuana for sale, which would have supported his self-defense claim by showing that Poston had a motive to shoot a rival drug dealer and was not the one who acted in self-defense. Poston argues: (1) the trial court should have granted his motion to sever; (2) the evidence was insufficient to support his convictions for murder and attempted murder; (3) the trial court erred by admitting highly prejudicial evidence of his involvement in pimping and prostitution to impeach his credibility; (4) the trial court should not have given CALCRIM No. 3471 regarding the effect of mutual combat on a self-defense claim because it was not supported by the evidence; (5) the trial court should have instructed the jury he could not be guilty of murder under a provocative act theory if it found he did not initiate the course of conduct leading to the killing; (6) the prosecutor committed misconduct by appealing to the jurors' emotions, racial bias and fear of street violence; and (7) cumulative error and prejudice require reversal of the judgment. We affirm.[2]

FACTS AND PROCEDURAL HISTORY

a. *The Shooting*

Shortly after 10:00 p.m. on April 5, 2013, McNeely pulled his Mazda sedan into a Valero gas station at the corner of MacArthur Boulevard and Seminary Avenue in Oakland and parked next to one of the pumps. The gas station, which operated surveillance cameras that captured the events in this case, was across the street from

---

[2] On August 10, 2016, Poston filed a petition for a writ of habeas corpus, the consideration of which was deferred pending consideration of this appeal. (In re Donel Poston, A148986.) At this court's invitation, the People filed an informal response, and Poston filed a reply. We have summarily denied the petition by separate order.

Mills College and was busy even at that time of night. McNeely was carrying a nine-millimeter semiautomatic handgun in his inner jacket pocket.

McNeely spoke to a few people at the gas station. At 10:06 p.m., Poston drove to the gas station with his girlfriend Tamena Bailey and parked her Lexus sedan in front of the station's minimart. A loaded .40 caliber semiautomatic handgun was concealed inside his right waistband. Poston went inside the minimart while Bailey remained in the passenger seat of the Lexus with the window rolled down. When he came out, Poston spoke to McNeely and walked over to McNeely's car. McNeely took out a baggie and showed it to Poston, but it did not appear that Poston took the baggie and a detective reviewing a surveillance video of the encounter believed it to be a drug sale that was not completed.

The surveillance videos (which do not have sound) show that after the unconsummated drug transaction, Poston walked back to the Lexus followed by McNeely, who was apparently upset. McNeely followed Poston as he walked around the Lexus and seemed to be berating Poston, pacing and repeatedly grabbing the lapels of his own leather jacket. Poston initially walked away from McNeely, but then engaged with him verbally. As the two men were standing between the passenger side of the Lexus and the door of the minimart, McNeely threw a fast food drink he was carrying on the ground.

After throwing down the drink, McNeely hit the right side of Poston's face with his hand while simultaneously placing his left leg behind Poston to trip him. Bailey jumped out of the Lexus and ran inside the minimart. Poston staggered but did not fall, and as he was recovering his balance he immediately pulled his gun from his waistband and began shooting at McNeely, firing ten rounds and hitting McNeely six times. McNeely, at virtually the same time, was reaching inside his jacket and pulled out either his own gun or a magazine for that gun. He fell to the ground and dropped the object after being hit by Poston's bullets. Poston stopped shooting, possibly because his gun jammed or he ran out of bullets. McNeely got up on one knee, reached into his jacket, pulled out either his gun or its magazine, and loaded the gun. He got up and started

chasing Poston as Poston ran north onto Seminary Avenue, firing a total of eight shots. A janitor who worked at the gas station saw Poston attempt to jump the chain link fence around Mills College and then turn around with his hands up. None of the bullets fired by McNeely struck Poston, but one of them hit and killed Lionel Fluker as he was driving south on Seminary Avenue on his way home from visiting a friend.[3]

b. *Aftermath*

After the shooting, McNeely jogged back to his car and Poston kept running from the scene. Bailey drove away in the Lexus. McNeely was approached by his friend, Ansar Muhammad, who had arrived at the gas station about 15 minutes earlier. Muhammed agreed to follow McNeely in his own car, and McNeely drove to a location about half a mile away and parked his car in front of the home of Muhammad's girlfriend. McNeely moved his duffel bag into Muhammad's car and got into the passenger seat so Muhammad could drive him to Highland Hospital.

At the hospital, Muhammad was detained by the police while McNeely was being treated for his injuries. McNeely had gunshot wounds in his left and right thighs, his scrotum, his left armpit, his left shoulder and his upper back, but he was still lucid. A nurse found a fired bullet in the stretcher used to transport McNeely and gave it to the police. McNeely was interviewed by an Oakland reserve police officer and falsely said he had been walking down Seminary Avenue when he heard a series of gunshots, felt their impact and fell down. He told the officer he did not see the person who shot him.

---

[3] The surveillance videos, which we have reviewed at the parties' request, show that McNeely started to pull what appears to be a metal cylindrical object from his jacket almost immediately after hitting and tripping Poston, was shot by Poston a fraction of a second later, dropped the object on the ground as a result of being shot, reached into his jacket while getting up, pulled out another object, put the two objects together, and began shooting at Poston. At trial, the prosecutor argued that McNeely drew his gun before Poston fired a shot, but the Attorney General has taken the position on appeal that McNeely removed the magazine for the gun a fraction of a second before Poston started shooting, and then drew his gun and loaded it with the magazine after being shot by Poston. Whether McNeely first removed the gun or the magazine does not affect our analysis of the legal issues in this case. Either way, a logical inference would be that he was preparing to fire his gun immediately after hitting and tripping Poston.

Muhammad also lied to the police and said he had been driving down the street when he saw McNeely, whom he picked up and drove straight to the hospital. After Muhammad was told someone had died in the incident, he admitted he had seen McNeely at the gas station, had followed him to his (Muhammad's) girlfriend's house, and had driven him to the hospital.

Police searched Muhammad's car, which was parked near the hospital, and found a duffel bag containing marijuana, methamphetamine tablets and scales. The day after the shooting, police searched McNeely's Mazda and found marijuana in plastic wraps and "suspected Ecstasy" capsules that turned out to be methamphetamine. The guns used in the shooting were never found.

Within a few days of the shooting, Poston left for Los Angeles and did not return for three months. He was arrested on June 14, 2014, and when told he was being charged with attempted murder, said he was not trying to kill McNeely, he was just trying to get McNeely off of him. Police found .40 caliber ammunition in Poston's bedroom during a search of his home on the date of his arrest, and an examination of that ammunition showed that one round had been cycled through the same unidentified gun as two of the .40 caliber bullets found at the Valero gas station after the shooting. Also discovered in Poston's home were handwritten rap lyrics and blank check paper, as well as a credit card manufacturing machine, blank credit cards, and credit cards in various names.

c. *Poston's Jailhouse Writings and Telephone Calls*

In July 2013, while Poston was in jail after his arrest, a sheriff's technician intercepted a letter written by Poston, in which he suggested a woman had incriminated him. He wrote that he would assert his speedy trial rights and "forc[e] they hand" because "I ain't did shit but stand my ground." In another letter written to his roommate, Poston stated he would learn the identity of a woman who had emailed the police and identified him as having shot someone. Poston's cell was searched because the authorities believed witnesses might be in danger, and officers seized several pages of rap lyrics, among them:

"You got to be higher than Richard Pryor . . . wit a prior. If you think

you gonna to fire on a nigga and get away wit it, that'll be the day when hell freezes over, dondidit, don't get it. That's why I pack this pistola - gone off cola, probably off a molly.[4] You almost got bodied, instead caught you a body. I'm swift on my toes. Niggas in my circle keep them 40's real close concealed in they clothes, and never lose composure, make a nigga see the light over exposure. Wit 5 Bingo-Jingo from the dondiditliveshow. It's all self-defense under the proper pretense."

"I am 37 and countin'. Ya 38 and down.[5] Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold 'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill 'em."

"This prick on some bull shit, now I wish I woulda, shoulda, coulda, but I did just popped a nigger and my BM e-mailing investigators. Consider that snitchin but I ain't trippin. . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings. Bottom line to that, I ain't dealing. . . . If God is willing when this soap opera over I'll have All My Children - Days of our Life. Hustling all night, married to the game, and the streets is my wife."

"Niggas hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses. What you got them guns for if you ain't using 'em. Better start shootin dem nigger to left just a faggot. When ya see nigga at, I'm ya best dog. I'm the pick of the litter. Won't hesitate to make the K go cray, Dirty Dada Nigga. Yeah, make my day. Strip the Nigger down to his birthday suit. All about you. Aint thinking about me. You got brand new shoes. I got no commissary. Tom, Dick, and Hairy sleeping on my fucking couch. Must a forgot I'm the reason . . . in the house."

"Yeah, the game is deep. We are the lost sheep. It's the irony of the info age, them little niggas showing choppas on they Facebook page. Assemblin' a Glock on their me-ma porch, let that thing rang like it was

---

4 In street slang, "molly" is slang for Ecstasy or MDMA. To "fire" on a person means to punch that person, and the meaning of the first lines of the rap is that someone would need to be high or crazy to think they could punch the speaker and get away with it.

5 At the time of the shooting, Poston was 38 years old and McNeely was 37 years old.

> the 4th. . . . Fuck you. Fuck you, pal. I ain't having that. Don't never leave the house without my strap."

A number of Poston's telephone calls from the jail were recorded. In a June 29, 2013, call to an unknown male, he said his lawyer had told him "this is in the bag. We got this." He continued, "On self-defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity." In a July 1, 2013, call to his mother, Poston told her, "I'm not even trying to say that I wasn't there no more . . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're going to see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag."

During another phone call with his mother, Poston expressed concern that the prosecution had seen two letters confiscated from his house and were "trying to use, it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? You know what I'm saying? [¶] Just having an optimistic attitude. But in their eyes, that may be an aggressive front." His mother suggested the video would show who the aggressor was and Poston responded, "Okay, so then, this is a valid point they raised the other day. You can't bring a knife to a gun fight. Okay? . . . . See how slick they are with that shit? You feel me? . . . . No. No, no, no, no. Not a knife. They said you can't bring a knife to a fistfight."

During a phone call with his mother on August 31, 2013, Poston fretted about how Bailey would present at trial, indicating he wanted her to tell the truth, but was worried about her appearance, clothing and body odor. His mother told him she had advised Bailey to avoid talking to the prosecution ahead of time, and Poston said he would call

her and tell her to stop driving so she wouldn't be pulled over and taken into custody. He told his mother he had been practicing his testimony and would not say "one ghetto-ebonic slur" and mused that "[p]roper preparation prevents poor performance." In a call on September 5, 2013, Poston told his mother: "[Defense counsel] do got a good point, [he] said he [a witness who was at the gas station store] couldn't even identify you. He was like how the fuck, if we figure out who this [confidential informant] is, and they don't want to tell you who it is, then everything that, they whole statement, they whole shit collapses, you feel me? You can't identify him without that fucking statement. You know what I'm saying? . . .[¶] But they got three different angles that they trying to push. I'm not saying that I'm not there, you feel me? That's why they went and did the thing, why they went and did the swab, to do the ballistics. I'm not saying that I'm not there, you feel me? That's not my defense."

d. *Poston and Bailey's Trial Testimony*

Poston and Bailey both testified about the incident at trial. Poston acknowledged having suffered felony convictions for possessing cocaine base for sale, evading the police, possessing counterfeit check paper and burglary. He described his business endeavors, which included book writing, photography, screen printing and the production of the "Done did It Live" show for "YouTube", a series of sketch comedies in which fewer than one percent depicted a real or fake gun. The prosecution played some of Poston's "Done did It Live" videos for the jury, including one in which he spoke like a gangster and made threats while a large amount of cash and two Glock semiautomatic handguns were visible on a table. In another video, someone referred to "sliders," meaning credit card fraud.

Poston had known his girlfriend, Tamena Bailey, for almost three years at the time of the shooting. In June 2012, while Bailey was staying the night at his house, an intruder entered his bedroom and shot him in the chest. After that, Poston obtained the .40 caliber gun that he used in the shooting. He knew that as a convicted felon it was wrong for him to have the gun, but he wanted it for protection.

On the night of the shooting, Poston went to the Valero gas station to buy some cigars and inquire about buying "mollies," which he sometimes used to bribe security guards so he could get backstage at concerts to interview the stars. He was approached by McNeely, whom he had met in 2003 and knew by the nickname "Two Gun Joe." McNeely said "I got some" and the two men negotiated a price and went to McNeely's car. Poston bought two mollies after haggling about the price and walked back inside the store to talk to some people about his show. When he walked back outside, McNeely approached him and said something like, "You think you all that" and opened his jacket to show Poston he had a gun in his inside pocket. Poston said, "[wherever] you driving this car, I don't want a ride," and gestured with his hands as if to say "I'm out of here." Poston felt threatened as McNeely continued ranting and making threats in a loud voice.

Poston walked to the Lexus, and McNeely said "No bitch ass, ain't even from Seminary" and "That's why I keep my strap [gun] up, bitch ass niggers like you." Poston responded that his father had been driving for the transit system in the neighborhood since 1976. Poston considered getting inside the Lexus but was afraid McNeely would shoot at him and place Bailey in danger. McNeely said, "I'll slap the shit out of you," and threw down the cup he was carrying. Poston said something like "[d]amn, you're going to slap Don Datta," looking back at a guy in the store as if to say "[c]an you believe this?"

McNeely hit Poston hard and tripped him, causing Poston to lose his balance. Poston looked over his shoulder and saw McNeely reaching into his inside jacket pocket and saw a weapon in McNeely's hand. Believing McNeely was going to shoot him, Poston took out his gun and shot McNeely. He stopped shooting once McNeely had hit the ground; the gun did not run out of bullets or jam, and if it had jammed, he could have fixed the malfunction by racking the slide. Poston only fired the number of shots he believed were necessary to disable McNeely and escape, and he did not want to kill McNeely.

After he stopped shooting, Poston ran toward Seminary Avenue. He dropped his gun along the way and when he got to the middle of the street he turned and held up his

hands to indicate he was no longer armed. Poston had not gone to the gas station intending to hurt or kill anyone but was just defending himself, and he believed McNeely would have killed him if he had not shot first. He did not go to the police after the shooting because he was scared. Poston acknowledged he was arrested for possessing a gun in 2000, for possessing three rifles in 2006, and for stealing a bicycle at gunpoint in 1996, though he denied he had actually used a gun.

Bailey testified she had been Poston's girlfriend for two years and stayed at his house several nights a week, but had never seen him with a gun. In June 2012, she had been with Poston when an armed intruder came into his room through a window and shot him.

Bailey spent all day with Poston on April 5, 2013, and went with him to the Valero gas station to buy cigars. Poston went into the store and when he came out, he spoke to McNeely.[6] She did not hear what they said initially but McNeely became upset and starting yelling, calling Poston names and saying he was not from the neighborhood. Poston walked away from McNeely and Bailey saw the handle of a gun in McNeely's inside jacket pocket when he opened his jacket, which he did three or more times. McNeely threw down a cup he was carrying and said he was going to slap Poston. When McNeely raised his hand and gave Poston "a serious slap," Bailey jumped out of the car and ran inside the store because she did not know whether McNeely was going to shoot them. After she heard the shots she came out of the store and drove away. She did not look for Poston that night but saw him the next day. At some point between the shooting and his arrest, Poston went to Los Angeles on business. After his arrest, she visited him and spoke to him on the phone, but they did not talk about the shooting.

e. *Context: Poston's Connection to the Neighborhood*

Oakland Police Department Officer Tony Jones testified that "Sem City" (a term used by Poston) was a nickname for the Seminary neighborhood and was used by people

[6] Bailey variously stated that she had never seen McNeely before the shooting, that she believed the father of her children knew McNeely, and that she had known McNeely before but had not seen him in 15 years.

involved in drug dealing rather than by law abiding citizens. In the world portrayed in some of Poston's YouTube videos, it would have been insulting for someone to tell him he was not from Seminary. Had Poston walked away from an encounter where someone made such an accusation, Poston would have been viewed as a "punk." According to the rules of the street in Oakland, a man who is disrespected in front of his girlfriend would lose credibility if he just walked away.

f. *Verdict and Sentence*

Based on the evidence presented at trial, the prosecutor argued that McNeely and Poston were both guilty of attempted murder because they had simultaneously formed an intent to kill the other during a mutual argument and had drawn their guns at almost the same time. She argued Poston did not act in self-defense because he drew his gun first and was not entitled to respond to a fist fight with deadly force. She urged the jury to reject McNeely's claim of self-defense because the surveillance video shows he began to draw his gun before Poston actually fired and continued to shoot at Poston when Poston was running away and no longer presented a danger.[(See footnote 3.)] The jury was instructed on second degree murder under theories of implied malice and transferred intent with respect to McNeely and second degree provocative act murder with respect to Poston. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654 (*Gonzalez*) [discussing malice aforethought, transferred intent, and provocative act doctrine].) The jury also received instructions on self-defense as a justification for murder and attempted murder and the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on provocation and imperfect self-defense.

After the jury returned its verdict convicting appellants as charged and finding true the section 12022.53, subdivision (d), allegations attached to the murder and attempted murder counts, the court sentenced each of them to 72 years to life: 15 years to life for second degree murder plus 25 years to life for the firearm enhancement attached to that count, plus a consecutive seven-year middle term for attempted murder with a 25-year-to-life enhancement on that count. (See *People v. Palacios* (2007) 41 Cal.4th 720, 727–728, *People v. Oates* (2004) 32 Cal.4th 1048, 1063 [multiple § 12022.53(d) enhancements

appropriately imposed for multiple counts when only a single victim was injured by the discharge of the defendant's firearm].) The sentences on the felon in possession counts were stayed under section 654.

DISCUSSION

I. *Denial of Severance Motion (McNeely and Poston)*

Appellants argue the trial court abused its discretion and deprived them of due process in denying Poston's motion to sever based on antagonistic defenses. They contend they were deprived of a fair trial because the jury could not have acquitted either of them without convicting the other and their attempts to shift the blame meant they each essentially faced two prosecuting attorneys. We disagree.

a. *Procedural Background*

Poston was originally charged by separate information with the attempted murder of McNeely and felon in possession of a firearm, along with special allegations. Before a jury could be impaneled, the prosecution dismissed the case and amended the information in McNeely's case to include the charges and allegations against Poston and to additionally charge Poston with the murder of Lionel Fluker.

Poston brought a motion to sever on the ground that he and McNeely would present conflicting defenses at trial: "Poston believes he had no malice because he was struck first by McNeely. Poston was aware that Mc Neely was armed and managed to fire his weapon first in perfect self defense. This absolves him of murder and attempted murder. McNeely's take is in conflict. He started no more than a fist fight and was forced to return fire in self-defense."

At the hearing on the motion, McNeely's counsel did not join in the request for severance, but stated he was submitting the issue to the court's "sound discretion." Counsel agreed the case would not involve the presentation of incriminating extrajudicial statements by one or both defendants under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). The trial court denied the motion for severance, noting the law favored joinder, the charges involved

common elements and facts, and there were no *Aranda-Bruton* issues requiring severance. It expressly extended its ruling to McNeely as well as to Poston.

b. *General Principles*

Section 954 provides, "An accusatory pleading may charge two or more different offenses connected together in their commission. . . ." Section 1098 provides, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." Read together, these statues allow two defendants to be tried together when " 'there is a joint charge as to one of the crimes and a common element of substantial importance in the commission of all of them.' " (*People v. Pike* (1962) 58 Cal.2d 70, 85.)

"Joint trials are favored because they 'promote [economy and] efficiency' and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*).) "When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial." (*Ibid.*)

Although joint trials are preferred, a court has the power to order separate trials " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Coffman*, *supra*, 34 Cal.4th at p. 40.) Severance may be called for when " 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*Ibid.*, citing *Zafiro v. United States* (1993) 506 U.S. 534, 538–539 (*Zafiro*).) In deciding whether to order joint trials, the court is required to decide whether the realistic benefits from a consolidated trial are outweighed by the likelihood of substantial prejudice to the defendant. (*People v. Keenan* (1988) 46 Cal.3d 478, 500 (*Keenan*).)

We review a trial court's ruling on a severance motion for abuse of discretion based on the facts at the time of the ruling. (*Coffman*, *supra*, 34 Cal.4th at p. 41.) " '[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182–183.) In cases where the trial court abuses its discretion by failing to grant severance, reversal is not required unless the defendant demonstrates a reasonable probability he would have received a more favorable result in a separate trial. (*Keenan*, *supra*, 46 Cal.3d at pp. 502–503.) If the denial of severance was proper at the time the ruling was made, a reviewing court may reverse a judgment only if the joint trial resulted in " ' "gross unfairness" ' amounting to a denial of due process." (*People v. Avila* (2006) 38 Cal.4th 491, 575 (*Avila*).)

c. *The Court Did Not Abuse its Discretion in Conducting a Joint Trial*

The shooting in this case was captured on surveillance videos, which together with other evidence showed that McNeely struck Poston after a verbal argument, after which Poston shot McNeely several times and McNeely shot back at Poston, killing Lionel Fluker with a stray bullet. At trial, both Poston and McNeely presented claims of self-defense: Poston because he reasonably believed McNeely had a gun and was going to shoot him after slapping him, and McNeely because Poston had escalated a fistfight into a gunfight, giving McNeely no choice but to respond in kind.

Appellants contend the trial court should have severed their cases because their competing self-defense claims amounted to conflicting or antagonistic defenses. They note that not only were they charged with the attempted murder of one another (an unusual circumstance, to be sure), each of them sought through their self-defense claims to shift the blame to the other for the killing of Fluker. We conclude the conflict in appellants' respective defenses did not require the court to grant the severance motion.[7]

---

[7] We reject the Attorney General's contention that McNeely forfeited this argument by his failure to independently seek a separate trial or join in Poston's motion. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048.) Although a defendant must generally join in an objection or motion by a codefendant to preserve the issue on appeal, no

" '[N]either antagonistic defenses nor the fact that . . . one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non. is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 169.) " 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*.' [Citation.] If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation.]" (*Ibid*.; see *Coffman, supra*, 34 Cal.4th at p. 41.)

Accordingly, a trial court denying severance on the basis of conflicting defenses "abuses its discretion only when the conflict between the defendants *alone* will demonstrate to the jury that they are guilty. If, instead, 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner*).) Here, it was not the conflict between appellants' stories alone that established their guilt. Rather, it was the independent evidence presented at trial, including the surveillance videos showing the sequence of the shootings.

Appellants argue a joint trial was unfairly prejudicial because the jury could not have logically accepted both their claims of self-defense. They rely largely upon federal authorities applying rule 14 of the Federal Rules of Criminal Procedure: *United States v.*

---

objection is required where one would be futile. (*People v. Wilson* (2008) 44 Cal.4th 758, 793 (*Wilson*).) Because the trial court denied Poston's motion to sever, which was based on the theory of inconsistent defenses, there is no reason to think it would have granted a similar motion brought by McNeely. In fact, it expressly extended its ruling denying the motion to McNeely.

*Tootick* (9th Cir.1991) 952 F.2d 1078, 1081–1082 [while defendants who raise inconsistent defenses may be jointly tried, severance was required when defenses raised were mutually exclusive in the sense that acquittal of one defendant would call for conviction of the other]; *United States v. Rucker* (11th Cir.1990) 915 F.2d 1511, 1513 [severance required when defenses are "so antagonistic as to be 'irreconcilable or mutually exclusive' " such that jury must disbelieve testimony on behalf of one defendant in order to believe testimony on behalf of the other]; and *United States v. Romanello* (5th Cir.1984) 726 F.2d 173, 177–180 [severance required when defenses offered by co-defendants were "irreconcilable and mutually exclusive"].

The case before us is distinguishable because appellants' self-defense claims were not mutually exclusive, being based as they were on each appellant's subjective, reasonable perception of a volatile situation. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1093 [reasonable self-defense requires subjective believe in the need to defend and objective reasonableness of that belief].) In any event, the federal authorities cited are not binding on this court, and have been criticized as " 'too rigid in circumscribing the discretion of the trial court.' " (*People v. Wallace* (1992) 9 Cal.App.4th 1515, 1519, fn. 3.) They also appear to have been implicitly overruled by the United States Supreme Court in its subsequent decision in *Zafiro, supra*, 506 U.S. at pages 538 to 539, which held that mutually antagonistic defenses are not prejudicial per se, and that rule 14 of the Federal Rules of Criminal Procedure does not require severance on that basis, even if prejudice is shown. (See *United States v. Blankenship* (11th Cir. 2004) 382 F.3d 1110, 1122, fn. 23 [recognizing implied overruling of case law requiring severance if jury must necessarily disbelieve testimony offered by one defendant in order to believe testimony offered on behalf of the other defendant]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1081–1082.)

Under the rule set forth in *Zafiro*, a federal trial court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not

consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. [Citation.] Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [Citation.] Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. [Citation.] The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but. . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. [Citation.]." (*Zafiro*, *supra*, 506 U.S. at pp. 538–539.)

None of the factors cited by the high court in *Zafiro* required severance in this case. Neither appellant complains he was prejudiced by the introduction of incriminating evidence admissible only against the other. Appellants acknowledged at the hearing on the severence motion there were no *Aranda-Bruton* issues. The evidence did not suggest any prior association between appellants, such that a finding of wrongdoing by one of them would have suggested the other was guilty. Their levels of culpability appeared to be about the same: both men were armed with concealed handguns, both engaged in an argument after what was apparently an unconsummated drug deal (though McNeely was the instigator), and both fired multiple shots at the other. (See *Zafiro*, *supra*, 506 U.S. at p. 539.)

We further conclude no "gross unfairness" occurred as a result of the joint trial. (See *Avila*, *supra*, 38 Cal.4th at pp. 574–575.) As to Poston, the primary incriminating evidence against him was the surveillance videos, which could reasonably be interpreted to show that he fired several shots at McNeely after McNeely struck him with his hand and tripped him, but before he saw McNeely reach for his own weapon. Poston testified

on his own behalf and called Tamena Bailey as a witness in an effort to show he fired first because he reasonably believed McNeely was armed. The surveillance tape would have been introduced in a separate trial; Poston's interest in taking the stand and calling Bailey as a witness would have been the same in a separate trial; and there is no reason to think any of the evidence offered against Poston would have been materially different had he been tried separately. Poston was not deprived of due process by virtue of the joint trial and, for similar reasons, it is not reasonably probable he would have obtained a more favorable result if he had been tried separately. (*Keenan, supra*, 46 Cal.3d at pp. 502–503.)

The analysis with respect to McNeely is slightly different, because it is improbable Poston would have been called as a witness if McNeely had been tried separately.[8] Poston testified that he shot McNeely because McNeely had shown him his gun and he saw McNeely reaching for it, which would obviously undermine McNeely's claim of self-defense if believed by a jury. But McNeely's counsel was able to fully cross-examine Poston as to his version of events, and the jury necessarily *rejected* this aspect of Poston's testimony in convicting him of the attempted murder and murder charges. Even without Poston's testimony, the jury could see from the surveillance video that McNeely was in the process of reaching for a gun or the magazine of the gun at approximately the same time Poston was drawing his own weapon. "[N]o denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (*People v. Turner* (1984) 37 Cal.3d 302, 313, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149.) "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." (*Zafiro, supra*, 506 U.S. at p. 540.)

---

[8] Poston would have had a Fifth Amendment right against self-incrimination until he was sentenced on the charges and pending resolution of any appeal. (*People v. Fonseca* (1995) 36 Cal.App.4th 631, 635.)

Although this trial was atypical in the sense that appellants were the alleged victims of each other's attempted murder charges, in all other respects it was a classic case for joinder: appellants were both charged with the murder of Lionel Fluker, the remaining counts arose from the same incident and were based on the same set of facts, and most of the evidence incriminating each defendant would have also been admissible in a separate trial. The trial court did not err in denying Poston's motion for severance.

II. *Sufficiency of the Evidence (Poston)*

Poston argues his convictions of attempted murder and second degree murder must be reversed because the evidence supporting them was insufficient. He contends no reasonable trier of fact hearing the evidence at trial could have found he did not act in self-defense (reasonable or unreasonable) or in the heat of passion. Poston additionally argues the jury could not have reasonably concluded he initiated a chain of events that proximately caused Lionel Fluker's death, as is necessary for a conviction of second degree murder under a provocative act theory. We disagree.

a. *Standard of Review*

When reviewing the sufficiency of the evidence on appeal, we apply the well-established and "highly deferential" substantial evidence standard. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) We do not reweigh the credibility of witnesses or substitute our own view of the evidence for that of the jury. (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.) That the evidence might be reasonably reconciled with a contrary result does not warrant a reversal of the judgment. (*Ibid.*) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

b. *Self-Defense and Attempted Murder*

Attempted murder requires a direct but ineffectual act toward killing a person accompanied by the mental state of express malice aforethought, i.e., a specific intent to unlawfully kill. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217; *People v. Perez* (2010) 50 Cal.4th 222, 229.) " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." [Citations.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Poston fired ten shots at McNeely, six of which hit him. Absent a legal excuse or justification for the shooting, the jury could readily infer the shooting satisfied the elements of attempted murder.

Poston argues his attempted murder conviction cannot stand because there was no substantial evidence he was not acting in self-defense. (See *People v. Saavedra* (2007) 156 Cal.App.4th 561, 571 [prosecution has burden to prove defendant did not act in self-defense].) He states: "The surveillance videos indisputably show that McNeely started a verbal altercation with Poston, hit him in the face and tripped him, knocking him to the ground, then pulled out a gun while Poston was getting up." We are not persuaded that the videos, which we have reviewed, show indisputably that Poston acted in self-defense.

While it appears from the videos that McNeely removed either his gun or the magazine for that gun from his jacket before Poston fired the first shot, the jurors could have reasonably concluded that action by McNeely did not occur before Poston drew his own weapon. Rather, the actions appear to be approximately simultaneous, with Poston drawing his gun slightly before McNeely pulled the magazine or gun from his jacket. Jurors viewing the video could also conclude that Poston did not see McNeely's weapon before he commenced shooting. Deadly force such as that used by Poston is excessive when used to respond to a simple assault, and the jury in this case could have concluded that *from Poston's perspective* at the time he pulled his gun from his waist and began to shoot, McNeely had done no more than hit and trip Poston after a verbal argument. (*People v. Quach* (2004) 116 Cal.App.4th 294, 301–302 [deadly force in response to simple assault is excessive].)

Poston testified he drew his weapon because he had seen McNeely's gun and feared for his life when he saw McNeely reach inside his jacket after hitting him. But the jury could have rejected this testimony and concluded Poston either did not know McNeely was armed, or shot him not because he was afraid for his life, but because he was angry about being hit and tripped. " '[S]elf defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*), and cases cited therein; see § 198.) " 'The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense.' " (*Nguyen*, at p. 1045.)[9]

In *Nguyen*, *supra*, 61 Cal.4th at pages 1043–1047, the Supreme Court rejected the argument that the defendant had acted in self-defense as a matter of law in shooting a rival gang member who approached the car the defendant was driving while carrying a shotgun. Just before the victim arrived at the driver's window, the defendant pulled out a gun, pointed it at the victim, and fired. (*Id*. at p. 1043.) The court concluded the jury could have reasonably found the defendant was not entitled to claim self-defense "because, in shooting [the victim], he did not act on the basis of fear alone but also on a desire to kill his rival." (*Id*. at p. 1044.) The prosecution's theory in this case was that both Poston and McNeely formed an intent to shoot the other before the shooting began, and that this intent was the product of anger rather than fear. The video of the events as they unfolded supports this theory, even if other interpretations of the video were reasonable.

"[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may

---

9 We deny Poston's request, filed on March 29, 2016, that we take judicial notice of a 2011 article concerning reaction time in shooting cases.

not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 379, abrogated on another point by *People v. Blakeley* (2000) 23 Cal.4th 82, 92; see *Nguyen*, *supra*, 61 Cal.4th at p. 1044.)

c. *Attempted Voluntary Manslaughter—Imperfect Self-Defense*

Nor do we agree that Poston's shooting of McNeely could be no greater than attempted voluntary manslaughter based on imperfect self-defense, under which a defendant who attempts to kill in the honest but unreasonable belief in the need to defend against imminent death or great bodily injury is deemed to have acted without malice. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833–834.) By convicting Poston of attempted murder in the face of the instructions on perfect self-defense, the jury implicitly and necessarily found that either he did not know McNeely was armed, or if he did know, was motivated to shoot him for a reason other than fear. Under this view of the shooting, which is supported by the evidence, "there was no basis for the jury to find that defendant *unreasonably* believed he was in imminent danger of death or great bodily injury. If anything, the evidence suggests that such fear was reasonable but that the jury, in rejecting defendant's claim of self-defense, concluded that defendant did not act out of such fear alone." (*Nguyen*, *supra*, 61 Cal.4th 1049.)

d. *Attempted Voluntary Manslaughter—Heat of Passion*

A defendant will also be deemed to lack the malice necessary for murder or attempted murder when he acts in a sudden quarrel or heat of passion. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241.) This variant of voluntary or attempted voluntary manslaughter has both a subjective and an objective component: "The defendant must actually, subjectively, kill [or attempt to kill] under the heat of passion. [Citation.] . . . [But the] 'passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "Provocation is adequate only when it would

render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 957.) It is not necessary that the provocation be such as would cause a reasonable person to kill or attempt to kill, as a killing in the heat of passion is necessarily unreasonable. (*Id.* at pp. 952–958.)

Poston did not claim to have shot McNeely on a sudden quarrel or heat of passion; rather, his defense was self-defense. But, "[e]ven if defendant's testimony provided some evidence of provocation for the jury to consider, it remains the jury's exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion." (*People v. Bloyd* (1987) 43 Cal.3d 333, 350.) "Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*People v. Moye* (2009) 47 Cal.4th 537, 557 [in light of jury's rejection of self-defense claim, it was not reasonably probable defendant would have been convicted of manslaughter rather than murder if heat of passion instruction had been given].) The jury in this case could have reasonably concluded Poston's reason was not, in fact, obscured by passion.

e. *Provocative-Act Second Degree Murder*

Poston was tried for second degree murder based solely on the provocative act doctrine, under which the perpetrator of an underlying crime may be guilty of murder when a third party kills an accomplice or innocent bystander in response to an act by the defendant that is "dangerous to human life because it is highly probable to provoke a deadly response." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.) He contends the evidence was insufficient to establish his actions proximately caused Lionel Fluker's death under this theory. We disagree.

A murder conviction under the provocative act doctrine "requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.) When the original crime is a violent assault, no additional provocative act apart from the crime itself is required. (*People v. Gallegos* (1997) 54 Cal.App.4th 453, 459–461; *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 57; see *People v. Mejia* (2012) 211 Cal.App.4th 586, 622 (*Mejia*).) A typical scenario for a provocative act murder is when the defendant instigates a gun battle, causing the victim or a police officer to shoot back and mistakenly hit the defendant's accomplice or an innocent bystander. (*People v. Cervantes* (2001) 26 Cal.4th 860, 867 (*Cervantes*); see *People v. Gardner* (1995) 37 Cal.App.4th 473, 475–482 [defendant drug dealer who shot at victim but did not hit him was liable for his murder when a rival drug dealer, believing he was being fired upon, shot back and fatally wounded the victim].)

An important question in a provocative act murder case is whether the defendant's actions proximately caused the death. (*Gonzalez, supra*, 54 Cal.4th at p. 655.) "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' " (*Cervantes, supra*, 26 Cal.4th at p. 866.) In cases where there is an intervening force in operation—such as a bullet fired by a third party—"the defendant's liability will depend on whether it can be demonstrated that his own conduct *proximately caused* the victim's death—i.e., whether it can be shown that the intermediary's conduct was merely a dependent intervening cause of death, and not an independent superseding cause." (*Id.* at pp. 872–873, fn. 15.)

As previously discussed, the evidence in this case supports a determination that Poston and McNeely engaged in a mutual gun battle during which each attempted to kill the other. In *People v. Sanchez* (2001) 26 Cal.4th 834, at pages 848–849, the court affirmed the defendant's conviction of first degree murder after concluding his

participation in a gang-motivated gun battle with his co-defendant, which killed an innocent bystander, was a "substantial concurrent, and hence proximate, cause" of the bystander's death even though it could not be determined who fired the fatal shot. So too here. Appellants "during their gun battle were attempting to kill each other, so that the killing of a bystander was a harm that both in kind and degree was within the risk [they] must have expected." (*Id*., p. 855 (conc. opn. of Kennard, J.).)

The *Sanchez* court did not resort to the provocative act doctrine to uphold the defendant's first degree murder conviction, and indeed suggested it might be an unsupported theory of guilt under the facts and verdicts in that case. (*Sanchez, supra,* 26 Cal.4th at pp. 844–845, 851–854; see concurring opn. of Werdeger, J., at p. 858 ["The majority, confusingly, suggests provocative act murder was an 'unsupported theory of liability' (maj. opn., *ante*, at p. 852), though the majority does not explain in what respect the theory is unsupported by the evidence"].) This is somewhat perplexing, particularly because the majority cited with approval the concurring decision of Justice Kennard who "avoids using the label," but analyzed the case and voted to affirm the conviction based on provocative act liability. (*Id*. at pp. 854, 855–857 (conc. opn. of Kennard, J.), 858–859 (con. opn. of Werdeger, J.).) We suspect the *Sanchez* majority's concern about the use of the provocative act doctrine arose because the rival shooter and co-defendant (who was not a party to the appeal) was convicted of first degree premeditated murder. (*Id*. at pp. 838–839.) The majority noted the Court of Appeal had reversed the defendant's conviction after finding "no theories under which the jury could have found both defendant and [his co-defendant] guilty of first degree murder;" rather, the Court of Appeal had accepted the scenario in which the co-defendant fired the fatal shot and concluded, the "premeditation as the actual shooter precluded or cut off defendant's provocative act murder liability." (*Id*., p. 839.) McNeely and Poston were convicted of second degree murder and there is no finding of premeditation by McNeely that would act as an independent superseding cause as a matter of law.

Poston argues that McNeely's shooting of Lionel Fluker must be viewed as an independent superseding cause of Fluker's death because McNeely instigated the quarrel

with Poston and was found not to have been acting in reasonable self-defense when he fired the fatal shot. We do not agree. "Provocative act murder is not dependent upon the reasonableness of the actual killer's lethal response. The inquiry instead focuses simply on whether or not a surviving perpetrator committed a provocative act that *proximately caused* the killing. [Citations.]" (*Mejia*, *supra*, 211 Cal.App.4th at pp. 630–631; see *Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 37.) The jury could reasonably have concluded McNeely was the victim of an attempted murder by Poston, and that McNeely's use of force was a natural and probable consequence of Poston's act of shooting at him ten times with a semiautomatic weapon.

The decision in *Cervantes*, *supra*, 26 Cal.4th 860, does not require a different result. In that case, the defendant and other members of the Highland Street gang went to a birthday party thrown by the Alley Boys gang. (*Id*. at p. 863.) During a confrontation initiated by one of the Alley Boys, the defendant shot Richard Linares, also an Alley Boy, in the arm. (*Ibid*.) A minute or two later, unidentified Alley Boys shot and killed Hector Cabrera, a Highland Street gang member, as he drove away from the party. (*Ibid*.) The court found insufficient evidence to support the defendant's conviction of the provocative act murder of Cabrera: "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered. [¶] *But the critical fact that distinguishes this case from other provocative act murder cases is that here the actual murderers were not responding to defendant's provocative act by shooting back at him or an accomplice, in the course of which someone was killed*. . . ." (*Id*. at p. 872, italics added.) The scenario in the case before us is much different because McNeely killed Lionel Fluker while shooting back at Poston in direct response to the shots Poston fired at him.

Substantial evidence supports the jury's determination that Poston proximately caused the death of Lionel Fluker. And, for reasons previously stated in connection with our discussion of self-defense and attempted murder, the jury could have concluded Poston did not act in self-defense, imperfect self-defense or heat of passion when he committed the acts leading to Fluker's death. The evidence was sufficient to support his conviction of second degree murder.

f. *Conclusion*

We emphasize that the jury in this case was fully instructed on the theories of self-defense, imperfect self-defense and heat of passion, and was accurately instructed on the theory of provocative act murder and principles of causation.(See Discussion, § V(a), *post.*) We are not here concerned with the jury's ability to consider lesser offenses and defenses supported by the evidence, but with the sufficiency of the evidence to support Poston's convictions of the charged crimes after the jury considered and rejected the lesser alternatives. That a jury could have reasonably found Poston to be not guilty or guilty only of lesser crimes does not render the evidence insufficient to support his convictions.

## III. *Evidentiary Rulings*

a. *Exclusion of Poston's Arrests for Possessing Marijuana for Sale (McNeely)*

McNeely argues the trial court should have allowed him to impeach Poston with evidence of his prior arrests for possessing marijuana for sale in the neighborhood where the shooting occurred. He contends such evidence would have shown that Poston had a motive to shoot him to maintain dominance of the marijuana dealing in the area. We do not agree.

The proffered evidence would have shown Poston was arrested for possessing marijuana for sale in 1995, 1996 and 2009. The trial court ruled the prior arrests were irrelevant, noting the evidence was insufficient to show Poston even knew McNeely was selling marijuana. We review the ruling for abuse of discretion. (*Avila, supra,* 38 Cal.4th at p. 578.)

" 'Relevant evidence, means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or

disprove any disputed fact that is of consequence to the determination of the action.' " (Evid. Code, § 210.) " ' "The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' [Citation.]" (*People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) "Evidence is irrelevant, however, if it leads only to speculative inferences. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) " ' "Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose." ' [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1337–1338.)

Evidence that Poston had been arrested for possessing marijuana for sale several years before the events in this case did not logically tend to prove he was still engaged in dealing drugs at the time of the shooting. And even if it did, it would be completely speculative to suggest this provided him with a motive to shoot McNeely for being a rival drug dealer. The "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

b. *Evidence of Pimping and Prostitution (Poston)*

In some of his recorded telephone calls from the jail, Poston referred to women as "hoes" and bitches and made statements suggesting he was engaged in pimping. After Poston and Bailey had testified, the trial court ruled such statements would be admissible as impeachment evidence. Poston contends the pimping/prostitution evidence should have been excluded because it was substantially more prejudicial than probative under Evidence Code section 352. We disagree.

1. <u>Challenged Evidence</u>

The following evidence was presented as a result of the ruling:

(1) In a June 19, 2013, call to an unknown male, Poston talked about his "bitches," his "ho-bo", and his "ho[e]-bitch," and complained he had "just paid the bitch phone bill" but he wanted "the bitch to pay [his] way." He said he only wanted one friend to have his "bitch" because "that's the only nigga gonna make sure I'm eating" instead of just

"fuck[ing] on the bitch." He continued, "I ain't never been too proud to beg from a bitch in my life, Robbie . . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my ho[e]-bos, all my baby mamas, I'm finna call my one baby mama right now."

(2) In a June 22, 2013, recorded phone call to an unknown male, Poston said he had asked Bailey what she was doing and she said she was sitting on the bed. Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner."

(3) In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. When his mother expressed concern about Bailey's reliability, he responded, "This is my bitch, mommy. . . . My bitch, mommy. Listen to me. That lay, she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to me, 'cause you not. I'm the one fucking her mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" Poston again told his mother Bailey would do what he told her to do, otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that.' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't." Poston's mother advised him to "reverse [his] whole attitude about this aggressiveness" and stop calling Bailey "bitch," and Poston told her Bailey was his "bitch" and Sharan was his woman.

(4) In an August 21, 2013, call to his mother, Poston complained that someone had taken his clothes from his house, including the suit he planned to wear for his trial. He said he had been "on the run" and did not have money for bills at his house even though he still had a prostitute.

(5) In portions of a letter to his brother (which the prosecutor read to Poston during cross-examination), Poston made comments about "hoes" and prostitutes, and wrote, "That last weed I gave you came from out a ho ass. She turned a date for two zips

and a hundred dollars." The woman Poston was referring to was Brianna Howard, who was with him when he was arrested for the crimes in this case.

(6) In a June 16, 2013, phone call (played by McNeely's counsel during his cross-examination of Poston), Poston talked about getting his "ho-bitch" "back to L.A." and indicated she earned "a thousand here, a thousand there."

(7) In a phone call on June 22, 2013, Bailey asked Poston why he was still trying to "hold onto" another woman and he responded, "Hold onto her, bitch, I ain't holding onto nothing except my mother-fucking pocketbook. What you talking about?" When Bailey suggested he didn't need the woman's phone number, Poston said, "Yeah, bitch, because I need all she got to offer me. What you mean? That bitch socking it to my pocket like the Chinese stock market, bitch."

2. General Principles and Standard of Review

It is well-settled that a witness's credibility may be impeached by evidence of a prior conviction or uncharged conduct showing moral turpitude, subject to the court's exercise of its discretion under Evidence Code Section 352. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) " '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.] Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] As we have advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.'

[Citation.] [¶] Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Id.* at pp. 931–932.)

3. Analysis

Poston contends his statements about pimping should have been excluded because they were highly prejudicial and involved "a collateral matter with little probative value as to his credibility." He notes he had already admitted several felony convictions, giving the prosecution "plenty of ammunition to impeach his credibility." Thus, the references to pimping, "bitches" and "hoes" "served only to inflame the jurors' passions against a bad character who mistreated women." We conclude the court did not abuse its discretion.

As Poston acknowledges, pimping is a crime involving moral turpitude. (*People v. Jaimez* (1986) 184 Cal.App.3d 146, 150.) His admissions that he had engaged in this activity were therefore relevant to his credibility as a witness, particularly in light of his testimony he was a legitimate businessman. (See *People v. Lankford* (1989) 210 Cal.App.3d 227, 234–239 [evidence of acts underlying pending robbery charges properly admitted on issue of defendant's credibility where he had testified he had not had any recent criminal incidents].) Some of Poston's statements were made to or about Bailey, whom he called as a witness, and were also relevant to the degree of control he exercised over her.

With respect to Evidence Code section 352, there are no issues of proof or unfair surprise because the pimping evidence came from Poston's own words, written and verbal. The evidence was not unduly time consuming, particularly when considering the importance of Poston's credibility to the issues in the case. Poston's pimping activities did not involve violent conduct or conduct similar to the shooting in this case. The jury was instructed with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, or committed other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. [¶] The fact of a conviction or other

misconduct does not necessarily destroy or impair a witness's credibility. [¶] It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." We presume the jury followed this instruction and did not consider the evidence of pimping for any other purpose. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

IV. *Prosecutorial Misconduct (Poston)*

Poston argues the prosecutor committed pervasive and prejudicial misconduct by attacking his character and appealing to the jurors' emotions, racial bias, and fear of random street violence.[10] He has forfeited this claim by his failure to object below.

"To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection. Failure to do so forfeits the issue for appeal. [Citation.] 'Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry.' " (*Wilson*, *supra*, 44 Cal.4th at p. 800.) A defendant may be excused from this requirement when an objection would have been futile or an admonition would not have cured the harm. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Poston has not demonstrated that an objection would have been futile or that an admonition would have been ineffective to cure the alleged harm.

---

[10] Poston cites the following actions by the prosecutor as misconduct: (1) referring to the charged crimes as a "shoot-out as if it were the wild wild west" during opening statement; (2) suggesting to Poston during cross-examination that he had been practicing his testimony and was presenting a false image by wearing a nice suit; (3) suggesting his use of African American Vernacular English (AAVE) in his rap lyrics and phone calls and his use of standard English in the courtroom showed he was lying; (4) characterizing Poston as a pimp and a thug; (5) questioning him about and focusing on the content of rap lyrics he wrote in an effort to refute his claim of self-defense; (6) emphasizing offensive language Poston used during his recorded jail calls; (7) arguing that Poston's flight and statements made during the recorded jail calls showed a consciousness of guilt; and (8) suggesting he had practiced his testimony to project a different persona than the one he assumed in his YouTube videos and in his rap lyrics.

V. *Jury Instructions*[11]

a. *CALCRIM No. 560 (Poston)*

Poston argues the trial court did not properly instruct the jury on an element of provocative act murder, namely, that the chain of events leading to the victim's death was initiated by the defendant. He argues the omission was not harmless beyond a reasonable doubt (*Gonzalez, supra*, 54 Cal.4th at pp. 662–663) because the evidence shows McNeely was the initial aggressor in their confrontation. We do not agree with the premise that a defendant can only be guilty of provocative act murder if he set in motion the chain of events in which the provocative act occurred.

1. Instructions Given

The trial court gave a modified version of CALCRIM No. 560 on the concept and elements of provocative act murder. It provided: "Donel Poston is charged in Count 1 with the murder of Lionel Fluker. [¶] A person can be guilty of murder under the provocative act murder doctrine, if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot. The provocative act murder doctrine focuses on the provocateur's *conduct* and his *knowing* his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet. [¶] The elements of provocative act murder are more fully explained below. [¶] To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that: [¶] 1. Donel Poston intentionally committed a provocative act; [¶] 2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life, and then acted with conscious disregard for human life; [¶] 3. In response to Poston's provocative act, McNeely killed Lionel Fluker; AND [¶] 4. Lionel Fluker's death was a natural and probable consequence of Poston's provocative act. [¶] A provocative act is an act: [¶] 1. That goes beyond what is necessary to

---

11 We reject the People's contention appellants forfeited the following issues by failing to object. Jury instructions affecting the elements of the charged offense affect the substantial rights of the defendant and do not require an objection for appellate review. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

accomplish the crime; AND [¶] 2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

"In order to prove that Lionel Fluker's death was the *natural and probable consequence* of the defendant's provocative act, the People must prove that: [¶] 1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act could begin a [chain] of events resulting in someone's death; [¶] 2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND [¶] 3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act. [¶] A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death."

"A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else. An *independent criminal act* is a free, deliberate, and informed criminal act by a person who is not acting with the defendant."

"The People allege that Donel Poston committed the following provocative acts: [¶] • Drawing a loaded .40 caliber semiautomatic gun [¶] • Shooting Joe McNeely multiple times [¶] You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another. [¶] You do not all have to agree on which provocative act Donel Poston committed."

The jury was also instructed with CALCRIM No. 240, concerning causation in a criminal case: "An act causes injury or death if the injury or death is the direct, natural and probable consequence of the act and the injury or death would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider the circumstances established by the evidence. [¶] There may be more than one cause of a crime, even a homicide. When the

conduct of two or more persons contributes concurrently as a cause of the homicide, the conduct of each is a cause of the homicide if that conduct was also a substantial factor contributing to the result. [¶] A cause is concurrent if it was operative at the moment of the homicide and acted with another cause to produce the homicide. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person [] contributed to the death."

2. Analysis

Poston argues the instructions should have made clear that he was not guilty of provocative act murder if the jury found McNeely was the person who set in motion the chain of events leading to the shooting. We disagree. Courts use "traditional notions of concurrent and proximate cause" to determine whether a killing was the result of a defendant's provocative act. (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583–584.) "The timing of events is critical. By necessity, the provocative act must occur before a victim [here, McNeely] may make a lethal response." (*Id*. at p. 584.) But there is no requirement that the defendant be responsible for initiating the chain of events leading to the killing, so long as the provocative act preceded the killing and was a substantial factor leading to the killing. The jury was properly instructed on these concepts, and was also instructed that appellant was not guilty of provocative act murder if he was acting in reasonable self-defense.

Poston cites language from *Sanchez, supra*, 26 Cal.4th 834, in which the court affirmed the first degree murder conviction of a defendant involved in a gun battle in which a single stray shot killed a bystander, even though it could not be determined which of the shooters fired the fatal bullet: " 'Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . [I]t is not unfair to hold them equally responsible for [the victim's] death.' " (*Id*. at p. 854.) Poston suggests that unlike the defendant in *Sanchez,* his own culpability is less than that of McNeely because McNeely "instigated and escalated the quarrel."

The notion of equally culpable mental states as a criteria for provocative act murder does not establish that a defendant must initiate a course of conduct that ends in the victim's death. Nor does Poston explain how the jury instructions should have been modified to encompass the concept of equally culpable mental states. In any event, Poston's mental state was not significantly less culpable than McNeely's. While McNeely appears on the surveillance video to have started a verbal argument and hit Poston with his hand, Poston responded by immediately drawing a loaded semiautomatic handgun and shooting McNeely several times in a crowded gas station. The case is similar to *Sanchez*, in which the Supreme Court concluded the culpability of two co-defendants who engaged in a gun battle was equivalent. (*Sanchez*, *supra*, 26 Cal.4th at p. 854.)

b. *CALCRIM No. 3471 (Poston)*

Poston contends the trial court deprived him of due process and interfered with his right to present a defense when it instructed the jury on the theory of mutual combat in connection with self-defense. We reject the claim.

The instruction challenged by Poston is CALCRIM No. 3471, which was requested by both the prosecution and McNeely and which provides: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated by word or conduct to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, then he had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop the fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting. [¶] A fight is [*mutual*] *combat* when it began or continued by mutual consent or

agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense."

"Mutual combat" has been judicially construed to mean "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045; see *Nguyen, supra*, 61 Cal.4th at p. 1044.) Poston does not suggest CALCRIM No. 3741 was inaccurate, but argues it had no application to his case because there was no substantial evidence he expressly or implicitly agreed to fight with McNeely before the exchange of physical blows and gunshots. Moreover, he claims, the instruction improperly suggested he did not possess the right of self-defense, even if he reasonably believed his life was in imminent danger when he shot McNeely.

The sequence of events in this case is nothing like that in *Ross, supra*, 155 Cal.App.4th 1033, on which Poston relies. In *Ross*, the female victim had lost her temper after a verbal argument and slapped the defendant, who punched her in the face in response. (*Id*. at p. 1039.) The court's instructions on the defendant's claim of self-defense to the assault and battery charges included a prior version of CALCRIM No. 3471 that did not define "mutual combat." (*Id*. at p. 1042, fn. 9.) When the jurors asked for clarification of the term during deliberations, the trial court did not provide additional guidance and instead told them to apply the common, everyday meaning of the those words. (*Id*. at p. 1043.) This response left the jury free to conclude the term "might properly describe any violent struggle between two or more people, however it came into being." (*Id*. at p. 1044.) The court of appeal concluded (1) the instruction limiting self-defense in cases of mutual combat should not have been given because there was no evidence the defendant and victim had mutually agreed to fight one another (*id*. at pp. 1053–1054); and (2) the "unwarranted and dangerously incomplete" instruction was prejudicial because it was "entirely likely that the case was decided on the basis of a mistaken understanding of 'mutual combat.' " (*Id*. at pp. 1054, 1057.)

Although no evidence was presented that Poston and McNeely expressly agreed to fight, the video surveillance tape shows a virtually simultaneous decision to draw their

weapons and such an agreement may be implied.[12] But even if we were to agree that the gunfight cannot not be characterized as "mutual combat" for purposes of assessing Poston's self-defense claim, this would not render CALCRIM No. 3471 erroneous or inapplicable. The version of the instruction given in this case limited the self-defense claims of a person who either engaged in mutual combat "*or started a fight*." (Italics added.) The instruction was plainly proper and necessary to assess the self-defense claim of McNeely, who had delivered the first, nonlethal blow with his fist before Poston responded with deadly force.

Assuming CALCRIM No. 3471 did not apply to Poston and should have been expressly limited to McNeely, no harm to Poston ensued. Unlike the situation in *Ross*, where the court declined to define mutual combat despite a jury request for clarification of that term, the version of CALCRIM No. 3471 that was given in this case defined mutual combat to require a preexisting agreement to fight. "Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally " ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

The court in this case gave CALCRIM No. 200, which advised the jury: "Remember that depending on what you find the facts of this case are, some of these instructions may not apply." This instruction made it "abundantly clear in straightforward language that it is the jury who decides the facts and the jury who determines which instructions apply to those facts." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 929.) Even the *Ross* court noted that CALCRIM No. 3471 might have been harmless if "mutual combat" had been properly defined, as it was in the more recent version of CALCRIM No. 3471 that was given in this case. (*Ross*, *supra*, 155

---

12 Assuming McNeely initially pulled the magazine of his gun from his pocket rather than the gun itself,(see footnote 3) this was a predicate to loading his gun so he could shoot it.

Cal.App.4th at p. 1056.) The court did not commit prejudicial error in giving the instruction.

c. *CALCRIM No. 3472 (McNeely)*

McNeely argues the court erred in giving CALCRIM No. 3472, which advised the jury, as a corollary to CALCRIM No. 3471: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." He contends the instruction misstates the law because it does not state that one who provokes a quarrel to create the need for a fistfight retains the right to use self-defense if the victim responds with deadly or excessive force.

McNeely relies primarily on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), in which a divided panel of the court concluded that *under the facts of that case*, CALCRIM No. 3472 misstated the law by effectively advising the jury "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Id.* at p. 947.) This was contrary to the rule that "[a] person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[] . . . his right to live.' " (*Id.* at p. 943.) Significantly, the prosecutor had repeatedly argued that under the instruction, it did not matter whether the defendant (who instigated a gang confrontation) had only contrived to start a fistfight. The court concluded the problem was not remedied by CALCRIM No. 3471, which provided (as it did in the case before us) that a defendant who starts a fight with nondeadly force has a right to self-defense if the opponent responds with deadly force. (*Id.* at pp. 949–950.) This was in large part because the prosecutor had argued the opposite to the jury—that "under CALCRIM No. 3472's command, 'it doesn't matter' whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions." (*Id.* at p. 950.)

No comparable misstatements were made during the closing arguments in this case. The prosecutor never suggested McNeely had forfeited his right to self-defense against Poston because he had struck the first blow with his fists, but instead focused on the evidence that McNeely had drawn his weapon immediately after hitting Poston, demonstrating an intent from the outset to use deadly force, and/or had fired the shots at

Poston after Poston's gun had apparently jammed and he was already running away. The court in *Ramirez* recognized that CALCRIM No. 3472 was a correct statement of the law in a case where the defendant contrived a deadly assault from the outset, as the prosecutor argued in this case. (*Ramirez, supra*, 233 Cal.App.4th at p. 947.) In light of the language in CALCRIM No. 3471 making clear that the rule that an initial aggressor could respond in kind to deadly force by the victim so long as the initial assault involved nondeadly force, and in light of the absence of prosecutorial misstatements about the law on this subject, we are unconvinced the jury would have construed CALCRIM No. 3472 in the manner found problematic by the *Ramirez* court.[13]

VI. *Cumulative Error*

Appellants argue the errors they have raised are cumulatively prejudicial even if they do not require reversal when considered individually. We have assumed only one error for the sake of argument, meaning there are no errors to cumulate.

DISPOSITION

The judgments are affirmed.

[13] The jury was also instructed with CALCRIM No. 5.31, which provided: "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believed, and a reasonable person in the same or similar circumstances would believe, that the assault is likely to inflict great bodily injury upon him."

____________________________

NEEDHAM, J.

We concur.

____________________________

SIMONS, ACTING P.J.

____________________________

BRUINIERS, J.