XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,**<br><br>Petitioner,<br><br>**v.**<br><br>**JASON PICKETT, Acting Warden,**<br><br>Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBITS 12-15

**12 Appellant's Petition for Review**
**13 Order Denying Petition for Review**
**14 Petition for Writ of Habeas Corpus**
**15 Respondent's Memorandum of Points and Authorities in Opposition to Petition for Writ of HC**

NO. ______________________

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| | ) | Appeal No. |
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | A141557 |
| | ) | |
| Plaintiff and Respondent, | ) | Alameda |
| | ) | No. 172522B |
| v. | ) | |
| | ) | |
| DONEL POSTON, | ) | |
| | ) | |
| Defendant and Appellant. | ) | |
| | ) | |

**APPELLANT POSTON'S PETITION FOR REVIEW**

Appeal from the Judgment of the Superior Court
Alameda County, State of California

HONORABLE MICHAEL GAFFEY, TRIAL JUDGE

RANDI COVIN
State Bar #168422
P.O. Box 1120
Willits, CA. 95490
Telephone: (707) 459-2456
Facsimile: (707) 459-2147
e-mail address: rcovin13@gmail.com

Attorney for Appellant
DONEL POSTON

By Appointment of the Court of Appeal Under the First District Appellate Project's Independent Case System

Received by First District Court of Appeal

TOPICAL INDEX

TABLE OF AUTHORITIES .......... 5

PETITION FOR REVIEW .......... 13

QUESTIONS PRESENTED .......... 14

INTRODUCTION .......... 16

NECESSITY FOR REVIEW .......... 20

STATEMENTS OF THE CASE AND FACTS .......... 25

ARGUMENT .......... 25

I. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE .......... 25

A. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN SELF-DEFENSE .......... 26

B. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN THE HEAT OF PASSION ON ADEQUATE PROVOCATION .......... 30

C. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON INITIATED A CHAIN OF EVENTS

THAT PROXIMATELY CAUSED LIONEL FLUKER'S DEATH.............................. 32

II. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL ........................................... 36

III. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE ...................................................................... 39

IV. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE................................................ 41

V. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL......... 46

VI. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING

POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS........... 54

VII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL ............................................ 57

CONCLUSION......................................................................... 58

WORD COUNT CERTIFICATE...................................................... 59

COURT OF APPEAL'S UNPUBLISHED OPINION

DECLARATION OF SERVICE

* * * * * *

# TABLE OF AUTHORITIES

## CASES

*Boyde v. California*
(1990) 494 U.S. 370 ........................................................... 39

*Chambers v. Mississippi*
(1973) 410 U.S. 284 ........................................................ 39, 41

*Chapman v. California,*
*supra*, 386 U.S. .............................................................. 52

*Crane v. Kentucky*
(1986) 476 U.S. 63 ......................................................... 39, 41

*Darden v. Wainwright*
(1986) 477 U.S. 168 ........................................................... 46

*Donnelly v. DeChristoforo*
(1974) 416 U.S. 637 ........................................................ 46, 52

*Estelle v. McGuire*
(1991) 502 U.S. 62 .......................................... 36, 38, 39, 41

*Evans-Smith v. Taylor*
(4th Cir. 1994) 19 F.3d 899 ................................................ 29

*In re Aurelio R.*
(1985) 167 Cal.App.3d 52 ................................................ 22, 43

*In re Christian S.*
(1994) 7 Cal.4th 768 ........................................................ 21, 29

*In re Winship*
(1970) 397 U.S. 358 ........................................................ 39, 41

*Jackson v. Virginia*
(1979) 443 U.S. 307 ........................................................... 26

*Lincoln v. Sunn*
(9th Cir. 1987) 807 F.2d 805 .............................................. 57

*Mak v. Blodgett*
(9th Cir. 1992) 970 F.2d 614 .......... 57

*McKinney v. Rees*
(9th Cir. 1993) 993 F.2d 1378 .......... 36, 38

*McKleskey v. Kemp*
(1987) 481 U.S. 279 .......... 46, 47

*Middleton v. McNeil*
(2004) 541 U.S. 433 .......... 39, 41, 44

*Moore v. Morton*
(3rd Cir. 2001) 255 F.3d 95 .......... 47

*O'Laughlin v. O'Brien*
(1st Cir. 2009) 568 F.3d 287 .......... 29

*People v. Barnes*
(1986) 42 Cal.3d 284 .......... 26

*People v. Barton*
(1995) 12 Cal.4th 186 .......... 40

*People v. Breverman*
(1998) 19 Cal.4th 142 .......... 30, 31

*People v. Bryant, Smith & Wheeler*
(2014) 60 Cal.4th 335 .......... 54

*People v. Caldwell*
(1984) 36 Cal.3d 210 .......... 22, 42

*People v. Cervantes*
(2001) 26 Cal.4th 860 .......... passim

*People v. Clark*
(2011) 52 Cal.4th 856 .......... 36

*People v. Cross*
(2008) 45 Cal.4th 58 .......... 39, 40

*People v. Cudjo*
(1993) 6 Cal.4th 585 ............................................................ 46, 47

*People v. Elmore*,
*supra*, 59 Cal.4th .................................................................... 52

*People v. Flood*
(1998) 18 Cal.4th 470 ..................................................... 41, 42, 44

*People v. Freeman*
(1988) 46 Cal.3d 419 ................................................................. 37

*People v. Gilbert*,
*supra*, 63 Cal.2d ........................................................... 22, 42

*People v. Gonzalez*
(2012) 54 Cal.4th 643 .............................................. 22, 41, 42, 44

*People v. Guiton*
(1993) 4 Cal.4th 1116 ................................................................ 40

*People v. Gutierrez*
(2003) 112 Cal.App.4th 704 ....................................................... 30

*People v. Hansen*
(1997) 59 Cal.App.4th 473 .................................................. 22, 43

*People v. Harris*
(1989) 47 Cal.3d 1047 ................................................................ 46

*People v. Herring*
(1993) 20 Cal.App.4th 1066 ........................................................ 47

*People v. Hill*
(1998) 17 Cal.4th 800 ..................................................... 46, 52, 57

*People v. Jones*
(1970) 7 Cal.App.3d 358 ............................................................ 47

*People v. Kainzrants*
(1996) 45 Cal.App.4th 1068 ................................................ 22, 43

*People v. Karapetyan*
(2003) 106 Cal.App.4th 609 .................................................. 22, 42

*People v. Lambert*
(1975) 52 Cal.App.3d 905 .......................................................... 47

*People v. Lasko*
(2000) 23 Cal.4th 101 ................................................................. 30

*People v. Lavergne*
(1971) 4 Cal.3d 735 ..................................................................... 37

*People v. Lenart*
(2004) 32 Cal.4th 1107 ................................................................ 30

*People v. Lima*
(2004) 118 Cal.App.4th 259 .................................................. 22, 42

*People v. Mai*
(1994) 22 Cal.App.4th 117 .................................................... 22, 43

*People v. Marshall*
(1997) 15 Cal.4th 1 ...................................................................... 40

*People v. Massie*
(1967) 66 Cal.2d 899 .................................................................... 54

*People v. Mejia*
(2012) 211 Cal.App.4th 586 .................................................. 22, 42

*People v. Mil*
(2012) 53 Cal.4th 400 ........................................................... 38, 52

*People v. Millbrook*
(2014) 222 Cal.App.4th 1122 ...................................................... 31

*People v. Mitchell*
(1939) 14 Cal.2d 237 .................................................................... 31

*People v. Moore*
(2011) 51 Cal.4th 386 ................................................................... 29

*People v. Najera*
(2006) 138 Cal.App.4th 212 .......................................................... 47

*People v. Nguyen*
(2015) 61 Cal.4th 1015 .................................................... 26, 27, 28

*People v. Roberts*
(1992) 2 Cal.4th 271 .............................................................. 22, 42

*People v. Ross*
(2007) 155 Cal.App.4th 1033 ........................................................ 28

*People v. Ross,*
*supra*, 155 Cal.App.4th 1044-1045 ............................................... 32

*People v. Sanchez*
(2001) 26 Cal.4th 834 .......................................................... passim

*People v. Sanchez*
(2014) 228 Cal.App.4th 1517 ........................................................ 47

*People v. Sifuentes*
(2011) 195 Cal.App.4th 1410 ........................................................ 29

*People v. Soojian,*
*supra*, 190 Cal.App.4th ............................................................... 52

*People v. Steele*
(2002) 27 Cal.4th 1230 .................................................................. 30

*People v. Superior Court (Bennett)*
223 Cal.App.3d 1166 ............................................................. 22, 43

*People v. Thomas*
(2013) 218 Cal.App.4th 630 .......................................................... 31

*People v. Turner*
(1984) 37 Cal.3d 302 ...................................................................... 54

*People v. Wheeler*
(1992) 4 Cal.4th 284 ...................................................................... 37

*People v. Williams*
(1998) 17 Cal.4th 148 ........ 52

*People v. Zarazua*
(2008) 162 Cal.App.4th 1348 ........ 22, 42

*Sullivan v. Louisiana*
(1993) 508 U.S. 275 ........ 39, 41

*Taylor v. Superior Court*
(1970) 3 Cal.3d 578 ........ 22, 42

*United States v. Cabrera and Mulgado*
(9th Cir. 2000) 222 F.3d 590 ........ 46, 47

*United States v. Mayfield*
(9th Cir. 1999) 189 F.3d 895 ........ 54, 55

*United States v, McLister*
(9th Cir. 1979) 608 F.2d 785 ........ 57

*United States v. Romanello*
(5th Cir. 1984) 726 F.2d 173 ........ 54, 55

*United States v. Rucher*
(11th Cir. 1990) 915 F.2d 1511 ........ 54, 55

*United States v. Tootick*
(9th Cir. 1991) 952 F.2d 1078 ........ 54, 55

*Winfred D. v. Michelin North America, Inc.*
(2008) 165 Cal.App.4th 1011 ........ 37

*Wooten v. Superior Court*
(2001) 93 Cal.App.4th 422 ........ 37

*Zafiro v. United States*
(1993) 506 U.S. 534 ........ 54

**CONSTITUTIONS**

Cal. Const., art I, §§ 15 .................................................. passim
16 .................................................. 39, 41

U.S. Const., amend. XIV .................................................. passim

**STATUTES**

Evid Code, §§ 352 .................................................. 36, 38
1101, subd. (a) .................................................. 37

Pen. Code, §§ 187 .................................................. 26
188 .................................................. 26
192 .................................................. 30
266h .................................................. 37
647, subd. (b) .................................................. 37
1098 .................................................. 54

**OTHER AUTHORITIES**

Cal. Rules of Court, rules 8.200(a)(5) .................................................. 54, 56
8.500(b) .................................................. 25
8.504(b) .................................................. 13
8.360 .................................................. 54

CALCRIM Nos. 560 .................................................. 19, 44
3471 .................................................. 14, 18, 39-40

Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html. .................................................. 48

John R. Rickford, African American Vernacular English, Blackwell Publishers (1999).................................................... 46-47

Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black ............................................. 48-49

Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle ..................................................................................... 48

* * * * * *

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | Appeal No. A141557 |
| Plaintiff and Respondent, | ) | Alameda No. 172522B |
| v. | ) | |
| DONEL POSTON, | ) | |
| Defendant and Appellant. | ) | |

**APPELLANT POSTON'S PETITION FOR REVIEW**

* * * * * *

**PETITION FOR REVIEW**

TO THE HONORABLE TANI CANTIL-SAKAUYE, CHIEF JUSTICE, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF CALIFORNIA:

Appellant DONEL POSTON, through counsel, petitions this Court for review following the unpublished decision of the Court of Appeal, the First Appellate District, Division Five (per Needham, J.), affirming the judgment imposed upon him. The Court of Appeal's unpublished opinion was filed on January 6, 2017. A copy of the opinion is attached hereto pursuant to California Rules of Court, rule 8.504(b)(4).

# QUESTIONS PRESENTED

1. Does malice aforethought require unlawful intent so that intent to kill in self-defense if sufficiently threatened cannot support conviction of murder or attempted murder?

2. Does provocative act murder require proof beyond a reasonable doubt that the non-killer defendant or an accomplice initiated the chain of events which proximately caused the death?

3. Does provocative act murder require proof beyond a reasonable doubt that the non-killer defendant did not have a substantially less culpable mental state than the killer?

4. Do Poston's convictions of murder and attempted murder violate due process and require reversal because they are not supported by sufficient evidence?

5. Did the trial court abuse its discretion in admitting extensive and inflammatory evidence of Poston's out-of-court statements regarding pimping and prostitution to impeach his credibility, rendering the trial fundamentally unfair and requiring reversal?

6. Did the trial court err prejudicially in instructing on mutual combat in accord with CALCRIM No. 3471, violating

Poston's constitutional rights to jury trial, to due process, and to present a defense?

7. Did the trial court err prejudicially in omitting instruction on an element of provocative act murder, violating Poston's constitutional rights to jury trial, to due process, and to present a defense?

8. Did pervasive prosecutorial misconduct violate due process and require reversal?

9. Did the trial court abuse its discretion in denying Poston's severance motion?

10. Was the joint trial fundamentally unfair in violation of due process?

11. Does cumulative prejudice violate due process and require reversal?

## INTRODUCTION

This is an unusual case in which the charged shooting was captured on surveillance videos and the undisputed facts show a textbook case of self-defense. Appellant, Donel Poston, had an unplanned encounter with co-appellant, Joe McNeely, at a little after 10 p.m. on April 5, 2013, at a Valero gas station in East Oakland.

The prosecutor, McNeely, the Attorney General, and the Court of Appeal all agree that McNeely was the aggressor. The surveillance videos show that McNeely started a quarrel with Poston - talking and gesturing aggressively, then slapping or punching and simultaneously tripping Poston, causing him to fall partway to the ground.

The videos show McNeely reaching inside his jacket and holding what appears to be a gun as Poston starts to get up. Poston pulls out his own gun and rapidly fires multiple shots at McNeely, then runs when McNeely goes down. McNeely gets up and follows Poston, shooting at him repeatedly as he runs away, hitting and killing Lionel Fluker, an innocent bystander.

Poston and McNeely were both charged, tried, and convicted of the second-degree murder of Fluker and the attempted murder of each other. Faced with Poston's seemingly irrefutable claim of self-

defense, the prosecutor managed to obtain guilty verdicts by portraying Poston as a "thug" and a "pimp" who did not look like the "true picture" of a crime victim acting in self-defense.

The prosecutor presented a mountain of Poston's irrelevant and inflammatory out-of-court statements in African American Vernacular English ("AAVE") in rap lyrics, letters, jail phone calls, and YouTube videos he produced. As Poston lamented to his mother in one of the jail phone calls, the prosecutor was twisting his words, managing to make even his protestations of innocence sound incriminating.

Poston's convictions of the second degree murder of Fluker and the attempted murder of McNeely are not supported by sufficient evidence and violate due process. There was insufficient evidence of malice aforethought to overcome compelling evidence that Poston acted in self-defense and/or in the heat of passion on adequate provocation. Thus Poston's convictions of murder and attempted murder should be reversed.

Poston's conviction of murder should also be reversed for insufficient evidence because he did not initiate the chain of events proximately causing Fluker's death - McNeely did; he had a substantially less culpable mental state than McNeely did; and

McNeely's criminal act of shooting at Poston in retaliation was an independent intervening cause. Thus, the provocative act doctrine does not apply and Poston is not legally responsible for McNeely's fatal shooting of Fluker.

Multiple trial errors also require reversal. Admission of the extensive, inflammatory evidence of Poston's largely irrelevant out-of-court statements about pimping, "hoes" and "bitches" to impeach his credibility was an abuse of the trial court's discretion which violated due process.

The trial court also erred in instructing the jury on mutual combat in accord with CALCRIM No. 3471 without any support in the evidence. "Mutual combat" requires an express or implied agreement to fight before the first blow is struck. Here, there was no evidence of any agreement or intent to fight on Poston's part until McNeely knocked him down and reached for his gun. The unsupported instruction allowed the jurors to reject Poston's compelling claim of self-defense and convict him based on the prosecutor's pervasive and misleading descriptions of McNeely's attack on Poston as a "gun battle."

Compounding the error, the provocative act murder instruction, CALCRIM No. 560, omitted crucial elements – that the defendant *initiated* the chain of events proximately causing death and had a substantially less culpable mental state than the actual killer.

Tying all the errors together, the prosecutor committed pervasive, prejudicial misconduct, repeatedly appealing to racial bias and fear of random street violence, both in her questioning of Poston and in her closing argument, portraying Poston as a "thug" and a "pimp" who called women "bitches" and "hoes."

Faced with a seemingly dispositive video showing that Poston shot McNeely in self-defense, the prosecutor obtained convictions by attacking Poston's character and twisting his words, even arguing that switching between African American Vernacular English with his friends and family and Standard English in court supposedly showed he was lying about his defense.

McNeely's counsel also contributed to the unfairness of the trial. The defenses of McNeely and Poston were antagonistic and irreconcilable. The trial court abused its discretion in denying severance at the outset. The conflicts between the two defendants, each charged with the attempted murder of the other, played

themselves out throughout the pretrial and trial proceedings. The joint trial was fundamentally unfair.

Poston had a right to stand his ground and defend himself against McNeely's unprovoked and potentially deadly assault, regardless of any unrelated crimes or character flaws. One need not be a perfect victim to act in self-defense or in the heat of passion. Absent the multiple, serious errors, a more favorable outcome was reasonably possible - in fact, it seems almost certain. The cumulative effect of the errors violated due process and the judgment should be reversed.

## NECESSITY FOR REVIEW

Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case. In addition, review should be granted to settle important points of law.

First, this case presents the question whether evidence of a prior intent to kill in self-defense if sufficiently threatened can support murder and attempted murder convictions on a mutual combat theory. The evidence here establishes at most that Poston had a prior intent to defend himself if necessary.

Poston argues that a prior intent to kill in self-defense if necessary is not intent to kill unlawfully and cannot support a murder or attempted murder conviction. (See *In re Christian S*. (1994) 7 Cal.4th 768, 779 [murder requires intent to kill unlawfully, not in self-defense].) The Court of Appeal's decision is inconsistent with *Christian S*. and requires clarification from this Court to protect every citizen's right to stand his or her ground and defend himself or herself if necessary, without being subject to prosecution for murder based on mutual combat.

This case also presents the questions whether conviction of murder on a provocative act theory requires proof beyond a reasonable doubt that a non-killer defendant (or an accomplice) initiated the chain of events proximately causing the death and that the killer's mental state was substantially more culpable than the non-killer defendant's mental state.

In *People v. Cervantes* (2001) 26 Cal.4th 860, 866-867, this Court found insufficient evidence to support the defendant's conviction of murder for a gang shooting based on the provocative act doctrine. (*People v. Cervantes, supra*, 26 Cal.4th at pp. 867-874., at pp. 872-873.) The Court observed that the defendant was not the

initial aggressor, also noting several other circumstances indicating that the chain of causation was too tenuous to impose criminal liability. (*Ibid*..)

In every provocative act murder case Poston could find, the defendant did initiate the chain of events leading to the victim's death, sometimes in concert with one or more accomplices. (See, e.g., *People v. Gonzalez* (2012) 54 Cal.4th 643, 656; *People v. Sanchez* (2001) 26 Cal.4th 834, 849-850; *People v. Roberts* (1992) 2 Cal.4th 271, 321; *People v. Caldwell* (1984) 36 Cal.3d 210, 219-220; *Taylor v. Superior Court* (1970) 3 Cal.3d 578, 584; *People v. Gilbert, supra*, 63 Cal.2d at 703-704; *People v. Mejia* (2012) 211 Cal.App.4th 586, 615-616, 618; *People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1362; *People v. Lima* (2004) 118 Cal.App.4th 259, 268; *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 618-619; *People v. Hansen* (1997) 59 Cal.App.4th 473, 481; *People v. Kainzrants* (1996) 45 Cal.App.4th 1068, 1079; *People v. Mai* (1994) 22 Cal.App.4th 117, 127; *People v. Superior Court (Bennett)* 223 Cal.App.3d 1166, 1172-1173; *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 59.)

Poston could find no case upholding a murder conviction under the provocative act doctrine where the defendant (or an accomplice)

did not initiate the chain of events and was not equally as culpable as the actual killer. (Compare *People v. Sanchez, supra,* 26 Cal.4th at pp. 846-848, 856 [conc. opn. of Kennard, J.: "Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act"].)

The Court of Appeal found this Court's decision in *Sanchez* "somewhat perplexing." (Slip opn. at p. 25; see also *People v. Sanchez, supra*, 26 Cal.4th at pp. 844-845, 851-854, and conc. opn. of Werdegar, J., at p. 858 ["The majority, confusingly, suggests provocative act murder was an 'unsupported theory of liability' (maj. opn., ante, at p. 852), though the majority does not explain in what respect the theory is unsupported by the evidence"].)

As the Court of Appeal observed, this Court suggested that provocative act murder was an unsupported theory in *Sanchez*, but this Court "cited with approval the concurring decision of Justice Kennard who 'avoids using the label,' but analyzed the case and voted to affirm the conviction based on provocative act liability." (Slip opn. at p. 25; see also *People v. Sanchez, supra*, at pp. 854, 855-857 (conc. opn. of Kennard, J.), 858-859 (conc. opn. of Werdegar, J.).) Justice

Kennard's concurring opinion suggests that the provocative act murder doctrine does not apply to a non-killer who did not initiate the chain of events and did not have an equally culpable mental state. (See *People v. Sanchez, supra*, at pp. 854, 855-857 (conc. opn. of Kennard, J.), 858-859 (conc. opn. of Werdegar, J.)

It was undisputed here that Poston did not initiate the chain of events that caused Fluker's death. Contrary to the Court of Appeal's conclusion, Poston's mental state was substantially less culpable than McNeely's. (See Slip opn. at p. 36.) McNeely initiated a quarrel, physically assaulted Poston, then fired wildly down the street at Poston's back, killing Fluker. (*Id*. at pp. 3-4.) As in *Cervantes*, "the evidence is insufficient as a matter of law to establish the requisite proximate causation to hold defendant liable for murder." (*People v. Cervantes, supra*, 26 Cal.4th at p. 874.)

In *Cervantes* and *Sanchez*, this Court went a long way toward articulating the limits of the provocative act doctrine. But questions remain. Can a non-killer lawfully be convicted of provocative act murder when he did not initiate the hostilities but, rather, only responded to the unlawful provocation of another party not acting in concert with him or her? Can a non-killer lawfully be convicted of

provocative act murder when his or her mental state was not equally culpable? Further guidance from this Court is needed and review should be granted.

## STATEMENTS OF THE CASE AND THE FACTS

For purposes of this petition only, Poston relies on the "Facts and Procedural History" set forth in the Court of Appeal's opinion. (Slip op. at pp. 1-12.)

## ARGUMENT

This Court will order review of a decision by a Court of Appeal "where it appears necessary to secure uniformity of decision or the settlement of important questions of law." (Cal. Rules of Court, rule 8.500 (b).) This petition for review should be granted for both of the foregoing reasons and to prevent the violation of Poston's constitutional rights and a miscarriage of justice, as set forth below.

### I. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

Poston argued on appeal that his convictions of murder and attempted murder violate due process and should be reversed because they are not supported by sufficient evidence; no rational juror could

have found proof beyond a reasonable doubt that Poston did not act in self-defense or in the heat of passion on adequate provocation, nor that he initiated a chain of events which proximately caused Fluker's death. (AOB 58-83; ARB 11-31; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; §§ 187-188; *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

A. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN SELF-DEFENSE.

Poston argued there was insufficient evidence he did not act in self-defense. (AOB 61-70; ARB 13-24.) The Court of Appeal rejected Poston's claim, concluding that a juror could have believed he started shooting before he saw McNeely's gun or that he shot McNeely because he was angry at being hit and tripped, not because he feared for his life. (Slip opn. at p. 21.) Contrary to the Court of Appeal's conclusions, no rational juror could have found proof beyond a reasonable doubt that Poston did not act in self-defense.

The Court of Appeal cited *People v. Nguyen* (2015) 61 Cal.4th 1015, in which this Court rejected an argument similar to Poston's - that the evidence was insufficient to prove malice aforethought and established self-defense as a matter of law. (Slip opn. at p. 21; *People*

*v. Nguyen, supra*, 61 Cal.4th at pp. 1044-1046.) This Court concluded in *Nguyen* that "the jury could have reasonably found the defendant was not entitled to claim self-defense 'because, in shooting [the victim], he did not act on the basis of fear alone but also a desire to kill his rival." (Slip opn. at p. 21, quoting *People v. Nguyen, supra*, at p. 1044 [Court of Appeal's insertion].)

This case is a far cry from *Nguyen*. There was substantial evidence of malice there because the prosecution gang expert testified that there was "an ongoing gang war" between the defendant's gang and the victim's. (*People v. Nguyen, supra*, at p. 1044.) That and evidence the defendant held his gun and smiled at an accomplice while waiting for the victim to approach just before shooting him was sufficient evidence the defendant did not act out of fear alone. (*Id*. at p. 1045.)

Here, on the other hand, there was no evidence whatsoever that either Poston or McNeely was a gang member or that they had any preexisting conflict or motive. On the contrary it was undisputed that McNeely attacked Poston unexpectedly during a chance encounter at a neighborhood gas station. (See Slip opn. at p. 3; 18 RT 1401-1402,

1426, 1516-1520; 19 RT 1797-1798.) There was no evidence Poston had ever engaged in any prior violence.

Citing *Nguyen*, the Court of Appeal concluded the jury could have rejected Poston's testimony that he feared for his life because he had seen McNeely's gun. (Slip opn. at p. 21.) According to the Court of Appeal, the jury could have concluded Poston did not know McNeely had a gun or, even if he knew, that he could have shot McNeely out of anger rather than fear. (*Ibid*.)

On the contrary, no rational juror could have found proof beyond a reasonable doubt that Poston did not reasonably fear for his life nor that he intended to engage in mutual combat before McNeely struck and tripped him. (See *People v. Ross* (2007) 155 Cal.App.4th 1033, 1044-1045 and fn. 13 ["Mutual combat" means "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*" - preceding the first assaultive conduct].)

At most, Poston's behavior and subsequent statements arguably demonstrate a prior intention to stand his ground and defend himself if attacked. A person who intends to kill in self-defense if sufficiently threatened does not intend to kill unlawfully and cannot be guilty of

murder or attempted murder. (See *In re Christian S.*, *supra*, 7 Cal.4th at p. 779 [murder requires proof of intent to kill unlawfully - not in self-defense].)

The Court of Appeal's suggestion that Poston may have shot at McNeely out of anger rather than fear is a mere speculative possibility, unsupported by substantial evidence. (See *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1419 [finding insufficient evidence to support conviction of unlawful possession of a firearm; "The possibility Sifuentes might have had the right to exercise control over the gun does not by itself provide a basis to infer he had the right to control it"]; *O'Laughlin v. O'Brien* (1st Cir. 2009) 568 F.3d 287, 303-304 [circumstantial evidence susceptible to conflicting inferences was insufficient to support the judgment]; *Evans-Smith v. Taylor* (4th Cir. 1994) 19 F.3d 899, 900-910 [same]; cf. *People v. Moore* (2011) 51 Cal.4th 386, 406 [speculation was insufficient to establish prejudicial error; "That an event *could* have happened . . . does not by itself support a deduction or inference it did happen"].)

Review should be granted to settle an important point of law: whether a prior intent to kill in self-defense if necessary can support a murder or attempted murder conviction on a mutual combat theory.

Review should also be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

B. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON DID NOT ACT IN THE HEAT OF PASSION ON ADEQUATE PROVOCATION.

Poston argued there was insufficient evidence he did not act in the heat of passion on adequate provocation. (AOB 71-74; ARB 25-27.) The Court of Appeal rejected Poston's claim, concluding that a juror could have concluded Poston's reason was not obscured by passion. (Slip opn. at p. 23.) Contrary to the Court of Appeal's conclusions, no rational juror could have found proof beyond a reasonable doubt that Poston did not act in the heat of passion on adequate provocation and the judgment should be reversed.

As Poston explained, malice is negated by evidence that the defendant acted upon a sudden quarrel in the heat of passion. (§ 192; *People v. Lenart* (2004) 32 Cal.4th 1107, 1126; *People v. Steele* (2002) 27 Cal.4th 1230, 1252; *People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Breverman* (1998) 19 Cal.4th 142, 163; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708-709.)

The passion aroused may be anger, rage, fear, or any “[v]iolent, intense, high wrought or enthusiastic emotion … other than revenge.”

(*People v. Breverman, supra*, at p. 163 [citations and internal quotation marks omitted]; see also *People v. Mitchell* (1939) 14 Cal.2d 237, 252 [heat of passion may be based on fear, rather than rage]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 [heat of passion may be based on a fear that did not rise to the level required to establish self-defense]; *People v. Thomas* (2013) 218 Cal.App.4th 630, 646 [failure to instruct on heat of passion was prejudicial error where the defendant testified that he shot the attacking victim because he was afraid; although the facts may have fit more precisely with imperfect self-defense, they also supported heat of passion due to a sudden quarrel].)

Here. McNeely insulted, ranted, and yelled right in Poston's face, calling him a "bitch ass nigger," while gesturing aggressively, punched or slapped Poston in the face, knocking him to the ground, then pulled out a handgun. Poston reacted to the dangerous and provocative situation in which he found himself. The uncontroverted evidence establishes as a matter of law that he acted in self-defense. In addition, McNeely's extreme provocation caused him to act from passion - fear for his life - which negated malice.

No rational juror could have found proof beyond a reasonable doubt that Poston did not act in the heat of passion on adequate provocation. Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

C. NO RATIONAL JUROR COULD HAVE FOUND PROOF BEYOND A REASONABLE DOUBT THAT POSTON INITIATED A CHAIN OF EVENTS THAT PROXIMATELY CAUSED LIONEL FLUKER'S DEATH.

Poston argued there was insufficient evidence he initiated a chain of events which proximately caused Fluker's death. (AOB 74-83; ARB 27-31.) The Court of Appeal rejected Poston's claim, finding sufficient evidence of proximate causation because a juror could have found that Poston engaged in a gun battle with McNeely; that it was foreseeable McNeely would shoot back; and that McNeely's retaliatory shooting was not an independent, superceding cause. (Slip opn. at pp. 25-26.) Contrary to the Court of Appeal's conclusions, no rational juror could have found proof beyond a reasonable doubt that Poston proximately caused Fluker's death.

Poston has explained that there was insufficient evidence of mutual combat - an intent or agreement to fight before the first blow - McNeely's blow - was struck. (See *People v. Ross*, *supra*, 155

Cal.App.4th 1044-1045 and fn. 13.) And he has explained that the provocative act murder doctrine should not apply to a non-killer who did not initiate the hostilities and did not have an equally culpable mental state. (See *People v. Sanchez, supra*, 26 Cal.4th at p. 856 [conc. opn. of Kennard, J.].) Contrary to the Court of Appeal's conclusion, Poston was significantly less culpable than McNeely, who started a quarrel, escalated it to a physical assault, and then shot wildly down the street at Poston's back as he fled. (See Slip opn. at pp. 17, 36.)

The Court of Appeal concluded that McNeely's reckless, retaliatory shooting was not an independent, superceding cause because it was "in direct response to the shots Poston fired at him" and there was no jury finding of premeditation, distinguishing *Cervantes* and *Sanchez*. (Slip opn. at pp. 25-26.)

Contrary to the Court of Appeal's conclusion, McNeely's retaliatory shooting was an independent, superceding cause because McNeely was the aggressor and because Poston was already running away when McNeely shot back in retaliation, not in self-defense. Like the killers in *Cervantes*, McNeely intended to exploit the situation and was not acting in concert with Poston, "a circumstance

that is normally held to relieve the first actor [defendant] of criminal responsibility." (See *People v. Cervantes, supra*, 26 Cal.4th at p. 874.)

Poston's act of shooting did not instigate a gun battle because it was in response to McNeely's unlawful, armed assault. This case presents the precise scenario this Court was not addressing in *Sanchez*. McNeely's mental state was substantially more culpable than Poston's. McNeely was the initial aggressor who apparently intended to use lethal force when he assaulted Poston without provocation and then fired at Poston's back as he ran away. (Slip opn. at p. 4, fn. 3.)

McNeely and Poston did not engage in precisely the same conduct at the same time as in *Sanchez*. (See *People v. Sanchez, supra*, 26 Cal.4th at p. 854, 856.) Rather McNeely instigated the gun battle, Poston responded in self-defense, then McNeely fired wildly down the street at Poston's back, killing Fluker. As in *Cervantes*, "the evidence is insufficient as a matter of law to establish the requisite proximate causation to hold defendant liable for murder." (*People v. Cervantes, supra*, 26 Cal.4th at p. 874.) No rational juror could have

found proof beyond a reasonable doubt that Poston proximately caused Fluker's death.

Review should be granted to settle an important point of law: whether the provocative act murder doctrine applies to a non-killer who did not initiate the hostilities and whose mental state was not equally as culpable as the killer's. Review should also be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

**II. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL.**

Poston argued that the trial court abused its discretion in admitting extensive, inflammatory evidence of his out-of-court statements regarding pimping and prostitution to impeach his credibility, violating due process and requiring reversal. (AOB 84-92; ARB 32-35; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; Evid. Code, § 352; *Estelle v. McGuire* (1991) 502 U.S. 62, 75; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378.)

The Court of Appeal rejected Poston's claim, concluding that evidence of pimping and prostitution was relevant to Poston's credibility and Bailey's and that its admission was within the trial court's discretion. (Slip opn. at pp. 31-32.) Contrary to the Court of Appeal's conclusion, the prejudicial effect of the evidence substantially outweighed its probative value and its admission rendered the trial fundamentally unfair.

As Poston explained, the probative value of the evidence was reduced because there was no conviction. (AOB 88; *People v. Clark*

(2011) 52 Cal.4th 856, 931; *People v. Wheeler* (1992) 4 Cal.4th 284, 297, fn. 7.) The jury was not instructed on the meaning of "pimping" and "prostitution" and Poston's out-of-court statements did not establish all the elements of the offenses. (See §§ 266h, 647, subd. (b); *People v. Freeman* (1988) 46 Cal.3d 419, 424; *Wooten v. Superior Court* (2001) 93 Cal.App.4th 422, 428.) The statements only established that Poston calls women "bitches" and "hoes" and "begs" money from them sometimes. (19 RT 1653-1654, 1666, 1675-1693, 1758-1759; Pros. Exh. 32A at pp. 1, 3-6, 17-18, 20, 22, 32, 40; Def. Exhs. P, P-1.)

The challenged evidence involved a collateral matter. (See *People v. Lavergne* (1971) 4 Cal.3d 735, 742; *Winfred D. v. Michelin North America, Inc*. (2008) 165 Cal.App.4th 1011, 1029-1033.) Poston had already admitted prior convictions for possession of crack cocaine for sale, evading the police, possession of counterfeit checks, and commercial burglary on direct examination. (18 RT 1517-1519.) Those prior convictions provided plenty of ammunition to impeach his credibility. Ambiguous references to pimping, "bitches," and "hoes" served only to inflame the jurors' passions against a bad character who mistreated women. (See also Evid. Code, § 1101, subd.

(a).) For all of these reasons, admission of the inflammatory evidence was an abuse of the trial court's discretion under Evidence Code section 352 which rendered Poston's trial fundamentally unfair in violation of due process. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 75; *McKinney v. Rees, supra*, 993 F.2d 1378.)

At least one juror could have had a reasonable doubt whether Poston was guilty of murder and attempted murder if the prejudicial pimping evidence had been excluded. (See *People v. Mil* (2012) 53 Cal.4th 400, 417, 419.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## III. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.

Poston argued that the trial court erred prejudicially in instructing on mutual combat in accord with CALCRIM No. 3471, violating his constitutional rights to jury trial, to due process, and to present a defense. (AOB 93-100; ARB 36-38; U.S. Const., amend. XIV; Cal. Const., art. I, §§ 15, 16; see also *Middleton v. McNeil* (2004) 541 U.S. 433, 437; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Crane v. Kentucky* (1986) 476 U.S. 63, 690.); *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *Boyde v. California* (1990) 494 U.S. 370, 380; *Chambers v. Mississippi* (1973) 410 U.S. 284; *In re Winship* (1970) 397 U.S. 358, 364; *People v. Cross* (2008) 45 Cal.4th 58, 67.)

The Court of Appeal rejected Poston's claim, finding sufficient evidence of an implied agreement to fight in Poston and McNeely's "virtually simultaneous decision to draw their weapons . . . ." (Slip opn. at pp. 37-38.) Contrary to the Court of Appeal's conclusion, no rational juror could have found proof beyond a reasonable doubt that

Poston intended or agreed to fight before McNeely's unprovoked assault.

As Poston explained, the surveillance video makes clear that McNeely was the initial aggressor. Poston stood passively by while McNeely gestured aggressively and berated him. There was no evidence of a prearranged meeting. Rather, it was undisputed that the encounter was spontaneous. If Poston had intended to fight, he would not have waited for McNeely to strike him and knock him down.

No rational juror could have found proof beyond a reasonable doubt that Poston shot McNeely pursuant to a pre-existing agreement to fight, rather than in self-defense. Thus, CALCRIM No. 3471 was not supported by substantial evidence and should not have been given. (See *People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Marshall* (1997) 15 Cal.4th 1, 40; *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8; *People v. Guiton* (1993) 4 Cal.4th 1116, 1131.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## IV. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE.

Poston argued that the trial court erred prejudicially in omitting instruction on an element of provocative act murder - that the chain of events proximately causing the victim's death must have been initiated by the defendant - violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (AOB 101-108; ARB 39-42; U.S. Const., amend. XIV; Cal. Const., art. I, §§ 15, 16; see also *Middleton v. McNeil, supra*, 541 U.S. at p. 437; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Crane v. Kentucky, supra*, 476 U.S. at p. 69.); *Estelle v. McGuire, supra*, 502 U.S. at p. 72; *Chambers v. Mississippi, supra*, 410 U.S. 284; *In re Winship, supra*, 397 U.S. at p. 364; *People v. Gonzalez, supra*, 54 Cal.4th at pp. 662-663; *People v. Flood* (1998) 18 Cal.4th 470, 479-480.)

The Court of Appeal rejected Poston's claim, concluding that "there is no requirement that the defendant be responsible for initiating the chain of events leading to the killing, so long as the provocative act preceded the killing and was a substantial factor

leading to the killing." (Slip opn. at p. 35.) The court also concluded that Poston's mental state was not significantly less culpable than McNeely's. (*Id*. at p. 36.) Contrary to the Court of Appeal's conclusions, provocative act murder does not apply to a non-killer like Poston, who did not initiate the chain of events and had a significantly less culpable mental state than the killer.

As Poston explained, this Court noted in finding insufficient evidence of proximate causation in *Cervantes* that the defendant there did not initiate the chain of events. (*People v. Cervantes, supra*, 26 Cal.4th at p. 872.) In every provocative act murder case Poston could find, the defendant did initiate the chain of events leading to the victim's death, sometimes in concert with one or more accomplices. (AOB 105-106; see also *People v. Gonzalez, supra*, 54 Cal.4th at p. 656; *People v. Sanchez, supra*, 26 Cal.4th at pp. 849-850; *People v. Roberts, supra,* 2 Cal.4th at p. 321; *People v. Caldwell, supra,* 36 Cal.3d at pp. 219-220; *Taylor v. Superior Court, supra*, 3 Cal.3d at p. 584; *People v. Gilbert, supra*, 63 Cal.2d at 703-704; *People v. Mejia, supra,* 211 Cal.App.4th at pp. 615-616, 618; *People v. Zarazua, supra*, 162 Cal.App.4th at p. 1362; *People v. Lima, supra*, 118 Cal.App.4th at p. 268; *People v. Karapetyan, supra,* 106 Cal.App.4th

at pp. 618-619; *People v. Hansen, supra*, 59 Cal.App.4th at p. 481; *People v. Kainzrants, supra,* 45 Cal.App.4th at p. 1079; *People v. Mai, supra,* 22 Cal.App.4th at p. 127; *People v. Superior Court (Bennett), supra,* 223 Cal.App.3d at pp. 1172-1173; *In re Aurelio R., supra*, 167 Cal.App.3d at p. 59.)

In *Sanchez*, this Court quoted Justice Kennard's concurring opinion with approval:

> Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . Because defendant and [his rival] had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for [the victim's] death, without regard to which of them actually fired the bullet that struck and killed [the victim].

(*People v. Sanchez, supra*, 26 Cal.4th at p. 854.)

Here, Poston and McNeely did not have equally culpable mental states and did not engage in precisely the same conduct at the same time. There was no evidence Poston had a preexisting intent to fight or shoot McNeely, unlike the defendants in *Sanchez*. Rather, the uncontroverted evidence showed that he started carrying a gun for self-protection after being shot in the chest. He had his gun with him when he went to the Valero station because "it's nighttime, it's Friday

night in Oakland, it is crazy. . . . [T]here is a war going on out there . . . ." (19 RT 1612.)

Poston's shooting of McNeely was a spontaneous response to McNeely's provocative acts. McNeely was significantly more culpable because he instigated and escalated the quarrel. He was the first to use physical force, and he apparently intended to use potentially lethal force from the outset - after knocking Poston to the ground, he reached for his gun while Poston was still getting up. Because Poston did not initiate the chain of events and was not equally as culpable as the actual killer, he could not be liable for Fluker's murder under the provocative act doctrine.

CALCRIM No. 560 as given omitted key elements of provocative act murder, violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (See *Middleton v. McNeil, supra*, 541 U.S. at p. 437; *People v. Gonzalez, supra*, 54 Cal.4th at pp. 662-663; *People v. Flood, supra*, 18 Cal.4th at pp. 479-480.)

Review should be granted to settle important questions of law: whether provocative act murder requires proof beyond a reasonable doubt that a non-killer initiated the chain of events and whether he had

an equally culpable mental state. Review should also be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## V. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL.

Poston argued that the prosecutor committed pervasive, prejudicial misconduct by appealing to the jurors' emotions, racial bias, and fear of random street violence; attacking Poston's character; and misleading the jurors, violating due process. (AOB 109-128; ARB 43-48; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; *McKleskey v. Kemp* (1987) 481 U.S. 279, 309; *Darden v. Wainwright* (1986) 477 U.S. 168, 179-180; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637; *United States v. Cabrera and Mulgado* (9th Cir. 2000) 222 F.3d 590, 594; *People v. Hill* (1998) 17 Cal.4th 800; *People v. Cudjo* (1993) 6 Cal.4th 585, 625; *People v. Harris* (1989) 47 Cal.3d 1047, 1083-1084.)

The Court of Appeal rejected Poston's claim, concluding that it was forfeited by failure to object. (Slip opn. at p. 32.) Contrary to the Court of Appeal's conclusion, objection would have been futile and Poston's failure to object to should be excused.

As Poston explained, the prosecutor used deception and consciously or unconsciously racist attacks on Poston's character to overcome compelling video evidence of McNeely's assault and

Poston's defensive response. (AOB 119-129; see also *McKleskey v. Kemp* (1987) 481 U.S. 279, 309; *People v. Cudjo* (1993) 6 Cal.4th 585, 625; *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529; *People v. Najera* (2006) 138 Cal.App.4th 212, 220-221; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1074 *People v. Lambert* (1975) 52 Cal.App.3d 905, 910; *People v. Jones* (1970) 7 Cal.App.3d 358, 363; *Moore v. Morton* (3rd Cir. 2001) 255 F.3d 95, 113-114; *United States v. Cabrera and Mulgado* (9th Cir. 2000) 222 F.3d 590, 594.)

It was deceptive for the prosecutor to repeatedly refer to the charged shooting as a "gun battle" when it was and is undisputed that McNeely initiated the confrontation. (AOB 119, 124, 127.) McNeely began acting aggressively and unilaterally escalated the incident to a physical assault. There was no substantial evidence that Poston intended to fight McNeely before the assault, as explained, *ante*. Thus repeated reference to a "gun battle" was a deceptive and reprehensible attempt to persuade the jurors by alarming them and inflaming their passions.

The prosecutor's whole theory of the case was that Poston was guilty of murder and attempted murder, despite the undisputed fact that McNeely was the armed aggressor, because he was a bad

character - a "thug" and a "pimp" - who did not talk or behave like she thought an innocent person would. (20 RT 1897-1899, 1966-1967, 1971-1972.)

The prosecutor appealed to conscious and unconscious racial bias by calling Poston a "thug" - a racial "dog whistle," akin to using the N word. (See, e.g., Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle [a "dog whistle" is "a type of strategy of communication that sends a message that the general population will take a certain meaning from, but a certain group that is "in the know" will take away the secret, intended message. Often involves code words]; Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html.)

The prosecutor also appealed to racial bias by emphasizing Poston's use of African-American Vernacular English ("AAVE"). (See, e.g., John R. Rickford, African American Vernacular English, Blackwell Publishers (1999) at pp. 283-284 [discussing negative attitudes toward AAVE]; Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?"

https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black [discussing the conscious and unconscious racism underlying disdain for AAVE].)

As if that was not bad enough, the prosecutor argued that Poston's alternating use of AAVE with friends and family and Standard English on the witness stand showed that he was trying to fool the jury. In fact, it is very common for African-Americans and others to switch between standard English and their native language or dialect - a phenomenon called "code-switching." (See, e.g., Rickford, at pp. 340-342, Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black.)

Poston knew his mostly white and Asian jury would not judge him fairly if he spoke AAVE. He told his mother in a jail call that "not one ghetto-ebonic-slur" would come out of his mouth on the witness stand so that the jurors would get a favorable picture of him. (Pros. Exh. 32A at p. 41.) He knew he had to counter the picture the prosecutor would try to paint of him as a "thug." (19 RT 1627-1628.)

Indeed the prosecutor explicitly told the jurors that the picture of Poston she was presenting was of a "hardcore thug, into guns, and

being a gangster." (19 RT 1628.) Poston lamented to his mother that he had not said anything incriminating but the prosecutor was trying to twist his words, even using his protestations of innocence as proof of his guilt because "maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? . . . Just having an optimistic attitude. But in their eyes, that may be an aggressive front." (Pros. Exh. 32A at p. 26.)

The prosecutor repeatedly twisted Poston's words to make them seem incriminating. She quoted his rap lyrics - "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life." She argued that these words showed a murderous state of mind despite the fact that the actual words state that Poston is not one to fight. Rather, he takes flight. But if you cross a line, he will defend himself. (19 RT 1640.)

Poston astutely asked the prosecutor: "[M]a'am, . . . do you understand African-American vernacular from the street perspective?" (19 RT 1641-1642.) It seems clear she did not. Maybe she thought AAVE was a code for deception where everything Poston said meant its opposite. Poston said he had a strong claim of self-defense; the prosecutor argued it was an admission that he did not act in self-

defense. (19 RT 1633; 20 RT 1897; Pros. Exh. 32A at p. 8.) Poston said he told Bailey to tell the truth; the prosecutor argued it was an admission that he pressured Bailey to lie. (19 RT 1650; 20 RT 1898; Pros. Exh. 32A at p. 39.) The prosecutor's repeated twisting of Poston's words in an attempt to incriminate him was misleading and unfair.

According to the prosecutor, a true case of self-defense exists only where the law-abiding citizen "wait[s] for the police. They are waiting on their porch with a smoking gun." (20 RT 1892.) Poston did not have the "state of mind [nor] the "use of phrasing that innocent, justified people use." (20 RT 1898.) He was "performing , and he was trying to paint a portrait of himself that's different than the portrait that you see in the video, and the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew you couldn't see that." (20 RT 1899.)

Contrary to the prosecutor's argument, one need not wait around for the police in order to establish the defense of self-defense. One need not be a law-abiding citizen. One need not speak Standard English or any English. All that is required is that a non-aggressor honestly and reasonably believed in the imminent need to use deadly

force in self-defense. (See *People v. Elmore, supra,* 59 Cal.4th at pp. 133-134)

The prosecutor did not and could not prove Poston's guilt of murder and attempted murder beyond a reasonable doubt in view of the uncontroverted evidence. Utterly lacking relevant evidence, she persuaded the jury by appealing to their emotions, attacking Poston's character, and misleading the jury in several crucial respects.

The pervasive misconduct rendered Poston's trial fundamentally unfair in violation of due process. (See *Donnelly v. DeChristoforo, supra*, 416 U.S. 637; *People v. Hill, supra*, 17 Cal.4th 800.) A reasonable juror could and likely would have had a reasonable doubt as to Poston's guilt if not for the misconduct. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Mil, supra,* 53 Cal.4th 400 at p. 419; *People v. Hill, supra*, 17 Cal.4th at pp. 844-845; *People v. Soojian, supra,* 190 Cal.App.4th at p. 521.)

The trial court's rulings and the pervasive nature of the misconduct show that objection would have been futile. (See also *People v. Williams* (1998) 17 Cal.4th 148, 161, n. 6 [a reviewing court has the authority to reach the merits of a misconduct claim regardless of any perceived forfeiture].) Review should be granted to prevent the

violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## VI. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND WHETHJER THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS.

Poston joined in and supplemented McNeely's Argument I: the trial court abused its discretion in denying Poston's severance motion and the joint trial was fundamentally unfair in violation of due process. (AOB 130-134; McNeely AOB 18-44; ARB 49-50; see also U.S. Const., amend. XIV*;* Cal. Const., art. I, § 15*;* § 1098; Cal. Rules of Court, rule 8.200 (a)(5); *Zafiro v. United States* (1993) 506 U.S. 534; *United States v. Mayfield* (9th Cir. 1999) 189 F.3d 895; *United States v. Rucher* (11th Cir. 1990) 915 F.2d 1511; *United States v. Romanello* (5th Cir. 1984) 726 F.2d 173; *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078; *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335; *People v. Turner* (1984) 37 Cal.3d 302, 312-313; *People v. Massie* (1967) 66 Cal.2d 899, 916-917.)

The Court of Appeal rejected Poston's claim, concluding that the trial court acted within its discretion and that the joint trial did not result in gross unfairness. (Slip opn. at pp. 16-18.) Poston disagrees.

As Poston explained, his case should have been severed from McNeely's based on antagonistic defenses because each defendant

was charged with the attempted murder of the other and their defenses were so antagonistic that the two defendants battled each other through their respective counsel repeatedly throughout the trial.

Poston could find no case where jointly tried defendants were charged with violent crimes against each other. As his trial attorney argued, this was a unique case in that respect. (2 RT 114.) Poston and McNeely were forced into the roles of both victim and perpetrator as to each other. Each had to prove that the other was solely responsible for the entire incident and that each acted in self-defense.

The jurors could not logically have accepted both defenses. (Cf. *United States v. Mayfield, supra,* 189 F.3d 895; *United States v. Rucher, supra,* 915 F.2d 1511; *United States v. Romanello, supra,* 726 F.2d 173; *United States v. Tootick, supra,* 952 F.2d 1078.) Thus, the great potential for prejudice was apparent from the outset and the trial court should have granted severance. Moreover, the two defense attorneys' contentious presentation of the antagonistic and irreconcilable defenses rendered the joint trial fundamentally unfair in violation of due process.

This was a unique case in which the defendants were charged with attempting to murder each other. The prosecutor's pervasive

"gun-battle" theme seriously impaired Poston's defense. McNeely's extensive, vicious attacks on Poston's character removed any chance of a fair trial. For all of the foregoing reasons and those stated in McNeely's opening brief, the trial court's denial of severance was an abuse of discretion and the joint trial was fundamentally unfair in violation of due process. (See Cal. Rules of Court, rule 8.200(a)(5).)

Review should be granted to settle an important question of law - whether and under what conditions two defendants can be tried together for violent crimes against each other. Review should also be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## VII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

Poston argued that the cumulative effect of the errors rendered the trial fundamentally unfair in violation of due process. (AOB 135-137; U.S. Const., amend. XIV; Cal. Const., art. I, § 15; see also *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814, fn. 6; accord *United States v, McLister* (9th Cir. 1979) 608 F.2d 785, 788; see also *People v. Hill* (1998) 17 Cal.4th 800, 845-847 [cumulative effect of multiple errors resulted in miscarriage of justice, requiring reversal under California Constitution].)

The Court of Appeal rejected Poston's claim, concluding that there were no errors and, thus, no prejudice to cumulate. (Slip opn. at p. 40.) Contrary to the Court of Appeal's conclusion, multiple serious errors resulted in an unfair trial. Even if no single error was prejudicial, cumulative prejudice requires reversal.

Review should be granted to settle important questions of law and to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## CONCLUSION

For all of the foregoing reasons, review should be granted.

DATED: February 6, 2017 Respectfully submitted,

/s/ Randi Covin

Attorney for Appellant
DONEL POSTON

WORD COUNT CERTIFICATE

I certify pursuant to California Rules of Court, rule 8.360, that, according to my word processing program, this Appellant Poston's Petition for Review contains 8,242 words, excluding the tables and this certificate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 6th day of February, 2017, at Willits, California.

/s/ Randi Covin

-

Filed 1/6/17 P. v. McNeely CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>JOE McNEELY et al. ,<br>Defendants and Appellants. | A141557<br><br>(Alameda County<br>Super. Ct. No. 172522A, 172522B) |

After an unconsummated drug transaction at a gas station, a dispute arose between appellants Joe McNeely and Donel Poston. The argument turned physical and then deadly. McNeely struck Poston with his hand, and both men reached for the semiautomatic handguns they were carrying. Poston fired first and shot McNeely six times, and McNeely returned fire as Poston fled. Lionel Fluker was killed by a stray bullet from McNeely's gun as he was driving by on his way home from a friend's house.

A jury convicted both McNeely and Poston of the second degree murder of Fluker, the attempted murder of each other, and firearm possession by a felon, and found true allegations that each had personally discharged a firearm causing great bodily injury or death in connection with the murder and attempted murder counts. (Pen. Code, §§ 187, subd. (a), 664/187, 29800, subd. (a)(1), 12022.53, subd. (d).)[1] The case before us thus presents an unusual scenario: two co-defendants who are also the victims of crimes committed by the other.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

On appeal, McNeely contends (1) the trial court should have granted Poston's motion to sever and ordered separate trials; (2) the trial court erred by instructing the jury on CALCRIM No. 3472 regarding a contrived theory of self-defense, and counsel was ineffective to the extent this argument was forfeited by the failure to object at trial; and (3) he was prejudiced by the exclusion of evidence that Poston had a history of possessing marijuana for sale, which would have supported his self-defense claim by showing that Poston had a motive to shoot a rival drug dealer and was not the one who acted in self-defense. Poston argues: (1) the trial court should have granted his motion to sever; (2) the evidence was insufficient to support his convictions for murder and attempted murder; (3) the trial court erred by admitting highly prejudicial evidence of his involvement in pimping and prostitution to impeach his credibility; (4) the trial court should not have given CALCRIM No. 3471 regarding the effect of mutual combat on a self-defense claim because it was not supported by the evidence; (5) the trial court should have instructed the jury he could not be guilty of murder under a provocative act theory if it found he did not initiate the course of conduct leading to the killing; (6) the prosecutor committed misconduct by appealing to the jurors' emotions, racial bias and fear of street violence; and (7) cumulative error and prejudice require reversal of the judgment. We affirm.[2]

FACTS AND PROCEDURAL HISTORY

a. *The Shooting*

Shortly after 10:00 p.m. on April 5, 2013, McNeely pulled his Mazda sedan into a Valero gas station at the corner of MacArthur Boulevard and Seminary Avenue in Oakland and parked next to one of the pumps. The gas station, which operated surveillance cameras that captured the events in this case, was across the street from

---

[2] On August 10, 2016, Poston filed a petition for a writ of habeas corpus, the consideration of which was deferred pending consideration of this appeal. (In re Donel Poston, A148986.) At this court's invitation, the People filed an informal response, and Poston filed a reply. We have summarily denied the petition by separate order.

Mills College and was busy even at that time of night. McNeely was carrying a nine-millimeter semiautomatic handgun in his inner jacket pocket.

McNeely spoke to a few people at the gas station. At 10:06 p.m., Poston drove to the gas station with his girlfriend Tamena Bailey and parked her Lexus sedan in front of the station's minimart. A loaded .40 caliber semiautomatic handgun was concealed inside his right waistband. Poston went inside the minimart while Bailey remained in the passenger seat of the Lexus with the window rolled down. When he came out, Poston spoke to McNeely and walked over to McNeely's car. McNeely took out a baggie and showed it to Poston, but it did not appear that Poston took the baggie and a detective reviewing a surveillance video of the encounter believed it to be a drug sale that was not completed.

The surveillance videos (which do not have sound) show that after the unconsummated drug transaction, Poston walked back to the Lexus followed by McNeely, who was apparently upset. McNeely followed Poston as he walked around the Lexus and seemed to be berating Poston, pacing and repeatedly grabbing the lapels of his own leather jacket. Poston initially walked away from McNeely, but then engaged with him verbally. As the two men were standing between the passenger side of the Lexus and the door of the minimart, McNeely threw a fast food drink he was carrying on the ground.

After throwing down the drink, McNeely hit the right side of Poston's face with his hand while simultaneously placing his left leg behind Poston to trip him. Bailey jumped out of the Lexus and ran inside the minimart. Poston staggered but did not fall, and as he was recovering his balance he immediately pulled his gun from his waistband and began shooting at McNeely, firing ten rounds and hitting McNeely six times. McNeely, at virtually the same time, was reaching inside his jacket and pulled out either his own gun or a magazine for that gun. He fell to the ground and dropped the object after being hit by Poston's bullets. Poston stopped shooting, possibly because his gun jammed or he ran out of bullets. McNeely got up on one knee, reached into his jacket, pulled out either his gun or its magazine, and loaded the gun. He got up and started

chasing Poston as Poston ran north onto Seminary Avenue, firing a total of eight shots. A janitor who worked at the gas station saw Poston attempt to jump the chain link fence around Mills College and then turn around with his hands up. None of the bullets fired by McNeely struck Poston, but one of them hit and killed Lionel Fluker as he was driving south on Seminary Avenue on his way home from visiting a friend.[3]

b. *Aftermath*

After the shooting, McNeely jogged back to his car and Poston kept running from the scene. Bailey drove away in the Lexus. McNeely was approached by his friend, Ansar Muhammad, who had arrived at the gas station about 15 minutes earlier. Muhammed agreed to follow McNeely in his own car, and McNeely drove to a location about half a mile away and parked his car in front of the home of Muhammad's girlfriend. McNeely moved his duffel bag into Muhammad's car and got into the passenger seat so Muhammad could drive him to Highland Hospital.

At the hospital, Muhammad was detained by the police while McNeely was being treated for his injuries. McNeely had gunshot wounds in his left and right thighs, his scrotum, his left armpit, his left shoulder and his upper back, but he was still lucid. A nurse found a fired bullet in the stretcher used to transport McNeely and gave it to the police. McNeely was interviewed by an Oakland reserve police officer and falsely said he had been walking down Seminary Avenue when he heard a series of gunshots, felt their impact and fell down. He told the officer he did not see the person who shot him.

---

[3] The surveillance videos, which we have reviewed at the parties' request, show that McNeely started to pull what appears to be a metal cylindrical object from his jacket almost immediately after hitting and tripping Poston, was shot by Poston a fraction of a second later, dropped the object on the ground as a result of being shot, reached into his jacket while getting up, pulled out another object, put the two objects together, and began shooting at Poston. At trial, the prosecutor argued that McNeely drew his gun before Poston fired a shot, but the Attorney General has taken the position on appeal that McNeely removed the magazine for the gun a fraction of a second before Poston started shooting, and then drew his gun and loaded it with the magazine after being shot by Poston. Whether McNeely first removed the gun or the magazine does not affect our analysis of the legal issues in this case. Either way, a logical inference would be that he was preparing to fire his gun immediately after hitting and tripping Poston.

Muhammad also lied to the police and said he had been driving down the street when he saw McNeely, whom he picked up and drove straight to the hospital. After Muhammad was told someone had died in the incident, he admitted he had seen McNeely at the gas station, had followed him to his (Muhammad's) girlfriend's house, and had driven him to the hospital.

Police searched Muhammad's car, which was parked near the hospital, and found a duffel bag containing marijuana, methamphetamine tablets and scales. The day after the shooting, police searched McNeely's Mazda and found marijuana in plastic wraps and "suspected Ecstasy" capsules that turned out to be methamphetamine. The guns used in the shooting were never found.

Within a few days of the shooting, Poston left for Los Angeles and did not return for three months. He was arrested on June 14, 2014, and when told he was being charged with attempted murder, said he was not trying to kill McNeely, he was just trying to get McNeely off of him. Police found .40 caliber ammunition in Poston's bedroom during a search of his home on the date of his arrest, and an examination of that ammunition showed that one round had been cycled through the same unidentified gun as two of the .40 caliber bullets found at the Valero gas station after the shooting. Also discovered in Poston's home were handwritten rap lyrics and blank check paper, as well as a credit card manufacturing machine, blank credit cards, and credit cards in various names.

c. *Poston's Jailhouse Writings and Telephone Calls*

In July 2013, while Poston was in jail after his arrest, a sheriff's technician intercepted a letter written by Poston, in which he suggested a woman had incriminated him. He wrote that he would assert his speedy trial rights and "forc[e] they hand" because "I ain't did shit but stand my ground." In another letter written to his roommate, Poston stated he would learn the identity of a woman who had emailed the police and identified him as having shot someone. Poston's cell was searched because the authorities believed witnesses might be in danger, and officers seized several pages of rap lyrics, among them:

"You got to be higher than Richard Pryor . . . wit a prior. If you think

you gonna to fire on a nigga and get away wit it, that'll be the day when hell freezes over, dondidit, don't get it. That's why I pack this pistola - gone off cola, probably off a molly.[4] You almost got bodied, instead caught you a body. I'm swift on my toes. Niggas in my circle keep them 40's real close concealed in they clothes, and never lose composure, make a nigga see the light over exposure. Wit 5 Bingo-Jingo from the dondiditliveshow. It's all self-defense under the proper pretense."

"I am 37 and countin'. Ya 38 and down.[5] Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold 'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill 'em."

"This prick on some bull shit, now I wish I woulda, shoulda, coulda, but I did just popped a nigger and my BM e-mailing investigators. Consider that snitchin but I ain't trippin. . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings. Bottom line to that, I ain't dealing. . . . If God is willing when this soap opera over I'll have All My Children - Days of our Life. Hustling all night, married to the game, and the streets is my wife."

"Niggas hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses. What you got them guns for if you ain't using 'em. Better start shootin dem nigger to left just a faggot. When ya see nigga at, I'm ya best dog. I'm the pick of the litter. Won't hesitate to make the K go cray, Dirty Dada Nigga. Yeah, make my day. Strip the Nigger down to his birthday suit. All about you. Aint thinking about me. You got brand new shoes. I got no commissary. Tom, Dick, and Hairy sleeping on my fucking couch. Must a forgot I'm the reason . . . in the house."

"Yeah, the game is deep. We are the lost sheep. It's the irony of the info age, them little niggas showing choppas on they Facebook page. Assemblin' a Glock on their me-ma porch, let that thing rang like it was

---

4 In street slang, "molly" is slang for Ecstasy or MDMA. To "fire" on a person means to punch that person, and the meaning of the first lines of the rap is that someone would need to be high or crazy to think they could punch the speaker and get away with it.

5 At the time of the shooting, Poston was 38 years old and McNeely was 37 years old.

> the 4th. . . . Fuck you. Fuck you, pal. I ain't having that. Don't never leave the house without my strap."

A number of Poston's telephone calls from the jail were recorded. In a June 29, 2013, call to an unknown male, he said his lawyer had told him "this is in the bag. We got this." He continued, "On self-defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity." In a July 1, 2013, call to his mother, Poston told her, "I'm not even trying to say that I wasn't there no more . . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're going to see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag."

During another phone call with his mother, Poston expressed concern that the prosecution had seen two letters confiscated from his house and were "trying to use, it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? You know what I'm saying? [¶] Just having an optimistic attitude. But in their eyes, that may be an aggressive front." His mother suggested the video would show who the aggressor was and Poston responded, "Okay, so then, this is a valid point they raised the other day. You can't bring a knife to a gun fight. Okay? . . . . See how slick they are with that shit? You feel me? . . . . No. No, no, no, no. Not a knife. They said you can't bring a knife to a fistfight."

During a phone call with his mother on August 31, 2013, Poston fretted about how Bailey would present at trial, indicating he wanted her to tell the truth, but was worried about her appearance, clothing and body odor. His mother told him she had advised Bailey to avoid talking to the prosecution ahead of time, and Poston said he would call

her and tell her to stop driving so she wouldn't be pulled over and taken into custody. He told his mother he had been practicing his testimony and would not say "one ghetto-ebonic slur" and mused that "[p]roper preparation prevents poor performance." In a call on September 5, 2013, Poston told his mother: "[Defense counsel] do got a good point, [he] said he [a witness who was at the gas station store] couldn't even identify you. He was like how the fuck, if we figure out who this [confidential informant] is, and they don't want to tell you who it is, then everything that, they whole statement, they whole shit collapses, you feel me? You can't identify him without that fucking statement. You know what I'm saying? . . .[¶] But they got three different angles that they trying to push. I'm not saying that I'm not there, you feel me? That's why they went and did the thing, why they went and did the swab, to do the ballistics. I'm not saying that I'm not there, you feel me? That's not my defense."

d. *Poston and Bailey's Trial Testimony*

Poston and Bailey both testified about the incident at trial. Poston acknowledged having suffered felony convictions for possessing cocaine base for sale, evading the police, possessing counterfeit check paper and burglary. He described his business endeavors, which included book writing, photography, screen printing and the production of the "Done did It Live" show for "YouTube", a series of sketch comedies in which fewer than one percent depicted a real or fake gun. The prosecution played some of Poston's "Done did It Live" videos for the jury, including one in which he spoke like a gangster and made threats while a large amount of cash and two Glock semiautomatic handguns were visible on a table. In another video, someone referred to "sliders," meaning credit card fraud.

Poston had known his girlfriend, Tamena Bailey, for almost three years at the time of the shooting. In June 2012, while Bailey was staying the night at his house, an intruder entered his bedroom and shot him in the chest. After that, Poston obtained the .40 caliber gun that he used in the shooting. He knew that as a convicted felon it was wrong for him to have the gun, but he wanted it for protection.

On the night of the shooting, Poston went to the Valero gas station to buy some cigars and inquire about buying "mollies," which he sometimes used to bribe security guards so he could get backstage at concerts to interview the stars. He was approached by McNeely, whom he had met in 2003 and knew by the nickname "Two Gun Joe." McNeely said "I got some" and the two men negotiated a price and went to McNeely's car. Poston bought two mollies after haggling about the price and walked back inside the store to talk to some people about his show. When he walked back outside, McNeely approached him and said something like, "You think you all that" and opened his jacket to show Poston he had a gun in his inside pocket. Poston said, "[wherever] you driving this car, I don't want a ride," and gestured with his hands as if to say "I'm out of here." Poston felt threatened as McNeely continued ranting and making threats in a loud voice.

Poston walked to the Lexus, and McNeely said "No bitch ass, ain't even from Seminary" and "That's why I keep my strap [gun] up, bitch ass niggers like you." Poston responded that his father had been driving for the transit system in the neighborhood since 1976. Poston considered getting inside the Lexus but was afraid McNeely would shoot at him and place Bailey in danger. McNeely said, "I'll slap the shit out of you," and threw down the cup he was carrying. Poston said something like "[d]amn, you're going to slap Don Datta," looking back at a guy in the store as if to say "[c]an you believe this?"

McNeely hit Poston hard and tripped him, causing Poston to lose his balance. Poston looked over his shoulder and saw McNeely reaching into his inside jacket pocket and saw a weapon in McNeely's hand. Believing McNeely was going to shoot him, Poston took out his gun and shot McNeely. He stopped shooting once McNeely had hit the ground; the gun did not run out of bullets or jam, and if it had jammed, he could have fixed the malfunction by racking the slide. Poston only fired the number of shots he believed were necessary to disable McNeely and escape, and he did not want to kill McNeely.

After he stopped shooting, Poston ran toward Seminary Avenue. He dropped his gun along the way and when he got to the middle of the street he turned and held up his

hands to indicate he was no longer armed. Poston had not gone to the gas station intending to hurt or kill anyone but was just defending himself, and he believed McNeely would have killed him if he had not shot first. He did not go to the police after the shooting because he was scared. Poston acknowledged he was arrested for possessing a gun in 2000, for possessing three rifles in 2006, and for stealing a bicycle at gunpoint in 1996, though he denied he had actually used a gun.

Bailey testified she had been Poston's girlfriend for two years and stayed at his house several nights a week, but had never seen him with a gun. In June 2012, she had been with Poston when an armed intruder came into his room through a window and shot him.

Bailey spent all day with Poston on April 5, 2013, and went with him to the Valero gas station to buy cigars. Poston went into the store and when he came out, he spoke to McNeely.[6] She did not hear what they said initially but McNeely became upset and starting yelling, calling Poston names and saying he was not from the neighborhood. Poston walked away from McNeely and Bailey saw the handle of a gun in McNeely's inside jacket pocket when he opened his jacket, which he did three or more times. McNeely threw down a cup he was carrying and said he was going to slap Poston. When McNeely raised his hand and gave Poston "a serious slap," Bailey jumped out of the car and ran inside the store because she did not know whether McNeely was going to shoot them. After she heard the shots she came out of the store and drove away. She did not look for Poston that night but saw him the next day. At some point between the shooting and his arrest, Poston went to Los Angeles on business. After his arrest, she visited him and spoke to him on the phone, but they did not talk about the shooting.

e. *Context: Poston's Connection to the Neighborhood*

Oakland Police Department Officer Tony Jones testified that "Sem City" (a term used by Poston) was a nickname for the Seminary neighborhood and was used by people

---

[6] Bailey variously stated that she had never seen McNeely before the shooting, that she believed the father of her children knew McNeely, and that she had known McNeely before but had not seen him in 15 years.

involved in drug dealing rather than by law abiding citizens. In the world portrayed in some of Poston's YouTube videos, it would have been insulting for someone to tell him he was not from Seminary. Had Poston walked away from an encounter where someone made such an accusation, Poston would have been viewed as a "punk." According to the rules of the street in Oakland, a man who is disrespected in front of his girlfriend would lose credibility if he just walked away.

f. *Verdict and Sentence*

Based on the evidence presented at trial, the prosecutor argued that McNeely and Poston were both guilty of attempted murder because they had simultaneously formed an intent to kill the other during a mutual argument and had drawn their guns at almost the same time. She argued Poston did not act in self-defense because he drew his gun first and was not entitled to respond to a fist fight with deadly force. She urged the jury to reject McNeely's claim of self-defense because the surveillance video shows he began to draw his gun before Poston actually fired and continued to shoot at Poston when Poston was running away and no longer presented a danger.(See footnote 3.) The jury was instructed on second degree murder under theories of implied malice and transferred intent with respect to McNeely and second degree provocative act murder with respect to Poston. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654 (*Gonzalez*) [discussing malice aforethought, transferred intent, and provocative act doctrine].) The jury also received instructions on self-defense as a justification for murder and attempted murder and the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on provocation and imperfect self-defense.

After the jury returned its verdict convicting appellants as charged and finding true the section 12022.53, subdivision (d), allegations attached to the murder and attempted murder counts, the court sentenced each of them to 72 years to life: 15 years to life for second degree murder plus 25 years to life for the firearm enhancement attached to that count, plus a consecutive seven-year middle term for attempted murder with a 25-year-to-life enhancement on that count. (See *People v. Palacios* (2007) 41 Cal.4th 720, 727–728, *People v. Oates* (2004) 32 Cal.4th 1048, 1063 [multiple § 12022.53(d) enhancements

appropriately imposed for multiple counts when only a single victim was injured by the discharge of the defendant's firearm].) The sentences on the felon in possession counts were stayed under section 654.

DISCUSSION

I. *Denial of Severance Motion (McNeely and Poston)*

Appellants argue the trial court abused its discretion and deprived them of due process in denying Poston's motion to sever based on antagonistic defenses. They contend they were deprived of a fair trial because the jury could not have acquitted either of them without convicting the other and their attempts to shift the blame meant they each essentially faced two prosecuting attorneys. We disagree.

a. *Procedural Background*

Poston was originally charged by separate information with the attempted murder of McNeely and felon in possession of a firearm, along with special allegations. Before a jury could be impaneled, the prosecution dismissed the case and amended the information in McNeely's case to include the charges and allegations against Poston and to additionally charge Poston with the murder of Lionel Fluker.

Poston brought a motion to sever on the ground that he and McNeely would present conflicting defenses at trial: "Poston believes he had no malice because he was struck first by McNeely. Poston was aware that Mc Neely was armed and managed to fire his weapon first in perfect self defense. This absolves him of murder and attempted murder. McNeely's take is in conflict. He started no more than a fist fight and was forced to return fire in self-defense."

At the hearing on the motion, McNeely's counsel did not join in the request for severance, but stated he was submitting the issue to the court's "sound discretion." Counsel agreed the case would not involve the presentation of incriminating extrajudicial statements by one or both defendants under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). The trial court denied the motion for severance, noting the law favored joinder, the charges involved

common elements and facts, and there were no *Aranda-Bruton* issues requiring severance. It expressly extended its ruling to McNeely as well as to Poston.

b. *General Principles*

Section 954 provides, “An accusatory pleading may charge two or more different offenses connected together in their commission. . . .” Section 1098 provides, “When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.” Read together, these statues allow two defendants to be tried together when “ ‘there is a joint charge as to one of the crimes and a common element of substantial importance in the commission of all of them.’ ” (*People v. Pike* (1962) 58 Cal.2d 70, 85.)

“Joint trials are favored because they ‘promote [economy and] efficiency’ and ‘ “serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.” ’ ” (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*).) “When defendants are charged with having committed ‘common crimes involving common events and victims,’ as here, the court is presented with a ‘ “classic case” ’ for a joint trial.” (*Ibid*.)

Although joint trials are preferred, a court has the power to order separate trials “ ‘in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.’ ” (*Coffman*, *supra*, 34 Cal.4th at p. 40.) Severance may be called for when “ ‘there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.’ ” (*Ibid*., citing *Zafiro v. United States* (1993) 506 U.S. 534, 538–539 (*Zafiro*).) In deciding whether to order joint trials, the court is required to decide whether the realistic benefits from a consolidated trial are outweighed by the likelihood of substantial prejudice to the defendant. (*People v. Keenan* (1988) 46 Cal.3d 478, 500 (*Keenan*).)

We review a trial court's ruling on a severance motion for abuse of discretion based on the facts at the time of the ruling. (*Coffman*, *supra*, 34 Cal.4th at p. 41.) " '[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182–183.) In cases where the trial court abuses its discretion by failing to grant severance, reversal is not required unless the defendant demonstrates a reasonable probability he would have received a more favorable result in a separate trial. (*Keenan*, *supra*, 46 Cal.3d at pp. 502–503.) If the denial of severance was proper at the time the ruling was made, a reviewing court may reverse a judgment only if the joint trial resulted in " ' "gross unfairness" ' amounting to a denial of due process." (*People v. Avila* (2006) 38 Cal.4th 491, 575 (*Avila*).)

c. *The Court Did Not Abuse its Discretion in Conducting a Joint Trial*

The shooting in this case was captured on surveillance videos, which together with other evidence showed that McNeely struck Poston after a verbal argument, after which Poston shot McNeely several times and McNeely shot back at Poston, killing Lionel Fluker with a stray bullet. At trial, both Poston and McNeely presented claims of self-defense: Poston because he reasonably believed McNeely had a gun and was going to shoot him after slapping him, and McNeely because Poston had escalated a fistfight into a gunfight, giving McNeely no choice but to respond in kind.

Appellants contend the trial court should have severed their cases because their competing self-defense claims amounted to conflicting or antagonistic defenses. They note that not only were they charged with the attempted murder of one another (an unusual circumstance, to be sure), each of them sought through their self-defense claims to shift the blame to the other for the killing of Fluker. We conclude the conflict in appellants' respective defenses did not require the court to grant the severance motion.[7]

[7] We reject the Attorney General's contention that McNeely forfeited this argument by his failure to independently seek a separate trial or join in Poston's motion. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048.) Although a defendant must generally join in an objection or motion by a codefendant to preserve the issue on appeal, no

" '[N]either antagonistic defenses nor the fact that . . . one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non. is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 169.) " 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*.' [Citation.] If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation.]" (*Ibid*.; see *Coffman*, *supra*, 34 Cal.4th at p. 41.)

Accordingly, a trial court denying severance on the basis of conflicting defenses "abuses its discretion only when the conflict between the defendants *alone* will demonstrate to the jury that they are guilty. If, instead, 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner*).) Here, it was not the conflict between appellants' stories alone that established their guilt. Rather, it was the independent evidence presented at trial, including the surveillance videos showing the sequence of the shootings.

Appellants argue a joint trial was unfairly prejudicial because the jury could not have logically accepted both their claims of self-defense. They rely largely upon federal authorities applying rule 14 of the Federal Rules of Criminal Procedure: *United States v.*

---

objection is required where one would be futile. (*People v. Wilson* (2008) 44 Cal.4th 758, 793 (*Wilson*).) Because the trial court denied Poston's motion to sever, which was based on the theory of inconsistent defenses, there is no reason to think it would have granted a similar motion brought by McNeely. In fact, it expressly extended its ruling denying the motion to McNeely.

*Tootick* (9th Cir.1991) 952 F.2d 1078, 1081–1082 [while defendants who raise inconsistent defenses may be jointly tried, severance was required when defenses raised were mutually exclusive in the sense that acquittal of one defendant would call for conviction of the other]; *United States v. Rucker* (11th Cir.1990) 915 F.2d 1511, 1513 [severance required when defenses are "so antagonistic as to be 'irreconcilable or mutually exclusive' " such that jury must disbelieve testimony on behalf of one defendant in order to believe testimony on behalf of the other]; and *United States v. Romanello* (5th Cir.1984) 726 F.2d 173, 177–180 [severance required when defenses offered by co-defendants were "irreconcilable and mutually exclusive"].

The case before us is distinguishable because appellants' self-defense claims were not mutually exclusive, being based as they were on each appellant's subjective, reasonable perception of a volatile situation. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1093 [reasonable self-defense requires subjective believe in the need to defend and objective reasonableness of that belief].) In any event, the federal authorities cited are not binding on this court, and have been criticized as " 'too rigid in circumscribing the discretion of the trial court.' " (*People v. Wallace* (1992) 9 Cal.App.4th 1515, 1519, fn. 3.) They also appear to have been implicitly overruled by the United States Supreme Court in its subsequent decision in *Zafiro, supra*, 506 U.S. at pages 538 to 539, which held that mutually antagonistic defenses are not prejudicial per se, and that rule 14 of the Federal Rules of Criminal Procedure does not require severance on that basis, even if prejudice is shown. (See *United States v. Blankenship* (11th Cir. 2004) 382 F.3d 1110, 1122, fn. 23 [recognizing implied overruling of case law requiring severance if jury must necessarily disbelieve testimony offered by one defendant in order to believe testimony offered on behalf of the other defendant]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1081–1082.)

Under the rule set forth in *Zafiro*, a federal trial court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not

consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. [Citation.] Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [Citation.] Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. [Citation.] The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but. . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. [Citation.]." (*Zafiro*, *supra*, 506 U.S. at pp. 538–539.)

None of the factors cited by the high court in *Zafiro* required severance in this case. Neither appellant complains he was prejudiced by the introduction of incriminating evidence admissible only against the other. Appellants acknowledged at the hearing on the severence motion there were no *Aranda-Bruton* issues. The evidence did not suggest any prior association between appellants, such that a finding of wrongdoing by one of them would have suggested the other was guilty. Their levels of culpability appeared to be about the same: both men were armed with concealed handguns, both engaged in an argument after what was apparently an unconsummated drug deal (though McNeely was the instigator), and both fired multiple shots at the other. (See *Zafiro*, *supra*, 506 U.S. at p. 539.)

We further conclude no "gross unfairness" occurred as a result of the joint trial. (See *Avila*, *supra*, 38 Cal.4th at pp. 574–575.) As to Poston, the primary incriminating evidence against him was the surveillance videos, which could reasonably be interpreted to show that he fired several shots at McNeely after McNeely struck him with his hand and tripped him, but before he saw McNeely reach for his own weapon. Poston testified

on his own behalf and called Tamena Bailey as a witness in an effort to show he fired first because he reasonably believed McNeely was armed. The surveillance tape would have been introduced in a separate trial; Poston's interest in taking the stand and calling Bailey as a witness would have been the same in a separate trial; and there is no reason to think any of the evidence offered against Poston would have been materially different had he been tried separately. Poston was not deprived of due process by virtue of the joint trial and, for similar reasons, it is not reasonably probable he would have obtained a more favorable result if he had been tried separately. (*Keenan*, *supra*, 46 Cal.3d at pp. 502–503.)

The analysis with respect to McNeely is slightly different, because it is improbable Poston would have been called as a witness if McNeely had been tried separately.[8] Poston testified that he shot McNeely because McNeely had shown him his gun and he saw McNeely reaching for it, which would obviously undermine McNeely's claim of self-defense if believed by a jury. But McNeely's counsel was able to fully cross-examine Poston as to his version of events, and the jury necessarily *rejected* this aspect of Poston's testimony in convicting him of the attempted murder and murder charges. Even without Poston's testimony, the jury could see from the surveillance video that McNeely was in the process of reaching for a gun or the magazine of the gun at approximately the same time Poston was drawing his own weapon. "[N]o denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (*People v. Turner* (1984) 37 Cal.3d 302, 313, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149.) "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." (*Zafiro*, *supra*, 506 U.S. at p. 540.)

---

[8] Poston would have had a Fifth Amendment right against self-incrimination until he was sentenced on the charges and pending resolution of any appeal. (*People v. Fonseca* (1995) 36 Cal.App.4th 631, 635.)

Although this trial was atypical in the sense that appellants were the alleged victims of each other's attempted murder charges, in all other respects it was a classic case for joinder: appellants were both charged with the murder of Lionel Fluker, the remaining counts arose from the same incident and were based on the same set of facts, and most of the evidence incriminating each defendant would have also been admissible in a separate trial. The trial court did not err in denying Poston's motion for severance.

II. *Sufficiency of the Evidence (Poston)*

Poston argues his convictions of attempted murder and second degree murder must be reversed because the evidence supporting them was insufficient. He contends no reasonable trier of fact hearing the evidence at trial could have found he did not act in self-defense (reasonable or unreasonable) or in the heat of passion. Poston additionally argues the jury could not have reasonably concluded he initiated a chain of events that proximately caused Lionel Fluker's death, as is necessary for a conviction of second degree murder under a provocative act theory. We disagree.

a. *Standard of Review*

When reviewing the sufficiency of the evidence on appeal, we apply the well-established and "highly deferential" substantial evidence standard. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) We do not reweigh the credibility of witnesses or substitute our own view of the evidence for that of the jury. (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.) That the evidence might be reasonably reconciled with a contrary result does not warrant a reversal of the judgment. (*Ibid.*) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

b. *Self-Defense and Attempted Murder*

Attempted murder requires a direct but ineffectual act toward killing a person accompanied by the mental state of express malice aforethought, i.e., a specific intent to unlawfully kill. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217; *People v. Perez* (2010) 50 Cal.4th 222, 229.) " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." [Citations.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Poston fired ten shots at McNeely, six of which hit him. Absent a legal excuse or justification for the shooting, the jury could readily infer the shooting satisfied the elements of attempted murder.

Poston argues his attempted murder conviction cannot stand because there was no substantial evidence he was not acting in self-defense. (See *People v. Saavedra* (2007) 156 Cal.App.4th 561, 571 [prosecution has burden to prove defendant did not act in self-defense].) He states: "The surveillance videos indisputably show that McNeely started a verbal altercation with Poston, hit him in the face and tripped him, knocking him to the ground, then pulled out a gun while Poston was getting up." We are not persuaded that the videos, which we have reviewed, show indisputably that Poston acted in self-defense.

While it appears from the videos that McNeely removed either his gun or the magazine for that gun from his jacket before Poston fired the first shot, the jurors could have reasonably concluded that action by McNeely did not occur before Poston drew his own weapon. Rather, the actions appear to be approximately simultaneous, with Poston drawing his gun slightly before McNeely pulled the magazine or gun from his jacket. Jurors viewing the video could also conclude that Poston did not see McNeely's weapon before he commenced shooting. Deadly force such as that used by Poston is excessive when used to respond to a simple assault, and the jury in this case could have concluded that *from Poston's perspective* at the time he pulled his gun from his waist and began to shoot, McNeely had done no more than hit and trip Poston after a verbal argument. (*People v. Quach* (2004) 116 Cal.App.4th 294, 301–302 [deadly force in response to simple assault is excessive].)

Poston testified he drew his weapon because he had seen McNeely's gun and feared for his life when he saw McNeely reach inside his jacket after hitting him. But the jury could have rejected this testimony and concluded Poston either did not know McNeely was armed, or shot him not because he was afraid for his life, but because he was angry about being hit and tripped. " '[S]elf defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*), and cases cited therein; see § 198.) " 'The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense.' " (*Nguyen*, at p. 1045.)[9]

In *Nguyen*, *supra*, 61 Cal.4th at pages 1043–1047, the Supreme Court rejected the argument that the defendant had acted in self-defense as a matter of law in shooting a rival gang member who approached the car the defendant was driving while carrying a shotgun. Just before the victim arrived at the driver's window, the defendant pulled out a gun, pointed it at the victim, and fired. (*Id*. at p. 1043.) The court concluded the jury could have reasonably found the defendant was not entitled to claim self-defense "because, in shooting [the victim], he did not act on the basis of fear alone but also on a desire to kill his rival." (*Id*. at p. 1044.) The prosecution's theory in this case was that both Poston and McNeely formed an intent to shoot the other before the shooting began, and that this intent was the product of anger rather than fear. The video of the events as they unfolded supports this theory, even if other interpretations of the video were reasonable.

"[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may

---

9 We deny Poston's request, filed on March 29, 2016, that we take judicial notice of a 2011 article concerning reaction time in shooting cases.

not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 379, abrogated on another point by *People v. Blakeley* (2000) 23 Cal.4th 82, 92; see *Nguyen*, *supra*, 61 Cal.4th at p. 1044.)

c. *Attempted Voluntary Manslaughter—Imperfect Self-Defense*

Nor do we agree that Poston's shooting of McNeely could be no greater than attempted voluntary manslaughter based on imperfect self-defense, under which a defendant who attempts to kill in the honest but unreasonable belief in the need to defend against imminent death or great bodily injury is deemed to have acted without malice. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833–834.) By convicting Poston of attempted murder in the face of the instructions on perfect self-defense, the jury implicitly and necessarily found that either he did not know McNeely was armed, or if he did know, was motivated to shoot him for a reason other than fear. Under this view of the shooting, which is supported by the evidence, "there was no basis for the jury to find that defendant *unreasonably* believed he was in imminent danger of death or great bodily injury. If anything, the evidence suggests that such fear was reasonable but that the jury, in rejecting defendant's claim of self-defense, concluded that defendant did not act out of such fear alone." (*Nguyen*, *supra*, 61 Cal.4th 1049.)

d. *Attempted Voluntary Manslaughter—Heat of Passion*

A defendant will also be deemed to lack the malice necessary for murder or attempted murder when he acts in a sudden quarrel or heat of passion. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241.) This variant of voluntary or attempted voluntary manslaughter has both a subjective and an objective component: "The defendant must actually, subjectively, kill [or attempt to kill] under the heat of passion. [Citation.] . . . [But the] 'passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "Provocation is adequate only when it would

render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 957.) It is not necessary that the provocation be such as would cause a reasonable person to kill or attempt to kill, as a killing in the heat of passion is necessarily unreasonable. (*Id*. at pp. 952–958.)

Poston did not claim to have shot McNeely on a sudden quarrel or heat of passion; rather, his defense was self-defense. But, "[e]ven if defendant's testimony provided some evidence of provocation for the jury to consider, it remains the jury's exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion." (*People v. Bloyd* (1987) 43 Cal.3d 333, 350.) "Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*People v. Moye* (2009) 47 Cal.4th 537, 557 [in light of jury's rejection of self-defense claim, it was not reasonably probable defendant would have been convicted of manslaughter rather than murder if heat of passion instruction had been given].) The jury in this case could have reasonably concluded Poston's reason was not, in fact, obscured by passion.

e. *Provocative-Act Second Degree Murder*

Poston was tried for second degree murder based solely on the provocative act doctrine, under which the perpetrator of an underlying crime may be guilty of murder when a third party kills an accomplice or innocent bystander in response to an act by the defendant that is "dangerous to human life because it is highly probable to provoke a deadly response." (*Gonzalez, supra*, 54 Cal.4th at p. 655.) He contends the evidence was insufficient to establish his actions proximately caused Lionel Fluker's death under this theory. We disagree.

A murder conviction under the provocative act doctrine "requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.) When the original crime is a violent assault, no additional provocative act apart from the crime itself is required. (*People v. Gallegos* (1997) 54 Cal.App.4th 453, 459–461; *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 57; see *People v. Mejia* (2012) 211 Cal.App.4th 586, 622 (*Mejia*).) A typical scenario for a provocative act murder is when the defendant instigates a gun battle, causing the victim or a police officer to shoot back and mistakenly hit the defendant's accomplice or an innocent bystander. (*People v. Cervantes* (2001) 26 Cal.4th 860, 867 (*Cervantes*); see *People v. Gardner* (1995) 37 Cal.App.4th 473, 475–482 [defendant drug dealer who shot at victim but did not hit him was liable for his murder when a rival drug dealer, believing he was being fired upon, shot back and fatally wounded the victim].)

An important question in a provocative act murder case is whether the defendant's actions proximately caused the death. (*Gonzalez, supra*, 54 Cal.4th at p. 655.) "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' " (*Cervantes, supra*, 26 Cal.4th at p. 866.) In cases where there is an intervening force in operation—such as a bullet fired by a third party—"the defendant's liability will depend on whether it can be demonstrated that his own conduct *proximately caused* the victim's death—i.e., whether it can be shown that the intermediary's conduct was merely a dependent intervening cause of death, and not an independent superseding cause." (*Id*. at pp. 872–873, fn. 15.)

As previously discussed, the evidence in this case supports a determination that Poston and McNeely engaged in a mutual gun battle during which each attempted to kill the other. In *People v. Sanchez* (2001) 26 Cal.4th 834, at pages 848–849, the court affirmed the defendant's conviction of first degree murder after concluding his

participation in a gang-motivated gun battle with his co-defendant, which killed an innocent bystander, was a "substantial concurrent, and hence proximate, cause" of the bystander's death even though it could not be determined who fired the fatal shot. So too here. Appellants "during their gun battle were attempting to kill each other, so that the killing of a bystander was a harm that both in kind and degree was within the risk [they] must have expected." (*Id*., p. 855 (conc. opn. of Kennard, J.).)

The *Sanchez* court did not resort to the provocative act doctrine to uphold the defendant's first degree murder conviction, and indeed suggested it might be an unsupported theory of guilt under the facts and verdicts in that case. (*Sanchez, supra*, 26 Cal.4th at pp. 844–845, 851–854; see concurring opn. of Werdeger, J., at p. 858 ["The majority, confusingly, suggests provocative act murder was an 'unsupported theory of liability' (maj. opn., *ante*, at p. 852), though the majority does not explain in what respect the theory is unsupported by the evidence"].) This is somewhat perplexing, particularly because the majority cited with approval the concurring decision of Justice Kennard who "avoids using the label," but analyzed the case and voted to affirm the conviction based on provocative act liability. (*Id*. at pp. 854, 855–857 (conc. opn. of Kennard, J.), 858–859 (con. opn. of Werdeger, J.).) We suspect the *Sanchez* majority's concern about the use of the provocative act doctrine arose because the rival shooter and co-defendant (who was not a party to the appeal) was convicted of first degree premeditated murder. (*Id*. at pp. 838–839.) The majority noted the Court of Appeal had reversed the defendant's conviction after finding "no theories under which the jury could have found both defendant and [his co-defendant] guilty of first degree murder;" rather, the Court of Appeal had accepted the scenario in which the co-defendant fired the fatal shot and concluded, the "premeditation as the actual shooter precluded or cut off defendant's provocative act murder liability." (*Id*., p. 839.) McNeely and Poston were convicted of second degree murder and there is no finding of premeditation by McNeely that would act as an independent superseding cause as a matter of law.

Poston argues that McNeely's shooting of Lionel Fluker must be viewed as an independent superseding cause of Fluker's death because McNeely instigated the quarrel

with Poston and was found not to have been acting in reasonable self-defense when he fired the fatal shot. We do not agree. "Provocative act murder is not dependent upon the reasonableness of the actual killer's lethal response. The inquiry instead focuses simply on whether or not a surviving perpetrator committed a provocative act that *proximately caused* the killing. [Citations.]" (*Mejia*, *supra*, 211 Cal.App.4th at pp. 630–631; see *Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 37.) The jury could reasonably have concluded McNeely was the victim of an attempted murder by Poston, and that McNeely's use of force was a natural and probable consequence of Poston's act of shooting at him ten times with a semiautomatic weapon.

The decision in *Cervantes*, *supra*, 26 Cal.4th 860, does not require a different result. In that case, the defendant and other members of the Highland Street gang went to a birthday party thrown by the Alley Boys gang. (*Id*. at p. 863.) During a confrontation initiated by one of the Alley Boys, the defendant shot Richard Linares, also an Alley Boy, in the arm. (*Ibid*.) A minute or two later, unidentified Alley Boys shot and killed Hector Cabrera, a Highland Street gang member, as he drove away from the party. (*Ibid*.) The court found insufficient evidence to support the defendant's conviction of the provocative act murder of Cabrera: "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered. [¶] *But the critical fact that distinguishes this case from other provocative act murder cases is that here the actual murderers were not responding to defendant's provocative act by shooting back at him or an accomplice, in the course of which someone was killed*. . . ." (*Id*. at p. 872, italics added.) The scenario in the case before us is much different because McNeely killed Lionel Fluker while shooting back at Poston in direct response to the shots Poston fired at him.

Substantial evidence supports the jury's determination that Poston proximately caused the death of Lionel Fluker. And, for reasons previously stated in connection with our discussion of self-defense and attempted murder, the jury could have concluded Poston did not act in self-defense, imperfect self-defense or heat of passion when he committed the acts leading to Fluker's death. The evidence was sufficient to support his conviction of second degree murder.

f. *Conclusion*

We emphasize that the jury in this case was fully instructed on the theories of self-defense, imperfect self-defense and heat of passion, and was accurately instructed on the theory of provocative act murder and principles of causation.(See Discussion, § V(a), *post*.) We are not here concerned with the jury's ability to consider lesser offenses and defenses supported by the evidence, but with the sufficiency of the evidence to support Poston's convictions of the charged crimes after the jury considered and rejected the lesser alternatives. That a jury could have reasonably found Poston to be not guilty or guilty only of lesser crimes does not render the evidence insufficient to support his convictions.

## III. *Evidentiary Rulings*

a. *Exclusion of Poston's Arrests for Possessing Marijuana for Sale (McNeely)*

McNeely argues the trial court should have allowed him to impeach Poston with evidence of his prior arrests for possessing marijuana for sale in the neighborhood where the shooting occurred. He contends such evidence would have shown that Poston had a motive to shoot him to maintain dominance of the marijuana dealing in the area. We do not agree.

The proffered evidence would have shown Poston was arrested for possessing marijuana for sale in 1995, 1996 and 2009. The trial court ruled the prior arrests were irrelevant, noting the evidence was insufficient to show Poston even knew McNeely was selling marijuana. We review the ruling for abuse of discretion. (*Avila, supra,* 38 Cal.4th at p. 578.)

" 'Relevant evidence, means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or

disprove any disputed fact that is of consequence to the determination of the action.' " (Evid. Code, § 210.) " ' "The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' [Citation.]" (*People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) "Evidence is irrelevant, however, if it leads only to speculative inferences. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) " ' "Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose." ' [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1337–1338.)

Evidence that Poston had been arrested for possessing marijuana for sale several years before the events in this case did not logically tend to prove he was still engaged in dealing drugs at the time of the shooting. And even if it did, it would be completely speculative to suggest this provided him with a motive to shoot McNeely for being a rival drug dealer. The "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

b. *Evidence of Pimping and Prostitution (Poston)*

In some of his recorded telephone calls from the jail, Poston referred to women as "hoes" and bitches and made statements suggesting he was engaged in pimping. After Poston and Bailey had testified, the trial court ruled such statements would be admissible as impeachment evidence. Poston contends the pimping/prostitution evidence should have been excluded because it was substantially more prejudicial than probative under Evidence Code section 352. We disagree.

1. <u>Challenged Evidence</u>

The following evidence was presented as a result of the ruling:

(1) In a June 19, 2013, call to an unknown male, Poston talked about his "bitches," his "ho-bo", and his "ho[e]-bitch," and complained he had "just paid the bitch phone bill" but he wanted "the bitch to pay [his] way." He said he only wanted one friend to have his "bitch" because "that's the only nigga gonna make sure I'm eating" instead of just

"fuck[ing] on the bitch." He continued, "I ain't never been too proud to beg from a bitch in my life, Robbie . . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my ho[e]-bos, all my baby mamas, I'm finna call my one baby mama right now."

(2) In a June 22, 2013, recorded phone call to an unknown male, Poston said he had asked Bailey what she was doing and she said she was sitting on the bed. Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner."

(3) In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. When his mother expressed concern about Bailey's reliability, he responded, "This is my bitch, mommy. . . . My bitch, mommy. Listen to me. That lay, she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to me, 'cause you not. I'm the one fucking her mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" Poston again told his mother Bailey would do what he told her to do, otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that.' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't." Poston's mother advised him to "reverse [his] whole attitude about this aggressiveness" and stop calling Bailey "bitch," and Poston told her Bailey was his "bitch" and Sharan was his woman.

(4) In an August 21, 2013, call to his mother, Poston complained that someone had taken his clothes from his house, including the suit he planned to wear for his trial. He said he had been "on the run" and did not have money for bills at his house even though he still had a prostitute.

(5) In portions of a letter to his brother (which the prosecutor read to Poston during cross-examination), Poston made comments about "hoes" and prostitutes, and wrote, "That last weed I gave you came from out a ho ass. She turned a date for two zips

and a hundred dollars." The woman Poston was referring to was Brianna Howard, who was with him when he was arrested for the crimes in this case.

(6) In a June 16, 2013, phone call (played by McNeely's counsel during his cross-examination of Poston), Poston talked about getting his "ho-bitch" "back to L.A." and indicated she earned "a thousand here, a thousand there."

(7) In a phone call on June 22, 2013, Bailey asked Poston why he was still trying to "hold onto" another woman and he responded, "Hold onto her, bitch, I ain't holding onto nothing except my mother-fucking pocketbook. What you talking about?" When Bailey suggested he didn't need the woman's phone number, Poston said, "Yeah, bitch, because I need all she got to offer me. What you mean? That bitch socking it to my pocket like the Chinese stock market, bitch."

2. General Principles and Standard of Review

It is well-settled that a witness's credibility may be impeached by evidence of a prior conviction or uncharged conduct showing moral turpitude, subject to the court's exercise of its discretion under Evidence Code Section 352. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) " '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.] Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] As we have advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.'

[Citation.] [¶] Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Id*. at pp. 931–932.)

3. Analysis

Poston contends his statements about pimping should have been excluded because they were highly prejudicial and involved "a collateral matter with little probative value as to his credibility." He notes he had already admitted several felony convictions, giving the prosecution "plenty of ammunition to impeach his credibility." Thus, the references to pimping, "bitches" and "hoes" "served only to inflame the jurors' passions against a bad character who mistreated women." We conclude the court did not abuse its discretion.

As Poston acknowledges, pimping is a crime involving moral turpitude. (*People v. Jaimez* (1986) 184 Cal.App.3d 146, 150.) His admissions that he had engaged in this activity were therefore relevant to his credibility as a witness, particularly in light of his testimony he was a legitimate businessman. (See *People v. Lankford* (1989) 210 Cal.App.3d 227, 234–239 [evidence of acts underlying pending robbery charges properly admitted on issue of defendant's credibility where he had testified he had not had any recent criminal incidents].) Some of Poston's statements were made to or about Bailey, whom he called as a witness, and were also relevant to the degree of control he exercised over her.

With respect to Evidence Code section 352, there are no issues of proof or unfair surprise because the pimping evidence came from Poston's own words, written and verbal. The evidence was not unduly time consuming, particularly when considering the importance of Poston's credibility to the issues in the case. Poston's pimping activities did not involve violent conduct or conduct similar to the shooting in this case. The jury was instructed with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, or committed other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. [¶] The fact of a conviction or other

misconduct does not necessarily destroy or impair a witness's credibility. [¶] It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." We presume the jury followed this instruction and did not consider the evidence of pimping for any other purpose. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

IV. *Prosecutorial Misconduct (Poston)*

Poston argues the prosecutor committed pervasive and prejudicial misconduct by attacking his character and appealing to the jurors' emotions, racial bias, and fear of random street violence.[10] He has forfeited this claim by his failure to object below.

"To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection. Failure to do so forfeits the issue for appeal. [Citation.] 'Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry.' " (*Wilson*, *supra*, 44 Cal.4th at p. 800.) A defendant may be excused from this requirement when an objection would have been futile or an admonition would not have cured the harm. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Poston has not demonstrated that an objection would have been futile or that an admonition would have been ineffective to cure the alleged harm.

---

[10] Poston cites the following actions by the prosecutor as misconduct: (1) referring to the charged crimes as a "shoot-out as if it were the wild wild west" during opening statement; (2) suggesting to Poston during cross-examination that he had been practicing his testimony and was presenting a false image by wearing a nice suit; (3) suggesting his use of African American Vernacular English (AAVE) in his rap lyrics and phone calls and his use of standard English in the courtroom showed he was lying; (4) characterizing Poston as a pimp and a thug; (5) questioning him about and focusing on the content of rap lyrics he wrote in an effort to refute his claim of self-defense; (6) emphasizing offensive language Poston used during his recorded jail calls; (7) arguing that Poston's flight and statements made during the recorded jail calls showed a consciousness of guilt; and (8) suggesting he had practiced his testimony to project a different persona than the one he assumed in his YouTube videos and in his rap lyrics.

## V. *Jury Instructions*[11]

a. *CALCRIM No. 560 (Poston)*

Poston argues the trial court did not properly instruct the jury on an element of provocative act murder, namely, that the chain of events leading to the victim's death was initiated by the defendant. He argues the omission was not harmless beyond a reasonable doubt (*Gonzalez*, *supra*, 54 Cal.4th at pp. 662–663) because the evidence shows McNeely was the initial aggressor in their confrontation. We do not agree with the premise that a defendant can only be guilty of provocative act murder if he set in motion the chain of events in which the provocative act occurred.

1. Instructions Given

The trial court gave a modified version of CALCRIM No. 560 on the concept and elements of provocative act murder. It provided: "Donel Poston is charged in Count 1 with the murder of Lionel Fluker. [¶] A person can be guilty of murder under the provocative act murder doctrine, if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot. The provocative act murder doctrine focuses on the provocateur's *conduct* and his *knowing* his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet. [¶] The elements of provocative act murder are more fully explained below. [¶] To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that: [¶] 1. Donel Poston intentionally committed a provocative act; [¶] 2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life, and then acted with conscious disregard for human life; [¶] 3. In response to Poston's provocative act, McNeely killed Lionel Fluker; AND [¶] 4. Lionel Fluker's death was a natural and probable consequence of Poston's provocative act. [¶] A provocative act is an act: [¶] 1. That goes beyond what is necessary to

---

[11] We reject the People's contention appellants forfeited the following issues by failing to object. Jury instructions affecting the elements of the charged offense affect the substantial rights of the defendant and do not require an objection for appellate review. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

accomplish the crime; AND [¶] 2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

"In order to prove that Lionel Fluker's death was the *natural and probable consequence* of the defendant's provocative act, the People must prove that: [¶] 1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act could begin a [chain] of events resulting in someone's death; [¶] 2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND [¶] 3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act. [¶] A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death."

"A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else. An *independent criminal act* is a free, deliberate, and informed criminal act by a person who is not acting with the defendant."

"The People allege that Donel Poston committed the following provocative acts: [¶] • Drawing a loaded .40 caliber semiautomatic gun [¶] • Shooting Joe McNeely multiple times [¶] You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another. [¶] You do not all have to agree on which provocative act Donel Poston committed."

The jury was also instructed with CALCRIM No. 240, concerning causation in a criminal case: "An act causes injury or death if the injury or death is the direct, natural and probable consequence of the act and the injury or death would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider the circumstances established by the evidence. [¶] There may be more than one cause of a crime, even a homicide. When the

conduct of two or more persons contributes concurrently as a cause of the homicide, the conduct of each is a cause of the homicide if that conduct was also a substantial factor contributing to the result. [¶] A cause is concurrent if it was operative at the moment of the homicide and acted with another cause to produce the homicide. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person [] contributed to the death."

2. Analysis

Poston argues the instructions should have made clear that he was not guilty of provocative act murder if the jury found McNeely was the person who set in motion the chain of events leading to the shooting. We disagree. Courts use "traditional notions of concurrent and proximate cause" to determine whether a killing was the result of a defendant's provocative act. (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583–584.) "The timing of events is critical. By necessity, the provocative act must occur before a victim [here, McNeely] may make a lethal response." (*Id*. at p. 584.) But there is no requirement that the defendant be responsible for initiating the chain of events leading to the killing, so long as the provocative act preceded the killing and was a substantial factor leading to the killing. The jury was properly instructed on these concepts, and was also instructed that appellant was not guilty of provocative act murder if he was acting in reasonable self-defense.

Poston cites language from *Sanchez, supra*, 26 Cal.4th 834, in which the court affirmed the first degree murder conviction of a defendant involved in a gun battle in which a single stray shot killed a bystander, even though it could not be determined which of the shooters fired the fatal bullet: " 'Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . [I]t is not unfair to hold them equally responsible for [the victim's] death.' " (*Id*. at p. 854.) Poston suggests that unlike the defendant in *Sanchez,* his own culpability is less than that of McNeely because McNeely "instigated and escalated the quarrel."

The notion of equally culpable mental states as a criteria for provocative act murder does not establish that a defendant must initiate a course of conduct that ends in the victim's death. Nor does Poston explain how the jury instructions should have been modified to encompass the concept of equally culpable mental states. In any event, Poston's mental state was not significantly less culpable than McNeely's. While McNeely appears on the surveillance video to have started a verbal argument and hit Poston with his hand, Poston responded by immediately drawing a loaded semiautomatic handgun and shooting McNeely several times in a crowded gas station. The case is similar to *Sanchez*, in which the Supreme Court concluded the culpability of two co-defendants who engaged in a gun battle was equivalent. (*Sanchez*, *supra*, 26 Cal.4th at p. 854.)

b. *CALCRIM No. 3471 (Poston)*

Poston contends the trial court deprived him of due process and interfered with his right to present a defense when it instructed the jury on the theory of mutual combat in connection with self-defense. We reject the claim.

The instruction challenged by Poston is CALCRIM No. 3471, which was requested by both the prosecution and McNeely and which provides: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated by word or conduct to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, then he had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop the fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting. [¶] A fight is [*mutual*] *combat* when it began or continued by mutual consent or

agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense."

"Mutual combat" has been judicially construed to mean "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045; see *Nguyen, supra*, 61 Cal.4th at p. 1044.) Poston does not suggest CALCRIM No. 3741 was inaccurate, but argues it had no application to his case because there was no substantial evidence he expressly or implicitly agreed to fight with McNeely before the exchange of physical blows and gunshots. Moreover, he claims, the instruction improperly suggested he did not possess the right of self-defense, even if he reasonably believed his life was in imminent danger when he shot McNeely.

The sequence of events in this case is nothing like that in *Ross, supra*, 155 Cal.App.4th 1033, on which Poston relies. In *Ross,* the female victim had lost her temper after a verbal argument and slapped the defendant, who punched her in the face in response. (*Id*. at p. 1039.) The court's instructions on the defendant's claim of self-defense to the assault and battery charges included a prior version of CALCRIM No. 3471 that did not define "mutual combat." (*Id*. at p. 1042, fn. 9.) When the jurors asked for clarification of the term during deliberations, the trial court did not provide additional guidance and instead told them to apply the common, everyday meaning of the those words. (*Id*. at p. 1043.) This response left the jury free to conclude the term "might properly describe any violent struggle between two or more people, however it came into being." (*Id*. at p. 1044.) The court of appeal concluded (1) the instruction limiting self-defense in cases of mutual combat should not have been given because there was no evidence the defendant and victim had mutually agreed to fight one another (*id*. at pp. 1053–1054); and (2) the "unwarranted and dangerously incomplete" instruction was prejudicial because it was "entirely likely that the case was decided on the basis of a mistaken understanding of 'mutual combat.' " (*Id*. at pp. 1054, 1057.)

Although no evidence was presented that Poston and McNeely expressly agreed to fight, the video surveillance tape shows a virtually simultaneous decision to draw their

weapons and such an agreement may be implied.[12] But even if we were to agree that the gunfight cannot not be characterized as "mutual combat" for purposes of assessing Poston's self-defense claim, this would not render CALCRIM No. 3471 erroneous or inapplicable. The version of the instruction given in this case limited the self-defense claims of a person who either engaged in mutual combat "*or started a fight*." (Italics added.) The instruction was plainly proper and necessary to assess the self-defense claim of McNeely, who had delivered the first, nonlethal blow with his fist before Poston responded with deadly force.

Assuming CALCRIM No. 3471 did not apply to Poston and should have been expressly limited to McNeely, no harm to Poston ensued. Unlike the situation in *Ross*, where the court declined to define mutual combat despite a jury request for clarification of that term, the version of CALCRIM No. 3471 that was given in this case defined mutual combat to require a preexisting agreement to fight. "Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally " ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

The court in this case gave CALCRIM No. 200, which advised the jury: "Remember that depending on what you find the facts of this case are, some of these instructions may not apply." This instruction made it "abundantly clear in straightforward language that it is the jury who decides the facts and the jury who determines which instructions apply to those facts." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 929.) Even the *Ross* court noted that CALCRIM No. 3471 might have been harmless if "mutual combat" had been properly defined, as it was in the more recent version of CALCRIM No. 3471 that was given in this case. (*Ross*, *supra*, 155

---

[12] Assuming McNeely initially pulled the magazine of his gun from his pocket rather than the gun itself,(see footnote 3) this was a predicate to loading his gun so he could shoot it.

Cal.App.4th at p. 1056.) The court did not commit prejudicial error in giving the instruction.

c. *CALCRIM No. 3472 (McNeely)*

McNeely argues the court erred in giving CALCRIM No. 3472, which advised the jury, as a corollary to CALCRIM No. 3471: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." He contends the instruction misstates the law because it does not state that one who provokes a quarrel to create the need for a fistfight retains the right to use self-defense if the victim responds with deadly or excessive force.

McNeely relies primarily on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), in which a divided panel of the court concluded that *under the facts of that case*, CALCRIM No. 3472 misstated the law by effectively advising the jury "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Id*. at p. 947.) This was contrary to the rule that "[a] person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[] . . . his right to live.' " (*Id.* at p. 943.) Significantly, the prosecutor had repeatedly argued that under the instruction, it did not matter whether the defendant (who instigated a gang confrontation) had only contrived to start a fistfight. The court concluded the problem was not remedied by CALCRIM No. 3471, which provided (as it did in the case before us) that a defendant who starts a fight with nondeadly force has a right to self-defense if the opponent responds with deadly force. (*Id*. at pp. 949–950.) This was in large part because the prosecutor had argued the opposite to the jury—that "under CALCRIM No. 3472's command, 'it doesn't matter' whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions." (*Id.* at p. 950.)

No comparable misstatements were made during the closing arguments in this case. The prosecutor never suggested McNeely had forfeited his right to self-defense against Poston because he had struck the first blow with his fists, but instead focused on the evidence that McNeely had drawn his weapon immediately after hitting Poston, demonstrating an intent from the outset to use deadly force, and/or had fired the shots at

Poston after Poston's gun had apparently jammed and he was already running away. The court in *Ramirez* recognized that CALCRIM No. 3472 was a correct statement of the law in a case where the defendant contrived a deadly assault from the outset, as the prosecutor argued in this case. (*Ramirez, supra*, 233 Cal.App.4th at p. 947.) In light of the language in CALCRIM No. 3471 making clear that the rule that an initial aggressor could respond in kind to deadly force by the victim so long as the initial assault involved nondeadly force, and in light of the absence of prosecutorial misstatements about the law on this subject, we are unconvinced the jury would have construed CALCRIM No. 3472 in the manner found problematic by the *Ramirez* court.[13]

VI. *Cumulative Error*

Appellants argue the errors they have raised are cumulatively prejudicial even if they do not require reversal when considered individually. We have assumed only one error for the sake of argument, meaning there are no errors to cumulate.

DISPOSITION

The judgments are affirmed.

---

[13] The jury was also instructed with CALCRIM No. 5.31, which provided: "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believed, and a reasonable person in the same or similar circumstances would believe, that the assault is likely to inflict great bodily injury upon him."

NEEDHAM, J.

We concur.

SIMONS, ACTING P.J.

BRUINIERS, J.

# DECLARATION OF SERVICE

I, Randi Covin, declare that I am over 18 years of age and not a party to this action. My business address is P.O. Box 1120, Willits, California, 95490. On February 6, 2017, I served true and correct copies of **APPELLANT POSTON'S PETITION FOR REVIEW** ON:

Mr. Donel Poston
AT2512
High Desert State Prison
PO Box 3030
Susanville, CA. 96127

Mr. David Bryden
Attorney at Law
160 Franklin St.
Oakland, CA. 94607

District Attorney
1225 Fallon St.
Oakland, CA. 94612

Alameda County Courts
Att: Hon. Michael Gaffey
1225 Fallon St.
Oakland, CA. 94612

Public Defender
1401 Lakeside Dr., Ste 400
Oakland, CA. 94612

by depositing such copies in the U.S. Mail, addressed as indicated above, postage pre-paid, at Willits, California.

On February 6, 2017, I also transmitted a PDF version of **APPELLANT POSTON'S PETITION FOR REVIEW** by Truefiling e-service to:

Attorney General
SFAG.Docketin@doj.ca.gov

First District Appellate Project
Eservice@fdap.org

Philip Brooks
philipmbrooks@gmail.com

Clerk, Court of Appeal
First District, Division Five

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 6, 2017, at Willits, California.

/s/ Randi Covin

# EXHIBIT 13

Court of Appeal, First Appellate District, Division Five - No. A141557

**S239918**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

THE PEOPLE, Plaintiff and Respondent,

v.

JOE McNEELY et al., Defendants and Appellants.

---

The petitions for review are denied.

SUPREME COURT
FILED

MAR 29 2017

Jorge Navarrete Clerk

Deputy

CANTIL-SAKAUYE

*Chief Justice*

RECEIVED
ATTORNEY GENERAL
2017 MAR 29 P 2:08
CA. DEPT OF JUSTICE
SAN FRANCISCO
DOCKET UNIT

**Supreme Court of California**
Clerk of the Court
350 McAllister Street
San Francisco, CA 94102-4797

S239918
Attorney General - San Francisco Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

# EXHIBIT 14

NO. ________________________

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re DONEL POSTON, | ) Related Appeal |
| | ) No. A141557 |
| Petitioner, | ) |
| | ) Alameda County |
| | ) No. 172522B |
| On Habeas Corpus. | ) |
| ____________________________________ | ) |

**PETITION FOR WRIT OF HABEAS CORPUS**

RANDI COVIN
State Bar #168422
P.O. Box 1120
Willits, CA. 95490
Telephone: (707) 459-2456
Facsimile: (707) 459-2147
e-mail address: rcovin13@gmail.com

Attorney for Petitioner
DONEL POSTON

By Appointment of the Court of Appeal Under the First District Appellate Project's Independent Case System

TOPICAL INDEX

TABLE OF AUTHORITIES ........................................................... 7

PETITION FOR WRIT OF HABEAS CORPUS ................................ 8

PRAYER FOR RELIEF ...................................................................... 22

VERIFICATION .................................................................................. 25

MEMORANDUM OF POINTS AND AUTHORITIES.................... 26

INTRODUCTION.................................................................... 26

ADDITIONAL EVIDENCE IN SUPPORT
OF THE PETITION.......................................................... 36

I. POSTON'S DECLARATION ............................. 36

II. CORROBORATING EVIDENCE...................... 45

III. THE EXPERT DECLARATIONS...................... 47

A. LINGUISTICS PROFESSOR AND
AAVE EXPERT JOHN RICKFORD....... 47

B. EDUCATION PROFESSOR AND
AFRICAN-AMERICAN CULTURE
EXPERT ERNEST MORRELL ............... 54

IV. THE DECLARATIONS OF COUNSEL ............ 58

A. TRIAL COUNSEL.................................... 58

B. APPELLATE COUNSEL ......................... 67

ARGUMENT ........................................................................... 73

I. TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ............................ 73

A. TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT WAS INEFFECTIVE ASSISTANCE ...... 73

B. TRIAL COUNSEL'S DEFICIENT PERFORMANCE REQUIRES REVERSAL ............................................. 76

II. TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ............................ 78

A. FACTUAL BACKGROUND ................... 78

B. TRIAL COUNSEL'S FAILURE TO OBJECT OR REQUEST MODIFICATION OF THE MUTUAL COMBAT INSTRUCTION WAS INEFFECTIVE ASSISTANCE ................ 79

C. TRIAL COUNSEL'S DEFICIENT PERFORMANCE REQUIRES REVERSAL ............................................. 81

III. TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE

EFFECTIVE ASSISTANCE OF COUNSEL ........................................................ 82

IV. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ........................... 85

V. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ........................... 88

VI. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ........................................................ 94

VII. THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY BRADY V. MARYLAND AND DUE PROCESS .......... 101

VIII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL ..................................................... 104

CONCLUSION ..................................................................... 106

WORD COUNT CERTIFICATE ......................................... 107

EXHIBIT 1: STATEMENTS OF THE CASE AND THE FACTS .................................................. 108

EXHIBIT 2: DECLARATION OF DONEL POSTON ........ 141

EXHIBIT 3: SELF-DEFENSE PACKET ............................ 151

EXHIBIT 4: DICTIONARY PAGE .................................... 165

EXHIBIT 5: EARLIER DRAFT OF RAP LYRICS ............ 168

EXHIBIT 6: DECLARATION OF LEATTA POSTON...... 170

EXHIBIT 7: DECLARATION OF ROBERT SAMUELS...................................................... 172

EXHIBIT 8: DECLARATION OF ANGEL GARCIA ........ 174

EXHIBIT 9: DECLARATION OF JOHN RICKFORD....... 176

EXHIBIT 10: CURRICULUM VITAE OF JOHN RICKFORD .................................................... 187

EXHIBIT 11: DECLARATION OF ERNEST MORRELL ..................................................... 217

EXHIBIT 12: CURRICULUM VITAE OF ERNEST MORRELL ..................................................... 223

EXHIBIT 13: DECLARATION OF DAVID BRYDEN....... 261

EXHIBIT 14: CALCRIM NO. 3471.................................... 271

EXHIBIT 15: DECLARATION OF RANDI COVIN.......... 274

EXHIBIT 16: NEWS REPORT NO. 1 ................................ 293

EXHIBIT 17: NEWS REPORT NO. 2 ................................ 300

EXHIBIT 18: LETTER FROM DISTRICT ATTORNEY .................................................. 305

EXHIBIT 19: BRADY DEMAND ...................................... 307

EXHIBIT 20: POLICE BEAT WEBPAGE .......................... 309

EXHIBIT 11: JUROR QUESTIONNAIRES ........................ 312

DECLARATION OF SERVICE

* * * * * *

# TABLE OF AUTHORITIES

## CASES

*Alcala v. Woodford*
(9th Cir. 2003) 334 F.3d 862 .......... 82, 88, 94

*Bell v. Miller*
(2d Cir. 2007) 500 F.3d 149 .......... 88, 94

*Bemore v. Chappell*
(9th Cir, 2015) 788 F.3d 1151 .......... 82, 83, 85

*Bloom v. Calderon*
(9th Cir. 1997) 132 F.3d 1267 .......... 88, 94

*BMS Entertainment/Heat Music, LLC v. Bridges*
(S.D.N.Y. 2005) ___ F.Supp.2d ___, 2005 U.S. Dist. LEXIS 13491 .......... 89

*Brady v. Maryland*
(1963) 373 U.S. 83 ..........

*Imbler v. Pachtman*
(1976) 424 U.S. 409 .......... 101

*In re Sixto*
(1989) 48 Cal.3d 1247 .......... passim

*In re Steele*
(2004) 32 Cal.4th 682 .......... 101, 102

*In re Thomas*
(2006) 37 Cal.4th 1249 .......... 85

*Kyles v. Whitley*
(1995) 514 U.S. 419 .......... 101, 102

*Lincoln v. Sunn*
(9th Cir. 1987) 807 F.2d 805 .......... 104

*Luchenburg v. Smith*
(4th Cir. 1996) 79 F.3d 388 .......... 79

*Mak v. Blodgett*
(9th Cir. 1992) 970 F.2d 614 .......................................................... 104

*People v. Bledsoe*
(1984) 36 Cal.3d 236 .......................................................... 95

*People v. Bowker*
(1988) 203 Cal.App.3d 385 .......................................................... 95

*People v. Brown*
(2004) 33 Cal.4th 892 .......................................................... 95

*People v. Centeno*
(2014) 60 Cal.4th 659 .......................................................... 74

*People v. Cowan*
(2010) 50 Cal.4th 401 .......................................................... 76

*People v. Day*
(1992) 2 Cal.App.4th 405 .......................................................... 95

*People v. Donel Poston,*
No. 172522B .......................................................... 12

*People v. Estrada*
(2002) ___ Cal.App.4th ___, 2002 Cal. App. ................................ 88

*People v. Gardelay*
(1996) 14 Cal.4th 605 .......................................................... 95

*People v. Hill*
(1998) 17 Cal.4th 800 .......................................................... 104

*People v. Howard*
(1987) 190 Cal.App.3d 41 .......................................................... passim

*People v. Humphrey*
(1996) 13 Cal.4th 1073 .......................................................... 95

*People v. McAlpin*
(1991) 53 Cal.3d 1289 .......................................................... 95, 96

*People v. McDonald*
(1984) 37 Cal.3d 351 .......... 95

*People v. McGehee*
(2016) 246 Cal.App.4th 1190 .......... 96

*People v. Mendoza-Tello*
(1997) 15 Cal.4th 264 .......... 74

*People v. Price*
(1991) 1 Cal.4th 324 .......... 76

*People v. Riggs*
(2008) 44 Cal.4th 248 .......... 95

*People v. Ross*
(2007) 155 Cal.App.4th 1033 .......... passim

*People v. Soojian*
(2010) 190 Cal.App.4th 491 .......... passim

*People v. Vu*
(1991) 227 Cal.App.3d 810 .......... 95

*People v. Ward*
(2005) 36 Cal.4th 186 .......... 94

*People v. Wiidanen*
(2011) 201 Cal.App.4th 526 .......... 96

*People v. Wright*
(2004) ___ Cal.App.4th ___, 2004 Cal. App. .......... 88

*Riley v. Payne*
(9th Cir. 2003) 352 F.3d 1313 .......... 85

*Strickland v. Washington*
(1984) 466 U.S. 668 .......... passim

*United States v. Are*
(7th Cir. 2009) 590 F.3d 499 .......... 89

*United States v. Bagley*
(1985) 473 U.S. 667 .......... 101

*United States v. Herron*
(E.D.N.Y. 2014) .......... 89

*United States v. Span*
(9th Cir. 1996) 75 F.3d 1383 .......... 79

*United States v. Williams*
(7th Cir. 2000) ___ F.3d ___, 2000 U.S. App. LEXIS 168 .......... 88

*Youngblood v. West Virginia*
(2006) ___ U.S. ___, 126 S.Ct. 2188 .......... 101, 102

**CONSTITUTIONS**

Cal. Const., art I, § 15 .......... 73, 78, 82, 85, 88, 94, 101, 104

U.S. Const., amend. XIV .......... 73, 78, 82, 85, 88, 94, 101, 104

**STATUTES**

Evid Code, § 352 .......... 16
801 .......... 95

Pen. Code, §§ 187 .......... 13
664 .......... 13
995 .......... 23, 59, 62
1118.1 .......... 23-24, 60, 62
12022.53, subd. (d) .......... 13

**OTHER AUTHORITIES**

Cal. Rules of Court, rules 8.204 .......... 107
8.360 .......... 107
8.384 .......... 107

CALCRIM Nos. 505 ........ 78
3471 ........ *passim*

CALJIC No. 5.30 ........ 78

* * * * * *

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re DONEL POSTON, | ) Related Appeal |
| | ) No. A141557 |
| Petitioner, | ) |
| | ) Alameda County |
| | ) No. 172522B |
| On Habeas Corpus. | ) |
| ______________________________ | ) |

**PETITION FOR WRIT OF HABEAS CORPUS**

TO THE HONORABLE PRESIDING JUSTICE AND ASSOCIATE JUSTICES OF THE COURT OF APPEAL OF THE STATE OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION FIVE:

Petitioner DONEL POSTON, by and through his appointed attorney, hereby petitions this Court for a writ of habeas corpus, and by this verified petition alleges as follows:

I.

Poston's liberty is unlawfully restricted in that he is confined by the Department of Corrections and Rehabilitation at High Desert State Prison, Lassen County, pursuant to the judgment of the Superior Court of the State of California for the County of Alameda, *People v. Donel Poston,* No. 172522B, in which Poston was convicted of second degree murder, attempted murder, and possession of a firearm by a

felon. (See Pen. Code, §§ 187, 664, 12022.53, subd. (d).)[1] The jury found true a section 12022.53, subdivision (d), firearm enhancement allegation.

II.

On March 21, 2014, Poston was sentenced to an aggregate term of 72 years to life in prison.

III.

Poston's appeal is presently before this Court - he filed his Appellant's Reply Brief on March 1, 2016, and he requested oral argument on April 13, 2016.

IV.

Poston argues on appeal that the restrictions on his liberty are unlawful and in contravention of rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution, in that:

I. POSTON'S CONVICTIONS OF MURDER AND ATTEMPTED MURDER VIOLATE DUE PROCESS AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE;

[1] All further statutory references are to the Penal Code unless otherwise noted.

II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE, AND INFLAMMATORY EVIDENCE OF POSTON'S OUT-OF-COURT STATEMENTS REGARDING PIMPING AND PROSTITUTION TO IMPEACH HIS CREDIBILITY, RENDERING THE TRIAL FUNDAMENTALLY UNFAIR AND REQUIRING REVERSAL;

III. THE TRIAL COURT ERRED PREJUDICIALLY IN INSTRUCTING ON MUTUAL COMBAT IN ACCORD WITH CALCRIM NO. 3471, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE;

IV. THE TRIAL COURT ERRED PREJUDICIALLY IN OMITTING INSTRUCTION ON AN ELEMENT OF PROVOCATIVE ACT MURDER, VIOLATING POSTON'S CONSTITUTIONAL RIGHTS TO JURY TRIAL, TO DUE PROCESS, AND TO PRESENT A DEFENSE;

V. PERVASIVE PROSECUTORIAL MISCONDUCT VIOLATED DUE PROCESS AND REQUIRES REVERSAL;

VI. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING POSTON'S SEVERANCE MOTION AND THE JOINT TRIAL WAS FUNDAMENTALLY UNFAIR IN VIOLATION OF DUE PROCESS; AND

VII. CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL.

V.

In addition, the restrictions on Poston's liberty are unlawful and in contravention of rights guaranteed by the Sixth and Fourteenth

Amendments to the United States Constitution and article I, section 15, of the California Constitution, in that he was denied the effective assistance of counsel and due process of law. The following facts known to Poston support his claims:

a. Poston was charged, along with Joe McNeely, with the murder of Lionel Fluker. Poston and McNeely were also charged with the attempted murder of each other and unlawful possession of a firearm. The charges arose out of a shooting at a gas station in East Oakland.

b. Surveillance videos showed that McNeely attacked Poston, talked to him aggressively, threatened him with a gun, slapped or punched him, causing Poston to fall to the ground, and reached for his gun and/or separate ammunition magazine, as Poston got up. Poston pulled out his own gun and shot McNeely multiple times in self defense, then ran away. McNeely got up and ran after Poston, shooting at his back, hitting and killing Fluker, an innocent bystander.

c. Despite compelling evidence of self-defense, the prosecutor got convictions by attacking Poston's character, emphasizing his out-of-court statements in recorded jail phone

calls and rap lyrics calling women "hos" and "bitches," and speaking informally in African-American Vernacular English ("AAVE"). The prosecutor used unfair and misleading arguments and insinuations to persuade the jurors that Poston was not an innocent person entitled to defend himself.

d. Trial counsel David Bryden moved to suppress all evidence pertaining to pimps and prostitutes as cumulative and unduly prejudicial under Evidence Code section 352. That motion was denied and extensive evidence of Poston's offensive and inflammatory out-of-court statements in AAVE was presented to the jury. A detailed summary of the evidence at trial with citations to the record is attached hereto as Exhibit 1.

e. Bryden did not object when the prosecutor repeatedly twisted Poston's words in the jail calls and rap lyrics and misled the jury during her opening statement, her cross-examination of Poston, and her closing argument.

f. In her opening statement, the prosecutor referred to the charged offenses as "a shoot-out as if it were the wild wild west." As the result of the defendants' "gun battle," an "innocent passerby" was shot dead. The "gun-battle" theme

was repeated throughout the trial. This entire theory and theme was misleading because the charged shooting was not a gun battle - mutual combat. Rather, it was an unprovoked attack by McNeely on Poston, to which Poston lawfully responded with potentially lethal force in self-defense.

g. In her cross-examination of Poston, the prosecutor suggested that Poston's desire for a nice suit to wear for his testimony and his references to "practicing" for that "performance" showed that he was lying. She asked: "[Y]ou're trying to get over on this jury, aren't you?"

h. The prosecutor suggested that Poston's alternating use of AAVE in rap lyrics, YouTube videos, letters, and phone calls from the jail, and Standard American English ("SAE") in court showed that he was lying. And she suggested that, "out on the streets," Poston was "a hard-core thug, into guns, and being a gangster[.]" The prosecutor asked Poston about his rap lyrics, suggesting that they refuted his claim of self-defense.

i. The prosecutor played Poston's recorded phone calls from the jail, emphasizing that he lied to his girlfriend, Tamena Bailey, and called her a "bitch." She played phone

calls in which Poston and his mother talked about Bailey, her vulnerability on cross-examination, and the need for her to tell the truth, arguing paradoxically that they pressured Bailey to lie.

j. The prosecutor emphasized Poston's use of the words "ho," "pimp," and "prostitute," quoting some of the most offensive and inflammatory statements in the jail calls, such as: "That last weed I gave you came from out a ho ass."

k. The prosecutor questioned Poston about his quoting of her statement in a prior court proceeding that you can't bring "a knife to a fistfight," suggesting that Poston's use of the expression in a jail phone call was an admission of guilt, when Poston was only lamenting and expressing concern about the prosecutor's argument.

l. The prosecutor argued to the jury that in a true case of self-defense, "the person who had to use force because they were instantly about to die, calls the police. They wait for the police. They are waiting on their porch with a smoking gun. 'Yeah, I had to kill him, and you know what, I would do it again

tomorrow, because my life was in danger.' That's the true picture of self-defense. Not what you have here."

m. The prosecutor argued: "There is no clearer picture of what was going on in [Poston's] mind than his own words. You know, normal people, law-abiding citizens, don't go into an altercation with someone with the state of mind of, "Disrespect me and you're going to find yourself six feet under. With respect to Mr. Poston, he fled the scene, he left Oakland. He said repeatedly in the jail calls he was on the run. Not the state of mind and not the use of phrasing that innocent, justified people use. And he also dumped the gun."

n. The prosecutor argued: "[T]here were a variety of jail calls that we listened to with [Poston] talking to his girlfriend, with him talking to his mom about his girlfriend, and what she should say. And, you know that, hmm, he tried to get her to lie for him."

o. The prosecutor argued: "With respect to Mr. Poston's testimony, you know when you tell the truth. The truth is the truth. You don't have to practice it, you don't have to perform it. And you heard in a variety of jail calls from him

how much of the story he was trying to sell all of you. He was performing, and he was trying to paint a portrait of himself that's different than the portrait that you've seen in the video, in the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew that you couldn't see that. [¶] So he was practiced, he was prepared, he stayed calm."

p. In her rebuttal argument, the prosecutor returned to her "gun battle" theme, explaining that if it is a gun battle, it is murder: You know, [McNeely's counsel] counted how many times I used the word "gun battle" [more than 15 according to McNeely's counsel] and I submit to you that's because that is the position that I'm taking. This was a gun battle. And that's why you have implied malice, and that's why it's murder.

q. The prosecutor argued: " . . . you have to ask yourselves, why is the defense so afraid of it being a gun battle? Why spend so much time talking about it's not a gun battle? Why did they not want you to find that it was a gun battle? Because a gun battle equals murder, and then you're done because you're looking at their state of mind at the time that this

starts. A gun battle equals murder for both defendants, and they're both equally guilty."

r. The prosecutor explained that people like McNeely and Poston walk around ready for gun battles, disregarding the safety of innocent bystanders:

> You know, this world is a world that I would hope and imagine is unfamiliar to all of you. It's a world that you've gotten a glimpse of, but it's a world that you heard yesterday from Lieutenant Jones, now they're not playing by any rules. But there are some things that are expected. Both of them were a part of this world. Both of them went to this gas station that is known for crime, it's known for shootings, it's known for murders. McNeely went there with drugs for sale. McNeely is the one walking up to this car, that car, and another car, talking to people in the parking lot of a gas station. So he's a drug dealer. He's in this world.
>
> Mr. Poston clearly is in this world, a self-professed person who promotes his videos and whatnot. Both of them knew they couldn't walk away. That's just not how it happens. That's not how you walk away and save face and have any respect.
>
> But these days, they don't settle disputes with fists, they settle them with guns. You know, I don't know if Mr. Poston could see Mr. McNeely was armed. I would submit to you it's not important. Each of them knew that the other was armed.
>
> You know, I'm reminded of a friend of mine and a story he told me, his little brother was going off to college. And I shouldn't say little, his younger brother, he's huge, ginormous. My friend sits him down and he says, "Look, if you are ever out, whether it's a party, or a game, or

> restaurant or wherever, and some little guy wants to pick a fight with you, you have to know that he has an equalizer of some sort, he has some sort of weapon. Because what little guy is going to pick a fight with you, this big strapping football player?"
>
> That's what's (sic) it's like on the streets of Oakland now. You've got all these little guys running around, but they're all armed, making them feel like big men. And that's what happened in this case. These guys were going to shoot it out, and that - and who cares about who was left in their wake? Who cares what innocent people are in the way?

s. The prosecutor argued that Poston's alternating use of AAVE in the jail calls and SAE on the witness stand showed that he was lying:

> You have heard a lot of our evidence about Mr. Poston and his world. You heard a lot of jail calls where he is not speaking in the same calm, controlled manner that he's speaking here in court. And that's why you heard the other jail call, where he's talking about the fact that he needs to paint a different portrait for you and put on a performance. Because if you see the real him, you'll know the verdict that is required.

t. Finally, the prosecutor argued that Poston's rap lyrics showed he did not feel badly about Fluker's death:

> There is no evidence that [Poston] feels badly about what happened to Mr. Fluker. The evidence is actually contrary to that. Because the only rap that he wrote regarding this incident was boastful. It was bragging. It was, "I wish I coulda, shoulda, woulda killed him."

> The argument seems to be that this, on one hand or another, is perfectly acceptable behavior. And that's offensive. Because what is Lionel Fluker? Just collateral damage? Your verdict will not bring him back to the family who loved him. It will not restore any social order or change things in the area of Seminary and MacArthur, but holding them accountable for what they did will bring some sort of justice. And so I trust you now, and I leave it in your hands to do justice.

u. Trial counsel David Bryden explains that he thought the prosecutor's statements and questions were misleading and improper but he did not object because the trial court had denied his suppression motion as to the "pimp" and "ho" evidence. "Gun battle" was the prosecutor's theory and pervasive theme of the case. Bryden thought there was insufficient evidence that Poston did not act reasonably in self-defense but the trial court had denied his motion to dismiss pursuant to section 995 and his motion for judgment of acquittal pursuant to section 1118.1. He thought objecting was futile and would only further alienate the jury.

v. Unfortunately, Bryden missed many opportunities to derail the prosecutor's "gun battle" theory. He might have prevailed on his section 995 and/or 1118.1 motions if he had adequately investigated the law and read *People v. Ross* (2007)

155 Cal.App.4th 1033, 1045, cited in the notes to CALCRIM No. 3471. If he had read *Ross*, Bryden would have discovered that "mutual combat" means a "reciprocal exchange of blows . . . pursuant to mutual intention, consent, or agreement" *preceding "the first assaultive conduct* . . . ."

w. It was undisputed that McNeely committed the first assaultive conduct. No evidence was presented that Poston intended or agreed to fight before McNeely's assault. Had Bryden cited *Ross* and argued that there was insufficient evidence of an agreement to fight before McNeely's assault to support the mutual combat theory, the case would likely have been resolved before trial, as Bryden had expected. (Exh. 13.)

x. Had Bryden cited *Ross* in support of his section 1118.1 motion, the case would likely never have made it to the jury. And had Bryden objected to CALCRIM No. 3471 or requested modification in accord with *Ross*, there is a reasonable probability of a more favorable outcome.

y. Bryden should also have objected every time the prosecutor made an unfair and misleading insinuation or statement. It was unfair and misleading for the prosecutor to

insinuate and argue that Poston should be convicted because his alternating use of AAVE and SAE showed he was lying, trying to pull one over on the jury; that his statements in AAVE meant the opposite of their apparent meaning; that he was a pimp and a thug, not a law abiding citizen entitled to use self-defense; that he did not talk like an innocent person; that his possession of a firearm and flight after the crime refuted his claim of self-defense; and that he and all the other "little guys" in Oakland were running around engaging in gun battles, endangering innocent bystanders like Fluker.

z. Bryden could also have derailed some of the prosecutor's unfair and misleading insinuations and arguments if he had adequately prepared Poston for his testimony and/or adequately rehabilitated him on redirect. Bryden should have provided Poston with a transcription of the jail phone calls and rap lyrics which had been admitted over his objection. Both Poston and Bryden state that Bryden never provided Poston with a transcription, never listened to the recordings with him, never talked to him about the calls in any detail, never talked to

him about pimping and prostitution, and spent little or no time preparing him to testify. (Exhs. 2, 13.)

aa. If Bryden had adequately investigated, prepared Poston, and/or rehabilitated him, some of the key points the prosecutor and McNeely's lawyer used to attack Poston's credibility would have been neutralized. For instance, Poston could have explained that he did not mean to indicate falsity when he wrote in a rap lyric: "It's all self-defense under the proper pretense."

bb. Poston explains that he intended to use one of several alternative definitions of "pretense" in his dictionary - one which did not indicate "falsity." To make sure his lyrics were clear, Poston used the word "proper" or "correct" to emphasize that he was not using the definition which indicated falsity. He explains that his primary purpose was artistic - crafting clever rhymes.

cc. Poston could have explained that he never considered himself a pimp and never wanted to be a pimp, which in his world meant someone who abused and controlled prostitutes and took all their money. He did not know that the

legal definition of pimping is just knowingly taking money from a prostitute's earnings.

dd. If Poston had known the legal definition of pimping, he could have explained what he meant when he denied being a pimp, while admitting that he sometimes took money from women, some of whom may have earned some of it by prostitution at times. Because Poston was not prepared and did not understand the legal definition of pimping, both the prosecutor and McNeely's attorney were able to argue that Poston's seemingly conflicting statements about pimping and prostitution showed he was a liar.

ee. Had Bryden adequately investigated, he could have presented evidence corroborating Poston's testimony about his legal research (Exh. 3), his rap lyrics (Exhs. 4, 5), and the radiator of Bailey's car (Exhs. 6, 7, 8). Poston testified that McNeely shot a hole in the radiator which had to be repaired. McNeely's attorney cross-examined Poston about it and argued that Poston's uncorroborated testimony was another example of him lying.

ff. Poston's mother states that she paid for the radiator repair. (Exh. 6.) Poston's brother saw the bullet hole and sent Poston's girlfriend to his mechanic. (Exh. 7.) Angel Garcia states that he is the mechanic who replaced the radiator a few years ago. (Exh. 8.)

gg. Bryden knew the prosecutor's statements and insinuations pertaining to AAVE were misleading and unfair. He should have investigated and presented expert testimony on AAVE. He should also have investigated and presented expert testimony on African-American culture to counter the prosecutor's arguments that Poston's possession of a firearm and flight after the shooting showed that he did not act in self-defense.

hh. Professor John Rickford could have testified as an expert on AAVE that rap lyrics should not be taken literally even when facially incriminating, but that most of Poston's statements and rap lyrics in AAVE were not incriminating at all. Professor Rickford could also have explained that switching between AAVE and SAE ("code-switching") is

normal, appropriate, and necessary, and does not indicate dishonesty. (Exhs. 9, 10.)

ii. Professor Ernest Morrell could have testified as an expert on African-American culture in Oakland and other urban areas. Professor Morrell agrees with Professor Rickford about code-switching. In addition, Professor Morrell could have testified that many urban African-American people reasonably distrust the police and courts based on their own past experiences and those of their friends and relatives. (Exhs. 11, 12.)

ii. Professor Morrell could have explained that many African-American people use self-help to protect against crime rather than calling the police for help. They are afraid the police will just make it worse - that the police will beat, shoot, and/or arrest black people even if they are innocent. The fact that an African-American man armed himself and fled after a shooting instead of calling 911 does not indicate a consciousness of guilt. It is not inconsistent with innocence and self-defense.

jj. All of Bryden's failures described above denied Poston the effective assistance of counsel. In addition, the prosecutor failed to disclose material impeachment evidence as required by *Brady v. Maryland* (1963) 373 U.S. 83, and due process.

kk. Recent news reports indicate that Oakland Police Lieutenant Tony Jones, who testified against Poston as an expert on street terminology and culture, sent "racially charged" text messages to other officers. The text messages referred to African-American people in an unflattering way and referenced "Klansman," suggesting bias against African-Americans. Lieutenant Jones was placed on leave pending investigation of the text messages. (Exhs. 16, 17.)

ll. Appellate counsel recently sent a *Brady* demand letter to the prosecutor, specifically referencing Lieutenant Jones, and got no response. (Exh. 19.) Trial counsel reports he has never received any disclosure pertaining to Lieutenant Jones's racist text messages, nor about lawsuits apparently settled by the Oakland Police Department which involved him. (Exhs. 15, 20.)

VI.

Poston has no adequate remedy at law in that this petition is based on evidence outside the appellate record. Thus, the issues raised herein could not have been raised on appeal.

VII

Poston hereby incorporates by reference the accompanying memorandum of points and authorities and the attached exhibits. Poston's claims are based on the Petition, the accompanying memorandum of points and authorities, the attached exhibits, and the Court's records and files in the related appeal.

WHEREFORE, Poston requests that this Court:

1. Take judicial notice of the appellate record, briefs, and all other records and files in the related appeal;

2. Issue an order to show cause why Poston's conviction and sentence should not be set aside;

3. Order an evidentiary hearing to determine any material, disputed facts;

///

//

4. Upon final review, issue an order setting aside Poston's conviction and sentence and granting such further relief as the Court deems appropriate in the interests of justice.

DATED: August 10, 2016 Respectfully submitted,

/s/ Randi Covin
Attorney for Petitioner
DONEL POSTON

# VERIFICATION

I, RANDI COVIN, declare as follows:

I am an attorney admitted to practice in the courts of the State of California. I was appointed by this Court to represent Poston in the related appeal, No. A141557. I make this verification on Poston's behalf because he is incarcerated at the High Desert State Prison, Shasta County, in Susanville, California, far from the county of Mendocino where I have my office.

I have read the foregoing petition for writ of habeas corpus and declare under penalty of perjury under the laws of the State of California that the contents of the petition are true to the best of my knowledge.

Executed this 10th day of August, 2016, at Willits, California.

/s/ Randi Covin

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

As petitioner Donel Poston explains on appeal, this is an unusual case in which the charged shooting was captured on surveillance video and the undisputed facts show a textbook case of self-defense. Faced with a seemingly dispositive video showing that Poston shot Joe McNeely in self-defense, the prosecutor obtained convictions by attacking Poston's character and twisting his words, insinuating and arguing that Poston did not look or sound like an innocent person and that switching between African American Vernacular English ("AAVE") with his friends and family and Standard American English ("SAE") in court showed he was lying about his defense, trying to put one over on the jury.

Poston raises a number of issues on appeal, including insufficiency of the evidence; trial court error in admitting irrelevant character evidence; erroneous instruction on mutual combat; prosecutorial misconduct; and denial of severance. In addition, Poston's convictions of murder and attempted murder should be reversed because trial counsel's deficient performance denied him the effective assistance of counsel, and the prosecutor's failure to disclose

material impeachment evidence violated *Brady v. Maryland* (1963) 373 U.S. 83, and due process.

Poston's trial attorney, David Bryden, failed to object to pervasive prosecutorial misconduct, and to instruction on mutual combat, an unsupported theory. Bryden failed to adequately prepare Poston for his testimony and failed to adequately rehabilitate him on redirect. Bryden failed to adequately investigate and present evidence corroborating Poston as well as expert testimony regarding AAVE and African-American culture.

In this companion habeas corpus action, Poston presents Bryden's declaration, his own declaration, and those of his mother, Leatta Poston; his brother, Robert Samuels; Samuels' mechanic, Angel Garcia, Stanford Linguistics Professor and nationally renowned AAVE expert John Rickford; Columbia Teachers College Professor and African-American culture expert Ernest Morrell; and appellate counsel. Poston also presents evidence that the prosecutor failed to disclose material, impeachment evidence of racial bias on the part of a testifying police expert. As explained below, the judgment should be reversed.

ADDITIONAL EVIDENCE IN SUPPORT OF THE PETITION

A detailed summary of the procedural background and the evidence at trial, with citations to the record, is attached hereto as Exhibit 1. The following additional evidence supports the petition:

## I. POSTON'S DECLARATION.

Poston states he ran after he shot McNeely because McNeely chased him down the street trying to shoot him. McNeely was obviously alive and mad that Poston had shot him. Poston had no idea anyone else had been shot. He left town a few days later because he was afraid McNeely would come after him. (Exh. 2, ¶ 3.)

Poston saw and heard news reports about Lionel Fluker while he was on the run in L.A. He felt really bad that an innocent person had been shot, especially since he was a photographer like Poston. Poston stayed in L.A because of McNeely and also because he was afraid the police might be looking for him on account of the shooting. Poston was just defending himself when he shot McNeely but he knew he was not supposed to have a gun and he didn't think the police and the courts would believe him. (Exh. 2, ¶ 4.)

When Poston was arrested, he denied knowing anything about anything at first. He did not trust the police and the courts to treat him

fairly even though he shot McNeely in self-defense. He ran from the scene because McNeely was shooting at him but he would never have called 911 or waited for the police to arrive because he thought they would probably shoot him or arrest him - they probably would not believe anything he said. (Exh. 2, ¶ 7.)

Growing up in Oakland, pretty much all of Poston's experiences with the police were bad. Police officers came to black neighborhoods harassing, shooting and arresting black people, including kids. Poston saw other black kids get beaten and he was badly beaten by a police officer once himself. Everyone always ran when the police came around. Most of the black people Poston knew were the same - they would not call the police no matter what happened because, whatever was going on, the police would only make things worse. (Exh. 2 ¶ 8.)

In the jail at Santa Rita, there is no access to a law library. Inmates have to tell the law librarian what their charges are and request legal materials on particular subjects. Poston requested a lot of materials, including materials about murder and self-defense. He had been to college. He is a good reader and writer and he wanted to know about his case. (Exh. 2, ¶ 9.)

When Poston got the legal research packet on self-defense he was very relieved because it seemed like he had a clear cut defense of self-defense. He was happy to learn that even a felon has a right to use a gun in self-defense and that there is no duty to retreat - he had a right to stand his ground when he was attacked. He gave a copy of the self-defense packet he got from the law librarian to appellate counsel, Randi Covin. (Exh. 2, ¶ 10; Exh. 3.)

The prosecutor made a big deal about one of Poston's rap lyrics where he says, "it's all self-defense under the proper pretense." The prosecutor claimed Poston was saying his claim of self-defense was false. He was not. Poston used the words "pretense" and "pretext" interchangeably in different drafts of this rap because his dictionary showed them as synonyms. The definitions of "pretense" included "a claim" and "a mere display." Poston explains that "pretext" is even better than "pretense" artistically because it is a less perfect rhyme with "self-defense." An imperfect rhyme is considered better than a perfect rhyme in rap lyrics - it is more clever. (Exh. 2, ¶ 12.)

Poston saw in his dictionary that "pretense" could also mean something false so he used the word "proper" before it to show he was using the other definition - a claim or display. In his first draft he

used the word "correct" instead of "proper." He was writing rhyming lyrics, looking for words that rhymed with "self-defense." He did not mean to say his self defense claim was false, but just that it is self-defense if the proper facts are shown, as they were in his case. Poston gave a copy of the dictionary page he used to Covin. (Exh. 2, ¶ 13; Exh. 4.) He also gave Covin an earlier draft of the same rap lyrics using the words "correct" and "pretext." (Exh. 5.)

Poston knew all his jail calls were recorded but he was not worried because he did not say anything incriminating. He was just talking in a very casual way to his friends and family about his life, his case, and his girlfriends. It never occurred to him that the prosecutor would be able to use his casual language to make him look bad. It was very stressful being in jail facing trial for murder. Sometimes Poston got upset and raised his voice. He also used words like "bitch" and "ho," which are not polite words, but are common in African American Vernacular. "Ho" does not necessarily mean "prostitute." (Exh. 2, ¶ 15.)

Poston's trial lawyer never showed him the transcription of the jail calls which the prosecutor used to cross-examine him. The first time Poston saw the transcription was on the witness stand at the

beginning of cross-examination when the prosecutor handed it to him and started asking questions. Bryden never talked to Poston about the jail calls or his letters or rap lyrics at all. He never mentioned pimping or prostitution. He did not tell Poston the legal definitions and did not counsel Poston on how to answer any questions about that. (Exh. 2, ¶ 16.)

Bryden did not spend much time with Poston before trial. He went out to the jail in Santa Rita to see Poston twice, for about 15 minutes each time, just before the trial started. Bryden was always in a hurry and said he hated going out to Santa Rita because it took too long to go through security. Poston would see Bryden for a minute before court hearings when Bryden would go by the holding cell and tell Poston what was going to happen in court that day. They did not talk much on the phone because the calls are recorded. (Exh. 2, ¶ 17.)

Bryden told Poston he had to testify because it was a self-defense case. He asked Poston to write down questions Poston thought he should ask on direct examination. Other than asking Poston to write down questions, Bryden did not help Poston prepare to testify at all. He never talked to Poston about cross-examination by the prosecutor or McNeely's lawyer. (Exh. 2, ¶ 18.)

Poston did not know what to expect on cross-examination. He practiced by himself, speaking in polite English with no ghetto talk - no African American vernacular or profanity. He wanted to wear a suit and speak properly on the witness stand so the jurors could see he was an intelligent and believable witness. (Exh. 2, ¶ 19.)

When the prosecutor started asking Poston about pimps and hos he answered honestly to the best of his knowledge. Poston is not a pimp and never has been. In his world, a pimp is someone whose business is to control and sell prostitutes, usually with some physical violence. Poston has never done anything like that. He has never been in the business of pimping though he does know pimps. (Exh. 2, ¶ 20.)

Poston has taken money from women he has been involved with personally when he needed it and some of those women may have done some dating for money. Poston has no idea whether they actually had sex for money or just went on dates like paid escorts. He did not concern himself with how they got their money - whether from work, welfare, or dating - it was none of his business. It never occurred to Poston that taking a little money from a woman he knew now and then made him a pimp. (Exh. 2, ¶ 20.)

Poston was surprised when Covin told him that the legal definition of pimping is simply taking money from a prostitute's earnings. He may have done so from time to time but not by intention or demand, just by request for help from someone he knew, and not as his business. (Exh. 2, ¶ 21.)

Poston wishes Bryden had talked to him about this before his testimony so he could have done a better job under cross-examination. The prosecutor and McNeely's lawyer both made Poston look like a liar for saying he was not a pimp. Poston never thought he was a pimp or meant to be a pimp but he can see how his answers sounded like double-talk because he did not know the legal definitions. (Exh. 2, ¶ 21.)

During cross-examination by the prosecutor Poston said that a "ho" is a garden tool. He explains he was frustrated by the prosecutor twisting his words and trying to make him say he was a pimp, which he was not. Poston was also trying to make the point that words have different meanings. "Ho" can mean "prostitute" but it can also be a more general, informal word for any woman. The prosecutor also used this statement to make Poston look like a liar but Poston was just trying to explain that just because he cooks a dinner doesn't make him

a chef and just because he takes money from a woman now and then doesn't make him a pimp. (Exh. 2, ¶ 22.)

The first time Poston saw the video of the shooting in his case was in jail when defense investigator, Walt Stannard, watched it with him for about half an hour at Santa Rita. Bryden never watched the video with Poston. Stannard noticed that it looked like McNeely got off the first shot, hitting the radiator of Bailey's car. You can see on the video that the ground is wet after she drives off. (Exh. 2, ¶ 23.)

Afterward, Bailey had to have the radiator repaired. Poston's mother paid $300 or $400 to fix the radiator from the bullet hole. Poston told Bryden about the radiator but Bryden did not put on any proof that it was shot and repaired. McNeely's lawyer used this to make Poston look like a liar. (Exh. 2, ¶ 23.)

Poston told Bryden he did not know anything about the credit cards and machine found in his house, not in his bedroom. Poston had been gone for three months and other people were living in his house. The checks and stubs found in Poston's bedroom belonged to him. He used the stubs to write receipts as he explained in his testimony. He has never done anything like credit card fraud. He has never seen a

machine like that and would not know what to do with it. (Exh. 2, ¶ 24.)

Poston's theft priors are all for cashing counterfeit traveler's checks. You can buy them on the street - $200 for $1000 worth - and cash them in stores. Poston states he wishes Bryden had helped him prepare for cross-examination so he could have explained better. He would have admitted the check fraud he committed and explained the difference. (Exh. 2, ¶ 24.)

During Poston's trial it seemed like everything he said was twisted to make him look bad. He was not lying or trying to fool the jurors like the prosecutor said. Poston shot McNeely in self-defense and he did his best to tell the jury what happened.

But, just as he feared in the beginning, no one believed him and everything he said was unfairly turned around and used against him. Poston remembers during his testimony he asked the prosecutor if she understood African-American vernacular because it sure didn't seem like she did. She didn't seem to understand what he said much at all. (Exh. 2, ¶ 25.)

## II. CORROBORATING EVIDENCE.

Poston's mother, his brother, and his brother's mechanic corroborate his report that there was a bullet hole in the radiator of Bailey's car immediately after the shooting in this case. (Exhs. 6 [Declaration of Leatta Poston], 7 [Declaration of Robert Samuels], and 8 [Declaration of Angel Garcia].)

Leatta Poston states that she is Poston's mother. (Exh. 6, ¶ 1.) A day or two after the charged shooting, Ms. Poston helped Bailey, get her car fixed. Bailey called Ms. Poston because she had to take the kids to school and needed money for the radiator of her car which she said had a bullet hole. That's the first Ms. Poston heard about the shooting. She states that "the kids tried to keep it from me because they knew I would be very upset.." (Exh. 6, ¶ 2.)

Ms. Poston told Bailey she would help her. She said "just tell me how much and I'll give you the money." Bailey called Ms. Poston back a day or two later and told her how much. Ms. Poston remembers the car - a Lexus - and she remembers giving Bailey money, but she does not remember how much she gave her. It was whatever Bailey said it cost to replace the radiator. (Exh. 6, ¶ 3.)

Robert Samuels states that he is Poston's brother. Covin asked Samuels about the radiator of Bailey's car. (Exh. 7, ¶ 1.) After the shooting in this case, Samuels helped Bailey get her car fixed - there was a bullet hole in the radiator and the car was barely drivable. Samuels told Bailey to take the car to his mechanic, Angel, on the corner of 76th Avenue and International Boulevard in Oakland. (Exh. 7, ¶ 2.)

Samuels told Covin about Angel. He did not know Angel's last name. At Covin's request, he went to see Angel to ask if he remembered replacing the radiator. Before Samuels could describe the car, Angel said, "a Lexus, right?" He remembered that the Lexus was green and that he replaced the radiator. (Exh. 7, ¶ 3.)

Samuels told Covin where to find Angel and met her there at her request. Covin asked Angel a few questions and he told her he remembered replacing the radiator on a blue or green Lexus for the lady Samuels sent to him. Angel did not remember that there was a bullet hole in the radiator but Samuels states that he saw it - there was. (Exh. 7, ¶ 4.)

Angel Garcia states that he works at Danny's Auto Repair in Oakland as a mechanic. Samuels has been a customer of his for years.

(Exh. 8, ¶ 1.) Garcia recalls that, a few years ago, a woman brought a green or blue Lexus in to him - she said Robert sent her. When Robert asked Garcia about it recently, Garcia remembered the car. He remembers that he replaced the radiator but he does not remember what was wrong with it. (Exh. 8, ¶ 2.)

## III. THE EXPERT DECLARATIONS.

### A. LINGUISTICS PROFESSOR AND AAVE EXPERT JOHN RICKFORD.

John Rickford is a Professor of Linguistics at Stanford University and an expert on AAVE. (Exh. 9, ¶ 1 [John Rickford Declaration]; Exh. 10 [John Rickford curriculum vitae].) Professor Rickford could have testified at Poston's trial that AAVE is often unfairly considered to be "bad" English when in fact it is a distinct dialect with sophisticated and consistent structures and rules. Professor Rickford explains that discussing these issues was critical in order to neutralize the jurors' unconscious racism and bias against AAVE. (Exh. 9, ¶ 5.)

Professor Rickford could also have testified that alternating use of AAVE and SAE, called "code-switching" or "style-shifting," is normal and desirable. Meticulous linguistic research from the 1950s to the present has documented that every speaker of American English

code-switches—varying qualitatively or quantitatively in their pronunciation, grammar, or word choice—depending on audience and context. (Exh. 9, ¶ 6.)

In particular, it is very common for African-Americans to utilize some degree of code-switching, using more AAVE with other African-Americans and shifting towards SAE with non-African Americans, especially in a formal setting. African-Americans who are not able to code-switch effectively tend to be viewed negatively, not only by non-African-Americans, but also by African-Americans who are more adept at code-switching and, therefore, more successful in mainstream society. (Exh. 9, ¶ 7.)

Many linguists and educators believe all African-American children should be taught to increase their ability to code-switch - to alternate between AAVE and SAE depending on the audience and the setting. Because of the stigma associated with AAVE, ability to switch to SAE may be an important determinant of success in the majority culture. (Exh. 9, ¶ 9.)

At the same time, perceived “over use” of SAE or “talking White” is sometimes perceived as a handicap, or seen as suspicious - an indication of falsity or insincerity. This is a difficult dilemma for

African-American people, who are often acutely conscious of the way they are perceived in the mainstream culture and take pains to communicate in a way that will be understood and well-received by different audiences. (Exh. 9, ¶ 9.)

Professor Rickford emphasizes that it was *essential* for Poston to avoid AAVE as well as profanity and speak in formal SAE in the courtroom. Had he spoken informal AAVE, as he did with his family members and friends, he would almost certainly have been perceived negatively by the jurors and others in the courtroom. Moreover, his testimony might have been incomprehensible and incredible to the jurors. (Exh. 9, ¶¶ 10, 11.)

Professor Rickford could have testified that code-switching to SAE for one's court appearance is similar to defendants (and others) dressing formally for appearances in court. Poston talked with his mother about both forms of shifting. He expressed a need to dress appropriately for court in a suit and tie and also to speak appropriately with "not a single ghetto-Ebonic slur" coming from his mouth. Professor Rickford could have rebutted the prosecutor's allegation in cross examination of Poston that practicing to avoid AAVE was

somehow tantamount to not telling the truth, since “you don’t have to practice the truth….” (Exh. 9, ¶ 12; 19 RT 1624.)

Professor Rickford could have testified at Poston's trial that AAVE is not a code for obfuscation whereby a statement means the opposite of its literal meaning. There were several instances where the prosecutor suggested that Poston's statements in AAVE did mean the opposite of their literal meaning. For instance, the prosecutor suggested that some of Poston's rap lyrics refuted his claim of self-defense: "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life[.]" (Exh. 9, ¶ 13; 19 RT 1640.)

Professor Rickford could have testified that the literal meaning of these lyrics is that Poston is not the type of person who would start a fight without provocation, but that he would defend himself if necessary. Rap lyrics are an artistic, poetic form of expression and should not always be taken literally when they are facially incriminating. But these lyrics are not incriminating at all. Professor Rickford could have testified that it is unlikely speakers conversant in AAVE would interpret these lyrics to mean that Poston wanted to fight or kill anyone. (Exh. 9, ¶ 14.)

Professor Rickford could have rebutted the prosecutor's claim that Poston spoke in an "aggressive" tone in the jail phone calls. He could have explained that the terms "bitch" and "ho" are widely used in rap and hip hop music and everyday conversation among African Americans and others. Neither term necessarily indicates that the woman is a prostitute or that the speaker is a pimp. And neither term necessarily shows aggression. (Exh. 9, ¶¶ 16, 17.)

Professor Rickford could have rebutted the prosecutor's claim that another of Poston's statements in rap lyrics refuted his claim of self-defense and showed a lack of remorse for Mr. Fluker's death: "Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda . . . ." (Exh. 9, ¶ 18; 16 RT 1136; 20 RT 1972.)

Professor Rickford could have explained that the entire writing appears to be braggadocio, a common feature of rap lyrics. . Poston appears to be bragging that he successfully defended himself against McNeely's gun. He laments that he did not mean to kill McNeely but

maybe he should have - then Fluker would still be alive. Professor Rickford could have testified that this passage does not refute Poston's claim of self-defense at all and does not show a lack of remorse for Fluker's death. On the contrary, Poston seems to be expressing sorrow and regret about Fluker. (Exh. 9, ¶ 19.)

Professor Rickford could have rebutted the prosecutor's interpretation of another of Poston's rap lyrics to mean he did not act in self-defense. Poston wrote: "It's all self defense under the proper pretense." (16 RT 1135.) The prosecutor argued that the word "pretense" indicated that Poston's claim of self-defense was false. Professor Rickford could have testified that this is not necessarily so. Rap lyrics are a form of artistic expression and should not necessarily be taken literally. As Poston explained, he was trying to express himself in rhyme. (Exh. 9, ¶ 20.)

Professor Rickford could have rebutted the prosecutor's interpretation of several of Poston's statements in jail phone calls to mean he was fabricating his claim of self-defense. Poston said his lawyer told him "this is in the bag. We got this." (Pros. Exh. 32A at p. 6.) He said: "On self defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity. You

feel me?" (Pros. Exh. 32A at p. 6.) In a July 1, 2013, phone call to his mother, Poston said: "I'm not even trying to say that I wasn't there no more. . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're gonna see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag." (Pros. Exh. 32A at p. 8.)

Professor Rickford could have testified that none of these statements show fabrication. On the contrary the statements express relief and confidence because the law of self-defense apparently encompassed the facts of his case and made him feel optimistic about the outcome. (Exh. 9, ¶¶ 21. 22.)

B. EDUCATION PROFESSOR AND AFRICAN-AMERICAN CULTURE EXPERT ERNEST MORRELL.

Ernest Morrell is a Professor of Education and the Director of the Institute for Urban and Minority Education, at Columbia University Teachers College in New York City. He is an African-American man who grew up in Oakland and is an expert on urban African-African culture. (Exh. 11 [Ernest Morrell Declaration], ¶¶ 1-3; Exh. 12 [Ernest Morrell curriculum vitae].)

Professor Morrell could have rebutted the prosecutor's argument that Poston's possession of a firearm before the shooting and his flight after the shooting showed that he did not act in self-defense, but rather, in retaliation for McNeely's assault and with an intent to engage in mutual combat. Professor Morrell could have testified that it is not uncommon for urban African-American people to arm themselves for self-defense, with no intention to act unlawfully or to harm anyone. And it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police based on their own past experiences and those of their friends and relatives. (Exh. 11, ¶ 5.)

Poston's history and beliefs, as conveyed to Professor Morrell during a telephone interview, were consistent with those of many African-American people the professor has known as well as his own experience and the professional literature. (Exh. 11, ¶ 6.) Poston told Professor Morrell that his experiences with the police growing up were frightening. All his friends and family members knew the police were "brutal" and "no good." His family "shut the door" and avoided police officers as much as possible. (Exh. 11, ¶¶ 7, 8.)

Poston was beaten by police officers several times when he was young and saw other African-American kids being beaten by police officers. Once, he was beaten so badly, he was bleeding all over the street and should have been taken to the hospital but instead he was thrown in jail. No one ever wanted to get caught by the police - they would all run because they did not want to get killed or arrested. (Exh. 11, ¶ 7.)

Poston told Professor Morrell that he and his friends and family members have never believed the police were there to protect and serve them. The police protect and serve residents of Piedmont, Montclair, and Skyline neighborhoods but not African-American people in the flatlands of Oakland. When the police come to African-

American neighborhoods, they kill people or take them to jail. They can't seem to tell the difference between violent criminals and people who just emulate urban, African-American, hip hop culture. (Exh. 11, ¶ 8.)

Poston told Professor Morrell he is still suffering the effects of being shot by an intruder in his bedroom some years ago. He had a bullet in his chest and spent 26 days in the hospital. He is still haunted by that near-death experience. He was determined not to ever let that happen to him again so he started carrying a gun for self-protection. (Exh. 11, ¶ 9.)

Poston told Professor Morrell he remembered during his trial the prosecutor suggested he should have moved out of Oakland. Poston asked Professor Morrell: "Don't they understand? You can't just beam me up Scotty and move out of Oakland. Where am I supposed to go? They asked me why didn't I leave Oakland. I lived in Oakland 35 of my 37 years. I have 3 daughters that live in Oakland. Leave Oakland with what? I don't have a nest egg. I don't have a 401K. I am an artist and I was trying to get my books published." (Exh. 11, ¶ 10.)

Poston told Professor Morrell he remembered the prosecutor suggesting he should have known the gas station on Seminary Drive where the shooting occurred was dangerous and he should have avoided it. Poston explained that every gas station in East Oakland is dangerous. He had been going to this particular gas station in his neighborhood for 20 years. Prosecutors and jurors probably go to gas stations in Montclair and other nice neighborhoods. They have no idea what it is like in East Oakland: "They live in a different world." (Exh. 11, ¶ 11.)

Poston told Professor Morrell he was afraid for his life when he was attacked by Mr. McNeely at the gas station. He had to react quickly. He does not believe in violence and has never been involved in violence before except as a victim. He did the best he could to survive in the situation. He would never have called the police or waited around for them because he "might have gotten shot faster." (Exh. 11, ¶ 12.)

Professor Morrell could have testified that Poston's report is entirely consistent with everything the professor knows about urban African-American culture from his own personal experience and from his professional training and review of the relevant professional

literature. If called as an expert witness, he could have testified that the circumstances of this case - in particular, Poston's possession of a firearm and his flight after the shooting - were not inconsistent with a young, urban African-American man acting in self-defense, rather than in retaliation for an assault or with an intention to engage in mutual combat. (Exh. 11, ¶ 13.)

Nor was Poston's alternating use of AAVE and SAE inconsistent with innocence and honesty. While the prosecutor's arguments may have seemed logical to the predominantly suburban White and Asian jurors who convicted Poston, they were based on inaccurate assumptions and myths about African-American people which Professor Morrell could have refuted. (Exh. 11, ¶ 13.)

## III. THE DECLARATIONS OF COUNSEL.

### A. TRIAL COUNSEL.

David Bryden states he was appointed to represent Poston in superior court. (Exh. 13 [David Bryden Declaration], ¶ 1.) He reports that Poston always maintained he shot McNeely in self-defense after McNeely assaulted him without provocation. It was undisputed that McNeely shot Lionel Fluker by accident while shooting at Poston, who was running away. (Exh. 13, ¶ 2.)

When Bryden saw the surveillance video of the charged shooting, he thought the case may have been resolved favorably, most likely before trial, because it appeared to be a case of self-defense. He made a motion to dismiss the murder and attempted murder charges against Poston pursuant to Penal Code section 995 but the motion was denied. (Exh. 13, ¶ 3; 5 CT 1347, 1371.)

Bryden believes he lost this case in the pretrial motions. First, this was the strongest case for severance he ever saw. He might have had a chance at a favorable verdict if he had not had McNeely's attorney fighting him and attacking Poston every step of the way. Bryden felt like he had two prosecutors working against him - in jury selection, pretrial motions and during trial. The prosecutor just sat back and let the two defense lawyers fight it out. (Exh. 13, ¶ 4.)

Second, Bryden states he lost this case when the trial court denied his pretrial motion to exclude all of Poston's inflammatory statements in jail phone calls and rap lyrics about "pimps," "bitches," and "hos." Bryden objected strenuously to the admission of this irrelevant and inflammatory evidence which portrayed Poston as a bad character who mistreated women. Once Bryden lost that battle, it seemed there was little he could do to counter the prosecutor's oft-

repeated theme that the shooting in this case was a "gun battle" between two armed criminals.. (Exh. 13, ¶ 5.)

Bryden still believed at the end of the trial that the evidence was insufficient because Poston was reasonably defending himself against McNeely's assault. He moved for dismissal pursuant to section 1118.1 but that motion was also denied. (Exh. 13, ¶ 6.)

Although Bryden knew the bad character evidence was devastating to the defense he was shocked when the jury convicted Poston of murder and attempted murder. He could not understand how he had lost. He moved for new trial on the grounds of insufficiency of the evidence and erroneous denial of severance. (Exh. 13, ¶ 7.)

When the new trial motion was denied, Bryden just hoped the Court of Appeal would correct this injustice. When he was contacted by Covin, he told her he would gladly help her however he could. He sent her his files at her request and answered her questions. (Exh. 13, ¶8.)

Covin asked Bryden if he considered objecting to the prosecutor's arguments and questions on cross-examination of Poston which portrayed him as a bad character who engaged in a gun battle -

mutual combat. Bryden states he did consider objecting. He agrees that many of the prosecutor's questions and statements were misleading and unfair. This was not a case of mutual combat. Poston was attacked and responded in self-defense. Regardless of how he talked about women, he had a right to defend himself against McNeely's unprovoked assault. The admission of the evidence and the prosecutor's repeated emphasis of it denied Poston a fair trial in Bryden's opinion. (Exh. 13, ¶ 9.)

Nevertheless, Bryden did not object because he thought it was futile. The trial court had admitted all the prejudicial "bitch" and "ho" evidence over his objection. Bryden did not think it was misconduct for the prosecutor to emphasize evidence admitted by the trial court, no matter how devastating to the defense. And he was certain any objections would be overruled, likely making things appear even worse to the jurors. (Exh. 13, ¶ 10.)

Covin asked Bryden if he considered objecting to the jury instruction on mutual combat in accord with CALCRIM No. 3471. Bryden states he did consider objecting and he reviewed the instruction but he did not see any basis for an objection. Mutual

combat was the prosecution's entire theory of the case. Bryden's section 995 and 1118.1 motions were denied. (Exh. 13, ¶ 11.)

Bryden recalls taking a look at all of the relevant jury instructions both before and during trial. He proposed two special jury instructions pertaining to self-defense and provocative act murder which the trial court refused. (5 CT 1431-1432, 1456-1457.) He did not see anything else objectionable in CALCRIM No. 3471. (Exh. 13, ¶ 11.)

Covin asked Bryden if he was familiar with *People v. Ross* (2007) 155 Cal.App.4th 1033, 1045, in which the Sixth District Court of Appeal defined mutual combat as a "reciprocal exchange of blows . . . *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities."* (*People v. Ross, supra,* 155 Cal.App.4th at p. 1045 [Court's emphasis].) (Exh. 13, ¶ 12.)

The Court of Appeal explained in *Ross* that "preceding the initiation of hostilities" means preceding "the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target." (*Id.* at p. 1045, fn. 14.) CALCRIM No. 3471 as given in this case defines "mutual combat" as a fight which "began or continued by mutual consent or agreement . . . before the claim to

self-defense arose" - a less specific and less favorable standard to Poston on the facts of this case. (Exh. 13, ¶ 12.)

Bryden read *Ross* when Covin inquired about it. He does not believe he read it before or during Poston's trial - he does not recall seeing this additional language requiring agreement or intent to fight *before the first assaultive conduct*. In asking for Bryden's recollections regarding the mutual combat instruction, Covin provided him with the print-out of CALCRIM No. 3471 which she found in his file. (Exh. 14.) It does cite *Ross* for the definition of "mutual combat" but does not quote the "first assaultive conduct" language. Bryden vaguely remembers seeing that citation but he does not recall actually reading *Ross* and he probably did not read it. (Exh. 13, ¶ 13.)

Bryden states that, if he had seen the language in *Ross* regarding "the first assaultive conduct," he would have objected to CALCRIM No. 3471 and/or he would have requested modification. Modification pursuant to *Ross* would have strongly supported Poston's defense and it would have cut off the prosecutor's argument that it was mutual combat because Poston fired the first shot even though McNeely committed the first assault. Poston did not have a duty to

retreat and he was entitled to defend himself but CALCRIM No. 3471 supported the prosecutor's argument to the contrary. (Exh. 13, ¶ 14.)

Covin asked Bryden if he considered presenting expert testimony to counter the prosecutor's arguments and insinuations about Poston's use of AAVE in jail phone calls, letters, and rap lyrics. Bryden states that it never occurred to him that he could or should present such an expert. (Exh. 13, ¶ 15.)

Bryden has represented numerous African-American defendants and he is somewhat familiar with AAVE. He is also aware that many African American people speak SAE as well as AAVE. Bryden did believe that the prosecutor's interpretation of some of Poston's statements in AAVE was incorrect and he tried to present a different, innocent interpretation in his redirect examination of Poston and his closing argument. It simply did not occur to Bryden that he needed an expert or that there was an expert who could provide any admissible, favorable testimony. (Exh. 13, ¶ 16.)

Nor did it occur to Bryden that he could or should present expert testimony on African-American culture with regard to the police and the court system. Bryden is aware that criminal defense lawyers have occasionally presented a cultural defense explaining the

defendant's perspective as a member of a minority group. He is aware that many African American people in Oakland and elsewhere distrust the police and the court system. (Exh. 13, ¶ 17.)

But it never occurred to Bryden that Poston's possession of a loaded firearm and flight after the shooting could not properly be argued by the prosecutor as consciousness of guilt. Bryden has seen this argument made by numerous prosecutors as to defendants of various races. It never occurred to him that he could or should object, present evidence to counter the argument, or argue that, among African American people, firearm possession and flight do not show consciousness of guilt because of distrust of the police and court system. (Exh. 13, ¶ 18.)

Bryden states he thought he had done all he could to defend Poston in the face of critical, adverse rulings from the trial court. He certainly tried to give Poston a vigorous defense. Bryden always represents his clients to the best of his ability. He was even more passionate than usual in his defense of Poston because it seemed so clear that Poston was not guilty of murder and attempted murder. (Exh. 13, ¶ 18.)

Bryden states he would have done anything he legally and ethically could to persuade the trial court and/or the jurors that this was a case of complete self-defense and not mutual combat. Unfortunately, he did not think of presenting expert rebuttal testimony or challenging the mutual combat instruction. He did think about objecting to the prosecutor's unfair questions and comments but he decided that objection was futile and would only make things worse given the trial court's adverse rulings. (Exh. 13, ¶ 19.)

Bryden reviewed the two expert declarations obtained by Covin. He states it is possible that the trial court would have admitted at least some of the proposed testimony described by Professor Rickford and Professor Morrell - two apparently well-qualified experts in their fields. It is possible that the proposed expert testimony would have swayed at least one juror at least to the point of harboring a reasonable doubt as to Poston's guilt. It is possible that some or all of the jurors, almost all of whom were White or Asian and from the suburbs, would have benefitted from the proposed expert testimony, refuting the incorrect assumptions about African-American people and AAVE put forth by the prosecution. (Exh. 13, ¶ 20.)

B. APPELLATE COUNSEL.

Covin states she was appointed to represent Poston on appeal. (Exhibit 15 [Declaration of Randi Covin], ¶ 1.) She diligently investigated the case but experienced numerous unavoidable delays, as explained in her declaration. She filed the instant petition as soon as she possibly could. (Exh. 15, ¶¶ 7-41.)

Covin first called Bryden on August 25, 2016, shortly after filing Poston's opening brief on appeal. (Exh. 15, ¶ 1, 7.) Bryden told Covin that he was shocked at the verdict in this case and still feels terrible about it. All along, he felt confident it was a clear-cut case of self-defense. He told Covin he does not understand how the jury could have convicted Poston of murder and attempted murder. (Exh. 15, ¶ 7.) Bryden said he must have done something wrong to lose a slam dunk self-defense case like this one - he does not know what went wrong. (Exh. 15, ¶ 9.)

Covin asked Poston if Bryden gave him a copy of the transcription of the jail calls. When he said no, she sent him a copy and asked him to review it as well as the rap lyrics quoted by the prosecutor. (Exh. 15, ¶ 16.)

Covin asked Poston what he meant by "it's all self-defense under the proper pretense" - specifically, whether he understood that "pretense" means a false claim. Poston responded that "pretense" does not necessarily mean false. He said he looked it up in his dictionary, which he uses to help with his writing, along with a thesaurus. Covin asked Poston to copy that page of the dictionary and bring it to their meeting at High Desert State Prison. (Exh. 15, ¶ 17.)

In her last phone call with Poston before her visit, Covin asked Poston to bring any notes or lists he had with him to their meeting. Poston came to the meeting with a big folder full of legal papers, including the appellate briefs, Covin's letters, and his notes and materials from trial. Among Poston's papers was a copy of his dictionary's definition of "pretense." (Exh. 15, ¶ 20; Exh. 4.)

Poston also showed Covin an early draft of the same rap lyric showing that he had started with "[i]t's all self-defense under the correct pretext." He had crossed out "correct" and written in "proper." (Exh. 15, ¶ 21; Exh. 5.) Poston told Covin about his legal research at the Santa Rita jail. He looked through his folder and pulled out several packets of legal research, including one on self-defense. (Exh. 15, ¶ 22; Exh. 3.)

Poston told Covin to ask his mother about the radiator of Bailey's car. He said his mother had paid $300 or $400 to have the radiator fixed. He said he had tried to tell Bryden about the radiator but Bryden did not seem interested. (Exh. 15, ¶ 23.)

In a phone call on July 8, 2016, Covin asked Bryden about his preparation of Poston to testify. Bryden said he did not recall how much time he spent or how many times he visited Poston at the jail - probably a couple of times. He told Covin he never had the jail phone calls transcribed and never saw a transcription before trial so Poston is correct that he, Bryden, did not give the transcription to Poston. Nor did he listen to the recordings with Poston. (Exh. 15, ¶ 24.)

Bryden told Covin he talked to Poston generally about the jail phone calls when he made the motion to suppress. He probably gave Poston a copy of the motion. He does not recall ever talking to Poston about the jail phone calls in preparation for his testimony or in any detail. He does not recall talking to Poston about pimping and prostitution. (Exh. 15, ¶ 25.)

Bryden told Covin he did not spend a lot of time preparing Poston for his testimony because he did not seem to need it. Poston

seemed sophisticated and well-spoken. Bailey was the one who really needed a lot of help preparing. (Exh. 15, ¶ 26.)

Bryden told Covin he did not discover any corroborating evidence of the bullet hole in Bailey's radiator. He does not recall asking Bailey or Poston's family about it. He does recall that his investigator, Walt Stannard, mentioned something about it after watching the surveillance video and that Poston brought it up a couple of times. All Bryden can recall about the radiator is that the car was gone - they tried and could not locate it. (Exh. 15, ¶ 27.)

Covin spoke with Poston's mother and brother about Bailey's radiator and got their declarations, Exhibits 2 and 3. On July 12, 2016, Covin met Samuels at the intersection of International Boulevard and 76th Avenue in Oakland - the auto repair shop where Samuels said he sent Bailey to get her radiator repaired. (Exh. 15, ¶ 28.)

A mechanic at the shop identified himself to Covin as Angel Garcia. Garcia said that Samuels had been a customer of his for years. Several years ago a woman brought in a blue or green Lexus and told Garcia that Robert sent her. Garcia told Covin he replaced the radiator on the Lexus. (Exh. 15, ¶ 29.)

In June 2016, Covin heard news reports that Oakland Police Lieutenant Tony Jones was placed on leave after Sergeant Mike Gantt filed a complaint stating that Jones sent him racist text messages. (Exh. 15, ¶ 38; Exh. 16; Exh. 17.) According to news reports, the Oakland Police Department's Internal Affairs Unit is investigating the allegations. Both Lieutenant Jones and Sergeant Gantt are African-American. The text messages reportedly used "racially charged" language and joked about Klansmen, suggesting a bias against African-American people. (Exh. 15, ¶ 38; Exh. 16; Exh. 17.)

Both Lieutenant Jones and Sergeant Gantt testified at Poston's trial. Officer Gantt has also been under investigation for having his girlfriend prepare his police reports. On June 24, 2016, Covin received a letter by e-mail from Bryden's office, which Bryden had received from Alameda County District Attorney Nancy O'Malley, disclosing information about the investigation of Sergeant Gantt. (Exh. 18.) On July 5, 2016, Covin wrote to O'Malley, requesting similar disclosure regarding Lieutenant Jones. (Exh. 19.) Covin did not receive any response from O'Malley. (Exh. 15, ¶ 39.)

In searching online for information about Lieutenant Jones and the racist text messages, Covin discovered a Police Beat webpage

indicating that the Oakland Police Department has settled two lawsuits involving Lieutenant Jones, most recently in 2005. (Exh. 15, ¶ 40; Exh. 20.) Covin searched Bryden's files and did not find any discovery or other information pertaining to Lieutenant Jones, racist text messages, or settled lawsuits. (Exh. 15, ¶ 40.)

On August 5, 2016, Covin sent an e-mail to Bryden, asking if he had ever received any disclosure of impeachment evidence pertaining to Lieutenant Jones - specifically the racist text messages and settled lawsuits. Bryden responded that he had not received any such disclosure. (Exh. 15, ¶ 40.)

* * * * * *

## ARGUMENT

### I. TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argues on appeal that the prosecutor committed pervasive, prejudicial misconduct in her cross-examination of Poston and her closing argument. (AOB 109-129.) In addition, trial counsel's failure to object denied Poston the effective assistance of counsel. (U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

#### A. TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT WAS INEFFECTIVE ASSISTANCE.

The Sixth Amendment to the United States Constitution and Article I, section 15, of the California Constitution guarantee a criminal defendant the right to the effective assistance of counsel. To show denial of the right, a defendant must demonstrate that the attorney's performance failed to meet the standard expected of reasonably competent attorneys, and also that the attorney's performance resulted in prejudice to the defendant's case. (*Strickland v. Washington* (1984) 466 U.S. 668, 686.)

Unreasonable failure to object to prosecutorial misconduct constitutes ineffective assistance. (*People v. Centeno* (2014) 60 Cal.4th 659, 674-677.) Where the record contains no explanation for trial counsel's failure to object, a claim of ineffective assistance is more appropriately presented in a petition for writ of habeas so that counsel can be given an opportunity to explain. (*People v. Mendoza-Tello* (1997) 15 Cal.4th 264, 266.)

Bryden explains that he considered objecting to the prosecutor's many unfair and misleading statements and questions. (Exh. 13, ¶ 9.) He decided not to object because he thought it was futile. The trial court had admitted all the prejudicial "bitch" and "ho" evidence over his objection. Bryden did not think it was misconduct for the prosecutor to emphasize evidence admitted by the trial court, no matter how devastating to the defense. And he was certain any objections would be overruled, likely making things appear even worse to the jurors. (Exh. 13, ¶ 10.)

Of course, Bryden could have objected at sidebar or during any of the many hearings outside the jury's presence. He could have protested that the prosecutor was going way beyond the main asserted purpose for the character evidence - to try to show that Poston

controlled Bailey's testimony as her pimp. (8 RT 396-400.) Poston had already been impeached with multiple prior convictions involving moral turpitude. (18 RT 1516-1520.) The prosecutor's argument that the "pimp," "bitch," and "ho" evidence was also admissible to show Poston's "illegitimate lifestyle," state of mind, and the absence of self-defense was specious. (18 RT 1875.)

Poston believes the trial court abused its discretion in admitting the "pimp," "bitch," and "ho" evidence. But the prosecutor's repeated emphasis on the bad character evidence was unconstitutional even if some limited evidence was admissible to impeach Poston's and/or Bailey's credibility.

Similarly, the prosecutor's repeated emphasis of her "gun-battle" theme, complete with accusations that Poston did not care about the safety of innocent bystanders, was objectionable even if the gun-battle theme had been supported by the evidence. But the gun-battle theme was not supported, as Bryden would have discovered if he had read *People v. Ross*, *supra*, 155 Cal.App.4th at p. 1045, cited in the notes to CALCRIM No. 3471. (See also Argument II, *post*.)

Some objections may have been futile, as Bryden believed. But the trial court may well have sustained an objection that the

prosecutor's pervasive emphasis on bad character evidence went beyond any permissible use. (See *People v. Cowan* (2010) 50 Cal.4th 401, 476 [denial of a pretrial motion to exclude evidence does not necessarily make further objection futile]; compare *People v. Price* (1991) 1 Cal.4th 324, 386 [counsel does not render ineffective assistance by failing to make motions or objections that counsel *reasonably* determines would be futile].)

And the trial court may well have sustained objections to the prosecutor's unfair and misleading statements and questions relating to AAVE, consciousness of guilt, and mutual combat. Any reasonably competent criminal defense attorney would have realized that the prosecutor's improper questions and arguments exceeded the scope of the trial court's pretrial rulings and would have objected.

B. TRIAL COUNSEL'S DEFICIENT PERFORMANCE REQUIRES REVERSAL.

Defense counsel's failure to object to pervasive prosecutorial misconduct requires reversal of the judgment. Under *Strickland,* prejudice is demonstrated where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re*

*Sixto* (1989) 48 Cal.3d 1247, 1257, citing *Strickland*, *supra*, 466 U.S. at p. 694; see also *People v. Howard* (1987) 190 Cal.App.3d 41, 48 ["*Strickland* requires a significant but something-less-than-50 percent likelihood of a more favorable verdict"]; cf. *People v. Soojian* (2010) 190 Cal.App.4th 491, 521 [prejudice is shown under state law standard if a single juror would likely have had a reasonable doubt because "a hung jury is a more favorable result than a guilty verdict"].)

Here, there is a reasonable chance of a more favorable outcome had trial counsel objected. The surveillance videos and Poston's testimony should have been dispositive - no rational trier of fact could have found proof beyond a reasonable doubt that Poston did not act reasonably in self-defense. But the prosecutor persuaded the jury to convict Poston by appealing to their emotions, attacking Poston's character, and misleading them in several crucial respects.

The pervasive misconduct rendered Poston's trial fundamentally unfair in violation of due process, as explained on appeal. (AOB 129.) Trial counsel's failure to object undermines confidence in the judgment and requires reversal.

## II. TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argues on appeal that the trial court erred in instructing on mutual combat without sufficient evidence, violating Poston's constitutional rights to jury trial, to due process, and to present a defense. (AOB 93-100.) In addition, trial counsel's failure to object or request modification of the standard instruction denied Poston the effective assistance of counsel. (U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

### A. FACTUAL BACKGROUND.

The trial court instructed generally on self-defense in accord with CALJIC No. 5.30 and CALCRIM No. 505. (6 CT 1467.52, 1467.57-1467.60; 20 RT 2000-2005.) The court also instructed on mutual combat as a limitation on self-defense in accord with CALCRIM No. 3471 as follows:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
>
> 1. He actually and in good faith tried to stop fighting;
>
> 2. He indicated, by word or conduct, to his opponent, in a way

that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

(6 CT 1467.53-1467.54; 20 RT 2001-2002.)

B. TRIAL COUNSEL'S FAILURE TO OBJECT OR REQUEST MODIFICATION OF THE MUTUAL COMBAT INSTRUCTION WAS INEFFECTIVE ASSISTANCE.

A trial lawyer's unreasonable failure to object or request modification of an incorrect, incomplete, or inapplicable instruction constitutes ineffective assistance of counsel. (*Luchenburg v. Smith* (4th Cir. 1996) 79 F.3d 388, 392-393; *United States v. Span* (9th Cir. 1996) 75 F.3d 1383, 1387-1389.)

Bryden acknowledges that he did not read *Ross* and did not know the mutual combat exception to self-defense applies only if there is proof beyond a reasonable doubt that the defendant intended or agreed to fight before the first assaultive conduct occurred. (Exh. 13, ¶¶ 11-14; *Ross*, 155 Cal.App.4th at 1045, fn. 14.) He acknowledges that he would have objected to CALCRIM No. 3471 and/or requested modification to include the "first assaultive conduct" language if he had read *Ross*. (Exh. 13, ¶ 14.) As Bryden explains, modification "would have cut off the prosecutor's argument that it was mutual combat because Poston fired the first shot even though McNeely committed the first assault." (Exh. 13, ¶ 15.)

Poston's primary defense was self-defense and the prosecutor's pervasive response was "mutual combat." Bryden saw the citation to *Ross* for the definition of "mutual combat." (Exh. 13, ¶ 13.) Any reasonably competent criminal defense lawyer would have read *Ross* instead of relying entirely on the CALCRIM notes on the most critical issue in the case. Bryden's failure to do so denied Poston the effective assistance of counsel.

## C. TRIAL COUNSEL'S DEFICIENT PERFORMANCE REQUIRES REVERSAL.

Bryden's failure to object to CALCRIM No. 3471 as unsupported or to request modification with the "first assaultive conduct" language of *Ross* undermines confidence in the judgment and requires reversal. (See *Strickland*, 466 U.S. at 694; *Sixto*, 48 Cal.3d at 1257; *Howard*, 190 Cal.App.3d at 48; cf. *Soojian*, 190 Cal.App.4th at 521.)

It was undisputed that McNeely committed the first assaultive conduct. The prosecutor argued pervasively that Poston was not entitled to claim self-defense because he engaged in mutual combat - a gun battle. Had Bryden objected to CALCRIM No. 3471 or requested modification pursuant to *Ross*, there is a reasonable chance of a more favorable outcome - a reasonable chance that at least one juror would have had a reasonable doubt. Bryden's failure to do so undermines confidence in the judgment and requires reversal.

* * * * * *

## III. TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Bryden's failure to adequately prepare Poston to testify and failure to adequately rehabilitate him on redirect examination denied Poston the effective assistance of counsel. (U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington*, *supra*, 466 U.S. 668.)

A trial lawyer's unreasonable failure to adequately prepare a defense witness to testify constitutes ineffective assistance of counsel. (*Bemore v. Chappell* (9th Cir, 2015) 788 F.3d 1151, 1163-1166; *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 889-890.) Bryden's mishandling of Poston's testimony was unreasonable.

Bryden told Poston he had to testify, but admittedly did not spend much time preparing him because he thought he was sophisticated and well-spoken and did not need help. (Exh. 2, ¶ 18; Exh. 13, ¶ 26.)

Bryden knew the bad character evidence in the jail phone calls and rap lyrics was "devastating to the defense." (Exh. 13, ¶ 7.) Yet he never had a transcription made; never listened to the calls with

Poston; never discussed the calls in detail with Poston; and never counseled him as to how to respond to questions on cross-examination about the calls and rap lyrics. (Exh. 2, ¶¶ 16, 19, 21.)

Nor did Bryden give Poston a copy of his letter from the jail, provided in discovery, which was used during cross-examination to impeach Poston. (19 RT 1633.) Nor did Bryden counsel Poston as to how to respond to questions about his prior convictions or apparently incriminating items seized from Poston's house. (Exh. 2, ¶ 24.)

As a result of Bryden's complete abdication of his duty to prepare Poston to testify, both the prosecutor and McNeely's attorney were able to unfairly portray Poston as a liar, as well as a pimp and a thug. (Cf. *Bemore v. Chappell, supra*, 788 F.3d at p. 1165 [by failing to investigate alibi defense and prepare alibi witness, defense counsel "essentially abdicated his role as a lawyer"].)

Had Poston been properly prepared, he could have explained why he did not consider himself a pimp; why he used the word "pretense" in his rap about self-defense; why he talked to his family about the legal rules pertaining to self-defense; and why he denied knowledge of the indicia of credit card fraud in his house, though he was previously convicted of check fraud.

Had Bryden discussed these issues, Poston's testimony on cross-examination would likely have been more coherent and believable. Bryden could also have addressed the issues on redirect, if necessary, neutralizing the unfair attacks on Poston's credibility by the prosecutor and McNeely's counsel.

Poston's credibility was critical, despite the seemingly dispositive surveillance video, because the prosecutor's whole theory of the case was that Poston was a bad character looking for a fight who was not entitled to defend himself. Had Bryden adequately prepared Poston and/or rehabilitated him on redirect, at least one juror might well have had a reasonable doubt as to his guilt. (See *Strickland*, 466 U.S. at 694; *Sixto*, 48 Cal.3d at 1257; *Howard*, 190 Cal.App.3d at 48; cf. *Soojian*, 190 Cal.App.4th at 521.) Bryden's unreasonable failure to do so undermines confidence in the judgment and requires reversal.

* * * * * *

## IV. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Bryden's failure to investigate and present corroborating evidence denied petitioner the effective assistance of counsel. (U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668.)

A trial lawyer's unreasonable failure to investigate and present corroborating evidence on a disputed point constitutes ineffective assistance of counsel. (*In re Thomas* (2006) 37 Cal.4th 1249, 1261-1265; *Bemore v. Chappell, supra,* 788 F.3d at pp. 1162-1165; *Riley v. Payne* (9th Cir. 2003) 352 F.3d 1313, 1317-1319; see also *Strickland v. Washington, supra*, 466 U.S. at p. 691 ["counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"].)

Here, Bryden failed to adequately investigate and present evidence corroborating Poston's testimony, almost all of which was disputed. Had Bryden just discussed Poston's jail calls and rap lyrics with him, he would have discovered and could have presented the self-defense packet Poston received from the law librarian at the jail. Poston's handwritten comments on the self-defense packet would have

strongly supported his testimony that he did not fabricate the circumstances of his case to fit the legal rules; rather, he was happy and relieved to find that the law of self-defense fit his case. (Exh. 2, ¶¶ 9-10; Exh. 3; Exh. 15, ¶ 22.)

For instance, Poston noted on the self-defense packet that he could prove his fear of McNeely was reasonable. He commented that it was "important" that there is no duty to retreat and that even a felon can use a firearm in self-defense, though he is prohibited from possessing it. (Exh. 3, pp. xxxxxx.) None of Poston's notes on the self-defense packet are incriminating, so as to preclude their use to support his testimony. (19 RT 1643, 1757.)

Bryden would also have discovered that Poston's dictionary included two alternative definitions of "pretense" which were neutral - they did not indicate falsity. (Exh. 4.) The dictionary page and the earlier draft of the rap lyric stating, "[i]t's all self-defense under the correct pretext," could have corroborated Poston's testimony that he was trying to write rhyming lyrics and did not mean to indicate a false claim. (Exhs. 4, 5; 16 RT 1135-1136.)

If Bryden had adequately investigated, even after Poston's cross-examination, he could have presented the testimony of Poston's

mother and brother and his brother's mechanic to corroborate Poston's testimony that there was a bullet hole in Bailey's car right after the charged shooting. (Exhs. 6, 7, 8, 15, ¶ 22; 19 RT 1738-1740.) Had Bryden presented the corroborating evidence, he could have countered McNeely's insinuations during cross-examination, cutting off McNeely's argument that Poston's testimony about the radiator was another example of him lying. (20 RT 1907, 1918.)

The prosecutor and McNeely's counsel unfairly used Poston's out-of-court statements about the law of self-defense, his rap lyrics, and his testimony about Bailey's radiator to portray him as a liar who should not be believed. Bryden should have investigated and countered these attacks on Poston's credibility with readily available corroborating evidence. His failure to do so denied Poston the effective assistance of counsel.

Had Bryden investigated and presented the corroborating evidence there is a reasonable probability that at least one juror would have had a reasonable doubt as to Poston's guilt. (See *Strickland*, 466 U.S. at 694; *Sixto*, 48 Cal.3d at 1257; *Howard*, 190 Cal.App.3d at 48; cf. *Soojian*, 190 Cal.App.4th at 521.) Bryden's unreasonable failure to do so undermines confidence in the judgment and requires reversal.

## V. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Bryden's failure to investigate and present expert testimony on AAVE denied petitioner the effective assistance of counsel. (U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668.)

A trial attorney's unreasonable failure to investigate and present available, favorable expert testimony constitutes ineffective assistance of counsel. (*Bell v. Miller* (2d Cir. 2007) 500 F.3d 149, 155-157; *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 891-893; *Bloom v. Calderon* (9th Cir. 1997) 132 F.3d 1267.)

At least one court has admitted testimony on the meaning of words in AAVE. (*United States v. Williams* (7th Cir. 2000) ___ F.3d ___, 2000 U.S. App. LEXIS 168 [AAVE expert testified at sentencing that words spoken in a recorded conversation did not necessarily relate to criminal activity; they might have had an innocent meaning]; see also *People v. Wright* (2004) ___ Cal.App.4th ___, 2004 Cal. App. Unpub. LEXIS 2430, at pp. 15-18 [expert properly testified regarding the meaning of rap lyrics]; *People v. Estrada* (2002) ___

Cal.App.4th ___, 2002 Cal. App. Unpub. LEXIS 7787, at pp. 12-14 [same]; *United States v. Herron* (E.D.N.Y. 2014) ___ F.Supp.2d ___, 2014 U.S. Dist. LEXIS 63872, at pp. 16-26 [same]; *BMS Entertainment/Heat Music, LLC v. Bridges* (S.D.N.Y. 2005) ___ F.Supp.2d ___, 2005 U.S. Dist. LEXIS 13491 [expert declarations regarding the originality of rap lyrics was admitted on motion for summary judgment in a copyright infringement action]; see also *United States v. Are* (7th Cir. 2009) 590 F.3d 499, 502 [expert testimony is routinely admitted to translate "code words"].)

Professor Rickford's testimony would have been admissible to interpret Poston's statements in AAVE. Indeed, Lieutenant Jones testified as to the meaning of some of Poston's statements in AAVE. (19 RT 1799-1828.)

Bryden acknowledges that at least some of Professor Rickford's testimony might have been admitted; that Professor Rickford appears to be a well-qualified expert; that Professor Rickford's proposed expert testimony might have swayed at least one juror at least to the point of harboring a reasonable doubt as to Poston's guilt; and that some or all of the jurors, almost all of whom were white or Asian and from the suburbs, might have benefitted from the proposed expert

testimony, refuting the incorrect assumptions about AAVE put forth by the prosecution. (Exh. 13, ¶ 20.)

Bryden claims no tactical reason for failing to investigate possible expert testimony on AAVE. (Exh. 13, ¶ 15.) He has represented numerous African-American defendants and he is somewhat familiar with AAVE. He is also aware that many African American people speak SAE as well as AAVE. (Exh. 13, ¶ 16.)

Bryden did believe that the prosecutor's interpretation of some of Poston's statements in AAVE was incorrect and he tried to present a different, innocent interpretation in his redirect examination of Poston and his closing argument. It simply did not occur to Bryden that he needed an expert or that there was an expert who could provide any admissible, favorable testimony. (Exh. 13, ¶ 16.)

A Google search for "African American Vernacular" turns up Professor Rickford's webpage - the second entry: https://www.google.com/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#q=african%20american%20vernacular; http://www.johnrickford.com/.

Professor Rickford is a nationally recognized expert on AAVE who teaches at Stanford University and has a special interest in AAVE in the courts. (Exh. 9, ¶¶ 1-2, 8-12; Exh. 10.) He could have testified that most of Poston's statements and rap lyrics are not incriminating at all. The one that is arguably facially incriminating - "it's all self-defense under the proper pretense" - should not be interpreted literally because rap lyrics are a form of artistic expression and Poston may have just been trying to use rhymes. (Exh. 9, ¶¶ 13-22.)

Professor Rickford could have testified that it was normal, desirable and even essential for Poston to practice speaking in SAE for his testimony. Had he testified in AAVE with profanity he would almost certainly have been negatively judged and disbelieved. His testimony might even have been incomprehensible to the jurors. (Exh. 9, ¶¶ 10-12.)

Professor Rickford could have testified that virtually all English speakers code-switch - they change their language and sentence structure depending on audience and context. (Exh. 9, ¶¶ 6-7.) Code-switching does not indicate dishonesty. (Exh. 9, ¶¶ 7-12.) Nor does AAVE indicate dishonesty, criminality, or "bad" English, though non-

African Americans and even some African-Americans view it negatively. (Exh. 9, ¶¶ 5, 9.) Professor Rickford states it was "critical" to discuss these issues pertaining to AAVE and SAE in order to neutralize the jurors' unconscious racism and bias against AAVE. (Exh. 9, ¶ 5.)

Any reasonably competent criminal defense lawyer would have concluded that the prosecutor's heavy reliance on incorrect interpretations of the defendant's statements in AAVE, bolstered by a police expert, with an almost all suburban, White and Asian jury, at least warranted investigation into the possible availability of a rebuttal expert. Had Bryden investigated even minimally, he would have found Professor Rickford.

There is a reasonable probability of a more favorable outcome had Bryden investigated and presented expert testimony to counter the unfair and misleading interpretations of Poston's statements put forth by the prosecutor and McNeely's counsel. At least one juror would likely have had a reasonable doubt as to Poston's guilt. (See *Strickland*, 466 U.S. at 694; *Sixto*, 48 Cal.3d at 1257; *Howard*, 190 Cal.App.3d at 48; cf. *Soojian*, 190 Cal.App.4th at 521.) Bryden's

failure to do so undermines confidence in the judgment and requires reversal.

* * * * * *

## VI. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Bryden's failure to investigate and present expert testimony on African-American culture denied petitioner the effective assistance of counsel. (U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra*, 466 U.S. 668.)

As explained, *ante*, a trial attorney's unreasonable failure to investigate and present available, favorable expert testimony constitutes ineffective assistance of counsel. (*Bell v. Miller, supra*, 500 F.3d at pp. 155-157; *Alcala v. Woodford, supra*, 334 F.3d at pp. 891-893; *Bloom v. Calderon, supra*, 132 F.3d 1267.)

California courts have long admitted expert testimony "to explain to lay jurors conduct that may appear counterintuitive in the absence of such insight." (*People v. Ward* (2005) 36 Cal.4th 186, 211.) In *Ward*, the Supreme Court held that expert testimony was admissible to explain that witnesses to gang crimes "are often reluctant to identify or testify against gang members out of fear for their safety." (*Ibid.*) Without such testimony, the jurors might assume that a witness's initial failure to identify a suspect indicates a lack of credibility. (*People v. Ward, supra*, 36 Cal.4th at p. 211; see

also *People v. Gardelay* (1996) 14 Cal.4th 605, 617 [expert testimony regarding the "culture and habits of criminal street gangs" is admissible under Evid. Code, § 801.)

California courts have long admitted expert testimony to explain the sometimes counterintuitive behavior of abuse victims as well. (See *People v. Riggs* (2008) 44 Cal.4th 248, 293-294 [battered women]; *People v. Brown* (2004) 33 Cal.4th 892, 904-906 [domestic violence victims]; *People v. Humphrey* (1996) 13 Cal.4th 1073 [battered women]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 242-243 [rape victims]; *People v. Bowker* (1988) 203 Cal.App.3d 385, 392-294 [sexually abused children]; see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1302 [parents of sexually abused children]; *People v. Day* (1992) 2 Cal.App.4th 405, 415-417 [trial counsel was ineffective for failing to present expert testimony regarding battered woman syndrome].)

California courts have also admitted expert testimony regarding the perceptions of witnesses and defendants. (See, e.g., *People v. McDonald* (1984) 37 Cal.3d 351, 361 [expert testimony on psychological factors which affect the reliability of eyewitness identification is admissible to educate the jury]; *People v. Vu* (1991)

227 Cal.App.3d 810, 814-815 [expert testimony on the effects of stress on perception was admissible to explain defendant's honest but unreasonable perception of a threat to his life].)

Other types of evidence may rebut an asserted inference of consciousness of guilt. (See *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1204-1205 [mental illness]; *People v. Wiidanen* (2011) 201 Cal.App.4th 526, 1204-1205 [intoxication].)

Expert testimony is admissible even if the jurors might have some knowledge of the subject matter. The Supreme Court explained in *McAlpin*: "The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, [Evidence Code section 801] declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only one it would add nothing at all to the jury's common fund of information, i.e., when the 'the subject of inquiry is one of such common knowledge that men of ordinary education reach a conclusion as intelligently as the witness.'" (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300, quoting *People v. McDonald*, *supra*, 37 Cal.3d at p. 367.)

As with Professor Rickford, Bryden acknowledges that at least some of Professor Morrell's testimony might have been admitted; that Professor Morrell appears to be a well-qualified expert; that Professor Morrell's proposed expert testimony might have swayed at least one juror at least to the point of harboring a reasonable doubt as to Poston's guilt; and that some or all of the jurors, almost all of whom were white or Asian and from the suburbs, might have benefitted from the proposed expert testimony, refuting the incorrect assumptions about African-American people put forth by the prosecution. (Exh. 13, ¶ 20.)

Again, Bryden does not claim a tactical reason for his omission. Bryden is aware that criminal defense lawyers have occasionally presented a cultural defense explaining the defendant's perspective as a member of a minority group. He is aware that many African American people in Oakland and elsewhere distrust the police and the court system. (Exh. 13, ¶ 17.)

But it never occurred to Bryden that Poston's possession of a loaded firearm and flight after the shooting could not properly be argued by the prosecutor as consciousness of guilt. Bryden has seen this argument made by numerous prosecutors as to defendants of

various races. It never occurred to him that he could or should object, present evidence to counter the argument, or argue that, among African American people, firearm possession and flight do not show consciousness of guilt because of distrust of the police and court system. (Exh. 13, ¶ 18.)

While Professor Morrell was more difficult to find than Dr. Rickford, numerous other local experts on African-American culture confirmed Covin's suppositions about African-Americans' distrust of the police and courts. They all agreed with Covin that possession of a firearm and flight from the police does not indicate consciousness of guilt among African-Americans. Professor Morrell was the first expert Covin found who was willing to work on a court case, but every step of her investigation encouraged her to continue and led her to Professor Morrell. (Exh., 15, ¶¶ 7, 10.)

Had Bryden investigated, Professor Morrell could have refuted the prosecutor's argument that Poston's possession of a firearm before the shooting and his flight after the shooting showed that he did not act in self-defense, but rather, in retaliation for McNeely's assault and with an intent to engage in mutual combat. Professor Morrell could have testified that it is not uncommon for urban African-American

people to arm themselves for self-defense, with no intention to act unlawfully or to harm anyone. And it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police based on their own past experiences and those of their friends and relatives. (Exh. 11, ¶ 5.)

Poston's history and beliefs, as conveyed to Professor Morrell during a telephone interview, were consistent with those of many African-American people the professor has known as well as his own experience and the professional literature. (Exh. 11, ¶ 6.) If called as an expert witness, Professor Morrell could have testified that the circumstances of this case - in particular, Poston's possession of a firearm and his flight after the shooting - were not inconsistent with a young, urban African-American man acting in self-defense, rather than in retaliation for an assault or with an intention to engage in mutual combat. (Exh. 11, ¶ 13.)

Nor was Poston's alternating use of AAVE and SAE inconsistent with innocence and honesty. While the prosecutor's arguments may have seemed logical to the predominantly suburban white and Asian jurors who convicted Poston, they were based on

inaccurate assumptions and myths about African-American people which Professor Morrell could have refuted. (Exh. 11, ¶ 13.)

Bryden knew that many African American people in Oakland and elsewhere distrust the police and the court system and he knew that criminal defense lawyers have occasionally presented a cultural defense explaining the defendant's perspective as a member of a minority group. (Exh. 13, ¶ 17.) His failure to investigate and present expert testimony refuting the prosecutor's arguments about consciousness of guilt denied Poston the effective assistance of counsel.

There is a reasonable probability of a more favorable outcome had Bryden investigated and presented expert testimony to counter the unfair and misleading inferences urged by the prosecutor. At least one juror would likely have had a reasonable doubt as to Poston's guilt. (See *Strickland*, 466 U.S. at 694; *Sixto*, 48 Cal.3d at 1257; *Howard*, 190 Cal.App.3d at 48; cf. *Soojian*, 190 Cal.App.4th at 521.) Bryden's failure to do so undermines confidence in the judgment and requires reversal.

* * * * * *

## VII. THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY *BRADY V. MARYLAND* AND DUE PROCESS.

The prosecutor failed to disclose material impeachment evidence as required by *Brady v. Maryland* and due process. (U.S. Const., amend. XIV; Cal. Const., art. 1, § 15; *Brady v. Maryland* (1963) 373 U.S. 83; *Imbler v. Pachtman* (1976) 424 U.S. 409, 427, fn. 25; *Kyles v. Whitley* (1995) 514 U.S. 419, 442, fn. 134, 445-451; *Youngblood v. West Virginia* (2006) ___ U.S. ___, 126 S.Ct. 2188; *In re Steele* (2004) 32 Cal.4th 682, 695.)

The Supreme Court held in *Brady* that due process requires the prosecution to disclose material, exculpatory evidence to the defense. (*Brady v. Maryland, supra*, at p. 90.) *Brady* imposes a continuing obligation on the state to disclose favorable, material evidence even after conviction. (See *Imbler v. Pachtman, supra*, at p. 427, fn. 25; *In re Steele* (2004) 32 Cal.4th 682, 695.) Evidence is favorable and material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*United States v. Bagley* (1985) 473 U.S. 667, 682.)

The *Brady* obligation extends to any evidence providing grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks. (*Youngblood v. West Virginia*, *supra*,126 S.Ct. 2188; *Kyles v. Whitley*, *supra*, 514 U.S. at pp. 442, fn. 134, 445-451.) And it extends to information known by law enforcement authorities. (*Kyles v. Whitley*, *supra*, at p. 437; accord *In re Steele*, *supra*, 32 Cal.4th at p. 697.)

It appears from news reports that Lieutenant Jones has been placed on leave during an Internal Affairs investigation into a complaint that he sent racist text messages to another officer. (Exhs. 16, 17.) In addition, it appears that the Oakland Police Department paid to settle two lawsuits involving Lieutenant Jones, most recently in 2005. (Exh. 20.)

Covin specifically requested disclosure pursuant to *Brady v. Maryland* of any information pertaining to Lieutenant Jones, including information about the racist text messages. (Exh. 19.) She did not receive any response from the District Attorney. (Exh. 15, ¶ 39.) Bryden reports that he never received disclosure of any

impeachment evidence pertaining to Lieutenant Jones, racist text messages, or settled lawsuits. (Exh. 15, ¶ 40.)

The news reports state that the racist text messages date back to at least 2014. (Exhs. 16, 17.) Poston's trial was in January 2014. (3 CT 739; 5 CT 1421.) Sentencing was on March 21, 2014. (3 CT 887-891; 6 CT 1483-1487.)

As the result of the *Brady* violation, Poston was denied the opportunity to cross-examine Lieutenant Jones about his text messages as an indication of possible bias against African-American suspects. Race and racism, conscious and/or unconscious, pervaded Poston's trial. The remedy was to bring it out in the open through Poston's testimony, expert testimony on AAVE and African-American culture, and cross-examination of Lieutenant Jones about the extent to which bias against African-Americans may have colored his expert testimony against Poston.

The prosecutor's failure to disclose material impeachment evidence pertaining to Lieutenant Jones' racist text messages and involvement in settled lawsuits violates *Brady* and due process. Thus, the writ should be granted and the judgment should be reversed.

* * * * * *

## VIII. CUMULATIVE PREJUDICE VIOLATES THE SIXTH AMENDMENT AND DUE PROCESS, REQUIRING REVERSAL.

Poston believes that each and every error of the trial court, the prosecutor, and defense counsel was prejudicial but, even if the Court disagrees, the cumulative effect of the errors raised on appeal and on habeas corpus rendered the trial fundamentally unfair in violation of due process. (U.S. Const., amends. VI, XIV; Cal. Const., art. 1, ¶ 15; *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814, fn. 6; *People v. Hill* (1998) 17 Cal.4th 800, 845-847.)

The prosecutor won convictions despite compelling video evidence that Poston shot McNeely in self-defense by attacking Poston's character and exploiting the jurors' conscious and unconscious racism and fear of street violence. There were a number of ways Bryden could have mitigated the harm: he could have objected to pervasive prosecutorial misconduct and unsupported, incomplete instruction on mutual combat; he could have prepared Poston to testify and rehabilitated him further on redirect examination if needed. He could have investigated and presented evidence corroborating Poston's testimony on disputed points. And he could

have presented expert testimony on AAVE and African-American. If the prosecutor had timely disclosed material impeachment evidence, Bryden could also have cross-examined Lieutenant Jones about racial bias and possible misconduct toward African-American suspects.

Even if no single error was prejudicial, cumulative prejudice rendered the trial fundamentally unfair in violation of due process and requires reversal.

* * * * * *

## CONCLUSION

For the foregoing reasons, an order to show cause should be issued as to why the judgment against petitioner should not be reversed.

DATED: August 10, 2016

Respectfully submitted,

/s/ Randi Covin
Attorney for Petitioner
DONEL POSTON

WORD COUNT CERTIFICATE

I certify pursuant to California Rules of Court, rules 8.204 and 8.384, that, according to my word processing program, the Memorandum of Points and Authorities in support of the petition for writ of habeas corpus contains 13,955 words, excluding the petition, verification, tables, exhibits, and this certificate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 10th of August, 2016, at Willits, California.

/s/ Randi Covin

# EXHIBIT 1

## STATEMENT OF THE CASE

Donel Poston and Joe McNeely were jointly tried on an amended information charging them both with the murder of Lionel Fluker. (1 CT 24; count one; § 187, subd. (a).) The information also charged Poston and McNeely with attempted murder of each other and possession of a firearm by a felon. (1 CT 27-33; 3 CT 776, 778; counts two through five; §§ 187, subd. (a), 245, subd. (b), 664, and 29800, subd. (a)(1).)[1]

The information alleged that both Poston and McNeely personally and intentionally discharged a firearm causing great bodily injury and death within the meaning of sections 12022.5, subdivision (a), 12022.7, subdivision (a), and 12022.53 subdivisions (b), (c), (d), and (g). (1 CT 25-28; counts two and three; §§ 187, subd. (a), 664.)

---

[1] Initially, Poston and McNeely were charged separately. (See 1 Supp. CT 1603-1615; 1 CT 1-14.) The prosecutor's motions to dismiss the separate case against Poston and amend the complaint against McNeely to add the same charges against Poston were granted. (1 Supp. CT 1731; 1 CT 1-32.) That amended information charged both defendants with assault with a semiautomatic firearm on each other in counts four and five. (1 CT 30-32; 5 CT 1460.) Those counts were later dismissed on motion of the prosecution and counts six and seven were renumbered counts four and five, respectively. (3 CT 776, 778; 5 CT 1462.)

The information also alleged six prior convictions with four prior prison terms as to Poston and nine prior convictions with two prior prison terms as to McNeely. (1 CT 34-41; § 667.5, subd. (b).)

Jury trial commenced on January 8, 2014. (3 CT 739; 5 CT 1421.)

On February 3, 2014, the jury found Poston and McNeely guilty on all counts and found true the section 12022.53, subdivision (d), allegations. (3 CT 873-876, 887-890; 6 RT 1471-1474, 1483-1487.)

On March 21, 2014, the trial court denied Poston's motion for new trial, denied probation, and sentenced both defendants to aggregate terms of 72 years to life in prison. (3 CT 887-891; 6 CT 1483-1487.)

Poston's timely notice of appeal was filed that same date, March 21, 2014, and McNeely's, on March 24, 2014. (4 CT 927; 6 CT 1531.)

* * * * * *

STATEMENT OF FACTS

## I. POSTON ARMED HIMSELF FOR SELF-DEFENSE.

Appellant Donel Poston testified that he grew up in Oakland and owned a home in the Seminary District, half a mile from the Valero gas station where the charged shooting occurred. (18 RT 1516-1517; 19 RT 1749.) Poston has had some brushes with the law. In 2003, he was convicted of possession of crack cocaine for sale. (18 RT 1517.) In 2007, he was convicted of evading the police - a Vehicle Code violation. (18 RT 1518.) In 2008, he was convicted of possession of counterfeit checks. (18 RT 1518.) In 2010, he was convicted of commercial burglary in connection with counterfeit checks. (18 RT 1519.) None of these incidents involved any guns or violence. (18 RT 1516-1520.)

Poston is a professional writer, photographer, screen printer, and videographer who produced 355 episodes of the "Dondiditliveshowww," which is available on the internet. (13 RT 869-870; 18 RT 1520, 1523; 19 RT 1640.) The show features live music, interviews, and comedy sketches. (13 RT 870; 18 RT 1520, 1524.) A few episodes feature flashing rolls of money and prop guns - real guns that are inoperable - with Poston portraying a gangster

rapper. (18 RT 1523; 19 RT 1609, 1631, 1663, 1751.) In one episode, Poston portrays a homeless person living in a cardboard box. (19 RT 1617.)

One night in June 2012, less than a year before the charged shooting, Poston came home late after recording a show and called his girlfriend, Tamena Bailey, to come over. (18 RT 1524-1525.) He and Bailey were awakened in the middle of the night when an intruder came in the bedroom window and said, "Don't nobody fucking move, I got a gun." (18 RT 1525.)

Poston did not have a gun and was "scared to death . . . ." (18 RT 1525-1526.) He reacted instinctively, throwing a blanket over the intruder's head. (18 RT 1526.) Poston turned on the light and tried to pull off the intruder's mask and wig. (18 RT 1526.) He was shot in the chest and thought he was dying. (18 RT 1526-1527.) He and Bailey testified that she helped him to the car and drove him to the hospital, where he spent a month or more convalescing. (18 RT 1398, 1527-1528; 19 RT 1720.)

After his release from the hospital, Poston continued his "hard recovery" with the help of physical and psychological therapy. (18 RT 1398, 1528-1529.) According to Bailey, he was more cautious

and nervous than before; "[l]ike, after getting shot, you can't trust nobody." (18 RT 1399.) Poston testified that he was scared after being shot; he had trouble sleeping and, when he did sleep, he had nightmares. (18 RT 1529.) Staying in the same house where he had almost been killed was difficult but Poston did not feel he could move away because he had children in Oakland and a move was "financially impossible." (18 RT 1529-1530.)

By November 2012, Poston was back at work. (18 RT 1530.) He had to be out at all hours of the night and morning at his studio, screen printing T-shirts, sometimes carrying large amounts of cash from customers. (18 RT 1530.) He bought a .40 caliber handgun for protection. (18 RT 1530; 19 RT 1607.) The gun held 15 rounds of ammunition. (18 RT 1531.)

Poston knew it was illegal for him to carry a gun because he was a convicted felon. (18 RT 1531.) But he felt that was what he had to do to protect himself. (18 RT 1531.) He carried the gun on his way to work the evening of April 5, 2013, because, "it's nighttime, it's Friday night in Oakland, it is crazy. . . . [T]here is a war going on out there . . . ." (19 RT 1612.)

## II. MCNEELY ATTACKED POSTON.

Poston and Bailey drove to the Valero gas station at Seminary Avenue and MacArthur Boulevard the evening of April 5, 2013, to buy some cigars. (18 RT 1535; 19 RT 1709.) When they pulled up at the gas station, Poston saw McNeely, whom he knew as "Two Gun Joe." (18 RT 1534-1535.)

Poston went inside the store and asked someone he knew in there where he could buy some "Mollies" - a party drug Poston sometimes used to bribe his way backstage at concerts to get interviews for his show. (15 RT 1058-1059; 18 RT 1536-1537; 19 RT 1711; see also http://www.drugabuse.gov/publications/drugfacts/mdma-ecstasy-or-molly ["Molly" is methylenedioxymethamphetamine, also called "MDMA" or "Ecstasy"].) The man Poston asked said he might know someone who had Mollies. (18 RT 1537.)

Poston went back outside and was talking to Bailey when McNeely came up behind him and said, "I got some." (18 RT 1538.) McNeely gave Poston an "outrageous price," which Poston declined, then McNeely said he would "cut [Poston] a deal." (18 RT 1538.) Poston testified that he bought two Mollies from McNeely, then

happily danc[ed] into the store, telling the guys in the store about his show and the interview he hoped to get with Jim Jones, a well-known rapper. (18 RT 1539-1540; see also http://en.wikipedia.org/wiki/Jim_Jones_%28rapper%29.)

McNeely said something like "[y]ou think you're all that," opening his jacket and showing a gun in his left inside jacket pocket. (18 RT 1540-1541, 1559; see also Pros. Exh. 9 [surveillance videos].) Poston said, "[w]hat ever you driving this car, I don't want a ride," and gestured with his hands as if to say, "I'm out of here." (18 RT 1542.) McNeely started "ranting" at Poston. (18 RT 1542.) He said: "Bitch ass nigger ain't even from Seminary," and "that's why I keep my strap up, bitch ass niggas like you." (18 RT 1543, 1560; 19 RT 1723-1724.) "Strap" means gun. (19 RT 1724.)

When Poston argued back, McNeely said, "I'll slap the shit out of you," and threw his cup down. (18 RT 1543-1544.) Poston said something like, "[d]amn, you going to slap Don Dotta," looking back at the guy in the store as if to say, "[c]an you believe this?" (18 RT 1544.)

McNeely continued to yell at Poston. (18 RT 1544-1545.) Then he slapped or punched Poston in the face, tripping him at the

same time. (18 RT 1545, 1561; 19 RT 1730-1731; Pros. Exh. 9.) As Poston fell backwards, he grabbed the camera he always wore around his neck and looked over his shoulder toward Bailey. (18 RT 1546, 1561.) He saw McNeely reaching inside his jacket and thought he was about to get shot. (18 RT 1546, 1561.)

Poston was afraid for his life. (19 RT 1638.) He only had one or two seconds to think. (19 RT 1756.) He pulled out his gun and started shooting, "rapid fire," at McNeely. (18 RT 1546; 19 RT 1756.) He did not intend to kill McNeely - just to disable him. (18 RT 1547.) He aimed at McNeely's arms and legs. (18 RT 1547; 19 RT 1736-1743.)

Poston stopped shooting when McNeely fell. (18 RT 1548.) Poston's gun did not jam and the clip was not empty - there were still bullets left. (18 RT 1549; 19 RT 1743-1744.) He stopped shooting because he did not want to kill McNeely, blow up the gas pumps, or hurt anybody else. (18 RT 1549; 19 RT 1656.) He "shot until [he] felt it was safe to escape." (19 RT 1657.) As soon as McNeely was down, Poston stopped shooting and ran away. (18 RT 1549-1550.) But McNeely did not stay down. (18 RT 1551.) He got up and ran after Poston, shooting toward Seminary Avenue. (18 RT 1551-1552.)

Eutiquio Garcia-Chavez, the janitor at the Valero station, told the police and testified that he heard gunshots and saw McNeely chasing another man, shooting at his back. (15 RT 934-937, 972-973; 17 RT 1319-1322; Def. Exhs. T-1 [recording], T-2 [transcription].) The runner tried to jump a fence but could not get over. (15 RT 966.)

The police officers did not ask Garcia-Chavez about the runner's hands and he did not bring it up himself, but he testified that the runner turned toward McNeely and made a hand gesture as if to say "stop already" - both hands out with the palms facing forward. (15 RT 940, 966; 17 RT 1323-1324, 1326, 1346-1347; Def. Exhs. T-1, T-2.) McNeely turned and went back toward the gas station. (15 RT 941, 965-966, 971.)

Poston testified that he had dropped his gun and his cell phone somewhere along the way and had his hands up. (18 RT 1551-1552; 19 RT 1745-1746.) About five days later, he went down to Los Angeles for a few months; he was "on the run" because he knew what he had done was wrong. (19 RT 1615-1616, 1664, 1748.) He was arrested in Oakland on June 14, 2013. (13 RT 858-861; 16 RT 1133; 19 RT 1616, 1666.)

Bailey testified that she and Poston went to the Valero gas station for cigars. (18 RT 1401.) Poston's investigator, Walter Stannard, testified that Bailey told him they went there to buy "weed," but she testified that they only went to buy cigars. (18 RT 1426; 19 RT 1797-1798.) Poston agreed, explaining that he had a medical cannabis card and did not have to buy marijuana on the street. (18 RT 1535.)

Bailey testified that she and Poston did not discuss McNeely before going to the gas station. (18 RT 1401.) Nor did Poston indicate in any way that he was going to meet someone. (18 RT 1402.) They were just going to get some cigars. (18 RT 1402.)

Poston was wearing his camera on a strap across his shoulder, as he always did - "[a]bout 24 hours a day." (18 RT 1403.) Bailey did not notice McNeely until he was yelling at Poston. (18 RT 1405-1406.) That made her nervous. (18 RT 1411.) McNeely was "calling [Poston] names," saying he was not from the neighborhood. (18 RT 1407, 1463.) He said Poston was a "bitch ass nigger" and "thought he was all that." (18 RT 1508.)

McNeely kept opening his jacket. (18 RT 1409-1410, 1412.) Bailey saw something that looked like a gun handle. (18 RT 1412-

1413.) Stannard testified that Bailey told him she saw the butt of a semiautomatic pistol. (19 RT 1797.) Bailey testified that she was not very familiar with guns and was not sure what she saw but there were two pieces - one in the inside pocket and one lower. (18 RT 1467, 1470-1476.) It could have been two guns. (18 RT 1509.)

Bailey saw McNeely throw down his cup and heard him say he was "going to slap" Poston. (18 RT 1413-1414.) Poston responded to the effect that McNeely was not going to slap him. (18 RT 1479.) He may have said something like "you don't slap Don Dotta," a nickname he sometimes used. (18 RT 1479-1480.)

When McNeely slapped or punched Poston, Bailey jumped out of the car and ran in the store because she did not know if McNeely was going to shoot them. (18 RT 1414-1415.) She told Stannard that McNeely hit Poston so hard she heard the contact. (19 RT 1797.) She said Poston fell down, got up, and started to run. (19 RT 1797.) Bailey testified that she was already inside the store, did not see anything after the slap, and did not hear the slap, but she did hear the shots from inside the store. (18 RT 1415; 19 RT 1797.)

McNeely did not testify. His friend Ansar Muhammad testified that was he was at the Valero station at around 10 p.m. on April 5,

2013, and spoke to McNeely before going in the store. (12 RT 612-613, 616.) The Valero store did not have what he wanted so he walked across the street to a liquor store, then walked back to his car in the Valero parking lot. (12 RT 616-617, 631.)

Muhammad never heard any gunshots but, as he was about to leave, he noticed a "commotion" at the Valero station. (12 RT 617-618, 633.) McNeely said he had been shot and asked Muhammad to take him to the hospital. (12 RT 620.) But McNeely did not get in Muhammad's car; he got in his own car and drove off, parking near Muhammad's girlfriend's house on 65th Avenue. (12 RT 620-622.) Muhammad followed and took McNeely to the hospital from there. (12 RT 622, 632.)

Highland Hospital trauma surgeon Nancy Parks testified that McNeely was treated for six gunshot wounds in his thighs, scrotum, armpit and back. (17 RT 1279-1287.) A urologist later removed a bullet from the base of McNeely's penis. (17 RT 1287.)

Shannon Ellis testified that she was driving near Seminary Avenue in Oakland some time after 10 p.m. on April 5, 2013. (12 RT 543-544.) She saw a car parked on the side of the road with the lights on, the motor running and the driver in an odd position. (12 RT 545-

547, 560.) Ellis stopped to see if the driver needed help and discovered Lionel Fluker, apparently dead from a gunshot wound to the head. (12 RT 547-548.) She flagged down Officer William Febel, who confirmed that Fluker was dead. (12 RT 572-574.) Sarah Hudson testified that Fluker, her friend, was on his way home from her house shortly after 10 p.m. on April 5, 2013. (12 RT 538-542.)

## III. MCNEELY KILLED FLUKER.

Pathologist, Paul Herrmann, M.D., testified that a gunshot wound to the head was indeed the cause of Fluker's death. (13 RT 808, 818.) Dr. Herrmann retrieved a 9 mm bullet from the inside of Fluker's skull. (13 RT 815-816; 16 RT 1224, 1226.)

Crime Scene Technician, Christine Middleton, testified that two different calibers of bullet casings were found at the crime scene: eight 9 mm casings and ten .40 caliber casings. (12 RT 665, 679-681.)

It was undisputed at trial that McNeely's handgun fired the 9 mm bullets and casings and that Poston's handgun fired the .40 caliber bullets and casings. (11 RT 496, 505, 519; 20 RT 1887-1888, 1920.) It was undisputed that McNeely fired the bullet that killed Fluker. (11 RT 494, 508, 529; 20 RT 1881, 1903.)

## IV. THE SHOOTING WAS CAUGHT ON SURVEILLANCE VIDEO.

Officer Febel, Officer Eriberto Perez-Angeles, and Officer Richard Vass all viewed surveillance videos from the Valero gas station on the night of April 5, 2013. (12 RT 578-579; 13 RT 831-833; 16 RT 1128, 1130.) The Valero videos were repeatedly played for the jury. (12 RT 578-579, 629, 704-707; 15 RT 983; 16 RT 1089, 1128, 1130; Pros. Exh. 8.)

Valero camera 11 shows McNeely opening his jacket while talking to Poston. (Pros. Exh. 8, file 4_11_R_20130405100000PM.dav at 10:12:21-22.) At 10:12:28 to 10:12:29, McNeely approaches Poston, getting right in his face. At 10:12:30, McNeely punches or slaps Poston in the face or head with his right hand while placing his left foot behind Poston's right foot. At 10:12:31, Poston falls backwards with both hands on the ground.

Valero camera 13 shows McNeely reaching inside his jacket with his right hand as Poston gets up. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 33.) McNeely has what appears to be a gun in his right hand before Poston fires his first shot. (Pros. Exh. 8, file 6_13_R_20130405100000PM.dav at 10:12 34.)

## V. POLICE OFFICERS SEARCHED MUHAMMAD'S CAR, MCNEELY'S CAR, AND POSTON'S HOME.

Within a few hours after the shooting, Oakland Police Evidence Technician Meeke Hoang watched as two police officers searched Muhammad's car near Highland Hospital and removed a duffel bag containing a cardboard box. (16 RT 1176-1184.) Inside the box were plastic bags of marijuana, methamphetamine tablets, and a digital scale. (15 RT 1040-1046; 16 RT 1090-1091.)

On April 6, 2013, Oakland Police Evidence Technician Jeffrey Haymon searched McNeely's car. (12 RT 651-653, 657-658, 663; 15 RT 1000, 1002, 1007.) Haymon found "indicia" of McNeely, marijuana packaged in small plastic wraps, and "suspected Ecstasy" capsules and tablets which turned out to be methamphetamine. (15 RT 1000, 1042, 1046-1049, 1052, 1055, 1058-1061.)

On June 14, 2013, police officers searched Poston's home. (13 RT 861-863, 876-888.) In one bedroom, Officer Steve Valle found indicia of Nicholas Bosworth, Poston's housemate, and a .40 caliber handgun. (13 RT 864-865.)

In what appeared to be Poston's bedroom, Officer Anthony Tedesco found .40 caliber ammunition, hand-written rap lyrics, and blank check paper, which Poston testified was used in his business.

(13 RT 875, 882, 888; 19 RT 1619, 1789.) In a third room, officers found what appeared to be a credit card manufacturing machine, blank credit cards, and credit cards in various names. (19 RT 1787-1788.) Oakland Police Lieutenant Tony Jones testified that such items are used to commit credit card fraud. (19 RT 1815-1817.) Poston denied any knowledge of the credit cards and machine. (19 RT 1619-1624.)

## VI. POSTON'S OUT-OF-COURT STATEMENTS WERE ADMITTED TO IMPEACH HIS CREDIBILITY AND COUNTER HIS CLAIM OF SELF-DEFENSE.

Officer Perez-Angeles and Sergeant James Gantt interviewed Poston after his arrest and then transported him to the jail. (19 RT 1780-1781.) Poston asked about the charges. (19 RT 1781.) When he was told he was being charged with attempted murder, Poston said he was not trying to kill McNeely; he was just trying to get McNeely off of him. (19 RT 1781-1782.)

On July 8, 2013, Sheriff's Technician Tina Key intercepted a letter from Poston to Bosworth stating that he would find out the identity of a woman who e-mailed the police and identified him as having shot someone. (16 RT 1105, 1109; Pros. Exh. 25.) On July 24, 2013, Key intercepted a letter from Poston to Jon Owens

suggesting that a woman had incriminated him. (16 RT 1110, 1112; Pros. Exh. 26.)

In the second letter, Poston talked about all the songs he had written, some of which had been confiscated in a cell search. (16 RT 1111-1112.) He said he planned to assert his speedy trial rights and "forc[e] they hand," because "I ain't did shit but stand my ground." (16 RT 1112.)

Key forwarded Poston's letters to Officer Perez-Angeles, who then searched Poston's cell because he believed witnesses might be in danger. (16 RT 1128-1129, 1133.) Officer Perez-Angeles seized four pages of rap lyrics from Poston's cell. (16 RT 1134-1135; Pros. Exh. 30.) The rap lyrics stated:

[Page 1]

> You got to be higher than Richard Pryor . . . wit a prior. If you think you gonna to fire on a nigga and get away with it, that'll be the day when hell freezes over, dondidit, don't get it. That's why I pack this pistola - gone off cola, probably off a molly. You almost got bodied, instead caught you a body. I'm swift on my toes. Niggas in my circle keep them 40s real close concealed in they clothes, and never lose composure, make a nigga see the light over exposure. Wit 5 Bingo-Jingo from the dondiditliveshow. It's all self-defense under the proper pretense.

(16 RT 1135-1136.)

[Page 2]

> I am 37 and countin'. Ya 38 and down. Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda, but I just popped a nigger and my BM e-mailing investigators. Consider that snitchin but I ain't trippin. . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings. Bottom line to that, I ain't dealing. . . . If God is willing when this soap opera over I'll have All My Children - Days of our Life. Hustling all night, married to the game, and the streets is my wife.

(16 RT 1136.)

> [Page 3]
>
> Niggas hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses. What you got them guns for if you ain't using 'em. Better start shootin dem nigger to left just a faggot. When ya see nigga at, I'm ya best dog. I'm the pick of the litter. Won't hesitate to make the K go cray, Dirty Dada Nigga. Yeah, make my day. Strip the Nigger down to his birthday suit. All about you. You got brand new shoes. I got no commissary. Tom, Dick, and Hairy sleeping on my fucking couch. Must a forgot I'm the reason . . . in the house.

(16 RT 1136-1137.)

> [Page 4]
>
> Yea, the game is deep. We are the lost sheep. It's the irony of the info age, them little niggas showing choppas [assault rifles] on they Facebook page. Assemblin' a Glock [brand of firearm] on their me-ma porch, let that thing rang like it was the 4th. . . . Fuck you. Fuck you, pal. I ain't having that. Don't never leave the house without my strap [firearm].

(16 RT 1137 [Officer Perez-Angeles's definitions in brackets].)

The prosecutor played a Youtube video of one episode of Poston's internet show, Donditliveshowww, showing Poston with cash and two guns. (16 RT 1086; Pros. Exh. 24A [recording], 24B [transcription].) In the redacted audio portion, Poston says:

> It's the Donditititliveshowww. I am Don Dada. I have done did it. And it is a done deal. You know what I'm sayin'? But if you come around this motherfucker, I'm playing with little sure things - these little dumb dumb - they gonna, they gonna just - they gonna put it right in the uh, in the snub nose in my motherfuckin' pocket. You know what I'm sayin'? I'm not gonna keep on playing with these dudes man. This is Don Dada.

(Pros. Exh. 24A, 24B.)

Sergeant Gantt testified that he viewed multiple episodes of the Dondiditliveshowww and only this one had any evidentiary value. (16 RT 1101.) In some of the episodes, Poston played a character - a different persona. (16 RT 1101.)

The prosecutor also played numerous recorded phone calls Poston made from the jail to his mother, Bailey, and an "unknown male," apparently his brother Robert. (19 RT 1625, 1628; Pros. Exhs. 32 [recording], 32A [transcription].) In a June 19, 2013, call to an unknown male, Poston talked about his "bitches" - his "hoe-bo, [his] hoe-bo, [and] [his] hoe-bitch . . . ." (Pros. Exh. 32A at p. 1.)

Poston complained that he had "just paid the bitch phone bill" when he wanted "the bitch to pay [his] way." (Pros. Exh. 32A at p. 1.) The unknown male said, "(Unintelligible) a old pimp is a new pimp." (Pros. Exh. 32A at p. 1.) Poston said there was only one friend he wanted to have his "bitch" because "that's the only nigga gonna make sure I'm eating" instead of just "fuck[ing] on the bitch." (Pros. Exh. 32A at p. 2.)

In a June 19, 2013, phone call to an unknown male, Poston said, "I ain't never been too proud to beg from a bitch in my life, Robbie. . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my hoe-bos, all my baby mamas, I'm finna call my one baby mama right now." (Pros. Exh. 32A at p. 3.)

In a June 22, 2013, phone call to an unknown male, Poston said he had asked Bailey what she was doing and she said she was sitting in the bed. (Pros. Exh. 32A at p. 4.) Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner." (Pros. Exh. 32A at p. 4-5.)

In a June 29, 2013, phone call to an unknown male, Poston said his lawyer told him "this is in the bag. We got this." (Pros. Exh. 32A

at p. 6.) He said: "On self defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity. You feel me?" (Pros. Exh. 32A at p. 6.)

In a July 1, 2013, phone call to his mother, Poston said: "I'm not even trying to say that I wasn't there no more. . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're gonna see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag." (Pros. Exh. 32A at p. 8.)

In a July 14, 2013, phone call to his mother, Poston asked if "Sharan" was coming to court. (Pros. Exh. 32A at p. 10.) When his mother said she was, Poston said to tell Bailey something else. (Pros. Exh. 32A at p. 10.) In a July 16, 2013, phone call to Bailey, Poston said he did not tell her not to go to court because of another woman.

(Pros. Exh. 32A at p. 11.) He said he kept getting mad at Bailey for asking "stupid questions" because "I be trying to keep it, I'm trying to keep it, I mean these phone calls is being recorded, you know what I'm saying? So if I say too much then I'm giving up my fucking game though . . . ." (Pros. Exh. 32A at p. 12.)

A moment later, Poston said he was not cussing out Bailey, he was not mad, he was just "under a lot of duress right now," but he was "happy as a faggot in a dick farm . . . ." (Pros. Exh. 32A at p. 13.) He told Bailey to cooperate with his investigator. (Pros. Exh. 32A at p. 13.)

In a July 22, 2013, phone call to Robbie, Poston said his lawyer was mad at him: "Ah man, that man mad as a motherfucker. That nigga seen all that money on Youtube. That nigga mad as a motherfucker. That nigga, everytime I come, the first thing he says, 'That's a lot of money.' I swear to God. Everytime that nigga see me, that nigga be like, "That's a lot of money. You're tripping.' I'm like 'hey man that shit is gone in the wind. I mean I need you right now. What could we do.' He's like 'no.' I'm like 'yeah man.' He like 'man, are you sure?" I'm like 'look, check this out nigga. I was on the run

for 90 days. Man, hotels, hoes, you name it I did it nigga." (Pros. Exh. 32A at pp. 17-18.)

In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. (Pros. Exh. 32A at p. 19.) Poston's mother expressed concerns about Bailey's reliability. (Pros. Exh. 32A at p. 19.) Poston said: "This is my bitch, mommy. . . . . My bitch, mommy. Listen to me. That lay, she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to me, 'cause you not. I'm the one fucking her mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" (Pros. Exh. 32A at p. 20.)

A moment later, Poston said again that Bailey would do what he told her to do. (Pros. Exh. 32A at p. 21.) Otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that?' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't. . . . [If I marry anyone,] I'm gonna marry Sharan, you feel me? And that's 'cause I

need her smarts. I don't need a dumb broad who don't even know how to work the internet in 2013." (Pros. Exh. 32A at p. 22.)

Poston's mother told him to "reverse [his] whole attitude about this aggressiveness," and stop calling Bailey "bitch." (Pros. Exh. 32A at p. 21.) Poston explained that Bailey was his "bitch" and Sharan was his woman. (Pros. Exh. 32A at p. 22.)

In an August 21, 2013, phone call to his mother, Poston said he was "shook up" about the paperwork he had gotten showing that the prosecutor had two letters confiscated from his house. (Pros. Exh. 32A at p. 24.) He had not said anything incriminating but they were "trying to take [his] statement and twist it" to fit their theory of the case. (Pros. Exh. 32A at p. 24-25.) They were "trying to use it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? . . . Just having an optimistic attitude. But in their eyes, that may be an aggressive front." (Pros. Exh. 32A at p. 26.)

Poston's mother asked if they were going to show the video because "the video itself will show who the aggressor is. The video will show you never touched the man." (Pros. Exh. 32A at p. 25.) Poston responded: "Okay, so then, this is a valid point they raised the

other day. You can't bring a knife to a gun fight. Okay? . . . See how slick they are with that shit? You feel me? . . . No. No, no, no, no. Not a knife. They said you can't bring a knife to a fistfight." (Pros. Exh. 32A at p. 25.)

Poston complained that someone had taken his clothes from his house, including the suit he had intended to wear for his trial. (Pros. Exh. 32A at p. 30.) He said he had been "on the run" and did not have money for bills at his house even though he still had a prostitute. (Pros. Exh. 32A at p. 31.) When his mother protested at his mention of a prostitute, Poston said, "I'm the one in here doing time. Do you think I'm gonna incriminate myself?" (Pros. Exh. 32A at p. 32.)

In an August 31, 2013, phone call to his mother, Poston again brought up the suit he wanted to wear for his testimony. (Pros. Exh. 32A at p. 35.) He said he wanted more comfortable clothes to wear in court "until it was time for me to actually go perform." (Pros. Exh. 32A at p. 35.) He told his mother how he had been trying to instruct Bailey about how to dress and groom herself for court. (Pros. Exh. 32A at pp. 38-39.) Poston agreed when his mother said Bailey "needs to tell the truth" - the same thing she had told Poston's attorney. (Pros. Exh. 32A at p. 39.)

Poston's mother said: "She don't need to put nothing on it. She needs to tell the truth, Donnie." (Pros. Exh. 32A at p. 39.) Poston responded: "Exactly. That's what I told her, mommy." (Pros. Exh. 32A at p. 39.) Poston and his mother shared concerns about Bailey's poor grooming, body odor, and lack of intelligence. (Pros. Exh. 32A at pp. 39-40.) Poston said, "Man they gonna eat this bitch alive." (Pros. Exh. 32A at p. 40.)

Poston said he was going to practice his testimony: "I was like I'm going in here, and I need to have my full, I will not say one ghetto-ebonic-slur, will not come out of my mouth. All the articulate shit that I've learned in my 37 years, all the positive things and attributes that I got to say about myself, will truly be honed out today. You feel me? I mean, you know, I mean man, 'cause I just, I have to paint a different portrait than what . . . ." (Pros. Exh. 32A at p. 41.) He asked: "You know what they always say, mommy? Proper preparation prevents poor performance. You feel me?" (Pros. Exh. 32A at p. 42.)

In a September 5, 2013, phone call to his mother, Poston said he was not saying he was not there - that was not his defense. (Pros.

Exh. 32A at p. 45.) Then he chastised himself for talking about his legal strategy on the recorded phone call. (Pros. Exh. 32A at p. 45.)

In a September 14, 2013, phone call to Bailey, Poston said he was trying to figure out the best strategy for winning his case. (Pros. Exh. 32A at p. 48.)

Based on the recorded phone calls, the prosecutor asked Poston on cross-examination: "[Y]ou've been practicing your performance for this case, right?" (19 RT 1625.) And, "you only need to practice if it's not the truth, right?" (19 RT 1625.) The prosecutor continued:

Q: [Y]ou're trying to get over on this jury, aren't you?

A: No, ma'am.

Q: Didn't you tell your mom that you wanted to save your good suit for when it was time for you to perform?"

A: Ma'am, maybe only a metaphor.

Q: Well, didn't you also tell your mom you have to paint a different picture, a different portrait for this jury?

A: Yes, ma'am, especially if you're going to paint one picture.

Q: Well, the picture that you are on the streets is what you're afraid of, right?

A: Hmm, I don't get it.

Q: Well, the picture that you are out on the streets as a hard-core thug, into guns, and being a gangster?

A: No, ma'am.

(19 RT 1627-1628.)

The prosecutor suggested that Poston fabricated his defense of self-defense when incriminating letters were seized from his jail cell in which he admitted he was there at the Valero and dropped his hat when he ran away. (19 RT 1643.) She asked, "You've read a lot of cases about self-defense, haven't you?" and "[y]ou know exactly what you need to say in order to try and prevail on a claim of self-defense?" (19 RT 1643.)

The prosecutor asked Poston if he was a pimp, quoting statements he made about "hoes" and prostitutes. (19 RT 1653-1654.) She asked Poston about a letter to his brother stating, "[t]hat last weed I gave you came from out a ho ass. She turned a date for two zips and a hundred dollars." (19 RT 1654.) The "ho" Poston talked about in jail calls was Brianna Howard, the young woman who was with him when he was arrested. (17 RT 1353-1354; 19 RT 1666.)

McNeely's attorney played additional jail phone calls during his cross-examination of Poston, further emphasizing Poston's discussion of "hoes," and "bitches." (19 RT 1675-1693, 1758-1759; Def. Exhs. P, P-1, Z, AA, BB.) In a June 16, 2013, phone call, Poston said:

> But the Ho-Bitch need to go on about her way, though. You feel me? She can get down to LA with her friends and shit you know what I mean, she can get back to working where she belongs . . . you know what I mean but she can get down there with their friends and shit, she can turn some dates down there, do what she need to do, and get back in the mix. She got a few tricks that we was leaning on, you feel me. A thousand here. A thousand there. She'll be alright.

(Def. Exh. P-1 at p. 3.)

In a June 22, 2013, phone call, Poston and Bailey discussed another woman:

> Bailey: What did you . . . still trying to hold onto her for?
>
> Poston: Hold onto her, bitch, I ain't holding onto nothing except my motherfucking pocketbook, what you talking about?
>
> Bailey: But you talking about you wish you had her number, You don't even need her number.
>
> Poston: Yeah, bitch, 'cause I need all she got to offer me! What you mean? That bitch sockin it to my pocket like the Chinese stock market, bitch, you got nothing to give me right now, what the fuck you mean?! What you talking about? You ain't taking no contributions, no donations. What you talking about? When did you stop taking contributions and donations?

(Def. Exh. P-1 at p. 5.)

McNeely also played more of Poston's Youtube videos talking about the Seminary neighborhood, the "kill zone," where most East

Oakland murders occur, Poston's book, "A Day in the Life of a Hustler," and rap lyrics Poston wrote. (19 RT 1696-1709.)

## VII. EXPERT WITNESSES TESTIFIED ABOUT GUNS, DRUGS, AND STREET TERMINOLOGY.

Prosecution criminalist Susan Molloy testified as a firearm expert that the gun found in what appeared to be Bosworth's bedroom in Poston's house could not have fired the bullets recovered at the Valero station. (13 RT 864-865; 16 RT 1231.) According to Molloy, one of the bullets found in what appeared to be Poston's bedroom had been cycled through the same unknown gun as two of the .40 caliber cartridge cases found at the Valero station. (13 RT 880-885; 16 RT 1233.)

Prosecution criminalist Waliana Dieu testified that there had been a significant drop in Ecstasy samples seen in the police lab in the previous two years. (15 RT 1027, 1060.) All the recent items which appeared to be Ecstasy had turned out to be methamphetamine. (15 RT 1060.) The methamphetamine capsules and tablets found in McNeely's car and duffel bag appeared to be Ecstasy. (15 RT 1060-1061.)

Sergeant Gantt testified as an expert in controlled substances that Valero camera 13 showed an attempted drug transaction at

10:07:45 p.m. (16 RT 1079-1084, 1090-1091; Pros. Exh. 8.) According to Sergeant Gantt, McNeely offered Poston drugs packaged for sale but Poston declined, perhaps because the package was too small. (16 RT 1090-1091.) Gantt testified that all the packages of drugs found in McNeely's car were possessed for sale. (16 RT 1091-1094.)

Lieutenant Jones testified, apparently as an expert in East Oakland street terminology and culture. (19 RT 1799-1828.) He identified some men on one of Mr. Poston's Dondiditliveshowww Youtube videos as people he knew from the Seminary neighborhood - from the "street life." (19 RT 1811-1813, 1828.) He said, "[l]ive by the gun and die by the streets" means that "you are in the streets and you . . .play with guns, or you are constantly doing things with guns that eventually the streets are going to catch up with you and you're going to die." (19 RT 1818.) There are also people called "studio gangstas." (19 RT 1825.) A "studio gangsta" is a "fake gangsta, like a person that carries himself like a gangsta, but they're really not." (19 RT 1825.)

Lieutenant Jones testified that it would be an insult to Poston for someone to tell him he was not from Seminary. (19 RT 1814.) If

Poston were to walk away from such an insult, he would be "viewed as a punk," opening the door to further harassment. (19 RT 1814-1815.)

Lieutenant Jones testified that to "fire on" someone means to punch them or shoot at them, depending on the context. (19 RT 1817, 1827.) "Shine" means reputation. (19 RT 1819.) Rap lyrics found in Poston's jail cell mean "you got to be high or crazy to think you can punch me and get away with it" and "you almost got killed, and . . . instead . . . you killed somebody." (19 RT 1818.)

Respect is important to young men in Oakland and Lieutenant Jones has investigated a lot of murders committed because someone felt that they were disrespected. (19 RT 1821.) When one grown man slaps another man in the face, it is very disrespectful. (19 RT 1822.) According to the lieutenant, the second man could not just walk away without losing his street credibility. (19 RT 1822.) Lieutenant Jones acknowledged that, if a man slapped him, knocking him to the ground, then drew a gun on him, he would pull out his gun too. (19 RT 1825.)

* * * * * *

# EXHIBIT 2

# DECLARATION OF DONEL POSTON

I, DONEL POSTON, declare as follows:

1. I am the appellant and petitioner in this case. I still can't believe I was convicted of murder and attempted murder - I shot Joe McNeely in self-defense right on the videotape.

2. As I tried to explain in my testimony, I acted instinctively when McNeely hit me in the face, tripped me, and knocked me down, after showing me his gun and saying he kept a strap for niggers like me. Everything happened so quickly, in a matter of seconds. It was the same when I was shot a few years ago - I acted instinctively, pulling off the burglar's wig and throwing a blanket over his head when he came into my bedroom with a gun. I was shot in the chest and almost died in that incident. Since then, I have been very cautious and alert, ready to protect myself at any moment.

3. I ran after I shot McNeely because he chased me down the street trying to shoot me. He was obviously alive and mad that I had shot him. I had no idea anyone else had been shot. I left town a few days later because I was afraid McNeely would come after me. At the bus station on my way out of town, I saw someone I knew who said he thought I was dead because the news had said a "camaraman" had been killed, and I was a photographer. He told me everyone thought I was dead.

4. After that I saw and heard news reports about Mr. Fluker while I was on the run in L.A. I felt really bad that an innocent person had been shot, especially since he was a photographer like me. I stayed in L.A because of McNeely and also because I was afraid the

police might be looking for me on account of the shooting. I was just defending myself when I shot McNeely but I knew I was not supposed to have a gun and I didn't think the police and the courts would believe me - they never do.

5. After I had been in L.A. for a few months, I was stopped by a police officer who ran my driver's license. I was afraid there might be a warrant for me from Oakland. When my license came back clear and the officer let me go, I thought it was safe to go back to Oakland - that I would not be arrested. And I hoped McNeely would forget about me. I drove back to Oakland in a rented car with Brianna Howard, a young lady I met in L.A. and got involved with.

6. I figured out eventually that Brianna was doing some dates to make money. We didn't share much personal information and I still don't know what she did for that money. I know some ladies get paid just for social dates - there is a range going all the way to sexual activity for money. I don't know what Brianna did. I was not her pimp and did not control her or make money off of her. I didn't pay her for sex either. We just hung out together, having a casual sexual relationship, taking turns paying for hotels and meals.

7. When I was arrested, I denied knowing anything about anything at first. I didn't trust the police and the courts to treat me fairly even though I shot McNeely in self-defense. I ran from the scene because McNeely was shooting at me but I would never have called 911 or waited for the cops to arrive because they would probably shoot me or arrest me - they probably would not believe anything I said.

8. Growing up in Oakland, pretty much all of my experiences with the police were bad. They came to black neighborhoods harassing, shooting and arresting black people, including kids. I saw other black kids get beaten and I was badly beaten by a cop once myself. Everyone always ran when the cops came around. Most of the black people I knew were the same - they would not call the police no matter what happened because, whatever was going on, the police would only make things worse.

9. In the jail at Santa Rita, there is no access to a law library. You have to tell the law librarian what your charges are and request legal materials on particular subjects. I requested a lot of materials, including materials about murder and self-defense. I have been to college. I am a good reader and writer and I wanted to know about my case.

10. When I got the legal research packet on self-defense I was very relieved because it seemed like I had a clear cut defense of self-defense. I was happy to learn that even a felon has a right to use a gun in self-defense and that there is no duty to retreat - I had a right to stand my ground when I was attacked. I gave a copy of the self-defense packet I got from the law librarian to my appellate lawyer Randi Covin

11. I talked to my mother and brother on the jail phone about self-defense and how my lawyer, David Bryden, agreed I had a strong defense. My mother and I talked about how the video of the shooting showed it was self-defense.

12. The prosecutor made a big deal about one of my rap lyrics where I say "it's all self-defense under the proper pretense." The prosecutor claimed I was saying my claim of self-defense was false. I was not. I used the words "pretense" and "pretext" interchangeably in different drafts of this rap because my dictionary showed them as synonyms. The definitions of "pretense" included "a claim" and "a mere display." "Pretext" was even better than "pretense" artistically because it was a less perfect rhyme with "self-defense." An imperfect rhyme is considered better than a perfect rhyme in rap lyrics - it is more clever.

13. I saw that "pretense" could also mean something false so I used the word "proper" before it to show I was using the other definition - a claim or display. In my first draft I used the word "correct" instead of "proper." I was writing rhyming lyrics, looking for words that rhymed with "self-defense." I did not mean to say my self defense claim was false, but just that it is self-defense if the proper facts are shown, as they were in my case. I gave a copy of the dictionary page I used to Ms. Covin.

14. My mother and I talked on the jail phone about my girlfriend Tamena Bailey. We were worried that she would not be a good witness because she is not educated or articulate and the DA would tear her up. We both said all Tamena had to do was tell the truth. That's all we wanted her to do because she saw the whole thing and knew I was defending myself.

15. I knew all my jail calls were recorded but I wasn't worried because I did not say anything incriminating. I was just talking in a very casual way to my friends and family about my life,

my case, and my girlfriends. It never occurred to me that the prosecutor would be able to use my casual language to make me look bad. It was very stressful being in jail facing trial for murder. Sometimes I got upset and raised my voice. I also used words like "bitch" and "ho," which are not polite words, but are common in African American Vernacular. "Ho" does not necessarily mean "prostitute."

16. My lawyer, Mr. Bryden, never showed me the transcription of the jail calls which the prosecutor used to cross-examine me. The first time I saw the transcription was on the witness stand at the beginning of cross-examination when the prosecutor handed it to me and started asking questions. Mr. Bryden never talked to me about the jail calls or my letters or rap lyrics at all. He never mentioned pimping or prostitution. He did not tell me the legal definitions and did not counsel me on how to answer any questions about that.

17. Mr. Bryden did not spend much time with me before trial. He came out to Santa Rita to see me twice, for about 15 minutes each time, just before my trial started. He was always in a hurry and said he hated going out to Santa Rita because it took too long to go through security. I would see him for a minute before court hearings when he would come by the holding cell and tell me what was going to happen in court that day. We didn't talk much on the phone because the calls are recorded.

18. Mr. Bryden told me I had to testify because it was a self-defense case. He asked me to write down questions I thought he should ask me on direct examination. I still have a couple pages of

questions I wrote out for him. We didn't have access to a copy machine at Santa Rita so I would write things once, then copy them neatly to give to Mr. Bryden, keeping the first draft for my records. I gave my copies of some questions I wrote for Mr. Bryden to Ms. Covin.

19. Other than asking me to write down questions, Mr. Bryden did not help me prepare to testify at all. He never talked to me about cross-examination by the prosecutor or McNeely's lawyer. I did not know what to expect. I practiced by myself, speaking in polite English with no ghetto talk - no African American vernacular or profanity. I wanted to wear a suit and speak properly on the witness stand so the jurors could see I was an intelligent and believable witness.

20. When the prosecutor started asking me about pimping and hos I answered honestly to the best of my knowledge. I am not a pimp and never have been. In my world, a pimp is someone whose business is to control and sell prostitutes, usually with some physical violence and control. I have never done anything like that. I have never been in the business of pimping though I do know pimps. I have taken money from women I have been involved with personally when I needed it and some of those women may have done some dating for money. I have no idea whether they actually had sex for money or just went on dates like paid escorts. I did not concern myself with how they got their money - whether from work, welfare, or dating - it was none of my business. It never occurred to me that taking a little money from a woman I knew now and then made me a pimp.

21. I was surprised when Ms. Covin told me that the legal definition of pimping is taking money from a prostitute's earnings. I may have done so from time to time but not by intention or demand, just by request for help from someone I knew, and not as my business. I wish Mr. Bryden had talked to me about this before my testimony so I could have done a better job under cross-examination. The prosecutor and McNeely's lawyer both made me look like a liar for saying I was not a pimp. I never thought I was a pimp or meant to be a pimp but I can see how my answers sounded like double-talk because I didn't know the legal definition.

22. During my cross-examination by the prosecutor I said that a "ho" is a garden tool. I was frustrated by the prosecutor twisting my words and trying to make me say I was a pimp, which I was not. I also was trying to make the point that words have different meanings. "Ho" can mean "prostitute" but it can also be a more general, informal word for any woman. The prosecutor also used this statement to make me look like a liar but I was just trying to explain that just because I cook a dinner doesn't make me a chef and just because I take money from a woman now and then doesn't make me a pimp.

23. The first time I saw the video of the shooting in my case was in jail when the private investigator, Walt Stannard, came and watched it with me for about half an hour. Mr. Bryden never watched the video with me. Walt pointed out that it looked like McNeely got off the first shot, hitting the radiator of Tamena's car. You can see on the video that the ground is wet after she drives off. Afterward, we had to have the radiator repaired. My mother paid $300 or $400 to fix the radiator from the bullet hole. I told Mr. Bryden about the radiator

but he didn't put on any proof that it was shot and repaired. The prosecutor used this too to make me look like a liar.

24. I told Mr. Bryden I didn't know anything about the credit cards and machine found in my house, not in my bedroom. I had been gone for three months and other people were living in my house. The checks and stubs found in my bedroom belonged to me. I used the stubs to write receipts as I explained in my testimony. I have never done anything like credit card fraud. I have never seen a machine like that and wouldn't know what to do with it. My theft priors are all for cashing counterfeit traveler's checks. You can buy them on the street - $200 for $1000 worth - and cash them in stores. I wish Mr. Bryden had helped me prepare for cross-examination so I could have explained better. I would have admitted the check fraud I committed and explained the difference.

25. During my trial it seemed like everything I said was twisted to make me look bad. I wasn't lying or trying to fool the jurors like the prosecutor said. I shot McNeely in self-defense and I did my best to tell the jury what happened. But, just as I feared in the beginning, no one believed me and everything I said was unfairly turned around and used against me. I remember during my testimony I asked the prosecutor if she understood African-American vernacular because it sure didn't seem like she did. She didn't seem to understand what I said much at all.

///

//

I declare under penalty of perjury under the laws of the states of California that the foregoing is true and correct.

Executed this 16 day of July, 2016, at Susanville, California.

DONEL POSTON

# EXHIBIT 3

Copyright (c) 2012 B.E. Witkin Article Sixth Testamentary Trust

Witkin
California Criminal Law, Fourth Edition
B.E. Witkin, Norman L. Epstein, and Members of the Witkin Legal Institute

Chapter III. Defenses
IV. SELF-DEFENSE
A. In General.

1. [§ 67] Nature of Defense.

(1) *Justification for Otherwise Criminal Act.* Self-defense may be a justification for acts that would otherwise be criminal. In California the statute on justifiable homicide makes it a defense "when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished." (P.C. 197(3); see P.C. 197(2), infra, §88; P.C. 693, infra, §90; *People v. Holt* (1944) 25 C.2d 59, 65, 153 P.2d 21; *People v. Collins* (1961) 189 C.A.2d 575, 588, 11 C.R. 504; *People v. Mercer* (1962) 210 C.A.2d 153, 158, 26 C.R. 502; on burden of proof, see 5 *Cal. Crim. Law* (4th), *Criminal Trial*, §627; on distinct defense of excusable homicide by misfortune or accident, see infra, §274; on defense of third person, see infra, §§86, 87; on similar defense to tort liability, see 5 *Summary* (10th) *Torts*, §§417, 418.)

In *People v. Lee* (2005) 131 C.A.4th 1413, 32 C.R.3d 745, defendant, a retired deputy sheriff, fired her handgun to scare away two unleashed<<* **p.508**>> dogs that she encountered while walking her dog. Following her conviction for discharge of a firearm with gross negligence, she argued that the trial court erred in refusing to instruct on self-defense. The prosecution countered that the defense did not apply to attack by an animal. *Held*, the defense is available. Although self-defense generally involves attacks by humans, nothing requires that the threat of imminent harm come from a human; it is only necessary that a defendant actually and reasonably believe in the need to defend against imminent danger. Here, defendant's testimony that she fired her gun to prevent an imminent attack by an approaching, aggressive dog constituted substantial evidence, which required giving the self-defense instruction. (131 C.A.4th 1426.)

The following cases are instructive:

*People v. Stitely* (2005) 35 C.4th 514, 552, 26 C.R.3d 1, 108 P.3d 182 [no substantial evidence of actual fear of imminent harm sufficient to support self-defense instruction].

*People v. Hill* (2005) 131 C.A.4th 1089, 1102, 31 C.R.3d 891 [trial judge properly refused to instruct on self-defense where defendant sought out and initiated shootout with undercover officers and defendant never testified as to apprehension of danger].

*People v. Villanueva* (2008) 169 C.A.4th 41, 52, 86 C.R.3d 534 [defendant's assertion that shooting was accidental did not foreclose instruction on self-defense where substantial evidence supported that theory].

*People v. Adams* (2009) 176 C.A.4th 946, 954, 98 C.R.3d 383 [right of self-defense applies in context of citizen's arrest and may be shown where person acts in reasonable apprehension of imminent danger; person need not "wait for first punch" before defending self; CALCRIM, No. 3470 and instruction on citizen's arrest were correct statements of law and would not have confused jury].

*People v. Johnson* (2009) 180 C.A.4th 702, 709, 203 C.R.3d 321 [where defendant, charged with stabbing motel employee who attempted to eject him for trespassing, claimed that he did so to prevent greater injury and to prevent employee from accessing pellet gun, trial judge properly instructed jury on self-defense pursuant to CALCRIM self-defense instructions; there was no error in rejecting as irrelevant CALCRIM, No. 3475 on use of force by owners and lawful occupants to eject trespasser].

(2) *Jury Instructions.* The following jury instructions deal with self-defense:

CALCRIM, No. 505 [Justifiable Homicide: Self-Defense or Defense of Another].<<* **p.509**>>

CALCRIM, No. 2514 [Possession of Firearm by Person Prohibited by Statute: Self-Defense].





CALCRIM, No. 3470 et seq. [Self-Defense and Defense of Another (Non-Homicide)].

CALJIC, No. 5.10 et seq. [Justifiable Homicide].

CALJIC, No. 5.30 et seq. [Non-Homicidal Defense of Self or Others].

CALJIC, No. 5.50 et seq. [General Principles Concerning Self-Defense].

(3) *Commentary and Practice Works.* Commentary on self-defense is extensive. (See Boyce 10th, p. 902 et seq.; 2 Wharton, Crim. Law (15th ed.), §§127, 189; La Fave, Criminal Law 2d, 5.7; 64 Cal. L. Rev. 881; 14 Loyola L.A. L. Rev. 435; 36 Loyola L.A. L. Rev. 1575 [developments in California homicide law, self-defense]; 25 Southwestern U. L. Rev. 429 [right of abused children who commit parricide to claim self-defense]; 15 U.C. Davis L. Rev. 873 [deadly self-defense against rape]; 42 U.C. Davis L. Rev. 471 ["gay panic defense" (reaction of heterosexual male to alleged unwanted homosexual advances) in connection with claim of provocation or self-defense]; 32 U.C.L.A. L. Rev. 61 [critique of modern concept of justification]; 44 U.S.F. L. Rev. 155 [nonviolent homosexual advances should not be considered sufficient provocation to provoke reasonable person to murder]; 6 Am.Jur.2d (2008 ed.), Assault and Battery §46 et seq.; 40 Am.Jur.2d (1999 ed.), Homicide §138 et seq.; 42 Am.Jur. Trials 151 [Self-Defense in Homicide Cases]; 11 Proof of Facts 2d 351 [intentional killing of aggressor as "accidental death"]; 33 Proof of Facts 2d 211 [privileged use of force in self-defense]; 4 Cal. Crim. Practice 3d, §47:1 et seq.)

2. [§ 68] Conditions for Exercise.

The following general conditions of the privilege of self-defense are important to remember:

(1) The test is apparent necessity; i.e., an honest and reasonable belief in the apparent peril and the need for defense is enough. (P.C. 197(3), supra, §67; see infra, §70.)

(2) The means used, whether deadly or nondeadly force, must be reasonable under the circumstances. (See infra, §75.)

(3) The threatened act must be unlawful, e.g., a trespass or assault; the threat of a lawful arrest or privileged entry on land does not justify an attack by way of self-defense. (P.C. 197(3).)<<* **p.510**>>

(4) There is ordinarily no need to retreat; i.e., the defendant may stand his or her ground. (See infra, §77.)

(5) The privilege is not available to one who sought a quarrel with the fraudulent intent to force a deadly issue and thus, to create a real or apparent necessity to assault another. (See *People v. Garnier* (1950) 95 C.A.2d 489, 496, 213 P.2d 111; 2 Wharton, Crim. Law (15th ed.), §190; infra, §78 et seq.)

(6) The defense is not available to a defendant charged with felony-murder; the purpose of the felony-murder rule is to deter even accidental killings by imposing strict liability on persons who kill while committing specified felonies. (*People v. Loustaunau* (1986) 181 C.A.3d 163, 170, 226 C.R. 216.)

(7) The defense is available to a person who shoots at an aggressor but inadvertently hits another person; under the doctrine of transferred intent, the lack of criminal intent toward the aggressor is transferred to the unintended victim. (See *People v. Mathews* (1979) 91 C.A.3d 1018, 1024, 154 C.R. 628; *People v. Levitt* (1984) 156 C.A.3d 500, 507, 508, 203 C.R. 276; 55 A.L.R.3d 620 [unintentional killing of or injury to third person during attempted self-defense].)

3. [§ 69] Prisoners and Ex-Felons.

It is true that I am a Exfelon but I Dont forfeit all Rights

Prisoners and ex-felons ordinarily operate under restrictions not imposed on the average person. A prisoner, for example, is subject to the commands of correctional officers. An ex-felon is prohibited from possessing any firearm. (P.C. 29800, 2 *Cal. Crim. Law* (4th), *Crimes Against Public Peace and Welfare*, §233 et seq.) However, these persons do not forfeit all rights to self-defense.

Doesnt apply for him since he iniated the argument with the fraudulent intent to force a deadly issue.

A person claiming self defense is entitled to prove that the fear was reasonable.
??? Can I prove that the fear was reasonable? (yes)



good to know

Thus, a correctional officer is not entitled to use unreasonable or excessive force while escorting a prisoner. If the officer does, and the prisoner uses only reasonable force to protect himself or herself, the prisoner is not guilty of violating P.C. 4501.5 (battery by prisoner on nonprisoner, 1 *Cal. Crim. Law* (4th), *Crimes Against the Person*, §57). (*People v. Coleman* (1978) 84 C.A.3d 1016, 1022, 149 C.R. 134.)

Although self-defense is not generally available to a charge of possession of a weapon by an inmate (P.C. 4502) who claims the weapon was possessed for protection from an anticipated attack, it may be allowed when the inmate is confronted with an emergency that justifies seizing a weapon for immediate protection. (*People v. Saavedra* (2007) 156 C.A.4th 561, 569, 67 C.R.3d 403 [self-defense was available to prisoner in possession of inmate-made weapon where evidence supported theory that<<* **p.511**>> defendant had not armed himself prior to attack by two other inmates, temporarily seized weapon from assailants to prevent immediate harm, and did not immediately disclose weapon to correctional officers due to extent of injuries he had suffered].)

Important — Ex felon - Firearm / Justifiable

Similarly, an ex-felon may use a concealable firearm in self-defense, notwithstanding the statutory prohibition on possession of a firearm by an ex-felon. This statute was not intended to apply to self-defense; denying ex-felons the right to use a concealable weapon in self-defense, when they admittedly have the right to use deadlier nonconcealable weapons for this purpose, would lead to absurd results. (*People v. King* (1978) 22 C.3d 12, 23, 148 C.R. 409, 582 P.2d 1000 [disapproving contrary dicta in *People v. Evans* (1974) 40 C.A.3d 582, 586, 115 C.R. 304, 1 *Cal. Crim. Law* (4th), *Crimes Against Public Peace and Welfare*, §235].)

The following jury instructions are applicable:

CALCRIM, No. 2670 [Lawful Performance: Peace Officer].

CALCRIM, No. 2672 [Lawful Performance: Resisting Unlawful Arrest With Force].

CALJIC, No. 9.26 [Arrest or Detention—Use of Reasonable Force—Duty To Submit].

CALJIC, No.9.28 [Use of Excessive Force by Officer].

B. Apparent Necessity.

**1. [§ 70] General Requirement.**

A defendant claiming self-defense must be in reasonable fear of imminent danger of great bodily injury. (P.C. 197(3).) Hence, the following principles apply:

(1) *Bare Fear Is Not Sufficient.* The circumstances "must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (P.C. 198; see *People v. Glover* (1903) 141 C. 233, 239, 74 P. 745; *People v. Lopez* (1948) 32 C.2d 673, 675, 197 P.2d 757 [same rule applies in felonious assault as in homicide; defense was not sustained]; *People v. Gonzales* (1917) 33 C.A. 340, 342, 164 P. 1131 [prior threats, not coupled with hostile act or apparent design to carry them into present effect, were not sufficient]; *People v. Wong* (1947) 83 C.A.2d 60, 64, 187 P.2d 828 [claim was not available where defendant twice shot victim whose only hostile gesture was to take a few steps in defendant's direction]; *People v. Shade* (1986) 185 C.A.3d 711, 716, 717, 230 C.R. 70, citing the text [defense not available where, although defendant may have had reasonable fear at time<<* **p.512**>> he first beat victim, there could be no justification for later attack when victim was unconscious]; *People v. Trevino* (1988) 200 C.A.3d 874, 879, 246 C.R. 357 [defendant's anger or other emotions do not preclude defense, but emotions other than fear cannot be causal factors in decision to use deadly force]; CALJIC, No. 5.12 [Justifiable Homicide in Self-Defense]; 2 Wharton, Crim. Law (15th ed.), §189.)

Important

"The justification of self-defense requires a double showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person." (*People v. Sonier* (1952) 113 C.A.2d 277, 278, 248 P.2d 155.) (On factors relevant in determining whether belief is reasonable, see infra, §72 et seq.; on imperfect self-defense where belief is unreasonable, see infra, §82 et seq.; on right to resist battery despite lack of imminent threat, see infra, §71.)

(2) *Honest and Reasonable Belief Is Sufficient.* The defendant may act on an honest and reasonable belief that imminent danger exists. (*People v. Dawson* (1948) 88 C.A.2d 85, 96, 198 P.2d 338; *People v. Toledo* (1948) 85 C.A.2d 577, 580, 193 P.2d 953; *People v. Collins* (1961) 189 C.A.2d 575, 588, 11 C.R. 504; see *People v. Jackson* (1965) 233 C.A.2d 639, 43 C.R. 817 [reversing conviction for refusal to give instruction]; CALJIC, No. 5.30 [Self-Defense Against Assault]; CALJIC, No. 5.51 [Self-Defense—Actual Danger Not Necessary]; 2 Wharton,



① P.C 197(3) - This code applies because
Note: There was more than bare fear, simply because first he showed me a gun then he attacked me.

Ⓐ "Showed me a pistol and said he was gonna slap the shit out of me," verbatim"





Crim. Law (15th ed.), §189.)

Where the victim has previously threatened the defendant, the defendant is entitled to act more quickly and to take harsher measures of self-protection than one who has not been threatened. *People v. Torres* (1949) 94 C.A.2d 146, 151, 210 P.2d 324 [error to refuse instruction to this effect]; see *People v. Spencer* (1996) 51 C.A.4th 1208, 1220, 59 C.R.2d 627 [error to refuse request to broaden instruction on self-defense to include homicide victim's threats and assaults against third persons of which defendant was aware].)

(3) *Peril Must Be Imminent.* In *People v. Aris* (1989) 215 C.A.3d 1178, 264 C.R. 167, the defendant testified to a long history of beatings by her husband. On the night of the killing, he beat and threatened her; when he fell asleep, defendant shot him. The trial judge gave CALJIC, No. 5.17, on imminent peril, and, in response to a jury inquiry about the term, gave the following explanation: " 'Imminent peril,' as used in these instructions, means that the peril must have existed or appeared to the defendant to have existed at the very time the fatal shot was fired. In other words, the peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from<<* **p.513**>> appearances, must be instantly dealt with." *Held,* this instruction was correct. (215 C.A.3d 1187.) (See *People v. Hill* (2005) 131 C.A.4th 1089, 1101, 31 C.R.3d 891 ["[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice" for perfect or imperfect self-defense]; *People v. Lopez* (2011) 199 C.A.4th 1297, 1306, 132 C.R.3d 248 [jury instructions correctly stated concept of "imminent peril" requirement, and there was no reasonable likelihood that jurors would fail to understand difference between imminent danger and future harm, one being immediate and the other not"].)

① ② ① ②

**2. [§ 71] Exception: Simple Battery.**

A person may resist a simple battery, despite the lack of a threat of imminent bodily injury. In *People v. Myers* (1998) 61 C.A.4th 328, 71 C.R.2d 518, defendant, charged with aggravated assault and battery, claimed that he was being poked in the chest by a man with whom he had long feuded. Defendant retaliated by pushing the man, who then slipped on the wet pavement, struck his head, and suffered serious injury. Relying on self-defense, defendant requested the trial judge to modify CALJIC, No. 5.30, the self-defense instruction, by deleting the requirement that he must have been in fear of imminent bodily harm. The trial judge refused to do so, and defendant was found guilty of aggravated battery and simple assault. *Held,* reversed. Under P.C. 693 (infra, §90), a victim of a battery or assault may use force that is reasonable under the circumstances, even though there is no fear of imminent bodily harm. "To hold otherwise would lead to the ludicrous result of a person not being able to lawfully resist or defend against a continuing assault or battery." (61 C.A.4th 335.)

C. Determining Whether Belief Is Reasonable.

**1. [§ 72] Reasonableness Based on Defendant's Perspective.**

Self-defense requires not only that the defendant honestly believe in the necessity of using force, but also that the belief be objectively reasonable. (On doctrine of imperfect self-defense, see infra, §82 et seq.) In *People v. Aris* (1989) 215 C.A.3d 1178, 264 C.R. 167, the court held that evidence of the battered woman syndrome was relevant to prove defendant's subjective honesty but not to prove the objective reasonableness of her actions. (215 C.A.3d 1196, 1199.) *People v. Day* (1992) 2 C.A.4th 405, 2 C.R.2d 916, reached a similar conclusion. (2 C.A.4th 414, 415.)

In *People v. Humphrey* (1996) 13 C.4th 1073, 56 C.R.2d 142, 921 P.2d 1, the Supreme Court disagreed, holding that a defendant's personal<<* **p.514**>> situation and knowledge are relevant in determining the objective reasonableness of THE defendant's actions, and that expert testimony may assist in that determination. The court considered the defense in light of Ev.C. 1107, which allows expert opinion evidence about battered woman syndrome in criminal trials, and which states that it is intended as a rule of evidence only and makes no substantive change affecting the Penal Code. (See 1 *Cal. Evidence* (5th), *Opinion Evidence*, §52.)

(a) Self-defense requires an actual and reasonable belief in the need to defend. Objective reasonableness is judged from the point of view of a reasonable person in defendant's position, i.e., a person in a situation and with knowledge similar to that of defendant. (13 C.4th 1082, 1083.) "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself." (13 C.4th 1083.)

(b) *Aris* and *Day* interpreted the reasonableness element too narrowly and "failed to consider that the jury, in determining objective reasonableness, must view the situation from the *defendant's perspective.*" (13 C.4th 1086.) Evidence of a victim's behavior toward the defendant, including threats and violence, is relevant to reasonableness. The attempt to distinguish between evidence of this behavior and expert testimony



① [72] A self defense defined by the penal code (13 C.4th 1086 B

In CAbable of being Defended or
Sustained (Supported)
~~Incable of~~



about its effects on defendant is untenable. To effectively present the situation as perceived by her and to show the reasonableness of her fear, defendant should be able to present expert testimony on the battering syndrome and its effects on a woman. (13 C.4th 1086.)

(c) "Contrary to the Attorney General's argument, we are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard. Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' Evidence Code section 1107 states a 'rule of evidence only' and makes 'no substantive change.' . ... The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the *jury*, not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable." (13 C.4th 1087.)

(d) Some of the expert testimony may be relevant only with respect to defendant's subjective belief. "To dispel any possible confusion, it might be appropriate for the court, on request, to clarify that, in assessing reasonableness, the question is whether a reasonable person in the defendant's circumstances would have perceived a threat of imminent injury or<<* **p.515**>> death, and not whether killing the abuser was reasonable in the sense of being an understandable response to ongoing abuse; and that, therefore, in making that assessment, the jury may not consider evidence merely showing that an abused person's use of force against the abuser is understandable." (13 C.4th 1088.) (See *People v. Romero* (1999) 69 C.A.4th 846, 854, 81 C.R.2d 823 [proposed testimony of defense expert as to sociology of poverty and sense of honor felt by Hispanic gang members was properly excluded as irrelevant to claim of self-defense in homicide prosecution; relying on statement in *Humphrey* regarding "reasonable gang member" standard].)

There has been considerable commentary on the subject. (See 32 Hastings L. J. 895 [battered wife syndrome as defense]; 6 Pepperdine L. Rev. 213 [same]; 34 Stanf. L. Rev. 615 [same]; 46 Stanf. L. Rev. 781 [rationality of race-based attitudes in assessing risk of violence]; 73 A.L.R.4th 993 [standard of reasonableness for belief that physical force is necessary]; 58 A.L.R.5th 749 [admissibility of battered women's syndrome evidence on self-defense issue]; 34 Proof of Facts 2d 1 [battered woman defense].)

**2. [§ 73] Evidence of Mental Illness Is Not Admissible.**

(b) *People v. Jefferson* (2004) 119 C.A.4th 508, 14 C.R.3d 473, defendant, while incarcerated for murder and robbery and an inmate in the psychiatric services unit, severely kicked several correctional officers on two different occasions, and spat on two of them. Defendant said his actions were the result of "voices" outside his head that warned him of impending harm from the officers. He stated that the voices he heard "everyday, all day" were usually voices of women he knew, and that they brought him news and warnings. Defendant pleaded not guilty to battery charges and not guilty by reason of insanity. In the guilt phase, the trial court granted the prosecution's motion to exclude evidence of defendant's mental condition on relevancy grounds. When asked by the jury, the trial judge advised that they could not consider defendant's mental state in deliberating whether defendant was justified in attacking the officers, but that they are to consider how a reasonable person in defendant's position and with his knowledge would act. The jury found defendant guilty on all the battery counts. *Held,* judgment affirmed.

(a) The test here is not whether someone "like" defendant would reasonably believe there was danger, but whether a reasonable person in defendant's situation, "seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm." A reasonable person, by definition, is not one who hears voices because of mental illness. (119 C.A.4th 519.)<<* **p.516**>>

(b) Although *People v. Humphrey* (1996) 13 C.4th 1073, 56 C.R.2d 142, 921 P.2d 1, supra, §72, permitted expert testimony on battered women's syndrome to establish the objective reasonableness of the defendant's belief in the need to kill the victim, *Humphrey* did not alter the reasonable person standard from objective to subjective, and thus does not require that evidence of defendant's mental condition be admitted. The jury knew of defendant's inmate status at the psychiatric unit, the crimes for which he was incarcerated, that he was being involuntarily medicated, and the extent to which he heard voices and what he perceived them to say. Therefore, the jury "had before it all of the relevant facts and circumstances in which defendant found himself. The trial court correctly denied defense counsel's efforts to define the reasonable person as a mentally ill person hearing voices." (119 C.A.4th 520.)

**3. [§ 74] Threats by Third Person.**

In *People v. Minifie* (1996) 13 C.4th 1055, 56 C.R.2d 133, 920 P.2d 1337, defendant had previously killed K, apparently in self-defense. In a subsequent incident in a bar, A, who was on crutches, hit and knocked defendant to the floor, and defendant then shot and wounded A. At his trial on assault and other charges, defendant claimed self-defense and proffered evidence that the K family and their friends had made threats against him, and that A and K had been friends. *Held,* the evidence was improperly excluded.



we Could have had A fist fight if he
wouldn't have showed me that Gun.

154



(a) A person claiming self-defense is entitled to prove that the fear was reasonable. "The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual." (13 C.4th 1065, 1066.) As established by *People v. Lee Chuck* (1887) 74 C. 30, 15 P. 322, a defendant claiming self-defense may present evidence of threats by the victim's associates to show that the defendant's fear was reasonable. (13 C.4th 1065, 1066.)

(b) The prosecution's argument that it is unfair to permit evidence of threats made by persons other than the victim is flawed in that "it assumes the law of self-defense centers on the *victim's* acts and intent. To the contrary, the law recognizes the justification of self-defense not because the victim 'deserved' what he or she got, but because the defendant acted *reasonably* under the circumstances. Reasonableness is judged by how the situation appeared to the *defendant,* not the victim. ... The test, therefore, is not whether the victim adopted the third party threats, but whether the defendant reasonably associated the victim with those threats." (13 C.4th 1068.) (See 55 A.L.R.5th 449 [admissibility of third-party threats to support claim of self-defense in assault or homicide case].)<<* **p.517**>>

we Could have had A fist fight

D. Use of Force.

**1. [§ 75] Reasonable Force.**

Applies to me

(1) *Deadly Force.* Deadly force is justified only when the apparent peril is great and imminent. (P.C. 197(3), supra, §67; see *People v. Anderson* (1922) 57 C.A. 721, 727, 208 P. 204 [simple assault does not justify homicide]; *People v. Jones* (1961) 191 C.A.2d 478, 482, 12 C.R. 777 [same]; *People v. Clark* (1982) 130 C.A.3d 371, 380, 181 C.R. 682 [right to use deadly force was not established as matter of law where, although defendant had affair with victim's wife and victim approached defendant with obvious intent of assaulting him, victim was unarmed and was not so physically overwhelming that defendant had reason to fear great bodily injury]; CALCRIM, No. 505 [Justifiable Homicide: Self-Defense or Defense of Another]; CALJIC, No. 5.12 [Justifiable Homicide in Self-Defense]; CALJIC, No. 5.31 [Assault With Fists—When Use Of Deadly Weapon Not Justified]; CALJIC, No. 9.11 [Insulting Words—Not Justification for Assault]; 2 Wharton, Crim. Law (15th ed.), §189; cf. *People v. Collins* (1961) 189 C.A.2d 575, 11 C.R. 504 [killing was justifiable homicide where victim attacked defendant to force consent to act of sodomy].)

(2) *Excessive Force.* Force that is excessive, i.e., unreasonable under the circumstances, is not justified. (See *People v. Moody* (1943) 62 C.A.2d 18, 22, 143 P.2d 978; *People v. Olquin* (1981) 119 C.A.3d 39, 44, 173 C.R. 663 [defendant used reasonable force to protect himself against officer's excessive force in making arrest].)

**2. [§ 76] Presumption That Force Used in Residence Is Reasonable.**

(1) *In General.* A person who uses force intended or likely to cause death or great bodily injury to an intruder into his or her residence is presumed to have reasonably feared imminent danger of death or great bodily injury to himself or herself, family, or a household member. This presumption applies only if (a) the intruder was not a family or household member, (b) the intruder unlawfully and forcibly entered the residence, and (c) the resident knew or had reason to believe that an unlawful and forcible entry had occurred. (P.C. 198.5.) "Great bodily injury" is defined as "a significant or substantial physical injury." (P.C. 198.5.) (See *People v. Owen* (1991) 226 C.A.3d 996, 1004, 277 C.R. 341 [intruder need not be stranger to resident, only nonmember of family or household]; CALJIC, No. 5.44 [Presumption of Fear of Death/Great Bodily Injury]; CALCRIM, No. 3477 [Presumption That Resident Was Reasonably Afraid of Death or Great Bodily Injury].)<<* **p.518**>>

(2) *Entry Is Required.* Entry into the residence is required before the presumption applies. (See *People v. Brown* (1992) 6 C.A.4th 1489, 1495, 8 C.R.2d 513 [entry onto unenclosed front porch does not constitute entry into residence]; *People v. Curtis* (1994) 30 C.A.4th 1337, 1362, 37 C.R.2d 304 [defendant was not entitled to benefit of presumption where there was no actual entry].)

(3) *Presumption Is Available Only to Resident.* The presumption is available only to a resident of the habitation. A guest who occasionally is allowed to stay overnight is not a resident and is not entitled to the presumption. (See *People v. Silvey* (1997) 58 C.A.4th 1320, 1326, 68 C.R.2d 681.)

(4) *Prosecution Has Burden of Proving Lack of Reasonable Fear.* If the evidence supports the presumption, the prosecution has the burden of proving lack of reasonable fear, and the defendant is entitled on proper request to an instruction on the presumption. However, the trial court is not required to instruct on its own motion if the jury is otherwise properly instructed on the pertinent law. (See *People v. Owen*, supra, 226 C.A.3d 1005, 1007.)

Case 3:18-cv-03450-GPB Document 25-6 Filed 09/17/20 Page 262 of 483 PageID #: 9257



E. Right To Stand Ground.

[§ 77] No Retreat Rule.

A person threatened with attack under conditions that create the privilege of a counter-attack in self-defense (supra, §67 et seq.), may sometimes elect to flee or otherwise escape from the scene of danger. A minority of states, following the common law rule, hold that the person must attempt to do so, i.e., "retreat to the wall" before killing. (See 2 Wharton, Crim. Law (15th ed.), §128; 1 U.C.L.A. L. Rev. 145, 150, 160; 6 Am.Jur.2d (2008 ed.), Assault and Battery §54; 40 Am.Jur.2d (2008 ed.), Homicide §155 et seq.)

Important

The majority and California rule place no such limitation on the privilege. The person attacked may "stand his ground" and defend by deadly force if necessary. (People v. Newcomer (1897) 118 C. 263, 273, 50 P. 405; *People v. Maughs* (1906) 149 C. 253, 260, 86 P. 187; *People v. Dawson* (1948) 88 C.A.2d 85, 95, 198 P.2d 338; *People v. Garcia* (1969) 275 C.A.2d 517, 522, 79 C.R. 833; *Roads v. Superior Court* (1969) 275 C.A.2d 593, 601, 80 C.R. 169; see *Brown v. United States* (1921) 256 U.S. 335, 41 S.Ct. 501, 502, 65 L.Ed. 961, 963 ["Detached reflection cannot be demanded in the presence of an uplifted knife"]; *People v. Rhodes* (2005) 129 C.A.4th 1339, 1346, 29 C.R.3d 226 [testimony of defendant that he<<* p.519>> shot victim because he saw victim with gun and was afraid that victim would shoot him if he drove away from encounter was sufficient evidence to warrant instruction on no retreat rule]; 41 A.L.R.3d 584 [duty to retreat when one is attacked at office or place of business or employment]; 100 A.L.R.3d 532 [duty to retreat when assailant is social guest on premises]; 67 A.L.R.5th 637 [duty to retreat where assailant and assailed share same living quarters]; CALJIC, No. 5.50 [Self-Defense—Assailed Person Need Not Retreat].)

Nor does a person have a duty to curtail his or her activities to avoid an encounter with a person who has threatened to attack. "For one may know that if he travels along a certain highway he will be attacked by another with a deadly weapon, and be compelled in self-defense to kill his assailant, and yet he has the right to travel that highway, and is not compelled to turn out of his way to avoid the expected unlawful attack." (*People v. Gonzales* (1887) 71 C. 569, 578, 12 P. 783.)

2. Exception: Aggressor or Other Wrongdoer.

a. [§ 78] Duty To Retreat.

Applies to Him

(1) *In General.* The person who wrongfully attacks, or who voluntarily engages in a fight, and is met by a counterattack, has no privilege to stand his ground and defend. If the defendant "was the assailant or engaged in mutual combat," he or she "must really and in good faith have endeavored to decline any further struggle before the homicide was committed." (P.C. 197(3); see *People v. Button* (1895) 106 C. 628, 632, 634, 39 P. 1073; *People v. Hecker* (1895) 109 C. 451, 462, 463, 42 P. 307; *People v. Holt* (1944) 25 C.2d 59, 65, 153 P.2d 21; *People v. Bolton* (1979) 23 C.3d 208, 215, 152 C.R. 141, 589 P.2d 396 [defendant pointed gun at H; when H reached for his gun defendant was bound to retreat]; *In re Christian S.* (1994) 7 C.4th 768, 773, footnote 1, 30 C.R.2d 33, 872 P.2d 574, infra, §82, citing the text [defendant who has created circumstances under which adversary's attack or pursuit is legally justified may not invoke self-defense doctrine]; *People v. Duchon* (1958) 165 C.A.2d 690, 693, 332 P.2d 373; *People v. Rios* (2007) 151 C.A.4th 1154, 1161, 60 C.R.3d 591 [defendant was properly convicted of voluntary manslaughter where use of broken beer bottles in mutual combat resulted in defendant severing victim's jugular vein; no substantial evidence that victim initiated fight by "such sudden and deadly force" that defendant could not withdraw].)

In *People v. Watie* (2002) 100 C.A.4th 866, 124 C.R.2d 258, defendant and his cohorts went to defendant's mother's house to retrieve his<<* p.520>> stepsiblings after defendant's mother fled the dwelling following a fight with the victim. Defendant argued with the victim through a locked security gate, threatened and challenged the victim, and at various times attempted to gain entry. Defendant mistakenly thought the victim had a firearm and fired his own gun into the house, killing the victim. Defendant was tried for second degree murder, but the jury found him guilty of voluntary manslaughter, discharging a firearm at an inhabited dwelling, and related enhancements. Defendant argued that the trial court erred in instructing the jury that the victim had a right to defend his dwelling, and that these instructions removed actual self-defense from the jury's consideration. *Held,* the instructions were proper under the facts. The jury had to decide whether defendant's use of deadly force was justified when he confronted the victim at the residence and whether defendant's unlawful conduct created circumstances that would legally justify the victim using force. Given the trespass, threats, and intimidations by defendant and his cohorts, the victim had the right to defend himself in his home, and defendant had no right of self-defense. (100 C.A.4th 878.)

(2) *Meaning of "Mutual Combat."* Mutual combat means "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose.*" (*People v. Ross* (2007) 155 C.A.4th 1033, 1046, 1056,



Clearly Thru up my hands and turned down the battle, " told him wherever he was driving that car I didn't want to ride" Then Boom! Smack!





66 C.R.3d 438 [where defendant who punched assailant after being slapped in face was convicted of aggravated assault and battery, it was prejudicial error for trial court to improperly instruct on mutual combat and suggest that doctrine might apply to any exchange of blows, thus disqualifying defendant from asserting right to self-defense]; *People v. Valenzuela* (2011) 199 C.A.4th 1214, 1233, 133 C.R.3d 196 [testimonial evidence from rival gang members, including defendant, about exchange of gun fire between two autos showed an intention to fight and supported instruction on mutual combat].)

(3) *Jury Instructions.* The following jury instructions are applicable:

CALCRIM, No. 3471 [Right to Self-Defense: Mutual Combat or Initial Aggressor].

CALCRIM, No. 3472 [Right to Self-Defense: May Not Be Contrived].

CALJIC, No. 5.54 [Self-Defense by an Aggressor].

CALJIC, No. 5.55 [Plea of Self-Defense May Not Be Contrived].<<* p.521>>

CALJIC, No. 5.56 [Self-Defense—Participants in Mutual Combat].

b. [§ 79] Right of Defense After Retreat or Withdrawal.

(1) *Withdrawal and Notification.* If the original aggressor or participant in an unlawful fight does attempt to withdraw, and so informs the opponent, and is nevertheless pursued and attacked, he or she may have the usual right of self-defense to this new attack. But both conditions—withdrawal and notification—must appear: "In order for an assailant to justify the killing of his adversary he must not only endeavor to really and in good faith withdraw from the combat, but he must make known his intentions to his adversary. His secret intentions to withdraw amount to nothing. They furnish no guide for his antagonist's future conduct. They indicate in no way that the assault may not be repeated, and afford no assurance to the party assailed that the need of defense is gone." (*People v. Button* (1895) 106 C. 628, 632, 39 P. 1073; see 2 Wharton, Crim. Law (15th ed.), §§128, 190; 55 A.L.R.3d 1000 [withdrawal, after provocation of conflict, as reviving right of self-defense]; 3 Proof of Facts 2d 705 [withdrawal by aggressor as reviving right of self-defense].)

(2) *Effective Communication of Withdrawal.* An ineffectual attempt to communicate the intent to withdraw does not give the aggressor the right. "For, as the deceased, acting upon the appearances created by the wrongful acts of the aggressor, would have been justified in killing him, he whose fault created these appearances cannot make the natural and legal acts of the deceased looking to his own defense a justification for the homicide. Before doing so he must have destroyed these appearances and removed, to the other's knowledge, his necessity, actual or apparent, for self-preservation." (*People v. Hecker* (1895) 109 C. 451, 463, 42 P. 307.) (See *People v. Button,* supra, 106 C. 635 [inability to communicate withdrawal because defendant's original attack left his retaliating victim dazed and unable to understand]; *People v. Hernandez* (2003) 111 C.A.4th 582, 588, 3 C.R.3d 586, citing the text [original aggressor may communicate withdrawal by words *or* conduct]; *People v. Nem* (2003) 114 C.A.4th 160, 166, 7 C.R.3d 478 [jury instruction did not require defendant to communicate verbally; instruction encompassed communication by words or by nonverbal conduct, including informing opponent that defendant has stopped fighting "by acts attendant to stopping or withdrawing"]; CALCRIM, No. 3471 [permits use of words or conduct to convey withdrawal]; CALJIC, No. 5.54 [same].)<<* p.522>>

This might Be an issue Just in case they try to use this

c. [§ 80] Nonfelonious Aggressor.

Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force (supra, §75). If the victim uses excessive force, the aggressor's right of self-defense arises. "For, as his acts did not justify upon the part of the other the use of deadly means for their prevention, his killing by the other would be criminal, and one may always defend himself against a criminal attempt to take his life." Ordinarily the original aggressor must first attempt to withdraw. "If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense." (*People v. Hecker* (1895) 109 C. 451, 464, 42 P. 307.) Thus, the risk of effective communication of withdrawal is only on the original aggressor whose attack is deadly or otherwise felonious. (109 C. 463, 464.) (See *People v. Quach* (2004) 116 C.A.4th 294, 301, 10 C.R.3d 196, citing the text [attempted murder and assault with firearm convictions were reversed where jury was instructed with CALJIC No.



* This clause is the only setback in perfect self ~~defense~~ defense.

* Simply

5.56 but was not instructed that defendant could reasonably react to sudden and perilous counterassault]; CALJIC, No 5.56 [revised to add alternate paragraph based on *Quach* that permits reasonable force in response to sudden and deadly counterassault].)

4. [§ 81] Pursuit and Punishment.

I abided by this statue

(1) *Unwarranted Punishment When Danger Has Ended.* If the person attacked defends himself or herself so successfully that the attacker is rendered incapable of inflicting injury, or if for any other reason the danger no longer exists, there is no justification for further retaliation or killing as punishment or revenge. (See *People v. Tamkin* (1882) 62 C. 468 [after using vile language and threats deceased walked away and defendant shot him]; *People v. Keys* (1944) 62 C.A.2d 903, 916, 145 P.2d 589 [gunfight; defendant fired fatal shot at victim's back after victim had abandoned conflict and started to run away]; *People v. Evans* (1969) 2 C.A.3d 877, 882, 82 C.R. 877 [right to self-defense ceased when knife-wielding defendant began to chase unarmed person]; *People v. Perez* (1970) 12 C.A.3d 232, 236, 90 C.R. 521, citing the text [several minutes after booking officer allegedly slammed defendant's head against desk and while officer's back was turned, defendant hit him with stool]; *People v. Smith* (1981) 122 C.A.3d 581, 588, 176 C.R. 73 [15 minutes after being assaulted, defendant returned and attacked the assaulter; refusal to instruct<<* **p.523**>> that right of self-defense continued until reasonable man would have "cooled down" was proper]; CALCRIM, No. 3474 [Danger No Longer Exists or Attacker Disabled]; CALJIC, No. 5.52 [Self-Defense—When Danger Ceases]; CALJIC, No. 5.53 [Self-Defense Not an Excuse After Adversary Disabled]; 2 Wharton, Crim. Law (15th ed.), §127.)

(2) *Pursuit of Fleeing Attacker.* The "stand his ground" doctrine (supra, §77) is said to give the defendant a further right. If the fleeing attacker still represents a potential threat of serious injury, the defendant may pursue the attacker until the defendant has made himself or herself secure from danger. (See *People v. Hatchett* (1942) 56 C.A.2d 20, 22, 132 P.2d 51; CALJIC, No. 5.50 [Self-Defense—Assailed Person Need Not Retreat].)

Rarely do the circumstances give rise to this limited right to pursue and to kill, for it must be exercised only to protect, and not to punish an attacker who is attempting to escape. "[T]he pursuit must not be in revenge, nor after the necessity for defense has ceased, but must be prosecuted in good faith to the sole end of winning his safety and securing his life." (*People v. Hecker* (1895) 109 C. 451, 463, 42 P. 307; see *People v. Conkling* (1896) 111 C. 616, 626, 44 P. 314 ["Killing under such circumstances is not done in self-defense, for the necessity to kill is not present, but it is simply wreaking vengeance in satisfaction of a prior wrong"]; *People v. Finali* (1916) 31 C.A. 479, 160 P. 850 [victim threw rock at defendant, then attempted to escape; defendant pursued, shot, and killed him].)

F. Imperfect Self-Defense.

Connected

1. [§ 82] Availability of Defense.

(1) *In General.* It is a well-established rule that an honest but *unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury, although insufficient for self-defense, is sufficient to negate malice aforethought, the mental element necessary for murder, and thus to reduce murder to manslaughter. (*People v. Flannel* (1979) 25 C.3d 668, 674, 160 C.R. 84, 603 P.2d 1; see *People v. Murtishaw* (1989) 48 C.3d 1001, 1013, 1014, 258 C.R. 821, 773 P.2d 172, 4 *Cal. Crim. Law* (4th), *Introduction to Criminal Procedure*, §12 [unreasonable self-defense rule of *Flannel* is based on state common law, not United States Constitution]; *People v. Goins* (1991) 228 C.A.3d 511, 516, 279 C.R. 42 [*Flannel* rule does not apply to enhancement]; 33 U.C.L.A. L. Rev. 1679 [women and imperfect self-defense]; CALJIC, No. 5.17 [Actual but Unreasonable Belief in Necessity To Defend—Manslaughter]; on<<* **p.524**>> sharp criticism of imperfect self-defense doctrine, see concurring opinion in *People v. Wright* (2005) 35 C.4th 964, 975, 28 C.R.3d 708, 111 P.3d 973; on application of doctrine of imperfect defense of others, see supra, §87.)

Where the doctrine of imperfect self-defense applies, the manslaughter of which the defendant is guilty may be either voluntary or involuntary, depending on the circumstances. A defendant who, with intent to kill or with conscious disregard for life, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter. (*People v. Blakeley* (2000) 23 C.4th 82, 91, 96 C.R.2d 451, 999 P.2d 675, 1 *Cal. Crim. Law* (4th), *Crimes Against the Person*, §243; see 36 Loyola L.A. L. Rev. 1588 [developments in California homicide law; imperfect self-defense].)

(2) *Defense Is Not Available to Charge of Mayhem.* The defense does not apply to mayhem. (See *People v. Sekona* (1994) 27 C.A.4th 443, 448, 457, 32 C.R.2d 606 [trial judge was not required to instruct on own motion on imperfect self-defense as defense to charge of mayhem]; *People v. Hayes* (2004) 120 C.A.4th 796, 801, 15 C.R.3d 884 [imperfect self-defense is not available to reduce charge of mayhem; belief that one is acting in self-defense, whether reasonable or not, does not negate malice element in mayhem which, unlike malice aforethought in murder, only requires wish to vex, annoy, or injure another or intent to do wrongful act; distinguishing *People v. Flannel*]; *People v. Quintero* (2006) 135 C.A.4th 1152, 1167, 37 C.R.3d 884 [imperfect self-defense is not available to charge of aggravated mayhem]; *People v.*







*Szadziewicz* (2008) 161 C.A.4th 823, 836, 74 C.R.3d 416 [in trial for attempted murder and aggravated mayhem, trial court had no duty to instruct on imperfect self-defense; defense is not available to charge of aggravated mayhem and evidence showed that defendant created circumstances that justified victim's resistance].)

(3) *Effect of Abolition of Diminished Capacity. In re Christian S.* (1994) 7 C.4th 768, 771, 30 C.R.2d 33, 872 P.2d 574, held that the doctrine of imperfect self-defense survived the 1981 abolition of the defense of diminished capacity (supra, §27 et seq.).

(a) The doctrine of imperfect self-defense is based on the principle that an actual but unreasonable belief in the necessity of self-defense negates the malice aforethought that is an element of murder, so that the offense is reduced to manslaughter. The opinions refer to an "honest belief," but the term "actual belief" is more precise. (7 C.4th 773.) "Because imperfect self-defense and diminished capacity were firmly established by 1981, we assume the Legislature was aware of both doctrines and would have made clear any intent to abolish either doctrine." (7 C.4th 774.)<<* **p.525**>>

(b) Both the language and history of the 1981 amendments make clear the Legislature's intent to abolish the diminished capacity defense. (7 C.4th 774.) P.C. 28(b) provides that there is "no defense of diminished capacity, diminished responsibility, or irresistible impulse," and P.C. 188, in a reference to the diminished capacity defense, provides that "an awareness of the obligation to act within the general body of laws regulating society is not included within the definition of malice." (7 C.4th 775.) Conspicuously absent from these amendments, as well as from the legislative history, is any reference to imperfect self-defense. (7 C.4th 774, 781.) The most reasonable inference is that the Legislature intended not to abolish that doctrine. (7 C.4th 775, 781.)

This might apply

(c) The doctrine of imperfect self-defense is narrow. "It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. ... Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. ... Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." (7 C.4th 783.) An instruction on imperfect self-defense is required only where there is substantial evidence to support the defense, not whenever a self-defense instruction is given. (7 C.4th 783.) (See *People v. Humphrey* (1996) 13 C.4th 1073, 1082, footnote 2, 56 C.R.2d 142, 921 P.2d 1, supra, §72 [reiterating preference for term "actual belief" instead of "honest belief"]; 22 Pepperdine L. Rev. 1199 [*Christian S.*]; 26 West L.A. L. Rev. 423 [same].)

2. [§ 83] Defense Is Not Available Where Defendant Provokes Adversary.

(1) *In General.* "The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined." Ordinary self-defense doctrine, which applies when a defendant *reasonably* believes that his or her safety is endangered, does not apply if the defendant's "own wrongful conduct ... created circumstances under which his adversary's attack or pursuit is legally justified." Stated more generally, "not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense." (*People v. Valencia* (2008) 43 C.4th 268, 288, 74 C.R.3d 605, 180 P.3d 351.)

The issue is also illustrated in *People v. Hardin* (2000) 85 C.A.4th 625, 102 C.R.2d 262. Defendant was tried for murder in the beating death of an elderly woman whose home he had entered under a cocaine-induced belief that he was being pursued by killers. When the victim tried to evict<<* **p.526**>> defendant by threatening him with a hammer, he used the hammer to bludgeon her. Defendant argued that he was guilty of manslaughter, not murder, because his drug-induced perceptions permitted him to defend himself when the victim approached him with the hammer. He challenged an instruction that imperfect self-defense is not available if the defendant's wrongful conduct created the circumstances that are claimed to justify use of force. *Held*, the instruction was correct.

(a) Defendant relied on that portion of *People v. Hecker* (1895) 109 C. 451, 42 P. 307, supra, §80, that suggests a mere trespass onto property, even if forcible, does not permit a victim to use deadly or other excessive force to repel the intruder. From this, defendant concluded the language in the instruction is erroneous and prejudicial to his claim of imperfect self-defense. (85 C.A.4th 632.) Although the right to use deadly force has been narrowed, a fundamental shift of emphasis has taken place regarding defense of habitation. Under P.C. 198.5 (supra, §76), the use of deadly force by a homeowner is now presumed to be in response to a reasonable fear of imminent deadly danger. Thus, insofar as *Hecker* "can be read as granting home invaders the right of imperfect self-defense to resist attempts at forcible eviction by a residential homeowner," that construction is no longer tenable in light of P.C. 198.5. (85 C.A.4th 634.)

(b) When defendant invaded her home, the victim was presumptively justified in fearing that the entry entailed a threat to her life and safety. Thus, although she only threatened use, she was entitled to use force to evict defendant, force that P.C. 198.5 would make presumptively reasonable. As the jury was instructed, defendant had a duty to retreat, but the victim did not. Defendant was given the opportunity to do so, but

Case 3:18-cv-03450-CRB Document 25-6 Filed 09/17/20 Page 264 of 483 PageID #: 9259



did not, and therefore created the entire situation. The victim's use of force was privileged; defendant's was not. The instructions so advising the jury were proper. (85 C.A.4th 634.) (See *People v. Seaton* (2001) 26 C.4th 598, 664, 110 C.R.2d 441, 28 P.3d 175 [because defendant was initial aggressor and victim's response was legally justified, defendant could not rely on "unreasonable" self-defense as basis for voluntary manslaughter].)

(2) *Distinction: Where Victim's Use of Force Is Unlawful.* The defense is available where the defendant sets dangerous events in motion but the victim's use of force is unlawful. In *People v. Vasquez* (2006) 136 C.A.4th 1176, 1180, 39 C.R.3d 433, a wheelchair-bound defendant invited his cousin, A, to join him and others in an alley where defendant then confronted A about a sexual attack on defendant's younger brother years earlier. In response, A lunged at defendant and began choking him. Defendant then drew a gun and repeatedly shot A. The trial judge refused to instruct the jury on imperfect self-defense, stating that (a) as a factual<<* **p.527**>> matter defendant did not believe he was in imminent peril, and (b) defendant created the need to defend himself by luring A to the alley. Defendant was convicted of second degree murder. *Held,* judgment reversed and remanded for retrial.

(a) The chief witness against defendant testified that A was choking defendant when defendant drew his gun and fired. That defendant had a gun to thwart A's attack does not mean that defendant could not have believed his life was in peril. Generally, "a defendant claiming imperfect self-defense will *always* have had the means to rebuff the victim's attack, or else the homicide would not have occurred." Thus, there was a factual basis for the defense, and it was for the jury to decide whether defendant actually feared serious injury or death. (136 C.A.4th 1179.)

(b) Although imperfect self-defense does not apply when a defendant creates circumstances in which the victim is legally justified in retaliating, the defense is available when the victim's use of force is unlawful, "even when the defendant set in motion the chain of events that led the victim to attack the defendant." Accordingly, defendant was entitled to assert the defense. (136 C.A.4th 1180.)

(c) The court's refusal to instruct on the defense was not harmless. Although defendant was charged with first degree murder, the jury convicted on second degree, finding that defendant did not go into the alley with a wilful, deliberate, and premeditated plan to kill A. Thus, the jury felt that defendant formed his intent to kill only in the circumstance of the confrontation, which is consistent with the verdict and voluntary manslaughter arising from imperfect self-defense. Because a reasonable jury could conclude that defendant believed his life was in imminent peril, the matter must be retried. (136 C.A.4th 1180.)

**[§ 84] Delusion Is Not Sufficient for Defense.**

In *People v. Mejia-Lenares* (2006) 135 C.A.4th 1437, 38 C.R.3d 404, defendant presented evidence that he fatally stabbed H out of fear that H was transforming into the devil and wanted to kill defendant. Although defendant conceded that he imagined H's transformation, he presented evidence that near the time of the homicide he was diagnosed as suffering from major depression with psychotic features, including delusions. The trial judge instructed the jury on first and second degree murder, as well as manslaughter based on sudden quarrel or heat of passion or on imperfect self-defense. The trial judge also instructed with CALJIC, No. 8.73.1, that evidence of a hallucination may be considered in determining the degree of murder, but refused defendant's request to modify the instruction to<<* **p.528**>> permit consideration of a hallucination with respect to imperfect self-defense. *Held,* there was no error.

(a) Defendant's evidence of the events leading to the stabbing showed that his belief in the need to defend himself arose solely from his delusion that H was turning into the devil. Imperfect self-defense is "a species of mistake of fact ... as such, it cannot be founded on delusion," which is a conception entirely divorced from fact or reason. "[A] mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality." (135 C.A.4th 1453.) Permitting a defendant to use delusion alone as a basis of unreasonable mistake of fact amounts to permitting the defendant to use insanity as a defense without pleading not guilty by reason of insanity and "thus to do indirectly what [defendant] could not do directly." (135 C.A.4th 1456.)

(b) Because imperfect self-defense may not be based on delusion alone, defendant was not entitled to have the jury consider evidence of hallucination on whether defendant killed in the actual but unreasonable belief of the need to defend himself against imminent peril. (135 C.A.4th 1461.)

**[§ 85] Illustrations.**

The following decisions illustrate the scope and application of imperfect self-defense:







*People v. Stitely* (2005) 35 C.4th 514, 552, 26 C.R.3d 1, 108 P.3d 182 [absent substantial evidence that defendant actually feared imminent harm, trial judge properly refused to instruct on perfect or imperfect self-defense].

*People v. Rogers* (2006) 39 C.4th 826, 882, 48 C.R.3d 1, 141 P.3d 135 [defendant's testimony that victim was walking toward him with her finger pointed at him and that he felt "threatened" and "afraid" and shot her out of need for "protection" was not sufficient evidence to support instruction].

*People v. Valencia* (2008) 43 C.4th 268, 289, 74 C.R.3d 605, 180 P.3d 351 [where defendant in murder prosecution was relying on imperfect self-defense, trial court did not err in instructing jury on both perfect and imperfect self-defense to help jury fully understand law of both and ensure that jury was aware of differences].

*People v. Curtis* (1994) 30 C.A.4th 1337, 1354, 37 C.R.2d 304 [doctrine of imperfect self-defense applies to volitional, not accidental, shooting].<<* **p.529**>>

*People v. Vital* (1996) 45 C.A.4th 441, 445, 446, 52 C.R.2d 676 [trial judge was not required to instruct on its own motion on imperfect self-defense as defense to charge of torture].

*People v. Rodriguez* (1997) 53 C.A.4th 1250, 1270, 62 C.R.2d 345 [court properly rejected defendant's claim of error in failing to instruct on imperfect self-defense; although there was evidence that defendant feared future harm from victim, there was no evidence that he feared imminent harm].

*People v. Tabios* (1998) 67 C.A.4th 1, 6, 78 C.R.2d 753 [trial judge properly precluded defendants from asserting imperfect self-defense claim as defense to prosecution's second degree felony-murder theory of liability].

*People v. Viramontes* (2001) 93 C.A.4th 1256, 1262, 115 C.R.2d 229 [evidence that someone in crowd other than defendant might have fired first shot could have led jury to find that defendant had actual but unreasonable belief of need to defend himself and was thus sufficient to entitle defendant to imperfect self-defense instruction].

*People v. Jaspar* (2002) 98 C.A.4th 99, 110, 119 C.R.2d 470 [although battered women's syndrome instruction (CALJIC, No. 9.35.1) was potentially misleading as referring only to perfect self-defense, when read together with CALJIC, No. 5.17 and considering expert testimony and closing argument, confusion was dissipated and jury was allowed to consider defendant's subjective state of mind for purposes of imperfect self-defense].

*People v. Waite* (2002) 100 C.A.4th 866, 878, 124 C.R.2d 258, supra, §78 [victim's right to defend self and property is relevant in determining whether defendant can prevail on imperfect self-defense to negate malice aforethought].

*People v. Oropeza* (2007) 151 C.A.4th 73, 82, 59 C.R.3d 653 [where defendant shot and killed passenger in adjacent vehicle while traveling on freeway, trial court properly denied defendant's instruction on imperfect self-defense; neither defendant nor witnesses provided evidence of defendant's actual belief of imminent peril to life or great bodily injury from victim or other occupants of victim's vehicle].

*People v. Villanueva* (2008) 169 C.A.4th 41, 52, 86 C.R.3d 534 [even though defendant testified that he shot victim by accident, trial court erred in refusing defendant's requested instruction on attempted manslaughter based on imperfect self-defense where there was sufficient evidence that defendant shot victim from fear of being hit by victim's vehicle].

*People v. Frandsen* (2011) 196 C.A.4th 266, 275, 126 C.R.3d 640 [defendant was not entitled to imperfect self-defense where unlawfully<<* **p.530**>> imprisoned murder victim sought escape by charging at defendant; defendant had options of avoidance or acquiescence, but no right to defend self from victim's lawful resort to self-defense and escape].

*People v. Valenzuela* (2011) 199 C.A.4th 1214, 1231, 133 C.R.3d 196 [there was no evidence to merit instruction on imperfect self-defense, and trial judge was not required to so instruct on own motion; only conclusion to be drawn by jurors if they believed defendant's testimony was that defendant acted in justifiable self-defense, not in imperfect self-defense].

## V. DEFENSE OF THIRD PERSON

### A. [§ 86] Availability of Defense.

The privilege of defense of a third person is recognized in most jurisdictions. (See LaFave, Criminal Law 2d, §5.8; on similar defense to tort liability, see 5 *Summary* (10th), *Torts*, §417.)

In California, the justifiable homicide statute provides that a person may defend a household member, specified as "a wife or husband, parent, child, master, mistress, or servant." (P.C. 197(3); see P.C. 198 ["bare fear" is not sufficient if unreasonable]; CALJIC, No. 5.13 [Justifiable Homicide—Lawful Defense of Self or Another]; CALJIC, No. 5.14 [Homicide in Defense of Another]; CALCRIM, No. 505 [Justifiable Homicide: Self-Defense or Defense of Another]; on imperfect defense of others, see infra, §87.)

A broader privilege is declared where the wrongdoer seeks to enter the defendant's habitation (infra, §88), and where the defendant is resisting an attempt to murder or do great bodily harm to "any person" (P.C. 197(1)). (See Boyce 10th, p. 942 et seq.)

P.C. 692 et seq. permit a person to make "resistance sufficient to prevent" an offense against a family member or other person "about to be injured." (See *People v. McKee* (1968) 265 C.A.2d 53, 61, 71 C.R. 26 [bar owner came to aid of patron harassed by defendants; P.C. 694 was proper basis for instruction].)

### B. [§ 87] Imperfect Defense of Others.

In *People v. Michaels* (2002) 28 C.4th 486, 122 C.R.2d 285, 49 P.3d 1032, defendant confessed that he killed his girlfriend's mother in order to protect the girlfriend from further physical and sexual abuse, which the girlfriend said was driving her to suicide. Defendant did not submit<<* **p.531**>> instructions, was convicted of first degree murder, and argued on appeal that the trial court, on its own motion, should have instructed on the doctrine of imperfect defense of others. *Held*, the trial court had no duty to instruct on unreasonable or imperfect defense of others because the doctrine had not been well established in California. (28 C.4th 528.) However, the Supreme Court acknowledged that the concept of imperfect defense of others "follows logically from the interplay between statutory and decisional law." (28 C.4th 530.) (See CALJIC, No. 5.17 [instructions apply to person who kills in purported defense of another]; on imperfect self-defense, see supra, §82 et seq.)

The defense is now fully established. In *People v. Randle* (2005) 35 C.4th 987, 28 C.R.3d 725, 111 P.3d 987, defendant and his cousin, B, were surprised by R immediately after they had burglarized an auto belonging to L, and defendant fired a shot either at R or in the air. R and L pursued defendant and B, catching B and recovering the stolen property. L and R severely beat B for a prolonged period. When L left the scene, defendant returned and shouted to R to leave B alone. Although defendant and B testified that R was still beating B when defendant again fired his weapon, defendant's pretrial statements indicated that R was fleeing when defendant fired one shot. R died from a bullet wound. Although defendant's primary defense was that he acted in perfect defense of another, he also asked for an instruction on imperfect defense of another. The trial court denied the request, and the jury convicted defendant of second degree murder. *Held*, the trial court erred in refusing to instruct on the doctrine of imperfect defense of others. "[O]ne who kills in imperfect defense of others—in actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter." (35 C.4th 997.)

(a) As recognized in *Michaels*, the doctrine of imperfect defense of others follows logically from the interplay between statutory and case law. P.C. 197 provides that a homicide is justifiable when committed in lawful defense of another, and a reasonable person standard governs that defense. Thus, the circumstances must be sufficient to excite the fears of a reasonable person, and the defendant must have acted under the influence of those fears and "not in a spirit of revenge." (35 C.4th 999.) In addition, early California cases support the principle that a jury instruction that focuses on a defendant's point of view, rather than the point of view of the person the defendant was defending, may be upheld. (35 C.4th 1000.)

(b) Recognizing the doctrine of imperfect defense of others does not offend public policy. The controlling public policy decision was made by the Legislature when it enacted P.C. 192, declaring that the unlawful killing of a human being without malice is manslaughter. (35 C.4th 1001.)<<* **p.532**>>

(c) Defendant's conduct does not preclude him from invoking the defense. Although the burglary set in motion the series of events leading to the fatal shooting, defendant's retreat and the recovery of the stolen property from B "extinguished the *legal justification*" for R's attack and beating of B. (35 C.4th 1002.)





(d) Defendant testified that he shot at R in the reasonable belief that he had to do so in order to protect B from imminent death or great bodily harm. "However, the evidence was also susceptible of the interpretation that defendant's belief in the necessity of protecting [B], supposing he held such a belief, was *unreasonable* because [B] was not really in imminent danger of death or great bodily injury." Therefore, defendant was entitled to an instruction on imperfect defense of others, and the failure to give one was prejudicial. (35 C.4th 1004.)

## VI. DEFENSE OF PROPERTY

### A. [§ 88] In General.

(1) *Defense of Habitation.* This fundamental privilege, based on the common law concept of one's dwelling as one's "castle," has been codified. Homicide is justifiable when committed in defense of habitation or property "against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein." (P.C. 197(2).) (See P.C. 198, supra, §70 ["bare fear" is not sufficient if unreasonable]; *People v. Flanagan* (1881) 60 C. 2; *People v. Reese* (1944) 65 C.A.2d 329, 340, 150 P.2d 571; *People v. Smith* (1967) 249 C.A.2d 395, 401, 57 C.R. 508 [instruction on defense of property is not required where primary defense is self-defense]; *People v. Curtis* (1994) 30 C.A.4th 1337, 1361, 1362, 37 C.R.2d 304 [defense of habitation applies only if defendant reasonably believed that trespass was occurring or about to occur; instruction was not required where there was no evidence that reasonable person would have believed that victim was about to break in]; 2 Wharton, Crim. Law (15th ed.), §191; 6 Am.Jur.2d (2008 ed.), Assault and Battery §57 et seq.)

However, one cannot intentionally kill merely in defense of the habitation against a simple nonfelonious trespasser who does not threaten violence to the person or the commission of a felony. "While one may use force, if necessary to remove an intruder who refuses to leave after being requested to depart, it must not be assumed that he may *intentionally* kill<<* **p.533**>> another solely in defense of habitation. ... He can kill intentionally only in defense of life or person, or to prevent a felony. ... But a person assailed in his own house is not bound to retreat from the house to avoid violence, even though a retreat may safely be made. And if the intruder resists his ejection and assaults the lawful occupant, the latter need not retreat, but, in protecting his person, he may, if necessary, intentionally take the intruder's life if he has reason to believe and does believe that his own life is in danger or that he is in danger of receiving great bodily harm." (*People v. Hubbard* (1923) 64 C.A. 27, 35, 220 P. 315.)

Moreover, a felonious intrusion does not automatically bestow the right to use deadly force. Thus, deadly force may not be used against a burglar who does not threaten death or serious bodily harm. (*People v. Ceballos* (1974) 12 C.3d 470, 479, 116 C.R. 233, 526 P.2d 241, infra, §89; *People v. Quesada* (1980) 113 C.A.3d 533, 539, 169 C.R. 881, infra, §96; see *People v. Corlett* (1944) 67 C.A.2d 33, 52, 53, 153 P.2d 595, 964 [no more force than reasonably necessary to protect habitation or outbuildings]; on rule in tort cases, see 5 *Summary* (10th), *Torts*, §420; on presumption of reasonableness when deadly force is used in residence, see supra, §76; on impropriety of using deadly mechanical device, see infra, §89.)

Even nondeadly force may be excessive and unprivileged. In *People v. Miller* (1946) 72 C.A.2d 602, 165 P.2d 30, two drunken soldiers appeared at defendant's house in the early morning and repeatedly rang the doorbell, knocked, and demanded admission. Defendant threw a solution of lye into their faces, causing serious burns. *Held*, she was properly convicted of assault with caustic chemicals (P.C. 244). (72 C.A.2d 606.)

(2) *Defense of Ordinary Property.* Deadly force merely to protect ordinary property against a nonfelonious trespasser is not justified. However, if the trespasser is a burglar or robber, the privilege of killing to prevent a felony may be available. (See *Nakashima v. Takase* (1935) 8 C.A.2d 35, 46 P.2d 1020, 5 *Summary* (10th), *Torts*, §420; 2 Wharton, Crim. Law (15th ed.), §191.)

(3) *Jury Instructions.* The following jury instructions are applicable:

CALCRIM, No. 506 [Justifiable Homicide: Defending Against Harm to Person Within Home or on Property].

CALCRIM, No. 3475 [Right to Eject Trespasser From Real Property].

CALCRIM, No. 3476 [Right to Defend Real or Personal Property].

CALJIC, No. 5.40 [Defense of Property—Ejection of Trespasser].<<* **p.534**>>

CALJIC, No. 5.42 [Resisting an Intruder Upon One's Property].

CALJIC, No. 5.43 [Force That May Be Used in Defense of Property].

**B. [§ 89] Use of Deadly Mechanical Devices.**

In *People v. Ceballos* (1974) 12 C.3d 470, 116 C.R. 233, 526 P.2d 241, defendant had suffered a burglary of his home and later noticed signs of attempted entry into his garage, where he stored valuables and occasionally slept. To prevent further intrusions, he rigged up a .22 caliber pistol so that it would discharge when the garage door was opened. While he was away, two unarmed teenagers (the persons who previously tried to break into the premises) pried open the door lock and opened the door, and one was hit in the face with a bullet. Defendant was convicted of assault with a deadly weapon (P.C. 245). *Held,* judgment affirmed.

(a) Many jurisdictions hold a person criminally or civilly liable if the person kills or injures another with a deadly mechanical device on the person's premises. An exception has been recognized where the intrusion is such that the resident, were he or she present, would be justified in killing or injuring with his or her own hands. (12 C.3d 476.) However, the use of these devices should not be encouraged. "Allowing persons, at their own risk, to employ deadly mechanical devices imperils the lives of children, firemen and policemen acting within the scope of their employment, and others. Where the actor is present, there is always the possibility he will realize that deadly force is not necessary, but deadly mechanical devices are without mercy or discretion. Such devices 'are silent instrumentalities of death. They deal death and destruction to the innocent as well as the criminal intruder without the slightest warning. The taking of human life [or infliction of great bodily injury] by such means is brutally savage and inhuman.' " (12 C.3d 477.)

(b) The exception for liability in tort law, excusing the actor if he would have been privileged to shoot in person, is not appropriate in penal law because it does not prescribe a workable standard of conduct. (12 C.3d 477, 481.) But even if the exception had been available here, defendant was not justified in shooting the victim. P.C. 197(1) (justifiable homicide in defense of person) cannot be read literally to permit killing to prevent any felony (infra, §91), and P.C. 197(2) (justifiable homicide in defense of property) is likewise limited because, e.g., "it cannot be said that under all circumstances burglary ... constitutes a forcible and atrocious crime." (12 C.3d 479.) Neither death nor serious injury was threatened here; and a defendant is not protected from liability merely by the fact that the intruder's conduct would have justified the defendant, were he or she present, in believing that such a threat existed. (12 C.3d 479.)<<* **p.535**>>

(c) Defendant would not have been justified in shooting the intruder under P.C. 197(4) (apprehension of felon; infra, §93), for there was no showing of that intent. Defendant sought to prevent a burglary, protect his property, and avoid the possibility that a thief might enter and injure him on his return. (12 C.3d 482.)

(d) Neither P.C. 692 nor 693 (prevention of crime; infra, §90) excuses defendant, even though they allow lawful resistance to an offense by the party about to be injured. P.C. 693 must be read in light of the common law, which held that deadly force was justified only if the offense was a forcible and atrocious crime. (12 C.3d 482.)

(e) Like the other relevant statutes, C.C. 50 (right to use force) must be read in light of the common law on necessary force to protect person or property. In general, deadly force could not be used solely to protect property. (12 C.3d 483.) The exceptions—e.g., dispossession or burning of a dwelling house—are not applicable here. (12 C.3d 484.) (See 47 A.L.R.3d 646 [use of set gun, trap, or similar device on defendant's own property]; 6 Am.Jur.2d (2008 ed.), Assault and Battery §57 et seq.)





159

Judicial Council Of California Criminal Jury Instructions
Database updated October 2012
The Judicial Council of California Advisory Committee on Criminal Jury Instructions

Defenses and Insanity
D. Self-Defense and Defense of Another

**3470 Right to Self-Defense or Defense of Another (Non-Homicide)**

Self-defense is a defense to 147 (A) *<insert list of pertinent crimes charged>*. The defendant is not guilty of (that/those crime[s]) if (he/she) used force against the other person in lawful (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if:

1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] Daniel Postoral *<insert name of third party>*) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully];

2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;

AND

3. The defendant used no more force than was reasonably necessary to defend against that danger.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was (imminent danger of bodily injury to (himself/herself/ [or] someone else)/[or] an imminent danger that (he/she/[or] someone else) would be touched unlawfully). Defendant's belief must have been reasonable and (he/she) must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful (self-defense/ [or] defense of another).

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

[The slightest touching can be unlawful if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.]

[The defendant's belief that (he/she/ [or] someone else) was threatened may be reasonable even if (he/she) relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.]

[If you find that Joe Lister *<insert name of victim>* threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]

[If you find that the defendant knew that Joe Lister *<insert name of victim>* had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]

[Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.]

[If you find that the defendant received a threat from someone else that (he/she) reasonably associated with Joe Lister *<insert name of victim>*, you may consider that threat in deciding whether the defendant was justified in acting in (self-defense/ [or] defense of another).]

[A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of (death/bodily injury/__________ *<insert crime>*) has passed. This is so even if safety could have been achieved by retreating.]

The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful (self-defense/ [or] defense of another). If the People have not met this burden, you must find the defendant not guilty of 157(a) <insert crime(s) charged>.

*New January 2006; Revised June 2007, April 2008, August 2009, February 2012, August 2012*

## BENCH NOTES

### *Instructional Duty*

The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense. The court has a **sua sponte** duty to instruct on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case. When the court concludes that the defense is supported by substantial evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes instruction on this alternate theory. (People v. Gonzales (1999) 74 Cal.App.4th 382, 389–390 [88 Cal.Rptr.2d 111]; People v. Breverman (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Substantial evidence means evidence of a defense, which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. (People v. Salas (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40].)

On defense request and when supported by sufficient evidence, the court must instruct that the jury may consider the effect of "antecedent threats and assaults against the defendant on the reasonableness of defendant's conduct." (People v. Garvin (2003) 110 Cal.App.4th 484, 488 [1 Cal.Rptr.3d 774].) The court must also instruct that the jury may consider previous threats or assaults by the aggressor against someone else or threats received by the defendant from a third party that the defendant reasonably associated with the aggressor. (See People v. Pena (1984) 151 Cal.App.3d 462, 475 [198 Cal.Rptr. 819]; People v. Minifie (1996) 13 Cal.4th 1055, 1065, 1068 [56 Cal.Rptr.2d 133, 920 P.2d 1337]; see also CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another.)

### *Related Instructions*

CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another.

CALCRIM Nos. 3471– 3477, Defense Instructions: Defense of Self, Another, Property.

CALCRIM No. 851, Testimony on Intimate Partner Battering and Its Effects: Offered by the Defense.

CALCRIM No. 2514, Possession of Firearm by Person Prohibited by Statute: Self-Defense.

## AUTHORITY

- Instructional Requirements. People v. Moody (1943) 62 Cal.App.2d 18 [143 P.2d 978]; People v. Myers (1998) 61 Cal.App.4th 328, 335, 336 [71 Cal.Rptr.2d 518].
- Lawful Resistance. Pen. Code, §§ 692, 693, 694; Civ. Code, § 50; see also People v. Myers (1998) 61 Cal.App.4th 328, 335 [71 Cal.Rptr.2d 518].
- Burden of Proof. Pen. Code, § 189.5; People v. Banks (1976) 67 Cal.App.3d 379, 383–384 [137 Cal.Rptr. 652].
- Elements. People v. Humphrey (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1].
- Imminence. People v. Aris (1989) 215 Cal.App.3d 1178, 1187 [264 Cal.Rptr. 167] (overruled on other grounds in People v. Humphrey (1996) 13 Cal.4th 1073, 1089 [56 Cal.Rptr.2d 142, 921 P.2d 1]).
- No Duty to Retreat. People v. Hughes (1951) 107 Cal.App.2d 487, 494 [237 P.2d 64]; People v. Hatchett (1942) 56 Cal.App.2d 20, 22 [132 P.2d 51].
- Temporary Possession of Firearm by Felon in Self-Defense. People v. King (1978) 22 Cal.3d 12, 24 [148 Cal.Rptr. 409, 582 P.2d 1000].







- Duty to Retreat Limited to Felon in Possession Cases. People v. Rhodes (2005) 129 Cal.App.4th 1339, 1343–1346 [29 Cal.Rptr.3d 226].
- Inmate Self-Defense. People v. Saavedra (2007) 156 Cal.App.4th 561 [67 Cal.Rptr.3d 403].
- Reasonable Belief. People v. Humphrey (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1]; People v. Clark (1982) 130 Cal.App.3d 371, 377 [181 Cal.Rptr. 682].

### *Secondary Sources*

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, §§ 65, 66, 69, 70.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications*, §§ 73.11, 73.12 (Matthew Bender).

6 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 124, *Jurisdiction and Disposition Hearings*, § 124.04 (Matthew Bender).

## RELATED ISSUES

### *Brandishing Weapon in Defense of Another*

The defense of others is a defense to a charge of brandishing a weapon under Penal Code section 417(a)(2). (People v. Kirk (1986) 192 Cal.App.3d Supp. 15, 19 [238 Cal.Rptr. 42].)

### *Reasonable Person Standard Not Modified by Evidence of Mental Impairment*

In People v. Jefferson (2004) 119 Cal.App.4th 508, 519 [14 Cal.Rptr.3d 473], the court rejected the argument that the reasonable person standard for self-defense should be the standard of a mentally ill person like the defendant. "The common law does not take account of a person's mental capacity when determining whether he has acted as the reasonable person would have acted. The law holds 'the mentally deranged or insane defendant accountable for his negligence as if the person were a normal, prudent person.' (Prosser & Keeton, Torts (5th ed. 1984) § 32, p. 177.)" (*Ibid.*; see also Rest.2d Torts, § 283B.)

See also the Related Issues section of CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another.

WEST'S EDITORIAL REFERENCES

**Related References:**

See CALJIC 5.30–5.32, 5.50–5.51

**Research References:**

West's Key Number Digest, Assault and Battery k67

West's Key Number Digest, Criminal Law k772(1)

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)

**3471 Right to Self-Defense: Mutual Combat or Initial Aggressor**

A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

(He/She) actually and in good faith tried to stop fighting;

[AND]

2 (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.)

*<Give element 3 in cases of mutual combat.>*

[AND

(He/She) gave (his/her) opponent a chance to stop fighting.]

If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.

[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]

[A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]

*New January 2006; Revised April 2008, December 2008, April 2011*

**BENCH NOTES**

***Instructional Duty***

The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense. The court has a **sua sponte** duty to instruct on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case.

Give CALCRIM No. 3470, *Right to Self-Defense or Defense of Another (Non-Homicide)*, together with this instruction.

When the court concludes that the defense is supported by substantial evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes instruction on this alternate theory. (People v. Gonzales (1999) 74 Cal.App.4th 382, 389–390 [88 Cal.Rptr.2d 111]; People v. Breverman (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Substantial evidence means evidence of a defense, which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. (People v. Salas (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40].)

Give bracketed element 3 if the person claiming self-defense was engaged in mutual combat.

If the defendant started the fight using non-deadly force and the opponent suddenly escalates to deadly force, the defendant may defend himself or herself using deadly force. (See People v. Quach (2004) 116 Cal.App.4th 294, 301–302 [10 Cal.Rptr.3d 196]; People v. Sawyer (1967) 256 Cal.App.2d 66, 75 [63 Cal.Rptr. 749]; People v. Hecker (1895) 109 Cal. 451, 464 [42 P. 307].) In such cases, give the bracketed sentence that begins with "However, if the defendant."

If the defendant was the initial aggressor and is charged with homicide, always give CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another, in conjunction with this instruction.



Sua Sponte



**AUTHORITY**

- Instructional Requirements. See Pen. Code, § 197, subd. 3; People v. Button (1895) 106 Cal. 628, 633 [39 P. 1073]; People v. Crandell (1988) 46 Cal.3d 833, 871–872 [251 Cal.Rptr. 227, 760 P.2d 423]; People v. Sawyer (1967) 256 Cal.App.2d 66, 75 [63 Cal.Rptr. 749].
- Escalation to Deadly Force. People v. Quach (2004) 116 Cal.App.4th 294, 301–302 [10 Cal.Rptr.3d 196]; People v. Sawyer (1967) 256 Cal.App.2d 66, 75 [63 Cal.Rptr. 749]; People v. Hecker (1895) 109 Cal. 451, 464 [42 P. 307]; People v. Anderson (1922) 57 Cal.App. 721, 727 [208 P. 204].
- Definition of Mutual Combat. People v. Ross (2007) 155 Cal.App.4th 1033, 1045 [66 Cal.Rptr.3d 438].

***Secondary Sources***

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, § 75.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications*, § 73.11[2][a] (Matthew Bender).

WEST'S EDITORIAL REFERENCES

**Related References:**

See CALJIC 5.54, 5.56

**Research References:**

West's Key Number Digest, Criminal Law k772(1)

West's Key Number Digest, Homicide k750

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)

**3472 Right to Self-Defense: May Not Be Contrived**

A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.

*New January 2006*

**BENCH NOTES**

***Instructional Duty***

The court may give this instruction on request when supported by the evidence. (People v. Olguin (1995) 31 Cal.App.4th 1355, 1381 [37 Cal.Rptr.2d 596].)

**AUTHORITY**

- Instructional Requirements. People v. Olguin (1995) 31 Cal.App.4th 1355, 1381 [37 Cal.Rptr.2d 596]; Fraguglia v. Sala (1936) 17



161

Cal.App.2d 738, 743–744 [62 P.2d 783]; People v. Hinshaw (1924) 194 Cal. 1, 26 [227 P. 156].

*Secondary Sources*

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, § 75.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications*, § 73.11[2][a] (Matthew Bender).
WEST'S EDITORIAL REFERENCES

**Related References:**

See CALJIC 5.55

**Research References:**

West's Key Number Digest, Criminal Law k772(1)

West's Key Number Digest, Homicide k750

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)

**3474 Danger No Longer Exists or Attacker Disabled**

The right to use force in (self-defense/ [or] defense of another) continues only as long as the danger exists or reasonably appears to exist. [When the attacker (withdraws/ [or] no longer appears capable of inflicting any injury), then the right to use force ends.]
*New January 2006*

BENCH NOTES

*Instructional Duty*

The court may give this instruction on request when supported by the evidence. (See People v. Martin (1980) 101 Cal.App.3d 1000, 1010 [162 Cal.Rptr. 133].)

AUTHORITY

• Instructional Requirements. See People v. Keys (1944) 62 Cal.App.2d 903, 916 [145 P.2d 589]; People v. Perez (1970) 12 Cal.App.3d 232, 236 [90 Cal.Rptr. 521].

*Secondary Sources*

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, § 76.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications*, § 73.11[1][b] (Matthew Bender).
WEST'S EDITORIAL REFERENCES







**Related References:**

See CALJIC 5.52, 5.53

**Research References:**

West's Key Number Digest, Criminal Law k31

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)

**3475 Right to Eject Trespasser From Real Property**

The (owner/lawful occupant) of a (home/property) may request that a trespasser leave the (home/property). If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to (the (home/property)/ [or] the (owner/ [or] occupants), the (owner/lawful occupant) may use reasonable force to make the trespasser leave.

*Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.

[If the trespasser resists, the (owner/lawful occupant) may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.]

When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable. If the People have not met this burden, you must find the defendant not guilty of ___________ *<insert crime>*.
*New January 2006; Revised April 2008*

BENCH NOTES

*Instructional Duty*

The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense. The court has a **sua sponte** duty to instruct on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case.

When the court concludes that the defense is supported by substantial evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes instruction on this alternate theory. (People v. Gonzales (1999) 74 Cal.App.4th 382, 389–390 [88 Cal.Rptr.2d 111]; People v. Breverman (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Substantial evidence means evidence of a defense, which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. (People v. Salas (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40].)
***Related Instructions***

CALCRIM No. 3476, *Right to Defend Real or Personal Property.*

CALCRIM No. 3477, *Presumption That Resident Was Reasonably Afraid of Death or Great Bodily Injury.*

CALCRIM No. 506, *Justifiable Homicide: Defending Against Harm to Person Within Home or on Property.*

AUTHORITY

• Instructional Requirements. See People v. Corlett (1944) 67 Cal.App.2d 33, 51(52 [153 P.2d 595]; People v. Teixeira (1899) 123 Cal. 297, 298(299 [55 P. 988]; Civ. Code, § 50.

• Burden of Proof. See Boyer v. Waples (1962) 206 Cal.App.2d 725, 727 [24 Cal.Rptr. 192] [civil action].

*Secondary Sources*

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, § 78.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications,* §§ 73.11[1], 73.13[2] (Matthew Bender).

RELATED ISSUES

*Negating Self-Defense Claim*

The right to defend one's home may negate a defendant's claim of imperfect self-defense, as held in People v. Watie (2002) 100 Cal.App.4th 866, 878 [124 Cal.Rptr.2d 258]:

[T]he right of a victim to defend himself and his property is a relevant consideration in determining whether a defendant may prevail when he seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense ... [¶] ... If [the victim] had a right to use force to defend himself in his home, then defendant had no right of self-defense, imperfect, or otherwise.

WEST'S EDITORIAL REFERENCES

**Related References:**

See CALJIC 5.40

**Research References:**

West's Key Number Digest, Assault and Battery k96(4)

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)







**3476 Right to Defend Real or Personal Property**

The owner [or possessor] of (real/ [or] personal) property may use reasonable force to protect that property from imminent harm. [A person may also use reasonable force to protect the property of a (family member/guest/master/servant/ward) from immediate harm.]

*Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm.

When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of ____________<*insert crime*>.

*New January 2006; Revised April 2008*

BENCH NOTES

*Instructional Duty*

The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense. The court has a **sua sponte** duty to instruct on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case.

When the court concludes that the defense is supported by substantial evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes instruction on this alternate theory. (People v. Gonzales (1999) 74 Cal.App.4th 382, 389–390 [88 Cal.Rptr.2d 111]; People v. Breverman (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Substantial evidence means evidence of a defense, which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. (People v. Salas (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40].)

***Related Instructions***

CALCRIM No. 3475, *Right to Eject Trespasser From Real Property.*

CALCRIM No. 3477, *Presumption That Resident Was Reasonably Afraid of Death or Great Bodily Injury.*

CALCRIM No. 506, *Justifiable Homicide: Defending Against Harm to Person Within Home or on Property.*

AUTHORITY

• Instructional Requirements. See Civ. Code, § 50; Boyer v. Waples (1962) 206 Cal.App.2d 725, 727 [24 Cal.Rptr. 192].

• Burden of Proof. See Boyer v. Waples (1962) 206 Cal.App.2d 725, 727 [24 Cal.Rptr. 192] [civil action].

***Secondary Sources***

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, § 78.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications,* § 73.13 (Matthew Bender).

WEST'S EDITORIAL REFERENCES

**Related References:**

See CALJIC 5.42, 5.43

**Research References:**

West's Key Number Digest, Assault and Battery k96(4)

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)

**3477 Presumption That Resident Was Reasonably Afraid of Death or Great Bodily Injury (Pen. Code, § 198.5)**

The law presumes that the defendant reasonably feared imminent death or great bodily injury to (himself/herself)[, or to a member of (his/her) family or household,] if:

1. An intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home;

2. The defendant knew [or reasonably believed] that an intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home;

3. The intruder was not a member of the defendant's household or family;

AND

4. The defendant used force intended to or likely to cause death or great bodily injury to the intruder inside the home.

[*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.]

The People have the burden of overcoming this presumption. This means that the People must prove that the defendant did not have a reasonable fear of imminent death or injury to (himself/herself)[, or to a member of his or her family or household,] when (he/she) used force against the intruder. If the People have not met this burden, you must find the defendant reasonably feared death or injury to (himself/herself)[, or to a member of his or her family or household].

*New January 2006*

BENCH NOTES

*Instructional Duty*

The court has a **sua sponte** duty to instruct on presumptions relevant to the issues of the case. (See People v. Hood (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]; but see People v. Silvey (1997) 58 Cal.App.4th 1320, 1327 [68 Cal.Rptr.2d 681] [presumption not relevant because defendant was not a resident]; People v. Owen (1991) 226 Cal.App.3d 996, 1005 [277 Cal.Rptr. 341] [jury was otherwise adequately instructed on pertinent law].)

AUTHORITY

- Instructional Requirements. Pen. Code, § 198.5; People v. Brown (1992) 6 Cal.App.4th 1489, 1494–1495 [8 Cal.Rptr.2d 513].

- Rebuttable Presumptions Affecting Burden of Proof. Evid. Code, §§ 601, 604, 606.





***Secondary Sources***

1 Witkin & Epstein, California Criminal Law (3d ed. 2000) Defenses, § 73.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications*, §§ 73.11[1], 73.13 (Matthew Bender).

WEST'S EDITORIAL REFERENCES

**Related References:**

See CALJIC 5.44

**Research References:**

West's Key Number Digest, Homicide k919

**Westlaw Databases:**

California State Criminal Jury Instruction Filings (CA-CRJIF)

California State Criminal Trial Court Filings and Jury Instruction Filings (CA-CRFILING-JIF)

California State and Federal Criminal Jury Instruction Filings (CA-CRJIF-ALL)

© 2012 by the Judicial Council of California. All rights reserved.

# EXHIBIT 4

[1]**pres·to** \ˈpres-tō\ *interj* [It, quick, quickly] — used to indicate the sudden appearance or occurrence of something

[2]**presto** *adv or adj* **1** : suddenly as if by magic : IMMEDIATELY **2** : at a rapid tempo — used as a direction in music

**pre·stress** \(ˌ)prē-ˈstres\ *vb* : to introduce internal stresses into (as a structural beam) to counteract later load stresses

**pre·sum·ably** \pri-ˈzü-mə-blē\ *adv* : by reasonable assumption

**pre·sume** \pri-ˈzüm\ *vb* **pre·sumed; pre·sum·ing** **1** : to take upon oneself without leave or warrant : DARE **2** : to take for granted : ASSUME **3** : to act or behave with undue boldness — **pre·sum·able** \-ˈzü-mə-bəl\ *adj*

**pre·sump·tion** \pri-ˈzəmp-shən\ *n* **1** : presumptuous attitude or conduct : AUDACITY **2** : an attitude or belief dictated by probability; *also* : the grounds lending probability to a belief — **pre·sump·tive** \-tiv\ *adj*

**pre·sump·tu·ous** \pri-ˈzəmp-chə-wəs\ *adj* : overstepping due bounds : taking liberties — **pre·sump·tu·ous·ly** *adv*

**pre·sup·pose** \ˌprē-sə-ˈpōz\ *vb* **1** : to suppose beforehand **2** : to require beforehand as a necessary condition — **pre·sup·po·si·tion** \(ˌ)prē-ˌsə-pə-ˈzi-shən\ *n*

**pre·teen** \ˈprē-ˈtēn\ *n* : a boy or girl not yet 13 years old — **preteen** *adj*

**pre·tend** \pri-ˈtend\ *vb* **1** : PROFESS ⟨doesn't ~ to be scientific⟩ **2** : FEIGN ⟨~ to be angry⟩ **3** : to lay claim ⟨~ to a throne⟩ — **pre·tend·er** *n*

**pre·tense** *or* **pre·tence** \ˈprē-ˌtens, pri-ˈtens\ *n* **1** : CLAIM; *esp* : one not supported by fact **2** : mere display : SHOW **3** : an attempt to attain a certain condition ⟨made a ~ at discipline⟩ **4** : false show : PRETEXT — **pre·ten·sion** \pri-ˈten-chən\ *n*

**pre·ten·tious** \pri-ˈten-chəs\ *adj* **1** : making or possessing usu. unjustified claims (as to excellence) ⟨a ~ literary style⟩ **2** : making demands on one's ability or means : AMBITIOUS ⟨too ~ an undertaking⟩ — **pre·ten·tious·ly** *adv* — **pre·ten·tious·ness** *n*

**pret·er·it** *or* **pret·er·ite** \ˈpre-tə-rət\ *n* : a verb form expressing action in the past

**pre·term** \(ˌ)prē-ˈtərm, ˈprē-ˌ\ *adj* : of, relating to, being, or brought forth by premature birth ⟨a ~ infant⟩

**pre·ter·nat·u·ral** \ˌprē-tər-ˈna-chə-rəl\ *adj* **1** : exceeding what is natural **2** : inexplicable by ordinary means — **pre·ter·nat·u·ral·ly** *adv*

**pre·text** \ˈprē-ˌtekst\ *n* : a purpose stated or assumed to cloak the real intention or state of affairs

**pret·ti·fy** \ˈpri-ti-ˌfī\ *vb* **-fied; -fy·ing** : to make pretty — **pret·ti·fi·ca·tion** \ˌpri-ti-fə-ˈkā-shən\ *n*

[1]**pret·ty** \ˈpri-tē\ *adj* **pret·ti·er; -est** [ME *praty, prety,* fr. OE *prættig* tricky, fr. *prætt* trick] **1** : pleasing by delicacy or grace : having conventionally accepted elements of beauty ⟨~ flowers⟩ **2** : MISERABLE, TERRIBLE ⟨a ~ state of affairs⟩ **3** : moderately large ⟨a ~ profit⟩ **4** : PLEASANT — usu. used in negative constructions ⟨the truth was not so ~⟩ ◆ *Synonyms* COMELY, FAIR, BEAUTIFUL, ATTRACTIVE, LOVELY — **pret·ti·ly** \-tə-lē\ *adv* — **pret·ti·ness** \-tē-nəs\ *n*

[2]**pretty** *adv* : in some degree : MODERATELY; *also* : QUITE, MAINLY

[3]**pretty** *vb* **pret·tied; pret·ty·ing** : to make pretty — usu. used with *up*

**pretty boy** *n* : a man who is notably good-looking

**pret·zel** \ˈpret-səl\ *n* [G *Brezel,* ultim. fr. L *brachiatus* having branches like arms, fr. *brachium* arm] : a brittle or chewy glazed usu. salted slender bread often shaped like a loose knot

**prev** *abbr* previous; previously

**pre·vail** \pri-ˈvāl\ *vb* **1** : to win mastery : TRIUMPH **2** : to be or become effective : SUCCEED **3** : to urge successfully ⟨~*ed* upon her to sing⟩ **4** : to be frequent : PREDOMINATE — **pre·vail·ing·ly** *adv*

**prev·a·lent** \ˈpre-və-lənt\ *adj* : generally or widely existent : WIDESPREAD — **prev·a·lence** \-ləns\ *n*

**pre·var·i·cate** \pri-ˈver-ə-ˌkāt\ *vb* **-cat·ed; -cat·ing** [L *praevaricari* to act in collusion, lit., to straddle, fr. *prae* in front of + *varicare* to straddle, fr. *varus* bowlegged] : to deviate from the truth : EQUIVOCATE — **pre·var·i·ca·tion** \-ˌver-ə-ˈkā-shən\ *n* — **pre·var·i·ca·tor** \-ˈver-ə-ˌkā-tər\ *n*

**pre·vent** \pri-ˈvent\ *vb* **1** : to keep from happening or existing ⟨steps to ~ war⟩ **2** : to hold back : HINDER, STOP ⟨~ us from going⟩ — **pre·vent·able** *also* **pre·vent·ible** \-ˈven-tə-bəl\ *adj* — **pre·ven·tion** \-ˈven-chən\ *n* — **pre·ven·tive** \-ˈven-tiv\ *adj or n* — **pre·ven·ta·tive** \-ˈven-tə-tiv\ *adj or n*

**pre·ver·bal** \ˌprē-ˈvər-bəl\ *adj* : having not yet acquired the faculty of speech

[1]**pre·view** \ˈprē-ˌvyü\ *vb* : to see or discuss beforehand; *esp* : to view or show in advance of public presentation

[2]**preview** *n* **1** : FORETASTE **2** : an advance showing or viewing **3** *also* **pre·vue** \-ˌvyü\ : a showing of snatches from a motion picture advertised for future appearance

**pre·vi·ous** \ˈprē-vē-əs\ *adj* : going before : EARLIER, FORMER ◆ *Synonyms* FOREGOING, PRIOR, PRECEDING, ANTECEDENT — **pre·vi·ous·ly** *adv*

**pre·vi·sion** \prē-ˈvi-zhən\ *n* **1** : FORESIGHT, PRESCIENCE **2** : FORECAST, PREDICTION

**pre·war** \ˈprē-ˈwȯr\ *adj* : occurring or existing before a war

[1]**prey** \ˈprā\ *n, pl* **prey** *also* **preys** **1** : an animal taken for food by a predator; *also* : VICTIM **2** : the act or habit of preying

[2]**prey** *vb* **1** : to raid for booty **2** : to seize and devour prey **3** : to have a harmful or wearing effect

**prf** *abbr* proof

[1]**price** \ˈprīs\ *n,* **1** *archaic* : VALUE **2** : the amount of money paid or asked for the sale of a specified thing; *also* : the cost at which something is obtained

# The Merriam-Webster Dictionary®

Merriam-Webster, Incorporated
Springfield, Massachusetts

## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2004 by Merriam-Webster, Incorporated

ISBN 978-0-87779-930-6

*All rights reserved. No part of this work covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA

27 PTG QGMB WB 2/2013

# EXHIBIT 5

u gotta Be Higher than Richard Pryor at a
ocha wit a prior if you think you gonna fire on
nigga and get away wit it
that'll be the Day when, hell freezes over
and if it don't get it, thats why I Pack this pistola
gone off cola, probably off a molly
you almost got bodied, instead caught you a Body
you would'a Been Better off with a fuckin Botch Robbery
attempt on a pimp, but I'm Swift on my toes
niggas in my circle keep them 40's real close
Concealed in they Clothes, and never lose
Composure, make a nigga see the light, over exposure,
Wake his game up, Nigga Snickers in his folders
Co-Co and a Red Hot, let him know that leads Hot
Penitentiary Caddillac, cuz, thats where you'll reside at
Sittin in ya cell knowing ~~you~~ DAMN ~~well~~ well ya ~~fail~~ fail
wit 5 bingo-Jingos from the dond.d.t live shown
it's ~~was~~ all self defence under the ~~[illegible]~~ proper pretext
now that 10 time felon is a lifetime convict YOU
let the drugs get the best of you all over [illegible]
now you waddle in a puddle ~~of~~ in your own
self disgust is probably wouldn't discuss, comment
are show interest it have a nigga vomiting
throwing up [illegible] [illegible] [illegible] my suggestion
follow the star and create it, submit ya will to God
and Count ya Blessings!

# EXHIBIT 6

# DECLARATION OF LEATTA POSTON

I, LEATTA POSTON, declare as follows:

1. I am Donel Poston's mother. Donel's lawyer, Randi Covin, asked me about the radiator of Tamena Bailey's car.

2. A day or two after the shooting in my son's case, I helped his girlfriend, Tamena Bailey, get her car fixed. Tamena called me because she had to take the kids to school and needed money for the radiator of her car which she said had a bullet hole. That's the first I heard about the shooting involving Donel. The kids tried to keep it from me because they knew I would be very upset.

3. I told Tamena I would help her. I said "just tell me how much and I'll give you the money." Tamena called me back a day or two later and told me how much. I remember the call. I remember the car - a Lexus - and I remember giving Tamena money, but I don't remember how much I gave her. It was whatever she said it cost to replace the radiator.

4. When Ms. Covin first asked me about the radiator, I could not remember any details. I called Tamena and asked her and she reminded me. Then it all came back to me except for the amount of money I gave her - I still don't remember that.

I declare under penalty of perjury under the laws of the states of California that the foregoing is true and correct.

Executed this 22 day of July, 2016, at Oakland, California.

[signature]

LEATTA POSTON

# EXHIBIT 7

# DECLARATION OF ROBERT SAMUELS

I, ROBERT SAMUELS, declare as follows:

1. I am Donel Poston's brother. Donel's lawyer, Randi Covin asked me about the radiator of Tamena Bailey's car.

2. After the shooting in my brother's case, I helped his girlfriend, Tamena Bailey, get her car fixed - there was a bullet hole in the radiator and the car was barely drivable. I told her to take it to my mechanic, Angel, on the corner of 76th Avenue and International Boulevard in Oakland.

3. When Ms. Covin asked me about it last week, I told her about Angel. I did not know his last name. At Ms. Covin's request, I went to see Angel to ask if he remembered replacing the radiator. Before I could describe the car, he said, "a Lexus, right?" He remembered that the Lexus was green and that he replaced the radiator.

4. I told Ms. Covin where to find Angel and I met her there at her request. Ms. Covin asked Angel a few questions and he told her he remembered replacing the radiator on a blue or green Lexus for the lady I sent to him. He did not remember that there was a bullet hole in the radiator but I saw it - there was.

I declare under penalty of perjury under the laws of the states of California that the foregoing is true and correct.

Executed this 20th day of July, 2016, at Oakland, California.

[signature]

ROBERT SAMUELS

# EXHIBIT 8

DECLARATION OF ANGEL GARCIA

I, ANGEL GARCIA, declare as follows:

1. I work at Danny's Auto Repair in Oakland as a mechanic. My business address is 7520 International Blvd., Oakland, California. Robert Samuels has been a customer of mine for years.

2. A few years ago, a woman brought a green or blue Lexus in to me - she said Robert sent her. When Robert asked me about it in the last week or so, I remembered the car. I remember that I replaced the radiator - I don't remember what was wrong with it.

I declare under penalty of perjury under the laws of the states of California that the foregoing is true and correct.

Executed this 20th day of July, 2016, at Oakland, California.

[signature]

ANGEL GARCIA

# EXHIBIT 9

# DECLARATION OF JOHN R. RICKFORD

I, JOHN R. RICKFORD, declare as follows:

1. I am a professor in the Department of Linguistics at Stanford University, where I have taught since 1980. I earned my bachelor's degree in Sociolinguistics at the University of California, Santa Cruz, in 1971, with highest honors and my M.A and Ph.D. in Linguistics from the University of Pennsylvania in 1973 and 1979, respectively. I am the Immediate Past President of the Linguistic Society of America, having served as President in 2015.

2. I have, for more than 45 years, studied various issues related to African American Vernacular English ("AAVE") from a sociolinguistic perspective. I have published extensively on the subject and am widely considered an expert. (See my 1999 book *African American Vernacular English*, my 2000 book, *Spoken Soul: The Story of Black English*, and other items on the attached CV.)

3. I was contacted by attorney Randi Covin, who consulted me about her client Donel Poston. At Ms. Covin's request I reviewed the following documents: Excerpts of Mr. Poston's Appellant's Opening Brief (the Statement of Facts and the Argument pertaining to prosecutorial misconduct); the Reporter's Transcript of the prosecutor's cross-examination of Mr. Poston; the Reporter's Transcript of the prosecutor's arguments to the jury; and the transcription of Mr. Poston's phone calls from the jail (Pros. Exh. 32A). I also listened to every one of the recordings of Mr. Poston's jail calls (Pros. Exh. 32), noting several instances in which the transcripts needed to be corrected to accurately reflect what was said.

4. Ms. Covin asked me to consider whether I could have given helpful expert testimony at Mr. Poston's trial to rebut the prosecutor's assertions related to AAVE. After reviewing the materials, I am confident I could have provided helpful testimony.

5. First, I could have explained that while AAVE is used by many African Americans and often valued for its expressiveness and as an ethnic in-group marker, it is also viewed negatively in mainstream, non-African-American culture (and by some African Americans as well, especially those in the middle or upper class). AAVE is often unfairly considered to be "bad" English when in fact it is a distinct dialect with sophisticated and consistent structures and rules. It is also the most widely studied variety of American English. (See Sonja Lanehart, ed., *The Oxford Handbook of African American Language*. (Oxford University Press, 2015).) Discussing these issues was critical in order to neutralize the jurors' unconscious racism and bias against AAVE.

6. Second, I could have explained that alternating use of AAVE and Standard American English ("SAE"), called "code-switching," also called "style-shifting," is normal and desirable. Meticulous linguistic research from the 1950s to the present has documented that every speaker of American English code-switches—varying qualitatively or quantitatively in their pronunciation, grammar, or word choice—depending on audience and context. This is also true of speakers of other languages around the world. As William Labov (the founder of modern sociolinguistics and my mentor) noted in 1972: " As far as we can see, *there are no single-style speakers*. Some informants show a much wider range of style

shifting than others, but every speaker we have encountered shows a shift of some linguistic variables as the social context and topic change ….” (William Labov, *Sociolinguistic Patterns* (University of Pennsylvania Press 1972) at p. 208).

7. In particular, it is very common for African-Americans to utilize some degree of code-switching, using more AAVE with other African-Americans and shifting towards Mainstream or Standard American English [SAE] with non-African Americans, especially in a formal setting. For instance, one study found that African American teenagers in “Sunnyside,” California, used AAVE copula absence—omission of “is” and “are” in sentences like “he walking” 80% of the time with familiar Black peers, but only 11% of the time with unfamiliar Whites. (See H. Samy Alim, *You Know my Steez: An Ethnographic and Sociolinguistic Study of Style Shifting in an African American Speech Community* (Duke University Press 2004).) African-Americans who are not able to code-switch effectively tend to be viewed negatively, not only by non-African-Americans, but also by African-Americans who are more adept in code-switching and, therefore, more successful in mainstream society.

8. For instance, in the 2013 trial of George Zimmerman, the testimony of Trayvon Martin's young African-American friend Rachel Jeantel was given almost entirely in AAVE because Jeantel was not able to shift to SAE as much as was needed in the formal, courtroom setting whose proceedings were nationally broadcast on TV. As a result the jurors did not understand or believe Jeantel. According to Bloom, citing juror Maddy, Jeantel’s crucial testimony was not mentioned in jury deliberations, and “played no role whatsoever in

their decision." (Lisa Bloom, *Suspicion Nation: The Inside Story of the Trayvon Martin Injustics and Why we Continue to Repeat It,* (Counterpoint Press 2014) at p. 148.) I have studied the effect of AAVE and Jeantel's inability to switch to SAE on Zimmerman's jury in some depth and have given public presentations (e.g. my LSA Presidential Address, in Washington DC in January 2016) and written on the subject. (See my 7.10.13 contribution to *Language Log*, for instance, and an article on Rachel Jeantel's testimony that I am preparing for *Language*, the leading linguistics journal in the US.)

9. Many linguists and educators believe all African-American children should be taught to increase their ability to code-switch - to alternate between AAVE and SAE depending on the audience and the setting. Because of the stigma associated with AAVE, ability to switch to SAE may be an important determinant of success in the majority culture. At the same time, perceived "over use" of SAE or "talking White" is sometimes perceived as a handicap, or seen as suspicious - an indication of falsity or insincerity. (See John McWhorter, "Thick of Tongue," *Guernica* (March 15, 2016). https://www.guernicamag.com/features/thick-of-tongue/.) This is a difficult dilemma for African-American people, who are often acutely conscious of the way they are perceived in the mainstream culture and take pains to communicate in a way that will be understood and well-received by different audiences.

10. It was not only appropriate but *essential* that Mr. Poston try to avoid AAVE as well as profanity and speak in formal SAE in the courtroom. Had he spoken informal AAVE, as he did with his family members and friends, he would almost certainly have been

perceived negatively by non-African-American jurors and others in the courtroom. Moreover, his testimony might have been *incomprehensible* to the jurors. (See Daniel H. Swett, "Cultural Bias in the American Legal System," Law and Society Review 4.1 (August 1969) at pp. 79-110 and fn. 17 [Swett notes that jurors in a 1965 murder trial involving an AAVE speaking defendant and witnesses from the San Francisco Bay Area said after the trial that "the greater part of the testimony had been incomprehensible to them"].)

11. And they might have considered his testimony not *credible*, as Rachel Jeantel's testimony in the 2013 Zimmerman trial was to Juror B37, who said in a CNN interview with Roger Andersen that "I didn't think it was very credible … because of her education, her communication skills, …she just wasn't a good witness." Mr. Poston might even have been perceived negatively by African-American jurors, as they would likely find his use of informal AAVE and profanity inappropriate in the courtroom setting, even if they themselves spoke AAVE with their own friends and families. Had Poston testified in AAVE, his testimony would almost certainly have been rejected by the jurors.

12. Code-switching to SAE for one's court appearance is similar to defendants (and others) dressing formally for appearances in court. (Note in *The New York Times* May 13, 2016, PA14 report on the trial of Baltimore police officer Edward M. Nero, the significant detail that he "sat upright in court … clad in a three-piece suit"). Mr. Poston talked with his mother about both forms of shifting. He expressed a need to dress appropriately for court in a suit and tie and also to speak appropriately with "not a single ghetto-Ebonic slur"

coming from his mouth. (Ebonics is another name for AAVE.) Again both forms of shifting were appropriate and necessary. And I would certainly have been able to challenge the prosecutor's allegation (in cross examination, p. 1624 ff) that practicing to avoid AAVE was somehow tantamount to not telling the truth, since "you don't have to practice the truth…."

13. I could have testified at Mr. Poston's trial that AAVE is not a code for obfuscation whereby a statement means the opposite of its literal meaning. There were several instances where the prosecutor suggested that Mr. Poston's statements in AAVE did mean the opposite of their literal meaning. For instance, the prosecutor suggested that some of Mr. Poston's rap lyrics refuted his claim of self-defense: "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life[.]" (19 RT 1640.)

14. The literal meaning of these lyrics is that Mr. Poston is not the type of person who would *start* a fight without provocation, but that he would defend himself if necessary. Rap lyrics are an artistic, poetic form of expression and should not always be taken literally when they are facially incriminating. But these lyrics are not incriminating at all. It is unlikely that speakers conversant in AAVE would interpret these lyrics to mean that Mr. Poston wanted to fight or kill anyone.

15. There was one instance in which Mr. Poston did appear to be talking in code, when he told Tamena Bailey in Jail Call 1374014312 on July 16, 2013, to have his "fake brother" (p. 13, transcript) "go around to where um, the uh, the *woo-woo-woo-woo-*

*woo-woo*, go around to where I buy *backwoods* at, okay?" *Backwoods* is easy to gloss, as "the best blunt wraps you can find" (*Urban Dictionary*). But the referent of *woo-woo-woo-woo-woo-woo* is unclear. It could just be a hesitation marker, or a momentary stammer. But in context, it could be an attempt to refer to something that anyone overhearing the conversation could not interpret (perfectly normal, I would assume, for someone aware that his phone calls are being recorded and could be used against him.) In any case, *woo-woo-woo-woo-woo-woo* is not a regular feature of AAVE or urban slang. In general, Mr. Poston's use of AAVE was never intended to obfuscate his meaning - he was simply speaking informally in AAVE with friends and family members.

16. The prosecutor argued that Mr. Poston spoke in an aggressive tone in the jail phone calls, asking the jurors to contrast that tone with his polite tone in court. Mr. Poston's language did appear harsh at times, e.g. referring to women, including his girlfriend Mena, as *bitch* in jail call 1376945398, and elsewhere. It is important to note that *bitch*, like *ho(e)*, another "derogatory" word he uses, is much more widespread in rap and hip hop music and everyday conversation than many might realize, among African Americans and others. Dr. Geneva Smitherman explains that *bitch* is "a generic term for female … not always used with a negative meaning," and notes that "[t]his generic use of *bitch* is occurring with increasing frequency among female RAP groups, such a LeShaun and Nikki D…" (See Smitherman, Geneva, *Black Talk*: *Words and Phrases from the Hood to the Amen Corner,* Houghton Mifflin (1994) at p. 59.) About *ho'* Smitherman says something similar: "A generic reference to any

female, used by males as well as females; women use the term to refer to close friends and intimates, as well as to antagonists and rivals." (*Id*. at p. 135.) Neither term necessarily indicates that the woman is a prostitute or that the speaker is a pimp. And neither term necessarily shows aggression.

17. At the same time, it would be disingenuous to suggest that these terms do not carry any negative potential. Smitherman herself notes (p. 59) that *bitch* "is generally considered negative when used by males," and (p. 135) that "*ho* remains a controversial word." In jail call 1376945398 Mr. Poston's mother pulls him up for using this word to refer to Mena, and he himself explains that he didn't mean to use it (perhaps especially in a conversation with his mother) "in a disrespectful way." However, whether Mr. Poston's usage of these terms is viewed neutrally or negatively, this much is clear: the terms themselves do not show criminal intent in the charged shooting nor do they refute Mr. Poston's claim of self-defense.

18. The prosecutor argued that another of Mr. Poston's statements in rap lyrics refuted his claim of self-defense and showed a lack of remorse for Mr. Fluker's death: "Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda . . . ." (16 RT 1136; 20 RT 1972.)

19. The first sentence, like the rest of this statement, appears to be braggadocio, a common feature of rap lyrics. (Indeed, as *Wikipedia* notes, citing Paul Edwards, *How to Rap* (Chicago Review

Press, 2009, at page 25) and Geneva Smitherman, *Talking That Talk* (Routledge 2000, at p. 219), "Braggadocio is a type of rapping where the MC is 'bragging and boasting' and can include subjects such as physicality, fighting ability, material wealth, sexual prowess, or coolness." https://en.wikipedia.org/wiki/Braggadocio_%28rap%29.) Taken in context, Mr. Poston appears to be bragging that he successfully defended himself against Mr. McNeely's gun. He laments that he did not mean to kill Mr. McNeely but maybe he should have - then Mr. Fluker would still be alive. In my opinion this passage does not refute Mr. Poston's claim of self-defense at all and does not show a lack of remorse for Mr. Fluker's death. On the contrary, Mr. Poston seems to be expressing sorrow and regret about Mr. Fluker.

20. The prosecutor interpreted another of Mr. Poston's rap lyrics to mean he did not act in self-defense. Mr. Poston wrote: "It's all self defense under the proper pretense." (16 RT 1135.) The prosecutor argued that the word "pretense" indicated that Mr. Poston's claim of self-defense was false. This is not necessarily so. Again, rap lyrics are a form of artistic expression and should not necessarily be taken literally. As Mr. Poston explained, he was trying to express himself in rhyme.

21. The prosecutor interpreted several of Mr. Poston's statements in jail phone calls to mean he was fabricating his claim of self-defense. Mr. Poston said his lawyer told him "this is in the bag. We got this." (Pros. Exh. 32A at p. 6.) He said: "On self defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity. You feel me?" (Pros. Exh. 32A at p.

6.) In a July 1, 2013, phone call to his mother, Poston said: "I'm not even trying to say that I wasn't there no more. . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're gonna see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag." (Pros. Exh. 32A at p. 8.)

22. I do not see how the prosecutor could have concluded these statements showed fabrication. On the contrary the statements express relief and confidence because the law of self-defense apparently encompassed the facts of his case and made him feel optimistic about the outcome. I do not believe these statements demonstrate that Mr. Poston was fabricating his defense.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 17th day of May, 2016, at Stanford, California.

John R. Rickford

JOHN R. RICKFORD

# EXHIBIT 10

# CURRICULUM VITAE, JOHN R. RICKFORD
# (April 2016)

Professor, Department of Linguistics
J.E. Wallace Sterling Professor of the Humanities
Bass University Fellow in Undergraduate Education
President, Linguistic Society of America (2015)
Stanford University, Stanford, CA 94305-2150
Work: (650)-725-1565 Fax: (650)-723-5666
Department Office: (650) 723-4284
Email: rickford@stanford.edu
Web page: http://www.johnrickford.com

## A. IDENTIFYING DATA

Date of Birth: September 16, 1949
Place of Birth: Georgetown, Guyana
Citizenship: United States citizen
Marital Status: Married to Angela, with four children

## B. ACADEMIC HISTORY

### 1.Colleges and Universities Attended

University of California, Santa Cruz [UCSC], 1968-71
University of Pennsylvania, 1971-79

### 2.Degrees

1971 BA, Sociolinguistics, University of California, Santa Cruz
Highest Honors (academic); Stevenson College Honors
1973 MA, Linguistics, University of Pennsylvania
1979 PhD, Linguistics, University of Pennsylvania

### 3.Scholarships and Academic Honors

1960 Guyana Government Scholarship for secondary education
1965 Queen's College prize for best results at London University General Certificate of Education (GCE) Ordinary Level exams
1967 Wishart Memorial Prize for distinction in English at London University GCE Advanced Level exams
1968 Fulbright/IIE Grant for undergraduate study in US
1970 First Prize, Stevenson College oratory competition, UCSC
1984 Dean's Award for Distinguished Teaching, Stanford
1992 Bing Fellowship for Excellence in Teaching, Stanford
1998 Martin Luther King Centennial Professorship, Stanford
2000 American Book Award (for *Spoken Soul*), Before Columbus Foundation
2001 Elected Chair of the Stanford University Faculty Senate for 2001-02
2002 Anthropology and the Media Award (American Anthropology Association)
2002 Linguistics, Language and the Public Award (Linguistic Society of America)

2003 Collitz Professorship, Linguistic Society of America Institute, Michigan State
2004 Wordsworth McAndrew Award for outstanding contributions to Guyana's cultural life
2004 Pritzker University Fellowship in Undergraduate Education, Stanford (renewed 2009)
2009 Alumni Achievement Award, University of California, Santa Cruz
2009 Nominated and elected a Fellow of the Linguistic Society of America
2009 Endowed chair: J.E. Wallace Sterling Professor of the Humanities, Stanford
2013 Nominated and elected Vice-President and President Elect, Linguistic Society of America.
2015 President, Linguistic Society of America

4.Fellowships for academic study and/or teaching (See El for Research Grants)

1971 Danforth Graduate Fellowship
1973 Linguistic Society of America Institute Fellowship
1974 National Science Foundation Doctoral Dissertation Grant
1989 Fellowship, Center for Advanced Study in the Behavioral Sciences, Stanford
1997 Ellen Andrews Wright Fellowship, Stanford Humanities Center (for study/writing there while on sabbatical in 1997-1998)
1997 Fulbright Fellowship (for teaching and research in Jamaica in fall 1998; declined)
2002 Visiting Erskine Fellowship (teaching), University of Canterbury, New Zealand
2005 Fulbright Fellowship (teaching and research at UWI, Mona Jamaica in spring 2006)

5.Other Study

1970 Sociolinguistics Institute, Stanford, summer
1971 California Linguistics Institute, UCSC, summer
1973 Linguistic Society of America Linguistic Institute, University of Michigan, summer
1979 University Teaching Methods course, taught at U of Guyana by visiting University of London Teaching Methods unit staff, summer
1991 Linguistic Society of America Linguistic Institute, UC Santa Cruz, summer
2003 Linguistic Society of American Linguistic Institute, Michigan State U, summer

C. EMPLOYMENT

a.United States

1977 Visiting Assistant Professor, Anthropology, Johns Hopkins University, fall
1980-81 Visiting Assistant Professor, Linguistics, Stanford
1981-86 Assistant Professor, Linguistics, Stanford
1986-90 Associate Professor, with tenure, Linguistics, Stanford
1987 Instructor, Linguistic Society of America Linguistics Institute, Stanford, summer
1988-90 Associate Professor, by courtesy, Education, Stanford
1990- Professor, with tenure, Linguistics, Stanford
1990- Professor, by courtesy, Education, Stanford
1990 Director, Stanford Overseas Studies Summer Focus Program, Oxford
1993 Instructor, Linguistic Society of America Linguistics Institute, Ohio State University, summer
1996 Vice-Chair, Department of Linguistics, Stanford

1998- Director, Program in African and African American Studies, Stanford, and holder of the Martin Luther King, Jr., Centennial Chair
1999- Taught in Sophomore College, Stanford ("Spoken Soul in American Comedy"), summer.
2001 Taught in Sophomore College, Stanford ("Ebonics and other Vernaculars in Schools and Society" course), summer.
2003 Linguistic Society of America Linguistic Institute, Michigan State U, summer (held Herman and Clara Collitz Professorship in historical linguistics, taught one course, and delivered plenary Forum lecture)
2004 Taught in Sophomore College, Stanford ("Language in the USA" course), summer.
2007 Instructor, “Stylistic Variation” course (LSA349, with Ed Finegan, U Southern California), Linguistic Society of America Linguistic Institute, Stanford, July
2007 Taught Sophomore College course (“Ebonics, Creoles, and Standard English in Education”), Stanford, September

b.Overseas (Guyana, West Indies, New Zealand)

1974-80 Lecturer, Linguistics, University of Guyana
1979-80 Assistant Dean, Faculty of Arts, University of Guyana
1980 Promoted to Reader, Linguistics (intermediate between Associate and Full Professor), with tenure, University of Guyana
1982- External Examiner, Linguistics courses, MA and PhD theses, University of the West Indies (Mona, Cave Hill and St. Augustine campuses), University of Guyana
2002 Erskine Professor, Department of Linguistics, University of Canterbury, New Zealand (Taught two courses and delivered two university/dept lectures, Jul-Aug)
2005 Team leader, External Quality Assurance Review of the Linguistics program, University of the West Indies, Mona, Jamaica. October
2006 Team leader, External Quality Assurance Reviews of the Linguistics programs, University of the West Indies, Cave Hill, Barbados (February) and St. Augustine, Trinidad (March)
2006 Visiting Professor, University of the West Indies, Mona, Jamaica (taught Linguistics 620, “Language Variation,” under the auspices of a Fulbright fellowship)
2008 Taught “Sociolinguistic Variation” at inaugural Caribbean Language and Linguistics Institute, University of the West Indies, Mona, Jamaica, summer

D. PUBLIC SERVICE AND EXTRACURRICULAR ACTIVITIES

2.Santa Cruz, California, 1968-71

Teaching volunteer, tutorial program; President, Black Students’ Association; Member, Drama Society: acted in The Tempest, Julius Caesar, and An Evening of Leonard Cohen, and directed An Evening of Black Poetry and Song, and People Get Ready evening (latter while participating in a quarter-long extra mural community service program on Daufuskie Island,

South Carolina, which included work as a tutor in the elementary school, and other community responsibilities).

3.Georgetown, Guyana, 1974-80

Chairman, University Press subcommittee, Faculty of Arts Grading Subcommittee; Faculty of Arts representative, Academic Board and Research and Publications committee; member, Subcommittee on Status of Women on Campus, Board for Graduate Studies, Task Force on Priorities in University Offerings. Member, Toastmasters Club, Georgetown, St. George's Cathedral Vestry. Executive committee member, Society for Caribbean Linguistics.

4.Palo Alto and East Palo Alto, 1980-present (See E7 for Stanford Service)

Educational Vice-President, Toastmasters Early Risers Club, Palo Alto; Cub scout leader, Juana Briones school; Soccer Coach, American Youth Soccer Organization; designer/director (w. Christine Theberge) of lecture program on "Rapping, Reading, and Writing" for Costaño School 6th graders (Mrs. Morrison's 5th grade), East Palo Alto; guest lecturer, Gunn High School; classroom volunteer (Mrs. Bader's 6th grade), Costaño School, East Palo Alto.

E. POST DEGREE HONORS AND AWARDS

1.Research/training Grants and Awards

1974 Research and Publications Grant, University of Guyana
1981 Spencer Seed Grant, School of Education, Stanford
1982 Grant, Center for Research on International Studies, Stanford
1984 Summer support, Center for Research on Language and Information, Stanford
1984 Rockefeller Humanities Fellowship (for research on adequacy of pidgins and creoles)
1985 Grant for summer research, Pew Foundation, Stanford
1986 Center for Urban Studies Fellowship (for research on divergence of black and white vernaculars in East Palo Alto)
1988 Grant from Irvine Foundation for mentorship and research with four black Stanford students (two undergraduate, two graduate), as part of an effort to attract more minority students into graduate school and high-school/college teaching
1989 National Science Foundation Grant, Sep 89-Aug 91 (for research on copula contraction and absence in Vernacular Black English, mesolectal Creole English and other varieties)
1990 Fellowship from Center for Advanced Study in the Behavioral Sciences, Stanford, for research at the Center, Sep 1990-Aug l991
1995 National Science Foundation Grant, to organize international workshop at Stanford on Stylistic Variation in Feb 1996 (with Penny Eckert), and produce edited proceedings
1997 Ellen Andrews Wright Fellowship, Stanford Humanities Center
1999 Seed money from the Stanford President's fund, to lead African and African American Studies Learning Expeditions (30-50 students, staff and faculty) to the South Carolina and Georgia Sea Islands (1999), Jamaica (2000), and Ghana (2001), over Spring Break.

2002 Grant from the Vice Provost for Undergraduate Education, Stanford to involve undergraduates in ongoing individualized reading project in East Palo Alto
2003 Award from Associate Dean, Humanities and Sciences, to lead an African and African American Studies Learning Expedition (30+ students, staff and faculty) to Belize over Spring Break.
2003 Grant from the Vice Provost for Undergraduate Education, Stanford (via Linguistics), to involve undergraduates in research on plural marking in Caribbean English creoles
2004 Grants from the Vice Provost for Undergraduate Education, Stanford to involve undergraduates in two separate research projects: 1. An annotated bibliography of African American English and other vernaculars in Education (via Linguistics) and 2. An Oral History of East Palo Alto (via African and African American Studies)
2004- Stanford Humanities Lab grant for research on ongoing change in intensive and quotative "all" in California, involving a team of Linguistics faculty members and graduate students, and undergraduates from Linguistics and other departments.
2004 National Science Foundation grant for a three-year study of grammatical variation in Caribbean Creoles, African American Vernacular English, and Appalachian English, beginning Winter 2006.
2011 National Science Foundation grant for a two-year study of "Neighborhood Moves and Sociolinguistic Mobility," drawing on data from five US cities involved in Housing and Urban Development's "Moving to Opportunity" program. First year report submitted to NSF July 20, 2012.
2013 Nominated and elected Vice-President and President Elect, Linguistic Society of America, November.
2015 President, Linguistic Society of America

2.Invited Lectures

1970 "Language Problems in Guyana." Sociolinguistics Colloquium, Stanford
1973 "Black English and Creole Studies: Where Now?" Washington DC Linguistics Society panel presentation and discussion
1974 "The Insights of the Mesolect." Anthropology Colloquium, The Johns Hopkins University
1977 "Linguistic and Cultural Similarities between the Sea Islands and Guyana." Howard University, Washington, DC
1979 "Language Variation and Change in a Creole Continuum." Linguistics Colloquium, University of California, Los Angeles
1980- Invited presentations on "Black English," "Creoles," "Language Attitudes," and "Sociolinguistic Variation" in classes of colleagues in Linguistics, English, and Psychology
1981 "Creoles, Linguistic Variation, and Language Change." University of Southern California
1981 "Decreolization and Language Change." Gallaudet College
1981 "Some Recent Language Policy Related Developments and Issues in the English-Speaking Caribbean." Center for Applied Linguistics, Stocktaking Meeting on Language and Educational, Occupational or Social Issues in Different Parts of the World

1981 “Social Differentiation and Linguistic Variation.” Kroeber Anthropological Society and Berkeley Linguistics Club meeting
1982 “Plumbing Sociolinguistic Competence.” UC Berkeley
1982 “Variable Rules.” U of Southern California
1984 “In Defense of the Creole Continuum.” Plenary session address, NWAV XIII (New Ways of Analyzing Variation in Language XIII) U of Pennsylvania
1984 “Me Tarzan, You Jane! Cognition, Expressiveness, and the Adequacy of Pidgins and Creoles.” Washington DC Linguistics Club
1985 “Concord and Conflict in the Characterization of the Speech Community.” Anthropology Colloquium, Duke University
1985 “Where the Roots Still Show: The Sea Islands as a Cultural Resource.” U of Nevada, Reno
1985 “The Divergence of Black and White Vernaculars.” Panel presentation and discussion, NWAV-XIV, Georgetown U
1986 “Early Nineteenth Century Guyanese Creole: Three Views.” Creole Workshop, Linguistic Society of America
1986 Institute, City University of New York
1986 “Black English (Creole and Ex-Creole) in the New World.” Talk to Black faculty, Afro-American Studies, Stanford
1986 Keynote address, Annual Convention of the Anglistentag (German Departments of English), Kiel, W. Germany
1987 “Language Contact, Variation, and Change.” Georgetown U Round Table Meeting on Language Spread and Language Policy
1987 “Making the Most of a Stanford Education: Research.” Talk to Freshmen, Orientation Activities, Stanford
1987 “The Evolution of Creole Languages.” (Panel Presentation, NWAV-XVI, The University of Texas at Austin.)
1988 “The Creole Continuum.” California State U, Fullerton
1988 “Variability in the VBE Copula: New Light on Old Issues.” Washington Linguistics Club, Washington, DC
1988 “Making the Most of a Stanford Education: Research.” Talk to Freshmen, New Student Orientation, Stanford. (Repeated 1989.)
1989 “Variation in the Copula in Vernacular Black English.” U. of California, Santa Cruz. (With A. Ball, R. Jackson, N. Martin)
1990 Macalester College Convocation Address, St Paul, Minnesota 1990 “African American Language and Culture: Roots and Branches.” Hamilton College, New York
1991 "Language in Humanity." University of the West Indies, Cave Hill, Barbados.
1991 "Addressee and Topic Influenced Style Shift in Language." (With Faye McNair-Knox.) Opening session presentation, NWAV-XX, Georgetown University, Washington, DC.
1991 "Variation in the Jamaican Creole Copula: New Data and Analysis." Presented at the Bailey Symposium, American Anthropological Association meeting, Chicago.
1992 "English Transplanted, English Transformed." Association of Commonwealth Language and Literature, University of the West Indies, Mona, Jamaica, August.
1992 "Creolization in Black Language and Culture." Anthropology 1 guest lecture, Stanford.

1993 "Methodology in Pidgin-Creole Studies." (Contribution to Panel on this topic.) Society for Pidgin Creole Linguistics meeting, Los Angeles, January.

1993 "Concord and Conflict in the Speech Community." Invited lecture, Dean's Symposium on Competition and Cooperation in the Context of the Social Sciences, University of Chicago, April.

1993 "Linguistic and Cultural Diversity as Opportunity and Resource." Paper presented at symposium on "Immigration in Europe," Stanford Study Center, Berlin, June.

1993 "Addressee- and Topic- Influenced Style Shift in Language." (With Faye McNair-Knox.) Presentation in Language and Human Affairs Lecture series, 1993 Linguistic Institute, Ohio State University, Columbus, July.

1994 "Fieldwork Issues in my East Palo Alto and Sea Island Research." Anthro 84 class, Stanford ("From Research to Performance, " taught by Paulla Ebron), April.

1994 "Creolization in African American Language and Culture." Anthro CIV track taught by George Collier, Winter.

1994 "Sociolinguistic Theory and Application in the African American Speech Community." Lecture at New York University, November (in "Language in the City" series).

1995 "Linking Public Service and Learning in a University Context." Lecture to faculty/staff group at invitation of Provost. California State University, Monterey Bay. February.

1995 "Basic and Applied Linguistic Research within the African American Speech Community." Keynote Address, Conference on African American English, University of Massachusetts at Amherst, March.

1995 "Sociolinguistic Perspectives on African American English." Workshop presentation, American Speech and Hearing Association, Orlando, Florida, December.

1996 "The Systematicity (and Beauty) of the Vernacular." Presentation at the American Association for the Advancement of Science meeting, Language Standards and Linguistics session, Baltimore, Maryland, February.

1996 "Quality Integration of Service in the Curriculum: Experiences as Student and Professor." Edward C. Moore Symposium, Indiana University and Purdue University Indianapolis, March, and Stanford Summer Institute on Service Learning, June.

1996 Keynote address, Linguistics and Language Development Graduation Ceremony, San Jose State University, May.

1996 "American English: Changing Even as we Speak." Stanford Alumni Reunion lecture, October.

1996 "Discussion Leading and Small Group Methods." Center for Teaching and Learning seminar, in Award-Winning Teachers on Teaching series, Stanford, November.

1997 Numerous talks on *Ebonics*, in response to public interest and controversy following the Oakland School Board's Dec 1996 decision to recognize the vernacular of their African American students and use it in the teaching of Standard English. My talks focused, among other things, on the structure and history of Ebonics or African American Vernacular English [AAVE], and its potential for improving the success of inner city African American students in reading, writing and the language arts, as demonstrated in studies of contrastive analysis and dialect readers in the United States and Europe. Talks were given, sometimes as part of panels or symposia, at Stanford University (several sites), the University of California at Berkeley, Medgar Evers

College, the University of Michigan, Michigan State University, California State University at Long Beach, San Francisco State University, The Standard English Proficiency conference of the California State Department of Education, the Oakland Alliance of Black Educators, First Presbyterian Church (Palo Alto), UC Santa Cruz Alumni Association, XEROX PARC, Woodside Village Church, Rotary Club, and the National Black Association of Speech, Language and Hearing Practitioners. I also gave a talk on "Ebonics Humor"at the Stanford Humanities Center in December.

I was also interviewed about Ebonics by reporters/broadcasters from a variety of local and national news media, including ABC, CBS, Nickelodeon News, the News Hour with Jim Lehrer, the New York Times, the Washington Post, the Chicago Tribune, the Chronicle of Higher Education, the Los Angeles Times, Education Newsday, WOR, KALW, KKUP, The Education Forum (Public Access TV, Palo Alto), Charleston Post and Courier, the Stanford Daily, Education Daily, Education Week, the Christian Science Monitor, USA Today, Newsweek, KQED ("Talk of the Nation," "Forum" and "To the Best of our Knowledge" shows), US News and World Report, the Detroit News, Psychiatric times, San Francisco Chronicle, San Jose Mercury News, Oakland Tribune, Toronto Star.

I also drafted the resolutions of the Linguistic Society of America on Ebonics, which were approved, with minor revisions, at the Society's January 1997 annual meeting in Chicago.

1998 "Language Diversity and Academic Achievement in the Education of African American Students: An Overview of the Issues." Invited opening address at the Conference on Language Diversity and Academic Achievement in the Education of African American Students," organized by the Center for Applied Linguistics and Howard University, held after the Linguistic Society of America's annual meeting, New York, Jan 11-12.

1998 "Teaching Reading to Ebonics Speakers." Lecture/Workshop at the "Ebonics/African American Language and Literacy Conference: The Real Deal," University of Minnesota, Minneapolis, Jan. 31.

1998 "Issues in the Evolution of African American English." Invited paper in the session, "Divergence in Linguistic Evolution: Ebonics and other 20th Century Developments." American Association for the Advancement of Science annual meeting, Philadelphia, Feb.12-17.

1998 "African American Language and Culture: Roots and Branches." Stanford Linear Accelerator Center (SLAC) Black History Month program, Feb 18.

1998 "African American Language and Culture: Roots and Branches." John Baugh's Linguistics 73 class, Stanford, Feb 24.

1998 "Languages in Transition: Language Change and Language Preservation." California State University, Dominguez Hills, Curriculum Development Symposium, Feb 27.

1998 Seminar/Workshop on "The Ebonics Controversy" at the annual meeting of the California Speech-Language-Hearing Association, San Jose, California, March 28.

1998 "The Role of Ebonics in Language Arts Instruction for African American Students." Workshop, 7th Annual Professional Development Conference, Language

Development Program for African American Students, Los Angeles Unified School District, May 2.

1998 Stanford talks to Haas Center for Public Service, prospective (admitted) ethnic minority graduate students, AAAS 105 class, EDGE (Engineering students) and Africa Forum, on various topics, including "Ebonics and Education," "Why Stanford?" and "Africanisms in Gullah Language and Culture." May, June.

1998 "Why Graduate School?. Some Thoughts and Recommendations." Invited talk at BGSA symposium on "Imagining Graduate School" for Stanford undergraduates, May 9.

1998 Invited lecture on "Where the roots still show: Africanisms in African American Language and Culture." Symposium on "Issues in the African Diaspora: Connections and Continuity in the Americas" University of San Francisco, June 19.

1999 "A challenge for applied linguistics: The challenges confronting Ebonics speakers in schools and society." Plenary session address to the Annual meeting of the American Association for Applied Linguistics, Stamford, Connecticut, March.

1999 Keynote address, colloquium on "Language and African Diaspora Culture," The City College of New York.

1999 Lectures on "Ebonics humor" to the Linguistics Departments, University of California at San Diego, and University of California at Davis, May and June.

2000 Plenary speaker ("Education and the Ebonics Firestorm") at Georgetown University Round Table Meeting on Languages and Linguistics, focus on Linguistics and the Professions, March.

2000 Keynote address, Conference on Lorenzo Dow Turner and Africanisms on the Sea Islands, Howard University, October

2000 “Vernacular English in August Wilson’s *Fences*.” Lecture to honors English class at Henry Gunn Senior High School, Palo Alto, California, December.

2000 “The Ebonics controversy revisited.” Invited presentation, Research Institute for the Comparative Study of Race and Ethnicity, Stanford, December.

2001 Invited lectures on "Language and Ethnicity," "Language and Culture and other topics to Stanford classes in African and African American Studies, Cultural and Social Anthropology, and History.

2001 "Language mastery, cultural affirmation, and the success of African American and other students." Invited presentation at the Los Angeles Unified School District Conference on Developing a Culturally Relevant Education Program that Benefits African American and All Other Students, held at the University of Southern California, October.

2002 Panel presentations on "The American Heritage Dictionary of the English Language" and on "African American Vernacular English and Education" for Continuing Studies, Stanford University, January and February.

2002 "Working with Vernacular English Speakers in Schools: A Sociolinguist's Perspectives, informed by Controversies involving Ebonics in the US and English-Based Creoles in the Caribbean." Invited presentations at the Auckland University of Technology and the University of Victoria at Wellington, New Zealand, July, August

2002 "African American Language and Culture: African and Creole Roots." Invited presentation at English and Ethnicity conference, University of Alabama, October

2002 "Ebonics: Don't believe the hype." Stanford Fall Visitation program, October.

2002 "Contrastive Analysis revised: Extending students' linguistic versatility through literature and song (the "versatility" approach). Paper presented (with Angela E. Rickford) at the Thirty-first annual meeting on New Ways of Analyzing Variation in Language, Stanford. October.

2003 Presentation on Ebonics and Education at Carnegie Mellon University, Pittsburgh, February.

2003 "Waapm? What happened? The creolist/anglicist quest for the roots and branches of AAVE." Collitz lecture, Linguistic Society of America Summer Institute, Michigan State University.

2003 Gave lecture on the linguistic and cultural significance of the South Carolina and Georgia Sea Islands, and then conducted all-day workshops on the features, history, and educational implications of African American Vernacular English, University of Puerto Rico, September.

2003 Talk/workshop on "Discussion-leading and small group methods." Linguistics Dept. Teaching Assistant training seminar, October.

2004 Keynote talk, Gunn High School, Black History Month celebration, February.

2004 Four lectures, on history/linguistic significance of Sea Islands, the Gullah language, my work with author Patrick Conroy and students on Daufuskie Island, South Carolina, and Gullah folklore, during the ten-day Intracoastal Waterway College (Florida, Georgia, South Carolina), a Stanford Alumni Association Travel/Study program.

2004 Panel presentation on the 1979 Ann Arbor Martin Luther King, Jr., decision (regarding AAVE and Education), revisited. Conference on New Ways of Analyzing Variation in Language, University of Michigan, Ann Arbor, October.

2004 Invited lectures on "Quantitative and qualitative barriers to a consensus on AAVE creole origins" and "Strategies for taking AAVE into account in the schools." New York University, Department of Linguistics. December.

2005 "Ebonics and Education: Building on the African American vernacular (vs. ignoring it, laughing at it or trying to legislate it away) to help students succeed in schools. Invited address at University of Texas, San Antonio. April.

2005 "Against consensus: Challenging the New Anglicists' contentions concerning the development of AAVE." Keynote address at the Symposium on Language and Culture [SALSA], University of Texas, Austin. April.

2005 "African American Vernacular English (aka Ebonics) and the Black/White Achievement Gap in Schools." Keynote speech at the Mary Lou Fulton Endowed Symposium, Arizona State University, Tempe, November.

2006 " Creole in the Literature and Orature of Caribbean Poets and Ordinary People." Keynote address, Literacy conference, University of the Virgin Islands, St. Croix.

2006 “Creole/English vernaculars and educational challenges in the West Indies.” Inaugural Cassidy-Le Page Memorial lecture, University of the West Indies, Mona, Jamaica, April.

2006 “Understanding and building on African American Vernacular English to help students perform better in reading and writing in California schools.” Presentation to educators and publishers at the Voices of African American Students meeting, Los Angeles School District headquarters, California, September.

2006 "African American Vernacular English and Education." Talk to Professor Noah Borrero's Education class, University of San Francisco, California, October.

2006 "The Black/White achievement gap in reading/language arts in K-12 schools and some linguistic strategies for narrowing it." Ethics at Noon talk, Stanford, October.

2006 "From outside agitators to inside implementers." Invited panel presentation (with Angela E. Rickford) at the 35th annual New Ways of Analyzing Variation [NWAV 35] conference, Ohio State University, November.

2007 "Improving the literacy education of vernacular and creole speakers." Invited presentation (with Angela E. Rickford), Center for Study of African American Language, University of Massachusetts. Amherst, April

2007 Commentary on William Labov's paper, 'Unendangered Dialects, Endangered People: The case of African American Vernacular English'." American Anthropology Association Presidential session, *Confronting endangerment, seeking equality*, organized by Arthur Spears. Washington, DC. November.

2008 "African American Vernacular English and the Black/White achievement gap in American schools. " Public lecture, University of South Carolina, February.

2008 "Where the Roots still show: African Roots and Creole Connections in the language and culture of the S Carolina and Georgia Sea Islands." Public lecture, Emory University, Atlanta, Georgia, March.

2008 Opening Address, Caribbean Language and Linguistics Institute, University of the West Indies, Mona, Jamaica, June.

2008 "Collaborations: As far as different subfields, we're all, "Aint no reason we shouldn't work together." (With Tom Wasow.) Invited plenary talk, Linguistic Society of America summer meeting, Ohio State University, July.

2008 "Relativizer omission in Caribbean English creoles, African American Vernacular English and Appalachian English." University of Zurich, Switzerland, October.

2008 "Relativizer omission in various English vernaculars: How dependable as a diagnostic of diachronic relationships?" Plenary address at the inaugural meeting of the International Society for the Linguistics of English [ISLE], organized by Bernd Kortmann and Christian Mair, University of Freiburg, Germany, October.

2008 "African American Vernacular English, Linguistics, and the Black-White Achievement Gap." Distinguished Alumni Lecture, Stevenson College, University of California, Santa Cruz, October.

2009 "Girlz II Women: Age-grading, Language Change, and Stylistic Variation." Invited plenary address, Linguistic Society of America annual meeting, San Francisco, January.

2009 "Relativizer Omission in Anglophone Caribbean Creoles, Appalachian, and AAVE, with implications for the controversy over the English/Creole origins of AAVE." Paper presented at the Linguistics Colloquium, University of California, Davis, February.

2010 "Stability, Change and Stylistic Variation in Individuals and Communities over Time." Keynote address, International Conference on Applied Linguistics, Department of Foreign Languages, National Chiayi University, Taiwan, November.

2011 "Now you see them, now you don't: Insights from the relatives in English Vernaculars." Plenary talk, 24th Annual Conference on Human Sentence Processing [CUNY2011], Stanford University, March.

2012 " 'If yuh see people!' Appreciating the systematicity and expressive power of Creolese."

Invited Republic of Guyana Lecture, Georgetown, Guyana, February.

2012 "African American Vernacular English and the Achievement Gap in Education." Invited lecture, Linguistics Department, University of Michigan. March.

2012 "Relativizer Omission, the independence of linguistic and social constraints, and variationist Comparative Reconstruction." Department of Linguistics, University of Pennsylvania, March, and ICAME33, Leuven, Belgium, May.

2012 "Why don't People in Contact Talk More Like Each Other? Ecological, Ethological and Other Considerations." Language Contact Conference, Wroclaw, Poland. May.

2012 Book talk on my newly-released, co-edited book (with Jeannette Allsopp), *Language, Culture and Caribbean Identity*. Society for Caribbean Linguistics, Nassau, The Bahamas. August.

2012 "The ~~Problem~~ Challenge of Stylistic Variation for Longitudinal Studies of Language Change." Workshop on Longitudinal Studies of Change, NWAV-41, Indiana University, Washington, DC, October.

2012 "Obama, The Daily Caller, and Variation in Language Use and Attitudes." Talk to Political Psychology Group, Stanford, October.

2013 "Relativizer Omission, the independence of linguistic and social constraints, and variationist Comparative Reconstruction." Departments of Linguistics, Queen Mary College, University of London (April), and University of Edinburgh, Scotland September.

2013 "My Linguistics research on African and African American Themes." In *Real Talk: Intimate Discussions about the African Diaspora*, Program in African and African American Studies (Africaam 31), Stanford University, October 24.

2013 "Caribbean English-Based Creoles." Talk to the Caribbean Students Association, Stanford University, November 1.

2014 "Increasing the representation of under-represented ethnic minorities in Linguistics." Symposium on Diversity in Linguistics, Linguistic Society of America (LSA) annual meeting, Minneapolis, Minnesota, January.

2014 "Commentary: Labovian Legacies." At Symposium on Sociolinguistics and Education: A Tribute to William Labov. American Educational Research Association [AERA] annual meeting, Philadelphia, Pennsylvania, April.

2014 "Stylistic variation in panel studies of language change in real time." Paper presented in Panel Studies Workshop, Methods in Dialectology Conference XV, Groningen, The Netherlands, August.

2015 "Aspects of the testimony of Rachel Jeantel." Invited public lecture at Stony Brook University, New York, December.

3.Other Research Presentations (Sample)

1975 "Problems in the Study of Pronominal Variation in a Creole Continuum." NWAV-IV, Georgetown University, Washington, DC

1980 "Language Attitudes in a Creole Continuum." Linguistic Society of America Annual Meeting, San Antonio, Texas

1981 "Modeling Decreolization: Language, Individual and Community Viewpoints." NWAV-11, U. of Pennsylvania

1984 "The Diachronic and Sociolinguistic Significance of Some Early Creole Texts." Fifth Annual Meeting, Society for Caribbean Linguistics, Mona, Jamaica

1985 "The Need for New Approaches to Social Class Analysis in Sociolinguistics." Linguistic Society of America Annual Meeting, Seattle

1986 "Anteriority and the Historical Present in Narrative." NWAV-XV, Stanford University
1986 "Nineteenth Century Guyanese Creole: Three Views." Creole Workshop, LSA Linguistic Institute, City U of New York
1987 "Conjugated and Invariant be VBE: A West Coast Perspective." (With F. McNair-Knox, NWAV-XVI, U of Texas at Austin.)
1988 "Rappin on the Copula Coffin: Theoretical and Methodological Issues in the Variable Analysis of Conjugated and Deleted BE in VBE." (With A. Ball, R. Blake, R. Jackson and N. Martin, NWAV-XVII, U of Montreal)
1989 "Grammatical Variation and Change in Vernacular Black English." Workshop on Internal and External Factors in Syntactic Change, Ninth International Conference on Historical Linguistics, Rutgers, New Jersey.
1989 "Continuity and Innovation in the Development of BEV be 2." NWAV-XVIII, Duke University, Durham, N. Carolina.
1989 "Preterite had in the BEV of Elementary School Children." (With C. Theberge.) NWAV-XVIII, Duke University, Durham, N. Carolina.
1990 "Copula Contraction and Absence in Barbadian English." (With R. Blake, Berkeley Linguistics Society Meeting, UC Berkeley)
1990 "Variability in the Jamaican Creole Copula: A Reanalysis." NWAV-XIX, U of Pennsylvania, Philadelphia.
1991 "How People are Talking and Why: Internal and External Constraints on Linguistic Variation." Seminar presentation, Center for Advanced Study in the Behavioral Sciences, Stanford.
1992 "The Creole Residue in Barbados." Presented at the combined annual meetings of the Linguistic Society of America and the Society for Pidgin and Creole Linguistics, Philadelphia, Pennsylvania, January.
1992 "Addressee and Topic Influenced Style Shift in Language." Bay Area Sociolinguistics Association, University of California, Berkeley, February.
1992 "Textual Evidence on the Nature of Early Barbadian English, 1676-1870." (With Jerome S. Handler.) Ninth Biennial Meeting, Society for Caribbean Linguistics, University of the West Indies, Cave Hill, Barbados, August.
1992 "Bridging the Gap, as far as Sociolinguistics and Syntax Ø." (With Thomas A. Wasow, Norma Mendoza-Denton and Julie Espinoza.) NWAV-XXI, Ann Arbor.
1992 "As far as Variation and Change in "AS FAR AS" Constructions are Concerned." (With Thomas A. Wasow, Norma Mendoza-Denton and Julie Espinoza.) Linguistics Colloquium, University of California, Berkeley, November.
1993 "Negative Inversion in African American Vernacular English." (With Peter Sells and Thomas A. Wasow.) Linguistic Society of America Annual Meeting, Los Angeles, January.
1994 "Copula Absence and the Question of Prior Creolization in AAVE." Poster presentation at NWAV-XXIII, Stanford.
1994 "An Optimality Theoretic Approach to Variation in Negative Inversion in AAVE." (With Peter Sells and Tom Wasow.) NWAV-III, Stanford.
1995 "AAVE and the Creole Hypothesis: Reflections on the State of the Issue." Linguistics Colloquium presentation, the Ohio State University, Columbus, October.

1996 "Creolization? Sociohistorical and Textual Evidence." Twenty-fifth annual meeting on New Ways of Analyzing Variation (NWAV-XV), Las Vegas.

1997 "Unequal partnership: Sociolinguistics and the African American Speech Community." At "Service in Return" colloquium, Linguistic Society of America meeting, Chicago.

1997 "The relationship between linguistics and the public debates of our time: Lessons from the Ebonics controversy." Symposium paper at NWAV-XVI, Quebec City, Canada.

1999 "Ebonics and the African American diaspora." Talk at San Jose State University symposium, February.

2000 Prosodic conditioning of the copula. Paper presented (with Julie Sweetland and Joy Hsu) at the New Ways of Analyzing Variation [NWAV] conference, Michigan State University.

2002 Creole/AAVE copula patterning as evidence of second language learning effects? Paper presented (with Devyani Sharma) at the Society for Pidgin Creole Linguistics meeting, in conjunction with the Linguistics Society of America, San Francisco, January.

2003 Presentations in panels on "The University Minorities Reading Project" and "African American Language, Literacy and Liberation: The Educational Implications of Sociolinguistic Research." American Educational Research Association (AERA) meeting, Chicago, April.

2003 Panel presentation on African American Vernacular English and Education, National Reading Conference (NRC), Scottsdale, Arizona, December.

2004 "Early African American English and Pidgin/Creole Englishes: Evidence from plural marking." Paper presented at the Language Variety in the South (LAVIS III) conference, University of Alabama, Tuscaloosa, April.

2004 "Plural marking variability in 'Early' African American English & Caribbean & W. African pidgin/creole Englishes, with implications for the creole origins debate." Paper for the joint meeting of the *Society for Caribbean Linguistics* (SCL) and the *Society for Pidgin Creole Linguistics* (SPCL), Curaçao, West Indies, August.

2005 "Intensive and Quotative ALL: Something Old, Something New." Presentation (as founder/member of the "Stanford All Project"), 34th annual New Ways of Analyzing Variation conference [NWAV 34], New York University, October.

2005 "Against consensus: Challenging the contentions of the New Anglicists and divergencists concerning the development of AAVE." New Ways of Analyzing Variation conference [NWAV 34], New York University, October.

2006 "The sociolinguistics of a short-lived innovation: quotative *all*." Paper presented (with Isabelle Buchstaller, Elizabeth Traugott, Tom Wasow, and Arnold Zwicky) at the 35th annual New Ways of Analyzing Variation conference [NWAV 35], Ohio State University, November.

2007 "Ethnography: Local categories and perspectives." Paper presented at the Workshop on Ethnographic Methods in Sociocultural Linguistics, LSA Linguistic Institute, Stanford, July.

2007 "Problems to be faced . . .: Le Page's theoretical and applied legacy in sociolinguistics and creole studies." Paper presented at the Robert Le Page workshop, LSA Linguistic Institute, Stanford, July.

2008 "Girlz II Women: Foxy and Tinky revisited." (With Mackenzie Price.) African American Women's Language conference, organized by Sonja Lanehart, University of Texas, San Antonio, March.

2008 "Relativizer omission in Anglophone Caribbean creoles: A quantitative analysis." (With Laura Smith.) Presented at the joint meeting of the Society for Caribbean Linguistics and the Society for Pidgin and Creole Linguistics, Cayenne, French Guiana, July, and at the New Ways of Analyzing Variation in language conference, Rice University, November.

2010 "Sociolinguistic Lessons in Ernest J. Gaines, *A Lesson Before Dying*." (With Lisa Young.) Paper presented at the annual meeting of the American Dialect Society, Baltimore, Maryland, January.

2010 "Relativizer Omission in Anglophone Caribbean Creole Varieties, and its Theoretical Implications." Presidential address, annual meeting of the *Society for Caribbean Linguistics*, Bridgetown, Barbados. August.

2010 "A Variationist Approach to Question Inversion in Bajan." (With Robin Melnick.) Paper presented at the annual meeting of the *Society for Caribbean Linguistics*, Bridgetown, Barbados. August.

2010 "Question Inversion in Bajan." (With Robin Melnick.) Paper presented at the Thirty-Ninth Annual conference on New Ways of Analyzing Variation in language (NWAV39), University of Texas, San Antonio. November.

2010 "Black at Heart: Insights from the Relatives in Barbados." Paper presented at the Thirty-Ninth Annual conference on New Ways of Analyzing Variation in language (NWAV39), University of Texas, San Antonio. November.

2011 "Language Processing and Relative Clauses in Dorset English." (With Caroline Piercy, Thomas Wasow, T. Florian Jaeger and Ewart Thomas.) Variation and Language Processing [VALP], University of Chester, England, April.

2012 "Relativizer Omission and the independence of linguistic and social constraints." Society for Caribbean Linguistics, Nassau, the Bahamas, August.

2012 "Highlights of the Bibliography on AAVE, Creole, and Other Vernacular Englishes in Education." Paper presented at the annual meeting of the National Council of Teachers of English [NCTE], Las Vegas, November.

2013 "Neighborhood Moves and Sociolinguistic Mobility in Five American Cities." Paper presented at the annual meeting of the Linguistic Society of America, Boston.

2013 "Girlz II Women: Age Grading, Linguistic Change and Stylistic Variation." Paper presented at the Franklin Symposium honoring William Labov, University of Pennsylvania, April 2013.

2013 "Justice for Jeantels: Fighting Linguistic Prejudice and Racial Inequity in Courts and Schools, after Florida vs. Zimmerman." Panel presentation with Sharese King, New Ways of Analyzing Variation in language [NWAV42], Pittsburgh, October.

2014 "Towards understanding African American English phonology: A multi-city study of merging and shifting." (With Brittany McLaughlin.) American Dialect Society annual meeting, Minneapolis, Minnesota, January.

2014 "Predicting reading error rates with frequency, function, and sound-to-spelling rules." Round table presentation, American Educational Research Association [AERA] annual meeting, Philadelphia, Pennsylvania, April.

2015 "Race, dialect prejudice and literacy in the George Zimmerman Trial and Beyond: Rachel Jeantel's Testimony about Trayvon Martin." Paper presented at the University of the West Indies, Department of Language, Linguistics and Literature, Cave Hill, Barbados, June 20, 2015.

4.Editorial and Refereeing Duties for Journals, Grant Agencies

1974- Referee for *Language*, *Language in Society, Studies in Second Language Acquisition*, National Science Foundation
1982- Editorial Board, Camden House
1982-86 Editor, *The Carrier Pidgin* newsletter
1983- Editorial Board, Foris Publications (*Topics in Socio-linguistics* series)
1986- Associate Editor, *The Carrier Pidgin* Newsletter
1986- Editorial Board, *American Speech*
1986-96 Editorial Board, *Journal of Pidgin and Creole Languages*
1986-89 Member, National Science Foundation Linguistics Panel, reviewing sociolinguistics and other grant proposals
1987- Board of Consulting Editors, *Multilingua*
1987- Editorial Board, *Papers in Pragmatics*
1987 Guest Editor, issue #71, *International Journal of the Sociology of Language* ("Sociolinguistics and Pidgin-Creole Studies")
1992 Member, Committee of Visitors, Division of Behavioral and Cognitive Sciences, National Science Foundation (June)
1992-98 Editorial Board, *Language in Society*
1995- Editorial Board, *Journal of English Linguistics*
1995- Editorial Board, *Journal of Linguistic Anthropology*
1995- Editorial Board, *Journal of Sociolinguistics*
1998- Editorial Board, *Links and Letters*
1999- Editorial Board, *21st Century Perspectives on Language, Ethnicity, and Education* Series, Kluwer Academic Publishers
2001- Editorial Board, *Language , Identity and Education*
2004- Editorial Board, *Journal of Pidgin and Creole Languages*
2005- Reviewer, grant proposals in Linguistics, National Science Foundation
2007- Editorial Board, *Reading Research Quarterly*
2013- Hon. Co-Editor, *Languages in Contact* series, Polish Academy of Sciences

5. Memberships in Professional Societies

*Co-founder and Chair* (with Susan Ervin-Tripp), Bay Area Sociolinguistics Association
*Member:* American Anthropological Association, American Dialect Society, International Sociolinguistics Association, Linguistic Society of America, Society for Caribbean Linguistics, Society for Linguistic Anthropology, Society for Pidgin and Creole Linguistics. *Executive Committee Member*, Linguistic Society of America [LSA], and member, LSA's Committee on Ethnic Diversity in Linguistics. *Vice-President, President and Immediate Past President,* Society for Pidgin and Creole Linguistics. Elected Vice President, and President Elect, Society for Caribbean Linguistics, at SCL Dominica meeting. President, Society for Caribbean Linguistics (2008-10), Immediate Past President, Society for Caribbean Linguistics (2010-12). Vice-President (2014) and President (2015), Linguistic Society of America.

6.Conference Organization and Program Directorships

1975 Coordinator, Festival of Guyanese Words Colloquium, U Guyana
1986 Coordinator, Fifteenth Annual Conference on New Ways of Analyzing Variation in Language (NWAV-XV), Stanford; and coeditor, with K. Denning, S. Inkelas, and F. McNair-Knox, of proceedings (Variation in Language. Stanford, 1987).
1987 Co-organizer, with P. Eckert and C. A. Ferguson, Conference on "The Social Context of Language Change," Linguistic Society of America Institute, Stanford
1987 Director, Undergraduate Summer Humanities Research program (eight-week residential lecture and data-analysis program involving ten undergraduates)
1989 Co-organizer, student conference in Linguistics 73 "Black English" course; and co-editor, with B. McElhinny and A. Ball, of proceedings (The B. E. Happenin' 1989. Stanford.)
1989 Faculty Advisor, Stanford Upward Bound program (academic enrichment program for low income minority high school students)
1990 Director, Stanford Overseas Studies Oxford Summer Focus Program, "Britain in the Third World; The Third World in Britain"
1990- Co-Organizer (with Susan Ervin-Tripp and Thomas Veatch) of meetings of the Bay Area Sociolinguistics Association, alternating between Berkeley and Stanford
1993 Co-Organizer (with CTL and Bing Fellowship funds) of Stanford faculty/TA workshop series on university teaching featuring Dr. Donald Bligh and Dr Roy Cox (of the UK).
1994 Co-Organizer (with CTL and Bing Fellowship funds) of Stanford faculty/TA workshop series on university teaching featuring Dr. David Warren Piper (from Australia).
1994 Co-Organizer (with Penelope Eckert and others) of NWAV-XXIII (New Ways of Analyzing Variation in Language XXIII), Stanford, October.
1997 Organizer, "Service in Return" colloquium, annual meeting of the Linguistics Society of America, Chicago, January.
2002 Co-Organizer (with Penelope Eckert and others) of NWAV-XXXI (New Ways of Analyzing Variation in Language XXXI), Stanford, October
2004 Co-Organizer (with Vera Grant and Sarita Ocon, of the Program in African and African American Studies, Stanford) of a National Workshop on Black Studies Curriculum and Pedagogy, Stanford, December.
2010 Co-founder (with H. Samy Alim and Arnetha Ball) and Associate Director, Center for Race, Ethnicity and Language (Stanford).
2012 Co-Organizer (with H. Samy Alim and Arnetha Ball), "Racing Language, Languaging Race" international symposium, Center for Race, Ethnicity and Language, Stanford, May.

7.Stanford Service

a.University level

1981-92 Committee on Black Performing Arts
1981-84 Freshman Advisor

1983-84 Search Committee, Assistant Dean, Memorial Church
1987-88 Committee on Undergraduate Residential Affairs
1987-88 Committee on Improvement and Evaluation of Teaching
1987-88 Search Committee, Dean, Humanities and Sciences
1988-89 Bi-weekly interdisciplinary faculty seminar on poverty
Faculty Steering Committee, Haas Center for Public Service 1988-
90 Committee on Curriculum and Teacher Education
Resident Fellow, Arroyo House, Wilbur Hall
1988- Advisory Board, Center for Teaching and Learning
1989-91 Faculty Sponsor and PI, Upward Bound Program
1989-90 Chair, Search Committee, Director, African and Afro-American Studies
1990-91 Stanford Judicial Council
1991- Resident Fellow, Kimball Hall
1991-92 Search Committee, Vice President for Student Resources
1992 Student Resources Advisory Committee on Budget Cuts
1992 African American Mentoring Group
1992-93 Stanford Committee on Legislative Conduct
1992-93 Committee on Undergraduate Admissions and Financial Aid
1993 Advisory Committee on Selection of 1993 Bing Teaching Fellows
1993-94 Commission on Undergraduate Education (and Academic Environment subcttee)
1994-96 Advisory Committee, Center for Teaching and Learning
1996-97 Chair, Steering Committee, Program in African and Afro-American Studies
1996-97 Committee on Independently Designed Majors
1998 Member, Campus Advisory Committee, Stanford Conference on Race: The Status of African Americans at the Turn of the Century (Nov 1999, L. Barker, Director)
1998-2005 Director, Program in African and African American Studies (prepared reports in 1999 and 2005 in connection with its five year review and degree-granting reapproval by the university senate)
1998-2005 Faculty Steering Committee, and Undergraduate Curriculum Committee, Center for Comparative Studies in Race and Ethnicity
1999-2003 Member, Stanford Faculty Senate and Task Force on Faculty Diversity
2000-01 Member, Senate Steering Committee, and Humanities and Sciences Dean's Search Committee
2001-02 Chair, Stanford Faculty Senate and Senate Steering Committee;
2002-05 Chair, Graduate Student Subcommittee, Provost's Diversity Action Council. Final report was submitted to the Provost in May 2005
2003-04 Member, Planning and Policy Board (comprised of former Senate Chairs and others appointed by the Provost; charged with making broad policy recommendations for future directions and policies of the university)
2004-05 Member, Advisory Board, Center for Comparative Studies in Race and Ethnicity
2006-07 Member, Provost's Search Committee for new Humanities and Sciences Dean
2006- Member, Steering Committee, African and African American Studies
2007 Member, Graduate Diversity Steering Committee
2010 Member, Residential Education Advisory Committee
2010-12 Member, Center for Teaching and Learning Advisory Committee
2012- Associate Director, Center for Race and Ethnicity in Language (CREAL)
2015- Faculty Director, Mellon-Mays Undergraduate Fellowship Program

b.Department level

| | |
|---|---|
| 1981- | Undergraduate Co-advisor |
| 1981-89 | Carrier Pidgin Production Committee |
| 1982-83 | Search Committee, Assistant Professor, Phonetics |
| 1982-84 | Graduate Student Admissions Committee |
| 1983,84 | Chair, Departmental Majors Day Program |
| | Graduate Degree Program Review Committee |
| | Coordinator, Ferguson-Greenberg Lecture Series on Language Universals and Sociolinguistics |
| 1985-86 | Phonetics Lab Committee |
| 1985-86 | Chair, Teaching Equipment Committee |
| 1986-87 | Search Committee, Asst. Prof., Universals/Sociolinguistics |
| 1986-87 | Authentic Discourse Research Group, CSLI |
| 1987- 91 | Chair, Undergraduate Studies Committee |
| 1987- | Graduate Admissions Committee |
| 1989-90 | Tenure review committee, William Poser |
| 1990 | Chair, Ad hoc committee on possible promotion of Gregory Guy |
| 1991- | Co-Organizer (with T.Veatch , J.Solomon et al.) of Sociolinguistics Rap Sessions |
| 1992-93 | Faculty Search Committee (Semantics/Sociolinguistics position) |
| 1992-93 | Chair, Graduate Admissions Committee |
| 1993 | Chair, Sociolinguistics Search Committee |
| 1995- | Chair, Undergraduate Studies Committee |
| 1996-97 | Vice Chair, Department of Linguistics |
| 1998- | Instructor, Department of Linguistics' "Writing in the Major" course (L150) |
| 2000-01 | Chair, Library Committee, Linguistics |
| 2002 | Member, Phonetics/Sociolinguistics Search Committee |
| 2002-05 | Member, Graduate Admissions Committee |
| 2005 | Undergraduate Advisor and Chair, Undergraduate Advising, Spring |
| 2006-07 | Chair, Graduate Admissions Committee |
| 2007-08 | Chair, Graduate Admissions Committee |
| 2009-10 | Member, Sociolinguistics and Syntax Search Committee |
| 2009-10 | Undergraduate Advisor and Chair, Undergraduate Advising |
| 2010-11 | Member, Linguistics Faculty Search Committee |
| 2010-15 | Chair, Qualifying Paper festival (QP-Fest). |
| 2015-16 | Director, Undergraduate Studies |

BIBLIOGRAPHICAL INFORMATION

Books and Edited Works

1976 (Ed.), *A Festival of Guyanese Words*. Georgetown: University of Guyana. Second edition, revised and expanded, 1978.

1987a *Dimensions of a Creole Continuum*. Stanford: Stanford University Press.

1987b (Ed.), *Sociolinguistics and Pidgin-Creole Studies.* Issue #71, *International Journal of the Sociology of Language*. Mouton, The Hague.

1987c (Ed., with Keith Denning, Sharon Inkelas, and Faye McNair-Knox), *Variation in Language*. Department of Linguistics, Stanford University.

1998 *African American English*, ed. by Salikoko S. Mufwene, John R. Rickford, Guy Bailey and John Baugh. London: Routledge.

1999a *African American Vernacular English: Features and Use, Evolution, and Educational Implications.* Oxford: Blackwell.

1999b (Ed.) *Creole Genesis, Attitudes and Discourse: Studies Celebrating Charlene Sato*, ed. (with Suzanne Romaine). Amsterdam: John Benjamins .

2000 *Spoken Soul: The Story of Black English.* (With Russell J. Rickford) New York: John Wiley. [Winner of a 2000 American Book Award]

2002 (Ed.) *Style and Sociolinguistic Variation*, ed. (with Penelope Eckert). Cambridge: Cambridge University Press.

2004 *Language in the USA: Themes for the Twenty-First Century*, ed. (With Edward Finegan). Cambridge: Cambridge University Press.

2012 *Language, Culture and Caribbean Identity*. (Co-ed. with Jeannette Allsopp.) Kingston, Jamaica: University of the West Indies Press.

2013 *African American, Creoles and Other English Vernaculars in Education*: *A Bibliographical Resource*. (With Julie Sweetland, Angela E. Rickford and Tom Grano.) NY: Lawrence Erlbaum and National Council of Teachers of English.

2014a *Languages in Contact 2012*. (Hon. editor, with Piotr P. Chruszczewski, Katarzyna Buczek, Aleksandra R. Knapik, and Jacek Mianowski.) Wroclaw, Poland: Wyższa Szkoła Filologiczna and Polska Akademia Nauk.

2014b *Ways to Protolanguage 3*. (Hon. editor, with Piotr P. Chruszczewski, Katarzyna Buczek, Aleksandra R. Knapik, and Jacek Mianowski, and guest editors Sławomir Wacewicz and Przemysław Żywiczyński.) Wroclaw, Poland: Wyższa Szkoła Filologiczna and Polska Akademia Nauk.

In press (Ed.) *Racing Language, Languaging Race*. (With H. Samy Alim and Arnetha Ball.) Stanford: Center for Study of Race and Ethnicity and Stanford University Press.

In prep. *Variation and Change in Sociolinguistics and Creole Studies: Theory and Analysis*. [Collection of my papers on these topics, including two not previously published. Under contract for publication by Cambridge University Press.]

Papers: Articles & Reviews [Copies are on my website, matching these dates: 1976a, b, etc.]

1974 "The Insights of the Mesolect." In *Pidgins and Creoles: Current Trends and Prospects*, ed. D. DeCamp and I. Hancock, 92-117. Washington, D. C.: Georgetown U. Press.

1975 "Carrying the New Wave into Syntax: the Case of Black English BIN." In *Analyzing Variation in Language*, ed. R. Fasold and R. Shuy, 162-83. Washington, D. C.: Georgetown U. Press.

1976a "Communicating in a Creole Continuum." In *New Directions in Creole Studies*. Papers from the first annual colloquium, Society for Caribbean Linguistics, ed. G. Cave. Georgetown: Society for Caribbean Linguistics.

1976b (With Angela E. Rickford). "Cut-Eye and Suck-Teeth: African Words and Gestures in New World Guise." *Journal of American Folklore*, 89 (353): 194-309. Reprinted 1978 in *Readings in American Folklore*, ed. J. H. Brunvand, 355-73. New York: W. W. Norton and Co., Inc., Also reprinted 1980 in *Perspectives on American English*, ed. J. Dillard, 347-66. The Hague: Mouton.

1976c (With Barbara Greaves). "Non-Standard Words and Expressions in the Writing of Guyanese School-Children." In *A Festival of Guyanese Words*, ed. J. R. Rickford, 25-45. Georgetown: University of Guyana. Reprinted in second edition, 1978: 40-56.

1977a "The Field of Pidgin-Creole Studies: a Review Article on Loreto Todd's Pidgins and Creoles." *World Literature Written in English* (MLA Division #33) 16: 477-513.

1977b "The Question of Prior Creolization in Black English." In *Pidgin and Creole Linguistics*, ed. A. Valdman, 126-46. Bloomington, Indiana: Indiana U. Press.

1980a "How Does DOZ Disappear?" In *Issues in English Creoles: Papers from the 1975 Hawaii Conference*, ed. R. Day, 77-96. Heidelberg: Julius Groos.

1980b "Analyzing Variation in Creole Languages." In *Theoretical Orientations in Creole Studies*, ed. A. Valdman and A. Highfield, 165-84. New York: Academic Press.

1981 "A Variable Rule for a Creole Continuum." In *Variation Omnibus*, ed. D. Sankoff and H. Cedergren, 201-8. Carbondale and Edmonton: Linguistic Research, Inc.

1983a Review of M. Alleyne (1980) Comparative Afro-American *Language* 59.3: 670-676.

1983b "Standard and Non-Standard Language Attitudes in a Creole Continuum." *Society for Caribbean Linguistics Occasional Paper* 16. Mona, Jamaica: U. of the West Indies. Reprinted 1985 in *Language of Inequality*, ed. N. Wolfson and J. Manes, 145-60. The Hague: Mouton.

1983c "What Happens in Decreolization." In *Pidginization and Creolization as Language Acquisition*, ed. R. Andersen, 298-319. Rowley, Ma.: Newbury House.

1985a Review article on E. Woolford and W. Washabaugh, eds., The Social Context of Creolization. *Studies in Second Language Acquisition*, 7:343-50.

1985b "Ethnicity as a Sociolinguistic Boundary." *American Speech* 60 (3): 90-125.

1985c (With Elizabeth Closs Traugott.) "Symbol of Powerlessness and Degeneracy, or Symbol of Solidarity and Truth? Paradoxical Attitudes towards Pidgins and Creoles." In *The English Language Today*, ed. S. Greenbaum. Oxford: Pergamon, 252-61.

1985d "Standard and Non-Standard Language Attitudes in a Creole Continuum." in *Language of Inequality*, ed. N. Wolfson and J. Manes, 145-60. The Hague: Mouton. [Reprint of 1983b.]

1985e “Some Principles for the Study of Black and White Speech in the South.” In *Language Variety in the South: Perspectives in Black and White*, ed. M. Montgomery and G. Bailey. Tuscaloosa: U. of Alabama Press, 38-62.

1986a Review of L. Carrington in collaboration with D. Craig and R. Todd-Dandaré, eds., Studies in Caribbean Language. *Journal of Caribbean Education*.

1986b “Me Tarzan, You Jane: Cognition, Expression and the Creole Speaker.” *Journal of Linguistics* 22.2:281-310.

1986c “The Need for New Approaches to Social Class Analysis in Sociolinguistics.” *Language and Communication* 6.3:215-21.

1986d “Riddling and Lying: Participation and Performance.” In *The Fergusonian Impact*, vol. 2, ed. J. A. Fishman. The Hague: Mouton, 89-106.

1986e “Note (On the Significance and Use of Documentary Pidgin-Creole Texts).” *Journal of Pidgin and Creole Languages* 1.1:159-63.

1986f “Concord and Contrast in the Characterization of the Speech Community.” In *Sheffield Working Papers in Language and Linguistics* 3:87-119.

1986g “Social Contact and Linguistic Diffusion: Hiberno English and New World Black English” *Language* 62.2: 245-89.

1987a “The Haves and Have Nots: Sociolinguistic Surveys and the Assessment of Speaker Competence.” *Language in Society* 16.2: 149-77.

1987b “Decreolization Paths for Guyanese Singular Pronouns.” In *Pidgin and Creole Languages: Essays in Honor of John E. Reinecke*, ed. G. Gilbert. Honolulu: University Press of Hawaii, 130-38.

1987c “Are Black and White Vernaculars Diverging?” (Contribution to NWAV-XIV panel discussion of topic.) *American Speech* 62.1: 55-62.

1987d “Past Marking in the Mesolect: A Close Look at Bonnette.” In *Variation in Language*, ed. K. Denning, S. Inkelas, F. McNair-Knox and J. R. Rickford. Stanford: Department of Linguistics, 379-94.

1987e “Social Class Groupings in Sociolinguistic Research.” (Response to recent paper by L. Davis.) *American Speech* 62.3: 281-85.

1988a “Language Contact, Variation and Diffusion: Microlevel Community Perspectives.” In *Language Spread and Public Policy: Issues, Implications, and Case Studies*, ed. P. Lowenberg. Washington, DC: Georgetown U. Press, 25-44.

1988b “Sociolinguistic Research on the Caribbean.” In *Sociolinguistics: An International Handbook Q the Science of Language and Society*, ed. U. Ammon, N. Dittmar, K. J. Mattheier. Berlin/New York: Walter de Gruyter, vol. 2: 1313-1324.

1988c “The Evolution of Creole Languages: Real and Apparent Time Evidence.” In *Linguistic Change and Contact: NWAV-XVI*, ed. K. Ferrara, B. Brown, K. Walters and J. Baugh. Austin: University of Texas, 298-309.

1990a Review of P. Trudgill, Dialects in Contact. *Language in Society* 19.2:268-74.

1990b “Contraction and Deletion of the Copula in Barbadian English.” (With R. Blake.) In *Proceedings of the Sixteenth Annual Meeting of the Berkeley Linguistics Society* (=BLS 16). Berkeley, CA; Berkeley Linguistics Society, 257-268..

1990c “Number Delimitation in Gullah: A Response to Mufwene.” *American Speech* 65.2:148-163.

1991a “Contemporary Source Comparison as a Critical Window on the Afro-American Linguistic Past.” In *Verb Phrase Patterns in Black English and Creole,* ed. W. Edwards and D. Winford. Detroit: Wayne State U Press, 302-322.

1991b “Sociolinguistic Variation in Cane Walk: A Quantitative Case Study.” In *English Around The World: Sociolinguistic Perspectives,* ed. J. Cheshire. Cambridge: Cambridge University Press, 609-616.

1991c “Representativeness and Reliability of the Ex-Slave Narrative Materials, with Special Reference to Wallace Quarterman’s Tape and Transcript.” In *The Emergence of Black English: Texts & Commentary,* ed. G. Bailey, N. Maynor and P. Cukor-Avila. Amsterdam: John Benjamins, 191-212.

1991d “Pidgins, Creoles and Language Change.” In the *Oxford International Encyclopedia of Linguistics,* ed. William Bright, 224-232. Oxford: Oxford U Press. [Reprinted in 2003 second edition as well; see below.]

1991e “Implicational Scaling and Critical Age Limits in Models of Linguistic Variation, Acquisition and Change.” In *Cross Currents in Second Language Acquisition and Linguistic Theories,* ed. C. A. Ferguson and T. Huebner. Amsterdam and Philadelphia: John Benjamins, 225-246.

1991f “Rappin on the Copula Coffin: Theoretical and Methodological Issues in the Analysis of Copula Variation in African American Vernacular English." (With A. Ball, R. Blake, R. Jackson and N. Martin.) *Language Variation and Change* 3.1:103-132.

1992a “Grammatical Variation and Divergence in Vernacular Black English.” In *Internal and External Factors in Syntactic Change,* ed. Marinel Gerritsen and Dieter Stein. Berlin and New York: Mouton, 175-200.

1992b "The Creole Residue in Barbados." In *Old English and New: Studies in Language and Linguistics in Honor of Frederic G. Cassidy*, ed. by Joan Hall, Nick Doane, and Dick Ringler. New York and London: Garland Publishing, Inc., 183-201.

1993a “Phonological Features in Afro-American Pidgins and Creoles and their Diachronic Significance: Comments on the Papers by Holm and Carter.” In *Africanisms in Afro-American Language Varieties*, ed. S. Mufwene. Amsterdam: John Benjamins, 346-63.

1993b "Comments on 'Ethics, Advocacy and Empowerment'." *Language and Communication* 13.2:129-131.

1993c "Linguistic and Cultural Diversity as Challenge and Opportunity: American and European Perspectives." In *Migration in Europe: Challenges and Opportunities*, ed. by Heike Dörrenbächer, Karen Kramer, and Steve Baughman, 70-84. Berlin: Stanford Program in Berlin.

1993d “Concord and Conflict in the Speech Community.” [Revised version of Rickford 1986f, prepared for the Dean's Symposium on Competition and Cooperation in the Context of the Social Sciences, University of Chicago, April 1993.]

1994 "Addressee- and Topic-Influenced Style Shift: A Quantitative Sociolinguistic Study." (With Faye McNair-Knox.) In *Perspectives on Register: Situating Register Variation within Sociolinguistics*, ed. by Douglas Biber and Edward Finegan. Oxford: Oxford University Press, 235-76.

1995a "Syntactic Variation and Change in Progress: Loss of the Verbal Coda in Topic-Restricting *As far As* Constructions." *Language* 71.1:102-131. (With Tom Wasow, Norma Mendoza-Denton, and Juli Espinoza.)

1995b "Textual Evidence on the Nature of Early Barbadian English, 1676-1870." (With Jerome S. Handler.) *Journal of Pidgin and Creole Languages* 9.2:221-55.

1995c "Dialect Readers Revisited.' (With Angela E. Rickford.) *Linguistics and Education* 7:107-128.

1996a "Regional and Social Variation in Language." In *Sociolinguistics and Language Teaching* ed. by Sandra McKay and Nancy Hornberger, 151-194. Cambridge: Cambridge University Press, 1995.

1996b "Negative Inversion in African American Vernacular English." (With Peter Sells and Thomas A. Wasow.) *Natural Language and Linguistic Theory* 14.3:591-627.

1996c "Foreword" to *Sociolinguistic Variation: Data, Theory and Analysis: Selected Papers from NWAV23 at Stanford.* Stanford: Center for the Study of Language and Information, ix-xiii.

1996d "Copula Variability in Jamaican Creole and African American Vernacular English: A Reanalysis of DeCamp's Texts." In *Towards a Social Science of Language: A Festschrift for William Labov*, ed. by Gregory R. Guy, John G. Baugh, Deborah Schiffrin and Crawford Feagin, 357-372. Philadelphia and Amsterdam: John Benjamins.

1996e "Language Contact and Language Generation: Pidgins and Creoles." (With John McWhorter.) In *The Handbook of Sociolinguistics*, ed. by Florian Coulmas, 238-256. Oxford: Basil Blackwell.

1996f “Preterit had in the Narratives of African American Adolescents.” (With Christine Theberge Rafal.) *American Speech.* 71:227-254.

1996g "Ebonics Succeeds where Traditional Methods do not." *San Jose Mercury News*, December 26, 1996, page 8B.

1997a "Suite for Ebony and Phonics." *Discover* 18.12 (December):82-87.

1997b "Unequal Partnership: Sociolinguistics and the African American Speech Community." *Language in Society*. 26:161-197.

1997c "Prior Creolization of AAVE? Sociohistorical and Textual Evidence from the 17th and 18th Centuries." *Journal of Sociolinguistics* 1.3:315-336.

1998 "The Creole Origins of African American Vernacular English: Evidence from Copula Absence." In *African American English*, ed. by Salikoko S. Mufwene, John R. Rickford, Guy Bailey and John Baugh, 154-200. London: Routledge.

1999a "Using the Vernacular to Teach the Standard." In *Ebonics in the Urban Education Debate*, ed. by David Ramirez, Terrence Wiley, Gerda de Klerk, and Enid Lee, 23-41. Long Beach: Center for Language Minority Education and Research, California State University, Long Beach.

1999b The Ebonics Controversy in my Backyard: A Sociolinguist's Experiences and Reflections. *Journal of Sociolinguistics* 3.

1999c "Language Diversity and Academic Achievement in the Education of African American Students: An Overview of the Issues." In *Language Diversity and Academic Achievement in the Education of African American Students*, ed. by Carolyn Adger, Donna Christian, and Orlando Taylor. Washington, DC: Center for Applied Linguistics, in conjunction with Delta.

| | |
|---|---|
| 1999d | "Variation in the JC copula: New Data and Analysis." In "*Creole Genesis, Attitudes and Discourse: Studies Celebrating Charlene Sato*, ed. by John R. Rickford and Suzanne Romaine, 143-156. Amsterdam: John Benjamins. |
| 1999e | "Phonological and Grammatical Features of African American Vernacular English." In African American English, by John R. Rickford, 3-14. Malden, MA, and Oxford, UK: Blackwell. |
| 2000 | "The Living Language." Introductory essay, and Living Language notes, in the 4th edition of *The American Heritage Dictionary*. Boston: Houghton Mifflin, 2000. |
| 2001a | "Sociolinguistics and the public: Digging and being dug in return." *American Speech* 75.3:273-275. |
| 2001b | "Ebonics and Education: Lessons from the Caribbean, Europe and the USA." In *Ebonics and Language Education*, ed. by Clinton Crawford, 263-284. New York and London: Sankofa World Publishers. |
| 2001c | "The Ubiquity of Ebonics." *American Language Review* 5.2: 20-23. (With Russell J. Rickford.) |
| 2001d | "Style and Stylizing from the Perspective of a Non-Autonomous Sociolinguistics." In *Style and Sociolinguistic Variation*, ed. by Penelope Eckert and John R. Rickford, 220-231. Cambridge: Cambridge University Press. |
| 2001e | "Introduction." (With Penelope Eckert.) In *Style and Sociolinguistic Variation*, ed. by Penelope Eckert and John R. Rickford, 1-18. Cambridge: Cambridge University Press. |
| 2002a | "Implicational Scales." In *The Handbook of Language Variation and Change*, ed. by James K. Chambers, Peter Trudgill & Natalie Schilling-Estes, 142-67. Oxford: Blackwell. |
| 2002b | "Linguistics, Education, and the Ebonics Firestorm." In *Round Table on Languages and Linguistics, 2000: Linguistics, Language and the Professions*, ed. by James E. Alatis, Heidi E. Hamilton & Ai-Hui Tan, 25-45. Washington, DC: Georgetown University Press. |
| 2002c | "Language mastery, cultural affirmation, and the success of African American and other students." In *Proceedings of the Los Angeles Unified School District Conference on Developing a Culturally Relevant Education Program that Benefits African American and All Other Students*, ed. by Floraline I. Stevens. |
| 2003a | "African American Vernacular English. " In the *Oxford Encyclopedia of Linguistics*, second edition, Oxford University Press. |
| 2003b | "Pidgins and Creoles." " In the *Oxford Encyclopedia of Linguistics*, second edition, Oxford University Press, ed. by William Bright, 340-344 [excluding list of pidgins and creoles added by editor]. |
| 2003c | "What is Ebonics (African American Vernacular English)?" In Linguistic Society of America's *Frequently Asked Questions* series, at: http://www.lsadc.org/. |
| 2004a | "Introductions" to thirteen of the twenty-six chapters in *Language in the USA: Themes for the Twenty-First Century*, ed. by Edward Finegan and John R. Rickford. Cambridge: Cambridge University Press. |
| 2004b | "Spoken Soul: The Beloved, Belittled Language of Black America." In Carmen Fought, ed., *Sociolinguistic Variation: Critical Reflections*, 198-208. New York: Oxford U Press. |

2004c “African American English and other vernaculars in education: A topic-coded bibliography.” *Journal of English Linguistics* 32.3:230-320.

2005 "Using the Vernacular to Teach the Standard." In *Ebonics in the Urban Education Debate*, ed. by David Ramirez, Terrence Wiley, Gerda de Klerk, Enid Lee and Wayne E. Wright, 2nd edition, 18-40. Long Beach: Center for Language Minority Education and Research, California State University, Long Beach. [Significantly revised version of Rickford 1999a]

2006a "Down for the Count? The Creole Origins Hypothesis of AAVE at the Hands of the Ottawa Circle, and Their Supporters. Review article on *The English History of African American English*, ed. by Shana Poplack. Oxford: Basil Blackwell. *Journal of Pidgin and Creole Languages* 21.1:97-154.

2006b "Against consensus: Challenging the New Anglicists' contentions concerning the development of AAVE." In *Texas Linguistic Forum* 49: 22- 38: [=*Proceedings of the Thirteenth Annual Symposium on Language and Society, Austin*, April 15-17, 2005 ed. by Vivian Newdick et al. Austin, TX: University of Texas.]

2006c Preface to and editing of two papers by S.R. Richard Allsopp, "The Case for Afrogenesis" and "The Afrogenesis of Caribbean Creole Proverbs." *Society for Caribbean Linguistics Occasional Papers* Nos. 33 and 34, 3-52.

2006d “Foreword” to Rebecca S. Wheeler and Rachel Swords, *Code-Switching: Teaching Standard English in Urban Classrooms*, xi-xii. Urbana, IL: National Council of Teachers of English.

2006e “African American English: Roots and Branches.” In *English and Ethnicity*, ed. by Janina Brutt-Griffler and Catherine Evans Davies. Palgrave Macmillan.

2006f “African American English: Roots and Branches.” [Powerpoint with slides not included in Rickford 2006e.]

2006g "The creolist/anglicist quest for the roots and branches of AAVE." In Linda Thornburg and Janet M. Fuller, eds., *Studies in Contact Linguistics: Essays in Honor of Glenn G. Gilbert*, 27-43: Bern/New York: Peter Lang.

2007a “Intensive and quotative ALL: Something old, something new.” (Lead author, with Isabelle Buchstaller, Tom Wasow, and Arnold Zwicky.) *American Speech* 82.1:3-31.

2007b "Variation, versatility, and contrastive analysis in the classroom.” (With Angela E. Rickford.) In *Sociolinguistic Variation: Theories, Methods and Applications*, ed. by Robert Bayley and Ceil Lucas, 276-96. Cambridge: Cambridge University Press.

2009a "AAVE/Creole copula absence: A critique of the imperfect learning hypothesis." (With Devyani Sharma.) *Journal of Pidgin and Creole Languages* 24.1:53-92.

2009b “White Paper on African American Vernacular English [AAVE] and its Relevance to Elementary School Teachers of Reading and the Language Arts in the USA.” (With Angela E. Rickford.) For SRA/McGraw Hill in connection with the launch of their new *Imagine It!* readers, for which we served as language consultants.

2009c “From outside agitators to inside implementers: Improving the literacy education of vernacular and creole speakers.” (With Angela E. Rickford.) In *Ethnolinguistic Diversity and Literacy Education*, ed. by Marcia Farr and Lisya Seloni. London: Routledge.

2010a “Geographical diversity, residential segregation, and the vitality of AAVE and its speakers’.” *Transforming Anthropology* 18.1 (special issue focusing on *Languages and speakers: Confronting endangerment, seeking equality*, ed. by Arthur Spears).

2010b “The sociolinguistics of a short-loved innovation: Tracing the development of quotative *all* across spoken and usernet data.” (With Isabelle Buchstaller, Elizabeth Closs Traugott, Thomas Wasow, and Arnold Zwicky.) *Language Variation and Change* 22:1-29.

2011a Relativizer omission in Anglophone Caribbean Creoles, Appalachian, and African American Vernacular English. In *Language from a Cognitive Perspective: Grammar, Usage and Processing* (Studies in Honor of Thomas Wasow), ed. by Emily M. Bender and Jennifer E. Arnold, 139-160. Stanford: CSLI Publications.

2011b “LePage’s theoretical and applied legacy in sociolinguistics and creole studies.” In *Variation in the Caribbean*, ed. by Lars Hinrichs and Joseph Farquharson, 251-271. Creole Language Library. Amsterdam and Philadelphia: John Benjamins.

2011c Revised version of “The Living Language.” Introductory essay, and Living Language notes, in the 5th edition of *The American Heritage Dictionary*. Boston: Houghton Mifflin, 2011.

2012 “The social *and* the linguistic in sociolinguistic variation: *Mii en noo* (Me ain’t know).” In *Language, Culture and Caribbean Identity*, ed. by Jeannette Allsopp and John R. Rickford, 51-59. Kingston, Jamaica, and Cave Hill, Barbados: Canoe Press and the Centre for Caribbean Lexicography, University of the West Indies.

2013 “Girlz II Women: Age-grading, language change, and stylistic variation.” *Journal of Sociolinguistics*, 17.2:143-179.

2014a “An early study of the speech of young Black children in California: Why it matters.” *American Speech* 89.2:121-142.

2014b “Style shifting in a creole-speaking community.” *PAPIA*, São Paulo, 24.1:217-238.

2014c “Situation: Stylistic variation in sociolinguistic corpora and theory.” *Language and Linguistics Compass* 8/11: 590-603.

2014d “A variationist approach to subject-aux question inversion in Bajan and other Caribbean Creole Englishes, AAVE, and Appalachian.” (With Robin Melnick.) In *Linguistic Variation: Confronting Fact and Theory*, ed. by Rena Torres Cacoullos, Nathalie Dion, and Andre Lapierre, 56-72. London: Routledge.

2014e “Teaching English to Vernacular Speakers in US and Caribbean Schools.” (With Angela E. Rickford.) In Hazel Simmons-McDonald and Ian F. Robertson, eds. *Education Issues in Creole and Creole-Influenced Contexts*, 271-29. Mona: University Press of the West Indies.

2015a “Appendix: Participating in policy debates about language.” In Francis M. Hult and David Cassels Johnson, eds., *Research Methods in Language Policy and Planning: A Practical Guide*. New York: Wiley/Blackwell.

2015b “The Creole Origins hypothesis.” In *Oxford Handbook of African American Language*,[i] eg. by Sonja Lanehart, 35-56. Oxford: Oxford University Press.

2015c “African American Vernacular English in California: A vibrant half century of study.” In *Oxford Handbook of African American Language*,[ii] eg. by Sonja Lanehart, 299-315. Oxford: Oxford University Press.

2015d. “Neighborhood effects on use of African American Vernacular English.” *PNAS* 112.38:11817-11822. [*Proceedings of the National Academy of Sciences*, USA, with a 62-page Supporting Information Appendix.] Lead author, with Greg J. Duncan, Lisa A. Gennetian, Ray Yun Gou, Rebecca Greene, Lawrence F. Katz, Ronald C. Kessler, Jeffrey R. Kling, Lisa Sanbonmatsu, Andres Sanchez-Ordoñez , Matthew Sciandra,

Ewart Thomas, and Jens Ludwig. http://www.pnas.org/content/112/38/11817

[Publication from my NSF grant 1125795, representing collaboration with scholars from Stanford and the National Bureau of Economic Research on linguistic aspects of the nation-wide "Moving to Opportunity" research project.]

2016 a "Foreword." In Anna Babel, ed., *Awareness and Control in Sociolinguistic Research*, xiii-xviii. Cambridge: Cambridge University Press.

2016 b "Foreword "to Robert Lawson & Dave Sayers ed., *Sociolinguistics: Application & Impact.* Routledge.

2016 c "William Labov's work on African American English, and social and linguistic equity." For a 2016 theme issue of *Journal of Sociolinguistics*, celebrating fifty years since the publication of Labov's *The Social Stratification of English in New York City*.

In press b "*h*-deletion, *ai*-monophthongization, and other phonological variables in Guyanese Creole English pronouns." In Cecelia Cutler, Zvjezdana Vrzic, and Philipp Angermeyer, eds. *Language Contact in Africa and the African Diaspora in the Americas*. Amsterdam and Philadelphia: John Benjamins.

In revision. "Sociolinguistic Variation, and the Independence of Social and Linguistic Constraints." [Being revised for resubmission to *Language* with Ewart Thomas, in response to referee comments.]

In prep. a "Ain't no justice: Race, Dialect Prejudice, and Inequities in US Courts and Schools: A linguistic analysis of the testimony of Rachel Jeantel in the Florida vs. Zimmerman case." [With Sharese King; revised version of my LSA Presidential Address]

In prep. b "Foreword" to book of collected papers by John Baugh on African American Language.

In prep. c "Relativizer omission in the Switchboard corpus: linguistic and social factors." (With Tom Wasow and Carra Rentie.)

In prep. d "Sociolinguistic Lessons in *A Lesson Before Dying*." (With Lisa Young)

# EXHIBIT 11

DECLARATION OF ERNEST MORRELL

I, ERNEST MORRELL, declare as follows:

1. I am the Macy Professor of Education and the Director of the Institute for Urban and Minority Education, at Columbia University Teachers College in New York City. I am Co-Chair of the Race, Culture, and Diversity Subcommittee at Teacher's College and also serve on many other committees there.

2. I earned my Ph.D. in Language, Literacy, and Culture, at the University of California at Berkeley, where I received the Outstanding Dissertation Award, in 2001. Before my present position, I was the Associate Director of the Institute for Democracy, Education, and Access at the University of California, Los Angeles, from 2005 to 2011. From 2007 to 2011, I was also Affiliated Faculty of the Bunche Center for African American Studies. Before that, I was the Division Head of the Urban Schooling Division of the Department of Education at the University of California, Los Angeles.

2. I grew up in Oakland, California, where I still visit family members on a regular basis. I am African-American and I am well acquainted with the culture and prevailing attitudes of African-American people in Oakland as well as other U.S. urban areas from my own experiences and those of my friends and family members and also from my professional training and review of relevant professional literature.

3. I was asked to interview Donel Poston to determine whether I might have been able to give helpful testimony at his trial. I reviewed the Statement of Facts and prosecutorial misconduct

argument from Mr. Poston's opening brief on appeal, the reporter's transcript of Mr. Poston's trial testimony, and the reporter's transcript of the prosecutor's argument to the jury. I also conducted a one-hour, confidential, telephone interview with Mr. Poston, in which we discussed his experiences growing up in Oakland, especially with regard to the police, and the shooting for which he was convicted of murder and attempted murder.

4. I understand that the prosecutor argued to the jury in this case that Mr. Poston's possession of a firearm before the shooting and his flight after the shooting showed that he did not act in self-defense, but rather, in retaliation for Mr. McNeely's assault and with an intent to engage in mutual combat. I understand that the prosecutor also argued that Mr. Poston's alternating use of African-American Vernacular English ("AAVE") in writings and jail phone calls with family members and Standard American English (SAE") on the witness stand showed that he was lying, trying to "pull one over on the jurors." I understand that the prosecutor persuaded the jury to convict Mr. Poston of murder and attempted murder in part on these bases.

5. After reviewing all the materials described above and talking to Mr. Poston, I believe I could have offered helpful testimony at his trial. I could have testified as an expert on urban African-American culture that it is not uncommon for urban African-American people to arm themselves for self-defense, with no intention to act unlawfully or to harm anyone. And it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police

based on their own past experiences and those of their friends and relatives. I could have testified that most if not all African-American people switch between AAVE and SAE depending on the context and that it is appropriate and desirable for them to do so. Code-switching, as it is called, does not indicate dishonesty.

6. Mr. Poston's history and beliefs, as conveyed to me during our interview, were consistent with those of many African-American people I have known as well as the professional literature. (Khalil Muhammad's, *The Condemnation of Blackness: Race, Crime and the Making of Urban America*; Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*; and Pedro Noguera's *The Trouble with Black Boys*, are a few of many titles that come to mind)

7. Mr. Poston told me that his experiences with the police growing up were frightening. All his friends and family members knew the police were "brutal" and "no good." His family "shut the door" and avoided police officers as much as possible. He was beaten by police officers several times when he was young and saw other African-American kids being beaten by police officers. Once, he was beaten so badly, he was bleeding all over the street and should have been taken to the hospital but instead he was thrown in jail. No one ever wanted to get caught by the police - they would all run because they did not want to get killed or arrested.

8. Mr. Poston told me that he and his friends and family members have never believed the police were there to protect and serve them. The police protect and serve residents of Piedmont, Montclair, and Skyline neighborhoods but not African-American

people in the flatlands of Oakland. When the police come to African-American neighborhoods, they kill people or take them to jail. They can't seem to tell the difference between violent criminals and people who just emulate urban, African-American, hip hop culture.

9. Mr. Poston told me he is still suffering the effects of being shot by an intruder in his bedroom some years ago. He had a bullet in his chest and spent 26 days in the hospital. He is still haunted by that near-death experience. He was determined not to ever let that happen to him again so he started carrying a gun for self-protection.

10. Mr. Poston remembers during his trial the prosecutor suggested he should have moved out of Oakland. He asked me: "Don't they understand? You can't just beam me up Scotty and move out of Oakland. Where am I supposed to go? They asked me why didn't I leave Oakland. I lived in Oakland 35 of my 37 years. I have 3 daughters that live in Oakland. Leave Oakland with what? I don't have a nest egg. I don't have a 401K. I am an artist and I was trying to get my books published."

11. Mr. Poston remembers the prosecutor suggesting he should have known the gas station on Seminary Drive where the shooting occurred was dangerous and he should have avoided it. Mr. Poston explained that every gas station in East Oakland is dangerous. He had been going to this particular gas station in his neighborhood for 20 years. Prosecutors and jurors probably go to gas stations in Montclair and other nice neighborhoods. They have no idea what it is like in East Oakland: "They live in a different world."

12. Mr. Poston told me he was afraid for his life when he was attacked by Mr. McNeely at the gas station. He had to react quickly. He does not believe in violence and has never been involved in violence before except as a victim. He did the best he could to survive in the situation. He would never have called the police or waited around for them because he "might have gotten shot faster."

13. Mr. Poston's report is entirely consistent with everything I know about urban African-American culture from my own personal experience and from my professional training and review of the relevant professional literature. If called as an expert witness, I could have testified at Mr. Poston's trial that his possession of a firearm and his flight after the shooting were not inconsistent with a young, urban African-American man acting in self-defense, rather than in retaliation for an assault or with an intention to engage in mutual combat. Nor was his alternating use of AAVE and SAE inconsistent with innocence and honesty. While the prosecutor's arguments may have seemed logical to the predominantly suburban white and Asian jurors who convicted Mr. Poston (according to Ms. Covin), it was based on inaccurate assumptions and myths about African-American people that I could have refuted.

I declare under penalty of perjury under the laws of the states of California and New York that the foregoing is true and correct. Executed this 21st day of April, 2016, at New York, New York.

______________________________

ERNEST MORRELL

# EXHIBIT 12

**Ernest Morrell**
**Macy Professor of Education**
**Director, Institute for Urban and Minority Education (IUME)**
Teachers College, Columbia University
520 West 120th Street, Box #183
New York, NY 10027
(212) 678-3159 Office --(212) 678-8197 Fax --em2822@tc.columbia.edu

**EDUCATION**

| | |
|---|---|
| 2001 | Ph.D., Language, Literacy, and Culture, University of California at Berkeley (Recipient of Outstanding Dissertation Award, 2001) |
| 1997 | M.A., Language, Literacy, and Culture, University of California at Berkeley |
| 1994 | Credential, Secondary English, University of California at Berkeley |
| 1993 | B.A., English Literature, University of California at Santa Barbara |

**EXECUTIVE AND ADMINISTRATIVE POSITIONS**

| | |
|---|---|
| 2011- | Director, Institute for Urban and Minority Education (IUME)<br>Teachers College, Columbia University |
| 2005-2011 | Associate Director, Institute for Democracy, Education, and Access (IDEA) University of California, Los Angeles |
| 2008-2011 | Division Head, Urban Schooling Division, Department of Education<br>University of California, Los Angeles |
| 2008-2010 | Director, Educational Studies Minor, Department of Education<br>University of California, Los Angeles |

**FACULTY POSITIONS**

| | |
|---|---|
| 2014- | Inaugural Macy Professor of English Education<br>Teachers College, Columbia University |
| 2011-2014 | Professor of English Education<br>Teachers College, Columbia University |
| 2007-2011 | Associate Professor & Division Head, Urban Schooling<br>Director, Education Studies Minor (ESM)<br>Affiliated Faculty, Bunche Center for African-American Studies<br>Graduate School of Education & Information Studies<br>University of California, Los Angeles |

| | |
|---|---|
| 2005-2007 | Assistant Professor, Division of Urban Schooling<br>Graduate School of Education and Information Studies<br>University of California, Los Angeles |
| 2001-2005 | Assistant Professor, Department of Teacher Education<br>Affiliated faculty member of the African-American and African Studies<br>Affiliated faculty Writing, Rhetoric and American Cultures (WRAC)<br>Michigan State University |
| 2001-2004 | Postdoctoral Fellow, American Educational Research Association |
| 2001-2004 | Faculty Fellow & Co-Director, Critical Research and Writing Seminar<br>Institute for Democracy, Education, and Access<br>University of California, Los Angeles |
| 2000-2001 | Research Associate, Institute for Democracy, Education, and Access<br>University of California, Los Angeles |
| 1999-2000 | Research Associate, Center X, Graduate School of Education<br>University of California, Los Angeles |
| 1999-2001 | Coordinator of Teacher Recruitment, Graduate School of Education<br>University of California, Los Angeles |
| 1998-1999 | Supervisor of Student Teaching, University of San Francisco |
| 1997-1999 | Instructor, Graduate School of Education, University of California, Berkeley |
| 1997 | College Writing Instructor, University of California, Berkeley |
| 1996-1999 | Research Associate, Graduate School of Education<br>University of California, Berkeley |
| 1994-1999 | Secondary English & Social Studies Teacher, Basketball Coach<br>Oakland High School, Oakland, California |

**ELECTED POSITIONS AND NATIONAL APPOINTMENTS**

| | |
|---|---|
| 2015- 2017 | Appointed member, Literacy Research Panel, International Literacy Association (ILA), appointed members serve 3-year terms |
| 2011-2015 | President, Vice President, President-Elect, and Past President (Elected) National Council of Teachers of English (NCTE) |
| 2013-2014 | National Advisor, Advisory Board<br>Illinois Education Research Council (IERC) |

| | |
|---|---|
| 2011-2014 | National Academy of Education, Spencer Postdoc Retreat Committee |
| 2010-2013 | Social Justice Action Committee (Appointed)<br>American Educational Research Association (AERA) |
| 2009-2010 | Literacy Assessment Commission (Appointed)<br>National Council of Teachers of English (NCTE) |
| 2003-2007 | Conference on English Education Executive Committee (Elected)<br>National Council of Teachers of English (NCTE) |

**AWARDS AND HONORS**

2014 Outstanding Academic Title Book Award, American Library Association
Harvard Graduate School of Education, Dean's Distinguished Lecturer
Class of 2014 AERA Fellow, American Educational Research Association
President of the National Council of Teachers of English,
Beacon Press Race, Education, & Democracy Lecturer
Who's Who in Black Los Angeles
Department of Education Distinguished Teaching Award Winner, UCLA
Selected for inclusion in Academic Keys Who's Who in Education (WWE)
Elected to the Executive Committee of the Conference on English Education,
Outstanding Dissertation Award, UC, Berkeley, Graduate School of Education,
Recipient, AERA/OERI Postdoctoral Fellowship
Recipient, University of California Office of the President Postdoctoral Fellowship,
UCLA, Teacher Education Program—Social Justice Fellow
University of California, Berkeley--Passed Qualifying Examinations with Distinction,
University of California, Berkeley-- Myrtle L. Judkins Memorial Fellowship,
University of California, Berkeley-- Ned Flanders for Urban Education
California Senate Certificate of Recognition for commitment to Oakland High
University of California at Berkeley--Outstanding Instructor Award Recipient
Oakland Unified School District--Certificate of Recognition
Included in Positive Images of Oakland Calendar
UC, Santa Barbara-- Vice Chancellor Award for Outstanding High School Teachers,
San Jose State University--Dorothy Wright Award for Teaching Excellence
Louise M. Patterson Award for service to the African American community
University of California, Berkeley--Graduate Opportunity Program Fellowship
Who's Who Among America's Teachers

**BOARD SERVICE**

Board of Directors, LitWorld, an International non-profit literacy organization
Board of Directors, Voices for Democracy Institute
Advisory Board, Tucson Unified Desegregation Initiative
Advisory Board, Mikva Action Civics Los Angeles Project
Advisory Board, Illinois Education Research Council (IERC)
Advisory Board, Young Global Scholars, Institute of Education, University of London
Advisory Board, Hip-Hop Education Center (New York)
Advisory Board, HOPE Foundation Courageous Leadership Awards
Advisory Board, Campaign for Educational Equity, Teachers College

Advisory Board, Ralph J. Bunche Center for African-American Studies, UCLA
Advisory Board, African and African-American Studies Department, Michigan State

**PUBLICATIONS**
**Books and Edited Special Journal Issues**

1. Allyn, P., and Morrell, E. (2015). *Every Child a Super Reader: Using the 7 Strengths to Open a World of Possible*. New York: Scholastic.

2. Morrell, E., and Scherff, L. (Eds.) (2015). *New Directions in Teaching English: Reimagining Teaching, Teacher Education and Research*. Lanham, MD: Rowman and Littlefield.

3. Mirra, N., Garcia, A., and Morrell, E. (2015). *Doing youth participatory action research: A methodological handbook for researchers, educators, and youth*. New York: Routledge.

4. Morrell, E., Duenas, R., Garcia, V, and Lopez, J. (2013). *Critical Media Pedagogies: Teaching for Achievement in City Schools.* New York: Teachers College Press. [Winner of the 2014 Outstanding Academic Title by Choice Magazine of the American Library Association]

5. Garcia, A., and Morrell, E. (Eds.) (2013). City Youth and the Pedagogy of Participatory Media. *Learning, Media, and Technology*. London: Taylor and Francis [Special Issue]

6. Duncan-Andrade, J., and Morrell, E. (2008) *The Art of Critical Pedagogy: The Promise of Moving from Theory to Practice in Urban Schools*. New York: Peter Lang.

7. Morrell, E. (2008). *Critical Literacy and Urban Youth: Pedagogies of Access, Dissent, and Liberation.* New York: Routledge.

8. Morrell, E. (2004). *Linking Literacy and Popular Culture: Finding Connections for Lifelong Learning*. Norwood, MA: Christopher-Gordon.

9. Morrell, E. (2004). *Becoming Critical Researchers: Literacy and Empowerment for Urban Youth.* New York: Peter Lang.

**Book Chapters and Articles in Peer-Reviewed Journals**

1. Morrell, E. (2015). The 2014 Presidential Address. *NCTE Council Chronicle, 24* (3).

2. Morrell, E. (2015). Powerful English at NCTE Yesterday, Today, and Tomorrow: Toward the Next Movement. *Research in the Teaching of English, 49* (3), 307-327.

3. de los Rios, C., Lopez, J., and Morrell, E. (2015). Toward a critical pedagogy of race: Ethnic studies and literacies of power in high school classrooms. *Race and Social Problems, 7*(1), 84-96.

4. Garcia, A., Mirra, N., Morrell, E. Scorza, D., and Martinez, A. (2015). The council of youth research: Critical literacy and civic agency in the digital age. *Reading and Writing Quarterly, 31*(2) 151-167*.*

5. Morrell, E. (2015). Popular culture 2.0: Teaching critical media literacy in the English Language Arts classroom. *New England Reading Association Journal*,

6. Morrell, E. (2014). English Teaching as Teaching Students to Read the Word and the World: A Presidential Commentary. *NCTE Council Chronicle, 24* (2).

7. Morrell, E. (2014). Critical Action Research and the Future of English Education: A Presidential Commentary. *NCTE Council Chronicle, 24* (1).

8. Morrell, E. (2014). Toward a Critical Model of Teacher Learning: Lessons from the South Carolina Reading Initiative. *Reading and Writing Quarterly, 30 (3)*.

9. Morrell, E. (2014). Cultures, contexts, and codes: An interview with NCTE President Ernest Morrell. *English Journal, 103* (4) 12-15.

10. Bautista, M., Bertrand, M., Morrell, E., Scorza, D., and Matthews, C. (2013). Participatory Action Research and City Youth: Methodological Insights from the Council of Youth Research. *Teachers College Record*, 115 (2).

11. Mirra, N., Morrell, E., Cain, E., Scorza, D., and Ford, A. (2013). Educating for a critical democracy: Civic participation re-imagined in the council of youth research. *Democracy and Education, 21* (1) 1-10.

12. Morrell, E. (2013). Inventors of the Future: A Vision for NCTE and Our Affiliates. *Statement*.

13. Morrell, E. (2013). 21st century literacies, critical media pedagogy, and the future of English language arts. *Reading Teacher, 66* (4)

14. Scorza, D., Mirra, N., and Morrell, E. (2013). It should just be education: Critical pedagogy normalized as academic excellence. *International Journal of Critical Pedagogy, 4* (2), 15-34.

15. Morrell, E. (2012). Teachers as critical researchers: An empowering model for urban education. In G. Cannella & S. Steinberg (Eds). *The Critical Qualitative Research Reader* (pp. 364-379). New York: Peter Lang.

16. Morrell, J., and Morrell, E. (2012). Linking the Word to the World: Connecting Multicultural Literature to the Lives of 21st Century Youth. *The Dragon Lode*.

17. Morrell, E., and Morrell, J. (2012). Multicultural Readings of Multicultural Literature and the Promotion of Social Awareness in ELA Classrooms. *New England Reading Association Journal, 47*(2), 10-16.

18. Garcia, A., and Morrell, E. (2013). City youth and the pedagogy of participatory media. *Learning, Media, and Technology, 38* (2), 123-137.

19. Morrell, E., and Noguera, P. (2011). A framework for change: A broader and bolder approach to school reform. *Teachers College Record.* August 4, 2011: http://www.tcrecord.org. ID Number 16503.

20. Morrell, E., Maloney, E. and De Maret, P. (2011) A Conversation Between Three Literacy Educators. *Statement*, *48* (1), 21-25.

21. Morrell, E. (2011). Critical Approaches to Media in Urban English Language Arts Teacher Development. *Action in Teaching Education, 33* (2), 157-171.

22. Morrell, E. (2011). The Importance of Context in Literacy Instruction. In D. Fisher and D. Lapp. (Eds.)*The Handbook of Research on English Language Arts* (pp. 69-76). New York: Routledge.

23. Rogers, J., and Morrell, E. (2011). A Force to Reckon With: The Campaign for College Access in Los Angeles. In M. Orr and J. Rogers (Eds.). *Public Engagement and Public Education: Joining Forces to Revitalize Democracy and Equalize Schools* (pp. 227-250). Stanford: Stanford University Press.

24. Mirra, N., and Morrell, E. (2011). Teachers as Civic Agents: Toward a Critical Democratic Theory of Urban Teacher Development *Journal of Teacher Education, 62* (4), 408-420.

25. Morrell, E. (2011). Powerful Leadership in English Education. *English Leadership Quarterly, 34*(2) 14-18.

26. Florio-Ruane, S. and Morrell, E. (2011). Discourse Analysis: Conversation. In N. Duke and M. Mallette. *Literacy Research Methodologies*. New York: Guilford, Completely revised second edition.

27. Morrell, E. (2010). Critical Literacy, Educational Investment, and the Blueprint for Educational Reform: An Analysis of the Reauthorization of the Elementary and Secondary Education Act. *Journal of Adolescent and Adult Literacy, 54* (2) 146-149.

28. Morrell, E. (2009). Critical Research and the Future of Literacy Education. *Journal of Adolescent and Adult Literacy, 53* (2), 96-104.

29. Morrell, E. (2009). Teaching Hip-hop in the English Classroom. In R. Hammer and D. Kellner (Eds.) *Media/Cultural Studies: Critical Approaches* (pp. 152-164). New York: Peter Lang.

30. Morrell, E. (2008). Teaching Became a Revolution. In S. Nieto (Ed.) *Dear Paulo: Letters from those who dare teach* (pp. 102-103). New York: Paradigm.

31. Morrell, E. (2008). Rebel Musics: African Diaspora Popular Culture and Critical Literacies. In C. Payne and C. Strickland (Eds.)*Teach Freedom: The African American Tradition of Education for Liberation* (pp. 222-235). New York: Teachers College Press.

32. Morrell, E., and Duncan-Andrade, J. (2008). Comin' from the School of Hard Knocks: Hip and the Revolution of English Classrooms in City Schools. In B. Ayres, G. Ladson-Billings, G. Michie, and P. Noguera (Eds.) *City Kids, City Schools: More reports from the front row* (pp. 197-207). New York: New Press.

33. Morrell, E. (2008). The Critical Uses of Hip-hop in Antiracist Education. In M. Pollock (Ed.) *Everyday Antiracism* (pp. 161-165). New York: New Press.

34. Morrell, E. (2008). Creating Communities of Writers and Connections Between Writers and Communities: Professional Resources for Teachers. *Language Arts*, *85 (4)* , 322-324.

35. Morrell, E. (2007). Youth Participatory Action Research, Civic Engagement, and Educational Reform: Lessons from the IDEA Seminar. In J. Camarrota and M. Fine (Eds). *Revolutionizing Education: Youth Participatory Action Research in Motion* (pp. 155-185). New York: Routledge.

36. Morrell, E. (2007). Preface. In sj Miller and L. Norris. *Unpacking the Loaded Teacher Matrix: Negotiating Space and Time Between University and Secondary English Classrooms* (pp. xi-xv). New York: Peter Lang.

37. Duncan-Andrade, J., and Morrell, E. (2007). Critical Pedagogy and Popular Culture in an Urban English Classroom. In J. Kincheloe and P. McLaren (Eds.) *Critical Pedagogy: Where Are We Now?* (pp. 183-201). New York: Peter Lang.

38. Morrell, E. (2007). Critical Literacy and Popular Culture in Urban Education: Toward a Pedagogy of Access and Dissent. In C. Clark and M. Blackburn (Eds.). Literacy Research for Political Action and Social Change (pp. 235-255). New York: Peter Lang.

39. Morrell, E. (2007). Urban Students as Critical Ethnographers: Critical Textual Production through Community-Based Research. In J. Kincheloe & K. Hayes (Eds.), *Teaching City Kids: Understanding and Appreciating Them* (pp. 267-281). New York: Peter Lang.

40. Rogers, J., Morrell, E., and Enyedy, N. (2007). Contexts for becoming critical researchers: Designing for identities and creating new learning opportunities. *American Behavioral Scientist, 51* (3), 419-443.

41. Barone, D., and Morrell, E. (2007). Knowledge to Support the Teaching of Reading: Preparing Teachers for a Changing World. *Reading Research Quarterly, 42* (1), 167-180.

42. Morrell, E., and Rogers, J. (2006). Students as Critical Public Historians: Insider Research on Diversity and Access in Post Brown v. Board Los Angeles. *Social Education, 70* (6), 366-369.

43. Morrell, E. (2006). Critical Participatory Action Research and the Literacy Achievement of Ethnic Minority Groups. *55th Annual Yearbook of the National Reading Conference, 55*, 60-78.

44. Morrell, E., and Duncan-Andrade, J. (2006). Popular Culture and Critical Media Pedagogy in Secondary Literacy Classrooms. *International Journal of Learning,* 12 (9), 273-280.

45. Boyd, F., Morrell, E., et. al. (2006). Real teaching for real diversity: Preparing English language arts teachers for 21st century classrooms. *English Education, 38* (4), 329-350.

46. Morrell, E., and Orellana, M. (2006). Professional Resources for Teaching Multimodal Literacies. *Language Arts, 84* (1), 87-92.

47. Morrell, E. (2006). Toward a Bottom-Up Accountability System in Urban Education: Students as Researchers in Urban Schools. In J.Cammarota, S. Ginwright, and P. Noguera (Eds.) *Beyond Resistance! Youth Activism and Community Change* (pp. 111-129). New York: Routledge.

48. Burns, L., and Morrell, E. (2005). Critical Discourse Analysis in Literacy Research. *54th Annual Yearbook of the National Reading Conference*, *54*, 132-143.

49. Morrell, E. (2005). Toward a Critical English Education: Reflections on and Projections for the Discipline. *English Education*, *37* (4), 312-322

50. Duncan-Andrade, J. and Morrell, E. (2005). Turn Up That Radio, Teacher: Popular Cultural Pedagogy in New Century Urban Schools. *Journal of School Leadership*, *15*, 284-308.

51. Morrell, E. (2004). Bahktin's Dialogic Pedagogy: Implications for Critical Pedagogy, Teacher Research, and Literacy Education in the United States. *Journal of Russian and Eastern European Psychology* , *42* (6), 90-95.

52. Collatos, A., Morrell, E., Lara, R., and Nuno, A. (2004). Critical Sociology in K-16 Early Intervention: Remaking Latino Pathways to Higher Education. *Journal of Hispanic Higher Education*, 3 (2), 164-180.

53. Morrell, E., & Duncan-Andrade, J. (2004) What Youth Do Learn in School: Using Hip-Hop as a Bridge to Canonical Poetry. In J. Mahiri (Ed.), *What They Don't Learn in School: Literacy in the Lives of Urban Youth* (pp. 247-268). New York: Peter Lang.

54. Florio-Ruane, S. and Morrell, E. (2004). Discourse Analysis: Conversation. In N. Duke and M. Mallette. *Literacy Research Methodologies* (pp. 46-61). New York: Guilford.

55. Morrell, E. (2003). English/Language Arts Curriculum Revisited: Using Court Trials to Teach Writing in Secondary English Classrooms. *Florida English Journal, 39* (1), 20-22.

56. Reprinted as "Focus" on Writing for NCTE's Classroom Notes Plus, January 2004.

57. Morrell, E., & Collatos, A. (2003). Toward a Critical Teacher Pedagogy: Utilizing Student Sociologists as Teacher Educators. *Social Justice*, *29* (4), 60-71.

58. Morrell, E. (2003). Writing to Change the World: Creating Critical and Relevant Texts in Secondary English Classrooms. Language Arts Journal of Michigan, *19* (1), 25-27.

59. Morrell, E. (2003). Legitimate Peripheral Participation as Professional Development: Lessons from a Summer Research Seminar. *Teacher Education Quarterly, 30* (2), 89-99.

60. Collatos, A., & Morrell, E. (2003). Apprenticing Urban Youth as Critical Researchers: Implications for School Reform. In B. Rubin and E. Silva (Eds.) *Critical Voices in School Reform: Students Living Through Change* (pp.113-132). New York: Routledge/Falmer.

61. Morrell, E. (2003). Teaching about Diversity through Popular Film in Secondary English Classrooms. *Arizona English Bulletin, 45* (2), 23-27.

62. Morrell, E. (2002). Putting Chaucer on Trial: Using Popular Cultural Schemata to Increase Critical Reading in Secondary Classrooms. *California English*, *7* (5), 24-25.

63. Morrell, E. (2002). Toward a Critical Pedagogy of Popular Culture: Literacy Development among Urban Youth. *Journal of Adolescent and Adult Literacy*, *46* (1), 72-77.

64. Reprinted through the peer-reviewed internet journal of the International Reading Association *Reading Online: Focus on Urban Education initiatives*, 2003.

65. Morrell, E., & Duncan-Andrade, J. (2002). Toward a Critical Classroom Discourse: Promoting Academic Literacy through Engaging Hip-hop Culture with Urban Youth. *English Journal, 91* (6), 88-94.

66. Morrell, E. (2002). Getting Tuned In: Teaching Television and Film in Diverse Secondary English Classrooms. *Indiana English, 25* (1), 22-25.

67. Morrell, E. (2002). Cybercommunities of Practice: Implications for Secondary English Teachers. *Michigan English Teacher, 54* (2), 14.

68. Morrell, E. (2002). Teaching Popular Culture to Diverse Students in Secondary English Classrooms: Implications for Literacy Development. *Language Arts Journal of Michigan, 18* (1), 9-12.

69. Oakes, J., Rogers, J., Lipton, M., & Morrell, E. (2002). The Social Construction of College Access: Confronting the Technical, Cultural, and Political in Eligibility. In Tierney, W.G. and Haggerdon, L.S. (Eds.), *Extending our Reach: Strategies for Increasing Access to College* (pp.105-121). Albany, NY: State University of New York Press.

70. Morrell, E. (2001). Using Hip-hop Culture to Promote Academic and Critical Literacy in Urban Schools. *Center X Forum.*

71. Morrell, E. (2000) In Their Words, For Their Worlds: Academic and Critical Literacy Development in a High School Urban Studies Seminar. *Center X Quarterly.*

**Encyclopedia Entries**

1. Morrell, E (2009). Media Literacy. In K. Lomotey (Ed.) *Encyclopedia for African-American Education*. Thousand Oaks, CA: Sage.

2. Morrell, E. (2007) Media Literacy. In C. Claus- Ehlers (Ed.) *Encyclopedia of Cross-Cultural School Psychology*. Springer International.

3. Morrell, E. (2007). Academic Achievement. In Kathryn Borman, Spencer Cahill, and Bridget Cotner (Eds.) *The Praeger Handbook of the American High School*. Westport, CT: Greenwood Publishing Group.

4. Duncan-Andrade, J. and Morrell, E. (2007). Youth Culture. In Kathryn Borman, Spencer Cahill, and Bridget Cotner (Eds.) *The Praeger Handbook of the American High School*. Westport, CT: Greenwood Publishing Group.

**Articles in Popular Media**

1. Morrell, E. (2010). The Sound of Silence: Reflections on a Recent Trip to Our State Capitol. *New America Media*. August 2, 2010.

2. Morrell, E. (2009). Focus on resources, not standards. Room for Debate. *New York Times*. September 22, 2009.

3. Morrell, E. (2008). *Powerful English in 21st Century Classrooms.* NCTE-sponsored web-seminar created live with 100 teacher participants and archived at http://www.ncte.org

4. Morrell, E. (2004). *Teaching Literacy through Popular Culture to Diverse Learners*. Web text created for the “Ask LARC” section of the website of the Literacy Achievement Research Center.

5. Cushman, E., and Morrell, E. (2004)[DVD-Rom]. *Digital Technology, Critical Research, and Literacy Development in Urban Schools.*

6. Morrell, E. (2004). *Becoming a Highly Qualified Teacher: Research-Based Strategies for Promoting Achievement in Culturally and Linguistically Diverse Classrooms*. Online module prepared for beginning Michigan teachers through the ASSIST (Advocating Strong Standard-based Induction Support for Teachers) project.

7. Morrell, E. (2000, January 26). Class Acts. *The Village Voice.*

**Dissertation**

Morrell, E. (2001). *Transforming Classroom Discourse: Academic and Critical Literacy Development through Engaging Popular Culture.* Dissertation, University of California at Berkeley. [Winner, Outstanding Dissertation Award.]

**PRESENTATIONS TO NATIONAL AND INTERNATIONAL CONFERENCES**

1. Morrell, E. (2015). Educational Scholarship AS Praxis: Fighting for Justice in Local and Global Contexts. Invited keynote address given at the annual meeting of the American Educational Research Association, Chicago, IL.

2. Critical Media Pedagogy: Transforming Adolescent Literacy Instruction. Invited keynote address given at the annual meeting of the Manitoba Reading Association, Winnipeg, MB.

3. Morrell, E. (2014). Powerful English Yesterday, Today, and Tomorrow: Toward the Next Movement. Invited Presidential address delivered at the annual meeting of the National Council of Teachers of English, Washington DC.

4. Morrell, E. (2014). Critical Media Pedagogy and Supports for Struggling Readers. Invited Keynote presentation given at the annual meeting of the International Reading Association, New Orleans, LA.

5. Morrell, E. De los Rios, C. and Lopez, J. (2014). Toward a critical pedagogy of race: Ethnic Studies and literacies of power in High School Classrooms. Invited keynote delivered at the NYU Brown@60 Conference, New York, NY.

6. Morrell, E. (2013). Cultivating Youth Voices: Teaching Writing in the Media Age. Paper presented at the annual meeting of the American Educational Research Association. San Francisco, CA.

7. Morrell, E. (2013). Powerful Writing Instruction for the 21st Century. Presentation given at the annual meeting of the International Reading Association, San Antonio, TX.

8. Morrell, E. (2012). (Re)Inventing the Future of English. Invited keynote and paper delivered to the annual meeting of the National Council of Teachers of English, Las Vegas, NV.

9. Morrell, E. (2012). The Educational Imperative for Hip Hop Education. Invited paper delivered to the Hip-Hop Think Tank II Summit, New York, NY.

10. Morrell, E. (2012). Popular Culture, Action Research, and Math Achievement in City Schools. Invited keynote delivered at the annual meeting of the Ohio Council of Teachers of Mathematics (OCTM), Columbus, OH.

11. Morrell, E. (2012). The Literacies They Need: Teaching Reading and Writing in the 21st Century. Invited keynote delivered at the Diamond State Reading Association Conference, Dover, DE.

12. Morrell, E. (2012). Our Second Century: A Grassroots Vision for Affiliates and the Future of NCTE. Invited keynote delivered at the annual meeting of the NCTE Affiliates, St. Louis, MO.

13. Morrell, E. (2012). Engaged Research and the Re-Imaging of Classroom Life. Invited keynote delivered at the annual meeting of the Critical Race Studies in Education Association, New York, NY.

14. Morrell, E. (2012). Powerful English Language Arts: Reading and Writing Pedagogies for the 21st Century. Invited Teaching Edge Keynote delivered at the annual meeting of the International Reading Association, Chicago, IL.

15. Morrell, E. (2012). Critical Media Pedagogy and Critical Language Awareness: Youth Production and the Re-Imaging of Classroom Life. Paper presented at the annual meeting of the American Educational Research Association, Vancouver, BC.

16. Morrell, E. (2012). Toward a grounded theory of engaged literacy research. Keynote delivered at the annual meeting of the National Council of Teachers of English Assembly for Research (NCTEAR), Tuscaloosa, AL.

17. Morrell, E. (2011). The Uses of Paulo Freire in 21st Century English Education. Paper given to the annual meeting of the National Council of Teachers of English (NCTE), Chicago, IL.

18. Morrell, E. (2011). Community Engagement in Education: Does it Really Take a Village? Invited panel participant on the 5th Annual Children's Storefront Urban Education Symposium. New York, NY.

19. Morrell, E. (2011). Multicultural Readings of Multicultural Literatures in Diverse ELA Classrooms. Invited workshop keynote given to the annual meeting of the New England Reading Association, Sturbridge, Massachusetts.

20. Morrell, E. (2011). Critical Literacies and 21st Century Youth: New Possibilities for English Language Arts. Invited workshop keynote given to the annual meeting of the Colorado Language Arts Society, Golden, Colorado.

21. Morrell, E. (2011). *Accounting for Demographic Differences in Powerful English Language Arts Classrooms.* Paper presentation given at the annual meeting of the International Reading Association, Orlando, Florida.

22. Bautista, M., Bertrand, M., Morrell, E, Matthews, C., and Scorza, D. (2011) *Youth research, democracy, and education transformation: Defying tradition in research*. Paper presented at the annual meeting of the American Educational Research Association, New Orleans, LA.

23. Morrell, E., Garcia, A., Martinez, A., Mirra, N., and Scorza, D. (2011).*Learning for social change: Youth as Critical Researchers and Community Advocates.* Paper presented to the annual meeting of the American Educational Research Association, New Orleans, LA.

24. Morrell, E. (2011). Critical Democratic Theory and Urban Teacher Development. Paper presented to the annual meeting of the American Association of Colleges for Teacher Education, San Diego, CA.

25. Morrell, E. (2010). *Context Specific Literacy Instruction.* Paper presented at the annual meeting of the National Council of Teachers of English, Orlando, Florida.

26. Morrell, E. (2010). *Academic and Critical Literacy through Documentary Filmmaking: Apprenticeships in Practice*. Paper presented at the annual meeting of the National Council of Teachers of English, Orlando, Florida.

27. Morrell, E. (2010). *Youth Voice and Adolescent Literacy Development: Toward a critical framework for Twenty-first Century Reading Pedagogies.* Keynote address given to the annual meeting of the California Reading Association, Riverside, CA.

28. Morrell, E., et. al. (2010). *Proceedings. NSF Sponsored Colloquy on Minority Males in STEM.* Baltimore, MD.

29. Morrell, E. (2010). *I Too Sing, America: Youth Voice and College Access for African-American Youth.* Keynote address delivered to the annual meeting of the California Alliance of African-American Educators, Los Angeles, California.

30. Morrell, E. (2010). *Rigor, Relevance, and Powerful Literacies in Diverse 21st Century Classrooms*. Keynote and presentation delivered at the NCTE Spring Virtual Conference.

31. Morrell, E. (2010). *Developing Youth Voices: Literacy, Identity and Achievement through Community Centered Activity.* Keynote address delivered to the 20th annual meeting of the Superintendents' Commission for the Study of Demographics and Diversity, Chicago, Illinois.

32. Morrell, E. (2010). *High School Students as Researchers of the Social Ecologies of their Lives.* Presidential Session at the annual meeting of the American Educational Research Association, Denver, Colorado.

33. Morrell, E., Mirra, N., and Rogers, J. (2010). *Youth Research and Advocacy: Actions and Achievements for Change.* Paper presented at the annual meeting of the American Educational Research Association, Denver, Colorado.

34. Morrell, E. (2010). *Critical Urban Literacy as Critical Documentary Filmmaking: Apprenticeships in Practice*. Paper given to the Digital Media and Learning Conference, University of California, San Diego.

35. Morrell, E. (2010). *Literacy, Learning, and Leadership in 21st Century Schools.* Presentation given to the annual meeting of the American Association of School Administrators, Phoenix, AZ.

36. Alvermann, D., Duffy, G., Morrell, E., & Siegel, M. (2009). *Integrative Research Review - A Debate With Ourselves About the Contributions of Literacy Research to Practice and Policy.* Review of Research Address presented to the annual meeting of the National Reading Conference, Albuquerque, NM.

37. Morrell, E. (2009) *Critical Literacy for ALL Learners: Pedagogies of Access, Dissent, and Liberation.* Invited keynote address given to the annual meeting of the California State University Center for the Advancement of Reading (CAR) Conference, Sacramento, California.

38. Morrell, E. (2009). *Teachers in Communities: Collaborations for Action and Change.* Invited keynote and workshop given to the Teaching and Learning in the 21st Century Conference, Tucson, Arizona.

39. Morrell, E. (2009). *Youth Research and the Project of Urban School Reform.* Paper presented at the annual meeting of the American Educational Research Association, San Diego, California.

40. Morrell, E. (2009). *Plotting the Revolution: Being and Becoming Critical Educators.* Paper presented at the annual meeting of the American Educational Research Association, San Diego, California.

41. Morrell, E. (2008). *Conducting Community-Based Research with Urban Youth: Writing the Word and the World.* Paper presented at the annual meeting of the National Reading Conference, Orlando, Florida.

42. Morrell, E. (2008). *Oral Storytelling and Multimodal Presentations in a Powerful Urban English Classrooms.* Paper presented at the annual meeting of the National Council of Teachers of English, San Antonio, Texas.

43. Morrell, E. (2008). *Powerful English in Diverse 21st Century Classrooms.* Paper presented to the NCTE Institute for 21st Century Literacies. Indianapolis, Indiana.

44. Morrell, E. (2008). *Critical Literacy Education in an Era of Globalization: Designs for Action, Achievement, and Change.* Paper presented at the annual meeting of the American Educational Research Association, New York.

45. Morrell, E. (2008). *Critical Pedagogy in High School English: Achievement, Advocacy, and Small Spaces for Revolutionary Love.* Paper presented at the annual meeting of the American Educational Research Association, New York.

46. Morrell, E. (2007). *Bloggers, Texters, Rappers, and More: Youth Literacies in the 21st Century.* Paper presented at the annual convention of the National Council of Teachers of English, New York.

47. Morrell, E. (2007). *Critical Literacy and Popular Culture in Urban Education: Toward a Pedagogy of Access and Dissent.* Paper presented at the annual convention of the National Council of Teachers of English, New York.

48. Morrell, E. (2007). *Becoming Documentary Filmmakers: Adolescent Learning and Literacy Development.* Paper presented at the annual convention of the National Council of Teachers of English, New York.

49. Morrell, E. (2007). *Critical Pedagogy, Popular Culture, and Literacy Development in K-12 Classrooms.* Paper presented at the annual meeting of the International Reading Association, Toronto, Ontario.

50. Morrell, E. (2007). *Critical Research and Urban Youth: Methodological Insights from a Summer Research Seminar.* Paper presented at the annual meeting of the American Educational Research Association, Chicago, IL.

51. Morrell, E. (2007). *Academic Literacy Development During the Making of an iMovie: Multimodal Literacy Instruction for Urban Adolescents*. Paper presented at the annual meeting of the American Educational Research Association, Chicago, IL.

52. Morrell, E. (2007). *Tensions, Possibilities, and a New Critical Pedagogy in Urban K-12 Education.* Paper presented at the Oxford Critical Pedagogy Conference. Oxford, UK.

53. Morrell, E. (2006). *Critical Approaches to Teaching Film and Media Culture in Secondary English Classrooms.* Paper presented at the annual meeting of the National Council of Teachers of English, Nashville, TN.

54. Burns, L., and Morrell, E. (2006). *Why Critical Discourse Analysis in Literacy Research.* Paper virtually presented at the international virtual conference; The Role of Description and Explanation in Educational and Social Research.

55. Morrell, E. (2006). *Youth Participatory Action Research as Critical Pedagogy: Lessons from Practice.* Paper presented at the annual meeting of the American Educational Research Association, San Francisco.

56. Morrell, E., and Duncan-Andrade, J. (2006). *Toward a Critical Pan-Ethnic Studies Framework for Educational Research and Practice*. Paper presented at the annual meeting of the American Educational Research Association, San Francisco.

57. Morrell, E. (2006). *Teaching Critical Literacy through Popular Culture: Increasing Academic Achievement and Civic Engagement in Urban Education.* Paper and interactive workshop delivered to the annual meeting of the National Council of Teachers of English Assembly for Research, Chicago.

58. Morrell, E. (2005) *A Review of the Research: Critical/Action Research and the Academic Achievement of Ethnic Minority Groups.* Invited paper presented at the annual meeting of the National Reading Conference, Miami Beach, FL.

59. Morrell, E. (2005). *Critical Approaches to Teaching Hip-Hop in Secondary English Classrooms.* Paper presented at the annual convention of the National Council of Teachers of English, Pittsburgh, PA.

60. Morrell, E. (2005). *Popular Culture, Cultural Studies, and Critical English Education.* Paper presented at the Conference on English Education Colloquium, Pittsburgh, PA.

61. Morrell, E. (2005). *Toward a Radical/ International/ Decolonizing Model of Teacher Development.* Paper virtually presented at the 4th annual conference of the Centre for Caribbean Thought, University of West Indies, Mona, Jamaica.

62. Duncan-Andrade, J., and Morrell, E. (2005). *Critical Media Literacy and Urban Youth.* Paper virtually presented at the Twelfth Annual International Conference on Learning, Grenada Spain.

63. Morrell, E. (2005). *Critical Sociology as Civic Engagement: Urban Teens as Indigenous Researchers*. Paper presented at the annual meeting of the American Educational Research Association, Montreal.

64. Morrell, E. (2005). *Critical Pedagogy, Popular Culture, and CHAT: Implications for literacy research and Praxis.* Paper presented at the annual meeting of the American Educational Research Association, Montreal.

65. Morrell, E. (2005). *Critical Literacy, Media Production, and Civic Engagement among Urban Youth.* Paper presented at the annual meeting of the American Educational Research Association, Montreal.

66. Morrell, E. (2005). *Rebel Music on the Black Atlantic: From Urban Literacies to Academic and Social Transformations*. Paper presented at the annual meeting of the Caribbean Studies Association, Santo Domingo, Dominican Republic.

67. Cushman, E., and Morrell, E. (2005). *Critical Approaches to English Education: Sites for Pre-service Teacher Training*. Paper presented at the annual meeting of the American Educational Research Association, Montreal.

68. Morrell, E. (2005). *The Critical Uses of Hip-Hop in Antiracist Pedagogies in Secondary Classrooms.* Paper presented at the fourth annual Race in the 21st Century conference, East Lansing, Michigan.

69. Morrell, E. (2005). *Critical Literacy and Popular Culture in Urban Education: Toward a Pedagogy of Access and Dissent*. Invited paper and lecture presented at the annual meeting of the National Council of Teachers of English Assembly for Research, Columbus, Ohio.

70. Morrell, E., and Burns, L. (2004). *Critical Discourse Analysis in Literacy Research*. Paper presented at the annual meeting of the National Reading Conference. San Antonio, Texas.

71. Morrell, E. (2004). *Toward a Bottom-Up Accountability System in Urban Education: Students as Researchers in Urban Schools*. Paper presented at the Youth, Communities, and Social Justice conference. Sponsored by the Ford Foundation, New York.

72. Morrell, E. (2004). *Discourse Analysis: Conversation*. Paper presented at the annual meeting of the American Educational Research Association, San Diego.

73. Morrell. E. (2004). *Enacting Pedagogies and Literacies of Power: Lessons from a Research Seminar for Urban Students, Teachers, and Parents.* Paper presented at the annual meeting of the American Educational Research Association, San Diego.

74. Morrell, E. (2004). *Critical and Digital: New Media and Textual Production for Social Action in a Research and Writing Seminar.* Paper presented at the Conference on College Composition and Communication, San Antonio.

75. Morrell, E. (2004). *Critical Ethnography in Urban Education: Promoting Literacy and Social Change through Community Research.* Paper presented at the annual meeting of the Conference for Urban Ethnography, University of Pennsylvania.

76. Morrell, E. (2003). *Parents and Students as Partners in Critical Research: Implications for Literacy Education*. Paper presented at the annual meeting of the National Council of Teachers of English, San Francisco.

77. Morrell, E. (2003). *Urban Students as Critical Ethnographers: Pedagogy and Production in Community-Based Research.* Paper presented at the annual meeting of the American Anthropological Association, Chicago.

78. Morrell, E. and Collatos, A. (2003) *Critical Pedagogy in a College Access Program for Students of Color.* Paper presented at the annual meeting of the American Educational Research Association, Chicago.

79. Collatos, A. and Morrell, E. (2003) *Futures in Theory and Practice: Critical Sociology in a College Access Intervention Program.* Paper presented at the annual meeting of the American Educational Research Association, Chicago.

80. Collatos, A., & Morrell, E. (2003). *Apprenticing Urban Youth as Critical Researchers: Implications for School Reform.* Paper presented at the annual meeting of the American Educational Research Association, Chicago.

81. Morrell, E. (2003). *Teachers as Critical Researchers: The Role of Critical Research in Urban Teacher Transformation and Development.* Paper prepared for the annual forum of the Center for Urban Ethnography, University of Pennsylvania.

82. Morrell, E. and Rogers, J. (2003). *Critical Learning and Critical Research in the IDEA Summer Seminar.* Paper presented the annual meeting of the American Educational Research Association, Chicago.

83. Duncan-Andrade, J. and Morrell, E. (2003). *E"race"ing, Enabling: Toward a Critical Media Pedagogy in Urban Secondary Literacy Classrooms.* Paper presented at the NCTE Assembly for Research Midwinter Research Conference; Teaching and Researching Across Color Lines: Literacies, Pedagogies, and Politics of Difference; Minneapolis, MN.

84. Morrell, E. (2003). *Writing the Word and the World: Critical Literacy and Counter-textual Production in College Composition Courses.* Paper presented at the Conference of College Composition and Communication, New York, NY.

85. Collatos, A. and Morrell, E. (2003). *Engaging Urban Students as Critical Researchers in the Sociology of Education: Disrupting Social Reproduction and Increasing Access to Higher Education.* Paper presented to the annual meeting of the Athens Institute for Education and Research, Athens, Greece.

86. Morrell, E. (2002). *Legitimate Peripheral Participation as Professional Development: Lessons from a Summer Research Seminar*. Paper presented at the first annual conference of the Urban Teacher Educator Network, Los Angeles, CA.

87. Morrell, E. (2002). *Becoming Critical Researchers: Literacy and Empowerment for Urban Youth.* A paper presented at the annual meeting of the National Reading Conference, Miami.

88. Morrell, E. (2002). *Teaching Popular Culture in Secondary English Classrooms.* A paper presented at the annual meeting of the National Council of Teachers of English, Atlanta.

89. Morrell, E. (2002). *Toward a Critical Hip-Hop Pedagogy: Literacy and Empowerment for African-American Males in Urban Schools*. Paper presented at the annual meeting of the American Educational Research Association, New Orleans.

90. Rogers, J. and Morrell, E. (2002). *Learning about Capital: Social Theory in the High School Curriculum*. Paper presented at the annual meeting of the Sociology of Education Association, Asilomar.

91. Morrell, E. (2001). *Building Cybercommunities of Practice Among Urban Youth: Implications for Academic and Critical Literacy Development.* Paper presented at the annual meeting of the National Council of Teachers of English, Baltimore.

92. Morrell, E., & Collatos, A. (2001). *Toward a Critical Teacher Pedagogy: Using Student Sociologists as Teacher Educators.* Paper presented at the annual meeting of the American Educational Research Association, Seattle.

93. Morrell, E., Collatos, A., & Rogers, J. (2001). *Transforming Consciousness: The Role of Critical Theory in a College Access Intervention Program.* Paper presented at the annual meeting of the American Educational Research Association, Seattle.

94. Morrell, E. & Rogers, J. (2001). *Learning about Capital: Toward a Grounded Theory of Critical Capital*. Paper presented at the annual meeting of the American Educational Research Association, Seattle.

95. Morrell, E. (2000) *Curriculum and Popular Culture: Building Bridges and Making Waves.* Paper presented at the annual meeting of the American Educational Research Association, New Orleans.

96. Morrell, E. (2000) *Using Hip-Hop Culture as a Bridge to Canonical Poetry Texts in an Urban Secondary English Class*. A paper presented at the annual meeting of the American Educational Research Association, New Orleans.

97. Morrell, E., & Rogers, J. (2000) *ED 001: A Case Study in Reconstructing College "Readiness".* Paper presented at the annual meeting of the American Educational Research Association, New Orleans.

98. Morrell, E., Montaño, T., Lopez-Metcalfe, E., Pacheco, M., & Wilcher, M. (2000) *Diversity and Teacher Education: Multicultural Perspectives of a Teacher Education Program as a Community of Practice.* Paper presented at the annual meeting of the American Educational Research Association, New Orleans.

**GRANTS -- PRINCIPAL INVESTIGATOR**

1. Health Literacy for City Youth. Recipient of a grant from the Provost's Investment Fund (2014-2016). $20,000.

2. The History of Education in Harlem. Recipient of a grant from the Provost's Investment Fund. 2012-2014. $25,000.

3. Gordon Commission on the Future of Educational Assessment (sub-contract from ETS). 2011-2013. $269,000.

4. The Council of Youth Research. Three-year (2008-2011) project funded by:
   i. The Surdna Foundation. 2008-2011. $375,000.
   ii. The Annenberg Foundation. 2008-2010. $150,000
   iii. The Stuart Foundation. 2008-2010. $150,000

5. Life in Our Schools: Youth Research, College Access, and Educational Reform. One-year project funded by the Institute for American Cultures. 2008. $7,000.

6. The 21st Century Literacies of African-American Youth. A project funded by the Ralph Bunche Center for African-American Studies through their Ford-funded College Access Program for African Americans (CAPAA) grant. 2006-2007. $18,000.

7. Critical Literacy, Teacher Development and Student Empowerment: A Case Study of a Critical Research and Writing Seminar. A postdoctoral research grant funded by the American Educational Research Association and the Institute for Education Sciences. 2001-2004. $150,393.

8. Creating Interactive Software Programs for Critical Literacy Educators in K-12 Grades (with Ellen Cushman). Funded by the WIDE Research Center (Writing | Information | Design in E-Space). 2004. $15,000.

9. The Urban Literacies Project. Seed grant funded through the Michigan State University College of Education. 2005. $3767.

**INVITED KEYNOTE ADDRESSES**

1. “Critical Media Pedagogy: Teaching for Achievement in City Schools.” Harvard Graduate School of Education’s Dean’s Distinguished Lecture. Harvard University, Cambridge, MA, March 10, 2015.

2. “Powerful Teaching, Powerful Schools: Engaging Youth in the Digital Age.” Inaugural Macy Endowed Lecture, Teachers College, Columbia University, New York, NY, March 4, 2015.

3. “Critical Pedagogy and Hip Hop in the College English Classroom” Invited keynote delivered at the Hip Hop Summit sponsored by Bergen Community College. Paramus, NJ, February 18, 2015.

4. “Powerful English Language Arts: Socially, Culturally, and Technologically Relevant Instruction.” Invited keynote delivered at the annual meeting of the Texas Council of Teachers of English Language Arts, Houston, TX, January 23, 2015.

5. “Powerful Readers and Writers: Pedagogies of NOW.” Invited keynote delivered at the annual meeting of the North Carolina English Teachers Association. Raleigh, NC, October 10, 2014.

6. “Developing Readers and Writers through Community Engagement.” Invited keynote delivered at the Western Michigan Community Summit, Grand Rapids, MI, September 29, 2014.

7. “Towards a Critical Pedagogy of Race: Ethnic Studies and Literacies of Power in HS Classrooms.” Invited keynote delivered at the NYU Brown@60 Conference, May 16, 2014.

8. “Critical Pedagogy and Media Production: Engaging Struggling Readers” invited keynote delivered at the annual meeting of the International Reading Association, New Orleans, LA, May 9, 2014.

9. “Pedagogies of Change and the Future of Engaged Research” William and Mary Jane Brinton Family Chair Lecture delivered at the University of California at Berkeley, May 6, 2014.

10. "(Re) Inventing the Future of Literacy Education: Socially, Culturally, and Technologically Relevant Instruction" Invited keynote delivered at the 8th Annual Literacy Essentials Conference, New Berlin, CT, April 12, 2014.

11. "Engaging ALL Students through Technology" Invited keynote delivered at the annual meeting of the Council for Exceptional Children, Philadelphia, PA, April 10, 2014.

12. "Teaching English in the Digital Age" Invited keynote delivered at the annual convention of the Minnesota Council of Teachers of English, April 3, 2014.

13. "Engaging Youth through Technology Across the Disciplines" Invited keynote given at the annual meeting of the TCEA, Austin, Texas, February 6, 2014.

14. "Developing Powerful Readers in 21st Century Classrooms" Invited keynote delivered at the Secondary Reading Council of Florida annual conference, January 24, 2014.

15. " Powerful Teaching, Powerful Schools: Engaging Youth in the Digital Age" Invited keynote delivered to the California League of Schools, January 10, 2014.

16. "Integrating Powerful Reading and Writing Instruction Across the Disciplines" Invited keynote delivered at Nassau Community College, November 8, 2013.

17. "Culture Matters: Teaching African-American Literature in the Digital Age" Invited keynote delivered at the Givens Foundation Culture Matters Conference, Minneapolis, MN, November 2, 2013.

18. "Teaching Literature in the Digital Age" Invited keynote delivered at the annual meeting of the Florida Council of Teachers of English, October 18, 2013.

19. "Teaching Writing in the 21st Century Classroom" Invited keynote delivered at the annual meeting of the Council of Language Arts Supervisors, October 17, 2013.

20. "Cultivating Youth Voices: Powerful Writing Pedagogies for the 21st Century" Invited keynote delivered at the Rhode Island Writing Project Spring Conference. Providence, Rhode Island March 9, 2013.

21. "Lifting Every Voice: Powerful Literacy Pedagogies for the 21st Century." Invited keynote delivered at Nassau Community College. March 8, 2013.

22. "Promoting Achievement and Justice in Perilous Times." Invited keynote delivered at Siena College. Albany, NY February 28, 2013.

23. "Promising Directions in Scholarship: Re-Imaging Race in American Education." Invited keynote delivered for the Race in the Academy lecture series at the University of Pennsylvania. February 7, 2013

24. "Pedagogies of Access for 21st Century Youth." Invited keynote delivered at Southern Illinois University, Edwardsville, January 9, 2013.

25. "Hip-Hop and English Education: Production, Poetics, Pedagogy, and Praxis." Invited keynote delivered for the Hip-Hop Education Videoconference Series, University of Wisconsin, November 19, 2012.

26. "Powerful Teaching, Powerful Schools: Towards a Critical, Community-Centered, Culturally Sustaining Agenda for Educational Excellence." Invited keynote address delivered at the annual meeting of the California League of Schools, October 27, 2012.

27. "Powerful Teaching for Social Justice in City Schools" Invited keynote address delivered at Quinnipiac University, October 16, 2012.

28. "Building Bridges to Literacy: How Libraries can promote literacy and agency for African-American males." Invited Keynote delivered at the UNC Library Sciences Building a Bridge to Literacy Summit, June 3, 2012.

29. "Powerful English Language Arts: Reading and Writing for the 21st Century", Inaugural Correll Presidential Lecture delivered at the University of Maine, March 26, 2012.

30. "Eliminating the Achievement Gap" Invited panel presentation at the Columbia University Law School, March 7, 2012.

31. "Living MLK's Dream: Youth Voice, Civic Agency, and the American Future" Invited address delivered at the annual MLK celebration of Baylor School, Chattanooga, TN, January 13, 2012.

32. "Classroom Engagement and the Future of Arts Education" Invited keynote address given to the Berklee College of Music. Boston, Massachusetts, December 5, 2011.

33. "Powerful English Language Arts: The Necessity of Cultivating Youth Voices," Invited keynote given to the annual meeting of the New England Reading Association, Sturbridge, Massachusetts, September 29, 2011.

34. "Youth Participatory Action Research: Critical Literacy and Civic Engagement in English Classrooms," Invited keynote given to the annual meeting of the Colorado Language Arts Society, Golden, Colorado, September 24, 2011.

35. "Nurturing Literate Communities through Participatory Action Research" Invited keynote address given to the annual meeting of the Whole Language Umbrella Conference, Las Vegas, July 24, 2011.

36. "Youth Writing to Change the World." Invited keynote give to the Student Press Initiative, New York, New York, July 11, 2011.

37. "For Those Who Dare Teach: A New Pedagogy for the Global City" Invited keynote given at Ohio State University, Columbus, OH, May 23, 2011.

38. “Voice, New Media, and Literacy Teaching in the New Century,” Invited keynote address given at the Region VII Literacy conference, Fresno, May 17, 2011.

39. “Language, Literature, and Learning: From powerful voices to powerful literacies in K-8 classrooms.” Invited keynote delivered at the International Reading Association Conference, Orlando, FL, May 10, 2011.

40. “Navigating Urban Literacies: Empowering writing pedagogies for the 21st century.” Invited Keynote given to the annual meeting of the National Writing Project’s Urban Sites Network Conference, Boston, MA, April 30, 2011.

41. “Youth Re-Writing the World: Literacy, Learning, and Civic Engagement in 21st Century Urban Schools,” Keynote address jointly sponsored by the Northridge Writing Project and the Council for Exceptional Children at California State University Northridge, Tuesday April 19, 2011.

42. “Why You? Why Now?: Education, Human Rights, and Public Service During These Perilous Times,” Keynote address to be given at the 25th anniversary of the Peace Corps Fellows event at Teachers College, Columbia University, April 1, 2011.

43. Youth Voice, Critical Literacy, and the Spirit of Cesar Chavez. Keynote address delivered to the 8th Annual Cesar Chavez conference on Literacy at Fresno State University, March 26, 2011.

44. “Toward a Pedagogy of the Global City: Voice, Affirmation, Achievement, Purpose, and Love,” Invited keynote delivered as part of the Simmons College/Beacon Press Race, Education, and Democracy Lecture and Book Series, Boston, March 15, 2011.

45. “Youth Participatory Action Research, Academic Literacy, and Civic Engagement in Urban Schools,” Invited keynote delivered as part of the Simmons College/Beacon Press Race, Education, and Democracy Lecture and Book Series, Boston, March 16, 2011.

46. “Popular Culture, Media Production, and a Re-Imaging of Classroom Life,” Invited keynote delivered as part of the Simmons College/Beacon Press Race, Education, and Democracy Lecture and Book Series, Boston, March 17, 2011.

47. “Breaking Barriers to Healthy African-American Development: Black Males in the 21st Century, Myths, Data, Reality” Invited keynote address given at the 144th Morehouse Founder’s Day Symposium. February 18, 2011.

48. “Powerful English Leadership for 21st Century Classrooms” Invited keynote address given to the annual meeting of the Conference on English Leadership (CEL), Orlando, Florida, November 21, 2010.

49. Cultural Transformations: Race and Youth Media. Invited keynote address delivered as part of an annual lecture series at Washington University, St. Louis, November 10, 2010,

50. Using Multicultural Literature to promote social awareness. Invited keynote given to the St. Louis Suburban IRA, November 10, 2010.

51. “Cultivating Youth Voices: Reading and Writing Pedagogies for the 21st Century” Keynote address given to the Teachers College Reading and Writing Project, November 3, 2010.

52. “Leading for Literacy: Youth Research and Academic Literacy in the Twenty-first century,” Invited keynote address delivered at the Kentucky Reading Association annual meeting, October 29, 2010

53. “Powerful Beyond Measure: Pedagogy and Production in Higher Education” invited keynote address delivered at the Art Institute of California, July 9, 2010.

54. “Art and Critical Pedagogy: Rethinking Education” Invited keynote address given at the Biennial Educator Symposium of the Chicago Museum of Contemporary Art, May, 4, 2010.

55. “Youth Voice and Critical Literacy Development in Urban Schools” invited keynote co-sponsored by the Latino Resource Center and the Center for the Interdisciplinary Study of Language and Literacy (CISLL) at Northern Illinois University, April 22, 2010.

56. “Towards a Pedagogy of the City: Voice, Agency, Achievement, Action, Purpose, and Love” invited talk given at Teachers College, Columbia University, March 23, 2010.

57. “Civic Agency in Politically Dangerous Times” invited keynote sponsored by the Political Science department at Cal Lutheran University, March 11, 2010.

58. “ Critical Pedagogy for Cincinnati Schools” invited keynote to be given at the University of Cincinnati, March 4, 2010.

59. “Motivation through Popular Culture and Youth Research” invited keynote given to the annual professional development seminar of John Muir Charter Schools, January 12, 2010.

60. “Courageous Leadership, Literacy, and the Education of Black Boys,” invited keynote given to Pikes Township Schools, December 3, 2009.

61. Invited member of NCTE Featured Panel, “Adolescent Literacy: What Works Best.” Philadelphia, Pennsylvania, November 21, 2009.

62. “Reshaping the Landscape of Urban Education: Focusing on Possibilities” invited lecture given at Syracuse University, Syracuse, New York, October 1, 2009.

63. “Successful Teaching Across Communities and Cultures: Academic Success, Cultural

Competence, and Critical Consciousness" invited keynote given to the professional development conference of the Alliance for College- Ready Schools, Los Angeles, August 20, 2009.

64. "Making Literacy Matter for Kids: Moving from Theory to Practice" invited keynote given to the professional development conference of Cherry Creek Schools, Cherry Creek, Colorado, August 15, 2009.

65. "The Art of Critical Pedagogy: Possibilities for Moving from Theory to Practice in New Century Schools," Invited keynote address given to the annual meeting of the California Association of Freirian Educators (CAFÉ), Los Angeles, California, May 9, 2009.

66. "Youth Voice and Powerful Writing in the English Classroom" Invited keynote given to the annual meeting of the California Association of Teachers of English, San Jose, California, February 19, 2009.

67. "Ensuring Equity and Excellence for All Students: Engagement, Affirmation, Discipline, Purpose, Inspiration, and Love" Lecture and workshop given to the Equity and Excellence in Education Conference, Prince William County Schools, Manasas, Virginia, August 5, 2008.

68. "Paulo Freire's Critical Pedagogical Project and its Applications for American Urban Education," Invited lecture given to the Paulo Freire Institute, Los Angeles, CA, July 8, 2008.

69. " The Uses of Paulo Freire in Diverse 21st Century Classrooms." Invited keynote delivered to the annual meeting of the Mid-Atlantic Equity Center. Washington, DC, June 27, 2008.

70. "Building Critical Literacy and Research Skills in Small Border Communities. Invited Address and workshop given at the University of Arizona, South, February 9, 2008.

71. "Powerful English: Innovative Practices in Diverse 21st Century Classrooms." Invited address given to secondary English Teachers in Clayton County, Georgia schools, October 19, 2007.

72. "Creating Engaging Learning Environments: What Principals Can Do!" Invited keynote delivered to the annual conference of the Arizona School Administrators, October 8, 2007.

73. "Motivating Hard to Reach Students through Community-Based Research" Invited keynote delivered to the Los Angeles County Office of Education Title I In-service, October 3, 2007.

74. "Powerful Parenting: Achievement and Empowerment for African-American Youth," Invited keynote delivered to the annual conference of the Council for African-American Parents, California Polytechnic University, Pomona, September 9, 2007.

75. “African-American Art, Popular Culture, and Literacy Development in Urban K-12 Classrooms,” Invited keynote delivered to the summer program at Fowler Museum, UCLA, July 12, 2007.

76. “Popular Culture and Literacy Development in Global Cities in the New Millennium” Invited keynote delivered to the annual convention of the United Kingdom Literacy Association, Swansea, Wales, July 7, 2007.

77. “Powerful Pedagogies: Achievement, Empowerment, and Social Justice for Ethnic Minority Youth” Invited keynote delivered to the NEA Regional Minority Leadership Training Institute. Anaheim, CA, February 16, 2007.

78. “Pedagogies of HOPE and Transformation in K-12 Education” Invited keynote delivered to the HOPE Foundation Institute. Sedona, AZ, January 24, 2007.

79. “Popular Culture, Engaged Pedagogy, and Sustained Academic Achievement in New Century Schools,” Invited keynote delivered to the “Failure is NOT an Option” Institute sponsored by the HOPE Foundation. San Francisco, CA October 13, 2006.

80. “Reaching the ‘Unreachable’: Engaging ALL students in 21st Century Schools.” Invited keynote address delivered to the Charleston Public School District. Charleston, SC August 17, 2006.

81. “Innovating Approaches to Reaching Students Who Are Falling Through the Cracks,” invited keynote address delivered to the North American Summit on Courageous Leadership for School Success. Toronto, Ontario, May 6, 2006.

82. “Education and the Disciplines: Promises and Dilemmas in Considering Research Agendas and Careers.” Invited address given as part of the Division G Fireside Chat for graduate students at the annual meeting of the American Educational Research Association, April 8, 2006.

83. “The Uses of Popular Culture in the Literacy Classroom.” Invited keynote address delivered at the annual conference of the Michigan Reading Association, March 19, 2006.

84. “Critical Literacy Education in an Era of Accountability.” Invited keynote address delivered at the Bright Ideas Conference of the Michigan Council of Teachers of English, March, 18, 2006.

85. “Intergenerational Organizing and the Pedagogy of Social Movements,” Invited address given to the Harvard Colloquium for Organizing and Community Reform, March 11, 2006.

86. “Critical Literacy and Urban Education.” Invited address delivered as part of the annual lecture series on issues in urban education, co-sponsored by Barnard and Columbia universities, March 2, 2006.

87. "Youth Participatory Research Literacy, and Power for Middle School Students: Lessons from practice" Invited keynote address given to the annual meeting of the Turning Points National Winter Institute for Middle Schools, February 9, 2006

88. "Critical Pedagogy, New Media, and the future of Secondary English Teaching," Invited address delivered to the annual convention of the California Association of Teachers of English, February 2, 2006.

89. "Participatory Action Research and the Literacy Achievement of Ethnic Minority Groups," Invited Review of Research Address given to the annual meeting of the National Reading Conference, December 3, 2005

90. "Decolonizing the Literacy Classroom," Invited Lecture to be delivered to the Department of Education at the University of California at Irvine, November 10, 2005.

91. "Popular Culture, Race, and Literacy Achievement in Urban Schools." Invited Lecture delivered as part of the Race, Identity, and Achievement Series. Boston, Massachusetts, September 29, 2005.

92. "Developing Critical Literacy through Popular Culture in Non-School Settings." Invited lecture and workshop given at the Powerful Literacy conference sponsored by the Gilbert Foundation, July 6 2005.

93. "Using Popular Culture to Improve the Academic Achievement of African-American Youth." Invited address given to the Alliance of Black Educators of Massachusetts, April, 9, 2005.

94. "Teacher Development and Critical Research in Urban Schools." Invited talk for the Boston Plan for Excellence in Public Schools, April 8, 2005.

95. "Critical Literacy and Popular Culture: Pedagogies of Access and Dissent." Invited address given to the annual conference of the Michigan Reading Association, March 11, 2005.

96. "Youth as Critical Social Researchers." Invited address given to the Steans Center for Community-based Learning and the Graduate School of Education at DePaul University, February 3, 2005.

97. "Teaching Popular Culture: From Urban Literacies to Academic Achievement and Social Change." Invited address given to the Steinhardt School of Education, New York University, December 10, 2004.

98. "Critical Research and Literacy Development Among Urban Youth." Invited address to the Language, Literacy, and Culture Colloquium. University of Massachusetts at Amherst, November 10, 2004.

99. "The Grandma Rule and other Important Lessons for Postdoctoral Fellows Transitioning into Tenure-Track Positions." Presentation delivered at the annual

retreat of AERA/IES Postdoctoral Fellows and Mentors. Princeton, NJ, July 11, 2004.

100. "High School Students as Critical Researchers: Investigating the Struggle for Education on 'Equal Terms.'" Workshop given at the "Brown Plus Fifty: A Renewed Agenda for Social Change" conference at New York University from May 17 - 20, 2004.

101. "Teaching Popular Culture and the Michigan Content Standards: Considerations for Beginning English Teachers." Invited lecture given to the student affiliate of the National Council of Teachers of English. Michigan State University, April 16, 2003.

102. "Equity and Access in Literacy Development and Instruction: The Use of Critical Texts to Transform Student Achievement in the Urban Classroom." Presentation given at the annual meeting of the Michigan Council of Teachers of English (MCTE), October 18, 2002.

103. "Putting Chaucer on Trial: Using Popular Cultural Schemata to Increase Critical Reading Among Urban Youth." Paper presentation given at the Michigan Council of Teachers of English (MCTE) "Bright Ideas Conference," April 13, 2002.

104. "Martin Luther King's Border Discourse: Implications for Literacy Research and Education." Invited address for the Michigan State University College of Education's Martin Luther King Day Celebration. East Lansing, MI, January 21, 2002.

105. "Using Popular Culture to Improve Writing Instruction for Urban Students." Invited address to the California Writing Project Summer Institute. Los Angeles, July 26, 2001.

106. "Veteran Teachers as Teacher Educators in a Time of Crisis. Invited keynote address to the annual banquet of the California Subject Matter Projects." University of California, Los Angeles, June 11, 2001.

107. "Critical Multicultural Education: Using Popular Culture to Make Meaningful Connections with Diverse Learners in Urban Schools." Invited lecture to a graduate urban education course. University of California, Berkeley, July 17, 2001.

108. "Using Popular Culture in the Bilingual Classroom." Invited lecture to a graduate language acquisition course. University of California, Los Angeles, May 17, 2001.

109. "Becoming Critical Educators: Teaching for Social Justice in New Century Schools." Invited keynote to the annual banquet of the Teacher Education Program Alumni Association. University of California, Los Angeles, May 10, 2001.

110. "Being Critical, and Still Getting the Job: Strategies for the Job Search and the Job Talk." Invited lecture to a graduate student forum. University of California, Berkeley, April 30, 2001.

111. "Academic and Critical Literacy Development through Apprenticing Urban Youth as Critical Researchers." Invited lecture to an undergraduate sociology course. University of San Francisco, April 26, 2001.

112. "Strategies for "Reforming" America's Public Schools." Invited lecture to an undergraduate urban education course. University of California, Berkeley, November 17, 2000.

113. "When Urban Youth Become Sociologists: Implications for Academic Achievement and Urban Reform." Member of invited keynote panel for the annual conference of the National Coalition of Educational Activists. Los Angeles, June 3, 2000.

**TEACHING AND MENTORING**

**Graduate Courses Taught**

- Postcolonial Theory and English Education
- Advanced Qualitative Seminar in Participatory Action Research
- African-American Literature and Literary Theory
- English Education and the Media Age
- The Politics of Teaching English
- Great Thinkers and Theory in Educational Leadership and Research
- Advanced Graduate Seminar in Literacy Research and Education
- Contemporary Issues in African-African Education
- Critical Theory and Research Methodologies in Urban Education
- Sociocultural and Critical Perspectives on Literacy Theory and Research
- Social Foundations and Cultural Diversity in American Education
- Critical English Methods for Secondary Teachers
- Teaching Critical Research: A Seminar for Transformative Teachers
- Literacy Learning in Sociocultural Contexts
- Seminar in Critical English Education
- Reflection and Inquiry in Secondary English Teaching Practice
- Urban Education: Social, Cultural, Ecological, and Historical Perspectives
- African-American Cultural Perspectives on Teaching and Learning

**Undergraduate Courses Taught**

- African-American Education
- Critical Pedagogy and Cultural Studies in Urban Education
- The State of Education in California and Educational Acts of Courage
- Life in Our Schools: Disinvestment and Engagement in LA Public Schools
- Urban Youth, Political Participation, and Educational Reform
- Education on Equal Terms: A Half Century of Struggle in Greater LA
- Researching Equity and Access in California's Public Schools
- Education, Access, & Democracy in Los Angeles: LA Youth and Convention 2000
- Language, Popular Culture, and Resistance in Urban Schools
- Critical Methods for Teaching Literature to Diverse Learners
- Experiencing Race and Ethnicity in American Education
- Social and Cultural Foundations of Education
- Introduction to College Writing

**Student Dissertations (Ph.D.)(Year Defended)**

1. Belle, C. (2015). Not Your Average Brotha: Examining the Educational Lives, Literacies, and Masculinities of Black Males. (Teachers College, Columbia University)

2. Lyiscott, J. (2015). How Broken English Made Me Whole: Exploring Race, New Literacies, and Social Justice Within a Youth Participatory Action Research Framework. (Teachers College, Columbia University)

3. Lofton, R. (2014). Plessy's Tracks: Tracing the Routes, roots, and tracks. (Teachers College, Columbia University)

4. White, T. (2014). Culture, power, and pedagogy(s) in market-driven times: Embedded case studies of instructional approaches across four charter schools. (Teachers College, Columbia University)

5. Martinez, A.N. (2014). Movement of the people: Teacher development in a teacher-led inquiry group and the application of teacher-generated knowledge. (UCLA)

6. Gentry, C. (2014). Speak, memory: Oral storytelling in the high school classroom. (Teachers College, Columbia University.

7. Golden, N.A. (2013). In a position I see myself in: Young men of color (re) negotiating educational identities: (CUNY Graduate Center)

8. Ryoo, J. (2013). Pedagogy matters: Engaging diverse students as community researchers in three computer classrooms. (UCLA)

9. Alford, J. (2013). For Alma Mater: Fighting for change at historically Black colleges and universities. (Teachers College)

10. Moya, J. (2012). Apprenticeships in power and critique: How classrooms and youth organizing spaces provide Latino youth with opportunities for critical civic development (UCLA)

11. Ford, A. (2012) In the struggle for new meanings in the education of African-Americans and other students of color. (UCLA)

12. Bautista, M. (2012). Pedagogy of Agency: How Urban Youth Use Critical Research as a Tool for Agency and Empowerment (UCLA)

13. Bertrand, M. (2012). Working Toward Social Change: Youth Researchers Using Discourse to Challenge Systemic Racism in Education. (UCLA)

14. Viola, M. (2012). Toward a Filipino/a Critical (FilCrit) Pedagogy: A Study of United States Exposure Programs to the Philippines. (UCLA)

15. Lee, C. (2012). Culturally Relevant Pedagogy 2.0: Recognizing and affirming the life experiences and cultural practices of urban youth in critical computational literacy through a serious video game project. (UCLA)

16. Moreno, D. (2012). La Cultura Cura en Nuestra Escuela: A Narrative Inquiry of Ancestral Praxis and Computer Science Learning Para el Buen Vivir Comunitario en El Sereno. (UCLA)

17. Martinez, D. (2012). Expanding Linguistic Repertoires: An Ethnography of Black and Latina/o Youth Transcultural Communication In Urban English Language Arts Classrooms. (UCLA)

18. Mirra, N. (2012). Getting the News from Poems: Critical Civic Pedagogy in Urban Secondary English Classrooms. (UCLA)

19. Garcia, A. (2012). Good reception: Using mobile media and games to develop critical inner-city agents of change. (UCLA)

20. Johnson, S. (2011). Powerful pedagogies: An examination of effective culturally relevant English instruction for high-achieving African-American males in Advanced Placement classes. (UCLA)

21. Pacheco, D. (2011). Writing Out Loud: Apprenticing Youth Poets in an Urban Elementary School. (UCLA)

22. Carroll, J. (2011). Guess who's coming to class? Examining the pedagogy of a black male teacher educator. (UCLA)

23. Anya, O.C. (2011) Communities of learners in communities of speakers: How African-American Portuguese students negotiate ethno-racialized and gendered identities in second language learning. (UCLA)

24. Tunstall, J. (2011). Moving from Critical Consciousness to Critical Action: A phenomenological study of high school students' experiences in a social justice intervention program. (UCLA)

25. Jimenez, R. (2010). *Educación and Empowerment: Community Cultural Wealth and Family Histories in a Sixth Grade Class with Mexican Immigrant Students*. (UCLA)

26. Zavala, M. (2010). *An Auto/Ethnography of Teacher Led Community Organizing and Its Implications for Developing a Decolonizing Raza Research Methodology.* (UCLA)

27. D'warte, J. (2010). *Literacy in the History Classroom: A Cross Case Analysis of Teacher Implemented Participatory Action Research*. (UCLA)

28. Desai, S. (2010). *Emancipate Yourself From Mental Slavery, None But Ourselves Can Free Our Mind: Spoken Word as a Site of Resistance, Reflection, and Rediscovery*. (UCLA)

29. Kim, G. (2010). *The Popular as the Political: Critical Media Pedagogy as a Condition for Grassroots Collective Action Mobilization via YouTube Videos*.(UCLA)

30. Schoon-Tanis, K. (2010) *Wait! I Can Use That in My Classroom: Popular Culture in/and English Language Arts.* (Michigan State).

31. Carbone, P. (2009). *Investigating a Critical Writing Pedagogy: Implications for Classroom Practice.* (UCLA)

32. Martinez, R. (2009). *Spanglish as Transformative Literacy Tool: Toward an Understanding of the Role of Spanish-English Code-Switching in the Development of Critical Literacy.* (UCLA)

33. Camangian, P. (2009). *Teaching Like Our Lives Matter: Critical Pedagogy and Classroom Research.* (UCLA) [Winner AERA Division-B Outstanding Dissertation Award]

34. Pineda-Scott, C. (2009). *Maximizing College Pathways for Urban Youth: An evaluative, quasi-experimental study of a university-based partnership.* (UCLA)

35. Chang, B. (2009). *The Platform: Liberatory Teaching, Community Organizing, and Sustainability in the Inner-City Community of Los Angeles Chinatown*. (UCLA)

36. Crawford, J. (2009). *Navigating Actions and Social Justice Educators: A Study of the Instructional Practices Used By Three Teachers Working for Change in California's Public Schools.* (UCLA)

37. Katz, J. (2009). *The Presidency as Pedagogy: A Cultural Studies Analysis of Violence, Media, and the Construction of Presidential Masculinities*. (UCLA)

38. Terry, C.L. (2009). *An Exploration of the Impact of Critical Math Literacies and Alternative Schooling Spaces on the Identity Development of High-School Aged Black Males in South Los Angeles.* (UCLA)

39. Barajas, F. (2009). *Between the Border of Hope and Despair: Immigrant Students' Narratives of Schooling and Mathematics Learning.* (UCLA)

40. Bailey, B. (2009). *Reel Literacies: Digital Video Production as Literacy Practice.* (University of Rochester)

41. Petrone, R. (2008). *Shreddin' it up: Rethinking "Youth" Through the Logics of Learning and Literacy in a Skateboarding Community*. (Michigan State)

42. Pepper, K. (2007). *Creative Bytes: Literacy and Learning in the Media Arts Practices of Urban Youth.* (UCLA)

43. Francis, J. (2007). *English as Myth: Uncovering the Mythology of Secondary English Language Arts.* (Michigan State University)

44. Gallagher, D. (2006). *Negotiating English, Literature, and the New Literacies: Maintaining and Expanding Boundaries in One 9th Grade English Language Arts Classroom*. (Michigan State University)

45. Tate, S. (2006). *That Which the Soul Lives By: Critical Literacy and Critical Pedagogy in an Urban Secondary Classroom.* (Michigan State University)

46. Kirkland, D. (2006). *The Boys in the Hood: Exploring Literacy in the Lives of Urban Adolescent Black Males*. (Michigan State University)

47. Hall, T. (2005) *Media and Children: Emerging Literacies Among Urban Middle School Students.* (Michigan State University)

48. Burns, L. (2005). *Moving Targets: A Critical Discourse Analysis of Literacy, Ideology, and Standards in English Language Arts Teacher Preparation Guidelines.* (Michigan State University)

49. Reynolds, J. (2005). *Preservice Secondary Teachers' Conceptions of Teaching for Understanding, Adolescents, and Literacy Within Content Areas.* (Michigan State University)

50. Smith, J. (2004). *A tension in the mind: Meditations on ascriptive citizenship, the general welfare, and Rawlsian justice in the education of citizens.* (Michigan State University)

51. Buursma, D.(2004). *Traveling with a New View: How Four Course Features Supported Transformative Teacher Learning Journeys.* (Michigan State University)

52. Basmadjian, K. (2004): *Interpretive Discussions of Literature: Teacher Learning and Opportunities to Learn.* (Michigan State University)

53. Damico, J. (2003). *Education as Practices of Freedom: Critical Literacy in a 5th Grade Classroom.* (Michigan State University) [Winner AERA Division B Outstanding Dissertation Award]

54. Lowenstein, K. (2003). *Conceptualizing White preservice teachers as learners about diversity: A study of Undergraduates' perceptions of whole class discussions.* (Michigan State University)

**Selected Student Dissertations (Ed.D.) (Year Defended)**

1. Vega, B. (2015). Beyond Racial Incidents and Apologies: Towards a New Understanding of Campus Racial Conflict in Higher Education. (Teachers College, Columbia University).

2. Reid, H. (2015). Jamaica on a Mission: Educational Policies and Student Outcomes in a "Post-Colonial Attempt to Use School Reform to Advance National Development. (Teachers College, Columbia University).

3. Shurtleff, A. (2015). Human maps for the digital age: Classics-based core curricula and new media technology. (Teachers College, Columbia University)

4. Watson, W. (2015). Putting up a fight: Exploring a youth of color social justice praxis. (Teachers College, Columbia University)

5. Becker, C. (2014). Reflective artistry: African-American high school students' artistic identities and programs of engagement. (Teachers College, Columbia University)

6. Watson, V.V. (2014). Literacies, learning, (re) imagining identities, and envisioning civic imaginaries: Youth remixing discourses of production. (Teachers College, Columbia University)

7. Hatwood, E. (2013). Racial identity, self-esteem, and academic achievement in African-American high school students. (Teachers College, Columbia University)

8. Garcia, V. (2013). Voices from the juvenile justice system: What we learned from the life histories and literacy experiences of formerly incarcerated young Latino males. (USC)

9. Patterson, J. (2012). The road to the top: How educationally resilient black students defied the odds and earned admission to a selective university. (UCLA)

10. Mun, V. (2011). *Moving beyond basic skills in community colleges: The beliefs and practices of culturally responsive peer mentors*. (UCLA)

11. Yokota, M. (2011). Recovering from Loss: A qualitative study examining student loss while in medical school. (UCLA)

12. Cuza, H. (2011). *Racism, education, and life trajectory: A critical race study of young adults*. (UCLA)

13. Carlson, M.L. (2011) *Engaging Patients in Managing Their Health Care: Patients' Perceptions on the Impact of a Total Joint Replacement Pre-surgical Class.* (UCLA)

14. Stewart, T. (2010). *Culturally Relevant Physics Teaching: Content or Conveyance? (UCLA)*

15. Cassie, J. (2010). *The effects of a participatory action research intervention on middle school students' understanding of schools, culture, and place.* (UCLA)

16. Mosqueda, C. (2010). *The Effect of a First Year Experience Program on Transfer Readiness and the Transfer Process of Community College Students.* [Winner of the UCLA GSEIS Outstanding Dissertation Award]

17. Marcy, R. (2010). *How Teachers Experience and Think about Race in Professional Development.* (UCLA)

18. Kheel, M. (2010). *The Impact of Lesson Link on Teacher Effectiveness and Student Achievement.* (UCLA)

**EDITORIAL APPOINTMENTS**

Consulting Editor, *Review of Research in Education*
Guest Editor, Special Issue, *Learning, Media, and Technology*
Series Editor, Black Studies in Critical Thinking, Peter Lang
Advisory Board, Lumina Foundation Report on Black Males in Higher Education
Editorial Advisory Board (Inaugural), *International Journal of Critical Pedagogy*

Editorial Advisory Board, *Journal of Adolescent and Adult Literacy* (JAAL)
Editorial Advisory Board, *Research in the Teaching of English* (RTE)
Editorial Advisory Board, *American Educational Research Journal* (AERJ)
Editorial Advisory Board, *Reading Research Quarterly*
Editor, Professional Book Reviews, *Language Arts*
Editorial Advisory Board, *Yearbook of the National Reading Conference*
Advisory Board, Publications Committee, International Reading Association
Advisory Board, Pearson Learning Group
Reviewer, NCTE Publications
Advisory Board, IRA; *The Literacy Dictionary*
Reviewer, Stenhouse Publishers
Reviewer, Teachers College Press, NCRLL Language and Literacy Series
Reviewer, State University of New York Press
Reviewer, *Qualitative Studies in Education*
Reviewer, *Pedagogies: An International Journal*
Reviewer, *International Journal of Learning*
Reviewer, *Language Arts*
Reviewer, *Research in the Teaching of English*
Reviewer, *American Educational Research Journal*
Reviewer, *Teaching Education*
Reviewer, *Journal of Teacher Education*
Reviewer, *English Education*
Reviewer, *Equity and Excellence*
Reviewer, *Urban Education*
Reviewer, Prentice Hall, Secondary English Education

**PROFESSIONAL ORGANIZATIONS & ACTIVITIES**

Professional Organizations

*American Educational Research Association (AERA)*
*International Reading Association (IRA)*
*National Council of Teachers of English (NCTE)*
*Conference on English Education (CEE)*
*Conference on College Composition and Communication (CCCC)*
*Literacy Research Association (LRA)*

Professional Activities

Appointed, Ambassador's Circle, National Council of Teachers of English
Participant in Higher Learning Series @Schomburg Center for Research on Black Culture
Planning Committee, National Academy of Education Annual Postdoctoral Fellows Retreat
Appointed Member, Standing Committee on Research, NCTE
Appointed Member, Social Justice Action Committee, AERA
Invited Participant, NSF-sponsored Colloquy on Minority Males in STEM
Reader of Proposals for NSF's Gender in Science and Engineering
Section Co-chair, Division K, Area 3, AERA
Chair, Janet Emig Award selection committee, Conference of English Education
AERA, Co-chair, Division G Dissertation Award Committee
AERA, Appointed Member, Committee on Scholars of Color in Education

IRA, Member of Publications Committee
AERA, Section Chair, Division B Area 5; Curriculum and Diversity
AERA, Reviewer of Proposals Division B, Curriculum Studies,
AERA, Reviewer of Proposals Division G, Social Contexts of Education,
AERA, Reviewer of Proposals Division K, Teaching and Teacher Education,
Chair, AERA Invited Presidential Symposium on Critical Research in Education,
Discussant, AERA, Teaching and Research for Social Justice in LA and Urban Mexico: At the Intersection of Learning, Culture, "Street Socialization," Immigration and Community Change (Invited Presidential Session)
University of California, Berkeley—Teacher Education, CLAD advisory board,
Oakland High School--English Department Representative, Faculty Advisory Council,
Oakland High School--Faculty Sponsor; African American Student Union
Oakland High School--Faculty Representative to the School Site Council,
Appointed member, Standing Committee on Research, NCTE
Appointed member, Assessment Commission, NCTE
Invited panel, Adolescent Literacy: What works Best, NCTE,
Invited keynote for the 10th Annual Middle Mosaic, NCTE,
Invited panel participant on Adolescent Literacy, NCTE
Invited participant, Centennial Retrospective Documentary, NCTE
Appointed member, Standing Committee on Research, NCTE.
Co-Chair, CEE Colloquium, "Multimodal Technologies and English Education"
Member, Janet Emig Award selection committee, CEE
Co-Chair, CEE Colloquium, "Popular Culture & the English Methods Course"
Organizing Committee, CEE Leadership Summit,
Chair, James Britton Award selection committee, CEE2
Member, James Britton Award selection committee, CEE,
Nationally elected member of CEE Executive Committee,
Commission on English Methods, Teaching, and Learning
Liaison to the commission on creating and maintaining student affiliates, CEE,
Invited member of Urban Teacher Education Network (UTEN), Stuart Foundation,
California Writing Project (CWP) Invited Presenter for Summer Invitational Program,
National Coalition of Educational Activists Member of invited keynote panel
Invited educational roundtable participant with U.S. Representative Barbara Lee

**SELECTED UNIVERSITY SERVICE**
Faculty Executive Committee, Teachers College
Faculty Development Advisory Committee, Teachers College
Co-Chair, Race, Culture, and Diversity Subcommittee, Teachers College
International and Transcultural Studies Search Committee, Teachers College
Selection committee, TC Minority Postdoctoral Fellowship, Teachers College
Selection Committee, TC 2015 Medal for Distinguished Service, Teachers College
Selection Committee, TC 2014 Medal for Distinguished Service, Teachers College
Ad Hoc committee member, Regina Cortina Promotion to Full Professor
Arts and Humanities Representative to the Faculty Executive Committee, Teachers College
Educating Teacher Educators Professor Search Committee, Teachers College
Affirmative Action Committee, Teachers College
Standing Committee on Appointment to Tenure, Teachers College

Klingenstein Center School Design Project Reviewer, Teachers College
Teachers College Centers & Institutes Directors Council, Teachers College
Assistant Professor in Health Education, Search Committee, Teachers College
Office of School and Community Partnerships Advisory Board, Teachers College
Director, Educational Studies Minor, Department of Education, UCLA
Search committee, Ralph Bunche Center for African-American Studies, UCLA
Search committee, MacArthur Chair of Media Studies, UCLA
Selection committee, Roxanne Chisholm Endowed Scholarship, UCLA
Appointed member, Educational Executive Committee, Department of Education, UCLA
Member, Committee on Degrees & Academic Standards (CDAS), UCLA
Co-author, UCLA Department of Education; Eight-year review, UCLA
Member, Ad hoc committee for promotion to full professor, Marjorie Orellana, UCLA
Division Head, Urban Schooling, Department of Education, UCLA
Faculty Mentor, Stone Scholars Program, UCLA
Chair, Faculty Advisory Committee, Center for African-American Studies, UCLA
Member, Faculty Advisory Committee, Latin American Institute, UCLA
Member, Search committee for Teacher Education, Department of Education, UCLA
Elected member, Academic Personnel Committee, Department of Education, UCLA
Chair, Commencement Speaker Selection Committee, UCLA
Faculty Mentor, McNair Research Scholars Program, UCLA
Reviewer of Applicants, McNair Research Scholars Program, UCLA
Reviewer of Proposals, Institute for American Cultures Research Grants, UCLA
Fellowship Review Board, Ralph J. Bunche Center for African-American Studies, UCLA
Appointed member, University Writing Task Force, Michigan State
Associate Member, Literacy Team; Teachers for a New Era Grant, Michigan State
Chair, Teacher Education Ph.D. Admission, Planning, and Policy Committee, Michigan State
Elected Member, Ph.D. Admission, Planning and Policy Committee, Michigan State
Faculty Leader, Secondary English Team, Michigan State
Member, Department of Teacher Education Curriculum Committee, Michigan State
Member, Search Committee, Science Education, Michigan State
Member, Search Committee, Literacy Education, Michigan State
Member, Search Committee, Assistant Director of the Writing Center, Michigan State
Member, MSU-Lansing School District Partnership Committee, Michigan State
Member, Post BA- Urban Education Emphasis Design Team, Michigan State
Member, College Urban Study Project (CUSP), Michigan State
Member, Literacy Specialization Ph.D. Committee, Michigan State
Faculty Mentor, Spencer Research Training Program, Michigan State
Faculty Mentor, Beaumont Tower Scholars Program, Michigan State

**PROFESSIONAL MEMBERSHIPS**

American Educational Research Association (AERA)
American Association of Colleges for Teacher Education (AACTE)
National Council of Teachers of English (NCTE)
Conference on English Education (CEE)
Conference on English Leadership (CEL)
Caribbean Studies Association (CSA)

# EXHIBIT 13

DECLARATION OF DAVID BRYDEN

I, DAVID BRYDEN, declare as follows:

1. I am an attorney, licensed to practice law in California since 1992. I have handled approximately 480 criminal cases for the defense, including approximately 75 jury trials, many of them involving murder charges. I was appointed to represent Donel Poston in Alameda County No. 172522B.

2. Mr. Poston was charged, along with codefendant Joe McNeely, with the second-degree murder of Lionel Fluker, a bystander. Mr. Poston and Mr. McNeely were also charged with the attempted murder of each other. Mr. Poston always maintained that he shot Mr. McNeely in self-defense after McNeely assaulted him without provocation. It was undisputed that Mr. McNeely shot Lionel Fluker by accident while shooting at Mr. Poston, who was running away.

3. When I saw the surveillance video of the charged shooting, I thought the case may have been resolved favorably, most likely before trial, because it appeared to be a case of self-defense. I made a motion to dismiss the murder and attempted murder charges against Mr. Poston pursuant to Penal Code section 995 but the motion was denied.

4. I believe I lost this case in the pretrial motions. First, this was the strongest case for severance I have ever seen. I might have had a chance at a favorable verdict if I had not had Mr. McNeely's attorney fighting me and attacking Mr. Poston every step of the way. I felt like I had two prosecutors working against me - in jury selection, pretrial motions and during trial. The prosecutor just sat back and let the two defense lawyers fight it out.

5. A second, and serious factor contributing to my loss that the trial court denied my pretrial motion to exclude all of Mr. Poston's inflammatory statements in jail phone calls and rap lyrics about "pimps," "bitches," and "hos." I objected strenuously to the admission of this irrelevant and inflammatory evidence which portrayed Mr. Poston as a bad character who mistreated women. Once I lost that battle, it seemed there was little I could do to counter the prosecutor's oft-repeated theme that the shooting in this case was a "gun battle" between two armed criminals. The denial of severance and admission of extensive, inflammatory bad character evidence resulted in an unfair trial.

6. I still believed at the end of the trial that the evidence was insufficient because Mr. Poston was reasonably defending himself

against Mr. McNeely's assault. I moved for dismissal pursuant to section 1118.1 but that motion was also denied.

7. Although I knew the bad character evidence was devastating to the defense I was still surprised when the jury convicted Mr. Poston of murder and attempted murder. I moved for new trial on the grounds of insufficiency of the evidence and erroneous denial of severance.

8. When the new trial motion was denied I just hoped the Court of Appeal would correct this injustice. When I was contacted by Mr. Poston's appellate attorney, Randi Covin, I told her I would gladly help her however I could. I sent her my files at her request and answered her questions.

9. Ms. Covin asked me if I considered objecting to the prosecutor's arguments and questions on cross-examination of Mr. Poston which portrayed him as a bad character who engaged in a gun battle - mutual combat. I did consider objecting. I agree with Ms. Covin that many of the prosecutor's questions and statements were misleading and unfair. This was not a case of mutual combat. Mr. Poston was attacked and responded in self-defense. Regardless of how he talked about women, he had a right to defend himself against Mr. McNeely's unprovoked assault. The admission of the evidence

and the prosecutor's repeated emphasis of it denied Mr. Poston a fair trial in my opinion.

10. Nevertheless I did not object because I thought it was futile. The trial court had admitted all the prejudicial "bitch" and "ho" evidence over my objection. I did not think it was misconduct for the prosecutor to emphasize evidence admitted by the trial court, no matter how devastating to the defense. And I was certain any objections would be overruled, likely making things appear even worse to the jurors.

11. Ms. Covin asked me if I considered objecting to the jury instruction on mutual combat in accord with CALCRIM No. 3471. I did consider objecting and I reviewed the instruction but I did not see any basis for an objection. Mutual combat was the prosecution's entire theory of the case. My section 995 and 1118.1 motions were denied. I recall taking a look at all of the relevant jury instructions both before and during trial. I proposed two special jury instructions pertaining to self-defense and provocative act murder which the trial court refused. I did not see anything else objectionable in CALCRIM No. 3471.

12. Ms. Covin asked me if I am familiar with *People v. Ross* (2007) 155 Cal.App.4th 1033, 1045, in which the Sixth District Court

of Appeal defined mutual combat as a "reciprocal exchange of blows . . . *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities."* (Court's emphasis.) The Court of Appeal clarified in *Ross* that "preceding the initiation of hostilities" means preceding "the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target." (*Id.* at p. 1045, fn. 14.) CALCRIM No. 3471 as given in this case defines "mutual combat" as a fight which "began or continued by mutual consent or agreement . . . before the claim to self-defense arose" - a less specific and less favorable standard to Mr. Poston on the facts of this case.

13. I read *Ross* when Ms. Covin inquired about it. I do not believe I read it before or during Mr. Poston's trial - I do not recall seeing this additional language requiring agreement or intent to fight *before the first assaultive conduct*. In asking for my recollections regarding the mutual combat instruction, Ms. Covin provided me with the print-out of CALCRIM No. 3471 which she found in my file. It does cite *Ross* for the definition of "mutual combat" but does not quote the "first assaultive conduct" language. I vaguely remember seeing that citation but I do not recall actually reading *Ross* and I probably did not read it.

14. If I had seen the language in *Ross* regarding "the first assaultive conduct," I would have objected to CALCRIM No. 3471 and/or I would have requested modification. Modification pursuant to *Ross* would have strongly supported Mr. Poston's defense and it would have cut off the prosecutor's argument that it was mutual combat because Mr. Poston fired the first shot even though Mr. McNeely committed the first assault. Mr. Poston did not have a duty to retreat and he was entitled to defend himself but CALCRIM No. 3471 supported the prosecutor's argument to the contrary.

15. Ms. Covin asked me if I considered presenting expert testimony to counter the prosecutor's arguments and insinuations about Mr. Poston's use of African American Vernacular English ("AAVE") in jail phone calls, letters, and rap lyrics. It never occurred to me that I could or should present such an expert.

16. I have represented numerous African-American defendants and I am somewhat familiar with AAVE. I am also aware that many African American people can speak standard English as well as AAVE. I did believe that the prosecutor's interpretation of some of Mr. Poston's statements in AAVE was incorrect and I tried to present a different, innocent interpretation in my redirect examination of Mr. Poston and my closing argument. It simply did not occur to me

that I needed an expert or that there was an expert who could provide any admissible, favorable testimony.

17. Nor did it occur to me that I could or should present expert testimony on African-American culture with regard to the police and the court system. I am aware that criminal defense lawyers have occasionally presented a cultural defense explaining the defendant's perspective as a member of a minority group. I am aware that many African American people in Oakland and elsewhere distrust the police and the court system.

18. It never occurred to me that Mr. Poston's possession of a loaded firearm and flight after the shooting could not properly be argued by the prosecutor as consciousness of guilt. I have seen this argument made by numerous prosecutors as to defendants of various races. It never occurred to me that I could or should object, present evidence to counter the argument, or argue that, among African American people, firearm possession and flight do not show consciousness of guilt because of distrust of the police and court system. It appeared to me that Poston was fleeing because he was being shot at.

19. I thought I had done all I could to defend Mr. Poston in the face of critical, adverse rulings from the trial court. I certainly

tried to give him a vigorous defense. I always represent my clients to the best of my ability.

19. I would have done anything I legally and ethically could to persuade the trial court and/or the jurors that this was a case of complete self-defense and not mutual combat. Unfortunately, I did not think of presenting expert rebuttal testimony or challenging the mutual combat instruction. I did think about objecting to the prosecutor's unfair questions and comments but I decided that objection was futile and would only make things worse given the trial court's adverse rulings.

20. I have reviewed the two expert declarations Ms. Covin has obtained. It is possible that the trial court would have admitted at least some of the proposed testimony described by Dr. Rickford and Dr. Morrell - two apparently well-qualified experts in their fields. It is possible that the proposed expert testimony would have swayed at least one juror at least to the point of harboring a reasonable doubt as to Mr. Poston's guilt. It is possible that some or all of the jurors, almost all of whom were white or Asian and from the suburbs, would have benefitted from the proposed expert testimony, refuting the incorrect assumptions about African-American people and AAVE put forth by the prosecution.

21. I have always believed that Mr. Poston's convictions and sentence are unjust and I would not want any mistake of mine to keep him in prison a day longer than necessary. Thus, I will gladly testify regarding any of these issues if called.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 31st day of May, 2016, at Oakland, California.

David Bryden

# EXHIBIT 14

## 3471. Right to Self-Defense: Mutual Combat or Initial Aggressor

A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if:

1. (He/She) actually and in good faith tries to stop fighting;

[AND]

2. (He/She) indicates, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wants to stop fighting and that (he/she) has stopped fighting(;/.)

*<Give element 3 in cases of mutual combat.>*

[AND

3. (He/She) gives (his/her) opponent a chance to stop fighting.]

If a person meets these requirements, (he/she) then has a right to self-defense if the opponent continues to fight.

[A fight is ***mutual combat*** when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self defense arose.]

[If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting.]

*New January 2006; Revised April 2008, December 2008*

### BENCH NOTES

*Instructional Duty*

The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense. The court has a **sua sponte** duty to instruct on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case.

When the court concludes that the defense is supported by substantial



Copyright 2010 Judicial Council of California. Published by LexisNexis Matthew Bender, official publisher of the Judicial Council Jury Instructions.

evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes instruction on this alternate theory. (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 389–390 [88 Cal.Rptr.2d 111]; *People v. Breverman* (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Substantial evidence means evidence of a defense, which, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40].)

Give bracketed element 3 if the person claiming self-defense was engaged in mutual combat.

If the defendant started the fight using non-deadly force and the opponent suddenly escalates to deadly force, the defendant may defend himself or herself using deadly force. (See *People v. Quach* (2004) 116 Cal.App.4th 294, 301–302 [10 Cal.Rptr.3d 196]; *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75 [63 Cal.Rptr. 749]; *People v. Hecker* (1895) 109 Cal. 451, 464 [42 P. 307].) In such cases, give the bracketed sentence that begins with "If you decide that."

If the defendant was the initial aggressor and is charged with homicide, always give CALCRIM No. 505, *Justifiable Homicide: Self-Defense or Defense of Another*, in conjunction with this instruction.

## AUTHORITY

- Instructional Requirements. See Pen. Code, § 197, subd. 3; *People v. Button* (1895) 106 Cal. 628, 633 [39 P. 1073]; *People v. Crandell* (1988) 46 Cal.3d 833, 871–872 [251 Cal.Rptr. 227, 760 P.2d 423]; *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75 [63 Cal.Rptr. 749].
- Escalation to Deadly Force. *People v. Quach* (2004) 116 Cal.App.4th 294, 301–302 [10 Cal.Rptr.3d 196]; *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75 [63 Cal.Rptr. 749]; *People v. Hecker* (1895) 109 Cal. 451, 464 [42 P. 307]; *People v. Anderson* (1922) 57 Cal.App. 721, 727 [208 P. 204].
- Definition of Mutual Combat. *People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 [66 Cal.Rptr.3d 438].

### *Secondary Sources*

1 Witkin & Epstein, Caifornia. Criminal Law (3d ed. 2000) Defenses, § 75.

3 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 73, *Defenses and Justifications*, § 73.11[2][a] (Matthew Bender).



Copyright 2010 Judicial Council of California. Published by LexisNexis Matthew Bender, official publisher of the Judicial Council Jury Instructions.

# EXHIBIT 15

# DECLARATION OF RANDI COVIN

I, RANDI COVIN, declare as follows:

1. I am an attorney licensed to practice in the courts of the State of California. This Court appointed me to represent Donel Poston on appeal on May 12, 2014. I filed Mr. Poston's AOB on August 7, 2015, and his ARB, on March 28, 2016. I requested oral argument on his behalf on April 13, 2016.

2. In the course of reviewing the record of Mr. Poston's trial, I was struck by the unusually compelling strength of his defense - that he shot co-appellant Joe McNeely in self-defense. The surveillance videos seem to be dispositive, showing that Mr. McNeely started a quarrel with Mr. Poston, escalated it, slapped or punched Mr. Poston to the ground, then pulled out a gun while Mr. Poston was getting up. Mr. McNeely had what appeared to be a gun in his hand before Mr. Poston fired a shot. Mr. Poston shot Mr. McNeely multiple times, "rapid fire," then ran and dropped the gun when Mr. McNeely went down. But Mr. McNeely got back up and chased Mr. Poston, firing at his back as he ran away. It was undisputed that Mr. McNeely accidentally shot and killed an innocent bystander, Lionel Fluker, while chasing the unarmed, fleeing Poston.

3. By the time I finished reviewing Mr. Poston's trial record, it was apparent to me that the prosecutor persuaded the jury to convict Mr. Poston, despite seemingly irrefutable evidence that he acted in self-defense, by attacking his character, twisting his words, appealing to racial bias and fear of random street violence, and misleading the jurors. The prosecutor argued and insinuated unfairly that Mr. Poston's alternating use of African-American Vernacular English ("AAVE") in jail phone calls and Standard American English ("SAE") in court showed his bad character, guilt, and dishonesty. She argued that his tone was "aggressive," and she insinuated during cross-examination of Mr. Poston that some of his statements in AAVE meant the exact opposite of their plain meaning. The prosecutor also argued that Mr. Poston's act of arming himself, his flight and his failure to call or wait for the police showed malice aforethought, contrary to his claim of self-defense.

4. In reviewing the record, it seemed to me that the prosecutor's arguments and insinuations pertaining to Mr. Poston's statements in AAVE were unfair appeals to racial bias and improper attempts to mislead the jurors. The prosecutor's arguments pertaining to Mr. Poston's flight and the "true picture" of self-defense as a

shooter who waits for the police with the "smoking gun" in hand also seemed unfair and misleading.

5. It has been my perception, based on more than 20 years representing indigent criminal defendants on appeal and post-conviction collateral review, that African-American people in east Oakland and many other places distrust the police and the criminal justice system to such an extent that an African American person who shot someone in reasonable self-defense might well flee the scene and try to avoid detection, even if completely innocent. But the prosecutor's argument might have rung true to the mostly white, Asian, and other suburban jurors, who might have been unfamiliar with urban, African-American culture. Both Mr. Bryden and Mr. Poston told me the jurors in this case were mostly white and Asian and from the suburbs. There was only one African-American juror and maybe one Latino.

6. The juror questionnaires, which asked for "[r]acial or ethnic group" as well as "[c]ity and general area of residence," bore out the reports of Mr. Bryden and Mr. Poston regarding the jury's ethnic and geographic make-up. (2 Supp. CT 1 [Juror No. 1: "Asian"; San Leandro], 21 [Juror No. 2: "White"; Oakland - Grand

Lake neighborhood], 41 [Juror No. 3: "Hispanish"; Pleasanton], 61 [Juror No. 4: "Asian"; Castro Valley], 81 [Juror No. 5: "Caucasian"; Fremont, 101 [Juror No. 6: "Italian"; Bay Area]. 121 [Juror No. 7: "Asian"; Livermore], 141 [Juror No. 8: "Asian"; Alameda], 161 [Juror No. 9: "Hindu"; Fremont], 181 [Juror No. 10: "Caucasian"; Pleasanton], 201 [Juror No. 11: "Caucasian"; Dublin], 221 [Juror No. 12: "Black"; Castro Valley], 241 [Alt. Juror No. 1: "White"; Dublin], 261 [Alt. Juror No. 2: "White"; San Leandro], 281 [Alt. Juror No. 3: "Asian"; Alameda].) True and correct copies of the first pages of all the selected jurors' questionnaires are attached hereto collectively as Exhibit 21 for the Court's convenience.

7. It was not difficult to find experts who supported my hypotheses in the abstract. Stanford Professor John Rickford is a nationally known linguist and expert on AAVE. He has published numerous articles and books on the subject, including one cited in Mr. Poston's AOB. (AOB 121-124; see also John R. Rickford, African American Vernacular English, Blackwell Publishers (1999); Exhs. 9, 10.) Columbia Teachers College Professor of Education, Ernest Morrell, is an expert on urban African-American culture and Oakland culture in particular. (See Exhs. 11, 12.)

7. I called Mr. Poston's trial attorney, David Bryden on August 25, 2015. Mr. Bryden told me that he was shocked at the verdict in this case and still feels terrible about it. All along, he felt confident it was a clear-cut case of self-defense. He told me he does not understand how the jury could have convicted Mr. Poston of murder and attempted murder.

8. Mr. Bryden told me it never occurred to him, before, during, or after trial, that he needed experts on AAVE and African-American culture. It did occur to him to object to the prosecutor's cross-examination of Mr. Poston and closing argument but he felt it would be futile and would only make things worse in front of the jury.

9. Mr. Bryden also considered objecting to CALCRIM No. 3471 on mutual combat but could not see any grounds for objection. I reviewed Mr. Bryden's files and found a print-out of CALCRIM No. 3471. A true and correct copy of the CALCRIM No. 3471 print-out which I found in Mr. Bryden's files is attached hereto as Exhibit 14.

9. Mr. Bryden told me he must have done something wrong to lose a slam dunk self-defense case like this one - he does not know what went wrong. He said he would gladly sign a supportive

declaration and testify if needed. He did sign a supportive declaration, as promised. (See Exh. 13.)

10. I had hoped to file this petition sooner but there have been many delays in the investigation and the preparation of the petition and supporting documents. I found Dr. Rickford right away but it took some effort to find a suitable expert on African-American culture who was willing to testify. I spoke with four or five such experts - college professors with appropriate training and expertise - who supported my hypotheses. But none of them had any experience in the legal arena and none were willing to work on a court case. Each one gave me additional references and ultimately I found Dr. Morrell, who teaches in New York but grew up in Oakland and was willing to accept the assignment.

11. When I first spoke with Dr. Rickford it was spring 2015. He was eager to get to work on the case during summer break, when he had no teaching responsibilities. Unfortunately I was not able to find Dr. Morrell and seek and obtain funding until the fall, when school was in session for both professors. I provided all the materials and instructions immediately and both professors promised to work on

the case as soon as possible - over the holiday break in December 2015 and January 2016.

12. Dr. Morrell's work was further delayed because my time estimate for his work in this case was based on borrowing the background and general statements from his declaration in another case with a similar issue. The U.S. District Court for the Northern District of California had approved 8 hours for Dr. Morrell to talk to my other client and work with me on a declaration. By having Dr. Morrell complete work on the other case first, I was able to obtain his excellent declaration for this case in only 4 hours.

13. The federal case was further along than this one and I did not expect significant delays. Unfortunately, there were difficulties and delays in arranging Dr. Morrell's interview of my other client as well as Mr. Poston. Thus, I could not complete my consultation with Dr. Morrell and draft his declaration until April 2016.

14. I did not want to talk to Mr. Bryden about specific issues until I had the expert declarations finalized, so I was not able to obtain Mr. Bryden's declaration until May 2016 - it took some time to communicate further with him and negotiate the language of the declaration.

15. I had hoped to file Mr. Poston's petition shortly thereafter - in early June 2016. I intended to raise claims of ineffective assistance for failing to object to prosecutorial misconduct and to the mutual combat instruction, and failure to investigate and present expert testimony on AAVE and African-American culture. But in the course of talking to Mr. Poston on the telephone about the claims, it became obvious I needed to visit him and investigate additional possible claims.

16. Among the possible issues we discussed was Mr. Bryden's apparent failure to adequately prepare Mr. Poston for his testimony. Mr. Poston told me he never saw the transcription of the jail phone calls until the beginning of cross-examination when the prosecutor handed it to him. He never heard the recordings and Mr. Bryden never discussed the calls with him. I sent Mr. Poston a copy of the transcription, I asked him to review the transcription and the rap lyrics quoted by the prosecutor and think about what questions he could have answered better if he had been prepared.

17. I brought up an example of Mr. Poston's failure to adequately explain one of his rap lyrics, which the prosecutor used to attack his credibility. I asked Mr. Poston what he meant by "it's all

self-defense under the proper pretense" - specifically, whether he understood that "pretense" means a false claim. Mr. Poston told me "pretense" does not necessarily mean false. He said he looked it up in his dictionary, which he uses to help with his writing, along with a thesaurus. I asked Mr. Poston to copy that page of the dictionary and bring it to our meeting.

18. I immediately requested and received permission from FDAP to visit Mr. Poston at High Desert State Prison. I immediately began communicating with prison authorities to arrange the visit. Unfortunately, I had several deadlines, another prison visit, and an oral argument already scheduled in June 2016. The soonest I could visit Mr. Poston, almost six hours away from my home and office, was on June 30, 2016.

19. In our last phone call before my visit, I told Mr. Poston I was coming and that I wanted to discuss any and all complaints he had about his trial - everything he thought had gone wrong. I asked him to bring any notes or lists with him to our meeting. I told Mr. Poston I was particularly concerned that Mr. Bryden did not seem to have adequately prepared him for his testimony.

20. I spent 3 hours talking with Mr. Poston at High Desert on June 30, 2016, leading to two additional claims and supporting evidence. Mr. Poston came to our meeting with a big folder full of legal papers, including the appellate briefs, my letters, and his notes and materials from trial. The relevant information he gave me is summarized in his declaration, Exhibit 1. Among his papers was a copy of his dictionary's definition of "pretense." A true and correct copy of the dictionary page Mr. Poston gave me is attached hereto as Exhibit 4.

21. Mr. Poston also showed me an early draft of the same rap lyric showing that he had started with "[i]t's all self-defense under the correct pretext." He had crossed out "correct" and written in "proper." A true and correct copy of the rap lyrics Mr. Poston gave me is attached hereto as Exhibit 5.

22. Mr. Poston told me about his legal research at the Santa Rita jail. He looked through his folder and pulled out several packets of legal research, including one on self-defense. A true and correct copy of the self-defense packet Mr. Poston gave me, with his notes, is attached hereto as Exhibit 3.

22. Another issue Mr. Poston and I discussed was the radiator of Tamena Bailey's car. Mr. Poston had testified that he thought Mr. McNeely shot a hole in the radiator and Mr. McNeely's attorney had made it seem like he was lying, pointing out there was no corroboration. (18 RT 1547, 1562; 19 RT 1739-1740; 20 RT 1907, 1918.) Mr. Poston told me to ask his mother about the radiator - that she had paid $300 or $400 to have it fixed. He said he had tried to tell Mr. Bryden about the radiator but Mr. Bryden did not seem interested.

23. When I returned to my office, I prepared a declaration for Mr. Poston to sign based on our discussions. I talked to Mr. Bryden again, as well as to Mr. Poston's mother and brother. I finalized and mailed a draft declaration to Mr. Poston on July 7, 2016.

24. In a phone call on July 8, 2016, I asked Mr. Bryden about his preparation of Mr. Poston to testify. Mr. Bryden told me he did not recall how much time he spent or how many times he visited Mr. Poston at the jail - probably a couple of times. He told me he never had the jail phone calls transcribed and never saw a transcription before trial so Mr. Poston is correct that he, Bryden, did not give the transcription to Mr. Poston. Nor did he listen to the recordings with Mr. Poston.

25. Mr. Bryden told me he talked to Mr. Poston generally about the jail phone calls when he made the motion to suppress. He probably gave Mr. Poston a copy of the motion. He does not recall ever talking to Mr. Poston about the jail phone calls in preparation for his testimony or in any detail. He does not recall talking to Mr. Poston about pimping and prostitution.

26. Mr. Bryden told me he did not spend a lot of time preparing Mr. Poston for his testimony because he did not seem to need it. Mr. Poston seemed sophisticated and well-spoken. Ms. Bailey was the one who really needed a lot of help preparing.

27. Mr. Bryden offered to provide me with billing records for the case to show how much time he spent meeting with Mr. Poston on specific dates. I got sidetracked in our phone conversation but I e-mailed him the same day asking for the billing records. A few days later I e-mailed Mr. Bryden again when I had not received a response. He e-mailed me back saying he was not able to get the billing records. He said the billing was done electronically on the superior court's website and no breakdown of hours was available.

28. I spoke with Mr. Poston's mother and brother about Bailey's radiator and got their declarations, Exhibits 6 and 7. On July

12, 2016, I met Mr. Poston's brother, Robert Samuels, at the intersection of International Boulevard and 76th Avenue in Oakland - the auto repair shop where Mr. Samuels told me he sent Ms. Bailey to get her radiator repaired.

29. A mechanic at the shop identified himself to me as Angel Garcia. Mr. Garcia told me Mr. Samuels had been a customer of his for years. Several years ago a woman brought in a blue or green Lexus and told Mr. Garcia that Robert sent her. Mr. Garcia said he replaced the radiator.

30. I asked Mr. Garcia if he remembered what was wrong with the radiator and he said no. I asked him if he remembered a bullet hole and he said no. I asked if he remembered how much it cost and he said no. But he reaffirmed that he remembered the car and that it was the radiator that he replaced.

31. I asked Mr. Garcia if he was a friend of Mr. Samuels. Both Mr. Garcia and Mr. Samuels said no - that Mr. Garcia is Mr. Samuels' mechanic and that is how they know each other. Mr. Garcia said he does not know Mr. Samuels' brother or other family members and only sees him once in a while when his car needs repairs.

32. Mr. Garcia told me he would sign a declaration and we agreed that Mr. Samuels would bring it to him. I mailed copies of Mr. Samuels' declaration and Mr. Garcia's declaration to Mr. Samuels with two self-addressed stamped envelopes, per Mr. Samuels' request. A few days later, Mr. Samuels texted and e-mailed me to let me know he had gotten Mr. Garcia's signature and had mailed both signed declarations to me. I received them a couple of days later.

33. I asked Mr. Samuels if he thought Ms. Bailey would talk to me (or him) and hopefully sign a declaration about the radiator. I had already tried to reach Ms. Bailey by telephone but she did not seem willing to talk to me. Mr. Samuels said he did not know. He said that was in the past, she had moved on, and she might not want anything to do with it. Mr. Samuels seemed reluctant to contact Ms. Bailey for me.

34. I tried to call Ms. Bailey again myself. I called three or four times altogether. Each time Ms. Bailey answered the phone but then, when I identified myself, she quickly hung up, saying she was busy, and that she would call me back. Ms. Bailey did not call me back.

35. Next, I asked Mr. Poston's mother, Leatta Poston, if she would be willing to contact Ms. Bailey and ask her if she would talk to me and/or sign a declaration about the radiator. After talking to Ms. Bailey, Ms. Poston told me to send her a declaration - that Ms. Bailey said she would sign it. I drafted a declaration for Ms. Bailey based on my conversations with everyone else. I asked Ms. Poston to talk to Ms. Bailey and let me know if any corrections were needed. On August 3, 2016, Ms. Poston sent me an e-mail note stating that Ms. Bailey would not sign a declaration.

36. In the third and fourth weeks of July, while I was waiting for Mr. Poston to return his signed declaration, he tried to call me collect numerous times. Unfortunately I was out of my office every time he called, after business hours at least some of the time. This is a problem with many of my incarcerated clients, who have jobs in prison and can only call after business hours. Finally, I contacted the Litigation Office at High Desert on July 29, 2016, asking if they could help facilitate a phone call. I said the call did not need to be confidential and that I could be available any time in the next week at their convenience. he first time the call could be arranged was Thursday morning August 4, 2016.

37. When I spoke with Mr. Poston on August 4, 2016, he told me he had received the declaration, signed it, and mailed it back to me more than a week before. I received the signed declaration in the mail that same day, August 4, 2016.

38. In June 2016, I heard news reports that Oakland Police Lieutenant Tony Jones was placed on leave after Sergeant Mike Gantt filed a complaint stating that Jones sent him racist text messages. (Exhs. 16, 17.) According to news reports, the Oakland Police Department's Internal Affairs Unit is investigating allegations that Lieutenant Jones, who is African-American, sent racist text messages to Sergeant Gantt, who is also African-American, as well as several other officers. The text messages reportedly used "racially charged" language and joked about Klansmen, suggesting a bias against African-American people.

39. Both Lieutenant Jones and Sergeant Gantt testified at Poston's trial. Officer Gantt has also been under investigation for having his girlfriend prepare his police reports. On June 24, 2016, I received a letter by e-mail from Mr. Bryden's office, which Mr. Bryden had received from Alameda County District Attorney Nancy O'Malley, disclosing information about the investigation of Sergeant

Gantt. (Exh. 18.) On July 5, 2016, I wrote to Ms. O'Malley, requesting similar disclosure regarding Lieutenant Jones. (Exh. 19.) I have not received any response from Ms. O'Malley.

40. In searching online for information about Lieutenant Jones and the racist text messages, I discovered a Police Beat webpage indicating that the Oakland Police Department has settled two lawsuits involving Lieutenant Jones, most recently in 2005. (Exh. 20.) I searched Mr. Bryden's files and did not find any discovery or other information pertaining to Lieutenant Jones, racist text messages, or settled lawsuits. On August 5, 2016, I sent an e-mail to Mr. Bryden, asking if he had ever received any disclosure of impeachment evidence pertaining to Lieutenant Jones - specifically the racist text messages and settled lawsuits. Mr. Bryden responded that he had not received any such disclosure to the best of his recollection.

41. I have investigated and prepared the instant habeas petition as promptly as I could under the circumstances. There were many delays outside my control, as described above. In addition I was responsible for many other appeals and habeas corpus cases in the last year. I also had various family obligations and health problems, including chronic, severe repetitive stress problems in my hands and

neck from years of overuse at the computer. I filed Mr. Poston's habeas petition as quickly as I could. Mr. Poston was at all times helpful, cooperative, and eager for me to complete my investigation and file this petition. He relied entirely on me to get it timely filed.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed this 10th day of August, 2016, at Willits, California.

/s/ Randi Covin

# EXHIBIT 16

Today's Top Stories WATCH NOW

67°

breakfast
LIKE NO OTHER™

OPD

# ONLY ON ABC7NEWS.COM: SOURCE SAYS OAKLAND HOMICIDE DETECTIVE IS BEING RETALIATED AGAINST

Share G+1 Tweet

EMBED </> MORE NEWS VIDEOS

It's been reported that OPD Sgt. Mike Gantt had a woman he knew type up his police reports. A source with knowledge of the investigation says Gantt is being retaliated against for filing a complaint with OPD in 2014 after he received racist texts. (KGO-TV)

by Melanie Woodrow

Wednesday, June 22, 2016

OAKLAND, Calif. (KGO) -- ABC7 News has new information and insights into the turmoil at the Oakland Police Department.

A rapid change of leadership, four people in nine days, complicates the investigations into scandals which involve sex with an underage girl, racist texts, and the mishandling of reports.

**RELATED:** I-Team: More fallout expected in cases handled by Oakland detective

It's been reported that OPD Sgt. Mike Gantt had a woman he knew type up his police reports. A source with knowledge of the investigation says Sgt. Gantt believes he's being retaliated against for filing a complaint with OPD in 2014 after he received racist texts.

The scandal spilled over to Alameda County Court Wednesday. Defense attorney Annie Beles wants to know if Sgt. Mike Gantt, the primary detective in a 2013 homicide, did something to taint the case.

"What is concerning to me is the secrecy of it. I have received no information regarding allegations against Sgt. Gantt except for through the press," Beles said.

**RELATED:** Two men arrested for murder of pet sitter in East Oakland

Those allegations are that Sgt. Gantt had a woman he knew type up three witness statements.

Beles is representing Mario Floyd, one of the men accused of killing popular Oakland dog walker Judy Salamon.

67°

A source with knowledge of the investigation tells ABC7 News Gantt had a friend type up the statements because he was under time pressure. But that's not the reason the source says Gantt is on administrative leave. The source says it's because Gantt had an argument with his wife.

The same source says Gantt believes OPD is retaliating against him for filing an Internal Affairs complaint in 2014 after receiving racist texts from Lt. Tony Jones.

According to the source, Gantt named Lt. Jones in the complaint, as well as Lt. John Lois, who is now deputy chief, along with several other homicide investigators.

The source says Sgt. Gantt also filed a similar federal EEOC complaint in 2016.

According to an emailed statement from an Oakland Police Department spokesperson, "the Oakland Police Department does not discuss or provide details regarding personnel matters and active Internal Affairs investigations."

Motions defense attorney Beles made in court Wednesday regarding Gantt will be heard in July.

**Related Topics:**

news | police | homicide | homicide investigation | OPD | court | court case | Oakland

Share G+1 Tweet

(Copyright ©2016 KGO-TV. All Rights Reserved.)


## YOU MIGHT ALSO LIKE



Home Cleaning: Why The EU May Have It Right
Seventh Generation on Upworthy



Homeowners Born Before 1985 Are Getting a Huge…
FetchRate



Lower Back Pain Treatment Options
Yahoo Search







How to Shop C
for…
BuzzFeed





67°

restaurant

“Shark Tank” Star’s Brilliant Advice For Paying Off Your Mortgage (OneSmartPenny.com)

Downsizing? Ditch These 12 Items (AARP)

Easy Ways to Lower Your Blood Sugar Naturally (Yahoo Search)

Rheumatoid Arthritis Symptoms & Treatments (Yahoo Search)

Fats from These Fruits and Nuts Can Make the Brain Healthier (Staying Sharp - AARP)

Man advertises home for sale to 'whites only' in Oregon

Thousands of bees swarm truck in San Francisco

4 hospitalized after hit-and-run accident in San Jose

Maurice Smith's mom says Nick Saban blocking transfer to Georgia

Source: Alameda Co. Sheriff's deputy in beating, bribery case fired

Recommended by

LOAD COMMENTS


Sponsored From Around the Web



Watch: Alzheimer’s Reversal “Cocktail” Changing Lives



Where To Get Away From Olympics Crowds In Brazil



1 Food That Kills High Blood Pressure



Police Urge Americans to Carry This With Them at All Times



62Year Old Wife Surprises Husband, Cries After Sees Makeover



New Video Could Force Hillary To Give Up White House Dreams



4 Common Foods Weighing You Down



Watch: Toenail Fungus Destroyed My Life, Until I Found This


# RELATED

296


EXCLUSIVE: Former Oakland top cop speaks out on current scandal


I-TEAM: More fallout expected in cases handled by Oakland detective



OBAMA ELIMINATES FEE FOR HOMEOWNERS WHO SWITCH TO A 15 YEAR FIXED
If you owe less than $625,000 on your home, use Obama's free refi program before it expires in 2016. Read this while there is still time.
TAP YOUR AGE: 18-25 26-35 36-45 46-55 56-65 OVER 65
©2016 NMLS ID 167283; 3306 nmlsconsumeraccess.org Calculate New House Payment LowerMyBills.com

67°

## OPD



Arrests made after OPD officer shot at, murder in East Oakland


Suspect accused of shooting at Oakland officer still at large


Investigation confirms OPD officer, wife committed suicide


Suspect accused of shooting at Oakland officer

Oakland police search for suspect after officer shot at, but not struck

MORE OPD

## NEWS



Court workers staging 1 day strike in Santa Clara County
Updated 3 mins ago


N. Korea Threatens US Prisoners With Wartime Laws
Updated 13 mins ago


Death toll in Merced Co. bus crash adjusted to 4
Updated 17 mins ago



Obama Commutes Sentences of 214 Prisoners
Updated 20 mins ago



Pence Breaks With Trump: 'I Strongly Support' Paul Ryan
Updated 21 mins ago

OBAMA ELIMINATES FEE FOR HOMEOWNERS WHO SWITCH TO A 15 YEAR FIXED
If you owe less than $625,000 on your home, use Obama's free refi program before it expires in 2016. Read this while there is still time.
TAP YOUR AGE: 18-25 26-35 36-45 46-55 56-65 OVER 65
©2016 NMLS ID 167283; 3306 nmlsconsumeraccess.org Calculate New House Payment LowerMyBills.com

## TOP ST

67°



Cold Fire burns 4,000 acres, is 5 percent contained
Updated 1 hr 21 mins ago



First US officer charged in plot to support ISIS




Court workers staging 1 day strike in Santa Clara County
Updated 3 mins ago

At least 1 dead, 1 hospitalized in crash off Hwy 9 in Santa Clara Co.

Emirates airliner crash lands in Dubai; all evacuated safely

GOP Officials Exploring Options if Trump Drops Out

SHOW MORE

## TOP VIDEO



First US officer charged in plot to support ISIS



Emirates airliner crash lands in Dubai; all evacuated safely



At least 1 dead, 1 hospitalized in crash off Hwy 9 in Santa Clara Co.




Court workers staging 1 day strike in Santa Clara County
Updated 3 mins ago

MORE VIDEO

OBAMA ELIMINATES FEE FOR HOMEOWNERS WHO SWITCH TO A 15 YEAR FIXED
If you owe less than $625,000 on your home, use Obama's free refi program before it expires in 2016. Read this while there is still time.
TAP YOUR AGE: 18-25 26-35 36-45 46-55 56-65 OVER 65
©2016 NMLS ID 167283; 3306 nmlsconsumeraccess.org Calculate New House Payment LowerMyBills.com

Home

67°

Local News

Categories

Station Info

Shows

Apps

Search Our Site GO

Follow Us

Privacy Policy

Terms of Use

Children's Privacy Policy

Interest-Based Ads

Your California Privacy Rights

Public Inspection File

Copyright © 2016 ABC Inc., KGO-TV San Francisco. All Rights Reserved.
34em/544px

# EXHIBIT 17




The Mercury News (http://www.mercurynews.com)

# CRIME AND COURTS

Weather (http://www.mercurynews.com/weather)

San Jose, CA | Now: 79° (http://www.mercurynews.com/weather) | High: 83° (http://www.mercurynews.com/weather) | Low: 56° (http://www.mercurynews.com/weather) | 5-Day Forecast (http://www.mercurynews.com/weather)

BAY AREA NEWS GROUP EXCLUSIVE THE WASHINGTON POST NATIONAL WEEKLY JUST 99¢ PLUS TAX Subscribe Now BayArea NewsGroup

# Another Oakland police chief out

By David DeBolt and Matthew Artz, Staff Writers
POSTED: 06/17/2016 05:53:43 PM PDT
UPDATED: 06/17/2016 10:02:32 PM PDT






(/portlet/article/html/imageDisplay.jsp?contentItemRelationshipId=7607720)

City Administrator Sabrina Landreth, left, answers questions while standing next to Oakland Mayor Libby Schaaf during a press conference held to announce the resignation of Paul Figueroa, who was named acting chief two days ago, at Oakland City Hall in Oakland, Calif., on Friday, June 17, 2016. (Doug Duran/Bay Area News Group)

OAKLAND -- The Oakland police scandal reached a new low Friday night as the department lost its third chief in a week amid accusations that several African-American commanders had sent racist text messages to each other and that a sergeant had his girlfriend ghostwrite his homicide report in a high-profile 2013 murder case.

"I'm here to run a police force, not a frat house," a visibly angry Mayor Libby Schaaf said Friday evening, referring to the department's growing list of scandals, which until this week had centered on allegations that multiple officers had sex with the teenage daughter of a police dispatcher.

## RELATED STORIES

Jun 18:

- Oakland: Police Association 'disappointed' about recent department upheaval (http://www.mercurynews.com/crime-courts/ci_30032134/oakland-police-association-disappointed-about-recent-department-upheaval?source=pkg)

Jun 16:

- Oakland police sex scandal: Interim chief out after five days (http://www.mercurynews.com/bay-area-news/ci_30019298/oakland-police-chief-interim-chief-ben-fairow-out?source=pkg)

Jun 12:

Sources say that Sgt. Mike Gantt came forward about the alleged 2-year-old racist text messages after learning that he was under investigation himself.

- Oakland police scandal spreads: Teen claims sex with dozens of officers (http://www.mercurynews.com/bay-area-news/ci_30005624/oakland-police-scandal-spreads-other-east-bay-departments?source=pkg)

Jun 10:

- Oakland police chief steps down amid sex scandal (http://www.mercurynews.com/crime-courts/ci_29999771/oakland-police-chief-whent-steps-down?source=pkg)



(/portlet/article/html/imageDisplay.jsp?contentItemRelationshipId=7606250)

File photo: Oakland acting Police Chief Paul Figueroa (Doug Duran/Bay Area News Group )

The saga appeared to prove too much for Acting Chief Paul Figueroa, who voluntarily took a leave of absence and demotion to captain after struggling with the stress of a job he held for only two days, sources said.

After considering tapping a new acting chief -- who would have been the department's fourth in eight days -- Schaaf instead placed City Administrator Sabrina Landreth in charge of the department and pledged to root out a "toxic, macho culture" that she also described as "disgusting."

The mayor called for civilian oversight of the police department.

Advertisement




Multiple sources said police commanders -- lieutenants and officers both white and African-American, and some in the homicide unit -- frequently texted each other, and at least two of those messages were racially charged. One of those messages depicted a picture of Klansmen suggesting that they did not need to harm black people because black people were killing each other.

Lt. Tony Jones has been placed on leave as part of the ongoing investigation, multiple sources said.

Jones and Gantt, who are both African-American, had a falling out, which led to Gantt going to investigators with text messages dating back to at least 2014, sources said.

Gantt is under investigation for mishandling a homicide case, apparently leaving evidence at the home of a girlfriend who would also do his investigative paperwork, according to sources. The veteran homicide detective who handled several high-profile cases is also on leave, sources said.

The evidence was part of Gantt's investigation into the shooting death of 66-year-old Judy Salamon. Salamon was killed in July 2013 after using her cellphone to take a video of her suspected killers committing a crime in her Maxwell Park neighborhood. Stephon Lee, 22, and Mario Floyd, 21, have been charged with homicide in her death and are awaiting trial.

The case and numerous others investigated by Gantt could be compromised if he made a habit of not authoring his own homicide reports.

The city now has no police chief after cycling through three chiefs in eight days. Figueroa replaced Ben Fairow, whom Schaaf fired Wednesday after he apparently admitted to having an extramarital affair while working in the department more than a decade ago. Fairow, who was on loan from BART, where he serves as a deputy chief, was the city's top cop for five days, having replaced now ex-Chief Sean Whent.

Whent was pushed out as chief June 16 because of the department's sexual misconduct scandal, according to sources. Figueroa was the fifth chief in Oakland since 2013.

"We're left with an administrator, and she doesn't know anything about policing," Councilman Noel Gallo said. "It all comes down to lack of experience and failed leadership. We went from worse to worse."

"The department is spiraling out of control, and we need to stop it," Councilwoman Desley Brooks said. "The mayor needs to demonstrate some leadership. I'm extremely disappointed. It's embarrassing for the members of the department as well as the city."

Meanwhile, police and the Alameda County District Attorney's Office continue to investigate claims that officers were sexually involved with a police dispatcher's daughter who worked in the sex trade and was underage during some of her contact with officers.

When asked who might be next to go, Schaaf said: "I'm hoping to not have to fire anyone else anytime soon, but we will continue to take this matter extremely seriously."

Staff writer Matthias Gafni contributed to this report. Contact David DeBolt at 510-208-6453. Follow him at Twitter.com/daviddebolt (http://Twitter.com/daviddebolt).

**FROM AROUND THE WEB**
selected for you by a sponsor



Trump's IQ Will Shock You
Choice or Life
(http://choiceorlife.com/smartest-dumbest-u-s-presidents-ranked-by-iq-score/?utm_campaign=col-desk-us-pri1&utm_source=outbrain&utm_content=2563a88&utm_medium=248358)



Rheumatoid Arthritis Symptoms & Treatments
Yahoo Search
(https://search.yahoo.com/search?p=rheumatoid+arthritis+symptoms&fr=mktg-search-ginsu2&.tsrc=mktg-search-ginsu2&type=RAs)



How To Fix Your Fatigue And Get More Energy
Gundry MD
(http://gundrymd.com/cmd.php?ad=804277&ad=804277)



Fats from These Fruits and Nuts Can Make the Brain Healthier
Staying Sharp - AARP
(https://stayingsharp.aarp.org/art/nourish/13/good-fats-brain-diet.html?campaignURL=SL&cmp=SL-DSO-Outbrain-DESKTAB-SSS-LAUNCH-NOURISH-Good+Fats+Should+Be+Part+of+Brain+Healthy+Diet_1279195481_248358)



An “Unforgettable” Reason to Eat More Blueberries and Colorful Fruit
Staying Sharp - AARP
(https://stayingsharp.aarp.org/art/nourish/15/blueberries-memory.html?campaignURL=SL&cmp=SL-DSO-Outbrain-DESKTAB-SSS-LAUNCH-NOURISH-Blueberries+Repair+Damage+From+Free+Radicals_1279194489_248358)



Meet the bomber we're sending to crush ISIS
CNET
(http://www.cnet.com/pictures/the-b-52-bomber-turns-60-photos/?ftag=ACQ63afa6d&vndid=248358)

## MORE FROM THE WEB

Psoriatic Arthritis Symptoms: What You Should Know Yahoo Search (https://search.yahoo.com/search?p=psoriatic+arthritis+symptoms&fr=mktg-search-ginsu2&.tsrc=mktg-search-ginsu2&type=psoras)

These Sisters Took The Same Photo 40 Years in a Row… Your Daily Dish (http://www.yourdailydish.com/galleries/4-sisters-beautifully-age-40-year-photo-series/?utm_source=Outbrain&utm_medium=cpc&utm_term=248358&utm_content=57356587&utm_campaign=Outbrain_4SSP)

Lower Back Pain Treatment Options Yahoo Search (https://search.yahoo.com/search?p=lower+back+pain+treatment&fr=mktg-search-ginsu2&.tsrc=mktg-search-ginsu2&type=lowerback)

Homeowners Born Before 1985 Are Getting a Huge Reward FetchRate (https://www.fetcharate.com/pa/mortgage/?tg_ref=fetobran&csg_ref=tapa&keyword=ad_id&sub2=248358&camp_id=ad_title)

Best Exercises For Psoriatic Arthritis Health Central (http://www.healthcentral.com/skin-care/cf/slideshows/best-exercises-psoriatic-arthritis/?ap=835)

Thinking About Going Solar? Read This First Home Solar Programs (http://www.homesolarprograms.com/out021/homeowners-are-furious-with-their-power-company/?campid=31064DF8B6003CE3&utm_source=Outbrain)

## YOU MIGHT ALSO LIKE

Revelation of human remains in pet cemetery… (http://www.mercurynews.com/weird-news/ci_30202218/revelation-human-remains-pet-cemetery-complicates-lands-sale)

Japan knife attack: At least 19 dead, 20 injured (http://www.mercurynews.com/nation-world/ci_30167631/japan-knife-attack-19-dead-20-injured)

Palo Alto: Man missing for three weeks returns home (http://www.mercurynews.com/crime-courts/ci_30186554/palo-alto-man-missing-three-weeks-returns-home)

Concord: Former De La Salle QB dies on first day of U… (http://www.mercurynews.com/ci_30179986/concord-former-de-la-salle-qb-dies-during)

Warriors' Anderson Varejao has back injury (http://www.mercurynews.com/warriors/ci_30167640/warriors-anderson-varejao-has-back-injury)

Ask Amy: My husband sent suspicious texts to his… (http://www.mercurynews.com/bay-area-living/ci_30120616/ask-amy-marriage-hits-skids-virtual-affair)

Recommended by (http://www.outbrain.com/what-is/default/en)

## RELATED (http://www.mercurynews.com/crime-courts)

In a sign of broader ambitions, Facebook opens hardware lab (http://www.mercurynews.com/business/ci_30202787/sign-broader-ambitions-facebook-opens-hardware-lab)

Trump Taj Mahal casino to close after Labor Day (http://www.mercurynews.com/business/ci_30202531/trump-taj-mahal-casino-close-after-labor-day)

Survey: Expansion by U.S. services companies slowed in July (http://www.mercurynews.com/business/ci_30201837/survey-expansion-by-u-s-services-companies-slowed)

## This Week's Circulars



HOVER FOR CIRCULAR



HOVER FOR CIRCULAR



HOVER FOR CIRCULAR

# EXHIBIT 18

Office of the District Attorney
Alameda County
Nancy E. O'Malley, District Attorney

Rene C. Davidson Courthouse
1225 Fallon Street, Suite 900
Oakland, CA 94612

June 23, 2016

David Bryden
160 Franklin Street
Oakland, CA 94607

Re: People v. Donel Poston, Docket 172522

Dear Mr. Bryden:

In our continuing efforts to ensure the integrity of our convictions and our ethical and professional discovery obligations, we are writing to inform you that we have conducted a review of recent criminal cases that involved investigation by Oakland Police Sgt. Mike Gantt.

Recently, allegations surfaced that Gantt involved a third party may have been involved in the typing of reports, and/or summaries or transcriptions of recordings related to cases assigned to Sgt. Gantt for investigation. This Office immediately opened an inquiry into these allegations.

Our Office interviewed the third party to determine the timeline, nature and extent of her involvement. The interview revealed that between May 2014 and January 2014, Sgt. Gantt would bring her CDs of audio recordings and she would transcribe verbatim the recordings in a Word document on his laptop. She was only given the CDs and never saw any other documents or paperwork including the police report, any criminal history, any DMV information or Sgt. Gantt's notes. She never saw any finished police reports. After transcribing the recordings on Sgt. Gantt's laptop, he would take the computer and CDs with him when he left. She typed the information onto his computer only and never used any other devices or flash drives. She never discussed the cases with Gantt. She could not state the exact number of cases on which she transcribed verbatim recordings.

There were ten (10) criminal cases in which Sgt. Gantt was involved that resulted in charges being filed by this Office. People v. Donel Poston, in which you were the attorney of record for the defendant, is one of those cases.

We have reviewed all the cases involving Sgt. Gantt during the above-noted timeframe. We have determined that our file contains all reports, audio statements and other evidence in this case. The assigned DDA compared the file to the Investigative Packet from OPD and through that review, we have confirmed that you were provided with all the discovery in the case.

After a thorough review of all matters involving Sgt. Gantt, the Office finds that, while Sgt. Gantt may have violated internal departmental policy, no criminal conduct occurred. There is no provision in the Penal Code that prohibits engaging third party transcriptionists. Likewise, we have no reason to believe that the investigation was mishandled in any way that compromised the integrity of the conviction or your client's right to a fair trial.

Very truly yours,

Nancy E. O'Malley

NANCY E. O'MALLEY
District Attorney

Phone: (510) 272-6222 • Email: askrcd-da@acgov.org • www.alcoda.org

# EXHIBIT 19

Case 3:18-cv-03450-CRB Document 25-6 Filed 09/17/20 Page 415 of 483
PageID #: 9410

P.O. Box 1120
Willits, CA. 95490

RANDI COVIN
attorney at law
rcovin13@gmail.com

Phone: (707) 459-2456
Fax: (707) 459-2147

July 5, 2016

Ms. Nancy O'Malley
District Attorney
1225 Fallon St., Suite 900
Oakland, CA. 94612

Re: *People v. Donel Poston*; Appeal No. A141557;
Alameda No. 172522B

Dear Ms. O'Malley:

I represent Donel Poston in the above referenced appeal. I am in receipt of your June 23, 2016, letter to Mr. Poston's trial attorney, David Bryden, regarding a recent investigation pertaining to Oakland Police Sergeant Mike Gantt. I am writing to request similar disclosure regarding Oakland Police Lieutenant Tony Jones, who testified against Mr. Poston.

I am aware of recent news report regarding racist text messages between Lieutenant Jones and another officer. Evidence that Lieutenant Jones may have been biased against African-American suspects may be relevant to Mr. Poston's defense. (See *Brady v. Maryland* (1963) 373 U.S. 83; *Imbler v. Pachtman* (1976) 424 U.S. 409, 427, fn. 25; *Kyles v. Whitley* (1995) 514 U.S. 419, 442, fn. 134, 445-451; *Youngblood v. West Virginia* (2006) ___ U.S. ___, 126 S.Ct. 2188; *In re Steele* (2004) 32 Cal.4th 682, 695.)

I appreciate very much your "continuing efforts to ensure the integrity of [your] convictions and [your] ethical and professional discovery obligations," as reported in your letter to Mr. Bryden. Please provide any potential impeachment evidence pertaining to Lieutenant Jones as soon as possible. Thank you for your anticipated cooperation.

Sincerely,

# EXHIBIT 20

# Tony Jones

## Settled Lawsuits

SE00329, 2005-04-05, Greg Killens, (individually and as legal guardian for Khaliyah Killens), and Camisha Coleman, **$20,000**
SE00174, 1998-09-11, Jose F Garcia, **$5,000**

## Shootings

According to the OPD this officer was not involved in any shootings.

## Awards

The OPD did not provide awards data for this officer.

*Case summaries have been taken directly from Oakland City Attorney records and/or federal or state court documents. For more on our methodology, visit How We Analyzed Our Police Officer Data.*

### Search the Oakland Police Beat Officer Database

Search for:

Search

*For more information on how we researched and reported our stories and data, check out our Frequently Asked Questions or our post on How We Analyzed Our Police Officer Data.*

### Data Downloads

### Watch Our (Almost) 2 Minute Tour of the Officer Database



### Tell Us Your OPD Officer Stories

*What's your experience interacting with Oakland Police Department officers? What do you wish police officers did better? What makes for a good officer in Oakland? Email or use our contact form and let us know.*

### Download the Latest Officer Misconduct Lawsuit Updates

**Dixon v. City of Oakland et al 4:12-cv-05207** (Download Complaint)

- 05/30/2014 - Stipulation And (Proposed) Order To Settle Case

**Clay v. City of Oakland et al 3:13-cv-04633** (Download Complaint)

**Herd v. City of Oakland et al**
**3:13-cv-04443** (Download Complaint)
- 05/28/2014 - Answer To Amended Complaint

**Van Dusen v. City of Oakland et al**
**3:13-cv-05023** (Download Complaint)
- 05/28/2014 - Order Staying Case Pending Criminal Trial

**Ross v. City Of Oakland**
**3:14-cv-00800** (Download Complaint)
- 05/28/2014 - Order Granting Motion To Dismiss

**Estate of Fletcher Jackson et al v. City of Oakland et al**
**12-cv-02101** (Download Complaint)
- 05/21/2014 - Order Granting Stipulation To Continue Case Management Conference



## Funding

We are part of Oakland Local/The Center for Media Change and funded by The Ethics and Excellence in Journalism Foundation and The Fund for Investigative Journalism. *More...*

## Frequently Asked Questions

Why are you publishing allegations from court documents? What do these old cases have to do with the current OPD? Why are you allowed to publish this kind of information about individual police officers? *More...*

## Commenting and Privacy Policy

We encourage readers to be a part of Oakland Police Beat and exchange their insights, analysis and criticism -- especially when it contributes to a greater understanding of the Oakland Police Department and its officers. *More...*

Webcraft by **maiki**

# EXHIBIT 21

Juror #1 CT001

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: Male Date of Birth: 1/30/1975

3. Any other names you have used: None

4. City and general area of residence (do not provide home address): San Leandro

5. How long have you lived at current residence: 4 yrs

6. Do you own your residence or are you renting? Own

7. Are you a citizen of the United States? Yes X No ____

8. Place of Birth: China

9. Where did you grow up? China

10. Racial or ethnic group: Asian

11. Marital status (Please circle all that may apply).

    (Single) Married Divorced Widowed Domestic Partner Re-Married

    Number of Prior Marriages ________

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

China 27 years
San Leandro, 11 years

13. Please describe how you were raised:

X Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Other, Please explain ________
____ Raised by mother alone
____ Raised by mother and stepfather
____ Raised by relatives

Juror #2 CT0021 (2)

# QUESTIONNAIRE

1. Full Name: [redacted]
2. Gender: M Date of Birth: 7/3/63
3. Any other names you have used: ______
4. City and general area of residence (do not provide home address): Oakland - Grand Lake
5. How long have you lived at current residence: 14 yrs
6. Do you own your residence or are you renting? own
7. Are you a citizen of the United States? Yes ✓ No ______
8. Place of Birth: Las Vegas, NV
9. Where did you grow up? Tustin, San Diego, Sacramento
10. Racial or ethnic group: White
11. Marital status (Please circle all that may apply).

    (Single) Married Divorced Widowed Domestic Partner Re-Married

    Number of Prior Marriages ______

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability. Oakland - 23 yrs; SF - 5 yrs; Davis - 4 yrs, Folsom - 3 yrs; Bakersfield - 2 yrs; Bonita - 3 yrs; Tustin - 12 yrs.

13. Please describe how you were raised:

    ______ Both parents lived together;
    ______ Raised by father alone
    ______ Raised by father and stepmother
    ✓ Raised by mother alone
    ______ Raised by mother and stepfather
    ______ Raised by relatives
    ______ Other, Please explain ______

CT0041

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: M Date of Birth: 7-22-52

3. Any other names you have used: —

4. City and general area of residence (do not provide home address): Pleasanton

5. How long have you lived at current residence: 24

6. Do you own your residence or are you renting? own

7. Are you a citizen of the United States? Yes X No ____

8. Place of Birth: Panama city Panama

9. Where did you grow up? Panama

10. Racial or ethnic group: Hispanish

11. Marital status (Please circle all that may apply).

    Single **(Married)** Divorced Widowed Domestic Partner Re-Married

    Number of Prior Marriages 1

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

    1- 30 year Panama city Panama

    30-36 Union city, CA. USA

    36-61 Pleasanton, CA.

13. Please describe how you were raised:

- ____ Both parents lived together;
- ____ Raised by father alone
- ____ Raised by father and stepmother
- ____ Other, Please explain ____
- X Raised by mother alone
- ____ Raised by mother and stepfather
- ____ Raised by relatives

CT0061

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: MALE Date of Birth: SEPT. 8, 1961

3. Any other names you have used: ____

4. City and general area of residence (do not provide home address): CASTRO VALLEY CA

5. How long have you lived at current residence: 6 YRS

6. Do you own your residence or are you renting? OWN

7. Are you a citizen of the United States? Yes ✓ No ____

8. Place of Birth: MANILA PHILIPPINES

9. Where did you grow up? PHILIPPINES

10. Racial or ethnic group: ASIAN

11. Marital status (Please circle all that may apply).

Single **(Married)** Divorced Widowed Domestic Partner Re-Married

Number of Prior Marriages ____

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability. HAYWARD 5 YEARS, UNION CITY 11 YEARS, SANFRANCISCO 10 YEARS, SAN MATEO 8 YEARS

13. Please describe how you were raised:

✓ Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Other, Please explain ____
____ Raised by mother alone
____ Raised by mother and stepfather
____ Raised by relatives

Juror #5 CT0081

# QUESTIONNAIRE

1. Full Name: [redacted]
2. Gender: Female Date of Birth: 10/15/66
3. Any other names you have used: Andrea Draper, Emma Fitzwilliam,
4. City and general area of residence (do not provide home address): Fremont / Brookvale
5. How long have you lived at current residence: 4 years
6. Do you own your residence or are you renting? Renting
7. Are you a citizen of the United States? Yes X No ____
8. Place of Birth: Portland, OR
9. Where did you grow up? West Coast / Oregon
10. Racial or ethnic group: Caucasian
11. Marital status (Please circle all that may apply).

    Single Married (Divorced) Widowed Domestic Partner Re-Married

    Number of Prior Marriages 1

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

    (1) Campbell, CA 5 years (4) Mildenhall, England 3 years
    (2) Mt. View, CA 1 year (5) Marina, CA 3 years
    (3) Marina, CA 3 years (6) Eureka, CA 3 years

13. Please describe how you were raised:
    - ____ Both parents lived together;
    - ____ Raised by father alone
    - ____ Raised by father and stepmother
    - ____ Other, Please explain ____
    - X Raised by mother alone
    - ____ Raised by mother and stepfather
    - ____ Raised by relatives

Juror #6

CT00101

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: Female Date of Birth: 5/5/45

3. Any other names you have used: Josephine Dull (when married)

4. City and general area of residence (do not provide home address): Hayward, near All Saints Catholic Church

5. How long have you lived at current residence: 7 yrs. in March 2014

6. Do you own your residence or are you renting? Renting

7. Are you a citizen of the United States? Yes X No ____

8. Place of Birth: Chicago, Ill.

9. Where did you grow up? Bay Area

10. Racial or ethnic group: Italian

11. Marital status (Please circle all that may apply).

Single Married (Divorced) Widowed Domestic Partner Re-Married

Number of Prior Marriages 1

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

Oakland 4yrs, San Leandro 20+, Hayward 30+.

13. Please describe how you were raised:

____ Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Other, Please explain ____
____ Raised by mother alone
X Raised by mother and stepfather
____ Raised by relatives

Juror #7

CT00121

# QUESTIONNAIRE

1. Full Name: [redacted]
2. Gender: Female  Date of Birth: 4/22/56
3. Any other names you have used: Paula Harue Hirayama
4. City and general area of residence (do not provide home address): Livermore
5. How long have you lived at current residence: 25 years
6. Do you own your residence or are you renting? own
7. Are you a citizen of the United States? Yes ✓ No ___
8. Place of Birth: Palo Alto, California
9. Where did you grow up? Palo Alto
10. Racial or ethnic group: Asian
11. Marital status (Please circle all that may apply).

    Single Married Divorced (Widowed) Domestic Partner Re-Married

    Number of Prior Marriages 1

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

    Palo Alto (18 years); Davis, CA (4 years); Bethesda, MD (2 years); San Jose, CA (3 years); Mountain View, CA (3 years); Sunnyvale, CA (2 years); Livermore, CA (27 years)

13. Please describe how you were raised:

    ✓ Both parents lived together;
    ___ Raised by father alone
    ___ Raised by father and stepmother
    ___ Raised by mother alone
    ___ Raised by mother and stepfather
    ___ Raised by relatives
    ___ Other, Please explain ___

Juror #8 CT00181

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: MALE Date of Birth: 8/8/65

3. Any other names you have used: —

4. City and general area of residence (do not provide home address): ALAMEDA

5. How long have you lived at current residence: 14 YEARS

6. Do you own your residence or are you renting? OWN

7. Are you a citizen of the United States? Yes X No ____

8. Place of Birth: OAKLAND, CA

9. Where did you grow up? ALAMEDA

10. Racial or ethnic group: ASIAN

11. Marital status (Please circle all that may apply).

(Single) Married Divorced Widowed Domestic Partner Re-Married

Number of Prior Marriages ____

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

ALAMEDA - 24 YEARS
OAKLAND - 10 YEARS

13. Please describe how you were raised:

X Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Raised by mother alone
____ Raised by mother and stepfather
____ Raised by relatives
____ Other, Please explain ____

Juror #9 CT00161

# QUESTIONNAIRE

1. Full Name: [redacted]
2. Gender: FEMALE Date of Birth: 05-15-1977
3. Any other names you have used: CHETHANA VEERANNA
4. City and general area of residence (do not provide home address): FREMONT, CA
5. How long have you lived at current residence: 5 years
6. Do you own your residence or are you renting? OWN
7. Are you a citizen of the United States? Yes ✓ No ____
8. Place of Birth: INDIA
9. Where did you grow up? INDIA
10. Racial or ethnic group: HINDU
11. Marital status (Please circle all that may apply).

    Single (Married) Divorced Widowed Domestic Partner Re-Married

    Number of Prior Marriages 0

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

    EMERYVILLE, CA - 2 1/2 years
    PITTSBURGH, PA - 3 years
    CINCINNATI, OH - 3 1/2 years.

13. Please describe how you were raised:
    - ✓ Both parents lived together;
    - ____ Raised by father alone
    - ____ Raised by father and stepmother
    - ____ Other, Please explain ____
    - ____ Raised by mother alone
    - ____ Raised by mother and stepfather
    - ____ Raised by relatives

Juror #10 CT00181

# QUESTIONNAIRE

1. Full Name: [redacted]
2. Gender: Female Date of Birth: 8/10/1960
3. Any other names you have used: Patricia "Patty" Simmons
4. City and general area of residence (do not provide home address): Pleasanton
5. How long have you lived at current residence: 3 yrs.
6. Do you own your residence or are you renting? Own
7. Are you a citizen of the United States? Yes ✓ No ____
8. Place of Birth: Milwaukee, WI
9. Where did you grow up? Milwaukee, WI
10. Racial or ethnic group: Caucasian
11. Marital status (Please circle all that may apply).

    Single **(Married)** Divorced Widowed Domestic Partner Re-Married

    Number of Prior Marriages 0

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.
    Milwaukee 20 yrs. Wiesbaden, Germany 3 yrs. Ft. Benning, GA 1 yr. Colorado 3 yrs. Texas 8 yrs. New Jersey 1.5 yrs. Florida 3 yrs. Illinois 1.5 yrs. CA 10 yrs (3.5 yrs in India while maintaining home in Pleasanton)
13. Please describe how you were raised:
    - ✓ Both parents lived together;
    - ____ Raised by father alone
    - ____ Raised by father and stepmother
    - ____ Other, Please explain ____
    - ____ Raised by mother alone
    - ____ Raised by mother and stepfather
    - ____ Raised by relatives

Juror # 11 CT00201

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: Female Date of Birth: 5/2/1974

3. Any other names you have used: Cherise Katherine Jones

4. City and general area of residence (do not provide home address): Dublin - West Dublin

5. How long have you lived at current residence: 1.5 years

6. Do you own your residence or are you renting? Own

7. Are you a citizen of the United States? Yes ✓ No ____

8. Place of Birth: Anchorage, AK

9. Where did you grow up? Anchorage, AK & Wasilla AK

10. Racial or ethnic group: Caucasion

11. Marital status (Please circle all that may apply).

Single (Married) Divorced Widowed Domestic Partner Re-Married

Number of Prior Marriages Φ

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.
Anchorage, AK - 10yrs, Wasilla AK - 8yrs, Davis, Ca - 5yrs
Stockton, Ca - 1yr, Oakland, Ca - 2yrs, Alameda, Ca - 2yrs,
Honolulu, Hi - 1yrs, Orange Cty. Ca, 6mo, Chico - Ca 6mo, Walnut Creek, Ca - 10yrs
Dublin, Ca - 1 year

13. Please describe how you were raised:

X Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Other, Please explain ____
____ Raised by mother alone
____ Raised by mother and stepfather
____ Raised by relatives

Juror #12

CT00221

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: Male Date of Birth: 9-14-1962

3. Any other names you have used: ______

4. City and general area of residence (do not provide home address): ______
Castro Valley

5. How long have you lived at current residence: 4 years

6. Do you own your residence or are you renting? own

7. Are you a citizen of the United States? Yes ✓ No ______

8. Place of Birth: Oakland

9. Where did you grow up? Bay Area, Virginia

10. Racial or ethnic group: Black

11. Marital status (Please circle all that may apply).

Single (Married) Divorced Widowed Domestic Partner Re-Married

Number of Prior Marriages 2

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.
Norfolk, Virginia 13 yr
Virginia Beach, VA 4 yr

13. Please describe how you were raised:
____ Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Other, Please explain ______
X Raised by mother alone
____ Raised by mother and stepfather
____ Raised by relatives

A/+CT00241

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: F Date of Birth: 8-5-59

3. Any other names you have used: ______

4. City and general area of residence (do not provide home address): DUBLIN

5. How long have you lived at current residence: 8 YEARS

6. Do you own your residence or are you renting? OWN

7. Are you a citizen of the United States? Yes ✓ No ____

8. Place of Birth: PALO ALTO

9. Where did you grow up? SAN JOSE

10. Racial or ethnic group: WHITE

11. Marital status (Please circle all that may apply).

    Single (Married) (Divorced) Widowed Domestic Partner (Re-Married)

    Number of Prior Marriages 1

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.
SAN JOSE (14) SUNNYVALE (8) LOS GATOS (6) years
SANTA CLARA (14) SANTA ROSA (2) TRACY (2)

13. Please describe how you were raised:
____ Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
✓ Raised by mother alone
✓ Raised by mother and stepfather
____ Raised by relatives
____ Other, Please explain HAD MANY STEPFATHER - DID VISIT WITH FATHER

CT00261
AH 2

# QUESTIONNAIRE

1. Full Name: [redacted]
2. Gender: Male Date of Birth: 8/28/54
3. Any other names you have used: —NA—
4. City and general area of residence (do not provide home address):
San Leandro, Ca.
5. How long have you lived at current residence: 6 months
6. Do you own your residence or are you renting? Renting
7. Are you a citizen of the United States? Yes X No ____
8. Place of Birth: Vallejo, Ca.
9. Where did you grow up? Vallejo till Jr. High then Concord Ca.
10. Racial or ethnic group: White
11. Marital status (Please circle all that may apply).

    Single (Married) (Divorced) Widowed Domestic Partner Re-Married

    Number of Prior Marriages 1

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability. Hayward, Ca. 8 years, Antioch Ca. 6 years, Concord Ca. 10 years, Oroville Ca. 3 years, Hemet, Ca. 1 year, Banning Ca. 1 year, Perris Ca. 2 years, Linda, Ca. 6 years
13. Please describe how you were raised:

____ Both parents lived together;
____ Raised by father alone
____ Raised by father and stepmother
____ Other, Please explain ____
X Raised by mother alone
____ Raised by mother and stepfather
____ Raised by relatives

AH CT00281

# QUESTIONNAIRE

1. Full Name: [redacted]

2. Gender: F Date of Birth: 12/26/1981

3. Any other names you have used: JOYCE YEN

4. City and general area of residence (do not provide home address): ALAMEDA, CA

5. How long have you lived at current residence: 1.5 years

6. Do you own your residence or are you renting? OWN

7. Are you a citizen of the United States? Yes X No ____

8. Place of Birth: MONTEREY PARK, CA

9. Where did you grow up? Arcadia, CA (San Gabriel Valley)

10. Racial or ethnic group: ASIAN / CHINESE AMERICAN

11. Marital status (Please circle all that may apply).

Single **(Married)** Divorced Widowed Domestic Partner Re-Married

Number of Prior Marriages Ø

12. Where have you lived in the past? Please provide number of years at each location to the best of your ability.

California: Monterey Park, San Gabriel (9), Arcadia/Temple City (2) (7), El Segundo (1)

Berkeley (4), Alameda (5), Taiwan (4)

13. Please describe how you were raised:

- ____ Both parents lived together;
- ____ Raised by father alone
- X Raised by father and stepmother
- ____ Other, Please explain ____
- ____ Raised by mother alone
- ____ Raised by mother and stepfather
- ____ Raised by relatives

# DECLARATION OF SERVICE

I, Randi Covin, declare that I am over 18 years of age and not a party to this action. My business address is P.O. Box 1120, Willits, California, 95490. On August 10, 2016, I served true and correct copies of **POSTON'S PETITION FOR WRIT OF HABEAS CORPUS** on:

Mr. Donel Poston
AT2512
High Desert State Prison
PO Box 3030
Susanville, CA. 96127

Alameda County Courts
Att: Hon. Michael Gaffey
1225 Fallon St.
Oakland, CA. 94612

Public Defender
1401 Lakeside Dr., Ste 400
Oakland, CA. 94612

by depositing such copies in the U.S. Mail, addressed as indicated above, postage pre-paid, at Willits, California.

That same date, I also transmitted a PDF version of **POSTON'S PETITION FOR WRIT OF HABEAS CORPUS** by e-mail to:

Attorney General
SFAG.Docketin@doj.ca.gov

First District Appellate Project
Eservice@fdap.org

Philip Brooks
philipmbrooks@gmail.com

Alameda County District Attorney
ACDAdocket@acgov.org

Mr. David Bryden
dbryden@sbcglobal.net

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 10, 2016, at Willits, California.

/s/ Randi Covin

# EXHIBIT 15

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| **In re**<br>**DONEL POSTON,**<br>**On Habeas Corpus.** | Case No. A148986 |

Alameda County Superior Court Case No. 172522B
The Honorable Michael J. Gaffey, Judge

# MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

KAMALA D. HARRIS
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
JEFFREY M. LAURENCE
Senior Assistant Attorney General
RENÉ A. CHACÓN
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-1308
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for*

# TABLE OF CONTENTS

**Page**

Issues . ........................................ 7
Introduction ........................................ 7
Statement of the Case and Facts ........................................ 12
A. Procedural background ........................................ 12
B. Trial evidence ........................................ 13
Argument ........................................ 16
I. Trial counsel was not ineffective for failing to object to either the prosecutor's questions about pimping or the prosecutor's argument that the defendants engaged in mutual combat ........................................ 16
II. Trial counsel was not deficient for failing to object, or request modifications, to the instruction on mutual combat (CALCRIM No. 3471) ........................................ 19
III. Even if trial counsel failed to adequately prepare petitioner to testify, there was no prejudice and, therefore, no ineffective assistance ........................................ 23
IV. Trial counsel was not deficient in his pretrial investigation ........................................ 27
V. Trial counsel was not deficient for failing to present expert testimony on African-American Vernacular English ........................................ 30
VI. Trial counsel was not deficient for failing to present an expert who would testify that petitioner fled because African-Americans distrust the criminal justice system ...... 34
VII. The prosecutor did not violate *Brady v. Maryland* ........................................ 37
VIII. There were neither multiple errors nor cumulative prejudice ........................................ 43
Conclusion ........................................ 45

# TABLE OF AUTHORITIES

**Page**

CASES

*Brady v. Maryland*
(1963) 373 U.S. 83 .......... *passim*

*Chambers v. Mississippi*
(1973) 410 U.S. 284 .......... 44

*Kennedy v. Superior Court*
(2006) 145 Cal.App.4th 359 .......... 39

*People v. Adcox*
(1988) 47 Cal.3d 207 .......... 22

*People v. Anderson*
(2001) 25 Cal.4th 543 .......... 16

*People v. Bolin*
(1998) 18 Cal.4th 297 .......... 33

*People v. Bradford*
(1997) 14 Cal.4th 1005 .......... 44

*People v. Cain*
(1995) 10 Cal.4th 1 .......... 44

*People v. Catlin*
(2001) 26 Cal.4th 99 .......... 31, 33, 35

*People v. Cunningham*
(2001) 25 Cal.4th 926 .......... 25

*People v. Duvall*
(1995) 9 Cal.4th 464 .......... *passim*

*People v. Eulian*
(2016) 247 Cal.App.4th 1324 .......... 22

*People v. Gentry*
(1969) 270 Cal.App.2d 462 .......... 27

## TABLE OF AUTHORITIES
## (continued)

**Page**

*People v. Guiton*
(1993) 4 Cal.4th 1116 .......... 23

*People v. Hill*
(1998) 17 Cal.4th 800 .......... 43

*People v. Hines*
(1997) 15 Cal.4th 997 .......... 26

*People v. Hoyos*
(2007) 41 Cal.4th 872 .......... 42

*People v. Killebrew*
(2002) 103 Cal.App.4th 644 .......... 36

*People v. Kronemeyer*
(1987) 189 Cal.App.3d 314 .......... 43

*People v. Larsen*
(2012) 205 Cal.App.4th 810 .......... 21

*People v. Lopez*
(2008) 42 Cal.4th 960 .......... 17

*People v. McDermott*
(2002) 28 Cal.4th 946 .......... 24, 35

*People v. Osband*
(1996) 13 Cal.4th 622 .......... 16

*People v. Price*
(1992) 1 Cal.4th 324 .......... 19, 22

*People v. Ross*
(2007) 155 Cal.App.4th 1033 .......... 10, 20, 22

*People v. Superior Court* (*Johnson*)
(2015) 61 Cal.4th 696 .......... 38

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*People v. Vang*
(2011) 52 Cal.4th 1038 .......... 36

*People v. Waidla*
(2000) 22 Cal.4th 690 .......... 16

*People v. Whitmer*
(2014) 59 Cal. 4th 733 .......... 43

*People v. Williams*
(1988) 44 Cal.3d 883 .......... 32

*People v. Williams*
(1997) 16 Cal.4th 153 .......... 25

*People v. Zaragoza*
(2016) __ Cal.4th __ .......... 38

*Pitchess v. Superior Court*
(1974) 11 Cal.3d 531 .......... 42

*Strickland v. Washington*
(1984) 466 U.S. 668 .......... *passim*

*Strickler v. Greene*
(1999) 527 U.S. 263 .......... *passim*

**STATUTES**

Evidence Code
§ 791, subd. (b) .......... 28
§ 801, subd. (a) .......... 31, 35

Penal Code
§ 187, subd. (a) .......... 12
§ 664 .......... 12
§ 667.5, subd. (b) .......... 12
§ 1054.9 .......... 38
§ 12022.53, subd. (d) .......... 12
§ 29800, subd. (a)(1) .......... 12

## TABLE OF AUTHORITIES
## (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Fourteenth Amendment ........................................................................ 43

**OTHER AUTHORITIES**

CALCRIM, Judicial Council of California, Criminal Jury Instructions
No. 200........................................................................................ 22
No. 3471.............................................................................. 10, 19, 20, 22

## ISSUES

1. Whether petitioner has established a prima facie case for relief on habeas corpus so that this Court should issue an order to show cause.

2. Whether an evidentiary hearing is required and, if so, whether the order to show cause should be returnable in the superior court.

## INTRODUCTION

Petitioner renews his defense theory from his direct appeal that "the charged shooting was captured on surveillance video and the undisputed facts show a textbook case of self-defense. Faced with a seemingly dispositive video showing that Poston shot McNeely in self-defense, the prosecutor obtained convictions by attacking Poston's character and twisting his words . . . ." (Pet. 34.) Respondent disagrees. As discussed more fully in the Respondent's Brief, the video shows that McNeely slapped and tripped petitioner, and then petitioner immediately pulled out his gun and shot at McNeely 10 times. The jury could have reasonably determined that petitioner unjustifiably elevated the conflict to lethal force.

Alternatively, the jury could have concluded that petitioner and McNeely had a preexisting agreement to engage in mutual combat. After all, the video shows that the two men had a heated conversation. It would be reasonable to infer from the way the men interacted on the video that McNeely challenged petitioner to combat. Likewise, it could be inferred that McNeely slapped petitioner after petitioner said something that indicated a willingness to fight.

Moreover, contrary to petitioner's argument, the video was far from dispositive. It did not show self-defense as a matter of law. (See Pet. 77 [petitioner argues, "The surveillance videos and Poston's testimony should have been dispositive—no rational trier of fact could have found proof beyond a reasonable doubt that Poston did not act reasonably in self-

defense."].) Petitioner *could* have simply claimed that he drew his gun because he feared McNeely was armed; and he started firing when he saw McNeely reach into his jacket pocket. Instead, he repeatedly lied in order to make a more compelling case for self-defense. But by doing so, petitioner completely undermined his own credibility.

For example, petitioner claimed that he acted in reasonable self-defense because he knew that McNeely was armed. That might have been true. But petitioner and his girlfriend, Tamena Bailey, testified that McNeely repeatedly opened his jacket and flashed his gun at them. The video does not support that claim. Moreover, in a jail call, petitioner told his mother Bailey would testify to anything he told her to. (19 RT 1647–1650.)

Petitioner testified that he did not reach for his gun right after he was slapped; he merely steadied the camera that was hanging from his neck. However, the video clearly shows that petitioner reached for his gun. Petitioner testified that McNeely reached for his gun first. But the video clearly shows that, after slapping petitioner, McNeely kept his hands at his sides; he did not reach for his gun. Petitioner testified that McNeely shot at him while he was still firing at McNeely. However, the video clearly shows that McNeely did not even take out his gun until after petitioner had fired his last shot. Likewise, petitioner lied about McNeely shooting the Lexus's radiator. The smoke in the video is clearly gun smoke, not steam from the radiator.

Petitioner also lied when he testified his gun did not jam or run out of bullets; he just decided to stop shooting. The video clearly shows that petitioner tried to keep shooting, but the gun did not fire. Moreover, it was disingenuous for petitioner to claim he decided to stop shooting at the precise moment that McNeely took out his gun.

Petitioner also lied when he testified he dropped his gun at the scene because he was scared. Petitioner was not too scared to draw and use the gun; why would he have been too scared to hold onto it? Why would he drop a gun—which supposedly was still capable of firing bullets—when McNeely was chasing him and firing shots? And, of course, no gun was found at the scene. So the jury undoubtedly inferred that petitioner lied and disposed of his gun later because it was incriminating evidence.

In addition, petitioner illegally possessed his handgun; he lied to the police about his involvement in the crimes; he fled to Los Angeles; and he was properly impeached with four prior felony convictions. Therefore, for all of the reasons discussed above, petitioner's claim that the prosecutor obtained a conviction by unjustifiably attacking his character and appealing to the jury's prejudices rings hollow. Viewed in the light most favorable to the verdicts, the evidence supported the jury's determination that petitioner shot McNeely out of a desire to engage in mutual combat, out of pride, or the wish to protect his reputation—not an actual and reasonable fear of death or great bodily injury.

Petitioner makes eight claims of error which purport to explain how the prosecutor obtained convictions even though the video supposedly showed self-defense as a matter of law. Six of those claims allege trial counsel provided ineffective assistance. Petitioner also alleges the prosecutor withheld evidence that could have been used to impeach Oakland Police Lieutenant Tony Jones's testimony—a violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)). And petitioner alleges cumulative prejudice. However, petitioner has failed to make out a prima facie case for any of his eight claims. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474–475 (*Duval*) ["An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the

petitioner would be entitled to relief. [Citations.] If no prima facie case for relief is stated, the court will summarily deny the petition.”].)

(1) In his direct appeal, petitioner contended that the prosecutor committed misconduct by questioning petitioner in a manner that twisted the meaning of his prior statements and by attacking his character in closing argument. Despite petitioner’s contention that there was “pervasive” prosecutorial misconduct, he argued it would have been *futile for trial counsel to make any objections*. (PAOB 109–111 [Argument V].) In the current matter, however, petitioner alleges that “the trial court may well have *sustained an objection* that the prosecutor’s pervasive emphasis on bad character evidence went beyond any permissible use.” (Pet. 75–76.) In either case, there was no prosecutorial error; there was no reason for trial counsel to object; and there was no prejudice.

(2) Petitioner renews the claim from his direct appeal that trial counsel should have objected to the instruction on mutual combat (CALCRIM No. 3471). (PAOB 93–96 [Argument III].) Petitioner now cites trial counsel’s concession that he should have objected or requested a modification based on *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*). However, notwithstanding *Ross*, the instruction was proper as given. Moreover, petitioner has not shown how the instruction was prejudicial if it did not apply.

(3) Petitioner has not shown that trial counsel failed to adequately prepare him to testify. Despite other concessions, trial counsel does not concede that he failed to adequately prepare petitioner. Presumably, he does not agree with petitioner’s and appellate counsel’s characterization. In any case, petitioner has not shown that trial counsel’s preparation fell below professional standards. Nor has petitioner shown that he would have received a more favorable result if he had been better prepared to testify.

(4) Petitioner has not shown that additional investigation would have proven that petitioner acted in self-defense.

Petitioner has not shown that presenting an expert on (5) African-American vernacular English *or* (6) African-American culture was the only competent legal strategy. Nor can petitioner show prejudice from failing to call such experts.

(7) Petitioner also cannot prevail on his claim that the prosecutor withheld evidence that Oakland Police Lieutenant Tony Jones sent racist text messages to Oakland Police Sergeant Mike Gantt. Petitioner has not shown that there was discoverable evidence at the time of his trial. Petitioner has also not shown that the evidence was material. For example, petitioner does not discuss Jones's testimony *at all*. Petitioner does not claim Jones's testimony was false, or that the text messages would have caused the jury to doubt Jones's testimony about Oakland street culture, street slang, and credit card fraud. Nor does petitioner explain how, by attacking Jones's credibility, it would have produced more favorable verdicts. Therefore, petitioner has not made out a prima facie case of a *Brady* violation.

(8) Because there were no errors, petitioner has not made out a prima facie case of cumulative prejudice.

Finally, there is no need for an evidentiary hearing. Petitioner has not shown that he was prejudiced by trial counsel's purportedly deficient performance or by the alleged *Brady* error. Therefore, even if petitioner's factual bases are assumed to be true, there is not a reasonable probability petitioner would have received a more favorable result absent the errors. Moreover, because petitioner has not made out a prima facie case for any of his claims, this Court should not issue an order to show cause and it should deny the petition.

## STATEMENT OF THE CASE AND FACTS

### A. Procedural Background

The Alameda County District Attorney filed an information on October 10, 2013. As amended on January 28, 2014, the information charged petitioner and codefendant Joe McNeely with five counts. (1 CT 24–41; 3 CT 776, 778; 5 CT 1462.[1]) **Count one** charged the codefendants with the murder of Lionel Fluker (Pen. Code, § 187, subd. (a)),[2] with enhancements for the personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). (1 CT 24–26.) **Counts two and three** separately charged the codefendants with the attempted murder of one another (§§ 187, subd. (a), 664), with enhancements for the personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). (1 CT 27–29.) **Counts four and five** separately charged the codefendants with possession of a firearm by a felon (§ 29800, subd. (a)(1)). (1 CT 32–34.) The information also alleged that McNeely had nine prior convictions and two prison priors (§ 667.5, subd. (b)); petitioner had six prior convictions and four prison priors (§ 667.5, subd. (b)). (1 CT 34–41.)

On February 3, 2015, the jury found the codefendants guilty as charged and it found the firearm enhancements true. (3 CT 873–876; 6 CT 1471–1474; 20 RT 2042–2045.) The trial court did not make findings on the prison priors.

---

[1] References to the Reporter's and Clerk's Transcripts are to the record in petitioner's direct appeal (case No. A141557). References to exhibits are to petitioner's exhibits unless otherwise indicated.

[2] Further statutory references are to the Penal Code unless otherwise indicated.

On March 21, 2014, the trial court sentenced each codefendant to 72 years to life. (3 CT 887–891; 6 CT 1483–1487; 21 RT 27–29.[3])

The codefendants filed notices of appeal on March 21 and 24, 2014, respectively. (4 CT 927; 6 CT 1531.)

Briefing in the codefendants' joint appeal (case No. A141557) was completed in March 2016. The codefendants requested oral argument in April 2016, but that hearing has not yet been calendared.

On August 10, 2016, petitioner filed the current petition for writ of habeas. On August 11, 2016, this Court requested that respondent file points and authorities in response to the petition.

### B. Trial Evidence

Around 10:00 p.m. on April 5, 2013, codefendant Joe McNeely parked his car at the Valero gas station at the intersection of MacArthur Boulevard and Seminary Avenue in east Oakland.[4] (12 RT 663; 13 RT 829; 15 RT 1002–1012.) In his car, McNeely had 5.4 ounces of marijuana, 30 baggies of marijuana packaged for sale, methamphetamine pills which may have been fabricated to look like ecstasy (MDMA), and a digital scale. (12 RT 623, 628; 15 RT 1037, 1010–1012, 1020–1024, 1041–1049, 1058–1059; 16 RT 1092, 1181, 1184; People's Exh. 1-E-14.) After he put gas in his car, McNeely walked around the gas station; he was likely trying to sell drugs. (12 RT 636–637, 679; 16 RT 1222–1230; People's Exh. 8.)

At 10:07 p.m., petitioner and his girlfriend, Tamena (Mena) Bailey, parked her Lexus in front of the Valero mini market. Bailey remained in the front passenger seat while petitioner got out of the car. Petitioner had a

[3] Respondent refers to the Reporter's Transcript for sentencing on March 21, 2014, as Volume 21.

[4] Respondent incorporates by reference its Statement of Facts from petitioner's direct appeal. (RB 18–44.) Respondent repeats the most relevant facts here for the Court's convenience.

loaded .40 caliber semiautomatic handgun inside his right waistband. Petitioner went into the market to buy cigars that could be used as rolling paper for marijuana. (12 RT 679–681, 703; 13 RT 855–856; 15 RT 985; 16 RT 1171, 1222–1230.)

After petitioner came out of the market, he spoke to McNeely. They walked over to McNeely's car and McNeely offered petitioner a bag of marijuana. However, petitioner turned it down and walked back the Lexus. (16 RT 1089–1091, 1098.)

McNeely joined petitioner and they stood between the market doors and the Lexus's front passenger door. McNeely was upset and berated petitioner. Petitioner tried to turn away and ignore him, but McNeely became more annoyed. Bailey had her window down and tried to talk to the men—perhaps to calm down McNeely. McNeely paced around and repeatedly grabbed the lapels of his jacket out of frustration. McNeely threw a cup onto the ground. He went up close to petitioner and continued to talk belligerently. (13 RT 837; Exhs. 8, 12.)

At 10:12:31 p.m., McNeely used his right hand to forcefully slap the left side of petitioner's face. McNeely simultaneously stuck out his left leg so when petitioner staggered to his right, he tripped over that leg. McNeely probably intended to trip petitioner to the ground, but petitioner only stumbled and quickly regained his balance. As he straightened back up, petitioner used his right hand to remove his handgun from his waistband. (13 RT 837; Exhs. 8, 12.)

Petitioner's momentum carried him several feet out in front of the Lexus. McNeely took a couple of steps to his left to stay close to petitioner, and then stepped just in front of the Lexus. Just as McNeely pulled out the magazine from his left inside jacket pocket, petitioner fired three or four shots at McNeely. McNeely fell backward to the ground, scrambled backward so he was in front of his car's front passenger side tire,

and dropped the magazine. Petitioner walked toward McNeely and came within six feet of him as he fired additional shots for a total of 10 shots. Petitioner's gun ran out of bullets (or jammed); he pulled the trigger two or three more times, but the gun did not fire. (12 RT 680; 13 RT 740–741, 758, 837; 15 RT 936, 998; Exhs. 8, 12.)

Six of petitioner's bullets struck McNeely. Nevertheless, McNeely got up on one knee; pulled his handgun out of his right jacket pocket; picked up the magazine he had dropped; and loaded the magazine into the gun. Petitioner ran away and McNeely got up and chased him. McNeely immediately fired five shots at petitioner's back. Petitioner ran 94 feet north through the gas station lot. McNeely fired another shot and then petitioner ran north on Seminary Avenue. McNeely stopped in front of Mill's Hoagie Shop and fired two last shots at petitioner. None of the bullets struck petitioner. (12 RT 681; 13 RT 742, 753, 758–759, 771; 15 RT 936–942, 958, 960, 965, 971, 973; 16 RT 1254–1255; Exhs. 8, 12; see 15 RT 922–923.)

However, Lionel Fluker had been driving south on Seminary Avenue. He heard the initial gunshots, pulled over to the right side of the road, and put both feet on the brake. One of McNeely's last two or three shots went through Fluker's windshield and struck him in the center of his forehead. The bullet passed through Fluker's brain and lodged at the back of his skull. He died almost instantly. (12 RT 542, 545–549, 570, 689; 13 RT 814–815, 817–818; 16 RT 1170, 1250–1251.)

## ARGUMENT

### I. TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT TO EITHER THE PROSECUTOR'S QUESTIONS ABOUT PIMPING OR THE PROSECUTOR'S ARGUMENT THAT THE DEFENDANTS ENGAGED IN MUTUAL COMBAT

Petitioner renews his contention from his direct appeal (Argument V) "that the prosecutor committed pervasive, prejudicial misconduct in her cross-examination of Poston and her closing argument." (Pet. 73, citing PAOB 109–129.) Petitioner complains the prosecutor questioned him about his out-of-court statements which suggested he was a pimp; she argued that petitioner did not care about the safety of innocent bystanders; and she argued that petitioner and McNeely agreed to engage in mutual combat. (Pet. 75.) Petitioner contended in his direct appeal that objecting would have been futile. (PAOB 111.) However, he now claims "trial counsel's failure to object denied Poston the effective assistance of counsel." (Pet. 73.)

To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694 (*Strickland*); *People v. Waidla* (2000) 22 Cal.4th 690, 718.)

Respondent incorporates by reference its argument from the direct appeal: Since there was no prosecutorial error, there was no reason for trial counsel to object. (See RB 137–141; see also *People v. Osband* (1996) 13 Cal.4th 622, 678 [there is no need for defense counsel to make pointless objections to admissible evidence]; *People v. Anderson* (2001) 25 Cal.4th

543, 587.) And because any objection would have been overruled, there was no prejudice. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694 [petitioner must establish a reasonable probability of a more favorable result]; *People v. Lopez* (2008) 42 Cal.4th 960, 966.)

Though petitioner barely discusses the nature of his claims, his focus seems to be on the "'pimp,' 'bitch,' and 'ho' evidence." (Pet. 75.) Trial counsel moved in limine to exclude evidence that petitioner was a pimp. (5 RT 185; 8 RT 399.) The trial court deferred its ruling. (8 RT 401; 18 RT 1443.) After petitioner's direct testimony, the prosecutor argued that evidence petitioner was pimping was admissible to rebut the impression he gave that he only engaged in legitimate business activity. (18 RT 1574.) "Pimping also comes with intimidation, and guns, and goes directly to a lack of self-defense." (18 RT 1574–1575) The prosecutor also argued it was relevant to whether Bailey was under any sort of influence to testify falsely on petitioner's account. (18 RT 1575.) The trial court ruled that petitioner's jail calls admitting he was a pimp were admissible. (18 RT 1579.) It deferred its ruling on petitioner's letter to his brother regarding pimping. It ruled that petitioner's phone call to his mother indicating Bailey would say whatever he told her to say was admissible. (18 RT 1580.)

Trial counsel did not object when the prosecutor questioned petitioner about pimping. Petitioner denied being a pimp even when the prosecutor confronted him with an out-of-court statement which indicated he was. (19 RT 1653–1654.) On McNeely's cross-examination, petitioner admitted that Brianna Howard earned some money for him, but "[n]ot enough to call myself a pimp . . . ." (19 RT 1678.) Then petitioner seemed to take it back. He testified Howard earned "a thousand here, a thousand there." (19 RT 1679.) But she kept the money for herself. (19 RT 1679–1680)

Petitioner contends trial counsel "could have protested that the prosecutor was going way beyond the main asserted purpose for the character evidence—to try to show that Poston controlled Bailey's testimony as her pimp. (8 RT 396–400.)"[5] (Pet. 74–75.) However, the evidence was not admitted only for that purpose. It was also intended to rebut petitioner's claim that he was a legitimate businessman. (See 18 RT 1520, 1530; 19 RT 1618–1619.) It also undercut petitioner's self-defense claim by showing that he was involved in Oakland street crime—so he knew exactly what he was dealing with when he faced-off with McNeely.

Moreover, as trial counsel acknowledges in his declaration, he could not object to evidence the trial court had ruled was admissible. (See Exh. 13 at p. 265.) Furthermore, the prosecutor and McNeely needed to question petitioner somewhat aggressively because he denied being a pimp. Petitioner has not shown that the prosecutor's questioning was intemperate or deceptive. Nor has he shown the evidence was irrelevant or elicited solely to stir prejudice.

Likewise, the prosecutor properly elicited petitioner's tacit admission that Bailey would do what he said. (See, e.g., 18 RT 1649, 1652–1654, 1666.) That showed that Bailey's testimony that McNeely flashed his gun was weak corroboration for petitioner's similar claim.

Petitioner complains that the prosecutor improperly emphasized the theory that the shooting was a "'gun-battle'" and petitioner did not care about the safety of innocent bystanders. (Pet. 75.) But it is a peculiar argument to claim that the prosecutor acted improperly by emphasizing her

---

[5] Prior to trial, McNeely argued that Bailey might have prostituted for petitioner. (8 RT 397–400.) The prosecutor argued that pimping evidence was relevant to whether petitioner controlled Bailey. (18 RT 1575.) However, no evidence was discussed or admitted that showed Bailey actually prostituted for petitioner.

main theory of the case. Likewise, the prosecutor had every right and obligation to argue for an element of the crimes charged—i.e. that petitioner had a conscious disregard for human life. (See 3 CT 841–843.) Thus, because there was no prosecutorial error, there was no reason for trial counsel to object. (See *People v. Price* (1992) 1 Cal.4th 324, 387 [counsel not ineffective for failing to make futile objections].)

Finally, petitioner must prove that, absent the purported errors, there is a reasonable *probability* of a more favorable result. (See *Strickland*, *supra*, 466 U.S. at p. 694.) That means he must not only prove it is probable that the trial court would have sustained objections, but that doing so probably would have produced a more favorable result. But the best petitioner can muster is to argue that "the trial court *may* well have sustained objections . . . ." (Pet. 75–76, italics added.) That is insufficient, on its face, to make out a prima facie case of prejudice. (See *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.) Therefore, this Court should not issue an order to show cause on this claim.

## II. Trial Counsel Was Not Deficient for Failing to Object, or Request Modifications, to the Instruction on Mutual Combat (CALCRIM No. 3471)

The prosecutor's theory was that petitioner and McNeely knew that each other was armed and they agreed to engage in mutual combat—possibly over a drug dispute or whether petitioner was really from the Seminary neighborhood. (20 RT 1865, 1872, 1963, 1965; see 18 RT 1569.) Pursuant to CALCRIM No. 3471, the trial court instructed the jury, "A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (3 CT 831–832.)

Petitioner renews the claim from his direct appeal that trial counsel should have objected to that instruction. (Pet 78; PAOB 93–96 [Argument

III].) Petitioner contends that, pursuant to *Ross*, *supra*, 155 Cal.App.4th 1033, there was insufficient evidence of a *preexisting* agreement to engage in mutual combat, so there was no basis to give the instruction. (See Pet. 78; see also *Ross*, at p. 1045 [“‘[M]utual combat’ means not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities,” italics omitted].)

In the current matter, petitioner augments his claim with trial counsel’s declaration. (See Exh. 13 at pp. 265–267.) Trial counsel declares, “If I had seen the language in *Ross* regarding ‘the first assaultive conduct,’ I would have objected to CALCRIM No. 3471 and/or I would have requested modification. Modification pursuant to *Ross* would have strongly supported Mr. Poston’s defense and it would have cut off the prosecutor’s argument that it was mutual combat because Mr. Poston fired the first shot even though Mr. McNeely committed the first assault.” (Exh. 13 at p. 267.)

However, as trial counsel also noted, “Mutual combat was the prosecution’s entire theory of the case.” (Exh. 13 at p. 265.) And as respondent argued in the direct appeal, and incorporates here by reference, that theory was supported by substantial evidence. (See RB 121–123 [Argument VII-B].) The evidence showed that petitioner and McNeely likely knew each other was armed. (See 19 RT 1541.) Petitioner testified that McNeely said, “‘No bitch ass, ain’t even from Seminary.’” Petitioner replied, “‘My father be driving AC Transit since 1976 . . . .’” (18 RT 1543.) That showed a dispute about street credentials—though there might have been an underlying disagreement about drugs.

The evidence also showed that petitioner could have walked away from McNeely, or could have entered the Lexus and driven away. But he apparently remained with McNeely to protect his reputation. The video showed McNeely pacing around, gesticulating, and getting in petitioner’s

face. It would not be a stretch for the jury to infer that McNeely challenged petitioner to a fight. It was also reasonable to infer that petitioner accepted the challenge, and that is when McNeely slapped him. Moreover, since the agreement could have been implied, the jury did not need to find that petitioner and McNeely expressly discussed the parameters. It was enough that both men demonstrated an intention to fight and neither man backed-off or expressed a desire to withdraw. That was particularly credible in light of Lieutenant Jones's testimony. He testified that, in Oakland street culture, men could not back down without looking like a punk. (19 RT 1822.) So petitioner and McNeely understood they were going to fight.

The fact that petitioner immediately grabbed his gun also supported the inference that he anticipated a gunfight even before McNeely slapped him. Likewise, petitioner and another witness testified that, after he stopped shooting at McNeely, petitioner ran into the middle of the street; he turned around while McNeely was still shooting at him; and petitioner showed his hands to indicate he no longer wanted to fight. (15 RT 936, 940–941; 18 RT 1551–1552.) The jury could have reasonably interpreted that testimony as meaning that petitioner wanted to withdraw from the preexisting agreement to have a gunfight because petitioner no longer had a working gun. Thus, there was substantial evidence that petitioner and McNeely had an implied agreement to fight. Therefore, the trial court properly instructed the jury pursuant to CALCRIM No. 3471.[6] (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 823.) Moreover, because the instruction was supported by substantial evidence, there was no reason for

---

[6] Petitioner argues that trial counsel should have objected because the prosecutor did not prove the mutual-combat exception to self-defense *beyond a reasonable doubt*. (Pet. 80.) However, the issue here is whether substantial evidence support giving the instruction—not whether mutual combat was ultimately proven.

trial counsel to object. (See *People v. Price*, *supra*, 1 Cal.4th at p. 387 [counsel not ineffective for failing to make futile objections].) Likewise, any objection would have been overruled, so petitioner cannot show prejudice. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694.)

In addition, contrary to trial counsel's concession and petitioner's argument, the instruction did not prevent petitioner from claiming self-defense. (Pet. 81.) CALCRIM No. 3471 expressly applied only if the agreement was made "before the claim to self-defense arose." (3 CT 831–832.) Petitioner's claim to self-defense arose when McNeely slapped him. So, pursuant to the instruction, the agreement to engage in mutual combat had to have taken place before the slap, i.e., when petitioner and McNeely were talking. Therefore, the jury would have used that instruction only if it found the agreement was made *before* the fight. Thus, the instruction included *Ross*'s requirement that mutual combat had to be based on a *preexisting* agreement. (See *Ross*, *supra*, 155 Cal.App.4th at p. 1045.) And contrary to petitioner's argument (Pet. 81), the jury could *not* have used the instruction to find that defendants signaled their agreement to engage in mutual combat by "a reciprocal exchange of blows." (*Ibid.*)

Finally, if petitioner is correct that the instruction was not supported by substantial evidence, then the jury would not have used it. The trial court instructed the jury that "some of these instructions may not apply." (See 3 CT 802; CALCRIM No. 200.) And this Court presumes that the jury followed the trial court's instructions. (See *People v. Adcox* (1988) 47 Cal.3d 207, 253.) In short, if the instruction "was erroneously given because it was irrelevant under the facts, the error is merely technical and not grounds for reversal." (See *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1335.) Therefore, it is not reasonably probable that if the trial court had not instructed the jury with CALCRIM No. 3471, petitioner would have received a more favorable result. (See *Strickland*, *supra*, 466 U.S. at

pp. 687, 694; *People v. Guiton* (1993) 4 Cal.4th 1116, 1130.) Accordingly, petitioner has not made out a prima facie case of ineffective assistance. (See *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.)

## III. Even If Trial Counsel Failed to Adequately Prepare Petitioner to Testify, There Was No Prejudice and, Therefore, No Ineffective Assistance

Petitioner contends that trial counsel's "failure to adequately prepare Poston to testify and failure to adequately rehabilitate him on redirect examination denied Poston the effective assistance of counsel." (Pet. 82.) But while trial counsel admitted he could have handled other aspects of the defense better, he did not corroborate any aspect of petitioner's allegations. (See Exh. 13.) Presumably, trial counsel did not agree with petitioner's claim that he failed to adequately prepare him for trial. More importantly, petitioner has not shown that he would have testified differently with more preparation. He only suggests that he could have finessed certain answers so they appeared less incriminating.

To support his claim of deficient performance, petitioner asserts that trial counsel told petitioner "he had to testify, but admittedly did not spend much time preparing him because he thought he was sophisticated and well-spoken and did not need help. (Exh. 2, ¶ 18; Exh. 13, ¶ 26.)" (Pet. 82.) Thus, petitioner seems to suggests that trial counsel "admitted" he should have prepared petitioner more. However, *there is no such concession* in trial counsel's declaration. Rather, petitioner supports this proposition by citing *his own* biased declaration and a *nonexistent* paragraph (No. 26) in trial counsel's declaration. (See Exh. 13 at p. 270 [only 21 paragraphs].) Not only is this mischaracterization troubling on its face, it sheds substantial doubt on the credibility of petitioner's own description of how he was prepared by trial counsel.

In determining whether petitioner has made out a prima facie case, this Court presumes that his factual allegations are true. (See *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.) However, it cannot go unsaid that the *only* support for petitioner's contention is his own declaration. And petitioner has very little credibility. In the current matter, he has falsely suggested that trial counsel admitted he failed to adequately prepare petitioner to testify. Petitioner's claim that trial counsel "did not help me prepare to testify at all" is unsupported by trial counsel's declaration and rings false. (Exh. 2 at p. 147; see Pet. 83 [petitioner argues trial counsel's performance was a "complete abdication of his duty to prepare Poston to testify . . . ."].) And as discussed above and in the Respondent's Brief, petitioner lied throughout his testimony. Therefore, petitioner's declaration is a thin reed on which to base his entire claim.

Furthermore, "In assessing the adequacy of counsel's performance, a court must indulge 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."'" (*People v. McDermott* (2002) 28 Cal.4th 946, 988, quoting *Strickland*, *supra*, 466 U.S. at p. 689.) Therefore, given that petitioner's facts must be assumed to be true, he may have made out a prima facie case of deficient performance. However, if this Court were to consider petitioner's claim on the merits, petitioner's uncorroborated and untrustworthy declaration would fall far short of overcoming the presumption that trial counsel acted competently. (See *ibid.*)

Nevertheless, even if petitioner's allegations are taken as true, he has still failed to establish a prima facie case of ineffective assistance because he cannot demonstrate prejudice. As noted in *Strickland,* "a court need not determine whether counsel's performance was deficient before examining

the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

Based on his dubious declaration, petitioner contends that trial counsel never discussed petitioner's jail calls with him; never gave him a copy of the letter petitioner sent from jail to Nicholas Bosworth at petitioner's house; and never discussed how petitioner should answer questions about his prior convictions or the embossing machines found at petitioner's house. (Pet. 83.) However, petitioner does not claim that his testimony on these matters was incomplete or mistaken. He does not explain how the incriminating inferences from the jail calls and jail letter could have been avoided.

Moreover, the fact that petitioner's testimony was not entirely favorable does not establish that trial counsel was deficient. (See *People v. Williams* (1997) 16 Cal.4th 153, 263 [no amount of preparation can make a witness impervious to effective cross-examination]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1031–1032 ["we may not hold defense counsel responsible for the potentially damaging responses furnished by a defendant . . . ."].) Petitioner also offers no argument that better preparation would have enabled him to testify so much more believably that it would have resulted in more favorable verdicts. (See *People v. Williams*, *supra*, 16 Cal.4th at p. 263 [even assuming trial counsel had not fully prepared every witness, the record did not suggest that any witness's testimony would have been different had that witness been prepared in the manner the defendant suggested].)

Petitioner also contends trial counsel failed to adequately advise him how to explain he was not a pimp; why he used the word "pretense" in a rap about self-defense; and why he researched and discussed the law on

self-defense. (Pet. 83.) However, petitioner clearly intended to avoid admitting he was a pimp. He successfully dodged that issue for a while. It was only after additional questioning that he made a tacit admission. (19 RT 1678–1681.) Because petitioner conceded he engaged in some pimping even though he clearly intended to deny it, he cannot show that he would have testified differently if trial counsel had prepared him. (See *People v. Cunningham*, *supra*, 25 Cal.4th at pp. 1031–1032 [“even the most carefully prepared witness may give a surprise answer . . . .”].)

Likewise, additional preparation could not have erased the fact that petitioner wrote the potentially inculpating lyric, “It’s all self-defense under the proper pretense.’” (16 RT 1136; People’s Exh. 30; see *People v. Hines* (1997) 15 Cal.4th 997, 1032 [defendant must show that his testimony would have been different had there been greater preparation].) Petitioner also admitted he had been brushing up on the law of self-defense. (19 RT 1643; see *People v. Hines*, at p. 1032.) Presumably, that was true, and the only way to avoid admitting it was to lie—which trial counsel had no duty to recommend. And, of course, that admission was only damaging because petitioner clearly lied and tailored his testimony about what happened to strengthen his self-defense claim.

Petitioner complains that trial counsel did not advise him how to respond to questions about his prior felony convictions. (Pet. 83.) However, trial counsel did what most defense attorneys do: he raised the issue at the beginning of direct examination to deemphasize the priors. (18 RT 1517–1519.) Moreover, petitioner does not explain what he could have said other than to admit the truth.

Petitioner also complains that trial counsel did not prepare him to explain why there were credit card embossing machines in his house. (Pet. 83.) However, it seems petitioner did a reasonably good job of deflecting those questions—considering there were also hundreds of pages of check

paper in his house and he had a prior conviction for passing counterfeit checks. (18 RT 1518; 19 RT 1618–1624, 1700–1703.) In any case, petitioner offers no clue how he could have testified more effectively or prevented that evidence from adversely affecting his credibility.

Finally, petitioner contends that he could have persuaded the jury of his version of the facts if he had only been better prepared. But as discussed above, the video showed that petitioner lied about many basic facts surrounding the shooting. So, no matter how polished petitioner was, the jury was going to distrust petitioner's testimony because he clearly made up his mind to lie—even about facts that were easily refutable.

Thus, for all the reasons discussed above, petitioner has not shown that it is reasonably probable he would have received a more favorable result if trial counsel had spent more time preparing him to testify. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694.) Therefore, even if it were true that trial counsel totally failed to prepare petitioner for trial, petitioner has not made out a prima facie case of ineffective assistance. (See *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.)

## IV. Trial Counsel Was Not Deficient in His Pretrial Investigation

Petitioner contends that trial counsel's "failure to investigate and present corroborating evidence denied petitioner the effective assistance of counsel." (Pet. 85.) However, none of petitioner's claims are persuasive and he has not shown that additional investigation would have proven that petitioner acted in self-defense and did not tailor his testimony to conform to his legal research.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a

heavy measure of deference to counsel's judgments." (*Strickland*, *supra*, 466 U.S. at p. 691.)

Here, petitioner contends, "Poston's handwritten comments on the self-defense packet would have strongly supported his testimony that he did not fabricate the circumstances of his case to fit the legal rules . . . ." (Pet. 85–86.) However, petitioner does not bother to explain what hearsay exception would authorize him to present the jury with his own handwritten notes. The hearsay exception for prior consistent statements applies only to statements made "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b); see *People v. Gentry* (1969) 270 Cal.App.2d 462, 473.) Here, of course, petitioner had every motive to fabricate while he was sitting in jail awaiting trial. Moreover, even if the evidence was admissible, the jury would have known it was self-serving and petitioner conformed his testimony to his research on self-defense law—even when petitioner's testimony plainly contradicted the video shown to the jury.

Petitioner claims that trial counsel should have introduced petitioner's dictionary because it would have shown that the lyric, "'It's all self-defense under the proper pretense'" did not indicate that his self-defense claim was contrived: "Poston's dictionary included two alternative definitions of 'pretense' which were neutral—they did not indicate falsity." (Pet. 86, citing Exhs. 4, 5; see 16 RT 1136; People's Exh. 30.) However, all of the definitions indicate an attempt to be false or misleading. (Exh. 4 at p. 166 ["not supported by fact," "mere display," "an attempt to attain a certain condition," "false show," "pretext"].) Moreover, petitioner makes no showing that he intended to use the term differently than its common usage.

According to petitioner, McNeely shot at him and the bullet struck the Lexus's radiator before petitioner finished shooting at McNeely. Petitioner contends that trial counsel should have investigated and determined that

petitioner's mother, brother, and brother's mechanic could "corroborate Poston's testimony that there was a bullet hole in Bailey's car right after the charged shooting." (Pet. 87, citing Exhs. 6 at p. 171, 7 at p. 173, 8 at p. 175, 15 at p. 285; 19 RT 1738–1740)

However, trial counsel could reasonably decide not to investigate that assertion because it was a lie. None of the declarations indicate "there was a bullet hole in Bailey's car," i.e., the body. The smoke in the video was from petitioner's gun—not the Lexus's radiator. And the smoke was clearly visible *before* McNeely pulled out his gun and started shooting. Moreover, petitioner's exhibits are far from convincing. Petitioner's mother and brother were biased. (Exhs. 6 at p. 171, 7 at p. 173.) The declaration by appellate/habeas counsel is hearsay. (Exh. 15 at p. 285.) And petitioner's brother's mechanic did not even remember what was wrong with the radiator. (Exhs. 8 at p. 175.) It seems peculiar that he remembered replacing a radiator—which must be a fairly common (and forgettable) procedure for a mechanic—but not the fact that it was damaged by a bullet. Nor has petitioner produced a receipt for the repair—which would have been several hundred dollars. Thus, petitioner's claim is based on wholly unreliable and implausible declarations.

Moreover, even if petitioner had established that the radiator had been shot, the only plausible explanation was that *petitioner* shot it. After all, petitioner was standing in front of the Lexus when he shot McNeely; he could have easily shot the radiator. On the other hand, McNeely was off to the side of the passenger compartment when he started shooting. So it seems dubious that McNeely could have even shot the radiator since the bullet likely would have had to pass through the side panel and engine. Therefore, even if the radiator was shot, it did not prove that McNeely shot it; nor did it prove that McNeely shot at petitioner before he finished shooting at McNeely.

In any case, petitioner's lie about the radiator was the least of his problems. As discussed above, petitioner repeatedly lied about more important facts that were easily refuted by the video. Therefore, petitioner cannot show he would have received a more favorable result if trial counsel had called a witness to testify the radiator had been shot. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694.)

In sum, there was no need for trial counsel to investigate further because no evidence could disprove the impeaching nature of petitioner's statement about researching self-defense law; or his lyric about contriving his self-defense claim; or his testimony about McNeely shooting the Lexus's radiator. Therefore, petitioner has not made out a prima facie case of deficient performance. (See *Strickland*, *supra*, 466 U.S. at p. 691 ["counsel has a duty to make . . . a reasonable decision that makes particular investigations unnecessary."].) Likewise, petitioner has not shown that it is reasonably probable that additional investigation would have changed the jury's perception of petitioner's veracity or resulted in a more favorable result at trial. (See *id.* at pp. 687, 694.)

## V. TRIAL COUNSEL WAS NOT DEFICIENT FOR FAILING TO PRESENT EXPERT TESTIMONY ON AFRICAN-AMERICAN VERNACULAR ENGLISH

Petitioner contends that trial counsel's "failure to investigate and present expert testimony on AAVE [African-American Vernacular English] denied petitioner the effective assistance of counsel." (Pet. 88.) Petitioner also argues, "At least one [non-precedential] court has admitted testimony on the meaning of words in AAVE." (Pet. 88.) However, that hardly supports the proposition that failing to call such an expert meant trial counsel fell below professional norms. In particular, petitioner has not shown that presenting an expert on AAVE was the only competent legal

strategy. Nor can petitioner show prejudice from failing to call such an expert.

"An expert witness's testimony in the form of an opinion is limited to a subject 'that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' (Evid. Code, § 801, subd. (a).)" (*People v. Catlin* (2001) 26 Cal.4th 99, 131.)

Petitioner argues, "Professor [John R.] Rickford is a nationally recognized expert on AAVE . . . [and h]e could have testified that most of Poston's statements and rap lyrics are not incriminating at all." (Pet. 91.) However, petitioner discusses only one lyric "that is arguably facially incriminating—'it's all self-defense under the proper pretense' . . . ." Petitioner contends the lyric "should not be interpreted literally because rap lyrics are a form of artistic expression and Poston may have just been trying to use rhymes." (Pet. 91, citing Exh. 9 at pp. 182–186.)

However, the jury did not need an expert to explain that "rap lyrics are a form of artistic expression and should not necessarily be taken literally." (Exh. 9 at p. 185.) It is common knowledge that rap is an art form. It is common knowledge that artists try to be creative and do not feel constrained by the literal truth. However, it is also common knowledge that artists draw on their life experiences and reveal much about themselves—whether or not they consciously intend to do so. Therefore, the jury did not need an expert to explain that petitioner's lyrics could have been a creative fictional expression or an expression of true facts through an artistic lens. (See *People v. Catlin*, *supra*, 26 Cal.4th at p. 131.) Petitioner does not discuss any other statement that needed to be interpreted by an expert in AAVE. So he has fallen far short of showing the need for such an expert at trial.

As discussed in Argument VII, the prosecutor called Oakland Police Lieutenant Tony Jones to testify as a rebuttal witness. (19 RT 1799.)

Though he does not discuss Lieutenant Jones's testimony, petitioner seems to suggest that an expert on AAVE could have refuted some of Jones's explanations.[7] (Pet. 89–90 [an expert could have "refut[ed] the incorrect assumptions about AAVE put forth by the prosecution."].) Respondent disagrees.

Lieutenant Jones testified that "Sem City" was a nickname for the Seminary neighborhood in the context of drug-dealing. (19 RT 1806.) When someone in petitioner's video referred to "slide" or "sliders," he was referring to credit card fraud. (19 RT 1815.) To "fire on" someone means to punch—not slap—them. (19 RT 1817, 1828.) Jones recognized the lyric, "'You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a nigga and get away with it.'" It meant someone would need to "be high or crazy to think that you can punch me and get away with it." (19 RT 1818.) The phrase, "'You almost got bodied, instead caught you a body,'" meant you almost were killed, but instead you killed someone. (*Ibid.*) "Zips" are ounces of marijuana, cocaine, and heroin. (*Ibid.*) "Turning a date" is when a prostitute has sex with a john. (19 RT 1819.) In the phrase, "disrespect my shine," "shine" means "reputation, everything that is good about me . . . ." (*Ibid.*)

Respondent submits that this testimony was either self-evidently correct or rings true. In any case, petitioner has made no specific argument that Jones's testimony was wrong or prejudicial. So he cannot show that an expert was necessary to rebut it. In fact, an expert witness would have served so little purpose that trial counsel could have reasonably chosen to accomplish the same thing by cross-examining petitioner and Lieutenant

[7] The trial court did not recognize Lieutenant Jones as an expert and he did not purport to be one. (See *People v. Williams* (1988) 44 Cal.3d 883, 915 ["Lay opinion testimony is admissible where no particular scientific knowledge is required . . . .'"].)

Jones. (See *People v. Bolin* (1998) 18 Cal.4th 297, 334; see also Exh. 12 at p. 267 [trial counsel declared, "I tried to present a different, innocent interpretation in my redirect examination of Mr. Poston and my closing argument."].)

Petitioner contends "it was essential for Poston to practice speaking in SAE [Standard American English] for his testimony"; "that virtually all English speakers code-switch—they change their language and sentence structure depending on audience and context"; and that AAVE did not indicate dishonesty or criminality. (Pet. 91.) Respondent does not disagree. However, petitioner has not shown that an expert was necessary to explain those things. (See *People v. Catlin*, *supra*, 26 Cal.4th at p. 131.)

Finally, for all of the reasons discussed above, petitioner cannot show he would have obtained a better result if trial counsel had called an expert on AAVE. Contrary to petitioner's argument, the jury did not reject his self-defense claim because of improper character evidence or prejudicial inferences about AAVE. As discussed above, the jury convicted petitioner because he had a questionable claim of self-defense, and he squandered all of his credibility by repeatedly lying to the jury.

Indeed, petitioner relies on trial counsel's declaration for the proposition that "some of Professor Rickford's testimony *might* have been admitted . . . ." and that testimony "*might* have swayed at least one juror . . . ." (Pet. 89, italics added.) But petitioner must prove a reasonable *likelihood* of a more favorable result, not a mere possibility. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694.) Accordingly, petitioner has not made out a prima facie case of prejudice or ineffective assistance. (See *ibid.*; *People v. Bolin*, *supra*, 18 Cal.4th at p. 333; *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.)

## VI. TRIAL COUNSEL WAS NOT DEFICIENT FOR FAILING TO PRESENT AN EXPERT WHO WOULD TESTIFY THAT PETITIONER FLED BECAUSE AFRICAN-AMERICANS DISTRUST THE CRIMINAL JUSTICE SYSTEM

Petitioner fled from the crime scene because his gun stopped working and McNeely was shooting at him. However, petitioner never contacted the police to admit he was involved in the shooting, or to explain that he acted in self-defense. A few days after the shooting, petitioner fled to Los Angeles. He remained there for three months even though he knew the police were looking for him. He was arrested soon after he returned to Oakland. (13 RT 855, 860, 877; 16 RT 1133, 1157; 18 RT 1488; 19 RT 1616, 1666, 1700–1701, 1748.) When he was arrested, petitioner claimed he did not know anything about the shooting. (19 RT 1642.) He told the officers, "'It wasn't me.'" (19 RT 1643.) At trial, petitioner acknowledged that he was on the run in Los Angeles. (19 RT 1616.) During closing argument, the prosecutor argued that fleeing to Los Angeles showed petitioner's consciousness of guilt. (20 RT 1890, 1898–1899.) Trial counsel argued that petitioner fled because someone was shooting at him. (20 RT 1959.)

Petitioner contends that trial counsel's "failure to investigate and present expert testimony on African-American culture denied petitioner the effective assistance of counsel." (Pet. 94.) According to petitioner and "numerous other local experts on African-American culture[,] . . . distrust of the police and courts [means that]. . . possession of a firearm and flight from the police does not indicate consciousness of guilt among African-Americans." (Pet. 98.)

Respondent does not disagree with petitioner's habeas expert, Professor Ernest Morrell, that "it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police . . . ." (Exh. 11 at p. 219.)

However, petitioner's contention that African-Americans never flee from the police out of consciousness of guilt is patently false. Moreover, petitioner cannot show that presenting an expert on African-American culture was the only competent legal strategy; nor can he show prejudice from failing to call such an expert.

There was no need for trial counsel to call an expert to testify that some members of the African American culture distrust the criminal justice system because that is common knowledge. (See Evid. Code, § 801, subd. (a); *People v. Catlin*, *supra*, 26 Cal.4th at p. 131.) More importantly, it rings hollow to claim that trial counsel should have called an expert when petitioner, himself, never claimed that he fled because he did not trust the police or courts. Furthermore, petitioner does not explain why his testimony along those lines would have been insufficient. After all, anyone can understand that admitting participation in a shootout that resulted in a death is a risky proposition. Even in the best of worlds, the other shooter will try to shift the blame and the prosecutor may interpret the evidence in an unforeseen way.

Trial counsel could have reasonably assumed the jury understood that many African Americans distrusted the police and court system. (See Exh. 13 at p. 268.) Nevertheless, he could have decided that raising that issue would be seen as an effort by petitioner to avoid responsibility; or perhaps trial counsel believed that making that excuse for fleeing would antagonize the jury. Therefore, petitioner has not shown that calling an expert on African-American culture was the only reasonable trial tactic. (See *People v. McDermott*, *supra*, 28 Cal.4th at p. 988 [a defendant must overcome the presumption that defense counsel's challenged action might have been sound trial strategy].)

Petitioner also cannot show that any reasonably competent attorney would have called an expert. Even petitioner admits he contacted several

experts on African American culture and only one agreed to participate in a legal proceeding. (Pet. 98.) And contrary to petitioner's argument, Professor Morrell did not testify that flight was always a neutral act for African Americans. He testified only that some African-Americans may flee because they distrust the police. (Exh. 11 at p. 219.) Again, that did not prove petitioner fled for that reason. Only petitioner could identify his own reason. Indeed, speculating on what petitioner was thinking at the time of the crime was not within the province of an expert witness. (See *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657–658, overruled on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1049 [expert may not testify about defendant's subjective knowledge and intent]; see also *People v. Vang*, at p. 1048 [expert witness may not testify about defendant's specific intent because jury is as competent to evaluate the ultimate issues as the witness].) So trial counsel's failure to call an expert was not deficient performance.

In addition, petitioner has not demonstrated prejudice. Petitioner must prove a reasonable likelihood of a more favorable result, not a mere possibility. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694.) However, petitioner contends only that "Professor Morrell's testimony *might* have been admitted . . . ."; it "*might* have swayed at least one juror . . . ."; and some jurors "*might* have benefitted from the proposed expert testimony . . . ." (Pet. 97, italics added.) That claims fails on its face.

Moreover, the jury convicted petitioner because the evidence showed he responded to a slap with lethal force and he lost all credibility by repeatedly lying to the jury about facts that the video easily refuted. Therefore, petitioner has failed to show that, if Professor Morrell had testified, it is reasonably likely petitioner would have obtained a more favorable result. (*Strickland*, *supra*, 466 U.S. at pp. 687, 694.) For the

same reasons, petitioner has failed to make a prima facie case of ineffective assistance. (See *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.)

## VII. THE PROSECUTOR DID NOT VIOLATE *BRADY V. MARYLAND*

Oakland Police Lieutenant Tony Jones testified as the prosecutor's sole rebuttal witness. (19 RT 1806–1828.) Jones testified that drug dealers in the Seminary neighborhood needed to protect their turf; he described a video made by petitioner; he defined the meaning of certain slang phrases; and he testified how gift card and credit card fraud was perpetrated. Jones also opined that, according to the rules of the street in Oakland, a man needed to respond to an assault or he would lose his reputation.

Petitioner cites two news reports which indicate that Jones was accused of sending racist text messages to other officers. One report, dated June 22, 2016, indicates that Oakland Police Sergeant Mike Gantt filed an internal affairs complaint against Jones in 2014. (Exh. 16 at pp. 294–295; see 16 RT 1079 [Gantt also testified at the trial].) The other report, dated June 17, 2016, indicates that the text messages dated back to at least 2014, and Jones was put on administrative leave during the investigation. (Exh. 17 at p. 302.) A third exhibit indicates that, in 1998 and 2005, the Oakland Police Department settled two lawsuits involving Jones.[8] (Exh. 20 at p. 310.)

Petitioner contends, "The prosecutor failed to disclose material impeachment evidence as required by *Brady v. Maryland* and due process." (Pet. 101.) However, it seems unlikely there was anything to disclose because the internal affairs complaint was probably filed after the

---

[8] On August 31, 2016, Deputy District Attorney Stacie Pettigrew told respondent that Officer Tony Jones's suspension has been lifted and he is back on duty. Also, the Alameda County District Attorney's Office does not have Jones in its *Brady* bank. Unfortunately, Pettigrew was unable to determine when Officer Gant filed his internal affairs complaint.

conclusion of petitioner's trial. And even if the complaint was filed earlier, it was not material. Moreover, petitioner has the burden of proving materiality (*Strickler v. Greene* (1999) 527 U.S. 263, 289), but he does not even discuss Jones's testimony. So he has not shown any likelihood that the text messages would have undercut critical testimony and produced a more favorable result at trial.

"To challenge a conviction on *Brady* grounds, defendant must show that the prosecution suppressed evidence, that the suppressed evidence was favorable to the defense, and that it was material." (*People v. Zaragoza* (2016) __ Cal.4th __ [204 Cal.Rptr.3d 131, 159]; see § 1054.9.) "The duty extends to evidence known to others acting on the prosecution's behalf, including the police . . . . For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial. [Citations.]" (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709–710.)

Here, petitioner claims the prosecutor should have disclosed text messages Lieutenant Jones sent to Sergeant Gantt and possibly other Oakland police officers. Petitioner is not clear about when he thinks that duty arose. But he cannot possibly mean that the prosecutor was responsible for monitoring all communications between officers and judging which might be favorable and material in every prosecution. Presumably, petitioner means that the duty to disclose the texts arose after Gantt filed an internal affairs complaint. However, the exhibits indicate only that the complaint was filed sometime in 2014.

Submission of evidence in petitioner's trial concluded on January 28, 2014. And the jury found petitioner guilty on February 3, 2014. It is likely, therefore, that Sergeant Gantt's internal affairs complaint was filed after petitioner's trial was over. Thus, petitioner has not established that there was anything to discover during his trial. (See *Duvall*, *supra*, 9

Cal.4th at p. 474 ["Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief . . . ."]; *Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 393 [*Brady* does not authorize "defendants to engage in fishing expeditions . . . ."].) Moreover, petitioner has not made any argument that disclosure of the complaint after his trial could have been material. Therefore, petitioner has not made out a prima facie case of a *Brady* violation.[9]

Even if this Court believes it is sufficient that the internal affairs complaint *might* have been filed before the conclusion of petitioner's trial, petitioner still has not established a prima facie case because he has not shown that the texts messages could have been material. (See *Strickler v. Greene*, *supra*, 527 U.S. at pp. 289, 291 [defendant has burden of proving *Brady* violation].)

Respondent will assume, arguendo, that the messages were "racist" against African-Americans. But it should be noted that Officers Jones and Gantt were both African-American. And while a person can certainly be prejudiced against one's own race, it is also true that people often feel they have more license to poke fun at their own race. It does not necessarily mean they are actually prejudiced against members of that race or would treat members unfairly. So while it can be assumed that Jones's texts were offensive, it is not at all clear that they revealed an actual prejudice against

[9] Petitioner discusses news reports about actions against Officer Jones in 2005 and 2014. Then he asserts, "Covin specifically requested disclosure pursuant to *Brady v. Maryland* of any information pertaining to Lieutenant Jones, including information about the racist text messages." And then petitioner notes that *trial counsel* never received any disclosures. (Pet. 102.) This has the appearance of a chronological summary. But the *Brady* request was made by appellate/habeas counsel (Covin) more than two years after trial. (Exh. 19 at p. 308.)

African-Americans. And even if the racist text messages did show that Jones was prejudiced against African-Americans, that did not necessarily undermine his testimony. After all, racists can still testify truthfully.

Here, petitioner does not discuss Lieutenant Jones's testimony at all. It is difficult to see how petitioner can establish that the text messages were material if he does not explain how they would have undermined Jones's testimony or how undermining that testimony would have produced more favorable verdicts.

Lieutenant Jones testified about the meaning of some slang terms such as "Sem City," "sliders," "to fire on," "turning a date," "zips," and "disrespect my shine." (19 RT 1806, 1815, 1817–1819, 1828.) He also testified about the names of people in petitioner's video. (19 RT 1812-1814, 1819–1820.) It is difficult to see why the jury would have disbelieved this testimony if Jones had been impeached with the text messages.

Lieutenant Jones opined that the world portrayed by petitioner's video suggested that petitioner took pride in being from Sem City. (19 RT 1814.) Jones opined that it would have been disrespectful for someone to tell petitioner he was not from Sem City. (*Ibid.*) Again, there is no reason to think the text messages would have affected the credibility of this testimony.

Lieutenant Jones testified that, when someone in the video referred to "sliders." that person was referring to credit card or gift card fraud. Jones described how that crime was typically accomplished. (19 RT 1815–1816.) Petitioner denied he engaged in that type of activity even though he had been previously convicted of check fraud, and credit card embossing machines were found in his home. (19 RT 1619–1620.) It is difficult to see how the jury would have doubted Jones's testimony when petitioner's testimony was so dubious.

Lieutenant Jones testified that petitioner wrote the following lyrics: "'You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a nigga and get away with it.'" It meant someone would need to "be high or crazy to think that you can punch me and get away with it." (19 RT 1818.) The lyric, "'You almost got bodied, instead caught you a body,'" meant you almost were killed, but instead you killed someone. (*Ibid.*) Jones's testimony seems correct on its face and petitioner offers no reason the text messages would have caused the jury to doubt its accuracy.

Lieutenant Jones testified that, according to the rules of the street in Oakland, if a man disrespects another man in front of his girlfriend, he will lose credibility with that woman if he just walks away. (19 RT 1822.) If he does so in front of two people he knows, he would risk being labeled a punk. It would be more degrading for a man to slap another man than to punch him because a punch is what men do and it is like combat. Getting up in someone's face and personal space could be disrespectful. A man could not just walk away and keep his credibility. (*Ibid.*) Again, that seems like a reasonable interpretation on its face. Petitioner offers no evidence that the text messages would have caused the jury to doubt this type of opinion from an experienced Oakland police officer.

In response to a hypothetical posed by defense counsel, Lieutenant Jones testified that if one man slapped a second man; and then the first man pulled out a gun; the second man would be justified in pulling out his gun. (19 RT 1825.) That hypothetical echoed petitioner's self-defense theory, but it did not match the video. The video showed that McNeely slapped petitioner, but petitioner drew his gun first. Nevertheless, Jones's testimony supported petitioner's defense theory. So it could not have helped petitioner to impeach that portion of Jones's testimony.

In short, there is no reason to believe that Lieutenant Jones's testimony was so one-sided or divorced from common sense that the jury could only believe it if it assumed he was beyond reproach. More importantly, shedding some doubt on Jones's testimony would not have changed the result of petitioner's trial. After all, Jones was a rebuttal witness and he testified about tangential issues and hypotheticals—not the crimes themselves. Moreover, a couple of offensive text messages would not have completely undermined Jones's testimony because he had years of police experience and his testimony rang true.

In contrast, petitioner's self-defense theory depended squarely on his own credibility. And that credibility was eviscerated by the fact that petitioner fled to southern California; he lied to the police about his involvement; and he repeatedly and flagrantly lied to the jury about things that could be easily seen on the video. So it is a bit disingenuous for petitioner to suggest that, despite all the reasons to distrust his testimony, the verdicts would have turned on some offensive text messages that had nothing to do with his case. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 917–918, abrogated on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636 ["Such evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable possibility is a probability sufficient to undermine confidence in the outcome." Internal quotation marks omitted.].)

Lastly, petitioner cites lawsuits that were settled nine and 14 years before his trial. No information is given about the lawsuits and petitioner makes no argument that they were discoverable under either *Brady* or *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Again, it is petitioner's burden to make a prima facie case. Since he has made no argument, he has

not carried his burden. (See *Strickler v. Greene*, *supra*, 527 U.S. at p. 289; *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.)

## VIII. THERE WERE NEITHER MULTIPLE ERRORS NOR CUMULATIVE PREJUDICE

Petitioner argues that "the cumulative effect of the errors raised on appeal and on habeas corpus rendered the trial fundamentally unfair in violation of due process." (Pet. 104.) Respondent disagrees. Petitioner has not established any errors in his opening brief or petition. So there is no prejudice to cumulate. Moreover, contrary to petitioner's oft-repeated contention, he did not act in clear-cut self-defense. Petitioner did not have the right to shoot at McNeely 10 times just because McNeely slapped and tripped him. Therefore, because *petitioner* escalated the conflict to lethal force, he cannot prove he acted in self-defense as a matter of law.

The due process clause of the Fourteenth Amendment entitles a defendant to a fair trial, but not a perfect one. (*People v. Hill* (1998) 17 Cal.4th 800, 844–847 [multiple errors can have "a negative synergistic effect" resulting in an unfair trial].) Our Supreme Court has explained that it "will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Id.* at p. 844.) When a defendant relies upon the cumulative error doctrine, "the litmus test is whether defendant received due process and a fair trial." (*People v. Kronemeyer* (1987) 189 Cal.App.3d 314, 349, disapproved on another ground in *People v. Whitmer* (2014) 59 Cal. 4th 733, 742.) Any claim based upon cumulative errors must be assessed "to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid.*)

Here, there were no errors and trial counsel put on a vigorous defense. Contrary to petitioner's arguments, trial counsel could not have done anything to exclude evidence the trial court had ruled was admissible. He could not have prevented the trial court from giving a proper instruction

on mutual combat. Aside from petitioner's self-serving declaration, nothing in the record or petitioner's exhibits supports petitioner's contention that trial counsel failed to appropriately prepare petitioner to testify. Trial counsel performed adequate investigation and additional investigation would not have proven petitioner acted in self-defense. And there was no compelling reason for trial counsel to proffer the testimony of experts on African-American vernacular and culture.

Finally, petitioner argues that the prosecutor obtained the convictions only "by attacking Poston's character and exploiting the jurors' conscious and unconscious racism and fear of street violence." (Pet. 104.) However, petitioner ignores the fact that his self-defense claim was weak because he responded to a slap by immediately drawing his illegally possessed semiautomatic handgun and firing 10 shots at McNeely from close range.

Moreover, the jury rejected petitioner's defense because he was not credible—not because the prosecutor fooled them or appealed to their prejudices. In fact, petitioner repeatedly lied to the jury about the facts surrounding the shooting. Therefore, notwithstanding any errors, the jury would have still found petitioner's defense disingenuous. Thus, even if there were multiple errors, it is not reasonably probable petitioner would have received a better result absent those errors. (See *Chambers v. Mississippi* (1973) 410 U.S. 284, 302–303 [cumulative errors assessed for due process and whether there was a fair trial]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [rejecting claim of cumulative prejudice because there was only one error and it was not prejudicial]; *People v. Cain* (1995) 10 Cal.4th 1, 82 [multiple minor errors not prejudicial because a defendant is entitled to a fair trial, not a perfect one].) Accordingly, petitioner has not made out a prima facie case of prejudicial cumulative error. (See *Duvall*, *supra*, 9 Cal.4th at pp. 474–475.)

## CONCLUSION

Accordingly, respondent respectfully requests that this Court not issue an order to show cause; not order an evidentiary hearing; and deny the petition for writ of habeas corpus.

Dated: September 9, 2016

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
JEFFREY M. LAURENCE
Senior Assistant Attorney General
RENÉ A. CHACÓN
Supervising Deputy Attorney General

*/s/ David M. Baskind*
DAVID M. BASKIND
Deputy Attorney General
*Attorneys for Respondent*

DMB:er
SF2016400823
20893734.doc

## CERTIFICATE OF COMPLIANCE

I certify that the attached MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS uses a 13 point Times New Roman font and contains 11,870 words.

Dated: September 9, 2016

KAMALA D. HARRIS
Attorney General of California

*/s/ David M. Baskind*
DAVID M. BASKIND
Deputy Attorney General
*Attorneys for Respondent*

# DECLARATION OF ELECTRONIC SERVICE AND SERVICE BY U.S. MAIL

Case Name: **In re Poston, on Habeas Corpus** No.: **A148986**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collecting and processing electronic and physical correspondence. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business. Correspondence that is submitted electronically is transmitted using the TrueFiling electronic filing system. Participants who are registered with TrueFiling will be served electronically. Participants in this case who are not registered with TrueFiling will receive hard copies of said correspondence through the mail via the United States Postal Service or a commercial carrier.

On September 9, 2016, I electronically served the attached **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS** by transmitting a true copy via this Court's TrueFiling system. Because one or more of the participants in this case have not registered with the Court's TrueFiling system or are unable to receive electronic correspondence, on September 9, 2016, I placed a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Randi D. Covin
Attorney at Law
P.O. Box 1120
Willits, CA 95490

The Honorable Nancy O'Malley
District Attorney
Alameda County District Attorney's Office
1225 Fallon Street, Room 900
Oakland, CA 94612-4203

County of Alameda
Criminal Division
Rene C. Davidson Courthouse
Superior Court of California
1225 Fallon Street, Room 107
Oakland, CA 94612-4293
**Sent via U.S. mail**

First District Appellate Project
Attn.: Executive Director
475 Fourteenth Street, Suite 650
Oakland, CA 94612

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on September 9, 2016, at San Francisco, California.

| E. Rios | /s/ E. Rios |
|---|---|
| Declarant | Signature |

SF2016400823
20893774.doc