XAVIER BECERRA
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
DAVID M. BASKIND
Deputy Attorney General
State Bar No. 208883
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3759
Fax: (415) 703-1234
E-mail: David.Baskind@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DONEL POSTON,**<br>Petitioner,<br>**v.**<br>**JASON PICKETT, Acting Warden,**<br>Respondent. | 3:18-cv-03450-CRB (PR) |

# EXHIBITS 16-19

**16 Informal Reply in Support of Petition for Writ of HC**
**17 Order Denying Petition for Writ of HC**
**18 Petitioner's Petition for Review**
**19 Order Denying Petition for Review**

NO. A148986

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re DONEL POSTON, | ) Related Appeal |
| | ) No. A141557 |
| Petitioner, | ) |
| | ) Alameda County |
| | ) No. 172522B |
| On Habeas Corpus. | ) |
| ______________________________ | ) |

**INFORMAL REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

RANDI COVIN
State Bar #168422
P.O. Box 1120
Willits, CA. 95490
Telephone: (707) 459-2456
Facsimile: (707) 459-2147
e-mail address: rcovin13@gmail.com

Attorney for Petitioner
DONEL POSTON

By Appointment of the Court of Appeal Under the First District Appellate Project's Independent Case System

# TOPICAL INDEX

ARGUMENT.....11

I. TRIAL COUNSEL’S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL. .....11

A. IF ANY OF POSTON'S CLAIMS OF PROSECUTORIAL MISCONDUCT WERE FORFEITED, TRIAL COUNSEL'S FAILURE TO OBJECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL. .....12

B. PERVASIVE PROSECUTORIAL MISCONDUCT WARRANTED FURTHER OBJECTION.....14

C. TRIAL COUNSEL'S FAILURE TO OBJECT UNDERMINES CONFIDENCE IN THE JUDGMENT.....22

II. TRIAL COUNSEL’S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.....25

A. CALCRIM NO. 3471 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE. .....25.

B. DEFENSE COUNSEL SHOULD HAVE REQUESTED MODIFICATION OF CALCRIM NO. 3471 IN ACCORD WITH ROSS. .....30

C. TRIAL COUNSEL'S FAILURE TO OBJECT OR REQUEST MODIFICATION OF CALCRIM NO. 3471 UNDERMINES CONFIDENCE IN THE OUTCOME....................................................................32

III. TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT EXAMINATION DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL..........................................35

A. TRIAL COUNSEL CORROBORATES POSTON'S DECLARATION REGARDING THE LACK OF PREPARATION TO TESTIFY. ...........36

B. AT LEAST ONE JUROR WOULD LIKELY HAVE HAD A REASONABLE DOUBT AS TO POSTON'S GUILT IF HE HAD BEEN ADEQUATELY PREPARED TO TESTIFY AND ADEQUATELY REHABILITATED ON REDIRECT. .......................................................39

IV. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.........................................48.

A. POSTON'S LEGAL RESEARCH PACKET ON SELF-DEFENSE WOULD HAVE REBUTTED THE PROSECUTOR'S ARGUMENT THAT HE FABRICATED HIS DEFENSE. .............................49

B. POSTON'S DICTIONARY EXCERPT WOULD HAVE REBUTTED THE INFERENCE THAT HIS USE OF THE WORDS "PRETENSE" AND "PRETEXT" IN HIS RAP LYRIC INDICATED THAT HE FABRICATED HIS DEFENSE. ...........54

C. CORROBORATING EVIDENCE THAT BAILEY'S RADIATOR WAS SHOT WOULD HAVE REBUTTED ARGUMENTS THAT POSTON LIED ABOUT THE RADIATOR. .........55

D. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE WAS PREJUDICIAL. ......................................................58

V. TRIAL COUNSEL’S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL........................................60

A. EXPERT TESTIMONY ON AAVE WOULD HAVE ASSISTED THE JURY...............................60

B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AAVE UNDERMINES CONFIDENCE IN THE OUTCOME. ....................65

VI. TRIAL COUNSEL’S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL. ..................................................................67

A. EXPERT TESTIMONY ON AFRICAN-AMERICAN CULTURE WOULD HAVE ASSISTED THE JURY..........................................67

B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN-AMERICAN CULTURE UNDERMINES CONFIDENCE IN THE OUTCOME................................................70

VII. THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY *BRADY V. MARYLAND* AND DUE PROCESS. ...............................................................72

VIII. CUMULATIVE PREJUDICE VIOLATES THE SIXTH AMENDMENT AND DUE PROCESS, REQUIRING REVERSAL. ..............................................79

AN ORDER TO SHOW CAUSE SHOULD BE ISSUED AND MADE RETURNABLE IN THE SUPERIOR COURT ........................83

CONCLUSION...........................................................................85

WORD COUNT CERTIFICATE........................................................86

EXHIBIT A: SUPPLEMENTAL COVIN DECLARATION...............87

DECLARATION OF SERVICE

* * * * * *

# TABLE OF AUTHORITIES

## CASES

*Alcala v. Woodford*
(9th Cir. 2003) 334 F.3d 862 ........................................................ 39

*Baldwin v. Blackburn*
(5th Cir. 1981) 653 F.2d 942 ........................................................ 34

*Bemore v. Chappell*
(9th Cir, 2015) 788 F.3d 1151 ................................................ 39, 56

*Boyde v. California*
(1990) 494 U.S. 370 .......................................................................... 33

*Brady v. Maryland*
(1963) 373 U.S. 83 ..................................................... 72, 73, 74, 78

*Chapman v. California*
(1967) 368 U.S. 18 ............................................................................ 23

*Commonwealth v. Warren*
(Mass. 2016) 475 Mass. 530 ........................................................ 68

*Donnelly v. DeChristoforo,*
*supra*, 416 U.S. 637 ................................................................... 22, 23

*Evans-Smith v. Taylor*
(4th Cir. 1994) 19 F.3d 899 ........................................................... 28

*Ho v. Carey*
(9th Cir. 2003) 332 F.3d 587 ........................................................ 33

*Imbler v. Pachtman*
(1976) 424 U.S. 409 .......................................................................... 72

*In re Christian S.*
(1994) 7 Cal.4th 768 .......................................................................... 29

*In re Sixto*
(1989) 48 Cal.3d 1247 ...................................................... 47, 65, 70

*In re Steele*
(2004) 32 Cal.4th 682 .......... 72, 73

*In re Thomas*
(2006) 37 Cal.4th 1249 .......... 56

*Kyles v. Whitley*
(1995) 514 U.S. 419 .......... 72, 73, 78

*Lincoln v. Sunn*
(9th Cir. 1987) 807 F.2d 805 .......... 79

*Mak v. Blodgett*
(9th Cir. 1992) 970 F.2d 614 .......... 59, 71, 79

*O'Laughlin v. O'Brien*
(1st Cir. 2009) 568 F.3d 287 .......... 28

*People v. Baldwin*
(2006) 142 Cal.App.4th 1416 .......... 20

*People v. Bledsoe*
(1984) 36 Cal.3d 236 .......... 69

*People v. Bowker*
(1988) 203 Cal.App.3d 385 .......... 69

*People v. Brown*
(2004) 33 Cal.4th 892 .......... 69

*People v. Catley*
(2007) 148 Cal.App.4th 500 .......... 20

*People v. Clark*
(2016) 63 Cal.4th 522 .......... 53, 55

*People v. Cowan*
(2010) 50 Cal.4th 401 .......... 13

*People v. Day*
(1992) 2 Cal.App.4th 405 .......... 69

*People v. Dennis*
(1998) 17 Cal.4th 468 ........................................................ 20

*People v. Duvall*
(1995) 9 Cal.4th 464 ........................................................ passim

*People v. Elmore*
(2014) 59 Cal.4th 121 ........................................................ 21

*People v. Hill,*
*supra*, 17 Cal.4th 800 ........................................ 22, 23, 24, 79

*People v. Howard*
(1987) 190 Cal.App.3d 41 ........................................ 47, 65, 71

*People v. Keeper*
(2011) 192 Cal.App.4th 511 ........................................................ 20

*People v. King*
(1978) 22 Cal.3d 12 ........................................................ 19, 26

*People v. McAlpin*
(1991) 53 Cal.3d 1289 ........................................................ 63, 69

*People v. Mil*
(2012) 53 Cal.4th 400 ........................................................ 24

*People v. Moore*
(2011) 51 Cal.4th 386 ........................................................ 28, 29

*People v. Randle*
(2005) 35 Cal.4th 987 ........................................................ 19, 26

*People v. Rhodes*
(2005) 129 Cal.App.4th 1339 ........................................ 19, 26

*People v. Riggs*
(2008) 44 Cal.4th 248 ........................................................ 69

*People v. Ross*
(2007) 155 Cal.App.4th 1033 ........................................ passim

*People v. Sanchez*
(2001) 26 Cal.4th 834 ........................................................ 29

*People v. Sifuentes*
(2011) 195 Cal.App.4th 1410 ................................................ 28

*People v. Smith*
(2003) 30 Cal.4th 581 ........................................................ 52

*People v. Soojian*
(2010) 190 Cal.App.4th 491 ............................... 24, 47, 65, 71

*People v. Superior Court (Johnson)*
(2015) 61 Cal.4th 696 ........................................................ 74

*People v. Vasquez*
(2006) 136 Cal.App.4th 1176 ......................................... 19, 26

*People v. Ward*
(2005) 36 Cal.4th 186 ........................................................ 69

*People v. Whalen*
(2013) 56 Cal.4th 1 ............................................................ 74

*People v. Williams*
(1998) 17 Cal.4th 148 ........................................................ 12

*Riley v Payne*
(9th Cir. 2003) 352 F.3d 1313 ............................................ 56

*Sons v. Superior Court*
(2004) 125 Cal.App.4th 110 ................................................ 20

*Strickland v. Washington*
(1984) 466 U.S. 668 ................................................... passim

*Suniga v. Bunnell*
(9th Cir. 1993) 998 F.2d 664 .............................................. 33

*United States v. Are*
(7th Cir. 2009) 590 F.3d 499 .............................................. 64

*United States v. Herron*
(E.D.N.Y. 2014) ........................................................................ 64

*United States v. Williams*
(7th Cir. 2000) ___ F.3d ___, 2000 U.S. App. LEXIS 168 .......... 64

*Youngblood v. West Virginia*
(2006) ___ U.S. ___, 126 S.Ct. 2188 ..................................... 72, 73

**CONSTITUTIONS**

Cal. Const., art I, § 15 ................................................................. passim

U.S. Const., amends. VI ........................................................... passim
XIV ........................................................ passim

**STATUTES**

Evid Code, §§ 791 ........................................................................ 52
801 ........................................................................ 63
1250 ...................................................................... 53
1252 ................................................................. 53, 55

**OTHER AUTHORITIES**

Cal. Rules of Court, rules 8.204(c) ................................................... 14
8.384 ....................................................... 14

CALCRIM Nos. 200 ........................................................................ 32
3471 ................................................................. passim

Eli Wolfe, Blowing Racial Dog Whistles: Berkeley Prof Blasts
Conservatives For "Coded Messages,"
http://alumni.berkeley.edu/california-magazine/just-in/2014-
02-25/blowing-racial-dog-whistles-berkeley-prof-blasts .............. 16

Ian Haney Lopez, Dog Whistle Politics: How Coded Racial
Appeals Have Reinvented Racism and Wrecked the Middle
Class, Oxford University Press (2014) ........................................... 16

Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html. .......................... 16

Sarah D. Sparks, Students Learn to 'Toggle' Between Dialects, Education Week (Sept. 10, 2014) http://www.edweek.org/ew/articles/2014/09/10/03dialect.h34.html?qs=students+learn+to+toggle+between+dialects. ............ 17

Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black .................................................. 17

Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle .......................................................................................... 15

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re DONEL POSTON, | ) Related Appeal<br>) No. A141557 |
| Petitioner, | ) |
| | ) Alameda County<br>) No. 172522B |
| On Habeas Corpus. | )<br>) |

**INFORMAL REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

ARGUMENT

**I. TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.**

Poston alleges in the Petition that trial counsel's failure to object to pervasive prosecutorial misconduct denied him the effective assistance of counsel. (Petition 16-23, 73-77; AOB 109-129 [prosecutorial misconduct]; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668.)

Respondent counters in its Informal Response that there was no prosecutorial misconduct and, thus, no duty to object. (Informal Response 16.) Respondent also argues there was no prejudice

because any objection would have been overruled. (Informal Response 17.) These contentions should be rejected and the writ should be granted.

A. IF ANY OF POSTON'S CLAIMS OF PROSECUTORIAL MISCONDUCT WERE FORFEITED, TRIAL COUNSEL'S FAILURE TO OBJECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Respondent suggests that Poston's ineffective assistance claim is inconsistent with his argument on appeal that the prosecutorial misconduct claim was not forfeited because objection would have been futile. (Informal Response 16; Petition 73; Poston AOB 111.)

Poston explained that the misconduct should be addressed on appeal because the trial court's prior rulings suggested that objection might have been futile and also because this Court has discretion to address serious misconduct claims even in the absence of timely and specific objections. (Poston AOB 111; Poston ARB 44-45; see also *People v. Williams* (1998) 17 Cal.4th 148, 161, n. 6 ["Surely, the fact that a party may forfeit the right to present a claim of error to the appellate court if he did not do enough to prevent or correct the claimed error in the trial court does not compel the conclusion that, by operation of his default, the appellate court is deprived of authority in

the premises. An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].)

But respondent argues on appeal that Poston's prosecutorial misconduct claims were forfeited by failure to object. (RB 135-137.) If this Court finds that any of Poston's claims of prosecutorial misconduct were forfeited, Poston was denied the effective assistance of counsel.

Any reasonably competent criminal defense attorney would have posed further objections when the prosecutor far exceeded any legitimate purpose for admission of prejudicial "pimp" and "ho" evidence and repeatedly tried to mislead the jury about Poston's statements in African-American Vernacular English ("AAVE"); his testimony in Standard American English ("SAE"); his flight after the shooting; his failure to flee before the shooting; his right to stand his ground and defend himself; the meaning of "mutual combat"; and the meaning of "gun battle." (Petition 75-76; see also *People v. Cowan* (2010) 50 Cal.4th 401, 476 [denial of a pretrial motion to exclude evidence does not necessarily make further objection futile].) To the

extent any of trial counsel's objections were inadequate, Poston was denied the effective assistance of counsel.

### B. PERVASIVE PROSECUTORIAL MISCONDUCT WARRANTED FURTHER OBJECTION.

Respondent comments that Poston "barely discusses the nature of his [prosecutorial misconduct] claims . . . ." (Informal Response 17.) But Poston thoroughly explains his prosecutorial misconduct claims in his AOB and in the Petition. (Poston AOB 112-129; Petition 15-25.) Discussion had to be limited in the memorandum of points and authorities in support of the Petition because of the 14,000 word limit. (See Cal. Rules of Court, rules 8.204(c), 8.384(c).)

As Poston has explained, the prosecutor's whole theory of the case was misleading. She contended that Poston was guilty of murder and attempted murder, despite the undisputed fact that McNeely was the armed aggressor, because Poston was a bad character - a "thug" and a "pimp" - who did not talk or behave like the prosecutor thought an innocent person would. (Poston AOB 119; 20 RT 1897-1899, 1966-1967, 1971-1972.)

The prosecutor appealed to the jurors' fear of random street violence - of being crime victims - with repeated references to a gun battle and both defendants' disregard for the safety of innocent

bystanders. The argument was misleading and unfair because there was no evidence Poston agreed or intended to engage in mutual combat or a gun battle before McNeely struck the first blow. Rather all the evidence showed that Poston acted in self-defense. (Poston AOB 119-120; see also *People v. Ross* (2007) 155 Cal.App.4th 1033, 1045.)

The prosecutor emphasized Poston's references to "pimps" and "hos." (19 RT 1954-1966.) As Poston explained, references to "pimps" and "hos" were irrelevant and inflammatory, and the prosecutor used them unfairly to attack Poston's character and portray him as the kind of person who would deliberately instigate a shooting and then claim self-defense. (Poston AOB 88-92, 120.)

The prosecutor appealed to conscious and unconscious racial bias by calling Poston a "thug" - a racial "dog whistle," akin to using the N word. (19 RT 1628; see also Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle [a "dog whistle" is "a type of strategy of communication that sends a message that the general population will take a certain meaning from, but a certain group that is "in the know" will take away the secret, intended message. Often involves code words]; Ian Haney Lopez,

Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class, Oxford University Press (2014); Eli Wolfe, Blowing Racial Dog Whistles: Berkeley Prof Blasts Conservatives For "Coded Messages," http://alumni.berkeley.edu/california-magazine/just-in/2014-02-25/blowing-racial-dog-whistles-berkeley-prof-blasts; Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html.)

The prosecutor also appealed to racial bias by emphasizing Poston's use of AAVE. (See Exh. 9 to Petition [John Rickford Decl.); John R. Rickford, African American Vernacular English, Blackwell Publishers (1999) at pp. 283-284 [discussing negative attitudes toward AAVE]; Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black [discussing the conscious and unconscious racism underlying disdain for AAVE].)

As if that was not bad enough, the prosecutor argued that Poston's alternating use of AAVE with friends and family and SAE on

the witness stand showed that he was trying to fool the jury. (20 RT 1899, 1971.) In fact, it is very common for African-Americans and others to switch between SAE and their native language or dialect - a phenomenon called "code-switching." (See Exh. 9, ¶ 8; Rickford, at pp. 340-342, Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black; Charisse Jones, Shifting: The Double Lives of Black Women in America, Harper e-book (2003) at p. 108].)

Indeed, prominent educators advocate teaching African American children to code switch as a way of mastering SAE and accessing more opportunities for advancement. (Exh. 9, ¶ 9; Rickford, at pp. 283-345; Sarah D. Sparks, Students Learn to 'Toggle' Between Dialects, Education Week (Sept. 10, 2014), http://www.edweek.org/ew/articles/2014/09/10/03dialect.h34.html?qs=students+learn+to+toggle+between+dialects.)

The prosecutor repeatedly twisted Poston's words to make them seem incriminating. She quoted his rap lyrics - "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life." She argued that these words showed a murderous state of mind despite the fact that the actual

words state that Poston is not one to fight. Rather, he takes flight. But if you cross a line, he will fight back. (19 RT 1640; Exh. 9, ¶¶ 13, 14.)

Poston astutely asked the prosecutor: "[M]a'am, . . . do you understand African-American vernacular from the street perspective?" (19 RT 1641-1642.) It seems clear she did not. Maybe she thought AAVE was a code for deception where everything Poston said meant its opposite. Poston said he had a strong claim of self-defense; the prosecutor argued it was an admission that he did not act in self-defense. (19 RT 1633; 20 RT 1897; Pros. Exh. 32A at p. 8.)

Poston said he told Bailey to tell the truth; the prosecutor argued it was an admission that he pressured Bailey to lie. (19 RT 1650; 20 RT 1898; Pros. Exh. 32A at p. 39.)[1] The prosecutor's

---

[1] Like the prosecutor, respondent argues that Poston told Bailey to lie. (Informal Response 8, 18; 19 RT 1649-1654.) In fact, Poston made clear in his testimony and in his telephone conversation with his mother that he just wanted Bailey to tell the truth and that is what he and his mother told Bailey to do. (19 RT 1649, 1652--1654, 1666; Pros. Exh. 32A at pp. 37-39.)

In the phone call, Poston and his mother expressed concern about Bailey being gullible, naïve, and unsophisticated - that, if the police and prosecutor talked to Bailey before her testimony they would confuse her and trip her up. They expressed concern about the way Bailey presented herself - her clothing and body odor. (Pros. Exh. 32A at pp. 37-39; see also Petition 145 [Donel Poston Decl.].)

repeated twisting of Poston's words in an attempt to incriminate him was misleading and unfair.

The prosecutor's argument that Poston's failure to run away before the shooting refuted his self-defense claim was also misleading and unfair. (19 RT 1634-1639; 20 RT 1892, 1898.) Poston had no duty to retreat. (See *People v. Randle* (2005) 35 Cal.4th 987, 992; *People v. King* (1978) 22 Cal.3d 12, 24; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180; *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1346; *People v. Ross, supra,* 155 Cal.App.4th at p. 1044 and fn. 13.)

Poston was in a public place where he had every right to be when McNeely started a quarrel, escalated it, knocked Poston down, and pulled out a gun. Poston had every right to defend himself. His failure to run away before he was assaulted says nothing about his claim of self-defense and the prosecutor's repeated suggestion that it did was a deceptive and reprehensible way to try to persuade the jury - it was misconduct.

---

Poston told his mother, ". . . they gonna eat this bitch alive." (Pros. Exh. 32A at p. 40.) Nothing in Poston's testimony or in the recorded phone call cited by the prosecutor indicates that Poston told Bailey to lie.

The prosecutor's argument that Poston's references to "practicing" for his "performance" on the witness stand meant that he was lying, "trying to get over on this jury," was misleading and unfair. (19 RT 1627, 1633; 20 RT 1899; Pros. Exh. 32A at pp. 35, 41-42.) It is hardly unusual to refer to a witness's testimony as "performance." (See, e.g., *People v. Dennis* (1998) 17 Cal.4th 468, 527, fn. 12; *People v. Keeper* (2011) 192 Cal.App.4th 511, 520, fn. 2; *People v. Catley* (2007) 148 Cal.App.4th 500, 506-507; *People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421; *Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 119-120.) Indeed, the word "perform" is commonly used in reference to the duties of all courtroom actors - witnesses, judges, lawyers, and jurors. (See *People v. Baldwin*, *supra*, at p. 1421.)

Poston knew he had to perform well on the witness stand, meaning no "ghetto-ebonic-slur[s], if he was to be believed. (Pros. Exh. 32A at p. 41; Exh. 9, ¶ 10.) He knew he had to practice speaking in a way the jurors could understand. He knew the prosecutor would do her best to trip him up and twist his words, using them to portray him as a pimp and a thug, not a "normal" person, not a "law-abiding citizen[]."

According to the prosecutor, a true case of self-defense exists only where the law-abiding citizen "wait[s] for the police. They are waiting on their porch with a smoking gun." (20 RT 1892.) Poston did not have the "state of mind [nor] the "use of phrasing that innocent, justified people use." (20 RT 1898.) He was "performing , and he was trying to paint a portrait of himself that's different than the portrait that you see in the video, and the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew you couldn't see that." (20 RT 1899.)

Contrary to the prosecutor's argument, one need not wait around for the police in order to establish the defense of self-defense. One need not be a law-abiding citizen. One need not speak Standard English or any English. All that is required is that the accused, who did not initiate the fight or agree to engage in mutual combat, honestly and reasonably believed in the imminent need to use deadly force in self-defense. (See *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.)

As Poston explained, the prosecutor did not and could not prove his guilt of murder and attempted murder beyond a reasonable doubt in view of the uncontroverted evidence - the surveillance videos and Poston's testimony. Utterly lacking relevant evidence, she persuaded

the jury by appealing to their emotions, attacking Poston's character, and misleading the jury in several crucial respects. (AOB 129.)

The pervasive misconduct rendered Poston's trial fundamentally unfair in violation of due process. (See *Donnelly v. DeChristoforo, supra*, 416 U.S. 637; *People v. Hill, supra*, 17 Cal.4th 800.) To the extent any claims of misconduct were forfeited, trial counsel's failure to object denied Poston the effective assistance of counsel.

C. TRIAL COUNSEL'S FAILURE TO OBJECT UNDERMINES CONFIDENCE IN THE JUDGMENT.

Respondent argues that trial counsel's failure to object was not prejudicial because any objections would have been overruled. (Informal Response 17.)

But whether or not the particular trial judge in this case would have sustained particular objections or overruled them is irrelevant to the prejudice determination under *Strickland*. The Supreme Court explained there:

> An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker,

> such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.

(*Strickland v. Washington*, *supra*, 466 U.S. at p. 695.)

The question is not whether an objection would have been sustained, but whether it would have been meritorious. (See *ibid*.) Numerous objections to the prosecutor's misleading questions and arguments would have been meritorious.

The misconduct was prejudicial because it was serious and pervasive, unfairly attacking Poston's character and credibility and misleading the jurors about his exceptionally strong defense. Even respondent acknowledges that Poston's defense was "plausible" and "viable" because "the video clearly showed that McNeely reached into his jacket - and Poston could reasonably assume he was reaching for a gun - before Poston fired a shot." (RB 45, 55, 78.)

The misconduct rendered Poston's trial fundamentally unfair in violation of due process. (See *Donnelly v. DeChristoforo* (1974) 416 U.S. 637; *People v. Hill* (1998) 17 Cal.4th 800, 819.) A reasonable juror could and likely would have had a reasonable doubt as to Poston's guilt if not for the misconduct. (See *Chapman v. California*

(1967) 368 U.S. 18, 24; *People v. Mil* (2012) 53 Cal.4th 400, 419; *People v. Hill, supra,* 17 Cal.4th at p. 819; *People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

Trial counsel's failure to object undermines confidence in the outcome. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 694-695.) Thus, the writ should be granted.

* * * * * *

## II. TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston alleges in the Petition that trial counsel's failure to object or request modification of the standard instruction on mutual combat, CALCRIM No. 3471, denied him the effective assistance of counsel. (Petition 23-24, 78-81; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington*, *supra*,466 U.S. 668.)

Respondent counters that substantial evidence supported CALCRIM No. 3471 and, if it did not, the jurors would not have applied it so it could not have prejudiced Poston. (Informal Response 22, citing CALCRIM No. 200 ["some of these instructions may not apply"].) Respondent's contentions should be rejected and the writ should be granted.

### A. CALCRIM NO. 3471 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

As Poston explains on appeal, there was insufficient evidence he expressly or impliedly agreed to engage in mutual combat before McNeely slapped him. (Poston AOB 64-65, 95-96.) The surveillance videos and the testimony of Poston and Bailey show that McNeely instigated the quarrel, escalated it, and unlawfully assaulted Poston, as

the prosecutor necessarily conceded. (20 RT 1867, 1884-1885, 1888.) There was no evidence whatsoever that Poston expressly or impliedly agreed to fight before McNeely struck the first blow. (See *People v. Ross, supra,* 155 Cal.App.4th at p. 1044 and fn. 13.)

As on appeal, respondent argues that Poston's failure to flee before McNeely slapped him showed an intention to fight. (Informal Response 20-21; RB 97, 121; 20 RT 1896.) But Poston had no reason to flee before McNeely became aggressive and, after that point, Poston did not feel he could safely flee because he believed McNeely had a gun. (18 RT 1543.) Moreover, Poston had no duty to flee, as respondent has acknowledged. (RB 140-141.)

As Poston has explained, even a felon is entitled to stand his ground and, if necessary, use a firearm in self-defense, even if it is unlawful for him to possess the firearm more than momentarily and even if he instigated a quarrel, as long as his adversary was the first to use unlawful force. (AOB 64; see also *People v. Randle, supra,* 35 Cal.4th at p. 992; *People v. King, supra,* 22 Cal.3d at p. 24; *People v. Vasquez, supra,* 136 Cal.App.4th at pp. 1179-1180; *People v. Rhodes, supra,* 129 Cal.App.4th at p. 1346.)

Here, Poston did not even instigate the quarrel - McNeely did. Poston did not escalate the quarrel - McNeely did. Poston did not react aggressively to McNeely's verbal and physical aggression until after the slap.

As respondent has conceded, Poston stood by passively until the slap while McNeely alone acted aggressively: "McNeely paced around and repeatedly grabbed the lapels of his jacket out of frustration. McNeely threw a cup on the ground. He went up close to Poston and continued to talk belligerently." (RB 19, 91.) Then McNeely "forcefully" slapped Poston's face and tripped him, as respondent has acknowledged. (RB 20.)

An assault victim's failure to flee cannot show intent to engage in mutual combat. If it could, there would no longer be any right to stand one's ground except perhaps in one's home. (Poston ARB 22; see also § 198.5 [homeowner who uses deadly force against intruder is presumed to have acted in self-defense].) Poston's failure to flee before the slap cannot defeat his self-defense claim.

Contrary to respondent's contention, Poston's gesture of holding his hands up after the shooting as if to say "stop already" says little about his intent before McNeely slapped him, pulled out a gun, and

shot at Poston's back as he ran down the street. (15 RT 936, 940-941.) It is possible Poston meant to withdraw from a prior agreement to fight, as respondent suggests. (Informal Response 21; RB 122.) But it is at least equally possible - more likely considering all the evidence - that he simply meant, "stop already," as eyewitness Eutiquio Garcia-Chavez interpreted it. (15 RT 940.)

The mere speculative possibility that Poston intended to withdraw from a prior agreement to fight does not constitute substantial evidence supporting instruction on mutual combat. (Cf. *People v. Moore* (2011) 51 Cal.4th 386, 406 [speculation was insufficient to establish prejudicial error; "That an event *could* have happened . . . does not by itself support a deduction or inference it did happen"]; *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1419 [finding insufficient evidence to support conviction of unlawful possession of a firearm; "The possibility Sifuentes might have had the right to exercise control over the gun does not by itself provide a basis to infer he had the right to control it"]; *O'Laughlin v. O'Brien* (1st Cir. 2009) 568 F.3d 287, 303-304 [circumstantial evidence susceptible to conflicting inferences was insufficient to support the judgment]; *Evans-Smith v. Taylor* (4th Cir. 1994) 19 F.3d 899, 900-910 [same].)

This was not a case of mutual combat. There was nothing mutual about it. Poston's behavior did not suggest in any way that he intended to fight McNeely before McNeely's initiation of hostilities. (Compare *People v. Moore, supra*, 51 Cal.4th at p. 1136 ["where the prosecution's evidence show[ed] a jailhouse scuffle, the scene as witnessed [did] not suggest defendant may have been acting in self-defense, and defendant present[ed] no evidence in mitigation," mutual combat supported a finding of criminal assault]; *People v. Sanchez* (2001) 26 Cal.4th 834, 851-854 [both defendants were equally culpable because they engaged in a "gun battle" - "simultaneous attempts to murder one another in a preplanned blaze of gunfire"].)

At most, Poston's behavior and subsequent statements arguably demonstrate a prior intention to stand his ground and defend himself if attacked. A person who intends to kill in self-defense if sufficiently threatened does not intend to kill unlawfully and cannot be guilty of murder or attempted murder. (See *In re Christian S.* (1994) 7 Cal.4th 768, 779 [murder requires proof of intent to kill unlawfully - not in self-defense].)

If the defendant was not sufficiently threatened, imperfect self-defense applies, reducing the homicide to manslaughter. If the

defendant was sufficiently threatened and if he reasonably believed in the need to defend himself with lethal force, complete self-defense justifies any homicide even if the defendant stood out on the most dangerous street corner in town for a week hoping someone would attack him so he could lawfully fight back.

Of course, no evidence suggests Poston was looking for trouble. He has no history of violent offenses, and no history of conflicts with McNeely or anyone. The evidence shows that he just stopped at the gas station for cigars (or marijuana according to Walt Stannard's report of Bailey's statement). (18 RT 1401-1402, 1426, 1516-1520; 19 RT 1797-1798.) But, even if Poston had been looking for an opportunity to use lethal force in reasonable self-defense, he could not properly be convicted of murder or attempted murder because he did not intend to kill unlawfully.

### B. DEFENSE COUNSEL SHOULD HAVE REQUESTED MODIFICATION OF CALCRIM NO. 3471 IN ACCORD WITH ROSS.

Respondent does not answer Poston's argument that his trial attorney should have requested modification of CALCRIM No. 3471 in accord with *Ross*. (Petition 80; see also *People v. Ross, supra*, 155 Cal.App.4th at p. 1044 and fn. 13.) Bryden acknowledges that he did

not read *Ross* and did not know the mutual combat exception to self-defense applies only if there is proof beyond a reasonable doubt that the defendant intended or agreed to fight before the first assaultive conduct occurred. (Petition 265-267 [Bryden Decl.]; *People v. Ross*, 155 Cal.App.4th at p. 1045, fn. 14.)

Bryden acknowledges that he would have objected to CALCRIM No. 3471 and/or requested modification to include the "first assaultive conduct" language if he had read *Ross*. (Petition 265-267.) As Bryden explains, modification "would have cut off the prosecutor's argument that it was mutual combat because Poston fired the first shot even though McNeely committed the first assault." (Petition 267.)

Poston's primary defense was self-defense and the prosecutor's pervasive response was "mutual combat." Bryden saw the citation to *Ross* for the definition of "mutual combat." (Exh. 13, ¶ 13.) Any reasonably competent criminal defense lawyer would have read *Ross* instead of relying entirely on the CALCRIM notes on the most critical issue in the case. Bryden's failure to do so denied Poston the effective assistance of counsel.

C. TRIAL COUNSEL'S FAILURE TO OBJECT OR REQUEST MODIFICATION OF CALCRIM NO. 3471 UNDERMINES CONFIDENCE IN THE OUTCOME.

Respondent argues any error in giving CALCRIM No. 3471 was harmless because the jurors would have simply ignored it, as instructed, if it did not apply. (Informal Response 22; CALCRIM No. 200.) But respondent ignores the prosecutor's argument that it was mutual combat because Poston fired the first shot even though it was undisputed that McNeely committed the first assault. (20 RT 1864-1866, 1872, 1883, 1887, 1890, 1901, 1963-1968, 1971.)

Without the mutual combat instruction a juror could well have had a reasonable doubt whether Poston acted with malice instead of an actual belief in the need to use lethal force in self-defense, whether reasonable or not. CALCRIM No. 3471 told the jurors Poston did not have a right to self-defense if he "engage[d] in mutual combat" and did not try to withdraw from the fight before shooting. (6 CT 1467.53; 20 RT 2001.)

The instruction defined "mutual combat" as a fight that "began or continued by mutual consent or agreement," express or implied. (6 CT 1467.53; 20 RT 2002.) Although it stated the agreement to fight "must occur before the claim to self-defense arose," a reasonable juror

could well have believed that Poston's decision to shoot McNeely instead of "walking away" showed an agreement to fight before the claim to self-defense arose," as the prosecutor argued. (6 CT 1467.53-1467.54; 20 RT 1895, 1897, 2001-2002; see also *Boyde v. California* (1990) 494 U.S. 370, 380 [when an instruction is ambiguous, the question is “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence”].) But to constitute mutual combat, the agreement to fight had to come before the first blow - McNeely's blow - was struck.

CALCRIM 3471 incorrectly suggested that Poston engaged in mutual combat and did not have a right to self-defense if he expressly or impliedly agreed to continue the fight McNeely started, even if he reasonably believed his life was in imminent danger. The instruction and the prosecutor's pervasive argument virtually compelled rejection of Poston's defense. (Cf. *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, 596 [reversing denial of writ because instructions permitted conviction of second-degree murder even if the defendant acted in self-defense]; *Suniga v. Bunnell* (9th Cir. 1993) 998 F.2d 664, 669-670 [erroneous jury instructions required reversal because they

permitted conviction on a theory which precluded consideration of relevant defenses]; *Baldwin v. Blackburn* (5th Cir. 1981) 653 F.2d 942, 949 [“If the instructions given the jury are likely to cause an imprecise, arbitrary or insupportable finding of guilt” the conviction violates due process].)

It was undisputed that McNeely committed the first assaultive conduct. There was insufficient evidence Poston agreed or intended to fight before McNeely's assault. Had Bryden objected to CALCRIM No. 3471 and/or requested modification in accord with *Ross*, the prosecutor's entire theory of the case would have been eviscerated.

Indeed, had Bryden read *Ross* and cited its "first assaultive conduct" language, his motion for dismissal pursuant to section 995 or at least his motion for judgment of acquittal pursuant to section 1118.1 might well have been granted. Bryden's failure to object or request modification of CALCRIM No. 3471 undermines confidence in the judgment. Thus, the writ should be granted.

* * * * * *

## III. TRIAL COUNSEL’S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT EXAMINATION DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston alleges in the Petition that Bryden's failure to adequately prepare him to testify and failure to adequately rehabilitate him on redirect examination denied him the effective assistance of counsel. (Petition 25-27, 82-84; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington*, *supra*, 466 U.S. 668.)

Respondent concedes that Poston "may have made out a prima facie case of deficient performance," given that the factual allegations of the Petition must be presumed true in determining whether a prima facie case has been made and an order to show cause should be issued. (Informal Response 24; see also *People v. Duvall* (1995) 9 Cal.4th 464, 474-475.) Thus, respondent focuses on a perceived lack of prejudice. (Informal Response 24-27.) Contrary to respondent's contentions, Poston has stated a prima facie case of prejudicial ineffective assistance of counsel and the writ should be granted.

///

//

### A. TRIAL COUNSEL CORROBORATES POSTON'S DECLARATION REGARDING THE LACK OF PREPARATION TO TESTIFY.

Respondent concedes that Poston's allegations and the factual assertions in his sworn declaration must be presumed true in determining whether a prima facie case of ineffective assistance requires issuance of an order to show cause. (Informal Response 24.) But respondent also attacks Poston's credibility, arguing incorrectly that Poston's declaration is the only support offered for his claim that Bryden did not adequately prepare him to testify. (Informal Response 23-24.)

In fact Poston's declaration is corroborated in crucial respects by Bryden's statements to Covin as described in Covin's declaration. As Covin explains, she did not identify or investigate the claim pertaining to inadequate preparation until she spoke with Poston and arranged to visit him to investigate additional possible claims, in May and June 2016. (Petition 279-280, 282 [Covin Dec.].)

At that point Covin already had Bryden's signed declaration about the original habeas claims she had previously identified: ineffective assistance of counsel in failing to object to prosecutorial misconduct; failing to object to CALCRIM No. 3471 and request

modification; failing to investigate and present expert testimony on AAVE, and failing to investigate and present expert testimony on African-American culture. (Petition 279-280, 282 [Covin Decl.].) Rather than take the time to renegotiate Bryden's declaration, Covin summarized her telephone conversation with Bryden about his preparation of Poston to testify in her own declaration, Exhibit 15. (Petition 279-286 [Covin Dec.].)

Bryden told Covin he did not spend much time preparing Poston to testify because he did not think Poston needed it. (Petition 285-286 [Covin Decl.].) Bryden said he probably visited Poston at the jail a couple of times. (Petition 285 [Covin Decl.].) Bryden told Covin he never had the jail phone calls transcribed and never saw a transcription before trial so Poston is correct that he, Bryden, did not give the transcription to Poston. (Petition 285 [Covin Decl.].) Nor did Bryden listen to the recordings with Poston. (Petition 285 [Covin Decl.].)

Bryden told Covin he talked to Poston generally about the jail phone calls when he made the motion to suppress. (Petition 286 [Covin Decl.].) He probably gave Poston a copy of the pretrial motion. (Petition 286 [Covin Decl.].) He does not recall ever talking

to Poston about the jail phone calls in preparation for his testimony or in any detail. (Petition 286 [Covin Decl.].) He does not recall talking to Poston about pimping and prostitution. (Petition 286 [Covin Decl.].)

Bryden's statements to Covin strongly corroborate Poston's sworn statements about Bryden's failure to prepare him to testify.[2] Poston's allegations must be presumed true, as respondent reluctantly concedes. (Informal Response 23-24; see also *People v. Duvall*, *supra*, 9 Cal.4th at pp. 474-475.)

Any reasonably competent criminal defense attorney would have provided a testifying defendant with impeachment material

---

[2] Respondent accuses Poston of mischaracterizing the evidence, falsely claiming support from Bryden. (Informal Response 23.) According to respondent the "mischaracterization" is not only "troubling on its face, it sheds substantial doubt on the credibility of petitioner's own description of how he was prepared by trial counsel." (Informal Response 23.)

Respondent is referring to a typographical error by appointed counsel, not Poston, in accidentally citing ¶ 26 of Exh. 13 - Bryden's declaration - rather than ¶ 26 of Exh. 15 - Covin's declaration. (Petition 286 [Covin Decl.].) As Covin's declaration explains, Bryden did in fact admit that he did not spend much time preparing Poston, did not provide Poston with a transcription of the jail phone calls, and did not talk to Poston about pimping and prostitution, just as Poston swears under penalty of perjury. (Petition 82 [Donel Poston Decl.], 286 [Covin Decl.].)

which the trial lawyer himself believed was devastating to the defense and would have helped the defendant prepare for cross-examination. (Petition 263-264 [Bryden Decl.]; see also *Bemore v. Chappell* (9th Cir, 2015) 788 F.3d 1151, 1163-1166 [trial lawyer's unreasonable failure to adequately prepare a defense witness to testify was ineffective assistance of counsel]; *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 889-890 [same].) And any reasonably competent criminal defense attorney would have conferred with the defendant after cross-examination and would have adequately rehabilitated him on redirect. As explained below, Bryden's failure to do so was prejudicial.

B. AT LEAST ONE JUROR WOULD LIKELY HAVE HAD A REASONABLE DOUBT AS TO POSTON'S GUILT IF HE HAD BEEN ADEQUATELY PREPARED TO TESTIFY AND ADEQUATELY REHABILITATED ON REDIRECT.

Respondent argues that any failure of counsel was not prejudicial because additional preparation would not have significantly changed Poston's testimony. (Informal Response 25-27.) As Poston has explained, however, adequate preparation and rehabilitation would have enabled him to testify more coherently and credibly. (Petition 38-44, 83-84, 142-147.)

Perhaps most significantly, Poston could have testified credibly about pimping if Bryden had explained the legal definition to him: knowingly deriving financial support from a prostitute's earnings. (§ 266h; see also § 647, subd. (b).) Poston could have more credibly explained that he has never considered himself a pimp, which in his world is someone whose business is to control and sell prostitutes, usually with some physical violence. Poston has never done anything like that. He has never been in the business of pimping though he does know pimps. (Petition 147 [Donel Poston Decl.].)

Poston could have explained that he has taken money from women he has been involved with personally when he needed it and some of those women may have done some dating for money. Poston has no idea whether they actually had sex for money or just went on dates like paid escorts. He did not concern himself with how they got their money - whether from work, welfare, or dating - it was none of his business. It never occurred to Poston that taking a little money from a woman he knew now and then made him a pimp. (Petition 147 [Donel Poston Decl.].)

Poston explains he was surprised when Covin told him the legal definition of pimping. He may have violated the pimping statute from

time to time but not by intention or demand, just by request for help from someone he knew, and not as his business. (Petition 148 [Donel Poston Decl.].)

Had Bryden talked to Poston about pimping before his testimony, Poston could have done a better job explaining coherently under cross-examination instead of repeatedly denying he was a pimp but then admitting he took money from a prostitute - an apparent contradiction. (Petition 148 [Donel Poston Decl.].) Poston's further testimony on redirect did not explain the apparent contradiction because Poston still did not know the legal definition of pimping. (19 RT 1757.)

The prosecutor and McNeely's lawyer both made Poston look like a liar for insisting he was not a pimp while admitting he took money from a prostitute. (19 RT 1653-1654, 1677-1678; 20 RT 1900, 1917.) McNeely's counsel argued that Poston's "I'm not a pimp" was like Richard Nixon's "I'm not a crook." (10 RT 1917.)

Poston could have testified more credibly had Bryden competently advised and prepared him. The jurors might still have concluded Poston was a pimp, but they would not have concluded from his denials that he was a liar.

Had Bryden competently prepared him, Poston could have credibly explained why his rap lyric - "[i]t's all self-defense under the proper pretense" - did not indicate fabrication. (16 RT 1136.) Poston could have explained that he did not believe the words "pretense" and "pretext" necessarily indicate falsity, because his dictionary included two neutral definitions for "pretense" which did not suggest falsity. (Petition 38-39, 68, 145, 166-167, 169, 282-284.)

Thus, Poston believed that "pretense" could mean simply "a claim" and not necessarily "a false claim." But since some of the definitions indicated falsity, Poston used the adjectives "proper" and "correct" in different versions of the rap lyric to make clear he did not mean to indicate falsity. Rather he meant to use "pretense" in its neutral sense. (Petition 38-39, 68, 145, 166-167, 169, 282-284.)

Poston used the words "pretense" and "pretext" interchangeably in different versions of this rap lyric because his dictionary showed them as synonyms. Poston explains that "pretext" is even better than "pretense" artistically because it is a less perfect rhyme with "self-defense." An imperfect rhyme is considered better than a perfect rhyme in rap lyrics - it is more clever. (Petition 145 [Donel Poston Decl.].)

The record supports Poston's sworn statement that he did not believe "pretense" or "pretext" indicated falsity. When the prosecutor asked Poston about a different rap lyric, suggesting he was bragging about shooting McNeely, Poston himself brought up the "pretext" language, apparently believing it supported his claim of self-defense: "Ma'am, that's an excerpt. I also said, "Under the right pretext, it's all self-defense." (19 RT 1633.) The prosecutor responded: "Right. 'Under the right pretext,' as long as you testify to the right things, right?" (19 RT 1633.) Poston answered: "No, ma'am. As long as the jury and the people see the truth to this, that maybe this is self-defense, because a man was trying to kill me." (19 RT 1633.)

Poston denied the suggestion of fabrication but, perhaps not realizing that the "pretext" - "pretense" language would suggest falsity to many people, he did not explain about his dictionary's definitions. As with his denials that he was a pimp, Poston's bare denial that his self-defense claim was fabricated was not credible in light of the apparent admission in the rap lyric. Had Bryden competently prepared Poston or competently rehabilitated him on redirect examination, the jurors might well have believed Poston's explanation, neutralizing the damaging potential of the rap lyric.

Had Bryden competently prepared him, Poston could have credibly explained that he did not know anything about the credit cards and embossing machine found in his house. Poston had been gone for three months and other people were living in his house. The checks and stubs found in Poston's bedroom belonged to him. He used the stubs to write receipts as he explained in his testimony. (19 RT 1619.) He has never done anything like credit card fraud. He has never seen a machine like that and would not know what to do with it. (Petition 149 [Donel Poston Decl.].)

Poston's theft priors are all for cashing counterfeit traveler's checks. You can buy them on the street - $200 for $1000 worth - and cash them in stores. Poston states he wishes Bryden had helped him prepare for cross-examination so he could have explained better. He would have explained how the check fraud he did commit was different than credit card fraud and did not involve an embossing machine. (Petition 149 [Donel Poston Decl.].) Because Poston was not adequately prepared, the prosecutor was able to make him look like a liar when he denied knowledge of indicia of credit card fraud found in his home. (19 RT 1619-1624.)

Respondent argues Poston could not have persuaded the jury no matter how well-prepared he was because "the video showed that petitioner lied about many basic facts surrounding the shooting." (Informal Response 27.) Elsewhere respondent describes Poston's supposed lies: that McNeely showed his gun before the slap; that Poston reached for his camera, not his gun, immediately after the slap; that McNeely shot the radiator of Bailey's car; and that Poston intentionally stopped shooting after McNeely went down. (Informal Response 8.)

But the whole shooting incident was over in 15 seconds. (18 RT 1550.) Poston acted on survival instincts. (18 RT 1550.) He only saw the video once before trial. (Petition 148 [Donel Poston Decl.].) He identified the frames of the video when McNeely opened his jacket, showing his gun. (18 RT 1559-1560.) Any discrepancies between Poston's testimony and the video are adequately explained by the stress of the situation.

Several witnesses corroborate Poston's testimony that McNeely shot the radiator of Bailey's car. (Petition 45-47, 171, 173, 175.) Respondent's repeated suggestion that Poston told Bailey to lie is not

supported by the record. (Informal Response 8, 18; 19 RT 1647-1654; Pros. Exh. 32A at pp. 37-40; see also fn. 1, *ante*.)

Moreover, respondent concedes that McNeely started a quarrel with Poston and escalated it by slapping and tripping Poston, knocking him at least partway down to the ground. (RB 19-20, 69, 82, 91.) McNeely agrees and so did the prosecutor; it was and is undisputed that McNeely was the aggressor. (McNeely AOB 41, 46-48, 54-55; McNeely ARB 26, 30; 1 RT 44; 20 RT 1888.) As respondent explains, the surveillance video makes clear that Poston "stood around passively while McNeely acted aggressively." (RB 91.)

Respondent concedes that McNeely reached for his ammunition magazine, if not his gun, just "a second" after Poston drew his gun in response to McNeely's unprovoked assault. (RB 72 and fn. 12.) Respondent concedes that "Poston had a viable self-defense claim because the video clearly showed that McNeely reached into his jacket - and Poston could reasonably assume he was reaching for a gun - before Poston fired a shot." (RB 45, 78.)

The prosecutor could not have obtained convictions without unfairly attacking Poston's character and credibility. The prosecutor's misconduct itself requires reversal as explained on appeal. (AOB

109-129.) In addition, trial counsel missed multiple opportunities to support Poston's credibility and counteract the unfair attacks from the prosecutor and McNeely's counsel.

Had Bryden adequately prepared and rehabilitated Poston, at least one juror would likely have had a reasonable doubt as to Poston's guilt. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 694-695; *In re Sixto* (1989) 48 Cal.3d 1247, 1257; *People v. Soojian*, *supra*, 190 Cal.App.4th at p. 521; *People v. Howard* (1987) 190 Cal.App.3d 41, 48.) Thus, the writ should be granted.

* * * * * *

## IV. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston alleges in the Petition that Bryden's failure to investigate and present corroborating evidence denied him the effective assistance of counsel. (Petition 27-28, 85-87; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington*, *supra*, 466 U.S. 668.)

Respondent counters that Poston's legal research packet on self-defense would not have been admissible as a prior consistent statement; Poston's dictionary excerpt would not have rebutted the inference of fabrication from his use of the words "pretense" and "pretext" in his rap lyric; Bryden could reasonably have chosen not to investigate Poston's report of a bullet hole in Bailey's radiator "because it was a lie"; and no additional investigation would have changed the jurors' perceptions of Poston's credibility. (Informal Response 29-30.) Respondent's contentions should be rejected and the writ should be granted.

///

///

//

### A. POSTON'S LEGAL RESEARCH PACKET ON SELF-DEFENSE WOULD HAVE REBUTTED THE PROSECUTOR'S ARGUMENT THAT HE FABRICATED HIS DEFENSE.

The prosecutor and McNeely's counsel suggested and argued that Poston fabricated his defense. (19 RT 1630-1633, 1641-1644, 1676, 1681-1685; 20 RT 1896-1900; Pros. Exh. 32A at pp. 6-8, 45.) Poston testified on cross-examination by McNeely's attorney that his defense was always self-defense and that he was talking about self-defense before he got his legal research materials. (19 RT 1685.) On redirect, he explained that he did study the law while in jail, finding that the law fit the facts of this case. (19 RT 1757.) He was not trying to fit the facts of this case to the law. (19 RT 1757.)

Bryden's question to Poston on redirect shows that he knew Poston read about the law of self-defense while in jail before the trial of this case. (19 RT 1757.) Unfortunately, Bryden neglected to ask Poston if he had any research notes or materials. If he had, he would have discovered that Poston's hand written comments on the research materials pertaining to self-defense corroborated his testimony. (Petition 153-164 [self-defense packet].)

For instance, Poston commented at the top: "A person claiming self-defense is entitled to prove that the fear was reasonable. ??? can I

prove that the fear was reasonable? (yes)." (Petition 153.) Where the packet stated that an ex-felon is entitled to use a firearm in self - defense, Poston commented: "Important[.] Ex felon - Firearm/Justifiable." (Petition 153.)

At the bottom of the first page, Poston commented: P.C. 197(3) - This code applies because note: There was more than bare fear simply because [f]irst he showed me a gun then he attacked me." (Petition 153; see also § 197(3) ["When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed"].)

With regard to mutual combat, Poston commented: "Clearly thru up my hands and turned down the battle, 'told him wherever he was driving that car I didn't want to ride[.]' Then Boom! Smack!" (Petition 155.) With regard to responding to a non-felonious

aggressor, Poston commented: "This might be an issue[.] Just in case they try to use this[. . . .] This clause is the only setback in perfect self defense." (Petition 155.) With regard to "Unwarranted Punishment When Danger Has Ended," Poston commented: "I abided by this statute." (Petition 156.)

Not a single comment on the 11 page packet suggests fabrication. Rather, every single comment suggests that Poston was evaluating whether the facts of the case fit the law of self-defense. Every single comment is perfectly consistent with Poston's testimony that he was just happy to find out the law fit his case - he was not trying to fit the facts to the law.

Respondent argues Poston's comments on the self-defense packet would not have been admissible as prior consistent statements because they were not made before the motive for fabrication arose: "petitioner had every motive to fabricate while he was sitting in jail awaiting trial." (Informal Response 28, citing Evid. Code, § 791, subd. (b) ["Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . . (b) An express or implied charge has been made that his testimony at the hearing is

recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen"].)

Respondent ignores Evidence Code section 791, subdivision (a): "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . . (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement."

The prosecutor and McNeely's counsel argued that Poston's statements about self-defense in the jail phone calls were inconsistent with his testimony. (19 RT 1630-1633, 1641-1644, 1676, 1681-1685; 20 RT 1896-1900; Pros. Exh. 32A at pp. 6-8, 45.) Thus, Poston's prior consistent statements on the self-defense packet would have been admissible to rebut the allegations of fabrication under Evidence Code section 791, subdivision (a). (Compare *People v. Smith* (2003) 30 Cal.4th 581, 630 [defendant's statements in a recorded phone conversation with his wife were not admissible under Evid. Code,

§ 791, subd. (a), because the prosecutor never argued that more recent statements were inconsistent with the defendant's testimony].

Poston's comments would also have been admissible to show his state of mind (See Evidence Code, § 1250, subd. (a)(1) ["Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action"]; *People v. Clark* (2016) 63 Cal.4th 522, 591-593 [in addition to hearsay exception for state of mind, non-hearsay statements, not admitted for their truth, may be admissible as circumstantial evidence of the declarant's state of mind].)

Poston's comments corroborated his testimony and rebutted the arguments of the prosecutor and McNeely's counsel that he fabricated his defense. They would have been admissible as prior consistent statements and statements of Poston's then existing mental state. Bryden's failure to adequately investigate, discover, and present the

corroborating evidence denied Poston the effective assistance of counsel.

B. POSTON'S DICTIONARY EXCERPT WOULD HAVE REBUTTED THE INFERENCE THAT HIS USE OF THE WORDS "PRETENSE" AND "PRETEXT" IN HIS RAP LYRIC INDICATED THAT HE FABRICATED HIS DEFENSE.

Respondent argues that Poston's dictionary excerpt would not have rebutted the inference that he fabricated his defense because every definition of "pretense" in Poston's dictionary indicates falsity. (Informal Response 28.)

But the first definition states that a "pretense" is a "claim; esp. one not supported by fact." (Petition 166.) This definition makes clear that a pretense is not always a false claim even if it usually is. "Especially" is not the same as "always." The second definition is "a mere display." (Petition 166.) Poston did not understand "a mere display" to mean a false display. (Petition 145 [Donel Poston Decl.].)

Poston explains he understood that "pretense" can mean false but does not necessarily mean false. Thus, he used the adjectives "correct" and "proper" to show he did not mean to indicate falsity. (Petition 145 [Donel Poston Decl.], 282-284 [Covin Decl.].)

Had Bryden asked Poston about his use of the words "pretense" and "pretext," he would have learned that Poston relied on his dictionary, which indicated to him that "pretense" and "pretext" sometimes mean simply a claim or display, and not necessarily a false claim or display. Like the self-defense packet, the dictionary page would have been admissible as circumstantial evidence of Poston's state of mind. (See Evid. Code, § 1252; *People v. Clark*, 63 Cal.4th at pp. 591-593.) Bryden's failure to adequately investigate, discover, and present the corroborating evidence denied Poston the effective assistance of counsel.

C. CORROBORATING EVIDENCE THAT BAILEY'S RADIATOR WAS SHOT WOULD HAVE REBUTTED ARGUMENTS THAT POSTON LIED ABOUT THE RADIATOR.

Respondent argues that Bryden "could reasonably decide not to investigate [Poston's] assertion [that there was a bullet hole in Bailey's car] because the assertion "was a lie." (Informal Response 29.)

Of course, as respondent concedes elsewhere, Poston's factual allegations must be presumed true in deciding whether an order to show cause should be issued. (Informal Response 24; see also *People v. Duvall*, *supra*, 9 Cal.4th at pp. 474-475.) Poston alleges that there was a hole in the radiator of Bailey's car immediately after the

shooting in this case. (Petition 27-28, 45-47, 85-87.) He provides reasonably available documentary evidence - his own declaration and four others. (Petition 148-149 [Donel Poston Decl.], 171 [Leatta Poston Decl.], 173 [Robert Samuels Decl.], 173 [Angel Garcia Decl.], 285-288 [Covin Decl.].)

To the extent respondent suggests Bryden need not have investigated because he did not believe Poston's claim that there was a bullet hole in the radiator of Bailey's car, Bryden could not reasonably have dismissed Poston's claim without adequate investigation. (See *Strickland v.Washington, supra*, 466 U.S. 668 ["counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"]; *In re Thomas* (2006) 37 Cal.4th 1249, 1261-1265 [a trial lawyer's unreasonable failure to investigate and present corroborating evidence on a disputed point constitutes ineffective assistance of counsel]; accord *Bemore v. Chappell* (9th Cir, 2015) 788 F.3d 1151, 1162-1165; *Riley v Payne* (9th Cir. 2003) 352 F.3d 1313, 1317-1319.)

Moreover, Bryden apparently believed Poston generally. (Petition 262-264.) And he told Covin he remembered Stannard and Poston mentioning the radiator. He did investigate minimally but

Bailey had already sold the car, which could not be located. (Supplemental Covin Decl., attached hereto as Exhibit A.)

If Bryden had adequately investigated, he would have heard credible reports from Poston's mother, his brother, and his brother's mechanic corroborating Poston's claim. (Petition 148-149 [Donel Poston Decl.], 171 [Leatta Poston Decl.], 173 [Robert Samuels Decl.], 173 [Angel Garcia Decl.], 285-288 [Covin Decl.].) Based on Poston's mother's declaration, it seems likely Bailey would also have corroborated Poston's claim, if Bryden had only asked her. (Petition 171 [Leatta Poston Decl.].)

Respondent argues Poston's declarations "are far from convincing." (Informal Response 29.) But again, in determining whether to issue an order to show cause, Poston's factual allegations must be presumed true, as respondent acknowledges. (Informal Response 24; see also *People v. Duvall, supra*, 9 Cal.4th at pp. 474-475.)

McNeely's attorney used Poston's "uncorroborated" testimony about the radiator to argue that Poston was a liar who should not be believed. (19 RT 1738-1740; 20 RT 1907, 1918.) At that point, if not sooner, any reasonably competent criminal defense attorney would

have considered whether any corroborating evidence was available. Bryden's failure to adequately investigate and present the corroborating testimony of Poston's mother, his brother, and his brother's mechanic denied Poston the effective assistance of counsel.

### D. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE WAS PREJUDICIAL.

Respondent argues that Poston cannot state a prima case because he cannot show prejudice - "petitioner has not shown that it is reasonably probable that additional investigation would have changed the jurors' perception of petitioner's veracity or resulted in a more favorable result at trial." (Informal Response 24.)

On the contrary, Poston has shown that his credibility was crucial to his defense; that his credibility and character were unfairly attacked by the prosecutor and McNeely's counsel in various ways; and that Bryden failed to utilize multiple opportunities to counter the unfair attacks. Bryden's failure to adequately investigate and present corroborating evidence was one of the many ways Bryden failed to competently contest the state's case against Poston.

At least in conjunction with all of the other instances of ineffective assistance, Bryden's failure to adequately investigate and

present corroborating evidence undermines confidence in the judgment. (See *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622 [considering cumulative prejudice from multiple instances of ineffective assistance in reversing under *Strickland*].) Thus, the writ should be granted.

* * * * * *

## V. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston alleges in the Petition that Bryden's failure to investigate and present expert testimony on AAVE denied him the effective assistance of counsel. (Petition 28-29, 88-93; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra*, 466 U.S. 668.)

Respondent counters that no expert on AAVE was necessary and that Bryden's omission was not prejudicial because Poston "squandered all of his credibility by repeatedly lying to the jury." (Informal Response 30-33.) These contentions should be rejected and the writ should be granted.

### A. <u>EXPERT TESTIMONY ON AAVE WOULD HAVE ASSISTED THE JURY.</u>

Respondent argues that no AAVE expert was needed because only one of Poston's statements was facially incriminating - that "it's all self-defense under the proper pretense." (Informal Response 31.) Respondent ignores the prosecutor's suggestions and arguments that multiple other statements in AAVE were incriminating. (AOB 124-126.)

The prosecutor suggested that Poston's rap lyrics - "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life" - showed a murderous state of mind. (19 RT 1640.) She argued that another of his rap lyrics refuted his claim of self-defense and showed a lack of remorse for Mr. Fluker's death: "Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda . . . ." (16 RT 1136; 20 RT 1972.)

Poston said he had a strong claim of self-defense; the prosecutor argued it was an admission that he did not act in self-defense. (19 RT 1633; 20 RT 1897; Pros. Exh. 32A at p. 8.) Poston said he told Bailey to tell the truth; the prosecutor argued it was an admission that he pressured Bailey to lie. (19 RT 1650; 20 RT 1898; Pros. Exh. 32A at p. 39.)

Professor Rickford could have testified that none of these statements were incriminating and that Poston seemed to be expressing sorrow and regret about Fluker. (Petition 182, 184-186

[Rickford Decl.].) Poston seemed to be expressing relief and confidence because the law of self-defense apparently encompassed the facts of his case and made him feel optimistic about the outcome. (Petition 186 [Rickford Decl.].)

Only one of Poston's statements arguably suggested fabrication - "It's all self defense under the proper pretense." (Petition 185 [Rickford Decl.]; 16 RT 1135.) Professor Rickford could have testified that rap lyrics are a form of artistic expression and should not necessarily be taken literally. As Poston explained, he was just trying to express himself in rhyme. (Petition 185 [Rickford Decl.]; 16 RT 1135.)

Professor Rickford could have explained that AAVE is a distinct dialect with sophisticated and consistent structures and rules. It is not "bad English," as many believe, and does not necessarily indicate aggression. (Petition 178 [Rickford Decl.].) Alternating use of AAVE and SAE - "code-switching" - is normal and desirable. It does not indicate dishonesty. (Petition 178-180 [Rickford Decl.].)

Professor Rickford could have testified that it was essential for Poston to avoid AAVE and profanity in his testimony if he was to be believed or even understood by the mostly White and Asian, suburban

jurors. (Petition 180-181 [Rickford Decl.], 313-327 [excerpts of juror questionnaires]; 2 Supp. CT 1, 21, 41, 61, 81, 101, 121, 141, 161, 181, 201, 221, 241, 261, 281.) And it was "critical" to discuss these issues pertaining to AAVE and SAE at trial in order to neutralize the jurors' unconscious racism and bias against AAVE. (Petition 178-181 [Rickford Decl.].)

Bryden acknowledges that the prosecutor's interpretation of many of Poston's statements in AAVE was incorrect. (Petition 267 [Bryden Decl.].) But it never occurred to him that he needed an expert to counter those incorrect interpretations or that there was an expert who could provide admissible, favorable testimony. (Petition 267 [Bryden Decl.].)

Bryden acknowledges that Professor Rickford appears to be a well-qualified expert on AAVE; that at least some of his proposed testimony would likely have been admissible; and that some or all of the jurors might have benefitted from the proposed testimony. (Petition 269 [Bryden Decl.]; see also Evid. Code, § 801 [expert testimony is admissible if it will assist the jurors]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 [expert testimony is admissible even if the jurors have some knowledge of the subject matter; it

should be excluded only when "the subject of inquiry is one of such common knowledge that men of ordinary education reach a conclusion as intelligently as the witness" - only when the expert testimony would add nothing to the jurors' "well of information"].)

Contrary to respondent's contention, the meaning and significance of statements in AAVE is not a subject of such common knowledge among non-African-Americans that expert testimony would add nothing to the jurors' well of information. (See, e.g., (*United States v. Are* (7th Cir. 2009) 590 F.3d 499, 502 [expert testimony is routinely admitted to translate "code words"]; *United States v. Williams* (7th Cir. 2000) ___ F.3d ___, 2000 U.S. App. LEXIS 168 [AAVE expert testified at sentencing that words spoken in a recorded conversation did not necessarily relate to criminal activity; they might have had an innocent meaning]; *United States v. Herron* (E.D.N.Y. 2014) ___ F.Supp.2d ___, 2014 U.S. Dist. LEXIS 63872, at pp. 16-26 [expert properly testified regarding the meaning of rap lyrics] .) In light of the prosecutor's multiple incorrect assertions, expert testimony was essential in this case.

Any reasonably competent criminal defense lawyer would have concluded that the prosecutor's heavy reliance on incorrect

interpretations of the defendant's statements in AAVE with an almost all suburban, White and Asian jury, at least warranted investigation into the possible availability of a rebuttal expert. Had Bryden investigated even minimally, he would have found Professor Rickford. (Petition 90 [a Google search for "African American Vernacular" turns up Professor Rickford's website - the second entry].) Bryden's failure to undertake any investigation whatsoever denied Poston the effective assistance of counsel.

B. <u>TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AAVE UNDERMINES CONFIDENCE IN THE OUTCOME.</u>

There is a reasonable probability of a more favorable outcome had Bryden investigated and presented expert testimony to counter the unfair and misleading interpretations of Poston's statements put forth by the prosecutor and McNeely's counsel. At least one juror would likely have had a reasonable doubt as to Poston's guilt. (See *Strickland v. Washington, supra*, 466 U.S. at p. 694; *In re Sixto, supra*, 48 Cal.3d at p. 1257; *People v. Howard, supra*, 190 Cal.App.3d at p. 48; cf. *People v. Soojian, supra*, 190 Cal.App.4th at p. 521.)

Respondent argues again there was no prejudice because Poston repeatedly lied to the jury. (Informal Response 33.) But respondent's accusations of lying, like those from the prosecutor and McNeely's counsel, are unfair and unfounded. The accusations could have been rebutted had defense counsel adequately investigated and contested the state's case.

Poston had a "plausible" and "viable" claim of self-defense, as respondent acknowledges. (RB 45, 55, 78.) A more favorable outcome was at least reasonably probable had Bryden competently challenged accusations that Poston lied about his defense through presentation of expert testimony on AAVE, among other possible methods. Bryden's failure to investigate and present expert testimony on AAVE undermines confidence in the judgment and the writ should be granted.

* * * * * *

## VI. TRIAL COUNSEL’S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston alleges in the Petition that Bryden’s failure to investigate and present expert testimony on African-American culture denied petitioner the effective assistance of counsel. (Petition 29; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668.)

Respondent counters that no expert on African-American culture was necessary and that Bryden's omission was not prejudicial because Poston lied. (Informal Response 34-37) These contentions should be rejected and the writ should be granted.

### A. EXPERT TESTIMONY ON AFRICAN-AMERICANCULTURE WOULD HAVE ASSISTED THE JURY.

Respondent "does not disagree" with Professor Morrell that "it is not uncommon for urban African-American people to flee the police even if they had committed no crime at all because they reasonably distrust the police . . . ." (Informal Response 34; Petition 219-220 [Morrell Decl.].) Thus respondent focuses on answering an argument that Poston did not make - "that African-Americans never

flee from the police out of consciousness of guilt." (Informal Response 35.)

Poston agrees it is possible that an African-American person's flight might reflect consciousness of guilt - he has not argued that an African-American person's flight never reflects consciousness of guilt. But the usual inferences of criminal intent and consciousness of guilt are severely weakened because it is not uncommon for innocent African-American people to possess firearms and flee the police based on a reasonable distrust of the police and the criminal justice system. (Petition 97-100, 219-220, 222.)

If these acts are not uncommon among innocent African-American people, then the acts do not support inference of criminal intent or consciousness of guilt. They do not necessarily or even likely show criminal intent or consciousness of guilt. Rather, they are just as likely attributable to distrust. (Cf. *Commonwealth v. Warren* (Mass. 2016) 475 Mass. 530, 539 [reversing for 4th Amend. violation in part because the African-American defendant's flight from the police was not necessarily probative of consciousness of guilt; a black male fleeing the police "might just as easily be motivated by the

desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity"].)

Expert testimony is often admissible to provide an alternative explanation for an individual's acts. (See, e.g. *People v. Ward* (2005) 36 Cal.4th 186, 211 [expert testimony was admissible to explain that witnesses to gang crimes "are often reluctant to identify or testify against gang members out of fear for their safety," to rebut the jurors' likely assumption that a witness's initial failure to identify a suspect indicates a lack of credibility"]; *People v. Riggs* (2008) 44 Cal.4th 248, 293-294 [expert testimony is admissible to explain the sometimes counterintuitive behavior of battered women]; *People v. Brown* (2004) 33 Cal.4th 892, 904-906 [of domestic violence victims]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1302 [of parents of sexually abused children]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 242-243 [of rape victims]; *People v. Bowker* (1988) 203 Cal.App.3d 385, 392-294 [of sexually abused children]; see also *People v. Day* (1992) 2 Cal.App.4th 405, 415-417 [trial counsel was ineffective for failing to present expert testimony regarding battered woman syndrome].)

Respondent argues that trial counsel "could have reasonably assumed the jury understood that many African-Americans distrusted

the police and court system." (Informal Response 35.) But Bryden states it simply never occurred to him that he could or should challenge the prosecutor's arguments. (Petition 268 [Bryden Decl.].)

Bryden acknowledges that Professor Morrell appears to be a well-qualified expert; that at least some of his proposed testimony would likely have been admissible; and that some or all of the jurors might have benefitted from the proposed testimony. (Petition 269 [Bryden Decl.].) His failure to investigate and present expert testimony providing an alternative explanation for Poston's possession of a firearm and flight from the police denied Poston the effective assistance of counsel.

### B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN-AMERICAN CULTURE UNDERMINES CONFIDENCE IN THE OUTCOME.

There is a reasonable probability of a more favorable outcome had Bryden investigated and presented expert testimony to counter the unfair and misleading inferences of criminal intent and consciousness of guilt put forth by the prosecutor. At least one juror would likely have had a reasonable doubt as to Poston's guilt. (See *Strickland v. Washington, supra,* 466 U.S. at p. 694; *In re Sixto, supra,* 48 Cal.3d at

p. 1257; *People v. Howard*, *supra*, 190 Cal.App.3d at p. 48; cf. *People v. Soojian*, *supra*, 190 Cal.App.4th at p. 521.)

Respondent argues again that trial counsel's omission was not prejudicial because Poston lied. (Informal Response 36.) As explained, *ante*, however, Bryden missed numerous opportunities to rebut the accusations that Poston lied. Bryden also missed the opportunity to rebut the prosecutor's argument that Poston's possession of a firearm and flight from the police showed that he did not act in self-defense.

Professor Morrell's testimony would have supported Poston's innocent explanation and, at least in conjunction with the other omitted evidence and instructions, would likely have raised a reasonable doubt as to Poston's guilt. (See *Mak v. Blodgett*, *supra*, 970 F.2d at p. 622.) Bryden's failure to undertake any investigation undermines confidence in the judgment. Thus, the writ should be granted.

* * * * * *

## VII. THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY *BRADY V. MARYLAND* AND DUE PROCESS.

Poston alleges in the Petition that the prosecutor failed to disclose material impeachment evidence as required by *Brady v. Maryland* and due process. (Petition 30; U.S. Const., amend. XIV; Cal. Const., art. 1, § 15; *Brady v. Maryland* (1963) 373 U.S. 83; *Imbler v. Pachtman* (1976) 424 U.S. 409, 427, fn. 25; *Kyles v. Whitley* (1995) 514 U.S. 419, 442, fn. 134, 445-451; *Youngblood v. West Virginia* (2006) ___ U.S. ___, 126 S.Ct. 2188; *In re Steele* (2004) 32 Cal.4th 682, 695.)

Respondent counters that the prosecutor had no duty to disclose before Sergeant Gantt filed his internal affairs complaint, which was likely after Poston's trial. (Informal Response 37-38.) Respondent also argues that the impeachment evidence was not material because Lieutenant Jones is African-American and his racially charged text messages may not have reflected bias against African-Americans. (Informal Response 39-40.)

Even if the text messages showed bias against African-Americans, respondent argues they would not necessarily have undermined Lieutenant Jones's testimony, which "seems correct on its

face" and "rang true." (Informal Response 40-42.) And respondent argues again that there could be no prejudice because Poston lied. (Informal Response.)

Contrary to respondent's contentions, the prosecutor failed to disclose material impeachment evidence, in violation of *Brady* and due process. As Poston explained, the *Brady* obligation extends to any evidence providing grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks. (*Youngblood v. West Virginia, supra,*126 S.Ct. 2188; *Kyles v. Whitley, supra,* 514 U.S. at pp. 442, fn. 134, 445-451.) And it extends to information known by law enforcement authorities. (*Kyles v. Whitley, supra,* 514 U.S. at p. 437; accord *In re Steele, supra,* 32 Cal.4th at p. 697.)

Respondent acknowledges that *Brady* extends to impeachment evidence "known to others acting on the prosecution's behalf , including the police," but apparently assumes knowledge is imputed to the prosecutor, triggering a duty of disclosure to the defendant, only if the exculpatory evidence is the subject of an official complaint, like Sergeant Gantt's. (Informal Response 38.)

Poston does not believe such official knowledge is required. The question is not whether the prosecutor can reasonably be expected to discover the evidence, as respondent suggests, but rather whether material exculpatory evidence was known to anyone acting on the prosecution's behalf. (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.)

The prosecutor has a duty to disclose material, exculpatory evidence known by even a single employee of an investigating agency. (See *People v. Whalen* (2013) 56 Cal.4th 1, 64.) In *Whalen*, the Supreme Court held that *Brady* applied to notes in the possession of a law enforcement criminalist, apparently unknown to anyone else. (*Ibid*.)

The Court explained: "Because [the criminalist] participated in the investigation of [a charged murder] and was employed by an investigating agency, he was part of the prosecution team, and the prosecutor therefore had a constitutional duty to disclose exculpatory, material evidence in [the criminalist's] possession regardless of whether the prosecutor was personally aware of the existence of the evidence." (*People v. Whalen*, *supra*, 56 Cal.4th at p. 64.)

Here, Lieutenant Jones and Sergeant Gantt were both employed by the investigating agency - the Oakland Police Department - and they were both involved in the investigation of this case. They both testified against Poston. According to the news reports Poston provided, both Jones and Gantt knew that Jones sent "racially charged" text messages to Gantt and other officers which were likely insulting and offensive to African-American people. (Petition 294-304.)

According to the news reports, the racist text messages date back at least to some time in 2014. (Petition 294-304.) Poston's trial was in January 2014. (3 CT 739; 5 CT 1421.) Sentencing was on March 21, 2014. (3 CT 887-891; 6 CT 1483-1487.) It is reasonably likely that Jones sent at least one racist text message prior to the conclusion of Poston's trial.

Poston is African-American. Had he known about the racist text messages, he could have used them to impeach Jones's credibility. He could have argued that Jones was biased against him because he is African-American and, therefore, that Jones's disputed conclusions should not be believed.

Jones testified that law abiding citizens do not refer to the Seminary area as "Sem City," as in Poston's video. (19 RT 1806-1809.) "Sem City" is a slang name "[i]n the context of drug dealing" and rap music. (19 RT 1806, 1827.) Though Oakland police officers hear "Sem City" all the time in different rap songs, the expression is only used by "street people," not "normal people." (19 RT 1827-1828.)

Jones testified it would be an insult to Poston for someone to tell him, "you ain't from Seminary." (19 RT 1814.) If Poston simply walked away, he would be viewed as a "punk," according to Jones, and would be subject to harassment. (19 RT 1814-1815, 1821-1822.) He would lose his "street credibility." (19 RT 1822.)

Jones testified that to "fire on" someone means to punch him. (19 RT 1817-1819, 1827.) He admitted on cross-examination that "fire on" could possibly mean "shoot" rather than "punch," but he "never heard it used in that context." (19 RT 1826-1827.)

Finally, Jones acknowledged on cross-examination that someone can be a "studio gangsta" - a "fake gangsta, like a person that carries himself like they're a gangster, but they're really not." (19 RT

1825.) But he testified that Poston was not a studio gangsta. (19 RT 1825.)

Poston could have argued that Jones assumed the worst, most incriminating inferences against him because of racial bias. Contrary to Jones's testimony, Poston was a studio gangsta - he associated with rappers and pimps and others with criminal ties but was not an actual gangster himself. If he was a gangsta, it was literally in the studio - in his hundreds of videos - as well as in his rap lyrics and his book about "hustling." (Petition 111-112; 13 RT 869-870; 18 RT 1520, 1523; 19 RT 1640; 19 RT 1609, 1617, 1631, 1663, 1751.) But Poston had no history of violence.

Contrary to Jones's testimony, some "normal people" in the Seminary neighborhood called it "Sem City." Contrary to Jones's testimony, Poston's rap lyric meant: "[Y]ou got to be high or crazy to think you can shoot me and get away with it." (19 RT 1818.) Contrary to Jones's testimony, Poston could have walked away from McNeely's provocation if his life had not been in danger.

Jones's testimony contributed to the prosecution's overall theme that Poston was a criminal - a bad character who could not lawfully defend himself and should not be believed. Had Poston known about

the racist text messages, he could have impeached Jones's conclusions on the basis of racial bias. The settled lawsuits might well have provided additional evidence of racial bias.

As Poston has explained, race and racism, conscious and/or unconscious, pervaded Poston's trial. The remedy was to bring it out in the open through Poston's testimony, expert testimony on AAVE and African-American culture, and cross-examination of Lieutenant Jones about the extent to which bias against African-Americans may have colored his testimony against Poston.

The prosecutor's failure to disclose material impeachment evidence pertaining to Lieutenant Jones's racist text messages and involvement in settled lawsuits violates *Brady* and due process. Contrary to respondent's suggestion, no further showing of prejudice is required. (See *Kyles v. Whitley*, *supra*, 514 U.S. at p. 436.)

Moreover, Poston has already answered respondent's claim that other asserted errors and omissions were not prejudicial because Poston lied. Poston was unfairly made to look like a liar and impeachment of Lieutenant Jones on the basis of racial bias would have been yet another way to counter the unfair accusations. The writ should be granted.

## VIII. CUMULATIVE PREJUDICE VIOLATES THE SIXTH AMENDMENT AND DUE PROCESS, REQUIRING REVERSAL.

Poston alleges in the Petition that the cumulative effect of the errors raised on appeal and on habeas corpus rendered the trial fundamentally unfair in violation of due process. (Petition 15-30, 104-105; U.S. Const., amends. VI, XIV; Cal. Const., art. 1, ¶ 15; *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814, fn. 6; *People v. Hill* (1998) 17 Cal.4th 800, 845-847.)

Respondent counters that there are no errors and, thus, no prejudice to cumulate. (Informal Response 43-44.) These contentions should be rejected and the judgment should be reversed.

Respondent argues that Poston's defense "was weak because he responded to a slap by immediately drawing his illegally possessed semiautomatic handgun and firing 10 shots at McNeely from close range." (Informal Response 44.) But responded has conceded that "Poston had a viable self-defense claim because the video clearly showed that McNeely reached into his jacket - and Poston could reasonably assume he was reaching for a gun - before Poston fired a shot." (RB 45, 78.)

Respondent argues that Bryden put on a "vigorous defense" and could not have done any more to contest the prosecution case. (Informal Response 43.) On the contrary, Bryden could have done a lot more. As Poston has explained, Bryden could have objected to the prosecutor's many unfair and misleading statements and questions. He could have objected to CALCRIM No. 3471 and requested modification in accord with *Ross*. (See *People v. Ross*, *supra*, 155 Cal.App.4th at p. 1045.)

Bryden could have given Poston a transcript of the jail phone calls and copies of the letters and rap lyrics which were admitted over his objection. Bryden's failure to make any effort whatsoever to prepare Poston for cross-examination is inexplicable given that the pervasive theme of the prosecution case was an attack on Poston's character and credibility.

Bryden could have investigated whether any evidence could corroborate Poston on disputed points. Had Bryden just talked to Poston, he would have learned that Poston made prior consistent statements showing his innocent mental state on a self-defense legal packet. He would have learned that Poston thought "pretense" and

"pretext" had neutral meanings - that they did not necessarily indicate falsity.

And Bryden would have learned that Poston's mother, his brother, and his brother's mechanic could corroborate Poston's report about Bailey's radiator. The corroborating evidence would have strongly rebutted arguments by the prosecutor and McNeely's counsel that Poston was a liar who fabricated his defense.

Bryden could have investigated whether any expert testimony could have countered the prosecution's interpretation of Poston's statements in AAVE, which Bryden knew were inaccurate, and the prosecutor's arguments regarding about Poston's possession of a firearm and flight from police, which Bryden knew might not fairly reflect the mental state of an African-American defendant who had prior bad experiences with the police and the courts.

Had Bryden investigated, he would have multiple experts who would have confirmed that the inferences of criminal intent and consciousness of guilt were unsupported. Though it would have taken a little more effort to find an expert willing to provide a declaration and testify if necessary, confirmation by multiple experts who were

unwilling to work on a court case should have spurred him to investigate further, as appellate counsel did.

Respondent argues repeatedly that no errors were prejudicial because Poston was a liar. But the evidence Bryden failed to discover and present would have shown that Poston was not lying in many instances. Absent the errors of the trial court, the prosecutor, and defense counsel, a more favorable result was reasonably possible and probable. Even if no single error was prejudicial, cumulative prejudice rendered the trial fundamentally unfair in violation of due process. Thus, the writ should be granted.

* * * * * *

## AN ORDER TO SHOW CAUSE SHOULD BE ISSUED AND MADE RETURNABLE IN THE SUPERIOR COURT

In its order for informal briefing, the Court requested that respondent address whether "an order to show cause should issue, and if so, whether the Attorney General anticipates that the return and traverse will raise factual issues that require resolution at an evidentiary hearing, making this matter more appropriate for issuance of an order to show cause made returnable in the superior court."

Respondent argues that Poston has not stated a prima facie case for relief, except perhaps on his claim that trial counsel's failure to adequately prepare him to testify denied him the effective assistance of counsel. (Informal Response 24.) Respondent challenges the credibility of Poston's declaration and those of his family members and his brother's mechanic. (Informal Response 28-29.) And respondent accuses Poston of fabricating claimed corroboration from his trial attorney. (Informal Response 23.)

As respondent concedes, however, Poston's factual allegations are presumed true. (Informal response 19, 24; see also *People v. Duvall*, *supra*, 9 Cal.4th at pp. 474-475.) Poston has alleged multiple failures of counsel, all related to his credibility, which was under attack by the prosecutor and McNeely's counsel throughout the trial.

Unfortunately, Poston's attorney missed a number of opportunities to corroborate Poston, explain his allegedly guilty statements and actions, and rebut pervasive accusations that Poston was lying. Respondent repeats those accusations, arguing that any errors were harmless on that basis. But the very actions Poston claims his attorney should have taken would have rebutted the accusations.

Had Bryden objected to pervasive prosecutorial misconduct; had he objected to CALCRIM No. 3471 and requested modification in accord with *People v. Ross, supra*, 155 Cal.App.4th at p. 1045; had he adequately prepared Poston to testify and adequately rehabilitated him on redirect; had he adequately investigated and presented corroborating evidence and expert testimony on AAVE and African-American culture, there is a reasonable chance that at least one juror would have had a reasonable doubt as to Poston's guilt.

Poston has stated a prima facie case on all his claims. An order to show cause should issue. Since respondent disputes many of Poston's factual allegations, an evidentiary hearing appears nece4ssary and the order to show cause should be made returnable in the superior court.

* * * * * *

## CONCLUSION

For the foregoing reasons, an order to show cause should be issued and made returnable in the superior court as to why the judgment against petitioner should not be reversed.

DATED: September 29, 2016

Respectfully submitted,

/s/ Randi Covin
Attorney for Petitioner
DONEL POSTON

WORD COUNT CERTIFICATE

I certify pursuant to California Rules of Court, rules 8.204 and 8.384, that, according to my word processing program, Poston's Informal Reply Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus contains 13,727 words, excluding the petition, verification, tables, exhibits, and this certificate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 29th of September, 2016, at Willits, California.

/s/ Randi Covin

# EXHIBIT A

SUPP. DECLARATION OF RANDI COVIN

I, RANDI COVIN, declare as follows:

1. After finalizing the declaration of Mr. Poston's trial counsel, David Bryden, I visited Mr. Poston at High Desert State Prison on June 30, 2016, because our telephone conversations suggested there might be additional habeas corpus issues warranting investigation. When I returned to my office, I called Mr. Bryden with additional questions.

2. My declaration in support of the Petition sets out most of the relevant statements Mr. Bryden made to me in that phone call. I thought I had included everything and was surprised to find in the course of drafting Mr. Poston Informal Reply, that I had omitted Mr. Bryden's statements about the radiator of Tamena Bailey's car.

3. I asked Mr. Bryden if he investigated a possible bullet hole in the radiator. He told me he recalled that both his investigator, Walt Stannard, and Mr. Poston mentioned a bullet hole in the radiator. Mr. Bryden told me he tried to locate the car, which Ms. Bailey had already sold, but he was not able to locate the car. He did not recall anything else about the radiator or the car.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed this 29th day of September, 2016, at Willits, California.

/s/ Randi Covin

**DECLARATION OF SERVICE**

I, Randi Covin, declare that I am over 18 years of age and not a party to this action. My business address is P.O. Box 1120, Willits, California, 95490. On September 30, 2016, I served true and correct copies of **INFORMAL REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS on:**

Mr. Donel Poston
AT2512
High Desert State Prison
PO Box 3030
Susanville, CA. 96127

Alameda County Courts
Att: Hon. Michael Gaffey
1225 Fallon St.
Oakland, CA. 94612

Public Defender
1401 Lakeside Dr., Ste 400
Oakland, CA. 94612

by depositing such copies in the U.S. Mail, addressed as indicated above, postage pre-paid, at Willits, California.

On September 29, 2016, I served true and correct pdf copies of **INFORMAL REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** by e-mail to:

Attorney General
SFAG.Docketin@doj.ca.gov

First District Appellate Project
Eservice@fdap.org

Philip Brooks
philipmbrooks@gmail.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 29, 2016, at Willits, California.

/s/ Randi Covin

# EXHIBIT 17

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

Court of Appeal First Appellate District
FILED
JAN - 6 2017
Diana Herbert, Clerk
by ________ Deputy Clerk

In re DONEL POSTON on Habeas Corpus.
A148986
Alameda No. 172522B

BY THE COURT:*

The petition for writ of habeas corpus is denied.

Date: JAN - 6 2017 Simons, J., Acting P.J.

*Before Simons, Acting P.J., Needham, J., and Bruiniers, J.

DOCKETED
SAN FRANCISCO
JAN - 0 2017
By PM
No. SF2016400823

# EXHIBIT 18

NO. ______________________

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| | ) Court of Appeal |
| In re DONEL POSTON, | ) No. A148986 |
| | ) |
| Petitioner, | ) Related Appeal |
| | ) No. A141557 |
| | ) |
| On Habeas Corpus. | ) Alameda County |
| | ) No. 172522B |

**PETITIONER'S PETITION FOR REVIEW**

Appeal from the Judgment of the Superior Court
Alameda County, State of California

HONORABLE MICHAEL GAFFEY, TRIAL JUDGE

RANDI COVIN
State Bar #168422
P.O. Box 1120
Willits, CA. 95490
Telephone: (707) 459-2456
Facsimile: (707) 459-2147
e-mail address: rcovin13@gmail.com

Attorney for Petitioner
DONEL POSTON

By Appointment of the Court of Appeal Under the First District Appellate Project's Independent Case System

TOPICAL INDEX

TABLE OF AUTHORITIES ........ 4

PETITION FOR REVIEW ........ 9

QUESTIONS PRESENTED ........ 10

INTRODUCTION ........ 12

STATEMENTS OF THE CASE AND FACTS ........ 16

ARGUMENT ........ 16

I. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ........ 16

II. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ........ 27

III. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ........ 30

IV. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT

CORROBORATING EVIDENCE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ..................................... 34

V. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ..................................... 38

VI. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN CULTURE DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL ....... 43

VII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY BRADY V. MARYLAND AND DUE PROCESS ..................................... 49

VIII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER CUMULATIVE PREJUDICE VIOLATES DUE PROCESS AND REQUIRES REVERSAL ..................................... 53

CONCLUSION ..................................... 55

WORD COUNT CERTIFICATE ..................................... 56

COURT OF APPEAL'S UNPUBLISHED OPINION ..................................... 57

COURT OF APPEAL'S ORDER DENYING PETITION ................ 98

DECLARATION OF SERVICE

TABLE OF AUTHORITIES

**CASES**

*Alcala v. Woodford*
(9th Cir. 2003) 334 F.3d 862 .................................................... 38, 43

*Bemore v. Chappell*
(9th Cir, 2015) 788 F.3d 1151 ............................................. 30, 31, 34

*Brady v. Maryland*
(1963) 373 U.S. 83 ....................................................... 11, 14, 49, 52

*Commonwealth v. Warren*
(Mass. 2016) 475 Mass. 530 ........................................................... 46

*Donnelly v. DeChristoforo*
(1974) 416 U.S. 637 ....................................................................... 26

*Ho v. Carey*
(9th Cir. 2003) 332 F.3d 587 .......................................................... 29

*Imbler v. Pachtman*
(1976) 424 U.S. 409 ....................................................................... 49

*In re Sixto*
(1989) 48 Cal.3d 1247 .................................................. 33, 37, 41, 48

*In re Steele*
(2004) 32 Cal.4th 682 .............................................................. 49, 50

*In re Thomas*
(2006) 37 Cal.4th 1249 ................................................................... 34

*Kyles v. Whitley*
(1995) 514 U.S. 419 ....................................................................... 49

*Lincoln v. Sunn*
(9th Cir. 1987) 807 F.2d 805 .......................................................... 53

*Mak v. Blodgett*
(9th Cir. 1992) 970 F.2d 614 .......................................................... 53

*People v. Baldwin*
(2006) 142 Cal.App.4th 1416 .......................................................... 22

*People v. Bledsoe*
(1984) 36 Cal.3d 236 .......................................................... 47

*People v. Bowker*
(1988) 203 Cal.App.3d 385 .......................................................... 47

*People v. Brown*
(2004) 33 Cal.4th 892 .......................................................... 47

*People v. Catley*
(2007) 148 Cal.App.4th 500 .......................................................... 22

*People v. Centeno*
(2014) 60 Cal.4th 659 .......................................................... 17

*People v. Clark*
(2016) 63 Cal.4th 522 .......................................................... 35, 36

*People v. Cowan*
(2010) 50 Cal.4th 401 .......................................................... 25

*People v. Day*
(1992) 2 Cal.App.4th 405 .......................................................... 47

*People v. Dennis*
(1998) 17 Cal.4th 468 .......................................................... 22

*People v. Elmore*
(2014) 59 Cal.4th 121 .......................................................... 24

*People v. Hill*
(1998) 17 Cal.4th 800 .......................................................... 26, 53

*People v. Howard*
(1987) 190 Cal.App.3d 41 .......................................................... 33, 37, 41, 48

*People v. Keeper*
(2011) 192 Cal.App.4th 511 .......................................................... 22

*People v. King*
(1978) 22 Cal.3d 12 .......................................................... 21

*People v. McAlpin*
(1991) 53 Cal.3d 1289 .......................................................... 40, 47

*People v. Price*
(1991) 1 Cal.4th 324 .......................................................... 26

*People v. Randle*
(2005) 35 Cal.4th 987 .......................................................... 21

*People v. Rhodes*
(2005) 129 Cal.App.4th 1339 .......................................................... 21

*People v. Riggs*
(2008) 44 Cal.4th 248 .......................................................... 46

*People v. Ross*
(2007) 155 Cal.App.4th 1033 .......................................................... passim

*People v. Soojian*
(2010) 190 Cal.App.4th 491 .......................................................... 33, 37, 41, 48

*People v. Vasquez*
(2006) 136 Cal.App.4th 1176 .......................................................... 21

*People v. Ward*
(2005) 36 Cal.4th 186 .......................................................... 46

*People v. Whalen*
(2013) 56 Cal.4th 1 .......................................................... 50

*Riley v. Payne*
(9th Cir. 2003) 352 F.3d 1313 .......................................................... 34

*Sons v. Superior Court*
(2004) 125 Cal.App.4th 110 .......................................................... 22

*Strickland v. Washington*
(1984) 466 U.S. 668 .......................................................... passim

*Suniga v. Bunnell*
(9th Cir. 1993) 998 F.2d 664 .......... 29

*United States v. Are*
(7th Cir. 2009) 590 F.3d 499 .......... 40

*United States v. Herron*
(E.D.N.Y. 2014) .......... 41

*United States v. Span*
(9th Cir. 1996) 75 F.3d 1383 .......... 27

*United States v. Williams*
(7th Cir. 2000) ___ F.3d ___, 2000 U.S. App. LEXIS 168 .......... 40

*Youngblood v. West Virginia*
(2006) ___ U.S. ___, 126 S.Ct. 2188 .......... 49

**CONSTITUTIONS**

Cal. Const., art I, § 15 .......... passim

U.S. Const., amend. XIV .......... passim

**STATUTES**

Evid Code, § 791, subd. (a) .......... 35
801 .......... 40
1250, subd. (a)(1) .......... 35
1252 .......... 36

Pen. Code, §§ 266h .......... 31
647, subd. (b) .......... 31

**OTHER AUTHORITIES**

Cal. Rules of Court, rules 8.360 .......... 56
8.500 (b) .......... 16
8.504 (b) .......... 9

CALCRIM Nos. 560.......... 14
3471 .......... *passim*

Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html. .......... 19

Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?" https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black .......... 19-20

Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle .......... 19

* * * * * *

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| | ) Court of Appeal |
| In re DONEL POSTON, | ) No. A148986 |
| | ) |
| Petitioner, | ) Related Appeal |
| | ) No. A141557 |
| | ) |
| On Habeas Corpus. | ) Alameda County |
| | ) No. 172522B |

**PETITIONER'S PETITION FOR REVIEW**

* * * * * *

**PETITION FOR REVIEW**

TO THE HONORABLE TANI CANTIL-SAKAUYE, CHIEF JUSTICE, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF CALIFORNIA:

Petitioner DONEL POSTON, through counsel, petitions this Court for review following the order of the Court of Appeal, the First Appellate District, Division Five (per Needham, J.), denying his petition for writ of habeas corpus. The Court of Appeal's order and unpublished opinion affirming the judgment on appeal were both filed on January 6, 2017. Copies of the order and the opinion are attached hereto pursuant to California Rules of Court, rule 8.504(b)(4) and (5).

## QUESTIONS PRESENTED

1. Did trial counsel's failure to object to pervasive prosecutorial misconduct deny Poston the effective assistance of counsel?

2. Did trial counsel's failure to object to instruction on mutual combat or to request modification of CALCRIM No. 3471 deny Poston the effective assistance of counsel?

3. Did trial counsel's failure to adequately prepare Poston to testify and failure to adequately rehabilitate him on redirect deny Poston the effective assistance of counsel?

4. Did trial counsel's failure to investigate and present corroborating evidence deny Poston the effective assistance of counsel?

5. Did trial counsel's failure to investigate and present expert testimony on African American Vernacular English ("AAVE") deny Poston the effective assistance of counsel?

6. Did trial counsel's failure to investigate and present expert testimony on African-American culture deny Poston the effective assistance of counsel?

7. Did the prosecutor fail to disclose material impeachment evidence as required by *Brady v. Maryland* and due process?

8. Does cumulative prejudice violate due process and require reversal?

* * * * * *

# INTRODUCTION

This is an unusual case in which the charged shooting was captured on surveillance videos and the undisputed facts show a textbook case of self-defense. Petitioner, Donel Poston, had an unplanned encounter with co-defendant, Joe McNeely, at a little after 10 p.m. on April 5, 2013, at a Valero gas station in East Oakland.

The prosecutor, McNeely, the Attorney General, and the Court of Appeal all agreed that McNeely was the aggressor. The surveillance videos show that McNeely started a quarrel with Poston - talking and gesturing aggressively, then slapping or punching and simultaneously tripping Poston, causing him to fall partway to the ground.

The videos show McNeely reaching inside his jacket and holding what appears to be a gun as Poston starts to get up. Poston pulls out his own gun and rapidly fires multiple shots at McNeely, then runs when McNeely goes down. McNeely gets up and follows Poston, shooting at him repeatedly as he runs away, hitting and killing Lionel Fluker, an innocent bystander.

Poston and McNeely were both charged, tried, and convicted of the second-degree murder of Fluker and the attempted murder of each

other. Faced with Poston's seemingly irrefutable claim of self-defense, the prosecutor managed to obtain guilty verdicts by portraying Poston as a "thug" and a "pimp" who did not look like the "true picture" of a crime victim acting in self-defense.

The prosecutor presented a mountain of Poston's irrelevant and inflammatory out-of-court statements in AAVE in rap lyrics, letters, jail phone calls, and YouTube videos he produced. As Poston lamented to his mother in one of the jail phone calls, the prosecutor was twisting his words, managing to make even his protestations of innocence sound incriminating.

Poston argued on appeal that (1) his convictions of the second degree murder of Fluker and the attempted murder of McNeely are not supported by sufficient evidence that he did not act in self-defense or in the heat of passion on adequate provocation, and that he proximately caused Fluker's death; (2) admission of the extensive, inflammatory evidence of Poston's largely irrelevant out-of-court statements about pimping, "hos," and "bitches" to impeach his credibility was an abuse of the trial court's discretion which violated due process; (3) the trial court erred in instructing the jury on mutual combat in accord with CALCRIM No. 3471 without any support in

the evidence; (4) the provocative act murder instruction, CALCRIM No. 560, omitted crucial elements – that the defendant *initiated* the chain of events proximately causing death and that his mental state was not equally as culpable as the actual killer's; (5) the prosecutor committed pervasive, prejudicial misconduct, attacking Poston's character, appealing to racial bias, and misleading the jurors; (6) the trial court abused its discretion in denying severance, resulting in a fundamentally unfair joint trial; and (7) the cumulative effect of the errors violates due process.

Poston also filed a petition for writ of habeas corpus ("Petition") in the Court of Appeal alleging that numerous failures of his trial attorney, David Bryden, denied him the effective assistance of counsel and that the prosecutor's failure to disclose material impeachment evidence violated *Brady v. Maryland* (1963) 373 U.S. 83, and due process. The Court of Appeal affirmed in an unpublished opinion and issued an order denying the Petition on the same date, January 6, 2017.

As Poston explained in the Petition, Bryden missed multiple opportunities to counter the prosecutor's pervasive misconduct. First, Bryden failed to object to the prosecutor's repeated attacks on Poston's

character, appeals to racial bias and fear of street crime, and misleading arguments. (Argument I.)

Bryden also failed to object to instruction on mutual combat, an unsupported theory, or to request modification of the mutual combat instruction, CALCRIM No. 3471. (Argument II.) He failed to adequately prepare Poston to testify and failed to adequately rehabilitate him on redirect examination. (Argument III.)

Bryden failed to investigate and present corroborating evidence on disputed points as to which both the prosecutor and co-defendant McNeely's counsel accused Poston of lying. (Argument IV.) He failed to investigate and present expert testimony on AAVE to counter the prosecutor's many misleading insinuations and arguments to the jury about Poston's statements in AAVE. (Argument V.) And he failed to investigate and present expert testimony on African-American culture to counter the prosecutor's unfair arguments about consciousness of guilt and criminal intent. (Argument VI.)

At least in combination, the multiple failures of counsel and the prosecutor's failure to disclose material impeachment evidence regarding racist text messages sent by the prosecution's law enforcement expert rendered the trial fundamentally unfair in

violation of due process, requiring reversal. (Arguments VII and VIII.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

## STATEMENTS OF THE CASE AND THE FACTS

For purposes of this petition only, Poston relies on the "Facts and Procedural History" set forth in the Court of Appeal’s opinion. (Slip op. at pp. 1-12.)

## ARGUMENT

This Court will order review of a decision by a Court of Appeal “where it appears necessary to secure uniformity of decision or the settlement of important questions of law.” (Cal. Rules of Court, rule 8.500 (b).) This petition for review should be granted for both of the foregoing reasons and to prevent the violation of Poston's constitutional rights and a miscarriage of justice, as set forth below.

### I. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL’S FAILURE TO OBJECT TO PERVASIVE PROSECUTORIAL MISCONDUCT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argued on appeal that the prosecutor committed pervasive, prejudicial misconduct in her cross-examination of Poston and her closing argument. (AOB 109-129.) He argued on habeas

corpus that trial counsel's failure to object denied Poston the effective assistance of counsel. (Petition 16-23, 73-77; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 686; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674-677 [unreasonable failure to object to prosecutorial misconduct constitutes ineffective assistance of counsel].)

The Court of Appeal rejected petitioner's claim of prosecutorial misconduct, concluding that it was forfeited by failure to object. (Slip opn. at p. 32.) As Poston explained in the Petition and the Informal Reply, trial counsel's failure to object to pervasive prosecutorial misconduct denied Poston the effective assistance of counsel.

Any reasonably competent criminal defense attorney would have objected when the prosecutor far exceeded any legitimate purpose for admission of prejudicial "pimp" and "ho" evidence and repeatedly tried to mislead the jury about Poston's statements in AAVE; his testimony in Standard American English ("SAE"); his flight after the shooting; his failure to flee before the shooting; his right to stand his ground and defend himself; the meaning of "mutual combat"; and the meaning of "gun battle." (Petition 75-76.)

The prosecutor's whole theory of the case was misleading. She contended that Poston was guilty of murder and attempted murder, despite the undisputed fact that McNeely was the armed aggressor, because Poston was a bad character - a "thug" and a "pimp" - who did not talk or behave like the prosecutor thought an innocent person would. (20 RT 1897-1899, 1966-1967, 1971-1972.)

The prosecutor appealed to the jurors' fears of random street violence - of being crime victims - with repeated references to a gun battle and both defendants' disregard for the safety of innocent bystanders. The argument was misleading and unfair because there was no evidence Poston agreed or intended to engage in mutual combat or a gun battle before McNeely struck the first blow. Rather all the evidence showed that Poston acted in self-defense. (See *People v. Ross* (2007) 155 Cal.App.4th 1033, 1044-1045 and fn. 13 ["Mutual combat" means "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*" - preceding the first assaultive conduct].)

The prosecutor emphasized Poston's references to "pimps" and "hos." (19 RT 1954-1966.) References to "pimps" and "hos" were

irrelevant and inflammatory, and the prosecutor used them unfairly to attack Poston's character and portray him as the kind of person who would deliberately instigate a shooting and then claim self-defense.

The prosecutor appealed to conscious and unconscious racial bias by calling Poston a "thug" - a racial "dog whistle," akin to using the N word. (19 RT 1628; see also Urban Dictionary, http://www.urbandictionary.com/define.php?term=dog+whistle [a "dog whistle" is "a type of strategy of communication that sends a message that the general population will take a certain meaning from, but a certain group that is "in the know" will take away the secret, intended message. Often involves code words]; Jamell Bouie, Richard Sherman Is Right: Thug Is the New N-Word, http://www.thedailybeast.com/articles/2014/01/27/richard-sherman-is-right-thug-is-the-new-n-world.html.)

The prosecutor also appealed to racial bias by emphasizing Poston's use of AAVE. (See Petition 177-186 [John Rickford Decl.); John R. Rickford, African American Vernacular English, Blackwell Publishers (1999) at pp. 283-284 [discussing negative attitudes toward AAVE]; Tami Winfrey-Harris, What Is So Wrong With "Sounding Black?"

https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black [discussing the conscious and unconscious racism underlying disdain for AAVE].)

As if that was not bad enough, the prosecutor argued that Poston's alternating use of AAVE with friends and family and SAE on the witness stand showed that he was trying to fool the jury. (20 RT 1899, 1971.) In fact, it is very common for African-Americans and others to switch between SAE and their native language or dialect - a phenomenon called "code-switching." (See Exh. 9, ¶ 8; Rickford, at pp. 340-342, Harris, https://www.psychologytoday.com/blog/colorstruck/201009/whats-so-wrong-sounding-black.)

The prosecutor repeatedly twisted Poston's words to make them seem incriminating. She quoted his rap lyrics - "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life." She argued that these words showed a murderous state of mind despite the fact that the actual words state that Poston is not one to fight. Rather, he takes flight. But if you cross a line, he will fight back. (19 RT 1640; Exh. 9, ¶¶ 13, 14.)

Poston astutely asked the prosecutor: "[M]a'am, . . . do you understand African-American vernacular from the street perspective?" (19 RT 1641-1642.) It seems clear she did not. Maybe she thought AAVE was a code for deception where everything Poston said meant its opposite. Poston said he had a strong claim of self-defense; the prosecutor argued it was an admission that he did not act in self-defense. (19 RT 1633; 20 RT 1897; Pros. Exh. 32A at p. 8.)

Poston said he told Bailey to tell the truth; the prosecutor argued it was an admission that he pressured Bailey to lie. (19 RT 1650; 20 RT 1898; Pros. Exh. 32A at p. 39.) The prosecutor's repeated twisting of Poston's words in an attempt to incriminate him was misleading and unfair.

The prosecutor's argument that Poston's failure to run away before the shooting refuted his self-defense claim was also misleading and unfair. (19 RT 1634-1639; 20 RT 1892, 1898.) Poston had no duty to retreat. (See *People v. Randle* (2005) 35 Cal.4th 987, 992; *People v. King* (1978) 22 Cal.3d 12, 24; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180; *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1346; *People v. Ross, supra,* 155 Cal.App.4th at p. 1044 and fn. 13.)

Poston was in a public place where he had every right to be when McNeely started a quarrel, escalated it, knocked Poston down, and pulled out a gun. Poston had every right to defend himself. His failure to run away before he was assaulted says nothing about his claim of self-defense and the prosecutor's repeated suggestion that it did was a deceptive and reprehensible way to try to persuade the jury - it was misconduct.

The prosecutor's argument that Poston's references to "practicing" for his "performance" on the witness stand meant that he was lying, "trying to get over on this jury," was misleading and unfair. (19 RT 1627, 1633; 20 RT 1899; Pros. Exh. 32A at pp. 35, 41-42.) It is hardly unusual to refer to a witness's testimony as "performance." (See, e.g., *People v. Dennis* (1998) 17 Cal.4th 468, 527, fn. 12; *People v. Keeper* (2011) 192 Cal.App.4th 511, 520, fn. 2; *People v. Catley* (2007) 148 Cal.App.4th 500, 506-507; *People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421; *Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 119-120.) Indeed, the word "perform" is commonly used in reference to the duties of all courtroom actors - witnesses, judges, lawyers, and jurors. (See *People v. Baldwin*, *supra*, 142 Cal.App.4th at p. 1421.)

Poston knew he had to perform well on the witness stand, meaning no "ghetto-ebonic-slur[s], if he was to be believed. (Pros. Exh. 32A at p. 41; Exh. 9, ¶ 10.) He knew he had to practice speaking in a way the jurors could understand. He knew the prosecutor would do her best to trip him up and twist his words, using them to portray him as a pimp and a thug, not a "normal" person, not a "law-abiding citizen[]."

According to the prosecutor, a true case of self-defense exists only where the law-abiding citizen "wait[s] for the police. They are waiting on their porch with a smoking gun." (20 RT 1892.) Poston did not have the "state of mind [nor] the "use of phrasing that innocent, justified people use." (20 RT 1898.) He was "performing , and he was trying to paint a portrait of himself that's different than the portrait that you see in the video, and the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew you couldn't see that." (20 RT 1899.)

Contrary to the prosecutor's argument, one need not wait around for the police in order to establish the defense of self-defense. One need not be a law-abiding citizen. One need not speak Standard English or any English. All that is required is that the accused, who

did not initiate the fight or agree to engage in mutual combat, honestly and reasonably believed in the imminent need to use deadly force in self-defense. (See *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.)

Trial counsel, David Bryden, explains that he considered objecting to the prosecutor's many unfair and misleading statements and questions. (Petition 264.) He decided not to object because he thought it was futile. The trial court had admitted all the prejudicial "bitch" and "ho" evidence over his objection. Bryden did not think it was misconduct for the prosecutor to emphasize evidence admitted by the trial court, no matter how devastating to the defense. And he was certain any objections would be overruled, likely making things appear even worse to the jurors. (Petition 265.)

Of course, Bryden could have objected at sidebar or during any of the many hearings outside the jury's presence. He could have protested that the prosecutor was going way beyond the main asserted purpose for the character evidence - to try to show that Poston controlled Bailey's testimony as her pimp. (8 RT 396-400.) Poston had already been impeached with multiple prior convictions involving moral turpitude. (18 RT 1516-1520.) The prosecutor's argument that the "pimp," "bitch," and "ho" evidence was also admissible to show

Poston's "illegitimate lifestyle," state of mind, and the absence of self-defense was specious. (18 RT 1875.)

Poston believes the trial court abused its discretion in admitting the "pimp," "bitch," and "ho" evidence. But the prosecutor's repeated emphasis on the bad character evidence was unconstitutional even if some limited evidence was admissible to impeach Poston's and/or Bailey's credibility.

Similarly, the prosecutor's repeated emphasis of her "gun-battle" theme, complete with accusations that Poston did not care about the safety of innocent bystanders, was objectionable even if the gun-battle theme had been supported by the evidence. But the gun-battle theme was not supported, as Bryden would have discovered if he had read *People v. Ross*, *supra*, 155 Cal.App.4th at pp. 1044-1045, ad fn. 13, cited in the notes to CALCRIM No. 3471. (See also Argument II, *post*.)

Some objections may have been futile, as Bryden believed. But the trial court may well have sustained an objection that the prosecutor's pervasive emphasis on bad character evidence went beyond any permissible use. (See *People v. Cowan* (2010) 50 Cal.4th 401, 476 [denial of a pretrial motion to exclude evidence does not

necessarily make further objection futile]; compare *People v. Price* (1991) 1 Cal.4th 324, 386 [counsel does not render ineffective assistance by failing to make motions or objections that counsel *reasonably* determines would be futile].)

And the trial court may well have sustained objections to the prosecutor's unfair and misleading statements and questions relating to AAVE, consciousness of guilt, and mutual combat. Any reasonably competent criminal defense attorney would have realized that the prosecutor's improper questions and arguments exceeded the scope of the trial court's pretrial rulings and would have objected.

The pervasive misconduct rendered Poston's trial fundamentally unfair in violation of due process. (See *Donnelly v. DeChristoforo* (1974) 416 U.S. 637; *People v. Hill* (1998) 17 Cal.4th 800.) Trial counsel's failure to object denied Poston the effective assistance of counsel and undermines confidence in the outcome. (See *Strickland v. Washington, supra*, 466 U.S. at pp. 694-695.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## II. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO OBJECT TO INSTRUCTION ON MUTUAL COMBAT OR TO REQUEST MODIFICATION OF CALCRIM NO. 3471 DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argued in the Petition that trial counsel's failure to object or request modification of the standard instruction on mutual combat, CALCRIM No. 3471, denied him the effective assistance of counsel. (Petition 23-24, 78-81; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668; see also *United States v. Span* (9th Cir. 1996) 75 F.3d 1383, 1387-1389 [a trial lawyer's unreasonable failure to object or request modification of an incorrect, incomplete, or inapplicable instruction constitutes ineffective assistance of counsel].)

As Poston has explained, "mutual combat" means "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*" - preceding the first assaultive conduct. (See *People v. Ross, supra,* 155 Cal.App.4th at pp. 1044-1045 and fn. 13.) CALCRIM No. 3471 failed to communicate this standard, providing only that "[a] fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and

must occur before the claim to self-defense arose." (6 CT 1467.53-1467.54; 20 RT 2001-2002.)

The surveillance videos and the testimony of Poston and Bailey show that McNeely instigated the quarrel, escalated it, and unlawfully assaulted Poston, as the prosecutor necessarily conceded. (20 RT 1867, 1884-1885, 1888.) There was no evidence whatsoever that Poston expressly or impliedly agreed to fight before McNeely struck the first blow. The prosecutor argued that it was mutual combat because Poston fired the first shot even though it was undisputed that McNeely committed the first assault. (20 RT 1864-1866, 1872, 1883, 1887, 1890, 1901, 1963-1968, 1971.)

Bryden acknowledges that he did not read *Ross* and did not know the mutual combat exception to self-defense applies only if there is proof beyond a reasonable doubt that the defendant intended or agreed to fight before the first assaultive conduct occurred. (Petition 265-267; *People v. Ross*, 155 Cal.App.4th at p. 1045, fn. 14.)

Bryden acknowledges that he would have objected to CALCRIM No. 3471 and/or requested modification to include the "first assaultive conduct" language if he had read *Ross*. (Petition 265-267.) As Bryden explains, modification "would have cut off the

prosecutor's argument that it was mutual combat because Poston fired the first shot even though McNeely committed the first assault." (Petition 267.)

Poston's primary defense was self-defense and the prosecutor's pervasive response was "mutual combat." CALCRIM 3471 and the prosecutor's argument virtually compelled rejection of Poston's defense. (Cf. *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, 596 [reversing denial of writ because instructions permitted conviction of second-degree murder even if the defendant acted in self-defense]; *Suniga v. Bunnell* (9th Cir. 1993) 998 F.2d 664, 669-670 [erroneous jury instructions required reversal because they permitted conviction on a theory which precluded consideration of relevant defenses].)

Bryden's failure to read *Ross* and object or request modification of CALCRIM No. 3471 undermines confidence in the judgment. Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## III. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO ADEQUATELY PREPARE POSTON TO TESTIFY AND FAILURE TO ADEQUATELY REHABILITATE HIM ON REDIRECT DENIED POSTON THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argued in the Petition that Bryden's failure to adequately prepare him to testify and failure to adequately rehabilitate him on redirect examination denied him the effective assistance of counsel. (Petition 25-27, 82-84; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668; see also *Bemore v. Chappell* (9th Cir, 2015) 788 F.3d 1151, 1163-1166 [a trial lawyer's unreasonable failure to adequately prepare a defense witness to testify constitutes ineffective assistance of counsel].)

Bryden told Poston he had to testify, but admittedly did not spend much time preparing him because he thought he was sophisticated and well-spoken and did not need help. (Petition 146-147, 286.) Bryden knew the bad character evidence in the jail phone calls and rap lyrics was "devastating to the defense." (Petition 264.) Yet he never had a transcription made; never listened to the calls with Poston; never discussed the calls in detail with Poston; and never counseled him as to how to respond to questions on cross-examination about the calls and rap lyrics. (Petition 146-148.)

Nor did Bryden give Poston a copy of his letter from the jail, provided in discovery, which was used during cross-examination to impeach Poston. (19 RT 1633.) Nor did Bryden counsel Poston as to how to respond to questions about his prior convictions or apparently incriminating items seized from his house. (Petition 285-286.)

As a result of Bryden's complete abdication of his duty to prepare Poston to testify, both the prosecutor and McNeely's attorney were able to unfairly portray Poston as a liar, as well as a pimp and a thug. (Cf. *Bemore v. Chappell, supra*, 788 F.3d at p. 1165 [by failing to investigate alibi defense and prepare alibi witness, defense counsel "essentially abdicated his role as a lawyer"].)

Adequate preparation and rehabilitation would have enabled Poston to testify more coherently and credibly. Perhaps most significantly, Poston could have testified credibly about pimping if Bryden had explained the legal definition to him: knowingly deriving financial support from a prostitute's earnings. (§ 266h; see also § 647, subd. (b).) Poston could have more credibly explained that he has never considered himself a pimp, which in his world is someone whose business is to control and sell prostitutes, usually with some physical violence. Poston has never done anything like that. He has

never been in the business of pimping though he does know pimps. (Petition 147.)

The prosecutor and McNeely's lawyer both made Poston look like a liar for insisting he was not a pimp while admitting he took money from a prostitute. (19 RT 1653-1654, 1677-1678; 20 RT 1900, 1917.) McNeely's counsel argued that Poston's "I'm not a pimp" was like Richard Nixon's "I'm not a crook." (10 RT 1917.) Had Bryden competently prepared him, Poston could have explained that it never occurred to him that taking a little money from a woman he knew now and then made him a pimp. (Petition 147.)

Had Bryden competently prepared him, Poston could also have credibly explained why his rap lyric - "[i]t's all self-defense under the proper pretense" - did not indicate fabrication. (16 RT 1136.) Poston could have explained that he did not believe the words "pretense" and "pretext" necessarily indicate falsity, because his dictionary included two neutral definitions for "pretense" which did not suggest falsity. (Petition 38-39, 68, 145, 166-167, 169, 282-284.)

Thus, Poston believed that "pretense" could mean simply "a claim" and not necessarily "a false claim." But since some of the definitions indicated falsity, Poston used the adjectives "proper" and

"correct" in different versions of the rap lyric to make clear he did not mean to indicate falsity. Rather he meant to use "pretense" in its neutral sense. (Petition 38-39, 68, 145, 166-167, 169, 282-284.)

The prosecutor could not have obtained convictions without unfairly attacking Poston's character and credibility. The prosecutor's misconduct itself requires reversal as explained on appeal. (AOB 109-129.) In addition, trial counsel missed multiple opportunities to support Poston's credibility and counteract the unfair attacks from the prosecutor and McNeely's counsel.

Had Bryden adequately prepared and rehabilitated Poston, at least one juror would likely have had a reasonable doubt as to his guilt. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 694-695; *In re Sixto* (1989) 48 Cal.3d 1247, 1257; *People v. Soojian* (2010) 190 Cal.App.4th 491, 521; *People v. Howard* (1987) 190 Cal.App.3d 41, 48.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## IV. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT CORROBORATING EVIDENCE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argued in the Petition that Bryden's failure to investigate and present corroborating evidence denied him the effective assistance of counsel. (Petition 27-28, 85-87; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668; see also *In re Thomas* (2006) 37 Cal.4th 1249, 1261-1265 [a trial lawyer's unreasonable failure to investigate and present corroborating evidence on a disputed point constitutes ineffective assistance of counsel; accord *Bemore v. Chappell, supra*, 788 F.3d at pp. 1162-1165; *Riley v. Payne* (9th Cir. 2003) 352 F.3d 1313, 1317-1319.)

Had Bryden adequately investigated, he would have discovered and could have presented the self-defense packet Poston received from the law librarian at the jail. Poston's handwritten comments on the self-defense packet would have strongly supported his testimony that he did not fabricate the circumstances of his case to fit the legal rules; rather, he was happy and relieved to find that the law of self-defense fit his case. ( Petition 153-164; 19 RT 1630-1633, 1641-1644, 1676, 1681-1685; 20 RT 1896-1900.)

For instance, Poston commented at the top: "A person claiming self-defense is entitled to prove that the fear was reasonable. ??? can I prove that the fear was reasonable? (yes)." (Petition 153.) Where the packet stated that an ex-felon is entitled to use a firearm in self - defense, Poston commented: "Important[.] Ex felon - Firearm/Justifiable." (Petition 153.) With regard to mutual combat, Poston commented: "Clearly thru up my hands and turned down the battle, 'told him wherever he was driving that car I didn't want to ride[.]' Then Boom! Smack!" (Petition 155.)

Not a single comment on the 11 page packet suggests fabrication. Rather, every single comment is perfectly consistent with Poston's testimony that he was just happy to find out the law fit his case - he was not trying to fit the facts to the law. Poston's notes on the self-defense packet were admissible as prior consistent statements as well as statements of Poston's then existing mental state. (See Evid. Code, §§ 791, subd. (a), 1250, subd. (a)(1); *People v. Clark* (2016) 63 Cal.4th 522, 591-593.)

Had Bryden adequately investigated, he would also have discovered and could have presented Poston's dictionary excerpt and prior versions of his rap lyrics, strongly corroborating his testimony

that his rap lyric - "it's all self-defense under the right pretense" - was not meant to indicate falsity. Poston's dictionary included two alternative definitions of "pretense" which were neutral - they did not indicate falsity. (Petition 166.)

Poston explains he understood that "pretense" can mean false but does not necessarily mean false. Thus, he used the adjectives "correct" and "proper" to show he did not mean to indicate falsity. (Petition 145 [Donel Poston Decl.], 282-284 [Covin Decl.].) Like the self-defense packet, the dictionary page and rap lyrics would have been admissible as circumstantial evidence of Poston's state of mind. (See Evid. Code, § 1252; *People v. Clark*, 63 Cal.4th at pp. 591-593.)

If Bryden had adequately investigated, he could have presented the testimony of Poston's mother and brother and his brother's mechanic to corroborate Poston's testimony that there was a bullet hole in Bailey's car right after the charged shooting. (Petition 148-149 [Donel Poston Decl.], 171 [Leatta Poston Decl.], 173 [Robert Samuels Decl.], 173 [Angel Garcia Decl.], 285-288 [Covin Decl.]; 19 RT 1738-1740.) The corroborating testimony could have countered McNeely's insinuations during cross-examination and cut off his

argument that Poston's testimony about the radiator was another example of him lying. (20 RT 1907, 1918.)

The prosecutor and McNeely's counsel unfairly used Poston's out-of-court statements about the law of self-defense, his rap lyrics, and his testimony about Bailey's radiator to portray him as a liar who should not be believed. Bryden should have investigated and countered these attacks on Poston's credibility with readily available corroborating evidence. His failure to do so denied Poston the effective assistance of counsel and undermines confidence in the judgment. (See *Strickland*, 466 U.S. at 694; *Sixto*, 48 Cal.3d at 1257; *Howard*, 190 Cal.App.3d at 48; cf. *Soojian*, 190 Cal.App.4th at 521.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## V. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN AMERICAN VERNACULAR ENGLISH DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argued in the Petition that Bryden's failure to investigate and present expert testimony on AAVE denied him the effective assistance of counsel. (Petition 28-29, 88-93; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668; see also *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 891-893 [a trial attorney's unreasonable failure to investigate and present available, favorable expert testimony constitutes ineffective assistance of counsel].)

Professor Rickford could have presented helpful testimony as an expert on AAVE to counter the prosecutor's misleading insinuations and arguments. The prosecutor suggested that Poston's rap lyrics - "I ain't never been a nigga that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life" - showed a murderous state of mind. (19 RT 1640.)

The prosecutor argued that another of Poston's rap lyrics refuted his claim of self-defense and showed a lack of remorse for Mr. Fluker's death: "Them 40 oz bullets made that 9 sit down. In part

about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda . . . ." (16 RT 1136; 20 RT 1972.)

Poston said he had a strong claim of self-defense; the prosecutor argued it was an admission that he did not act in self-defense. (19 RT 1633; 20 RT 1897; Pros. Exh. 32A at p. 8.) Poston said he told Bailey to tell the truth; the prosecutor argued it was an admission that he pressured Bailey to lie. (19 RT 1650; 20 RT 1898; Pros. Exh. 32A at p. 39.)

Professor Rickford could have testified that none of these statements were incriminating and that Poston seemed to be expressing sorrow and regret about Fluker. (Petition 182, 184-186.) Poston seemed to be expressing relief and confidence because the law of self-defense apparently encompassed the facts of his case and made him feel optimistic about the outcome. (Petition 186.)

Bryden acknowledges that the prosecutor's interpretation of many of Poston's statements in AAVE was incorrect. (Petition 267.) But it never occurred to him that he needed an expert to counter those

incorrect interpretations or that there was an expert who could provide admissible, favorable testimony. (Petition 267.)

Bryden acknowledges that Professor Rickford appears to be a well-qualified expert on AAVE; that at least some of his proposed testimony would likely have been admissible; and that some or all of the jurors might have benefitted from the proposed testimony. (Petition 269; see also Evid. Code, § 801 [expert testimony is admissible if it will assist the jurors]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 [expert testimony is admissible even if the jurors have some knowledge of the subject matter; it should be excluded only when "the subject of inquiry is one of such common knowledge that men of ordinary education reach a conclusion as intelligently as the witness" - only when the expert testimony would add nothing to the jurors' "well of information"].)

The meaning and significance of statements in AAVE is not a subject of such common knowledge among non-African-Americans that expert testimony would add nothing to the jurors' well of information. (See, e.g., *United States v. Are* (7th Cir. 2009) 590 F.3d 499, 502 [expert testimony is routinely admitted to translate "code words"]; *United States v. Williams* (7th Cir. 2000) ___ F.3d ___, 2000

U.S. App. LEXIS 168 [AAVE expert testified at sentencing that words spoken in a recorded conversation did not necessarily relate to criminal activity; they might have had an innocent meaning]; *United States v. Herron* (E.D.N.Y. 2014) ___ F.Supp.2d ___, 2014 U.S. Dist. LEXIS 63872, at pp. 16-26 [expert properly testified regarding the meaning of rap lyrics].) In light of the prosecutor's multiple incorrect assertions, expert testimony was essential in this case.

Any reasonably competent criminal defense lawyer would have concluded that the prosecutor's heavy reliance on incorrect interpretations of Poston's statements in AAVE with an almost all suburban, White and Asian jury, at least warranted investigation into the possible availability of a rebuttal expert. Had Bryden investigated even minimally, he would have found Professor Rickford. (Petition 90 [a Google search for "African American Vernacular" turns up Professor Rickford's website - the second entry].)

Bryden's failure to undertake any investigation whatsoever denied Poston the effective assistance of counsel and undermines confidence in the judgment. (*Strickland v. Washington, supra*, 466 U.S. at p. 694; *In re Sixto, supra,* 48 Cal.3d at p. 1257; *People v. Howard, supra,* 190 Cal.App.3d at p. 48; cf. *People v. Soojian, supra,*

190 Cal.App.4th at p. 521.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## VI. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON AFRICAN-AMERICAN CULTURE DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF COUNSEL.

Poston argued in the Petition that Bryden's failure to investigate and present expert testimony on African-American culture denied him the effective assistance of counsel. (Petition 29, 94-100; U.S. Const., amends. VI, XIV; Cal. Const. art I, § 15; *Strickland v. Washington, supra,* 466 U.S. 668; see also *Alcala v. Woodford, supra,* 334 F.3d at pp. 891-893.)

Professor Morrell could have presented helpful testimony as an expert on African-American culture to counter the prosecutor's misleading arguments. The prosecutor argued that this was not a true case of self-defense because Poston armed himself, fired the first shots, and did not wait around to talk to the police, but fled the city and "dumped the gun." (20 RT 1892, 1896, 1898.) In a true case of self-defense, "the person who had to use force because they were instantly about to die, calls the police. They wait for the police. They are waiting on their porch with a smoking gun. 'Yeah, I had to kill him, and you know what, I would do it again tomorrow, because my

life was in danger.' That's the true picture of self-defense. Not what you have here." (20 RT 1892.)

The prosecutor explained that people like McNeely and Poston walk around ready for gun battles, disregarding the safety of innocent bystanders:

> You know, this world is a world that I would hope and imagine is unfamiliar to all of you. It's a world that you've gotten a glimpse of, but it's a world that you heard yesterday from Lieutenant Jones, now they're not playing by any rules. But there are some things that are expected. Both of them were a part of this world. Both of them went to this gas station that is known for crime, it's known for shootings, it's known for murders.
>
> McNeely went there with drugs for sale. McNeely is the one walking up to this car, that car, and another car, talking to people in the parking lot of a gas station. So he's a drug dealer. He's in this world.
>
> Mr. Poston clearly is in this world, a self-professed person who promotes his videos and whatnot. Both of them knew they couldn't walk away. That's just not how it happens. That's not how you walk away and save face and have any respect.
>
> But these days, they don't settle disputes with fists, they settle them with guns. You know, I don't know if Mr. Poston could see Mr. McNeely was armed. I would submit to you it's not important. Each of them knew that the other was armed.
>
> You know, I'm reminded of a friend of mine and a story he told me, his little brother was going off to college. And I shouldn't say little, his younger brother, he's huge, ginormous. My friend sits him down and he says, "Look, if you are ever out, whether it's a party, or a game, or restaurant or wherever, and some little guy wants to pick a fight with you, you have to know that he

> has an equalizer of some sort, he has some sort of weapon. Because what little guy is going to pick a fight with you, this big strapping football player?"
>
> That's what's (sic) it's like on the streets of Oakland now. You've got all these little guys running around, but they're all armed, making them feel like big men. And that's what happened in this case. These guys were going to shoot it out, and that - and who cares about who was left in their wake? Who cares what innocent people are in the way?

(20 RT 1966-1967.)

Professor Morrell could have testified as an expert on urban African-American culture that "it is not uncommon for urban African-American people to arm themselves for self-defense, with no intention to act unlawfully or to harm anyone. And it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police based on their own past experiences and those of their friends and relatives." (Petition 219-220 [Morrell Decl.].)

Professor Morrell could have rebutted the usual inferences of criminal intent and consciousness of guilt from arming and flight; if these acts are not uncommon among innocent African-American people, then the acts do not support inferences of criminal intent or consciousness of guilt. They do not necessarily or even likely show criminal intent or consciousness of guilt.

Rather, arming and flight by African-American people are just as likely attributable to distrust. (Cf. *Commonwealth v. Warren* (Mass. 2016) 475 Mass. 530, 539 [reversing for 4th Amend. violation in part because the African-American defendant's flight from the police was not necessarily probative of consciousness of guilt; a black male fleeing the police "might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity"].) While the prosecutor's arguments may have seemed logical to the predominantly suburban white and Asian jurors who convicted Poston, they were based on inaccurate assumptions and myths about African-American people which Professor Morrell could have refuted. (Petition 222.)

Expert testimony is often admissible to provide an alternative explanation for an individual's acts and motivations. (See, e.g. *People v. Ward* (2005) 36 Cal.4th 186, 211 [expert testimony was admissible to explain that witnesses to gang crimes "are often reluctant to identify or testify against gang members out of fear for their safety," to rebut the jurors' likely assumption that a witness's initial failure to identify a suspect indicates a lack of credibility"]; *People v. Riggs* (2008) 44 Cal.4th 248, 293-294 [expert testimony is admissible to explain the

sometimes counterintuitive behavior of battered women]; *People v. Brown* (2004) 33 Cal.4th 892, 904-906 [of domestic violence victims]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1302 [of parents of sexually abused children]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 242-243 [of rape victims]; *People v. Bowker* (1988) 203 Cal.App.3d 385, 392-294 [of sexually abused children]; see also *People v. Day* (1992) 2 Cal.App.4th 405, 415-417 [trial counsel was ineffective for failing to present expert testimony regarding battered woman syndrome].)

Bryden knew that many African American people in Oakland and elsewhere distrust the police and the court system and he knew that criminal defense lawyers have occasionally presented a cultural defense explaining the defendant's perspective as a member of a minority group. (Petition 268.) He acknowledges that Professor Morrell appears to be a well-qualified expert; that at least some of his proposed testimony would likely have been admissible; and that some or all of the jurors might have benefitted from the proposed testimony. (Petition 269.) Bryden explains that it simply never occurred to him that he could or should challenge the prosecutor's arguments. (Petition 268.)

Bryden's failure to investigate and present expert testimony providing an alternative explanation for Poston's possession of a firearm and flight from the police denied Poston the effective assistance of counsel and undermines confidence in the judgment. (See *Strickland v. Washington, supra*, 466 U.S. at p. 694; *In re Sixto, supra*, 48 Cal.3d at p. 1257; *People v. Howard, supra*, 190 Cal.App.3d at p. 48; cf. *People v. Soojian, supra*, 190 Cal.App.4th at p. 521.) Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## VII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER THE PROSECUTOR FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE AS REQUIRED BY *BRADY V. MARYLAND* AND DUE PROCESS.

Poston argued in the Petition that the prosecutor failed to disclose material impeachment evidence as required by *Brady v. Maryland* and due process. (Petition 30, 101-103; U.S. Const., amend. XIV; Cal. Const., art. 1, § 15; *Brady v. Maryland* (1963) 373 U.S. 83; *Imbler v. Pachtman* (1976) 424 U.S. 409, 427, fn. 25; *Kyles v. Whitley* (1995) 514 U.S. 419, 442, fn. 134, 445-451; *Youngblood v. West Virginia* (2006) ___ U.S. ___, 126 S.Ct. 2188; *In re Steele* (2004) 32 Cal.4th 682, 695.)

The *Brady* obligation extends to any evidence providing grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks. (*Youngblood v. West Virginia*, *supra*,126 S.Ct. 2188; *Kyles v. Whitley*, *supra*, 514 U.S. at pp. 442, fn. 134, 445-451.) And it extends to information known by even a single employee of an investigating law enforcement agency. (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 437;

*People v. Whalen* (2013) 56 Cal.4th 1, 64; *In re Steele, supra*, 32 Cal.4th at p. 697.)

Here, Lieutenant Jones and Sergeant Gantt were both employed by the investigating law enforcement agency - the Oakland Police Department - and they were both involved in the investigation of this case. They both testified against Poston. According to the news reports Poston provided, both Jones and Gantt knew that Jones sent "racially charged" text messages to Gantt and other officers which were likely insulting and offensive to African-American people. (Petition 294-304.)

According to the news reports, the racist text messages date back at least to some time in 2014. (Petition 294-304.) Poston's trial was in January 2014. (3 CT 739; 5 CT 1421.) Sentencing was on March 21, 2014. (3 CT 887-891; 6 CT 1483-1487.) It is reasonably likely that Jones sent at least one racist text message prior to the conclusion of Poston's trial.

Poston is African-American. Had he known about the racist text messages, he could have used them to impeach Jones's credibility. He could have argued that Jones was biased against him because he is

African-American and, therefore, that Jones's disputed conclusions should not be believed.

Jones testified that law abiding citizens do not refer to the Seminary area as "Sem City," as in Poston's video. (19 RT 1806-1809.) He testified it would be an insult to Poston for someone to tell him, "you ain't from Seminary." (19 RT 1814.) If Poston simply walked away, he would be viewed as a "punk," according to Jones, and would be subject to harassment. (19 RT 1814-1815, 1821-1822.) Jones acknowledged on cross-examination that someone can be a "studio gangsta" - a "fake gangsta, like a person that carries himself like they're a gangster, but they're really not." (19 RT 1825.) But he testified that Poston was not a studio gangsta. (19 RT 1825.)

Poston could have argued that Jones assumed the worst, most incriminating inferences against him because of racial bias. Contrary to Jones's testimony, Poston was a "studio gangsta" - he associated with rappers and pimps and others with criminal ties but was not an actual gangster himself. If he was a gangsta, it was literally in the studio - in his hundreds of videos - as well as in his rap lyrics and his book about "hustling." (Petition 111-112; 13 RT 869-870; 18 RT

1520, 1523; 19 RT 1640; 19 RT 1609, 1617, 1631, 1663, 1751.) Poston had no history of violence.

Jones's testimony contributed to the prosecution's overall theme that Poston was a criminal - a bad character who could not lawfully defend himself and should not be believed. Had Poston known about the racist text messages, he could have impeached Jones's conclusions on the basis of racial bias. The settled lawsuits might well have provided additional evidence of racial bias.

The prosecutor's failure to disclose material impeachment evidence pertaining to Lieutenant Jones's racist text messages and involvement in settled lawsuits violates *Brady* and due process. Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## VIII. REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER CUMULATIVE PREJUDICE VIOLATES THE SIXTH AMENDMENT AND DUE PROCESS, REQUIRING REVERSAL.

Poston argued in the Petition that the cumulative effect of the errors raised on appeal and on habeas corpus rendered the trial fundamentally unfair in violation of due process. (Petition 15-30, 104-105; U.S. Const., amends. VI, XIV; Cal. Const., art. 1, ¶ 15; *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814, fn. 6; *People v. Hill* (1998) 17 Cal.4th 800, 845-847.)

The prosecutor won convictions despite compelling video evidence that Poston shot McNeely in self-defense by attacking Poston's character and exploiting the jurors' conscious and unconscious racism and fear of street violence. There were a number of ways Bryden could have mitigated the harm.

Bryden could have objected to pervasive prosecutorial misconduct and unsupported, incomplete instruction on mutual combat. He could have prepared Poston to testify and rehabilitated him further on redirect examination if needed. He could have investigated and presented evidence corroborating Poston's testimony on disputed points. And he could have presented expert testimony on

AAVE and African-American culture. If the prosecutor had timely disclosed material impeachment evidence, Bryden could also have cross-examined Lieutenant Jones about racial bias and possible misconduct toward African-American suspects.

Even if no single error was prejudicial, cumulative prejudice rendered the trial fundamentally unfair in violation of due process. Review should be granted to prevent the violation of Poston's constitutional rights and a miscarriage of justice in this case.

* * * * * *

## CONCLUSION

For all of the foregoing reasons, review should be granted.

DATED: February 6, 2017 Respectfully submitted,

/s/ Randi Covin

Attorney for Petitioner
DONEL POSTON

WORD COUNT CERTIFICATE

I certify pursuant to California Rules of Court, rule 8.360, that, according to my word processing program, this Petitioner Poston's Petition for Review contains 8,373 words, excluding the tables and this certificate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 6th day of February, 2017, at Willits, California.

/s/ Randi Covin

–

-

-

-

Filed 1/6/17 P. v. McNeely CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>JOE McNEELY et al. ,<br>Defendants and Appellants. | A141557<br><br>(Alameda County<br>Super. Ct. No. 172522A, 172522B) |

After an unconsummated drug transaction at a gas station, a dispute arose between appellants Joe McNeely and Donel Poston. The argument turned physical and then deadly. McNeely struck Poston with his hand, and both men reached for the semiautomatic handguns they were carrying. Poston fired first and shot McNeely six times, and McNeely returned fire as Poston fled. Lionel Fluker was killed by a stray bullet from McNeely's gun as he was driving by on his way home from a friend's house.

A jury convicted both McNeely and Poston of the second degree murder of Fluker, the attempted murder of each other, and firearm possession by a felon, and found true allegations that each had personally discharged a firearm causing great bodily injury or death in connection with the murder and attempted murder counts. (Pen. Code, §§ 187, subd. (a), 664/187, 29800, subd. (a)(1), 12022.53, subd. (d).)[1] The case before us thus presents an unusual scenario: two co-defendants who are also the victims of crimes committed by the other.

---

1 Further statutory references are to the Penal Code unless otherwise indicated.

On appeal, McNeely contends (1) the trial court should have granted Poston's motion to sever and ordered separate trials; (2) the trial court erred by instructing the jury on CALCRIM No. 3472 regarding a contrived theory of self-defense, and counsel was ineffective to the extent this argument was forfeited by the failure to object at trial; and (3) he was prejudiced by the exclusion of evidence that Poston had a history of possessing marijuana for sale, which would have supported his self-defense claim by showing that Poston had a motive to shoot a rival drug dealer and was not the one who acted in self-defense. Poston argues: (1) the trial court should have granted his motion to sever; (2) the evidence was insufficient to support his convictions for murder and attempted murder; (3) the trial court erred by admitting highly prejudicial evidence of his involvement in pimping and prostitution to impeach his credibility; (4) the trial court should not have given CALCRIM No. 3471 regarding the effect of mutual combat on a self-defense claim because it was not supported by the evidence; (5) the trial court should have instructed the jury he could not be guilty of murder under a provocative act theory if it found he did not initiate the course of conduct leading to the killing; (6) the prosecutor committed misconduct by appealing to the jurors' emotions, racial bias and fear of street violence; and (7) cumulative error and prejudice require reversal of the judgment. We affirm.[2]

## FACTS AND PROCEDURAL HISTORY

a. *The Shooting*

Shortly after 10:00 p.m. on April 5, 2013, McNeely pulled his Mazda sedan into a Valero gas station at the corner of MacArthur Boulevard and Seminary Avenue in Oakland and parked next to one of the pumps. The gas station, which operated surveillance cameras that captured the events in this case, was across the street from

---

[2] On August 10, 2016, Poston filed a petition for a writ of habeas corpus, the consideration of which was deferred pending consideration of this appeal. (In re Donel Poston, A148986.) At this court's invitation, the People filed an informal response, and Poston filed a reply. We have summarily denied the petition by separate order.

Mills College and was busy even at that time of night. McNeely was carrying a nine-millimeter semiautomatic handgun in his inner jacket pocket.

McNeely spoke to a few people at the gas station. At 10:06 p.m., Poston drove to the gas station with his girlfriend Tamena Bailey and parked her Lexus sedan in front of the station's minimart. A loaded .40 caliber semiautomatic handgun was concealed inside his right waistband. Poston went inside the minimart while Bailey remained in the passenger seat of the Lexus with the window rolled down. When he came out, Poston spoke to McNeely and walked over to McNeely's car. McNeely took out a baggie and showed it to Poston, but it did not appear that Poston took the baggie and a detective reviewing a surveillance video of the encounter believed it to be a drug sale that was not completed.

The surveillance videos (which do not have sound) show that after the unconsummated drug transaction, Poston walked back to the Lexus followed by McNeely, who was apparently upset. McNeely followed Poston as he walked around the Lexus and seemed to be berating Poston, pacing and repeatedly grabbing the lapels of his own leather jacket. Poston initially walked away from McNeely, but then engaged with him verbally. As the two men were standing between the passenger side of the Lexus and the door of the minimart, McNeely threw a fast food drink he was carrying on the ground.

After throwing down the drink, McNeely hit the right side of Poston's face with his hand while simultaneously placing his left leg behind Poston to trip him. Bailey jumped out of the Lexus and ran inside the minimart. Poston staggered but did not fall, and as he was recovering his balance he immediately pulled his gun from his waistband and began shooting at McNeely, firing ten rounds and hitting McNeely six times. McNeely, at virtually the same time, was reaching inside his jacket and pulled out either his own gun or a magazine for that gun. He fell to the ground and dropped the object after being hit by Poston's bullets. Poston stopped shooting, possibly because his gun jammed or he ran out of bullets. McNeely got up on one knee, reached into his jacket, pulled out either his gun or its magazine, and loaded the gun. He got up and started

chasing Poston as Poston ran north onto Seminary Avenue, firing a total of eight shots. A janitor who worked at the gas station saw Poston attempt to jump the chain link fence around Mills College and then turn around with his hands up. None of the bullets fired by McNeely struck Poston, but one of them hit and killed Lionel Fluker as he was driving south on Seminary Avenue on his way home from visiting a friend.[3]

b. *Aftermath*

After the shooting, McNeely jogged back to his car and Poston kept running from the scene. Bailey drove away in the Lexus. McNeely was approached by his friend, Ansar Muhammad, who had arrived at the gas station about 15 minutes earlier. Muhammed agreed to follow McNeely in his own car, and McNeely drove to a location about half a mile away and parked his car in front of the home of Muhammad's girlfriend. McNeely moved his duffel bag into Muhammad's car and got into the passenger seat so Muhammad could drive him to Highland Hospital.

At the hospital, Muhammad was detained by the police while McNeely was being treated for his injuries. McNeely had gunshot wounds in his left and right thighs, his scrotum, his left armpit, his left shoulder and his upper back, but he was still lucid. A nurse found a fired bullet in the stretcher used to transport McNeely and gave it to the police. McNeely was interviewed by an Oakland reserve police officer and falsely said he had been walking down Seminary Avenue when he heard a series of gunshots, felt their impact and fell down. He told the officer he did not see the person who shot him.

---

[3] The surveillance videos, which we have reviewed at the parties' request, show that McNeely started to pull what appears to be a metal cylindrical object from his jacket almost immediately after hitting and tripping Poston, was shot by Poston a fraction of a second later, dropped the object on the ground as a result of being shot, reached into his jacket while getting up, pulled out another object, put the two objects together, and began shooting at Poston. At trial, the prosecutor argued that McNeely drew his gun before Poston fired a shot, but the Attorney General has taken the position on appeal that McNeely removed the magazine for the gun a fraction of a second before Poston started shooting, and then drew his gun and loaded it with the magazine after being shot by Poston. Whether McNeely first removed the gun or the magazine does not affect our analysis of the legal issues in this case. Either way, a logical inference would be that he was preparing to fire his gun immediately after hitting and tripping Poston.

Muhammad also lied to the police and said he had been driving down the street when he saw McNeely, whom he picked up and drove straight to the hospital. After Muhammad was told someone had died in the incident, he admitted he had seen McNeely at the gas station, had followed him to his (Muhammad's) girlfriend's house, and had driven him to the hospital.

Police searched Muhammad's car, which was parked near the hospital, and found a duffel bag containing marijuana, methamphetamine tablets and scales. The day after the shooting, police searched McNeely's Mazda and found marijuana in plastic wraps and "suspected Ecstasy" capsules that turned out to be methamphetamine. The guns used in the shooting were never found.

Within a few days of the shooting, Poston left for Los Angeles and did not return for three months. He was arrested on June 14, 2014, and when told he was being charged with attempted murder, said he was not trying to kill McNeely, he was just trying to get McNeely off of him. Police found .40 caliber ammunition in Poston's bedroom during a search of his home on the date of his arrest, and an examination of that ammunition showed that one round had been cycled through the same unidentified gun as two of the .40 caliber bullets found at the Valero gas station after the shooting. Also discovered in Poston's home were handwritten rap lyrics and blank check paper, as well as a credit card manufacturing machine, blank credit cards, and credit cards in various names.

c. *Poston's Jailhouse Writings and Telephone Calls*

In July 2013, while Poston was in jail after his arrest, a sheriff's technician intercepted a letter written by Poston, in which he suggested a woman had incriminated him. He wrote that he would assert his speedy trial rights and "forc[e] they hand" because "I ain't did shit but stand my ground." In another letter written to his roommate, Poston stated he would learn the identity of a woman who had emailed the police and identified him as having shot someone. Poston's cell was searched because the authorities believed witnesses might be in danger, and officers seized several pages of rap lyrics, among them:

"You got to be higher than Richard Pryor . . . wit a prior. If you think

you gonna to fire on a nigga and get away wit it, that'll be the day when hell freezes over, dondidit, don't get it. That's why I pack this pistola - gone off cola, probably off a molly.[4] You almost got bodied, instead caught you a body. I'm swift on my toes. Niggas in my circle keep them 40's real close concealed in they clothes, and never lose composure, make a nigga see the light over exposure. Wit 5 Bingo-Jingo from the dondiditliveshow. It's all self-defense under the proper pretense."

"I am 37 and countin'. Ya 38 and down.[5] Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold 'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill 'em."

"This prick on some bull shit, now I wish I woulda, shoulda, coulda, but I did just popped a nigger and my BM e-mailing investigators. Consider that snitchin but I ain't trippin. . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings. Bottom line to that, I ain't dealing. . . . If God is willing when this soap opera over I'll have All My Children - Days of our Life. Hustling all night, married to the game, and the streets is my wife."

"Niggas hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses. What you got them guns for if you ain't using 'em. Better start shootin dem nigger to left just a faggot. When ya see nigga at, I'm ya best dog. I'm the pick of the litter. Won't hesitate to make the K go cray, Dirty Dada Nigga. Yeah, make my day. Strip the Nigger down to his birthday suit. All about you. Aint thinking about me. You got brand new shoes. I got no commissary. Tom, Dick, and Hairy sleeping on my fucking couch. Must a forgot I'm the reason . . . in the house."

"Yeah, the game is deep. We are the lost sheep. It's the irony of the info age, them little niggas showing choppas on they Facebook page. Assemblin' a Glock on their me-ma porch, let that thing rang like it was

---

[4] In street slang, "molly" is slang for Ecstasy or MDMA. To "fire" on a person means to punch that person, and the meaning of the first lines of the rap is that someone would need to be high or crazy to think they could punch the speaker and get away with it.

[5] At the time of the shooting, Poston was 38 years old and McNeely was 37 years old.

> the 4th. . . . Fuck you. Fuck you, pal. I ain't having that. Don't never leave the house without my strap."

A number of Poston's telephone calls from the jail were recorded. In a June 29, 2013, call to an unknown male, he said his lawyer had told him "this is in the bag. We got this." He continued, "On self-defense nigga. I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity." In a July 1, 2013, call to his mother, Poston told her, "I'm not even trying to say that I wasn't there no more . . . . I have a clear defense of self-defense. I mean it's clear. I mean it's to the point where I done read some shit that said it said just like this. In a law book, mommy, it say, it say the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him. And it said that situation was upheld and woo-woop and dude got off. I said well Godammit if that ain't my shit down to a fucking tee. I said whoa. You're going to see it this week when I send it to you. So I ain't worried, I'm not worried about getting off this case, mommy. This is over, this is in the bag."

During another phone call with his mother, Poston expressed concern that the prosecution had seen two letters confiscated from his house and were "trying to use, it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me? You know what I'm saying? [¶] Just having an optimistic attitude. But in their eyes, that may be an aggressive front." His mother suggested the video would show who the aggressor was and Poston responded, "Okay, so then, this is a valid point they raised the other day. You can't bring a knife to a gun fight. Okay? . . . . See how slick they are with that shit? You feel me? . . . . No. No, no, no, no. Not a knife. They said you can't bring a knife to a fistfight."

During a phone call with his mother on August 31, 2013, Poston fretted about how Bailey would present at trial, indicating he wanted her to tell the truth, but was worried about her appearance, clothing and body odor. His mother told him she had advised Bailey to avoid talking to the prosecution ahead of time, and Poston said he would call

her and tell her to stop driving so she wouldn't be pulled over and taken into custody. He told his mother he had been practicing his testimony and would not say "one ghetto-ebonic slur" and mused that "[p]roper preparation prevents poor performance." In a call on September 5, 2013, Poston told his mother: "[Defense counsel] do got a good point, [he] said he [a witness who was at the gas station store] couldn't even identify you. He was like how the fuck, if we figure out who this [confidential informant] is, and they don't want to tell you who it is, then everything that, they whole statement, they whole shit collapses, you feel me? You can't identify him without that fucking statement. You know what I'm saying? . . .[¶] But they got three different angles that they trying to push. I'm not saying that I'm not there, you feel me? That's why they went and did the thing, why they went and did the swab, to do the ballistics. I'm not saying that I'm not there, you feel me? That's not my defense."

d. *Poston and Bailey's Trial Testimony*

Poston and Bailey both testified about the incident at trial. Poston acknowledged having suffered felony convictions for possessing cocaine base for sale, evading the police, possessing counterfeit check paper and burglary. He described his business endeavors, which included book writing, photography, screen printing and the production of the "Done did It Live" show for "YouTube", a series of sketch comedies in which fewer than one percent depicted a real or fake gun. The prosecution played some of Poston's "Done did It Live" videos for the jury, including one in which he spoke like a gangster and made threats while a large amount of cash and two Glock semiautomatic handguns were visible on a table. In another video, someone referred to "sliders," meaning credit card fraud.

Poston had known his girlfriend, Tamena Bailey, for almost three years at the time of the shooting. In June 2012, while Bailey was staying the night at his house, an intruder entered his bedroom and shot him in the chest. After that, Poston obtained the .40 caliber gun that he used in the shooting. He knew that as a convicted felon it was wrong for him to have the gun, but he wanted it for protection.

On the night of the shooting, Poston went to the Valero gas station to buy some cigars and inquire about buying "mollies," which he sometimes used to bribe security guards so he could get backstage at concerts to interview the stars. He was approached by McNeely, whom he had met in 2003 and knew by the nickname "Two Gun Joe." McNeely said "I got some" and the two men negotiated a price and went to McNeely's car. Poston bought two mollies after haggling about the price and walked back inside the store to talk to some people about his show. When he walked back outside, McNeely approached him and said something like, "You think you all that" and opened his jacket to show Poston he had a gun in his inside pocket. Poston said, "[wherever] you driving this car, I don't want a ride," and gestured with his hands as if to say "I'm out of here." Poston felt threatened as McNeely continued ranting and making threats in a loud voice.

Poston walked to the Lexus, and McNeely said "No bitch ass, ain't even from Seminary" and "That's why I keep my strap [gun] up, bitch ass niggers like you." Poston responded that his father had been driving for the transit system in the neighborhood since 1976. Poston considered getting inside the Lexus but was afraid McNeely would shoot at him and place Bailey in danger. McNeely said, "I'll slap the shit out of you," and threw down the cup he was carrying. Poston said something like "[d]amn, you're going to slap Don Datta," looking back at a guy in the store as if to say "[c]an you believe this?"

McNeely hit Poston hard and tripped him, causing Poston to lose his balance. Poston looked over his shoulder and saw McNeely reaching into his inside jacket pocket and saw a weapon in McNeely's hand. Believing McNeely was going to shoot him, Poston took out his gun and shot McNeely. He stopped shooting once McNeely had hit the ground; the gun did not run out of bullets or jam, and if it had jammed, he could have fixed the malfunction by racking the slide. Poston only fired the number of shots he believed were necessary to disable McNeely and escape, and he did not want to kill McNeely.

After he stopped shooting, Poston ran toward Seminary Avenue. He dropped his gun along the way and when he got to the middle of the street he turned and held up his

hands to indicate he was no longer armed. Poston had not gone to the gas station intending to hurt or kill anyone but was just defending himself, and he believed McNeely would have killed him if he had not shot first. He did not go to the police after the shooting because he was scared. Poston acknowledged he was arrested for possessing a gun in 2000, for possessing three rifles in 2006, and for stealing a bicycle at gunpoint in 1996, though he denied he had actually used a gun.

Bailey testified she had been Poston's girlfriend for two years and stayed at his house several nights a week, but had never seen him with a gun. In June 2012, she had been with Poston when an armed intruder came into his room through a window and shot him.

Bailey spent all day with Poston on April 5, 2013, and went with him to the Valero gas station to buy cigars. Poston went into the store and when he came out, he spoke to McNeely.[6] She did not hear what they said initially but McNeely became upset and starting yelling, calling Poston names and saying he was not from the neighborhood. Poston walked away from McNeely and Bailey saw the handle of a gun in McNeely's inside jacket pocket when he opened his jacket, which he did three or more times. McNeely threw down a cup he was carrying and said he was going to slap Poston. When McNeely raised his hand and gave Poston "a serious slap," Bailey jumped out of the car and ran inside the store because she did not know whether McNeely was going to shoot them. After she heard the shots she came out of the store and drove away. She did not look for Poston that night but saw him the next day. At some point between the shooting and his arrest, Poston went to Los Angeles on business. After his arrest, she visited him and spoke to him on the phone, but they did not talk about the shooting.

e. *Context: Poston's Connection to the Neighborhood*

Oakland Police Department Officer Tony Jones testified that "Sem City" (a term used by Poston) was a nickname for the Seminary neighborhood and was used by people

---

[6] Bailey variously stated that she had never seen McNeely before the shooting, that she believed the father of her children knew McNeely, and that she had known McNeely before but had not seen him in 15 years.

involved in drug dealing rather than by law abiding citizens. In the world portrayed in some of Poston's YouTube videos, it would have been insulting for someone to tell him he was not from Seminary. Had Poston walked away from an encounter where someone made such an accusation, Poston would have been viewed as a "punk." According to the rules of the street in Oakland, a man who is disrespected in front of his girlfriend would lose credibility if he just walked away.

f. *Verdict and Sentence*

Based on the evidence presented at trial, the prosecutor argued that McNeely and Poston were both guilty of attempted murder because they had simultaneously formed an intent to kill the other during a mutual argument and had drawn their guns at almost the same time. She argued Poston did not act in self-defense because he drew his gun first and was not entitled to respond to a fist fight with deadly force. She urged the jury to reject McNeely's claim of self-defense because the surveillance video shows he began to draw his gun before Poston actually fired and continued to shoot at Poston when Poston was running away and no longer presented a danger.(See footnote 3.) The jury was instructed on second degree murder under theories of implied malice and transferred intent with respect to McNeely and second degree provocative act murder with respect to Poston. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654 (*Gonzalez*) [discussing malice aforethought, transferred intent, and provocative act doctrine].) The jury also received instructions on self-defense as a justification for murder and attempted murder and the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on provocation and imperfect self-defense.

After the jury returned its verdict convicting appellants as charged and finding true the section 12022.53, subdivision (d), allegations attached to the murder and attempted murder counts, the court sentenced each of them to 72 years to life: 15 years to life for second degree murder plus 25 years to life for the firearm enhancement attached to that count, plus a consecutive seven-year middle term for attempted murder with a 25-year-to-life enhancement on that count. (See *People v. Palacios* (2007) 41 Cal.4th 720, 727–728, *People v. Oates* (2004) 32 Cal.4th 1048, 1063 [multiple § 12022.53(d) enhancements

appropriately imposed for multiple counts when only a single victim was injured by the discharge of the defendant's firearm].) The sentences on the felon in possession counts were stayed under section 654.

DISCUSSION

I. *Denial of Severance Motion (McNeely and Poston)*

Appellants argue the trial court abused its discretion and deprived them of due process in denying Poston's motion to sever based on antagonistic defenses. They contend they were deprived of a fair trial because the jury could not have acquitted either of them without convicting the other and their attempts to shift the blame meant they each essentially faced two prosecuting attorneys. We disagree.

a. *Procedural Background*

Poston was originally charged by separate information with the attempted murder of McNeely and felon in possession of a firearm, along with special allegations. Before a jury could be impaneled, the prosecution dismissed the case and amended the information in McNeely's case to include the charges and allegations against Poston and to additionally charge Poston with the murder of Lionel Fluker.

Poston brought a motion to sever on the ground that he and McNeely would present conflicting defenses at trial: "Poston believes he had no malice because he was struck first by McNeely. Poston was aware that Mc Neely was armed and managed to fire his weapon first in perfect self defense. This absolves him of murder and attempted murder. McNeely's take is in conflict. He started no more than a fist fight and was forced to return fire in self-defense."

At the hearing on the motion, McNeely's counsel did not join in the request for severance, but stated he was submitting the issue to the court's "sound discretion." Counsel agreed the case would not involve the presentation of incriminating extrajudicial statements by one or both defendants under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). The trial court denied the motion for severance, noting the law favored joinder, the charges involved

common elements and facts, and there were no *Aranda-Bruton* issues requiring severance. It expressly extended its ruling to McNeely as well as to Poston.

b. *General Principles*

Section 954 provides, "An accusatory pleading may charge two or more different offenses connected together in their commission. . . ." Section 1098 provides, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." Read together, these statues allow two defendants to be tried together when " 'there is a joint charge as to one of the crimes and a common element of substantial importance in the commission of all of them.' " (*People v. Pike* (1962) 58 Cal.2d 70, 85.)

"Joint trials are favored because they 'promote [economy and] efficiency' and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*).) "When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial." (*Ibid*.)

Although joint trials are preferred, a court has the power to order separate trials " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Coffman*, *supra*, 34 Cal.4th at p. 40.) Severance may be called for when " 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*Ibid*., citing *Zafiro v. United States* (1993) 506 U.S. 534, 538–539 (*Zafiro*).) In deciding whether to order joint trials, the court is required to decide whether the realistic benefits from a consolidated trial are outweighed by the likelihood of substantial prejudice to the defendant. (*People v. Keenan* (1988) 46 Cal.3d 478, 500 (*Keenan*).)

We review a trial court's ruling on a severance motion for abuse of discretion based on the facts at the time of the ruling. (*Coffman*, *supra*, 34 Cal.4th at p. 41.) " '[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182–183.) In cases where the trial court abuses its discretion by failing to grant severance, reversal is not required unless the defendant demonstrates a reasonable probability he would have received a more favorable result in a separate trial. (*Keenan*, *supra*, 46 Cal.3d at pp. 502–503.) If the denial of severance was proper at the time the ruling was made, a reviewing court may reverse a judgment only if the joint trial resulted in " ' "gross unfairness" ' amounting to a denial of due process." (*People v. Avila* (2006) 38 Cal.4th 491, 575 (*Avila*).)

c. *The Court Did Not Abuse its Discretion in Conducting a Joint Trial*

The shooting in this case was captured on surveillance videos, which together with other evidence showed that McNeely struck Poston after a verbal argument, after which Poston shot McNeely several times and McNeely shot back at Poston, killing Lionel Fluker with a stray bullet. At trial, both Poston and McNeely presented claims of self-defense: Poston because he reasonably believed McNeely had a gun and was going to shoot him after slapping him, and McNeely because Poston had escalated a fistfight into a gunfight, giving McNeely no choice but to respond in kind.

Appellants contend the trial court should have severed their cases because their competing self-defense claims amounted to conflicting or antagonistic defenses. They note that not only were they charged with the attempted murder of one another (an unusual circumstance, to be sure), each of them sought through their self-defense claims to shift the blame to the other for the killing of Fluker. We conclude the conflict in appellants' respective defenses did not require the court to grant the severance motion.[7]

---

[7] We reject the Attorney General's contention that McNeely forfeited this argument by his failure to independently seek a separate trial or join in Poston's motion. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048.) Although a defendant must generally join in an objection or motion by a codefendant to preserve the issue on appeal, no

" '[N]either antagonistic defenses nor the fact that . . . one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non. is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 169.) " 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*.' [Citation.] If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation.]" (*Ibid*.; see *Coffman*, *supra*, 34 Cal.4th at p. 41.)

Accordingly, a trial court denying severance on the basis of conflicting defenses "abuses its discretion only when the conflict between the defendants *alone* will demonstrate to the jury that they are guilty. If, instead, 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner*).) Here, it was not the conflict between appellants' stories alone that established their guilt. Rather, it was the independent evidence presented at trial, including the surveillance videos showing the sequence of the shootings.

Appellants argue a joint trial was unfairly prejudicial because the jury could not have logically accepted both their claims of self-defense. They rely largely upon federal authorities applying rule 14 of the Federal Rules of Criminal Procedure: *United States v.*

---

objection is required where one would be futile. (*People v. Wilson* (2008) 44 Cal.4th 758, 793 (*Wilson*).) Because the trial court denied Poston's motion to sever, which was based on the theory of inconsistent defenses, there is no reason to think it would have granted a similar motion brought by McNeely. In fact, it expressly extended its ruling denying the motion to McNeely.

*Tootick* (9th Cir.1991) 952 F.2d 1078, 1081–1082 [while defendants who raise inconsistent defenses may be jointly tried, severance was required when defenses raised were mutually exclusive in the sense that acquittal of one defendant would call for conviction of the other]; *United States v. Rucker* (11th Cir.1990) 915 F.2d 1511, 1513 [severance required when defenses are "so antagonistic as to be 'irreconcilable or mutually exclusive' " such that jury must disbelieve testimony on behalf of one defendant in order to believe testimony on behalf of the other]; and *United States v. Romanello* (5th Cir.1984) 726 F.2d 173, 177–180 [severance required when defenses offered by co-defendants were "irreconcilable and mutually exclusive"].

The case before us is distinguishable because appellants' self-defense claims were not mutually exclusive, being based as they were on each appellant's subjective, reasonable perception of a volatile situation. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1093 [reasonable self-defense requires subjective believe in the need to defend and objective reasonableness of that belief].) In any event, the federal authorities cited are not binding on this court, and have been criticized as " 'too rigid in circumscribing the discretion of the trial court.' " (*People v. Wallace* (1992) 9 Cal.App.4th 1515, 1519, fn. 3.) They also appear to have been implicitly overruled by the United States Supreme Court in its subsequent decision in *Zafiro, supra*, 506 U.S. at pages 538 to 539, which held that mutually antagonistic defenses are not prejudicial per se, and that rule 14 of the Federal Rules of Criminal Procedure does not require severance on that basis, even if prejudice is shown. (See *United States v. Blankenship* (11th Cir. 2004) 382 F.3d 1110, 1122, fn. 23 [recognizing implied overruling of case law requiring severance if jury must necessarily disbelieve testimony offered by one defendant in order to believe testimony offered on behalf of the other defendant]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1081–1082.)

Under the rule set forth in *Zafiro*, a federal trial court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not

consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. [Citation.] Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [Citation.] Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. [Citation.] The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but. . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. [Citation.]." (*Zafiro*, *supra*, 506 U.S. at pp. 538–539.)

None of the factors cited by the high court in *Zafiro* required severance in this case. Neither appellant complains he was prejudiced by the introduction of incriminating evidence admissible only against the other. Appellants acknowledged at the hearing on the severence motion there were no *Aranda-Bruton* issues. The evidence did not suggest any prior association between appellants, such that a finding of wrongdoing by one of them would have suggested the other was guilty. Their levels of culpability appeared to be about the same: both men were armed with concealed handguns, both engaged in an argument after what was apparently an unconsummated drug deal (though McNeely was the instigator), and both fired multiple shots at the other. (See *Zafiro*, *supra*, 506 U.S. at p. 539.)

We further conclude no "gross unfairness" occurred as a result of the joint trial. (See *Avila*, *supra*, 38 Cal.4th at pp. 574–575.) As to Poston, the primary incriminating evidence against him was the surveillance videos, which could reasonably be interpreted to show that he fired several shots at McNeely after McNeely struck him with his hand and tripped him, but before he saw McNeely reach for his own weapon. Poston testified

on his own behalf and called Tamena Bailey as a witness in an effort to show he fired first because he reasonably believed McNeely was armed. The surveillance tape would have been introduced in a separate trial; Poston's interest in taking the stand and calling Bailey as a witness would have been the same in a separate trial; and there is no reason to think any of the evidence offered against Poston would have been materially different had he been tried separately. Poston was not deprived of due process by virtue of the joint trial and, for similar reasons, it is not reasonably probable he would have obtained a more favorable result if he had been tried separately. (*Keenan*, *supra*, 46 Cal.3d at pp. 502–503.)

The analysis with respect to McNeely is slightly different, because it is improbable Poston would have been called as a witness if McNeely had been tried separately.[8] Poston testified that he shot McNeely because McNeely had shown him his gun and he saw McNeely reaching for it, which would obviously undermine McNeely's claim of self-defense if believed by a jury. But McNeely's counsel was able to fully cross-examine Poston as to his version of events, and the jury necessarily *rejected* this aspect of Poston's testimony in convicting him of the attempted murder and murder charges. Even without Poston's testimony, the jury could see from the surveillance video that McNeely was in the process of reaching for a gun or the magazine of the gun at approximately the same time Poston was drawing his own weapon. "[N]o denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (*People v. Turner* (1984) 37 Cal.3d 302, 313, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149.) "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." (*Zafiro*, *supra*, 506 U.S. at p. 540.)

---

[8] Poston would have had a Fifth Amendment right against self-incrimination until he was sentenced on the charges and pending resolution of any appeal. (*People v. Fonseca* (1995) 36 Cal.App.4th 631, 635.)

Although this trial was atypical in the sense that appellants were the alleged victims of each other's attempted murder charges, in all other respects it was a classic case for joinder: appellants were both charged with the murder of Lionel Fluker, the remaining counts arose from the same incident and were based on the same set of facts, and most of the evidence incriminating each defendant would have also been admissible in a separate trial. The trial court did not err in denying Poston's motion for severance.

II. *Sufficiency of the Evidence (Poston)*

Poston argues his convictions of attempted murder and second degree murder must be reversed because the evidence supporting them was insufficient. He contends no reasonable trier of fact hearing the evidence at trial could have found he did not act in self-defense (reasonable or unreasonable) or in the heat of passion. Poston additionally argues the jury could not have reasonably concluded he initiated a chain of events that proximately caused Lionel Fluker's death, as is necessary for a conviction of second degree murder under a provocative act theory. We disagree.

a. *Standard of Review*

When reviewing the sufficiency of the evidence on appeal, we apply the well-established and "highly deferential" substantial evidence standard. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) We do not reweigh the credibility of witnesses or substitute our own view of the evidence for that of the jury. (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.) That the evidence might be reasonably reconciled with a contrary result does not warrant a reversal of the judgment. (*Ibid*.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

b. *Self-Defense and Attempted Murder*

Attempted murder requires a direct but ineffectual act toward killing a person accompanied by the mental state of express malice aforethought, i.e., a specific intent to unlawfully kill. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217; *People v. Perez* (2010) 50 Cal.4th 222, 229.) " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." [Citations.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Poston fired ten shots at McNeely, six of which hit him. Absent a legal excuse or justification for the shooting, the jury could readily infer the shooting satisfied the elements of attempted murder.

Poston argues his attempted murder conviction cannot stand because there was no substantial evidence he was not acting in self-defense. (See *People v. Saavedra* (2007) 156 Cal.App.4th 561, 571 [prosecution has burden to prove defendant did not act in self-defense].) He states: "The surveillance videos indisputably show that McNeely started a verbal altercation with Poston, hit him in the face and tripped him, knocking him to the ground, then pulled out a gun while Poston was getting up." We are not persuaded that the videos, which we have reviewed, show indisputably that Poston acted in self-defense.

While it appears from the videos that McNeely removed either his gun or the magazine for that gun from his jacket before Poston fired the first shot, the jurors could have reasonably concluded that action by McNeely did not occur before Poston drew his own weapon. Rather, the actions appear to be approximately simultaneous, with Poston drawing his gun slightly before McNeely pulled the magazine or gun from his jacket. Jurors viewing the video could also conclude that Poston did not see McNeely's weapon before he commenced shooting. Deadly force such as that used by Poston is excessive when used to respond to a simple assault, and the jury in this case could have concluded that *from Poston's perspective* at the time he pulled his gun from his waist and began to shoot, McNeely had done no more than hit and trip Poston after a verbal argument. (*People v. Quach* (2004) 116 Cal.App.4th 294, 301–302 [deadly force in response to simple assault is excessive].)

Poston testified he drew his weapon because he had seen McNeely's gun and feared for his life when he saw McNeely reach inside his jacket after hitting him. But the jury could have rejected this testimony and concluded Poston either did not know McNeely was armed, or shot him not because he was afraid for his life, but because he was angry about being hit and tripped. " '[S]elf defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*), and cases cited therein; see § 198.) " 'The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense.' " (*Nguyen*, at p. 1045.)[9]

In *Nguyen*, *supra*, 61 Cal.4th at pages 1043–1047, the Supreme Court rejected the argument that the defendant had acted in self-defense as a matter of law in shooting a rival gang member who approached the car the defendant was driving while carrying a shotgun. Just before the victim arrived at the driver's window, the defendant pulled out a gun, pointed it at the victim, and fired. (*Id*. at p. 1043.) The court concluded the jury could have reasonably found the defendant was not entitled to claim self-defense "because, in shooting [the victim], he did not act on the basis of fear alone but also on a desire to kill his rival." (*Id*. at p. 1044.) The prosecution's theory in this case was that both Poston and McNeely formed an intent to shoot the other before the shooting began, and that this intent was the product of anger rather than fear. The video of the events as they unfolded supports this theory, even if other interpretations of the video were reasonable.

"[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may

---

9 We deny Poston's request, filed on March 29, 2016, that we take judicial notice of a 2011 article concerning reaction time in shooting cases.

not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 379, abrogated on another point by *People v. Blakeley* (2000) 23 Cal.4th 82, 92; see *Nguyen*, *supra*, 61 Cal.4th at p. 1044.)

c. *Attempted Voluntary Manslaughter—Imperfect Self-Defense*

Nor do we agree that Poston's shooting of McNeely could be no greater than attempted voluntary manslaughter based on imperfect self-defense, under which a defendant who attempts to kill in the honest but unreasonable belief in the need to defend against imminent death or great bodily injury is deemed to have acted without malice. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833–834.) By convicting Poston of attempted murder in the face of the instructions on perfect self-defense, the jury implicitly and necessarily found that either he did not know McNeely was armed, or if he did know, was motivated to shoot him for a reason other than fear. Under this view of the shooting, which is supported by the evidence, "there was no basis for the jury to find that defendant *unreasonably* believed he was in imminent danger of death or great bodily injury. If anything, the evidence suggests that such fear was reasonable but that the jury, in rejecting defendant's claim of self-defense, concluded that defendant did not act out of such fear alone." (*Nguyen*, *supra*, 61 Cal.4th 1049.)

d. *Attempted Voluntary Manslaughter—Heat of Passion*

A defendant will also be deemed to lack the malice necessary for murder or attempted murder when he acts in a sudden quarrel or heat of passion. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241.) This variant of voluntary or attempted voluntary manslaughter has both a subjective and an objective component: "The defendant must actually, subjectively, kill [or attempt to kill] under the heat of passion. [Citation.] . . . [But the] 'passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "Provocation is adequate only when it would

render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 957.) It is not necessary that the provocation be such as would cause a reasonable person to kill or attempt to kill, as a killing in the heat of passion is necessarily unreasonable. (*Id.* at pp. 952–958.)

Poston did not claim to have shot McNeely on a sudden quarrel or heat of passion; rather, his defense was self-defense. But, "[e]ven if defendant's testimony provided some evidence of provocation for the jury to consider, it remains the jury's exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion." (*People v. Bloyd* (1987) 43 Cal.3d 333, 350.) "Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*People v. Moye* (2009) 47 Cal.4th 537, 557 [in light of jury's rejection of self-defense claim, it was not reasonably probable defendant would have been convicted of manslaughter rather than murder if heat of passion instruction had been given].) The jury in this case could have reasonably concluded Poston's reason was not, in fact, obscured by passion.

e. *Provocative-Act Second Degree Murder*

Poston was tried for second degree murder based solely on the provocative act doctrine, under which the perpetrator of an underlying crime may be guilty of murder when a third party kills an accomplice or innocent bystander in response to an act by the defendant that is "dangerous to human life because it is highly probable to provoke a deadly response." (*Gonzalez, supra*, 54 Cal.4th at p. 655.) He contends the evidence was insufficient to establish his actions proximately caused Lionel Fluker's death under this theory. We disagree.

A murder conviction under the provocative act doctrine "requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.) When the original crime is a violent assault, no additional provocative act apart from the crime itself is required. (*People v. Gallegos* (1997) 54 Cal.App.4th 453, 459–461; *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 57; see *People v. Mejia* (2012) 211 Cal.App.4th 586, 622 (*Mejia*).) A typical scenario for a provocative act murder is when the defendant instigates a gun battle, causing the victim or a police officer to shoot back and mistakenly hit the defendant's accomplice or an innocent bystander. (*People v. Cervantes* (2001) 26 Cal.4th 860, 867 (*Cervantes*); see *People v. Gardner* (1995) 37 Cal.App.4th 473, 475–482 [defendant drug dealer who shot at victim but did not hit him was liable for his murder when a rival drug dealer, believing he was being fired upon, shot back and fatally wounded the victim].)

An important question in a provocative act murder case is whether the defendant's actions proximately caused the death. (*Gonzalez, supra*, 54 Cal.4th at p. 655.) "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' " (*Cervantes, supra*, 26 Cal.4th at p. 866.) In cases where there is an intervening force in operation—such as a bullet fired by a third party—"the defendant's liability will depend on whether it can be demonstrated that his own conduct *proximately caused* the victim's death—i.e., whether it can be shown that the intermediary's conduct was merely a dependent intervening cause of death, and not an independent superseding cause." (*Id*. at pp. 872–873, fn. 15.)

As previously discussed, the evidence in this case supports a determination that Poston and McNeely engaged in a mutual gun battle during which each attempted to kill the other. In *People v. Sanchez* (2001) 26 Cal.4th 834, at pages 848–849, the court affirmed the defendant's conviction of first degree murder after concluding his

participation in a gang-motivated gun battle with his co-defendant, which killed an innocent bystander, was a "substantial concurrent, and hence proximate, cause" of the bystander's death even though it could not be determined who fired the fatal shot. So too here. Appellants "during their gun battle were attempting to kill each other, so that the killing of a bystander was a harm that both in kind and degree was within the risk [they] must have expected." (*Id*., p. 855 (conc. opn. of Kennard, J.).)

The *Sanchez* court did not resort to the provocative act doctrine to uphold the defendant's first degree murder conviction, and indeed suggested it might be an unsupported theory of guilt under the facts and verdicts in that case. (*Sanchez, supra*, 26 Cal.4th at pp. 844–845, 851–854; see concurring opn. of Werdeger, J., at p. 858 ["The majority, confusingly, suggests provocative act murder was an 'unsupported theory of liability' (maj. opn., *ante*, at p. 852), though the majority does not explain in what respect the theory is unsupported by the evidence"].) This is somewhat perplexing, particularly because the majority cited with approval the concurring decision of Justice Kennard who "avoids using the label," but analyzed the case and voted to affirm the conviction based on provocative act liability. (*Id*. at pp. 854, 855–857 (conc. opn. of Kennard, J.), 858–859 (con. opn. of Werdeger, J.).) We suspect the *Sanchez* majority's concern about the use of the provocative act doctrine arose because the rival shooter and co-defendant (who was not a party to the appeal) was convicted of first degree premeditated murder. (*Id*. at pp. 838–839.) The majority noted the Court of Appeal had reversed the defendant's conviction after finding "no theories under which the jury could have found both defendant and [his co-defendant] guilty of first degree murder;" rather, the Court of Appeal had accepted the scenario in which the co-defendant fired the fatal shot and concluded, the "premeditation as the actual shooter precluded or cut off defendant's provocative act murder liability." (*Id*., p. 839.) McNeely and Poston were convicted of second degree murder and there is no finding of premeditation by McNeely that would act as an independent superseding cause as a matter of law.

Poston argues that McNeely's shooting of Lionel Fluker must be viewed as an independent superseding cause of Fluker's death because McNeely instigated the quarrel

with Poston and was found not to have been acting in reasonable self-defense when he fired the fatal shot. We do not agree. "Provocative act murder is not dependent upon the reasonableness of the actual killer's lethal response. The inquiry instead focuses simply on whether or not a surviving perpetrator committed a provocative act that *proximately caused* the killing. [Citations.]" (*Mejia*, *supra*, 211 Cal.App.4th at pp. 630–631; see *Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 37.) The jury could reasonably have concluded McNeely was the victim of an attempted murder by Poston, and that McNeely's use of force was a natural and probable consequence of Poston's act of shooting at him ten times with a semiautomatic weapon.

The decision in *Cervantes, supra*, 26 Cal.4th 860, does not require a different result. In that case, the defendant and other members of the Highland Street gang went to a birthday party thrown by the Alley Boys gang. (*Id*. at p. 863.) During a confrontation initiated by one of the Alley Boys, the defendant shot Richard Linares, also an Alley Boy, in the arm. (*Ibid*.) A minute or two later, unidentified Alley Boys shot and killed Hector Cabrera, a Highland Street gang member, as he drove away from the party. (*Ibid*.) The court found insufficient evidence to support the defendant's conviction of the provocative act murder of Cabrera: "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered. [¶] *But the critical fact that distinguishes this case from other provocative act murder cases is that here the actual murderers were not responding to defendant's provocative act by shooting back at him or an accomplice, in the course of which someone was killed*. . . ." (*Id*. at p. 872, italics added.) The scenario in the case before us is much different because McNeely killed Lionel Fluker while shooting back at Poston in direct response to the shots Poston fired at him.

Substantial evidence supports the jury's determination that Poston proximately caused the death of Lionel Fluker. And, for reasons previously stated in connection with our discussion of self-defense and attempted murder, the jury could have concluded Poston did not act in self-defense, imperfect self-defense or heat of passion when he committed the acts leading to Fluker's death. The evidence was sufficient to support his conviction of second degree murder.

f. *Conclusion*

We emphasize that the jury in this case was fully instructed on the theories of self-defense, imperfect self-defense and heat of passion, and was accurately instructed on the theory of provocative act murder and principles of causation. (See Discussion, § V(a), *post*.) We are not here concerned with the jury's ability to consider lesser offenses and defenses supported by the evidence, but with the sufficiency of the evidence to support Poston's convictions of the charged crimes after the jury considered and rejected the lesser alternatives. That a jury could have reasonably found Poston to be not guilty or guilty only of lesser crimes does not render the evidence insufficient to support his convictions.

III. *Evidentiary Rulings*

a. *Exclusion of Poston's Arrests for Possessing Marijuana for Sale (McNeely)*

McNeely argues the trial court should have allowed him to impeach Poston with evidence of his prior arrests for possessing marijuana for sale in the neighborhood where the shooting occurred. He contends such evidence would have shown that Poston had a motive to shoot him to maintain dominance of the marijuana dealing in the area. We do not agree.

The proffered evidence would have shown Poston was arrested for possessing marijuana for sale in 1995, 1996 and 2009. The trial court ruled the prior arrests were irrelevant, noting the evidence was insufficient to show Poston even knew McNeely was selling marijuana. We review the ruling for abuse of discretion. (*Avila, supra,* 38 Cal.4th at p. 578.)

" 'Relevant evidence, means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or

disprove any disputed fact that is of consequence to the determination of the action.' " (Evid. Code, § 210.) " ' "The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' [Citation.]" (*People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) "Evidence is irrelevant, however, if it leads only to speculative inferences. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) " ' "Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose." ' [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1337–1338.)

Evidence that Poston had been arrested for possessing marijuana for sale several years before the events in this case did not logically tend to prove he was still engaged in dealing drugs at the time of the shooting. And even if it did, it would be completely speculative to suggest this provided him with a motive to shoot McNeely for being a rival drug dealer. The "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

b. *Evidence of Pimping and Prostitution (Poston)*

In some of his recorded telephone calls from the jail, Poston referred to women as "hoes" and bitches and made statements suggesting he was engaged in pimping. After Poston and Bailey had testified, the trial court ruled such statements would be admissible as impeachment evidence. Poston contends the pimping/prostitution evidence should have been excluded because it was substantially more prejudicial than probative under Evidence Code section 352. We disagree.

1. <u>Challenged Evidence</u>

The following evidence was presented as a result of the ruling:

(1) In a June 19, 2013, call to an unknown male, Poston talked about his "bitches," his "ho-bo", and his "ho[e]-bitch," and complained he had "just paid the bitch phone bill" but he wanted "the bitch to pay [his] way." He said he only wanted one friend to have his "bitch" because "that's the only nigga gonna make sure I'm eating" instead of just

"fuck[ing] on the bitch." He continued, "I ain't never been too proud to beg from a bitch in my life, Robbie . . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my ho[e]-bos, all my baby mamas, I'm finna call my one baby mama right now."

(2) In a June 22, 2013, recorded phone call to an unknown male, Poston said he had asked Bailey what she was doing and she said she was sitting on the bed. Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner."

(3) In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. When his mother expressed concern about Bailey's reliability, he responded, "This is my bitch, mommy. . . . My bitch, mommy. Listen to me. That lay, she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to me, 'cause you not. I'm the one fucking her mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" Poston again told his mother Bailey would do what he told her to do, otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that.' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't." Poston's mother advised him to "reverse [his] whole attitude about this aggressiveness" and stop calling Bailey "bitch," and Poston told her Bailey was his "bitch" and Sharan was his woman.

(4) In an August 21, 2013, call to his mother, Poston complained that someone had taken his clothes from his house, including the suit he planned to wear for his trial. He said he had been "on the run" and did not have money for bills at his house even though he still had a prostitute.

(5) In portions of a letter to his brother (which the prosecutor read to Poston during cross-examination), Poston made comments about "hoes" and prostitutes, and wrote, "That last weed I gave you came from out a ho ass. She turned a date for two zips

and a hundred dollars." The woman Poston was referring to was Brianna Howard, who was with him when he was arrested for the crimes in this case.

(6) In a June 16, 2013, phone call (played by McNeely's counsel during his cross-examination of Poston), Poston talked about getting his "ho-bitch" "back to L.A." and indicated she earned "a thousand here, a thousand there."

(7) In a phone call on June 22, 2013, Bailey asked Poston why he was still trying to "hold onto" another woman and he responded, "Hold onto her, bitch, I ain't holding onto nothing except my mother-fucking pocketbook. What you talking about?" When Bailey suggested he didn't need the woman's phone number, Poston said, "Yeah, bitch, because I need all she got to offer me. What you mean? That bitch socking it to my pocket like the Chinese stock market, bitch."

2. General Principles and Standard of Review

It is well-settled that a witness's credibility may be impeached by evidence of a prior conviction or uncharged conduct showing moral turpitude, subject to the court's exercise of its discretion under Evidence Code Section 352. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) " '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.] Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] As we have advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.'

[Citation.] [¶] Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Id*. at pp. 931–932.)

3. Analysis

Poston contends his statements about pimping should have been excluded because they were highly prejudicial and involved "a collateral matter with little probative value as to his credibility." He notes he had already admitted several felony convictions, giving the prosecution "plenty of ammunition to impeach his credibility." Thus, the references to pimping, "bitches" and "hoes" "served only to inflame the jurors' passions against a bad character who mistreated women." We conclude the court did not abuse its discretion.

As Poston acknowledges, pimping is a crime involving moral turpitude. (*People v. Jaimez* (1986) 184 Cal.App.3d 146, 150.) His admissions that he had engaged in this activity were therefore relevant to his credibility as a witness, particularly in light of his testimony he was a legitimate businessman. (See *People v. Lankford* (1989) 210 Cal.App.3d 227, 234–239 [evidence of acts underlying pending robbery charges properly admitted on issue of defendant's credibility where he had testified he had not had any recent criminal incidents].) Some of Poston's statements were made to or about Bailey, whom he called as a witness, and were also relevant to the degree of control he exercised over her.

With respect to Evidence Code section 352, there are no issues of proof or unfair surprise because the pimping evidence came from Poston's own words, written and verbal. The evidence was not unduly time consuming, particularly when considering the importance of Poston's credibility to the issues in the case. Poston's pimping activities did not involve violent conduct or conduct similar to the shooting in this case. The jury was instructed with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, or committed other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. [¶] The fact of a conviction or other

misconduct does not necessarily destroy or impair a witness's credibility. [¶] It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." We presume the jury followed this instruction and did not consider the evidence of pimping for any other purpose. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

IV. *Prosecutorial Misconduct (Poston)*

Poston argues the prosecutor committed pervasive and prejudicial misconduct by attacking his character and appealing to the jurors' emotions, racial bias, and fear of random street violence.[10] He has forfeited this claim by his failure to object below.

"To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection. Failure to do so forfeits the issue for appeal. [Citation.] 'Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry.' " (*Wilson*, *supra*, 44 Cal.4th at p. 800.) A defendant may be excused from this requirement when an objection would have been futile or an admonition would not have cured the harm. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Poston has not demonstrated that an objection would have been futile or that an admonition would have been ineffective to cure the alleged harm.

---

[10] Poston cites the following actions by the prosecutor as misconduct: (1) referring to the charged crimes as a "shoot-out as if it were the wild wild west" during opening statement; (2) suggesting to Poston during cross-examination that he had been practicing his testimony and was presenting a false image by wearing a nice suit; (3) suggesting his use of African American Vernacular English (AAVE) in his rap lyrics and phone calls and his use of standard English in the courtroom showed he was lying; (4) characterizing Poston as a pimp and a thug; (5) questioning him about and focusing on the content of rap lyrics he wrote in an effort to refute his claim of self-defense; (6) emphasizing offensive language Poston used during his recorded jail calls; (7) arguing that Poston's flight and statements made during the recorded jail calls showed a consciousness of guilt; and (8) suggesting he had practiced his testimony to project a different persona than the one he assumed in his YouTube videos and in his rap lyrics.

V. *Jury Instructions*[11]

a. *CALCRIM No. 560 (Poston)*

Poston argues the trial court did not properly instruct the jury on an element of provocative act murder, namely, that the chain of events leading to the victim's death was initiated by the defendant. He argues the omission was not harmless beyond a reasonable doubt (*Gonzalez*, *supra*, 54 Cal.4th at pp. 662–663) because the evidence shows McNeely was the initial aggressor in their confrontation. We do not agree with the premise that a defendant can only be guilty of provocative act murder if he set in motion the chain of events in which the provocative act occurred.

1. Instructions Given

The trial court gave a modified version of CALCRIM No. 560 on the concept and elements of provocative act murder. It provided: "Donel Poston is charged in Count 1 with the murder of Lionel Fluker. [¶] A person can be guilty of murder under the provocative act murder doctrine, if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot. The provocative act murder doctrine focuses on the provocateur's *conduct* and his *knowing* his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet. [¶] The elements of provocative act murder are more fully explained below. [¶] To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that: [¶] 1. Donel Poston intentionally committed a provocative act; [¶] 2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life, and then acted with conscious disregard for human life; [¶] 3. In response to Poston's provocative act, McNeely killed Lionel Fluker; AND [¶] 4. Lionel Fluker's death was a natural and probable consequence of Poston's provocative act. [¶] A provocative act is an act: [¶] 1. That goes beyond what is necessary to

---

[11] We reject the People's contention appellants forfeited the following issues by failing to object. Jury instructions affecting the elements of the charged offense affect the substantial rights of the defendant and do not require an objection for appellate review. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

accomplish the crime; AND [¶] 2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

"In order to prove that Lionel Fluker's death was the *natural and probable consequence* of the defendant's provocative act, the People must prove that: [¶] 1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act could begin a [chain] of events resulting in someone's death; [¶] 2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND [¶] 3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act. [¶] A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death."

"A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else. An *independent criminal act* is a free, deliberate, and informed criminal act by a person who is not acting with the defendant."

"The People allege that Donel Poston committed the following provocative acts: [¶] • Drawing a loaded .40 caliber semiautomatic gun [¶] • Shooting Joe McNeely multiple times [¶] You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another. [¶] You do not all have to agree on which provocative act Donel Poston committed."

The jury was also instructed with CALCRIM No. 240, concerning causation in a criminal case: "An act causes injury or death if the injury or death is the direct, natural and probable consequence of the act and the injury or death would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider the circumstances established by the evidence. [¶] There may be more than one cause of a crime, even a homicide. When the

conduct of two or more persons contributes concurrently as a cause of the homicide, the conduct of each is a cause of the homicide if that conduct was also a substantial factor contributing to the result. [¶] A cause is concurrent if it was operative at the moment of the homicide and acted with another cause to produce the homicide. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person [] contributed to the death."

2. Analysis

Poston argues the instructions should have made clear that he was not guilty of provocative act murder if the jury found McNeely was the person who set in motion the chain of events leading to the shooting. We disagree. Courts use "traditional notions of concurrent and proximate cause" to determine whether a killing was the result of a defendant's provocative act. (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583–584.) "The timing of events is critical. By necessity, the provocative act must occur before a victim [here, McNeely] may make a lethal response." (*Id*. at p. 584.) But there is no requirement that the defendant be responsible for initiating the chain of events leading to the killing, so long as the provocative act preceded the killing and was a substantial factor leading to the killing. The jury was properly instructed on these concepts, and was also instructed that appellant was not guilty of provocative act murder if he was acting in reasonable self-defense.

Poston cites language from *Sanchez, supra*, 26 Cal.4th 834, in which the court affirmed the first degree murder conviction of a defendant involved in a gun battle in which a single stray shot killed a bystander, even though it could not be determined which of the shooters fired the fatal bullet: " 'Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . [I]t is not unfair to hold them equally responsible for [the victim's] death.' " (*Id*. at p. 854.) Poston suggests that unlike the defendant in *Sanchez,* his own culpability is less than that of McNeely because McNeely "instigated and escalated the quarrel."

The notion of equally culpable mental states as a criteria for provocative act murder does not establish that a defendant must initiate a course of conduct that ends in the victim's death. Nor does Poston explain how the jury instructions should have been modified to encompass the concept of equally culpable mental states. In any event, Poston's mental state was not significantly less culpable than McNeely's. While McNeely appears on the surveillance video to have started a verbal argument and hit Poston with his hand, Poston responded by immediately drawing a loaded semiautomatic handgun and shooting McNeely several times in a crowded gas station. The case is similar to *Sanchez*, in which the Supreme Court concluded the culpability of two co-defendants who engaged in a gun battle was equivalent. (*Sanchez*, *supra*, 26 Cal.4th at p. 854.)

b. *CALCRIM No. 3471 (Poston)*

Poston contends the trial court deprived him of due process and interfered with his right to present a defense when it instructed the jury on the theory of mutual combat in connection with self-defense. We reject the claim.

The instruction challenged by Poston is CALCRIM No. 3471, which was requested by both the prosecution and McNeely and which provides: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated by word or conduct to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, then he had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop the fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting. [¶] A fight is [*mutual*] *combat* when it began or continued by mutual consent or

agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense."

"Mutual combat" has been judicially construed to mean "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045; see *Nguyen*, *supra*, 61 Cal.4th at p. 1044.) Poston does not suggest CALCRIM No. 3741 was inaccurate, but argues it had no application to his case because there was no substantial evidence he expressly or implicitly agreed to fight with McNeely before the exchange of physical blows and gunshots. Moreover, he claims, the instruction improperly suggested he did not possess the right of self-defense, even if he reasonably believed his life was in imminent danger when he shot McNeely.

The sequence of events in this case is nothing like that in *Ross*, *supra*, 155 Cal.App.4th 1033, on which Poston relies. In *Ross,* the female victim had lost her temper after a verbal argument and slapped the defendant, who punched her in the face in response. (*Id*. at p. 1039.) The court's instructions on the defendant's claim of self-defense to the assault and battery charges included a prior version of CALCRIM No. 3471 that did not define "mutual combat." (*Id*. at p. 1042, fn. 9.) When the jurors asked for clarification of the term during deliberations, the trial court did not provide additional guidance and instead told them to apply the common, everyday meaning of the those words. (*Id*. at p. 1043.) This response left the jury free to conclude the term "might properly describe any violent struggle between two or more people, however it came into being." (*Id*. at p. 1044.) The court of appeal concluded (1) the instruction limiting self-defense in cases of mutual combat should not have been given because there was no evidence the defendant and victim had mutually agreed to fight one another (*id*. at pp. 1053–1054); and (2) the "unwarranted and dangerously incomplete" instruction was prejudicial because it was "entirely likely that the case was decided on the basis of a mistaken understanding of 'mutual combat.' " (*Id*. at pp. 1054, 1057.)

Although no evidence was presented that Poston and McNeely expressly agreed to fight, the video surveillance tape shows a virtually simultaneous decision to draw their

weapons and such an agreement may be implied.[12] But even if we were to agree that the gunfight cannot not be characterized as "mutual combat" for purposes of assessing Poston's self-defense claim, this would not render CALCRIM No. 3471 erroneous or inapplicable. The version of the instruction given in this case limited the self-defense claims of a person who either engaged in mutual combat "*or started a fight*." (Italics added.) The instruction was plainly proper and necessary to assess the self-defense claim of McNeely, who had delivered the first, nonlethal blow with his fist before Poston responded with deadly force.

Assuming CALCRIM No. 3471 did not apply to Poston and should have been expressly limited to McNeely, no harm to Poston ensued. Unlike the situation in *Ross*, where the court declined to define mutual combat despite a jury request for clarification of that term, the version of CALCRIM No. 3471 that was given in this case defined mutual combat to require a preexisting agreement to fight. "Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally " ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

The court in this case gave CALCRIM No. 200, which advised the jury: "Remember that depending on what you find the facts of this case are, some of these instructions may not apply." This instruction made it "abundantly clear in straightforward language that it is the jury who decides the facts and the jury who determines which instructions apply to those facts." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 929.) Even the *Ross* court noted that CALCRIM No. 3471 might have been harmless if "mutual combat" had been properly defined, as it was in the more recent version of CALCRIM No. 3471 that was given in this case. (*Ross*, *supra*, 155

---

[12] Assuming McNeely initially pulled the magazine of his gun from his pocket rather than the gun itself,[(see footnote 3)] this was a predicate to loading his gun so he could shoot it.

Cal.App.4th at p. 1056.) The court did not commit prejudicial error in giving the instruction.

c. *CALCRIM No. 3472 (McNeely)*

McNeely argues the court erred in giving CALCRIM No. 3472, which advised the jury, as a corollary to CALCRIM No. 3471: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." He contends the instruction misstates the law because it does not state that one who provokes a quarrel to create the need for a fistfight retains the right to use self-defense if the victim responds with deadly or excessive force.

McNeely relies primarily on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), in which a divided panel of the court concluded that *under the facts of that case*, CALCRIM No. 3472 misstated the law by effectively advising the jury "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Id*. at p. 947.) This was contrary to the rule that "[a] person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[] . . . his right to live.' " (*Id.* at p. 943.) Significantly, the prosecutor had repeatedly argued that under the instruction, it did not matter whether the defendant (who instigated a gang confrontation) had only contrived to start a fistfight. The court concluded the problem was not remedied by CALCRIM No. 3471, which provided (as it did in the case before us) that a defendant who starts a fight with nondeadly force has a right to self-defense if the opponent responds with deadly force. (*Id*. at pp. 949–950.) This was in large part because the prosecutor had argued the opposite to the jury—that "under CALCRIM No. 3472's command, 'it doesn't matter' whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions." (*Id.* at p. 950.)

No comparable misstatements were made during the closing arguments in this case. The prosecutor never suggested McNeely had forfeited his right to self-defense against Poston because he had struck the first blow with his fists, but instead focused on the evidence that McNeely had drawn his weapon immediately after hitting Poston, demonstrating an intent from the outset to use deadly force, and/or had fired the shots at

Poston after Poston's gun had apparently jammed and he was already running away. The court in *Ramirez* recognized that CALCRIM No. 3472 was a correct statement of the law in a case where the defendant contrived a deadly assault from the outset, as the prosecutor argued in this case. (*Ramirez, supra*, 233 Cal.App.4th at p. 947.) In light of the language in CALCRIM No. 3471 making clear that the rule that an initial aggressor could respond in kind to deadly force by the victim so long as the initial assault involved nondeadly force, and in light of the absence of prosecutorial misstatements about the law on this subject, we are unconvinced the jury would have construed CALCRIM No. 3472 in the manner found problematic by the *Ramirez* court.[13]

VI. *Cumulative Error*

Appellants argue the errors they have raised are cumulatively prejudicial even if they do not require reversal when considered individually. We have assumed only one error for the sake of argument, meaning there are no errors to cumulate.

DISPOSITION

The judgments are affirmed.

---

[13] The jury was also instructed with CALCRIM No. 5.31, which provided: "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believed, and a reasonable person in the same or similar circumstances would believe, that the assault is likely to inflict great bodily injury upon him."

NEEDHAM, J.

We concur.

SIMONS, ACTING P.J.

BRUINIERS, J.

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

Court of Appeal First Appellate District
FILED
JAN - 6 2017
Diana Herbert, Clerk
by_______________Deputy Clerk

In re DONEL POSTON on Habeas Corpus.
A148986
Alameda No. 172522B

BY THE COURT:*

The petition for writ of habeas corpus is denied.

Date: JAN - 6 2017

Simons, J.
_____________________, Acting P.J.

*Before Simons, Acting P.J., Needham, J., and Bruiniers, J.

**DECLARATION OF SERVICE**

I, Randi Covin, declare that I am over 18 years of age and not a party to this action. My business address is P.O. Box 1120, Willits, California, 95490. On February 8, 2017, I served true and correct copies of **PETITIONER'S PETITION FOR REVIEW** ON:

Mr. Donel Poston
AT2512
High Desert State Prison
PO Box 3030
Susanville, CA. 96127

Mr. David Bryden
Attorney at Law
160 Franklin St.
Oakland, CA. 94607

District Attorney
1225 Fallon St.
Oakland, CA. 94612

Alameda County Courts
Att: Hon. Michael Gaffey
1225 Fallon St.
Oakland, CA. 94612

Public Defender
1401 Lakeside Dr., Ste 400
Oakland, CA. 94612

by depositing such copies in the U.S. Mail, addressed as indicated above, postage pre-paid, at Willits, California.

On February 8, 2017, I also transmitted a PDF version of **PETITIONER'S PETITION FOR REVIEW** by Truefiling e-service to Clerk, Court of Appeal, First District, Division Five, and by e-mail to:

Attorney General
SFAG.Docketin@doj.ca.gov

First District Appellate Project
Eservice@fdap.org

Philip Brooks
philipmbrooks@gmail.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 8, 2017, at Willits, California.

/s/ Randi Covin

# EXHIBIT 19

Court of Appeal, First Appellate District, Division Five - No. A148986

**S240034**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re DONEL POSTON on Habeas Corpus.

---

The petition for review is denied.

SUPREME COURT
FILED

MAR 29 2017

Jorge Navarrete Clerk

Deputy

CANTIL-SAKAUYE

*Chief Justice*

# EXHIBIT 19

Court of Appeal, First Appellate District, Division Five - No. A148986

**S240034**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re DONEL POSTON on Habeas Corpus.

---

The petition for review is denied.

SUPREME COURT
FILED

MAR 29 2017

Jorge Navarrete Clerk

Deputy

CANTIL-SAKAUYE

*Chief Justice*