IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DONEL POSTON,

           Petitioner,

   v.

M. ELIOT SPEARMAN,

           Respondent.

Case No. 18-cv-03450-CRB

**ORDER DENYING PETITION FOR A
WRIT OF HABEAS CORPUS**

Donel Poston, who is currently serving 72 years to life in California's High Desert State Prison for murder, attempted murder, and unlawful possession of a firearm, petitions for a writ of habeas corpus under 28 U.S.C. § 2254.

The circumstances underlying Poston's petition are tragic. They begin in Oakland, California with a gas station shootout between Poston and Joe McNeely that resulted in the death of Lionel Fluker, who was driving home from a friend's house when a stray bullet fired by McNeely struck and killed him. A California jury convicted both Poston and McNeely of Fluker's murder, attempted murder of one another, and prohibited firearm possession by a felon.

Poston challenged his convictions on direct appeal to no avail, and the California courts denied him postconviction relief. Poston now petitions this Court for a writ of habeas corpus on numerous grounds. The Court hereby denies Poston's petition.

United States District Court
Northern District of California

I.      **BACKGROUND**[1]

     **A.      Underlying Events and Trial**

       **1.      The Shooting**

Shortly after 10:00 PM on April 5, 2013, McNeely parked his Mazda sedan at a Valero gas station on the corner of MacArthur Boulevard and Seminary Avenue in Oakland.  McNeely was carrying a nine-millimeter semiautomatic handgun in his inner jacket pocket, and he spoke to a few people at the gas station.

At 10:06 PM, Poston arrived with his girlfriend Tamena Bailey and parked her Lexus sedan in front of the gas station's minimart.  A loaded .40 caliber semiautomatic handgun was concealed inside his right waistband.  Poston went inside the minimart while Bailey remained in the passenger seat with the window rolled down.  After exiting the minimart, Poston spoke to McNeely and walked to McNeely's car.  McNeely took out a baggie and showed it to Poston.  The California Court of Appeal stated that Poston did not take the baggie, and noted that at trial, a detective who reviewed the surveillance video believed that the interaction was a failed drug transaction.  See McNeely, 2017 WL 65832, at *2.  Poston testified that after haggling over the price, he purchased two "mollies," i.e., two pills containing methylenedioxy-methamphetamine (MDMA).  Id. at *5.

Regardless, McNeely was unhappy with Poston.  The gas station's surveillance videos show that McNeely, appearing upset, followed Poston as Poston walked back to and around Bailey's Lexus.  McNeely seemed to berate Poston, pacing and repeatedly grabbing the lapels of his own leather jacket.  Poston initially walked away from McNeely, but then engaged with him verbally.  As the two men were standing between the passenger side of the Lexus and the door of the minimart, McNeely threw a drink that he had been carrying on the ground in anger.

The altercation escalated rapidly from there.  McNeely hit the side of Poston's face

---

[1] This section draws from the California Court of Appeal's decision affirming Poston's convictions, with minor changes, except where otherwise noted with citations.  See People v. McNeely, 2017 WL 65832, *1–7 (Cal. Ct. App. Jan. 6, 2017) (dkt. 25-5, Ex. 11).  The Court omits some facts pertaining only to McNeely.

United States District Court
Northern District of California

with his hand while simultaneously placing his leg behind Poston to trip him. Bailey jumped out of the Lexus and ran inside the minimart. Poston staggered with his back to McNeely but did not fall. As he recovered his balance, Poston pulled his firearm from his waistband, turned, and began shooting at McNeely, firing ten bullets and hitting McNeely six times. When Poston began shooting, McNeely was reaching inside his own jacket. He pulled out either a firearm or a firearm magazine, but he fell to the ground and dropped the object after Poston's bullets struck him. Poston stopped shooting, possibly because his gun jammed or he ran out of bullets, and began running away. Despite having been shot six times, McNeely got up on one knee, reached into his jacket, pulled out either his firearm or its magazine (whichever he hadn't pulled out before), and put the two objects together to load his firearm. He stood up and started chasing Poston. During the chase, McNeely fired eight shots. A janitor who worked at the gas station saw Poston attempt to jump a chain link fence around nearby Mills College and then turn around with his hands up.

None of McNeely's bullets struck Poston, but one of them hit and killed Lionel Fluker as he was driving south on Seminary Avenue on his way home from visiting a friend.

The California Court of Appeal added the following footnote regarding the surveillance video:

> The surveillance videos . . . show that McNeely started to pull what appears to be a metal cylindrical object from his jacket almost immediately after hitting and tripping Poston, was shot by Poston a fraction of a second later, dropped the object on the ground as a result of being shot, reached into his jacket while getting up, pulled out another object, put the two objects together, and began shooting at Poston. At trial, the prosecutor argued that McNeely drew his gun before Poston fired a shot, but the Attorney General has taken the position on appeal that McNeely removed the magazine for the gun a fraction of a second before Poston started shooting, and then drew his gun and loaded it with the magazine after being shot by Poston. Whether McNeely first removed the gun or the magazine does not affect our analysis of the legal issues in this case. Either way, a logical inference would be that he was preparing to fire his gun immediately after hitting and tripping

United States District Court
Northern District of California

Poston.

McNeely, 2017 WL 65832, at *2 n.3.

This court has reviewed the surveillance footage as well. See Ex. 7 (Surveillance Video). The video shows McNeely slap and trip Poston. Id. 00:15–00:20. After he regains his balance (and while still facing away from McNeely), Poston reaches for his firearm. Id. 00:20–00:21. Poston spins around to point his firearm at McNeely, at which point McNeely reaches for his firearm. Id. 00:21–00:23. Just as McNeely pulls an object from his jacket, Poston shoots McNeely. Id. 00:23. McNeely falls to the ground while Poston continues to shoot. Id. 00:23–00:26. Eventually, Poston stops shooting and runs away; McNeely gets up and shoots at Poston while chasing after him. Id. 00:26–00:32.

### 2.    Aftermath

After the shootout, McNeely jogged back to his car and Poston fled the scene on foot. Bailey drove away in the Lexus. Eventually, McNeely's friend Ansar Muhammad drove McNeely to the hospital, where McNeely was treated for gunshot wounds in his left and right thighs, scrotum, left armpit, left shoulder, and upper back. Law enforcement never found the firearms that Poston and McNeely fired at each other at the gas station.

Within a few days of the shooting, Poston left for Los Angeles and did not return for three months. He was arrested on June 14, 2014. When told that he was being charged with attempted murder, Poston said that he had not attempted to kill McNeely, but had simply tried to get McNeely off him. Police found .40 caliber ammunition in Poston's bedroom during a search of his home on the date of his arrest, and an examination of that ammunition showed that one round had been cycled through the same unidentified gun as two of the .40 caliber bullets found at the gas station after the shooting. Police also discovered handwritten rap lyrics and blank check paper, as well as a credit card manufacturing machine, blank credit cards, and credit cards in various names.

### 3.    Poston's Jailhouse Writing and Telephone Calls

In July 2013, while Poston was in jail after his arrest, a sheriff's technician intercepted a letter written by Poston suggesting that a woman had incriminated him.

4

Poston wrote that he would assert his speedy trial rights and "forc[e] they hand" because he "ain't did shit but stand [his] ground."  In another letter written to his roommate, Poston stated that he would learn the identity of a woman who had emailed police and identified him as having shot someone.  Believing that witnesses might be in danger, officers searched Poston's cell and seized several pages of rap lyrics, among them:

> You got to be higher than Richard Pryor . . . wit a prior.  If you think you gonna to fire on a n— and get away wit it, that'll be the day when hell freezes over, dondidit, don't get it.  That's why I pack this pistola—gone off cola, probably off a molly.  You almost got bodied, instead caught you a body.  I'm swift on my toes.  N— in my circle keep them 40's real close concealed in they clothes, and never lose composure, make a n— see the light over exposure.  Wit 5 Bingo-Jingo from the dondiditliveshow.  It's all self-defense under the proper pretense.

> I am 37 and countin'.  Ya 38 and down.[2]  Them 40 oz bullets made that 9 sit down.  In part about it, you'll never see the town, never get no pussy and never get around.  Bet that a hold 'em; minus a left scrotum.  One to the shoulder, two to the bottom, hit in the armpit.  I wasn't try to kill 'em.

> This prick on some bull shit, now I wish I woulda, shoulda, coulda, but I did just popped a n— and my BM e-mailing investigators.  Consider that snitchin but I ain't trippin . . . What you see it, cuz, . . . I'm keep pushin wit no animosity, emotions, or feelings.  Bottom line to that, I ain't dealing . . . If God is willing when this soap opera over I'll have All My Children—Days of our Life.  Hustling all night, married to the game, and the streets is my wife.

> N— hella passive when they start blasting everybody and they mama got a . . . fucking . . . excuses.  What you got them guns for if you ain't using 'em.  Better start shootin dem n— to left just a f— .  When ya see n— at, I'm ya best dog.  I'm the pick of the litter.  Won't hesitate to make the K go cray, Dirty Dada N—.  Yeah, make my day.  Strip the N— down to his birthday suit.  All about you.  Ain't thinking about me.  You got brand new shoes.  I got no commissary.  Tom, Dick, and Hairy sleeping on my fucking couch.  Must a forgot I'm the reason . . . in the house.

> Yeah, the game is deep.  We are the lost sheep.  It's the irony of the info age, them little n— showing choppas on they Facebook page.  Assemblin' a Glock on their me-ma porch, let that thing rang like it was the 4th . . . Fuck

---

[2] At the time of the shooting, Poston was 37 years old and McNeely was 38 years old. The Court of Appeal appears to have confused their ages in an explanatory footnote.

United States District Court
Northern District of California

you.  Fuck you, pal.  I ain't having that.  Don't ever leave the house without my strap.

Several of Poston's telephone calls from the jail were recorded.  In a June 29, 2013 call to an unknown male, he said that his lawyer had told him "this is in the bag.  We got this."  He continued, "On self-defense n—.  I found all the clauses, all the statutes, everything that fit my shit to the maximum capacity."  In a July 1, 2013 call to his mother, Poston said "I'm not even trying to say that I wasn't there no more . . . . I have a clear defense of self-defense.  I mean it's clear.  I mean it's to the point where I done read some shit that said . . . just like this.  In a law book, mommy, it say . . . the guy said he shot him because he seen the gun and he was scared, he was scared to drive off because he knew that he'd shoot him.  And it said that situation was upheld and woo-woop and dude got off.  I said well Godammit if that ain't my shit down to a fucking T.  I said whoa.  You're going to see it this week when I send it to you.  So I ain't worried, I'm not worried about getting off this case, mommy.  This is over, this is in the bag."

During another phone call with his mother, Poston expressed concern that the prosecution had seen two letters confiscated from his house and was "trying to use it, maybe the way I worded it, I was saying it aggressively because I felt, because I felt that I'm gonna beat this shit, you feel me?  You know what I'm saying?  Just having an optimistic attitude.  But in their eyes, that may be an aggressive front."  His mother suggested the video would show who the aggressor was and Poston responded "Okay, so then, this is a valid point they raised the other day.  You can't bring a knife to a gun fight.  Okay?  . . . . See how slick they are with that shit?  You feel me? . . . . No.  No, no, no, no. Not a knife.  They said you can't bring a knife to a fistfight."

During yet another call with his mother, Poston fretted about how Bailey would present at trial, indicating that he wanted her to tell the truth, but was worried about her appearance, clothing, and body odor.  His mother told him that she had advised Bailey to avoid talking to the prosecution ahead of time, and Poston said that he would call her and tell her to stop driving so she wouldn't be pulled over and taken into custody.  He told his

mother he had been practicing his testimony and would not say "one ghetto-ebonic slur," and mused that "proper preparation prevents poor performance."  In a call on September 5, 2013, Poston told his mother that Poston's attorney made a "good point," that a witness who was at the gas station store "couldn't even identify" Poston.  "He was like how the fuck, if we figure out who this [confidential informant] is, and they don't want to tell you who it is, then everything that, they whole statement, they whole shit collapses, you feel me?  You can't identify him without that fucking statement.  You know what I'm saying? . . . . But they got three different angles that they trying to push.  I'm not saying that I'm not there, you feel me?  That's why they went and did the thing, why they went and did the swab, to do the ballistics.  I'm not saying that I'm not there, you feel me?  That's not my defense."

### 4.    Poston's Pre-Trial Motion to Sever

Poston moved to sever his trial from McNeely's on the ground that he and McNeely would present conflicting defenses at trial: "Poston believes he had no malice because he was struck first by McNeely.  Poston was aware that McNeely was armed and managed to fire his weapon first in perfect self-defense.  This absolves him of murder and attempted murder.   McNeely's take is in conflict.  He started no more than a fist fight and was forced to return fire in self-defense."

At the motion hearing, counsel agreed that the case would not involve the presentation of incriminating extrajudicial statements by one or both defendants under People v. Aranda, 407 P.2d 265 (Cal. 1965) and Bruton v. United States, 391 U.S. 123 (1968).

The trial court denied the motion for severance, noting that the law favored joinder, the charges involved common elements and facts, and there were no Aranda-Bruton issues requiring severance.

### 5.    The Trial

This Court will not detail everything that happened at trial, but will attempt to describe any statements, arguments, and testimony relevant to Poston's claims in the

instant habeas petition.

### a.   Opening Statement

In the prosecution's opening statement, when describing the incident, a prosecutor said that "[t]hese two convicted felons pulled out their guns and got in a shoot-out as if it were the wild wild west.  But unlike the old western movies where they would shoot it out at high noon with no one around and no innocent bystanders to catch a stray bullet, on this night people were everywhere."  Trial Tr. Vol. 11 (dkt. 24-2) at 483.  And as a "result of their gun battle," Fluker "was shot dead center in the middle of his forehead as he drove toward his home."  Id. at 484.  The prosecutor also played the surveillance video for the jury.  See id. at 485.

### b.   Poston's Testimony

Poston acknowledged having felony convictions for possessing cocaine base for sale, evading the police, possessing counterfeit check paper, and burglary.  He described his business endeavors, which included book writing, photography, screen-printing, and the production of a YouTube show called "Done did It Live," a series of sketch comedies in which fewer than one percent depicted a real or fake gun.

Poston testified that he had known his girlfriend, Bailey, for almost three years at the time of the shooting.  In June 2012, while Bailey was spending a night at Poston's house, an intruder entered his bedroom and shot him in the chest.  After that, Poston obtained the .40 caliber gun that he used in the shooting.  He knew that as a convicted felon it was wrong for him to have the gun, but he wanted it for protection.

Poston testified that on the night of the shooting, Poston went to the gas station to buy some cigars and inquire about buying "mollies," which he sometimes used to bribe security guards so that he could get backstage at concerts to interview performers.  He was approached by McNeely, whom he had met in 2003 and knew by the nickname "Two Gun Joe."  McNeely said that he had some mollies and the two men negotiated a price and went to McNeely's car.  After haggling, Poston bought two mollies and walked back inside the store to talk to people about his show.  When he walked back outside, McNeely

8

approached him and said something like "you think you all that" and opened his jacket to show Poston that he had a gun in his inside pocket. Poston said that wherever McNeely was "driving this car, I don't want a ride," and gestured with his hands as if to say "I'm out of here." Poston felt threatened as McNeely continued ranting and making threats in a loud voice.

Poston testified that he walked to the Lexus, and McNeely said, "bitch ass, ain't even from Seminary" and "that's why I keep my strap up, bitch ass n— like you." Poston responded that his father had been driving for the transit system in the neighborhood since 1976. Poston considered getting inside the Lexus but was afraid that McNeely would shoot at him and place Bailey in danger. McNeely said, "I'll slap the shit out of you" and threw down the cup he was carrying. Poston said something like "damn, you're going to slap Don Datta," looking back at a man in the store as if to say "can you believe this?"

Poston testified that McNeely hit Poston hard and tripped him, causing Poston to lose his balance. When the surveillance video first showed Poston reaching for something after being slapped, Poston was reaching for his camera to stop it from swinging across his chest. See Trial Tr. Vol. 18 (dkt. 24-7) at 1561. Poston also looked over his shoulder and saw McNeely reaching into his inside jacket pocket, and saw a weapon in McNeely's hand. Believing McNeely was going to shoot him, Poston took out his gun and shot McNeely. McNeely shot and hit the radiator of Bailey's car before Poston stopped shooting. See Trial Tr. Vol. 18 at 1562; Trial Tr. Vol. 19 (dkt. 24-8) at 1738. Poston stopped shooting once McNeely had fallen to the ground; the gun did not run out of bullets or jam, and if it had jammed, he could have fixed the jam. Poston fired only the number of shots he believed were necessary to disable McNeely and escape, and he did not want to kill McNeely.

Poston testified that after Poston stopped shooting, Poston ran toward Seminary Avenue. He dropped his gun along the way, and when he got to the middle of the street, he turned and held up his hands to indicate that he was no longer armed. Poston had not gone to the gas station intending to hurt or kill anyone but was just defending himself, and

9

United States District Court
Northern District of California

he believed that McNeely would have killed him if Poston had not shot first.  He did not go to the police after the shooting because he was scared.  Poston acknowledged that he was arrested for possessing a gun in 2000, for possessing three rifles in 2006, and for stealing a bicycle at gunpoint in 1996, though he denied having used a gun in that theft.

The prosecution cross-examined Poston at length.  The prosecution played some of Poston's "Done did It Live" videos, including one in which he made threats while a large amount of cash and two Glock semiautomatic handguns were visible on a table.  In another video, someone referred to "sliders" in an apparent reference to credit card fraud.[3]  When the prosecution asked Poston about a credit card embossing machine found in Poston's home, Poston said "that was found in my house.  I do not own that."  Trial Tr. Vol. 19 at 1620.  When asked about another machine that can make fake identification cards, Poston said "I've never, ever, seen that machine."  Id.  Poston later explained that he did not know where the police found the machine in his house because he "had been gone for 90 days."  Id. at 1700.

At one point, the following exchange occurred:

Q: And you're trying to get over on this jury, aren't you?
A: No, ma'am.
Q: Didn't you tell your mom that you wanted to save your good suit for when it was time for you to perform?
A: Ma'am, maybe only a metaphor?
Q: Well, didn't you also tell your mom you have to paint a different picture, a different portrait for this jury?
A: Yes, ma'am, especially if you're going to paint one picture.
Q: Well, the picture that you are on the streets is what you're afraid of, right?
A: Hmm, I don't get it.
Q: Well, the picture that you are out on the streets as a hard-core thug, into guns, and being a gangster?
A: No, ma'am.

Trial Tr. Vol. 19 at 1627–28.  The prosecution then played audio of two of the above-

---

[3] As explained in more detail below, in California, conduct involving moral turpitude is admissible as impeachment evidence.  See infra part I.A.5.d.

10

described calls between Poston and his mother.  Id. at 1628.

> Q:    That was your voice, right, Mr. Poston?
> A:    Yes, ma'am.
> Q:    You said that?
> A:    Yes, ma'am.
> Q:    You've been practicing this performance, right?
> A:    All my life.

Id. at 1629.

The prosecution also questioned Poston about his rap lyrics.  A prosecutor asked Poston if he was "bragging" when he wrote "Them 40 ounce bullets made that nine sit down, the sad part about it, you'll never see the town."  Id. at 1632–33.

> A:    Ma'am, that's an excerpt.  I also said, 'Under the right pretext, it's all self-defense.'
> Q:    Right.  'Under the right pretext,' as long as you testify to the right things, right?
> A:    No, ma'am.  As long as the jury and the people see the truth to this, that maybe this is self-defense, because a man was trying to kill me.

Id. at 1633.  The prosecutor asked Poston if lyrics like "Cross the dotted line, you might lose your life" and "You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a n—and get away with it" addressed "what happens to people when they disrespect" Poston.  Trial Tr. Vol. 19 at 1640–41.  Poston explained that his rap lyrics were his "artistic endeavors," based on his "perspective" of his "environment."  Id. at 1640.  He also explained that "fire means shoot," not punch, and asked the prosecutor if the prosecutor understood "African-American vernacular from the street perspective."  Id. at 1641–42.

The prosecutor also asked Poston why he had told the police and his brother Robby that he had not been at the gas station.  See id. at 1642–43, 1682–83.  Poston denied that when he made these statements, he was planning to assert a defense other than self-defense.  Id. at 1643.  He also initially denied telling Robby that he had not been at the gas station, but after the prosecutor played audio of their conversation, Poston stated that he "was just keeping [his] brother in the blind . . . so he wouldn't go talking on the streets."

1  Id. at 1683.

### c.    Bailey's Testimony

Bailey testified that she had been Poston's girlfriend for two years and stayed at his house several nights a week, but had never seen him with a firearm.  In June 2012, she had been with Poston when an armed intruder came into his room through a window and shot him.

Bailey also testified that on April 5, 2013, she spent all day with Poston and went with him to the gas station to buy cigars.  When Poston exited the minimart, he spoke to McNeely.  Bailey did not hear their initial conversation, but McNeely became upset and started yelling, calling Poston names and saying that Poston was not from the neighborhood.  Poston walked away from McNeely and Bailey saw the handle of a gun in McNeely's inside jacket pocket when he opened his jacket, which he did three or more times.  McNeely threw down a cup he was carrying and said he was going to slap Poston. When McNeely raised his hand and gave Poston "a serious slap," Bailey jumped out of the car and ran inside the store because she did not know whether McNeely was going to shoot them.  After she heard the shots, she exited the store and drove away.  She did not look for Poston that night but saw him the next day.  At some point between the shooting and his arrest, Poston went to Los Angeles on business.  After his arrest, she visited and spoke to him on the phone, but they did not talk about the shooting.

### d.    Impeachment Evidence Relating to Pimping and Prostitution

At various points, the prosecution presented certain statements that Poston had made during recorded telephone calls from jail.  In these statements, Poston referred to women as "hoes" and "bitches" and suggested that he was engaged in pimping.

As discussed in more detail below, under California law, evidence of a conviction or uncharged conduct showing moral turpitude is admissible for impeachment of credibility purposes, subject to the trial court's discretion under California Evidence Code section 352.  People v. Clark, 52 Cal. 4th 856, 931 (2011).  Over Poston's objection, see

United States District Court
Northern District of California

Trial Tr. Vol. 5 (dkt. 24) at 185; Trial Tr. Vol. 8 (dkt. 24-1) at 399–400,[4] the trial court admitted the following statements as impeachment evidence:

(1)  In a June 19, 2013, call to an unknown male, Poston talked about his "bitches," his "ho-bo", and his "ho[e]-bitch," and complained that he had "just paid the bitch phone bill" but he wanted "the bitch to pay [his] way." He said that he only wanted one friend to have his "bitch" because "that's the only n— gonna make sure I'm eating" instead of just "fuck[ing] on the bitch." He continued, "I ain't never been too proud to beg from a bitch in my life, Robbie . . . . That's why I got plenty of 'em. 'Cause when it's time like this, you need a bitch to beg off. . . . All my ho[e]-bos, all my baby mamas, I'm finna call my one baby mama right now."

(2)  In a June 22, 2013, recorded phone call to an unknown male, Poston said that he had asked Bailey what she was doing and she said she was sitting on the bed. Poston said, "That's not gonna get us any money! You gotta, you gotta get up and get in the streets, bro. You gotta hit a fucking corner."

(3)  In an August 19, 2013, phone call to his mother, Poston said Bailey would do whatever he told her to do. When his mother expressed concern about Bailey's reliability, he responded, "This is my bitch, mommy. . . . My bitch, mommy. Listen to me . . . she ain't gonna do nothing. . . . You ain't hearing me out, though. Listen to me, 'cause you not. I'm the one fucking her, mommy. Listen. She gonna do what I tell her, ma. You're not hearing me. You gotta hear what I'm saying. You gotta hear your, your son, mommy. Honest to God. She know I had prostitutes. She know I got all that. She don't wanna lose her place. Feel me?" Poston again told his mother that Bailey would do what he told her to do, otherwise he would "call her 52 bitches. And bitch, if you don't want to, you could leave. I tell her that all the time. She's like, 'why do you tell me that.' Because I got another bitch. I don't even need you like that, you feel me? So it ain't even like that. Sharan gonna step up if she won't." Poston's mother advised him to "reverse [his] whole attitude about this aggressiveness" and stop calling Bailey a "bitch." Poston told her that Bailey was his "bitch" and Sharan was his woman.

(4)  In an August 21, 2013, call to his mother, Poston complained that someone had taken his clothes from his house, including the suit he planned to wear for his trial. He said that he had been "on the run" and did not have money

---

[4] The prosecution argued that the evidence was relevant to (i) Poston's credibility because it showed conduct involving moral turpitude and (ii) Bailey's credibility because it showed her relationship with Poston, who had "told her to get out there and make some money." Trial Tr. Vol. 8 at 400.

for bills even though he still had a prostitute.

(5)     In portions of a letter to his brother, Poston made comments about "hoes" and prostitutes, and wrote: "That last weed I gave you came from out a ho ass. She turned a date for two zips and a hundred dollars." The woman Poston was referring to was Brianna Howard, who was with him when he was arrested for the crimes in this case.

(6)     In a June 16, 2013, phone call, Poston talked about getting his "ho-bitch" "back to L.A." and indicated that she earned "a thousand here, a thousand there."

(7)     In a phone call on June 22, 2013, Bailey asked Poston why he was still trying to "hold onto" another woman and he responded, "Hold onto her, bitch, I ain't holding onto nothing except my mother-fucking pocketbook. What you talking about?" When Bailey suggested he didn't need the woman's phone number, Poston said, "Yeah, bitch, because I need all she got to offer me. What you mean? That bitch socking it to my pocket like the Chinese stock market, bitch."

### e.     Oakland Police Department Lieutenant Tony Jones' Testimony

Oakland Police Department Lieutenant Tony Jones testified for the prosecution as a rebuttal witness. See Trial Tr. Vol. 19 at 1799–1828. Jones described his familiarity with crime and street terminology in Oakland. See id. at 1800–07. He testified that "Sem City" (a term used by Poston) was a nickname used for the Seminary neighborhood by people involved in drug dealing. Jones explained that in Oakland, gangs are defined by "neighborhoods," or "where a person is from." Id. at 1807. In the world portrayed in some of Poston's YouTube videos, it would have been insulting for someone to tell Poston that he was not from Seminary. "Because that's where he's from, that's where he clearly takes pride in being from Seminary. And for someone to say that you ain't from Seminary, it's disrespectful and insulting." Id. at 1814. Had Poston walked away from an encounter where someone had made such an accusation, Poston would have been viewed as a "punk." Id. According to the rules of the streets in Oakland, a man who is disrespected in front of his girlfriend would lose credibility if he just walked away. Id. at 1821. The prosecution asked Jones to interpret various out-of-court statements made by Poston. See

14

United States District Court
Northern District of California

id. at 1818–20.  For example, Jones testified that when Poston wrote in rap lyrics that "you got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a n— and get away with it," Poston meant "you got to be high or crazy to think that you can punch me and get away with it."  Id. at 1818.  On cross-examination, Poston's trial counsel suggested that the word "fire" more commonly refers "to shooting a weapon," but Jones said that he thought it meant to "punch somebody," but that it could "depend[] on the context."  Id. at 1826–27.

### 6.    Closing Arguments

During the prosecution's closing argument, a prosecutor stated to the jury that "[i]f you carry a gun, it's because you're prepared to use it.  If you pull a gun, it's because you're prepared to fire it.  And if you fire a gun, it's because you intend to kill."  Trial Tr. Vol. 20 (dkt. 24-9) at 1962.

> You know, this world is a world that I would hope and imagine is unfamiliar to all of you.  It's a world that you've gotten a glimpse of, but it's a world that you heard yesterday from Lieutenant Jones, now they're not playing by any rules.  But there are some things that are expected.  Both of them were a part of this world.  Both of them went to this gas station that is known for crime, it's known for shootings, it's known for murders. . . . Mr. Poston clearly is in this world, a self-professed person who promotes his videos and whatnot.  Both of them knew they couldn't walk away.  That's just not how it happens.  That's not how you walk away and save face and have any respect.  But these days, they don't settle disputes with fists, they settle them with guns. . . . That's what it's like on the streets of Oakland now.  You've got all these little guys running around, but they're all armed making them feel like big men.  And that's what happened in this case.  These guys were going to shoot it out, and that—and who cares about who is left in their wake?  Who cares what innocent people are in the way?

Id. at 1966–67.  The prosecutor also argued:

> You have heard a lot of our evidence about Mr. Poston and his world.  You heard a lot of jail calls where he is not speaking in the same calm, controlled manner that he's speaking here in court.  And that's why you heard the other jail call, where he's talking about the fact that he needs to paint a different portrait for you and put on a performance.  Because if you see the real him, you'll know the verdict that is required.

Trial Tr. Vol. 20 at 1971.  The prosecutor went on to say that Poston could have walked away: "maybe that's not cool in his world, maybe he would be a punk at that point.  But the situation ended with an innocent man being killed, for no reason.  This was over respect and nothing else."  Id. at 1971.  The prosecutor added that "the only rap that [Poston] wrote regarding this incident was boastful.  It was bragging."  Id. at 1972.

The prosecutor stated that Poston's attitude was that "[n]obody is going to disrespect me and get away with it."  Id. at 1897.  The prosecutor contrasted that with the attitude of "law-abiding citizens," who "don't go into an altercation with someone with the state of mind of, [d]isrespect me and you're going to find yourself six feet under."  Id. (internal quotation marks omitted).  The prosecution stated that Poston "escalated this situation into deadly force," "got [Bailey] to lie about . . . seeing the gun," "contrived [his] defense," "fled the scene," "said repeatedly in the jail calls [that] he was on the run," and "dumped the gun."  Id. at 1896, 1898.  The prosecution also argued that, at trial, Poston "was performing, and he was trying to paint a portrait of himself that's different than the portrait that you've seen in the video, in the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew that you couldn't see that."  Id. at 1899.

More generally, the prosecution argued that McNeely and Poston were both guilty of attempted murder because they had simultaneously formed an intent to kill the other during a mutual argument and had drawn their guns at almost the same time.  The prosecutor argued that Poston did not act in self-defense because he drew his gun first and was not entitled to respond to a fist-fight with deadly force.[5]

### 7.   Relevant Jury Instructions

The trial court instructed the jury at length, but this Court will recap only the instructions that are relevant here.

---

[5] The prosecutor also urged the jury to reject McNeely's claim of self-defense because the surveillance video shows that (1) McNeely began to draw his gun before Poston actually fired, and, perhaps more persuasively, (2) McNeely continued to shoot at Poston when Poston was running away and no longer presented a danger.

The trial court instructed the jury on second degree provocative act murder with respect to Poston.[6] That instruction, which constituted a modified version of CALCRIM No. 560, said:

> Donel Poston is charged in Count 1 with the murder of Lionel Fluker.
>
> A person can be guilty of murder under the provocative act murder doctrine, if he commits a dangerous act that provokes someone else to respond violently and fire a fatal shot. The provocative act murder doctrine focuses on the provocateur's conduct and his knowing his conduct has a high probability of causing a life-threatening response from the person who actually fires the fatal bullet.
>
> The elements of provocative act murder are more fully explained below.
>
> To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that:
>
>   1. Donel Poston intentionally committed a provocative act;
>   2. Poston knew that the natural and probable consequences of the provocative act were dangerous to human life, and then acted with conscious disregard for human life;
>   3. In response to Poston's provocative act, McNeely killed Lionel Fluker; AND
>   4. Lionel Fluker's death was a natural and probable consequence of Poston's provocative act.
>
> A provocative act is an act:
>
>   1. That goes beyond what is necessary to accomplish the crime; AND
>   2. Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.
>
> In order to prove that Lionel Fluker's death was the natural and probable consequence of the defendant's provocative act, the People must prove that:
>
>   1. A reasonable person in Donel Poston's position would have foreseen that there was a high probability that his act would begin

---

[6] The jury was instructed on second degree murder under theories of implied malice and transferred intent with respect to McNeely.

a chain of events resulting in someone's death;

2. Donel Poston's act was a direct and substantial factor in causing Lionel Fluker's death; AND

3. Lionel Fluker's death would not have happened if the defendant had not committed the provocative act.

A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that caused the death.

A defendant is not guilty of murder under the provocative act doctrine if the killing of Lionel Fluker was caused by the independent criminal act of someone else.  An independent criminal act is a free, deliberate, and informed criminal act by a person who is not acting with the defendant.

The People allege that Donel Poston committed the following provocative acts:

-Drawing a loaded .40 caliber semiautomatic gun.
-Shooting Joe McNeely multiple times

You may not find Donel Poston guilty of the murder of Lionel Fluker on the Provocative Act doctrine or theory, unless you all agree that the People have proved Donel Poston committed at least one of the provocative acts, and that in doing so Donel Poston did not act in perfect self-defense or in perfect defense of another.  You do not all have to agree on which provocative act Donel Poston committed.

Trial Tr. Vol. 20 at 2007–09.

The jury also received instructions on causation:

An act causes injury or death if the injury or death is the direct, natural and probable consequence of the act, and the injury or death would not have happened without the act.

A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.

In deciding whether a consequence is natural and probable, consider the circumstances established by the evidence.

There may be more than one cause of a crime, even a homicide.  When the conduct of two or more persons contributes concurrently as a cause of a homicide, the conduct of each is a cause of the homicide if that conduct was also a substantial factor in contributing to the result.

18

> A cause is concurrent if it was operative at the moment of the homicide and acted with another cause to produce the homicide.
>
> If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person contributed to the death.

Id. at 1989–90.

The trial court also instructed the jury on self-defense, including by explaining that Poston acted in lawful self-defense if:

> 1. The defendant reasonably believed that he or another was in imminent danger of being killed or suffering great bodily injury;
> 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend himself or another against that danger; and
> 3. The defendant used no more force than was reasonably necessary to defend himself or another against that danger.

See id. at 2003–04.

At the request of both the prosecution and McNeely, the trial court also instructed the jury on how "mutual combat" may affect a claim of self-defense, using CALCRIM No. 3471:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
>
> > 1. He actually and in good faith tried to stop fighting;
> > 2. He indicated by word or conduct to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting, and that he had stopped fighting; and
> > 3. He gave his opponent a chance to stop fighting.
>
> If the defendant meets these requirements, then he had a right to self-defense if the opponent continued to fight.
>
> However, if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop the fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

United States District Court
Northern District of California

> A fight is mutual combat when it began or continued by mutual consent or agreement.  The agreement may be expressly stated or implied and must occur before the claim to self-defense.

Id. at 2001–02.

The trial court further instructed the jury that a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion," and elaborated regarding circumstances that count as a sudden quarrel or heat of passion.  Id. at 2009–10.  And the trial court similarly instructed the jury that a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense."  Id. at 2011.  The court explained that a defendant acts in imperfect self-defense if:

1. The defendant actually believed that he or another were in imminent danger of being killed or suffering great bodily injury; and
2. The defendant actually believed that the immediate use of deadly force was necessary to defend against that danger, but
3. At least one of those two beliefs was unreasonable.

Id.[7]

As relevant to the impeachment evidence pertaining to Poston's pimping, the trial court instructed that if the jury found "that a witness has been convicted of a felony, or committed other misconduct," the jury could "consider that fact only in evaluating the credibility of the witness's testimony," but cautioned that "misconduct does not necessarily destroy or impair a witness's credibility," consistent with CALCRIM No. 316.  Id. at 1994; Clerk's Tr. Vol. 6 (dkt. 21-2) at 1467.43.

### 8. Verdict and Sentence

After the jury convicted both Poston and McNeely of the second degree murder of Fluker, the attempted murder of each other, and firearm possession by a felon, the trial court sentenced each of them to 72 years to life in prison.[8]

---

[7] The record contains the trial court's full instructions.  See Trial Tr. (dkt. 24-9) at 1980–2028.
[8] 15 years to life for second degree murder with a 25-year-to-life firearm enhancement, plus a consecutive 7 years for attempted murder with a 25-year-to-life firearm enhancement.  The trial court stayed Poston and McNeely's sentences for their felon-in-possession convictions.  Trial Tr. Vol. 21 (dkt. 24-9) at 29.

1

2

**B.     Post-Trial Procedural History**

       **1.     Direct Appeal to the California Court of Appeal and California Supreme Court**

3     Poston appealed his convictions on numerous grounds.  See McNeely, 2017 WL

4 65832, at *1.  He argued that

5

6

7

8

9

10

11

12

    (1) the trial court should have granted his motion to sever [his trial from McNeely's]; (2) the evidence was insufficient to support his convictions for murder and attempted murder; (3) the trial court erred by admitting highly prejudicial evidence of [Poston's] involvement in pimping and prostitution to impeach his credibility; (4) the trial court should not have given [jury instruction] CALCRIM No. 3471 regarding the effect of mutual combat on a self-defense claim because it was not supported by the evidence; (5) the trial court should have instructed the jury [that Poston] could not be guilty of murder under a provocative act theory if it found [that] he did not initiate the course of conduct leading to the killing; (6) the prosecutor committed misconduct by appealing to the jurors' emotions, racial bias and fear of street violence; and (7) cumulative error and prejudice require[d] reversal of the judgment.

13 Id.

14     On January 6, 2017, the Court of Appeal rejected these arguments and affirmed.

15 See id.  This Court describes the Court of Appeal's reasoning below.  Poston filed a

16 petition for review with the Supreme Court of California, see Review Pet. 1 (dkt. 25-6, Ex.

17 12), which summarily denied the petition on March 29, 2017, see Order Den. Review Pet.

18 1 (dkt. 25-6, Ex. 13).

19

       **2.     State Postconviction Proceedings**

20     While Poston's direct appeal was pending before the Court of Appeal, he petitioned

21 the Court of Appeal for a writ of habeas corpus.  See State Habeas Pet. (dkt. 25-6, Ex. 14)

22 at 12.

23     Poston's state habeas petition primarily argued that Poston had been denied due

24 process and the effective assistance of counsel in violation of the Sixth and Fourteenth

25 Amendments.  He asserted claims based on his trial counsel's failure to (1) object to

26 "pervasive prosecutorial misconduct," (2) object to or request modification of the mutual

27 combat jury instruction, (3) "adequately prepare" Poston to testify and adequately

28

"rehabilitate" Poston on redirect examination, (4) investigate and present corroborating evidence, (5) investigate and present expert testimony about "African American Vernacular English," and (6) investigate and present expert testimony about "African American culture." State Habeas Pet. at 73–100. Poston also asserted one claim based on (7) the prosecution's failure to disclose material evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and another claim asserting that (8) "cumulative prejudice" violated his due process rights. <u>Id.</u> at 101, 104. This Court describes these claims and Poston's supporting arguments in more detail below.

On January 6, 2017—the same day that the Court of Appeal affirmed Poston's convictions on direct appeal—the Court of Appeal summarily denied Poston's state habeas petition. <u>See</u> Order Den. State Habeas Pet. (dkt. 25-7, Ex. 17).

Poston filed a petition for review of that decision with the Supreme Court of California. <u>See</u> Review Pet. 2 (dkt. 25-7, Ex. 18). On March 29, 2017, the Supreme Court of California summarily denied that petition for review as well. <u>See</u> Order Den. Review Pet. 2 (dkt. 25-7, Ex. 19).

### 3.    Federal Habeas Petition (The Instant Petition)

On June 11, 2018, Poston petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. <u>See</u> Habeas Pet. (dkt. 1). Poston's federal habeas petition asserts all of the claims that Poston raised on direct appeal and in his California habeas petition. <u>See id.</u> On October 11, 2018, this Court appointed counsel and ordered M. Eliot Spearman, then warden of Poston's facility, to show cause why a writ of habeas corpus should not be granted. <u>See</u> OSC (dkt. 9) at 3. After several stays and filing extensions, acting warden (and now-Respondent) Jason Pickett has filed an Answer (dkt. 20), and Poston has filed a Traverse (dkt. 34). On July 28, 2021, the Court ordered limited discovery and supplemental briefing relevant to Poston's <u>Brady</u> claim. <u>See</u> Disc. Order (dkt. 35). The parties have now completed that process. <u>See</u> Pet. Supp Br. (dkt. 44); Resp. Supp. Br. (dkt. 45).

## II.    LEGAL STANDARD

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91 (2011).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If a petition for a writ of habeas corpus contains some claims that have been exhausted in state courts, but other claims that have not, the petition does not satisfy § 2254(b)(1)'s "total-exhaustion requirement." Dixon v. Baker, 847 F.3d 714, 719 (9th Cir. 2017).[9]

For properly exhausted claims, "the availability of federal habeas relief is limited with respect to claims previously adjudicated on the merits in state-court proceedings." Harrington, 562 U.S. at 92 (internal quotation marks omitted).  Section 2254(d) establishes that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> > (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Thus, "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Greene v. Fisher, 565 U.S. 34, 38 (2011) (quotation omitted).  When a federal court considers a state

---

[9] This exhaustion requirement may also be satisfied if "there is an absence of available State corrective process" or if "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. §§ 2254(b)(1)(B)(i)–(ii).

United States District Court
Northern District of California

prisoner's application for a writ of habeas corpus, the federal court does not ask whether the trial court erred, or even whether the state's appellate courts erred on direct review or when considering claims for postconviction relief.  See Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  Id.  Along the same lines, federal courts must "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"  Id. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

Section 2254(d) applies in the same manner "even where there has been a summary denial."  Cullen v. Pinholster, 563 U.S. 170, 187 (2011).  Thus, when a defendant raises claims in state postconviction proceedings and state courts deny those claims without explanation, the claims have nonetheless been "adjudicated on the merits" for purposes of § 2254(d).  See id.  When a federal court considers those same claims, it "must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court.  Id. at 188 (quoting Harrington, 562 U.S. at 102) (alterations omitted).

## III.   DISCUSSION

Poston raises 14 claims for relief of varying plausibility and complexity.  The Court concludes that the California courts' rejection of Poston's claims was not contrary to, and did not involve an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court.  The Court also concludes that the California courts' rejection of those claims was not based on an unreasonable determination of any facts.  And any claims that are arguably not subject to AEDPA's deferential standard of review fail regardless. Therefore, the Court must deny Poston's federal habeas petition.

### A.    Exhaustion

Before the Court turns to Poston's specific claims, it must ensure that Poston has

satisfied AEDPA's exhaustion requirement.  See 28 U.S.C. § 2254(b).  In California, when a "defendant raises in a petition for a [state] writ of habeas corpus an issue that was raised and rejected on direct appeal," the California courts have typically "denied the petition summarily."  In re Reno, 283 P.3d 1181, 1219 (Cal. 2012) (quotation omitted).  "[B]ecause the issue was previously raised and rejected on direct appeal," so long as "the petitioner does not allege sufficient justification for the issue's renewal on habeas corpus, the issue is procedurally barred from being raised again."  Id. (quotation omitted).  There are exceptions to this rule, including "where the issue" involves a "clear and fundamental" constitutional error that "strikes at the heart of the trial process."  Id. at 1220 (quotation omitted).

Poston unsuccessfully brought numerous claims on direct appeal.  He was not required to assert those same claims in California postconviction proceedings because those claims were procedurally barred.  And Poston asserted all other claims that he presents here in California postconviction proceedings.  Therefore, Poston has satisfied AEDPA's total exhaustion requirement.  See Dixon, 847 F.3d at 719.  Respondent does not argue to the contrary.  The Court thus turns to Poston's claims.

## B.    Sufficiency of the Evidence (Claim 1)

The Court of Appeal held that the jury's verdict was supported by substantial evidence—that is, a "rational trier of fact" could have found Poston "guilty beyond a reasonable doubt."  McNeely, 2017 WL 65832, at *11.  This Court concludes that the Court of Appeal's rejection of Poston's sufficiency of the evidence claim was not inconsistent with any clearly established U.S. Supreme Court precedent.

### 1.    The Court of Appeal's Reasoning

The Court of Appeal explained that it had to determine whether, "on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt."  Id.  "That the evidence might be reasonably reconciled with a contrary result [did] not warrant a reversal of the judgment."  Id.  Thus, the question was "whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable

1  doubt." Id. (quoting People v. Mincey, 827 P.2d 388, 402 (Cal. 1992)).

2        The Court of Appeal first applied that standard to Poston's attempted murder

3  conviction, which Poston argued could "not stand because there was no substantial

4  evidence he was not acting in self-defense." Id.  In other words, Poston argued that any

5  rational factfinder would conclude that Poston had acted in self-defense.  Based on the

6  surveillance video, the Court of Appeal held that the jury "could have concluded that from

7  Poston's perspective at the time he pulled his gun from his waist and began to shoot,

8  McNeely had done no more than hit and trip Poston after a verbal argument." Id.

9  (emphasis in original).  Because "deadly force in response to simple assault is excessive,"

10  a rational factfinder could have concluded that Poston did not act in self-defense.  Id.

11  (citing People v. Quach, 116 Cal. App. 4th 294, 301–02 (2004)).  The jury could have

12  rejected Poston's testimony that he had seen McNeely's gun and feared for his life when

13  he saw McNeely reach inside his jacket after hitting him—the jury could have instead

14  concluded that "Poston either did not know McNeely was armed, or shot him not because

15  he was afraid for his life, but because he was angry about being hit and tripped." Id. at

16  *12.  Because at least "some of the evidence" tended to "show a situation in which a

17  killing may not be justified," the self-defense question was "for the jury to determine."  Id.

18        The Court of Appeal then rejected Poston's argument that Poston was guilty of "no

19  greater than attempted voluntary manslaughter" because Poston's belief in his need to

20  defend against imminent death or great bodily injury was "honest but unreasonable." Id.

21  The Court of Appeal noted that the jury implicitly concluded otherwise, and that even if

22  the evidence could support the view that Poston had an honest but unreasonable fear, the

23  evidence could also support the contrary view that Poston had no such fear and was

24  motivated by anger or pride.  See id.

25        Next, the Court of Appeal held that the jury could have rationally concluded that

26  Poston did not act in the heat of passion.  See id. at *13.  The Court of Appeal noted that

27  Poston "did not claim to have shot McNeely on a sudden quarrel or a heat of passion;

28  rather, his defense was self-defense."  Id.  But even if Poston had presented a heat of

United States District Court
Northern District of California

26

passion theory to the jury, the jury "could have reasonably concluded that Poston's reason was not, in fact, obscured by passion." <u>Id.</u>  The jury implicitly rejected Poston's claim of self-defense, and there was "no direct testimonial evidence from [Poston] to support an inference that he <u>subjectively</u> harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." <u>Id.</u> (quoting <u>People v. Moye</u>, 213 P.3d 652, 665 (Cal. 2009)) (emphasis in original).

Finally, the Court of Appeal held that the jury could have rationally convicted Poston of provocative-act second degree murder because the evidence supported a finding that Poston's actions proximately caused Fluker's death. <u>Id.</u>  The Court of Appeal explained that "[a] typical scenario for a provocative act murder is when the defendant instigates a gun battle, causing the victim . . . to shoot back and mistakenly hit . . . an innocent bystander." <u>Id.</u>  The Court of Appeal then held that a rational factfinder could have concluded that Poston and McNeely "engaged in a mutual gun battle," such that Poston's actions could be considered a "substantial concurrent, and hence proximate, cause of the bystander's death." <u>Id.</u> at *14 (quotation omitted).  The Court of Appeal also noted that because McNeely and Poston were convicted of second degree murder, there was "no finding of premeditation by McNeely that would act as an independent superseding cause" and thus defeat proximate cause as to Poston "as a matter of law." <u>Id.</u>  In sum, "[t]he jury could reasonably have concluded [that] McNeely was the victim of an attempted murder by Poston, and that McNeely's use of force," while not reasonable self-defense, "was a natural and probable consequence of Poston's act of shooting at him ten times with a semiautomatic weapon." <u>Id.</u>

The Court of Appeal concluded its sufficiency of the evidence analysis by emphasizing that the jury was "fully instructed" on theories of self-defense, imperfect self-defense, heat of passion, and provocative act murder. <u>Id.</u> at *15.  "That a jury could have reasonably found Poston to be not guilty or guilty only of lesser crimes does not render the evidence insufficient to support his convictions." <u>Id.</u>

### 2.      Analysis

The Court of Appeal's denial of Poston's sufficiency of the evidence claim was not contrary to, and did not involve an unreasonable application of, U.S. Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1).

The parties agree that the relevant Supreme Court decision is Jackson v. Virginia, 443 U.S. 307 (1979).  See Answer at 10; Traverse at 50.  Jackson recited a familiar rule: "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."  443 U.S. at 309.  When reviewing "the sufficiency of the evidence to support a criminal conviction," then, courts must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Id. at 318.  The Court does not ask itself whether the evidence established guilt beyond a reasonable doubt.  Id. at 318–19.  "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (emphasis in original).

For this Court's purposes, the standard is even more deferential.  "Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam).  First, as discussed above, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Id. (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)).  Second, "on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable."  Coleman, 566 U.S. at 651 (quotations omitted).  The federal court looks to state law "to establish the elements" of the relevant offense, then "turns to the federal question" whether the state court was "objectively unreasonable" in concluding that there was sufficient evidence.  Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018).

The question here is not whether the evidence established that Poston was guilty beyond a reasonable doubt.  Nor is the question whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded that Poston was guilty beyond a reasonable doubt.  Instead, under the doubly-deferential standard, the question is whether the Court of Appeal was objectively unreasonable in concluding that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that Poston was guilty beyond a reasonable doubt.  See Coleman, 566 U.S. at 651.

Poston's claims fail under this highly deferential standard.

### a.    Self-Defense

As the Court of Appeal explained, a rational factfinder could conclude, based on the surveillance video, that Poston did not act in self-defense because he responded to non-deadly force with deadly force by reaching for his weapon before McNeely reached for his, then shooting McNeely while McNeely reached for his.

The record undermines Poston's argument that no rational factfinder "could have found proof beyond a reasonable doubt that Poston did not act in self-defense."  Traverse at 53.  To be sure, McNeely was the initial "aggressor" in the confrontation.  Id.  But otherwise, Poston's argument relies on inferences that favor him and ignores reasonable inferences that do not.  See Traverse at 54–56.  For example, Poston argues that any rational juror would conclude that Poston reasonably believed he was in imminent danger of being killed because McNeely not only was the aggressor, but also was armed and had a firearm or firearm magazine in his hand before Poston fired.  Id.  Plus, Poston had previously been shot and had little time to think.  Id. at 54–56.  But this chain of reasoning ignores obvious alternative explanations.  McNeely initiated the confrontation but not with deadly force, suggesting that he did not (at that point) intend to kill Poston.  A rational factfinder, viewing the surveillance footage, could conclude that after being slapped, but before McNeely reached for his weapon, Poston immediately reached for his firearm, whirled to point it at McNeely, and then shot McNeely as McNeely removed his firearm

29

from his jacket.  And a rational factfinder could disbelieve Poston's testimony that Poston knew McNeely was armed.  Because the surveillance video does not indicate whether Poston saw McNeely's firearm before McNeely slapped Poston, this was a question of Poston's credibility.  As discussed in more detail below, a rational factfinder could conclude that Poston's testimony was not credible for numerous reasons.  For example, the surveillance video appeared to contradict Poston's testimony that he looked over his shoulder and saw McNeely reaching for his weapon, that McNeely shot Bailey's Lexus before Poston finished shooting, that Poston stopped shooting once he saw McNeely fall to the ground, and that Poston grabbed his camera, not his gun, after McNeely tripped him.  See Ex. 8; Trial Tr. Vol. 18 at 1545–46, 1561–62; Trial Tr. Vol. 19 at 1657, 1733.  These apparent inconsistencies, among others, casted doubt on Poston's veracity.

A rational factfinder could thus conclude that Poston escalated a non-deadly situation into a deadly one, and acted out of anger, pride, or other emotions besides fear.[10] The Court of Appeal's acknowledgment of this plausible interpretation of the evidence was not objectively unreasonable.

Poston's further argument that he indisputably acted in self-defense because no rational factfinder "could have found proof beyond a reasonable doubt that Poston engaged in 'mutual combat'" fares no better.  Traverse at 57.  A finding that Poston engaged in mutual combat was not necessary for Poston's conviction.  As Poston acknowledges, mutual combat can defeat an otherwise valid assertion of self-defense.  See id.  But as this Court has explained, a rational factfinder could have concluded that Poston did not act in self-defense.  Such a factfinder would not need to consider whether Poston engaged in mutual combat, because the factfinder would have already concluded that Poston's self-defense theory failed.

Poston's other self-defense arguments are equally unavailing.  Poston argues that no

---

[10] For substantially the same reasons, a rational factfinder could have concluded that Poston did not shoot McNeely based on imperfect self-defense (i.e., in the honest but unreasonable belief in the need to defend against imminent death or great bodily injury).

rational factfinder "could have found proof beyond a reasonable doubt that Poston shot McNeely out of anger or vanity, rather than fear." Traverse at 61. But, as discussed above, the evidence (and especially the video footage) supports a finding that Poston did not act out of fear for his life, even if other evidence (like Poston's testimony) suggested that he feared for his life. The issue was for the jury. Poston also argues that no rational factfinder "could have found proof beyond a reasonable doubt of malice aforethought based on Poston's flight." Traverse at 69. Whether or not that is true, it makes no difference. A rational factfinder could have found proof of malice aforethought based on Poston's actions before fleeing—namely his decision to shoot at McNeely immediately after being slapped.

In sum, the Court of Appeal had ample reason to decide that a reasonable factfinder could conclude that Poston did not act in self-defense. The Court of Appeal did not unreasonably apply <u>Jackson</u> or any other clearly established Supreme Court precedent.

### b. Heat of Passion

Poston argues that no rational factfinder "could have found proof beyond a reasonable doubt that Poston did not act in the heat of passion on adequate provocation." Traverse at 72. One problem with Poston's argument is that neither Poston nor his trial counsel said anything pertaining to a heat of passion defense at trial, as the Court of Appeal recognized. <u>See</u> <u>McNeely</u>, 2017 WL 65832, at *13 ("Poston did not claim to have shot McNeely in a sudden quarrel or heat of passion."). Indeed, Poston's self-defense argument was in tension with any heat of passion theory, which may explain why Poston's trial counsel did not argue that Poston acted in the heat of passion. <u>See</u> <u>id.</u> Poston testified that he reached for his firearm because he saw McNeely reach for his, arguably implying that Poston was not acting out of passion. <u>Id.</u> at *5. And the jury's rejection of Poston's self-defense theory does not mean that the jury was required to reject Poston's implication that he was thinking clearly. The jury could have accepted that Poston was thinking clearly while rejecting Poston's testimony that he was thinking out of fear rather than anger, pride, or revenge. Therefore, in concluding that a rational juror could find that

"Poston's reason was not, in fact, obscured by passion," the Court of Appeal did not unreasonably apply any clearly established Supreme Court precedent.  Id. at *13.

### c.      Provocative Act Murder

Third, Poston argues that no rational factfinder "could have found proof beyond a reasonable doubt that Poston initiated a chain of events that proximately caused" Fluker's death.  Traverse at 74.  He argues that under the California Supreme Court's decisions explaining the provocative act murder doctrine, Poston could not have committed provocative act murder because he "did not instigate the quarrel . . . .  He did not initiate a gun battle.  He was not the initial aggressor.  Rather, he reacted to McNeely's provocative acts of insulting and yelling at him, punching or slapping and tripping him to the ground, and pulling out a gun."  Id. at 8.  Poston also argues that because "McNeely did not shoot back in self-defense," but rather "intended to exploit the situation and was not acting in concert with Poston," Poston lacks any "criminal responsibility."  Id. at 78–79 (quotation omitted).

Here, the Court must first look to state law "to establish the elements" of provocative act murder.  Johnson, 899 F.3d at 1056 (internal marks omitted).  In doing so, the Court primarily relies on the same California Supreme Court decision as Poston: People v. Cervantes, 26 Cal.4th 860 (2001).

Cervantes explained that in murder cases, "a cause of death . . . is an act or omission that sets in motion a chain of events that produces as a direct, natural, and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur."  26 Cal.4th at 861–62.  Even if there was "another contributing cause," the defendant "may also be criminally liable for a result directly caused by his or her act."  Id. at 862.  The provocative act doctrine has "traditionally been invoked" when "the perpetrator of the underlying crime instigates a gun battle, either by firing first or otherwise engaging in severe, life-threatening and usually gun wielding conduct, and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing . . . an innocent bystander."  Id. at 867.  As that paradigmatic

32

example makes clear, a "self-defensive killing . . . cannot be considered an independent intervening cause for which the defendant is not liable."  Id. at 868 (quotation omitted). On the other hand, non-self-defensive killings are not necessarily independent intervening causes that sever the causal chain.  To the contrary, "in order to be independent, the intervening cause must be unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause."  Id. at 871 (ellipsis in original) (internal marks omitted).  "The free, deliberate, and informed intervention of a second person, who intends to exploit the situation created by the first, but is not acting in concert with him, is normally held to relieve the first actor of criminal responsibility."  Id. (quoting Hart & Honore, Causation in the Law 326 (2d ed. 1985)).

Because this proximate cause standard is not a "bright line" rule, "[o]rdinarily" the provocative act question "will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus."  Id. at 871–72 (quotation omitted).

Cervantes involved such an "extraordinary and abnormal" intervening cause for which "no rational trier of fact could find the needed nexus."  Id.  Cervantes, a Highland Street gang member, insulted a woman at a party.  Id. at 863.  Cisneros, an Ally Boys gang member, confronted Cervantes, drew a gun, and threatened to kill him.  Id.  Cervantes responded by brandishing his own gun.  Id.  Linares, another Ally Boys gang member, attempted to separate Cervantes from Cisneros.  Id.  Cervantes shot Linares through the arm and chest.  "A melee erupted, and gang challenges were exchanged."  Id.  Shortly thereafter, a separate group of Alley Boys loyal to Linares spotted Cabrera, a Highland Street gang member, entering his car and driving away.  Id.  At least five different Alley Boys fired into the car, killing Cabrera.

Those facts compelled the conclusion that Cervantes had not murdered Cabrera under a provocative act theory.  Id. at 872.  The scenario was unusual for several reasons. Cervantes did not initiate the relevant confrontation: another man confronted him, pulled out his weapon, and threatened him.  Id. at 872, n.12.  And there was "no direct evidence"

33

United States District Court
Northern District of California

1    that the people who ultimately killed the victim "were even present at the scene" of

2    Cervantes' purportedly provocative act, or that Cervantes was present where Cabrera was

3    killed.  Id. at 872.  But beyond these unique circumstances, "the critical fact that

4    distinguishe[d]" Cervantes "from other provocative act murder cases" was that the "actual

5    murderers were not responding to [the] defendant's provocative act by shooting back at

6    him or an accomplice."  Id. at 872–73.  The people who shot Cabrera "intended to exploit

7    the situation created by [Cervantes], but were not acting in concert with him."  Id. at 874

8    (cleaned up).  Their murder of Cabrera was "willful and malicious," and was thus "an

9    independent intervening act."  Id.

10          Here, the California courts were not objectively unreasonable in concluding that, as

11   in most cases, the question whether Poston proximately caused Fluker's death was "for the

12   jury."  Id. at 871.  As discussed above, a rational factfinder could have concluded that

13   Poston was not acting in self-defense.  And the jury's implied finding that McNeely did

14   not act in self-defense does not necessarily mean that McNeely's conduct broke the causal

15   chain.  See id.  Although (like Cervantes) Poston did not initiate the confrontation, the

16   similarities between this case and Cervantes end there.  McNeely was present at the scene

17   of the provocative act (Poston's shooting)—indeed, he was the target.  And when McNeely

18   reacted by attempting to shoot back at Poston, he shot Fluker.  The "critical fact" that

19   distinguished Cervantes was that the "actual murderers" were not shooting at the person

20   who provoked them.  Id. at 872–73.  Here, McNeely was shooting at Poston, not merely

21   intending to "exploit the situation [he] created" by willfully and maliciously targeting

22   someone else, somewhere else.  Id. at 874.  Thus, it was for the jury to decide whether

23   McNeely's response was "extraordinary and abnormal" or whether Poston "should have

24   foreseen the possibility" that McNeely would fire back and potentially kill someone.  Id. at

25   871.  The California Courts were not objectively unreasonable in applying that usual rule

26   here.

27                                               *

28          Poston concludes his sufficiency of the evidence claim by invoking the First

34

1    Circuit's rule that

> [i]f the evidence viewed in the light most favorable to the verdict
> gives equal or nearly equal circumstantial support to a theory of guilt
> and a theory of innocence of the crime charged, this court must
> reverse the conviction. This is so because . . . where an equal or nearly
> equal theory of guilt and a theory of innocence is supported by the
> evidence viewed in the light most favorable to the prosecution, a
> reasonable jury <u>must necessarily entertain</u> a reasonable doubt.

<u>O'Laughlin v. O'Brien</u>, 568 F.3d 287, 301 (1st Cir. 2009) (quoting <u>United States v. Flores-Rivera</u>, 56 F.3d 319, 323 (1st Cir. 1995)) (emphasis in original).  And he argues that here, the evidence against self-defense and in favor of provocative act murder was "overly speculative" and "manifestly insufficient."  Traverse at 81.

Assuming that the First Circuit's rule applies here, Poston's argument ignores the rule's first step, which requires the Court to view the evidence in the light most favorable to the prosecution.  <u>See</u> <u>O'Laughlin</u>, 568 F.3d at 301.  When the evidence is viewed in that light, Poston did not act in self-defense or in the heat of passion.  And although he did not instigate the confrontation with McNeely, he escalated it without justification and thereby foreseeably caused Fluker's death.  Once the Court draws these inferences in favor of the prosecution—as it must—Poston's theory of innocence is not "equal or nearly equal" to any theory of guilt.  <u>O'Laughlin</u>, 568 F.3d at 301 (quotation omitted).

\*

In sum, the Court of Appeal's determination that a rational juror could have convicted Poston was not objectively unreasonable.

### C.    Impeachment Evidence (Claim 2)

As discussed above, the trial court admitted Poston's out-of-court statements about pimping and women for impeachment purposes.  <u>See</u> <u>supra</u> part I.A.5.c.  On direct appeal, Poston argued that this evidence "was substantially more prejudicial than probative" and thus "should have been excluded under [California] Evidence Code section 352."  Poston App. Br. (dkt. 25-5 Ex. 8) at 87.  He then argued that the admission of this evidence "requires reversal because it rendered Poston's trial fundamentally unfair in violation of due process and cannot be shown harmless beyond a reasonable doubt."  <u>Id.</u> at 91.

1    The Court of Appeal held that the trial court did not abuse its discretion by

2    admitting Poston's out-of-court statements about pimping and women. McNeely et al,

3    2017 WL 65832, at *17. In doing so, the Court of Appeal did not expressly hold that

4    admission of the evidence comported with Poston's due process rights.

5    This Court concludes that the trial court's admission of the impeachment evidence

6    provides no basis for granting Poston's habeas petition.

7                **1.      The Court of Appeal's Reasoning**

8    The Court of Appeal explained that in California, a witness's credibility "may be

9    impeached by evidence of . . . uncharged conduct showing moral turpitude, subject to the

10    court's exercise of its discretion under Evidence Code Section 352." Id. The Court of

11    Appeal further explained that Poston had acknowledged that "pimping is a crime involving

12    moral turpitude." Id. at *18. "His admissions that he had engaged in this activity were

13    therefore relevant to his credibility as a witness, particularly in light of his testimony [that]

14    he was a legitimate businessman." Id. And because "[s]ome of Poston's statements were

15    made to or about Bailey, whom he called as a witness," those statements "were also

16    relevant to the degree of control he exercised over her" and thus her credibility. Id.

17    The Court of Appeal then analyzed whether the trial court had abused its discretion

18    under section 352 of the California Evidence Code. The Court of Appeal explained that

19    when impeachment evidence of this sort pertains to misconduct "other than a prior

20    conviction," the evidence "may involve problems [of] proof, unfair surprise, and the

21    evaluation of moral turpitude." Id. at *17. And courts "should consider with particular

22    care whether the admission of [such impeachment] evidence might involve . . . prejudice

23    which outweighs its probative value." Id. That said, "[b]ecause the court's discretion to

24    admit or exclude impeachment evidence is as broad as necessary to deal with the great

25    variety of factual situations in which the issue arises, a reviewing court ordinarily will

26    uphold the trial court's exercise of discretion." Id. (quotation omitted). Here, there were

27    "no issues of proof or unfair surprise because the pimping evidence came from Poston's

28    own words." Id. at *18. Further, "[t]he evidence was not unduly time consuming,

particularly when considering the importance of Poston's credibility to the issues in the case." <u>Id.</u>  And the Court of Appeal assumed that the jury followed the trial court's instruction to consider the evidence only for impeachment purposes.  <u>See</u> <u>id.</u>

### 2.   Analysis

Poston's evidentiary challenge proceeds in several steps.  First, he argues that AEDPA's deferential standard does not apply because the California Court of Appeal did not address Poston's argument that admission of this impeachment evidence violated his right to due process under the U.S. Constitution (i.e., federal law).  <u>See</u> Traverse at 83. Poston also argues that deference is inappropriate because the Court of Appeal's decision was based on an unreasonable factual determination that the statements were relevant to Poston's credibility.  <u>See</u> <u>id.</u> at 85.  Next, Poston argues that because (i) there was insufficient evidence that Poston had actually engaged in pimping, and (ii) Poston's statements were not probative of his or Bailey's credibility, "their admission rendered the trial fundamentally unfair in violation of due process." <u>Id.</u> at 88.  Finally, Poston contends that admitting this evidence likely affected the jury's verdict.  <u>Id.</u> at 89.

### a.   AEDPA Deference

As Poston points out, in explaining that the impeachment evidence was admissible under California law, the Court of Appeal failed to expressly hold that admission of the evidence comported with Poston's federal due process rights.  The Court thus assumes that § 2254(d)'s deferential standard is inapplicable to Poston's federal due process claim.

### b.   Legal Standard

Nonetheless, this Court must review California's application of its evidentiary rules—an issue of state law—with significant deference, even when answering the question whether application of those rules violated Poston's federal due process rights. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991).  And "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." <u>Boyde v. Brown</u>, 404 F.3d 1159, 1172 (9th Cir. 2005).  Although courts may

37

ask whether the application of a state's evidentiary rule "pose[s] a sufficient danger of unfairness to the defendant to offend the Due Process Clause," the Due Process Clause "does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983). And when potentially prejudicial evidence is admitted under a state evidentiary rule, the Due Process analysis must account for any "instructions limiting the jury's use" of the evidence to proper purposes. Id.; see also Boyde, 404 F.3d at 1172 (explaining that "evidence introduced by the prosecution will often raise more than one inference, some permissible, some not" and that "we must rely on the jury to sort the inferences out in light of the court's instructions") (quotation and alteration omitted).

### c.    Analysis

The admission of this impeachment evidence did not violate Poston's federal constitutional right to due process.

This Court may not "reexamine" the Court of Appeal's determination that the trial court did not err in admitting the evidence under California law. Estelle, 502 U.S. at 67–68. In California, "[a] witness may be impeached with any prior conduct involving moral turpitude, whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." People v. Clark, 52 Cal. 4th 856, 931 (2011). And in California, pimping constitutes conduct involving moral turpitude. People v. Jaimez, 184 Cal.App.3d 146, 150 (Ct. App. 1986). Under section 352, the trial "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

> [B]ecause such misconduct other than a prior conviction . . . generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude . . . courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.

United States District Court
Northern District of California

Clark, 52 Cal.4th at 931–32 (quotation and citation omitted).  Whether the trial court and the Court of Appeal correctly applied these rules is a state law question.[11]

The Court thus turns to the question whether this application of California's evidentiary rules violated the Due Process Clause, bearing in mind that the Due Process Clause does not permit the Court "to engage in a finely-tuned review of the wisdom of state evidentiary rules."  Lonberger, 459 U.S. at 438 n.6.  Here, the impeachment evidence may have posed some danger of unfairness to Poston.  After all, the evidence made Poston look like a criminal who disrespected women, and some of the evidence was arguably cumulative.  That said, under California's rule that conduct involving moral turpitude is relevant to credibility, the admission of this evidence was not so extreme as to violate Poston's right to due process.  And evidence about Poston's control over Bailey was plainly relevant to her credibility as a witness.  In these circumstances, the Court is unable to conclude that the trial court's admission of this evidence was so flagrant as to violate due process.

### D.    Mutual Combat Instruction (Claim 3)

As discussed above, at the prosecution and McNeely's request, the trial court instructed the jury regarding how "mutual combat" may affect a claim of self-defense, using CALCRIM No. 3471:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
>
> 1.  He actually and in good faith tried to stop fighting;
> 2.  He indicated by word or conduct to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
> 3.  He gave his opponent a chance to stop fighting.
>
> If the defendant meets these requirements, then he had a right to self-defense

---

[11] For the same reason, this Court will not second-guess the California courts' determination that the statements about pimping were relevant to Poston's credibility.  In California, as a matter of law, they were.  The Court notes that Poston appeared to admit to engaging in pimping while testifying.  See Trial Tr. Vol. 19 (dkt. 24-8) at 1678.

United States District Court
Northern District of California

if the opponent continued to fight.

However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop the fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

A fight is [mutual] combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense.

Trial Tr. Vol. 20 at 2001–02.

Poston argues that this instruction violated "his constitutional rights to [a] jury trial, to due process, and to present a defense."  Traverse at 90.

### 1.    The Court of Appeal's Reasoning

The Court of Appeal expressly rejected Poston's contentions that "the trial court deprived him of due process and interfered with his right to present a defense when it instructed the jury on the theory of mutual combat in connection with self-defense." McNeely, 2017 WL 65832, at *20.

The Court of Appeal explained that in California, the phrase "mutual combat has been judicially construed to mean not merely a reciprocal exchange of blows[,] but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities." Id. at *21 (quotation and emphasis omitted).  Poston did "not suggest" that the instruction "was inaccurate," but argued that "it had no application to his case because there was no substantial evidence he expressly or implicitly agreed to fight with McNeely before the exchange of physical blows and gunshots."  Id.  Poston also argued that "the instruction improperly suggested he did not possess the right to self-defense, even if he reasonably believed his life was in imminent danger when he shot McNeely."  Id.

The Court of Appeal then explained that, assuming "the gunfight cannot be characterized as 'mutual combat' for purposes of assessing Poston's self-defense claim, this would not render [the instruction] erroneous or inapplicable."  Id.  "The version of the

1  instruction given in this case limited the self-defense claims of a person who either

2  engaged in mutual combat <u>or started a fight</u>."  <u>Id.</u> (quotation omitted) (emphasis in

3  original).  That instruction "was plainly proper and necessary to assess the self-defense

4  claim of McNeely, who had delivered the first, nonlethal blow with his fist before Poston

5  responded with deadly force."  <u>Id.</u>

6       Thus, assuming that the instruction "did not apply to Poston and should have been

7  expressly limited to McNeely, no harm to Poston ensued."  <u>Id.</u>  Although giving a legally

8  correct but irrelevant or inapplicable jury instruction "is error," such an error is "technical"

9  and "does not constitute [a] ground for reversal."  <u>Id.</u> (quotation omitted).  Further, the trial

10  court advised the jury "that depending on what you find the facts of this case are, some of

11  these instructions may not apply."  <u>Id.</u> at *22.  Accordingly, if the trial court erred in

12  giving the instruction, the error was not "prejudicial."  <u>Id.</u>

13            **2.    Analysis**

14       Poston's argument again proceeds in several steps.  First, Poston argues that

15  AEDPA's deferential standard does not apply to this claim because the Court of Appeal

16  did not address whether the instruction violated Poston's federal constitutional rights.  <u>See</u>

17  Traverse at 90–92.  Second, Poston argues that the mutual combat instruction "removed a

18  material factual issue from the jury's determination, lowered the prosecution's burden of

19  proof, and impinged on Poston's defense" of self-defense.  <u>Id.</u> at 93.  According to Poston,

20  the mutual combat instruction "incorrectly suggested that Poston engaged in mutual

21  combat and did not have a right to self-defense if he expressly or implicitly agreed to

22  continue the fight McNeely started, even if [Poston] reasonably believed his life was in

23  imminent danger."  <u>Id.</u> at 94.  Third, Poston argues that because the instruction "supported

24  the prosecutor's misleading argument that it was mutual combat if Poston agreed to a gun

25  battle after McNeely assaulted him . . . the harmlessness of the instructional error is in

26  grave doubt."  <u>Id.</u> at 95.

27            **a.    AEDPA Deference**

28       Contrary to Poston, California's rejection of this claim is entitled to AEDPA

United States District Court
Northern District of California

41

1  deference.  The Court of Appeal expressly rejected Poston's argument that the mutual

2  combat instruction "deprived him of due process and interfered with his right to present a

3  defense," McNeely, 2017 WL 65832, at *20, and thus "adjudicated" Poston's federal

4  claims "on the merits."[12]

<strong>b.      Legal Standard</strong>

6         This Court can grant Poston's claim for relief only if an erroneous jury instruction

7  "infected the entire trial" such that Poston's conviction "violates due process" based on a

8  reasonable likelihood that the jury misapplied the instructions.  Estelle v. McGuire, 502

9  U.S. at 72.

<strong>c.      Analysis</strong>

11        Under the applicable deferential standard, the Court of Appeal's holding regarding

12  the mutual combat instruction was not objectively unreasonable or based on an

13  unreasonable determination of the facts.  Indeed, this Court agrees with the Court of

14  Appeal that any failure to modify the instruction or limit the instruction to McNeely was

15  harmless.  As discussed above, the surveillance video footage supports a finding that

16  Poston did not act in self-defense because he escalated a non-deadly confrontation into a

17  shootout.  See supra part III.B.2.a.  Thus, the jury likely had no need to consider whether

18  Poston engaged in mutual combat, having already concluded that Poston's self-defense

19  theory failed for other reasons.  Even assuming otherwise, the mutual combat instruction

20  did not imply that Poston lacked a right to self-defense if Poston merely agreed to continue

21  the fight that McNeely started while holding the reasonable belief that "his life was in

22  imminent danger."  Traverse at 94.  To the contrary, the trial court informed the jury that

23  some instructions might not apply to both defendants, see McNeely, 2017 WL 65832, at

United States District Court
Northern District of California

---

[12] The Court of Appeal did not expressly mention Poston's right to a jury trial, but before the
Court of Appeal (and now before this Court), Poston lumped that "jury trial" claim together with
his other federal claims, without meaningfully distinguishing them.  See App. Br. at 96; Traverse
at 93.  The Court of Appeal thus adjudicated and rejected this claim.  The Court notes that the
"jury trial" claim would fail under any standard of review because Poston has cited no authority
for the proposition that giving a jury instruction that is irrelevant to a co-defendant effectively
deprives that co-defendant of his right to a jury trial.

*20, and the instruction clarified that an agreement to continue fighting constitutes mutual combat only if the agreement "occur[s] <u>before</u> the claim to self-defense," Trial Tr. Vol. 20 at 2002.  Thus, the instruction did not foreclose the jury from finding (i) that Poston drew his weapon in self-defense at the same time or before he formed any agreement to continue fighting, or (ii) that Poston never agreed to fight or continue fighting.  Because nothing in the instruction would have led the jury astray, Poston's argument assumes without support that the jury misunderstood and misapplied the provided instruction.  Because there is no reasonable likelihood that this occurred, the Court of Appeal reasonably concluded that any error in failing to limit the instruction to McNeely was harmless.[13]

### E.      Provocative Act Instruction (Claim 4)

As discussed above in detail, the trial court also instructed the jury on provocative act murder.  Before this Court, Poston argues "that the trial court erred prejudicially in omitting [an] instruction on an element of provocative act murder—that the chain of events proximately causing the victim's death must have been initiated by the defendant." Traverse at 96.  Poston argues that this omission violated his "constitutional rights to [a] jury trial, to due process, and to present a defense."  <u>Id.</u>

#### 1.      The Court of Appeal's Reasoning

The Court of Appeal rejected Poston's argument "that a defendant can only be guilty of provocative act murder if he set in motion the chain of events in which the provocative act occurred."  <u>McNeely</u>, 2017 WL 65832, at *19.  The Court of Appeal explained that "traditional notions of concurrence and proximate cause . . . determine whether a killing was the result of a defendant's provocative act."  <u>Id.</u> at *20 (quotation omitted).  Assuming that the provocative act murder doctrine embeds a "notion of equally culpable mental states," such an equal culpability rule "does not establish that a defendant

---

[13] Respondent argues that Poston agreed to combat by declining to leave as the verbal altercation escalated towards an inevitable physical confrontation.  <u>See</u> Answer at 29–30.  Under this theory, even if Poston acted in self-defense when he pulled his gun, Poston had already implicitly consented to combat.  <u>Id.</u>  Because Poston's claim fails regardless, the Court declines to address Respondent's argument.

1   must initiate a course of conduct that ends in the victim's death."  Id.  Poston had not

2   "explained[ed] how the jury instructions should have been modified to encompass the

3   concept of equally culpable mental states," and "[i]n any event, Poston's mental state was

4   not significantly less culpable than McNeely's" because although McNeely "started a

5   verbal argument and hit Poston with his hand, Poston responded by immediately drawing a

6   loaded semiautomatic handgun and shooting McNeely several times."  Id.

        **2.      Analysis**

8        "[A] jury instruction violates due process if it fails to give effect" to the requirement

9   that "the State must prove every element of the offense."  Middleton v. McNeil, 541 U.S.

10  433, 437 (2004).  That said, "not every . . . deficiency in a jury instruction rises to the level

11  of a due process violation."  Id.  Because the Court of Appeal rejected Poston's argument

12  that failure to give his instruction violated his due process rights, the question is whether

13  that rejection was "objectively unreasonable."  Id. at 436 (quoting Yarborough v. Gentry,

14  540 U.S. 1, 5 (2003) (per curiam)).

15      Here, the Court of Appeal's rejection of Poston's argument was not objectively

16  unreasonable in light of any U.S. Supreme Court precedent.  As the Court of Appeal

17  explained, under California law, a defendant need not have initiated the chain of events

18  leading to the murder to be guilty under a provocative act theory.  Poston acknowledges

19  that his proposed rule merely reflects the facts in cases that his counsel "could find," rather

20  than any holding.  See Traverse at 99.  As discussed at length above, Cervantes suggests at

21  most that a person guilty of provocative act murder will often have instigated the initial

22  confrontation, not that this is an element of the offense.  See 26 Cal.4th at 871–73; supra

23  part III.B.2.c.  Therefore, the Court of Appeal did not err (let alone objectively

24  unreasonably apply Middleton) in concluding that Poston was not entitled to this jury

25  instruction.[14]

26  _____

27  [14] The Court of Appeal's decision did not depend on a factual determination of relative culpability.
    See McNeely, 2017 WL 65832, at *20.  But even if it did, the Court of Appeal's determination

28  that Poston "was not significantly less culpable" than McNeely—based on video evidence that
    Poston escalated the confrontation that McNeely started into a shootout—was not objectively

United States District Court
Northern District of California

**F.      Prosecutorial Misconduct (Claim 5)**

Poston argues that "the prosecutor committed pervasive, prejudicial misconduct by appealing to the jurors' emotions, conscious or unconscious racial bias, and fear of random street violence; attacking Poston's character; and misleading the jurors, in violation of due process."  Traverse at 101.

### 1.      The Court of Appeal's Reasoning

The Court of Appeal noted that Poston cited the following actions by the prosecution as misconduct: (1) referring to the charged crimes as a "shoot-out as if it were the wild wild west" during opening statements; (2) suggesting to Poston during cross-examination that he had been practicing his testimony and was presenting a false image by wearing a nice suit; (3) suggesting that his use of African American Vernacular English (AAVE) in his rap lyrics and phone calls and his use of standard English in the courtroom showed he was lying; (4) characterizing Poston as a pimp and a thug; (5) questioning him about and focusing on the content of rap lyrics he wrote in an effort to refute his claim of self-defense; (6) emphasizing offensive language that Poston used during his recorded jail calls; (7) arguing that Poston's flight and statements made during the recorded jail calls showed a consciousness of guilt; and (8) suggesting he had practiced his testimony to project a different persona than the one he assumed in his YouTube videos and in his rap lyrics.  See McNeely, 2017 WL 65832, at *18 n.10.

The Court of Appeal held that Poston forfeited his prosecutorial misconduct claim "by his failure to object" to these actions at trial.  Id. at *18.  The Court of Appeal acknowledged that the requirement to object may not apply "when an objection would have been futile or an admonition would not have cured the harm," but held that Poston had not demonstrated that either was the case here.  Id.

### 2.      Analysis

Poston does not dispute that Poston's prosecutorial misconduct claim was

unreasonable.  Id.

45

procedurally barred on direct appeal because Poston failed to object at trial.[15]   And the parties agree that to present this claim here, Poston must demonstrate "cause and prejudice" or a "miscarriage of justice."  Answer at 43; Traverse at 101.  They also agree that "ineffective assistance of counsel" can constitute cause and prejudice. Answer at 43; Traverse at 101.

In his state and federal habeas petitions, Poston asserts a distinct ineffective assistance of counsel claim based on his trial counsel's failure to object to the prosecution's above-described actions.  See infra part III.H.2.a.  The parties disagree about whether, in the context of evaluating whether Poston has shown cause, prejudice, or a miscarriage of justice based on ineffective assistance of counsel, this Court's analysis should incorporate AEDPA deference to the California courts' rejection of Poston's distinct ineffective assistance of counsel claim based on the same failures to object. Answer at 43; Traverse at 101.

This Court must apply a "differing standard for evaluating constitutional error as a substantive basis of relief and as a cause to avoid default of other claims."  Visciotti v. Martel, 862 F.3d 749, 769 (9th Cir. 2016) (quotation omitted).  That means AEDPA deference does not apply.  See id.  Therefore, the question whether this Court can "review the merits" of Poston's prosecutorial misconduct claim "turns entirely" on whether Poston has established that trial counsel was "ineffective."  Id.  If trial counsel's failure to object at the relevant times constitutes ineffective assistance of counsel, then this Court can evaluate the merits of Poston's prosecutorial misconduct claim.  If not, then Poston has failed to show cause and prejudice or any miscarriage of justice, and this Court cannot reach the merits.

*

---

[15] On direct appeal, Poston argued that any objection would have been futile and could not have cured the harm.  See App. Br. (dkt. 25-5 Ex. 8) at 111.  Poston has not repeated this argument in the instant habeas petition or in his Traverse, which argue only that his trial counsel's failure to object constituted ineffective assistance of counsel.  See Habeas Pet. at 37–39; Traverse at 101, 102.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    To determine whether Poston's trial counsel's failure to object can support an

2    ineffective assistance of counsel claim (and thus establish cause, prejudice, or a

3    miscarriage of justice), this Court applies Strickland v. Washington, 466 U.S. 668, 688

4    (1984).  The Strickland standard is "highly deferential" even when AEDPA deference does

5    not apply.  Harrington, 562 U.S. at 105.  Under it, a defendant challenging his conviction

6    must show "both that his counsel provided deficient assistance and that there was prejudice

7    as a result."  Id. at 104.

8    "To establish deficient performance, a person challenging a conviction must show

9    that 'counsel's representation fell below an objective standard of reasonableness.'"  Id. at

10   104 (quoting Strickland, 466 U.S. at 688).  There is "a 'strong presumption' that counsel's

11   representation was within the 'wide range' of reasonable professional assistance."  Id.

12   (quoting Strickland, 466 U.S. at 689).  The challenger must show "that counsel made

13   errors so serious that counsel was not functioning as the 'counsel' guaranteed the

14   defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  Thus, "even under de

15   novo review, the standard for judging counsel's representation is a most deferential one."

16   Harrington, 562 U.S. at 105.  "The question is whether an attorney's representation

17   amounted to incompetence under 'prevailing professional norms,' not whether it deviated

18   from best practices or most common custom."  Id. (quoting Strickland, 466 U.S. at 690).

19   To show prejudice, "a challenger must demonstrate 'a reasonable probability that,

20   but for counsel's unprofessional errors, the result of the proceeding would have been

21   different.  A reasonable probability is a probability sufficient to undermine confidence in

22   the outcome.'"  Id. at 104 (quoting Strickland, 466 U.S. at 694).  "It is not enough 'to show

23   that the errors had some conceivable effect on the outcome of the proceeding.'"  Id.

24   (quoting Strickland, 466 U.S. at 693).  The errors "must be 'so serious as to deprive the

25   defendant of a fair trial, a trial whose result is reliable."  Id. (quoting Strickland, 466 U.S.

26   at 687).

27                                              *

28   The Court evaluates each purported failure to object in turn.

47

First, Poston cites the prosecutor's description of the incident at the gas station as a "shoot-out as if it were the wild wild west" during opening statements and as a "gun battle" throughout the proceedings.  See Habeas Pet. at 26; McNeely, 2017 WL 65832, at *18 n.10; Trial Tr. Vol. 11 at 483–84.  Failure to object to this and similar comments was neither objectively deficient nor prejudicial.  These statements were not inaccurate: Poston and McNeely literally engaged in a gun battle.  Even if Poston believes that describing the incident as a "gun battle" gives short shrift to his self-defense theory, the prosecution was not required to accept that theory in its arguments to the jury.  Thus, any objection to these statements likely would have been properly overruled, and failing to make a meritless objection is not deficient advocacy.  Further, even if the trial court would have sustained an objection, there is no reason to think the outcome of the trial would have been different.  Surveillance video captured the events to which the prosecution referred, and jurors could interpret those events for themselves.

Second, Poston cites the prosecutor's suggestion to Poston during cross-examination that Poston had been practicing his testimony, and the prosecutor's supposed suggestion that Poston was presenting a false image by wearing a nice suit.  See Habeas Pet. at 26–27; McNeely, 2017 WL 65832, at *18 n.10.  The prosecutor's statement that Poston had been practicing his testimony was directly supported by evidence that Poston had told his mother that he was practicing his testimony.  See McNeely, 2017 WL 65832, at *4 ("proper preparation prevents poor performance.").  And while criticizing a defendant for wearing a suit to court would certainly be improper, the prosecutor did not do that.  The prosecutor merely mentioned Poston's statement about his suit while asking Poston about his purported performance: "Didn't you tell your mom that you wanted to save your good suit for when it was time for you to perform?"  Trial Tr. Vol. 19 at 1627–28.  Poston did not deny telling his mother that, but explained that the comment was "maybe only a metaphor."  Id. at 1628.  In context, the prosecutor's question was relevant to Poston's credibility based on various statements that he made regarding his performance for the jury.  Interpreting the significance of those statements was for the jury.  Because

these questions were not improper, Poston's counsel's failure to object was neither objectively deficient nor prejudicial.

Third, Poston cites his trial counsel's failure to object to the prosecutor's supposed suggestion that Poston's use of African American Vernacular English (AAVE) in rap lyrics and phone calls and use of Standard English in the courtroom showed that he was lying.  See Habeas Pet. at 27; McNeely, 2017 WL 65832, at *18 n.10.  The prosecutor made no such suggestion.  Poston cites the following statement by the prosecutor during the prosecutor's closing argument:

> You have heard a lot of our evidence about Mr. Poston and his world. You heard a lot of jail calls where he is not speaking in the same calm, controlled manner that he's speaking here in court. And that's why you heard the other jail call, where he's talking about the fact that he needs to paint a different portrait for you and put on a performance. Because if you see the real him, you'll know the verdict that is required.

Traverse at 108 (citing Trial Tr. Vol. 20 at 1971).  Of course, it would be improper to argue that a criminal defendant lacks credibility based on his use of AAVE outside of court and standard English in court —a criminal defendant should not be punished for speaking more formally when under oath and facing a serious potential conviction.  Here, the prosecutor did not make that argument.  The prosecutor simply argued that when Poston was speaking naturally, he said arguably incriminating things, including that he would be putting on a performance for the jury.  According to the prosecution, that performance would be aimed at persuading the jury that he acted in self-defense and avoiding a "picture" that Poston was a "gangster."  Trial Tr. Vol. 19 at 1628.  That is not the same as suggesting that Poston's mere alternating use of AAVE and standard English showed that he was lying or guilty.  See Habeas Pet. at 27.[16]  Poston was free to argue that his prior

---

[16] Poston states that the prosecutor repeatedly emphasized Poston's use of AAVE.  See Traverse at 117 (citing Trial Tr. Vol. 19 at 1640–41, 1647–48, 1653–66, 1675–93, 1758–59; Trial Tr. Vol. 20 at 1897–99).  The cited portions of the trial transcript merely reflect the prosecutor's questions about specific rap lyrics, see Trial Tr. Vol. 19 at 1640–41, questions pertaining to Poston's relationship with and degree of control over Bailey, id. at 1647–48, questions about Poston's language indicating that he was a pimp (which, under California law, was relevant to his

United States District Court
Northern District of California

statements were minimally probative of his credibility, but that does not make the prosecutor's arguments about those statements improper. Thus, Poston's counsel's failure to object to this part of the prosecutor's closing argument was neither objectively deficient nor prejudicial.

Fourth, Poston cites his trial counsel's failure to object to the prosecutor's statements characterizing Poston as a pimp and a thug, see McNeely, 2017 WL 65832, at *18 n.10, or as Poston puts it, a person "who did not talk or behave like the prosecutor thought an innocent person would," see Traverse at 104. Poston cites several of the prosecutor's statements during closing arguments. Id. (citing Trial Tr. Vol. 20 at 1897–99, 1966–67, 1971–72). For example, the prosecutor stated that Poston's attitude was that "[n]obody is going to disrespect me and get away with it." Trial Tr. Vol. 20 at 1897. The prosecution contrasted that with the attitude of "law-abiding citizens," who "don't go into an altercation with someone with the state of mind of, disrespect me and you're going to find yourself six feet under." Id. (quotation marks omitted). The prosecution stated that Poston "tried to get [Bailey] to lie for him" and that Poston "was performing, and he was trying to paint a portrait of himself that's different than the portrait that you've seen in the video, in the YouTube videos, in the pictures, in the rap lyrics, all of the things that give you a glimpse into his world, he knew that you couldn't see that." Id. at 1898–99. The prosecution also argued:

> You know, this world is a world that I would hope and imagine is unfamiliar to all of you. It's a world that you've gotten a glimpse of, but it's a world that you heard yesterday from Lieutenant Jones, now they're not playing by any rules. But there are some things that are expected. Both of them were a part of this world. Both of them went to this gas station that is known for crime, it's known for shootings, it's known for murders. . . . Mr. Poston clearly is in this world, a self-professed person who promotes his videos and whatnot. Both of them knew they couldn't walk away. That's just not how

---

credibility) and about his self-defense theory, id. at 1653–66; 1675–93, 1758–59, and arguments about Poston's credibility, mindset, and degree of control over bailey, see Trial Tr. Vol. 20 at 1897–99. The prosecution unsurprisingly quoted Poston when asking these questions and making these arguments; the prosecution did not emphasize Poston's use of AAVE as an independent factor bearing on his guilt.

1

it happens.  That's not how you walk away and save face and have any
respect.  But these days, they don't settle disputes with fists, they settle them
with guns. . . .  That's what it's like on the streets of Oakland now.  You've
got all these little guys running around, but they're all armed making them
feel like big men.  And that's what happened in this case.  These guys were
going to shoot it out, and that—and who cares about who is left in their
wake?  Who cares that innocent people are in the way?

2

3

4

5

Id. at 1966–67.  The prosecutor went on to say that Poston could have walked away:

6

"maybe that's not cool in his world, maybe he would be a punk at that point.  But the

7

situation ended with an innocent man being killed, for no reason.  This was over respect

8

and nothing else."  Id. at 1971.  The prosecutor added that "the only rap that [Poston]

9

wrote regarding this incident was boastful.  It was bragging."  Id. at 1972.

10

Once again, Poston's trial counsel's failure to object to these statements was not

11

objectively deficient or prejudicial under Strickland.  As discussed several times above,

12

Poston's pimping activity was relevant to Poston's credibility under California law, so

13

references to that activity were proper and any objection would have been futile.  Nor did

14

the prosecution argue that Poston was guilty merely because he was a "thug."  The

15

prosecution's criticism of Poston and street violence was based on the prosecution's theory

16

that Poston had engaged in unjustified violence in this case.  This part of the prosecution's

17

closing argument was straightforward: Poston's prior statements about his testimony

18

indicated that he would be crafting his testimony to avoid appearing like a criminal.

19

Poston's rap lyrics referencing the incident, YouTube videos featuring threats and

20

firearms, past criminal conduct, and prior statements indicated that he lived by certain

21

principles.  Under those principles and based on the surveillance video, Poston's reaction

22

to being slapped was based on anger or pride, not a genuine fear for his life, despite

23

Poston's testimony to the contrary.  Whether right or wrong, the prosecutor was entitled to

24

make this argument based on the specific evidence presented.  Poston has not persuasively

25

explained why any objection to the prosecutor's relevant statements would have been

26

sustained.  And such an objection would not have changed the outcome of the trial given

27

the evidence.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fifth, Poston cites his trial counsel's failure to object to the prosecutor questioning him about the content of Poston's rap lyrics in an effort to refute Poston's self-defense claim. See McNeely, 2017 WL 65832, at *18 n.10. Poston focuses on the prosecutor's questions about two specific rap lyrics:

> I ain't never been a n— that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life.

> You got to be higher than Richard Pryor or a sucker with a prior if you think you're going to fire on a n— and get away with it.

Habeas Pet. at 27 (citing Trial Tr. Vol. 19 at 1640–41). The grounds for objecting to the prosecutor's questions about these lyrics remain unclear. The prosecutor asked Poston whether the lyrics addressed "what happens to people when they disrespect" Poston. Trial Tr. Vol. 19 at 1640. Poston explained that the rap lyrics were "artistic" and reflected events or perspectives that Poston had seen in his environment. See id. at 1640. But Poston also testified, based on other lyrics, that he acted in self-defense, see Trial Tr. Vol. 19 at 1633, implying that his lyrics generally had some relevance to the events that occurred at the gas station. Before this Court, Poston does not dispute that the lyrics discussed the events that occurred, but argues that they were "not incriminating" and "support his claim of self-defense" because they indicate that Poston "never picks a fight but he will defend himself if attacked." Traverse at 106. That may be a plausible interpretation of the lyrics. Indeed, it may be the most likely interpretation of the lyrics. But that does not mean the prosecutor was foreclosed from asking questions about the lyrics that suggested an alternative interpretation. Once again, because it is doubtful that the trial court would have had reason to sustain an objection, Poston's trial counsel's failure to object was not deficient or prejudicial under Strickland.

Sixth, Poston cites his trial counsel's failure to object to the prosecutor's emphasis on offensive language that Poston used during recorded jail calls. See Habeas Pet. at 28 McNeely, 2017 WL 65832, at *18 n.10. But the prosecution had to quote that language (namely Poston's use of the words "ho," "pimp," and "prostitute") while asking Poston

1   about his pimping conduct and his control over Bailey.  As discussed above, these subjects

2   were relevant to Poston and Bailey's credibility under California law.  Because any

3   objection would have been properly overruled, trial counsel's failure to object was not

4   deficient or prejudicial.

5       Seventh, Poston cites his trial counsel's failure to object to the prosecutor's

6   argument that Poston's flight and statements made during the recorded jail calls showed a

7   consciousness of guilt.  See Habeas Pet. at 28; McNeely, 2017 WL 65832, at *18 n.10.  As

8   the prosecutor put it, Poston "fled the scene, he left Oakland.  He said repeatedly in jail

9   calls [that] he was on the run.  Not the state of mind and not the use of phrasing that

10  innocent, justified people use.  And he also dumped the gun."  Trial Tr. Vol. 20 at 1898.

11  In another claim, Poston suggests that his trial counsel was deficient because his trial

12  counsel did not introduce evidence "that African Americans often flee because they

13  distrust the police."  Traverse at 174.  The Court addresses that important point below.  But

14  it is not relevant to whether the prosecution could properly argue for its own interpretation

15  of Poston's flight.  Poston's argument amounts to asserting that any interpretation of the

16  evidence that differs from his interpretation is objectionable.  But there is no reason why

17  the trial court would have sustained an objection to the prosecutor's argument, and thus

18  Poston has not shown deficient performance or prejudice.

19      Finally, Poston cites his trial counsel's failure to object to the prosecutor's

20  suggestion that Poston had practiced his testimony to project a different persona than the

21  one he assumed in YouTube videos and his rap lyrics.  See McNeely, 2017 WL 65832, at

22  *18 n.10.  This argument duplicates the arguments addressed and rejected above.  The

23  prosecutor was attacking Poston's credibility based on his own statements about his

24  performance at trial.  Poston was entitled to counter (and the jury was entitled to give no

25  weight to) the prosecutor's questions and arguments.  That does not mean those questions

26  or arguments were improper, let alone that Poston's trial counsel was objectively deficient

27  in failing to object to them.

28                                          *

United States District Court
Northern District of California

As this analysis makes clear, given the "strong presumption" that Poston's trial counsel's representation was within the "wide range" of reasonable professional assistance, see Strickland, 466 U.S. at 689, Poston's trial counsel was not ineffective based on these failures to object.  Because the hypothetical objections likely would have been properly overruled, Poston's trial counsel was not objectively deficient.  And trial counsel's failure to object did not prejudice Poston because there is no reasonable probability that objecting would have affected the outcome of the proceedings, even if the trial court had sustained some of the objections.

Because trial counsel's failure to object did not constitute ineffective assistance of counsel under Strickland, Poston has not shown any cause, prejudice, or miscarriage of justice that could overcome the procedural bar on his prosecutorial misconduct claim.

Therefore, the Court need not address the merits of that claim.  In any event, the claim would fail.  A prosecutor's improper statements during trial can warrant relief only if those statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quotation omitted); see also Traverse at 101 (citing Darden).  The Court's Strickland analysis above indicates that if there was any misconduct by the prosecutor, it did not meet this high bar.

### G.      Motion to Sever/Joint Trial (Claim 6)

The Court of Appeal held that the trial court did not abuse its discretion or deprive Poston and McNeely of due process by denying Poston's motion to sever his trial from McNeely's. See McNeely, 2017 WL 65832, at *1.  This Court concludes that the Court of Appeal's ruling was not inconsistent with any clearly established Supreme Court precedent.

#### 1.      The Court of Appeal's Reasoning

The Court of Appeal stated that under California law, "when two or more defendants are jointly charged with any public offense . . . they must be tried jointly, unless the court orders separate trials." Id. at *7 (citing Cal. Penal Code § 1098).  Joint trials are generally favored because they promote efficiency and avoid inconsistent verdicts.  See id.

54

United States District Court
Northern District of California

The Court of Appeal acknowledged, however, that a trial court may separate trials in various circumstances, including when codefendants present "conflicting defenses." Id. at *8 (citation omitted).  "In deciding whether to order joint trials, the court is required to decide whether the realistic benefits from a consolidated trial are outweighed by the likelihood of substantial prejudice to the defendant." Id.  The Court of Appeal further noted that it would review the trial court's ruling on the severance motion for an "abuse of discretion," which occurs "only if the [trial] court exceeds the bounds of reason" given the circumstances. Id.  If there was no abuse of discretion at the time the severance motion was denied, the Court of Appeal could reverse "only if the joint trial resulted in gross unfairness, amounting to a denial of due process." Id. (quotation marks omitted).  And even then, the Court of Appeal could reverse only if Poston demonstrated "a reasonable probability he would have received a more favorable result in a separate trial." Id.

Applying those rules to the trial court's denial of Poston's severance motion, the Court of Appeal held that the trial court did not abuse its discretion and that the joint trial did not result in gross unfairness. See id. at *8–10.  The Court of Appeal noted that under California law, antagonistic defenses arising from the same transaction might weigh in favor (rather than against) a joint trial. See id. at *8 (citing People v. Hardy, 2 Cal. 4th 86, 169 (1992)).  Thus, "a trial court denying severance on the basis of conflicting defenses 'abuses its discretion only when the conflict between the defendants alone will demonstrate to the jury that they are guilty.'" Id. at *9 (quoting People v. Letner and Tobin, 50 Cal. 4th 99, 150 (2010)).  The Ninth Circuit had once held that Rule 14 of the Federal Rules of Criminal Procedure required severance for federal co-defendants with mutually exclusive defenses, see United States v. Tootick, 952 F.2d 1078, 1081–82 (9th Cir. 1991), but that ruling (i) did not apply to California courts; and (ii) had been overruled by Zafiro v. United States, which held that conflicting defenses do not require severance, see McNeely, 2017 WL 65832, at *9 (citing 506 U.S. 534, 538–39 (1993)).  In any event, Poston and McNeely's self-defense claims were not "mutually exclusive" because they were based on Poston and McNeely's "subjective, reasonable perception of a volatile

1    situation," such that a jury could have conceivably determined that they both acted in self-

2    defense. McNeely, 2017 WL65832, at *9

3         The Court of Appeal further reasoned that applying the more detailed federal

4    standard set forth in Zafiro would not require severance. Id. Zafiro held that a federal trial

5    court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial

6    would compromise a specific trial right of one of the defendants, or prevent the jury from

7    making a reliable judgment about guilt or innocence." Id. That was not the case here,

8    where neither Poston nor McNeely complained that "he was prejudiced by the introduction

9    of incriminating evidence admissible only against the other," where no evidence suggested

10   a "prior association" between the defendants ("such that a finding of wrongdoing by one of

11   them would have suggested the other was guilty"), and where the defendants' "levels of

12   culpability appeared to be about the same . . . though McNeely was the instigator." Id. at

13   *10.

14        Having concluded that the trial court did not abuse its discretion at the time it

15   denied the severance motion, the Court of Appeal went on to conclude that no "gross

16   unfairness" had resulted from that denial. Id. "As to Poston, the primary incriminating

17   evidence . . . was the surveillance videos, which could reasonably be interpreted to show

18   that he fired several shots at McNeely after McNeely struck him with his hand and tripped

19   him, but before he saw McNeely reach for his own weapon." Id. Poston had also testified

20   and had called Bailey as a witness "in an effort to show he fired first because he

21   reasonably believed McNeely was armed." Id. at *10. But the surveillance tape and

22   Poston's interest in testifying and calling Bailey to testify "would have been the same in a

23   separate trial; and there is no reason to think any of the evidence offered against Poston

24   would have been materially different." Id.

25        In sum, the Court of Appeal determined that although the trial was "atypical"

26   because Poston and McNeely "were the alleged victims of each other's attempted murder

27   charges, in all other respects it was a classic case for joinder." Id. They were both charged

28   with murdering the same victim, the counts "arose from the same incident and were based

United States District Court
Northern District of California

1    on the same set of facts, and most of the evidence incriminating each defendant would

2    have also been admissible in a separate trial." Id. Thus, "[t]he trial court did not err in

3    denying Poston's motion for severance." Id.

4    　　　　　**2.　　Analysis**

5    　　　　The Court of Appeal's ruling was not contrary to, and did not involve an

6    unreasonable application of, U.S. Supreme Court precedent. See 28 U.S.C. § 2254(d)(1).

7    Poston has not pointed this Court to any Supreme Court decision that is clearly contrary

8    (or even arguably contrary) to the conclusion reached by the Court of Appeal. Indeed,

9    Poston relies primarily on Ninth Circuit decisions regarding joint trials when co-

10   defendants have "mutually exclusive defenses." Traverse at 126 (citing United States v.

11   Mayfield, 189 F.3d 895, 903 (9th Cir. 1999); United States v. Tootick, 952 F.2d 1078,

12   1082–83 (9th Cir. 1991)). Even if AEDPA permitted the Court to consider these Ninth

13   Circuit decisions, they would have no relevance here. After those decisions, Zafiro made

14   clear that under Rule 14 of the Federal Rules of Criminal Procedure (which does not apply

15   in state court anyway), "conflicting defenses" do not require a joint trial, and even if such

16   defenses give rise to "prejudice," "the tailoring of the relief to be granted" is within "the

17   district court's sound discretion." 506 U.S. at 538–39. And, as the Court of Appeal

18   explained, Poston and McNeely's self-defense claims were not mutually exclusive.

19   McNeely, 2017 WL 65832, at *9. It is logically possible for a jury to find that two co-

20   defendants who engaged in a shoot-out both acted in self-defense based on their reasonable

21   subjective beliefs, even if the jury did not reach that result here.

22   　　　　Poston argues that AEDPA's deferential standard for state court legal

23   determinations does not apply to this claim because the Court of Appeal's holding was

24   "based on an unreasonable determination of the facts under section 2254(d)(2)." Traverse

25   at 121. In particular, Poston takes issue with the Court of Appeal's statement that Poston

26   and McNeely's "levels of culpability appeared to be about the same." Id.; see also

27   McNeely, 2017 WL 65832, at *10.

28   　　　　This argument fails because the Court of Appeal's decision rested on several

United States District Court
Northern District of California

independent bases, and to the extent it rested on a finding about Poston and McNeely's relative culpability, that finding was reasonable.  <u>Zafiro</u> enumerated many factors that might indicate a heightened risk of prejudice in a joint trial.  506 U.S. at 539.  The Court of Appeal ticked through each of them, indicating that no single factor controlled its decision.[17]  As to just one of those factors, <u>Zafiro</u> observed that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, [the] risk of prejudice is heightened."  <u>Id.</u>  Here, there were not "many defendants," so this <u>Zafiro</u> factor was inapplicable.  In any event, the Court of Appeal's determination that Poston and McNeely did not have markedly different degrees of culpability was reasonable.  A reasonable factfinder could conclude from the surveillance video that McNeely (the initial aggressor who prolonged the shootout by chasing after Poston once Poston stopped shooting) and Poston (who responded to the slap by immediately reaching for his firearm and pointing it at McNeely, escalating the confrontation from a fight to a shootout, and shooting McNeely six times) were similarly culpable.  Poston disagrees with that assessment, but his view is not the only reasonable one.

In sum, the trial court's refusal to sever Poston and McNeely's trials provides no basis for this Court to grant Poston's petition for a writ of habeas corpus.

### H.      Ineffective Assistance of Counsel (Claims 7–12)

Poston raised six ineffective assistance of counsel claims in his California postconviction proceedings.  <u>See</u> State Habeas Pet. at 73–101.  The California courts summarily denied those claims, <u>see</u> dkt. 25-7, Exs. 17, 19, and he asserts them again here.

#### 1.      Legal Standard

When a state court has denied a petitioner's ineffective assistance of counsel claim on the merits (even summarily), the question under AEDPA is whether the state court unreasonably applied <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and its progeny.  <u>See</u>

---

[17] It bears repeating that <u>Zafiro</u> interpreted a Federal Rule of Criminal Procedure and thus was not binding on the Court of Appeal.

United States District Court
Northern District of California

1   Harrington, 562 U.S. at 104.

2   As discussed above, the Strickland standard is "highly deferential" even when
3   AEDPA deference does not apply.  Id. at 105.  Under Strickland, a defendant challenging
4   his conviction must show "both that his counsel provided deficient assistance and that
5   there was prejudice as a result."  Id. at 104.  Thus, a defendant must overcome the "strong
6   presumption that counsel's representation was within the wide range of reasonable
7   professional assistance," and "demonstrate a reasonable probability that, but for counsel's
8   unprofessional errors, the result of the proceeding would have been different."  Id.
9   (quotation marks omitted).

10   Although "[s]urmounting Strickland's high bar is never an easy task," Padilla v.
11   Kentucky, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of
12   Strickland was unreasonable under § 2254(d) is all the more difficult," Harrington, 562
13   U.S. at 105.  Because Strickland and § 2254(d) "are both highly deferential . . . when the
14   two apply in tandem, review is doubly so."  Id. (quotation omitted).  Under § 2254(d),
15   "[t]he question is whether there is any reasonable argument that counsel satisfied
16   Strickland's deferential standard."  Id.  "The Strickland standard is a general one, so the
17   range of reasonable applications is substantial."  Id.

18         **2.**    **Analysis**

19   Poston raises six different ineffective assistance of counsel claims.  Poston asserts
20   that his trial counsel was ineffective based on his (i) failure to object to prosecutorial
21   misconduct, (ii) failure to object to or request modification of the trial court's mutual
22   combat instruction, (iii) failure to prepare Poston to testify and to rehabilitate him on
23   redirect examination, (iv) failure to investigate and present corroborating evidence, (v)
24   failure to investigate and present expert evidence on African-American Vernacular
25   English, and (vi) failure to investigate and present expert evidence on African-American
26   culture.  The Court addresses each claim in turn.

27         **a.**    **Failure to Object to Prosecutorial Misconduct (Claim 7)**
28   Poston first argues that his "trial attorney's failure to object to pervasive

United States District Court
Northern District of California

prosecutorial misconduct denied Poston the effective assistance of counsel."  Traverse at 130.  This Court discussed Poston's failure to object to prosecutorial misconduct argument while addressing whether Poston's separate prosecutorial misconduct claim is procedurally barred.  See part III.F.2.  The Court applied Strickland without AEDPA deference and explained that Poston failed to show that trial counsel's failure to object at the relevant times constituted ineffective assistance of counsel.  See part III.F.2; Visciotti, 862 F.3d at 769.  Under the "doubly" deferential standard applicable here, see Harrington, 562 U.S. at 105, the outcome for Poston is the same.

### b.  Failure to Object to or Request Modification of Mutual Combat Instruction (Claim 8)

Poston next argues that his "trial counsel's failure to object or request modification of the mutual combat instruction denied him the effective assistance of counsel."  Traverse at 144.  This Court concluded above that, at worst, this instruction was harmless error.  See part III.D.2.  For the same reason, there is a "reasonable argument" that failure to object to the instruction was not prejudicial.  Harrington, 562 U.S. at 105.  Therefore, the California courts' rejection of this claim was not objectively unreasonable under § 2254(d).

### c.  Failure to Prepare Poston to Testify and to Rehabilitate Poston on Redirect Examination (Claim 9)

Poston next argues that his trial counsel's "failure to adequately prepare him to testify and failure to adequately rehabilitate him on redirect denied him the effective assistance of counsel."  Traverse at 149.  Poston relies on two declarations: one from Poston's state habeas counsel and one from Poston himself.  Id. at 149–152.

According to Poston's state habeas counsel, Poston's trial counsel stated that he visited Poston "a couple of times" at jail and "did not spend a lot of time preparing" Poston to testify.  Traverse at 150; Ex. 14 (dkt. 25-6) at 285–86.  In trial counsel's view, Poston "did not seem to need it" because he "seemed sophisticated and well-spoken.  Ms. Bailey was the one who really needed a lot of help preparing."  Ex. 14 at 286.  Trial counsel did not provide Poston with a transcript or recording of Poston's phone calls from jail and did

not recall speaking to Poston about the phone calls or pimping and prostitution.  See Traverse at 150–51.

According to Poston's declaration, Poston's trial counsel "did not spend much time with [Poston] before trial."  Traverse at 151 (citing Ex. 14 at 146).  Poston's trial counsel also did not discuss Poston's rap lyrics with Poston.  Id.  Indeed, besides asking Poston to write down questions for trial counsel to ask during direct examination, trial counsel "did not help [Poston] prepare to testify at all."  Id. (citing Ex. 14 at 146).

The California courts' rejection of Poston's Strickland claim based on his trial counsel's failure to adequately prepare Poston to testify was not objectively unreasonable. There is a "reasonable argument" that Poston was not prejudiced by any failure to prepare Poston to testify.  Harrington, 562 U.S. at 105.[18]  Poston does not argue that his testimony was inaccurate or misleading based on Poston's trial counsel's failure to prepare him. Instead, he argues that his testimony was less thorough and effective than it could have been.  See Traverse at 155–56.  Poston argues that had he been adequately prepared, he could have explained why (i) "he did not consider himself a pimp," id. at 155, (ii) "he used the word 'pretense' in his rap lyrics about self-defense," id. at 156, (iii) "he talked to his family about the legal rules pertaining to self-defense," id., and (iv) "he denied knowledge of the indicia of credit card fraud in his house," id.; see also Habeas Pet. at 43 (listing these same four categories of testimony).

The California courts could have reasonably concluded that Poston failed to show a reasonable probability that additional preparation would have changed the outcome of his trial.  See Harrington, 562 U.S. at 104.  Poston's more polished explanations for apparent inconsistencies within his testimony and between his testimony and his past statements

_____

[18] Respondent argues that, by relying on declarations from his habeas counsel and himself, Poston has failed to provide any reliable evidence that his trial counsel actually failed to prepare him to testify.  See Answer at 64–67. The Court need not decide that issue, or whether the facts presented by Poston establish objectively deficient performance. Even assuming that Poston's description of his trial counsel's conduct is accurate, and that his trial counsel's conduct was objectively deficient, there is (at least) a "reasonable argument" that Poston was not prejudiced. Harrington, 562 U.S. at 105.

might have marginally aided his credibility.  But they would not have helped much.  Thus, there is at least a "reasonable argument" that the jury would have convicted Poston regardless.  Id. at 105.

First, despite his purported lack of preparation, Poston explained to the jury his statements about pimping, his use of the word "pretense," discussions with his family members about self-defense, and his knowledge of a credit card machine found in his house.  Poston stated that he had never "been convicted of pimping," Trial Tr. Vol. 19 at 1677, that just because he "put a band-aid on a scratch" did not mean that he was a "doctor," id. at 1654, and that a woman to whom he referred as his "ho-bitch" did not make enough money for Poston for him to "call [him]self a pimp," id. at 1678.  He also testified that when he wrote that his conduct was self-defense under the right pretense, he meant that "[a]s long as the jury and the people see the truth to this, that maybe this is self-defense, because a man was trying to kill me."  Id. at 1633.[19]  Poston also addressed the prosecution's contentions that Poston's conversations with his mother showed that he had strategically switched to a self-defense strategy, arguing that his "mom wasn't at the event. Only I know.  So that's how I felt from . . . the beginning of the case, that it was self-defense."  Id. at 1682.  And Poston explained that he did not know about the credit card machine found in his house because he had been "gone for 90 days."  Id. at 1700.  There is little reason to think that Poston's substantively similar but more fully developed or articulate explanations would have materially altered the jury's view of Poston's credibility.  See Traverse at 155–56.

Second, there is a "reasonable argument" that the jury likely discounted Poston's credibility for numerous additional reasons that Poston fails to address.  Harrington, 562 U.S. at 105.  A non-exhaustive list:  The trial court admitted evidence of four prior convictions and Poston's pimping conduct for impeachment purposes, see Trial Tr. Vol. 18

_____

[19] Both Poston and the prosecutor used the word "pretext" when referring to Poston's rap lyrics, which used the word "pretense."  See Trial Tr. Vol. 19 at 1633.  As discussed below, both sides agree that Poston's intent in writing the word "pretense" (not "pretext") was at issue.

at 1517–19, Trial Tr. Vol. 19 at 1653–54, trial testimony indicated that Poston may have lied to police about whether he was present at the gas station when the incident occurred, see Trial Tr. Vol. 19 at 1642–43, 1683, and Poston testified—contrary to the surveillance video footage—that he looked over his shoulder and saw McNeely reaching for his weapon, that McNeely shot Bailey's Lexus before Poston finished shooting, that Poston stopped shooting once he saw McNeely fall to the ground, and that Poston grabbed his camera, not his gun, immediately after McNeely tripped him, see Ex. 8; Trial Tr. Vol. 18 at 1545–46, 1561–62; Trial Tr. Vol. 19 at 1657, 1733.  Therefore, it is unlikely that additional testimony in the four listed areas would have materially altered the jury's view of Poston's overall credibility.

Poston does not make any specific arguments regarding his redirect examination. See Traverse at 149, 157, 158.  Assuming that Poston intends to argue that his trial counsel should have provided him with more of an opportunity to present further explanations, for the same reasons explained above, any error by Poston's trial counsel along these lines was not prejudicial.

In sum, better explanations regarding Poston's pimping, rap lyrics, family discussions, and knowledge of credit card fraud would not likely have redeemed his credibility.  Therefore, there was a "reasonable argument" that Poston failed to satisfy Strickland's prejudice prong, see Harrington, 562 U.S. at 105, and the California courts' denial of this claim was not objectively unreasonable.

### d. Failure to Investigate and Present Corroborating Evidence (Claim 10)

Poston next argues that his trial counsel's "failure to investigate and present corroborating evidence denied him the effective assistance of counsel."  Traverse at 159. Poston raises three specific failures to investigate and present corroborating evidence.

First, had trial counsel "just discussed Poston's jail calls and rap lyrics with him, he would have discovered and could have presented the self-defense packet Poston received from the law librarian at the jail."  Habeas Pet. at 43–44.  According to Poston, his

63

United States District Court
Northern District of California

"handwritten comments on the self-defense packet would have strongly supported his testimony that he did not fabricate the circumstances of his case to fit the legal rules." Id. at 44.  Second, had trial counsel performed an adequate investigation, he would "have discovered that Poston's dictionary included two alternative definitions of 'pretense' which . . . did not indicate falsity." Id.  According to Poston, this "could have corroborated Poston's testimony that he was trying to write rhyming lyrics and did not mean to indicate a false claim." Id.  Third, had trial counsel performed an adequate investigation following Poston's cross-examination, "he could have presented the testimony of Poston's mother and brother and his brother's mechanic to corroborate Poston's testimony that there was a bullet hole in Bailey's car right after the charged shooting." Id.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.

This ineffective assistance claim fails because the California courts could have reasonably concluded that any failure to investigate and present this evidence was neither objectively deficient nor prejudicial.

### i.   Self-Defense Packet

Poston made the following notes in a self-defense research packet:

-   Next to a "Prisoners and Ex-Felons" heading, Poston wrote "It is true that I am a[n] Ex felon but I don't forfeit all rights."  Below the same section, Poston wrote "Doesn't apply for him since he initiated the argument with the fraudulent intent to force a deadly issue."

-   On the next page, Poston wrote "A person claiming self defense is entitled to prove that the fear was reasonable.  ???  Can I prove that the fear was reasonable?  (Yes)."  Poston also noted again that as an ex-felon he could use a firearm in self-defense.

-   At the bottom of the same page and top of the next page, Poston wrote "There was more than bare fear, simply because first he showed me a

gun then he attacked me.  Showed me a pistol and said he was gonna slap the shit out of me, verbatim."

- Above a section about expert testimony of reasonable fear, Poston wrote "incapable of being defended or sustained (supported)."  At the bottom of the same page, he wrote "we could have had a fist fight if he wouldn't have showed me that gun."

- On the next page, Poston again wrote "we could have had a fist fight." And above the sentence "Deadly force is justified only when the apparent peril is great and imminent," Poston wrote "applies to me."

- On the next page, Poston wrote "Important" above the sentence "The person attacked may 'stand his ground' and defend by deadly force if necessary."  Poston also wrote "applies to him" over the sentence "The person who wrongfully attacks, or who voluntarily engages in a fight, and is met by a counterattack, has no privilege to stand his ground and defend."  Under a paragraph defining "mutual combat," Poston wrote that Poston "clearly [threw] up my hands and turned down the battle, told him wherever he was driving that car I didn't want to ride, then Boom! Smack!"

- On the next page, Poston added notes above and below the following sentence:  "Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . .  If the victim uses excessive force, the aggressor's right of self-defense arises."  Poston wrote "This might be an issue just in case they try to use this," and "This clause is the only setback in perfect self-defense."

- On the next page, above a paragraph explaining that "once the danger no longer exists, there is no justification for further retaliation," Poston wrote "I abided by this statute."

- On the next page, above a paragraph defining imperfect self-defense, Poston wrote "this might apply."

Ex. 14 (dkt. 25-6) at 152–64.  This Court assumes without deciding that Poston's notes would have been admissible under California Evidence Code section 791(a).[20]

---

[20] Section 791(a) provides:

Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:

United States District Court
Northern District of California

Bearing in mind both <u>Strickland</u>'s "heavy measure of deference to counsel's judgments," 466 U.S. at 691, and the deference that this Court must give to the California courts' application of <u>Strickland</u>, <u>see</u> 28 U.S.C. § 2254(d), the California courts could have determined that trial counsel's failure to investigate and present these notes was reasonable.  As an initial matter, Poston's premise that his trial counsel necessarily would have become aware of the defense packet if he discussed Poston's "jail calls and rap lyrics with him," Habeas Pet. at 43–44, is dubious.  In any event, because the notes were self-serving and written by Poston, trial counsel could have concluded that they would be of minimal value in helping to establish Poston's credibility.  More importantly, trial counsel could have been concerned that presenting Poston's legal research would (i) play into the prosecution's theory that Poston was conforming his testimony to the law of self-defense; and (ii) call attention to the legal rule that a victim of simple assault may not respond with deadly force.

Further, there is a "reasonable argument" that Poston failed to show prejudice based on his trial counsel's failure to investigate and introduce the self-defense packet.  <u>See</u> <u>Harrington</u>, 562 U.S. at 105.  For the reasons discussed above, the California courts could have concluded that the notes would not have meaningfully impacted the jury's view of Poston's defense or his credibility.  Indeed, the notes referred to the rule that the victim of a non-deadly attack "has no right to use deadly or other excessive force" as a "setback" to Poston's perfect self-defense argument and a potential "issue" if invoked by the prosecution.  Ex. 14 at 155.  Thus, the California courts could have reasonably concluded that admitting the notes may have only buttressed the argument that Poston was not entitled to shoot at McNeely.  Of course, Poston's notes that McNeely showed him his gun would weigh in favor of Poston's self-defense claim.  But the California courts could have

---

(a)   Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement.

1  evaluated the notes in their totality, bearing in mind Poston's obvious interest in crafting a

2  defense and his concern regarding the rule about responding to non-deadly force, and

3  determined that there was no reasonable probability that the notes would have affected the

4  outcome.

### ii.  Dictionary Definition of "Pretense"

6  Poston's dictionary defined the word "pretense" as follows:

> **1** : CLAIM; *esp* : one not supported by fact **2** : mere display : SHOW **3** : an
> attempt to attain a certain condition <made a ~ at discipline> **4** : false show.

Ex. 14 at 166.

10  The California courts could have reasonably determined that trial counsel's failure

11  to investigate and present Poston's dictionary was reasonable.  There is no evidence that

12  Poston told his trial counsel about the dictionary.  And even assuming that Poston's trial

13  counsel should have asked Poston "what he meant," Traverse at 161, it is unclear whether

14  such a conversation would have led trial counsel to the dictionary.  More importantly, the

15  dictionary definition would arguably have hurt Poston more than helped him.  Consistent

16  with the word's ordinary usage, the dictionary definitions refer to claims "not supported by

17  fact," "mere" displays, and "false" showings.  Id.  As for the remaining definition, Poston

18  acknowledges that "an attempt to attain a certain condition" "does not seem particularly

19  relevant to the context of self-defense."  Traverse at 161.  Trial counsel could have

20  reasonably concluded that presenting these definitions to the jury would have led them to

21  believe that Poston had been using the word "pretense" in its ordinary sense.  Presenting

22  the dictionary also would have caused additional discussion of the "pretense" lyric,

23  focusing the jury's attention on a potentially damaging issue.

24  For substantially the same reasons, there is at least a "reasonable argument" that

25  trial counsel's failure to investigate and present the dictionary definition was not

26  prejudicial.  Harrington, 562 U.S. at 105.  The California courts could have concluded that

27  there is no reasonable probability that the definition would have helped Poston, and it may

28  have hurt him.

### iii.     Evidence of a Bullet in Bailey's Vehicle

Poston testified that at the point in the surveillance video when McNeely "appear[ed] to be falling," McNeely shot his firearm, striking the radiator of Bailey's vehicle, before Poston ceased shooting.  Trial Tr. Vol. 19 at 1738.  Poston now argues that Poston's trial counsel could have investigated and presented evidence that a bullet struck the vehicle's radiator:  "Even if the jurors determined that it was Poston and not McNeely who shot Bailey's radiator, the corroborating evidence would have shown that Poston was telling the truth, though he may have been mistaken in part."  Traverse at 161.

The California courts could have determined that trial counsel's failure to investigate and present evidence that the radiator had been shot was reasonable and not prejudicial.  The surveillance footage contradicted Poston's testimony that McNeely shot Bailey's car while Poston was still shooting.  Ex. 8 at 00:20–00:32.  It is unclear why the jury would have cared that, at some undetermined point, a bullet (likely shot by Poston) struck Bailey's radiator.  If the jury determined that Poston was telling the truth about a bullet striking the radiator, but that Poston was dishonest or mistaken about who shot that bullet, it would have done little for Poston's case.  Presenting evidence that a bullet struck the radiator might have simply drawn the jury's attention back to Poston's inaccurate testimony, which could have further damaged his credibility.  Therefore, there is at least a "reasonable argument" that any failure to present that evidence was neither deficient nor prejudicial.  See Harrington, 562 U.S. at 105.

### e.     Failure to Investigate and Present Expert Testimony on African American Vernacular English (Claim 11)

Poston next argues that his trial counsel's "failure to investigate and present expert testimony on AAVE denied him the effective assistance of counsel."  Traverse at 163.  Poston argues that at trial, "[t]he critical disputed issue was Poston's intent," and that both the prosecutor and McNeely's counsel used "Poston's out-of-court statements in profanity-laced AAVE to prove he did not act in self-defense."  Id. at 165.  The prosecutor also "used Lieutenant Jones to interpret some of Poston's statements in the most incriminating manner."  Id.  According to Poston, "[a]n expert like Professor [John R.] Rickford could

68

have assured" Poston's trial counsel "that Poston's statements were not susceptible to incriminating interpretations" because "no AAVE speaker would so understand them." Id. at 166.

In Poston's state postconviction proceedings, Professor Rickford submitted a declaration explaining his hypothetical testimony. See Ex. 14 (dkt. 25-6) at 176–86. Rickford stated that he was "confident" that he could have "provided helpful testimony" during Poston's trial. Id. at 178 ¶ 4. Rickford would have explained that "while AAVE is used by many African Americans and often valued for its expressiveness and as an ethnic in-group marker, it is also viewed negatively in mainstream, non-African American culture." Id. at 178 ¶ 5. Rickford believes that "[d]iscussing these issues was critical in order to neutralize the jurors' unconscious racism and bias against AAVE." Id. He also would have explained that alternating use of AAVE and Standard English "is normal and desirable." Id. at 178 ¶ 6.

Rickford's testimony would have addressed some of Poston's rap lyrics. For example, Poston wrote "I ain't never been a n— that would pick a fight, run up on me then I take flight. Cross the dotted line, you might lose your life." Trial Tr. Vol. 19 at 1640. According to Professor Rickford, this means "that Mr. Poston is not the type of person who would start a fight without provocation, but that he would defend himself if necessary." Ex. 14 at 182 ¶ 14 (emphasis in original). Poston also wrote "Them 40 oz bullets made that 9 sit down. In part about it, you'll never see the town, never get no pussy and never get around. Bet that a hold'em; minus a left scrotum. One to the shoulder, two to the bottom, hit in the armpit. I wasn't try to kill'em. This prick on some bullshit, now I wish I woulda, shoulda, coulda . . . ." Trial Tr. Vol. 16 (dkt. 24-5) at 1136, Vol. 20 at 1972. According to Professor Rickford, this statement "appears to be braggadocio, a common feature of rap lyrics." Ex. 14 at 184 ¶ 19. Poston "laments that he did not mean to kill Mr. McNeely but maybe he should have," and this "does not refute Mr. Poston's claim of self-defense at all" or show a "lack of remorse for Mr. Fluker's death." Id. at 185 ¶ 19. Professor Rickford also would have addressed Poston's "it's all self-defense under

69

the proper pretense" line.  Id. at 185 ¶ 20 (citing Trial Tr. Vol. 16 at 1135).  Professor

Rickford would have explained that this line did "not necessarily" indicate that Poston's

"claim of self-defense was false" because "rap lyrics are a form of artistic expression and

should not necessarily be taken literally," and because Poston "was trying to express

himself in rhyme."  Id. at 185 ¶ 20.

Professor Rickford's testimony also would have addressed some of Poston's prior

statements.  Professor Rickford noted that although "[t]here was one instance in which Mr.

Poston did appear to be talking in code" on a telephone call from jail to Bailey, "[i]n

general, Mr. Poston's use of AAVE was never intended to obfuscate his meaning—he was

simply speaking informally in AAVE with friends and family members."  Id. at 182–83

¶ 15.  Professor Rickford also would have testified that the word "bitch, like hoe, another

'derogatory' word he uses, is much more widespread in rap and hip hop music and

everyday conversation than [the jurors] might realize, among African Americans and

others."  Id. at 183 ¶ 16.  "Neither term necessarily indicates that the woman is a prostitute

or that the speaker is a pimp.  And neither term necessarily shows aggression."  Id. at 183–

84 ¶ 16.  Although the words do "carry . . . negative potential," their use did "not show

criminal intent in the charged shooting nor [did] they refute Mr. Poston's claim of self-

defense."  Id. at 184 n.17.  Professor Rickford also addressed Poston's statements in phone

calls that his lawyer told him "this is in the bag," that Poston had "found all the clauses, all

the statutes, everything that fit my shit to the maximum capacity," and that Poston was

"not even trying to say I wasn't there no more" because he had a "clear defense of self-

defense" based on what Poston had read.  Id. at 185–86 ¶ 21.  According to Professor

Rickford, these statements merely "express relief and confidence because the law of self-

defense apparently encompassed the facts of his case and made him feel optimistic about

the outcome," and did not show "fabrication."  Id. at 186 ¶ 22.

Although calling an expert witness like Professor Rickford may have aided Poston's

defense, this claim fails under § 2254(d) because there are "reasonable arguments" that

trial counsel's failure to investigate and present expert testimony on AAVE was neither

objectively deficient nor prejudicial.  See Harrington, 562 U.S. at 105.

### i.   Deficient Performance

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." Harrington, 562 U.S. at 106.   That said, there are "countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689.  Thus, "[r]are are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." Harrington, 562 U.S. at 106 (quoting Strickland, 466 U.S. at 689).  Although "in some cases counsel would be deemed ineffective for failing to consult or rely on experts . . . even that formulation is sufficiently general that state courts would have wide latitude in applying it." Id.

The question is thus whether there is a "reasonable argument" that "defense counsel could follow a strategy that did not require the use of" an AAVE expert. Id. at 105, 106–07.  That a particular type of expert's "insight might possibly have been useful" does not mean that trial counsel was required to present it. Id. at 107.  Trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Id.

Here, there is a reasonable argument that defense counsel was not required to use an AAVE expert.  The Court in no way discounts the general potential relevance of such evidence, or the reality that AAVE might trigger jurors' conscious or unconscious biases.  But "even if it had been apparent" that expert AAVE testimony "could support [Poston's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it." Id. at 108.  Presenting an AAVE expert and thus "concentrating" on Poston's out-of-court statements "carried its own serious risks." Id.  For example, such testimony could have focused the jury on arguably damaging statements (e.g., Poston's use of the word "pretense"—which Professor Rickford merely explained should "not necessarily be taken literally" and was part of Poston's attempt to form rhymes, Ex. 14 at 185 ¶ 20).  It could

United States District Court
Northern District of California

1   have given the prosecution an opportunity, on cross-examination, to focus further attention

2   on those statements, or other damaging statements for which Professor Rickford's

3   declaration provided no explanation.  The prosecution also may have presented further

4   expert evidence (beyond Lieutenant Jones's testimony) on the same topic.  See Harrington,

5   562 U.S. at 108–09.  And Poston's trial counsel may have thought that Poston could

6   explain his own words better than an expert.  Trial counsel had "wide latitude" to make

7   such tactical decisions, Strickland, 466 U.S. at 689, and the California courts had "wide

8   latitude" in determining whether those decisions were objectively deficient, Harrington,

9   562 U.S. at 106.

10      Poston's additional arguments do not persuade the Court otherwise.  Poston first

11   argues that his trial counsel's failure to present expert testimony on AAVE "was not a

12   strategic decision" because trial counsel stated that "it simply did not occur to him."

13   Traverse at 166 (citing Ex. 14 at 267).  But "Strickland . . . calls for an inquiry into the

14   objective reasonableness of counsel's performance, not counsel's subjective state of

15   mind."  Harrington, 562 U.S. at 110.  And there is a "'strong presumption' that counsel's

16   attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer

17   neglect.'"  Id. at 109 (quoting Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam)).

18   That presumption applies even if trial counsel later states that he did not contemplate the

19   relevant strategy.  "After an adverse verdict at trial even the most experienced counsel may

20   find it difficult to resist asking whether a different strategy might have been better, and, in

21   the course of that reflection, to magnify their own responsibility for an unfavorable

22   outcome."  Id.  Of course, if counsel's actions during trial affirmatively contradict any

23   tactical explanation, there can be no "post hoc rationalization."  Wiggins v. Smith, 539

24   U.S. 510, 526 (2003).  But that is not the case here.  Thus, trial counsel's failure to present

25   expert AAVE testimony was objectively reasonable, regardless of trial counsel's

26   subjective state of mind.  See Strickland, 466 U.S. at 688.

27      Poston also seeks to compare this case with others that are plainly distinguishable.

28   See Traverse at 164 (citing Dunn v. Jess, 981 F.3d 582, 591–95 (7th Cir. 2020) (failure to

United States District Court
Northern District of California

1    consult with a forensic pathologist regarding the immediacy of death); <u>Woolley v.</u>

2    <u>Rednour</u>, 702 F.3d 411, 423–25 (7th Cir. 2012) (failure to consult with a crime scene

3    investigator regarding the location of a gunshot); <u>Elmore v. Ozmint</u>, 661 F.3d 783, 864–66

4    (4th Cir. 2011) (failure to consult with a forensic pathologist regarding the time of death);

5    <u>Showers v. Beard</u>, 635 F.3d 625, 631–33 (3d Cir. 2011) (failure to consult with an expert

6    regarding voluntary and involuntary ingestion of a bitter toxic substance)).[21]   In these

7    cases, the outcome predictably hinged on forensic expert testimony.  Here, by contrast, an

8    AAVE expert would have testified about certain statements bearing on Poston's intent and

9    credibility, and the jury would then have weighed this evidence against other highly

10   probative evidence (e.g., the surveillance video and Poston's inconsistent testimony).

11   Failing to call such an expert is not similar to, for example, failing to conduct any

12   meaningful investigation of forensic evidence in a "who-done-it" case where "the need for

13   scrutiny" of that evidence was "indisputable."  <u>Elmore</u>, 661 F.3d at 861.

14          Adopting Poston's proposed rule would potentially have staggering consequences

15   for criminal defense attorneys and their clients.  Under that rule, a defense attorney would

16   be required to present AAVE expert testimony whenever (i) a client made statements in

17   AAVE, (ii) the prosecution attempts to use those statements to help prove a key issue in a

18   case, and (iii) the statements are susceptible to an innocent explanation.  The California

19   courts were not objectively unreasonable in declining to impose such a rule on defense

20   attorneys who may view such expert testimony as unnecessary or counterproductive—or

21   who simply prefer an alternative strategy.

22          For all of these reasons, the California courts could have reasonably concluded that

23   Poston's trial counsel's failure to present AAVE expert testimony was not objectively

24   unreasonable.

25   _____

26   [21] In <u>Woolley</u>, as here, trial counsel never thought about presenting the relevant expert.  702 F.3d
     at 423.  But in <u>Woolley</u>, "the State's indication that it was shifting its position on the location of
27   the gunshots would have alerted <u>any reasonable attorney</u> to the need to rebut with a defense
     expert." <u>Id.</u> (emphasis added). Thus, <u>Woolley</u> applied an objective standard, and trial counsel's
28   failure to subjectively consider the only reasonable strategy merely reinforced the Fourth Circuit's
     conclusion that counsel had been objectively deficient.

### ii.     Prejudice

This claim fails to satisfy <u>Strickland</u> for another, independent reason.  There are "reasonable arguments" that Poston did not show that his trial counsel's failure to present expert AAVE testimony was prejudicial.  <u>See</u> <u>Harrington</u>, 562 U.S. at 105.

First, The California courts could have reasonably concluded that the jury likely based its decision on the surveillance video footage and the numerous contradictions between Poston's testimony and that footage, <u>see</u> part III.H.2.c, such that the AAVE testimony would have made no difference.

Second, the California courts could have concluded that Professor Rickford's hypothetical testimony about Poston's rap lyrics and out-of-court statements would have been of little help.  Even if Professor Rickford could have persuasively explained that certain specific lyrics were consistent with Poston having acted in self-defense, the jury may have already understood as much.  And Professor Rickford's explanation that Poston's use of the word "pretense" "should not be taken literally" and was part of Poston "trying to express himself in rhyme," Ex. 14 at 185 ¶ 20, added nothing of substance to Professor Rickford's more general description of rap as a form of expression.  Similarly, assuming that the jury would have been persuaded by expert testimony regarding general use of words like "bitch" and "hoe," the record contained significant additional evidence (including what appeared to be an admission from Poston) that Poston had engaged in pimping activity and exercise control over Bailey.  <u>See</u> supra part I.A.5.c; Trial Tr. Vol. 19 at 1654, 1677–78.  And this more specific evidence likely would have trumped Professor Rickford's general testimony about those terms.  Finally, Professor Rickford's testimony regarding Poston's statements about his self-defense strategy would have had little to do with AAVE.  Professor Rickford believes that Poston's statements (i) that the case was "in the bag," (ii) that self-defense law "fit my shit to the maximum capacity," and (iii) that Poston was "not even trying to say I wasn't there no more" because he had a "clear defense of self-defense," merely expressed "relief and confidence."  Ex. 14 at 185–86 ¶ 21–22.  That is a plausible interpretation of Poston's comments.  But it does not depend

on specific knowledge about AAVE, as Poston's comments consisted of Standard English idioms.

Third, the California courts could have reasonably concluded that Professor Rickford's testimony about the general use of AAVE, and shifting between AAVE and Standard English, would not have affected the outcome of the proceedings.  As discussed above, the prosecution did not argue that Poston's use of AAVE or switching between AAVE and standard English was inculpatory.  See part III.F.2.  An AAVE expert may have reduced the likelihood that jurors would rely on their own conscious or unconscious biases regarding AAVE and "code-switching," Ex. 14 at 178 ¶¶ 5–6, but in light of the other evidence against Poston, there is a "reasonable argument" that Poston failed to show a reasonable probability that this would have affected the outcome of the proceedings, see Harrington, 562 U.S. at 105.

### f.    Failure to Investigate and Present Expert Testimony on African American Culture (Claim 12)

Poston next argues that his trial counsel's "failure to investigate and present expert testimony on African-American culture denied [him] the effective assistance of counsel." Traverse at 173.  According to Poston, an expert like Professor Ernest Morrell could have testified "about African-Americans' distrust of the police and courts" in order to show that "possession of a firearm and flight from the police does not indicate consciousness of guilt among African-Americans."  Habeas Pet. at 50.

In Poston's California postconviction proceedings, Professor Morrell submitted a declaration explaining his hypothetical testimony.  See Ex. 14 (dkt. 25-6) at 218–22. Professor Morrell stated that he believed he "could have offered helpful testimony," including by explaining "that it is not uncommon for urban African-American people to arm themselves for self-defense, with no intention to act unlawfully or to harm anyone." Id. at 219 ¶ 5.  Further, "it is not uncommon for urban African-American people to flee the police even if they have committed no crime at all, because they reasonably distrust the police based on their own past experiences and those of their friends and relatives."  Id. at

219–20 ¶ 5.  Professor Morrell also had a conversation with Poston, and could have explained that Poston's "experiences" and "beliefs" were consistent with these more general cultural points.  Id. at 220 ¶¶ 6–7.  In sum, "[i]f called as an expert witness," Professor Morrell would have testified that Poston's "possession of a firearm and his flight after the shooting were not inconsistent with a young, urban African-American man acting in self-defense, rather than in retaliation for an assault or with an intention to engage in mutual combat."  Id. at 222 ¶ 13.  In doing so, Professor Morrell could have "refuted" several "inaccurate assumptions and myths about African-American people."  Id.

Once again, although calling an expert witness like Professor Morrell may have aided Poston's defense, this claim fails under § 2254(d) because there are "reasonable arguments" that trial counsel's failure to investigate and present expert testimony on African-American culture was neither objectively deficient nor prejudicial.  See Harrington, 562 U.S. at 105.

### iii.   Deficient Performance

Here again, the question is whether there is a "reasonable argument" that "defense counsel could follow a strategy that did not require the use of" an expert on African-American culture.  Id. at 105, 106–07.

And here, the answer is yes.  The Court in no way discounts the general potential relevance of such an expert's testimony.  Nor does the Court discount the reality that jurors may often lack sensitivity to the mentality of urban African-Americans whose experiences might lead them to arm themselves for protection, or to distrust law enforcement officers.  But "even if it had been apparent" that expert testimony "could support [Poston's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it."  Id. at 108.

Poston's trial counsel could have reasonably concluded that testimony about Poston arming himself was unnecessary.  The prosecution did not argue that Poston's possession of a firearm was evidence of his consciousness of guilt; the prosecution argued that Poston's possession of a firearm was evidence that he had expected a confrontation and

76

United States District Court
Northern District of California

thus engaged in mutual combat.  <u>See, e.g.</u>, Trial Tr. Vol. 20 at 1962.  But Poston's trial counsel had already presented evidence that Poston had other reasons for carrying a firearm.  For example, trial counsel elicited testimony from both Poston and Bailey that Poston had been shot before.  Poston's more specific experiences were arguably more probative of his reasons for arming himself than Professor Morrell's general testimony about African American culture.

Trial counsel could also have reasonably concluded that testimony about Poston's flight was unnecessary or harmful.  When the prosecution asked whether Poston was "on the run" because he "knew what [he] did was wrong," Poston responded "Yes, ma'am, correct."  Trial Tr. Vol. 19 at 1664.  Trial counsel could have determined that general cultural evidence bearing on Poston's flight would draw attention back to Poston's own more specific testimony.

Thus, given trial counsel's entitlement "to balance limited resources in accord with effective trial tactics and strategies," <u>Harrington</u>, 562 U.S. at 107, there are at least "reasonable arguments" that trial counsel was not objectively deficient for failing to produce expert testimony on African-American culture.[22]

### iv.    Prejudice

This claim also fails to satisfy <u>Strickland</u> because there are "reasonable arguments" that Poston failed to show that his trial counsel's failure to present expert testimony on African-American culture was prejudicial.  <u>Id.</u> at 105.  As discussed above, the California courts could have reasonably determined that this case largely hinged on the surveillance video and Poston's contradictory testimony, which likely undermined his credibility.  <u>See</u> supra part III.H.2.e.ii.  Thus, Poston's reasons for possessing a firearm and fleeing Oakland after the incident were unlikely to sway the jury.  There are also reasonable arguments that Poston's own testimony rendered Professor Morrell's hypothetical

---

[22] Professor Morrell stated that he also could have testified that switching "between AAVE and SAE . . . does not indicate dishonesty."  Ex. 14 at 220 ¶ 5.  The Court has already addressed Professor Rickford's hypothetical testimony along the same lines.  <u>See</u> supra part III.H.2.e.ii (citing part III.F.2).

1   testimony unnecessary and potentially counterproductive.  In addition to the points

2   discussed above, Poston's testimony acknowledged that he was arrested for possessing a

3   gun in 2000, for possessing three rifles in 2006, and for stealing a bicycle at gunpoint in

4   1996, though he denied that he actually used a gun in that theft.  See McNeely, 2017 WL

5   65832, at *5.  The California courts could have reasonably concluded that this background

6   cut against more general testimony about people's reasons for carrying firearms.

7        The Court has little doubt that testimony like Professor Morrell's could be valuable

8   in many cases.  But whether it would have made a difference here is speculative at best.

9   Under the applicable doubly-deferential standard, the Court is unable to conclude that the

10   California courts were objectively unreasonable in rejecting this claim—or any of Poston's

11   ineffective assistance claims.

12        **I.**      **Failure to Disclose Material Impeachment Evidence (Claim 13)**

13        As he did while petitioning for postconviction relief from the California courts,

14   Poston argues that the prosecutor failed to disclose material impeachment evidence under

15   Brady v. Maryland, 373 U.S. 83 (1963).  See Traverse at 179.

16        Recall that Lieutenant Jones testified that "Sem City" (a term used by Poston) was a

17   nickname used for the Seminary neighborhood and was used by people involved in drug

18   dealing.  In the world portrayed in Poston's YouTube videos, it would have been insulting

19   for someone to tell Poston that he was not from Seminary.  Had Poston walked away from

20   an encounter where someone had made such an accusation, Poston would have been

21   viewed as a "punk."  According to the rules of the streets in Oakland, a man who is

22   disrespected in front of his girlfriend would lose credibility if he just walked away.  See

23   supra part I.A.5.b.

24        Poston now states that "Lieutenant Jones has been placed on leave during an

25   Internal Affairs investigation into a complaint that he sent racist text massages to another

26   officer" dating back to "at least 2014."  Habeas Pet. at 52–53.  One of those messages

27   "depicted a picture of Klansmen suggesting that they did not need to harm black people

28   because black people were killing each other."  Ex. 14 at 302; see also dkt. 45, Ex. 9 & 10.

United States District Court
Northern District of California

1    Poston further states that "it appears that the Oakland Police Department paid to settle two

2    lawsuits involving Lieutenant Jones, most recently in 2005." Id. at 53.

3        This Court ordered Respondent to "obtain and provide to Poston's habeas counsel

4    evidence relevant to when the prosecution discovered, or had a duty to discover, the

5    specific text messages at issue in the internal investigation." Disc. Order at 2. Respondent

6    complied. See dkt. 45. Because discovery revealed no evidence that Lieutenant Jones sent

7    any of these racist text messages before Poston was convicted and sentenced, the Court

8    concludes that there was no Brady violation.

9                    **1.      Legal Standard**

10       "Under Brady, the State violates a defendant's right to due process if it withholds

11   evidence that is favorable to the defense and material to the defendant's guilt or

12   punishment." Smith v. Cain, 565 U.S. 73, 75 (2012). The duty to disclose "encompasses

13   impeachment evidence as well as exculpatory evidence," whether or not the accused has

14   requested the evidence. Strickler v. Greene, 527 U.S. 263, 280 (1999). Evidence is

15   material "when there is a reasonably probability that, had the evidence been disclosed, the

16   result of the proceeding would have been different." Smith, 565 U.S. at 75 (citation

17   omitted). "A reasonable probability does not mean that the defendant would more likely

18   than not have received a different verdict with the evidence, only that the likelihood of a

19   different result is great enough to undermine confidence in the outcome of the trial." Id.

20   (citation and quotation omitted).

21       "If the prosecutor does not discover, or does not have a duty to discover, certain

22   evidence until after the trial ends, then there can be no Brady claim against it even if

23   exculpatory evidence later surfaces." Martinez v. Ryan, 926 F.3d 1215, 1228 (9th Cir.

24   2019).

25       "The proponent of a Brady claim . . . bears the initial burden of producing some

26   evidence to support an inference that the government possessed or knew about" Brady

27   material "but failed to disclose it." United States v. Price, 566 F.3d 900, 910 (9th Cir.

28   2009). "Once the defendant produces such evidence, the burden shifts to the government

United States District Court
Northern District of California

to demonstrate that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that he could have learned from 'others acting on the government's behalf.'"  Id. (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)).

### 2.  Analysis

Poston argues that because his attorneys lacked information about Lieutenant Jones's behavior, "Poston was denied the opportunity to cross-examine Lieutenant Jones about his . . . possible bias against African-American suspects."  Habeas Pet. at 53.  The California courts summarily rejected Poston's Brady claim.  So this Court must ask not whether that claim was meritorious, but whether the California Courts were objectively unreasonable in rejecting it.  See Harrington, 562 U.S. at 105.

### a.  Text Messages

Here, the Court assumes that evidence pertaining to Lieutenant Jones's racist text messages would have been favorable to Poston.  After all, Lieutenant Jones provided damaging and dubious testimony about how people involved in criminal activity in Oakland behave and about Poston's rap lyrics.  For example, he said that drug dealers used the term "Sem City," suggesting that a law abiding person would not (never mind that people of all walks of life often refer to neighborhoods using street slang).  See Trial Tr. Vol. 19 at 1807.  And he testified that to "fire" on someone means to "punch" them rather than shoot them before backpedaling slightly on cross-examination.  See id. at 1818, 1826–27.  This testimony arguably implied that Poston was a criminal based on his use of a neighborhood nickname, and that Poston's rap lyrics about what he would do if "fired on" were about what he did when slapped.  Id. at 1818.  Evidence suggesting that Lieutenant Jones harbored racial hostility would have severely undermined this testimony.  It would have indicated that Lieutenant Jones was not a neutral expert on street crime in Oakland and could not be trusted to interpret Poston's words and actions.  Given that Poston's mental state was the key issue in the case, that could have made a real difference.

That said, Poston can prevail on his Brady claim only if the prosecution had an obligation to turn over evidence relating to Lieutenant Jones's racist text messages.  Poston

80

1    was convicted on February 3, 2014 and sentenced on March 21, 2014.  See Answer at 1;

2    Traverse at 9.  Poston cites a June 2016 article showing that another officer filed a

3    complaint against Jones "in 2014."  Ex. 14 at 294–95.  Poston also cites a June 2016 report

4    stating that the text messages dated "back to at least 2014."  Id. at 302.  An unpublished

5    California Court of Appeal decision indicates that Lieutenant Jones did not send the

6    relevant text messages until after Poston's trial—such that the prosecution lacked any duty

7    to disclose them.  See People v. Torrence, No. A142592, 2018 WL 1376741, at *22 (Cal.

8    Ct. App. March 29, 2018).   While addressing Jones's text messages in another Brady

9    claim, the Court of Appeal stated that the messages "appear to have been sent in July

10   2014," and that the other officer "first complained about the texts in August 2014."  Id.

11         In discovery, Respondent produced statements by four Alameda County Deputy

12   District Attorneys that they possessed no Brady materials prior to March 22, 2014.  Resp.

13   Supp. Br., Ex. 2, 6-8.  Subpoenas were served on custodians of records for the Human

14   Resources Section and Internal Affairs Division of the Oakland Police Department, and

15   they also certified that they had no responsive records from that time period.  Resp. Supp.

16   Br., Ex 4-5; see also Ex. 9-10 (press report dating the earliest text message to May 2014).

17   To be sure, any racist sentiment Lieutenant Jones had was logically relevant to the

18   credibility of his testimony.  However, the undisputed facts show that the prosecution did

19   not discover and had no duty to discover this evidence before the end of sentencing, so it

20   lacked any Brady obligation.  See Martinez, 926 F.3d at 1228.

21                      **b.    Settled Cases**

22         Poston has also failed to carry his burden regarding the two lawsuits that the

23   Oakland police department settled (with the most recent settlement having occurred in

24   2005).  See Habeas Pet. at 52–53.  Here, the issue is not timing but materiality.  See Smith,

25   565 U.S. at 75.  Unlike the racist text messages, which would support an inference of bias

26   and impeach Lieutenant Jones's credibility, the mere existence of these settlements

27

28

1   (without more) raises no such inference.[23]

2        The California courts' rejection of Poston's <u>Brady</u> claim was thus reasonable.  <u>See</u>

3   <u>Harrington</u>, 562 U.S. at 102.

4       **J.**       **Cumulative Prejudice (Claim 14)**

5        Poston's final claim asserts "that the cumulative effect of all of the errors of the trial

6   court, the prosecutor, and defense counsel rendered the trial fundamentally unfair in

7   violation of due process."  Traverse at 183.  The California courts rejected this claim.  Dkt.

8   25-7, Exs. 17, 19.

9        "[T]he combined effect of multiple trial court errors violates due process where it

10  renders the resulting criminal trial fundamentally unfair . . . even where no single error

11  rises to the level of a constitutional violation or would independently warrant reversal."

12  <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007).  But "cumulative error warrants

13  habeas relief only where the errors have 'so infected the trial with unfairness as to make

14  the resulting conviction a denial of due process.'"  <u>Id.</u> (quoting <u>Donnelly v. DeChristoforo</u>,

15  416 U.S. 637, 643 (1974)).  The "combined effect of the errors" must have "had a

16  substantial and injurious effect or influence on the jury's verdict."  <u>Id.</u> (quotation omitted).

17  "[T]he fundamental question in determining whether the combined effect of trial errors

18  violated a defendant's due process rights is whether the errors rendered the criminal

19  defense fear less persuasive, and thereby had a substantial and injurious effect or influence

20  on the jury's verdict."  <u>Id.</u> at 928 (internal quotation marks and citations omitted).  Under

21  § 2254(d), this Court must ask whether the California courts' rejection of Poston's

22  cumulative error claim was an "objectively unreasonable application of clearly established

23  due process law as determined by the Supreme Court."  <u>Id.</u> at 929.

24       This Court begins by summarizing its conclusions regarding the claims that Poston

25

26  _____

    [23] <u>See</u> Cal. Evid. Code § 1152 ("Evidence that a person has, in compromise or from humanitarian

27  motives, furnished or offered or promised to furnish money or any other thing, act, or service to
    another who has sustained or will sustain or claims that he or she has sustained or will sustain loss

28  or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to
    prove his or her liability for the loss or damage or any part of it.").

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

raised on direct appeal (Claims 1 through 6).  Above, the Court generally concluded that the trial court did not err.  At most, this Court assumed that the trial court erred by failing to expressly limit the mutual combat instruction to McNeely, but this Court concluded that any error was harmless because "nothing in the language" of the mutual combat instruction "would have led the jury astray."  Supra part III.D.2.

The claims that Poston raised through postconviction proceedings (Claims 7 through 13) focused on trial counsel's effectiveness and the prosecution's Brady obligations.  Above, the Court assumed without deciding that trial counsel's (i) failure to object to or request modification of the mutual combat jury instruction; and (ii) failure to prepare Poston to testify, were objectively deficient.  See supra parts III.H.2.b, III.H.2.c. The Court did not otherwise identify any error by trial counsel or misconduct by the prosecution.  The Court concluded that any deficient performance regarding the mutual combat jury instruction was not prejudicial for the same reason that any error by the trial court was harmless.  See supra part III.H.2.b.  And the Court concluded that any failure to adequately prepare Poston to testify was not prejudicial because "Poston's more polished explanations for apparent inconsistencies in his testimony and past statements might have marginally aided his credibility," but "they would not have helped much" given the many additional inconsistencies that his claim failed to address.  Supra part III.H.2.c.

When combining these assumed errors, the result is no different.  Any errors, taken together, did not have a "substantial and injurious effect or influence on the jury's verdict." Parle, 505 F.3d at 927.  This case was largely about a surveillance video and Poston's explanation for his conduct in the video—that is, Poston's credibility given the obvious contradictions between his testimony and the video.  Many of the supposed errors that Poston raises in his habeas petition reflect his disagreement with the prosecution and jury's view of the evidence.  Although this Court takes seriously allegations that racial bias permeated a trial, Poston's characterizations of the trial court, the prosecution, and his own trial counsel are mostly belied by the record.  This Court may have handled certain isolated issues differently, and Poston's trial counsel could (and perhaps should) have made

different strategic choices, but that is not enough to warrant habeas relief here.

## IV.     CONCLUSION

For the foregoing reasons, the Court denies Poston's habeas petition.  The Court grants Poston a certificate of appealability as to Poston's prosecutorial misconduct and ineffective assistance of counsel claims.  The Court declines to issue a certificate of appealability as to any other claim.

**IT IS SO ORDERED.**

Dated: January 11, 2022



CHARLES R. BREYER
United States District Judge